WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Gary T. Holtzer
Robert J. Lemons
Kelly DiBlasi
Matthew P. Goren

*Proposed Attorneys for Debtors*
*and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x
                                 :

| | |
|---|---|
| In re | :      **Chapter 11** |
| | : |
| **WAYPOINT LEASING** | :      **Case No. 18-13648 (SMB)** |
| **HOLDINGS LTD., *et al.*,** | : |
| | :      **(Jointly Administered)** |
| Debtors.[1] | : |

------------------------------------------------------------------x

**MOTION OF DEBTORS PURSUANT TO 11 U.S.C. §§ 105, 361, 362,**
**363, 364, 507, AND 552, FED. R. BANKR. P. 2002, 4001, 6003, 6004, AND 9014,**
**AND L. BANKR. R. 2002-1, 4001-2, 9013-1, 9014-1, AND 9014-2 FOR INTERIM**
**AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN SENIOR**
**SECURED PRIMING SUPERPRIORITY POSTPETITION FINANCING, (B) GRANT**
**LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, AND**
**(C) UTILIZE CASH COLLATERAL; (II) GRANTING ADEQUATE PROTECTION;**
**(III) SCHEDULING FINAL HEARING; AND (IV) GRANTING RELATED RELIEF**

TO THE HONORABLE STUART M. BERNSTEIN
UNITED STATES BANKRUPTCY JUDGE:

            Waypoint Leasing Holdings Ltd. ("**Holdings**") and certain of its subsidiaries and

affiliates, as debtors and debtors in possession (collectively, the "**Debtors**") in the above-

captioned chapter 11 cases (collectively, the "**Chapter 11 Cases**"), respectfully represent as

---

[1] A list of the Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, is attached hereto as **Exhibit A**.

follows in support of this motion (the "**Motion**"):

## Preliminary Statement

1.    After months of negotiations with their stakeholders and following an extensive marketing process, the Debtors commenced these Chapter 11 Cases to implement a comprehensive restructuring through the sale of substantially all of their assets (the "**Sale**").  In June 2018, facing imminent liquidity constraints and potential defaults under their multiple secured loan facilities, the Debtors organized and engaged with a steering committee (the "**Steering Committee**") of their prepetition lenders to negotiate a forbearance period, during which (among other things) the Debtors launched a robust marketing and sale process.  This process continued after the Petition Date, with the Debtors and their advisors working hard to secure a buyer and be positioned to move quickly to close a value-maximizing, going concern sale.  These efforts culminated in the selection of Macquarie Rotorcraft Leasing Holdings Limited ("**Macquarie**") to serve as a stalking horse bidder (the "**Stalking Horse Bidder**") to purchase substantially all of the Debtors' assets and the execution of an asset purchase agreement memorializing the terms of that Sale.  The Debtors intend to file a motion seeking approval of bidding and sale procedures in short order, with the goal of closing the transaction by March 15, 2019.

2.    The Debtors commenced these cases with a small amount of cash and were able to effectively "freeze" payments for the first two weeks.  At this point, however, the Debtors require access to both existing cash and additional liquidity in order to fund ongoing operating expenses and the process costs of bridging to a going concern sale.

3.    Prior to the Petition Date, the Debtors engaged with the Steering Committee (among others) to solicit and negotiate postpetition financing, with the goal of having

that funding in place at the time of filing these Chapter 11 Cases. While the Debtors had received other debtor-in-possession financing proposals, they determined that the proposal from the Steering Committee provided the best terms and presented the least amount of execution risk. Unfortunately, despite weeks of negotiations, the exchange of multiple drafts of proposed postpetition financing term sheets, and countless calls, emails, and meetings, the Debtors were unable to reach agreement with the Steering Committee regarding a postpetition financing facility prior to the commencement of these Chapter 11 Cases. Given the status of the negotiations as of the Petition Date, and how close the parties were on final terms, the Debtors decided they needed to file the Chapter 11 Cases but would continue working diligently with the Steering Committee to quickly reach an agreement.

4.     The parties were successful, and the Debtors now seek approval of, and access to, a $45 million debtor-in-possession superpriority financing facility (the "**DIP Facility**" and the lenders thereunder, the "**DIP Lenders**") to be provided by certain lenders under six of the Debtors' existing prepetition secured lending facilities (each, a "**Participating WAC Facility**" and, collectively, the "**Participating WAC Facilities**"),[2] consistent with the terms and provisions of that certain senior secured superpriority debtor-in-possession credit agreement, a substantially final form of which is attached to the Interim Order as __**Exhibit A**__ (the "**DIP Credit Agreement**").[3] The DIP Facility will provide immediate access to critical capital, enabling the

---

[2] As set forth and defined in more detail herein, the Debtors' prepetition capital structure consists of several separate secured debt facilities, with each referred to as a "**WAC**" (Waypoint Asset Company) Facility. The lenders thereunder are referred to as "**WAC Lenders**." Each WAC Facility is governed by distinct credit and security documents, with separate loan parties and lenders, and different pools of collateral. References to "**Participating WAC Lenders**" herein shall mean the WAC Lenders under the Participating WAC Facilities, including the WAC1 Lenders, WAC6 Lenders, WAC7 Lenders, WAC8 Lenders, WAC9 Lenders, and WAC12 Lenders (each as defined herein). The "**Non-Participating WAC Lenders**" include the WAC2 Lenders, WAC3 Lenders, and WAC10 Lenders (each as defined herein).

[3] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the DIP Credit Agreement.

Debtors to continue operations without material disruption and pursue consummation of the Sale in these Chapter 11 Cases. The economic terms of the DIP Facility are reasonable, there are no financial covenants, and while there are case milestones, the Debtors believe they are reasonable and achievable.

5.     As set forth in further detail below, the Debtors have satisfied the requirements under section 364 of the Bankruptcy Code to obtain approval of the DIP Facility. The Debtors, with the assistance of their professionals, engaged in a good faith and rigorous process to solicit proposals for postpetition financing not only from sources within their existing capital structure – including from the Steering Committee, other WAC Lenders, and the Debtors' existing equity sponsors – but also from third party financial sources and institutions. In total, the Debtors received ten (10) written proposals for postpetition financing, including a term sheet from the Steering Committee that ultimately developed into the DIP Facility. Because substantially all of the Debtors' assets are already encumbered by liens in favor of the WAC Lenders, all of the proposals contemplated financing on a priming basis. One of the most attractive features of the Steering Committee's DIP financing proposal was that the lenders under the Participating WAC Facilities could deliver the consents necessary to avoid a priming fight.

6.     The Steering Committee designed a facility that offered participation to each of the WAC Lenders under the Participating WAC Facilities, with the facility backstopped by certain electing WAC Lenders. After weeks of negotiations, the Debtors, the DIP Lenders, and the Participating WAC Lenders agreed to terms on the DIP Facility as set forth herein, which will be secured by, among other things, first priority consensual priming liens on certain prepetition encumbered and unencumbered assets (as described in more detail herein). Importantly, the first priority liens securing the DIP Facility will only prime the liens of the

4

Participating WAC Lenders, and only up to a capped amount (referred to as the "**Maximum Intercompany Balance**").[4]    The Participating WAC Lenders have also consented to the Debtors' use of their cash collateral (as such term is defined in section 363(a) of the Bankruptcy Code, "**Cash Collateral**") to fund the cash needs related to the Debtors' operations (including amounts necessary to administer the Chapter 11 Cases).    This includes the direct expenses associated with operating and maintaining the Participating WAC Lenders' specific pools of collateral, as well as expenses of the overall business that are typically allocated or "charged" to the various WAC Groups, including covering expenses that are otherwise allocable to the Non-Participating WAC Groups that are outside of the DIP Facility.    In order to fund the direct expenses of the Non-Participating WAC Groups who are not participating in or primed by the DIP Facility, the Debtors are seeking Court authority to use such lenders' Cash Collateral exclusively for such expenses.

7.    The Debtors' access to sufficient working capital and liquidity, aided by the use of Cash Collateral and the incurrence of new indebtedness under the DIP Facility, is vital to the Debtors' ability to pursue their chapter 11 strategy.    Without access to postpetition financing and the use of Cash Collateral, the Debtors have a limited cash runway and risk damage to their businesses and the value of their assets.    The funds provided by the DIP Facility will allow the Debtors to continue operating and advancing the M&A Process (as defined herein) to conclusion.    For the 30-day period commencing upon the entry of the Interim Order (as herein defined) authorizing the Debtors to borrow under the DIP Facility, the Debtors seek authority to borrow up to $30 million of the proceeds of the DIP Facility.    Absent approval of the relief

---

[4] As further described in the DIP Credit Agreement, the Maximum Intercompany Balance is an amount equal to the lesser of each Participating WAC Facilities' "WAC Specific Cap" set forth on **Schedule 1.01(f)** to the DIP Credit Agreement and a loan to value coverage floor set forth on **Schedule 1.01(f)** to the DIP Credit Agreement.

requested herein, there is a significant threat to the Debtors' prospects for continuing operating

as a going concern. Accordingly, for the reasons set forth herein, the Debtors believe that

authority to obtain new financing, as provided under the DIP Facility, and use Cash Collateral is

in the best interests of the Debtors, their estates, and their creditors and should be granted.

### Relief Requested

8.      By this Motion, pursuant to sections 105, 361, 362, 363, 364, 507, and 552

of the Bankruptcy Code, Rules 2002, 4001, 6003, 6004, and 9014 of the Federal Rules of

Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 2002-1, 4001-2, 9013-1, 9014-1,

and 9014-2 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the

Southern District of New York (the "**Local Rules**"), the Debtors request entry of interim and

final orders:

(i)     authorizing Holdings, Waypoint Leasing (Ireland) Limited, ("**WLIL**"), Waypoint Leasing (Luxembourg) S.à r.l. ("**Luxco**"), and each of the other Participating WAC Group Borrowers to be borrowers (in such capacity, collectively, the "**Borrowers**") under the DIP Facility;

(ii)    authorizing each Debtor listed as a guarantor on the signature pages to the DIP Credit Agreement to serve as a guarantor under the DIP Facility (the "**Guarantors**" and, together with the Borrowers, the "**DIP Obligors**");

(iii)   authorizing the DIP Obligors to execute and deliver the DIP Credit Agreement and any other agreements, instruments, pledge agreements, guarantees, control agreements, security agreements, mortgages, and all related or ancillary documents and agreements (as amended, restated, amended and restated, supplemented, waived, and/or modified from time to time, and together with any exhibits attached thereto and the DIP Credit Agreement, the "**DIP Documents**"), and to perform all such other and further acts as may be necessary or appropriate in connection with the DIP Documents;

(iv)    authorizing the Borrowers to make an initial draw under the DIP Facility in the aggregate amount of up to $30 million to avoid

immediate and irreparable harm in accordance with the DIP Budget (as defined herein);

(v)  granting security interest, liens, and superpriority claims to the DIP Agent and the DIP Lenders to secure all obligations of the Debtors under and with respect to the DIP Facility in the order of priority and as provided in the DIP Orders (as defined herein) and the DIP Documents;

(vi)  granting adequate protection on the terms set forth in the DIP Orders and in the DIP Documents to the Participating WAC Lenders;

(vii)  authorizing the Debtors to use Cash Collateral;

(viii)  modifying the automatic stay set forth in section 362 of the Bankruptcy Code on the terms and conditions set forth herein to the extent necessary to implement and effectuate the terms of the DIP Documents and the DIP Orders;

(ix)  waiving any applicable stay with respect to the effectiveness and enforceability of the DIP Orders (including under Bankruptcy Rule 6004); and

(x)  scheduling a hearing (the "**Final Hearing**"), pursuant to Bankruptcy Rule 4001 and Local Rule 4001-2, within thirty (30) days of entry of the Interim Order granting the relief requested herein to consider entry of an order approving the relief requested herein on a final basis.

9.    A proposed form of order granting the relief requested herein on an interim basis is annexed hereto as **Exhibit B** (the "**Interim Order**" and, together with the order granting relief on a final basis, the "**Final Order**" the "**DIP Orders**").

**Bankruptcy Rule 4001 and Local Rule 4001-2 Concise Statement**[5]

10.    Pursuant to Bankruptcy Rules 4001(b)-(d) and Local Rule 4001-2, the

Debtors submit the following concise statements of the material terms of the Interim Order and

the DIP Documents:

| MATERIAL TERMS OF THE DIP FACILITY | | LOCATION |
|---|---|---|
| **Borrowers** Bankruptcy Rule 4001(c)(1)(B) | Holdings, WLIL, Luxco, and each of the other Borrowers. | **Preamble to DIP Credit Agreement; Interim Order, ¶ 1.** |
| **Guarantors** Bankruptcy Rule 4001(c)(1)(B) | Each subsidiary of WLIL that is a guarantor under a Participating WAC Facility (as listed on the signature pages to the DIP Credit Agreement) and Waypoint Asset Co 11 Limited. | **Preamble to DIP Credit Agreement; Interim Order, ¶ 1.** |
| **DIP Lenders** Bankruptcy Rule 4001(c)(1)(B) | The Participating WAC Lenders that are listed on the signature pages to the DIP Credit Agreement. | **Preamble to DIP Credit Agreement; Interim Order, ¶ 1.** |
| **DIP Agent** Bankruptcy Rule 4001(c)(1)(B) | Ankura Trust Company, LLC. | **Preamble to DIP Credit Agreement; Interim Order, ¶ 1.** |
| **DIP Facility** Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(1) | $45 million secured superpriority debtor-in-possession delayed draw credit facility, with an interim draw of $30 million, of which $15 million shall be available upon entry of the Interim Order and the remaining $15 million shall be available upon entry of an Acceptable Bidding Procedures Order.  The final $15 million will be available to draw upon entry of the Final Order. | **DIP Credit Agreement, §§ 2.01, 5 and 6; Interim Order, ¶ 1.** |
| **Borrowing Limits** Bankruptcy Rule 4001(c)(1)(B), Local Rule 4001-2(a)(3) | Up to $45 million, with an interim draw of $30 million, of which $15 million shall be available upon entry of the Interim Order and the remaining $15 million shall be available upon entry of an Acceptable Bidding Procedures Order.  The final $15 million will be available to draw upon entry of the Final Order. | **DIP Credit Agreement, §§ 2.01, 5 and 6; Interim Order, ¶ 1.** |
| **Interest Rates** | Base Rate:  Adjusted LIBOR subject to a 1% floor + 7.5% per | **DIP Credit** |

---

[5] The summaries and descriptions of the terms and conditions of the DIP Credit Agreement and the Interim Order set forth in this Motion are intended solely for informational purposes. The summaries and descriptions are qualified in their entirety by the DIP Credit Agreement and the Interim Order. In the event there is a conflict between this Motion, on the one hand, and the DIP Credit Agreement or the Interim Order on the other, the DIP Credit Agreement or the Interim Order, as applicable, shall control in all respects.

| MATERIAL TERMS OF THE DIP FACILITY | | LOCATION |
|---|---|---|
| Bankruptcy Rule 4001(c)(1)(B), Local Rule 4001-2(a)(3) | annum.<br><br>Default Interest Rate:  2.0% per annum. | **Agreement, § 2.07.** |
| **Budget** Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(2) | Attached as **Exhibit B** to the Interim Order<br><br>The Debtors shall deliver a variance report to the DIP Agent on (i) December 20, 2018, (ii) January 10, 2019, and (iii) every second Thursday thereafter.  The Debtors' compliance with the DIP Budget shall be tested on (i) December 20, 2018, (ii) January 10, 2019, and (iii) every second Thursday thereafter, on a cumulative basis (the period commencing on the Petition Date and ending on the last day of each applicable period, a "**Test Period**"): (i) on a "WAC Group by WAC Group" basis, the actual disbursements (excluding professional fees and expenses and adequate protection payments but including any Non-Participating WAC Fronted Expenses) may not exceed the greater of (x) $150,000 and (y) 115% of the amount of actual disbursements for such Test Period as set forth in the "Total Operating Disbursements" line items included in the Approved Budget and (ii) on a consolidated basis, the total actual "Rental Receipts" of the DIP Obligors may not be less than the greater of (x) $1,000,000 and (y) 80% of the amount of "Total Rental Receipts" for such Test Period included in the Approved Budget (the "**Permitted Variances**"). | **DIP Credit Agreement, §§ 8.01(k) and 8.28; Interim Order, Exhibit B.** |
| **Use of DIP Proceeds and Cash Collateral** Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(6)-(a)(7) | Pay working capital and general corporate purposes, including to (i) pay required debt service on the DIP Facility, (ii) pay the fees, costs, and expenses of the DIP Agent and the DIP Lenders as set forth in the DIP Documents, (iii) pay fees and expenses of professionals retained in the Chapter 11 Cases, (iv) provide Adequate Protection, in all cases subject to the Approved Budget and Permitted Variances, and (v) fund the Carve-Out and Expense Reimbursement as set forth in Schedule 8.25 to the DIP Credit Agreement. | **DIP Credit Agreement, § 8.12; Interim Order, ¶ J.** |
| **Expenses and Fees** Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(3) | Upfront Fee:  2% of the DIP Facility will be paid to the DIP Lenders in cash on a *pro rata* basis based on their respective commitments from the proceeds of the initial funding upon entry of the Interim Order.<br><br>Oversubscription Fee: 2% of the oversubscribed loan amounts payable to the Oversubscription Lenders (as such term is defined in the DIP Credit Agreement) in cash on a *pro rata* basis based on their respective commitments with respect to oversubscribed loans from the proceeds of the initial funding upon the entry of the Interim Order.<br><br>Fees and Expenses: The Debtors shall pay all reasonable, documented out of pocket fees, costs, and expenses incurred or accrued by the DIP Agent and the DIP Lenders. | **DIP Credit Agreement, § 3.01.** |

| MATERIAL TERMS OF THE DIP FACILITY | | LOCATION |
|---|---|---|
| **Maturity Date** Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(10) | Earliest of (i) May 27, 2019, (ii) December 14, 2018 unless the Interim Order is entered approving the Interim Loans, (iii) 30 days after the entry of the Interim Order unless the Final Order is entered approving the Final DIP Loans and an Acceptable Bidding Procedures Order is entered, (iv) the date on which all or substantially all of the assets of the DIP Obligors are sold (pursuant to section 363 of the Bankruptcy Code or otherwise), (v) the effective date of a Chapter 11 plan in these Chapter 11 Cases, and (vi) the date of a termination of the Term Loan Commitments in effect at such time and/or the acceleration of all of the Secured Obligations at the direction of the DIP Lenders holding more than 50% of the aggregate undrawn commitments and outstanding DIP Loans (the "**Required DIP Lenders**"), following the occurrence and during the continuation of any event of default under the DIP Facility. | **DIP Credit Agreement, Definition of "Maturity Date".** |
| **Prepayments** Local Rule 4001-2(a)(13) | Amounts outstanding under the DIP Facility may be voluntarily repaid in full at any time without premium or penalty. | **DIP Credit Agreement, § 4.01.** |
| **Cash Management Provisions** Bankruptcy Rule 4001(c)(1)(B) | • The DIP Obligors shall, on (i) December 14, 2018, (ii) January 4, 2019 and (iii) every second Friday ending thereafter (any such date, the "Cash Sweep Date"), deposit all post-petition receipts of the DIP Obligors, other than Extraordinary Receipts, into the Central Cash Account, which receipts (i) are received by the DIP Obligors on or before the Thursday immediately preceding such Cash Sweep Date and (ii) for any Participating WAC Group, only to the extent of receipts in excess of $100,000 in the aggregate. <br><br>• Disbursements (including, from the Central DIP Account and the Central Cash Account) shall be made in compliance with the Approved Budget (subject to Permitted Variances). <br><br>• In no event shall the DIP Obligors make any disbursement that would result in a Net WLIL Intercompany Claim for any Participating WAC Group in excess of the Maximum Intercompany Balance for such Participating WAC Group. <br><br>• The DIP Obligors shall maintain WAC Group and entity-specific intercompany accounting, including with respect to all receipts and disbursements from the Central DIP Account and the Central Cash Account, which will be reported to the DIP Agent and each Prepetition Approving Party on (i) December 21, 2018, (ii) January 11, 2019 and (iii) every second Friday ending thereafter, as detailed in the DIP Credit Agreement. <br><br>• To the extent that WLIL has, at any time, on a cumulative basis, a Net WLIL Intercompany Claim against a Participating WAC Group, WLIL shall receive a joint and | **DIP Credit Agreement, § 8.01(l); Interim Order, ¶ 16.** |

| MATERIAL TERMS OF THE DIP FACILITY | LOCATION |
|---|---|
| several superpriority intercompany claim (a "**WLIL Intercompany Protection Claim**") against each member of such Participating WAC Group, secured by priming liens ("**WLIL Intercompany Protection Liens**") against such Participating WAC Group's WAC Specific Collateral, subject to the Carve-Out.  To the extent any WLIL Intercompany Protection Claim or WLIL Intercompany Protection Lien against any Participating WAC Group or WAC Specific Collateral is satisfied by such Participating WAC Group or from such WAC Specific Collateral, any DIP Claim or DIP Lien against such Participating WAC Group or WAC Specific Collateral shall automatically and to the same extent be satisfied and released.<br>• To the extent a Participating WAC Group, has at any time, on a cumulative basis, a Net WAC Group Intercompany Claim against WLIL, each member of such Participating WAC Group shall receive a superpriority intercompany claim (a "**WAC Group Intercompany Protection Claim**") against WLIL, secured by priming liens ("**WAC Group Intercompany Protection Liens**") against all assets of WLIL that constitute DIP Collateral (including the Central DIP Account, the Central Cash Account, and the WLIL Intercompany Protection Claims), subject to the Carve-Out.<br>• The Intercompany Protection Claims and Intercompany Protection Liens shall be held for the ratable benefit of the Prepetition WAC Lenders under the Participating WAC Facilities and the DIP Lenders and may not be waived, compromised, released, subordinated, settled or extinguished without the consent of the Required DIP Lenders and each applicable Prepetition Approving Party.<br>• In the event the Net WAC Group Intercompany Claim in favor of WAC 9 would exceed $4,000,000, no further cash shall be swept from WAC 9 to the Central Cash Account until such time as the Net WAC Group Intercompany Claim in favor of WAC 9 would no longer exceed such amount. | |

| MATERIAL TERMS OF THE DIP FACILITY | | LOCATION |
|---|---|---|
| **Collateral**<br>Bankruptcy Rule 4001(c)(1)(B)(i); | The DIP Facility shall be secured by first priority (subject to permitted liens) priming liens (the "**DIP Liens**") on all assets of the DIP Obligors (whether now or hereafter acquired and all proceeds thereof) including, without limitation, (i) the WAC Specific Collateral in respect of each Participating WAC Group, solely to the extent of and not exceeding the amount of such Participating WAC Group's Net WLIL Intercompany Claim, if any, (ii) any asset that is not WAC Specific Collateral, other than (x) equity in a Non-Participating WAC Group member that is subject to a valid, unavoidable prepetition lien or security interest in favor of an agent for Non-Participating WAC Group and (y) the causes of action under Bankruptcy Code sections 502(d), 544, 545, 547, 548, 549, 550 or 553 or any other avoidance actions under the Bankruptcy Code or applicable non-bankruptcy law (collectively the "**Avoidance Actions**") but, subject to entry of the Final Order, including the proceeds of such Avoidance Actions, and (iii) pursuant to section 364(c)(3) of the Bankruptcy Code, valid, enforceable, non-avoidable automatically and fully perfected junior liens (the "**Junior DIP Liens**") on and security interests in all DIP Collateral (other than as set forth in clause (i) above) that is subject to valid, existing and perfected lien (including any Permitted Prior Lien (as defined in the Interim Order) as of the Petition Date (collectively, the "**DIP Collateral**"), subject and subordinate to (i) the Intercompany Protection Liens and (ii) the Carve-Out; provided that, any such DIP Liens in respect of a Participating WAC Group shall be solely to the extent of and not exceeding the amount of such Participating WAC Group's Net WLIL Intercompany Claim, if any. | **DIP Credit Agreement, § 8.09; Interim Order, ¶¶ 7-8.** |
| **Priority**<br>Bankruptcy Rule 4001(c)(1)(B)(i), 4001(c)(1)(B)(ii) | Subject to the Carve-Out and the Intercompany Protection Claims, the DIP Secured Parties shall have:<br>• joint and several superpriority administrative expense claims against Holdings, WLIL, Luxco and each other Obligor that is not a member of a Participating WAC Group (as such term is defined in the DIP Credit Agreement), senior to all other administrative expense claims in the Chapter 11 Cases; and<br>• joint and several superpriority administrative expense claims against each Participating WAC Group (but, for avoidance of doubt, the joint and several obligation will be within a given Participating WAC Group, not between Participating WAC Groups) in the amount of such Participating WAC Group's Net WLIL Intercompany Claim, which can never exceed the Maximum Intercompany Balance for such Participating WAC Group. | **DIP Credit Agreement, §§ 7.10 and 8.09; Interim Order, ¶ 9.** |

| MATERIAL TERMS OF THE DIP FACILITY | LOCATION |
|---|---|
| **Conditions to Closing and Borrowing** Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(2) | Usual and customary for financings of this type, including, without limitation:<br>• Consent of the lenders holding at least (x) 50.1% of the outstanding principal amount of each Participating WAC Facility (other than WAC6) and (y) 66 2/3% of the outstanding principal amount of WAC 6 to the imposition of first priority priming liens on their respective WAC Specific Collateral, the Carve-Out and to the use of Cash Collateral during the Chapter 11 Cases;<br>• Consent of the requisite lenders/holders of each Participating WAC Facility to (i) the funding of a Winddown Account from the proceeds of a sale of all or substantially all of the assets of the Debtors and (ii) the use of Cash Collateral held in such account to pay the Debtors' winddown costs;<br>• All of the material "first day orders" filed by the Debtors at the time of commencement of the Chapter 11 Cases shall have been amended such that they are in form and substance reasonably acceptable to the Required DIP Lenders;<br>• Delivery of the Initial Budget;<br>• Execution and delivery of the DIP Credit Agreement and other DIP Documents as the DIP Agent and the Required DIP Lenders shall reasonably require and as are usual and customary for transactions of this type;<br>• Entry of the Interim Order in form and substance acceptable to the DIP Agent and the DIP Lenders (and, to the extent applicable, all "first day orders" and "second day orders" (or any order authorizing payment or settlement of prepetition claims) shall contain language that the Interim DIP Order shall govern in the event of a conflict); and<br>• Delivery of all documents and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulation. | **DIP Credit Agreement, §§ 5-6.** |
| **Covenants** Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(a)(8) | Usual and customary for financings of this type, including, among other things:<br><br>Affirmative Covenants:<br>• Delivery of each Proposed Budget, the variance reporting and the Approved Budget informational updates;<br>• Delivery of consolidated monthly and quarterly financial statements (i.e., income statement, balance sheet and cash flow statement);<br>• Delivery to the DIP Agent and the Prepetition | **DIP Credit Agreement, §§ 8–9; Interim Order, ¶ 8.** |

13

| MATERIAL TERMS OF THE DIP FACILITY | LOCATION |
|---|---|
| Approving Parties (or their respective counsel on their behalf) promptly after the same is available copies of all material pleadings, motions, applications, judicial information, financial information and other material documents filed by or on behalf of the Debtors with the Bankruptcy Court in the Chapter 11 Cases;<br>• Compliance with the Interim DIP Order and the Final DIP Order, as applicable, the Approved Budget (subject to the Permitted Variance), and the Milestones; and<br>• The DIP Lenders (or counsel on their behalf) and the Prepetition Approving Parties (or counsel on their behalf) shall receive copies of all "second day" motions, pleadings, orders, and all related pleadings and filings at least 3 business days prior to the filing thereof (except where impracticable due to exigent circumstances in which case as soon as possible) and all such pleadings relating to the DIP Facility and Cash Collateral shall be in form and substance acceptable to the Required DIP Lenders and the Prepetition Approving Parties, as applicable.<br><br>Negative Covenants:<br>• Consent to termination or reduction of the "Exclusivity Period" or fail to object to any motion seeking to terminate or reduce the "Exclusivity Period" other than a motion filed by or with the consent of the Required DIP Lenders;<br>• Assert any right of subrogation or contribution against any other Obligor until all borrowings under the DIP Facility are paid in full and the commitments are terminated;<br>• Make any payment of principal or interest or otherwise on account of any prepetition indebtedness or payables, other than (i) Adequate Protection payments or payments agreed in writing by the Required DIP Lenders or authorized by the Bankruptcy Court or (ii) with respect to WAC 10 to the extent any payment of such indebtedness is funded with either the cash of or the proceeds from assets of the WAC Group for WAC 10; or<br>• Seek to invalidate, avoid, disallow, or otherwise impair any of the liens of the Participating WAC Lenders on WAC Specific Collateral.<br><br>Financial Covenants:  None. | |

| MATERIAL TERMS OF THE DIP FACILITY | | LOCATION |
|---|---|---|
| **Indemnification** Bankruptcy Rule 4001(c)(1)(B)(ix) | The DIP Obligors jointly and severally assume responsibility for, and agree to indemnify and hold harmless each DIP Lender, the DIP Agent and each of their officers, directors, employees, representatives, agents, partners, administrators, managers, advisors, trustees, successors, permitted assigns, and any Person of which the Indemnified Person is a direct or indirect Subsidiary and any direct or indirect Subsidiary of any such Person, and each of such Person's other Affiliates (each, an "**Indemnified Person**") for any Losses attributable to, among others, (i) certain claims arising from or related to any Mortgaged Aircraft or Part, (ii) any actual, threatened or prospective claim, investigation, litigation or other proceeding related to the DIP Credit Agreement, other Credit Documents, or proceeds of any Term Loans, and (iii) actual or alleged liability with respect to Hazardous Material, as specified in Section 4.05 of the Credit Agreement.<br><br>Among other exclusions, no Credit Party shall have any liability to an Indemnified Person to the extent such Loss is attributable to (i) any material breach of express obligations under the Credit Documents, or (ii) gross negligence or willful misconduct of such Indemnified Person. | **DIP Credit Agreement, § 4.05; Interim Order, ¶ 6.** |
| **DIP Events of Default** Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(10) | Usual and customary for financings of this type, including, among other things (and subject to customary grace periods):<br>• Failure to pay principal, interest or other amounts owed under the DIP Facility;<br>• Representations and warranties incorrect in any material respect when made or deemed made;<br>• Failure to comply with the Milestones or any covenant under the DIP Facility;<br>• Any Milestone is amended without the consent of the DIP Agent (acting at the direction of the Required Lenders);<br>• Filing by any Obligor of a plan of reorganization that does not propose to repay all obligations under the DIP Facility in full, in cash which is not withdrawn, dismissed, or denied within five business days after such filing, unless such plan of reorganization is an Acceptable Plan of Reorganization;<br>• Entry of an order approving any disclosure statement in support of a plan of reorganization that does not propose to repay all obligations under the DIP Facility in full, in cash, unless such Plan is an Acceptable Plan of Reorganization;<br>• Violation of any material term, provision, or condition in the DIP Orders;<br>• Any adverse deviation of more than the Permitted Variance under the DIP Budget for any Test Period; | **DIP Credit Agreement, § 10; Interim Order, ¶ 27.** |

15

| MATERIAL TERMS OF THE DIP FACILITY | LOCATION |
|---|---|
| • Appointment of a trustee or examiner with expanded powers (other than a fee examiner) in any of the Chapter 11 Cases (other than solely in the Chapter 11 Case of one or more members of a Non-Participating WAC Group);<br>• Entry of an order dismissing any of the Chapter 11 Cases or converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code (in each case other than the Chapter 11 Cases of one or more members of a Non-Participating WAC Group);<br>• Invalidation or impairment of the DIP Agent liens or security interests;<br>• Entry of an order by the Bankruptcy Court terminating or modifying the exclusive right of any Obligor to file a Chapter 11 plan pursuant to section 1121 of the Bankruptcy Code, without the prior written consent of the Required DIP Lenders, other than an order entered pursuant to a motion filed by or with the consent of the Required DIP Lenders; or<br>• Any Obligor seeks approval of a sale of any DIP Collateral or WAC Specific Collateral or approval of bidding procedures for such a sale (whether implemented through a plan of reorganization or otherwise) that would be inconsistent with the terms of the DIP Facility, without the prior written consent of the Required DIP Lenders. | |
| **Cash Collateral Events of Default** Bankruptcy Rule 4001(c)(1)(B); Local Rule 4001-2(10) <br><br> Usual and customary for financings of this type, including, among other things:<br>• Acceleration of the DIP Facility;<br>• Failure to comply with the Milestones;<br>• Amendment of any Milestone without the consent of each Prepetition Approving Party;<br>• Any adverse deviation of more than Permitted Variance under the Approved Budget for any Test Period;<br>• Violation of any term, provisions or condition in the Interim DIP Order or Final DIP Order applicable to the Prepetition Approving Parties;<br>• Appointment of a trustee or examiner with expanded powers (other than a fee examiner) in any of the Chapter 11 Cases (other than solely in the Chapter 11 Case of one or more members of a Non-Participating WAC Group);<br>• Entry of an order dismissing any of the Chapter 11 Cases or converting any of the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code (in each case other than the Chapter 11 Cases of a member of a Non-Participating WAC Group);<br>• Invalidation or impairment of the Adequate Protection | **Interim Order, ¶ 28.** |

| MATERIAL TERMS OF THE DIP FACILITY | LOCATION |
|---|---|
| Liens or security interests securing the applicable Participating WAC Facility;<br>• Entry of an order by the Bankruptcy Court terminating or modifying the exclusive right of any Obligor to file a plan pursuant to Section 1121 of the Bankruptcy Code, without the prior written consent of the Required DIP Lenders, other than an order entered pursuant to a motion filed by or with the consent of the applicable Prepetition Approving Parties;<br>• Maturity of the DIP Facility;<br>• With respect to any Participating WAC Facility, entry of a Final DIP Order not acceptable (with respect to any change from the Interim Order) to the Prepetition Approving Parties;<br>• With respect to a Participating WAC Facility, failure to company with terms of an Acceptable Bidding Procedures Order with respect to the rights granted thereunder to a secured party under such Participating WAC Facility, including the failure to obtain an order authorizing a sale pursuant to a properly submitted Streamlined Credit Bid by February 15, 2019;<br>• Failure of the Debtors to comply with certain covenants of the DIP Credit Agreement, with respect to a WAC Group or its WAC Specific Collateral, as applicable, and such failure continues unremedied for 15 days after the applicable Prepetition Approving Party gives notice to the Debtors of such failure; and<br>• Any Obligor seeks approval of a sale of any WAC Specific Collateral or approval of bidding procedures for such a sale (whether implemented through a plan of reorganization or otherwise) that would be inconsistent with the terms of the DIP Facility, without the prior written consent of the applicable Prepetition Approving Parties. | |
| **Milestones**<br>Bankruptcy Rule 4001(c)(1)(B)(vi); Local Rule 4001-2(10); Local Rule 4001-2(a)(12) | The DIP Credit Agreement includes the following milestones:<br>**Bidding Process Milestones**<br>• As promptly as possible, but in no event later than 2 days after the date of entry of the Interim DIP Order (the "**Sale Motion Filing Date**"), the DIP Obligors shall file a motion (the "**Sale Motion**") seeking approval of the Bidding Procedures Order (as defined below), which may seek approval of the Stalking Horse Transaction in accordance with the provisions hereof.<br>• The "**Stalking Horse Sale Transaction**" means a binding and executed purchase agreement (the "**Stalking Horse APA**") with Macquarie Rotorcraft Leasing Holdings Limited ("**Macquarie**"), that: | **DIP Credit Agreement, § 8.25.** |

| MATERIAL TERMS OF THE DIP FACILITY | LOCATION |
|---|---|
| <ul><li>provides for the purchase of up to substantially all of the Debtors' assets through a sale consummated pursuant to section 363 of the Bankruptcy Code (a "**363 Sale**") or, with the agreement of Macquarie, a Chapter 11 Sale;</li><li>provides that a topping credit bid from one or more Participating WAC Facilities will be due no earlier than January 14, 2019;</li><li>provides for an expense reimbursement of no more than $3 million;</li><li>does not require the payment of a breakup or similar fee in connection with the consummation of a topping credit bid by one or more of the Participating WAC Facilities properly submitted in accordance with the terms below.</li><li>The Sale Motion may contain bidding protections for Macquarie; provided that such bidding protections (and the 363 Sale Order (as defined below)) are consistent with the requirements for a Stalking Horse Sale Transaction described above. Other than with respect to the bidding protections specified above, the Sale Motion shall not contain any provision for bidding protections or a stalking horse bidder, unless consented to by the DIP Agent and the Prepetition Approving Parties.[6]</li><li>No later than 20 days following the date of the Sale Motion Filing Date, the Bankruptcy Court shall have entered an order (i) approving bidding procedures for the Sale Transaction and (ii) scheduling the date for an auction, if necessary, and the hearing to consider approval of the Sale Transaction. Such order (the "**Bidding Procedures Order**") will incorporate the Bidding Provisions set forth in Section C below.</li><li>In the event the Macquarie Bidding Provisions (as defined below) are not in effect:</li><li>The Bidding Procedures Order shall provide that (i) third-party bids are due by January 4, 2019 ("**Third Party Bid Deadline**") and (ii) credit bids from the lenders shall be due by January 14, 2019 (the "**Credit Bid Deadline**", and collectively with the Third Party Bid Deadline, the "**Bid Deadlines**");</li><li>Within 3 business days after the Third Party Bid</li></ul> | |

[6] As of the execution of this term sheet, the DIP Lenders and the Participating WAC Lenders have not reached agreement with Macquarie on a form of Stalking Horse APA. All rights of the DIP Lenders and the Participating WAC Lenders in connection with the approval of a proposed form of Stalking Horse APA because such form contains a term or condition that is inconsistent with this Annex D or which otherwise has not been consented to by the DIP Agent and the Prepetition Approving Parties are expressly preserved.

18

| MATERIAL TERMS OF THE DIP FACILITY | LOCATION |
|---|---|
| Deadline, the Debtors shall have commenced the auction, if necessary, pursuant to the Bidding Procedures Order;<br>• Within 10 business days after a definitive winning bidder(s) have been selected in accordance with the bidding procedures approved by the Bankruptcy Court, the Bankruptcy Court shall have entered an order approving the Sale Transaction (the "**363 Sale Approval Order**"); and<br>• The Debtors shall have consummated the Sale Transaction to the winning bidder or bidders no later than March 15, 2019 (other than a Chapter 11 Sale, which shall be consummated by May 15, 2019); provided, that the Bankruptcy Court has entered the Sale Order and the specified governmental approvals have been obtained and if not so provided, no later than March 31, 2019.<br>The Bidding Procedures Order, any proposed bidding procedures, and the 363 Sale Approval Order shall be at all times consistent with the Milestones above and otherwise in form and substance reasonably satisfactory to the Required DIP Lenders.  The Bidding Procedures Order will be in compliance with the provisions set forth in Schedule 8.25 to the DIP Credit Agreement. | |
| **Carve-Out**<br>Bankruptcy Rule 4001(b)(1)(B)(iii); Local Rule 4001-2(a)(5) | The term "Carve-Out" shall mean the sum of the following:<br>• all fees required to be paid to (A) the Clerk of the Court and all statutory fees payable to the U.S. Trustee under 28 U.S.C. § 1930(a) and 31 U.S.C. § 3717 (without regard to the Carve-Out Trigger Notice (as defined below)), (B) fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regards to the Carve-Out Trigger Notice, ((A) and (B) together, the "Statutory Fees"), and (C) to the extent allowed by the Bankruptcy Court at any time, whether by interim order or final compensation order, procedural order, or otherwise, all accrued and unpaid fees, disbursements, costs, and expenses (excluding any restructuring, sale, success, or similar fee of any Estate Professional) (the "Estate Professional Fees") incurred by professionals or professional firms retained by the Debtors, their estates, and/or the Committee (if any) pursuant to sections 327, 328, 363, or 1103 of the Bankruptcy Code (collectively, the "Estate Professionals") at any time before or on the first business day after delivery by the DIP Agent of a Carve-Out Trigger Notice (the "Pre-Notice Professional Fees" and together with the Statutory Fees, the "Pre-Trigger | **Interim Order, ¶ 17.** |

| MATERIAL TERMS OF THE DIP FACILITY | LOCATION |
|---|---|
| | Amount") and all unpaid out of pocket expenses of the members of the Committee ("Committee Members") (if any) that are incurred at any time before or on the first business day after delivery by the DIP Agent of a Carve-Out Trigger Notice, whether allowed by the Court or paid prior to or after delivery of a Carve-Out Trigger Notice, each in this subsection C in accordance with the applicable Approved Budget (other than ordinary course professionals); and<br><br>• all fees, incurred following the delivery of a Carve-Out Trigger Notice (as defined herein), by the Debtors to (A) the Clerk of the Bankruptcy Court and all statutory fees payable to the U.S. Trustee under 28 U.S.C. § 1930(a), (B) a chapter 7 trustee under section 726(b) of the Bankruptcy Code up to $50,000, and (C) the Estate Professionals up to $4,000,000 (the "Post-Carve-Out Trigger Notice Cap") provided, that, there shall be a dollar-for-dollar reduction of the Carve-Out for any unused retainers (if any) held by or on behalf of the Estate Professionals as of the delivery of the Carve-Out Trigger Notice to the extent allowed or paid at any time, whether by interim of final compensation order, procedural order, or otherwise (collectively, the "Post-Notice Professional Fees" and together with the Pre-Notice Professional Fees, the "Professional Fees." | |
| **Entities with Interest in Cash Collateral** Bankruptcy Rule 4001(b) | WAC Secured Parties (including the WAC2 Secured Parties, WAC3 Secured Parties, and WAC10 Secured Parties), DIP Agent, and DIP Lenders. | **Interim Order, ¶ D.** |
| **Liens, Cash Payments or Adequate Protection Provided for Use of Cash Collateral** Bankruptcy Rule 4001(b)(1)(B)(iv) and (c)(1)(B)(ii) | The Participating WAC Lenders shall receive:<br><br>• Payment of reasonable and documented fees and expenses of the Participating WAC Lenders' professionals (including any accrued and unpaid amounts);<br>• Superpriority administrative expense adequate protection claims, to the extent of diminution in value of their respective WAC Specific Collateral, against each of the DIP Obligors under the applicable Participating WAC Facility, senior to all other administrative expense claims other than the DIP Claims and Intercompany Protection Claims and subject to the Carve-Out;<br>• Replacement liens on their WAC Specific Collateral;<br>• Adequate protection liens on all DIP Collateral that does not constitute the WAC Specific Collateral of any | **Interim Order, ¶ 11.** |

| MATERIAL TERMS OF THE DIP FACILITY | LOCATION |
|---|---|
| | Participating WAC Group, junior to the DIP Liens and the Intercompany Liens and subject to the Carve-Out; <br>• Compliance with the Milestones and <br>• The bidding provisions set forth in the Milestones as the same are incorporated into any bidding procedures order contemplated therein shall be in form and substance reasonably acceptable to the Prepetition Approving Parties. | |
| **Liens on Avoidance Actions** <br>Bankruptcy Rule 4001(c)(1)(B)(xi); Local Bankruptcy Rule 4001-2(a)(6) | The Interim Order does not provide for liens on Avoidance Actions; however, subject to entry of the Final Order, the DIP Collateral shall include the proceeds of such Avoidance Actions. | **Interim Order, ¶ 8.** |
| **Determination Regarding Prepetition Claim** <br>Bankruptcy Rule 4001(c)(1)(B)(iii) | The Interim Order contains stipulated findings of fact, including those related to the validity and enforceability of the Debtors' prepetition indebtedness and the liens securing the Participating WAC Facilities. <br><br>There is a sixty (60) day challenge period for any creditors' committee and other parties-in-interest to investigate and challenge the validity of the WAC Facilities. | **Interim Order, ¶ 20.** |
| **Waiver or Modification of the Automatic Stay** <br>Bankruptcy Rule 4001(c)(1)(B)(iv) | Modification of the automatic stay to the extent necessary to implement and effectuate the terms of the DIP Documents, and to permit the DIP Secured Parties exercise their rights under the Interim Order, under the DIP Documents, and/or applicable non-bankruptcy law. | **Interim Order, ¶ 27.** |
| **Waiver or Modification of Applicability of Non-Bankruptcy Law Relating to the Perfection or Enforcement of a Lien** <br>Bankruptcy Rule 4001(c)(1)(B)(vii) | All of the DIP Liens shall be effective and perfected upon entry of the Interim Order and without the necessity of the execution of mortgages or similar undertakings. | **DIP Credit Agreement, § 7.10.** |
| **Section 506(c) Waiver** <br>Bankruptcy Rule 4001(c)(1)(B)(x) | Subject to entry of the Final Order, the Debtors irrevocably waive, and shall be prohibited from asserting any surcharge claim, under section 506(c) of the Bankruptcy Code or otherwise, for any costs and expenses incurred in connection with the preservation, protection, or enhancement of, or realization by the DIP Parties upon the DIP Collateral, or the realization by the Participating WAC Lenders upon their Prepetition Collateral. | **Interim Order, ¶ 21.** |

| MATERIAL TERMS OF THE DIP FACILITY | | LOCATION |
|---|---|---|
| | The Debtors reserve their rights under section 506(c) of the Bankruptcy Code or otherwise to assert any surcharge claim for any costs and expenses incurred in connection with the preservation, protection, or enhancement of, or realization by the Non-Participating WAC Lenders upon their asserted Prepetition Collateral. | |
| **Section 552(b) Waiver** Bankruptcy Rule 4001(c)(1)(B) | Subject to entry of the Final Order, the Debtors waive any "equities of the case" exceptions under section 552(b) of the Bankruptcy Code solely as to the Participating WAC Lenders. | **Interim Order, ¶ 23.** |

## Jurisdiction

11.    This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157(a)-(b) and 1334(b) and the *Amended Standing Order of Reference M-431*, dated January 31, 2012 (Preska, C.J.).  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## Background

12.    On November 25, 2018 (the "**Petition Date**"), the Debtors each commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code.  The Debtors are authorized to continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or statutory committee of creditors has been appointed in these Chapter 11 Cases.

13.    The Debtors' Chapter 11 Cases have been jointly administered for procedural purposes only pursuant to Bankruptcy Rule 1015(b).

14.    Additional information regarding the Debtors' business, capital structure, and the circumstances leading to the commencement of these Chapter 11 Cases is set forth in the *Declaration of Todd K. Wolynski Pursuant to L. Bankr. R. 1007-2* [ECF No. 14] (the "**Wolynski Declaration**") and the *Declaration of Robert A. Del Genio in Support of First Day Motions and*

22

*Applications* [ECF No. 15] (the "**Del Genio Declaration**" and, together with the Wolynski

Declaration, the "**First Day Declarations**"), which were filed with the Court on the Petition Date

and are incorporated herein by reference.  In addition, in support of the relief sought in this

Motion, the Debtors have filed contemporaneously herewith, (i) the *Declaration of Matthew*

*Niemann in Support of Motion of Debtors Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364,*

*507, and 552, Fed. R. Bankr. P. 2002, 4001, 6003, 6004, and 9014, and L. Bankr. R. 2002-1,*

*4001-2, 9013-1, 9014-1, and 9014-2 for Interim and Final Orders (I) Authorizing the Debtors to*

*(A) Obtain Senior Secured Priming Superpriority Postpetition Financing, (B) Grant Liens and*

*Superpriority Administrative Expense Status, and (C) Utilize Cash Collateral; (II) Granting*

*Adequate Protection; (III) Scheduling Final Hearing; and (IV) Granting Related Relief*, sworn to

on December 6, 2018 (the "**Niemann Declaration**"), (ii) the *Declaration of Michael B. Cox in*

*Support of Motion of Debtors Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 507, and 552,*

*Fed. R. Bankr. P. 2002, 4001, 6003, 6004, and 9014, and L. Bankr. R. 2002-1, 4001-2, 9013-1,*

*9014-1, and 9014-2 for Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain*

*Senior Secured Priming Superpriority Postpetition Financing, (B) Grant Liens and Superpriority*

*Administrative Expense Status, and (C) Utilize Cash Collateral;  (II) Granting Adequate*

*Protection; (III) Scheduling Final Hearing; and (IV) Granting Related Relief*, sworn to on the

date hereof (the "**Cox Declaration**"), and (iii) the *Declaration of Robert A. Del Genio in Support*

*of Motion of Debtors Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 507, and 552, Fed. R.*

*Bankr. P. 2002, 4001, 6003, 6004, and 9014, and L. Bankr. R. 2002-1, 4001-2, 9013-1, 9014-1,*

*and 9014-2 for Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Senior*

*Secured Priming Superpriority Postpetition Financing, (B) Grant Liens and Superpriority*

*Administrative Expense Status, and  (C) Utilize Cash Collateral;  (II) Granting Adequate*

23

*Protection; (III) Scheduling Final Hearing; and (IV) Granting Related Relief*, sworn to on the date hereof (the "**Del Genio DIP Declaration**").

## The Debtors' Corporate Structure

15.    As set forth in more detail in the First Day Declarations, all of the other Debtors are direct or indirect wholly-owned subsidiaries of Holdings.  Holdings is the direct parent of Waypoint Leasing (Luxembourg) S.à r.l. ("**Luxco**") and the indirect parent through Luxco of the Debtors' primary operating entity WLIL.  The Debtors acquire and lease all of their helicopters through WLIL's direct and indirect subsidiaries.  WLIL's direct and indirect subsidiaries are organized into silos (each referred to as a Waypoint Asset Company group or a "**WAC Group**"), comprised of an asset owning company at the top of the silo and in certain cases, various subsidiaries that hold title to, or beneficial interests in, the Debtors' various aircraft.

## Prepetition Indebtedness

16.    As described in the First Day Declarations, the Debtors have a complicated capital structure involving nine (9) separate debt facilities with a total of twenty-four (24) lenders (each such facility, a "**WAC Facility**" and together the "**WAC Facilities**"), with each WAC Facility constituting obligations of a separate WAC Group.  The only common claims are unsecured guarantee claims of the WAC Facilities against Holdings, Luxco, and WLIL.  There is no cross-collateralization and no intercreditor agreement among the WAC Facilities.  As of the Petition Date, the Debtors had outstanding funded debt obligations under the WAC Facilities in the aggregate principal amount of approximately $1.1 billion in United States dollars ("**USD**") or USD equivalent debt obligations,[7] which amount consists of:

---

[7] Unless otherwise indicated, all amounts listed in this Motion are in USD.  The amounts set forth herein with respect to all of the debt outstanding under the WAC10 Facility, and a portion of the debt issued pursuant to the

(i) approximately $292 million in secured borrowings under the Debtors' WAC1 Revolving Facility (as defined herein); (ii) approximately $54 million in asserted secured borrowings under the Debtors' WAC2 Facility (as defined herein); (iii) approximately $218 million in asserted secured borrowings under the Debtors' WAC3 Facility (as defined herein); (iv) approximately $65 million in secured borrowings under the Debtors' WAC6 Facility (as defined herein); (v) approximately $100 million in secured borrowings under the Debtors' WAC7 Revolving Facility (as defined herein); (vi) approximately $166 million in secured borrowings under the Debtors' WAC8 Senior Secured Notes (as defined herein); (vii) approximately $93 million in secured borrowings under the Debtors' WAC9 Facility (as defined herein); (viii) approximately $15 million in asserted secured borrowings under the Debtors' WAC10 Facility (as defined herein); and (ix) approximately $112 million in secured borrowings under the Debtors' WAC12 Facility (as defined herein).  *See* Wolynski Decl. ¶ 47.  The Debtors have granted security interests and liens on all or substantially all of their assets to secure the obligations under the WAC Facilities.  Below is a summary of the Debtors' prepetition secured indebtedness.

A.    **WAC1 Revolving Facility**

17.    Debtors Waypoint Asset Company Number 1 (Ireland) Limited ("**WAC1**") and Waypoint Asset Funding 1 LLC ("**WAF1**," and together with WAC1, the "**WAC1 Borrowers**"), as borrowers, along with the Parent Guarantors, as guarantors, are party to that certain *Amended and Restated Credit Agreement*, dated as of November 8, 2013 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**WAC1 Credit Agreement**" and, together with all agreements and documents

---

WAC8 Senior Secured Notes and outstanding under the WAC9 Facility and WAC12 Facility, represent Euro ("**EUR**") borrowings that have been translated into their USD equivalent based on the FX rate in effect on October 31, 2018, for EUR to USD conversions.

delivered pursuant thereto or in connection therewith, each as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**WAC1 Credit Documents**"), with the lenders party thereto from time to time (collectively, the "**WAC1 Lenders**"), SunTrust Bank, as administrative agent (in such capacity, the "**WAC1 Administrative Agent**"), and Wells Fargo Bank, National Association, as collateral agent (in such capacity, the "**WAC1 Collateral Agent**" and, together with the WAC1 Lenders and the WAC1 Administrative Agent, the "**WAC1 Secured Parties**").  The WAC1 Credit Agreement provides for revolving credit commitments in an aggregate principal amount of up to $428 million, which is composed of a tranche A commitment of $145 million maturing on September 30, 2018, and a tranche B commitment of $283 million maturing on September 30, 2020 (the "**WAC1 Revolving Facility**").  The WAC1 Revolving Facility bears interest at the election of the WAC1 Borrowers at a rate per annum equal to LIBOR or the base rate, plus an agreed applicable margin under tranche A and tranche B, respectively.

18.     The obligations under the WAC1 Revolving Facility are guaranteed by the Parent Guarantors and certain subsidiaries of WAC1 and are secured in accordance with the terms of certain local law security documents and that certain *Amended and Restated Aircraft Mortgage and Security Agreement*, dated as of November 8, 2013 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**WAC1 Aircraft Security Agreement**"), by and among the WAC1 Borrowers, the additional grantors who from time to time become grantors thereto (collectively with the WAC1 Borrowers, the "**WAC1 Grantors**" and each a "**WAC1 Grantor**"), and the WAC1 Collateral Agent. Pursuant to the WAC1 Aircraft Security Agreement, each WAC1 Grantor granted a first priority lien on (i) certain of such WAC1 Grantor's owned aircraft and related assets, including, without

limitation, any bill of sale for such aircraft and all rights, powers, and remedies of the WAC1

Grantor with respect thereto, including claims by the WAC1 Grantor for damages in respect of

the aircraft and related assets arising as a result of the default by the manufacturer under any bill

of sale and all other intangible property relating to such aircraft and related assets, (ii) the equity

and beneficial interests such WAC1 Grantor holds in certain of its subsidiaries, if any, (iii) cash

on deposit in certain of such WAC1 Grantor's bank accounts, if any, and (iv) certain aircraft

leases and subleases, in each case to secure the obligations under the WAC1 Revolving Facility,

subject to the exceptions specified in the WAC1 Credit Documents (collectively, the "**WAC1**

**Collateral**").   As of the Petition Date, the amount outstanding under the WAC1 Revolving

Facility is approximately $292 million in unpaid principal, plus accrued and unpaid interest, fees,

and other expenses.

B.      **WAC2 Facility**

19.     Debtors Waypoint Asset Company Number 2 (Ireland) Limited

("**WAC2**") and Waypoint Asset Funding 2 LLC ("**WAF2**," and together with WAC2,

the "**WAC2 Borrowers**"), as borrowers, along with the Parent Guarantors, as guarantors, are

party to that certain *Credit Agreement*, dated as of April 16, 2014 (as amended, restated,

amended and restated, supplemented, or otherwise modified from time to time, the "**WAC2**

**Credit Agreement**" and, together with all agreements and documents delivered pursuant thereto

or in connection therewith, each as amended, restated, amended and restated, supplemented, or

otherwise modified from time to time, the "**WAC2 Credit Documents**"), with the lenders party

thereto from time to time (collectively, the "**WAC2 Lenders**"), Wells Fargo Bank, National

Association, as both administrative agent in such capacity, the "**WAC2 Administrative Agent**")

and as collateral agent (in such capacity, the "**WAC2 Collateral Agent**" and, together with the

WAC2 Lenders and the WAC2 Administrative Agent, the "**WAC2 Secured Parties**").    The
WAC2 Credit Agreement provides for a term loan commitment in an aggregate principal amount
of $72.5 million (the "**WAC2 Facility**"), which matures on April 16, 2019.

20.    The obligations under the WAC2 Facility are guaranteed by the Parent
Guarantors and each subsidiary of WAC2 are secured in accordance with the terms of certain
local law security documents and that certain *Aircraft Mortgage and Security Agreement*, dated
as of April 16, 2014 (as amended, restated, amended and restated, supplemented, or otherwise
modified from time to time, the "**WAC2 Aircraft Security Agreement**"), by and among the
WAC2 Borrowers, the additional grantors who from time to time become grantors thereto
(collectively with the WAC2 Borrowers, the "**WAC2 Grantors**" and each a "**WAC2 Grantor**"),
and the WAC2 Collateral Agent.    Pursuant to the WAC2 Aircraft Security Agreement, each
WAC2 Grantor granted a first priority lien on (i) certain of such WAC2 Grantor's owned aircraft
and related assets, including, without limitation, any bill of sale for such aircraft and all rights,
powers, and remedies of the WAC2 Grantor with respect thereto, including claims by the WAC2
Grantor for damages in respect of the aircraft and related assets arising as a result of the default
by the manufacturer under any bill of sale and all other intangible property relating to such
aircraft and related assets, (ii) the equity and beneficial interests such WAC2 Grantor holds in
certain of its subsidiaries, if any, (iii) cash on deposit in certain of such WAC2 Grantor's bank
accounts, if any, and (iv) certain aircraft leases and subleases, in each case to secure the
obligations under the WAC2 Facility, subject to the exceptions specified in the WAC2 Credit
Documents (collectively, the "**WAC2 Collateral**").

21.    As of the Petition Date, the amount outstanding under the WAC2 Facility
is approximately $54 million in unpaid principal, plus accrued and unpaid interest, fees, and

other expenses.  The WAC2 Borrowers are required to make monthly amortization payments of the principal amount outstanding under the WAC2 Facility.  The WAC2 Facility bears interest at the election of the WAC2 Borrowers at a rate per annum equal to LIBOR or the base rate, plus an agreed applicable margin.

C.    **WAC3 Facility**

22.    Debtors Waypoint Asset Co 3 Limited ("**WAC3**") and Waypoint Asset Funding 3 LLC ("**WAF3**," and together with WAC3, the "**WAC3 Borrowers**"), as borrowers, along with the Parent Guarantors, as guarantors, are party to that certain *Credit Agreement*, dated as of August 6, 2014 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**WAC3 Credit Agreement**" and, together with all agreements and documents delivered pursuant thereto or in connection therewith, each as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**WAC3 Credit Documents**"), with the lenders party thereto from time to time (collectively, the "**WAC3 Lenders**"), the designated administrative agent (in such capacity, the "**WAC3 Administrative Agent**"), and Wells Fargo Bank, National Association, as collateral agent (in such capacity, the "**WAC3 Collateral Agent**" and, together with the WAC3 Lenders and the WAC3 Administrative Agent, the "**WAC3 Secured Parties**").  The WAC3 Credit Agreement provides for a term loan commitment in an aggregate principal amount of $340 million (the "**WAC3 Facility**"), which is composed of an initial term loan commitment of $300 million and an incremental term loan commitment of $40 million.  The WAC3 Facility matures on August 6, 2019.

23.    The obligations under the WAC3 Facility are guaranteed by the Parent Guarantors and each subsidiary of WAC3 and are secured in accordance with the terms of

certain local law security documents and that certain *Aircraft Mortgage and Security Agreement*, dated as of August 6, 2014 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**WAC3 Aircraft Security Agreement**"), by and among the WAC3 Borrowers, the additional grantors who from time to time become grantors thereto (collectively with the WAC3 Borrowers, the "**WAC3 Grantors**" and each a "**WAC3 Grantor**"), and the WAC3 Collateral Agent.    Pursuant to the WAC3 Aircraft Security Agreement, each WAC3 Grantor granted a first priority lien on (i) certain of such WAC3 Grantor's owned aircraft and related assets, including, without limitation, any bill of sale for such aircraft and all rights, powers, and remedies of the WAC3 Grantor with respect thereto, including claims by the WAC3 Grantor for damages in respect of the aircraft and related assets arising as a result of the default by the manufacturer under any bill of sale and all other intangible property relating to such aircraft and related assets, (ii) the equity and beneficial interests such WAC3 Grantor holds in certain of its subsidiaries, if any, (iii) cash on deposit in certain of such WAC3 Grantor's bank accounts, if any, and (iv) certain aircraft leases and subleases, in each case to secure the obligations under the WAC3 Facility, subject to the exceptions specified in the WAC3 Credit Documents (collectively, the "**WAC3 Collateral**").

24.     As of the Petition Date, the amount outstanding under the WAC3 Facility is approximately $218 million in unpaid principal, plus accrued and unpaid interest, fees, and other expenses.  The WAC3 Borrowers are required to make monthly amortization payments of the principal amount outstanding under the WAC3 Facility.  The WAC3 Facility bears interest at the election of the WAC3 Borrowers at a rate per annum equal to LIBOR or the base rate, plus an agreed applicable margin.

D.     **WAC6 Facility**

25.     Debtors Waypoint Asset Co 6 Limited ("**WAC6**") and Waypoint Asset Funding 6 LLC ("**WAF6**," and together with WAC6, the "**WAC6 Borrowers**"), as borrowers, along with the Parent Guarantors, as guarantors, are party to that certain *Credit Agreement*, dated as of March 23, 2015 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**WAC6 Credit Agreement**" and, together with all agreements and documents delivered pursuant thereto or in connection therewith, each as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**WAC6 Credit Documents**"), with the lenders party thereto from time to time (collectively, the "**WAC6 Lenders**"), and Bank of Utah, as both administrative agent (in such capacity, the "**WAC6 Administrative Agent**") and collateral agent (in such capacity, the "**WAC6 Collateral Agent**" and, together with the WAC6 Lenders and the WAC6 Administrative Agent, the "**WAC6 Secured Parties**").   The WAC6 Credit Agreement provides for a term loan commitment in an aggregate principal amount of $85 million (the "**WAC6 Facility**"), which matures on March 23, 2020.

26.     The obligations under the WAC6 Facility are guaranteed by the Parent Guarantors and each subsidiary of WAC6 and are secured in accordance with the terms of certain local law security documents and that certain *Aircraft Mortgage and Security Agreement*, dated as of March 23, 2015 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**WAC6 Aircraft Security Agreement**"), by and among the WAC6 Borrowers, the additional grantors who from time to time become grantors thereto (collectively with the WAC6 Borrowers, the "**WAC6 Grantors**" and each a "**WAC6 Grantor**"), and the WAC6 Collateral Agent.   Pursuant to the WAC6 Aircraft Security

31

Agreement, each WAC6 Grantor granted a first priority lien on (i) certain of such WAC6 Grantor's owned aircraft and related assets, including, without limitation, any bill of sale for such aircraft and all rights, powers, and remedies of the WAC6 Grantor with respect thereto, including claims by the WAC6 Grantor for damages in respect of the aircraft and related assets arising as a result of the default by the manufacturer under any bill of sale and all other intangible property relating to such aircraft and related assets, (ii) the equity and beneficial interests such WAC6 Grantor holds in certain of its subsidiaries, if any, (iii) cash on deposit in certain of such WAC6 Grantor's bank accounts, if any, and (iv) certain aircraft leases and subleases, in each case to secure the obligations under the WAC6 Facility, subject to the exceptions specified in the WAC6 Credit Documents.

27.    As of the Petition Date, the amount outstanding under the WAC6 Facility is approximately $65 million in unpaid principal, plus accrued and unpaid interest, fees, and other expenses.  The WAC6 Borrowers are required to make monthly amortization payments of the principal amount outstanding under the WAC6 Facility.  The WAC6 Facility bears interest at the election of the WAC6 Borrowers at a rate per annum equal to LIBOR plus an agreed applicable margin.

E.    **WAC7 Revolving Facility**

28.    Debtors Waypoint Asset Co 7 Limited ("**WAC7**") and Waypoint Asset Euro 7A Limited ("**EURO7**," and together with WAC7, the "**WAC7 Borrowers**"), as borrowers, along with the Parent Guarantors, Waypoint Asset Co 4 Limited ("**WAC4**"), Waypoint Asset Co 5 Limited ("**WAC5**"), and the subsidiaries of WAC5, as guarantors, are party to that certain *Amended and Restated Credit Agreement*, dated as of April 28, 2017 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to

time, the "**WAC7 Credit Agreement**" and, together with all agreements and documents delivered pursuant thereto or in connection therewith, each as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**WAC7 Credit Documents**"), with the lenders party thereto from time to time (collectively, the "**WAC7 Lenders**"), and SunTrust Bank, as both administrative agent (in such capacity, the "**WAC7 Administrative Agent**") and collateral agent (in such capacity, the "**WAC7 Collateral Agent**" and, together with the WAC7 Lenders and the WAC7 Administrative Agent, the "**WAC7 Secured Parties**"). The WAC7 Credit Agreement provides for revolving credit commitments in an aggregate principal amount of up to $110 million, which mature on September 30, 2019 (the "**WAC7 Revolving Facility**").

29.    The obligations under the WAC7 Revolving Facility are guaranteed by the Parent Guarantors, WAC4, WAC5, and WAC5's subsidiaries and are secured in accordance with the terms of local law security documents and a beneficial interest pledge agreement, dated as of May 12, 2017, between WAC5 and the WAC7 Collateral Agent (collectively, the "**WAC7 Security Documents**"). Pursuant to the WAC7 Security Documents, (i) WLIL has agreed to grant a first priority lien on the equity and beneficial interest it holds in WAC5 and (ii) WAC4, WAC5, and the WAC7 Borrowers have agreed to grant a first priority lien on certain of (x) the equity and beneficial interests each of them hold in certain of their subsidiaries, if any, and (y) cash on deposit in certain of their bank accounts, if any (collectively, the "**WAC7 Collateral**").

30.    As of the Petition Date, the amount outstanding under the WAC7 Revolving Facility is approximately $100 million in unpaid principal, plus accrued and unpaid interest, fees, and other expenses. The WAC7 Revolving Facility bears interest at the election of

the WAC7 Borrowers at a rate per annum equal to LIBOR or the base rate, plus an agreed applicable margin.

F.    **WAC8 Senior Secured Notes**

31.    Debtors Waypoint Asset Co 8 Limited ("**WAC8**") and Waypoint Asset Funding 8 LLC ("**WAF8**," and together with WAC8, the "**WAC8 Issuers**"), as issuers, along with the Parent Guarantors, as guarantors, are party to that certain *Note Purchase Agreement*, dated as of July 29, 2015 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**WAC8 Note Purchase Agreement**" and, together with all agreements and documents delivered pursuant thereto or in connection therewith, each as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**WAC8 Note Purchase Documents**"), and Wells Fargo Bank, National Association, as both administrative agent (in such capacity, the "**WAC8 Administrative Agent**") and collateral agent (in such capacity, the "**WAC8 Collateral Agent**" and, together with the Senior Secured Noteholders (defined below) and the WAC8 Administrative Agent, the "**WAC8 Secured Parties**"), pursuant to which the WAC8 Issuers issued (i) 4.41% Series A Guaranteed Senior Secured Notes due 2022 (the "**WAC8 Series A Notes**") in the aggregate principal amount of $125,000,000, (ii) 2.83625% Series B Guaranteed Senior Secured Notes due 2022 (the "**WAC8 Series B Notes**") in the aggregate principal amount of €45,000,000, and (iii) 4.51% Series C Guaranteed Senior Secured Notes due 2022 (the "**WAC8 Series C Notes**," and together with the WAC8 Series A Notes and WAC8 Series B Notes, the "**WAC8 Senior Secured Notes**" and the holders of such notes, the "**Senior Secured Noteholders**") in the aggregate principal amount of $25,000,000.

32.     The obligations under the WAC8 Senior Secured Notes are guaranteed by the Parent Guarantors and each subsidiary of WAC8 and are secured in accordance with the terms of certain local law security documents and that certain *Aircraft Mortgage and Security Agreement*, dated as of September 25, 2015 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**WAC8 Aircraft Security Agreement**"), by and among the WAC8 Issuers, the additional grantors who from time to time become grantors thereto (collectively with the WAC8 Issuers, the "**WAC8 Grantors**" and each a "**WAC8 Grantor**"), and the WAC8 Collateral Agent.  Pursuant to the WAC8 Aircraft Security Agreement, each WAC8 Grantor granted a first priority lien on (i) certain of such WAC8 Grantor's owned aircraft and related assets, including, without limitation, any bill of sale for such aircraft and all rights, powers, and remedies of the WAC8 Grantor with respect thereto, including claims by the WAC8 Grantor for damages in respect of the aircraft and related assets arising as a result of the default by the manufacturer under any bill of sale and all other intangible property relating to such aircraft and related assets, (ii) the equity and beneficial interests such WAC8 Grantor holds in certain of its subsidiaries, if any, (iii) cash on deposit in certain of such WAC8 Grantor's bank accounts, if any, and (iv) certain aircraft leases and subleases, in each case to secure the obligations under the WAC8 Senior Secured Notes, subject to the exceptions specified in the WAC8 Note Purchase Documents (collectively, the "**WAC8 Collateral**").

33.     As of the Petition Date, the Debtors owe approximately $166 million in aggregate principal amount of WAC8 Senior Secured Notes, comprised of approximately $99 million of WAC8 Series A Notes, €41mm of WAC8 Series B Notes, and $20 million of WAC8 Series C Notes.  The WAC8 Series A Notes bear interest at a rate of 4.41% per annum, the

WAC8 Series B Notes bear interest at a rate of 2.83625% per annum, and the WAC8 Series B Notes bear interest at a rate of 4.51% per annum, with interest payable, along with amortization payments, semiannually on the April 15 and October 15 each year.  The WAC8 Senior Secured Notes mature on October 15, 2022.

G.    **WAC9 Facility**

34.    Debtor Waypoint Asset Co 9 Limited (the "**WAC9 Borrower**"), as borrower, along with the Parent Guarantors, Waypoint Asset Euro 9A Limited, and Waypoint Asset Sterling 9A Limited, as guarantors, are party to that certain *Credit Agreement*, dated as of March 24, 2016 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**WAC9 Credit Agreement**" and, together with all agreements and documents delivered pursuant thereto or in connection therewith, each as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**WAC9 Credit Documents**"), with the lenders party thereto from time to time (collectively, the "**WAC9 Lenders**"), and Lombard North Central Plc, as both administrative agent (in such capacity, the "**WAC9 Administrative Agent**") and collateral agent (in such capacity, the "**WAC9 Collateral Agent**" and, together with the WAC9 Lenders and the WAC9 Administrative Agent, the "**WAC9 Secured Parties**").    The WAC9 Credit Agreement provides for a term loan commitment in an aggregate principal amount of $100 million (the "**WAC9 Facility**"), which matures on December 31, 2021.

35.    The obligations under the WAC9 Facility are guaranteed by the Parent Guarantors and each subsidiary of the WAC9 Borrower and are secured in accordance with the terms of certain local law security documents and that certain *Aircraft Mortgage and Security Agreement*, dated as of March 24, 2016 (as amended, restated, amended and restated,

supplemented, or otherwise modified from time to time, the "**WAC9 Aircraft Security Agreement**"), by and between the WAC9 Borrower, the additional grantors who from time to time become grantors thereto (collectively with the WAC9 Borrower, the "**WAC9 Grantors**" and each a "**WAC9 Grantor**"), and the WAC9 Collateral Agent.   Pursuant to the WAC9 Aircraft Security Agreement, each WAC9 Grantor granted a first priority lien on (i) certain of such WAC9 Grantor's owned aircraft and related assets, including, without limitation, any bill of sale for such aircraft and all rights, powers, and remedies of the WAC9 Grantor with respect thereto, including claims by the WAC9 Grantor for damages in respect of the aircraft and related assets arising as a result of the default by the manufacturer under any bill of sale and all other intangible property relating to such aircraft and related assets, (ii) the equity and beneficial interests such WAC9 Grantor holds in certain of its subsidiaries, if any, (iii) cash on deposit in certain of such WAC9 Grantor's bank accounts, if any, and (iv) certain aircraft leases and subleases, in each case to secure the obligations under the WAC9 Facility, subject to the exceptions specified in the WAC9 Credit Documents (collectively, the "**WAC9 Collateral**").

36.     As of the Petition Date, the amount outstanding under the WAC9 Facility is approximately $93 million in unpaid principal, plus accrued and unpaid interest, fees, and other expenses.   The WAC9 Borrower is required to make monthly amortization payments of the principal amount outstanding under the WAC9 Facility.   The WAC9 Facility bears interest at the election of the WAC9 Borrower at a rate per annum equal to LIBOR or the mid-swap rate, plus an agreed applicable margin.

H.     **WAC10 Facility**

37.     Debtor Waypoint Asset Co 10 Limited (the "**WAC10 Borrower**"), as borrower, along with the Parent Guarantors, as guarantors, are party to that certain *Facility*

*Agreement*, dated as of February 21, 2017 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**WAC10 Facility Agreement**" and, together with all agreements and documents delivered pursuant thereto or in connection therewith, each as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**WAC10 Facility Documents**"), with the financial institutions listed on Schedule 1 thereto, as lenders (collectively, the "**WAC10 Lender**s" and together with the WAC2 Lenders and the WAC3 Lenders, the "**Non-Participating WAC Lenders**"), Airbus Helicopters Financial Services Limited, as agent (in such capacity, the "**WAC 10 Agent**"), and Airbus Helicopters Financial Services Limited, as security trustee (in such capacity, the "**WAC10 Security Trustee**" and, together with the WAC10 Lenders and the WAC10 Agent, the "**WAC10 Secured Parties**").   The WAC10 Facility Agreement provides for a term loan commitment in an aggregate principal amount of €45 million (the "**WAC10 Facility**"), which matures on February 28, 2019.

38.     The obligations under the WAC10 Facility are guaranteed by the Parent Guarantors and each subsidiary of the WAC10 Borrower (each such subsidiary together with the WAC10 Borrower, the "**WAC10 Grantors**" and each a "**WAC10 Grantor**") and are secured in accordance with the terms of certain aircraft mortgages, pledge agreements, deeds of charge, and other security documents (collectively, the "**WAC10 Security Documents**").   Pursuant to the terms of the WAC10 Security Documents, the WAC10 Grantors granted a first priority lien in favor of the WAC10 Security Trustee on (i) certain of such WAC10 Grantor's owned aircraft and related assets, including, without limitation, any bill of sale for such aircraft and all rights, powers, and remedies of the WAC10 Grantor with respect thereto, including claims by the WAC10 Grantor for damages in respect of the aircraft and related assets arising as a result of the

default by the manufacturer under any bill of sale and all other intangible property relating to such aircraft and related assets, (ii) the equity and beneficial interests such WAC10 Grantor holds in certain of its subsidiaries, if any, (iii) cash on deposit in certain of such WAC10 Grantor's bank accounts, if any, and (iv) certain aircraft leases and subleases, in each case to secure the obligations under the WAC10 Facility (collectively, the "**WAC10 Collateral**").

39.    As of the Petition Date, the amount outstanding under the WAC10 Facility is approximately €13 million (or approximately $15 million) in unpaid principal, plus accrued and unpaid interest, fees, and other expenses.    The WAC10 Borrower is required to make monthly amortization payments of the principal amount outstanding under the WAC10 Facility. The WAC10 Facility bears interest at the election of the WAC10 Borrower at a rate per annum equal to EURIBOR plus an agreed applicable margin.

I.    **WAC12 Facility**

40.    Debtor Waypoint Asset Co 12 Limited (the "**WAC12 Borrower**" and, together with the WAC1 Borrowers, WAC6 Borrowers, WAC7 Borrowers, WAC8 Borrowers, and WAC9 Borrowers, the "**WAC Borrowers**"), as borrower, along with the Parent Guarantors, as guarantors, are party to that certain *Credit Agreement*, dated as of August 2, 2017 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**WAC12 Credit Agreement**" and, together with all agreements and documents delivered pursuant thereto or in connection therewith, each as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**WAC12 Credit Documents**"), with the lenders party thereto from time to time (collectively, the "**WAC 12 Lenders**" and, together with the WAC12 Administrative Agent (as defined herein) and the WAC12 Collateral Agent (as defined herein), the "**WAC 12 Secured Parties**" and the WAC 12

Secured Parties together with the WAC1 Secured Parties, the WAC6 Secured Parties, the WAC7 Secured Parties, the WAC8 Secured Parties, and the WAC9 Secured Parties, the "**WAC Secured Parties**"), Sumitomo Mitsui Banking Corporation, Brussels Branch, as administrative agent (in such capacity, the "**WAC12 Administrative Agent**" and, together with the WAC1 Administrative, the WAC2 Administrative Agent, the WAC3 Administrative Agent, the WAC6 Administrative Agent, the WAC7 Administrative Agent, the WAC8 Administrative Agent, the WAC9 Administrative Agent, and the Collateral Agents (as defined herein), the "**Agents**"), and Sumitomo Mitsui Banking Corporation Europe Limited, as collateral agent (in such capacity, the "**WAC12 Collateral Agent**" and, together with the WAC1 Collateral Agent, the WAC2 Collateral Agent, the WAC3 Collateral Agent, the WAC6 Collateral Agent, the WAC7 Collateral Agent, the WAC8 Collateral Agent, and the WAC9 Collateral Agent, the "**Collateral Agents**").  The WAC12 Credit Agreement provides for a term loan commitment in an aggregate principal amount of $120 million, which is composed of an initial term loan commitment of $87.5 million and an incremental term loan commitment up to a maximum of $37.5 million (the "**WAC12 Facility**").  The WAC12 Facility matures on May 31, 2021.

41.    The obligations under the WAC12 Facility are guaranteed by the Parent Guarantors and each subsidiary of the WAC12 Borrower and are secured in accordance with the terms of certain local law security documents and that certain *Aircraft Mortgage and Security Agreement*, dated as of August 2, 2017 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "**WAC12 Aircraft Security Agreement**"), by and among the WAC12 Borrower, the additional grantors who from time to time become grantors thereto (collectively with the WAC12 Borrower, the "**WAC12 Grantors**" and each a "**WAC12 Grantor**"), and the WAC12 Collateral Agent.  Pursuant to the WAC12

Aircraft Security Agreement, each WAC12 Grantor granted a first priority lien on (i) certain of

such WAC12 Grantor's owned aircraft and related assets, including, without limitation, any bill

of sale for such aircraft and all rights, powers, and remedies of the WAC12 Grantor with respect

thereto, including claims by the WAC12 Grantor for damages in respect of the aircraft and

related assets arising as a result of the default by the manufacturer under any bill of sale and all

other intangible property relating to such aircraft and related assets, (ii) the equity and beneficial

interests such WAC12 Grantor holds in certain of its subsidiaries, if any, (iii) cash on deposit in

certain of such WAC12 Grantor's bank accounts, if any, and (iv) certain aircraft leases and

subleases, in each case to secure the obligations under the WAC12 Facility, subject to the

exceptions specified in the WAC12 Credit Documents (collectively, the "**WAC12 Collateral**"

and, together with the WAC1 Collateral, WAC2 Collateral, WAC3 Collateral, WAC6 Collateral,

WAC7 Collateral, WAC8 Collateral, and WAC9 Collateral, the "**Prepetition Collateral**").

42.     As of the Petition Date, the amount outstanding under the WAC12 Facility

is approximately $112 million in unpaid principal, plus accrued and unpaid interest, fees, and

other expenses.  The WAC12 Borrower is required to make monthly amortization payments of

the principal amount outstanding under the WAC12 Facility.  The WAC12 Facility bears interest

at the election of the WAC12 Borrower at a rate per annum equal to LIBOR plus an agreed

applicable margin.

### The Debtors' Cash

43.     As described more fully in the Del Genio DIP Declaration, as of the

Petition Date, the Debtors, on a consolidated basis, hold approximately $1.247 million of cash in

various bank accounts worldwide that are not subject to any deposit account control agreements,

deeds of charge or similar agreements and are, thus, unencumbered (the "**Unencumbered**

**Cash**").  Such Unencumbered Cash is not subject to any actual or asserted prepetition lien or security interest held by or for the benefit for any of the WAC Lenders or any other party.

44.    The remainder of the Debtors' existing cash, approximately $6.95 million, is encumbered by asserted liens under the various WAC Facilities.

## Cash Management

45.    As described in more detail in the *Motion of Debtors Pursuant to 11 U.S.C. §§ 105(a), 345(b), 363(c), 364(a), and 503(b) and Fed. R. Bankr. P. 6003 and 6004 for Interim and Final Orders (I) Authorizing Debtors to (A) Continue Existing Cash Management System, (B) Honor Certain Prepetition Obligations Related to the Use Thereof, and (C) Continue Intercompany Transactions and Provide Administrative Expense Priority for Postpetition Intercompany Claims; (II) Extending Time to Comply With 11 U.S.C. § 345(b); and (III) Granting Related Relief* [ECF No. 13] (the "**Cash Management Motion**"), both Debtor and non-Debtor entities rely upon a centralized cash management system to efficiently collect funds generated through the Debtors' leasing operations and disburse those funds throughout the corporate structure to satisfy the obligations incurred in the course of operating their businesses. This centralized cash management system allows the company to efficiently pay overall costs of the business (payroll, corporate overhead, etc.) and each WAC Group's expenses, and use any excess receipts from a WAC Group to support any shortfalls in other parts of the corporate structure, thus stabilizing the Company's consolidated cash-inflows and out-flows.  As a result, at any one time, a WAC Group may be a net borrower or lender with respect to the other WAC Groups.

46.    Postpetition, to comply with their obligations under the DIP Facility, the Debtors propose to operate their cash management system in substantially the same manner,

although funds will flow through a centralized bank account (the "**Central Cash Account**") held at WLIL through which all disbursements and receipts of the company will be made, other than Extraordinary Receipts.  WLIL will sweep the net cash receipts in excess of $100,000 from each of the WAC Groups every two weeks into the Central Cash Account (creating a postpetition intercompany loan from such WAC Group in favor of WLIL) and make any necessary disbursements from that same account (creating an intercompany charge from WLIL to the beneficiary WAC Group).  The Debtors will net the postpetition intercompany loans made from a WAC Group against any intercompany charges made to that same WAC Group, resulting in either (i) the WAC Group having a "**Net WAC Group Intercompany Claim**" against WLIL for any positive difference, or (ii) WLIL having a "**Net WLIL Intercompany Claim**" against the WAC Group for any negative difference.

### The Debtors' Liquidity and Need for DIP Financing

47.    The Debtors require immediate access to the DIP Facility funds and their Cash Collateral to continue operating during these Chapter 11 Cases and to preserve their going concern value for the benefit of all stakeholders.  As described more fully in the First Day Declarations, the Debtors' chapter 11 strategy is focused on the swift implementation of a comprehensive reorganization through a sale of substantially all of their assets that will keep their platform intact and operating without interruption.  *See* Wolynski Decl. ¶ 6.

48.    The commencement of these Chapter 11 Cases is the culmination of a carefully crafted, strategic plan by the Debtors and their advisors to address the Company's balance sheet issues through a process that will maximize returns to creditors and enable the Company to maintain ongoing operations.  In early 2018, the Debtors recognized that they faced significant liquidity constraints and unsustainable debt service obligations under their prepetition

WAC Facilities.  At that time, they retained legal and financial advisors to explore potential restructuring strategies.  In June, the Debtors and their advisors facilitated the formation of the Steering Committee and quickly negotiated forbearance agreements, to provide the Company with relief from pending defaults and debt service while it worked with its prepetition lenders to explore alternatives and design a restructuring process.  In August 2018, after engaging the Steering Committee and discussing various scenarios and alternatives, the Debtors, together with Houlihan Lokey Capital Inc. ("**Houlihan**") and the Debtors' other advisors, commenced a sale and marketing process (the "**M&A Process**") to solicit bids for substantially all of the Debtors' assets.  As set forth in more detail in the Niemann Declaration, Houlihan conducted a robust three-month sale and marketing process, canvassing the market and contacting approximately one hundred and eighty (180) potential strategic and financial buyers as well as sovereign wealth funds that might be interested in purchasing some or all of the Debtors' assets.  *See* Niemann Decl. ¶ 13.  After multiple bidding rounds and extensive diligence and negotiations with the bidders, the Debtors agreed to terms with Macquarie, who submitted a bid for substantially all of the Debtors' assets for a bid of $650 million and has agreed to serve as Stalking Horse Bidder. The Debtors intend to file a motion to establish sale and other related bidding procedures as a means to implement a going concern transaction in short order.

49.     As set forth in the Del Genio DIP Declaration, the Debtors' aggregate cash balance as of the Petition Date of approximately $8.2 million is insufficient to fund the Debtors' ongoing operation and the expenses attendant to these Chapter 11 Cases.  As a result, the Debtors require an immediate infusion of liquidity and access to their Cash Collateral to continue operating during these Chapter 11 Cases.  The DIP Facility is necessary to allow the Debtors to advance the M&A Process to closing, and subsequently implement the sale transaction and then

wind down the estates. The DIP Facility is essential to address the Debtors' working capital needs, including funding maintenance expenses associated with their helicopters, and to provide assurances to the Debtors' customers and suppliers of the Debtors' ability to continue to operate in the ordinary course pending a sale transaction. Without access to their Cash Collateral and an infusion of incremental liquidity, the Debtors likely would be forced to cease operations and liquidate, resulting in the destruction of the significant going concern value of the Debtors' business. *See* Del Genio DIP Decl. ¶ 15.

### Debtors' Marketing Efforts to Obtain Postpetition Financing

50.    As described in the Niemann Declaration, the DIP Facility is the result of the Debtors' robust prepetition marketing efforts and contains competitive terms that are favorable to the Debtors and their creditors. In June of 2018, while negotiating forbearances with their WAC Lenders, the Debtors' professionals began to explore potential sources of financing in the event the Company needed to file for chapter 11 relief on an expedited basis. At the outset of this marketing process, the Debtors were cognizant of the challenges presented by the Debtors' complicated capital structure and the fact that substantially all of the Debtors' assets are encumbered by valid and perfected liens of the WAC Lenders. To ascertain whether a third party may be willing to provide financing, the Debtors and Houlihan initially reached out to a handful of potential lenders who would be able to provide postpetition financing on an expedited basis in the event the forbearance negotiations were unsuccessful and the Company had to file chapter 11 by the end of June. These parties included the Debtors' sponsors, lenders within the existing prepetition capital structure, and third-party financial institutions experienced in distressed lending and DIP financings. As a result of this initial solicitation, two of the Debtors' sponsors jointly provided a postpetition financing proposal. *See* Niemann Decl. ¶12.

45

51.     Following the successful forbearance negotiations, with the benefit of more time, Houlihan Lokey solicited interest in providing postpetition financing from over one hundred and eighty (180) third parties as part of the broader M&A Process.  Of the parties contacted, approximately ten (10) expressed an interest in providing postpetition financing and seven (7) executed the requisite nondisclosure agreements.  *See* Niemann Decl. ¶13.  Ultimately, the Debtors received ten (10) term sheet proposals—six from third-party institutions, one from certain of their sponsors, one joint proposal from two of the WAC Lenders, one from certain of the WAC3 Lenders, and one from the Steering Committee on behalf of the WAC Lenders—for new financing in amounts ranging from $50 million to $300 million.  *See* Niemann Decl. ¶14.  Each of the term sheets proposed postpetition financing on a priming basis.  The Debtors did not receive any proposal for unsecured financing or financing secured by junior liens.  *See* Niemann Decl. ¶14.  The Debtors and their advisors quickly realized that neither the sponsors nor a third-party institution was likely to reach a consensus with the WAC Lenders to prime their prepetition liens and, without such consensus, the Debtors would have to either (i) convince a third-party financial institution to provide postpetition financing on a junior-lien or unsecured basis, which did not seem likely and even if it was it would have been coupled with onerous financial terms, or (ii) attempt to prime the WAC Lenders on a non-consensual basis and face significant risk of costly and protracted litigation with the WAC Lenders at the outset of the cases regarding valuation, adequate protection, and related issues.

52.     Recognizing the challenges inherent in obtaining priming, postpetition financing without the consent of the existing WAC Lenders, the Debtors focused their efforts engaging with the Steering Committee over the terms of their proposal.  Shortly before the lending commitments were finalized, the sale of a portion of WAC Facility claims required a

reworking of the proposed chapter 11 financing. The Steering Committee had to adjust its proposal to provide funding for the additional general and administrative expense costs that are allocable to Non-Participating WAC Groups, which otherwise would have been funded by those WAC Lenders, but are outside of the DIP Facility. The evening before the Petition Date, the Debtors received a revised financing proposal from the Steering Committee, which continued to be negotiated postpetition. *See* Niemann Decl. ¶17

53.    After careful consideration of the revised Steering Committee proposal, as compared to the various other financing proposals the Debtors received, the Debtors and their advisors determined that the DIP Facility proposed by the Steering Committee provides reasonable terms, comparable to the financing proposed by the other potential funding sources, but also provides a clear and superior path towards implementation. Importantly, because the DIP Facility permits each of the Participating WAC Lenders to become DIP Lenders, is expressly conditioned on the consent of the requisite lenders under each of the Participating WAC Facilities to the imposition of priming liens and use of Cash Collateral, and does not contemplate placing liens on the collateral of the Non-Participating WAC Lenders, the DIP Facility enables the Debtors to avoid the delay and expense that would result from protracted litigation regarding the imposition of priming liens and use of Cash Collateral.

**The DIP Facility**

54.    As set forth herein and in the Niemann Declaration, the Debtors and the DIP Lenders engaged in extensive, good faith, arms' length negotiations with respect to the terms and conditions of the proposed DIP Facility and the use of Cash Collateral. These negotiations successfully culminated in the agreed upon terms set forth in DIP Credit Agreement and the DIP Orders. The DIP Facility provides that the Debtors may draw up to $30 million

during the interim period (comprised of $15 million upon entry of the Interim Order and $15 million upon entry of an Acceptable Bidding Procedures Order) and, upon entry of the Final Order, an additional $15 million. The DIP Lenders' commitments provide the Debtors with the ability to conclude the M&A Process, implement the Sale, fund the Debtors' ongoing operations in the meantime, and to satisfy their administrative obligations during these Chapter 11 Cases.

55.    The $45 million of new funding available under the DIP Facility provides the Debtors with sufficient funding to continue operations and accomplish the goals of these Chapter 11 Cases. There is a budget, with a reasonable variance covenant, with which the Debtors much comply, but the Debtors and their advisors have determined that these metrics are achievable and the DIP Facility contains no other financial covenants. Under the DIP Facility, the Debtors will be bound to certain case milestones tied to the M&A Process and geared toward swift implementation of a sale transaction. The Debtors agree that it is in the best interests of their estates and creditors to quickly execute and close a value-maximizing going concern sale, and believe the milestones are reasonable and appropriate.

56.    The DIP Facility will be secured by first priority priming liens on all assets of the DIP Obligors, subject to the Carve-Out and the Intercompany Protection Liens. Although it is a priming facility, the requisite lenders under each of the affected WAC Facilities have consented to the proposed priming. Significantly, as described in the DIP Credit Agreement, the first priority liens will only prime the liens of the Participating WAC Lenders on their respective collateral up to a specified Maximum Intercompany Balance agreed to by the requisite Participating WAC Lenders.

57.    The DIP Orders also contemplate the use of Cash Collateral, both of the Participating WAC Lenders and the Non-Participating WAC Lenders. The requisite lenders

under each of the Participating WAC Facilities has consented such use. Although the Non-Participating WAC Lenders have not affirmatively consented to the use of their Cash Collateral, the use of the Non-Participating WAC Lenders' Cash Collateral is essential to preserve the value of those lenders' other asserted Collateral and, thus, the Non-Participating WAC Lenders will be adequately protected for such use.

58. To ensure that the proceeds under the DIP Facility are used in the manner most likely to maximize its value, the Debtors and the DIP Lenders have agreed on a 13-week cash flow forecast of receipts and disbursements of the Debtors, commencing with the first week following the Petition Date (the "**DIP Budget**"), which shall be updated as set forth in the DIP Credit Agreement. A copy of the DIP Budget is attached to the Interim Order as **Exhibit B**. The Debtors believe that the DIP Budget is achievable and will allow the Debtors to operate without the accrual of unpaid administrative expenses.

59. Accordingly, the DIP Facility pending approval before the Court is the Debtors' best available option and should be approved.

### Basis for Relief Requested

A.  **The Debtors Should Be Authorized to Obtain Postpetition Financing Consistent with the Terms Set Forth in the DIP Credit Agreement**

60. Pursuant to section 364 of the Bankruptcy Code, a debtor is authorized to obtain postpetition financing on a secured or superpriority basis, so long as it was unable to obtain such financing on an unsecured or administrative expense priority basis. The Debtors satisfy this standard. As set forth above, the Debtors were unable to procure *any* financing on a non-priming basis or in the form of unsecured credit. The Debtors, with the assistance of their advisors, carefully reviewed their options with respect to postpetition financing. The Debtors' professionals made formal presentations to the Debtors' Boards of Directors regarding the DIP

proposals.    The Debtors carefully contemplated the advantages and disadvantages of the proposals submitted for their consideration and ultimately selected the proposal that is in the best interests of the Debtors, their estates, and their creditors.  The DIP Facility is tailored to the Debtors' circumstances and will effectively provide a path to the Debtors' emergence from these Chapter 11 Cases.  Its terms are reasonable and able to be executed without having to overcome a costly and protracted priming fight.  Absent the relief requested herein, the Debtors' ability to continue to operate their businesses and reorganize under Chapter 11 of the Bankruptcy Code will be in jeopardy.

61.    For the foregoing reasons and those discussed further below, the Debtors satisfy the necessary conditions under sections 364(c) and (d) of the Bankruptcy Code for authority to enter into the DIP Facility.

### i.    Entry into the DIP Facility is an Exercise of the Debtors' Sound Business Judgment

62.    Provided that an agreement to obtain postpetition secured credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts grant a debtor considerable deference in acting in accordance with its sound business judgment in obtaining such credit.  *See, e.g.*, *In re Republic Airways Holdings Inc.*, No. 16-10429 (SHL), 2016 WL 2616717, at *11 (Bankr. S.D.N.Y. May 4, 2016); *In re YL West 87th Holdings I LLC*, 423 B.R. 421, 441 (Bankr. S.D.N.Y. Jan. 13, 2010) ("Courts have generally deferred to a debtor's business judgment in granting section 364 financing"); *In re Barbara K. Enters., Inc.*, Case No. 08-11474, 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008) (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest"); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases

consistently reflect that the court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest."); *In re Los Angeles Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("Debtors correctly posit that courts will almost always defer to the business judgment of a debtor in the selection of a lender.").

63.     In determining whether the Debtors have exercised sound business judgment in selecting the DIP Facility, the Court should consider the economic terms of the DIP Facility under the totality of the circumstances. *See* Hr'g Tr. at 734 35:24, *In re Lyondell Chem. Co.*, Case No. 09-10023 (Bankr. S.D.N.Y. March 5, 2009) (recognizing "the terms that are now available for DIP financing in the current economic environment aren't as desirable" as in the past); *In re Elingsen McLean Oil Co., Inc.*, 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard" bargains to acquire funds for its reorganization). Moreover, the Court may appropriately take into consideration non-economic benefits to the Debtors offered by a proposed postpetition facility.  For example, in *In re ION Media Networks, Inc.*, the Bankruptcy Court for the Southern District of New York held that:

> Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms.  Relevant features of the financing must be evaluated, including non-economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization.  This is particularly true in a bankruptcy setting where cooperation and established allegiances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan.  That which helps foster consensus may be preferable to a notionally

> better transaction that carries the risk of promoting unwanted
> conflict.

No. 09-13125 (JMP), 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009).

64.    The Debtors' determination to obtain postpetition financing from the DIP

Lenders was a business decision guided by the Debtors' financial and restructuring needs, taking

into account both the economic terms and non-economic benefits of the facility.  Specifically, the

Debtors and their advisors determined that the Debtors require additional liquidity to advance the

M&A Process to auction and closing, implement the Sale, continue their operations in the

ordinary course of business, and finance these Chapter 11 Cases, including, if applicable, the

post-Sale wind down of the Debtors' estates.  After careful consideration of their options, the

Debtors determined that the DIP Facility was the only available option that would allow the

Debtors to execute a largely consensual, efficient restructuring process that would be value-

maximizing for their estates and all parties-in-interests.  Bankruptcy courts generally will not

second-guess a debtor's business decisions when those decisions involve "a business judgment

made in good faith, upon a reasonable basis, and within the scope of [its] authority under the

[Bankruptcy] Code."  *In re Curlew Valley Assocs.*, 14 B.R. 506, 513-14 (Bankr. D. Utah 1981)

(footnote omitted); *see also In re Nellson Nutraceutical, Inc.*, 369 B.R. 787, 797 (Bankr. D. Del.

2007).  To determine whether the business judgment test is met, "the court 'is required to

examine whether a reasonable business person would make a similar decision under similar

circumstances.'"  *In re Helm*, 335 B.R. 528, 538-89 (Bankr. S.D.N.Y. 2006) (citation omitted);

*In re Dura Auto. Sys. Inc.*, Case No. 06-11202 (KJC), 2007 Bankr. LEXIS 2764, at *272 (Bankr.

D. Del. Aug. 15, 2007) (citation omitted).

65.    As discussed in the Niemann Declaration, the Debtors, with the aid of

their advisors, undertook a comprehensive marketing effort and carefully evaluated all of the

available DIP financing options.  *See* Niemann Decl. ¶¶ 11-18.  The Debtors ultimately selected the proposed DIP Facility only after engaging in extensive negotiations designed to provide them with the best terms available under the circumstances.  *See* Niemann Decl. ¶¶ 19-20.

66.    The DIP Credit Agreement represents the most favorable terms on which such financing can be obtained.  The DIP Facility fees, interest rate, and other economics are comparable to most of the other proposals received.  *See* Niemann Decl. ¶ 20.  In addition, the non-economic terms are superior.  The DIP Facility provides the Debtors the ability to pursue their preferred restructuring path, which includes a value-maximizing Sale, on a largely consensual basis with the WAC Lenders.  *See* Niemann Decl. ¶¶ 18-19.  As discussed below, the Debtors' ability to procure a postpetition financing facility that could be implemented quickly while avoiding a priming fight and limiting litigation over the use of Cash Collateral was a critical consideration.  Accordingly, the Debtors believe that entering into the DIP Facility and obtaining the financing thereunder is a critical component towards preserving the Debtors' going concern value, and represents a sound exercise of their business judgment.

ii.    **The Debtors Should be Authorized to Obtain Postpetition Financing on a Secured and Superpriority Basis**

67.    The Debtors satisfy the requirements for relief under section 364 of the Bankruptcy Code, which authorizes a debtor to obtain secured or superpriority financing under certain circumstances.  Specifically, section 364(c) of the Bankruptcy Code provides that:

> If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt—
>
> (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;

(2) secured by a lien on property of the estate that is not otherwise
subject to a lien; or

(3) secured by a junior lien on property of the estate that is subject
to a lien.

11 U.S.C. § 364(c).

68.     To satisfy the requirements of section 364(c) of the Bankruptcy Code, a debtor need only demonstrate "by a good faith effort that credit was not available" to the debtor on an unsecured or administrative expense basis. *Bray v. Shenandoah Fed. Savs. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986). "The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." *Id.*; *see also Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp.*, 266 B.R. 575, 584 (S.D.N.Y. 2001) (superpriority administrative expenses authorized where debtor could not obtain credit as an administrative expense).   When few lenders are likely to be able and willing to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom.*, *Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n. 4 (N.D. Ga. 1989); *see also Ames Dep't Stores*, 115 B.R. at 40 (approving financing facility and holding that the debtor made reasonable efforts to satisfy the standards of section 364(c) where it approached four lending institutions, was rejected by two, and selected the most favorable of the two offers it received).

69.     As stated above, the Debtors contacted dozens of potential financing sources, including over 180 bidders as part of the M&A Process, as well as their WAC Lenders, Sponsors, and third parties to seek proposals for postpetition financing.   No offers were submitted on an unsecured or administrative expense basis. *See* Niemann Decl. ¶ 14.   This Court

should, therefore, authorize the Debtors to provide the DIP Agent and the DIP Lenders with (i) superpriority administrative expense claims against the DIP Obligors pursuant to section 364(c)(1) of the Bankruptcy Code and (ii) first priority liens on unencumbered assets of the DIP Obligors pursuant to section 364(c)(2) of the Bankruptcy Code, in each case subject only to the Carve-Out and the Intercompany Protection Claims and Intercompany Protection Liens.

### iii. The Debtors Should be Authorized to Obtain Postpetition Financing Secured by First Priority Liens on Certain Prepetition Collateral

70.     In addition to authorizing financing under section 364(c) of the Bankruptcy Code, courts also may authorize a debtor to obtain postpetition credit secured by a lien that is senior or equal in priority to existing liens on the encumbered property, if the debtor cannot otherwise obtain such credit and the interests of existing lien holders are adequately protected.  *See* 11 U.S.C. § 364(d)(1). Specifically, section 364(d) of the Bankruptcy Code provides:

> (1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if—
>
> (A) the trustee is unable to obtain such credit otherwise; and
>
> (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.
>
> (2) In any hearing under this subsection, the trustee has the burden of proof on the issue of adequate protection.

11 U.S.C. § 364(d).

71.     When determining whether to authorize a debtor to obtain credit secured by senior liens as authorized by section 364(d) of the Bankruptcy Code, courts focus on whether the transaction will enhance the value of the Debtors' assets.  Courts consider a number of factors, including, without limitation:

- Whether the party subject to a priming lien has consented to such treatment;

- Whether alternative financing is available on any other basis (*i.e.*, whether any better offers, bids, or timely proposals are before the court);

- Whether the proposed financing is necessary to preserve estate assets and is necessary, essential, and appropriate for continued operation of the debtors' business;

- Whether the terms of the proposed financing are reasonable and adequate given the circumstances of both the debtors and proposed lender(s); and

- Whether the proposed financing agreement was negotiated in good faith and at arms' length and entry therein is an exercise of sound and reasonable business judgment and in the best interest of the debtor's estate and its creditors.

*See*, *e.g.*, *Ames Dep't Stores*, 115 B.R. at 37–39; *Bland v. Farmworker Creditors*, 308 B.R. 109, 113-14 (S.D. Ga. 2003); *Farmland Indus.*, 294 B.R. at 862–79, *In re Lyondell Chem. Co.*, Case No. 09-10023 (Bankr. S.D.N.Y. March 5, 2009); *Barbara K. Enters.*, 2008 WL 2439649 at \*10; *see also* 3 Collier on Bankruptcy ¶ 364.04[1] (15th ed. rev. 2008).

72.    The obligations under the DIP Facility are to be secured by first priority priming liens on substantially all of the encumbered assets of the DIP Obligors, including (i) the WAC Specific Collateral in respect of each Participating WAC Group, up to the amount of such Participating WAC Group's Net WLIL Intercompany Claim, and (ii) any asset that is not WAC Specific Collateral, with certain exceptions.  The DIP Liens are subject and subordinate to the Intercompany Protection Liens and the Carve-Out.  Importantly, the Debtors are not proposing to grant the DIP Lenders any liens on assets of Non-Participating WAC Groups or on the equity held by WLIL in a Non-Participating WAC Group member.  This structure satisfies the requirements of section 364(d) of the Bankruptcy Code.

73.    <u>First</u>, the requisite percentages of WAC Lenders under each of the Participating WAC Facilities have consented to the priming of the liens held by the Collateral Agents on their respective Prepetition Collateral.  *See* Niemann Decl. ¶ 18.  The Debtors are not proposing any nonconsensual priming.

74.    <u>Second</u>, the Debtors and their advisors explored a variety of possible financing sources, and ultimately determined that the DIP Lenders offered the best option for obtaining the postpetition financing that the Debtors require.  As discussed above, postpetition credit is not available without the granting of a lien that primes existing prepetition liens.  All other postpetition financing proposals contemplated first priority priming liens on all of the Prepetition Collateral, to which the Collateral Agents were unlikely to consent, which would have led to costly litigation of the nonconsensual priming of each of the WAC Lenders and likely a dispute over continued use of Cash Collateral.  *See* Niemann Decl. ¶ 16.  In contrast, the Participating WAC Lenders have consented to the priming of their Prepetition Collateral by the DIP Facility and do not seek to prime the liens of the Non-Participating WAC Lenders.  *See* Niemann Decl. ¶ 18.  Thus, the DIP Facility, and the claims and liens securing such obligations, represent the best financing structure available.

75.    <u>Third</u>, the Debtors need the proceeds of the DIP Facility to maintain ongoing operations, fund the Chapter 11 Cases, and consummate the Sale.  Indeed, without access to the DIP Facility and use of the Cash Collateral, the Debtors likely would be forced to liquidate, which would not maximize value for the Debtors' creditors and other parties in interest.  *See* Del Genio DIP Decl. ¶ 16.  Providing the Debtors with the liquidity necessary to preserve their going concern value through the pendency of these Chapter 11 Cases is in the best interest of all stakeholders.

76.     Fourth, the DIP Financing will provide access to up to $45 million, allowing the Debtors to maintain their operations and meet the various obligations owed to key constituents.  *See* Del Genio DIP Decl. ¶ 17.  The Debtors and their advisors are confident they can operate within the DIP Budget and milestones, and carefully negotiated the terms of the DIP Facility, which are reasonable and within market.  *See* Del Genio DIP Decl. ¶ 10; Niemann Decl. ¶ 19.  Accordingly, the terms of the DIP Facility are reasonable and adequate to support the Debtors' operations and restructuring activities through the pendency of these Chapter 11 Cases.

77.     Fifth, as described in greater detail above and in the Niemann Declaration, the Debtors and the DIP Lenders negotiated the DIP Documents in good faith and at arms' length, and the Debtors' entry into the DIP Documents is an exercise of their sound business judgment.  The other proposed lenders submitted less favorable proposals that (i) were conditioned on the Debtors abandoning their preferred chapter 11 strategy, (ii) contained onerous economic terms, and/or (iii) would have required the Debtors to engage in litigation with the existing WAC Lenders with respect to postpetition financing and use of Cash Collateral at the outset of these Chapter 11 Cases, setting the stage for contentious and value-destructive Chapter 11 Cases.  *See* Niemann Decl. ¶¶ 16-18.

iv.     **The Interests of the Participating WAC Lenders are Adequately Protected**

78.     As noted above, the requisite Participating WAC Lenders have consented to the priming of the liens on their respective Prepetition Collateral, to the extent set forth in the DIP Facility and the DIP Orders.  In addition to having received their consent, the Participating WAC Lenders' interests in the Prepetition Collateral are adequately protected.

79.     Section 364(d)(1)(B) of the Bankruptcy Code requires a trustee or debtor in possession to establish that "there is adequate protection of the interest of the holder of the lien

on the property of the estate on which such senior or equal lien is proposed to be granted."

11 U.S.C. § 364(d)(1)(B) (emphasis added). The Bankruptcy Code does not expressly define

"adequate protection." *See* 11 U.S.C. § 361; *see also In re Swedeland Dev. Grp.*, 16 F.3d 552,

564 (3d Cir. 1994). Section 361 of the Bankruptcy Code, however, provides a non-exhaustive

list of examples of adequate protection, including replacement liens and administrative priority

claims. *See* 11 U.S.C. § 361. Generally, courts decide what constitutes adequate protection on a

case-by-case basis. *See In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("The

determination of adequate protection is a fact-specific inquiry."); *In re 495 Central Park Avenue

Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992); *In re O'Connor*, 808 F.2d 1393, 1397 (10th

Cir. 1987) ("Since 'value' is the linchpin of adequate protection, and since value is a function of

many factual variables, it logically follows that adequate protection is a question of fact"

(internal citation omitted); *In re Columbia Gas Sys., Inc.*, No. 91-803, 1992 WL 79323, at *2

(Bankr. D. Del. Feb. 18, 1992) (emphasizing that "the varying analyses and results contained in

the . . . slew of cases demonstrate that what interest is entitled to adequate protection and what

constitutes adequate protection must be decided on a case-by-case basis"); *see also In re Dynaco

Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (*citing* 2 Collier on Bankruptcy ¶ 361.01 [1] at

361-66 (15th ed. 1993) (explaining that adequate protection can take many forms and "must be

determined based upon equitable considerations arising from the particular facts of each

proceeding").

80.     The DIP Lenders and the Debtors propose to grant the Collateral Agents,

on behalf of the other Participating WAC Lenders, the following forms of adequate protection:

- **Adequate Protection Superpriority Claims**:  The Debtors will grant the Agents, for the benefit of themselves and the Participating WAC Lenders, superpriority administrative expense adequate protection claims, to the extent of diminution in value of their respective WAC Specific Collateral,

against each of the DIP Obligors under the applicable Participating WAC Facility, senior to all other administrative expense claims in the Chapter 11 Cases other than (i) the Carve-Out, (ii) the DIP Liens, and (iii) the Intercompany Protection Liens.

- **Adequate Protection Liens**:  The Debtors will grant the Agents, for the benefit of themselves and the Participating WAC Lenders, continuing, valid, binding, enforceable, and automatically perfected postpetition security interests in and liens on DIP Collateral that does not constitute the WAC Specific Collateral of any Participating WAC Group (essentially, the Debtors' unencumbered assets, excluding the Avoidance Actions) (the "**Adequate Protection Liens**").  The Adequate Protection Liens shall be junior only to the (i) the Carve-Out, (ii) the DIP Liens, and (iii) the Intercompany Protection Liens.

- **Replacement Liens**:  The Debtors will grant the Agents, for the benefit of themselves and the Participating WAC Lenders, replacement liens on their WAC Specific Collateral.

- **Payment of Fees and Expenses**:  The Debtors shall pay the accrued and unpaid reasonable and documented fees and expenses of the Prepetition WAC Lenders' professionals, including, without limitation, reasonable attorneys' fees and expenses, limited to (i) Milbank, Tweed, Hadley & McCloy LLP, Alvarez & Marsal LLP, IBA Group Ltd., and Arthur Cox, (ii) a single agent's counsel for each Participating WAC Facility, and (iii) any individual Prepetition WAC Lender's counsel approved by the requisite Prepetition WAC Lenders for such Participating WAC Facility (on a WAC-by-WAC basis), with certain conditions set forth in the DIP Credit Agreement and DIP Orders.

- **Additional Adequate Protection**:  The Debtors shall (i) comply with the Milestones attached to the Interim Order as **Exhibit C**, which may not be amended without the consent of each Prepetition Approving Party, which shall not be unreasonably withheld; (ii) incorporate the bidding provisions set forth in the Milestones into any bidding procedures order contemplated therein in form and substance acceptable to the Prepetition Approving Parties (an "**Acceptable Bidding Procedures Order**"), which Acceptable Bidding Procedures Order shall not be amended or modified without the consent of each Prepetition Approving Party; and the Acceptable Bidding Procedures Order and this Interim Order shall provide for the applicable Participating WAC Agent or Participating WAC Collateral Agent's absolute and irrevocable right to credit bid for the WAC Specific Collateral of such Participating WAC Facility subject only to such party complying with all of the requirements for a Streamlined Credit Bid (as described in **Exhibit C** to the Interim Order).  For the avoidance of doubt, in the event a Participating WAC Agent or Participating WAC Collateral Agent elects to make a Streamlined Credit Bid by January 14, 2019, and

complies with the requirements set forth in the Milestones, then by no later than February 15, 2019 either an order authorizing the sale pursuant to such credit bit shall have been entered or upon three (3) business days' notice by the relevant agent to the Debtors, the stay shall be automatically lifted so they can foreclose on their WAC Specific Collateral.

81.    As additional adequate protection from and against any priming or diminution in value as a result of any postpetition intercompany transfer,

- to the extent that WLIL has at any time, on a cumulative basis, a Net WLIL Intercompany Claim against a Participating WAC Group, WLIL shall receive a joint and several superpriority intercompany claim (a "**WLIL Intercompany Protection Claim**") against each member of such Participating WAC Group, secured by first priority priming liens ("**WLIL Intercompany Protection Liens**") against such Participating WAC Group's respective WAC Specific Collateral, subject to the Carve-Out and senior to any DIP Liens; provided, however that to the extent any WLIL Intercompany Protection Claim or WLIL Intercompany Protection Lien against any WAC Group or such WAC Group's WAC Specific Collateral is satisfied by such WAC Group or from its WAC Specific Collateral, any DIP Claim or DIP Lien against such WAC Group or its Prepetition Collateral shall automatically and to the same extent be satisfied and released; and

- to the extent a Participating WAC Group has at any time, on a cumulative basis, a Net WAC Group Intercompany Claim against WLIL, each member of such Participating WAC Group shall receive a superpriority intercompany claim (a "**WAC Group Intercompany Protection Claim**," and together with the WLIL Intercompany Protection Claim, the "**Intercompany Protection Claims**") against WLIL, secured by priming liens ("**WAC Group Intercompany Protection Liens**," and together with the WLIL Intercompany Protection Liens, the "**Intercompany Protection Liens**") against all assets of WLIL, subject only to the Carve-Out.

82.    The adequate protection claims and liens discussed above are sufficient adequate protection for the Participating WAC Lenders who have consented to the priming of their prepetition security interests and have consented to the proposed adequate protection package contemplated in the DIP Documents and the DIP Orders.  The adequate protection granted to the Participating WAC Lenders is both fair and reasonable.

B.    **The Debtors Should be Authorized to Use the Cash Collateral During the Interim Period**

83.    The Debtors also require immediate access to Cash Collateral (and other Prepetition Collateral) to continue operating during these Chapter 11 Cases, to preserve their going concern value for the benefit of all stakeholders, and to provide working capital and proceed to implement the Sale.  The orderly continuation of the Debtors' operations and these cases is dependent on their ability to use and disburse funds among Debtor and non-Debtor entities as needed.

84.    Section 363(c) of the Bankruptcy Code governs a debtor's use of a secured creditor's Cash Collateral.  Specifically, section 363(c) provides, in pertinent part, that:

> The trustee may not use, sell, or lease cash collateral . . . unless—
> (A) each entity that has an interest in such cash collateral consents; or
> (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section [363].

11 U.S.C. § 363(c)(2).  Furthermore, section 363(e) provides that "on request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest."  11 U.S.C. § 363(e).

85.    Participating WAC Lender Cash Collateral.  The Debtors propose to use the Participating WAC Lenders' Cash Collateral along with the DIP Loans to fund their operation in accordance with the DIP Budget.  As noted above, the Debtors intend to provide the Participating WAC Lenders with adequate protection on the terms described above for the use of Cash Collateral (and other Prepetition Collateral) and such parties otherwise consent to such use of their Cash Collateral.  Accordingly, the Debtors have satisfied the requirements of sections

363(c)(2) and (e), and should be authorized to use the Participating WAC Lenders' Prepetition Collateral, including Cash Collateral.

86.     <u>Non-Participating WAC Lender Cash Collateral</u>.  The Debtors propose to use the Cash Collateral asserted by the Non-Participating WAC Lenders, including the operating receipts generated by the WAC2, WAC3, and WAC10 entities during the pendency of these Chapter 11 Cases, in a very limited way, to cover only the direct expenses incurred at each of their respective WACs.[8]  Such direct expenses may include expenses related to storage costs, transportation, aircraft maintenance, enrollment in PBH programs, aircraft reconfigurations, and other costs necessary to meet contractual obligations under customer leases and to ensure that the aircraft in each WAC Group are properly maintained and their value is preserved.  The use of the Non-Participating WAC Lenders' Cash Collateral for such expenses is necessary to, among other things, support the continued operation of leased helicopters, continue to properly store and protect those aircraft that are grounded, and ensure the value of the assets of the Non-Participating WAC Groups are maintained so that such assets can retain their going concern value.  As set forth in the Cox Declaration, if these direct expenses are not paid, the value of the Non-Participating WAC Groups' aircraft collateral will diminish as, among other things, the serviceability and airworthiness of the aircraft collateral would be negatively impacted.  Accordingly, the use of the Non-Participating WAC Lenders' asserted Cash Collateral will serve to preserve or enhance the value of their aircraft collateral, including by generating future receipts in which the Non-Participating WAC Lenders will have an interest, thereby providing

---

[8] The Debtors reserve their right to seek to surcharge the WAC2 Collateral, WAC3 Collateral, or WAC10 Collateral pursuant to section 506(c) of the Bankruptcy Code or other applicable law for the reasonable, necessary, costs and expenses of preserving, or potentially disposing of the WAC2 Collateral, WAC3 Collateral, or WAC10 Collateral, respectively, during these Chapter 11 Cases with respect to other expenses paid on behalf of these entitles with unencumbered funds, funds from the DIP Facility, or other lenders' Cash Collateral.  11 U.S.C. §506(c).  The Debtors also reserve their right to challenge the validity, existence, and extent of all liens asserted under these WAC Facilities.

the Non-Participating WAC Lenders with adequate protection. *See In re Constable Plaza Assocs., L.P.*, 125 B.R. 98, 105 (Bankr. S.D.N.Y. 1991) ("the debtor's plowing back rents solely for the purpose of maintaining and operating its office building will serve to preserve or enhance the value of the building which, in turn, will protect the collateral. . ."); *In re Pine Lake Village Apartment Co.*, 16 B.R. 750, 756 (Bankr. S.D.N.Y. 1982) ("[t]he protection and maintenance of the plaintiff-mortgagee's collateral, without any diversion of funds to the debtor, clearly ensures that the plaintiff-mortgagee's investment is adequately protected"); *In re 499 W. Warren St. Assocs., Ltd. P'ship*, 142 B.R. 53, 58 (Bankr. N.D.N.Y. 1992) (finding that using rents to "operate and maintain the Property protects the underlying value of the collateral from decline and, therefore, provides adequate protection . . . for the continued generation of Rents," to which a lien will attach); *see also* Hr'g Tr. at 32:12–22, *In re Pacific Drilling S.A.*, Case No. 17-13193 (MEW) (Bankr. S.D.N.Y. Nov. 14, 2017) (reasoning that using cash collateral to pay expenses specific to the lenders' hard collateral "is not something that threatens a diminution in the value of [the cash] collateral; it maintains and enhances the value of [the hard] collateral.").

87.     As discussed above, the Non-Participating WAC Lenders are adequately protected for the use of their asserted Cash Collateral (and other asserted Prepetition Collateral) because such funds will be used to preserve and enhance the value of their other asserted collateral during the pendency of the Chapter 11 Cases.  The Debtors are not proposing to prime the liens asserted by the Non-Participating WAC Lenders, and any indirect/allocated expenses of the Non-Participating WAC Group entities will be covered by other funds (including from the DIP Facility and other lenders' Cash Collateral) and not paid with Non-Participating WAC Lenders' asserted Cash Collateral.  Thus, there is no need for any additional adequate protection.

88.    Given that the Participating WAC Lenders have consented to the priming and the proposed adequate protection and Cash Collateral provisions under the DIP Facility and the DIP Orders, and that the Non-Participating WAC Lenders are adequately protected from any diminution in the value of their asserted collateral, the Court should grant the Debtors the authority to use Cash Collateral and other Prepetition Collateral under section 363 of the Bankruptcy Code, consistent with the terms and conditions of the DIP Credit Agreement and the DIP Orders.

C.    **The Debtors Should be Authorized to Pay the Fees Required by the DIP Lenders and Honor Obligations Under the Credit Agreement**

89.    As described above, the Debtors have agreed, subject to Court approval, to pay certain fees to the DIP Lenders in exchange for their funding the DIP Facilities.  The Debtors and their advisors considered the requested fees and compared them against the fees set forth in the various financing proposals received from other parties and determined, in their sound business judgment, that the proposed fees are reasonable and necessary to secure the DIP Facility, which is the best financing available.  Paying these fees in order to obtain the DIP financing, therefore, is in the best interests of the Debtors' estates, creditors, and other parties in interest.

D.    **The Scope of the Carve-Out is Appropriate**

90.    The proposed DIP Facility and DIP Orders subject (i) the DIP Lenders' security interests and administrative expense claims, (ii) the adequate protection liens and claim, and (iii) the Participating WAC Lenders' prepetition liens and claims to the Carve-Out, and the Participating WAC Lenders have consented to this.  The Carve-Out is similar to other arrangements made for professional fees that have been found to be reasonable and necessary to ensure that a debtor's estate and any statutory committee can retain assistance from counsel.  *See*

65

*In re Ames Dep't Stores*, 115 B.R. at 40.  Without the Carve-Out, the Debtors' estates or other

parties-in-interest might be deprived of possible rights and powers because otherwise the

services for which professional persons may be paid in these Chapter 11 Cases could be

restricted.  *Id.* at 38 (observing that courts insist on carve-outs for professionals representing

parties-in-interest because "[a]bsent such protection, the collective rights and expectations of all

parties-in-interest are sorely prejudiced").    Additionally, the Carve-Out protects against

administrative insolvency during the course of the cases by ensuring that assets remain for the

payment of U.S. Trustee fees and professional fees of the Debtors and the Creditors' Committee,

if appointed, notwithstanding the grant of superpriority and administrative liens and claims under

the DIP Facility and the DIP Orders.

E.    **The Lenders Should be Deemed Good Faith Lenders under Section 364(e)**

91.    Section 364(e) of the Bankruptcy Code protects a good faith lender's right

to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the

authority of the debtor to obtain such loans or grant such liens is later reversed or modified on

appeal.  Section 364(e) provides that:

> The reversal or modification on appeal of an authorization under
> this section [364 of the Bankruptcy Code] to obtain credit or incur
> debt, or of a grant under this section of a priority or a lien, does not
> affect the validity of any debt so incurred, or any priority or lien so
> granted, to an entity that extended such credit in good faith,
> whether or not such entity knew of the pendency of the appeal,
> unless such authorization and the incurring of such debt, or the
> granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

92.    As explained in detail herein and in the Niemann Declaration, the DIP

Documents are the result of the Debtors' reasonable and informed determination that the DIP

Lenders offered the most favorable terms on which to obtain needed postpetition financing under

the circumstances, and of arms' length, good faith negotiations between the Debtors and the DIP

Lenders.  Niemann Decl. ¶ 11.  The terms and conditions of the DIP Documents are fair and

reasonable, and the proceeds of the DIP Facility will only be used for purposes that are

permissible under the Bankruptcy Code.  Further, no consideration is being provided to any party

to the DIP Documents other than as described herein.  Accordingly, the Court should find that

the DIP Lenders are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy

Code, and are entitled to all of the protections afforded by that section.

F.    **Modification of the Automatic Stay is Warranted**

93.    The relief requested herein contemplates a modification of the automatic

stay (to the extent applicable) to permit the Debtors to:  (i) grant the security interests, liens, and

superpriority claims described above with respect to the DIP Lenders and to perform such acts as

may be requested to assure the perfection and priority of such security interests and liens,

(ii) permit the DIP Lenders to exercise rights and remedies upon the occurrence and during the

continuance of an Event of Default, after the expiration of the applicable notice period or the

occurrence of the Maturity Date, as applicable, and (iii) implement the terms of the proposed

DIP Orders.

94.    Stay modifications of this kind are ordinary and standard features of

postpetition debtor financing facilities and, in the Debtors' business judgment, are appropriate

under the present circumstances.  *See, e.g., In re Sears Holdings Corp.*, Case No. 18-23538

(RDD) (Bankr. S.D.N.Y. Oct. 16, 2018) [ECF No. 101]; *In re Claire's Stores, Inc.*, Case No. 18-

10584 (MFW) (Bankr. D. Del. Apr. 24, 2018) [ECF No. 318]; *In re Tops Holding II Corp.*, Case

No. 18-22279 (RDD) (Bankr S.D.N.Y. Apr. 5, 2018) [ECF No. 238]; *In re The Great Atlantic &*

*Pacific Tea Company, Inc.*, Case No. 15-23007 (RDD) (Bankr. S.D.N.Y. July 21, 2015) [ECF

No. 88]; *In re Chassix Holdings, Inc.*, Case No. 15-10578 (MW) (Bankr. S.D.N.Y. Mar. 13, 2015) [ECF No. 67]; *In re The Great Atlantic & Pacific Tea Company, Inc.*, Case No. 10-24549 (RDD) (Bankr. S.D.N.Y. Jan. 13, 2010) [ECF No. 43]; *In re The Reader's Digest Assoc.*, Case No. 09-23529 (RDD) (Bankr. S.D.N.Y. Aug. 26, 2009) [ECF No. 26]; *In re Lear Corp.*, Case No. 09-14326 (ALG) (Bankr. S.D.N.Y. July 7, 2009) [ECF No. 59].

G.    **The Debtors Require Immediate Access to the Cash Collateral and DIP Financing**

95.    The Court may grant interim relief in respect of a motion filed pursuant to sections 363(c) or 364 of the Bankruptcy Code where, as here, interim relief is "necessary to avoid immediate and irreparable harm to the estate pending a final hearing." Fed. R. Bankr. P. 4001(b)(2), (c)(2).   In examining requests for interim relief under this rule, courts in this jurisdiction generally apply the same business judgment standard applicable to other business decisions. *See Ames Dep't Stores*, 115 B.R. at 36.

96.    The Debtors and their estates will suffer immediate and irreparable harm if the interim relief requested herein, including authorizing the Debtors to borrow up to $30 million, is not granted.   During the interim period, the Debtors are projected to need approximately $19.93 million for operating and restructuring-related disbursements, including approximately $10 million minimum cash on balance during this period, to provide a reasonable and conservative cushion to cover any unexpected expenses or a shortfall or delay in receipts. Del Genio DIP Decl. ¶ 11.   The Debtors have insufficient cash to fund operations and provide comfort to customers and vendors, let alone to continue the M&A Process, without immediate access to the DIP Facility and Cash Collateral.   Del Genio DIP Decl. ¶¶ 14-16.   Further, the commencement of these Chapter 11 Cases has significantly increased the risk of further strain on the Debtors' limited cash as a result of, among other things, the costs of administering these

Chapter 11 Cases and potential concerns of constituents regarding the Debtors' financial health and ability to continue operations. Since the Petition Date, the Debtors have been able to hold off on making any disbursements while they took the additional time needed to finish negotiating the terms of the DIP Facility. With that facility now in place, the Debtors need access to the crucial liquidity provided thereunder, as well as access to Cash Collateral. Accordingly, the Debtors have an immediate need for access to liquidity to, among other things, continue the operation of their businesses, maintain their relationships with customers, meet payroll, pay capital expenditures, procure goods and services from vendors and suppliers, and otherwise satisfy their working capital and operational needs, all of which is required to preserve and maintain the Debtors' enterprise value for the benefit of all parties in interest and to pursue a value-maximizing sale transaction. *See* Del Genio DIP Decl. at ¶¶ 11, 14-17.

97.    The importance of a debtor's ability to secure postpetition financing to prevent immediate and irreparable harm to its estate has been repeatedly recognized in this district in similar circumstances. *See, e.g., In re Nine West Holdings, Inc.*, Case No. 18-10947 (SCC) (Bankr. S.D.N.Y. Apr. 9, 2018) (order approving postpetition financing on an interim basis) [ECF No. 80]; *Breitburn Energy Partners LP*, Case No. 16-11390 (SMB) (Bankr. S.D.N.Y. May 23, 2016) [ECF No. 73] (same); *In re Chassix Holdings, Inc.*, Case No. 15-10578 (MW) (Bankr. S.D.N.Y. Mar. 13, 2015) [ECF No. 67] (same); *In re Eastman Kodak Co.*, Case No. 12-10202 (MEW) (Bankr. S.D.N.Y. Jan. 20, 2012) [ECF No. 54] (same); *In re The Great Atl. & Pac. Tea Co.*, Case No. 10-24549 (RDD) (Bankr. S.D.N.Y. Dec. 13, 2010) (same) [ECF No. 43]; *In re The Reader's Digest Assoc.*, Case No. 09-23529 (RDD) (Bankr. S.D.N.Y. Aug. 26, 2009) (same) [ECF No. 26]; *In re Tronox Inc.*, Case No. 09-10156 (MEW) (Bankr. S.D.N.Y. Jan. 13, 2009) (same) [ECF No. 46]; *In re Lyondell Chem. Co.*, No. 09-10023 (REG) (Bankr.

S.D.N.Y. Jan. 8, 2009) (same) [ECF No. 79]; *In re Frontier Airlines Holdings, Inc.*, Case No. 08-11298 (RDD) (Bankr. S.D.N.Y. Aug. 5, 2008) (same) [ECF No. 433]. Accordingly, for the reasons set forth above, prompt entry of the Interim Order is necessary to avert immediate and irreparable harm to the Debtors' estates and is consistent with, and warranted under, Bankruptcy Rules 4001(b)(2) and (c)(2).

H.    **Request for Final Hearing**

98.    Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date that is no later than 30 days after entry of the Interim Order as a final hearing for consideration of entry of the Final Order.

99.    The Debtors request that they be authorized to serve a copy of the signed Interim Order, which fixes the time and date for the filing of objections, if any, by first class mail upon the Notice Parties listed below. The Debtors further request that the Court consider such notice of the Final Hearing to be sufficient notice under Bankruptcy Rules 4001(b)(2) and 4001(c)(2).

**Bankruptcy Rule 4001(a)(3) Should Be Waived**

100.    The Debtors request a waiver of the stay of the effectiveness of the order approving this Motion under Bankruptcy Rule 4001(a)(3). Bankruptcy Rule 4001(a)(3) provides, "[a]n order granting a motion for relief from an automatic stay made in accordance with Rule 4001(a)(1) is stayed until the expiration of [fourteen (14)] days after the entry of the order, unless the court orders otherwise." The Debtors' ability to obtain funding under the DIP Facility is essential to prevent irreparable damage to the Debtors' operations. Accordingly, ample cause exists to justify the waiver of the fourteen-day stay imposed by Bankruptcy Rule 4001(a)(3), to the extent such stay applies.

## **Bankruptcy Rule 6003 Has Been Satisfied**

101.    Bankruptcy Rule 6003(b) provides that, to the extent relief is necessary to

avoid immediate and irreparable harm, a bankruptcy court may issue an order granting "a motion

to use, sell, lease, or otherwise incur an obligation regarding property of the estate, including a

motion to pay all or part of a claim that arose before the filing of the petition" before twenty-one

(21) days after filing of the petition.    Fed. R. Bankr. P. 6003(b).    The Debtors' estates would

suffer immediate and irreparable harm if the relief sought herein is not promptly granted.    As

explained above, the Debtors require immediate access to Cash Collateral and the interim

funding allowed under the DIP Facility.    Absent such authorization, the Debtors would not be

able to fund their ongoing operations and continue as a going concern.    Accordingly, the Debtors

have satisfied the requirements of Bankruptcy Rule 6003.

## **Request for Bankruptcy Rule 6004 Waiver**

102.    To implement the foregoing successfully, the Debtors request a waiver of

the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay imposed by

Bankruptcy Rule 6004(h), to the extent such stay applies.

## **Notice**

103.    Notice of this Motion has been provided to (i) William K. Harrington,

U.S. Department of Justice, Office of the U.S. Trustee, 201 Varick Street, Room 1006, New

York, NY 10014 (Attn: Andrea B. Schwartz, Esq.); (ii) the Debtors' thirty (30) largest unsecured

creditors on a consolidated basis; (iii) the Internal Revenue Service; (iv) the United States

Attorney's Office for the Southern District of New York; (v) the attorneys for SunTrust Bank, as

administrative agent under that certain Amended and Restated Credit Agreement, dated as of

November 8, 2013, and that certain Amended and Restated Credit Agreement, dated as of April

28, 2017; (vi) the attorneys for Wells Fargo Bank, National Association, as administrative agent

under that certain Credit Agreement, dated as of April 16, 2014, and that certain Note Purchase Agreement, dated as of July 29, 2015; (vii) the attorneys for Airbus Helicopters Financial Services Limited, as agent under that certain Euro Term Loan Facility Agreement, dated February 21, 2017; (viii) the attorneys for KeyBank N.A., as administrative agent under that certain Amended and Restated Credit Agreement, dated as of March 30, 2018; (ix) the attorneys for the administrative agent under that certain Credit Agreement, dated as of August 6, 2014; (x) the attorneys for Bank of Utah, as administrative agent under that certain Credit Agreement, dated as of March 23, 2015; (xi) the attorneys for Lombard North Central PLC, as administrative agent under that certain Credit Agreement, dated as of March 24, 2016; (xii) the attorneys for Sumitomo Mitsui Banking Corporation, Brussels Branch, as administrative agent under that certain Credit Agreement, dated as of August 2, 2017; (xiii) the attorneys for the Steering Committee; (xiv) the attorneys for the Sponsors; and (xv) the attorneys for the DIP Agent (collectively, the "**Notice Parties**").  The Debtors respectfully submit that no further notice is required.

No previous request for the relief sought herein has been made by the Debtors to this or any other Court.

WHEREFORE the Debtors respectfully request entry of interim and final orders granting the relief requested herein and such other and further relief as the Court may deem just and appropriate.

Dated: December 7, 2018
        New York, New York

/s/ Kelly DiBlasi
WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York  10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007
Gary T. Holtzer
Robert J. Lemons
Kelly DiBlasi
Matthew P. Goren

*Proposed Attorneys for Debtors
and Debtors in Possession*

## EXHIBIT A

**Debtors**

| Debtor | Last 4 Digits of Tax ID Number | Debtor | Last 4 Digits of Tax ID Number |
|---|---|---|---|
| Waypoint Leasing Holdings Ltd. | 2899 | AE Helicopter (5) Limited | N/A |
| Waypoint Leasing (Luxembourg) S.à r.l. | 7041 | AE Helicopter (6) Limited | N/A |
| Waypoint Leasing (Ireland) Limited | 6600 | MSN 31141 Trust | N/A |
| Waypoint Asset Co 10 Limited | 2503 | MSN 31492 Trust | N/A |
| MSN 2826 Trust | N/A | MSN 36458 Trust | N/A |
| MSN 2879 Trust | N/A | MSN 760543 Trust | N/A |
| Waypoint Asset Co 11 Limited | 3073 | MSN 760551 Trust | N/A |
| MSN 2905 Trust | N/A | MSN 760581 Trust | N/A |
| Waypoint Asset Co 12 Limited | 0541 | MSN 760628 Trust | N/A |
| MSN 20042 Trust | N/A | MSN 760631 Trust | N/A |
| MSN 41202 Trust | N/A | MSN 760682 Trust | N/A |
| MSN 920280 Trust | N/A | MSN 920022 Trust | N/A |
| Waypoint Asset Co 1E Limited | 6089 | MSN 920062 Trust | N/A |
| Waypoint Asset Euro 1F Limited | 7099 | MSN 920125 Trust | N/A |
| MSN 20093 Trust | N/A | MSN 9229 AS | N/A |
| Waypoint Asset Malta 1A Limited | 2966 | Waypoint Asset Co 3A Limited | 6687 |
| Waypoint Leasing Singapore 1 Pte. Limited | 2403 | MSN 41371 Trust | N/A |
| Waypoint Leasing UK 1A Limited | 2226 | Waypoint Asset Euro 1A Limited | 9804 |
| Waypoint Asset Co 14 Limited | 1585 | MSN 4466 Trust | N/A |
| Waypoint Asset Co 15 Limited | 1776 | MSN 4469 Trust | N/A |

| Debtor | Last 4 Digits of Tax ID Number | Debtor | Last 4 Digits of Tax ID Number |
|---|---|---|---|
| Waypoint Asset Co 3 Limited | 3471 | MSN 6655 Trust | N/A |
| MSN 6658 Trust | N/A | Waypoint Asset Funding 6 LLC | 4964 |
| Waypoint 760626 Business Trust | N/A | Waypoint Asset Co 7 Limited | 9689 |
| MSN 7152 Trust | N/A | Waypoint Asset Euro 7A Limited | 2406 |
| MSN 7172 Trust | N/A | Waypoint Asset Co 8 Limited | 2532 |
| Waypoint Asset Funding 3 LLC | 4960 | MSN 31041 Trust | N/A |
| Waypoint Asset Malta Ltd | 5348 | MSN 31203 Trust | N/A |
| Waypoint Leasing Labuan 3A Limited | 8120 | MSN 31578 Trust | N/A |
| Waypoint Leasing UK 3A Limited | 0702 | MSN 760617 Trust | N/A |
| Waypoint Asset Co 4 Limited | 0301 | MSN 760624 Trust | N/A |
| Waypoint Asset Co 5 Limited | 7128 | MSN 760626 Trust | N/A |
| MSN 1251 Trust | N/A | MSN 760765 Trust | N/A |
| MSN 14786 Trust | N/A | MSN 920063 Trust | N/A |
| MSN 2047 Trust | N/A | MSN 920112 Trust | N/A |
| MSN 2057 Trust | N/A | Waypoint 206 Trust | N/A |
| Waypoint Asset Co 5B Limited | 2242 | Waypoint 407 Trust | N/A |
| Waypoint Leasing UK 5A Limited | 1970 | Waypoint Asset Euro 1B Limited | 3512 |
| Waypoint Asset Co 6 Limited | 8790 | Waypoint Asset Euro 1C Limited | 1060 |
| MSN 31042 Trust | N/A | MSN 20012 Trust | N/A |
| MSN 31295 Trust | N/A | MSN 20022 Trust | N/A |
| MSN 31308 Trust | N/A | MSN 20025 Trust | N/A |

2

| Debtor | Last 4 Digits of Tax ID Number | Debtor | Last 4 Digits of Tax ID Number |
|---|---|---|---|
| MSN 920119 Trust | N/A | MSN 920113 Trust | N/A |
| Waypoint Asset Funding 8 LLC | 4776 | Waypoint Asset Co Germany Limited | 5557 |
| Waypoint Leasing UK 8A Limited | 2906 | MSN 31046 Trust | N/A |
| Waypoint Leasing US 8A LLC | 8080 | MSN 41511 Trust | N/A |
| Waypoint Asset Co 9 Limited | 6340 | MSN 760608 Trust | N/A |
| MSN 20052 Trust | N/A | MSN 89007 Trust | N/A |
| MSN 31312 Trust | N/A | MSN 920141 Trust | N/A |
| MSN 41329 Trust | N/A | MSN 920152 Trust | N/A |
| MSN 760538 Trust | N/A | MSN 920153 Trust | N/A |
| MSN 760539 Trust | N/A | MSN 920273 Trust | N/A |
| MSN 760541 Trust | N/A | MSN 920281 Trust | N/A |
| MSN 760542 Trust | N/A | MSN 9205 Trust | N/A |
| Waypoint Asset Co 1B Limited | 5795 | MSN 9229 Trust | N/A |
| MSN 41272 Trust | N/A | Waypoint Asset Co 1A Limited | 1208 |
| Waypoint Asset Co 5A Limited | 4148 | Waypoint Leasing Labuan 1A Limited | 2299 |
| MSN 69052 Trust | N/A | Waypoint Asset Co 1C Limited | 0827 |
| Waypoint Asset Euro 9A Limited | 2276 | Waypoint Asset Co 1D Limited | 7018 |
| Waypoint Asset Euro 1E Limited | 6050 | Waypoint Asset Co 1F Limited | 6345 |
| Waypoint Leasing UK 9A Limited | 5686 | Waypoint Asset Co 1G Limited | 6494 |
| Waypoint Asset Sterling 9A Limited | 1161 | Waypoint Asset Co 1H Limited | 7349 |
| Waypoint Asset Company Number 1 (Ireland) Limited | 6861 | Waypoint Asset Co 1J Limited | 7729 |

3

| Debtor | Last 4 Digits of Tax ID Number | Debtor | Last 4 Digits of Tax ID Number |
|---|---|---|---|
| Waypoint Asset Euro 1D Limited | 1360 | MSN 20159 Trust | N/A |
| Waypoint Asset Co 1L Limited | 2360 | MSN 31431 Trust | N/A |
| Waypoint Asset Co 1M Limited | 5855 | MSN 760734 Trust | N/A |
| Waypoint Asset Co 1N Limited | 3701 | MSN 920024 Trust | N/A |
| Waypoint Asset Euro 1G Limited | 4786 | MSN 920030 Trust | N/A |
| Waypoint Asset Funding 1 LLC | 7392 | Waypoint Asset Funding 2 LLC | 7783 |
| Waypoint Leasing UK 1B Limited | 0592 | Waypoint Asset Co 1K Limited | 2087 |
| Waypoint Leasing UK 1C Limited | 0840 | Waypoint Leasing Services LLC | 8965 |
| Waypoint Asset Company Number 2 (Ireland) Limited | 7847 | Waypoint Leasing (Luxembourg) Euro S.à r.l. | 8928 |
| Waypoint 2916 Business Trust | N/A | | |

4

# EXHIBIT B

**Interim Order**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------x
                                             :

In re                               :        **Chapter 11**

                               :

**WAYPOINT LEASING**         :        **Case No. 18-13648 (SMB)**

**HOLDINGS LTD.,** *et al.*,       :

                               :        **(Jointly Administered)**

           **Debtors.**[1]        :

-------------------------------------------------------------x

### INTERIM ORDER PURSUANT TO
### 11 U.S.C. §§ 105, 361, 362, 363, 364, 507, AND 552,
### FED. R. BANKR. P. 2002, 4001, 6003, 6004, AND 9014,
### AND L. BANKR. R. 2002-1, 4001-2 9013-1, 9014-1, AND 9014-2
### (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN SENIOR SECURED
### PRIMING SUPERPRIORITY POSTPETITION FINANCING, (B) GRANT
### LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, AND
### (C) UTILIZE CASH COLLATERAL; (II) GRANTING ADEQUATE PROTECTION,
### (III) SCHEDULING FINAL HEARING; AND (IV) GRANTING RELATED RELIEF

Upon the motion dated December 7, 2018 (the "Motion")[2] [ECF No. __] of the

above-captioned debtors and debtors in possession (collectively, the "Debtors") in the above-

captioned chapter 11 cases (collectively, the "Chapter 11 Cases"), for entry of an interim order

(this "Interim Order") and a final order (the "Final Order"), pursuant to sections 105, 361, 362,

363(c), 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e), 507 and 552 of title 11 of the United

States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), Rules 2002, 4001, 6003, 6004,

9013 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rules

2002-1, 4001-2, 9013-1, 9014-1 and 9014-2 of the Local Bankruptcy Rules for the Southern

District of New York (the "Local Rules"), seeking, among other things:

---

[1] A list of the Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, is attached to the Motion as **Exhibit A**.

[2] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Motion or the applicable DIP Documents (as defined herein).

(1)      authorization for the DIP Borrowers (as defined herein) to (a) obtain postpetition

secured debtor in possession financing in an aggregate principal amount of up to $45,000,000

(the "DIP Facility"), of which (x) up to $30,000,000 shall be available to the DIP Borrowers upon

entry of this Interim Order and the satisfaction or waiver of the borrowing conditions set forth in

the DIP Credit Agreement (as defined below) and may be drawn in two draws by the DIP

Borrowers on or after the date the DIP Credit Agreement is fully executed and this Interim Order

has been entered and the full amount of the proceeds shall be deposited into a controlled deposit

account held in the name of WLIL and maintained in the United Kingdom (the "Central DIP

Account") and (y) subject to the entry of the Final Order and the borrowing conditions set forth in

the DIP Credit Agreement, any remaining undrawn amounts may be drawn and the full amount of

the proceeds shall be deposited into a segregated account (the "DIP Funding Account") maintained

in the United States in the name of the DIP Agent (as defined herein) which the DIP Borrowers

may draw from on a weekly basis subject to the satisfaction (or waiver) of the conditions precedent

of that certain Senior Secured Superpriority Debtor-In-Possession Credit Agreement (substantially

in the form attached hereto as Exhibit A, and as hereafter amended, restated, amended and restated,

supplemented or otherwise modified from time to time in accordance with the terms thereof and

hereof, the "DIP Credit Agreement"), by and among Waypoint Leasing Holdings Ltd.

("Holdings"), Waypoint Leasing (Luxembourg) S.a.r.l. ("LuxCo"), Waypoint Leasing (Ireland)

Limited ("WLIL"), and each of the borrowers under the Participating WAC Facilities (as defined

herein), as borrowers (each of the foregoing, a "DIP Borrower" and collectively, the "DIP

Borrowers"), and (i) each subsidiary of WLIL that is a guarantor under the Participating WAC

Facilities and (ii) Waypoint Asset Co. 11 Limited, as guarantors (collectively, the "DIP

Guarantors", and together with the DIP Borrowers, the "DIP Obligors"), Ankura Trust Company,

LLC, as administrative agent and collateral agent (in such capacities, the "DIP Agent") and the lenders party thereto from time to time (the "DIP Lenders" and, together with the DIP Agent, the "DIP Parties"), and (b) incur the "Secured Obligations" under and as defined in the DIP Credit Agreement (such Secured Obligations, shall be referred to herein as the "DIP Obligations") (the DIP Credit Agreement, together with this Interim Order, any Final Order and any related agreements, documents, certificates, instruments, exhibits and schedules delivered or executed from time to time in connection therewith, as amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms thereof and hereof, collectively, the "DIP Documents");

(2)      authorization for the DIP Obligors to execute and enter into the DIP Documents and to perform their respective obligations thereunder and such other and further acts as may be required in connection with the DIP Documents, including, without limitation, the payment of all principal, interest, fees, expenses, premiums, and other amounts payable under the DIP Documents as such amounts become due and payable;

(3)      authorization for the DIP Obligors to grant valid, enforceable, non-avoidable, automatically and fully perfected security interests, liens and superpriority claims, including allowed superpriority administrative expense claims pursuant to section 364(c)(1) of the Bankruptcy Code and liens pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code (and, solely as set forth in paragraph 8 of this Interim Order, priming liens pursuant to section 364(d)(1) of the Bankruptcy Code) to the DIP Agent, for the benefit of the DIP Parties, in the DIP Collateral (as defined herein) (and all proceeds thereof), to secure all DIP Obligations, as more fully set forth in this Interim Order;

3

(4)     authorization for the Debtors' use of any property constituting "Cash Collateral" as defined in section 363(a) of the Bankruptcy Code ("Cash Collateral") of the WAC Secured Parties (as defined herein) solely as provided herein and in accordance with the Approved Budget (as defined herein) and for the provision of adequate protection to the WAC Secured Parties for any Diminution in Value (as defined herein) of their respective interests in the WAC Collateral (as defined herein), in each case including any Cash Collateral, and with respect to Cash Collateral of the Participating WAC Secured Parties;

(5)     authorization for the DIP Borrowers to borrow, and the DIP Guarantors to guarantee, amounts under the DIP Facility in accordance with the terms and conditions of the DIP Documents to finance, in accordance with the Approved Budget (including any Permitted Variances thereto), the ongoing working capital and general corporate needs of the Debtors, including to (a) pay the required debt service under the DIP Documents, (b) pay the fees, costs, and expenses of the DIP Parties as set forth in the DIP Documents, (c) pay fees and expenses of professionals retained in the Chapter 11 Cases (d) fund the Carve-Out (as defined herein), and (e) make required adequate protection payments to the Participating WAC Secured Parties, including, but not limited to, payment of the Participating WAC Secured Parties' professional fees and expenses, and (f) fund the payment of the expense reimbursement of the stalking horse bidder;

(6)     modification of the automatic stay imposed under section 362 of the Bankruptcy Code, to the extent necessary, to implement and effectuate the terms and provisions of the DIP Documents and this Interim Order; and

(7)     the scheduling of a final hearing (the "Final Hearing") on the Motion for a date that is before the 30th day after the date of entry of the Interim Order to consider entry of a Final Order,

*inter alia*, authorizing the borrowings under the DIP Facility and use of Cash Collateral on a final basis and approval of notice procedures with respect thereto.

This Court having found that due and proper notice of the Motion and the hearing on the Motion (the "Interim Hearing") was provided by the Debtors in accordance with Bankruptcy Rules 2002, 4001 and 9014 and Local Rule 2002-1, and having held the Interim Hearing on December 10, 2018 after considering all the pleadings, motions and other papers filed with this Court and the evidence proffered or adduced on the record at the Interim Hearing; and all objections to the interim relief requested in the Motion having been withdrawn, resolved, or overruled by the Court; and it appearing to the Court that granting the interim relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing, is otherwise fair and reasonable and in the best interests of the Debtors, their creditors, their estates, and all parties-in-interest, represents a sound exercise of the Debtors' business judgment, and is necessary for the continued operation of the Debtors' businesses and preservation of the value of the Debtors' assets; and upon the record of these Chapter 11 Cases and after due deliberation and consideration and for good and sufficient cause appearing therefor:

**THE COURT HEREBY FINDS AND CONCLUDES AS FOLLOWS**:

A.    *Petition Date*.  On November 25, 2018 (the "Petition Date"), each Debtor filed a voluntary petition with this Court commencing a case under chapter 11 of the Bankruptcy Code.  The Debtors are continuing to operate their businesses and manage their respective properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in any of the Chapter 11 Cases.

B.    *Jurisdiction and Venue*.  This Court has jurisdiction over these proceedings pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the*

*United States District Court for the Southern District of New York*, dated January 31, 2012. This is a core proceeding pursuant to 28 U.S.C. § 157(b). The statutory and legal predicates for the relief sought herein are sections 105, 361, 362, 363, 364, 507 and 552 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003, 6004, 9013 and 9014 and Local Rules 2002-1, 4001-2, 9013-1, 9014-1 and 9014-2.

        C.    *Committee Formation*. As of the date hereof, no official committee of unsecured creditors or any other statutory committee (collectively, the "<u>Committee</u>") has been appointed in the Chapter 11 Cases.

        D.    *Debtors' Stipulations*. Without prejudice to the rights of any other non-Debtor party-in-interest with standing (but subject to the limitations thereon described in paragraph 20 below), the Debtors hereby admit, acknowledge, agree and stipulate as follows:

        (i)    *WAC1 Credit Facility*. Pursuant to that certain Amended and Restated Credit Agreement, dated as of November 8, 2013 (as amended, restated, supplemented, or otherwise modified from time to time, the "<u>WAC1 Credit Facility</u>" and collectively with the Credit Documents (as defined in the WAC1 Credit Facility) and any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, supplemented, waived or otherwise modified from time to time, the "<u>WAC1 Documents</u>"), among (a) Waypoint Asset Company Number 1 (Ireland) Limited and Waypoint Asset Funding 1 LLC (together, the "<u>WAC1 Borrowers</u>"), (b) the guarantor parties thereto (the "<u>WAC1 Guarantors</u>" and, together with the WAC1 Borrowers, the "<u>WAC1 Obligors</u>"), (c) SunTrust Bank, as administrative agent (in such capacity, the "<u>WAC1 Administrative Agent</u>"), (d) Wells Fargo Bank, National Association, as collateral agent (in such capacity, the "<u>WAC1 Collateral Agent</u>"), and (e) the lenders party thereto from time to time (the "<u>WAC1 Lenders</u>" and, collectively with the WAC1 Administrative Agent and WAC1 Collateral Agent, the "<u>WAC1 Secured Parties</u>"), the WAC1 Lenders provided revolving credit and other financial accommodations to the WAC1 Borrowers pursuant to the WAC1 Documents. Prior to the Petition Date, the WAC1 Credit Facility was subject to that certain WAC1 Forbearance Agreement, dated as of June 29, 2018 (as amended, restated, supplemented, or otherwise modified from time to time). The WAC1 Documents are valid and enforceable in accordance with their terms by the WAC1 Secured

Parties against, and are binding upon, each of the WAC1 Obligors party thereto.

(ii) *WAC1 Obligations.*  As of the Petition Date, the WAC1 Obligors were indebted to the WAC1 Secured Parties, without defense, counterclaim or offset of any kind, in respect of loans made under the WAC1 Documents in an amount, as of November 30, 2018, not less than $300,928,128 (including accrued and unpaid interest and fees), which amount, for the avoidance of doubt, does not include the WAC1 Secured Parties' accrued and unpaid attorneys' fees, costs, and expenses, or any premium, fee, make-whole or penalty payments otherwise required by the terms of the WAC1 Documents, including, without limitation, upon a prepayment or acceleration of the obligations thereunder (such amounts, together with any amounts incurred or accrued but unpaid prior to the Petition Date in accordance with the WAC1 Documents, including but not limited to, any expenses, disbursements, derivative obligations, indemnification obligations, and other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the WAC1 Obligors' obligations pursuant to the WAC1 Documents, collectively, the "WAC1 Obligations").  The WAC1 Obligations constitute legal, valid, enforceable, non-avoidable, and binding obligations of the WAC1 Obligors, and (a) no offsets, set offs, defenses, or counterclaims to the WAC1 Obligations exist, (b) no portion of the WAC1 Obligations is subject to avoidance, disallowance, recharacterization, reduction, or subordination pursuant to contract, the Bankruptcy Code, or other applicable law, (c) the WAC1 Obligations constitute allowed secured claims against each of the applicable WAC1 Obligors' estate; and (d) the WAC1 Obligors and their estates have no claim, objection, challenge or cause of action against the WAC1 Secured Parties or any of their respective successors, assigns, affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers, shareholders, and employees, past, present and future, and their respective heirs, predecessors, successors and assigns, whether arising under applicable state or federal law (including, without limitation, any recharacterization, subordination, avoidance, or other claims arising under or pursuant to sections 105, 510, or 542 through 553 of the Bankruptcy Code or any other applicable law), in connection with any of the WAC1 Documents (or the transactions contemplated thereunder), the WAC1 Obligations, the WAC1 Liens (as defined herein), or the WAC1 Collateral, including, without limitation, any right to assert any disgorgement or recovery.

(iii) *WAC1 Liens.*  To secure the WAC1 Obligations, the WAC1 Obligors granted to the WAC1 Collateral Agent, for its benefit and the benefit of the WAC1 Lenders, a security interest in and lien upon (the "WAC1 Liens")

certain categories of the WAC1 Obligors' respective assets, including (a) certain aircraft, aircraft leases and related assets (including bills of sale for such aircraft, and all rights, powers and remedies of the WAC1 Obligors with respect thereto, including claims by the WAC1 Obligors for damages in respect of the aircraft and related assets arising as a result of the default by the manufacturer under any bill of sale), (b) bank accounts and cash on deposit in certain of the WAC1 Obligors' bank accounts, and (c) shares of capital stock, in each case subject to the parameters set forth in the WAC1 Documents (the "WAC1 Collateral").   The WAC1 Liens were fully perfected as of the Petition Date and constitute legal, valid, binding, enforceable and perfected first priority liens in and to the WAC1 Collateral and are not subject to avoidance, reduction, disallowance, disgorgement, counterclaim, surcharge, or (other than as contemplated by the WAC1 Documents) subordination pursuant to the Bankruptcy Code or any other applicable law, and such liens had priority over any and all other liens on the WAC1 Collateral, subject only to certain legal, valid, properly-perfected, non-avoidable and senior in priority liens that are otherwise expressly permitted by the WAC1 Documents and in existence as of the Petition Date or that are perfected subsequent thereto as permitted by section 546(b) of the Bankruptcy Code (the "WAC1 Permitted Prior Liens").

(iv)    *WAC1 Cash Collateral.*  All of the WAC1 Obligors' cash, wherever located, including, without limitation, any cash in deposit accounts of the WAC1 Obligors, constitutes Cash Collateral of the WAC1 Collateral Agent and the WAC1 Lenders.

(v)    *WAC6 Credit Facility.*  Pursuant to that certain Credit Agreement, dated as of March 23, 2015 (as amended, restated supplemented, or otherwise modified from time to time, the "WAC6 Credit Facility" and collectively with the Credit Documents (as defined in the WAC6 Credit Facility) and any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, supplemented, waived, or otherwise modified from time to time, the "WAC6 Documents"), among (a) Waypoint Asset Co 6 Limited and Waypoint Asset Funding 6 LLC (together, the "WAC6 Borrowers"), (b) the guarantor parties thereto (the "WAC6 Guarantors" and, together with the WAC6 Borrowers, the "WAC6 Obligors"), (c) Bank of Utah, as both administrative agent (in such capacity, the "WAC6 Administrative Agent") and collateral agent (in such capacity, the "WAC6 Collateral Agent"), and (d) the lenders party thereto from time to time (the "WAC6 Lenders" and, collectively with the WAC6 Administrative Agent and WAC6 Collateral Agent, the "WAC6 Secured Parties"), the WAC6 Lenders provided credit and other financial accommodations to the WAC6 Borrowers pursuant to the WAC6 Documents. Prior to the Petition Date, the WAC6 Credit Facility is subject to that certain WAC6 Forbearance Agreement, dated as of June 29, 2018

8

(as amended, restated, supplemented, or otherwise modified from time to time).  The WAC6 Documents are valid and enforceable in accordance with their terms by the WAC6 Secured Parties against, and are binding upon, each of the WAC6 Obligors party thereto.

(vi)     *WAC6 Obligations.*  As of the Petition Date, the WAC6 Obligors were indebted to the WAC6 Secured Parties, without defense, counterclaim or offset of any kind, in respect of loans made under the WAC6 Documents in an amount, as of November 30, 2018, not less than $67,152,750.12 (including accrued but unpaid interest and fees), which amount, for the avoidance of doubt, does not include the WAC6 Secured Parties' accrued and unpaid attorneys' fees, costs, and expenses, or any premium, fee, make-whole, or penalty payments otherwise required by the terms of the WAC6 Documents, including, without limitation, upon a prepayment or acceleration of the obligations thereunder (such amounts, together with any amounts incurred or accrued but unpaid prior to the Petition Date in accordance with the WAC6 Documents, including but not limited to, any fees, expenses, disbursements, derivative obligations, indemnification obligations, and other charges, amounts, and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the WAC6 Obligors' obligations pursuant to the WAC6 Documents, collectively, the "WAC6 Obligations").  The WAC6 Obligations constitute legal, valid, enforceable, non-avoidable and binding obligations of the WAC6 Obligors, and (a) no offsets, set offs, defenses, or counterclaims to the WAC6 Obligations exist, (b) no portion of the WAC6 Obligations is subject to avoidance, disallowance, recharacterization, reduction or subordination pursuant to contract, the Bankruptcy Code or other applicable law, (c) the WAC6 Obligations constitute allowed secured claims against each of the applicable WAC6 Obligors' estate, and (d) the WAC6 Obligors and their estates have no claim, objection, challenge or cause of action against the WAC6 Secured Parties or any of their respective successors, assigns, affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers, shareholders, and employees, past, present and future, and their respective heirs, predecessors, successors and assigns, whether arising under applicable state or federal law (including, without limitation, any recharacterization, subordination, avoidance or other claims arising under or pursuant to sections 105, 510 or 542 through 553 of the Bankruptcy Code or any other applicable law), in connection with any of the WAC6 Documents (or the transactions contemplated thereunder), the WAC6 Obligations, the WAC6 Liens (as defined herein), or the WAC6 Collateral, including, without limitation, any right to assert any disgorgement or recovery.

9

(vii)   *WAC6 Liens.*   To secure the WAC6 Obligations, the WAC6 Obligors granted to the WAC6 Collateral Agent, for its benefit and the benefit of the WAC6 Lenders, a security interest in and lien upon (the "WAC6 Liens") certain categories of the WAC6 Obligors' respective assets, including (a) certain aircraft, aircraft leases and related assets (including bills of sale for such aircraft, and all rights, powers and remedies of the WAC6 Obligors with respect thereto, including claims by the WAC6 Obligors for damages in respect of the aircraft and related assets arising as a result of the default by the manufacturer under any bill of sale), (b) bank accounts and cash on deposit in certain of the WAC6 Obligors' bank accounts, and (c) shares of capital stock, in each case subject to the parameters set forth in the WAC6 Documents (the "WAC6 Collateral").   The WAC6 Liens were fully perfected as of the Petition Date and constitute legal, valid, binding, enforceable and perfected first priority liens in and to the WAC6 Collateral and are not subject to avoidance, reduction, disallowance, disgorgement, counterclaim, surcharge or (other than as contemplated by the WAC6 Documents) subordination pursuant to the Bankruptcy Code or any other applicable law, and such liens had priority over any and all other liens on the WAC6 Collateral, subject only to certain legal, valid, properly-perfected, non-avoidable and senior in priority liens that are otherwise expressly permitted by the WAC6 Documents and in existence as of the Petition Date or that are perfected subsequent thereto as permitted by section 546(b) of the Bankruptcy Code (the "WAC6 Permitted Prior Liens").

(viii)   *WAC6 Cash Collateral.*   All of the WAC6 Obligors' cash, wherever located, including, without limitation, any cash in deposit accounts of the WAC6 Obligors, constitutes Cash Collateral of the WAC6 Collateral Agent and the WAC6 Lenders.

(ix)   *WAC7 Credit Facility.*   Pursuant to that certain Amended and Restated Credit Agreement, dated as of April 28, 2017 (as amended, restated supplemented, or otherwise modified from time to time, the "WAC7 Credit Facility" and collectively with the Credit Documents (as defined in the WAC7 Credit Facility) and any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, supplemented, waived or otherwise modified from time to time, the "WAC7 Documents"), among (a) Waypoint Asset Co 7 Limited and Waypoint Asset Euro 7A Limited (together, the "WAC7 Borrowers"), (b) the guarantor parties thereto (the "WAC7 Guarantors" and, together with the WAC7 Borrowers, the "WAC7 Obligors"), (c) SunTrust Bank, as both administrative agent (in such capacity, the "WAC7 Administrative Agent") and collateral agent (in such capacity, the "WAC7 Collateral Agent"), and (d) the lenders party thereto from time to time (the "WAC7 Lenders", and, collectively with the WAC7 Administrative Agent and WAC7 Collateral Agent, the "WAC7 Secured Parties"), the WAC7 Lenders provided

10

revolving credit and other financial accommodations to the WAC7 Borrowers pursuant to the WAC7 Documents. Prior to the Petition Date, the WAC7 Credit Facility was subject to that certain WAC7 Forbearance Agreement, dated as of June 29, 2018 (as amended, restated supplemented, or otherwise modified from time to time). The WAC7 Documents are valid and enforceable in accordance with their terms by the WAC7 Secured Parties against, and are binding upon, each of the WAC7 Obligors party thereto.

(x)    *WAC7 Obligations.* As of the Petition Date, the WAC7 Obligors were indebted to the WAC7 Secured Parties, without defense, counterclaim or offset of any kind, in respect of loans made under the WAC7 Documents in an amount, as of November 30, 2018, not less than $103,286,119.26 (including accrued but unpaid interest and fees), which amount, for the avoidance of doubt, does not include the WAC7 Secured Parties' accrued and unpaid attorneys' fees, costs, and expenses, or any premium, fee, make-whole or penalty payments otherwise required by the terms of the WAC7 Documents, including, without limitation, upon a prepayment or acceleration of the obligations thereunder (such amounts, together with any amounts incurred or accrued but unpaid prior to the Petition Date in accordance with the WAC7 Documents, including but not limited to, any fees, expenses, disbursements, derivative obligations, indemnification obligations, and other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the WAC7 Obligors' obligations pursuant to the WAC7 Documents, collectively, the "WAC7 Obligations"). The WAC7 Obligations constitute legal, valid, enforceable, non-avoidable and binding obligations of the WAC7 Obligors, and (a) no offsets, set offs, defenses, or counterclaims to the WAC7 Obligations exist, (b) no portion of the WAC7 Obligations is subject to avoidance, disallowance, recharacterization, reduction or subordination pursuant to contract, the Bankruptcy Code or other applicable law, (c) the WAC7 Obligations constitute allowed secured claims against each of the applicable WAC7 Obligors' estate, and (d) the WAC7 Obligors and their estates have no claim, objection, challenge or cause of action against the WAC7 Secured Parties or any of their respective successors, assigns, affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers, shareholders, and employees, past, present and future, and their respective heirs, predecessors, successors and assigns, whether arising under applicable state or federal law (including, without limitation, any recharacterization, subordination, avoidance or other claims arising under or pursuant to sections 105, 510, or 542 through 553 of the Bankruptcy Code or any other applicable law), in connection with any of the WAC7 Documents (or the transactions contemplated thereunder), the WAC7 Obligations, the WAC7 Liens (as defined herein), or the WAC7

11

Collateral, including, without limitation, any right to assert any disgorgement or recovery.

(xi)     *WAC7 Liens*.  To secure the WAC7 Obligations, the WAC7 Obligors granted to the WAC7 Collateral Agent, for its benefit and the benefit of the WAC7 Lenders, a security interest in and lien upon (the "<u>WAC7 Liens</u>") certain categories of the WAC7 Obligors' respective assets, including (a) bank accounts and cash on deposit in certain of the WAC7 Obligors' bank accounts and (b) shares of capital stock, in each case subject to the parameters set forth in the WAC7 Documents (the "<u>WAC7 Collateral</u>"). The WAC7 Liens were fully perfected as of the Petition Date and constitute legal, valid, binding, enforceable, and perfected first priority liens in and to the WAC7 Collateral and are not subject to avoidance, reduction, disallowance, disgorgement, counterclaim, surcharge, (other than as contemplate by the WAC7 Documents) or subordination pursuant to the Bankruptcy Code or any other applicable law, and such liens had priority over any and all other liens on the WAC7 Collateral, subject only to certain legal, valid, properly-perfected, non-avoidable and senior in priority liens that are otherwise expressly permitted by the WAC7 Documents and in existence as of the Petition Date or that are perfected subsequent thereto as permitted by section 546(b) of the Bankruptcy Code (the "<u>WAC7 Permitted Prior Liens</u>").

(xii)    *WAC7 Cash Collateral*.  All of the WAC7 Obligors' cash, wherever located, including, without limitation, any cash in deposit accounts of the WAC7 Obligors, constitutes Cash Collateral of the WAC7 Collateral Agent and the WAC7 Lenders.

(xiii)   *WAC8 Senior Secured Notes*.  Pursuant to that certain Note Purchase Agreement, dated as of July 29, 2015 (as amended, restated supplemented, or otherwise modified from time to time, the "<u>WAC8 Note Purchase Agreement</u>" and collectively with the Credit Documents (as defined in the WAC8 Note Purchase Agreement) and any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, supplemented, waived or otherwise modified from time to time, the "<u>WAC8 Documents</u>"), among (a) Waypoint Asset Co 8 Limited and Waypoint Asset Funding 8 LLC (together, the "<u>WAC8 Borrowers</u>"), (b) the guarantor parties thereto (the "<u>WAC8 Guarantors</u>" and, together with the WAC8 Borrowers, the "<u>WAC8 Obligors</u>"), (c) Wells Fargo Bank, National Association, as both  administrative agent (in such capacity, the "<u>WAC8 Administrative Agent</u>") and collateral agent (in such capacity, the "<u>WAC8 Collateral Agent</u>"), and (d) the purchasers parties thereto (the "<u>WAC8 Holders</u>" and, collectively with the WAC8 Administrative Agent and WAC8 Collateral Agent, the "<u>WAC8 Secured Parties</u>"), the WAC8 Holders provided credit and other financial accommodations to the WAC8 Borrowers pursuant to the WAC8 Documents.  Prior to the Petition

Date, the WAC8 Note Purchase Agreement was subject to that certain WAC8 Forbearance Agreement, dated as of June 29, 2018 (as amended, restated, supplemented, or otherwise modified from time to time). The WAC8 Documents are valid and enforceable in accordance with their terms by the WAC8 Secured Parties against, and are binding upon, each of the WAC8 Obligors party thereto.

(xiv)    *WAC8 Obligations.* As of the Petition Date, the WAC8 Obligors were indebted to the WAC8 Secured Parties, without defense, counterclaim or offset of any kind, in respect of loans made under the WAC8 Documents in an amount, as of November 30, 2018, not less than $169,081,291.04 (including accrued but unpaid interest and fees), which amount, for the avoidance of doubt, does not include the Secured Parties' accrued and unpaid attorneys' fees, costs, and expenses, or any premium, fee, make whole or penalty payments otherwise required by the terms of the WAC8 Documents, including, without limitation, upon a prepayment or acceleration of the obligations thereunder) (such amounts, together with any amounts incurred or accrued but unpaid prior to the Petition Date in accordance with the WAC8 Documents, including but not limited to, any fees, expenses, disbursements, indemnification obligations, and other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing or chargeable in respect of any of the WAC8 Obligors' obligations pursuant to the WAC8 Documents, collectively, the "WAC8 Obligations"). The WAC8 Obligations constitute legal, valid, enforceable, non-avoidable and binding obligations of the WAC8 Obligors, and (a) no offsets, set offs defenses or counterclaims to the WAC8 Obligations exist, (b) no portion of the WAC8 Obligations is subject to avoidance, disallowance, recharacterization reduction or subordination pursuant to contract, the Bankruptcy Code or other applicable law, (c) the WAC8 Obligations constitute allowed secured claims against each of the applicable WAC8 Obligors' estate, and (d) the WAC8 Obligors and their estates have no claim, objection, challenge or cause of action against the WAC8 Secured Parties or any of their respective successors, assigns, affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers, shareholders, and employees, past, present and future, and their respective heirs, predecessors, successors and assigns, whether arising under applicable state or federal law (including, without limitation, any recharacterization, subordination, avoidance or other claims arising under or pursuant to sections 105, 510, or 542 through 553 of the Bankruptcy Code or any other applicable law), in connection with any of the WAC8 Documents (or the transactions contemplated thereunder), the WAC8 Obligations, the WAC8 Liens (as defined herein), or the WAC8 Collateral, including, without limitation, any right to assert any disgorgement or recovery.

13

(xv)     *WAC8 Liens*.  To secure the WAC8 Obligations, the WAC8 Obligors granted to the WAC8 Collateral Agent, for its benefit and the benefit of the WAC8 Holders, a security interest in and lien upon (the "WAC8 Liens") certain categories of the WAC8 Obligors' respective assets, including (a) certain aircraft, aircraft leases and related assets (including bills of sale for such aircraft, and all rights, powers and remedies of the WAC8 Obligors with respect thereto, including claims by the WAC8 Obligors for damages in respect of the aircraft and related assets arising as a result of the default by the manufacturer under any bill of sale), (b) bank accounts and cash on deposit in certain of the WAC8 Obligors' bank accounts, and (c) shares of capital stock, in each case subject to the parameters set forth in the WAC8 Documents (the "WAC8 Collateral").   The WAC8 Liens were fully perfected as of the Petition Date and constitute legal, valid, binding, enforceable and perfected first priority liens in and to the WAC8 Collateral and are not subject to avoidance, reduction, disallowance, disgorgement, counterclaim, surcharge or (other than as contemplated by the WAC8 Documents) subordination pursuant to the Bankruptcy Code or any other applicable law, and such liens had priority over any and all other liens on the WAC8 Collateral, subject only to certain legal, valid, properly-perfected, non-avoidable and senior in priority liens that are otherwise expressly permitted by the WAC8 Documents and in existence as of the Petition Date or that are perfected subsequent thereto as permitted by section 546(b) of the Bankruptcy Code (the "WAC8 Permitted Prior Liens").

(xvi)    *WAC8 Cash Collateral.*  All of the WAC8 Obligors' cash, wherever located, including, without limitation, any cash in deposit accounts of the WAC8 Obligors, constitutes Cash Collateral of the WAC8 Collateral Agent and the WAC8 Holders.

(xvii)   *WAC9 Credit Facility.*  Pursuant to that certain Credit Agreement, dated as of March 24, 2016 (as amended, restated supplemented, or otherwise modified from time to time, the "WAC9 Credit Facility" and collectively with the Credit Documents (as defined in the WAC9 Credit Facility) and any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, supplemented, waived or otherwise modified from time to time, the "WAC9 Documents"), among (a) Waypoint Asset Co 9 Limited, the "WAC9 Borrower"), (b) the guarantor parties thereto (the "WAC9 Guarantors" and, together with the WAC9 Borrower, the "WAC9 Obligors"), (c) Lombard North Central Plc, as both administrative agent (in such capacity, the "WAC9 Administrative Agent") and collateral agent (in such capacity, the "WAC9 Collateral Agent"), and (d) the lenders party thereto from time to time (the "WAC9 Lenders" and, collectively with the WAC9 Administrative Agent and WAC9 Collateral Agent, the "WAC9 Secured Parties"), the WAC9 Lenders

provided credit and other financial accommodations to the WAC9 Borrower pursuant to the WAC9 Documents. Prior to the Petition Date, the WAC9 Credit Facility was subject to that certain WAC9 Forbearance Agreement, dated as of June 29, 2018 (as amended, restated, supplemented, or otherwise modified from time to time). The WAC9 Documents are valid and enforceable in accordance with their terms by the WAC9 Secured Parties against, and are binding upon, each of the WAC9 Obligors party thereto.

(xviii)  *WAC9 Obligations.*  As of the Petition Date, the WAC9 Obligors were indebted to the WAC9 Secured Parties, without defense, counterclaim or offset of any kind, in respect of loans made under the WAC9 Documents in an amount, as of November 30, 2018, not less than $95,431,511.90 (including accrued but unpaid interest and fees), which amounts, for the avoidance of doubt, does not include the WAC9 Secured Parties' accrued and unpaid attorneys' fees, costs, and expenses, or any premium, fee, make-whole or penalty payments otherwise required by the terms of the WAC9 Documents, including, without limitation, upon a prepayment or acceleration of the obligations thereunder (such amounts, together with any amounts incurred or accrued but unpaid prior to the Petition Date in accordance with the WAC9 Documents, including but not limited to, any fees, expenses, disbursements, treasury, cash management, derivative obligations, indemnification obligations, and other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing or chargeable in respect of any of the WAC9 Obligors' obligations pursuant to the WAC9 Documents, collectively, the "WAC9 Obligations"). The WAC9 Obligations constitute legal, valid, enforceable, non-avoidable and binding obligations of the WAC9 Obligors, and (a) no offsets, set offs, defenses or counterclaims to the WAC9 Obligations exist, (b) no portion of the WAC9 Obligations is subject to avoidance, disallowance, recharacterization, reduction or subordination pursuant to contract, the Bankruptcy Code or other applicable law, (c) the WAC9 Obligations constitute allowed secured claims against each of the applicable WAC9 Obligors' estate, and (d) the WAC9 Obligors and their estates have no claim, objection, challenge or cause of action against the WAC9 Secured Parties or any of their respective successors, assigns, affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers, shareholders, and employees, past, present and future, and their respective heirs, predecessors, successors and assigns, whether arising under applicable state or federal law (including, without limitation, any recharacterization, subordination, avoidance or other claims arising under or pursuant to sections 105, 510, or 542 through 553 of the Bankruptcy Code), in connection with any of the WAC9 Documents (or the transactions contemplated thereunder), the WAC9 Obligations, the WAC9 Liens (as defined herein), or the WAC9

15

Collateral, including, without limitation, any right to assert any disgorgement or recovery.

(xix)    *WAC9 Liens*.  To secure the WAC9 Obligations, the WAC9 Obligors granted to the WAC9 Collateral Agent, for its benefit and the benefit of the WAC9 Lenders, a security interest in and lien upon (the "WAC9 Liens") certain categories of the WAC9 Obligors' respective assets, including (a) certain aircraft, aircraft leases and related assets (including bills of sale for such aircraft, and all rights, powers and remedies of the WAC9 Obligors with respect thereto, including claims by the WAC9 Obligors for damages in respect of the aircraft and related assets arising as a result of the default by the manufacturer under any bill of sale), (b) bank accounts and cash on deposit in certain of the WAC9 Obligors' bank accounts, and (c) shares of capital stock, in each case subject to the parameters set forth in the WAC9 Documents (the "WAC9 Collateral").  The WAC9 Liens were fully perfected as of the Petition Date and constitute legal, valid, binding, enforceable and perfected first priority liens in and to the WAC9 Collateral and are not subject to avoidance, reduction, disallowance, disgorgement, counterclaim, surcharge or (other than as contemplated by the WAC9 Documents) subordination pursuant to the Bankruptcy Code or any other applicable law, and such liens had priority over any and all other liens on the WAC9 Collateral, subject only to certain legal, valid, properly-perfected, non-avoidable and senior in priority liens that are otherwise expressly permitted by the WAC9 Documents and in existence as of the Petition Date or that are perfected subsequent thereto as permitted by section 546(b) of the Bankruptcy Code (the "WAC9 Permitted Prior Liens").

(xx)    *WAC9 Cash Collateral.*  All of the WAC9 Obligors' cash, wherever located, including, without limitation, any cash in deposit accounts of the WAC9 Obligors, constitutes Cash Collateral of the WAC9 Collateral Agent and the WAC9 Lenders.

(xxi)    *WAC12 Credit Facility.*  Pursuant to that certain Credit Agreement, dated as of August 2, 2017 (as amended, restated supplemented, or otherwise modified from time to time, the "WAC12 Credit Facility,"[3] and collectively with the Credit Documents (as defined in the WAC12 Credit Facility) and any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, supplemented, waived, or otherwise modified from time to time, the "WAC12 Documents")[4], among

---

[3]    The WAC1 Credit Facility, collectively with the WAC6 Credit Facility, the WAC7 Credit Facility, the WAC8 Note Purchase Agreement, the WAC9 Credit Facility and the WAC12 Credit Facility shall be referred to herein as the "Participating WAC Facilities."

[4]    The WAC12 Documents, collectively with the WAC1 Documents, the WAC6 Documents, the WAC7 Documents, the WAC8 Documents, and the WAC9 Documents shall be referred to herein as the "Participating

(a) Waypoint Asset Co 12 Limited (the "<u>WAC12 Borrower</u>"), (b) the guarantor parties thereto (the "<u>WAC12 Guarantors</u>" and, together with the WAC12 Borrower, the "<u>WAC12 Obligors</u>")[5], (c) Sumitomo Mitsui Banking Corporation, Brussels Branch, as administrative agent (in such capacity, the "<u>WAC12 Administrative Agent</u>")[6], (d) Sumitomo Mitsui Banking Corporation Europe Limited, as collateral agent (in such capacity, the "<u>WAC12 Collateral Agent</u>") [7], and (e) the lenders party thereto from time to time (the "<u>WAC12 Lenders</u>"[8] and, collectively with the WAC12 Administrative Agent, the WAC12 Collateral Agent, and each other Secured Party (as defined in the WAC12 Credit Facility), the "<u>WAC12 Secured Parties</u>")[9], the WAC12 Lenders provided credit and other financial accommodations to the WAC12 Borrower pursuant to the WAC12 Documents.  Prior to the Petition Date, the WAC12 Credit Facility was subject to that certain WAC12 Forbearance Agreement[10], dated as of June 29, 2018 (as amended, restated supplemented, or otherwise modified from time to time).  The WAC12 Documents are valid and enforceable in accordance with their terms by the WAC12 Secured Parties against, and are binding upon, each of the WAC12 Obligors party thereto.

---

WAC Loan Documents."

[5]    The WAC12 Obligors, collectively with the WAC1 Obligors, the WAC6 Obligors, the WAC7 Obligors, the WAC8 Obligors, and the WAC9 Obligors shall be referred to herein as the "<u>Participating WAC Obligors</u>" and together with the obligors under the Non-Participating WAC Facilities, the "<u>Prepetition Obligors</u>."  The Participating WAC Obligors in each of the respective Participating WAC Facilities shall each be referred to herein as a "<u>Participating</u> <u>WAC Group</u>."

[6]    The WAC12 Collateral Agent, collectively with the WAC1 Collateral Agent, the WAC6 Collateral Agent, the WAC7 Collateral Agent, the WAC8 Collateral Agent, and the WAC9 Collateral Agent, shall be referred to herein as the "<u>Participating WAC Collateral Agents</u>."

[7]    The WAC12 Administrative Agent, collectively with the WAC1 Administrative Agent, the WAC6 Administrative Agent, the WAC7 Administrative Agent, the WAC8 Administrative Agent, and the WAC9 Administrative Agent, shall be referred to herein as the "<u>Participating WAC Agents</u>."  For the avoidance of doubt, in each instance in which the consent or approval of the WAC8 Agent is required in this Interim Order or in the DIP Documents, the consent of the Required Noteholders (as defined in the WAC8 Documents) shall constitute the consent of the WAC8 Administrative Agent.  Each WAC Participating Agent, to the extent that it has not terminated the Debtors' ability to use Cash Collateral, a "<u>Prepetition Approving Party</u>" and collectively, the "<u>Prepetition Approving Parties</u>")

[8] The WAC12 Lenders, collectively with the WAC1 Lenders, the WAC6 Lenders, the WAC7 Lenders, the WAC8 Holders, and the WAC9 Lenders, shall be referred to herein as the "<u>Participating WAC Lenders</u>."

[9]    The WAC12 Secured Parties, collectively with the WAC1 Secured Parties, the WAC6 Secured Parties, the WAC7 Secured Parties, the WAC8 Secured Parties, and the WAC9 Secured Parties, shall be referred to herein as the "<u>Participating WAC Secured Parties</u>."

[10] The WAC12 Forbearance Agreement, collectively with the WAC1 Forbearance Agreement, the WAC6 Forbearance Agreement, the WAC7 Forbearance Agreement, the WAC8 Forbearance Agreement, and the WAC9 Forbearance Agreement, the "Forbearance Agreements."

(xxii) *WAC12 Obligations.*  As of the Petition Date, the WAC12 Obligors were indebted to the WAC12 Secured Parties, without defense, counterclaim or offset of any kind, in respect of loans made under the WAC12 Documents in an amount, as of November 30, 2018, not less than $114,755,129.35 (including accrued but unpaid interest), which amount, for the avoidance of doubt, does not include the WAC12 Secured Parties' accrued and unpaid attorneys' fees, costs, and expenses, or any premium, fee, make-whole or penalty payments otherwise required by the terms of the WAC12 Documents, including, without limitation, upon a prepayment or acceleration of the obligations thereunder (such amounts, together with any amounts incurred or accrued but unpaid prior to the Petition Date in accordance with the WAC12 Documents, including but not limited to, any fees, expenses, disbursements, derivative obligations, indemnification obligations, and other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the WAC12 Obligors' obligations pursuant to the WAC12 Documents, collectively, the "WAC12 Obligations")[11].  The WAC12 Obligations constitute legal, valid, enforceable, non-avoidable, and binding obligations of the WAC12 Obligors, and (a) no offsets, set offs, defenses or counterclaims to the WAC12 Obligations exist, (b) no portion of the WAC12 Obligations is subject to avoidance, disallowance, recharacterization reduction or subordination pursuant to the Bankruptcy Code or other applicable law, (c) the WAC12 Obligations constitute allowed secured claims against each of the applicable WAC12 Obligors' estate, and (d) the WAC12 Obligors and their estates have no claim, objection, challenge or cause of action against the WAC12 Secured Parties or any of their respective successors, assigns, affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers, shareholders, and employees, past, present and future, and their respective heirs, predecessors, successors and assigns, whether arising under applicable state or federal law (including, without limitation, any recharacterization, subordination, avoidance or other claims arising under or pursuant to sections 105, 510, or 542 through 553 of the Bankruptcy Code), in connection with any of the WAC12 Documents (or the transactions contemplated thereunder), the WAC12 Obligations, the WAC12 Liens (as defined herein), or the WAC12 Collateral, including, without limitation, any right to assert any disgorgement or recovery.

(xxiii) *WAC12 Liens.*  To secure the WAC12 Obligations, the WAC12 Obligors granted to the WAC12 Collateral Agent, for its benefit and the benefit of

---

[11]    The WAC12 Obligations, collectively with the WAC1 Obligations, the WAC6 Obligations, the WAC7 Obligations, the WAC8 Obligations, and the WAC9 Obligations, shall be referred to herein as the "Participating WAC Secured Obligations."

the WAC12 Secured Parties, a security interest in and lien upon (the "WAC12 Liens")[12] all Collateral (as defined in the WAC12 Credit Facility), including, without limitation, certain categories of the WAC12 Obligors' respective assets, including, (a) certain aircraft, aircraft leases and related assets, (b) bank accounts and cash on deposit in certain of the WAC12 Obligors' bank accounts, and (c) shares of capital stock, in each case subject to the parameters set forth in the WAC12 Documents (the "WAC12 Collateral")[13].  The WAC12 Liens were fully perfected as of the Petition Date and constitute legal, valid, binding, enforceable and perfected first priority liens in and to the WAC12 Collateral and are not subject to avoidance, reduction, disallowance, disgorgement, counterclaim, surcharge or subordination pursuant to the Bankruptcy Code or any other applicable law, and such liens had priority over any and all other liens on the WAC12 Collateral, subject only to certain legal, valid, properly-perfected, non-avoidable and senior in priority liens that are otherwise expressly permitted by the WAC12 Documents and in existence as of the Petition Date or that are perfected subsequent thereto as permitted by section 546(b) of the Bankruptcy Code (the "WAC12 Permitted Prior Liens")[14].

(xxiv)    *WAC12 Cash Collateral.*   All of the WAC12 Obligors' cash, wherever located, including, without limitation, any cash in deposit accounts of the WAC12 Obligors, constitutes Cash Collateral of the WAC12 Collateral Agent and the WAC12 Secured Parties.

(xxv)    As a result of, among other things, the commencement of the Chapter 11 Cases, the Participating WAC Obligors are in default of the Participating WAC Loan Documents; and subject to paragraph 20 hereof (except with respect to section 364(e) of the Bankruptcy Code), the Debtors and each Participating WAC Obligor hereby forever, unconditionally and irrevocably release, discharge and acquit the Participating WAC Secured Parties, the Steering Committee (as defined herein), the DIP Lenders, and the DIP Agent, and each of their respective successors, assigns, affiliates, parents,

---

[12]   The WAC12 Liens, collectively with the WAC1 Liens, the WAC6 Liens, the WAC7 Liens, the WAC8 Liens, and the WAC9 Liens, shall be referred to herein as the "Participating WAC Liens."

[13]   The WAC12 Collateral, collectively with the WAC1 Collateral, the WAC6 Collateral, the WAC7 Collateral, the WAC8 Collateral, and the WAC9 Collateral, shall be referred to herein as the "Participating WAC Collateral." In addition, the term "WAC Specific Collateral" shall mean all encumbered assets of each respective Participating WAC Group, including, without limitation, all aircraft fixed assets (together with the lease and other revenue associated therewith), subject to valid and perfected liens as of the Petition Date under the applicable Participating WAC Facility, as well as any assets of an entity (x) whose equity was pledged, via a valid and perfected equity pledge as of the Petition Date, to secure a Participating WAC Facility or (y) that is a subsidiary of an entity specified in (x).

[14]   The WAC12 Permitted Prior Liens, collectively with the WAC1 Permitted Prior Liens, the WAC6 Permitted Prior Liens, the WAC7 Permitted Prior Liens, the WAC8 Permitted Prior Liens, the WAC9 Permitted Prior Liens, and the WAC12 Permitted Prior Liens, the "Permitted Prior Liens."

subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers, shareholders, and employees, past, present and future, and their respective heirs, predecessors, successors and assigns (collectively, the "Releasees") of and from any and all claims, controversies, disputes, liabilities, obligations, demands, damages, expenses (including, without limitation, reasonable and documented out-of-pocket attorneys' fees), debts, liens, actions and causes of action of any and every nature whatsoever, whether arising in law or otherwise, and whether or not known or matured, arising out of or relating to the DIP Facility, the Participating WAC Secured Obligations, the Participating WAC Loan Documents, including, without limitation, (A) any so-called "lender liability" or equitable subordination claims or defenses, (B) any and all claims and causes of action arising under the Bankruptcy Code, and (C) any and all claims and causes of action with respect to the validity, priority, perfection or avoidability of the Participating WAC Liens and the Participating WAC Secured Obligations.  Subject to the entry of the Final Order, the Participating WAC Obligors further waive and release any defense, right of counterclaim, right of set-off or deduction to the payment of the Participating WAC Secured Obligations that the Participating WAC Obligors now have or may claim to have against the Releasees, arising out of, connected with or relating to any and all acts, omissions or events occurring prior to the Bankruptcy Court entering this Interim Order.

E.        Non-Participating WAC Facilities.  The Debtors reserve their rights with respect to the liens and claims asserted pursuant to the following prepetition facilities:

(i)      *WAC2 Credit Facility*.  That certain Credit Agreement, dated as of April 16, 2014 (as amended, restated, supplemented or otherwise modified from time to time, the "WAC2 Credit Facility" and collectively with the Credit Documents (as defined in the WAC2 Credit Facility) and any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, supplemented, waived, or otherwise modified from time to time, the "WAC2 Documents"), among (a) Waypoint Asset Company Number 2 (Ireland) Limited and Waypoint Asset Funding 2 LLC, as borrowers (together, the "WAC2 Borrowers"), (b) the guarantor parties thereto (the "WAC2 Guarantors" and, together with the WAC2 Borrowers, the "WAC2 Obligors), (c) Wells Fargo Bank, National Association, as both administrative agent (in such capacity, the "WAC2 Administrative Agent") and collateral agent (in such capacity, the "WAC2 Collateral Agent"), and (d) the lenders party thereto from time to time (collectively, the "WAC2 Lenders" and, collectively with the WAC2 Collateral Agent and the WAC2 Administrative Agent, the "WAC2 Secured Parties"), pursuant to which the WAC2 Lenders have provided to the

20

WAC2 Borrowers a term loan commitment in an aggregate principal amount of $72,500,000.

(ii)    *WAC2 Collateral*.  The WAC2 Secured Parties have asserted that the obligations under the WAC2 Facility are secured in accordance with the terms of certain local law security documents and that certain Aircraft Mortgage and Security Agreement, dated as of April 16, 2014 (as amended, restated, supplemented, or otherwise modified from time to time, the "WAC2 Aircraft Security Agreement"), by and among the WAC2 Borrowers, the additional grantors who from time to time become grantors thereto (collectively with the WAC2 Borrowers, the "WAC2 Grantors" and each a "WAC2 Grantor"), and the WAC2 Collateral Agent.  The WAC2 Secured Parties have asserted that pursuant to the WAC2 Aircraft Security Agreement, each WAC2 Grantor granted a first priority lien on (a) certain of such WAC2 Grantor's owned aircraft and related assets, including, without limitation, any bill of sale for such aircraft and all rights, powers, and remedies of the WAC2 Grantor with respect thereto, including claims by the WAC2 Grantor for damages in respect of the aircraft and related assets arising as a result of the default by the manufacturer under any bill of sale and all other intangible property relating to such aircraft and related assets, (b) the equity and beneficial interests such WAC2 Grantor holds in certain of its subsidiaries, if any, (c) cash on deposit in certain of such WAC2 Grantor's bank accounts, if any, and (d) certain aircraft leases and subleases, in each case to secure the obligations under the WAC2 Credit Facility, subject to the exceptions specified in the WAC2 Documents (collectively, the "WAC2 Collateral").

(iii)    *WAC2 Cash Collateral*.  The WAC2 Secured Parties have asserted that all of the WAC2 Obligors cash, including cash in deposit accounts of the WAC2 Obligors, wherever located, constitutes Cash Collateral of the WAC2 Collateral Agent and the WAC2 Lenders (the "WAC2 Cash Collateral").

(iv)    *WAC3 Credit Facility*.  That certain Credit Agreement, dated as of August 6, 2014 (as amended, restated, supplemented or otherwise modified from time to time, the "WAC3 Credit Facility" and collectively with the Credit Documents (as defined in the WAC3 Credit Facility) and any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, supplemented, waived, or otherwise modified from time to time, the "WAC3 Documents"), among (a) Waypoint Asset Co 3 Limited and Waypoint Asset Funding 3 LLC, as borrowers (collectively, the "WAC3 Borrowers"), (b) the guarantor parties thereto (the "WAC3 Guarantors" and, together with the WAC3 Borrowers, the "WAC3 Obligors), (c) the successor administrative agent thereto (in such capacity, the "WAC3 Administrative Agent"), (d) Wells Fargo Bank, National Association, as collateral agent (in such capacity, the "WAC3

21

Collateral Agent" ); and (e) the lenders party thereto from time to time (collectively, the "WAC3 Lenders" and, collectively with the WAC3 Collateral Agent and the WAC3 Administrative Agent, the "WAC3 Secured Parties"), pursuant to which the WAC3 Lenders have provided to the borrowers thereunder a term loan commitment in an aggregate principal amount of $340,000,000, which is composed of an initial term loan commitment of $300,000,000 and an incremental term loan commitment of $40,000,000.

(v)     *WAC3 Collateral*.  The WAC3 Secured Parties have asserted that the obligations under the WAC3 Credit Facility are secured in accordance with the terms of certain local law security documents and that certain Aircraft Mortgage and Security Agreement, dated as of August 6, 2014 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "WAC3 Aircraft Security Agreement"), by and among the WAC3 Borrowers, the additional grantors who from time to time become grantors thereto (collectively with the WAC3 Borrowers, the "WAC3 Grantors" and each a "WAC3 Grantor"), and the WAC3 Collateral Agent. The WAC3 Secured Parties have asserted that pursuant to the WAC3 Aircraft Security Agreement, each WAC3 Grantor granted a first priority lien on (a) certain of such WAC3 Grantor's owned aircraft and related assets, including, without limitation, any bill of sale for such aircraft and all rights, powers, and remedies of the WAC3 Grantor with respect thereto, including claims by the WAC3 Grantor for damages in respect of the aircraft and related assets arising as a result of the default by the manufacturer under any bill of sale and all other intangible property relating to such aircraft and related assets, (b) the equity and beneficial interests such WAC3 Grantor holds in certain of its subsidiaries, if any, (c) cash on deposit in certain of such WAC3 Grantor's bank accounts, if any, and (d) certain aircraft leases and subleases, in each case to secure the obligations under the WAC3 Facility, subject to the exceptions specified in the WAC3 Credit Documents (collectively, the "WAC3 Collateral").

(vi)    *WAC3 Cash Collateral*.  The WAC3 Secured Parties have asserted that all of the WAC3 Obligors cash, including cash in deposit accounts of the WAC3 Obligors, wherever located, constitutes Cash Collateral of the WAC3 Collateral Agent and the WAC3 Lenders (the "WAC3 Cash Collateral").

(vii)   *WAC10 Credit Facility*.  That certain Facility Agreement, dated as of February 21, 2017 (as amended, restated, supplemented, or otherwise modified from time to time, the "WAC10 Credit Facility"[15] and, together with all agreements and documents delivered pursuant thereto or in

---

[15] The WAC10 Credit Facility together with the WAC2 Credit Facility and the WAC3 Credit Facility, shall be referred to herein as the "Non-Participating WAC Facilities."

22

connection therewith, each as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "WAC10 Documents"), among (a) Waypoint Asset Co 10 Limited, as borrower (the "WAC10 Borrower"), (b) the guarantor parties thereto (the "WAC10 Guarantors" and, together with the WAC10 Borrowers, the "WAC10 Obligors"), and (c) Airbus Helicopters Financial Services Limited, as lender (in such capacity the "WAC10 Lender"), as agent (in such capacity, the "WAC10 Agent"), and as security trustee (in such capacity, the "WAC10 Security Trustee"[16] and together with the WAC10 Lender and the WAC10 Agent, the "WAC10 Secured Party"),[17] pursuant to which the WAC10 Lender has provided to the borrower thereunder a term loan commitment in an aggregate principal amount of €45 million.

(viii)   *WAC10 Collateral*.   The WAC10 Secured Party has asserted that the obligations under the WAC 10 Credit Facility are secured in accordance with the terms of certain aircraft mortgages, pledge agreements, deeds of charge, and other security documents (collectively, the "WAC10 Security Documents") granted by the WAC10 Borrower and Wells Fargo Bank Northwest, National Association, not in its individual capacity, but solely as owner trustee (collectively, the "WAC10 Grantors").   The WAC 10 Secured Party has asserted that pursuant to the terms of the WAC10 Security Documents, each WAC10 Grantor granted a first priority lien on (a) certain of such WAC10 Grantor's owned aircraft and related assets, including, without limitation, any bill of sale for such aircraft and all rights, powers, and remedies of the WAC10 Grantor with respect thereto, including claims by the WAC10 Grantor for damages in respect of the aircraft and related assets arising as a result of the default by the manufacturer under any bill of sale and all other intangible property relating to such aircraft and related assets, (b) the equity and beneficial interests such WAC10 Grantor holds in certain of its subsidiaries, if any, (c) cash on deposit in certain of such WAC10 Grantor's bank accounts, if any, and (d) certain aircraft leases and subleases, in each case to secure the obligations under the WAC10 Facility, subject to the exceptions specified in the WAC10 Security Documents (collectively, the "WAC10 Collateral").[18]

---

[16] The WAC10 Security Trustee together with the WAC10 Agent, the WAC2 Administrative Agent, the WAC2 Collateral Agent, the WAC3 Administrative Agent, and the WAC3 Collateral Agent, shall be referred to herein as the "Non-Participating WAC Agents.

[17] The WAC10 Secured Party together with the WAC2 Secured Parties and the WAC3 Secured Parties, shall be referred to herein as the "Non-Participating WAC Secured Parties."   The Non-Participating WAC Secured Parties together with the Participating WAC Secured Parties, shall be referred to herein as the "WAC Secured Parties."

[18] The WAC10 Collateral together with the WAC2 Collateral and the WAC3 Collateral, shall be referred to herein as the "Non-Participating WAC Collateral."   The Non-Participating WAC Collateral together with the Participating WAC Collateral, shall be referred to herein as the "WAC Collateral."

23

(ix)     *WAC10 Cash Collateral*.  The WAC10 Secured Party has asserted that all of the WAC10 Obligors cash, including any cash in deposit accounts of the WAC10 Obligors, wherever located, constitutes Cash Collateral of the WAC10 Security Trustee and the WAC10 Lender (the "WAC10 Cash Collateral").

F.     *Need for Postpetition Financing and Use of Cash Collateral*.

(i)     Based upon the pleadings and proceedings of record in the Chapter 11 Cases, the Debtors do not have sufficient available sources of working capital and financing to carry on the operation of their businesses without the DIP Facility and the use of Cash Collateral.  In addition, based on the record presented at the Interim Hearing: (i) the Debtors' critical need for financing and the use of Cash Collateral is immediate and the entry of this Interim Order is necessary to avoid immediate and irreparable harm to the Debtors' estates and the value of their assets; and (ii) in the absence of the DIP Facility and the use of Cash Collateral, the continued operation of the Debtors' businesses would not be possible and serious and irreparable harm to the Debtors and their estates would occur.

(ii)     Findings Regarding the Use of WAC2 Cash Collateral.  The Debtors need to continue to use the WAC2 Cash Collateral to, among other things, conduct their business operations, generate revenue, and preserve and maintain the value of the WAC2 Collateral.  The Debtors have an immediate need to use the WAC2 Cash Collateral to, among other things, preserve and maintain the value of the WAC2 Collateral, absent which, immediate and irreparable harm will result to the Debtors, their estates and their creditors. The terms and conditions for the use of the WAC2 Cash Collateral pursuant to this Interim Order are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and constitute reasonably equivalent value and fair consideration.  The use of the WAC2 Cash Collateral in accordance with the terms and conditions of this Interim Order is in the best interest of the Debtors' estates.

(iii)     Findings Regarding the Use of WAC3 Cash Collateral.  The Debtors need to continue to use the WAC3 Cash Collateral to, among other things, conduct their business operations, generate revenue, and preserve and maintain the value of the WAC3 Collateral.  The Debtors have an immediate need to use the WAC3 Cash Collateral to, among other things, preserve and maintain the value of the WAC3 Collateral, absent which, immediate and irreparable harm will result to the Debtors, their estates and their creditors. The terms and conditions for the use of the WAC3 Cash Collateral pursuant to this Interim Order are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and constitute reasonably equivalent value and fair consideration.  The use of

24

the WAC3 Cash Collateral in accordance with the terms and conditions of this Interim Order is in the best interest of the Debtors' estates.

(iv)     <u>Findings Regarding the Use of WAC10 Cash Collateral</u>.  The Debtors need to continue to use the WAC10 Cash Collateral to, among other things, conduct their business operations, generate revenue, and preserve and maintain the value of the WAC10 Collateral.  The Debtors have an immediate need to use the WAC10 Cash Collateral to, among other things, preserve and maintain the value of the WAC10 Collateral, absent which, immediate and irreparable harm will result to the Debtors, their estates and their creditors.  The terms and conditions for the use of the WAC10 Cash Collateral pursuant to this Interim Order are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and constitute reasonably equivalent value and fair consideration.  The use of the WAC10 Cash Collateral in accordance with the terms and conditions of this Interim Order is in the best interest of the Debtors' estates.

G.     <u>*No Credit on More Favorable Terms*</u>.  Based upon, among other things, the testimony contained in the Niemann Declaration, given their current financial condition, financing arrangements and capital structure, the Debtors are unable to obtain sufficient interim and long-term financing from sources other than the DIP Lenders on terms more favorable than under the DIP Facility and the DIP Documents, and are not able to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code.  The Debtors also have been unable to obtain sufficient credit (i) having priority over administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, (ii) secured solely by a lien on property of the Debtors and their estates that is not otherwise subject to a lien, or (iii) secured solely by a junior lien on property of the Debtors and their estates that is subject to a lien. Postpetition financing is unavailable to the Debtors without providing the DIP Agent for the benefit of itself and the DIP Lenders: (i) the DIP Liens in the DIP Collateral, as provided herein and in the DIP Documents with the priorities set forth herein; (ii) the DIP Superpriority Claims (as defined herein); and (iii) the other protections set forth in this Interim Order.  After considering all

alternatives, the Debtors have concluded, in the exercise of their sound business judgment, that the DIP Facility represents the best financing available to them at this time, and is in the best interests of all of their stakeholders.

H.    *Findings Regarding the DIP Facility*.  Based upon the pleadings and proceedings of record in the Chapter 11 Cases, (i) the terms and conditions of the DIP Facility are fair and reasonable, are the best available to the Debtors under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and are supported by reasonably equivalent value and fair consideration, (ii) the terms and conditions of the DIP Facility and the use of the Cash Collateral have been negotiated in good faith and at arm's length among the Debtors, the DIP Parties, and the Participating WAC Lenders, with the assistance and counsel of their respective advisors, (iii) the use of Cash Collateral including, without limitation, pursuant to this Interim Order, has been allowed in "good faith" within the meaning of section 364(e) of the Bankruptcy Code, (iv) any credit extended, loans made, and other financial accommodations extended to the DIP Borrowers by the DIP Parties, including, without limitation, pursuant to this Interim Order, have been allowed, advanced, extended, issued, or made, as the case may be, in "good faith" within the meaning of section 364(e) of the Bankruptcy Code by the DIP Parties in express reliance upon the protections offered by Bankruptcy Code section 364(e), and (v) the DIP Facility, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, and Adequate Protection Claims (each as defined below) shall be entitled to the full protection of Bankruptcy Code section 364(e) in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

I.    *Sections 506(c) and 552(b)*.  As a material inducement to the DIP Parties to agree to provide the DIP Facility, and in exchange for (i) the DIP Agent's and the DIP Lenders'

agreement to subordinate their liens and superpriority claims to the Carve-Out and Intercompany

Protection Liens, and (ii) the Participating WAC Secured Parties' agreement to (a) subordinate

their Adequate Protection Liens (as defined herein) and any prepetition liens to the DIP Liens, the

Carve-Out, and the Intercompany Protection Liens, and (b) the consensual use of Cash Collateral

in accordance with and subject to the Approved Budget (including any Permitted Variances

thereto) and the terms of this Interim Order, the Debtors intend to seek a finding in the Final Order

that each of the DIP Agent, the DIP Lenders, and the Participating WAC Secured Parties are

entitled to receive, (x) a waiver of any equities of the case exceptions or claims under section

552(b) of the Bankruptcy Code, and (y) a waiver of the provisions of section 506(c) of the

Bankruptcy Code subject to the terms hereof.

J.      *Use of Proceeds of the DIP Facility; Use of Cash Collateral; Consent of*

*Participating WAC Secured Parties*.  The Debtors have received the necessary consents from the

Participating WAC Secured Parties to the (i) financing arrangements contemplated by this Interim

Order and the DIP Documents and (ii) the Debtors' proposed use of the Participating WAC

Secured Parties' Cash Collateral, on the terms and conditions set forth in this Interim Order.  Such

consents are expressly limited to the postpetition financing being provided by the DIP Lenders and

the use of Cash Collateral (in each case as contemplated by this Interim Order and the DIP

Documents and in accordance with the Approved Budget) and the provision of adequate protection

as provided herein, and shall not extend to any other postpetition financing or to any modified

version of the DIP Facility or to any other use of the WAC Secured Parties' Cash Collateral, except

as otherwise provided herein or in the DIP Documents.  The priming of the Participating WAC

Liens on the Participating WAC Collateral under section 364(d)(l) of the Bankruptcy Code, as

contemplated by this Interim Order and the DIP Facility and as further described below, will enable

27

the DIP Borrowers to obtain the DIP Facility and, among other benefits, continue to operate their businesses for the benefit of their estates and stakeholders.  The Participating WAC Agents, on behalf of, and at the direction of, the required lenders or noteholders, as applicable, under the applicable Participating WAC Facility, consent to the priming of the Participating WAC Liens on the WAC Specific Collateral, up to the Maximum Intercompany Balance (as defined herein) with respect to each Participating WAC Facility, solely to the extent contemplated by this Interim Order and the DIP Facility and have no objection to the adequate protection thereof as provided in this Interim Order.  Further, as a condition to entry into the DIP Documents, the extension of credit under the DIP Facility and the authorization to use the Participating WAC Secured Parties' Cash Collateral as provided in this Interim Order, the DIP Parties and the Participating WAC Secured Parties require, and the Debtors have agreed, that proceeds of the DIP Facility and the Participating WAC Secured Parties' Cash Collateral shall be used, in each case only in a manner consistent with the terms and conditions of the DIP Documents and this Interim Order and in accordance with the Approved Budget (subject to the Permitted Variances) (as the same may be modified from time to time consistent with the terms of the DIP Documents and subject to such variances as permitted in the DIP Credit Agreement), solely for the purposes set forth in the DIP Credit Agreement and this Interim Order, including ongoing working capital and general corporate needs of the Debtors, including to (a) pay the required debt service under the DIP Documents (b) pay the fees, costs, and expenses of the DIP Parties as set forth in the DIP Documents, (c) pay fees and expenses of professionals retained in the Chapter 11 Cases, (d) fund the Carve-Out, (e) make required adequate protection payments to the Participating WAC Secured Parties, including, but not limited to, payment of the Participating WAC Secured Parties' professional fees and expenses, and (f) fund the payment of the expense reimbursement of the stalking horse bidder; provided, that in no event

shall any proceeds of the DIP Facility or the Participating WAC Secured Parties' Cash Collateral be (a) transferred to (i) Waypoint Asset Company Number 2 (Ireland) Limited, (ii) Waypoint Asset Co 3 Limited, (iii) Waypoint Asset Co 10 Limited, or (iv) any of their respective subsidiaries (each of (i)-(iv), a **"Non-Participating WAC Group"**[19]); or (b) used to make payments for a Non-Participating WAC Group, except as expressly set forth in the Approved Budget (including any Permitted Variances thereto).

K.    *Adequate Protection*.

(i)    The Participating WAC Secured Parties are entitled to receive adequate protection as set forth in this Interim Order pursuant to sections 361, 362, 363, 364, and 507(b) of the Bankruptcy Code for any diminution in value of their respective interests in the Participating WAC Collateral, including the Participating WAC Secured Parties' Cash Collateral, resulting from, arising from, or attributable to, among other things, (a) the Debtors' use, sale or lease of the Participating WAC Collateral, including the Participating WAC Secured Parties' Cash Collateral, (b) the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code and (c) the priming of the Participating WAC Liens by the DIP Liens, the Intercompany Protection Liens, and the Carve-Out (collectively, and solely to the extent of any such diminution in value, the "Diminution in Value").

(ii)    The Non-Participating WAC Secured Parties are entitled to receive adequate protection as set forth in this Interim Order pursuant to sections 361 and 363 of the Bankruptcy Code for any diminution in value of their respective purported interests in the Non-Participating WAC Collateral, including the Non-Participating WAC Secured Parties' Cash Collateral, resulting from, arising from, or attributable to, among other things, (a) the Debtors' use, sale or lease of the Non-Participating WAC Collateral, including the Non-Participating WAC Secured Parties' Cash Collateral and (b) the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code (collectively, and solely to the extent of any such diminution in value).

---

[19] Collectively, the Non-Participating WAC Groups and the Participating WAC Groups, the "WAC Groups."

L.    _Other Liens_.  Nothing herein shall constitute a finding or ruling by this Court that any alleged Permitted Prior Lien or lien securing a Non-Participating WAC Facility[20] is valid, senior, enforceable, prior, perfected, or nonavoidable.  Moreover, nothing shall prejudice the rights of any party-in-interest, including but not limited to the Debtors, the DIP Parties, the Participating WAC Secured Parties, and the Committee, to challenge the validity, priority, enforceability, seniority, avoidability, perfection, or extent of any alleged or asserted lien or security interest against any asset of the Debtors other than the Participating WAC Liens, the DIP Liens, and the Intercompany Protection Liens.

M.    _Notice_.  The Debtors have provided notice of the Interim Hearing and the proposed entry of this Interim Order to: (a) William K. Harrington (the "U.S. Trustee"), U.S. Department of Justice, Office of the U.S. Trustee, 201 Varick Street, Room 1006, New York, NY 10014 (Attn: Andrea B. Schwartz, Esq.); (b) the Debtors' thirty (30) largest unsecured creditors on a consolidated basis; (c) the Internal Revenue Service and any other applicable taxing authority; (d) the United States Attorney's Office for the Southern District of New York; (e) Milbank, Tweed, Hadley & McCloy LLP ("Milbank"), as counsel to the committee of lenders (the "Steering Committee") under the Participating WAC Facilities and the DIP Facility; (f) Alston & Bird LLP ("Alston & Bird"), as counsel to the WAC1 Administrative Agent and the WAC7 Agent; (g) Mayer Brown LLP ("Mayer Brown"), as counsel to the WAC2 Administrative Agent; (h) Mayer Brown, as counsel to the WAC3 Administrative Agent; (i)  Norton Rose Fulbright US LLP ("Norton Rose"), as counsel to the WAC6 Agent; (j) Akin Gump Strauss Hauer & Feld LLP ("Akin"), as counsel to the WAC8 Noteholders; (k) Sullivan & Cromwell, LLP ("S&C"), as

---

[20] Collectively, the Non-Participating WAC Facilities and the Participating WAC Facilities, shall be referred to herein as  the "Prepetition WAC Facilities."

counsel to the WAC9 Agent; (l) counsel to Airbus Helicopters Financial Services Limited, as agent

under a Non-Participating WAC Facility; (m) Clifford Chance ("Clifford Chance"), as counsel to

the WAC12 Agent; (n) Winston & Strawn LLP ("Winston") as counsel to the DIP Agent; (o)

counsel to MSD Capital, L.P., Quantum Strategic Partners Ltd., and Cartesian Capital Group LLC;

(p) all known parties, to the best of the Debtors' knowledge, information, or belief, asserting a lien

against the DIP Collateral; and (q) any other party that has filed a request for notice pursuant to

Bankruptcy Rule 2002 or is required to receive notice under the Bankruptcy Rules.  Requisite

notice of the Motion and the relief requested thereby and this Interim Order has been provided in

accordance with Bankruptcy Rules 2002 and 4001, and no other notice need be provided for entry

of this Interim Order.

N.    *Immediate Entry*.  The Debtors have requested immediate entry of this

Interim Order pursuant to Bankruptcy Rules 4001(b)(2), 4001(c)(2) and 4001(d), and Local Rule

4001-2.  Absent entry of this Interim Order, the Debtors' businesses, properties and estates will be

immediately and irreparably harmed.  Entry of this Interim Order is in the best interests of the

Debtors' respective estates and their creditors and the Motion and this Interim Order comply with

the requirements of Local Rule 4001-2.

Based on the foregoing, and upon the record made before this Court at the Interim

Hearing, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT**:

1.    Approval of Interim Order.  The Motion is granted, the DIP Facility is

authorized and approved and the use of the Cash Collateral is authorized on an interim basis, in

each case, subject to the terms and conditions set forth in this Interim Order and the DIP

Documents.  Any objections to the interim relief requested in the Motion that have not previously

been withdrawn, waived, settled, or resolved and all reservations of rights included therein, are hereby denied and overruled. This Interim Order shall become effective immediately upon its entry.

**DIP Facility Authorization**

2.        <u>Approval of DIP Documents; Authority Thereunder</u>. The DIP Obligors are hereby authorized to enter into, and execute and deliver, the DIP Documents, including, without limitation, the DIP Credit Agreement, and such additional documents, instruments, certificates and agreements as may be required or reasonably requested by the DIP Parties to implement the terms or effectuate the purposes of this Interim Order and the DIP Documents.

3.        <u>Validity of DIP Documents</u>. Upon (a) entry of this Interim Order and (b) execution and delivery of the DIP Documents, each of the DIP Documents shall constitute, and is hereby deemed to be, the legal, valid and binding obligation of the DIP Obligors party thereto, enforceable against each such DIP Obligor, its estate, and any successor thereto (including any trustee or other estate representative appointed or elected in the Chapter 11 Cases or any successor cases and/or upon the dismissal of any of the Chapter 11 Cases or any successor cases), in accordance with its terms. Loans advanced under the DIP Credit Agreement until the Final Hearing will be made to fund the Debtors' working capital and general corporate needs to pay such amounts as are required or permitted to be paid pursuant to the DIP Credit Agreement, this Interim Order and any other orders of this Court, in each case to the extent permitted under the DIP Credit Agreement and the Approved Budget (subject to the Permitted Variances). No obligation, payment, transfer or grant of security under the DIP Documents or this Interim Order with respect to the DIP Facility shall be stayed, restrained, voided, voidable or recoverable under the

Bankruptcy Code or under any applicable non-bankruptcy law, or subject to any defense, reduction, setoff, recoupment or counterclaim.

4.      <u>Authorization to Borrow</u>.  Upon entry of this Interim Order and during the period prior to entry of any final order on the Motion, the DIP Borrowers are immediately authorized to borrow from the DIP Lenders under the DIP Facility in two draws in an aggregate principal amount of $30,000,000, subject to the terms and conditions set forth in the DIP Documents and this Interim Order and in accordance with the Approved Budget (subject to the Permitted Variances), and the DIP Guarantors are authorized to guarantee such borrowing.  The first such draw, in a principal amount of $15,000,000, may be made immediately provided that the Debtors have filed a motion seeking approval of an Acceptable Bidding Procedures Order (as defined below).  The second such draw, in a principal amount of $15,000,000, may be made upon entry of an Acceptable Bidding Procedures Order.  The DIP Lenders shall have no obligation to make any loan or advance under the DIP Documents unless all of the conditions precedent to the making of such extension of credit under the DIP Documents and this Interim Order have been satisfied in full or waived by the DIP Agent acting at the direction of the Required DIP Lenders.  Once repaid or prepaid, the DIP Loans incurred under the DIP Facility may not be re-borrowed.

5.      <u>Payment of DIP Costs and Expenses</u>.  Subject to the limitations set forth below, the DIP Borrowers are hereby authorized to and shall pay all fees, costs, expenses, premiums and other amounts as and when payable under the terms of the DIP Documents and all other reasonable and documented out-of-pocket costs and expenses of the DIP Parties and Steering Committee in accordance with the terms of this Interim Order and the DIP Documents as and when such amounts become due and payable (including, without limitation, the reasonable and documented prepetition and postpetition fees and out-of-pocket costs and expenses of (a) Milbank,

as counsel to the Steering Committee, (b) Alvarez & Marsal Securities, LLC ("A&M"), as financial advisor to the Steering Committee (including the $2,500,000 "Completion Fee" described in the engagement letter dated June 13, 2018 (the "A&M Completion Fee")), (c) Winston, as counsel to the DIP Agent and (d) one counsel in each relevant jurisdiction to the DIP Agent, subject to receiving a written invoice therefor).  None of such fees, costs, expenses or other amounts shall be subject to Court approval (subject to the limitations below) or U.S. Trustee guidelines, and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with this Court; provided, however, that copies of any such invoices provided to the Debtors shall be provided contemporaneously to the U.S. Trustee, counsel to the Steering Committee, and counsel to the Committee (if any); provided, further, however, that such invoices may be in summary form and may contain redactions, and in no event shall such invoices be required to contain time entries, and for the avoidance of doubt, the provision of such invoices shall not constitute a waiver of the attorney-client privilege or any benefits of the attorney work product doctrine.  If the Debtors, the U.S. Trustee or the Committee (if any) objects to the reasonableness of the fees and expenses of any DIP Parties, and such objection cannot be resolved within ten (10) calendar days of receipt of such invoices, the Debtors, the U.S. Trustee or the Committee (if any), as the case may be, shall file with the Court and serve on such DIP Parties and such professional (with a copy to the Debtors) an objection limited to the reasonableness of such fees and expenses and detailing with specificity which fees and/or expenses are being objected to (each, a "Fee Objection").  The professional fees of the DIP Parties shall not be subject to the provisions of sections 327, 328, 329, 330 or 331 of the Bankruptcy Code.  The Debtors shall pay the fees and expenses of the DIP Parties in accordance with the terms and conditions of the DIP Documents and this Interim Order within fifteen (15) calendar days after receipt of the applicable

34

invoice (a) the full amount invoiced if no Fee Objection has been timely filed, and (b) the undisputed fees, costs, and expenses reflected on any invoice to which a Fee Objection has been timely filed. All such unpaid fees, costs, expenses and other amounts owed or payable to the DIP Parties shall be secured by the DIP Collateral and afforded all of the priorities and protections afforded to the DIP Obligations under this Interim Order and the DIP Documents.

6.    Indemnification. The DIP Borrowers are hereby authorized to and hereby agree to indemnify and hold harmless the DIP Parties (in their capacity as such) and, solely in their capacities as such, each of their respective officers, directors, employees, representatives, agents, partners, administrators, managers, advisors, trustees, successors, permitted assigns, and Affiliates (each, an "Indemnified Party") from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses (including, without limitation, reasonable and documented out-of-pocket attorney's fees) or disbursements of any nature whatsoever which may be imposed on, incurred by or asserted against an Indemnified Party in any way relating to or arising out of any of the DIP Documents or any other document contemplated hereby or thereby or the transactions contemplated thereby or by this Interim Order or any action taken or omitted by the DIP Parties under any of the DIP Documents or any document contemplated hereby or thereby; provided that the DIP Borrowers shall not have any obligation to indemnify and hold harmless any Indemnified Party under this paragraph with respect to any matter resulting from (a) the fraud, gross negligence, bad faith or willful misconduct of such Indemnified Party, as determined by a court of competent jurisdiction in a final non-appealable judgment, (b) violations by such Indemnified Party of this Interim Order, or from breaches by such Indemnified Party of the DIP Documents, in each case as determined by a court of competent jurisdiction in a final non-appealable judgment or order, (c) any misrepresentation or the

35

inaccuracy of any representation or warranty made by such Indemnified Party in relation to any Credit Document to which it is a party (but excluding any misrepresentation in consequence of a misrepresentation by any other party to a Credit Documents or a failure by any other party to a Credit Document to perform any of its obligations thereunder), (d) ordinary and usual operating or overhead expenses of the Indemnified Party unless incurred after an Event of Default, in which circumstances the Credit Parties shall only be obligated to indemnify such Indemnified Party in respect of expenses to the extent that they are properly incurred and, if they relate to the expenditure of management time, to the extent that the time so expended was material.  No Indemnified Party shall have any liability (whether direct or indirect, in contract, tort or otherwise) to any Debtor or any of its subsidiaries or any shareholders or creditors of the foregoing for or in connection with the transactions contemplated hereby, except to the extent such liability is determined by a court of competent jurisdiction in a final non-appealable judgment or order to have resulted from such Indemnified Party's (x) fraud, gross negligence or willful misconduct, (y) violations of this Interim Order or from material breaches of the DIP Documents (other than a breach in consequence of a failure by any other party to a DIP Document to perform any of its obligations under any DIP Document) or (z) any misrepresentation or the inaccuracy of any representation or warranty made by such Indemnified Party in relation to any Credit Document to which it is a party (but excluding any misrepresentation in consequence of a misrepresentation by any other party to a Credit Documents or a failure by any other party to a Credit Document to perform any of its obligations thereunder).  All indemnities made or owed by any Debtor to the Indemnified Parties shall be secured by the DIP Collateral and afforded all of the priorities and protections afforded to the DIP Obligations under this Interim Order and the DIP Documents.

36

7.      <u>DIP Superpriority Claims</u>.  The DIP Agent, for the benefit of the DIP

Lenders, shall be granted, pursuant to Bankruptcy Code section 364(c)(1), and  the DIP Obligations

shall constitute, superpriority administrative expense claims against each of (a) Holdings,

(b) WLIL, (c) LuxCo, and (d) each DIP Obligor whose equity interests nor those of its direct or

indirect parent have been pledged to a Participating WAC Agent on account of a Participating

WAC Facility ((a) through (d), collectively, the "<u>Non-WAC Group Obligors</u>"), on a joint and

several basis (the "<u>DIP Parent Claims</u>"), subject to the Intercompany Protection Claims and the

Carve-Out.  In addition, the DIP Agent, for the benefit of the DIP Lenders, shall be granted,

pursuant to Bankruptcy Code section 364(c)(1), and  the DIP Obligations shall constitute, joint

and several superpriority administrative expense claims (a "<u>WAC DIP Claim</u>" and together with

the DIP Parent Claims, the "<u>DIP Superpriority Claims</u>") against each Participating WAC Group

(but, for avoidance of doubt, the joint and several obligation will be within a given Participating

WAC Group, not between Participating WAC Groups) in the amount of such Participating WAC

Group's Net WLIL Intercompany Claim (as defined below), which can never exceed its

"<u>Maximum Intercompany Balance</u>," which shall mean the amount equal to the lesser of (a) the

"<u>WAC Specific Cap</u>" for each Participating WAC Group as set forth on <u>Exhibit C</u> to hereto (which

amount, for any Participating WAC Group, may not be amended without the consent of the

relevant Prepetition Approving Party) and (b) a loan to value coverage floor for each Participating

WAC Group as set forth on <u>Exhibit C</u> hereto (its "<u>LTV Coverage Floor</u>") with respect to each

respective Participating WAC Group (which amount, for any Participating WAC Group, may not

be amended without the consent of the relevant Prepetition Approving Party), subject in each case

only to (i) the Intercompany Protection Claims (as defined herein) and (ii) the Carve-Out.  The

DIP Superpriority Claims shall have priority in payment over any and all administrative expenses

37

at any time existing or arising against the obligors thereof, of any kind or nature whatsoever, including, without limitation, the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, but not limited to, Bankruptcy Code sections 105, 326, 328, 330, 331, 364, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1113 and 1114 or otherwise, including those resulting from the conversion of any of the Chapter 11 Cases pursuant to section 1112 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment; provided, however, that the DIP Superpriority Claims shall be subject to the payment in full in cash of any amounts due (a) under the Carve-Out and (b) on account of the Intercompany Protection Claims; provided, further, that the DIP Superpriority Claims shall have recourse to and be payable from all prepetition and postpetition property of the DIP Obligors and their estates and all proceeds thereof based on the priorities and subject to the limitations set forth herein; provided that the proceeds of avoidance actions under chapter 5 of the Bankruptcy Code or other applicable bankruptcy or non-bankruptcy law ("Avoidance Actions") will not be available to fund such DIP Superpriority Claims unless so provided in the Final Order.

        8.      DIP Liens.

        (a)      As security for the DIP Obligations, immediately upon, and effective as of entry of this Interim Order, the DIP Agent, for the benefit of itself and the DIP Lenders, is hereby granted continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected security interests in and liens (collectively, the "DIP Liens") on all DIP Collateral as collateral security for the prompt and complete performance and payment when due (whether at the stated maturity, by acceleration or otherwise) of the DIP Obligations. The term "DIP Collateral" means all assets and properties (whether tangible, intangible, real,

personal, or mixed) of the DIP Obligors, whether now owned by or owing to, or hereafter acquired by, or arising in favor of, the DIP Obligors (including under any trade names, styles, or derivations thereof), and whether owned or consigned by or to, or leased from or to, or hereafter acquired by, the DIP Obligors, and regardless of where located, before or after the Petition Date including the proceeds, products, rents, profits, or offspring of the foregoing; provided, that DIP Collateral will not include (x) the Avoidance Actions (but the Final Order may provide for the proceeds of Avoidance Actions to be included in DIP Collateral) or (y) equity in a Debtor that is in a Non-Participating WAC Group and that is subject to a valid, unavoidable prepetition lien or security interest in favor of an agent for a Non-Participating WAC Facility.

(b)    To the fullest extent permitted by the Bankruptcy Code or applicable law, any provision of any lease, loan document, easement, use agreement, proffer, covenant, license, contract, organizational document, or other instrument or agreement that requires the consent or the payment of any fees or obligations to any entity in order for any of the DIP Borrowers or DIP Guarantors to pledge, grant, mortgage, sell, assign, or otherwise transfer any fee or leasehold interest or the proceeds thereof or other DIP Collateral, shall have no force or effect with respect to the DIP Liens on such leasehold interests or other applicable DIP Collateral or the proceeds of any assignment and/or sale thereof by any DIP Borrower or DIP Guarantor, in favor of the DIP Parties in accordance with the terms of the DIP Documents and this Interim Order or in favor of the Participating WAC Secured Parties in accordance with this Interim Order.

9.  Priority of DIP Liens.

(a)  In each case subject to the Intercompany Protection Liens, the Permitted Prior Liens, and the Carve-Out, the DIP Liens on the DIP Collateral shall have the following priorities:

(i)  pursuant to section 364(c)(2) of the Bankruptcy Code, first priority liens on and security interests in all DIP Collateral that is not otherwise (x) subject to a valid, perfected and non-avoidable security interest or lien as of the Petition Date or (y) deemed WAC Specific Collateral hereunder;

(ii)  pursuant to section 364(c)(3) of the Bankruptcy Code, junior liens (the "Junior DIP Liens") on and security interests in all DIP Collateral (other than as set forth in clauses (i) and (iii) of this paragraph) that is subject to valid, existing and perfected liens (including any Permitted Prior Lien) as of the Petition Date; and

(iii)  pursuant to section 364(d)(1) of the Bankruptcy Code, senior priming liens (the "Priming DIP Liens") on and security interests in all DIP Collateral that constitutes WAC Specific Collateral, wherever located, which Priming DIP Liens shall be senior to the Participating WAC Liens and the Adequate Protection Liens granted hereunder; provided, however that the DIP Parties' claims on account of such Priming DIP Liens at any Participating WAC Group shall in no event exceed the amount of the Net WLIL Intercompany Claim of such Participating WAC Group and such Net WLIL Intercompany Claim shall never exceed the applicable Maximum Intercompany Balance.

(b)  Except as expressly set forth herein or in the DIP Documents, the DIP Liens and the DIP Superpriority Claims: (i) shall not be made junior to or *pari passu* with (A) any lien, security interest or claim heretofore or hereinafter granted in any of the Chapter 11 Cases or any successor cases, and shall be valid and enforceable against the DIP Borrowers and DIP Guarantors, their estates, any trustee or any other estate representative appointed or elected in the Chapter 11 Cases or any successor cases and/or upon the dismissal of any of the Chapter 11 Cases or any successor cases, (B) any lien that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or otherwise, and (C) any intercompany or affiliate lien or claim; and (ii) shall not be subject to sections 510, 549, 550 or 551 of the Bankruptcy Code.

40

**Authorization to Use Cash Collateral and Adequate Protection**

10.    _Authorization to Use Cash Collateral_.  Subject to the terms and conditions of this Interim Order, the Debtors are authorized to use the Cash Collateral as set forth herein in accordance with the Approved Budget (and Permitted Variances).

11.    _Adequate Protection of the Participating WAC Secured Parties_.

a.    As adequate protection of the interest of the Participating WAC Secured Parties in the Participating WAC Collateral, including Cash Collateral, the Participating WAC Agents and the Participating WAC Collateral Agents for the benefit of the other Participating WAC Secured Parties are hereby granted:

(i)    payment in cash on a current basis of all reasonable and documented out-of-pocket fees and expenses of the professional advisors of Participating WAC Secured Parties(including any accrued and unpaid amounts), which shall be limited to (A) Milbank, as counsel to the Steering Committee, (B) Alvarez & Marsal, as financial advisor to the Steering Committee, (C) Arthur Cox, as Irish counsel to the Steering Committee, (D) IBA Group Ltd. as special aviation consultant to the Steering Committee; (E) one (1) counsel to each of the Participating WAC Agents, and (F) any individual Participating WAC Lender's counsel to the extent approved (on a Participating WAC Group by Participating WAC Group basis) by the requisite Participating WAC Lenders for such Participating WAC Facility (collectively, (A) through (F), the "Participating WAC Professionals") _provided that,_ the expenses in the previous clauses (E) and (F) shall be borne by each Participating WAC Group as a cash disbursement of such Participating WAC Group and included in such Participating WAC Group's Gross WAC Group Disbursements (as defined below); and _provided further_ that to the extent the expenses in (E) and (F) exceed the amount budgeted for such Participating WAC Group in the Approved Budget, such expenses shall only be paid to the extent that (x) after paying such amounts, the applicable Participating WAC Group does not have (and would not be projected to have during any week of the Approved Budget) a Net WLIL Intercompany Claim against it in excess of the Maximum Intercompany Balance for such  Participating WAC Group or (y) (i) the Prepetition Approving Party for such Participating WAC Group agrees to increase such Participating WAC Group's WAC Specific Cap so that after paying such amounts, such Participating WAC Group does not have (and would not be projected to have during any week of the Approved Budget) a Net WLIL Intercompany Claim against it in excess of the Maximum Intercompany Balance for such  Participating WAC Group and (ii) the aggregate amount of such increases in the WAC Specific Caps do not exceed $10,000,000.  With respect to any amounts payable on account of fees and expenses under clauses (E) and (F) that accrued prepetition, if invoices for such fees and expenses are provided as required in the following sentence no later than the date of entry of this Interim

Order then, unless a Fee Objection has been timely interposed, such invoice shall be paid contemporaneously with the second draw authorized by this Interim Order.  None of such fees, costs, expenses or other amounts shall be subject to Court approval (subject to the limitations below) or U.S. Trustee guidelines, and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with this Court; provided, however, that the Participating WAC Professionals must provide written invoices to the Debtors and copies of any such invoices shall be provided by the Participating WAC Professionals contemporaneously to the U.S. Trustee, counsel to the Steering Committee, and counsel to the Committee (if any); provided, further, however, that such invoices may be in detailed summary form and may contain redactions, and in no event shall such invoices be required to contain time entries, and for the avoidance of doubt, the provision of such invoices shall not constitute a waiver of the attorney-client privilege or any benefits of the attorney work product doctrine.  If any of the Debtors, the U.S. Trustee, the DIP Agent, the Steering Committee, or the Committee objects to the reasonableness of the fees and expenses of any of the Participating WAC Professionals, and such objection cannot be resolved within ten (10) calendar days of receipt of such invoices, the Debtors, the U.S. Trustee, the DIP Agent, the Steering Committee, or the Committee, as the case may be, shall file with the Court and serve on the applicable Participating WAC Professionals (with a copy to the Debtors) an objection limited to the reasonableness of such fees and expenses (a "Fee Objection").  The professional fees of Participating WAC Professionals shall not be subject to the provisions of sections 327, 328, 329, 330 or 331 of the Bankruptcy Code.  The Debtors shall pay the fees and expenses of the Participating WAC Professionals in accordance with the terms and conditions of this Interim Order within fifteen (15) calendar days after receipt of the applicable invoice (A) the full amount invoiced if no Fee Objection has been timely filed, and (B) the undisputed fees, costs, and expenses reflected on any invoice to which a Fee Objection has been timely filed, in each case regardless of whether such amounts are in excess of the amounts set forth in the Approved Budget.  All such fees, costs, expenses and other amounts owed or payable to the Participating WAC Professionals shall be secured by the Adequate Protection Liens, and afforded all of the priorities and protections afforded to the Participating WAC Facilities under this Interim Order and the Participating WAC Loan Documents.  To the extent any Participating WAC Professional is holding a retainer, they may apply such retainer against any outstanding invoice (whether prepetition or postpetition) by providing ten (10) calendar days' notice of their intent to do the same to the Debtors, the U.S. Trustee, the DIP Agent, the Steering Committee, and the Committee;

(ii)     solely to the extent of the Diminution in Value of the interest of the relevant Participating WAC Secured Parties in their applicable Participating WAC Collateral from and after the Petition Date, allowed superpriority administrative expense claims (the "Adequate Protection Claims") against each of the Participating WAC Obligors under the applicable Participating WAC Facility, senior to all other administrative expense claims in the Chapter 11 Cases, subject only to (A) the DIP Claims, (B) the Intercompany Protection Claims, and (C) the portion of the Carve-Out allocable to the relevant Participating WAC Facility;

(iii)    solely to the extent of the Diminution in Value of the interest of the relevant Participating WAC Secured Parties in their applicable Participating WAC

42

Collateral from and after the Petition Date, continuing, valid, binding, enforceable, unavoidable and automatically perfected postpetition liens and security interests (the "Adequate Protection Non-WSC Liens"), in the DIP Collateral that is not WAC Specific Collateral (the "Adequate Protection Non-WSC Collateral") which liens shall be immediately junior to the DIP Liens and subject to the Carve-Out, the Intercompany Protection Liens and any Permitted Liens (as defined in the DIP Documents), and (B) senior in priority to all other liens, including the Participating WAC Liens. Except as expressly provided in this Interim Order or as otherwise agreed to by the Participating WAC Secured Parties, the Adequate Protection Non-WSC Liens shall not be made junior to or *pari passu* with any lien or security interest heretofore or hereinafter granted or created in any of the Chapter 11 Cases or any successor cases and shall be valid and enforceable against the Debtors, their estates and any successors thereto, including, without limitation, any trustee appointed in any of the Chapter 11 Cases or any successor cases until such time as the Participating WAC Secured Obligations owed under the Participating WAC Facilities are paid in full or otherwise treated pursuant to a confirmed and effective chapter 11 plan; provided that, subject to further Court order, to the extent that the Non-Participating WAC Secured Parties consent to the use of the cash collateral, such Non-Participating WAC Secured Parties may be granted adequate protection liens on the Adequate Protection Non-WSC Collateral that are *pari passu* with the Adequate Protection Non-WSC Liens. The Adequate Protection Non-WSC Liens shall not be subject to sections 549 or 550 of the Bankruptcy Code. No lien or interest avoided and preserved for the benefit of the estates pursuant to section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the Adequate Protection Non-WSC Liens;

(iv)    solely to the extent of any Diminution in Value of the interest of the relevant Participating WAC Secured Parties in their applicable Participating WAC Collateral, replacement liens (the "Adequate Protection Replacement Liens" and together with the Adequate Protection Non-WSC Liens, the "Adequate Protection Liens") in their WAC Specific Collateral, which liens shall be (A) immediately junior to the DIP Liens, (B) subject to the Carve-Out and the Intercompany Protection Liens, and (C) senior in priority to all other liens, including the Participating WAC Liens. Except as expressly provided in this Interim Order or as otherwise agreed to by the Participating WAC Secured Parties, the Adequate Protection Replacement Liens shall not be made junior to or *pari passu* with any lien or security interest heretofore or hereinafter granted or created in any of the Chapter 11 Cases or any successor cases and shall be valid and enforceable against the Debtors, their estates and any successors thereto, including, without limitation, any trustee appointed in any of the Chapter 11 Cases or any successor cases until such time as the Participating WAC Secured Obligations owed under the applicable Participating WAC Documents are paid in full or otherwise treated pursuant to a confirmed and effective chapter 11 plan. The Adequate Protection Replacement Liens shall not be subject to sections 549 or 550 of the Bankruptcy Code. No lien or interest avoided and preserved for the benefit of the estates pursuant to section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the Adequate Protection Replacement Liens;

(v)    the Debtors shall comply with the milestones attached hereto as Exhibit D (the "Milestones") on the terms and conditions set forth herein, which may not be amended without the consent of each Prepetition Approving Party;

43

(vi) The Debtors shall comply with the bidding provisions set forth in the Milestones as the same are incorporated into any bidding procedures order contemplated therein, in form and substance acceptable the Prepetition Approving Parties (an "Acceptable Bidding Procedures Order"), which Acceptable Bidding Procedures Order shall not be amended or modified without the consent of each Prepetition Approving Party; and

(vii) The Debtors will request that the Acceptable Bidding Procedures Order and Final DIP Order contain a provision providing that the applicable Participating WAC Agent or Participating WAC Collateral Agent for a Participating WAC Facility will have the absolute and irrevocable right to credit bid for the WAC Specific Collateral of such Participating WAC Facility subject only to such party complying with all of the requirements for a Streamlined Credit Bid (as defined in the Milestones) (including payment of the Exit Fee). Such provision will provide that in the event that applicable Participating WAC Agent or Participating WAC Collateral Agent for a Participating WAC Facility elects to make a Streamlined Credit Bid by January 14, 2019 and complies with the requirements set forth in the Milestones, then by no later than February 15, 2019 either an order authorizing the sale pursuant to such credit bid shall have been entered (providing for consummation of such credit bid as soon as reasonably practicable) or, upon 3 business days' notice by the relevant Participating WAC Agent or Participating WAC Collateral Agent to the Debtors, the stay shall be automatically lifted so that they can foreclose on their WAC Specific Collateral.

12.     Adequate Protection of the Non-Participating WAC Secured Parties. As adequate protection of the interest of the Non-Participating WAC Secured Parties in the Non-Participating WAC Collateral, including Cash Collateral, solely to the extent of the diminution in value of the interest of the relevant Non-Participating WAC Secured Parties in their applicable Non-Participating WAC Collateral from and after the Petition Date, the Debtors shall use the Non-Participating WAC Secured Parties' Cash Collateral solely to pay the direct expenses incurred at their respective Non-Participating WAC Group related to storage costs, aircraft maintenance, aircraft repair, insurance, and other costs necessary to maintain compliance with numerous aircraft regulations and to ensure that the aircraft in each WAC are properly maintained and their value preserved.

44

**Provisions Common to DIP Facility and Use of Cash Collateral**

13.    <u>Use of Proceeds of DIP Facility and Cash Collateral; No Segregation</u>.

a.    Notwithstanding anything to the contrary in any of the "first day" orders, from the date hereof, the Debtors shall use advances of credit under the DIP Facility and Cash Collateral of the Participating WAC Secured Parties only for the purposes permitted by this Interim Order and the DIP Documents and in compliance with the Approved Budget (subject to any Permitted Variances); <u>provided</u>, that except as set forth in paragraph 20 hereof, no Cash Collateral or proceeds of the DIP Facility shall be used to investigate, challenge, object to, contest or raise any defense to, the validity, security, perfection, priority, extent or enforceability of any amount due under or the liens or claims granted under or in connection with the Participating WAC Facilities.  The Participating WAC Liens shall continue to attach to the Cash Collateral irrespective of the commingling of Cash Collateral with other cash of the Debtors (if any).  Any failure by the Debtors on or after the Petition Date to comply with the segregation requirements of section 363(c)(4) of the Bankruptcy Code (to the extent applicable) in respect of any Cash Collateral shall not be used as a basis to challenge the Participating WAC Secured Obligations, or the extent, validity, enforceability or perfected status of the Participating WAC Liens.

b.      The Debtors are hereby authorized to use the WAC2 Cash Collateral solely to pay for the direct expenses of Waypoint Asset Company Number 2 (Ireland) Limited and its subsidiaries (the "WAC2 Group"), including but not limited to expenses related to storage costs, aircraft maintenance, aircraft repair, insurance, and other costs necessary to maintain compliance with numerous aircraft regulations and to ensure that the aircraft owned by the WAC2 Group are properly preserved and maintained in accordance with the terms and conditions of this Interim Order.  Notwithstanding any other provision of this Order, nothing in this Order shall permit the Debtors to use the WAC2 Cash Collateral to pay any administrative claim that WLIL may asset against any entity in the WAC2 Group.  The WAC2 Cash Collateral shall not be transferred to or used to pay any expenses of, a Debtor or non-Debtors affiliate that is not an entity in the WAC2 Group.

c.      The Debtors are hereby authorized to use the WAC3 Cash Collateral solely to pay for the direct expenses of Waypoint Asset Co 3 Limited and its subsidiaries (the "WAC3 Group"), including but not limited to expenses related to storage costs, aircraft maintenance, aircraft repair, insurance, and other costs necessary to maintain compliance with numerous aircraft regulations and to ensure that the aircraft owned by the WAC3 Group are properly preserved and maintained in accordance with the terms and conditions of this Interim Order.  Notwithstanding any other provision of this Order, nothing in this Order shall permit the Debtors to use the WAC3 Cash Collateral to pay any administrative claim that WLIL may asset against any entity in the WAC3 Group.  The WAC3 Cash Collateral shall not be transferred to or used to pay any expenses of, a Debtor or non-Debtors affiliate that is not an entity in the WAC3 Group.

14.     The Debtors are hereby authorized to use the WAC10 Cash Collateral solely to pay for the direct expenses of Waypoint Asset Co 10 Limited and its subsidiaries (the "<u>WAC10 Group</u>"), including but not limited to expenses related to storage costs, aircraft maintenance, aircraft repair, insurance, and other costs necessary to maintain compliance with numerous aircraft regulations and to ensure that the aircraft owned by the WAC10 Group are properly preserved and maintained in accordance with the terms and conditions of this Interim Order.  Notwithstanding any other provision of this Order, nothing in this Order shall permit the Debtors to use the WAC10 Cash Collateral to pay any administrative claim that WLIL may asset against any entity in the WAC10 Group.  The WAC10 Cash Collateral shall not be transferred to or used to pay any expenses of, a Debtor or non-Debtors affiliate that is not an entity in the WAC10 Group.

15.     <u>Approved Budget</u>.

a.      <u>General</u>.  Except as otherwise provided herein or approved by the DIP Agent (at the direction of the Required DIP Lenders), the proceeds of the DIP Facility and Cash Collateral shall be used only in compliance with the Approved Budget (subject to any Permitted Variance).

b.      <u>Initial Budget</u>.  Attached as <u>Exhibit B</u> hereto and incorporated by reference herein is a 13-week statement that includes a statement of receipts (on a cumulative basis) and disbursements (on a "Participating WAC Group by Participating WAC Group" basis) for the Debtors, broken down by week, including all anticipated case uses for such period (the "<u>Initial Budget</u>").  The Initial Budget shall be deemed an "<u>Approved Budget</u>."

c.      <u>Proposed and Approved Budget</u>.  At the end of each ten (10)-week period, commencing with the tenth full week after the Petition Date, and thereafter following the commencement of the then applicable Approved Budget, the Debtors shall deliver to the DIP

Agent and each of the Prepetition Approving Parties, an updated 13-week statement for the 13 weeks commencing immediately following the 13-week period covered by the then applicable Approved Budget (the "Proposed Budget").  Each Proposed Budget shall be substantially in the form as the Initial Budget and reasonably satisfactory to (i) the DIP Agent, acting at the direction of the Required DIP Lenders and (ii) each of the Prepetition Approving Parties.  Each Proposed Budget shall become effective when approved by the DIP Agent (acting at the direction of the Required DIP Lenders) and each of the Prepetition Approving Parties; provided, that the DIP Agent and the Prepetition Approving Parties shall be deemed to have approved a Proposed Budget unless the DIP Agent, acting at the direction of the Required DIP Lenders, or any Prepetition Approving Party, shall have objected to such Proposed Budget within five (5) business days of receiving such Proposed Budget; provided further that, to the extent the DIP Agent or any Prepetition Approving Party objects to any Proposed Budget and any such objection is unresolved prior to the end of the 13th week of the Approved Budget, then a hearing with respect to any such objection shall be conducted by the Court; provided further that, to the extent any amounts related to employee obligations (including, but not limited to, any amounts related to healthcare costs, payments earned under a key employee incentive plan, or severance) set forth in an Approved Budget are not actually paid during the period covered by such Approved Budget, such amounts may be paid during a subsequent period on the earlier of (i) the consummation of a sale of substantially all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code or (ii) the effective date of a plan in the Chapter 11 Cases without the need for further approval from the DIP Lenders or Prepetition Approving Parties for such delay in payment unless such payment would result in one or more Participating WAC groups exceeding their Maximum Intercompany Balance. Any such approved Proposed Budget shall be deemed an "Approved Budget."  For the avoidance

48

of doubt, nothing in this Interim Order or the DIP Documents other than the Maximum Intercompany Balances shall be construed as a cap or limitation on the use of DIP Collateral (including Cash Collateral) to fund the obligations benefitting from the Carve-Out.

        d.     <u>Variance Reporting</u>.  On (i) December 20, 2018, (ii) January 10, 2019, and (iii) every second Thursday thereafter, the DIP Obligors shall deliver to the DIP Agent and each of the Participating WAC Agents a variance report (a "<u>Variance Report</u>") comparing (x) on a "Participating WAC Group by Participating WAC Group" basis, the actual disbursements made by or on behalf of a Participating WAC Group to the amount set forth in the "Total Operating Disbursements" line for such WAC Group in the Approved Budget for such period and (y) the total actual "Rental Receipts" of the Obligors as compared to the "Total Rental Receipts" line in the Approved Budget.  Along with the Variance Report, the DIP Obligors shall deliver an informational update to the then applicable Approved Budget in substantially the same form, which interim 13-week statement shall add an additional two weeks (or three weeks, in the case of the initial and second update).

        e.     <u>Permitted Variances and Financial Covenants</u>.  For the period commencing on the Petition Date and ending on the last day of each applicable two (2) or three (3)-week period covered by a Variance Report (each such period, a "<u>Test Period</u>"), (x) the actual disbursements made by or on behalf of a Participating WAC Group on a "Participating WAC Group by Participating WAC Group" basis (but excluding any amounts paid to professionals and adequate protection payments but including any Non-Participating WAC Fronted Expenses (as defined herein)) may not exceed the greater of (i) $150,000 and (ii) 115% of the amount set forth in the "Total Operating Disbursements" line for such Participating WAC Group in the Approved Budget for such period (the amount by which the greater of (i) and (ii) would exceed the "Total

Operating Disbursements" line for such Participating WAC Group in the Approved Budget for such period, a "Permitted Disbursement Variance"); and (y) the actual rental receipts of the DIP Obligors on a consolidated basis may not be less than the greater of (i) $1,000,000 and (ii) 80% of the amount set forth on the "Total Rental Receipts" line in the Approved Budget for such period (the amount by which the "Total Rental Receipts" line in the Approved Budget for such period would exceed the greater of (i) and (ii), a "Permitted Receipts Variance" and together with the Permitted Disbursement Variance, the "Permitted Variances").

f.    Non-Participating WAC Group Informational Statements.    For informational purposes only, the Debtor shall also provide to the DIP Agent, each of the Prepetition Approving Parties, and each of the Non-Participating WAC Secured Parties, (i) at the same time as the delivery of the Initial Budget and each Proposed Budget, a 13-week statement of the projected (x) direct expenses of each Non Participating WAC Group ("Non-Participating WAC Direct Expenses") and (y) allocated expenses of each Non- Participating WAC Group on a "WAC Group by WAC Group" basis and (ii) at the same time as the delivery of the Variance Report, a variance report on the actual Non-Participating WAC Fronted Expenses (as defined herein) and Non-Participating WAC Direct Expenses made.

16.    Cash Management.    As inducement for the DIP Lenders to provide the DIP Loans and as additional Adequate Protection for the Participating WAC Secured Parties, the following cash management procedures shall apply and supersede any contrary or inconsistent provisions in any cash management order.

a.    On  (i) December 14, 2018,  (ii) January 4, 2019,  and  (iii) every second Friday thereafter (any such date, a "Cash Sweep Date"), all post-petition receipts of any of the DIP Obligors shall be transferred or deposited into controlled deposit accounts held in the name

50

of WLIL and maintained in the United Kingdom (the "Central Cash Account"), provided that such receipts (i) were received on or before the Thursday immediately preceding such Cash Sweep Date and (ii) for any Participating WAC Group, exceed $100,000 in the aggregate; provided that any sale, insurance, casualty, hedge termination payment, or other receipts, which receipt is not set forth in any period in the Approved Budget (collectively, the "Extraordinary Receipts") shall not be swept; and provided further that in the event the Net WAC Group Intercompany Claim in favor of WAC 9 would exceed $4,000,000, no further cash shall be swept from WAC 9 to the Central Cash Account until such time as the Net WAC Group Intercompany Claim in favor of WAC 9 would no longer exceed $4,000,000.

b.      Disbursements (including from the Central DIP Account and the Central Cash Account) shall be made in compliance with the Approved Budget (subject to Permitted Variances).

c.      In no event shall the Obligors make any disbursement that would result in a Net WLIL Intercompany Claim for any Participating WAC Group in excess of the Maximum Intercompany Balance for such Participating WAC Group.

d.      The Obligors shall maintain Participating WAC Group and entity-specific intercompany accounting, including with respect to all receipts and disbursements from the Central DIP Account and the Central Cash Account, which will be reported to the DIP Agent and each Participating Approving Party on (i) December 14, 2018, (ii) January 4, 2019, and (iii) every second Friday thereafter.  Specifically, they shall report:

i.  The net cash receipts received by or on behalf of each Participating WAC Group during such period other than Extraordinary Receipts

that are not swept (such Participating WAC Group's "<u>Gross WAC Group Receipts</u>").

ii.   The net cash disbursements made by or on behalf of each Participating WAC Group during such period, including direct disbursements, allocated disbursements and, to the extent applicable, allocated Non-Participating WAC Fronted Expenses, (such amounts for each Participating WAC Group, its "<u>Gross WAC Group Disbursements</u>").

iii.  The net position of each Participating WAC Group vis-à-vis WLIL, calculated as the difference between such Participating WAC Group's Gross WAC Group Receipts and its Gross WAC Group Disbursements for such week and on a cumulative basis, in each case as deemed to be adjusted for purposes of effectuating the intercreditor settlement set forth in the Forbearance Agreements but not with respect to the Debtors' actual intercompany claim balances, and for agreed opening cash balances including adjustments to reflect the cash sources and uses during the forbearance period (any such positive difference, a "<u>Net WAC Group Intercompany Claim</u>" and any such negative difference a "<u>Net WLIL Intercompany Claim</u>").

e.     To the extent that WLIL has, at any time, on a cumulative basis, a Net WLIL Intercompany Claim against a Participating WAC Group, WLIL shall receive a joint and several superpriority intercompany claim (a "<u>WLIL Intercompany Protection Claim</u>") against

each member of such Participating WAC Group, secured by priming liens ("WLIL Intercompany Protection Liens") against such Participating WAC Group's WAC Specific Collateral, subject only to the Carve-Out.  To the extent any WLIL Intercompany Protection Claim or WLIL Intercompany Protection Lien against any Participating WAC Group or WAC Specific Collateral is satisfied by such Participating WAC Group or from such WAC Specific Collateral, any DIP Superpriority Claim or DIP Lien against such Participating WAC Group or WAC Specific Collateral shall automatically and to the same extent be satisfied and released.

f.      To the extent a Participating WAC Group, has at any time, on a cumulative basis, a Net WAC Group Intercompany Claim against WLIL, each member of such Participating WAC Group shall receive a superpriority intercompany claim (a "WAC Group Intercompany Protection Claim") against WLIL, secured by priming liens ("WAC Group Intercompany Protection Liens") against all assets of WLIL that constitute DIP Collateral (including the Central DIP Account, the Central Cash Account, and the WLIL Intercompany Protection Claims), subject only to the Carve-Out.

g.      Collectively, the WLIL Intercompany Protection Claims and the WAC Group Intercompany Protection Claims are referred to as the "Intercompany Protection Claims".  Collectively the WLIL Intercompany Protection Liens and the WAC Group Intercompany Protection Liens are referred to as the "Intercompany Protection Liens".

h.      The Intercompany Protection Claims and Intercompany Protection Liens shall be held for the ratable benefit of the Participating WAC Lenders and the DIP Lenders and may not be waived, compromised, released, subordinated, settled or extinguished without the consent of the DIP Agent (at the direction of the Required DIP Lenders) and each Participating WAC Agent (or, with respect to WAC8, the requisite noteholders under the WAC8 Note Purchase

53

Agreement) (so long as such relevant Participating WAC Group has not terminated the use of Cash

Collateral, a "Prepetition Approving Party").

   17. Carve-Out.

    a. As used in this Interim Order, the term "Carve-Out" shall mean the

sum of the following:

     (i) all fees required to be paid to (A) the Clerk of the Court and all statutory fees payable to the U.S. Trustee under 28 U.S.C. § 1930(a) and 31 U.S.C. § 3717 (without regard to the Carve-Out Trigger Notice (as defined below)), (B) fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the Bankruptcy Code (without regards to the Carve-Out Trigger Notice, ((A) and (B) together, the "Statutory Fees"), and (C) to the extent allowed by the Bankruptcy Court at any time, whether by interim order or final compensation order, procedural order, or otherwise, all accrued and unpaid fees, disbursements, costs, and expenses (the "Estate Professional Fees") incurred by professionals or professional firms retained by the Debtors, their estates, and/or the Committee (if any) pursuant to sections 327, 328, 363, or 1103 of the Bankruptcy Code (collectively, the "Estate Professionals") at any time before or on the first business day after delivery by the DIP Agent of a Carve-Out Trigger Notice (the "Pre-Notice Professional Fees" and together with the Statutory Fees, the "Pre-Trigger Amount") and all unpaid out of pocket expenses of the members of the Committee ("Committee Members") (if any) that are incurred at any time before or on the first business day after delivery by the DIP Agent of a Carve-Out Trigger Notice, whether allowed by the Court or paid prior to or after delivery of a Carve-Out Trigger Notice; and

     (ii) all fees, incurred following the delivery of a Carve-Out Trigger Notice (as defined herein), by the Debtors to the Estate Professionals and allowed by the Bankruptcy Court at any time, in an aggregate amount of up to $4,000,000 (the "Post-Carve-Out Trigger Notice Cap") provided, that, there shall be a dollar-for-dollar reduction of the Carve-Out for any unused retainers (if any) held by or on behalf of the Estate Professionals as of the delivery of the Carve-Out Trigger Notice to the extent allowed or paid at any time, whether by interim of final compensation order, procedural order, or otherwise (collectively, the "Post-Notice Professional Fees" and together with the Pre-Notice Professional Fees, the "Professional Fees."

    b. The Carve-Out shall be allocated, on a several basis, amongst the

Participating WAC Groups on the same percentage allocation as allocated expenses as set forth on

the then-current (or most recent) Approved Budget (without allocation to any Non-Participating

WAC Group that has not consented to the Carve-Out). The Carve-Out will be reduced dollar-for-

dollar to the extent any Non-Participating WAC Group agrees to the imposition of a separate carve-

out.  The Debtors shall use commercially reasonable efforts to recover (including by way of seeking a surcharge pursuant to section 506(c) of the Bankruptcy Code) a ratable portion of the Carve-Out from any Non-Participating WAC Group that does not provide the Debtors a carve-out (or provides a carve-out that is substantially smaller on a ratable basis than the Carve-Out) and any amounts so recovered will be refunded to the Lenders under the Participating WAC Secured Parties that funded the Carve-Out based on their funding thereof.

c.    Notwithstanding the foregoing, subject to paragraph 20 herein, no portion of the Carve-Out shall be used for the payment of fees, disbursements, costs or expenses incurred by any Estate Professional to investigate, challenge, object to, contest, or raise any defense to, the validity, security, perfection, priority, extent or enforceability of any amount due under or the liens or claims granted under or in connection with the Participating WAC Loan Documents.

d.    As used herein, the term "<u>Carve-Out Trigger Notice</u>" means a written notice delivered by electronic mail by the DIP Agent (acting at the direction of the Required DIP Lenders) to the Debtors, lead restructuring counsel to the Debtors (Weil, Gotshal & Manges LLP), the U.S. Trustee, and counsel to the Committee (if any), which notice (i) shall expressly state that the Carve-Out is triggered and the Post-Carve-Out Trigger Notice Cap has been invoked, and (ii) may be delivered only upon (A) the occurrence and during the continuation of a DIP Event of Default (as defined below) and acceleration of the DIP Obligations under the DIP Facility, or (B) the Maturity Date (as defined in the DIP Credit Agreement), in each case for which termination of funding under the DIP Credit Agreement has occurred.

e.    <u>Fee Reserve Account</u>.    The    Debtors    shall    (i) have contemporaneously with the second draw of the DIP Loans, under this Interim Order, transferred

cash proceeds from the DIP Facility in an amount equal to $1.5 million of the Post Carve-Out Trigger Notice Cap and (ii) thereafter on each Cash Sweep Date transfer cash proceeds from the DIP Facility or cash-on-hand in an amount equal to (x) the total budgeted weekly Professional Fees for the next unfunded week set forth in the Approved Budget (y) to the extent not already so transferred, the total budgeted weekly Professional Fees for the prior week and (z) an amount equal to the amount, if any, that, in the good faith estimate of the Estate Professionals, their aggregate actual fees for the prior two weeks exceeded the total budgeted weekly Professional Fees, in each case (i)-(ii) into a segregated account not subject to the control of the DIP Agent, any DIP Lender, or any WAC Secured Party (the "Fee Reserve Account").  Upon the consummation of a credit bid with respect to a Participating WAC Group, (A) if there are unfunded portions of the Carve-Out (other than the Post Carve-Out Trigger Notice Cap but including the good faith estimates of the Estate Professionals of fees accrued through the date of such consummation), the Debtors shall, to the extent consistent with the Applicable Budget, transfer cash proceeds from the DIP Funding Account or the Central DIP Account in an amount up to such Participating WAC Group's allocable portion of such unfunded amount and (B) if there are any remaining unfunded portions of the Carve-Out allocable to such Participating WAC Group (including its allocated portion of any unfunded portion of the Post Carve-Out Trigger Notice Cap) following the transfer in (A), the Participating WAC Secured Parties consummating such credit bid shall fund such amounts into the Fee Reserve Account contemporaneously with such consummation.  Any amounts funded to the Fee Reserve Account pursuant to (i), (ii), (iii) or (A) above shall be allocated to the applicable Participating WAC Group and included in such Participating WAC Group's Gross WAC Group Disbursements.  Funds in the Fee Reserve Account shall be held in trust to pay Professional Fees and, after delivery of a Carve-Out Trigger Notice as set forth above, to pay all amounts included

56

in the Carve-Out.  The Debtors shall be authorized to use funds held in the Fee Reserve Account to pay Professional Fees and expenses of Committee Members as they become allowed and payable pursuant to the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and any interim or final orders of the Court; provided that the Debtors' obligations to pay allowed Professional Fees shall not be limited or be deemed limited to funds held in the Fee Reserve Account.

        f.      <u>Fee Reserve Account Funding After a Carve-Out Trigger Notice</u>. On the day on which a Carve-Out Trigger Notice is received by the Debtors, the Carve-Out Trigger Notice shall constitute a demand to utilize all cash on hand in the Central Cash Account and the Central DIP Account to transfer to the Fee Reserve Account cash in an amount equal to all remaining unfunded portions of the Carve-Out as provided herein.   Any amounts funded to the Fee Reserve Account pursuant to the prior sentence shall be allocated to the applicable Participating WAC Group and included in such Participating WAC Group's Gross WAC Group Disbursements.  Following delivery of a Carve-Out Trigger Notice and the transfer set forth in the prior sentence, the DIP Agent shall deposit into the Fee Reserve Account any cash swept or foreclosed upon (including cash received as a result of the sale or other disposition of any assets) until the Fee Reserve Account has been fully funded in an amount equal to all remaining unfunded portions of the Carve-Out as provided herein.  Any amounts funded to the Fee Reserve Account pursuant to the prior sentence shall be allocated to the applicable Participating WAC Group and included in such Participating WAC Group's Gross WAC Group Disbursements.  Notwithstanding anything to the contrary in the DIP Documents or this Final Order, following delivery of a Carve-Out Trigger Notice, the DIP Agent shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the DIP Obligors until the Fee Reserve Account has been fully funded in an amount equal to the Carve-Out.  Further, notwithstanding

anything to the contrary herein, (i) disbursements by the Debtors from the Fee Reserve Account shall not constitute DIP Loans, (ii) the failure of the Fee Reserve Account to satisfy in full the Professional Fees shall not affect the priority of the Carve-Out, and (iii) in no way shall the Carve-Out, Fee Reserve Account, or an Approved Budget or any of the foregoing be construed as a cap on the amount of the Professional Fees due and payable by the Debtors or that may be allowed by the Court at any time (whether by interim order, final order, or otherwise).

g.     To the extent such cash on hand and availability and/or proceeds of any other postpetition financing facility are not sufficient to fully fund the Fee Reserve Account, the Carve-Out Trigger Notice shall be deemed to constitute a draw request to the DIP Agent under the DIP Documents to fully fund the Fee Reserve Account from the DIP Funding Account, following delivery of the Carve-Out Trigger Notice by the Debtors notwithstanding anything in the DIP Documents to the contrary, including with respect to the existence of any default or Event of Default (as defined in the DIP Documents), or any termination of the commitments thereunder following an Event of Default.  Any amounts transferred to the Fee Reserve Account shall be allocated to the Participating WAC Groups and shall be included as part of such Participating WAC Group's Gross WAC Group Disbursements.  Funds transferred to the Fee Reserve Account shall not (i) be subject to the Intercompany Protection Liens, Intercompany Protection Claims, DIP Liens, the DIP Superpriority Claims, the Adequate Protection Claims, the Adequate Protection Liens or any claim, liens or security interests granted to any other party (including the Non-Participating WAC Secured Parties), (ii) constitute DIP Collateral, (iii) constitute WAC Specific Collateral, or (iv) constitute Cash Collateral; provided that the Participating WAC Lenders shall have a reversionary interest in the funds held in the Fee Reserve Account, if any, after all amounts included in the Carve-Out, including any allowed Professional Fees, have been paid in full

pursuant to a final order of the Court (regardless of when such Professional Fees are allowed by the Court).  All payments and reimbursements made from the Fee Reserve Account after the delivery of a Carve-Out Trigger Notice shall permanently reduce the Carve-Out on a dollar-for-dollar basis.  For the avoidance of doubt, any payment or reimbursement in respect of any allowed Professional Fees made prior to the delivery of a Carve-Out Trigger Notice shall not reduce the Carve-Out.

   h. For the avoidance of doubt, the Carve-Out shall be senior to all liens and claims securing the DIP Facility and any and all other forms of adequate protection liens and claims securing the DIP Obligations including the Intercompany Protection Liens and all Intercompany Protections Claims.  Notwithstanding anything to the contrary contained in this Interim Order, any DIP Documents or any Participating WAC Loan Documents, the security interests, liens and claims granted to any of the DIP Parties or any of the Participating WAC Secured Parties (including, without limitation, the DIP Liens, DIP Superpriority Claims, Adequate Protection Liens and Adequate Protection Claims) under, pursuant to or in connection with the DIP Facility, any DIP Document, this Interim Order or any Participating WAC Loan Document, as applicable, shall be subject to the payment in full in cash of the amounts due under the Carve-Out.

   i. After receipt of the Carve-Out Trigger Notice, the Debtors shall provide notice by email and facsimile to all Estate Professionals, at the email addresses and facsimile numbers set forth in each Estate Professional's notice of appearance filed with the Bankruptcy Court (or, if there is no such notice of appearance, at such Estate Professional's last known email address and facsimile number) and by filing a notice thereof on the docket of the Bankruptcy Court within two (2) business days after the Debtors' receipt of a Carve-Out Trigger

Notice, informing them that such Carve-Out Trigger Notice has been received and further advising them that the Debtors' ability to pay such Estate Professionals is subject to and limited by the Carve-Out.

j.    Notwithstanding the foregoing, so long as a Carve-Out Trigger Notice has not been delivered in accordance with this Interim Order: (i) the Debtors shall be permitted to pay administrative expenses of Estate Professionals allowed and payable under sections 328, 330 and 331 of the Bankruptcy Code, as the same may become due and payable, including on an interim basis, and (ii) such payments shall not reduce, or be deemed to reduce, the Post Carve-Out Trigger Notice Cap.

k.    None of the DIP Agent, the DIP Lenders, or the Participating WAC Secured Parties shall be (i) responsible for the direct payment or reimbursement of any fees or disbursements of any Estate Professional incurred in connection with the Chapter 11 Cases or any successor cases under any chapter of the Bankruptcy Code, or (ii) obligated in any way to compensate, or to reimburse expenses of, any Estate Professional or to guarantee that the Debtors have sufficient funds to pay such compensation or reimbursement.

l.    Nothing in this Interim Order shall or shall be construed to limit the payment following the delivery of a Carve-Out Trigger Notice of any of the amounts included in the Carve-Out from cash that is not Cash Collateral, if any.

m.    Nothing contained herein is intended to constitute, nor should be construed as consent to, the allowance of any Estate Professional's fees, costs or expenses by any party and shall not affect the right of the Debtors, the DIP Parties, the Participating WAC Secured Parties, the Committee (if any), the U.S. Trustee, or any other party-in-interest to object to the allowance and payment of any amounts incurred or requested.

18.     <u>Limitation on Use of Cash Collateral and DIP Facility Proceeds</u>.

Notwithstanding anything herein to the contrary, no portion of the Carve-Out, DIP Facility, DIP

Collateral, or WAC Collateral, including Cash Collateral, shall include, apply to, or be available

for any fees, costs or expenses incurred by any party, including the Debtors or the Committee (if

any), in connection with any of the following: (a) the investigation (including by way of

examinations or discovery proceedings), initiation, assertion, joining, commencement, support or

prosecution of any claims, counter-claims, causes of action, adversary proceedings, applications,

motions, objections, defenses, or other contested matters against any of the DIP Parties, or the

Participating WAC Secured Parties, and each of their respective successors, assigns, affiliates,

parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors,

financial advisors, consultants, professionals, officers, directors, members, managers,

shareholders, and employees, past, present and future, and their respective heirs, predecessors,

successors and assigns, in each case in their respective capacities as such and with respect to any

contested matter, adversary proceeding, or other matter challenging or otherwise objecting to the

admissions, stipulations, findings, or releases included Paragraph D of this Interim Order (the

"<u>Stipulations</u>"), including, (i) investigating or challenging the amount, validity, extent, perfection,

priority, or enforceability of, or asserting any defense, counterclaim, or offset to the DIP

Obligations, DIP Superpriority Claims or security interests and liens of the DIP Parties in respect

thereof, (ii) investigating or challenging the amount, validity, extent, perfection, priority, or

enforceability of, or asserting any defense, counterclaim, or offset to the Participating WAC

Secured Obligations or the Participating WAC Liens, (iii) investigating or asserting any claims or

causes of action arising under chapter 5 of the Bankruptcy Code against the Participating WAC

Secured Parties, (iv) investigating or asserting any so-called "lender liability" claims and causes

of action against the Participating WAC Secured Parties or the DIP Parties; and (v) investigating

or asserting any action seeking to invalidate, set aside, avoid or (other than as contemplated by this

Interim Order and Bankruptcy Code section 510(a)) subordinate, in whole or in part, the

Participating WAC Secured Obligations or the DIP Loans (each, a "Loan Party Claim"), provided,

however, the Committee (if any) may use up to $25,000 or such higher amount as is agreed to in

the Final Order (the "Investigation Budget") to investigate the foregoing items (i) through (v) in

this paragraph 18, provided, further, however that no portion of the Investigation Budget may be

used by the Committee (if any) or any other party to prosecute or support any claims or challenges;

(b) the assertion of any claims or causes of action against the Participating WAC Secured Parties

or the DIP Parties, including, without limitation, claims or actions to hinder or delay the assertion,

enforcement or realization on the DIP Collateral or the liens securing the Participating WAC

Secured Obligations in accordance with this Interim Order other than to contest in good faith the

occurrence or continuance of any DIP Termination Event or Cash Collateral Termination Event;

(c) seeking to modify any of the rights, remedies, priorities, privileges, protections and benefits

granted to the Participating WAC Secured Parties or the DIP Parties hereunder or under the DIP

Documents or the Participating WAC Loan Documents, in each of the foregoing cases without

such applicable parties' prior written consent; (d) the payment of any amount on account of any

claims arising prior to the Petition Date unless such payments are permitted by the Approved

Budget (subject to any Permitted Variances) and the DIP Credit Agreement or are approved by

order of the Bankruptcy Court; or (e) any purpose that is prohibited under the Bankruptcy Code.

19.    Protection of DIP Lenders' Rights and Adequate Protection Liens.  So long

as there are any DIP Obligations outstanding under the DIP Credit Agreement, the Participating

WAC Secured Parties shall: (a) subject to Paragraph 38 have no right to, and take no action to,

foreclose upon or recover in connection with the liens granted thereto pursuant to the Participating WAC Loan Documents or this Interim Order or otherwise seek or exercise any enforcement rights or remedies against any DIP Collateral or in connection with the debt and obligations underlying the Participating WAC Loan Documents or the Adequate Protection Liens, including, without limitation, in respect of the occurrence or continuance of any Event of Default (as defined in the applicable Participating WAC Loan Documents, as applicable); (b) be deemed to have consented to any release of DIP Collateral authorized under the DIP Documents; (c) not file any further financing statements, patent filings, trademark filings, copyright filings, mortgages, memoranda of lease, notices of lien or similar instruments, or otherwise take any action to perfect their security interests in the DIP Collateral, unless, solely as to this clause (c), the DIP Lenders also file financing statements or other documents to perfect the liens granted pursuant to the DIP Documents and/or this Interim Order, or as may be required by applicable state law to continue the perfection of valid and unavoidable liens or security interests as of the date of filing; and (d) deliver or cause to be delivered, at the Debtors' costs and expense (for which the applicable Participating WAC Secured Parties shall be reimbursed upon submission to the Debtors of invoices or billing statements), any termination statements, releases and/or assignments (to the extent provided for herein) in favor of the DIP Agent and the DIP Lenders or other documents necessary to effectuate and/or evidence the release, termination and/or assignment of the Adequate Protection Liens on any portion of the DIP Collateral subject to any sale or disposition approved or arranged for by the DIP Agent.

20.    Reservation of Certain Third-Party Rights.  The Committee (if any) and any other party in interest solely to the extent such party is granted standing shall have a maximum of sixty (60) calendar days from the date of entry of the Final Order (the "Investigation Termination

Date") to commence an appropriate contested matter or adversary proceeding (a "Challenge")

asserting any Loan Party Claim.  If a Challenge is not filed on or before the Investigation

Termination Date (or such other later date as ordered by this Court or extended by the written

consent of the applicable Prepetition Approving Party, then: (a) the Stipulations shall be

irrevocably binding on the Debtors, the Committee (if any), all creditors of the Debtors, and all

parties-in-interest and any and all successors-in-interest as to any of the foregoing, including any

chapter 11 trustee or chapter 7 trustee appointed in the Chapter 11 Cases or any subsequent chapter

7 cases, without further action by any party or this Court, and the Debtors, the Committee (if any),

all creditors of the Debtors, and any other party-in-interest and any and all successors-in-interest

as to any of the foregoing, including any chapter 11 trustee or chapter 7 trustee appointed in the

Chapter 11 Cases or any subsequent chapter 7 cases, shall thereafter be forever barred from

bringing any Challenge with respect thereto; (b) the Participating WAC Liens shall be deemed to

constitute valid, binding, enforceable and perfected liens and security interests not subject to

avoidance or disallowance pursuant to the Bankruptcy Code or applicable non-bankruptcy law;

(c) the Participating WAC Secured Obligations shall be deemed to be finally allowed claims for

all purposes against each of the respective Participating WAC Obligors, including in any

subsequent chapter 7 cases, in the amounts set forth in paragraph D, and shall not be subject to

challenge by any party-in-interest as to validity, priority or otherwise; and (d) the Debtors shall be

deemed to have released, waived and discharged the Releasees, from any and all claims and causes

of action arising out of, based upon or related to, in whole or in part, the Participating WAC

Secured Obligations.  Notwithstanding anything to the contrary herein: (x) if any such Challenge

is timely commenced, the Stipulations shall nonetheless remain binding and preclusive on all

parties-in-interest (other than the party that has brought such Challenge in connection therewith

and then only with respect to the Stipulations that are subject to the Challenge and not to any Stipulations not subject to the Challenge) except to the extent that such Stipulations are successfully challenged in such Challenge; and (y) the Participating WAC Secured Parties and the DIP Parties reserve all of their rights to contest on any grounds any Challenge and preserve any and all of their rights to appeal and stay any orders issued in connection with a successful Challenge.  For the avoidance of doubt, nothing in this Interim Order vests or confers on the Committee (if any) or any person (as defined in the Bankruptcy Code) standing or authority to pursue any cause of action belonging to the Debtors or their estates.

21.    <u>Bankruptcy Code Section 506(c) Waiver</u>.  Subject to entry of the Final Order, the Debtors shall irrevocably waive, and shall be prohibited from asserting any surcharge claim, under section 506(c) of the Bankruptcy Code or otherwise, for any costs and expenses incurred in connection with the preservation, protection or enhancement of, or realization by the DIP Parties upon the DIP Collateral, or the realization by Participating WAC Secured Parties upon the Participating WAC Collateral (as applicable); provided the Debtors reserve all rights to surcharge the WAC2 Collateral, the WAC3 Collateral and/or the WAC10 Collateral pursuant to section 506(c) of the Bankruptcy Code subject to approval by the Court upon a motion after notice and hearing.

22.    <u>No Marshaling/Application of Proceeds</u>.  In the Final Order, the Debtors shall request that none of the Intercompany Protection Liens, the DIP Parties nor the Participating WAC Secured Parties be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to the DIP Collateral or the Participating WAC Collateral and all proceeds thereof shall be received and used in accordance with this Interim Order.

23.    <u>Section 552(b)</u>.  The Debtors intend to seek a finding in the Final Order that the Participating WAC Secured Parties shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and that the "equities of the case" exception under section 552(b) shall not apply to the Participating WAC Secured Parties with respect to the proceeds, products, offspring, or profits of any of the Participating WAC Collateral.

24.    <u>Disposition of Collateral; Application of Proceeds</u>.  Except as expressly permitted by the DIP Credit Agreement, the Debtors shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP Collateral or the Participating WAC Collateral other than in the ordinary course of business without an order of the Court or the prior written consent of the DIP Agent (subject to the consent of the Required DIP Lenders).  Notwithstanding anything otherwise provided herein, upon the sale of all or substantially all of the DIP Collateral, the Debtors shall, subject to the satisfaction of the Carve-Out and the Permitted Liens, use cash in an amount equal to 100% of any net cash proceeds of such sale to immediately satisfy the DIP Obligations; <u>provided</u> that upon the occurrence of an Asset Sale or Event of Loss (as such terms are defined in the DIP Credit Agreement) with respect to WAC Specific Collateral, other than in the case of (x) a sale, transfer, or other disposition of substantially all of the assets or equity of a Participating WAC Group; (y) in connection with a transaction resulting in a Change of Control (as such term is defined in the DIP Credit Agreement); or (z) the B412 SP MSN 33156 (in which case the proceeds shall be placed in a segregated account of WAC 7 and shall be excluded from DIP Collateral), the net cash proceeds used to satisfy the DIP Obligations shall not exceed the Maximum Intercompany Balance of the applicable Participating WAC Group.

25.    <u>Proceeds of Subsequent Financing</u>.  Subject in all respects to the Carve-Out, if at any time prior to (a) the indefeasible payment in full or otherwise acceptable satisfaction of

all DIP Obligations and the DIP Superpriority Claims; and (b) the termination of the DIP Agent's and the DIP Lenders' obligation to extend credit under the DIP Facilities, any of the Debtors or any trustee or examiner with expanded powers or any responsible officer subsequently appointed in any of the Chapter 11 Cases or any successor cases obtains credit or incurs debt pursuant to section 364(b), 364(c), or 364(d) of the Bankruptcy Code, whether or not in violation of the DIP Documents or this Interim Order, then unless otherwise agreed by the Required DIP Lenders, all of the cash proceeds derived from such credit or debt shall immediately be turned over to the DIP Agent and distributed in accordance with the terms of the DIP Documents.

26.    Automatic Effectiveness of Liens.  This Interim Order shall be sufficient and conclusive evidence of the creation, validity, perfection, and priority of all liens granted herein, including the Intercompany Protection Liens, DIP Liens, and Adequate Protection Liens, and such liens shall attach and become valid, perfected, binding, enforceable, non-avoidable and effective liens by operation of law as of December 7, 2018 without any further action by the Debtors, the DIP Parties or any of the Participating WAC Secured Parties, and without the necessity of executing, filing or recording any financing statements, security agreements, vehicle lien applications, mortgages, filings with a governmental unit (including, without limitation, the U.S. Patent and Trademark Office or the Library of Congress), or other documents or the taking of any other actions (including, for the avoidance of doubt, entering into any deposit account control agreement or taking possession of any collateral) to validate or perfect (in accordance with applicable law) such liens, or to entitle the applicable Debtor, DIP Parties, or the Participating WAC Secured Parties the priorities granted herein.  Any property or assets or other items of collateral constituting DIP Collateral which are in the possession of a Participating WAC Agent (or its agents or bailees) or under the control (as defined in the Uniform Commercial Code) of a

Participating WAC Agent as at the Petition Date shall at all times be held by such Participating

WAC Agent as gratuitous bailee for the benefit of the DIP Agent and the other DIP Parties. If the

DIP Agent or any of the Participating WAC Agents hereafter requests that the Debtors execute

and deliver to the DIP Agent or any of the Participating WAC Agents financing statements,

security agreements, pledge agreements, control agreements, collateral assignments, mortgages,

or other instruments and documents considered by the DIP Agent or any of the Participating WAC

Agents, as applicable, to be reasonably necessary or desirable to further evidence the perfection of

the DIP Liens or Adequate Protection Liens, as applicable, the Debtors are hereby authorized to

execute and deliver such financing statements, security agreements, pledge agreements, control

agreements, mortgages, collateral assignments, instruments, and documents, and the DIP Agent

and each of the Participating WAC Agents, as applicable, is hereby authorized to file or record

such documents in their discretion without seeking modification of the automatic stay under

section 362 of the Bankruptcy Code, in which event all such documents shall be deemed to have

been filed or recorded at the time and on December 7, 2018; provided, however, no such filing or

recordation shall be necessary or required in order to create or perfect the DIP Liens and the

Adequate Protection Liens. The DIP Agent and the each Participating WAC Agent, as applicable,

each in its sole discretion, may file a photocopy of this Interim Order as a financing statement with

any filing or recording office or with any registry of deeds or similar office in addition to, or in

lieu of, such financing statements, notices of liens, or similar statements, and any such filing,

recording, or similar office is directed to accept such filing as a financing statement.

27.    <u>Automatic Stay; Rights and Remedies Upon DIP Event of Default</u>. Subject

to the terms set forth herein, the automatic stay imposed under section 362(a) of the Bankruptcy

Code is hereby modified as necessary to effectuate all of the terms, rights, benefits, privileges,

remedies and provisions of this Interim Order and the DIP Documents, including, without limitation, to permit: (a) the DIP Obligors to grant the DIP Liens and the DIP Superpriority Claims, and to perform such acts as the DIP Agent may reasonably request, to assure the perfection and priority of the DIP Liens and any other liens granted hereunder; (b) the Debtors to take all appropriate actions necessary to (i) grant the Intercompany Protection Claims, Intercompany Protection Liens, Adequate Protection Claims, Adequate Protection Liens, and any other liens set forth herein, and (ii) ensure that the Intercompany Protection Liens, the Adequate Protection Liens, and any other liens granted hereunder are perfected and maintain the priority set forth herein; (c) the Debtors to incur all liabilities and obligations (including, with respect to the DIP Obligors, all the DIP Obligations) to the DIP Parties, the Participating WAC Secured Parties, the Non-Participating WAC Secured Parties and each other (as applicable), as contemplated under this Interim Order and the DIP Documents; (d) the DIP Obligors to pay all amounts required under, in accordance with, and subject to the DIP Documents and this Interim Order; (e) the DIP Parties and the Participating WAC Secured Parties to retain and apply payments made in accordance with the DIP Documents and this Interim Order; (f) subject to the proviso below in this paragraph 27, upon the occurrence and during the continuance of any Event of Default (under and as defined in the DIP Documents, a "DIP Event of Default"), the DIP Parties to exercise all rights and remedies provided for in the DIP Documents and take any or all actions provided therein, and (g) the implementation of all of the terms, rights, benefits, privileges, remedies, and provisions of this Interim Order and the DIP Documents, in each case, without further notice, motion, or application to, or order of or hearing before, this Court, subject to the terms of this Interim Order including as to the DIP Remedies Notice Period (as defined herein). Moreover, subject to the provisions of the DIP Documents and without further order from this Court, the automatic stay provisions of section

362 of the Bankruptcy Code are vacated and modified to the extent necessary to permit the DIP

Parties (or any of their respective agents) to exercise, upon the occurrence and during the

continuance of any DIP Event of Default, all rights and remedies provided for in the DIP

Documents, and to take any or all of the following actions without further notice, motion or

application to, order of or hearing before, this Court: (1) prohibit the DIP Borrowers from making

any further withdrawals under the DIP Facility (but without affecting any of the DIP Obligations

or the DIP Liens securing the DIP Obligations); (2) declare the termination, reduction, or

restriction of any individual Commitments (as defined in the DIP Credit Agreement) of any DIP

Lender to make further DIP Loans, to the extent such Commitment remains outstanding;

(3) declare the unpaid principal amount of all outstanding DIP Loans, all interest accrued and

unpaid thereon, and all other DIP Obligations to be immediately due and payable by notice to the

DIP Obligors, without presentment, demand, protest or further notice of any kind, all of which are

hereby expressly waived by the DIP Obligors; (4) subject to the Carve-Out and the Intercompany

Protection Claims, freeze monies or balances in the DIP Obligors' accounts; (5) subject to the

Carve-Out, the Intercompany Protection Claims, the Intercompany Protection Liens, and

immediately set off any and all amounts in (1) by notice to the DIP Obligors, declare the Term

Loan Commitment (as defined in the DIP Credit Agreement) terminated, whereupon all Term

Loan Commitments of each DIP Lender shall forthwith terminate immediately and any

commitment fee shall forthwith become due and payable without any other notice of any kind;

(2) by notice to the DIP Obligors, accelerate and declare the principal of and any accrued interest

in respect of all Term Loans (as defined in the DIP Credit Agreement) and all Secured Obligations

(as defined in the DIP Credit Agreement) owing hereunder and thereunder to be, whereupon the

same shall become, forthwith due and payable without presentment, demand, protest or other

notice of any kind, all of which are hereby waived by each DIP Obligor; (3) instruct the DIP Agent

to enforce in accordance with the provisions of the Orders and the Credit Documents all of the

Liens and security interests created pursuant to the Orders and the Security Documents; (4) enforce

each Guaranty (as defined in the DIP Credit Agreement); (5) instruct the DIP Agent to apply any

cash Collateral held by the DIP Agent in a pledged account to the repayment of the Secured

Obligations; (6) exercise, or instruct the DIP Agent to exercise, any other right or remedy available

against any DIP Obligor under the Orders, any of the other Credit Documents or under applicable

law, and (7) (A) terminate the DIP Facility as to any future liability or obligation of the DIP Agent

and the DIP Lenders, but without affecting any of the obligations under the DIP Facility, the Liens

under the DIP Facility, or post-petition administrative superpriority claim status, subject to the

Carve-Out and (B) upon three (3) Business Days' notice to the DIP Obligors and the DIP Agent,

declare a termination, reduction or restriction on the ability of the DIP Obligors to use any cash

collateral derived solely from the proceeds of Collateral; provided, however, that prior to the

exercise of any right or remedy described in this paragraph, the DIP Agent shall be required to

provide three (3) business days' written notice of the DIP Agent's intent to exercise its rights and

remedies to the DIP Borrowers (with a copy to their bankruptcy counsel), counsel to the Committee

(if any), counsel to the Steering Committee, all counsel to the Participating WAC Secured Parties

and the U.S. Trustee (the "Remedies Notice Period").  During the Remedies Notice Period, (a) any

party in interest shall be entitled to request a hearing on an expedited basis, including, without

limitation to seek to stay the DIP Agent's exercise of any rights or remedies and Cash Collateral

may be used for such purposes and (b) the Debtors may continue to use Cash Collateral for critical

and necessary expenses, set forth in the Approved Budget, including, with respect to the

Participating WAC Secured Parties' Cash Collateral, for the purposes of funding the Carve-Out,

and in no event may the Borrowers make any insider payments (other than ordinary course payroll, benefits and employee expense reimbursements or other extraordinary payments).  Unless the Court orders otherwise during the Remedies Notice Period (or extends the Remedies Notice Period to permit such expedited hearing to occur), the automatic stay, as to the DIP Parties, shall automatically be terminated at the end of the Remedies Notice Period without further notice or order, and, upon expiration of such notice period, the DIP Parties shall be permitted, subject to the Carve-Out and the Intercompany Protection Claims and Intercompany Protection Liens, to exercise all rights and remedies set forth in this Interim Order, the DIP Credit Agreement and the other DIP Documents, as applicable, and as otherwise available at law, without further notice, motion or application to, order of or hearing before, this Court, and without restriction or restraint by any stay under sections 105 or 362 of the Bankruptcy Code, or otherwise.  The rights and remedies of the DIP Parties specified herein are cumulative and not exclusive of any rights or remedies that the DIP Parties may have under the DIP Documents or otherwise.  Upon expiration of the Remedies Notice Period, the Debtors shall cooperate with the DIP Parties in their exercise of their rights and remedies, whether against the DIP Collateral or otherwise, shall not challenge or raise any objections to the exercise of such rights and shall waive any right to seek relief under the Bankruptcy Code, including under section 105 thereof, to the extent such relief would restrict or impair the rights and remedies of the DIP Parties set forth in this Interim Order and in the DIP Documents.  This Court shall retain exclusive jurisdiction to hear and resolve any disputes and enter any orders required by the provisions of this paragraph and relating to the application, re-imposition or continuance of the automatic stay as provided hereunder.  The delay or failure to exercise rights and remedies under the applicable DIP Documents or this Interim Order by the DIP Agent and the DIP Lenders shall not constitute a waiver of the applicable DIP Agent's or the DIP

Lenders' rights hereunder, thereunder or otherwise, unless such waiver is pursuant to a written instrument executed in accordance with the terms of the applicable DIP Documents and this Interim Order, as applicable.

        28.     <u>Rights and Remedies Upon Cash Collateral Event of Default</u>.

        a.     With respect to the Cash Collateral of any Participating WAC Facility, the following shall constitute "<u>Cash Collateral Events of Default</u>":

    i.   acceleration or maturity of the DIP Facility;

    ii.   failure of the Debtors to comply in any material respect with any covenant, agreement, or provision of this Interim Order with respect to its obligations to a Participating WAC Secured Party in such Participating WAC Facility and such failure shall continue unremedied for five (5) business days following notice by the applicable Participating WAC Agent of such failure;

    iii.   failure of the Debtors to comply with any Milestone (in the form attached hereto as <u>Exhibit D</u>) and such failure shall continue unremedied for five (5) business days following notice by the applicable Participating WAC Agent of such failure;

    iv.   with respect to any Participating WAC Facility, failure of the Debtors to comply with terms of an Acceptable Bidding Procedures Order with respect to the rights grants thereunder to a secured party under such Participating WAC Facility, including the failure to obtain an order authorizing a sale pursuant to a properly submitted Streamlined Credit Bid by February 15, 2019;

    v.   amendment of any Milestone without the consent of the Participating Approving Parties;

    vi.   appointment of a trustee, examiner with expanded powers or reciever in any of the Chapter 11 Cases (other than solely in the Chapter 11 Case of one or more members of a Non-Participating WAC Group);

    vii.   an order is entered reversing, amending, supplementing, staying, vacating or otherwise modifying this Interim Order with respect to any provision concerning cash management, the Intercompany Protection Liens, the Intercompany Protection Claims, or the Adequate Protection granted to the applicable Participating WAC Secured Parties without the consent of the applicable Prepetition Approving Party;

    viii.   the Final Order (to the extent it varies from this Interim Order) is not in form and substance reasonably acceptable to applicable Prepetition Approving Party with respect to any provision concerning cash management, the Intercompany Protection Liens, the Intercompany Protection Claims, the Maximum Intercompany Balance, or the

Adequate Protection granted to the applicable Participating WAC Secured Parties;

ix. any adverse deviation of more than the Permitted Variance under the Approved Budget for any Test Period;

x. this Court (or any court of competent jurisdiction) enters an order dismissing any of the Chapter 11 Cases (other than the Chapter 11 Case of a member of a Non-Participating WAC Group or the Chapter 11 Case of a member of different Participating WAC Group with the consent of the applicable Prepetition Approving Party for such Participating WAC Group);

xi. this Court (or any court of competent jurisdiction) enters an order converting any of the Chapter 11 Cases (other than the Chapter 11 Case of a member of a Non-Participating WAC Group) to a case under chapter 7 of the Bankruptcy Code;

xii. invalidation or impairment of the Adequate Protection Liens, Intercompany Protection Liens, or Participating WAC Liens of the applicable Participating WAC Secured Parties;

xiii. the entry of an order by the Court terminating or modifying the exclusive right of any DIP Obligor to file a plan pursuant to Section 1121 of the Bankruptcy Code, without the prior written consent of the Required DIP Lenders, other than an order entered pursuant to a motion filed by or with the consent of the applicable Prepetition Approving Parties;

xiv. any DIP Obligor seeks approval of a sale of any WAC Specific Collateral or approval of bidding procedures for such a sale (whether implemented through a plan of reorganization or otherwise) that would be inconsistent with the terms of the DIP Facility and the Milestones, without the prior written consent of the applicable Prepetition Approving Parties;

xv. with respect to a Participating WAC Facility, failure to comply with terms of an Acceptable Bidding Procedures Order with respect to the rights granted thereunder to a secured party under such Participating WAC Facility, including the failure to obtain an order authorizing a sale pursuant to a properly submitted Streamlined Credit Bid by February 15, 2019; and

xvi. the failure of the Debtors to comply with sections 8.03, 8.04, 8.05, 8.07, 8.11, 8.15, 8.19, 8.23, 8.24, 9.01, 9.02, 9.03, 9.04, 9.05, 9.07, 9.08, 9.10, 9.12, or 9.15 of the DIP Credit Agreement (in the form attached as <u>Exhibit A</u> hereto) with respect to a Participating WAC Group or its WAC Specific Collateral, as applicable, and such failure continues unremedied for 15 days after the applicable Prepetition Approving Party gives notice to the Debtors of such failure.

b.    Upon the occurrence of a Cash Collateral Event of Default, the applicable Participating WAC Agent (which, for the avoidance of doubt, with respect to

74

subsections (a)(ii), (a)(v), (a)(x), and (a)(xi) above, shall mean solely the Participating WAC Agent for the affected Participating WAC Facility or Participating WAC Secured Parties) may provide three (3) business days' written notice of such Participating WAC Agent's intent to terminate the use of Cash Collateral of its Participating WAC Facility to the Debtors (with a copy to their bankruptcy counsel), counsel to the Committee (if any), counsel to the DIP Parties, all counsel to the Participating WAC Secured Parties and the U.S. Trustee (the "Cash Collateral Remedies Notice Period"). During the Cash Collateral Remedies Notice Period the Debtors may continue to utilize Cash Collateral (including of the Participating WAC Facility seeking to terminate such use) in accordance with the terms of this Interim Order; provided that immediately upon receipt of such notice from a Participating WAC Agent, the Debtors shall not transfer the Cash Collateral of the applicable Participating WAC Group to any other Debtor entity other than to satisfy a Net WLIL Intercompany Protection Claim. During the Cash Collateral Remedies Notice Period, any party in interest shall be entitled to seek an emergency hearing with the Bankruptcy Court seeking (x) a finding that such Cash Collateral Event of Default has not occurred or is not continuing, (y) seeking a stay of the effectiveness of the termination of the use of Cash Collateral, or (z) to use the Cash Collateral of such terminating Participating WAC Secured Parties without their consent. Following the termination of the use of Cash Collateral, WLIL shall not make any payments to or on behalf of such terminating Participating WAC Group. Unless the Court orders otherwise during the Cash Collateral Remedies Notice Period (or extends the Cash Collateral Remedies Notice Period to permit such expedited hearing to occur), the automatic stay shall automatically be terminated at the end of the Cash Collateral Remedies Notice Period subject to the Carve-Out and the Intercompany Protection Claims and Intercompany Protection Liens, to permit the applicable Participating WAC Agent to immediately terminate the Debtors' rights, if any, under this Interim

Order to use Cash Collateral.  For the avoidance of doubt, declaration of a Cash Collateral Event of Default and the termination by one group of Participating WAC Secured Parties will not constitute a Cash Collateral Event of Default for, or terminate the use of Cash Collateral of, any other group of Participating WAC Secured Parties.

29.    <u>Third Party Access</u>.  Subject to entry of the Final Order, without limiting any other rights or remedies of the DIP Parties available at law or in equity, and subject to the terms of the DIP Documents, upon three (3) business days' written notice to counsel to the Debtors, counsel to the Committee (if any), any lienholder, licensor, or other third party owner of any licensed premises or intellectual property, that an Event of Default has occurred and is continuing under the DIP Documents, the DIP Agent, (a) may, unless otherwise expressly provided in any separate agreement by and between the applicable licensor and the DIP Agent (the terms of which shall be reasonably acceptable to the parties thereto), enter upon any licensed premises of the DIP Obligors for the purpose of exercising any remedy with respect to DIP Collateral located thereon and (b) shall be entitled to all of the DIP Obligors' rights, privileges, and responsibilities as licensee under the applicable license and to use any and all trademarks, trade names, copyrights, licenses, patents, or any other similar assets of the DIP Obligors, which are owned by or subject to a lien of any third party and which are used by DIP Obligors in their businesses, in either the case of subparagraph (a) or (b) of this paragraph 29 without interference from lienholders or licensors thereunder, subject to such lienholders' or licensors' rights under applicable law; <u>provided</u>, <u>however</u>, that the DIP Agent (on behalf of the DIP Lenders) shall pay only fees, royalties, or other monetary obligations of the DIP Obligors that first arise after the written notice referenced above from the DIP Agent and that accrue during the period of such occupancy or use by DIP Agent calculated on a per diem basis.  Nothing herein shall require the Debtors or the DIP Parties to

assume any license under Bankruptcy Code section 365(a) as a precondition to the rights afforded

to each of the foregoing in this paragraph 29.  For the avoidance of doubt, subject to (and without

the waiver of) the rights of the DIP Parties under nonbankruptcy law, the DIP Parties can only

enter upon a leased premises after a DIP Event of Default in accordance with (a) a separate

agreement with the landlord of the applicable leased premises or (b) upon entry of an order of this

Court upon motion by the DIP Parties and upon such notice to the landlord as shall be required by

this Court.

30.    <u>Maintenance of DIP Collateral</u>.  Unless the DIP Agent (at the direction of

the Required DIP Lenders) may otherwise consent in writing, until (x) the indefeasible payment

in full or otherwise acceptable satisfaction of all DIP Obligations and (y) the termination of the

DIP Agent's and the DIP Lenders' obligation to extend credit under the DIP Facilities, the DIP

Obligors shall (a) insure the DIP Collateral as required under the DIP Facilities or the Participating

WAC Facilities, as applicable and (b) maintain the cash management system in effect as of the

Petition Date, as modified by this Interim Order.

31.    <u>Binding Effect</u>.  The provisions of this Interim Order shall inure to the

benefit of the Debtors, the DIP Parties, the Participating WAC Secured Parties, the Non-

Participating WAC Secured Parties, and their respective successors and permitted assigns, and,

subject to Paragraph 20, shall be binding upon the Debtors, the DIP Parties, the Participating WAC

Secured Parties, the Committee (if any), and any and all other creditors of the Debtors or other

parties in interest and their successors and assigns, including without limitation, any trustee

hereafter appointed for the estate of any of the Debtors, whether in these Chapter 11 Cases or in

the event of a conversion of any of the Chapter 11 Cases to a liquidation under chapter 7 of the

Bankruptcy Code or dismissal of any of the Chapter 11 Cases.  Such binding effect is an integral

part of this Interim Order.  Further, upon entry of this Interim Order, the Stipulations shall be binding on the Debtors, and the DIP Obligations shall constitute allowed claims for all purposes in each of the Chapter 11 Cases.

32.    <u>Survival</u>.  The terms and provisions of this Interim Order and any actions taken pursuant hereto, including but not limited to the Intercompany Protection Liens, Intercompany Protection Claims, DIP Superpriority Claims, the DIP Liens, and the Adequate Protection Liens and Adequate Protection Claims granted pursuant to this Interim Order or the DIP Documents, shall survive the entry of any order: (a) confirming any chapter 11 plan in any of the Chapter 11 Cases; (b) converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code; or (c) dismissing any of the Chapter 11 Cases or any successor cases, and the terms and provisions of this Interim Order shall continue in full force and effect notwithstanding the entry of any such order.  Such claims and liens shall maintain their priority as provided by this Interim Order and the DIP Documents, as applicable, and to the maximum extent permitted by law, until all of the DIP Obligations and Participating WAC Secured Obligations are indefeasibly paid in full in cash (other than contingent indemnification obligations for which no claim has been asserted) and discharged or, with respect to the Participating WAC Secured Obligations, otherwise treated under a chapter 11 plan.  In no event shall any plan of reorganization be allowed to alter the terms of repayment of any of the DIP Obligations from those set forth in the DIP Documents unless agreed to by and among the DIP Borrowers and the DIP Parties.

33.    <u>Modifications of DIP Documents</u>.  Subject to the limitations set forth below, the DIP Obligors and the DIP Parties are hereby authorized to implement, in accordance with the terms of the DIP Documents, any non-material modifications or amendments (including without limitation, any change in the number or composition of the DIP Lenders or the DIP Agent) of the

DIP Documents without further notice, motion or application to, order of or hearing before, this Court. Any proposed material modification or amendment to the DIP Documents shall (a) be filed on the Court's docket and (b) provide parties-in-interest five (5) business days from the date of filing of such material modification or amendment to object in writing to such amendment, and if no objections are received, shall be submitted under certification of counsel; provided, that any forbearance from, or waiver of, (x) a breach by the DIP Obligors of a covenant, representation or any other agreement or (y) a default or a DIP Event of Default shall not require an order of this Court. If no objections are timely received during such five (5) business day notice period, the DIP Obligors, the DIP Agent and the DIP Lenders are authorized and empowered to implement, in accordance with the terms of the DIP Documents, such material modification or amendment, without further notice, hearing or approval of this Court. Any proposed material modification or amendment to the DIP Documents that is subject to a timely filed objection in accordance with this paragraph shall be subject to further order of this Court.

34.     <u>Insurance Policies</u>.  Upon entry of this Interim Order, on each insurance policy maintained by the DIP Obligors which in any way relates to the DIP Collateral: (a) the DIP Agent and the DIP Lenders shall be, and shall be deemed to be, without any further action by or notice to any person, named as additional insureds; and (b) the DIP Agent, on behalf of the DIP Lenders, shall be, and shall be deemed to be, without any further action by or notice to any person, named as a loss payee.

35.     <u>Protection Under Section 364(e) of the Bankruptcy Code</u>.  The DIP Parties and the Participating WAC Secured Parties have acted in good faith in connection with this Interim Order and their reliance on this Interim Order is in good faith.  Based on the record of these Chapter 11 Cases, and in accordance with section 364(e) of the Bankruptcy Code, if any or all of the

provisions of this Interim Order are hereafter reversed, modified, vacated or stayed, such reversal, modification, vacation or stay shall not affect the (a) validity of any DIP Obligations owing to the DIP Parties, or adequate protection obligations owing to the applicable Participating WAC Secured Party, incurred prior to the actual receipt by the DIP Agent or Participating WAC Agents, as applicable, of written notice of the effective date of such reversal, modification, vacation or stay, or (b) validity or enforceability of any DIP Loans or other advances previously made or any claim, lien, security interest or priority authorized or created hereby or pursuant to the DIP Documents with respect to any DIP Obligations owing to the DIP Parties or any adequate protection obligations owing to the applicable Participating WAC Secured Party.  Notwithstanding any such reversal, modification, vacation or stay, any use of Cash Collateral, incurrence of DIP Obligations or incurrence of adequate protection obligations by the Debtors prior to the actual receipt by the DIP Agent, or the Participating WAC Agents, as applicable, of written notice of the effective date of such reversal, modification, vacation or stay, shall be governed in all respects by the provisions of this Interim Order, and the DIP Parties and the applicable Participating WAC Secured Party shall be entitled to all of the rights, remedies, protections and benefits granted under section 364(e) of the Bankruptcy Code, this Interim Order, and the DIP Documents with respect to all uses of Cash Collateral and the incurrence of DIP Obligations and adequate protection obligations.

36.     Effect of Dismissal or Conversion of Chapter 11 Cases.  If the Chapter 11 Cases are dismissed or converted, then such dismissal or conversion of the Chapter 11 Cases shall not affect the rights of the DIP Parties and the Participating WAC Parties under their respective DIP Documents, Participating WAC Loan Documents or this Interim Order, and all of the respective rights and remedies thereunder of the DIP Parties and the Participating WAC Parties shall remain in full force and effect as if the Chapter 11 Cases had not been dismissed or converted.

If an order dismissing any of the Chapter 11 Cases is at any time entered, such order shall provide (in accordance with sections 105 and 349 of the Bankruptcy Code) that: (a) the DIP Liens and DIP Superpriority Claims granted to and conferred upon the DIP Parties and the protections afforded to the DIP Parties pursuant to this Interim Order and the DIP Documents shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all DIP Obligations shall have been paid and indefeasibly satisfied in full in cash (and that such DIP Liens, DIP Superpriority Claims and other protections shall, notwithstanding such dismissal, remain binding on all interested parties); (b) all Participating WAC Liens, Adequate Protection Liens and Adequate Protection Claims granted to and conferred upon the applicable Participating WAC Secured Parties shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all Participating WAC Secured Obligations shall have been paid and satisfied in full in cash (and that such Adequate Protection Liens and Adequate Protection Claims shall, notwithstanding such dismissal, remain binding on all interested parties); and (c) to the greatest extent permitted by applicable law, this Court shall retain jurisdiction, notwithstanding such dismissal, for the purpose of enforcing the DIP Liens, Adequate Protection Liens, Adequate Protection Claims and DIP Superpriority Claims referred to herein.

37.    <u>Proofs of Claim</u>.    Notwithstanding any order entered by the Bankruptcy Court in relation to the establishment of a bar date in the Chapter 11 Cases to the contrary, or otherwise, the DIP Parties and the Participating WAC Secured Parties shall not be required to file proofs of claim in the Chapter 11 Cases for any claim allowed herein, and Stipulations shall be deemed to constitute a timely filed proof of claim against the applicable Debtors.  Notwithstanding the foregoing, each of the Participating WAC Agents (on behalf of themselves and the applicable other Participating WAC Secured Parties) is hereby authorized and entitled, in its sole discretion,

but not required, to file (and amend and/or supplement, as it sees fit) a master proof of claim for any claims of the applicable Participating WAC Secured Parties arising from the applicable Participating WAC Loan Documents; provided that nothing herein shall waive the right of any Participating WAC Secured Party to file its own proofs of claim against the Debtors. The provisions set forth in this paragraph are intended solely for the purpose of administrative convenience and shall not affect the substantive rights of any party-in-interest or their respective successors-in-interest, including, without limitation, the numerosity requirements set forth in section 1126 of the Bankruptcy Code.

38.    Credit Bidding. Subject to entry of the Final Order and subject to the terms of the DIP Documents the Participating WAC Agents and/or participating WAC Collateral Agents shall have the right to credit bid as part of any asset sale process and shall have the right to credit bid the full amount of their respective claims during any sale of their respective Participating WAC Collateral, including without limitation, sales pursuant to section 363 of the Bankruptcy Code or included as part of any chapter 11 plan subject to confirmation under section 1129(b)(2)(A)(ii)–(iii) of the Bankruptcy Code. In any credit bid made by a Participating WAC Agent and/or participating WAC Collateral Agents, such bid shall include, among other things, (x) a cash amount sufficient to pay such Participating WAC Facility's portion of the Carve-Out, (y) a reserve for fees and expenses through the closing of such credit bid and (z) its Net WLIL Intercompany Claim. Additionally, in connection with a sale that is not consummated through a chapter 11 plan, the Participating WAC Agents, and/or participating WAC Collateral Agents at the direction of the required lenders under each Participating WAC Facility, consent to (a) the creation of a segregated winddown cash collateral account (the "Winddown Account"); (b) the funding of such Participating WAC Facility's allocable portion of such Winddown Account, and (c) the use of

funds in the Winddown Account to pay the items specified in the definition thereof in the Milestones; provided, that the Participating WAC Lenders shall have a reversionary interest in the funds held in the Winddown Account, if any, after all winddown costs have been paid in full and such reversionary interest shall constitute a superpriority administrative claim in favor of the applicable Participating WAC Secured Parties.  Funds maintained in the Winddown Account shall not (i) be subject to the Intercompany Protection Liens, Intercompany Protection Claims, DIP Liens, the DIP Superpriority Claims, the Adequate Protection Claims, the Adequate Protection Liens or any claim, liens or security interests granted to any other party (including the lenders and agents under the Non-Participating WAC Facilities), (ii) constitute DIP Collateral, (iii) constitute WAC Specific Collateral, or (iv) constitute Cash Collateral.

39.    No Third-Party Rights.  Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect, or incidental beneficiary other than the DIP Agent, the DIP Lenders and the WAC Secured Parties.

40.    Joint and Several Liability.  Nothing in this Interim Order shall be construed to constitute a substantive consolidation of any of the Debtors' estates, it being understood, however, that the Non-WAC Group Obligors shall be jointly and severally liable for all DIP Obligations as provided herein, including without limitation, the DIP Superpriority Claims in accordance with the terms of the DIP Facility and the DIP Documents.

41.    Non-Participating WAC Facilities.

a.    In no event shall the Debtors use the proceeds of the DIP Facility or the Cash Collateral of the Participating WAC Facilities to pay any Non-Participating WAC Direct Expenses.

b.      WLIL may utilize the proceeds of the DIP Financing and/or Cash Collateral of the Participating WAC Secured Parties, in accordance with the amounts set forth on the Approved Budget, to pay for Non-Participating WAC Allocated Expenses (any amounts so used, the "Non-Participating WAC Fronted Expenses"), which expenses shall be allocated to each Participating WAC Facility in the proportion set forth on the Approved Budget.

c.      WLIL will receive an administrative claim against any Non-Participating WAC Group to the extent of any Non-Participating WAC Fronted Expenses.  WLIL will use its commercially reasonable efforts to collect the Non-Participating WAC Fronted Expenses, including by seeking to surcharge the collateral of the applicable Non-Participating WAC under section 506(c) of the Bankruptcy Code for any Non-Participating WAC Fronted Expenses.

42.      Limitations on Liability.  Subject to the entry of the Final Order, in determining to make extensions of credit under the DIP Facility, permitting the use of Cash Collateral or in exercising any rights or remedies as and when permitted pursuant to this Interim Order (or any Final Order), the DIP Documents, or the Participating WAC Loan Documents, as applicable, none of the DIP Parties, the Participating WAC Secured Parties or any successor of any of the foregoing, shall be deemed to be in control of the operations of the Debtors or any affiliate (as defined in section 101(2) of the Bankruptcy Code) of the Debtors, or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors or any affiliate of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601 *et seq*., as amended, or any similar foreign, federal, or state statute).  Furthermore, nothing in this Interim Order, the DIP Documents or the Participating WAC Loan Documents shall in any

way be construed or interpreted to impose or allow the imposition upon the DIP Agent, the DIP

Lenders, the Participating WAC Secured Parties, or any successor of any of the foregoing, of any

liability for any claims arising from the prepetition or postpetition activities of the Debtors or any

affiliate of the Debtors, including any and all activities by the Debtors in the operation of their

business in connection with the Debtors' restructuring efforts, except to the extent caused by their

bad faith, gross negligence, or willful misconduct.

43.    <u>Findings of Fact and Conclusions of Law</u>.  This Interim Order constitutes

the Bankruptcy Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052,

and shall take effect and be fully enforceable *nunc pro tunc* to December 7, 2018, immediately

upon entry hereof.  To the extent any findings of fact constitute conclusions of law, they are

adopted as such.  To the extent any conclusions of law constitute findings of fact, they are adopted

as such.

44.    <u>Entry of this Interim Order; Waiver of Stay</u>.  Notwithstanding Bankruptcy

Rules 4001(a)(3), 6004(h), 7062 or 9024, any other Bankruptcy Rule or Rule 62(a) of the Federal

Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon

its entry and there shall be no stay of execution or effectiveness of this Interim Order.

45.    <u>Jurisdiction</u>.  The Bankruptcy Court shall have exclusive jurisdiction with

respect to any and all disputes or matters under, or arising out of or in connection with, either the

DIP Facility or DIP Documents.

46.    <u>Controlling Effect of Interim Order</u>.  To the extent any provision of this

Interim Order conflicts with the Motion or any DIP Document, the provisions of this Interim Order

shall control.

85

47.    Service.  Service of this Interim Order and notice of a final hearing shall be made upon the parties described in paragraph M of this Interim Order, any Committee (if and when it is appointed), and any person who, as of the date hereof, has filed a notice pursuant to Bankruptcy Rule 2002.

48.    Reservation of Rights of Participating WAC Secured Parties. Notwithstanding anything herein or in the DIP Documents to the contrary, the Debtors make no stipulation, and reserve all rights with respect to, the validity, perfection, and priority of the liens securing (or putatively securing) any Non-Participating WAC Facility and (b) this Interim Order and the transactions contemplated hereby shall be without prejudice to (x) the ability of each Participating WAC Secured Party to seek additional or different adequate protection, move to vacate the automatic stay, move for appoint of a trustee or examiner, move to dismiss or convert the Chapter 11 Cases or to take any other action in the Chapter 11 Cases and to appear and be heard in any matter raised in the Chapter 11 Cases, and (y) any and all rights, remedies, claims and causes of action which the applicable Participating WAC Agent or the applicable Participating WAC Secured Parties may have against any non-Debtor party liable for the Participating WAC Secured Obligations.

49.    Objections.  Objections to the entry of the Final Order shall be in writing and shall be filed with the Clerk of this Court, on or before 4:00 p.m. (prevailing Eastern time) on [____], 2018, which objections shall be served so as to be received on or prior to such date by: (a) counsel to the Debtors, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, NY 10153-0119 (Attn: Gary Holtzer, Esq., Robert J. Lemons, Esq., and Kelly DiBlasi, Esq.); (b) counsel to the Steering Committee, Milbank, Tweed, Hadley & McCloy LLP, 28 Liberty St., New York, New York 10005 (Attn: Tyson Lomazow, Esq. and Michael Price, Esq.); (c) Alston &

86

Bird (Attn: David Wender); (d); Mayer Brown (Attn: Frederick Hyman, Esq. and Scott Zemser, Esq.); (e) Norton Rose (Attn: Howard Beltzer, Esq.); (f) Akin (Attn: Renée Dailey, Esq.); (g) S&C (Attn: Chris Howard, Esq.); (h) Clifford Chance (Attn: Jennifer DeMarco, Esq.); (i) Winston (Attn.: Carey D. Schreiber, Esq. and Bart Pisella, Esq.) Counsel to the DIP Agent, (j) counsel to be selected by the Committee (if any) upon its formation if selected by such date, and (k) William K. Harrington, U.S. Department of Justice, Office of the U.S. Trustee, 201 Varick Street, Room 1006, New York, NY 10014 (Attn: Andrea B. Schwartz, Esq.).

50.    <u>Final Hearing</u>.  A final hearing on the Motion shall be heard before this Court on [_____], 2018 at [____] in Courtroom No. 723 at the United States Bankruptcy Court, One Bowling Green, New York, New York 10004.

Dated:  _____, 2018.

                                  _____
                                  Honorable Stuart M. Bernstein
                                  United States Bankruptcy Judge

# EXHIBIT A

**DIP CREDIT AGREEMENT**

SENIOR SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT

among

WAYPOINT LEASING HOLDINGS LTD.,
as Holdings and a Borrower,

WAYPOINT LEASING (LUXEMBOURG) S.À R.L.,
as Luxco and a Borrower,

WAYPOINT LEASING (IRELAND) LIMITED,
as Manager and a Borrower,

EACH OF THE OTHER BORROWERS PARTY HERETO,

EACH OF THE GUARANTORS PARTY HERETO,

VARIOUS LENDERS,

ANKURA TRUST COMPANY, LLC,
as Administrative Agent,

and

ANKURA TRUST COMPANY, LLC,
as Collateral Agent

_____

Dated as of December [●], 2018

_____

# TABLE OF CONTENTS

Page

SECTION 1.    Definitions and Accounting Terms ................................................................ 2

1.01    Defined Terms ................................................................................................ 2

1.02    Other Definitional Provisions ...................................................................... 32

SECTION 2.    Amount and Terms of Credit ........................................................................ 33

2.01    The Term Loan Commitments ..................................................................... 33

2.02    Notice of Borrowing ................................................................................... 34

2.03    Disbursement of Funds ............................................................................... 34

2.04    DIP Funding Account .................................................................................. 35

2.05    Absence of Term Notes ............................................................................... 35

2.06    Pro Rata Borrowing .................................................................................... 35

2.07    Interest; Computations ................................................................................ 36

2.08    Increased Costs, Illegality, Market Disruption ........................................... 36

2.09    Break Funding Compensation ..................................................................... 38

2.10    Duty to Mitigate ......................................................................................... 39

2.11    Replacement of Lenders .............................................................................. 39

2.12    [Reserved] ................................................................................................... 40

2.13    Replacement Eligible Lease ........................................................................ 40

2.14    [Reserved] ................................................................................................... 40

2.15    [Reserved] ................................................................................................... 40

2.16    Inter-Eligible Entity Transfer ..................................................................... 40

2.17    [Reserved] ................................................................................................... 41

2.18    Joint and Several Liability of the Borrowers .............................................. 41

SECTION 3.    Fees; Replacement of Lenders ...................................................................... 42

3.01    Fees .............................................................................................................. 42

3.02    Replacement of Lenders .............................................................................. 43

SECTION 4.    Prepayments; Payments; Taxes; General Indemnities; Pledged Accounts .... 43

4.01    Voluntary Prepayments ............................................................................... 43

4.02    Mandatory Repayments ............................................................................... 44

4.03    Method and Place of Payment ..................................................................... 44

4.04    Taxes ............................................................................................................ 45

4.05    General Indemnity ....................................................................................... 47

4.06    [Reserved] ................................................................................................... 51

#4848-3242-6112v16

4.07    Administration of Accounts; Investments; Other Matters......................................51

SECTION 5.    Conditions Precedent to the Closing Date......................................51

5.01    Officer's Certificate......................................51

5.02    [Reserved]......................................51

5.03    Company Documents; Proceedings; etc.......................................51

5.04    [Reserved]......................................52

5.05    Accounts......................................52

5.06    Credit Documents......................................52

5.07    Fees, etc.......................................52

5.08    Know Your Customer, etc.......................................52

5.09    Appointment of Process Agent......................................52

5.10    Cash Management Orders......................................53

5.11    Control Over Assets......................................53

5.12    Lien Searches and Other Evidence......................................53

5.13    Liens......................................53

5.14    Financing Statements; Company Act Filings......................................53

5.15    No Default; Representations and Warranties......................................53

5.16    Consent Letter......................................53

5.17    [Reserved]......................................53

5.18    First Day and  Second Day Orders......................................53

5.19    Initial Budget......................................53

5.20    Interim Order......................................53

SECTION 6.    Conditions Precedent to each Borrowing and each DIP Funding Account Withdrawal......................................54

6.01    No Default; Representations and Warranties......................................54

6.02    Notice of Borrowing or DIP Funding Account Withdrawal; Compliance Certificate......................................54

6.03    Final Order Entry Date......................................55

6.04    Budget Compliance......................................55

6.05    Compliance with Orders......................................55

SECTION 7.    Representations and Warranties......................................55

7.01    Company Status......................................55

7.02    Power and Authority......................................56

7.03    No Violation......................................56

7.04    Approvals......................................56

ii

7.05    Financial Statements; Financial Condition; Undisclosed Liabilities ............................ 56

7.06    Litigation ..................................................................................................................... 57

7.07    True and Complete Disclosure ..................................................................................... 57

7.08    Use of Proceeds; Margin Regulations ......................................................................... 57

7.09    Tax Returns and Payments ........................................................................................... 58

7.10    Security Documents ...................................................................................................... 58

7.11    Capitalization ............................................................................................................... 58

7.12    Subsidiaries .................................................................................................................. 59

7.13    [Reserved] .................................................................................................................... 59

7.14    Investment Company Act ............................................................................................. 59

7.15    Environmental Matters ................................................................................................. 59

7.16    ERISA .......................................................................................................................... 59

7.17    Intellectual Property, etc. ............................................................................................. 60

7.18    [Reserved] .................................................................................................................... 60

7.19    [Reserved] .................................................................................................................... 60

7.20    [Reserved] .................................................................................................................... 60

7.21    Representations and Warranties in Other Documents .................................................. 60

7.22    Properties ...................................................................................................................... 60

7.23    [Reserved] .................................................................................................................... 60

7.24    Business ........................................................................................................................ 60

7.25    Aircraft Objects ............................................................................................................ 61

7.26    Withholdings ................................................................................................................ 61

7.27    Sanctions; Anti-Money Laundering; Anti-Corruption ................................................ 61

7.28    Compliance with Statutes, etc. .................................................................................... 61

7.29    Secured Parties ............................................................................................................. 62

7.30    No Default .................................................................................................................... 62

SECTION 8.    Affirmative Covenants ............................................................................ 62

8.01    Information Covenants .................................................................................................. 62

8.02    Books, Records and Inspections ................................................................................... 65

8.03    Insurance ...................................................................................................................... 65

8.04    Existence; Franchises ................................................................................................... 66

8.05    Compliance with Statutes, etc. .................................................................................... 66

8.06    End of Fiscal Years; Fiscal Quarters ........................................................................... 66

8.07    Payment of Taxes ......................................................................................................... 66

8.08    [Reserved] .................................................................................................................... 67

| | | |
|---|---|---|
| 8.09 | Additional Security; Further Assurances; etc. | 67 |
| 8.10 | [Reserved] | 68 |
| 8.11 | Maintenance of Company Separateness | 68 |
| 8.12 | Use of Proceeds | 68 |
| 8.13 | [Reserved] | 68 |
| 8.14 | [Reserved] | 68 |
| 8.15 | Aircraft Registration | 68 |
| 8.16 | [Reserved] | 68 |
| 8.17 | Inspections | 68 |
| 8.18 | Asset Monitoring | 68 |
| 8.19 | Administration of Eligible Leases | 69 |
| 8.20 | Manager's Credit Policies and Procedures | 69 |
| 8.21 | [Reserved] | 69 |
| 8.22 | [Reserved] | 69 |
| 8.23 | Antisocial Force; Antisocial Relationship; Antisocial Conduct | 69 |
| 8.24 | Air Operators Certificate | 69 |
| 8.25 | Milestones | 69 |
| 8.26 | [Reserved] | 69 |
| 8.27 | Bankruptcy Related Matters | 69 |
| 8.28 | Budget Variance Testing | 70 |
| 8.29 | Cash Management | 70 |
| 8.30 | WAC Group Disbursements | 70 |
| SECTION 9. | Negative Covenants | 70 |
| 9.01 | Liens | 70 |
| 9.02 | Consolidation, Merger, Purchase or Sale of Assets, etc. | 72 |
| 9.03 | Restricted Junior Payments | 73 |
| 9.04 | Indebtedness | 74 |
| 9.05 | Borrowings, Investments and Loans | 75 |
| 9.06 | Transactions with Affiliates | 75 |
| 9.07 | Modifications of Aircraft Related Documents, State of Registration, Certificate of Incorporation, By-Laws and Certain Other Agreements; Limitations on Voluntary Payments, etc. | 76 |
| 9.08 | Business; etc. | 78 |
| 9.09 | Limitation on Creation of Subsidiaries | 78 |
| 9.10 | Sanctions; Anti-Corruption | 78 |

iv

| | | |
|---|---|---|
| 9.11 | [Reserved] | 79 |
| 9.12 | Tax Status | 79 |
| 9.13 | Manager's Credit Policies and Procedures | 79 |
| 9.14 | Permitted Currencies | 80 |
| 9.15 | Insurance | 80 |
| 9.16 | Rights of Subrogation or Contribution | 80 |
| 9.17 | Payments | 80 |
| 9.18 | Superpriority Claims; Adequate Protection | 80 |
| 9.19 | Chapter 11 Orders | 80 |
| SECTION 10. | Events of Default | 80 |
| 10.01 | Payments | 80 |
| 10.02 | Specific Covenants | 81 |
| 10.03 | Insurances | 81 |
| 10.04 | Other Defaults | 81 |
| 10.05 | Representations, Etc. | 81 |
| 10.06 | [Reserved] | 81 |
| 10.07 | Cross-Default to Other Agreements | 81 |
| 10.08 | Credit Documents | 82 |
| 10.09 | Guaranties | 82 |
| 10.10 | Judgments | 82 |
| 10.11 | ERISA | 82 |
| 10.12 | Dismissal or Conversion of Cases; Appointment of Trustee or Examiner | 82 |
| 10.13 | Certain Orders | 83 |
| SECTION 11. | The Administrative Agent; Collateral Agent; Lead Arrangers; etc. | 85 |
| 11.01 | Appointment | 85 |
| 11.02 | Nature of Duties | 86 |
| 11.03 | Lack of Reliance on the Administrative Agent | 87 |
| 11.04 | Certain Rights of the Administrative Agent | 87 |
| 11.05 | Reliance | 88 |
| 11.06 | Indemnification | 88 |
| 11.07 | The Administrative Agent in its Individual Capacity | 88 |
| 11.08 | [Reserved] | 89 |
| 11.09 | Resignation by the Administrative Agent | 89 |
| 11.10 | Collateral Matters | 90 |
| 11.11 | Collateral Agent as Security Trustee for UK Security Documents | 91 |

11.12    Delivery of Information ................................................................ 93

11.13    Withholding ................................................................................ 94

SECTION 12.    Miscellaneous .................................................................... 94

12.01    Payment of Expenses, etc. ........................................................... 94

12.02    Right of Setoff ........................................................................... 95

12.03    Notices ...................................................................................... 95

12.04    Benefit of Agreement; Assignments; Participations .......................... 97

12.05    No Waiver; Remedies Cumulative ................................................. 100

12.06    Payments Pro Rata ..................................................................... 100

12.07    Calculations; Computations ......................................................... 100

12.08    GOVERNING LAW; SUBMISSION TO JURISDICTION; VENUE; WAIVER OF JURY TRIAL ....................................................................... 101

12.09    Counterparts .............................................................................. 102

12.10    Effectiveness ............................................................................. 102

12.11    Headings Descriptive .................................................................. 102

12.12    Amendment or Waiver, Administrative Agent; etc............................. 102

12.13    Survival .................................................................................... 104

12.14    Domicile of Term Loans .............................................................. 104

12.15    Register .................................................................................... 104

12.16    Confidentiality ........................................................................... 104

12.17    Patriot Act ................................................................................ 106

12.18    Interest Rate Limitation ............................................................... 106

12.19    Lender Action ............................................................................ 106

12.20    Force Majeure ........................................................................... 107

12.21    No Third Party Beneficiary .......................................................... 107

12.22    Change in Accounting Standards ................................................... 107

12.23    [Reserved] ................................................................................ 107

12.24    Nature of Liability ...................................................................... 107

12.25    Acknowledgement and Consent to Bail-In of EEA Financial Institutions.................. 107

SECTION 13.    Guaranty ............................................................................ 108

13.01    Guaranty ................................................................................... 108

13.02    [Reserved] ................................................................................ 109

13.03    Nature of Liability ...................................................................... 109

13.04    Independent Obligation ............................................................... 109

13.05    Authorization ............................................................................ 109

vi

13.06    Reliance ................................................................................................................ 110

13.07    Subordination ........................................................................................................ 110

13.08    Waiver .................................................................................................................... 111

13.09    Payments ................................................................................................................ 111

13.10    Maximum Liability ................................................................................................ 111

13.11    Judgment Currency ................................................................................................ 112

SECTION 14.    Security and Priority ............................................................................... 112

14.01    Grants, Rights and Remedies ................................................................................ 112

14.02    Survival .................................................................................................................. 112

SECTION 15.    Orders ...................................................................................................... 112


SCHEDULE 1.01(a)        Term Loan Commitments
SCHEDULE 1.01(b)        Intercompany Loans
SCHEDULE 1.01(c)        Lender Addresses
SCHEDULE 1.01(d)        Participating WAC Credit Facilities
SCHEDULE 1.01(e)        Non-Participating WAC Credit Facilities
SCHEDULE 1.01(f)        WAC Specific Cap and Maximum Intercompany Balance
SCHEDULE 7.05           Existing Liabilities
SCHEDULE 7.12           Subsidiaries
SCHEDULE 8.03           Insurance Undertakings
SCHEDULE 8.25           Milestones
SCHEDULE 9.04(b)        Existing Indebtedness
SCHEDULE 9.05           Existing Investments
SCHEDULE 12.03          Credit Party Addresses


EXHIBIT A-1             Form of Notice of Borrowing
EXHIBIT A-2             Initial Aircrafts and Lessees
EXHIBIT A-3             Core Lease Provisions
EXHIBIT A-4             Manager's Credit Policies and Procedures
EXHIBIT A-5             Form of Withdrawal Notice
EXHIBIT B               [Reserved]
EXHIBIT C               Form of Officer's/Manager's Certificate
EXHIBIT D               Form of Aircraft Mortgage and Security Agreement
EXHIBIT E               Form of Manager's Irish Share Charge
EXHIBIT F               Form of English Law Account Pledge Agreement
EXHIBIT G               Form of Process Agent Confirmation Letter
EXHIBIT H               Form of Compliance Certificate
EXHIBIT I               Form of Assignment and Assumption Agreement
EXHIBIT J               Initial Budget
EXHIBIT K               Form of Interim Order
EXHIBIT L               Form of Cash Management Order

#4848-3242-6112v16

SENIOR SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT, dated as of December [●], 2018, among WAYPOINT LEASING HOLDINGS LTD., an entity organized under the laws of the Cayman Islands ("Holdings"), WAYPOINT LEASING (LUXEMBOURG) S.À R.L., a limited liability company incorporated under the laws of the Grand Duchy of Luxembourg with RCS number B 177.660 ("Luxco"), WAYPOINT LEASING (IRELAND) LIMITED, a private company limited by shares incorporated under the laws of Ireland with registered number 526388 (the "Manager"), each as a borrower, and together with certain of the Managers' Subsidiaries listed on the signature pages hereto as borrowers (collectively, the "Borrowers"), each of the direct and indirect Subsidiaries of the Manager, as listed on the signature pages hereto, as guarantors (collectively, the "Guarantors"), each of the financial institutions party hereto from time to time (individually, a "Lender" and collectively, the "Lenders"), ANKURA TRUST COMPANY, LLC, as Administrative Agent (the "Administrative Agent") and as Collateral Agent (the "Collateral Agent"). All capitalized terms used herein and defined in Section 1.01 are used herein as therein defined.

W I T N E S S E T H:

WHEREAS, on November 25, 2018 (the "Petition Date"), the Borrowers, the Guarantors and certain other Subsidiaries of the Participating WAC Borrowers (each, a "Debtor" and collectively, the "Debtors") filed voluntary petitions with the Bankruptcy Court initiating their respective cases that are pending under chapter 11 of the Bankruptcy Code under Chapter 11 Cases Nos. 18-13648 through 18-13790, as administratively consolidated at Chapter 11 Case No. 18-13648 (each case of the Debtors, a "Case" and collectively, the "Cases"). The Debtors continued to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, the Borrowers have requested that the Lenders provide a delayed draw term loan facility (the "DIP Facility") denominated in U.S. Dollars in an aggregate principal amount not to exceed $45,000,000, with an aggregate principal amount of up to $30,000,000 available for borrowings upon the occurrence of the Interim Order Entry Date, subject to the terms set out herein and the other Credit Documents and in the Interim Order, with all of the Borrowers' obligations under the DIP Facility to be guaranteed by each Guarantor, and the Lenders are willing to lend on the terms and subject to the conditions set forth herein;

WHEREAS, the relative priority of the DIP Facility with respect to the Collateral granted to secure the Loan Obligations shall be as set forth in the Interim Order and the Final Order, in each case upon entry thereof by the Bankruptcy Court, and in the Security Documents;

WHEREAS, all of the claims and the Liens granted under the Orders and the Credit Documents to the Administrative Agent, the Collateral Agent and the Lenders in respect of the DIP Facility shall be subject to the Carve-Out; and

WHEREAS, the Borrowers and the Guarantors are engaged in related businesses, and each Guarantor will derive substantial direct and indirect benefit from the making of the extensions of credit under this Agreement; and

WHEREAS, subject to and upon the terms and conditions set forth herein, the Lenders are willing to make available to the Borrowers the delayed draw term loan facility provided for herein.

NOW, THEREFORE, IT IS AGREED:

SECTION 1.    <u>Definitions and Accounting Terms</u>.

1.01    <u>Defined Terms</u>.  As used in this Agreement, the following terms shall have the following meanings (such meanings to be equally applicable to both the singular and plural forms of the terms defined):

"<u>363 Sale</u>" shall have the meaning specified in <u>Schedule 8.25</u>.

"<u>Acceptable Bidding Procedures</u>" shall mean a bidding procedures order containing the provisions set forth on <u>Schedule 8.25</u>.

"<u>Acceptable Plan of Reorganization</u>" shall mean a plan of reorganization that either (i) provides for the payment in full in cash of all Secured Obligations on or before the effective date of such plan of reorganization or (ii) has the consent of each affected Lender.

"<u>Account Bank</u>" shall mean Barclays Bank PLC.

"<u>Account Pledge Agreement</u>" shall mean all or any, as the context may require, the English Law Account Pledge Agreement and any other account pledge agreement executed from time to time by any Credit Party in connection with this Agreement, in form and substance reasonably satisfactory to the Required Lenders and the Administrative Agent as to its duties and obligations.

"<u>Adequate Protection</u>" shall have the meaning assigned to such term in the Orders.

"<u>Adjusted LIBOR</u>" shall mean, with respect to any Borrowing for any Interest Period, an interest rate per annum equal to the product of (i) LIBOR in effect for such Interest Period and (ii) Statutory Reserves.  For the avoidance of doubt, as of the Closing Date, clause (ii) of the definition of "Adjusted LIBOR" is equal to one.

"<u>Administrative Agent</u>" shall have the meaning provided in the first paragraph of this Agreement and shall include any successor to the Administrative Agent appointed pursuant to Section 11.09.

"<u>Affected Interest Period</u>" shall have the meaning provided in the definition of "Market Disruption Event".

"<u>Affected Lenders</u>" shall have the meaning provided in the definition of "Market Disruption Event".

"<u>Affected Party</u>" shall have the meaning provided in <u>Section 2.08(a)</u>.

"<u>Affiliate</u>" shall mean, with respect to any Person, any other Person directly or indirectly controlling (including, but not limited to, all directors and officers of such Person), controlled by, or under direct or indirect common control with, such Person.  A Person shall be deemed to control another Person if such Person possesses, directly or indirectly, the power to direct or cause the direction of the management and policies of such other Person, whether through the ownership of voting securities, by contract or otherwise; <u>provided</u>, <u>however</u>, that none of the Administrative Agent, any Lender or any of their respective Affiliates shall be considered an Affiliate of Holdings or any Subsidiary thereof.

"After-Tax" or "After-Tax Basis" shall mean after deduction of the net amount of all Taxes actually required to be paid by any Person (taking into account any Tax savings actually and currently realized and not already taken into account by such Person or any Affiliate thereof by reason of the event or circumstance giving rise to the payment that is being paid on an After-Tax Basis with respect to the receipt or accrual by it of an amount (including additional amounts received by reason of such amounts being paid on an After-Tax Basis)).

"Agent Fee Letter" shall mean the fee letter, dated as of the Closing Date, between Ankura Trust Company, LLC and the Manager.

"Agents" shall have the meaning provided in Section 11.09(a).

"Agreement" shall mean this Senior Secured Superpriority DIP Credit Agreement, including any annexes, schedules, exhibits and attachments hereto, in each case, as modified, supplemented, amended, restated (including any amendment and restatement hereof), extended or renewed from time to time.

"Aircraft" shall mean each aircraft owned on the Petition Date by any of the Credit Parties which are identified on Exhibit A-2, in each case, comprised of an Airframe together with the Engines, Rotor Blades and Rotor Components associated with such Airframe and, where the context permits, references to an "Aircraft" shall include the Manuals and Technical Records associated therewith.

"Aircraft Object" shall have the meaning provided in the Cape Town Convention.

"Aircraft Related Documents" shall mean, with respect to an Aircraft, (i) the Eligible Leases relating to such Aircraft and (ii) any material agreements relating to such Aircraft or the use or management of such Aircraft in effect on or after the Closing Date for such Aircraft to which a Credit Party or any of a Credit Party's Affiliates is a party.

"Aircraft Revenues" shall mean, in respect of any Aircraft, all amounts paid to and received by (including in any Pledged Account) an Eligible Entity, the Manager or any other Subsidiary of the Manager, attributable to such Aircraft, including but not limited to (i) any Scheduled Payments and other amounts payable by a Lessee to an Eligible Entity, the Manager or any other Subsidiary of the Manager, pursuant to the related Eligible Lease; (ii) amounts received from the Manufacturers or sellers of an Aircraft for breach of warranties relating thereto or in settlement of any claims, losses, disputes or proceedings relating to such Aircraft (to the extent such amounts are not required to be paid to the operator, repairer or a similar Person with respect to such Aircraft); and (iii) amounts paid by any guarantor or other credit support provider relating to such Lessee. Notwithstanding the foregoing, Aircraft Revenues do not include proceeds from Asset Sales or Event of Loss, Maintenance Reserve Payments or Security Deposits (unless, and to the extent that, such Security Deposit is applied toward the payment of any Scheduled Payment obligation under the related Eligible Lease) or Excluded Payments.

"Airframe" shall mean, at any time, each airframe which is part of the Aircraft at such time, together with all Parts relating to such airframe.

"Anti-Corruption Laws" shall mean FCPA, the OECD Convention on Combating Bribery of Foreign Public Officials in International Business Transactions, 1997, the UK Bribery Act of 2010 and/or any similar laws, rules or regulations issued, administered or enforced by Ireland or any Governmental Authority having jurisdiction over any Credit Party.

"Anti-Money Laundering Laws" shall mean all applicable financial recordkeeping and reporting requirements and the money laundering statutes and the rules and regulations thereunder and any related or similar rules, regulations or guidelines, which in each case are issued, administered or enforced by any Governmental Authority having jurisdiction over any Credit Party or to which any Credit Party is subject.

"Antisocial Conduct" shall mean:  (a) a demand and conduct with force and arms; (b) an unreasonable demand and conduct having no legal cause; (c) threatening or committing violent behavior relating to its business transactions; (d) an action to defame the reputation or interfere with the business of any Secured Party by spreading rumor, using fraudulent means or resorting to force; or (e) other actions similar or analogous to any of the foregoing in any jurisdiction.

"Antisocial Forces" shall mean, at any time:  (a) an organized crime group (*boryokudan*) (as defined under Article 2, item 1 of the Japanese Act on Prevention of Unjust Acts by Organized Crime Group Members); (b) a member of an organized crime group (*boryokudan in*); (c) an individual who was a member of an organized crime group within the five years preceding the relevant time; (d) a quasi-member of an organized crime group (*boryokudan junkoseiin*) including individuals who are not members of an organized crime group but who maintain relationships with an organized crime group and who may: (i) threaten that such organized crime group will engage in violent and unlawful activity, or (ii) cooperate in the maintenance and operation of an organized crime group; (e) a company (*bouryokudan kankei kigyo*) or association (*boryokudan kanren gaisha*) that:  (i) is substantially related to an organized crime group, (ii) is managed by present or former members or quasi-members of an organized crime group and which supports positively the maintenance or operation of an organized crime group by providing funds to the organized crime group, or (iii) actively takes advantage of an organized crime group to carry out its business or cooperates with an organized crime group in the maintenance and operation of the organized crime group; (f) a corporate extortionist or a blackmailer advocating social activism (*shakaiundoutou hyoubou goro*) or a racketeer or blackmailer (*sokaiya*) adopting social special intellectual violence group (*tokushu chinou boryoku shudan*); or (g) any persons similar to those listed in the foregoing.

"Antisocial Relationship" shall mean:  (a) an Antisocial Force controls its management; (b) an Antisocial Force is substantively involved in its management; (c) it has entered into arrangements with an Antisocial Force for the purpose of, or which have the effect of, unfairly benefiting itself or a third party or prejudicing a third party; (d) it is involved in the provision of funds or other benefits to an Antisocial Force; or (e) any of its directors or any other person who is substantively involved in its management has any socially repugnant relationship with an Antisocial Force.

"Applicable Margin" shall mean a rate per annum equal to 7.5%.

"Approved Budget" shall mean the Initial Budget and any Proposed Budget approved in accordance with Section 8.01(k)(ii), as applicable.

"Asset Sale" shall mean any sale, transfer or other disposition (exclusive of a lease or a sublease that is an operating lease or any credit bid that has paid for its Net WLIL Intercompany Claim) of any Collateral by any Credit Party to any Person (including by way of redemption by such Person) other than to an Eligible Entity.

"Assignment and Assumption Agreement" shall mean an Assignment and Assumption Agreement substantially in the form of Exhibit I (appropriately completed).

"Attributable Indebtedness" shall mean, on any date, (a) in respect of any Capitalized Lease of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person,

(b) in respect of any Synthetic Lease Obligation, the capitalized amount of the remaining lease or similar payments under the relevant lease or other applicable agreement or instrument that would appear on a balance sheet of such Person if such lease or other agreement or instrument were accounted for as a Capitalized Lease and (c) all Synthetic Debt of such Person.

"Aviation Authority" shall mean, with respect to an Aircraft, any Person who is or shall from time to time be vested with the control and supervision of, or have jurisdiction over, the registration, airworthiness and operation of aircraft or other matters relating to civil aviation in the State of Registration under applicable law.

"Avoidance Actions" shall mean all causes of action arising under Sections 542, 544, 545, 547, 548, 549, 550, 551, 553(b) or 724(a) of the Bankruptcy Code and any proceeds therefrom.

"Bankruptcy Code" shall mean Title 11 of the United States Code, 11 U.S.C. §§101-1532, as amended.

"Bankruptcy Court" shall mean the United States Bankruptcy Court for the Southern District of New York, or any appellate court having jurisdiction over the Cases from time to time.

"Base Rate" shall mean, for any day, a rate per annum equal to the greatest of (a) the Prime Rate in effect on such day, (b) the Federal Funds Rate in effect on such day plus 1/2 of 1.00% and (c) Adjusted LIBOR for a one month Interest Period on such day (or if such day is not a Business Day, the immediately preceding Business Day) plus 1.00%; provided, however, that for the purpose of clause (c) above, Adjusted LIBOR for any day shall be based on the rate per annum determined by the Administrative Agent on such day at approximately 11:00 a.m. (New York City time) in accordance with the definition of "LIBOR". If the Federal Funds Rate is not published on any given day the Base Rate for such day shall be determined without regard to clause (b) of the preceding sentence until the circumstances giving rise to such unavailability no longer exist. Any change in the Base Rate due to a change in the Prime Rate, the Federal Funds Rate or Adjusted LIBOR shall be effective on the effective date of such change in the Prime Rate, the Federal Funds Rate or Adjusted LIBOR, as the case may be.

"Borrowers" shall have the meaning provided in the first paragraph of this Agreement.

"Borrower Materials" shall have the meaning provided in Section 12.03.

"Borrowing" shall mean the borrowing of one or more Term Loans from the relevant Lenders prior to the Maturity Date.

"Borrowing Date" shall mean, in respect of each Term Loan, the date on which such Term Loan is disbursed in accordance with the applicable Notice of Borrowing.

"Business Day" shall mean (i) for all purposes other than as covered by clause (ii) below, any day except Saturday, Sunday and any day which shall be in New York, London or Dublin a legal holiday or a day on which banking institutions are authorized or required by law or other government action to close and (ii) with respect to all notices and determinations in connection with, and payments of principal and interest on, Term Loans, any day which is a Business Day described in clause (i) above and which is also a day for trading by and between banks in Dollar deposits in the London interbank market.

"Cape Town Convention" shall mean the Convention together with the Protocol.

#4848-3242-6112v16

"Capitalized Lease" shall mean a lease that, subject to Section 12.07, has been or should be, in accordance with GAAP, recorded as a capitalized lease.

"Carve-Out" shall have the meaning set forth in the Interim Order or the Final Order, as applicable.

"Cases" shall have the meaning set forth in the recitals to this Agreement

"Cash Equivalents" shall mean, as to any Person, (i) securities issued or directly and fully guaranteed or insured by the United States or any agency or instrumentality thereof (provided, however, that the full faith and credit of the United States is pledged in support thereof) having maturities of not more than twelve (12) months from the date of acquisition, (ii) marketable direct obligations issued by any state of the United States or any political subdivision of any such state or any public instrumentality thereof maturing within twelve (12) months from the date of acquisition thereof and, at the time of acquisition, having one (1) of the two (2) highest ratings obtainable from either S&P or Moody's, (iii) Dollar denominated time deposits, certificates of deposit and bankers acceptances of any Lender or any commercial bank having, or which is the principal banking subsidiary of a bank holding company having, a long-term unsecured debt rating of at least "A" or the equivalent thereof from S&P or "A2" or the equivalent thereof from Moody's with maturities of not more than six (6) months from the date of acquisition by such Person, (iv) commercial paper issued by any Person incorporated in the United States rated at least A-1 or the equivalent thereof by S&P or at least P-1 or the equivalent thereof by Moody's and in each case maturing not more than six (6) months after the date of acquisition by such Person, (v) investments in money market funds substantially all of whose assets are comprised of securities of the types described in clauses (i) through (iv) above and (vi) in the event that such Person is not incorporated or organized under the laws of the United States or any state thereof, other equivalent short-term marketable investments, including certificates of deposit, time deposits or deposit accounts, in each case (x) having a maturity date not more than six (6) months from the date of acquisition by such Person, (y) issued by or maintained with (A) any foreign bank or financial institution that is a Subsidiary of any commercial bank, trust company or national banking association incorporated or doing business under the laws of the United States of America or one of the states thereof; provided, however, that the U.S. Person controlling such foreign bank or financial institution Subsidiary shall have a long-term unsecured debt rating of at least "A" or the equivalent thereof from S&P or "A2" or the equivalent thereof from Moody's, (B) any foreign bank or financial institution organized or licensed under the laws of any member country (or any state or province thereof) of the Organization for Economic Co-operation and Development which has a long-term unsecured debt rating of at least "A" or the equivalent thereof from S&P or "A2" or the equivalent thereof from Moody's, (C) any commercial bank in Ireland or the United Kingdom at least majority owned by (or whose deposits are unconditionally guaranteed by) the government of Ireland or of the United Kingdom to the extent that Ireland or the United Kingdom, as the case may be, has a long-term unsecured debt rating of at least "BBB-" or the equivalent thereof from S&P or "Baa3" or the equivalent thereof from Moody's, (D) any bank or financial institution organized under the laws of Ireland or the United Kingdom to the extent that such bank or financial institution has a long-term unsecured debt rating of at least "BBB-" or the equivalent thereof from S&P or "Baa3" or the equivalent thereof from Moody's or (E) any other bank or financial institution that has been consented to in advance in writing by the Administrative Agent (such written consent not to be unreasonably withheld), and (z) denominated in Dollars or Euros.

"Cash Management Order" shall mean the interim or final order of the Bankruptcy Court, substantially in the form set forth in Exhibit L, with only such modifications as are reasonably acceptable to the Borrowers and the Required Lenders.

"Cash Proceeds" shall mean for any Asset Sale or Event of Loss, the gross cash proceeds (including any cash received by way of deferred payment pursuant to a promissory note, receivable or otherwise, but only as and when received) received from such event, net of, to the extent applicable, (i) selling expenses (including reasonable investment banker's fees, legal fees, broker's fees or commissions (including payable to any Credit Party), transfer and similar Taxes, the Borrowers' good faith estimate of Taxes paid or payable in connection with such event and legal fees and other disbursements, costs and expenses made or incurred in connection therewith) payable as a consequence of such event, (ii) maintenance reserve amounts payable or required to be refunded to the transferee, (iii) prepaid rent required to be refunded to the transferee and (iv) the principal amount, premium or penalty, if any, interest and other amounts of Indebtedness for borrowed money, which is secured by the assets subject to the Asset Sale or Event of Loss and which is required to be repaid with such proceeds.

"Central Cash Accounts" shall mean, collectively, the Dollar Central Cash Account, the Euro Central Cash Account and the Sterling Central Cash Account.

"Central DIP Account" shall mean account no. 54897144, in the name of Manager, maintained with the Account Bank, or any other deposit, trust, escrow or similar account of Manager, designated in writing by the Manager to the Administrative Agent and the Collateral Agent as the "Central DIP Account", into which the proceeds of the Interim Term Loans and the DIP Funding Account Withdrawals shall be deposited.

"Change of Control" shall mean the occurrence of any of the following:

(i)    (x) Holdings shall at any time cease to own directly or indirectly 100% of the Equity Interests of Luxco, (y) Luxco shall at any time cease to own directly or indirectly 100% of the Equity Interests of the Manager, or (z) the Manager shall at any time cease to own directly or indirectly 100% of the Equity Interests of any Participating WAC Borrower (in each case, other than director's qualifying shares and/or other nominal amounts of shares required to be held by Persons other than Holdings or its Subsidiaries under applicable law);

(ii)    any Participating WAC Borrower shall at any time cease to own directly or indirectly 100% of the Equity Interests of any Eligible Entity (other than, in the case of a non-U.S. Eligible Entity, director's qualifying shares and/or other nominal amounts of shares required to be held by Persons other than such Participating WAC Borrower under applicable law or any other arrangement required under a Local Requirements Exception); or

(iii)    the Permitted Holders shall at any time and for any reason fail to own at least a majority of the ordinary voting power represented by Holdings' outstanding Equity Interests (determined on a fully diluted basis).

"Charter Agreement" shall mean any wet lease agreement for the use of a Mortgaged Aircraft entered into by a Lessee Party with any third party.

"Closing Date" shall mean the date on which each of the conditions precedent under Section 5 has been satisfied or waived.

"Code" shall mean the Internal Revenue Code of 1986, as amended.

"Collateral" shall mean all property (whether real or personal) with respect to which any security interests have been granted (or purported to be granted) pursuant to any Credit Document, including, without limitation, the WAC Specific Collateral and any unencumbered assets, other than

the Avoidance Actions but, subject to entry of the Final Order, including the proceeds and property recovered in respect of such Avoidance Actions.

"Collateral Agent" shall have the meaning provided in the first paragraph of this Agreement and shall include any successor to the Collateral Agent appointed pursuant to Section 11.09.

"Collateral Supplement" shall have the meaning provided in the Security Agreement.

"Commitment Letter" shall mean the Senior Secured Priming Debtor-In-Possession Credit Facility Commitment Letter dated as of November 24, 2018 as amended by Amendment No. 1 dated December [●], 2018 by each of the Lenders (as defined therein) party thereto and acknowledged and agreed on December [●], 2018 by the Manager.

"Communications" shall have the meaning provided in Section 12.03.

"Company" shall mean any corporation, limited liability company, statutory trust, common law trust, partnership or other business entity (or the adjectival form thereof, where appropriate).

"Compliance Certificate" shall mean a certificate of the chief executive officer or chief financial officer of Holdings, substantially in the form of Exhibit H.

"Connection Income Taxes" shall mean Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profit Taxes.

"Contingent Obligation" shall mean, as to any Person, any obligation of such Person as a result of such Person being a general partner of any other Person, unless the underlying obligation is expressly made non-recourse as to such general partner, and any obligation of such Person guaranteeing or intended to guarantee any Indebtedness, leases, dividends or other obligations ("primary obligations") of any other Person (the "Primary Obligor") in any manner, whether directly or indirectly, including, without limitation, any obligation of such Person, whether or not contingent, (i) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (ii) to advance or supply funds (x) for the purchase or payment of any such primary obligation or (y) to maintain working capital or equity capital of the Primary Obligor or otherwise to maintain the net worth or solvency of the Primary Obligor, (iii) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the Primary Obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the holder of such primary obligation against loss in respect thereof; provided, however, that the term Contingent Obligation shall not include endorsements of instruments for deposit or collection in the ordinary course of business. The amount of any Contingent Obligation shall be deemed to be an amount equal to the stated or determinable amount of the primary obligation in respect of which such Contingent Obligation is made (or, in the event that the terms of such Contingent Obligation provide that such Person's obligations in respect of the applicable primary obligation shall be a lesser amount, such lesser amount) or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming such Person is required to perform thereunder) as determined by such Person in good faith.

"Convention" shall mean The Convention on International Interests in Mobile Equipment, concluded in Cape Town, South Africa, on November 16, 2001 (utilizing the English-language version thereof).

"Core Lease Provisions" shall mean the Core Lease Provisions set forth in Exhibit A-3.

"Credit Documents" shall mean this Agreement, the Orders, each Guaranty, each Assignment and Assumption Agreement, each Security Document, and the Agent Fee Letter.

"Credit Party" shall mean the Borrowers and the Guarantors.

"Debtor" shall have the meaning set forth in the recitals to this Agreement.

"Default" shall mean any event, act or condition which, with the giving of notice or lapse of time, or both, would constitute an Event of Default.

"Defaulting Lender" shall mean any Lender with respect to which a Lender Default is in effect.

"DIP Facility" shall have the meaning set forth in the recitals to this Agreement.

"DIP Funding Account" shall mean a non-interest bearing account no. [●], in the name of and under the control of the Administrative Agent, maintained by the Administrative Agent in the United States, or any other deposit, trust, escrow or similar account of the Administrative Agent, into which the proceeds of the Final Term Loans shall be deposited.

"DIP Funding Account Withdrawal" shall have the meaning given in Section 2.04.

"Dividend" shall mean, with respect to any Person, that such Person has declared or paid a dividend, distribution or returned any equity capital to its stockholders, shareholders, partners or members or authorized or made any other distribution, payment or delivery of property (other than common Equity Interests of such Person) or cash to its stockholders, shareholders, partners or members in their capacity as such, or redeemed, retired, purchased or otherwise acquired, directly or indirectly, for a consideration any shares of any class of its capital stock or any other Equity Interests outstanding on or after the Closing Date (or any options or warrants issued by such Person with respect to its capital stock or other Equity Interests), or set aside any funds for any of the foregoing purposes.  Without limiting the foregoing, "Dividends" with respect to any Person shall also include all payments made or required to be made by such Person with respect to any stock appreciation rights plans, equity incentive or achievement plans or any similar plans or setting aside of any funds for the foregoing purposes.

"Documents" shall mean, collectively, (i) the Credit Documents and (ii) the Aircraft Related Documents.

"Dollar Central Cash Account" shall mean account no. [●], in the name of the Manager, maintained with the Account Bank in London, England, or any other deposit, trust, escrow or similar account of the Manger, designated in writing by the Manager to the Administrative Agent and the Collateral Agent as the "Dollar Central Cash Account", into which Aircraft Revenues received after the Closing Date denominated in Dollars are deposited in accordance with the Cash Management Order.

"Dollars" and the sign "$" shall each mean freely transferable lawful money of the United States.

"Eligible Corporation" shall mean each corporation created for the sole purpose of owning an Aircraft, which corporation shall each be a direct or indirect Wholly-Owned Subsidiary of a Borrower and organized under the laws of Bermuda, the laws of Cayman Islands, the laws of Ireland, the laws of the United Kingdom, the laws of a state of the United States of America or the laws of any such other jurisdiction reasonably satisfactory to the Administrative Agent.

"<u>Eligible Entity</u>" shall mean the Borrowers, Eligible Corporation, Eligible Limited Liability Company, Eligible Trust (and, where indicated by the context, an Eligible Trustee) or any Wholly-Owned Subsidiary (other than an Intermediate Subsidiary) of a Borrower organized under the laws of Bermuda, the laws of Cayman Islands, the laws of Ireland, the laws of the United Kingdom, the laws of a state of the United States of America or the laws of any such other jurisdiction reasonably satisfactory to the Administrative Agent in each case (i) that holds title to a Mortgaged Aircraft, (ii) which has executed all Security Documents as reasonably required by the Administrative Agent in accordance with the terms hereof and (iii) is located in a Permitted Jurisdiction.

"<u>Eligible Lease</u>" shall mean a lease agreement (i) between an Eligible Entity or Intermediate Subsidiary, as the case may be, as lessor, and an Eligible Lessee, as lessee, as of the Closing Date in respect of a Mortgaged Aircraft or (ii) between an Eligible Entity or Intermediate Subsidiary, as the case may be, as lessor, and an Eligible Lessee, as lessee, entered into after the Closing Date and containing the Core Lease Provisions (or such other provisions as are reasonably satisfactory to the Administrative Agent) and, in either case, in respect of which Scheduled Payments are due and payable or accruing thereunder, as the case may be.  In addition, where applicable, the term "<u>Eligible Lease</u>" includes a Replacement Eligible Lease.

"<u>Eligible Lessee</u>" shall mean a Lessee that (i) is approved by the Administrative Agent and whose Mortgaged Aircraft is the subject of a lease containing the Core Lease Provisions (or such other provisions as are reasonably satisfactory to the Administrative Agent) or (ii) as of the date of the relevant Eligible Lease, (a) is a Lessee or a replacement Lessee approved by the Manager in accordance with the Manager's Credit Policies and Procedures, (b) is not in insolvency, bankruptcy or analogous proceedings, (c) is organized under the laws of a Permitted Jurisdiction, and (d) to the actual knowledge of any Responsible Officer of the applicable Borrower, is not under investigation for violation of the FCPA or the UK Bribery Act of 2010 and is not classified as an Antisocial Force, does not have any Antisocial Relationship and does not engage in Antisocial Conduct.

"<u>Eligible Limited Liability Company</u>" shall mean each limited liability company created for the sole purpose of owning an Aircraft, which shall be a direct or indirect Wholly-Owned Subsidiary of a Borrower and organized under the laws of Bermuda, the laws of Cayman Islands, the laws of Ireland, the laws of the United Kingdom, the laws of a state of the United States of America or the laws of any such other jurisdiction reasonably satisfactory to the Administrative Agent.

"<u>Eligible Transferee</u>" shall mean and include (i) a commercial bank, an insurance company, a finance company, a financial institution, any fund that invests in loans or any other "accredited investor" (as defined in Regulation D of the Securities Act), subject in each case to the consent of the Administrative Agent not to be unreasonably withheld or delayed, and (ii) any Lender, any Subsidiary of the parent company of a Lender or any Affiliate or parent company of the Lender; <u>provided</u>, <u>however</u>, that the term Eligible Transferee shall <u>exclude</u> (w) any Person that is engaged (or has an Affiliate that is engaged) in the helicopter leasing and operating business unless otherwise agreed to in writing by the Borrowers (provided that for this purpose, any Person operating helicopters primarily for its own personnel shall not be engaged in the helicopter leasing and operating business), (x) any Person that is a natural person and (y) any Specified Party.

"<u>Eligible Trust</u>" shall mean each named owner trust or statutory trust created for the sole purpose of owning an Aircraft pursuant to a corresponding Eligible Trust Agreement, the beneficial interest in which has been conveyed or otherwise assigned to a Borrower or a direct or indirect Wholly-Owned Subsidiary of a Borrower and which trust is organized, established or constituted under the laws of Bermuda, the laws of Cayman Islands, the laws of Ireland, the laws of the United Kingdom, the laws of a

#4848-3242-6112v16

state of the United States of America or the laws of any such other jurisdiction reasonably satisfactory to the Administrative Agent.

"Eligible Trust Agreement" shall mean (a) a trust agreement entered into by an Eligible Trustee and provided to, the Administrative Agent on or prior to the Closing Date (unless the Administrative Agent has notified the Manager on or prior to the Closing Date that any such trust agreement is not acceptable) or (b) a trust agreement satisfactory to the Administrative Agent in its reasonable discretion.

"Eligible Trustee" shall mean each trustee in respect of an Eligible Trust Agreement; in each case acting not in its individual capacity but solely as owner trustee or statutory trustee except as may be otherwise expressly provided therein.

"Engine" shall mean, with respect to any Airframe of an Aircraft any of the engines that is included as part of such Aircraft any and all related Parts.

"English Law Account Pledge Agreement" shall have the meaning given in Section 5.06(d).

"Environmental Law" shall mean any applicable Federal, state, local or foreign law (including principles of common law), rule, regulation, ordinance, code, directive, judgment, order or agreement, now or hereafter in effect and in each case as amended, and any judicial or administrative interpretation thereof, relating to the protection of the environment, or of human health (as it relates to the exposure to environmental hazards) or to the presence, Release or threatened Release, or the manufacture, use, transportation, treatment, storage, disposal or recycling of Hazardous Materials, or the arrangement for any such activities.

"Equity Interests" of any Person shall mean any and all shares, interests, rights to purchase, warrants, options, participations or other equivalents of or interests in (however designated) the equity of such Person, including any common stock, preferred stock, any limited or general partnership interest and any limited liability company membership interest.

"Equity Pledge Agreement" shall mean the Security Agreement and any Manager's Irish Share Charge.

"ERISA" shall mean the U.S. Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations promulgated and rulings issued thereunder.

"ERISA Affiliate" shall mean each person (as defined in Section 3(9) of ERISA) which together with any Credit Party would be deemed to be a "single employer" (i) within the meaning of Section 414(b), (c), (m) or (o) of the Code or (ii) as a result of any Credit Party being or having been a general partner of such person.

"ERISA Event" shall mean any one or more of the following:

(a)    any reportable event, as defined in Section 4043 of ERISA, with respect to a Plan, as to which the PBGC has not waived under subsection .22, .23, .25, .27 or .28 of PBGC Regulation Section 4043 the requirement of Section 4043(a) of ERISA that it be notified of such event;

(b)    the filing of a notice of intent to terminate any Plan, if such termination would require material additional contributions in order to be considered a standard termination within the

#4848-3242-6112v16

meaning of Section 4041(b) of ERISA, the filing under Section 4041(a)(2) of ERISA of a notice of intent to terminate any Plan or the termination of any Plan under Section 404 1 (c) of ERISA;

(c)    the institution of proceedings by the PBGC under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Plan;

(d)    the failure to make a required contribution to any Plan that would result in the imposition of a lien or other encumbrance under Section 430(k) of the Code or Section 303(k) or 4068 of ERISA, or the arising of such a lien or encumbrance; the failure to satisfy the minimum funding standard under Section 412 of the Code or Section 302 of ERISA, whether or not waived; or the filing of any request for or receipt of a minimum funding waiver under Section 412 of the Code with respect to any Plan, or that such filing may be made; or a determination that any Plan is, or is expected to be, considered an at-risk plan within the meaning of Section 430(i)(4) of the Code or Section 303(i)(4) of ERISA; or a violation of Section 436 of the Code with respect to a Plan;

(e)    engaging in a non-exempt prohibited transaction within the meaning of Section 4975 of the Code or Section 406 of ERISA with respect to a Plan;

(f)    the complete or partial withdrawal of any Credit Party or any ERISA Affiliate from a Multiemployer Plan, the insolvency under Title IV of ERISA of any Multiemployer Plan; or the receipt by any Credit Party or any ERISA Affiliate, of any notice, or the receipt by any Multiemployer Plan from any Credit Party or any ERISA Affiliate of any notice, that a Multiemployer Plan is in endangered or critical status under Section 432 of the Code or Section 305 of ERISA; or

(g)    any Credit Party or an ERISA Affiliate incurring any liability under Title IV of ERISA with respect to any Plan (other than premiums due and not delinquent under Section 4007 of ERISA).

"Euros" and the designation "FE" shall mean the currency introduced on January 1, 1999 at the start of the third stage of European economic and monetary union pursuant to the Treaty (expressed in Euros), or the lawful currency of the Federal Republic of Germany, if different.

"Euro Central Cash Account" shall mean account no. [●], in the name of the Manager, maintained with the Account Bank in London, England, or any other deposit, trust, escrow or similar segregated account of the Manger, designated in writing by the Manager to the Administrative Agent and the Collateral Agent as the "Euro Central Cash Account", into which Aircraft Revenues received after the Closing Date denominated in Euro are deposited in accordance with the Cash Management Order.

"Event of Default" shall have the meaning provided in Section 10.

"Event of Loss" shall mean, in respect of any Mortgaged Aircraft or any Airframe, any Engine, any Rotor Blade or any Rotor Component in respect of such Mortgaged Aircraft, (x) at any time such Mortgaged Aircraft, Airframe or "associated" Engine, "associated" Rotor Blade or "associated" Rotor Component is subject to an Eligible Lease, the occurrence of an "event of loss" (or similar term) pursuant to such Eligible Lease, or (y) at any time such Mortgaged Aircraft or any Airframe, Engine, Rotor Blade or Rotor Component in respect of such Mortgaged Aircraft is not subject to an Eligible Lease, any of the following events:

(i)    the loss of such property or the use thereof due to the destruction of or damage to such property that renders repair uneconomic or that renders such property permanently unfit for normal use;

#4848-3242-6112v16

(ii)    any damage or loss to or other circumstance in respect of such property that results in either an insurance settlement in respect of such property on the basis of a total loss, or a constructive or arranged total loss;

(iii)    the confiscation or nationalization of, or requisition of title to, such property by any Governmental Authority that shall have resulted in the loss of title to such property by the applicable Borrower or the applicable Eligible Entity;

(iv)    the theft or disappearance of such property that shall have resulted in the loss of possession of such property by the applicable Borrower or the applicable Eligible Entity for a period in excess of the lesser of (x) thirty (30) consecutive days and (y) the number of days remaining until the Maturity Date; or

(v)    the seizure of, or requisition for use of, such property by any Governmental Authority (other than the United States) that shall have resulted in the loss of possession of such property by the applicable Borrower or the applicable Eligible Entity and such requisition for use shall have continued beyond the earlier of (x) the lesser of (1) thirty (30) consecutive days and (2) the number of days remaining until the Maturity Date and (y) the date of receipt of insurance or condemnation proceeds with respect thereto.

An Event of Loss in respect of a Mortgaged Aircraft shall be deemed to have occurred if an Event of Loss occurs in respect of the associated Airframe.

For purposes of the Credit Documents, an Event of Loss in respect of a Mortgaged Aircraft shall be deemed to have occurred (A) in the case of an Event of Loss specified in clause (x) above, the earlier of (1) the date such Event of Loss occurs pursuant to the applicable Eligible Lease and (2) three (3) Business Days after the date of the applicable Eligible Entity's receipt of the amount required to be paid thereunder as a result thereof and (B) in the case of an Event of Loss in clause (y) above, as follows:

(a)    in the case of an actual total loss, at 5:00 pm (New York City time) on the actual date such Mortgaged Aircraft was lost or, if such date is not known, 5:00 pm (New York City time) on the day on which such Mortgaged Aircraft was last heard from;

(b)    in the case of any of the events described in paragraph (i) of the definition of "Event of Loss" above (other than an actual total loss), on the date such destruction or damage is determined to be uneconomic to repair or the date on which such property is determined to be permanently unfit for normal use;

(c)    in the case of any of the events described in paragraph (ii) of the definition of "Event of Loss" above (other than an actual total loss), on the date that such loss is admitted by the insurers or a competent court or arbitration tribunal issues a judgment to the effect that such loss has occurred; and

(d)    in the case of any of the events referred to in paragraph (iii), (iv) or (v) of the definition of "Event of Loss" above, upon the occurrence thereof.

"Excluded Payments" shall mean, with respect to any Mortgaged Aircraft and the related Eligible Lease, (i) any general indemnity, Tax indemnity or other indemnity or similar payments (whether or not payable as supplemental rent), expenses, reimbursements and similar payments and interest in respect thereof paid or payable in favor of any Credit Party or their respective successors or assigns, officers, directors, employees, agents, managers and servants pursuant to any such Eligible Lease or any related agreements, (ii) proceeds of public liability insurance (or government or other Person (including any

manufacturer, the applicable Eligible Lessee, any Sublessee or Sub-Sublessee) indemnities in lieu thereof)) in respect of the Mortgaged Aircraft payable as a result of insurance claims made, or losses suffered, by the relevant Eligible Entity or other indemnitee or payee entitled thereto, (iii) proceeds of insurance (including, if applicable, directors and officers liability insurance) maintained by any Credit Party for its or their own account or benefit and not required by this Agreement, and proceeds of insurance in excess of the amounts required hereunder, (iv) any interest that pursuant to such Eligible Lease may from time to time accrue in respect of any of the amounts described in clauses (i) through (iii) above, (v) the proceeds from the enforcement of any right to enforce the payment of any amount described in clauses (i) to (iv) above and any and all proceeds of each enforcement of any right under clauses (i) to (iv) above, and (vi) any right to exercise any election or option or make any decision or determination, or to give or receive any notice, consent, waiver or approval, or to take any other action in respect of, but in each case, only to the extent relating to, any Excluded Payments.

"Excluded Taxes" shall mean any of the following Taxes imposed on or with respect to an Indemnified Person or required to be withheld or deducted from a payment to an Indemnified Person, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Indemnified Person being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable Lending Office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) Taxes attributable to such Indemnified Person's failure to comply with Section 4.04(f), (c) any withholding Taxes imposed under FATCA and (d) any withholding Taxes on certain payments made to Luxembourg individual residents introduced by the Luxembourg amended law dated 23 December 2005.

"Existing Indebtedness" shall mean the Indebtedness as listed on Schedule 9.04(b).

"Expense Reimbursement" shall have the meaning specified in Schedule 8.25.

"Extraordinary Receipts" shall have the meaning set forth in the Orders.

"Fair Market Value" shall mean, (a) with respect to any Aircraft or any Eligible Entity owning an Aircraft, the appraised value of the relevant Aircraft, or (b) with respect to any other asset (including any Equity Interests of any Person other than an Eligible Entity owning an Aircraft), the price at which a willing buyer, not an Affiliate of the seller, and a willing seller who does not have to sell, would agree to purchase and sell such asset, as determined in good faith by the board of directors or other governing body (or, pursuant to a specific delegation of authority by such board of directors or governing body, a designated senior executive officer or committee), of the Manager, or the Subsidiary of the Manager selling such asset.

"FATCA" shall mean Sections 1471 through 1474 of the Code, as of the Closing Date (or any amended or successor version that is substantively comparable and not materially more onerous to comply with) and any current or future regulations thereunder or official interpretations thereof and any intergovernmental agreements entered into pursuant to Section 1471 (b)(l) of the Code and any intergovernmental agreements (and related legislation or official administrative guidance) implementing the foregoing.

"FCPA" shall mean The United States Foreign Corrupt Practices Act of 1977 (Pub. L. No. 95-213, §§101-104), as amended.

"Federal Funds Rate" shall mean, for any period, a fluctuating interest rate equal for each day during such period to the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published for such day (or,

#4848-3242-6112v16

if such day is not a Business Day, for the next preceding Business Day) by the Federal Reserve Bank of New York, or, if such rate is not so published for any day which is a Business Day, the average of the quotations for such day on such transactions received by the Administrative Agent from three (3) Federal funds brokers of recognized standing selected by the Administrative Agent.

"Fees" shall mean all amounts payable pursuant to or referred to in Section 3.01.

"Final Loan Date" shall mean the date on which the Final Term Loans are made.

"Final Order" shall mean the final order of the Bankruptcy Court approving the DIP Facility in substantially the form of the Interim Order (with only such modifications thereto as are reasonably necessary to convert the Interim Order to a final order and such other modifications as are reasonably satisfactory in form and substance to the Borrowers, the Required Lenders and the Administrative Agent).

"Final Order Entry Date" shall mean the date on which the Final Order is entered by the Bankruptcy Court.

"Final Term Loans" shall have the meaning specified in Section 2.01(b).

"Fiscal Quarter" shall mean, for any Fiscal Year, (i) the fiscal period commencing on (and including) January 1 of such Fiscal Year and ending on (and including) March 31 of such Fiscal Year, (ii) the fiscal period commencing on (and including) April 1 of such Fiscal Year and ending on (and including) June 30 of such Fiscal Year, (iii) the fiscal period commencing on (and including) July 1 of such Fiscal Year and ending on (and including) September 30 of such Fiscal Year and (iv) the fiscal period commencing on (and including) October 1 of such Fiscal Year and ending on (and including) December 31 of such Fiscal Year.

"Fiscal Year" shall mean the fiscal year of Holdings and its Subsidiaries, ending on December 31 of each calendar year.

"Fitch" shall mean Fitch Ratings, Inc.

"Funded Eligible Lease" shall mean an Eligible Lease in respect of a Mortgaged Aircraft.

"GAAP" shall mean generally accepted United States accounting principles.

"Governmental Authority" shall mean, as applicable, the government of the United States of America, any other nation or any political subdivision thereof, whether state, provincial or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"Gross WAC Group Disbursements" shall have the meaning specified in Section 8.01(l).

"Gross WAC Group Receipts" shall have the meaning specified in Section 8.01(l).

"Guaranteed Creditors" shall mean and include each of the Administrative Agent, the Collateral Agent and each Lender.

#4848-3242-6112v16

"<u>Guaranteed Obligations</u>" shall mean (i) the full and prompt payment when due (whether at the stated maturity, by acceleration or otherwise) of the principal and interest on each Term Loan made to the Borrowers under this Agreement, together with all the other obligations (including obligations which, but for the automatic stay under section 362(a) of the Bankruptcy Code or the corresponding provisions of any other applicable law, would become due), indebtedness and liabilities (including, without limitation, indemnities, fees and interest (including any interest accruing after the commencement of any bankruptcy, insolvency, receivership, examinership or similar proceeding at the rate provided for herein, whether or not such interest is an allowed claim in any such proceeding) thereon, owing to the Lenders, the Administrative Agent, the Collateral Agent and the Indemnified Persons now existing or hereafter incurred under this Agreement and each other Credit Document to which the Borrowers is a party and the due performance and compliance by the Borrowers with all the terms, conditions and agreements contained in this Agreement and in each such other Credit Document, (ii) the full and prompt payment when due (whether at the stated maturity, by acceleration or otherwise) of all obligations (including obligations which, but for the automatic stay under section 362(a) of the Bankruptcy Code or the corresponding provisions of any other applicable law, would become due), and the due performance and compliance with all terms, conditions and agreements contained therein, and (iii) the full and prompt performance by the Borrowers of each and every duty, agreement, covenant, undertaking, indemnity and obligation of the Borrowers under and in accordance with the terms of this Agreement and the other Credit Documents, however created, arising or evidenced, whether direct or indirect, primary or secondary, absolute or contingent, joint or several, and whether now or hereafter existing or due or to become due, taking into account applicable notice and grace periods.

"<u>Guarantor</u>" shall have the meaning provided in the first paragraph of this Agreement.

"<u>Guaranty</u>" shall mean the guaranty of the Guarantors pursuant to Section 13 in favor of the Collateral Agent for the benefit of the Guaranteed Creditors and any other guaranty granted in respect of the obligations of the Borrowers and their Subsidiaries in connection herewith.

"<u>Hazardous Materials</u>" shall mean any chemicals, materials, wastes, pollutants, contaminants or substances in any form that is prohibited, limited or regulated pursuant to any Environmental Law by virtue of their toxic or otherwise deleterious characteristics, including without limitation any petroleum or petroleum products, radioactive materials, asbestos in any form that is or could become friable, urea formaldehyde foam insulation, dielectric fluid containing levels of polychlorinated biphenyls, and radon gas.

"<u>Hedging Agreements</u>" shall mean any foreign exchange contracts, currency swap agreements, commodity agreements or other similar arrangements, or arrangements designed to protect against fluctuations in currency values.

"<u>Helicopter</u>" shall have the meaning provided in the Cape Town Convention.

"<u>Holdings</u>" shall have the meaning provided in the first paragraph of this Agreement.

"<u>Holdings Group Information</u>" shall have the meaning provided in <u>Section 7.07(a)</u>.

"<u>Indebtedness</u>" shall mean, as to any Person, without duplication, (i) all indebtedness of such Person for borrowed money or for the deferred purchase price of property or services (which deferred purchase price is due more than ninety (90) days after the purchase of such property or service), (ii) bankers' acceptances, bank guaranties, surety and appeal bonds and similar obligations issued for the account of such Person and all unpaid drawings and unreimbursed payments in respect of letters of credit, bankers' acceptances, bank guaranties, surety and appeal bonds and similar obligations, (iii) all equity which is

treated as debt under applicable accounting rules and has a mandatory redemption date that occurs earlier than the Maturity Date, (iv) all Contingent Obligations of such Person, (v) all Off-Balance Sheet Liabilities and Attributable Indebtedness of such Person, (vi) all obligations of such Person under any Interest Rate Protection Agreement and any Hedging Agreement or any similar type of agreement and (vii) all indebtedness of the types described in clause (i), (ii), (iii), (iv), (v) or (vi) of this definition secured by any Lien on any property owned by such Person, whether or not such indebtedness has been assumed by such Person; provided, however, that if the Person has not assumed or otherwise become liable in respect of such indebtedness, such indebtedness shall be deemed to be in an amount equal to the lesser of (x) the Fair Market Value of the property to which such Lien relates or (y) the stated amount of such indebtedness. The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is directly liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor.  Notwithstanding the foregoing, Indebtedness shall not include (A) trade payables, accrued expenses and deferred tax and other credits incurred by any Person in accordance with customary practices and in the ordinary course of business of such Person, or (B) any obligations of such Person incurred in connection with agreements for the disposition or acquisition of the assets of any Person, a business of any Person or the Equity Interests in any Person to the extent such agreements provide for indemnification, adjustment of purchase price or other post-closing payment adjustments or other contingent payment obligations, including wholly contingent earn-outs and other similar arrangements, in each case, until such obligation under this clause (B) becomes an accrued liability on the balance sheet in accordance with GAAP.

"Indemnified Person" shall mean each Guaranteed Creditor and each of their respective officers, directors, employees, representatives, agents, partners, administrators, managers, advisors, trustees, successors, permitted assigns, and any Person of which the Indemnified Person is a direct or indirect Subsidiary and any direct or indirect Subsidiary of any such Person, and each of such Person's other Affiliates.

"Indemnified Taxes" shall mean (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of a Credit Party under any Credit Document and (b) to the extent not otherwise described in clause (a), Other Taxes.

"Initial Budget" shall mean a 13-week cash flow forecast attached to that certain Commitment Letter, a copy of which is attached hereto as Exhibit J.

"Initial Interim Term Loans" shall have the meaning specified in Section 2.01(b).

"Insurances" shall mean the aircraft hull all risks, including engines and spares insurance and aircraft hull "war and allied perils" insurance and comprehensive aircraft liability and war risks liability insurances, or any equivalent insurances or, as the case may be, reinsurances required under an Eligible Lease and conforming to the insurance undertakings set forth in Schedule 8.03.

"Intercompany Loans" shall mean (i) the profit participating preferred equity certificates set forth on Schedule 1.01(b) and any other profit participating preferred equity certificates in substantially the same form and substance that are issued to Holdings by Luxco from time to time (whether in Dollars or Euros), (ii) the profit participating securities set forth on Schedule 1.01(b) and any other profit participating securities in substantially the same form and substance that are issued to Luxco by the Borrowers from time to time (whether in Dollars or Euros), and (iii) any other profit participating securities or intercompany loans or advances made by any Credit Party to any other Credit Party from time to time (whether in Dollars or Euros) to the extent such profit participating securities or intercompany loans or advances are expressly

#4848-3242-6112v16

subject and subordinate to the Secured Obligations and all other amounts due and owing under this Agreement and the other Credit Documents.

"Interest Determination Date" shall mean, with respect to any Term Loan, the second Business Day prior to the commencement of any Interest Period relating to such Term Loan.

"Interest Period" shall mean, with respect to any Borrowing, the period commencing on the date of such Borrowing and ending one (1) calendar month thereafter; provided, however, that (a) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day, (b) any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall, subject to clause (c), end on the last Business Day of the calendar month and (c) no Interest Period for any Borrowing shall extend beyond the Maturity Date. Interest shall accrue from and including the first day of an Interest Period to but excluding the last day of such Interest Period. For purposes of the definition of "Interest Period", the date of a Borrowing initially shall be the date on which such Borrowing is made and thereafter shall be the effective date of the most recent conversion or continuation of such Borrowing.

"Interest Rate Protection Agreement" shall mean any interest rate swap agreement, interest rate cap agreement, interest collar agreement, interest rate hedging agreement or other similar agreement or arrangement.

"Intermediate Lease" shall mean, in respect of any Mortgaged Aircraft, the lease to be entered into between the relevant Eligible Entity or an Intermediate Subsidiary (as lessor) and an Intermediate Subsidiary (as lessee).

"Intermediate Subsidiary" shall have the meaning provided in Section 9.09.

"Interim Order" shall mean an order of the Bankruptcy Court approving the DIP Facility on an interim basis, substantially in the form set forth in Exhibit K, with only such modifications as are reasonably satisfactory to the Borrowers, the Required Lenders and the Administrative Agent.

"Interim Order Entry Date" shall mean the date on which the Interim Order is entered by the Bankruptcy Court.

"Interim Term Loans" shall have the meaning specified in Section 2.01(b).

"International Interest" shall have the meaning assigned to the term "international interest" in the Cape Town Convention.

"International Registry" shall have the meaning assigned thereto in the Cape Town Convention.

"Investment" or "Investments" shall have the meaning provided in Section 9.05.

"Ireland" shall mean the Republic of Ireland.

"IRS" shall mean the United States Internal Revenue Service.

#4848-3242-6112v16

"Lender" shall mean each financial institution listed on Schedule 1.01(c), as well as any Person that becomes a "Lender" hereunder pursuant to Section 2.11 or 12.04(b).

"Lender Default" shall mean, as to any Lender, (i) the wrongful refusal (which has not been retracted) of such Lender or the failure of such Lender (which has not been cured) to make available its portion of any Borrowing within two (2) Business Days of the date the relevant Term Loan was required to be funded hereunder unless such Lender notifies the Administrative Agent and the Manager in writing that such failure is the result of such Lender's determination that one or more conditions precedent to the relevant Borrowing (each of which conditions precedent, together with any applicable default, shall be specifically identified in such writing) has not been satisfied, (ii) such Lender having become (x) the subject of a Bail-in Action (as defined in Section 12.25) or (y) such Lender having become the subject of a bankruptcy or insolvency proceeding or a takeover by a regulatory authority or having had a receiver, conservator, trustee, administrator, assignee for the benefit of creditors or similar person charged with reorganization or liquidation of its business or custodian, appointed for it, or has taken any action in furtherance of, or indicating its consent to, approval of or acquiescence in any such proceeding or appointment or (iii) such Lender having notified the Administrative Agent and/or any Credit Party, or having made any public statement to the effect, (x) that it does not intend to comply with its obligations under Section 2.01 in circumstances where such non-compliance would constitute a breach of such Lender's obligations under such Section, (y) of the events described in preceding clause (ii), or (z) that it generally does not intend to comply with its funding obligations under agreements in which it commits to extend credit; provided, however, that the term "Lender Default" shall also include, as to any Lender, any Affiliate of such Lender that has "control" (within the meaning provided in the definition of "Affiliate") of such Lender having become the subject of a bankruptcy or insolvency proceeding or a takeover by a regulatory authority or having had a receiver, conservator, trustee, administrator, assignee for the benefit of creditors or similar person charged with reorganization or liquidation of its business, or custodian, appointed for it, or has taken any action in furtherance of, or indicating its consent to, approval of or acquiescence in any such proceeding or appointment after the Closing Date.

"Lender Professionals" shall have the meaning specified in Section 12.01(a).

"Lending Office" shall mean the office or offices notified by a Lender to the Borrowers in writing on or before the date it becomes a Lender (or, following that date, by not less than five (5) Business Days' written notice) as the office or offices through which it will perform its obligations under this Agreement.

"Lessee" shall mean the lessee under an Eligible Lease that is (i) organized under the laws of a Permitted Jurisdiction, (ii) to the extent that it is the operator of a Mortgaged Aircraft, holds a valid aircraft operator's certificate and (iii) is not a Restricted Party.

"Lessee Party" shall mean a Lessee, Sublessee or Sub-Sublessee, as the context shall require.

"LIBOR" (a) shall mean, for any Interest Period, the rate per annum determined by the Administrative Agent at approximately 11:00 a.m. (London time) on the date that is two (2) Business Days prior to the commencement of such Interest Period by reference to the interest settlement rates for deposits in Dollars (as set forth by (a) ICE Benchmark Administration Limited, (b) any successor service or entity that has been authorized by the U.K. Financial Conduct Authority to administer the London Interbank Offered Rate or (c) any service selected by the Administrative Agent that has been nominated by such an entity as an authorized information vendor for the purpose of displaying such rates) for a period equal to such Interest Period; provided, however, that (x) to the extent an interest rate is not ascertainable pursuant to the foregoing provisions of this clause (a), or if the ICE Benchmark Administration interest settlement

rates for deposits in Dollars do not exist at such time, a successor index rate as may be agreed to by the Administrative Agent (as directed by the Required Lenders) and the Borrowers and (y) if any such rate is below zero, the rate shall be deemed to be zero; provided, further, that with respect to any Borrowing with an Interest Period of less than one month, for purposes of determining "LIBOR" pursuant to clauses (a), such Interest Period shall be deemed to be one month.

"Lien" shall mean any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge, or other security interest (or interest in the nature of a security interest) of any kind or nature whatsoever (including, without limitation, any conditional sale or other title retention agreement, any financing or similar statement or notice filed under the UCC or the Cape Town Convention or any other similar recording or notice statute, and any finance lease having substantially the same effect as any of the foregoing).

"Local Requirements Exception" shall mean an exception for Equity Interests or title to an Aircraft held by directors, trustees, nominees, conditional vendors or similar persons under similar arrangements in order to meet local nationality or other local requirements regarding registration or ownership of aircraft or to minimize the impact of any Taxes on the Borrowers, any of its Subsidiaries or any Lessee, which is consistent with the Manager's customary commercial practices, and subject to the consent of the Administrative Agent, not to be unreasonably withheld.

"Losses" shall mean any and all liabilities (including any liability in tort), losses, claims, damages, obligations, disbursements, penalties, judgments, reasonable out-of-pocket third-party costs, expenses and disbursements, fees, actions or suits of whatsoever kind and nature (and including reasonable legal fees and expenses) that may be imposed on, incurred by, suffered by or asserted against an Indemnified Person (provided, however, that the "reasonable" qualification with respect to out-of-pocket third-party costs, expenses and disbursements shall not apply to any such costs, expenses and disbursements incurred after the occurrence of an Event of Default).

"LTV Coverage Floor" shall mean a loan to value coverage floor as set forth on Schedule 1.01(f).

"Luxco" shall have the meaning provided in the first paragraph of this Agreement.

"Maintenance Reserve Payments" with respect to a Mortgaged Aircraft, shall mean any amounts paid by the related Lessee Party, pursuant to the terms of such Eligible Lease as reserves, security or maintenance reserves (howsoever described) in respect of the maintenance, repair or similar payments and expenses for the related Mortgaged Aircraft and shall include any letters of credit procured by a Lessee Party or an Affiliate of a Lessee Party to satisfy any maintenance reserve or supplemental rent obligations under such Eligible Lease.

"Manager" shall have the meaning provided in the first paragraph of this Agreement.

"Manager's Credit Policies and Procedures" shall mean the guidelines set forth in Exhibit A-4 in respect of the Manager and its Subsidiaries which guidelines have been delivered to and approved by the Administrative Agent, as such guidelines may be amended from time to time in accordance with Section 9.13.

"Manager's Irish Share Charge" shall have the meaning provided in Section 5.06(c).

"Manuals and Technical Records" shall mean, with respect to any Mortgaged Aircraft, Engine, Rotor Blade, Rotor Component or Part, all books, logs, manuals and data, and inspection,

maintenance, modification and overhaul records (including all job cards) and any certificates or documents as are required to be maintained with respect to such Mortgaged Aircraft, Engine, Rotor Blade, Rotor Component or Part under applicable rules and regulations of the relevant Aviation Authority and owned by the applicable Eligible Entity pursuant to the terms of the related Eligible Lease.

"Manufacturer" shall mean each or any of the manufacturers of an Airframe, Engine or Rotor Blade (or any of their respective successors or assigns).

"Margin Stock" shall have the meaning provided in Regulation U.

"Market Disruption Event" shall mean (i) at approximately 12:00 noon (London time) on the day two (2) Business Days prior to the commencement of any Interest Period for a Borrowing (the "Affected Interest Period"), the Administrative Agent shall have reasonably determined that reasonable means do not exist for ascertaining LIBOR or (ii) before close of business in London on the Interest Determination Date for the Affected Interest Period, the Administrative Agent receives notifications from Lenders which, in the aggregate, represent at least 50% of the total number of Lenders (such Lenders, the "Affected Lenders") that Adjusted LIBOR in respect of the Affected Interest Period will not be adequate to cover the cost to such Lenders of obtaining matching deposits in relation to such Term Loans for such Affected Interest Period in the relevant interbank market.

"Material Adverse Effect" shall mean (i) a material adverse effect on the business, operations, or financial condition of Holdings and its Subsidiaries taken as a whole or (ii) a material adverse effect (which does not result from any action or inaction of the Administrative Agent or a Lender) (x) on the rights or remedies of the Lenders, the Administrative Agent or the Collateral Agent hereunder and under the other Credit Documents taken as a whole or (y) on the ability of the Credit Parties taken as a whole, to perform in any material respect their obligations to the Lenders, the Administrative Agent or the Collateral Agent hereunder or under any other Credit Document; provided, however, that Material Adverse Effect shall expressly exclude (i) any matters publicly disclosed on Holdings' public website or in a press release prior to or simultaneous with the filing of the Cases (including, without limitation, the announcement of the Cases and the related transactions), (ii) any matters disclosed to the Lenders in writing on or prior to the date hereof in connection herewith (including the Schedules or Exhibits hereto) or otherwise disclosed to the Lenders in connection with any other Credit Document, (iii) any matters disclosed in any first day pleadings or declarations, (iv) the effect of filing the Cases, the events and conditions related to, resulting from and/or leading up thereto and the effects thereon and any action required to be taken under the Credit Documents or the Orders and (v) any action or omission of any Credit Party taken with the written consent of the Required Lenders.

"Maturity Date" shall mean the earliest to occur of:  (i) May 27, 2019, (ii) December 14, 2018 unless the Interim Order is entered, (iii) 30 days after the entry of the Interim Order unless the Final Order approving the Final DIP Loans and an Acceptable Bidding Procedures Order are entered, (iv) the consummation of a sale of all or substantially all of the assets of the Credit Parties (pursuant to a 363 Sale or otherwise), unless done pursuant to a confirmed Chapter 11 Plan, (v) the effective of date of a plan of reorganization in the Cases and (vi) the date of a termination of the Term Loan Commitments in effect at such time and/or the acceleration of all of the Secured Obligations at the direction of the Required Lenders, following the occurrence and during the continuation of any Event of Default.

"Maximum Intercompany Balance" shall mean, with respect to each WAC Group, an amount equal to the lesser of such WAC Group's (a) WAC Specific Cap and (b) LTV Coverage Floor.

"Maximum Rate" shall have the meaning provided in Section 12.18.

"Milbank" shall mean Milbank, Tweed, Hadley & McCloy LLP.

"Milestones" shall have the meaning specified in Section 8.25.

"Moody's" shall mean Moody's Investors Service, Inc.

"Mortgaged Aircraft" shall mean any Aircraft which is, on the relevant date of determination, subject to the Lien of the relevant Security Documents in connection with the financing contemplated by this Agreement and the other Credit Documents.

"Multiemployer Plan" shall mean any multiemployer plan as defined in Section 4001(a)(3) of ERISA, which is contributed to by (or to which there is or may be an obligation to contribute of) a Credit Party or an ERISA Affiliate, and each such plan for the five-year period immediately following the latest date on which a Credit Party or an ERISA Affiliate contributed to or had an obligation to contribute to such plan.

"Net WAC Group Intercompany Claim" shall have the meaning specified in Section 8.01(l).

"Net WLIL Intercompany Claim" shall have the meaning specified in Section 8.01(l).

"New York Law Credit Document" shall mean any Credit Document stated to be governed by the law of the State of New York.

"Non-Consenting Lender" shall mean any Lender that does not approve any change, waiver, discharge or termination with respect to this Agreement that (i) requires the approval of all Lenders or of all affected Lenders in accordance with the terms of Section 12.12(a) and (ii) has been approved by the Required Lenders.

"Non-Defaulting Lender" shall mean and include each Lender other than a Defaulting Lender.

"Non-Participating WAC Credit Facilities" shall mean each of the credit facilities described on Schedule 1.01(e).

["Non-Participating WAC Allocated Expenses" shall have the meaning specified in the Orders.]

"Non-Participating WAC Direct Expenses" shall have the meaning specified in the Orders.

"Non-Participating WAC Group" shall mean each of the obligors and entities whose Equity Interests are pledged as collateral under each Non-Participating WAC Credit Facility (other than Holdings, Luxco and Manager).

"Non-Participating WAC Fronted Expenses" shall have the meaning specified in the Orders.

"Notice of Borrowing" shall have the meaning given in Section 2.02.

"Notice Office" shall mean the office of the Administrative Agent located at 60 State Street, Suite 700, Boston, MA 02109, Attention of: Michael Fey, Managing Director; Email:

michael.fey@ankura.com, or such other office or person as the Administrative Agent may hereafter designate in writing as such to the other parties hereto from time to time.

"Obligors" shall have the meaning provided in Section 4.05.

"Off-Balance Sheet Liabilities" shall mean, of any Persons, any repurchase obligation or liability of such Person with respect to accounts or notes receivable sold by such Person.

"Omnibus Consent Letter" shall mean the omnibus consent letter dated as of November 24, 2018, as amended by Amendment No. 1 dated December [●], 2018 by each of the Consenting Prepetition Lenders (as defined therein) party thereto and acknowledged and agreed on December [●], 2018 by the Manager.

"Operating Expenses" shall mean the following costs and expenses of the Borrowers and the Eligible Entities (or paid by any Guarantor acting on their behalf), without duplication:  (i) the transaction costs with respect to the Documents in connection with any re-leasing in accordance with Section 2.13, (ii) any expenses incurred in connection with any repair, maintenance, storage, reconditioning or reconfiguration of an Aircraft, (iii) any expenses, contributions or similar amounts payable pursuant to any lease agreements or guarantee arrangements entered into in connection with the leasing of an Aircraft to the applicable Lessee (but not damages for breach of any lease by a Credit Party or settlement amounts relating to any alleged breach of any lease by a Credit Party), (iv) any other costs or expenses (excluding principal and interest in respect of the Term Loans due under the Credit Documents), including, but not limited to any Taxes incurred by the Borrowers and the Eligible Entities, audit expenses, tax return preparation expenses and other costs and expenses of the Borrowers and the Eligible Entities in the ordinary course of business and (v) costs and expenses incurred in connection with the actions taken to comply with Section 8 (it being understood and agreed that such costs and expenses in respect of this clause (v) shall not include Secured Obligations owing hereunder, and that such costs and expenses shall include costs and expenses such as legal fees and expenses, travel costs, insurance costs and similar costs); provided, however, that any such costs and expenses shall be documented to the reasonable satisfaction of the Administrative Agent as requested by the Administrative Agent from time to time.

"Operator" shall mean, in respect of each Aircraft, the relevant Lessee Party authorized to operate such Aircraft.

"Orders" shall mean the Interim Order and, upon entry thereof, the Final Order.

"Other Connection Taxes" shall mean, with respect to any Indemnified Person, Taxes imposed as a result of a present or former connection between such Indemnified Person and the jurisdiction imposing such Tax, including, for the avoidance of doubt, being resident for purposes of Tax in such jurisdiction (other than connections arising from such Indemnified Person having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, or engaged in any other transaction pursuant to or enforced any Credit Document, or sold or assigned an interest in any Term Loan or Credit Document (other than an assignment made pursuant to Section 2.10 or 2.11)).

"Other Taxes" shall mean all present or future stamp, excise, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Credit Document; except (i) such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Sections 2.10 or 2.11) and (ii) Luxembourg registration duties (*droits d'enregistrement*) payable due to a registration,

submission or filing by an Indemnified Person of any Document where such registration, submission or filing is or was not required to maintain or preserve the rights of the Indemnified Person under such Document.

"Oversubscription Lender" shall mean each Lender that provides an Oversubscription Term Loan Commitment.

"Oversubscription Term Loan Commitment" shall mean, for each Lender, the amount set forth opposite such Lender's name in Schedule 1.01(a) directly below the column entitled "Oversubscription Term Loan Commitments."

"Own" shall mean, with respect to any Aircraft or Equity Interest, to hold legal and sole ownership of such Aircraft or Equity Interest directly or to hold 100% of the beneficial ownership of such Aircraft or Equity Interest through a trust, conditional sale or similar arrangement with respect to the title to such Aircraft or Equity Interest. The terms "Ownership" and "Owned by" have a correlative meaning.

"Part" shall mean, with respect to an Airframe, Engine, Rotor Blade or Rotor Component, any auxiliary power unit, avionics, appliance, part, instrument, appurtenance, accessory, furnishing or other item of equipment of whatever nature (other than an Engine) which may from time to time be incorporated or installed in or attached to the relevant Airframe, Engine, Rotor Blade or Rotor Component and to which the Eligible Entity that owns such Airframe or Engine has title or, after removal therefrom, so long as title thereto shall remain vested in the related Eligible Entity.

"Participant Register" shall have the meaning provided in Section 12.04(e).

"Participating WAC Borrowers" shall mean each of the borrowers under the Participating WAC Credit Facilities.

"Participating WAC Documents" shall mean each of the credit facilities or note purchase agreements under the Participating WAC Credit Facilities, each of the mortgages, collateral assignments, supplements to all of the foregoing, security agreements, pledge agreements control agreements or other similar agreements delivered to the collateral agent under each Participating WAC Credit Facility in connection with the Participating WAC Credit Facilities and each of the other agreements, instruments or documents that creates or purports to create a Lien in favor of the collateral agent under each Participating WAC Credit Facility.

"Participating WAC Credit Facilities" shall mean each of the credit facilities and the note purchase agreement described on Schedule 1.01(d).

"Participating WAC Lenders" shall mean the lenders or holders (or equivalent term) of the Indebtedness under and as defined in each of the Participating WAC Credit Facilities.

"Patriot Act" shall have the meaning provided to such term in Section 12.17.

"Payment Date" shall mean in respect of all Term Loans, the last Business Day of each calendar month and the Maturity Date.

"Payment Office" shall mean the office of the Administrative Agent located at 60 State Street, Suite 700, Boston, MA 02109, Attention of Michael Fey, Managing Director or such other office as the Administrative Agent may hereafter designate in writing as such to the other parties hereto.

#4848-3242-6112v16

"PBGC" shall mean the U.S. Pension Benefit Guaranty Corporation.

"Permitted Holders" shall mean (x) MSD Capital, L.P., MSDC Management, L.P., Soros Fund Management, LLC and Cartesian Capital Group, LLC and their respective Affiliates and (y) the management, employees, directors, former employees, family trusts and other estate planning vehicles of Holdings and its Subsidiaries and their respective Affiliates.

"Permitted Jurisdiction" shall mean, in respect of the jurisdiction where any Lessee Party is organized or the State of Registration of any Mortgaged Aircraft, in each case, any jurisdiction that is not the target of country-wide or territory-wide Sanctions.

"Permitted Liens" shall have the meaning provided in Section 9.01.

"Permitted Variances" shall have the meaning specified in Section 8.28.

"Person" shall mean any individual, Company or any Governmental Authority.

"Petition Date" shall have the meaning set forth in the recitals to this Agreement.

"Plan" shall mean an "employee benefit plan" as defined in Section 3 of ERISA (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA maintained or contributed to by a Credit Party and each such plan for the five-year period immediately following the latest date on which a Credit Party or an ERISA Affiliate maintained, contributed to or had an obligation to contribute to (or is deemed under Section 4069 of ERISA to have maintained or contributed to or to have had an obligation to contribute to, or otherwise to have liability with respect to) such plan.

"Platform" shall have the meaning provided in Section 12.03.

"Pledge" shall mean the pledge of an additional Mortgaged Aircraft as Collateral.

"Pledged Account" shall mean each of the Central DIP Account and the Central Cash Accounts or such other account of the Borrowers that may from time to time be pledged in accordance with an Account Pledge Agreement.

"Pre-Petition WAC Documents" shall mean each of the credit facilities or note purchase agreements under the WAC Facilities, each of the mortgages, collateral assignments, supplements to all of the foregoing, security agreements, pledge agreements control agreements or other similar agreements delivered to the collateral agent under each WAC Facility in connection with the WAC Facilities and each of the other agreements, instruments or documents (including patent, trademark or copyright filings) that creates or purports to create a Lien in favor of the collateral agent under each WAC Facility.

"Prime Rate" shall mean the rate of interest per annum which is identified as the "Prime Rate" and (i) normally published in the Money Rates section of The Wall Street Journal or (ii) as quoted from such other generally available and recognizable source as the Administrative Agent may select. The prime rate is a reference rate and does not necessarily represent the lowest or best rate available.

"Process Agent" shall have the meaning provided in Section 5.09.

#4848-3242-6112v16

"Protocol" shall mean the Protocol to the Convention on International Interests in Mobile Equipment on Matters Specific to Aircraft Equipment, concluded in Cape Town, South Africa, on November 16, 2001 (utilizing the English-language version thereof).

"Public Lender" shall have the meaning provided in Section 12.03.

"Register" shall have the meaning provided in Section 12.15.

"Registration" shall mean the registration of an Aircraft with the Aviation Authority in the relevant State of Registration.

"Regulation D" shall mean Regulation D of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor to all or a portion thereof establishing reserve requirements.

"Regulation T" shall mean Regulation T of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor to all or a portion thereof.

"Regulation U" shall mean Regulation U of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor to all or a portion thereof.

"Regulation X" shall mean Regulation X of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor to all or a portion thereof.

"Related Assets" shall mean, with respect to a Mortgaged Aircraft, all of the following: (i) all Scheduled Payments, proceeds from Events of Loss, proceeds from Asset Sales, Maintenance Reserve Payments, Security Deposits and Aircraft Revenues related thereto, (ii) all right, title and interest in and to any Eligible Lease and the security and credit support relating thereto, including letters of credit, guarantees and collaterally assigned subleases, (iii) any manufacturer warranties and (iv) all payments, proceeds and income of the foregoing or related thereto.

"Related Parties" shall mean, with respect to any specified Person, such Person's Affiliates and the respective directors, trustees, officers, employees, agents and advisors of such Person and such Person's Affiliates.

"Release" shall mean disposing, discharging, injecting, spilling, pumping, leaking, leaching, dumping, emitting, escaping, emptying, pouring, seeping, or migrating into, through or upon any land or water or air, or otherwise entering into the environment.

"Remedies Notice Period" shall have the meaning specified in the last paragraph of Section 10.

"Replaced Lender" shall have the meaning provided in Section 2.11.

"Replacement Eligible Lease" shall mean a lease of a Mortgaged Aircraft by an Eligible Entity as lessor to an Eligible Lessee, containing the Core Lease Provisions (or such other provisions as are reasonably satisfactory to the Administrative Agent).

"Replacement Lender" shall have the meaning provided in Section 2.11.

#4848-3242-6112v16

"Required Cape Town Registrations" shall mean, for each Mortgaged Aircraft, a registration of International Interest in respect of the relevant Helicopter, from the relevant Eligible Entity to the Collateral Agent in respect of the relevant Mortgage unless the State of Registration of such Helicopter has designated an entry point or entry points pursuant to Article XIX(1) of the Protocol; provided, that no registration of International Interest in respect of the Helicopter bearing MSN 33156 shall be required.  For the avoidance of doubt, it is understood by the parties hereto that the order of filings of International Interests on the International Registry existing prior to a Closing Date will not be changed.

"Required Lenders" shall mean, at any time, Non-Defaulting Lenders the sum of whose outstanding Term Loans and Unutilized Term Loan Commitments at such time represents at least a majority of the sum of (i) all outstanding Term Loans of Non-Defaulting Lenders and (ii) the Total Unutilized Term Loan Commitment in effect at such time less the Unutilized Term Loan Commitments of all Defaulting Lenders at such time.

"Responsible Officer" shall mean any of the chief executive officer, the chief financial officer, the treasurer, the general counsel or a director.

"Restricted" shall mean, when referring to cash or Cash Equivalents of Holdings or any of its Subsidiaries, that such cash or Cash Equivalents (i) appears (or would be required to appear) as "restricted" on a consolidated balance sheet of Holdings or of any such Subsidiary (unless such appearance is related to the Credit Documents or Liens created thereunder), (ii) are subject to any Lien (provided that this shall not include any cash or Cash Equivalents in a pledged account in the name of Holdings or any of its Subsidiaries that Holdings or its relevant Subsidiary can remove on demand or that is scheduled to be released to Holdings or its relevant Subsidiary under the waterfall or similar provision of any other loan or credit agreement, so long as no "event of default" or other circumstance in connection with such loan or credit agreement then exists that would prevent the release of such cash or Cash Equivalents at the end of any relevant monthly period (or within thirty (30) days of the relevant date of determination)) in favor of any Person other than the Collateral Agent for the benefit of the Secured Parties or other Liens customary in account agreements or as provided by law or (iii) are not otherwise generally available for use by Holdings.

"Restricted Junior Payment" shall mean, with respect to any Person, (i) a Dividend or (ii) any payment or prepayment of principal of, premium, if any, or interest on, or redemption, purchase, retirement, defeasance (including in-substance or legal defeasance), sinking fund or similar payment with respect to, any Intercompany Loans or under any WAC Facility, other than (x) payments made in compliance with the Approved Budget, (y) payments agreed to in writing by the Required Lenders and (z) payments approved by the Order, and if necessary, authorized by the Bankruptcy Court.

"Restricted Lender" shall mean a Lender that notifies the Administrative Agent that complying with any given Sanctions would result in (i) a violation of, a conflict with or liability under EU Regulation (EC) 2271/96 as amended by Commission Delegated Regulation (EU) 2018/1100 of 6 June 2018 or (ii) a violation or conflict with section 7 foreign trade rules (AWV) (Außenwirtschaftsverordnung) (in connection with section 4 para 1 no 3 foreign trade law (AWG) (Außenwirtschaftsgesetz)) or a similar anti-boycott statute.

"Restricted Party" shall mean a Person that is:

(i)        listed on, or directly or indirectly owned (meaning 50% or greater ownership interest) or otherwise controlled by a person listed on, or acting on behalf of a person listed on, any Sanctions List;

(ii)    located or resident in or, organized under the laws of, or directly or indirectly owned or otherwise controlled by (in accordance with how OFAC has interpreted and applied these terms), or acting on behalf of, a person located or resident in or organized under the laws of, a Sanctioned Jurisdiction; or

(iii)    otherwise a target of Sanctions ("target of Sanctions" signifying a person with whom a U.S. Person or other national of a Sanctions Authority would be prohibited or restricted by law from engaging in trade, business, or other activities).

"Returns" shall have the meaning provided in Section 7.09.

"Rotor Blade" shall mean, with respect to any Airframe for a Mortgaged Aircraft, (a) each of the rotor blades associated with such Mortgaged Aircraft, which may from time to time be installed on the relevant Airframe and to which the Eligible Entity that owns such Airframe has title, or after removal therefrom, so long as title thereto shall remain vested in the related Eligible Entity, or any rotor blade that may be supplied as a substitute in accordance with the relevant Funded Eligible Lease, together with any and all Rotor Components and Parts (until replaced with a Replacement Rotor Blade), (b) any Replacement Rotor Blade, in any case whether or not from time to time installed on such Airframe or installed on any other airframe, and (c) any and all related Parts.

"Rotor Component" shall mean each of the main rotor gear boxes, tail rotor gear boxes, combining gearboxes, transmissions, servos, main and tail rotor head components and other rotor components installed on an Airframe for a Mortgaged Aircraft which may from time to time be installed on the relevant Airframe and to which the Eligible Entity that owns such Airframe has title or, after removal therefrom, so long as title thereto shall remain vested in the related Eligible Entity, or any rotor components that may be supplied as a substitute in accordance with the relevant Funded Eligible Lease, together with any and all Parts.

"Sanctioned Jurisdiction" shall mean any country, region or territory that is the subject of comprehensive Sanctions broadly restricting dealings in, with or involving such country, region or territory (as of the date hereof, Cuba, Iran, Syria, North Korea, Sudan and the Crimea region of Ukraine).

"Sanctions" shall mean the economic sanctions laws, regulations, embargoes or restrictive measures administered, enacted, or enforced by any Sanctions Authority.

"Sanctions Authorities" shall mean:  (i) the United States government; (ii) the United Nations; (iii) the European Union; (iv) the United Kingdom; or (v) the respective governmental institutions and agencies of any of the foregoing, including, without limitation, the Office of Foreign Assets Control of the U.S. Department of the Treasury ("OFAC"), the U.S. Department of State, her Majesty's Treasury ("HMT"), the United Nations Security Council ("UNSC"), Ireland or other relevant sanctions authority.

"Sanctions List" shall mean any list maintained by, or public pronouncement made by any Sanctions Authority of any individuals or entities that are the subject of Sanctions, including, without limitation, the Specially Designated Nationals and Blocked Persons List maintained by OFAC and, the Consolidated List of Financial Sanctions Targets maintained by HMT.

"S&P" shall mean Standard & Poor's Ratings Services, a division of McGraw-Hill, Inc.

"Scheduled Payment" shall mean, with respect to any Eligible Lease, the "basic" rent or other interim payment scheduled to be paid by the Lessee, or, as the case may be, accrued as revenue by the applicable Eligible Entity, in each case pursuant to the terms of such Eligible Lease.

"SEC" shall have the meaning provided in Section 8.01(e).

"Second Interim Loan Date" shall mean the date on which the Second Interim Term Loans are made.

"Second Interim Term Loans" shall have the meaning specified in Section 2.01(b).

"Secured Obligations" shall mean all amounts owing to the Secured Parties pursuant to the terms of this Agreement or any other Credit Document (including all interest which accrues after the commencement of any case or proceeding in bankruptcy, insolvency, examinership, receivership or similar proceeding after the insolvency of, or for the reorganization of any Credit Party, whether or not allowed in such case or proceeding).

"Secured Parties" shall mean the Administrative Agent, the Collateral Agent, and each Lender.

"Security Agreement" shall have the meaning provided in Section 5.06(b).

"Securities Act" shall mean the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

"Security Deposit" shall mean a deposit collected by an Eligible Entity or any of its Affiliates from, or on behalf of, a Lessee Party as a security deposit or "commitment fee" pursuant to the related Eligible Lease, Sublease or Sub-Sublease and shall include any letters of credit in favor of an Eligible Entity or any of its Affiliates procured by such Lessee Party or an Affiliate of such Lessee Party to satisfy any security deposit obligations under such Eligible Lease, Sublease or Sub-Sublease.

"Security Document" shall mean and include the Security Agreement, each Collateral Supplement, each Equity Pledge Agreement, each Account Pledge Agreement and any other documents designated as a "Security Document" in accordance with the terms of this Agreement.

"Specified Collateral" shall mean any assets which are deemed to be subject to an indirect lien on account of the pledged equity of a WAC Group member holding such assets under such Participating WAC Credit Facility.

"Specified Guarantors" shall mean Waypoint Asset Co 11 Limited, Waypoint Asset Co 4 Limited, Waypoint Asset Co 5 Limited, Waypoint Asset Euro 9A Limited and Waypoint Asset Sterling 9A Limited.

"Specified Party" means any Person (including any Affiliate, agent, or representative of such Person) that (a) holds or controls loans or commitments under any Non-Participating WAC Credit Facility and (b) did not otherwise hold or control any loans or commitments in a Participating WAC Credit Facility on November 1, 2018 for which such Person did not execute the Omnibus Consent Letter.

"Standard" shall mean, in relation to an Aircraft and any particular issue or matter, the exercise of reasonable care and diligence consistent with the standard which a reputable international helicopter operating lessor would apply in the applicable circumstances having regard to the standard of care it exercises in relation to its fleet of owned and/or managed aircraft.

"State of Registration" shall mean, with respect to any Aircraft, the jurisdiction under the laws of which such Aircraft is registered.

#4848-3242-6112v16

"Statutory Reserves" shall mean a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one minus the aggregate of the maximum reserve percentages (including any marginal, special, emergency or supplemental reserves) applicable to any member bank of the Federal Reserve System of the United States of America in respect of Eurocurrency Liabilities (as defined in Regulation D of the Board of Governors of the Federal Reserve System of the United States of America). Term Loans shall be deemed to constitute Eurocurrency Liabilities and to be subject to such reserve requirements. Statutory Reserves shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

"Sterling" or "£" shall mean the lawful currency of the United Kingdom of Great Britain and Northern Ireland.

"Sterling Central Cash Account" shall mean account no. [●], in the name of the Manager, maintained with the Account Bank in London, England, or any other deposit, trust, escrow or similar segregated account of the Manger, designated in writing by the Manager to the Administrative Agent and the Collateral Agent as the "Sterling Central Cash Account", into which Aircraft Revenues received after the Closing Date denominated in Sterling are deposited.

"Sublease" shall mean a lease of a Mortgaged Aircraft from a Lessee to a Sublessee; provided, however, that a Charter Agreement shall not be considered a Sublease within the meaning of this Agreement.

"Sublessee" shall mean a permitted sublessee (either as defined in the relevant Eligible Lease or as consented to by the Manager) of an Aircraft that is organized under the laws of a Permitted Jurisdiction and is not a Restricted Party.

"Subsidiary" shall mean, as to any Person, (i) any corporation more than 50% of whose stock of any class or classes thereof having by the terms thereof ordinary voting power to elect a majority of the directors of such corporation (irrespective of whether or not at the time stock of any class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is at the time owned by such Person and/or one or more Subsidiaries of such Person and (ii) any partnership, limited liability company, association, joint venture or other entity in which such Person and/or one or more Subsidiaries of such Person has more than a 50% equity interest at the time. Unless otherwise qualified, all references to a "Subsidiary" or to "Subsidiaries" in this Agreement shall refer to a Subsidiary or Subsidiaries of the Manager.

"Sub-Sublease" shall mean a lease of a Mortgaged Aircraft from a Sublessee to a Sub-Sublessee; provided, however, that a Charter Agreement shall not be considered a Sub-Sublease within the meaning of this Agreement.

"Sub-Sublessee" shall mean a permitted sublessee (either as defined in the relevant Eligible Lease or as consented to by the Manager) of an Aircraft that is organized under the laws of a Permitted Jurisdiction and is not a Restricted Party.

"Synthetic Debt" shall mean, with respect to any Person as of any date of determination thereof, all obligations of such Person in respect of transactions entered into by such Person that are intended to function primarily as a borrowing of funds (including any minority interest transactions that function primarily as a borrowing) but are not otherwise included in the definition of "Indebtedness" or as a liability on the consolidated balance sheet of such Person and its Subsidiaries in accordance with GAAP.

"Synthetic Lease Obligation" shall mean the monetary obligation of a Person under (a) a so-called synthetic, off-balance sheet or tax retention lease, or (b) an agreement for the use or possession of property creating obligations that do not appear on the balance sheet of such Person but which, upon the insolvency or bankruptcy of such Person, would be characterized as the indebtedness of such Person (without regard to accounting treatment).

"Taxes" shall mean all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax, penalties or similar liabilities applicable thereto.

"Term Loan" shall mean any loan made pursuant to Section 2.01(a).

"Term Loan Commitment" shall mean, for each Lender, the amount set forth opposite such Lender's name in Schedule 1.01(a) directly below the column entitled "Term Loan Commitment," or the amount set forth in the Assignment and Assumption Agreement pursuant to which such Lender becomes a party hereto as such amount may be adjusted or terminated from time to time in accordance with this Agreement. The aggregate Term Loan Commitment of all the Lenders on the Closing Date is $45,000,000.

"Total Term Loan Commitment" shall mean, at any time, the sum of the Commitments of each of the Lenders at such time.

"Total Unutilized Term Loan Commitment" shall mean, at any time, an amount equal to the excess (if any) of (x) the Total Term Loan Commitment in effect at such time over (y) the aggregate principal amount of all Term Loans outstanding at such time.

"Test Period" shall have the meaning specified in Section 8.01(k)(iii).

"Treaty" shall mean the Treaty on the Functioning of the European Union (formerly known as the Treaty establishing the European Community) being the Treaty of Rome of March 25, 1957, as amended by the Single European Act 1986, the Maastricht Treaty (which was signed at Maastricht on February 7, 1992), the Treaty of Amsterdam (which was signed in Amsterdam on October 2, 1997) and the Treaty of Lisbon (which was signed in Lisbon on December 13, 2007).

"Trigger Notice" shall mean the written notice that is delivered by the Administrative Agent to the Debtors and their counsel, the U.S. Trustee and the counsel for any statutory committee appointed in the Cases describing an Event of Default that is alleged to have occurred and be continuing under the Documents.

"UCC" shall mean the Uniform Commercial Code as from time to time in effect in Washington, D.C. or any other relevant jurisdiction.

"UCC Financing Statements" shall mean any applicable UCC-1 financing statements in respect of the Security Documents.

"Unfunded Pension Liability" of any Plan shall mean the excess of a Plan's benefit liabilities under Section 4001(a)(16) of ERISA over the current value of such Plan's assets, determined in accordance with the assumptions used by the actuary to the Plan in its most recent valuation of such Plan.

"United States" and "U.S." shall each mean the United States of America.

"Unutilized Term Loan Commitment" shall mean, with respect to any Lender at any time, such Lender's Term Loan Commitment at such time less the aggregate outstanding principal amount of all Term Loans made by such Lender at such time.

"Variance Report" shall have the meaning specified in Section 8.01(k)(iii).

"VAT" shall mean Value Added Tax as imposed by the member states of the European Union in accordance with Council Directive 2006/112/EC of 28 November 2006 on the common system of value added tax, as amended, or any other tax of a similar nature, whether imposed in a member state of the European Union or elsewhere.

"WAC Facility" shall mean collectively each Participating WAC Credit Facility and each Non-Participating WAC Credit Facility.

"WAC Group" shall mean each of the obligors and entities whose Equity Interests are pledged as collateral under each Participating WAC Credit Facility (other than Holdings, Luxco and Manager).

"WAC Specific Collateral" shall mean (i) all encumbered assets, including, without limitation, all Aircraft (together with the Leases and other Aircraft Revenues), subject to a valid and perfected Lien as of the Petition Date under the applicable Participating WAC Credit Facility and (ii) the Specified Collateral.

"WAC Specific Cap" shall mean, with respect to each WAC Group, the amount set forth on Schedule 1.01(e).

"Wholly-Owned Subsidiary" shall mean, as to any Person, (i) any corporation 100% of whose capital stock is at the time owned by such Person and/or one or more other Wholly-Owned Subsidiaries of such Person and (ii) any partnership, limited liability company, association, joint venture or other entity in which such Person and/or one or more other Wholly-Owned Subsidiaries of such Person has a 100% equity interest at such time subject in each case to the Local Requirements Exception.

"Winddown Account" shall have the meaning specified in the Orders.

"Withdrawal Date" shall mean the date of any DIP Funding Account Withdrawal.

"Withdrawal Notice" shall have the meaning given in Section 2.04.

"Withholding Agent" shall mean the Credit Parties and the Administrative Agent, as applicable.

1.02    Other Definitional Provisions.

(a)    Unless otherwise specified therein, all terms defined in this Agreement shall have the defined meanings when used in the other Credit Documents or any certificate or other document made or delivered pursuant hereto or thereto.

(b)    As used herein and in the other Credit Documents, and any certificate or other document made or delivered pursuant hereto or thereto, (i) accounting terms not defined in Section 1.01 shall have the respective meanings given to them under GAAP, (ii) the words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation", (iii) the word "incur" shall

be construed to mean incur, create, issue, assume, become liable in respect of or suffer to exist (and the words "incurred" and "incurrence" shall have correlative meanings), (iv) unless the context otherwise requires, the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, Equity Interests, securities, revenues, accounts, leasehold interests and contract rights, (v) the word "will" shall be construed to have the same meaning and effect as the word "shall", and (vi) unless the context otherwise requires, any reference herein (A) to any Person shall be construed to include such Person's successors and assigns and (B) to any Guarantor, the Borrowers or any other Credit Party shall be construed to include such Credit Party as debtor and debtor-in-possession and any receiver or trustee for the Manager, the Borrowers or any other Credit Party, as the case may be, in any insolvency or liquidation proceeding.

(c)    The words "hereof", "herein" and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Section, Schedule and Exhibit references are to this Agreement unless otherwise specified.

(d)    The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.

(e)    Except as otherwise expressly provided herein, any reference in this Agreement to any Credit Document (including this Agreement) shall mean such document as amended, modified, restated and/or supplemented from time to time, in each case, in accordance with the express terms of this Agreement.

SECTION 2.    Amount and Terms of Credit.

2.01    The Term Loan Commitments.

(a)    Subject to and upon the terms and conditions set forth herein and in the Orders, each Lender (through its Lending Office) with a Term Loan Commitment severally and not jointly agrees to make on the applicable Borrowing Date a term loan or term loans (each a "Term Loan", and collectively, the "Term Loans") to the Borrowers, which Term Loans shall be (x) incurred pursuant to three Borrowings, (y) denominated in Dollars, and (z) made by each such Lender in an aggregate principal amount which does not exceed the Term Loan Commitment of such Lender on such date (or such lesser amount as may be requested by the applicable Borrower).

(b)    Each Borrowing shall be made (i) in the case of the Term Loans made on the Closing Date (the "Initial Interim Term Loans"), in the aggregate principal amount not to exceed $15,000,000, (ii) in the case of the Term Loans made on the Second Interim Loan Date (the "Second Interim Term Loans", together with the Initial Interim Term Loans, the "Interim Term Loans"), in the aggregate principal amount not to exceed $15,000,000 and (iii) in the case of the Term Loans made on the Final Loan Date (the "Final Term Loans") in the remaining amount of the Term Loan Commitments then in effect. The proceeds of the Interim Term Loans shall be funded into the Central DIP Account and such proceeds shall be used solely as permitted herein in accordance with the Approved Budget (subject to the Permitted Variances) and the proceeds of the Final Term Loans shall be funded into the DIP Funding Account and such proceeds shall be used solely as permitted herein and in accordance with the Approved Budget (subject to the Permitted Variances). The Term Loan Commitments in respect of the Interim Term Loans shall terminate automatically after the making of the Interim Term Loans, and the Term Loan Commitments in respect of the Final Term Loans shall terminate automatically after the making of the Final Term Loans on the Final Loan Date.

(c)     Any Term Loans (if and when funded) shall have the same terms as and shall be treated as a single class with all other Term Loans funded prior thereto for all purposes of this Agreement and the other Credit Documents, except that interest on any Term Loans shall accrue commencing on the date of funding thereof.  Amounts prepaid or repaid in respect of the Term Loans may not be reborrowed.

2.02    Notice of Borrowing.  In order to request a Borrowing, the Borrowers shall give the Administrative Agent at the Notice Office three (3) Business Days' prior notice of each Term Loan to be incurred hereunder; provided, however, that any such notice shall be deemed to have been given on a certain day only if given before 2:00 p.m. (New York City time) on such day.  Such notice (each, a "Notice of Borrowing") shall be irrevocable and shall be in writing, substantially in the form of Exhibit A-1 (or such other form as shall be approved by the Administrative Agent) appropriately completed to specify:  (i) the aggregate principal amount of the Term Loans to be incurred pursuant to such Borrowing and (ii) the date of such Borrowing (which shall be a Business Day).  As soon as practicable, and in any event within one (1) Business Day of the receipt of such Notice of Borrowing, the Administrative Agent shall give each Lender which is required to make such Term Loan(s), notice in writing of (x) such proposed Borrowing, (y) such Lender's proportionate share thereof and (z) the other matters required by the immediately preceding sentence to be specified in the applicable Notice of Borrowing.  Subject to each of the applicable conditions precedent set forth in Sections 5 and 6 having been satisfied or waived in accordance with Section 12.12, the aggregate principal amount of Term Loans subject to such Notice of Borrowing shall be disbursed in accordance with Section 2.03.

2.03    Disbursement of Funds.  Subject to each of the applicable conditions precedent set forth in Sections 5 and 6 having been satisfied or waived in accordance with Section 12.12, (x) no later than 10:00 a.m. (New York City time) on the relevant Borrowing Date, each Lender will make available its pro rata portion (determined in accordance with Section 2.06) of the Borrowing requested to be made on such date and (y) one (1) Business Day prior to the relevant Borrowing Date, each Lender shall provide SWIFT details of the transfer described in (x) to the Administrative Agent.  For the avoidance of doubt, compliance with (y) above by each Lender shall not be a condition to any Borrowing.  All such amounts net of all fees and expenses then earned, due and payable under Section 3.01, will be made available in Dollars, and in immediately available funds to the Central DIP Account or the DIP Funding Account, as applicable.  Unless the Administrative Agent shall have been notified by any Lender prior to the applicable Borrowing Date that such Lender does not intend to make available to the Administrative Agent such Lender's portion of the Borrowing to be made on such date, the Administrative Agent may assume that such Lender has made such amount available to the Administrative Agent on the applicable Borrowing Date and the Administrative Agent may (but shall not be obligated to), in reliance upon such assumption, make available to the applicable Borrower a corresponding amount.   If such corresponding amount is not in fact made available to the Administrative Agent by such Lender, the Administrative Agent shall be entitled to recover such corresponding amount on demand from such Lender.  If such Lender does not pay such corresponding amount forthwith upon the Administrative Agent's demand therefor, the Administrative Agent shall promptly notify the applicable Borrower and the applicable Borrower shall immediately pay such corresponding amount to the Administrative Agent.  The Administrative Agent also shall be entitled to recover on demand from such Lender or the applicable Borrower, as the case may be, interest on such corresponding amount in respect of each day from the date such corresponding amount was made available by the Administrative Agent to the applicable Borrower until the date such corresponding amount is recovered by the Administrative Agent, at a rate per annum equal to one month LIBOR for the first three (3) days and at the interest rate otherwise applicable to such Term Loans for each day thereafter.  Nothing in this Section 2.03 shall be deemed to relieve any Lender from its obligation to make Term Loans hereunder or to prejudice any rights which the Borrowers may have against any Lender as a result of any failure by such Lender to make Term Loans hereunder.

2.04    DIP Funding Account.

(a)    On or after the Final Loan Date, the Borrowers may request disbursements from the DIP Funding Account (any such withdrawal, a "DIP Funding Account Withdrawal") by delivering to the Administrative Agent a notice at the Notice Office before 2:00 p.m. (New York City time) on the date prior to the date of any such DIP Funding Account Withdrawal and no more frequently than one DIP Funding Account Withdrawal per calendar week; provided, that the amount that may be withdrawn during any two-week calendar period shall not exceed the amount set forth in the Approved Budget for such period.  Such notice (each, a "Withdrawal Notice") shall be in writing, substantially in the form of Exhibit A-5 (or such other form as shall be approved by the Administrative Agent) appropriately completed to specify the aggregate amount and the date (which shall be a Business Day) of the DIP Funding Account Withdrawal.  Subject to the conditions precedent set forth in Sections 5 and 6 having been satisfied or waived, the aggregate amount of any DIP Funding Account Withdrawal shall be funded from the DIP Funding Account, to the extent of available funds, into the Central DIP Account by the Administrative Agent within one Business Day of receipt of the Withdrawal Notice.

(b)    All proceeds of the Final Term Loans shall be held in the DIP Funding Account at all times until such proceeds are disbursed in accordance with this Section 2.04 for purposes permitted under this Agreement.  The Borrowers and the other Credit Parties shall have no property interest of any kind in the DIP Funding Account and the funds held therein. Each submission by the Borrowers to the Administrative Agent of a Withdrawal Notice shall be deemed to constitute a representation and warranty to the Borrowers that the conditions set forth in Sections 5 and 6 have been satisfied or waived as of the date of the DIP Funding Account Withdrawal.

2.05    Absence of Term Notes.

(a)    The Borrowers' obligation to pay the principal of, and interest on, the Term Loans made by each Lender to the Borrowers shall be evidenced in the Register maintained by the Administrative Agent pursuant to Section 12.15.  For the avoidance of doubt, the Borrowers shall have no obligation to deliver a note evidencing the Borrowing of any Term Loan.

(b)    The absence of any note evidencing the Borrowing of the Term Loans shall not affect or in any manner impair the obligations of the Borrowers to pay the Term Loans (and all related Secured Obligations) incurred by the Borrowers which would otherwise be evidenced thereby in accordance with the requirements of this Agreement, and nor shall such failure in any way affect the security or guaranties therefor provided pursuant to the various Credit Documents.

2.06    Pro Rata Borrowing.

(a)    Except as otherwise provided in this Agreement, the Borrowing of Term Loans under this Agreement shall be incurred from the Lenders pro rata on the basis of their Term Loan Commitments;

(b)    It is understood that no Lender shall be responsible for any default by any other Lender of its obligation to make Term Loans hereunder and that each Lender shall be obligated to make the Term Loans provided to be made by it hereunder, regardless of the failure of any other Lender to make its Term Loans hereunder.

2.07    Interest; Computations.

(a)    The Borrowers agree to pay interest in respect of the unpaid principal amount of each Term Loan from the date of the Borrowing of such Term Loans until the maturity thereof (whether by acceleration or otherwise) at a rate per annum which shall, during each Interest Period applicable thereto, be, subject to Section 2.08(d) and (e), equal to the sum of the Applicable Margin plus the Adjusted LIBOR for such Interest Period.

(b)    Overdue principal and, to the extent permitted by law, overdue interest in respect of each Term Loan, as well as all other overdue amounts payable hereunder and under any other Credit Document, shall, in each case, bear interest at a rate per annum equal to the rate which is 2.00% in excess of the rate otherwise applicable to Term Loans from time to time.   Interest that accrues under this Section 2.07(b) shall be payable on demand.

(c)    Accrued (and theretofore unpaid) interest shall be payable in respect of each Term Loan, (i) monthly in arrears on each Payment Date, and (ii) on the date of any repayment or prepayment (on the amount repaid or prepaid), at maturity (whether by acceleration or otherwise) and, after such maturity, on demand.

(d)    Upon each Interest Determination Date, the Administrative Agent shall determine Adjusted LIBOR for each Interest Period applicable to the respective Term Loans and shall promptly notify the Borrowers and the Lenders thereof.

(e)    All computations of interest hereunder shall be made on the basis of a year of three hundred and sixty (360) days for the actual number of days (including the first day but excluding the last day) occurring in the period for which such interest are payable.

2.08    Increased Costs, Illegality, Market Disruption.

(a)    If either (i) the introduction of or any change (including, without limitation, any change by way of imposition or increase of reserve requirements) in or in the interpretation of any law or regulation, in each case, after the Closing Date or (ii) the compliance by a Lender or any holding company thereof (each, an "Affected Party") with any guideline or request promulgated or made after the Closing Date from any central bank or other Governmental Authority having jurisdiction (whether or not having the force of law), (A) shall subject an Affected Party to any Taxes (other than (1) Indemnified Taxes, (2) Taxes described in clauses (b) through (f) of the definition of "Excluded Taxes" and (3) Connection Income Taxes with respect to a Term Loan, or its deposits, revenues or other liabilities or capital attributable thereto), (B) shall impose, modify or deem applicable in relation to any Term Loan any reserve requirement (including, without limitation, any reserve requirement imposed by the Federal Reserve Board), special deposit or similar requirement against assets of, deposits with or for the amount of, or credit extended by, any Affected Party (other than any such reserve or other requirements with respect to Term Loans that are reflected in the definition of "Adjusted LIBOR") or (C) shall impose any other condition affecting a Term Loan or a Lender's obligations hereunder, the result of which is to increase, as reasonably determined in good faith by such Affected Party, the cost to any Affected Party or to reduce, as reasonably determined in good faith by such Affected Party, the amount of any sum received or receivable by an Affected Party under this Agreement, in each case, by an amount deemed by such Affected Party to be material, then within ten (10) Business Days after demand by such Affected Party (which demand shall be accompanied by a certificate in reasonable detail setting forth the basis for such demand and the calculation of the amount due (subject, however, to any limitations such Lender may require in respect of disclosure of confidential information relating to its capital structure) and certifying (x) that the amount due was calculated on an accurate basis and (y) that the Affected Party has exercised (or, contemporaneously therewith, shall

exercise), on a non-discriminatory basis, rights similar or comparable to those set forth in this Section 2.08 in all or substantially all of its financing transactions with similarly situated borrowers where it has such similar or comparable rights, such certificate to be conclusive absent manifest error), the Borrowers shall pay directly to such Affected Party such additional amount or amounts as will compensate such Affected Party for such additional or increased cost incurred or such reduction suffered; provided, however, that neither the Borrowers nor any other Credit Party shall be under any obligation to compensate any Affected Party under this paragraph (a) with respect to increased costs or reductions with respect to any period prior to the date that is two hundred (200) days prior to such demand if such Affected Party knew or could reasonably have been expected to know of the circumstances giving rise to such increased costs or reductions and of the fact that such circumstances would result in a claim for increased compensation by reason of such increased costs or reductions.

(b)      If either (i) the introduction of or any change in or in the interpretation of any law, guideline, rule, regulation, directive or request regarding capital or liquidity requirements after the Closing Date or (ii) compliance by an Affected Party with any law, guideline, rule, regulation, directive or request regarding capital or liquidity requirements promulgated or made, in each case, after the Closing Date, by any central bank or other Governmental Authority having jurisdiction (whether or not having the force of law), in each case issued after the Closing Date, has or would have the effect of reducing the rate of return on the capital of any Affected Party as a consequence of its obligations hereunder or arising in connection herewith to a level below that which any such Affected Party could have achieved but for such introduction, change or compliance (taking into consideration the policies of such Affected Party with respect to capital adequacy) by an amount deemed by such Affected Party to be material, as determined in good faith by such Affected Party, then from time to time, within ten (10) Business Days after demand by such Affected Party (which demand shall be accompanied by a certificate in reasonable detail setting forth the basis for such demand and the calculation of the amount due (subject, however, to any limitations such Lender may require in respect of disclosure of confidential information relating to its capital structure) and certifying (x) that the amount due was calculated on an accurate basis and (y) that the Affected Party has exercised (or, contemporaneously therewith, shall exercise), on a non-discriminatory basis, rights similar or comparable to those set forth in this Section 2.08(b) in all or substantially all of its financing transactions with similarly situated borrowers where it has such similar or comparable rights, such certificate to be conclusive absent manifest error), the Borrowers shall pay directly to such Affected Party such additional amount or amounts as will compensate such Affected Party for such reduction; provided, however, that neither the Borrowers nor any other Credit Party shall be under any obligation to compensate any Affected Party under this paragraph (b) with respect to a change in law regarding capital or liquidity requirements with respect to any period prior to the date that is two hundred (200) days prior to such demand if such Affected Party knew or could reasonably have been expected to know of the circumstances giving rise to such change in law and of the fact that such circumstances would result in a claim for increased compensation by reason of such change in law.

(c)      Notwithstanding anything in this Agreement to the contrary, implementation of the risk-based capital framework commonly known as Basel III, the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines, requirements and directives thereunder, issued in connection therewith or in implementation thereof, shall be deemed to be a change after the Closing Date in a requirement of law or government rule, regulation or order, regardless of the date enacted, adopted, issued or implemented (including for purposes of this Section 2.08).

(d)      Notwithstanding anything in this Agreement to the contrary, in the event that after the Closing Date the introduction of or any change in or in the interpretation of any law or regulation makes it unlawful, or any central bank or other Governmental Authority of competent jurisdiction asserts that it is unlawful, for any Lender to honor its obligation to make or maintain Term Loans hereunder, then, on notice thereof by such Lender to the Borrowers through the Administrative Agent, any obligation of such Lender

to make or continue Term Loans shall be suspended until such Lender notifies the Administrative Agent and the Borrowers that the circumstances giving rise to such determination no longer exist. Upon receipt of such notice, the Borrowers shall, upon demand from such Lender (with a copy to the Administrative Agent), (A) if it is possible to eliminate such illegality by converting such Term Loans to Term Loans bearing interest based on the Base Rate, all Term Loans of such Lender shall thereafter be converted to Term Loans that bear interest at a rate equal to the sum of the Base Rate plus 1.50% either on the last day of the Interest Period therefore, if such Lender may lawfully continue to maintain such Term Loans to such day, or immediately on demand, if such Lender may not lawfully continue to maintain such Term Loans or (B) in the case of an illegality that cannot be eliminated by the conversion of such Term Loans to Term Loans bearing interest at the Base Rate, and in each case subject to Section 2.10, prepay all Term Loans of such Lender either on the last day of the Interest Period therefor, if such Lender may lawfully continue to maintain such Term Loans to such day, or immediately, if such Lender may not lawfully continue to maintain such Term Loans. Any such prepayment shall be made in accordance with the provisions of Section 4.02 without a prepayment fee. For the avoidance of doubt, break funding compensation, if applicable, shall be due and payable in connection with any such conversion or prepayment in accordance with Section 2.09.

(e)    If a Market Disruption Event occurs with respect to any Interest Period and such Market Disruption Event is affecting the relevant interbank market generally and is not due to the individual circumstances of a Lender, the Administrative Agent shall promptly notify the Borrowers, and so long as the Market Disruption Event shall continue, (w) if such Market Disruption Event affects the availability of Dollars, the rate of interest on each Affected Lender's Term Loans, for such Interest Period, will be the sum of the Base Rate plus 1.50%. Each Market Disruption Event shall be deemed to be in existence only for the Interest Period in respect of which the notice to the Borrowers provided for above was given, and shall be deemed to cease to occur for any subsequent Interest Period unless the Administrative Agent or Affected Lenders (as applicable) make the determination that a Market Disruption Event exists for such subsequent Interest Period, in which case the applicable procedures described above shall be followed again for such subsequent Interest Period, including the notice by the Administrative Agent to the Borrowers and delivery of the officer's certificate described above. There cannot be more than one Market Disruption Event applicable for any Interest Period.

(f)    Upon the Market Disruption Event and receipt by the Borrowers of the notice of such Market Disruption Event from the Administrative Agent in accordance with Section 2.08(e), the Borrowers will have the right to require the Administrative Agent and each Affected Lender to consult with the Borrowers in good faith for a period of not less than ten (10) days with a view to agreeing a substitute basis for determining the rate of interest for the relevant Interest Period (which substitute basis may include alternative currencies, interest periods and/or alternative rates of interest, without limitation); provided, however, that, for the avoidance of doubt, the parties hereto agree and acknowledge that this Section 2.08(f) does not create an obligation of the Administrative Agent or any Affected Lender to reach an agreement with the Borrowers in connection with, or as a result of, such good faith consultations.

2.09    Break Funding Compensation. The Borrowers agree to compensate each Lender, upon its written request (which request shall set forth in reasonable detail the basis for requesting such compensation), for all losses, expenses and liabilities (including, without limitation, any loss, expense or liability incurred by reason of the liquidation or reemployment of deposits or other funds required by such Lender to fund its Term Loans but (x) excluding loss of margin or anticipated profits and (y) net of the amount of interest likely to be realized by such Lender in redeploying the funds released or not utilized by reason of such event) in respect of Term Loans which such Lender may sustain: (i) if for any reason (other than a default by any Lender or the Administrative Agent) a Borrowing of Term Loans does not occur on a date specified therefor in the applicable Notice of Borrowing (whether or not withdrawn by the Borrowers); (ii) if any prepayment or repayment

(including any prepayment or repayment made pursuant to Section 4.01, Section 4.02 or as a result of an acceleration of the Term Loans pursuant to Section 10) occurs on a date which is not the last day of an Interest Period with respect thereto; (iii) if any prepayment of any of its Term Loans is not made on any date specified in a notice of prepayment given by the Borrower; (iv) if any Term Loan is converted to a Term Loan at a rate calculated on a basis other than LIBOR, or the Interest Period with respect to any Term Loan is converted, in each case other than on the last day of the Interest Period in effect therefor; (v) if any transfer of a Term Loan is required to be made on a date which is not the last day of an Interest Period with respect thereto (other than any transfer between Lenders (including any prospective Lenders) unless such transfer is made at the request or demand of the Borrowers); or (vi) as a consequence of any other default by the Borrowers to repay Term Loans when required by the terms of this Agreement. For purposes of calculating amounts payable by the Borrowers to the Lenders under this Section 2.09, each Lender shall be deemed to have funded each Term Loan by a matching deposit or other borrowing in the London interbank market for a comparable amount and for a comparable period and denominated in the same currency, whether or not such Term Loan was in fact so funded, with the result that the Borrower's obligation to compensate each Lender for its loss, profit and expense as provided in this Section 2.09 shall be deemed to be in the amount of the excess, if any, of the interest at Adjusted LIBOR on the applicable amount for the remainder of such Interest Period over interest at Adjusted LIBOR as it would be in effect if quoted on the applicable date on the applicable amount for the remainder of the Interest Period.

2.10    Duty to Mitigate.  Each Lender agrees that on the occurrence of any event giving rise to the operation of Section 2.08(e) or Section 4.04 with respect to such Lender, it will, if requested by the Borrowers, use reasonable efforts (subject to overall policy considerations of such Lender) to designate another Lending Office for funding or booking any Term Loans affected by such event, or assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment would eliminate or reduce amounts payable pursuant to Section 2.08(e) or Section 4.04 or eliminate illegality, as the case may be, in the future or file any Tax certificate reasonably requested by the Borrower; provided, however, that such designation, assignment or filing is made on such terms that such Lender and its Lending Office suffer no economic, commercial, legal or regulatory disadvantage, with the object of avoiding the consequence of the event giving rise to the operation of such Section. Nothing in this Section 2.10 shall affect or postpone any of the obligations of the Borrowers or the right of any Lender provided in Sections 2.08(e) and 4.04. The Borrowers hereby agree to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

2.11    Replacement of Lenders.  (i) If any Lender becomes a Defaulting Lender, (ii) upon the occurrence of any event giving rise to the operation of Section 2.08(e) or Section 4.04 with respect to any Lender which results in such Lender charging to the Borrowers increased costs or otherwise requesting the payment of any compensation or additional amounts pursuant to Section 2.08(e) or Section 4.04, (iii) if any Lender becomes a Non-Consenting Lender or (iv) if any Lender is not an Eligible Transferee, the Borrowers shall have the right, in accordance with Section 12.12(b), (A) in the case of clauses (i), (ii) and (iv) above, if no Event of Default then exists or would exist after giving effect to such replacement or (B) in the case of clause (iii) above, if no Event of Default would exist after giving effect to such replacement, to replace such Lender in its entirety (the "Replaced Lender") with one or more other Eligible Transferees, none of whom shall constitute a Defaulting Lender at the time of such replacement (collectively, the "Replacement Lender") and each of which shall be reasonably acceptable to the Administrative Agent; provided, however, that if the Borrowers elect to replace a Lender in connection with clause (iii) above in the case of a refusal  by a Lender to consent to a proposed change or waiver or discharge or termination which requires the approval of all Lenders, the Borrowers shall be entitled to replace any such Non-Consenting Lender in accordance with this Section 2.11 and Section 12.12(b); provided, further, that:

#4848-3242-6112v16

(a)      at the time of any replacement pursuant to this Section 2.11, the Replacement Lender shall enter into one or more Assignment and Assumption Agreements pursuant to Section 12.04(b) (and with all fees payable pursuant to said Section 12.04(b) to be paid by the Replacement Lender and/or the Replaced Lender (as may be agreed to at such time by and among the Borrowers, the Replacement Lender and the Replaced Lender)) pursuant to which the Replacement Lender shall acquire all of the Term Loan Commitments and outstanding Term Loans of the Replaced Lender and, in connection therewith, shall pay to the Replaced Lender in respect thereof an amount equal to the sum of (i) an amount equal to the principal of, and all accrued interest on, all outstanding Term Loans of the respective Replaced Lender, and (ii) an amount equal to all accrued, but theretofore unpaid, Fees owing to the Replaced Lender pursuant to Section 3.01; and

(b)      all obligations of the Borrowers then owing to the Replaced Lender (other than those specifically described in clause (a) above in respect of which the assignment purchase price has been, or is concurrently being, paid, but including all amounts, if any, owing under Section 2.09) shall be paid in full to such Replaced Lender concurrently with such replacement.

Upon receipt by the Replaced Lender of all amounts required to be paid to it pursuant to this Section 2.11, the Administrative Agent shall be entitled (but not obligated) and is authorized (which authorization is coupled with an interest) to execute an Assignment and Assumption Agreement on behalf of such Replaced Lender, and any such Assignment and Assumption Agreement so executed by the Administrative Agent and the Replacement Lender shall be effective for purposes of this Section 2.11 and Section 12.04. Upon the execution of the respective Assignment and Assumption Agreement, the payment of amounts referred to in clauses (a) and (b) above, recordation of the assignment on the Register by the Administrative Agent pursuant to Section 12.15, and the Replacement Lender shall become a Lender hereunder and the Replaced Lender shall cease to constitute a Lender hereunder, except with respect to indemnification provisions under this Agreement (including Sections 2.08, 2.09, 4.04, 4.05, 11.06, 12.01 and 12.06), which shall survive as to such Replaced Lender.

2.12    [Reserved].

2.13    Replacement Eligible Lease.  In the event that any Funded Eligible Lease shall expire or otherwise terminate at any time prior to the Maturity Date, the relevant Eligible Entity shall be permitted to re-lease the applicable Mortgaged Aircraft pursuant to a Replacement Eligible Lease entered into with an Eligible Lessee; provided, however, the Borrowers shall grant to the Collateral Agent, for the benefit of the Secured Parties, a perfected, first-priority security interest in, and Lien on, the Replacement Eligible Lease related to the relevant Mortgaged Aircraft.

2.14    [Reserved].

2.15    [Reserved].

2.16    Inter-Eligible Entity Transfer.  Any Eligible Entity shall be entitled, by giving three (3) Business Days' prior written notice to the Administrative Agent (who shall promptly deliver such notice to the Lenders), to permit a Mortgaged Aircraft to be owned by any other Eligible Entity or leased by either such Eligible Entity to an Intermediate Subsidiary (including by transferring such ownership from one Eligible Entity to another or by transferring such lease from one Intermediate Subsidiary to another or interposing additional Intermediate Subsidiaries); provided, that, such Mortgaged Aircraft shall remain within a WAC Group; provided, further, that:

(a)      each relevant Eligible Entity shall have executed and delivered to the Collateral Agent a mortgage and such other certificates and documents (including UCC Financing Statements,

registrations and recordings with the Aviation Authority) as are required to grant to the Collateral Agent a perfected security interest in, and Lien on, the Collateral held by such Eligible Entity and with regard to any relevant Mortgaged Aircraft to be registered in any jurisdiction other than the United States, if applicable, the Required Cape Town Registrations will be made as promptly as practicable but in any event within five (5) Business Days after transferring such ownership;

(b)    each relevant Eligible Entity shall be (or shall be in the process of becoming in due course), as and to the extent permitted in the State of Registration of such Mortgaged Aircraft, registered as an owner and/or lessor with respect to such Mortgaged Aircraft subject to the Local Requirements Exception;

(c)    each relevant Intermediate Subsidiary shall have executed and delivered to the Collateral Agent a Mortgage or other Security Document and such other certificates and documents (including UCC Financing Statements, registrations and recordings with the Aviation Authority (if applicable) and the International Registry) as are required to grant to the Collateral Agent a perfected security interest in, and Lien on, the Collateral held by such Eligible Entity; and

(d)    subject to the Local Requirements Exception, the Borrower shall own all of the Equity Interests in such Eligible Entity or Intermediate Subsidiary and shall have executed and delivered to the Collateral Agent such certificates and documents requested by the Collateral Agent (including UCC Financing Statements and charge documents) as are required to grant to the Collateral Agent a perfected security interest in, and Lien on, the Equity Interests held by the Borrowers in such other Eligible Entity or Intermediate Subsidiary.

2.17    [Reserved].

2.18    Joint and Several Liability of the Borrowers.

(a)    Each of the Borrowers is accepting joint and several liability with respect to the Term Loans and all other Secured Obligations in consideration of the financial accommodation to be provided by the Lenders under this Agreement and the other Credit Documents, for the mutual benefit, directly and indirectly, of each of the Borrowers and in consideration of the undertakings of each of the Borrowers to accept joint and several liability for the obligations of each of them, regardless of which Borrower actually receives the benefit of such Term Loan or other Secured Obligations or the manner in which the Lenders account for such Term Loans or other Secured Obligations on their books and records. Each Borrower's obligations with respect to the Term Loans made to it, and each Borrower's obligations arising as a result of the joint and several liability of such Borrower hereunder, with respect to the Term Loans of the other Borrowers hereunder, shall be separate and distinct obligations, but all such obligations shall be primary obligations of each Borrower.

(b)    Each Borrower's obligations arising as a result of the joint and several liability of such Borrower hereunder with respect to the Secured Obligations in respect of the other Borrowers hereunder shall, to the fullest extent permitted by law, be unconditional irrespective of (i) the validity or enforceability or subordination of such Secured Obligations of the other Borrowers, (ii) the absence of any attempt to collect such Secured Obligations from the other Borrowers, any other guarantor, or any other security therefor, or the absence of any other action to enforce the same, (iii) the waiver, consent, extension, forbearance or granting of any indulgence by the Administrative Agent or the Lenders with respect to such Secured Obligations of the other Borrowers, or any part thereof, or any other agreement now or hereafter executed by the other Borrowers and delivered to the Collateral Agent or the Lenders, (iv) the failure by the Administrative Agent or the Lenders to take any steps to perfect and maintain their security interest in, or to preserve their rights to, any security or collateral for such Secured Obligations of the other Borrowers

or (v) any other circumstances which might constitute a legal or equitable discharge or defense of a guarantor or of the other Borrowers (other than the occurrence of the Maturity Date and the irrevocable payment in full of the Secured Obligations). With respect to each Borrower's obligations arising as a result of the joint and several liability of such Borrower hereunder with respect to the Term Loans and other Secured Obligations of the other Borrower hereunder, such Borrower waives, until the Maturity Date and the irrevocable payment in full of the Secured Obligations, any right to enforce any right of subrogation or any remedy which the Administrative Agent or any Lender now has or may hereafter have against such Borrower, any endorser or any guarantor of all or any part of such Secured Obligations, and any benefit of, and any right to participate in, any security or collateral given to the Administrative Agent or any Lender to secure payment of such Secured Obligations or any other liability of the Borrowers to the Administrative Agent or the Lenders.

(c)     Upon the occurrence and during the continuation of any Event of Default, the Lenders may proceed directly and at once, without notice, against any Borrower to collect and recover the full amount, or any portion of, the Secured Obligations, without first proceeding against the other Borrowers or any other Person, or against any security or collateral for such Secured Obligations. Each Borrower consents and agrees that the Lenders shall be under no obligation to marshal any assets in favor of any Borrower or against or in payment of any or all of such Secured Obligations.

(d)     Notwithstanding any provision to the contrary contained herein or in any other of the Credit Documents, the obligations of any Borrower that is a company incorporated under the laws of Ireland shall be limited to an aggregate amount equal to the largest amount that would not render its obligations hereunder subject to avoidance under section 548 of the Bankruptcy Code of the United States or any comparable provisions of any applicable fraudulent conveyance or fraudulent transfer law or similar law of any state, nation or other governmental unit.

(e)     Notwithstanding anything to the contrary in this Section 2.18 or any other Credit Document, the joint and several liability of each Participating WAC Borrower shall be limited to the amount of the applicable Net WLIL Intercompany Claim for the WAC Group in which such Participating WAC Borrower is a part of.

SECTION 3.     Fees; Replacement of Lenders.

3.01     Fees.  The Borrowers agree to pay the following:

(a)     to the Administrative Agent, for the ratable benefit of each Lender, an upfront fee in an aggregate amount equal to 2.0% of the Total Term Loan Commitment payable from the proceeds of the Interim Term Loans made on the Closing Date;

(b)     to the Administrative Agent, for the ratable benefit of each Oversubscription Lender, an oversubscription fee in an aggregate amount equal to 2.0% of the Oversubscription Term Loan Commitments payable from the proceeds of the Interim Term Loans made on the Closing Date;

(c)     to the Administrative Agent, for its own account, the administration fees set forth in the Agent Fee Letter;

(d)     such fees and expenses provided for in the Orders;

(e)     such other fees as may be agreed to in writing, if any, from time to time by the Manager or any of its Subsidiaries and the Administrative Agent, the Collateral Agent or any Lender; and

#4848-3242-6112v16

(f)    each of the fees set forth in Section 3.01(a), (b) and (c) shall be fully earned, due and payable on the Closing Date and shall not be refundable for any reason whatsoever.

3.02    <u>Replacement of Lenders</u>.    In the event of (x) any request by a Lender for increased costs pursuant to Section 2.08, (y) any claim by a Lender for an amount in respect of Taxes under Section 4.04 or (z) any refusal by a Lender to consent to a change or waiver or discharge or termination as required in Section 12.12(a), with respect to this Agreement which has been approved by or which would be approved by the Required Lenders or by all Lenders, as the case may be, in each case, the Borrowers shall have the right, upon five (5) Business Days' prior written notice to the Administrative Agent at the Notice Office (which notice the Administrative Agent shall promptly transmit to each of the Lenders), to terminate the entire Term Loan Commitment of such Lender, so long as all Term Loans, together with accrued and unpaid interest, Fees and all other amounts, owing to such Lender (including all amounts, if any, owing pursuant to Section 2.09) are repaid concurrently with the effectiveness of such termination (at which time Schedule 1.01(a) shall be deemed modified to reflect such changed amounts), or to require such Lender to assign its Term Loans to an Eligible Transferee selected by the Borrowers and reasonably satisfactory to the Administrative Agent if not currently a Lender or an Affiliate of a current Lender, and at such time, such Lender shall no longer constitute a "Lender" for purposes of this Agreement, except with respect to indemnifications under this Agreement (including, without limitation, Sections 2.07(e), 4.04, 11.06, 12.01 and 12.06), which shall survive as to such repaid Lender.

SECTION 4.    <u>Prepayments; Payments; Taxes; General Indemnities; Pledged Accounts</u>.

4.01    <u>Voluntary Prepayments</u>.

(a)    The Borrowers shall have the right to prepay in whole but not in part any or all of the Term Loans, without premium or penalty (except for all amounts, if any, owing pursuant to Section 2.09), from time to time by providing to the Administrative Agent prior to 2:00 p.m. (New York City time) at the Notice Office at least three (3) Business Days' written notice of its intent to prepay Term Loans, which notice (in each case) shall specify the amount of such prepayment of Term Loans, and which notice the Administrative Agent shall promptly transmit to the Lenders.

(b)    In the event (i) of a claim for increased costs under Section 2.08 or amounts on account of Taxes under Section 4.04 or (ii) at any time a Lender is not an Eligible Transferee, the Borrowers may, upon five (5) Business Days' prior written notice to the Administrative Agent at the Notice Office (which notice the Administrative Agent shall promptly transmit to each of the relevant Lenders), repay all Term Loans of such Lender, together with accrued and unpaid interest, Fees and all other amounts then owing to such Lender (including all amounts, if any, owing pursuant to Section 2.09), so long as the Term Loan Commitment of such Lender is terminated concurrently with such repayment pursuant to Section 3.03 (at which time Schedule 1.01(a) shall be deemed modified to reflect the changed Term Loan Commitments).

(c)    In the case of a Non-Consenting Lender, the Borrowers may, upon five (5) Business Days' prior written notice to the Administrative Agent at the Notice Office (which notice the Administrative Agent shall promptly transmit to each of the Non-Consenting Lenders), repay all Term Loans of such Non-Consenting Lender, together with accrued and unpaid interest, Fees and all other amounts then owing to such Non-Consenting Lender (including all amounts, if any, owing pursuant to Section 2.09) in accordance with, and subject to the requirements of Section 12.12(b), so long as the Term Loan Commitment of such Non-Consenting Lender is terminated concurrently with such repayment pursuant to Section 3.03 (at which time Schedule 1.01(a) shall be deemed modified to reflect the changed Term Loan Commitments).

4.02    Mandatory Repayments.

(a)    All remaining outstanding principal amount of the Term Loans shall be repaid in full on the Maturity Date.

(b)    On any date on or after the Closing Date upon which a Credit Party receives Cash Proceeds from any Asset Sale or Event of Loss, such Cash Proceeds shall promptly be applied as a mandatory repayment of the Term Loans; provided that with respect to an Asset Sale or Event of Loss with respect to WAC Specific Collateral, the Cash Proceeds utilized to repay the Term Loans shall not exceed the Maximum Intercompany Balance and shall be otherwise applied in compliance with the Orders; provided, further, however that with respect to an Asset Sale with respect to the B412 SP MSN 33156, the proceeds shall be placed in an account of Waypoint Asset Co 7 Limited or one of its Subsidiaries and shall be excluded from Collateral under the Credit Documents.

(c)    On any date on or after the Closing Date, upon receipt by a Credit Party or any of its Subsidiaries of net cash proceeds from a capital contribution to, or the issuance of any equity interests of, such Credit Party (other than issuances of Equity Interests by a Subsidiary to a Credit Party and capital contributions by a Credit Party to a Subsidiary), such net cash proceeds shall promptly be applied as a mandatory repayment of the Term Loans.

(d)    On any date on or after the Closing Date, upon incurrence by a Credit Party of any Indebtedness (other than as permitted to be incurred under this Agreement), the proceeds of such Indebtedness shall immediately be applied as a mandatory prepayment of the Term Loans.

(e)    In addition to any other mandatory repayments or commitment reductions pursuant to this Section 4.02, upon the occurrence of a Change of Control, an amount equal to the aggregate principal, interest and other amounts due and payable hereunder shall be applied within two (2) Business Days as a mandatory repayment in accordance with Section 4.02(f).

(f)    Other than as contemplated by this Agreement, repayments of Term Loans together with accrued and unpaid interest, Fees and all other amounts then owing to such Lender (including all amounts, if any, owing pursuant to Section 2.09) pursuant to this Section 4.02 may only be made on the last day of an Interest Period applicable thereto unless all Term Loans with Interest Periods ending on such date of required repayment have been paid in full. Any repayments under this Section 4.02 shall be applied to repay the outstanding principal amount of all remaining Term Loans. In addition to any other mandatory repayments pursuant to this Section 4.02, all then outstanding Term Loans shall be repaid in full on the Maturity Date (it being understood and agreed that any amount remaining in the DIP Funding Account (except for amounts relating to the Carve-Out and Winddown Account) shall be applied to repay then outstanding Term Loans).

4.03    Method and Place of Payment.

(a)    Except as otherwise specifically provided herein, all payments under this Agreement shall be made to the Administrative Agent for the account of the Lender or Lenders entitled thereto not later than 2:00 p.m. (New York City time) on the date when due and shall be made in Dollars in immediately available funds at the Payment Office. Whenever any payment to be made hereunder shall be stated to be due on a day which is not a Business Day, the due date thereof shall be extended to the next succeeding Business Day and, with respect to payments of principal, interest shall be payable at the applicable rate during such extension.

(b)    All payments of principal and interest and other amounts made by the Borrowers hereunder will be made without setoff, counterclaim or other defense.

4.04    <u>Taxes</u>.

(a)    <u>Payments Free of Taxes</u>.  Any and all payments by or on account of any obligation of any Credit Party under any Credit Document shall be made without deduction or withholding for any Taxes, except as required by applicable law.  If any applicable law (as determined in the good faith discretion of an applicable Withholding Agent) requires the deduction or withholding of any Tax from any such payment by a Withholding Agent, then the applicable Withholding Agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and, if such Tax is an Indemnified Tax, then the sum payable by the applicable Credit Party shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section 4.04) the applicable Indemnified Person receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(b)    <u>Payment of Other Taxes by the Credit Parties</u>.  The Credit Parties shall timely pay to the relevant Governmental Authority in accordance with applicable law any Other Taxes, or at the option (but without any obligation) of the Administrative Agent timely reimburse it for the payment of any Other Taxes.

(c)    <u>Indemnification by the Credit Parties</u>.  The Credit Parties shall jointly and severally indemnify each Indemnified Person, within ten (10) days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 4.04) payable or paid by such Indemnified Person and any reasonable expenses arising therefrom or with respect thereto, other than any penalties arising from the gross negligence, bad faith or willful misconduct of such Indemnified Person (as determined by a court of competent jurisdiction in a final and non-appealable decision), whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Borrowers by a Lender (with a copy to the Administrative Agent), or to the Borrowers by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(d)    <u>Indemnification by the Lenders</u>.  Each Lender shall severally indemnify the Administrative Agent, within ten (10) days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that any Credit Party has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Credit Parties to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 12.04(e) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent (at its option and without obligation) in connection with any Credit Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Credit Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this paragraph (d).

(e)    <u>Evidence of Payments</u>.  As soon as practicable after any payment of Taxes by any Credit Party to a Governmental Authority pursuant to this Section 4.04, such Credit Party shall deliver to

the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

        (f)      <u>Status of Lenders</u>.

        (i)      Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Credit Document shall deliver to the Borrowers and the Administrative Agent, at the time or times reasonably requested by the Borrowers or the Administrative Agent, such properly completed and executed documentation prescribed by law and reasonably requested by the Borrowers or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding.

        (ii)      In addition, each Lender shall deliver such other documentation prescribed by applicable law and reasonably requested by the Borrowers or the Administrative Agent as will enable the Borrowers or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.

        (iii)      Notwithstanding anything to the contrary in the preceding Sections 4.04(f)(i) and (ii), the completion, execution and admission of such documentation shall not be required if, in the Lender's reasonable judgment, such completion, execution or admission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

        (iv)      If a payment made to a Lender under any Credit Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrowers and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrowers or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) as may be necessary for the Borrowers and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment.  Solely for the purposes of this clause (iv), "FATCA" shall include any amendments made to FATCA after the Closing Date.

        (v)      Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrowers and the Administrative Agent in writing of its legal inability to do so.

        (g)      <u>Treatment of Certain Refunds</u>.  If a Lender determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 4.04 (including by the payment of additional amounts pursuant to this Section 4.04), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section 4.04 with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund).  Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this paragraph (g) (plus any penalties, interest or other charges imposed by the relevant Governmental

Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this paragraph (g), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this paragraph (g) the payment of which would place the indemnified party in a less favorable net After-Tax position than the indemnified party would have been in if the Taxes giving rise to such refund had never been owed and the indemnification payments or additional amounts had never been paid.  This paragraph shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(h)    Value Added Tax.  All amounts expressed to be payable under a Credit Document by any party to such Credit Document to the Lender shall be deemed to be exclusive of any VAT.  If VAT is or becomes chargeable on any supply made by the Lender to any party in connection with a Credit Document and the Lender is required to account to the relevant tax authority for the VAT, that party shall pay to the Lender (in addition to and at the same time as paying the consideration) an amount equal to the amount of the VAT and such Lender shall promptly provide an appropriate VAT invoice to such party.  Where a Credit Document requires any party to such Credit Document to reimburse or indemnify the Lender for any costs or expenses, such party shall also at the same time pay and indemnify the Lender against all VAT incurred by the Lender in respect of the costs or expenses to the extent that the Lender reasonably determines that neither it nor any other member of any group of which it is a member for VAT purposes is entitled to credit or repayment from the relevant tax authority in respect of the VAT.

(i)    Survival.  Each party's obligations under this Section 4.04 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Term Loan Commitments and the repayment, satisfaction or discharge of all obligations under any Credit Document.

For the avoidance of doubt, notwithstanding any provision of this Agreement, in no event shall the Administrative Agent be responsible for (or incur any liability in connection with) the filing of any Returns, IRS Forms or FATCA related documents of any Lender with any governmental authority or any other Person.

4.05    General Indemnity.  The Borrowers and the Guarantors (the "Obligors") hereby jointly and severally assume responsibility for (as between the Obligors, on the one hand, and the relevant Indemnified Person only), and hereby agree to indemnify and hold harmless, on an After-Tax Basis, from time to time, within ten (10) Business Days of first written demand, each Indemnified Person for all Losses suffered or incurred by such Indemnified Person with respect to or in connection with a claim:

(a)    relating to or, arising directly or indirectly from the purchase, sale, import, export, registration, ownership, replacement, leasing, sub-leasing, wet-leasing, chartering, operation, maintenance, possession, redelivery, control, use, storage, fueling, manning or supplying of any Mortgaged Aircraft or any Part;

(b)    relating to, or arising directly or indirectly in any manner or for any cause or reason whatsoever out of, the condition, testing, delivery, design, manufacture, modification, repair, refurbishment, insurance, maintenance, overhaul, replacement, removal or disposal of any Mortgaged Aircraft or any Part or relating to loss or destruction of or damage to any property or death or injury of or other loss of whatsoever nature suffered by any Person caused by, relating to or arising from or out of (in each case whether directly or indirectly) any of the foregoing matters;

#4848-3242-6112v16

(c)    due to any design, article or material in any Mortgaged Aircraft or any Part or the operation or use thereof constituting an infringement of any patent or other intellectual property right or any other similar right whatsoever;

(d)    in preventing or attempting to prevent the arrest, confiscation, seizure, taking in execution, impounding, forfeiture or detention of any Mortgaged Aircraft or in securing the release of any Mortgaged Aircraft;

(e)    relating to any actual, threatened or prospective claim, investigation, litigation or other proceeding (whether or not the Administrative Agent, Collateral Agent or any Lender is a party thereto and whether or not such claim, investigation, litigation or other proceeding is brought by or on behalf of any Credit Party or any third party) related to the entering into, the performance and/or the administration of this Agreement or any other Credit Document or the proceeds of any Term Loans hereunder or the consummation of the transactions contemplated herein or in any other Credit Document or the exercise of any of their rights or remedies with respect to the Credit Documents (including the enforcement of the indemnities herein); and

(f)    with respect to the actual or alleged presence of Hazardous Materials in the air, surface water or groundwater or on the surface or subsurface of any real property at any time leased or operated by Holdings or any of its Subsidiaries, the generation, storage, transportation, handling or disposal of Hazardous Materials by any Credit Party at any location, whether or not owned, leased or operated by any Credit Party, the non-compliance by any Credit Party with any Environmental Law (including applicable permits thereunder), or any Loss asserted against any Credit Party or any real property at any time leased or operated by any Credit Party, including, in each case, without limitation, the reasonable fees and disbursements of counsel and other consultants incurred in connection with any such investigation, litigation or other proceeding;

provided, however, that no Credit Party shall have any liability to an Indemnified Person pursuant to this Section 4.05 to the extent that such Loss:

(A)    which is suffered by or imposed upon such Indemnified Person is attributable to any material breach by such Indemnified Person of any of its express obligations under any of the Credit Documents (as determined by a court of competent jurisdiction in a final and non-appealable judgment), but excluding any breach in consequence of a failure by any other party to a Credit Document to perform any of its obligations under any Credit Document;

(B)    which is suffered by such Indemnified Person is attributable to any misrepresentation or the inaccuracy of any representation or warranty made by such Indemnified Person in relation to any of the Credit Documents to which it is a party (but excluding any misrepresentation in consequence of a misrepresentation by any other party to a Credit Document or a failure by any other party to a Credit Document to perform any of its obligations thereunder);

(C)    which is suffered by such Indemnified Person is attributable to any fraud, gross negligence or willful misconduct of such Indemnified Person (as determined by a court of competent jurisdiction in a final and non-appealable judgment);

(D)    constitutes ordinary and usual operating or overhead expenses of that Indemnified Person unless incurred after an Event of Default, in which circumstances, the Credit Parties shall only be obliged to indemnify such Indemnified Person in respect of

expenses to the extent that they are properly incurred and, if they relate to the expenditure of management time, to the extent that the time so expended was material;

      (E)    constitutes Taxes (other than obligations to pay amounts under this Section 4.05 on an After-Tax Basis);

      (F)    is an amount with respect to which the Indemnified Person receives and is entitled to retain (free from liability to account to any other Person therefor) a payment under any Insurances which is made in settlement or reimbursement of the relevant Loss; or

      (G)    has actually been indemnified and paid pursuant to any other provision of any Credit Document.

If a claim is made against an Indemnified Person involving one or more Losses and such Indemnified Person has notice thereof, such Indemnified Person shall within thirty (30) days after receiving such notice, give notice of such claim to the Manager; provided, however, that the failure to provide such notice shall not release the Obligors from any of their obligations to indemnify hereunder except to the extent the Obligors are materially prejudiced thereby, and no payment by the Obligors to an Indemnified Person pursuant to this Section 4.05 shall be deemed to constitute a waiver or release of any right or remedy which the Credit Parties may have against such Indemnified Person for any actual damages as a result of the failure by such Indemnified Person to give the Obligors such notice. No Obligor shall be liable under this Section 4.05 for any settlement made by any Indemnified Person without its prior written consent (which consent shall not be unreasonably withheld or delayed, except to the extent such loss is covered by a policy of insurance maintained by the Obligors and such action may not be settled without the consent of the relevant insurer which the Credit Party shall use commercially reasonable efforts to obtain); provided, however, that the indemnity and hold harmless obligations of the Obligors hereunder will apply to any such settlement in the event that the Obligors were offered the ability to assume the defense of the action that was the subject matter of such settlement and elected not to so assume.

    The Obligors, with the consent of the applicable Indemnified Person, may undertake the defense of the relevant claim on behalf of such Indemnified Person, provided that the Obligors have acknowledged their obligation to indemnify such Indemnified Person for the relevant losses, with counsel selected by the Obligors (which counsel shall be reasonably acceptable to such Indemnified Person) and if requested by a Indemnified Person, the Obligors shall have provided a bond or other security reasonably acceptable to such Indemnified Person. Such Indemnified Person shall provide the Obligors with relevant information in the possession or under the control of such Indemnified Person to assist the Obligors in understanding and defending such claim (subject to applicable law and confidentiality obligations) and such Indemnified Person shall reasonably cooperate with the Obligors in connection therewith; provided, however, that at all times such Indemnified Person shall be entitled to participate in such settlement or defense through counsel chosen by it. After written notice from the Obligors to such Indemnified Person of the Obligors' election so to assume the defense thereof, the Obligors will not be liable to such Indemnified Person hereunder for any legal or other expenses subsequently incurred by such Indemnified Person in connection with the defense thereof, other than reasonable costs of investigation and such other reimbursable expenses of cooperation with the Obligors; provided that if at any time after the Obligors assume such defense (i) counsel for such Indemnified Person determines in good faith that there is a conflict that requires separate representation for the Obligors and such Indemnified Person, (ii) the Obligors fail to assume or proceed in a timely and reasonable manner with the defense of such action or fail to employ counsel reasonably satisfactory to such Indemnified Person in any such action, or (iii) the defendants in any such proceedings include both such Indemnified Person and the Obligors and such Indemnified Person

shall have concluded that there may be legal defenses available to it that are different from or additional to those available to the Obligors, then in any such event, (A) such Indemnified Person (together with all other similarly situated Indemnified Persons) shall be entitled to separate counsel from the Obligors, (B) the Obligors shall not, or shall not any longer, be entitled to assume the defense thereof on behalf of such Indemnified Person and (C) such Indemnified Person shall be entitled to indemnification for the expenses of such defense (including reasonable fees and expenses of such counsel) to the extent provided above in this Section 4.05. Such counsel shall, to the fullest extent consistent with its professional responsibilities, cooperate with the Obligors and any counsel designated by the Obligors. Nothing contained herein shall preclude any Indemnified Person, at its own expense, from retaining additional counsel to represent such Indemnified Person in any action with respect to which indemnity may be sought from the Obligors hereunder. No Obligor shall settle any such claim or action without the prior written consent of the relevant Indemnified Persons unless such settlement (x) provides for a full and unconditional release of all liabilities arising out of such claim or action against the Indemnified Persons and (y) does not include a statement as to or an admission of fault, culpability or a failure to act, by or on behalf of the Indemnified Persons.

Notwithstanding any of the foregoing to the contrary, in the case of any Loss indemnified by the Obligors hereunder which is covered by a policy of insurance maintained by the Obligors (or any Lessee Party), the Indemnified Person that suffered such Losses shall use commercially reasonable efforts to cooperate with the insurers, at the cost and expense of the Obligors, in the exercise of their rights to investigate, defend or compromise such Loss as may be required to retain the benefits of such insurance with respect to such Loss; provided, however, that such Indemnified Person shall have no obligation to cooperate hereunder to the extent that such cooperation would cause the Indemnified Person to violate any applicable law or regulation or any confidentiality undertaking binding on it. Notwithstanding any of the foregoing to the contrary, with respect to any Loss which is covered under policies of insurance maintained by the Obligors (or any Lessee Party), the rights of an Indemnified Person to control or participate in any proceeding shall be modified to the extent necessary to comply with the requirements of such policies and the rights of the insurers thereunder (subject to the proviso to the preceding sentence).

Upon payment of any Loss pursuant to this Section 4.05, the Obligors or, if any Loss has been paid by insurers, the insurers, without any further action, shall be subrogated to any claims the affected Indemnified Person may have relating thereto; provided, however, that for the avoidance of doubt, and to the extent not contrary to the terms of the relevant insurance policy, the insurers may only maintain, investigate, defend, compromise and/or settle such subrogated claims in its own name and not in the name of the relevant Indemnified Person. Such Indemnified Person agrees, at the cost and expense of the Obligors, to give such further assurances or agreements and to cooperate with the Obligors or the insurers to permit the Obligors or the insurers to pursue such claims, if any, to the extent reasonably requested by the Obligors or the insurers; provided, however, that such Indemnified Person shall have no obligation to give further assurances or to use reasonable commercial efforts to cooperate to the extent that such further assurances or cooperation would cause the Indemnified Person to violate applicable law or regulation or any confidentiality undertaking binding on it. In the event that any time up to the date five (5) years after an Obligor shall have paid an amount to an Indemnified Person pursuant to this Section 4.05, and such Indemnified Person shall have determined (acting reasonably) that it has been unconditionally and irrevocably reimbursed in respect of such indemnified amount from any other Person (other than a Person related to the Indemnified Person), then such Indemnified Person shall promptly pay to the applicable Obligor an amount equal to the amount of such reimbursement.

If the relevant Indemnified Person fails to fulfill its obligations under the preceding two (2) paragraphs, such failure shall not release the Obligors from any of their obligations to

indemnify hereunder except to the extent (i) of any increased costs suffered by any Obligor, (ii) that any defense or counterclaim of any Obligor or the insurers covering such Loss has been materially prejudiced or (iii) that such insurance coverage is denied or limited, in each case, as a result thereof.

4.06    [Reserved].

4.07    Administration of Accounts; Investments; Other Matters.

(a)    Security Deposits.  The Manager or the applicable Borrower, as the case may be, shall retain and deal with all Security Deposits (if any) in cash and Maintenance Reserve Payments paid by the relevant Lessee Party under the related Eligible Lease.

(b)    [Reserved].

(c)    Investments.  All amounts on deposit in the Pledged Accounts shall be invested in cash or Cash Equivalents selected by the Manager and held by and in the name of the applicable Borrower.

(d)    Property.  The Pledged Accounts and any amounts on deposit in each such account shall not be the property of the Administrative Agent, the Collateral Agent or the Lenders, and shall not be so treated for income tax purposes.  All earnings on amounts on deposit in each such account shall be for account of the applicable Borrower, and such earnings shall not be included in the Administrative Agent's, the Collateral Agent's or any Lender's income for income tax purposes nor shall they be liable for any Taxes thereon.

SECTION 5.    Conditions Precedent to the Closing Date.  The occurrence of the Closing Date and the obligation of each Lender to make Term Loans on the Closing Date is subject to the satisfaction (or waiver) of the following conditions on or prior to the initial Borrowing Date in a manner, form and substance reasonably satisfactory to the Administrative Agent with the consent or direction of the Required Lenders:

5.01    Officer's Certificate.  On the Closing Date, the Administrative Agent shall have received a certificate, dated as of the Closing Date and signed on behalf of Holdings by a Director, the Chairman of the Board or the Chief Executive Officer of Holdings, certifying on behalf of Holdings as to satisfaction of the conditions set forth in Section 5.15.

5.02    [Reserved].

5.03    Company Documents; Proceedings; etc.    (a) On the Closing Date, the Administrative Agent and the Lenders shall have received a certificate from each Borrower and each Specified Guarantor, dated as of the Closing Date, signed by any of a Manager, Director, the Chairman of the Board, the Chief Executive Officer, the President, the Chief Financial Officer, or any Vice President of such Credit Party, and attested to by a Director, a Manager, Legal Officer, the Secretary or any Assistant Secretary of such Borrower or Specified Guarantor, in the form of Exhibit C with appropriate insertions, together with copies of the certificate or articles of incorporation, constitution and by-laws (or other equivalent organizational or constitutional documents), as applicable, of such Borrower or Specified Guarantor, the resolutions and any powers of attorney of such Borrower or Specified Guarantor referred to in such certificate, specimen signatures of the representatives of such Borrower or Specified Guarantor authorized to execute the Credit Documents and, if applicable, a good standing certificate from the relevant jurisdiction and each of the foregoing shall be in form and substance reasonably satisfactory to the Required Lenders and (b) on the Closing Date, all instruments

and agreements in connection with the transactions contemplated by this Agreement and the other Credit Documents shall be reasonably satisfactory in form and substance to the Administrative Agent.

5.04    [Reserved].

5.05    Accounts.  On or prior to the Closing Date, the Manager shall have established with the Account Bank (A) the Central DIP Account and (B) the Central Cash Accounts.

5.06    Credit Documents.  On the Closing Date, the Administrative Agent and the Lenders shall have received:

(a)    from each party hereto, duly authorized, executed and delivered counterparts of this Agreement;

(b)    from each party thereto, duly authorized, executed and delivered counterparts of the Aircraft Mortgage and Security Agreement in the form of Exhibit D (as amended, modified, amended and restated, restated and/or supplemented from time to time, the "Security Agreement");

(c)    a duly authorized, executed and delivered equitable charge from Luxco in respect of the Manager and the Manager in respect of the Participating WAC Borrowers and the Specified Guarantors, in each case, which are incorporated under the law of Ireland and as requested by the Required Lenders, in the form of Exhibit E (as amended, modified, amended and restated, restated and/or supplemented from time to time, the "Manager's Irish Share Charge"); and

(d)    a duly authorized, executed and delivered account pledge agreement from the Manager in the form of Exhibit F covering the Central DIP Account and the Central Cash Accounts (as amended, modified, restated and/or supplemented from time to time, the "English Law Account Pledge Agreement").

5.07    Fees, etc.  On the Closing Date, the Borrowers shall have paid, or shall have instructed the Administrative Agent to deduct from the proceeds of the Borrowings made on the Closing Date to pay, to the Administrative Agent, the Collateral Agent and the Lender Professionals, as the case may be, all unpaid costs, fees and expenses (including, without limitation, legal fees and expenses) and other compensation contemplated hereby and in the Agent Fee Letter incurred on or before the Closing Date for which invoices have been submitted at least two (2) Business Days prior to the Closing Date.

5.08    Know Your Customer, etc.  The Lenders and the Administrative Agent shall have received, to the extent requested at least three (3) days prior to the Closing Date, all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the Patriot Act at least three (3) days prior to the Closing Date.

5.09    Appointment of Process Agent.  On the Closing Date, the Administrative Agent shall have received a letter from Waypoint Leasing Services LLC (the "Process Agent"), presently located at 19 Old Kings Highway South, Darien, CT 06820, substantially in the form of Exhibit G, indicating its consent to its appointment by each non-U.S. Credit Party as its agent to receive service of process as specified in Section 12.08 and by the Borrowers as agent to receive service of process relating to the English Law Account Pledge Agreement.

#4848-3242-6112v16

5.10    Cash Management Orders.  The (i) Cash Management Order and (ii) orders related to adequate protection or post-petition financing (other than the Orders or ordered provisions or relating to adequate protection for secured parties under any Non-Participating WAC Credit Facilities) and all other motions and material documents filed or to be filed with, and submitted to, the Bankruptcy Court in connection therewith, shall be in form and substance reasonably satisfactory to the Required Lenders and the Administrative Agent.

5.11    Control Over Assets.  No trustee, examiner with expanded powers or receiver shall have been appointed or designated with respect to the Credit Parties' business, properties or assets.

5.12    Lien Searches and Other Evidence.  The Administrative Agent shall have received UCC, tax and judgment lien searches and other appropriate evidence, in form and substance reasonably satisfactory to the Required Lenders.

5.13    Liens.  The Collateral Agent, for its benefit and the benefit of each Lender, shall have been granted Liens on the Collateral by the Bankruptcy Court Orders on the terms and conditions set forth herein and in the other Credit Documents.

5.14    Financing Statements; Company Act Filings.  The  Administrative Agent and the Lenders shall have received (i) copies of appropriate UCC-1 financing statements for each Credit Party requested by the Required Lenders and (ii) drafts of appropriate (a) Required Cape Town Registrations for the Credit Parties and (b) forms of C1, in each case, to be filed by the applicable Credit Parties under the laws of Ireland for each Credit Party incorporated under the law of Ireland in accordance with Section 8.09.

5.15    No Default; Representations and Warranties.  On the Closing Date (i) there shall exist no Default or Event of Default and (ii) all representations and warranties contained herein and in the other Credit Documents shall be true and correct in all material respects with the same effect as though such representations and warranties had been made on the Closing Date (it being understood and agreed that (A) any representation or warranty which by its terms is made as of a specified date shall be required to be true and correct in all material respects only as of such specified date and (B) any representation or warranty that is qualified as to "materiality," "Material Adverse Effect" or similar language shall be true and correct in all respects on such date).

5.16    Consent Letter.  The Administrative Agent and the Lenders shall have received a copy of the Omnibus Consent Letter and no termination event shall have occurred with respect thereto as of the Closing Date.

5.17    [Reserved].

5.18    First Day and  Second Day Orders.  All material "first day" and "second day" orders filed by the Debtors on or prior to the Interim Order Entry Date shall have been amended such that they are in form and substance reasonably acceptable to the Required Lenders and the Administrative Agent. All "first day" orders and "second day" orders shall contain language that the Orders shall govern in the event of a conflict.

5.19    Initial Budget.  The Administrative Agent and the Lenders shall have received the Initial Budget.

5.20    Interim Order.  The Interim Order shall have been entered by the Bankruptcy Court by December 14, 2018 and shall be in form and substance reasonably acceptable to the Lenders and the Administrative Agent and shall be in full force and effect and shall not have been vacated or

reversed, shall not be subject to a stay, and shall not have been modified or amended in any respect without the prior written consent of the Required Lenders or the Administrative Agent (with the consent or direction of the Required Lenders), and the Administrative Agent shall have received a copy of the Interim Order entered by the Bankruptcy Court.

In determining the satisfaction of the conditions specified in this Section 5, (x) to the extent any item is required to be satisfactory to any Lender, such item shall be deemed satisfactory to each Lender which has not notified the Administrative Agent and each of the other Lenders in writing prior to the occurrence of the Closing Date and (y) in determining whether any Lender is aware of any fact, condition or event that has occurred and which would reasonably be expected to have a Material Adverse Effect, each Lender which has not notified the Administrative Agent and each of the other Lenders in writing prior to the occurrence of the Closing Date of such fact, condition or event shall be deemed not to be aware of any such fact, condition or event on the Closing Date. Upon the Administrative Agent's good faith determination that the conditions specified in this Section 5 have been met (after giving effect to the preceding sentence and after Milbank has provided confirmation to the Administrative Agent in form and substance satisfactory to the initial Lenders that all documentary conditions precedent required to be delivered by this Agreement and the other Credit Documents and not waived by the Administrative Agent and the Lenders, as applicable, have been received), then the Closing Date shall have been deemed to have occurred, regardless of any subsequent determination that one or more of the conditions thereto had not been met (although the occurrence of the Closing Date shall not release any Guarantor or the Borrowers from any liability for failure to satisfy one or more of the applicable conditions contained in this Section 5).

SECTION 6.    Conditions Precedent to each Borrowing and each DIP Funding Account Withdrawal.  The obligation of each Lender to make Term Loans (including Initial Interim Term Loans unless such condition is specified to only apply to a Second Interim Term Loan or Final Term Loan, in which case it shall only apply to the Second Interim Term Loan or Final Term Loan, as applicable) and the Borrower's right to make a DIP Funding Account Withdrawal on each Withdrawal Date, as requested by the Borrowers pursuant to a Notice of Borrowing or Withdrawal Notice, as applicable, is subject to the satisfaction of the following conditions on or prior to the relevant Borrowing Date or Withdrawal Date, as applicable:

6.01    No Default; Representations and Warranties.  In the case of any Borrowing or DIP Funding Account Withdrawal, at the time of such Borrowing Date or Withdrawal Date and also after giving effect thereto (i) there shall exist no Default or Event of Default and (ii) all representations and warranties contained herein and in the other Credit Documents shall be true and correct in all material respects with the same effect as though such representations and warranties had been made on the date of such Borrowing Date or Withdrawal Date (it being understood and agreed that (A) any representation or warranty which by its terms is made as of a specified date shall be required to be true and correct in all material respects only as of such specified date and (B) any representation or warranty that is qualified as to "materiality," "Material Adverse Effect" or similar language shall be true and correct in all respects on such date).  Each Borrowing Date and Withdrawal Date, as applicable, shall be deemed to constitute a representation and warranty by each of the Borrowers and each Guarantor on the date of such Borrowing Date or Withdrawal Date, as applicable, as to the matters specified in clauses (i) and (ii) of this Section 6.01.

6.02    Notice of Borrowing or DIP Funding Account Withdrawal; Compliance Certificate.  Prior to disbursing each Term Loan or a DIP Funding Account Withdrawal, the Administrative Agent shall have received a Notice of Borrowing meeting the requirements of Section 2.02 or a Notice of Withdrawal meeting the requirements of Section 2.04, as applicable.

6.03    <u>Final Order Entry Date</u>.  With respect to the Final Term Loans and each DIP Funding Account Withdrawal, the Final Order Entry Date shall have occurred no later than 30 days after the entry of  the Interim Order (unless such period is extended by the Required Lenders or the Administrative Agent (with the consent of the Required Lenders)) and shall be in form and substance reasonably acceptable to the Required Lenders or the Administrative Agent (with the consent of the Required Lenders), and the Final Order shall be in full force and effect, shall not have been vacated or reversed, and shall not be subject to any stay and shall not have been modified or amended other than as reasonably acceptable to the Required Lenders (or the Administrative Agent at the direction of the Required Lenders).

6.04    <u>Budget Compliance</u>.  The Credit Parties shall be in compliance with Sections 8.01(k) and 8.28.

6.05    <u>Compliance with Orders</u>.  The Credit Parties shall be in compliance in all material respects with the Interim Order or the Final Order, as the case may be, and the Cash Management Order.

6.06    <u>Bidding Procedures Motion</u>.  With respect to the Initial Interim Term Loans, the Credit Parties shall have filed a motion seeking the approval of the Acceptable Bidding Procedures Order, which form of Acceptable Bidding Procedures Order attached to such motion shall be in form and substance reasonably acceptable to the Required Lenders (or the Administrative Agent at the direction of the Required Lenders).

6.07    <u>Acceptable Bidding Procedures Order</u>.  With respect to the Second Interim Term Loans, the Final Term Loans and each DIP Funding Account Withdrawal, the Acceptable Bidding Procedures Order in form and substance reasonably acceptable to the Required Lenders (or the Administrative Agent at the direction of the Required Lenders) shall have been entered by the Bankruptcy Court and the Acceptable Bidding Procedures Order shall be in full force and effect, shall not have been vacated or reversed, and shall not be subject to any stay and shall not have been modified or amended in any material respect other than as reasonably acceptable to the Required Lenders (or the Administrative Agent at the direction of the Required Lenders).

SECTION 7.    <u>Representations and Warranties</u>.  In order to induce the Administrative Agent, the Collateral Agent and the Lenders to enter into this Agreement and to induce the Lenders to make the Term Loans, each of Holdings, Luxco, the Manager and the Borrowers makes the following representations and warranties, all of which shall survive the execution and delivery of this Agreement and the making of the Term Loans, with the occurrence of the Closing Date, each Withdrawal Date and each Borrowing Date (excluding, however, any continuation of a Term Loan) being deemed to constitute a representation and warranty that the matters specified in this Section 7 are true and correct in all material respects on and as of the Closing Date, such Withdrawal Date and such Borrowing Date (it being understood and agreed that any representation or warranty which by its terms is made as of a specified date shall be required to be true and correct in all material respects only as of such specified date).

7.01    <u>Company Status</u>  Each of the Credit Parties (i) is a Company duly organized or incorporated and validly existing (and in good standing, if applicable) under the laws of the jurisdiction of its organization or incorporation, (ii) has the Company power and authority to own its property and assets and to transact the business in which it is engaged and presently proposes to engage and (iii) is duly qualified and is authorized to do business (and is in good standing, if applicable) in each jurisdiction where the ownership, leasing or operation of its property or the conduct of its business requires such qualifications, except for in the case of clause (i) with respect to the good standing of

the Credit Parties and clause (iii) failures to be so qualified or authorized which, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

7.02    Power and Authority.  Subject to the entry of the Orders and the terms thereof, each Credit Party has the power and authority to execute, deliver and perform the terms and provisions of each of the Documents to which it is party and has taken all necessary Company action to authorize the execution, delivery and performance by it of each of such Documents.  Subject to the entry of the Orders and the terms thereof, each Credit Party has duly executed and delivered each of the Documents to which it is party, and each of such Documents constitutes its legal, valid and binding obligation enforceable in accordance with its terms, except to the extent that the enforceability thereof may be limited by applicable bankruptcy, examinership, insolvency, reorganization, moratorium or other similar laws generally affecting creditors' rights and by equitable principles (regardless of whether enforcement is sought in equity or at law).

7.03    No Violation.  Neither the execution, delivery or performance by any Credit Party of the Documents to which it is a party, nor compliance by it with the terms and provisions thereof, (i) other than violations arising as a result of the commencement of the Cases and except as otherwise stayed by section 362 of the Bankruptcy Code, will contravene any provision of any law, statute, rule or regulation or any order, writ, injunction or decree of any court or Governmental Authority applicable to such Credit Party in any case where it is reasonably expected to have a material adverse effect on the Lenders, (ii) other than violations arising as a result of the commencement of the Cases and except as otherwise stayed by Section 362 of the Bankruptcy Court, will conflict with or result in any breach of any of the terms, covenants, conditions or provisions of, or constitute a default under, or result in the creation or imposition of (or the obligation to create or impose) any Lien (except for Permitted Liens) upon any of the property or assets of any Credit Party pursuant to the terms of any indenture, mortgage, deed of trust, credit agreement or loan agreement, or any other material agreement, contract or instrument, in each case to which any Credit Party is a party or by which it or any its property or assets is bound or to which it may be subject, in each case where it is reasonably expected to have a material adverse effect on the Lenders, or (iii) will violate any provision of the certificate or articles of incorporation, certificate of formation, limited liability company agreement, trust agreement, constitution or by-laws (or equivalent organizational documents), as applicable, of any Credit Party.

7.04    Approvals.  Subject to the Orders and the terms thereof, no order, consent, approval, license, authorization or validation of, or filing, recording or registration with (except for (i) those that have otherwise been obtained or made on or prior to the relevant Borrowing Date  or Withdrawal Date and which remain in full force and effect on such Borrowing Date or Withdrawal Date, (ii) to the extent required at such time hereunder, filings which are necessary to perfect the security interests created under the Security Documents and (iii) such orders, consents, approvals, licenses, authorization or validation or filing the failure of which to obtain or make would not reasonably be expected to have a Material Adverse Effect), or exemption by, any Governmental Authority is required to be obtained or made by, or on behalf of, any Credit Party to authorize, or is required to be obtained or made by, or on behalf of, any Credit Party in connection with, (A) the execution, delivery and performance of any Document or (B) the legality, validity, binding effect or enforceability of any such Document.

7.05    Financial Statements; Financial Condition; Undisclosed Liabilities.

(a)    Except as otherwise fully disclosed on Schedule 7.05, and except for the Indebtedness incurred under this Agreement and the WAC Facilities, there were as of the Closing Date no liabilities or obligations with respect to Holdings or any of its Subsidiaries, on a consolidated basis, of any

nature whatsoever (whether absolute, accrued, contingent or otherwise and whether or not due) which, either individually or in the aggregate, could reasonably be expected to be materially adverse to Holdings and its Subsidiaries taken as a whole.

(b)    No Material Adverse Effect has occurred since the Petition Date.

7.06    <u>Litigation</u>.   Except for the Cases, there are no actions, suits or proceedings pending or, to the knowledge of the Holdings, the Manager and the other Borrowers, threatened that has had, or could reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect.

7.07    <u>True and Complete Disclosure</u>.

(a)    Written factual information (other than estimates, appraisals (except for information provided by or on behalf of any Credit Party to such appraiser), other forward-looking information and information of a general economic or industry specific nature) provided to the Administrative Agent, the Collateral Agent or any Lender by or on behalf of Holdings or any of its Subsidiaries in connection with the transaction contemplated by this Agreement and the other Credit Documents (the "<u>Holdings Group Information</u>") is, to the knowledge of Holdings or such Subsidiary, when taken as a whole, true and accurate in all material respects as at the date such information was provided or as at such date (if any) at which it was expressly stated by Holdings or such Subsidiary to be true and correct.

(b)    No material fact has been omitted that, to the knowledge of Holdings, is necessary to make the Holdings Group Information that was furnished prior to the Closing Date, taking into account the information received by the Administrative Agent, the Collateral Agent or the Lenders, taken as a whole, not misleading, in light of the circumstances under which it was provided, in any material respect when furnished.

(c)    The Approved Budget contained in the Holdings Group Information has been prepared in good faith and on the basis of assumptions believed to be reasonable at that time made and upon information believed by the Credit Parties to have been accurately based upon the information available to the Credit Parties at the time the Approved Budget was furnished (it being understood that such Approved Budget is not to be viewed as facts and are subject to significant uncertainties and contingencies, many of which are beyond the control of the Person that provided such Approved Budget, and that actual results during the period or periods covered by any such Approved Budget may differ from the projected results, and such differences may be material).

7.08    <u>Use of Proceeds; Margin Regulations</u>.

(a)    All proceeds of the Term Loans will be used by the Borrowers for working capital and general corporate purposes of the Borrowers and the other Credit Parties (including to (i) pay amounts due under this Agreement or in connection herewith, (ii) pay the fees, costs and expenses of the Administrative Agent, the Collateral Agent, the Lender Professionals and the Lenders, (iii) pay fees and expenses of professionals associated with the Cases, (iv) provide Adequate Protection, in each case subject to the Approved Budget (subject to the Permitted Variances), (v) fund the Carve-Out and (vi) fund the Expense Reimbursement as set forth on Schedule 8.25) and not in contravention of any applicable law or the terms and conditions of any Credit Document or the Orders.

(b)    Without the prior written consent of the Required Lenders, no portion of the proceeds of the Term Loans may be used: (i) in a manner prohibited by the Orders or (ii) to make any

#4848-3242-6112v16

payment in settlement of any claim, action or proceeding, before any court, arbitrator or other governmental body in excess of $1,000,000, individually, or $2,000,000, in the aggregate, other than claims that are budgeted on the Approved Budget.

(c)     No part of any Borrowing (or the proceeds thereof) will be used to purchase or carry any Margin Stock or to extend credit for the purpose of purchasing or carrying any Margin Stock. Neither the making of any Term Loan nor the use of the proceeds thereof nor the occurrence of any other Borrowing will violate or be inconsistent with the provisions of Regulation T, U or X of the Board of Governors of the Federal Reserve System.  Not more than 25% of the value of the assets of the Credit Parties taken as a whole is represented by Margin Stock.

7.09    Tax Returns and Payments.  Each of the Credit Parties has duly filed all Tax returns that it is required by applicable law to file (other than Tax returns the non-filing of which does not and will not, individually or in the aggregate, have a Material Adverse Effect) and such Tax returns (the "Returns") accurately reflect in all material respects all liability for taxes of the Credit Parties for the periods covered thereby.  Each of the Credit Parties has duly paid all Taxes stated to be due and payable in such Returns and in any and all notices, assessments, demands for payment or other communications issued by any taxing authority, in each case other than (A) Taxes which the Credit Parties are disputing in good faith or contesting in good faith and in accordance with applicable law, provided that such contest does not present any material risk of the sale, forfeiture, confiscation, seizure or loss of any Mortgaged Aircraft or interest therein as a result of such contest and provided that such Person maintains adequate reserves in accordance with and to the extent required by GAAP, with respect to the Taxes being contested, and (B) Taxes the nonpayment of which do not have (and could not reasonably be expected to have), individually or in the aggregate, in a Material Adverse Effect.

7.10    Security Documents.

Upon entry of the Interim Order, and subject to the Orders, the Security Documents are effective to create in favor of the Administrative Agent, for the benefit of the Secured Parties a valid security interest (subject to Liens permitted by Section 9.01) on all right, title and interest of the respective Credit Parties in the Collateral described therein (with such priority as provided for in the Orders and with respect to the Collateral of foreign Subsidiaries, to the extent the enforceability of such security interest is governed by the UCC), subject to the effects of bankruptcy, examinership, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally, general equitable principles, and principles of good faith and fair dealing (regardless of whether enforcement is sought in equity or at law. Except for filings contemplated by this Agreement or the Security Documents and by the Interim Order and Final Order, as applicable, no filing or other action will be necessary to perfect the Liens on any Collateral under the Laws of the United States of America.

7.11    Capitalization.  On the relevant Withdrawal Date or Borrowing Date, all outstanding Equity Interests in the Credit Parties has been duly and validly issued, are fully paid and non-assessable and have been issued free of preemptive rights except as otherwise provided by law and in its organizational documents.  As of the relevant Withdrawal Date or Borrowing Date, the Credit Parties have no outstanding Equity Interests or other securities convertible into or exchangeable for its Equity Interests or any rights to subscribe for or to purchase, or any options for the purchase of, or any agreement providing for the issuance (contingent or otherwise) of, or any calls, commitments or claims of any character relating to, Equity Interests or any stock appreciation or similar rights except as otherwise provided by law.

-58-

7.12    <u>Subsidiaries</u>.  On and as of the Closing Date, Holdings has no direct or indirect Subsidiaries other than those Subsidiaries listed on Schedule 7.12.  Schedule 7.12 sets forth, as of the relevant Borrowing Date, the percentage ownership (direct and indirect) of Holdings in each class of capital stock or other Equity Interests of each of its Subsidiaries and also identifies the direct owner thereof.  All outstanding Equity Interests of each Subsidiary of Holdings has been duly and validly issued, are fully paid and non-assessable and have been issued free of preemptive rights except as otherwise provided by law and in its charter documents.  No Subsidiary of Holdings has outstanding any securities convertible into or exchangeable for its Equity Interests or outstanding any right to subscribe for or to purchase, or any options or warrants for the purchase of, or any agreement providing for the issuance (contingent or otherwise) of or any calls, commitments or claims of any character relating to, its Equity Interests or any stock appreciation or similar rights, except as provided by applicable law.

7.13    [Reserved].

7.14    <u>Investment Company Act</u>.  No Credit Party is an "investment company" or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended.

7.15    <u>Environmental Matters</u>.  The operations and property (to the extent such property is under the control of Holdings or any of its Subsidiaries) of Holdings or any of its Subsidiaries comply with all applicable Environmental Laws, except to the extent that the failure to so comply (either individually or in the aggregate) could not reasonably be expected to have a Material Adverse Effect.

7.16    <u>ERISA</u>.

(a)    Except to the extent stayed by section 362 of the Bankruptcy Code or as a result of the filing of the Case, each Plan is in compliance in form and operation with its terms and with ERISA and the Code (including without limitation the Code provisions compliance with which is necessary for any intended favorable tax treatment) and all other applicable laws and regulations, except where any failure to comply could not reasonably be expected to have a Material Adverse Effect.  Each Plan (and each related trust, if any) which is intended to be qualified under Section 401 (a) of the Code has received a favorable determination letter from the IRS to the effect that it meets the requirements of Sections 401(a) and 501(a) of the Code covering all applicable tax law changes or is comprised of a master or prototype plan that has received a favorable opinion letter from the IRS, and, nothing has occurred since the date of such determination that would adversely affect such determination (or, in the case of a Plan with no determination, nothing has occurred that would materially adversely affect the issuance of a favorable determination letter or otherwise materially adversely affect such qualification).  No ERISA Event has occurred, or is reasonably expected to occur, other than as would not, individually or in the aggregate, have a Material Adverse Effect.

(b)    There exists no Unfunded Pension Liability with respect to any Plan, except as would not have a Material Adverse Effect.

(c)    There are no actions, suits or claims pending against or involving a Plan (other than routine claims for benefits and the entry of the Orders) or, to the knowledge of the Credit Parties or any ERISA Affiliate, threatened, which would reasonably be expected to be asserted successfully against any Plan and, if so asserted successfully, would reasonably be expected either singly or in the aggregate to have a Material Adverse Effect.

(d)        The Credit Parties and each ERISA Affiliate have made all contributions to or under each Plan and Multiemployer Plan required by law within the applicable time limits prescribed thereby, the terms of such Multiemployer Plan, or any contract or agreement requiring contributions to a Multiemployer Plan save where any failure to comply, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.

(e)        No Plan which is subject to Section 412 of the Code or Section 302 of ERISA has applied for or received an extension of any amortization period, within the meaning of Section 412 of the Code or Section 302 or 304 of ERISA.  None of the Credit Parties nor any ERISA Affiliate has ceased operations at a facility so as to become subject to the provisions of Section 4062(e) of ERISA, withdrawn as a substantial employer so as to become subject to the provisions of Section 4063 of ERISA or ceased making contributions to any Plan subject to Section 4064(a) of ERISA to which it made contributions. None of the Credit Parties nor any ERISA Affiliate has any liability under Section 4069 or 4212(c) of ERISA.

7.17    Intellectual Property, etc.  Holdings and each of its respective Subsidiaries owns or has the right to use all the patents, trademarks, permits, domain names, service marks, trade names, copyrights, licenses, franchises, inventions, trade secrets, proprietary information and know-how of any type, whether or not written (including, but not limited to, rights in computer programs and databases) and formulas, or rights with respect to the foregoing, and has obtained assignments of all leases, licenses and other rights of whatever nature, necessary for the present conduct of its business, without any known conflict with the rights of others in each case which, or the failure to own or have which, or a conflict with the rights of others, as the case may be, could reasonably be expected, either individually or in the aggregate, to have a Material Adverse Effect.

7.18    [Reserved].

7.19    [Reserved].

7.20    [Reserved].

7.21    Representations and Warranties in Other Documents.  All representations and warranties set forth in the other Credit Documents were true and correct in all material respects at the time as of which such representations and warranties were made (or deemed made) and shall be true and correct in all material respects as of the relevant Borrowing Date and each Withdrawal Date as if such representations or warranties were made on and as of such date (it being understood and agreed that any such representation or warranty which by its terms is made as of a specified date shall be true and correct in all material respects as of such specified date).

7.22    Properties.  Other than as a result of the Cases, each of the Credit Parties has good and marketable title to all its material property, including, on the relevant Borrowing Date and each Withdrawal Date, each Mortgaged Aircraft that is part of the Collateral on such Borrowing Date or such Withdrawal Date, in each case free and clear of any and all Liens other than the Permitted Liens, other than where the failure to have good and marketable title, could not reasonably be expected, either individually or in the aggregate, to have a Material Adverse Effect.

7.23    [Reserved].

7.24    Business.  The sole business of the Credit Parties (other than Holdings, Luxco and the Manager) and each of their respective Subsidiaries is, and has since the formation thereof been, the ownership, leasing, acquisition and disposition of the Aircraft and related activities or ownership,

acquisition and disposition of an Equity Interest under an Eligible Entity and the primary business of each of Holdings, Luxco and the Manager is the provision of services and investments with respect to aviation assets, including the acquisition, disposition, leasing, financing and managing of helicopters and fixed wing aircraft and businesses related thereto.

7.25    Aircraft Objects.  The Mortgaged Aircrafts that are part of the Collateral, and the Helicopter for each Mortgaged Aircraft, constitutes an "Aircraft Object" as defined in the Cape Town Convention.

7.26    Withholdings.  No withholding or deduction in respect of any Tax is required in respect of any payment of interest under this Agreement by the Borrowers to a Lender, except as a result of any change in law after the Closing Date.

7.27    Sanctions; Anti-Money Laundering; Anti-Corruption.

(a)    None of (i) the Credit Parties, (ii) or any of their respective directors, officers, employees or agents acting or benefiting in any capacity in connection with the Term Loans, or any of their respective Subsidiaries or Affiliates or (iii) to the knowledge of the Credit Parties, any Lessee Party, is a Restricted Party.

(b)    The Credit Parties represent and warrant that (i) they and their respective Subsidiaries, directors or officers and (ii) to the knowledge of the Credit Parties, their respective Affiliates, employees or agents and any Lessee Party, have not engaged in, and are not now engaged in, any dealings or transactions with any Restricted Parties that at the time of the entering into of the relevant Lease is or was a Restricted Party, in any manner that would reasonably be expected to result in any Secured Party, Credit Party or Lessee Party being in breach of any Sanctions or becoming a Restricted Party.

(c)    None of the Credit Parties or any director, officer, employee, or agent associated with or acting on behalf of the Credit Parties (i) has used any corporate funds for any unlawful contribution, gift, entertainment or other unlawful expense relating to political activity; (ii) offered, paid, given, promised to pay, authorized the payment of, or taken any action in furtherance of the payment of anything of value directly or indirectly to any officer or employee of any Governmental Authority or any other person to unlawfully influence the recipient's action or otherwise to unlawfully obtain or retain business or to unlawfully secure an improper business advantage; or (iii) otherwise violated or is in violation of any provision of any applicable Anti-Corruption Laws.

(d)    The operations of each Credit Party are and have been conducted at all times in compliance with Anti-Money Laundering Laws and no action, suit or proceeding by or before any court or governmental agency, authority or body or any arbitrator involving a Credit Party with respect to Anti-Money Laundering Laws is pending and to Holdings' knowledge, no such actions, suits or proceedings are threatened or contemplated.

(e)    None of the Credit Parties is classified as an Antisocial Force, has any Antisocial Relationship or engages in Antisocial Conduct, whether directly or (based upon the actual knowledge of such Credit Party) indirectly through a third party.

(f)    The representations and warranties set out in this Section 7.27 relating to Sanctions shall not apply to, nor be made in favor of, any Restricted Lender.

7.28    Compliance with Statutes, etc.  Other than violations arising as a result of the commencement of the Cases and except as otherwise excused by the Bankruptcy Court, each Credit

Party is in compliance with all applicable statutes, laws, rules, regulations and orders of, and all applicable restrictions imposed by, all Governmental Authorities in respect of the conduct of its business and the ownership of its property, except such non-compliances as could not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect and the Manager has the policies and procedures to prevent such non-compliance with (i) such statutes, laws, rules, regulations, orders and restrictions that could, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect and (ii) the requirements of Section 7.27.

7.29    <u>Secured Parties</u>.  It is not necessary to establish a place of business in any State of Registration of a Mortgaged Aircraft or to be licensed, qualified or entitled to do business in any State of Registration of a Mortgaged Aircraft solely in order to exercise or enforce any provisions of the Credit Documents and no Secured Party will be deemed to be resident, domiciled or carrying on any business in any State of Registration of a Mortgaged Aircraft or subject to any tax that is not indemnified by a Credit Party under this Agreement or the other Credit Documents in any State of Registration of a Mortgaged Aircraft solely as a result of the execution, delivery and performance of any of the Credit Documents or the consummation of any of the transactions contemplated by the Credit Documents.

7.30    <u>No Default</u>.  On the date hereof and after giving effect to this Agreement, no Default or Event of Default has occurred and is continuing.

SECTION 8.    <u>Affirmative Covenants</u>.  Each of the Credit Parties hereby covenants and agrees that, on and after the Closing Date and until the Total Term Loan Commitment has terminated and the Term Loans (in each case, with interest thereon), all Fees and all other Secured Obligations (other than indemnities described in Section 12.13 and reimbursement obligations under Section 12.01 which, in either case, are not then due and payable) incurred hereunder and thereunder, are paid in full:

8.01    <u>Information Covenants</u>.  Holdings will furnish, or cause to be furnished, to the Administrative Agent and upon receipt thereof, the Administrative Agent will provide to each Lender:

(a)    <u>Monthly and Quarterly Financial Statements</u>

(i)    <u>Monthly Financial Statements.</u>  Within thirty (30) days after the close of each month in any fiscal quarter of Holdings commencing with the fiscal month ending on December 31, 2018, the unaudited consolidated balance sheet of Holdings and its Subsidiaries as at the end of immediately preceding month's accounting period and the related unaudited consolidated statements of income and shareholders' equity and statement of cash flows for such immediately preceding month and for the elapsed portion of the Fiscal Year ended with the last day of such immediately preceding month, in each case, all of which shall be certified by the chief financial officer, principal accounting officer or the treasurer of Holdings as fairly presenting in all material respects and in accordance with GAAP the financial condition of Holdings and its Subsidiaries as of the dates indicated and the results of their operations for the periods indicated, subject to normal year-end audit adjustments and the absence of footnotes.

(ii)    <u>Quarterly Financial Statements.</u>  Within sixty (60) days after the close of each of the first three quarterly accounting periods in each Fiscal Year of Holdings commencing with the quarterly accounting period ending on March 31, 2019, the unaudited consolidated balance sheet of Holdings and its Subsidiaries as at the end of such quarterly accounting period and the related unaudited consolidated statements of income and shareholders' equity and statement of cash flows for such quarterly accounting period and for the elapsed portion of the Fiscal Year ended

with the last day of such quarterly accounting period, all of which shall be certified by the chief financial officer, principal accounting officer or the treasurer of Holdings as fairly presenting in all material respects and in accordance with GAAP the financial condition of Holdings and its Subsidiaries as of the dates indicated and the results of their operations for the periods indicated, subject to normal year-end audit adjustments and the absence of footnotes.

(b)      [Reserved].

(c)      Officer's Certificates.  At the time of the delivery of the financial statements provided for in Sections 8.01(a), a Compliance Certificate from the chief financial officer, principal accounting officer or the treasurer of Holdings certifying on behalf of Holdings that, to such officer's actual knowledge after due inquiry, no Default or Event of Default has occurred and is continuing or, if any Default or Event of Default has occurred and is continuing, specifying the nature and extent thereof.

(d)      Notice of Default, Litigation and Material Adverse Effect.  Promptly, and in any event within two (2) Business Days after a Responsible Officer of Holdings obtains actual knowledge thereof, notice of (i) the occurrence of any event which constitutes a Default or an Event of Default that has occurred and is continuing, (ii) any litigation or governmental investigation or proceeding pending against Holdings or any of its Subsidiaries (A) which, either individually or in the aggregate, has had, or could reasonably be expected to have, a Material Adverse Effect or (B) with respect to any Document, (iii) any other event, change or circumstance that has had a Material Adverse Effect or (iv) any event requiring a repayment of the Term Loan under Section 4.02(d).

(e)      Other Reports and Filings.  Promptly after the filing or delivery thereof, copies of all financial information, proxy materials and reports, if any, which Holdings, or any of its Subsidiaries shall publicly file with the U.S. Securities and Exchange Commission ("SEC") or any successor thereto or any similar securities regulatory authority of any jurisdiction.

(f)      [Reserved].

(g)      [Reserved].

(h)      [Reserved].

(i)      ERISA-Related Information.  Promptly and in any event within thirty (30) days after any Borrower knows of the occurrence, or forthcoming occurrence, of any ERISA Event, a certificate of a Responsible Officer of such Borrower describing such ERISA Event, what action such Borrower, any Subsidiary of such Borrower or any ERISA Affiliate has taken, is taking or proposes to take with respect to such ERISA Event and a copy of any notice filed with the PBGC or the IRS pertaining to such ERISA Event and any notices received by such Borrower or ERISA Affiliate from the PBGC or any other governmental agency with respect thereto.

(j)      Other Information.  From time to time, such other information or documents (financial or otherwise) with respect to any Credit Party or the Mortgaged Aircraft (subject, in the case of the Mortgaged Aircraft and the Lessee Parties, to applicable confidentiality restrictions and to the extent reasonably available to such Credit Parties or obtainable by such Credit Parties through reasonable commercial efforts) or the Credit Documents as the Administrative Agent, the Collateral Agent or any Lender (through the Administrative Agent) may reasonably request.

(k)     Budget & Variance Reporting.

(i)     Holdings shall deliver to Administrative Agent (for delivery to the Lenders) on (A) December 20, 2018, (B) January 10, 2019 and (C) every second Thursday thereafter, in each case, by 1:00 p.m. (New York City time) (x) an informational update to then applicable Approved Budget, in substantially the same form, which interim 13-week statement shall add an additional two weeks (or three weeks, in the case of the initial update and the second update) and provide an update to the remaining weeks covered by the most recently delivered interim statement pursuant to this Section 8.01(k)(i) and (y) for informational purposes only, a variance report on the actual Non-Participating WAC Fronted Expenses and Non-Participating WAC Direct Expenses made.

(ii)     Commencing with the tenth full week after the Petition Date, Holdings shall deliver to the Administrative Agent (for delivery to the Lender), every tenth Thursday following the commencement of the then applicable Approved Budget, by 1:00 pm (New York City time), (A) an updated 13-week statement for the 13 weeks commencing immediately following the 13-week period covered by the then applicable Approved Budget (such 13-week statement, the "Proposed Budget") and (B) for informational purposes only, a 13-week statement of the projected Non-Participating WAC Allocated Expenses and Non-Participating WAC Direct Expenses on a "Non-Participating WAC Group" by "Non-Participating WAC Group" basis. Each Proposed Budget shall be substantially in the form of the Initial Budget and reasonably satisfactory to the Administrative Agent, at the direction of the Required Lenders, and no Proposed Budget shall be effective until so approved; provided, that the Administrative Agent, at the direction of the Required Lenders shall be deemed to have approved a Proposed Budget unless the Administrative Agent, at the direction of the Required Lenders shall have objected to the Proposed Budget within 5 Business Days of receiving such Proposed Budget; provided that, to the extent the Administrative Agent, at the direction of the Required Lenders objects to any Proposed Budget and any such objection is unresolved prior to the end of the thirteenth (13th) week of the Approved Budget, then a hearing with respect to any such objection shall be conducted by the Court.

(iii)     Holdings shall deliver to Administrative Agent (for delivery to the Lenders) on (A) December 20, 2018, (B) January 10, 2019 and (C) every second Thursday thereafter, in each case, 1:00 pm (New York City time) a variance report (the "Variance Report"), detailing the following in each case for the period commencing on the Petition Date and ending on the immediately preceding Friday prior to the delivery thereof (a "Test Period"): (x) on a WAC Group basis, any variance between the actual disbursements made (excluding professional fees and expenses and Adequate Protection payments) during such Test Period against the aggregate "Total Operating Disbursements" set forth in the Approved Budget for such Test Period and (y) on a consolidated basis, any variance between the actual "Rental Receipts" against the "Total Rental Receipts" set forth in the Approved Budget for such Test Period; provided however, that to the extent any amounts related to employee obligations (including, but not limited to, any amounts related to healthcare costs, payments earned under a key employee incentive plan, or severance) set forth in an Approved Budget are not actually paid during the period covered by such Approved Budget, such amounts may be paid during a subsequent period on the earlier of (i) the consummation of a sale of substantially all of the Borrowers' assets pursuant to section 363 of the Bankruptcy Code or (ii) the effective date of an Acceptable Plan of Reorganization without the need for further approval from the Administrative Agent or the Required Lenders for such delay in payment unless such payment would result in one or more WAC Groups exceeding the Maximum Intercompany Balance. For the avoidance of doubt, the inclusion of any line item in the Approved

Budget shall in no way waive any applicable requirement to seek approval of the allowance or incurrence of such amount as an administrative expense of the estates.

(l)    <u>WAC Group Reporting.</u>  On (i) December 21, 2018, (ii) January 11, 2019 and (iii) every second Friday ending thereafter, Holdings shall deliver to the Administrative Agent (for delivery to the Lenders), by 1:00 pm (New York City time) a report (the "<u>WAC Report</u>") detailing WAC Group (and Subsidiary specific) intercompany accounting, including with respect to all receipts and disbursements from the Central DIP Account and the Central Cash Accounts for the period covered by such WAC Report (the "<u>Reporting Period</u>").  The WAC Report shall include (i)  the net cash receipts received by or on behalf of a WAC Group during such Reporting Period other than Extraordinary Receipts that are not swept (such WAC Group's "<u>Gross WAC Group Receipts</u>"), (ii) the net cash disbursements made by or on behalf of a WAC Group during such period, including both direct disbursements, allocated disbursements and to the extent applicable allocated Non-Participating WAC Fronted Expenses (such WAC Group's "<u>Gross WAC Group Disbursements</u>"); and the net position of each WAC Group vis-à-vis the Manager, which shall be calculated as the difference between such WAC Group's Gross WAC Group Receipts and its Gross WAC Group Disbursements for such Reporting Period on a cumulative basis, in each case as deemed to be adjusted for purposes of effectuating the intercreditor settlement set forth in certain forbearance agreements with respect to the WAC Facilities but not with respect to the Debtors' actual intercompany claim balances and for agreed opening cash balances including adjustments to reflect the cash sources and uses during the forbearance period (any such positive difference, a "<u>Net WAC Group Intercompany Claim</u>" and any such negative difference a "<u>Net WLIL Intercompany Claim</u>").

8.02    <u>Books, Records and Inspections.</u>

(a)    Holdings will, and will cause each other Credit Party to, keep proper books of record and accounts in which full, true and correct entries in all material respects in conformity with GAAP and in all material respects in conformity with all requirements of applicable law.  Holdings will, and will cause each other Credit Party to, permit officers and designated representatives of the Administrative Agent, the Collateral Agent or any Lender to examine, (in the presence of officers of the relevant Credit Party, if such Credit Party so requests), the books of account of such Credit Party and discuss the affairs, finances and accounts of such Credit Party with, and be advised as to the same by, its and their officers and request that its and their independent accountants make themselves reasonably available to the Administrative Agent, the Collateral Agent, and any Lender (through the Lender Professionals, who shall make reasonable commercial efforts to efficiently schedule such Lender consultations in order to minimize any disruption to the operations of Holdings and its Subsidiaries) (<u>provided</u> that a member of management of the applicable Credit Party shall be afforded a reasonable opportunity to be present at any such meeting with such accountants), all upon reasonable prior notice and at such reasonable times and intervals (to such reasonable extent as the Administrative Agent, the Collateral Agent or any such Lender may reasonably request).

(b)    To the extent that Holdings or any of its Subsidiaries has any rights of inspection under any Eligible Lease for a Mortgaged Aircraft, Holdings will, and will cause each of such Subsidiaries to (x) permit officers and designated representatives of the Administrative Agent, the Collateral Agent or any Lender (subject to a maximum of one person unless otherwise agreed by the Manager) to participate in such inspections to the extent exercised by Holdings or such Subsidiary (upon receipt of notice from the Administrative Agent of the intention of the Administrative Agent, Collateral Agent or Lender to participate in any such inspection).

8.03    <u>Insurance</u>.

(a)    The Manager will, and will cause the Borrowers and each of the Borrowers' Subsidiaries to, at all times carry out, or procure that there is carried out, in relation to each Mortgaged

Aircraft, the insurance undertakings as set forth in Schedule 8.03, either pursuant to (i) an Eligible Lease in respect of a Mortgaged Aircraft or (ii) a lessor contingent policy covering such Mortgaged Aircraft which contingent policy shall satisfy the insurance undertakings set forth in Schedule 8.03 and copies of insurance certificates in respect of which shall have been provided to the Administrative Agent (for delivery to the Lenders); provided, however, that the provisions of paragraphs (d) (Application of Insurance Proceeds) and (f) (Reports, etc.) of Schedule 8.03 shall be complied with at all times in respect of each Mortgaged Aircraft; provided, further, that all Insurances maintained by Eligible Lessees in respect of the Mortgaged Aircraft as of the Closing Date (and any renewals or extensions thereof on the same terms and conditions) shall be deemed to satisfy the insurance undertakings in Schedule 8.03 for purposes of clause (i) above.

(b)     If the Manager, the Borrowers or any of the Borrowers' Subsidiaries shall fail to maintain insurance in accordance with this Section 8.03, the Administrative Agent shall have the right (but shall be under no obligation) to procure any payment for such insurance and the Manager and the Borrowers jointly and severally agree to reimburse the Administrative Agent for all costs and expenses of procuring and paying for such insurance.

(c)     Within ten (10) Business Days following the date a Responsible Officer has actual knowledge of an Event of Loss (or similar event) with respect to an Airframe, Holdings shall deliver notice thereof to the Administrative Agent (for delivery to the Lenders).

8.04    Existence; Franchises.  Holdings will, and will cause each other Credit Party to, do or cause to be done, all things necessary to preserve and keep in full force and effect its existence (except as otherwise permitted by Section 9.02) and its material rights, franchises, licenses, permits, copyrights, trademarks and patents, except to the extent that the failure to so preserve and keep in full force and effect its material rights, franchises, licenses, permits, copyrights, trademarks and patents could not reasonably be expected to have a Material Adverse Effect; provided, however, that nothing in this Section 8.04 shall prevent the withdrawal by any Credit Party of its qualification as a foreign Company in any jurisdiction if such withdrawal could not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

8.05    Compliance with Statutes, etc.  Except as otherwise excused or prohibited by the Bankruptcy Code, and subject to any required approval by the Bankruptcy Court, Holdings will, and will cause each other Credit Party to, comply with all applicable statutes, laws, regulations and orders of, and all applicable restrictions imposed by, all Governmental Authorities in respect of the conduct of its business and the ownership of its property (including applicable statutes, regulations, orders and restrictions relating to environmental standards and controls), except such non-compliances as could not, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

8.06    End of Fiscal Years; Fiscal Quarters.  Holdings will cause its and each other Credit Party's (i) Fiscal Years to end on December 31 of each calendar year and (ii) Fiscal Quarters to end on the last day of each period described in the definition of "Fiscal Quarter".

8.07    Payment of Taxes.  In accordance with the Bankruptcy Code and subject to any required approval by the Bankruptcy Court (it being understood that Holdings and each other Credit Party shall not be obligated to make any payments hereunder that may, in its reasonable judgment, result in a violation of any applicable law, including the Bankruptcy Code, without an order of the Bankruptcy Court authorizing such payments), Holdings will, and will cause each other Credit Party to, pay and discharge, all Taxes imposed upon it or upon its income or profits or upon any properties belonging to it, prior to the date on which penalties attach thereto, and all lawful claims which, if unpaid, could reasonably be expected to become a Lien (other than Permitted Liens) upon any

properties of the Manager or the other Credit Parties; provided, however, that none of the Credit Parties shall be required to pay any such Tax which is being disputed in good faith or contested in good faith and by proper proceedings if it has maintained adequate reserves with respect thereto in accordance with GAAP, or where failure to pay such Taxes, individually or in the aggregate, cannot reasonably be expected to have a Material Adverse Effect.

8.08    [Reserved].

8.09    Additional Security; Further Assurances; etc.

(a)    Promptly upon request by the Administrative Agent, or any Lender through the Administrative Agent, Holdings will, and will cause each of the other Credit Parties to, at the expense of Holdings and the Borrowers, do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, deeds, certificates, assurances and other instruments as the Administrative Agent, Collateral Agent or any Lender through the Administrative Agent, may reasonably require from time to time in order to (i) carry out more effectively the purposes of the Credit Documents, (ii) to the extent required under Section 5 or 6, perfect and maintain the validity, effectiveness and priority of any of the Security Documents and any of the Liens intended to be created thereunder and (iii) assure, convey, grant, assign, transfer, preserve, protect and confirm more effectively unto the Collateral Agent the rights granted or now or hereafter intended to be granted to the Collateral Agent under any Credit Document or under any other instrument executed in connection with any Credit Document to which a Credit Party is or is to be a party, and cause each such Credit Party to do so.  In addition, upon request by the Administrative Agent, the Credit Parties will use commercially reasonable efforts to cause an Eligible Lessee to comply with its obligations under the related Eligible Lease in relation to Cape Town Convention matters. Without limitation of the foregoing, Holdings shall, or shall cause each Credit Party incorporated under the laws of Ireland, within 15 days of the Closing Date, to (i) file a form C1 in the Companies Registration Office of Ireland and (ii) complete the Required Cape Town Registrations.

(b)    Holdings will, and will cause each of the other Credit Parties to, at the expense of Holdings and the Borrowers, make, execute, endorse, acknowledge, file and/or deliver to the Collateral Agent from time to time such vouchers, invoices, schedules, confirmatory assignments, conveyances, financing statements, transfer endorsements, powers of attorney, certificates, reports, waivers, bailee agreements, control agreements and other assurances or instruments and take such further steps relating to the Collateral covered by any of the Security Documents as may be necessary to effect the purposes of this Section 8.09.

(c)    In addition to the foregoing, Holdings will, and will cause each of the other Credit Parties to, at the expense of Holdings and the Borrowers, do and perform such other and further acts and duly execute and deliver such further documents and assurances as the Administrative Agent or the Required Lenders may reasonably request to establish, maintain and protect the respective rights and remedies of the Administrative Agent, the Collateral Agent, and the Lenders and to carry out and effect the intent and purpose of this Agreement and the other Credit Documents. Without limiting the generality of the foregoing or anything to the contrary herein, the Administrative Agent and the Collateral Agent shall not be responsible for the preparation, filing, form, content or continuation of any UCC financing statements, mortgages, assignments, conveyances, financing statements, transfer endorsements or similar instruments.  For the avoidance of doubt, Holdings and/or any other applicable Credit Parties as applicable, shall make all filings (including filings of continuation statements and amendments to UCC financing statements that may be necessary to continue the effectiveness of such UCC financing statements) to the extent perfection is required by this Agreement or the Security Documents, and promptly provide evidence thereof to the Collateral Agent.

8.10    [Reserved].

8.11    <u>Maintenance of Company Separateness</u>.  Holdings will, and will cause each other Credit Party (other than Eligible Trusts) to, satisfy customary company formalities, including, as applicable, (i) the holding of regular board of directors' and shareholders' meetings or action by directors or shareholders without a meeting and (ii) except for consolidated or group tax return among Holdings and its relevant Subsidiaries, group VAT returns for any relevant jurisdiction, elections to be disregarded for tax purposes and consolidated financial statements for Holdings and its Subsidiaries and, subject to Section 8.21(a), the maintenance of separate accounts in its own name.

8.12    <u>Use of Proceeds</u>.  Holdings will, and will cause each other Credit Party to, use the proceeds of the Term Loans for working capital and general corporate purposes (including to (i) pay amounts due under this Agreement or in connection herewith, (ii) pay the fees, costs and expenses of the Administrative Agent, the Collateral Agent, the Lender Professionals and the Lenders, (iii) pay fees and expenses of professionals associated with the Cases, (iv) provide Adequate Protection, in each case subject to the Approved Budget (subject to the Permitted Variances), (v) fund the Carve-Out, and (vi) fund the Expense Reimbursement as set forth on Schedule 8.25, and not in contravention of any applicable law or the terms and conditions of any Credit Document or the Orders.

8.13    [Reserved].

8.14    [Reserved].

8.15    <u>Aircraft Registration</u>.  Except for temporary periods of deregistration during maintenance, modification, re-registration or shipment not to exceed ten (10) consecutive days or such shorter period as is allowed for such purpose under the applicable Eligible Lease (if the relevant Mortgaged Aircraft is then subject to an Eligible Lease) and except in the case of breach of an Eligible Lease, Sublease or Sub-Sublease as to which the Manager is using commercially reasonable efforts to exercise its rights and remedies in connection therewith in accordance with the Standard to cause such registration to be effected forthwith or to recover possession of the Mortgaged Aircraft, the Manager will cause each Mortgaged Aircraft to be, and remain, or be in the process of being registered with the applicable Aviation Authority in the name of the relevant Eligible Entity or Lessee Party.

8.16    [Reserved].

8.17    <u>Inspections</u>.  To the extent that Holdings or any of its Subsidiaries has any rights of inspection under any Eligible Lease in respect of a Mortgaged Aircraft, Holdings shall, and shall cause each of its Subsidiaries to, conduct or have conducted in accordance with the Standard an inspection of such Mortgaged Aircraft at a minimum of once in every twenty-four (24) month period but on average (with respect to all Mortgaged Aircraft) at a minimum of once in every eighteen (18) month period, or more frequently at the discretion of Holdings or any of its Subsidiaries in accordance with the Standard.  The Administrative Agent shall have the right on behalf of the Secured Parties (at such Secured Parties' expense) to inspect each Mortgaged Aircraft once in each calendar year in accordance with the terms of the relevant Eligible Lease.  To the extent the Administrative Agent exercises the right in the aforementioned sentence, it shall notify the Manager with at least ten (10) Business Days' notice so the Manager can obtain the upcoming maintenance schedules for the relevant Mortgaged Aircraft from the relevant Eligible Lessee.

8.18    <u>Asset Monitoring</u>.  The Manager shall provide asset and maintenance monitoring in accordance with customary practice in the industry to compare the maintenance program for the Mortgaged Aircraft to the (x) relevant Manufacturers' guidelines and (y) requirements of the

#4848-3242-6112v16

State of Registration in respect of Mortgaged Aircraft maintenance in order to enable the airworthiness certificate of the Aircraft to be issued and maintained, subject to Section 8.16 and maintenance, storage, inspections and repairs of the Mortgaged Aircraft.

8.19    <u>Administration of Eligible Leases</u>.  Each Credit Party, in its capacity as lessor under an Eligible Lease in respect of a Mortgaged Aircraft, or the Manager acting as such, shall administer such Eligible Lease and enforce its rights and remedies thereunder in accordance with the Standard.

8.20    <u>Manager's Credit Policies and Procedures</u>.  Holdings will, and will cause each other Credit Party to, comply with the Manager's Credit Policies and Procedures. The Manager and the other Credit Parties shall maintain and enforce policies and procedures designed to ensure compliance with the Anti-Corruption Laws and Anti-Money Laundering Laws.

8.21    [Reserved].

8.22    [Reserved].

8.23    <u>Antisocial Force; Antisocial Relationship; Antisocial Conduct</u>.  Each Credit Party shall use commercially reasonable efforts to ensure that it shall not be classified as an Antisocial Force, have any Antisocial Relationship or engage in any Antisocial Conduct, whether directly or (based upon the actual knowledge of such Credit Party) indirectly through a third party.  In the event such Credit Party obtains actual knowledge that any director, officer, employee or agent associated with such Credit Party is classified as an Antisocial Force, has any Antisocial Relationship or engages in any Antisocial Conduct, whether directly or indirectly through a third party, such Credit Party shall promptly notify the Administrative Agent thereof.

8.24    <u>Air Operators Certificate</u>.  Holdings shall, and shall cause the Manager and the other Credit Parties to, ensure that, with respect to each Mortgaged Aircraft, the relevant Operator maintains a valid air operators certificate issued by the relevant Aviation Authority.

8.25    <u>Milestones</u>.  The Credit Parties shall ensure the satisfaction of the covenants, agreements and milestones (collectively, the "<u>Milestones</u>" and each a "<u>Milestone</u>"), as shall be set forth on Schedule 8.25.

8.26    [Reserved].

8.27    <u>Bankruptcy Related Matters</u>.  The Credit Parties shall:

(a)    provide the Administrative Agent and its counsel promptly after the same is available copies of all material pleadings, motions, applications, judicial information, financial information and other material documents filed by or on behalf of the Credit Parties with the Bankruptcy Court in the Cases;

(b)    comply in all material respects with the Orders; and

(c)    provide to the Administrative Agent and the Lenders (or their respective counsel on their behalf) copies of all "second day" motions, pleadings, orders and all related pleadings and filings at least three (3) Business Days' prior to the filing thereof (except where impracticable due to exigent circumstances in which case as soon as possible) and all such pleadings relating to this Agreement and cash

collateral shall be in form and substance reasonably acceptable to the Administrative Agent and the Required Lenders.

8.28    <u>Budget Variance Testing</u>.  Commencing with December 20, 2018, as of the last day of each Test Period (i) on a "WAC Group by WAC Group" basis, the actual disbursements (excluding professional fees and expenses and adequate protection payments but including any Non-Participating WAC Fronted Expenses) may not exceed the greater of (x) $150,000 and (y) 115% of the amount of actual disbursements for such Test Period as set forth in the "Total Operating Disbursements" line items included in the Approved Budget and (ii) on a consolidated basis, the total actual "Rental Receipts" of the Borrowers and the Guarantors may not be less than the greater of (x) $1,000,000 and (y) 80% of the amount of "Rental Receipts" for such Test Period included in the Approved Budget (the "<u>Permitted Variances</u>").

8.29    <u>Cash Management</u>.  The Credit Parties shall comply in all material respects with the Cash Management Order and the Orders.

8.30    <u>WAC Group Disbursements</u>.  The Credit Parties may make disbursements which are in compliance with the Approved Budget (subject to the Permitted Variances) so long as no such disbursement would result in any WAC Group exceeding its Maximum Intercompany Balance.

SECTION 9.    <u>Negative Covenants</u>.  Each of the Credit Parties hereby covenants and agrees that on and after the Closing Date and until the Total Term Loan Commitment has terminated and the Term Loans (in each case, together with interest thereon), all Fees and all other Secured Obligations (other than any indemnities described in Section 12.13 and reimbursement obligations under Section 12.01 which, in either case, are not then due and payable) incurred hereunder and thereunder, are paid in full:

9.01    <u>Liens</u>.  The Credit Parties will not create, incur, assume or suffer to exist any Lien upon or with respect to any property or assets (real or personal, tangible or intangible) of the Credit Parties, whether now owned or hereafter acquired; <u>provided</u>, <u>however</u>, that the provisions of this Section 9.01 shall not prevent the creation, incurrence, assumption or existence of the following types of Liens on the property or the assets of the Credit Parties (Liens described below are herein referred to as "<u>Permitted Liens</u>"):

(a)    inchoate Liens for taxes, assessments or governmental charges or levies not yet due or Liens for taxes, assessments or governmental charges or levies being contested in good faith and by appropriate proceedings for which adequate reserves have been established in accordance with GAAP;

(b)    Liens in respect of property or assets of the Credit Parties imposed by law (other than ERISA Liens), which were incurred in the ordinary course of business and do not secure Indebtedness for borrowed money, such Liens by virtue of any requisition, seizure or confiscation of an Aircraft, repairer's, carrier's or hangar keeper's, warehousemen's, materialmen's and mechanics' Liens and other similar Liens arising in the ordinary course of business, and (i) do not involve any imminent likelihood of the sale, seizure, forfeiture or loss of any Aircraft, title thereto, interest therein or use thereof, (ii) which do not in the aggregate materially impair the use of the Credit Parties property or assets in the operation of the business of the Credit Parties, taken as a whole and (iii) which are being disputed or contested in good faith by appropriate proceedings, which proceedings have the effect of preventing the forfeiture or sale of the property or assets subject to any such Lien;

(c)    Liens in respect of any Aircraft for any fees or charges of any airport or air navigation or emissions or carbon regulator or similar authority arising by statute or operation of law;

(d)    Liens created by or pursuant to this Agreement, the Security Documents, or any other Credit Document or created by or permitted in accordance with the terms of an Eligible Lease for a Mortgaged Aircraft and affecting such Mortgaged Aircraft;

(e)    Liens arising out of the existence of judgments or awards in respect of which the Credit Parties shall in good faith be prosecuting an appeal or proceedings for review and in respect of which there shall have been secured a subsisting stay of execution pending such appeal or proceedings which do not involve any imminent likelihood of the sale, seizure, forfeiture or loss of any Mortgaged Aircraft, title thereto, interest therein or use thereof;

(f)    Liens for salvage or similar rights, and, if applicable, setoff rights for premiums due of insurers under insurance policies maintained pursuant to and in accordance with the Eligible Lease for an Aircraft or hereunder;

(g)    the interests of a voting or owner trustee, as applicable or of an Intermediate Subsidiary in connection with the relevant Intermediate Lease, including the interests of any Person in respect of arrangements under the Local Requirements Exception;

(h)    bankers' Liens, rights of setoff and other similar Liens existing solely with respect to cash and Cash Equivalents on deposit in one or more accounts maintained by the Credit Parties, in each case granted in the ordinary course of business in favor of the bank or banks with which such accounts are maintained, securing amounts owing to such bank or banks with respect to cash management and operating account arrangements;

(i)    Liens which arise by virtue of any act or omission of a Lessee Party or a Person claiming by or through any Lessee Party (whether permitted by the terms of the relevant Eligible Lease or in contravention thereof) so long as, in the case of any Lien that is in contravention of the terms of the relevant Eligible Lease, the applicable Credit Party or the Manager is using commercially reasonable efforts to cause such Lien to be lifted promptly, or otherwise to enforce its rights and remedies under the applicable Eligible Lease in accordance with the Standard after it becomes aware of such Lien; provided that such Liens that are in excess of $500,000 shall be lifted within one-hundred and eighty (180) days after the applicable Credit Party or the Manager becomes aware of such Lien;

(j)    any head lease, lease, conditional sale agreement (for registration purposes) or purchase option granted by a lessor or owner as to the purchase of the related Mortgaged Aircraft under or in respect of any Eligible Lease (including to an Affiliate of the Lessee) existing on the date of acquisition of such Mortgaged Aircraft by the relevant Eligible Entity or thereafter granted in accordance with the Manager's customary commercial practices;

(k)    Liens in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties in connection with the importation of goods;

(l)    [Reserved];

(m)    the respective rights of any third party that owns or leases equipment installed on a Mortgaged Aircraft under any lease relating to a Mortgaged Aircraft, including any assignment of the relevant warranties relating to such installed equipment;

(n)    any Lien fully bonded by the Manager or any Lessee Party or by similar third party security provided by the Manager or one of its Affiliates that is not a Credit Party or any Lessee Party (which itself does not result in a Lien on a Mortgaged Aircraft or any part thereof);

#4848-3242-6112v16

(o)     [Reserved];

(p)     Liens existing on the Petition Date with respect to the WAC Facilities; and

(q)     Liens on the Collateral granted to provide Adequate Protection.

In connection with the granting of Liens of the type described in clauses (c) and (d) of this Section 9.01 by the Credit Parties, the Administrative Agent and the Collateral Agent may take any actions authorized by Section 11.10 in connection therewith (including, without limitation, by executing appropriate lien releases or lien subordination agreements in favor of the holder or holders of such Liens, in either case solely with respect to the item or items of equipment or other assets subject to such Liens).

9.02    Consolidation, Merger, Purchase or Sale of Assets, etc.

(a)     The Credit Parties will not wind up, liquidate or dissolve their affairs or enter into any partnership, joint venture, or transaction of merger or consolidation, or convey, sell, lease or otherwise dispose of all or substantially all of the property and assets of the Credit Parties or purchase or otherwise acquire (in one transaction or a series of related transactions) any substantial part of the property and assets (other than purchases or other acquisitions of inventory, materials, equipment, goods and services in the ordinary course of business) of any Person (or agree to do any of the foregoing at any future time), except that:

(i)     so long as no Event of Default has occurred and is continuing or will result therefrom and WAC Specific Collateral remains collateral for such WAC Group, a Borrower or any Subsidiary of such Borrower may convey, sell or otherwise transfer all or any part of its business, properties and assets to any Wholly-Owned Subsidiary of such Borrower, so long as any security interests granted to the Collateral Agent for the benefit of the Secured Parties pursuant to the Security Documents and the applicable Participating WAC Documents in the assets so transferred shall remain in full force and effect and perfected (to at least the same extent as in effect immediately prior to such transfer assuming for purposes hereof that such Borrower and its Subsidiaries are in compliance with the terms of the Credit Documents at such time) and all actions required to maintain said perfected status have been taken and the successor or transferee of (x) such Borrower is organized or incorporated under the laws of the United States or Ireland; and (y) any Wholly-Owned Subsidiary is organized under such jurisdiction as is permitted hereunder, and, in each case, assumes all obligations under the Credit Documents by an agreement reasonably satisfactory to the Administrative Agent and the Guaranty remains in full force and effect;

(ii)    any Subsidiary of a Borrower may amalgamate, merge or consolidate with and into, or be dissolved or liquidated into, such Borrower or any Wholly-Owned Subsidiary of such Borrower, so long as (x) in the case of any such amalgamation, merger, consolidation, dissolution or liquidation involving such Borrower, such Borrower is the surviving or continuing entity of any such amalgamation, merger, consolidation, dissolution or liquidation, and (y) any security interests granted to the Collateral Agent for the benefit of the Secured Parties pursuant to the Security Documents in the assets of such Subsidiary shall remain in full force and effect and perfected (to at least the same extent as in effect immediately prior to such amalgamation, merger, consolidation, dissolution or liquidation) and all actions required to maintain said perfected status have been taken;

(iii)   the Credit Parties may liquidate Cash Equivalents or otherwise dispose of Cash Equivalents in the ordinary course of business, in each case for cash or Cash Equivalents at Fair Market Value;

#4848-3242-6112v16

(iv)    for the avoidance of doubt, Investments may be made to the extent permitted by Section 9.05;

(v)    the Credit Parties may conduct any other wind up, liquidation, dissolution, transfer, merger, consolidation, conveyance, sale, lease, disposition, purchase, or acquisition, Asset Sales or Investment approved by the Bankruptcy Court pursuant to an order in form and substance reasonably satisfactory to the Required Lenders; and

(vi)    any credit bid that has paid for its Net WLIL Intercompany Claim shall be permitted.

(b)    Holdings shall not (x) except as provided in clause (y) hereof, cease to do business as a going concern, liquidate or dissolve or (y) merge into or consolidate with any Person in a transaction as a result of which Holdings is not the surviving Person, or sell, transfer or otherwise dispose of all or substantially all of its properties and assets (in one or more related transactions) to any Person, unless;

(i)    the Person surviving such merger or consolidation (if other than the Credit Parties) or the Person which acquires by sale, transfer or other disposition all or substantially all of the properties and assets of Holdings shall be a corporation, limited liability company, partnership or trust, shall be organized and validly existing under the laws of an applicable jurisdiction permitted hereunder and shall expressly assume, by an amendment hereto, executed and delivered to the parties hereto, in form and substance reasonably satisfactory to the Administrative Agent, Holdings' obligations under this Agreement and the other Credit Documents to which it is a party;

(ii)    immediately before and after giving effect to such transaction, no Event of Default shall have occurred and be continuing;

(iii)    [Reserved];

(iv)    no Change of Control shall result therefrom; and

(v)    Holdings or successor Person has delivered to the Administrative Agent an officers' certificate that all conditions precedent herein provided for relating to such transaction have been complied with.

Upon any such merger or consolidation, the successor Person formed thereby, or in the case of any such sale, transfer or other disposition, the Person which acquires by sale, transfer or other disposition, shall succeed to, and be substituted for, and may exercise every right and power of, the Borrowers or the applicable Subsidiary under the Credit Documents with the same effect as if such successor Person had been named a Credit Party herein, and thereafter, in the case of any such sale, transfer or other disposition, the predecessor Person shall be relieved of all obligations and covenants under this Agreement and the other Credit Documents.

To the extent the Required Lenders waive the provisions of this Section 9.02 with respect to the sale of any Collateral, or any Collateral is sold as permitted by this Section 9.02 (other than to a Credit Party), such Collateral shall be sold free and clear of the Liens created by the Security Documents, and the Administrative Agent and the Collateral Agent shall be authorized to take any actions deemed appropriate in order to effect and/or evidence the foregoing.

9.03    Restricted Junior Payments.

(a)    The Credit Parties may not authorize, declare or pay any Restricted Junior Payments, except to the extent provided for in the Approved Budget and the Orders.

(b)    Holdings agrees that it will not, and will not permit any Credit Party to, authorize, declare or pay any Dividend to any holder of any Equity Interest in Holdings.

(c)    Each of the Credit Parties further agrees that it will not amend or modify the terms of the Pre-Petition WAC Documents unless consented to in writing by the Required Lenders or, solely in connection with any lease novations, the granting of additional security documents or modifications.

9.04    <u>Indebtedness</u>. Each Credit Party will not contract for, create, incur, assume or suffer to exist any Indebtedness, except:

(a)    Indebtedness incurred pursuant to this Agreement and the other Credit Documents;

(b)    (x) Existing Indebtedness outstanding on the Closing Date and listed on Schedule 9.04(b) (as reduced by any repayments of principal thereof), without giving effect to any subsequent extension, renewal or refinancing thereof, and (y) Indebtedness outstanding on the Petition Date under the WAC Facilities;

(c)    Indebtedness under the Interest Rate Protection Agreements and Hedging Agreements in effect on the Petition Date;

(d)    Indebtedness constituting (i) Intercompany Loans on the Petition Date, (ii) Intercompany Loans within a WAC Group and (iii) Net WAC Group Intercompany Claims and Net WLIL Intercompany Claims;

(e)    Indebtedness (x) consisting of unsecured guaranties by a Borrower and the Wholly-Owned Subsidiaries of the Borrowers of each other's Indebtedness and of each other's lease and other contractual obligations permitted under this Agreement and (y) under or in connection with any bonding, surety or other arrangements of each other's Indebtedness and lease and other contractual obligations permitted under this Agreement;

(f)    Indebtedness owed to any Person providing property, casualty, liability, or other insurance to a Credit Party, so long as the amount of such Indebtedness is not in excess of the amount of the unpaid cost of such insurance, and shall be incurred only to defer the cost of such insurance for the period in which such Indebtedness is incurred and such Indebtedness is outstanding only for a period not exceeding six (6) months;

(g)    Indebtedness under (x) performance bids or litigation or appeal bonds, in each case in the ordinary course of business or (y) statutory bonds in connection with the formation of Eligible Entities;

(h)    endorsements of instruments for collection, deposit or negotiation incurred, in each case, in the ordinary course of business;

(i)    unsecured Indebtedness incurred in lieu of paying an indemnification or reimbursement obligation to a director or officer of a Credit Party pursuant to indemnification arrangements between such persons to the extent permitted by the relevant indemnification arrangement on the Petition Date; and

#4848-3242-6112v16

(j)      Indebtedness incurred in connection with obtaining bonds and surety arrangements or similar arrangements in connection with the enforcement of any lease or to prevent or terminate possession of any Aircraft by any Governmental Authority or third party.

9.05    <u>Borrowings, Investments and Loans</u>.  The Credit Parties will not directly or indirectly, lend money or credit or make advances to any Person, or purchase or acquire any stock, obligations or securities of, or any other Equity Interest in (other than as permitted under Section 9.02), or make any capital contribution to, any other Person, or purchase or own a futures contract, or otherwise become liable for the purchase or sale of currency or other commodities at a future date, in each case, in the nature of a futures contract (each of the foregoing, an "<u>Investment</u>" and, collectively, "<u>Investments</u>"), except that the following shall be permitted:

(a)      the Credit Parties may acquire and hold accounts receivables owing to any of them, if created or acquired in the ordinary course of business and payable or dischargeable in accordance with customary trade terms of the Credit Parties;

(b)      the Credit Parties may acquire and hold cash and Cash Equivalents;

(c)      the Credit Parties may hold the Investments held by them on the Petition Date and described on Schedule 9.05; <u>provided</u>, <u>however</u>, that any additional Investments made with respect thereto shall be permitted only if permitted under the other provisions of this Section 9.05 or elsewhere in this Agreement;

(d)      the Credit Parties may acquire and own investments (including debt obligations) received in connection with the bankruptcy or reorganization of suppliers and customers and in good faith settlement of delinquent obligations of, and other disputes with, customers and suppliers arising in the ordinary course of business;

(e)      any Credit Party may make Intercompany Loans to any other Credit Party that is within the same WAC Group and the Net WAC Group Intercompany Claim and Net WLIL Intercompany Claim;

(f)      the Credit Parties may make additional non-cash Investments in Aircraft or other aircraft or in the Equity Interests of their respective Subsidiaries created or acquired in accordance with the terms of this Agreement; and

(g)      the Credit Parties may make non-cash advances in the form of a prepayment of the purchase price of aircraft to the manufacturer thereof or expenses to vendors, suppliers and trade creditors consistent with their past practices, so long as such expenses were incurred in the ordinary course of business of such Credit Party.

9.06    <u>Transactions with Affiliates</u>.  No Credit Party shall enter into any transaction or series of related transactions with any:

(a) Affiliates of any Credit Party other than (x) within the same WAC Group and (y) in the ordinary course of business and on terms and conditions substantially as favorable to such Credit Party as would reasonably be obtained by such Credit Party at that time in a comparable arm's-length transaction with a Person other than an Affiliate, except that the Credit Parties may enter into any loans or other transactions with Affiliates of any Credit Party to the extent permitted by Sections 9.02, 9.03, 9.04 and 9.05; or

(b)    officer, employee, director or agent of any Credit Parties or any Affiliates of such Credit Parties, other than in the ordinary course of business and on terms and conditions substantially as favorable to such Credit Party as would reasonably be obtained by such Credit Party at that time in a comparable arm's-length transaction with a Person other than an officer, employee, director or agent of such Credit Party or any Affiliate thereof, except (i) customary indemnities and reimbursements may be paid to directors and officers of the Manager, the Borrowers and any Subsidiary of the Borrowers and (ii) customary fees may be paid to directors of any Subsidiary of the Borrowers.

Notwithstanding anything to the contrary contained above in this Section 9.06, in no event shall the Credit Parties pay any management, consulting or similar fee to any of their respective Affiliates except, if contemplated by the Approved Budget, in compliance with the Approved Budget, and subject to Bankruptcy Court approval (with parties in interest having had an opportunity to object).

9.07    <u>Modifications of Aircraft Related Documents, State of Registration, Certificate of Incorporation, By-Laws and Certain Other Agreements; Limitations on Voluntary Payments, etc.</u>   The Credit Parties will not:

(a)    amend, modify, change or waive any term or provision of any Aircraft Related Document related to a Mortgaged Aircraft unless such amendment, modification, change or waiver is in accordance with the Manager's customary practices and does not violate the Core Lease Provisions;

(b)    amend, modify, change or waive any term or provision of any Eligible Lease if such amendment, modification, change or waiver could reasonably be expected to have a Material Adverse Effect; or

(c)    change, or permit the related Eligible Entity to change, or, if the related Eligible Entity has the right under the terms of the Sublease or Sub-Sublease to consent thereto, consent to any request by a Sublessee or Sub-Sublessee, to change the Registration of such Mortgaged Aircraft to a jurisdiction other than a Permitted Jurisdiction or lease such Mortgaged Aircraft to an Eligible Lessee if such Eligible Lessee is organized under the laws of or has its chief executive or principal office located in a jurisdiction other than a Permitted Jurisdiction.

In the case of any change in the Registration of any Mortgaged Aircraft from one Permitted Jurisdiction to another Permitted Jurisdiction or any change in the jurisdiction of organization or location of the chief executive or principal office of any Lessee from one Permitted Jurisdiction to another Permitted Jurisdiction, no prior written consent of the Administrative Agent shall be required, but the Borrowers will ensure that the Administrative Agent shall have received such further documentation and evidence as the Administrative Agent may reasonably request relating to such proposed lease and jurisdiction, tax and insurance documentation and officers certificates), reasonably satisfactory in form and substance to the Administrative Agent, including evidence that:

(1)    after giving effect to such change in Registration, the insurance requirements of Section 8.03 are satisfied in respect of such Mortgaged Aircraft;

(2)    the Mortgaged Aircraft is registered (or, in the case of any Aircraft which will have a State of Registration other than the United States, is in the process of being registered) in the name of the relevant Credit Party or Lessee Party with the Aviation Authority in the State of Registration, free of all Liens other than Permitted Liens, with the interests of the relevant Credit Party, as owner, noted to the extent permissible in accordance with applicable law; <u>provided</u>, <u>however</u>, that in any case where a Mortgaged

Aircraft which will have a State of Registration other than the United States is in the process of being registered, the Borrowers shall have caused completed filings in the proscribed form relating to such registration to be submitted to the relevant Aviation Authority in the relevant jurisdiction prior to the relevant Pledge and shall cause such registrations to be completed as promptly as practicable but in any event no later than thirty (30) days after the date of such change in Registration;

(3)     any value added tax, customs duty, tariff or similar governmental charge relating to the change in jurisdiction or registration of such Aircraft, or the import thereof, shall have been paid or adequately provided by the Borrowers or the relevant Lessee Party to the reasonable satisfaction of the Administrative Agent;

(4)     true copies of the relevant Operator's air operator's certificate issued by the relevant Aviation Authority with respect to aircraft of the same type as the Aircraft and the certificate of airworthiness in respect of the Aircraft issued by the relevant Aviation Authority;

(5)     each other Aircraft Related Document and each of the material documentary conditions precedent in connection with such a change in Registration that were not previously delivered to the Administrative Agent in connection with such Mortgaged Aircraft; and

(6)     such actions as required elsewhere under this Agreement in connection therewith shall have been accomplished.

All reasonable costs and expenses (including reasonable legal fees and expenses) of the Administrative Agent and the Collateral Agent incurred in connection with any such re-registration or lease shall be paid by the Borrowers.  Such costs and expenses, to the extent incurred, shall include the following:  (A) the fees and disbursements of United States counsel to the Administrative Agent and the Collateral Agent and of counsel to the Administrative Agent and the Collateral Agent in the country of registry or lease; (B) notarization, translation, filing or recordation fees, taxes or similar payments incurred in connection with the registration of the Mortgaged Aircraft, registration of the Mortgage and the creation and perfection of the security interests herein and therein to the extent applicable; (C) any costs and expenses incurred in connection with any UCC filings or other filings necessary to continue in the United States or any other applicable jurisdiction the perfection of the security interests herein and in the Mortgaged Aircraft and the Eligible Lease or Intermediate Lease and in connection with the recording of the International Interests under the Cape Town Convention; and (D) any other costs, expenses or taxes, whether initial or continuing, incurred by the Collateral Agent as a result of the re-registration of the applicable Mortgaged Aircraft, or the creation of the security interest therein, under the country of re-registry.

In addition to the above, prior to any such re-registration or lease, the Collateral Agent shall have received assurances, reasonably satisfactory to it, to the effect that (I) the insurance provisions of this Agreement will have been complied with after giving effect to such change of registry; (II) the original indemnities (and any additional indemnities for which the Borrowers are then willing to enter into a binding agreement to indemnify) in favor of the Administrative Agent, the Collateral Agent, the Lenders and the other Indemnified Persons under this Agreement afford each such party substantially the same protection as provided prior to such change of registry or lease; and (III) such change will not result in the imposition of, or increase in the amount of, any Tax assessed against the Administrative Agent, the Collateral Agent, any Lender or any other Indemnified Person not arising as a result of any of such Person's activities in such jurisdiction for which the Borrowers are not required to indemnify (and any additional indemnities for which the Borrowers are then willing to enter into a binding agreement to indemnify).

(d)    amend, modify or change its certificate or articles of incorporation (including, without limitation, by the filing or modification of any certificate or articles of designation), certificate of formation, limited liability company agreement, trust agreement or by-laws (or the equivalent organizational documents), as applicable, or any agreement entered into by it with respect to its capital stock or other Equity Interests, or enter into any new agreement with respect to its capital stock or other Equity Interests (as required by applicable law or otherwise required), unless such amendment, modification, change or other action contemplated by this clause (c) could not, individually or in the aggregate, when considered with all such other amendments, modifications, changes or other actions, reasonably be expected to be materially adverse to the interests of the Lenders; and

(e)    amend, modify or change any provision of any tax sharing agreement or enter into any new tax sharing agreement, tax allocation agreement or similar agreement unless such amendment, modification or change or new tax sharing agreement could not reasonably be expected to be materially adverse to the interests of the Lenders.

9.08    Business; etc.    Notwithstanding the foregoing or anything else in this Agreement to the contrary, the Credit Parties will not engage in any business or own any significant assets or have any material liabilities other than (i) its ownership of the capital stock of its Subsidiaries, (ii) holding cash and Cash Equivalents at any time (together with any investment income thereon), (iii) those liabilities which it is responsible for under this Agreement and the other Documents to which it is a party, (iv) liabilities arising in the ordinary course of its permitted business, including for intercompany charges), (v) liabilities arising from being a member of a consolidated or group tax return or report or from consolidated accounts, in each case with such consolidation taking place at the Holdings level and (vi) activities and liabilities that are incidental to (A) the maintenance of its existence in compliance with applicable law and (B) legal, tax and accounting matters in connection with any of the foregoing activities.

9.09    Limitation on Creation of Subsidiaries.    The Borrowers will not and will procure that each Eligible Entity will not create (excluding for this purpose, any Subsidiaries existing on the Petition Date) any Subsidiaries except for (i) new Eligible Entities in connection with the acquisition of an Aircraft and (ii) new Wholly-Owned Subsidiaries for the purposes of facilitating the leasing of an Aircraft (which purposes may include, without limitation, the elimination or minimization of taxes or registration of an Aircraft) (each, an "Intermediate Subsidiary") so long as such Intermediate Subsidiaries shall be organized in a jurisdiction that is in accordance with the Manager's customary practices and the Standard; provided, however, in each instance that such jurisdiction is a Permitted Jurisdiction and would recognize the title, beneficial ownership or leasehold interest, as the case may be, of such Eligible Entity or Intermediate Subsidiary in such Aircraft.

9.10    Sanctions; Anti-Corruption.

(a)    Each of the Credit Parties covenants that:

(i)    The Credit Parties and their respective directors, or officers and, to the knowledge of Holdings and the other Credit Parties, their respective Affiliates, employees or agents, as well as any Lessee Party will not knowingly engage in any dealings or transactions with any Restricted Parties in any manner that would reasonably be expected to result in any Secured Party, Credit Party or Lessee Party being in breach of any Sanctions or becoming a Restricted Party.

(ii)    None of the funds or assets of Holdings or its Subsidiaries that are used to repay or prepay the Term Loans shall constitute the property of, or shall be beneficially owned by, any Restricted Party.

(iii)    [reserved].

(iv)    The Credit Parties will not authorize the operation or location of a Mortgaged Aircraft, at any time, in any Sanctioned Jurisdiction, in any manner that would reasonably be expected to result in any Secured Party, Credit Party or Lessee Party being in breach of any Sanctions or becoming a Restricted Party; provided, however, that breach of this Section 9.10(a)(iv) shall not result in a Default or an Event of Default under Section 10.02 or 10.03 if such operation or location is attributable to circumstances outside the control of any Credit Party or any Lessee Party and limited to hijacking, acts of war or similar action, medical emergency, equipment malfunction, weather conditions, navigational error or such other actions taken on an emergency basis by the relevant crew members of such Mortgaged Aircraft and such breach is remedied as soon as practicable under such circumstances (and in any case no later than thirty (30) Business Days from when such Credit Party became aware of such breach.

(b)    No Credit Party will, or will permit or authorize any other person to, use, lend, make payments of, contribute, or otherwise make available, in each case directly or indirectly all or any part of the proceeds of any Term Loan or other transaction contemplated by this Agreement to fund any trade, business, or other activity:

(i)    involving or for the benefit of any Restricted Party; or

(ii)    in any other manner that would result in any Secured Party, Credit Party or Lessee Party being in breach of any Sanctions or becoming a Restricted Party.

(c)    Each Credit Party will not by act or omission, violate any applicable Anti-Corruption Laws.

(d)    The Credit Parties will not engage in any dealings or transactions in any manner in Sudan and/or South Sudan, with the exception of humanitarian operations involving the United Nations or other international aid agency relief missions disclosed to the Lenders.

(e)    The covenant set out in this Section 9.10 relating to Sanctions shall not apply to, nor be made in favor of, any Restricted Lender.

9.11    [Reserved].

9.12    Tax Status.  Each Credit Party shall endeavor in good faith not to (other than Subsidiaries of Credit Parties organized under the laws of a state of the United States that are or are treated as corporations for federal income tax purposes) be engaged in the conduct of a U.S. trade or business through a permanent establishment.

9.13    Manager's Credit Policies and Procedures.  The Manager shall not amend the Manager's Credit Policies and Procedures in any manner that is materially adverse to the Lenders without the consent of the Required Lenders, which shall not be unreasonably withheld.  For the avoidance of doubt, changes in process or procedures so that exceptions to a policy guideline are reviewed and approved or denied by a credit, investment or similar committee composed of members of management of the Manager instead of the Board of Directors of the Manager, shall not be a change that requires the consent of the Administrative Agent (provided that the Manager shall provide prompt notice of any such changes to the Administrative Agent for delivery to the Lenders).

9.14    <u>Permitted Currencies</u>.  The Borrowers shall not, and shall not permit any of its Subsidiaries to, enter into any Eligible Lease that provides for payment of Scheduled Payments in any currency other than Dollars, Euros, U.K. Pounds, Swiss Francs, Norwegian Krone, Australian Dollars or Canadian Dollars, except with the prior written consent of the Administrative Agent, such consent not to be unreasonably withheld.

9.15    <u>Insurance</u>.  The Credit Parties will not knowingly operate or locate a Mortgaged Aircraft, or knowingly permit the Mortgaged Aircraft to be operated or located, at any time, in a geographic area or in any manner not covered in all respects by the Insurances or war risks insurance provided by Brazil, Canada, the United States of America or any other government as reasonably consented to in writing by the Administrative Agent; <u>provided</u>, <u>however</u>, that breach of this Section 9.15 shall not result in a Default or an Event of Default under Section 10.02 or 10.03 if such operation or location is attributable to circumstances outside the control of any Credit Party or any Lessee Party and limited to hijacking, acts of war or similar action, medical emergency, equipment malfunction, weather conditions, navigational error or such other actions taken on an emergency basis by the relevant crew members of such Mortgaged Aircraft and such breach is remedied as soon as practicable under such circumstances (and in any case no later than thirty (30) Business Days from when such Credit Party became aware of such breach).

9.16    <u>Rights of Subrogation or Contribution</u>.  No Credit Party shall assert any right of subrogation or contribution against any other Credit Party until all Term Loans are repaid in full and the Term Loan Commitments are terminated.

9.17    <u>Payments</u>.  No Credit Party shall make any payment of principal or interest or otherwise on account of any Indebtedness outstanding on the Petition Date, other than (a) Adequate Protection or payments agreed to in writing by the Required Lenders and authorized by the Bankruptcy Court or (b) with respect to WAC 10, to the extent any payment of Indebtedness outstanding under WAC 10 is funded with either the cash of or the proceeds from assets of the obligors of such Indebtedness.

9.18    <u>Superpriority Claims; Adequate Protection</u>.  Other than as set forth in the Orders, or as may be consented to by the Administrative Agent (at the direction of the Required Lenders), no Credit Party shall incur, create, assume, suffer to exist or permit (i) any superpriority administrative expense claim with the same priority or senior to the superpriority claims of the Administrative Agent, the Collateral Agent and the Lenders granted by the Bankruptcy Court Order, or apply to the Bankruptcy Court for authority to do so or (ii) any obligation to make adequate protection payments, or otherwise provide adequate protection to any Person, other than as set forth in the Orders.

9.19    <u>Chapter 11 Orders</u>.  No Credit Party shall make or permit to be made any change, amendment or modification, or any application or motion for any change, amendment or modification, to the Cash Management Order or the Orders without the prior written consent of the Required Lenders (which shall not be unreasonably withheld).

SECTION 10.    <u>Events of Default</u>.    Upon the occurrence of any of the following specified events (each, an "<u>Event of Default</u>"):

10.01    <u>Payments</u>.    (a) The Credit Parties shall fail to pay when due hereunder any principal amount of the Term Loans on the Maturity Date or upon the date that any mandatory repayment is required under Section 4.02 or elsewhere in this Agreement (other than under Section 2.08(d)), (b) the Credit Parties shall fail to pay when due hereunder any principal amount of the Term Loans upon the date that any mandatory repayment is required under Section 2.08(d) and

such failure shall continue unremedied for three (3) or more Business Days, (c) the Credit Parties shall fail to pay any amount of interest on the Term Loans when due and owing and such failure shall continue for three (3) or more Business Days or (d) the Credit Parties shall fail to pay when due and owing any Fees or any other amounts owing hereunder or under any other Credit Document and such failure shall continue unremedied for three (3) or more Business Days after the Manager's receipt of notice thereof from a Lender; or

10.02    _Specific Covenants_.  Any Credit Party shall default in the due performance or observance by it of any term, covenant, obligation, undertaking or agreement binding on it contained in Section 8.01(d)(i), 8.01(d)(iv), 8.01(k), 8.01(l), 8.27(b), 8.28, 8.29 or Section 9; or

10.03    _Insurances_.  Subject to the proviso in Section 9.15, Insurances satisfying the terms and conditions of Section 8.03 shall fail to be in full force and effect at any time (after giving effect to the applicable notice periods required as a condition to termination or cancellation thereof) with respect to any of the Collateral Agent, the Administrative Agent or the Lenders as provided in Section 8.03 and such failure shall continue unremedied for five (5) or more Business Days after the Manager's receipt of notice thereof from the Administrative Agent; _provided_, _however_, such remedy period shall only apply if there is secondary coverage in place in respect of the Mortgaged Aircraft which is substantially equivalent in all particulars to the insurance required to be delivered pursuant to Section 8.03 and evidence thereof has been delivered to the Administrative Agent and any Lender at their request; or

10.04    _Other Defaults_.  Any Credit Party shall default in the due performance or observance by it, of any other term, covenant, obligation, undertaking or agreement contained in this Agreement (other than those set forth in Sections 10.01 through 10.03 inclusive) or any other Credit Document and, to the extent capable of being remedied, such default shall continue unremedied for a period of fifteen (15) days after the date on which written notice thereof is given to the Manager by the Administrative Agent or the Required Lenders; or

10.05    _Representations, Etc_.  Any representation, warranty or statement made or deemed made by any Credit Party herein or in any other Credit Document or in any certificate delivered to the Administrative Agent, the Collateral Agent or any Lender pursuant hereto or thereto shall prove to be untrue in any material respect on the date as of which made or deemed made and, to the extent capable of being remedied, such default shall continue unremedied for a period of fifteen (15) days after the date on which written notice thereof is given to the Manager by the Administrative Agent or the Required Lenders; _provided_, _however_, that in the case of any representation, warranty or statement that is qualified as to "materiality," "Material Adverse Effect" or similar language it shall be an Event of Default if such representation or warranty shall prove to be untrue in any respect; or

10.06    [Reserved]; or

10.07    _Cross-Default to Other Agreements_.  Any default or other event shall occur under any agreement for Indebtedness of Holdings or any of its Subsidiaries (other than under this Agreement), in each case incurred on or after the Petition Date, having an aggregate outstanding principal amount of $3,000,000 or more, and such default or other event shall (i) consist of the failure to make any payment in excess of $1,000,000 when due in respect of such Indebtedness (whether at scheduled maturity, by required prepayment, acceleration, demand or otherwise) after giving effect to any applicable grace period, if any, specified in the agreement or instrument relating to any such Indebtedness or (ii) result in the acceleration of any such Indebtedness (for the avoidance of doubt, this includes any accelerated Indebtedness guaranteed by Holdings or any of its Subsidiaries); _provided_, _however_, that solely for the purposes of this Section 10.07, the term "Indebtedness" shall

not (i) include the purchase price of property or services in the ordinary course of business, except for any unpaid balance of the purchase price of property or services which is due more than ninety (90) days after the purchase of such property or services and which is financed on a conditional sale or installment sale basis or in another manner that is equivalent to borrowed money (exclusive of any balance constituting (A) a trade payable or similar obligation to a trade creditor deferred in the ordinary course of business or (B) earn-out or similar obligations, until, in the case of clause (B), such obligation becomes an accrued liability on the balance sheet in accordance with GAAP) or (ii) obligations under any Hedging Agreements or Interest Rate Protection Agreements; or

10.08   Credit Documents.  (i) The Interim Order and the Final Order, as applicable together with the Credit Documents shall cease to be, or shall be asserted in writing by any Credit Party or any Person acting for or on behalf of such Credit Party not to be, in full force and effect or (ii) the Security Document shall cease to, or shall be asserted by any Credit Party or any Person acting for or on behalf of such Credit Party not to, create a perfected, first priority security interest in, and Lien on, all of the Collateral, in favor of the Collateral Agent, superior to and prior to the rights of all third Persons (except as permitted by Section 9.01), and subject to no other Liens (other than Permitted Liens, other than liens granted to the WAC Facilities), except in each case as provided in this Agreement (including, without limitation, Section 6) or in the applicable Security Documents; or

10.09   Guaranties.  Any Guaranty shall cease to be in full force or effect as to any Guarantor, or any Guarantor or any Person acting for or on behalf of such Guarantor shall deny or disaffirm such Guarantor's obligations under the Guaranty to which it is a party; or

10.10   Judgments.  Except for matters subject to the automatic stay, one or more judgments or decrees, in each case following the Petition Date, shall be entered against the Credit Parties or any Subsidiary of any Credit Party involving a liability for the payment of money (not paid or to the extent not covered by a reputable and solvent insurance company) and such judgments and decrees either shall be final and non-appealable or shall not be vacated, discharged or stayed (including as a result of the automatic stay of the Cases) or bonded pending appeal for any period of thirty (30) consecutive days, and the aggregate amount of all such judgments in respect of the Credit Parties shall exceed $3,000,000; or

10.11   ERISA.  Subject to the Approved Budget covenant set forth in Section 8.28, and other than as a result of the Cases:

(a)   (i) one or more ERISA Events shall have occurred, or (ii) there is or arises an Unfunded Pension Liability (taking into account only Plans with positive Unfunded Pension Liability);

(b)   there shall result from any such event or events described in clause (a) the imposition of a Lien or the granting of a security interest on any assets of the Credit Parties, or the incurring of a liability by the Credit Parties; and

(c)   such Lien, security interest or liability, individually or in the aggregate, has had or would be reasonably expected to have, a Material Adverse Effect; or

10.12   Dismissal or Conversion of Cases; Appointment of Trustee or Examiner.

(a)   a motion seeking conversion of any of the Cases (other than the Case of a debtor that is an obligor under a Non-Participating WAC Credit Facility) pending under Chapter 11 of the Bankruptcy Code to Cases under Chapter 7 of the Bankruptcy Code shall be filed by any Credit Party, or an order shall be entered which dismisses or converts the Cases (other than the Case of a debtor that is an

#4848-3242-6112v16

obligor under a Non-Participating WAC Credit Facility) to a case under Chapter 7 of the Bankruptcy Code or the Credit Parties shall support or fail to contest in good faith the entry of any such order; or

(b)    an order shall be entered in any of the Cases directing the appointment of (i) a trustee under section 1104 of the Bankruptcy Code or (ii) an examiner (other than a fee examiner) under section 1106(b) of the Bankruptcy Code having expanded powers relating to the operation of the business (beyond those set forth under sections 1106(a)(3) and (4) of the Bankruptcy Code in any of the Cases (other than the Case of a debtor that is an obligor under a Non-Participating WAC Credit Facility); or

10.13    Certain Orders.

(a)    The violation of any material terms, provisions and conditions of the Interim Order or Final Order;

(b)    subject to any Permitted Variances, any adverse deviation by the Credit Parties from the Approved Budget;

(c)    any order shall be entered  without the consent of all Lenders which dismisses any of the Cases of the Credit Parties and which order does not provide for payment in full in cash of the Secured Obligations (other than contingent indemnification obligations not yet due and payable) or the Credit Parties shall seek, support or fail to contest in good faith the entry of any such order;

(d)    the Interim Order (prior to the Final Order Entry Date) or the Final Order (on and after the Final Order Entry Date) shall cease to create a valid and perfected Lien on the Collateral or to be in full force and effect, shall have been reversed, modified, amended, stayed, vacated, or subject to stay pending appeal, in the case of modification or amendment, without prior written consent of the Required Lenders (or the Administrative Agent with the consent of the Required Lenders, which consent shall not be unreasonably withheld); or

(e)    any Credit Party shall file a motion seeking, or the Bankruptcy Court shall enter an order granting, the termination or modification of the exclusive right of any Credit Party to file a Chapter 11 plan pursuant to section 1121 of the Bankruptcy Code, other than an order pursuant to a motion filed by or with the consent of the Required Lenders; or

(f)    any Credit Party shall file a motion seeking to obtain additional or replacement financing from a party other than the Lenders under section 364 of the Bankruptcy Code, except with the express written consent of Required Lenders; or

(g)    any Credit Party shall file a motion seeking, or the Bankruptcy Court shall enter, an order (i) approving payment of any prepetition claim (or the Credit Parties shall otherwise make a payment on any prepetition claim) other than (x) as authorized in the Approved Budget, (y) otherwise consented to by the Required Lenders in writing, and (z) authorized by the Bankruptcy Court pursuant to the "first day" or "second day" orders; (ii) granting relief from the automatic stay in effect under section 362 of the Bankruptcy Code to any holder of any security interest to permit foreclosure on any assets having a book value in excess of $1,000,000 in the aggregate or to permit other actions that would have a Material Adverse Effect; or (iii) approving any settlement of any prepetition claim, or any action, proceeding, or other stipulation with respect to any prepetition claim in excess of $1,000,000 not approved by the Required Lenders; or

(h) (i) any Credit Party shall attempt to invalidate, reduce or otherwise impair the Liens or security interests of the Secured Parties or to charge any Collateral pursuant to section 506(c) of the

Bankruptcy Code or (ii) any action is commenced by the Credit Parties which contests the validity, perfection or enforceability of any of the Liens and security interests of the Secured Parties created by any of the Credit Documents; or

(i) (i) any Credit Party shall seek to, or shall support (in any such case by way of any motion or other pleading filed with the Bankruptcy Court or any other writing to another party-in-interest executed by or on behalf of such Credit Party) any other Person's request to, disallow in whole or in part the Lenders' claim in respect of the Secured Obligations or contest any material provision of any Credit Document or any material provision of any Credit Document shall cease to be effective or (ii) the Bankruptcy Court shall enter an order granting any Lien or claim which is senior to or pari passu with the Liens granted under the Credit Documents without the prior written consent of the Administrative Agent (or any motion shall be filed by any Credit Party seeking such relief); or

(j) (i) any Credit Party shall file with the Bankruptcy Court a plan of reorganization that is not an Acceptable Plan of Reorganization which is not withdrawn, dismissed or denied within five (5) Business Days of filing or (ii) the Bankruptcy Court shall enter an order confirming a plan of reorganization or liquidation that is not an Acceptable Plan of Reorganization; or

(k) any Credit Party shall seek approval of a sale of any DIP Collateral or WAC Specific Collateral or approval of bidding procedures for such sale (whether implemented through a plan of reorganization or otherwise) that would be inconsistent with the terms of this Agreement  without the prior written consent of the Required Lenders,

then, and in any such event, and at any time thereafter, if any Event of Default shall then be continuing, the Administrative Agent may, and upon the written request of the Required Lenders, shall, take any or all of the following actions, without prejudice to the rights of the Administrative Agent or any Lender to enforce its claims against any Credit Party (i) by notice to the Borrowers, declare the Term Loan Commitment terminated, whereupon all Term Loan Commitments of each Lender shall forthwith terminate immediately and any commitment fee shall forthwith become due and payable without any other notice of any kind; (ii) by notice to the Borrowers, accelerate and declare the principal of and any accrued interest in respect of all Term Loans and all Secured Obligations owing hereunder and thereunder to be, whereupon the same shall become, forthwith due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby waived by each Credit Party; (iii) instruct the Collateral Agent to enforce in accordance with the provisions of the Orders and the Credit Documents all of the Liens and security interests created pursuant to the Orders and the Security Documents; (iv) enforce each Guaranty; (v) instruct the Collateral Agent to apply any cash Collateral held by the Collateral Agent or the Administrative Agent in a Pledged Account to the repayment of the Secured Obligations; (vi) exercise, or instruct the Collateral Agent to exercise, any other right or remedy available against any Credit Party under the Orders, any of the other Credit Documents or under applicable law, and (vii) (A) terminate the DIP Facility as to any future liability or obligation of the Administrative Agent, the Collateral Agent and the Lenders, but without affecting any of the obligations under the DIP Facility, the Liens under the DIP Facility, or post-petition administrative superpriority claim status, subject to the Carve-Out provisions in the Orders and (B) upon three (3) Business Days' notice to the Credit Parties and the Administrative Agent, declare a termination, reduction or restriction on the ability of the Credit Parties to use any cash collateral derived solely from the proceeds of Collateral, underlined provided that any Credit Party or any party in interest shall be entitled to seek an emergency hearing with the Bankruptcy Court seeking to stay such termination.

After the occurrence of an Event of Default and in connection with the liquidation or other disposition of Collateral after the exercise of remedies provided for in Section 10 (or after any of the Loans have automatically become immediately due and payable), the Administrative Agent and the Lenders hereby agree that they will exercise remedies against the Collateral in the following order:

#4848-3242-6112v16

<u>first</u>,  from any amounts maintained in the DIP Funding Account;

<u>second</u>, from any Collateral that is not WAC Specific Collateral; and

<u>third</u>, on no less than 15 days notice to the relevant agent for the Participating WAC Credit Facility from each WAC Group's WAC Specific Collateral up to but not exceeding the amount of such WAC Group's applicable Net WLIL Intercompany Claim, if any; <u>provided</u> that during such 15 day period the secured parties under such Participating WAC Credit Facility may elect to succeed to the Liens under this DIP Facility in respect of the WAC Specific Collateral by paying the Administrative Agent cash in an amount of the Net WLIL Intercompany Claim.

Subject to the provisions of the Interim Order (or, if applicable, the Final Order), (x) with respect to enforcement of liens or remedies with respect to any Collateral other than the DIP Funding Account, Administrative Agent shall provide a Trigger Notice to the Borrowers, the U.S. Trustee and the agents for the Participating WAC Credit Facilities three Business Days' prior to taking such action (the "<u>Remedies Notice Period</u>"), and (y) after expiration of the Remedies Notice Period, the Administrative Agent shall, at the request of, or may, with the consent of, the Required Lenders, exercise all other rights and remedies provided for in the Credit Documents, the Orders and under applicable law.

During the Remedies Notice Period, the Debtors may continue to use cash collateral for critical and necessary expenses set forth in the Approved Budget, including for the purpose of funding the Carve-Out (but in no event may the Borrowers make any insider payments (other than ordinary course payroll benefits and employee expense reimbursements) or other extraordinary payments).  During the Remedies Notice Period, any party in interest shall be entitled to seek an emergency hearing with the Bankruptcy Court seeking to stay the Administrative Agent's exercise of any rights and remedies and cash collateral may be used for this purpose during the Remedies Notice Period.

SECTION 11.   <u>The Administrative Agent; Collateral Agent; Lead Arrangers; etc</u>.

11.01   <u>Appointment</u>.

(a)    The Lenders hereby designate and appoint (x) Ankura Trust Company, LLC, as Administrative Agent and (y) Ankura Trust Company, LLC, as Collateral Agent (for purposes of this Section 11 (other than <u>Section 11.09</u>) and <u>Section 12.01</u>, the term "Administrative Agent" also shall include Ankura Trust Company, LLC in its capacity as Collateral Agent) to act as specified herein and in the other Credit Documents. Each Lender hereby irrevocably authorizes the Administrative Agent to take such action on its behalf under the provisions of this Agreement, the other Credit Documents and any other instruments and agreements referred to herein or therein and to exercise such powers and to perform such duties hereunder and thereunder as are specifically delegated to or required of the Administrative Agent by the terms hereof and thereof and such other powers as are reasonably incidental thereto. The Administrative Agent may perform any of its respective duties hereunder by or through any one or more sub-agents appointed by it or by or through its or such sub-agents' officers, directors, agents, employees or affiliates, and the exculpatory provisions of this Section 11 shall apply to any such sub-agent, officer, director, agent, employee or affiliate, and shall apply to their respective activities in connection with the syndication of the credit facilities under this Agreement as well as activities as Administrative Agent.  Notwithstanding anything to the contrary contained herein, and for the avoidance of doubt, to the extent that any of the Credit Documents permit or allow or authorize or require the Administrative Agent to (i) take actions or refrain from taking actions as contemplated by the terms of the Credit Documents, (ii) confirm or reasonably confirm its satisfaction or acceptance or agreement, (iii) make or reasonably make any determination or good faith determination, (iv) select or reasonably select any option, (v) provide or reasonably provide any consent or approval, (vi) not unreasonably withhold or delay its consent or approval, (vii) require or

reasonably require another party to take action, (viii) require or reasonably require another party to provide information, (ix) request or reasonably request any information, (x) request or reasonably request any action to be taken, (xi) consult with other parties in good faith, (xii) state its reasonable opinion, (xiii) use its reasonable commercial efforts, (xiv) exercise its option, or (xv) otherwise exercise its discretion or reasonable discretion or sole discretion and as provided herein, including Section 11.04 hereof. Notwithstanding anything to the contrary herein, all references in the Credit Documents to the Administrative Agent shall be interpreted to mean the Administrative Agent acting with the consent of or at the direction of the Required Lenders and shall not mean or imply that the Administrative Agent will be acting in its individual capacity or exercising its own discretion or judgment.

(b)      The Collateral Agent may, and upon instructions of the Required Lenders shall, by an instrument in writing delivered to the Manager, the Borrowers and the Lenders, appoint a bank or trust company or an individual to act as separate collateral agent or co-collateral agent with respect to any Credit Document in any jurisdiction where the Collateral Agent is disqualified from acting or for any other purpose deemed by the Collateral Agent or the Required Lenders to be necessary or desirable to preserve or protect the interests of the Secured Parties, such separate collateral agent or co-collateral agent to exercise only such rights and to have only such duties as shall be specified in the instrument of appointment (which rights and duties shall not exceed the rights or duties of the Collateral Agent set forth herein and which rights shall be exercised and duties shall be performed only as expressly set forth in such instrument or as set forth in written instructions from the Collateral Agent). Without limiting the generality of the foregoing, in the event that the Collateral Agent is required to acquire title to any property for any reason, or take any managerial action of any kind in regard thereto, in order to carry out any obligation for the benefit of the Secured Parties, the Collateral Agent reserves the right, instead of taking such action, to either resign as Collateral Agent or arrange for the transfer of the title or control of the asset to a separate collateral agent, co-collateral agent or court-appointed receiver. Each party hereto by its execution or other acceptance of the terms hereof agrees to the appointment of any such separate collateral agent, co-collateral agent or court-appointed receiver and the Borrowers further agree that, if and only if such appointment is required because the Collateral Agent is prohibited from holding or enforcing a security interest in the Collateral, or to acquire title to any property for any reason, located in such jurisdiction or the policy of the Collateral Agent otherwise prohibits it from doing so, they will cause to be paid the reasonable compensation and out-of-pocket costs and expenses of any such separate collateral agent, co-collateral agent or court-appointed receiver, which shall be deemed to be costs and expenses of the Collateral Agent for the purpose of Section 12.01 hereof. If requested by the Collateral Agent or such separate collateral agent, co-collateral agent or court-appointed receiver, each party hereto affected thereby will enter into an amendment to this Agreement in accordance with the requirements of Section 12.12, confirming the rights and duties of such separate collateral agent, co-collateral agent or court-appointed receiver.

(c)      The Collateral Agent may, and upon instructions of the Required Lenders shall, by an instrument in writing delivered to the Manager, the Borrowers and the Lenders, remove such bank or trust company or individual appointed to act as separate collateral agent, co-collateral agent or court-appointed receiver pursuant to Section 11.01(b) above. In case any such separate collateral agent, co-collateral agent or court-appointed receiver shall die, become incapable of acting, resign or be removed, all the assets, property, rights, powers, trusts, duties and obligations of such separate collateral agent, co-collateral agent or court-appointed receiver, as the case may be, so far as permitted by applicable law, shall vest in and be exercised by the Collateral Agent or its designee, without the appointment of a new successor to such separate collateral agent, co-collateral agent or court-appointed receiver unless and until a successor is appointed in the manner hereinbefore provided.

11.02   Nature of Duties. The Administrative Agent shall not have any duties or responsibilities except those expressly set forth in this Agreement and in the other Credit Documents. Neither the Administrative Agent nor any of its officers, directors, agents, employees or Affiliates, nor

any separate collateral agent or co-collateral agent appointed pursuant to Section 11.01(b), shall be liable for any action taken or omitted by it or them hereunder or under any other Credit Document or in connection herewith or therewith, unless caused by its or their gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable decision). The duties of the Administrative Agent shall be mechanical and administrative in nature; the Administrative Agent shall not have by reason of this Agreement or any other Credit Document a fiduciary relationship in respect of any Lender, either before or after the occurrence of a Default or Event of Default; and nothing in this Agreement or in any other Credit Document, expressed or implied, is intended to or shall be so construed as to impose upon the Administrative Agent any obligations in respect of this Agreement or any other Credit Document except as expressly set forth herein or therein. Without limiting the generality of the foregoing, in the event that the Collateral Agent is required to acquire title to any property for any reason, or take any managerial action of any kind in regard thereto, in order to carry out any obligation for the benefit of the Secured Parties, the Collateral Agent reserves the right, instead of taking such action, to either resign as Collateral Agent or arrange for the transfer of the title or control of the asset to a separate collateral agent, co-collateral agent or court appointed receiver.

11.03    Lack of Reliance on the Administrative Agent.    Independently and without reliance upon the Administrative Agent, each Lender, to the extent it deems appropriate, has made and shall continue to make (i) its own independent investigation of the financial condition and affairs of Holdings and its Subsidiaries in connection with the making and the continuance of the Term Loans and the taking or not taking of any action in connection herewith and (ii) its own appraisal of the creditworthiness of Holdings and its Subsidiaries and, except as expressly provided in this Agreement, the Administrative Agent shall not have any duty or responsibility, either initially or on a continuing basis, to provide any Lender with any credit or other information with respect thereto, whether coming into its possession before the making of the Term Loans or at any time or times thereafter. The Administrative Agent shall not be responsible to any Lender for any recitals, statements, information, representations or warranties herein or in any document, certificate or other writing delivered in connection herewith or for the execution, effectiveness, genuineness, validity, enforceability, perfection, collectability, priority or sufficiency of this Agreement or any other Credit Document or the financial condition of Holdings or any of its Subsidiaries or be required to make any inquiry concerning either the performance or observance of any of the terms, provisions or conditions of this Agreement or any other Credit Document, or the financial condition of Holdings or any of its Subsidiaries or the existence or possible existence of any Default or Event of Default.

11.04    Certain Rights of the Administrative Agent.    If the Administrative Agent requests instructions from the Required Lenders with respect to any act or action (including failure to act) in connection with this Agreement or any other Credit Document, the Administrative Agent shall be entitled to refrain from such act or taking such action unless and until the Administrative Agent shall have received instructions from the Required Lenders, and the Administrative Agent shall not incur liability to any Lender by reason of so refraining, provided that the Administrative Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Administrative Agent to liability or that is contrary to any Credit Document or applicable law, including for the avoidance of doubt any action that may be in violation of the automatic stay under the Bankruptcy Code or any other debtor relief law or that may effect a forfeiture, modification or termination of property of a Defaulting Lender in violation of any such debtor relief law. The Administrative Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement or any other Credit Document in accordance with a request or consent of the Requisite Lenders and such request and any action taken or failure to act pursuant thereto shall be binding upon all of the Lenders. No provision of this Agreement or any other Credit Document or any agreement or instrument contemplated hereby or thereby, the transactions contemplated hereby or thereby shall

#4848-3242-6112v16

require the Administration Agent to: (i) expend or risk its own funds or provide indemnities in the performance of any of its duties hereunder or the exercise of any of its rights or power or (ii) otherwise incur any financial liability in the performance of its duties or the exercise of any of its rights or powers.  Without limiting the foregoing, no Lender shall have any right of action whatsoever against the Administrative Agent as a result of the Administrative Agent acting or refraining from acting hereunder or under any other Credit Document in accordance with the instructions of the Required Lenders.

11.05   <u>Reliance</u>.  The Administrative Agent shall be entitled to rely, and shall be fully protected in relying, upon any note, writing, resolution, notice, statement, certificate, telex, teletype or telecopier message, cablegram, radiogram, order or other document signed, sent or made by any Person that the Administrative Agent believed to be the proper Person, and, with respect to all legal matters pertaining to this Agreement and any other Credit Document and its duties hereunder and thereunder, upon advice of counsel selected by the Administrative Agent (who may be counsel for the Borrower). In addition, the Lenders hereby authorize Milbank to provide written directions (which may be made by electronic mail) to the Administrative Agent on behalf of the Required Lenders in regards to the  Credit Documents and such other matters until such time as the Required Lenders or Milbank advise the Administrative Agent in writing that Milbank is no longer authorized to provide any written directions to the Administrative Agent on behalf of the Required Lenders.  The giving of any such direction by Milbank shall be deemed a reaffirmation by Milbank that such authorization from the Required Lenders has been duly given.   The Administrative Agent may rely on and act upon any such direction given by Milbank and need not inquire as to the due authorization thereof. Notwithstanding the foregoing, to the extent the Administrative Agent determines that any direction from Milbank requires any clarification or supplementation, the Administrative Agent shall promptly inform the Required Lenders or Milbank, as applicable, of such determination and the Required Lenders or Milbank, as applicable, shall promptly provide to the Administrative Agent one or more additional clarifying or supplementing directions.   Until such time as the Administrative Agent receives such additional direction or directions from the Required Lenders or Milbank, as applicable, the Administrative Agent shall be under no duty or obligation to take, or refrain from taking, any course of action for which the Administrative Agent has requested additional directions.

11.06   <u>Indemnification</u>.  To the extent the Administrative Agent (or any affiliate thereof) is not reimbursed and indemnified by the Borrowers, the Manager or any other Credit Party in accordance with the terms of this Agreement and the other Credit Documents, the Lenders will reimburse and indemnify the Administrative Agent (and any affiliate thereof) in proportion to their respective "percentage" as used in determining the Required Lenders (determined as if there were no Defaulting Lenders) for and against any and all liabilities, obligations, losses, damages, penalties, claims, actions, judgments, costs, expenses or disbursements of whatsoever kind or nature which may be imposed on, asserted against or incurred by the Administrative Agent (or any affiliate thereof) in performing its duties hereunder or under any other Credit Document or in any way relating to or arising out of this Agreement or any other Credit Document; <u>provided</u>, <u>however</u>, that no Lender shall be liable for any portion of such liabilities, obligations, losses, damages, penalties, claims, actions, judgments, suits, costs, expenses or disbursements resulting from the Administrative Agent's (or such affiliate's) gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable decision).

11.07   <u>The Administrative Agent in its Individual Capacity</u>.   In the event the Administrative Agent shall have the obligation to make Term Loans under this Agreement, the Administrative Agent shall have the rights and powers specified herein for a "Lender" and may exercise the same rights and powers as though it were not performing the duties specified herein; and the term "Lender," "Required Lenders," or any similar terms shall, unless the context clearly indicates

otherwise, include the Administrative Agent in its respective individual capacities. The Administrative Agent and its affiliates may accept deposits from, lend money to, and generally engage in any kind of banking, investment banking, trust or other business with, or provide debt financing, equity capital or other services (including financial advisory services) to any Credit Party or any Affiliate of any Credit Party (or any Person engaged in a similar business with any Credit Party or any Affiliate thereof) as if they were not performing the duties specified herein, and may accept fees and other consideration from any Credit Party or any Affiliate of any Credit Party for services in connection with this Agreement and otherwise without having to account for the same to the Lenders.

11.08    [Reserved].

11.09    <u>Resignation by the Administrative Agent</u>.

(a)    Either the Administrative Agent or the Collateral Agent (for purposes of this Section 11.09, the Administrative Agent and the Collateral Agent are referred to as the "<u>Agents</u>") may, or, at the direction of the Required Lenders, shall resign from the performance of all its respective functions and duties hereunder and/or under the other Credit Documents at any time by giving fifteen (15) Business Days' prior written notice to the Lenders and the Borrowers. Such resignation shall take effect upon the appointment of a successor Agent pursuant to clauses (b) and (c) below or as otherwise provided pursuant to clause (d) below.

(b)    Upon any such notice of resignation by an Agent, the Required Lenders shall appoint a successor Agent hereunder or thereunder who shall be a commercial bank or trust company acceptable to the Borrowers, which acceptance shall not be unreasonably withheld or delayed; (provided, however, that the Borrowers' approval shall not be required if an Event of Default then exists).

(c)    If a successor Agent shall not have been so appointed within such fifteen (15) Business Day period, such Agent, with the consent of the Borrowers (which consent shall not be unreasonably withheld or delayed; provided, however, that the Borrowers' consent shall not be required if an Event of Default then exists), may then appoint a successor Agent who shall serve as Administrative Agent or Collateral Agent, as applicable, hereunder or thereunder until such time, if any, as the Required Lenders appoint a successor Agent as provided above.

(d)    If no successor Administrative Agent has been appointed pursuant to clauses (b) and (c) above within thirty (30) days after the date such notice of resignation was given by such Agent, such Administrative Agent's resignation shall become effective and the Required Lenders (or such of them as shall be agreed among themselves with the consent of the Borrowers (which consent shall not be unreasonably withheld or delayed)); provided, however, that the Borrower's consent shall not be required if an Event of Default then exists) shall thereafter perform all the functions and duties of such Administrative Agent hereunder and/or under the other Credit Documents until such time, if any, as the Required Lenders appoint a successor Administrative Agent in accordance with clause (b) above.

(e)    Upon a resignation of an Agent pursuant to this <u>Section 11.09</u>, such Agent shall remain indemnified and its outstanding fees and expenses shall be reimbursed to the extent provided in this Agreement and the other Credit Documents and the provisions of this <u>Section 11</u> (and the analogous provisions of the other Credit Documents) shall continue in effect for the benefit of such Agent for all of its actions and inactions while serving as the Administrative Agent or the Collateral Agent, as applicable.

11.10   <u>Collateral Matters</u>.

(a)    Each Lender authorizes and directs the Collateral Agent to enter into the Security Documents for the benefit of the Lenders and the other Secured Parties.  Each Lender hereby agrees that, except as otherwise set forth herein, any action taken by the Required Lenders in accordance with the provisions of this Agreement or the Security Documents, and the exercise by the Required Lenders of the powers set forth herein or therein, together with such other powers as are reasonably incidental thereto, shall be authorized and binding upon all of the Lenders.  Beyond the exercise of reasonable care in the custody of the Collateral in the possession or control of the Collateral Agent,  the Collateral Agent will not have any duty as to any other Collateral or any income thereon or as to preservation of rights against prior parties or any other rights pertaining thereto.  The Collateral Agent will be deemed to have exercised reasonable care in the custody of the Collateral in its possession if the Collateral is accorded treatment substantially equal to that which it accords its own property, and the Collateral Agent will not be liable or responsible for any loss or diminution in the value of any of the Collateral by reason of the act or omission of any carrier, forwarding agency or other agent or bailee selected by the Collateral Agent in good faith. The Collateral Agent is hereby authorized (but without obligation) on behalf of all of the Lenders, without the necessity of any notice to or further consent from any Lender, from time to time prior to an Event of Default, at the direction of the Administrative Agent, to take any action with respect to any Collateral or Security Documents which may be necessary to perfect and maintain perfected the security interest in and liens upon the Collateral granted pursuant to the Security Documents. Without limiting the generality of the foregoing or anything to the contrary herein, the Collateral Agent shall not be responsible for the preparation, filing, form, content or continuation of any UCC financing statements, mortgages or similar instruments. For the avoidance of doubt, the Borrowers and/or any other Credit Party, as applicable, shall make all UCC financing statement filings (including filings of continuation statements and amendments to UCC financing statements that may be necessary to continue the effectiveness of such UCC financing statements) to the extent perfection is required by this Agreement or the Security Documents, and promptly provide evidence thereof to the Collateral Agent.

(b)    The Lenders hereby authorize the Collateral Agent, at the direction of the Required Lenders, to release any Lien granted to or held by the Collateral Agent upon any Collateral (i) upon termination of the Term Loan Commitments and payment and satisfaction of all of the Secured Obligations (other than inchoate indemnification obligations that have been cash collateralized) at any time arising under or in respect of this Agreement or the Credit Documents or the transactions contemplated hereby or thereby, (ii) as provided below in this paragraph (b) or (iii) if approved, authorized or ratified in writing by the Required Lenders (or all of the Lenders hereunder, to the extent required by <u>Section 12.12</u>).  Upon request by the Administrative Agent at any time, the Lenders will confirm in writing the Collateral Agent's authority to release particular types or items of Collateral pursuant to this <u>Section 11.10</u>.

(c)    Notwithstanding the provisions of the other Credit Documents, the Collateral Agent shall have no obligation whatsoever to the Lenders or to any other Person for the genuineness or value of any of the Collateral or to assure that the Collateral exists or is owned by any Credit Party or is cared for, protected or insured or that the Liens granted to the Collateral Agent herein or pursuant hereto have been properly or sufficiently or lawfully created, perfected, protected or enforced or are entitled to any particular priority, or to exercise or to continue exercising at all or in any manner or under any duty of care, disclosure or fidelity any of the rights, authorities and powers granted or available to the Collateral Agent in this <u>Section 11.10</u> or in any of the Security Documents, it being understood and agreed that in respect of the Collateral, or any act, omission or event related thereto, the Collateral Agent shall have no duty or liability whatsoever to the Lenders, except for its gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable decision) to the extent of any duties or obligations of the Collateral Agent hereunder.

#4848-3242-6112v16

11.11    <u>Collateral Agent as Security Trustee for UK Security Documents</u>. For the purposes of any Liens or Collateral created under any UK Security Document, the following additional provisions shall apply, in addition to the provisions set out in Section 11 or otherwise hereunder.

(a)    In this Section 11.11, the following expressions have the following meanings:

"**Appointee**" means any receiver, administrator or other insolvency officer appointed in respect of any Credit Party or its assets.

"**Charged Property**" means the assets of any Credit Party subject to a security interest under the UK Security Documents.

"**Delegate**" means any delegate, agent, attorney or co-trustee appointed by Collateral Agent (in its capacity as security trustee).

"**UK Security Documents**" means the English Law Account Pledge Agreement and any other document designated as such by the parties.

(b)    The Lenders appoint the Collateral Agent to hold the security interests constituted by the UK Security Documents on trust for the Secured Parties on the terms of the Credit Documents and the Collateral Agent accepts that appointment.

(c)    The Collateral Agent, its subsidiaries and associated companies may each retain for its own account and benefit, as agreed with the Borrowers any fee, remuneration and profits paid to it in connection with (i) its activities under the Credit Documents; and (ii) its engagement in any kind of banking or other business with any Credit Party.

(d)    Nothing in this Agreement constitutes the Collateral Agent as a trustee or fiduciary of, nor shall the Collateral Agent have any duty or responsibility to, any Credit Party.

(e)    The Collateral Agent shall have no duties or obligations to any other Person except for those which are expressly specified in the Credit Documents or mandatorily required by applicable law.

(f)    The Collateral Agent may appoint one or more Delegates on such terms (which may include the power to sub-delegate) and subject to such conditions as it thinks fit, to exercise and perform all or any of the duties, rights, powers and discretions vested in it by the UK Security Documents and shall not be obliged to supervise any Delegate or be responsible to any person for any loss incurred by reason of any act, omission, misconduct or default on the part of any Delegate.

(g)    The Collateral Agent may (whether for the purpose of complying with any law or regulation of any overseas jurisdiction, or for any other reason) appoint (and subsequently remove) any person to act jointly with the Collateral Agent either as a separate trustee or as a co-trustee on such terms and subject to such conditions as the Collateral Agent thinks fit and with such of the duties, rights, powers and discretions vested in the Collateral Agent by the UK Security Documents as may be conferred by the instrument of appointment of that person.

(h)    The Collateral Agent shall notify the Lenders of the appointment of each Appointee (other than a Delegate).

(i)    The Collateral Agent may pay reasonable remuneration to any Delegate or Appointee, together with any costs and expenses (including legal fees) reasonably incurred by the Delegate

#4848-3242-6112v16

or Appointee in connection with its appointment. All such remuneration, costs and expenses shall be treated, for the purposes of this Agreement and any Agent Fee Letter, as paid or incurred by the Collateral Agent.

(j)    Each Delegate and each Appointee shall have every benefit, right, power and discretion and the benefit of every exculpation (together "Rights") of the Collateral Agent (in its capacity as security trustee) under the UK Security Documents, and each reference to the Collateral Agent (where the context requires that such reference is to the Collateral Agent in its capacity as security trustee) in the provisions of the UK Security Documents which confer rights shall be deemed to include a reference to each Delegate and each Appointee.

(k)    Each Secured Party confirms its approval of the UK Security Documents and authorizes and instructs the Collateral Agent: (i) to execute and deliver the UK Security Documents; (ii) to exercise the rights, powers and discretions given to the Collateral Agent (in its capacity as security trustee) under or in connection with the UK Security Documents together with any other incidental rights, powers and discretions; and (iii) to give any authorizations and confirmations to be given by the Collateral Agent (in its capacity as security trustee) on behalf of the Secured Parties under the UK Security Documents.

(l)    The Collateral Agent may accept without inquiry the title (if any) which any person may have to the Charged Property.

(m)    Each other Secured Party confirms that it does not wish to be registered as a joint proprietor of any security interest constituted by a UK Security Document and accordingly authorizes: (a) the Collateral Agent to hold such security interest in its sole name (or in the name of any Delegate) as security trustee for the Secured Parties; and (b) the Land Registry (or other relevant registry) to register the Collateral Agent (or any Delegate or Appointee) as a sole proprietor of such security interest.

(n)    Except to the extent that a UK Security Document otherwise requires, any moneys which the Collateral Agent receives under or pursuant to a UK Security Document may be: placed on deposit at any bank or institution (including the Collateral Agent) on terms that the Collateral Agent thinks fit, in each case in the name or under the control of the Collateral Agent, and the Collateral Agent shall hold those moneys, together with any accrued income (net of any applicable Tax) to the order of the Lenders, and shall pay them to the Lenders on demand.

(o)    On a disposal of any of the Charged Property which is permitted under the Credit Documents, the Collateral Agent shall (at the cost of the Credit Parties) execute any release of the UK Security Documents or other claim over that Charged Property and issue any certificates of non-crystallisation of floating charges that may be required or take any other action that the Collateral Agent considers desirable.

(p)    The Collateral Agent shall not be liable for:

(i)    any defect in or failure of the title (if any) which any person may have to any assets over which security is intended to be created by a UK Security Document;

(ii)    any loss resulting from the investment or deposit at any bank of moneys which it invests or deposits in a manner permitted by the Credit Documents;

(iii) the exercise of, or the failure to exercise, any right, power or discretion given to it by or in connection with any Credit Document or any other agreement, arrangement or document entered into, or executed in anticipation of, under or in connection with, any Credit Document; or

#4848-3242-6112v16

(iv)    any shortfall which arises on enforcing a UK Security Document.

(q)    The Collateral Agent shall not be obligated to:

(i)    obtain any authorization or environmental permit in respect of any of the Charged Property or a UK Security Document;

(ii)    hold in its own possession a UK Security Document, title deed or other document relating to the Charged Property or a UK Security Document; or

(iii)    require any further assurances in relation to a UK Security Document.

(r)    In respect of any UK Security Document, the Collateral Agent shall not be obligated to: (i) insure, or require any other person to insure, the Charged Property; or (ii) make any enquiry or conduct any investigation into the legality, validity, effectiveness, adequacy or enforceability of any insurance existing over such Charged Property.

(s)    In respect of any UK Security Document, the Collateral Agent shall not have any obligation or duty to any person for any loss suffered as a result of: (i) the lack or inadequacy of any insurance; or (ii) the failure of the Collateral Agent to notify the insurers of any material fact relating to the risk assumed by them, or of any other information of any kind, unless Required Lenders have requested it to do so in writing and the Collateral Agent has failed to do so within fourteen (14) days after receipt of that request.

(t)    Every appointment of a successor the Collateral Agent under a UK Security Document shall be by deed.

(u)    Section 1 of the Trustee Act 2000 (UK) shall not apply to the duty of the Collateral Agent in relation to the trusts constituted by this Agreement.

(v)    In the case of any conflict between the provisions of this Agreement and those of the Trustee Act 1925 (UK) or the Trustee Act 2000 (UK), the provisions of this Agreement shall prevail to the extent allowed by law, and shall constitute a restriction or exclusion for the purposes of the Trustee Act 2000 (UK).

(w)    The rights, powers and discretions conferred upon the Collateral Agent by this Agreement shall be supplemental to the Trustee Act 1925 and the Trustee Act 2000 and in addition to any which may be vested in the Collateral Agent by any other Credit Document by general law or otherwise.

11.12    Delivery of Information.  The Administrative Agent shall not be required to deliver to any Lender originals or copies of any documents, instruments, notices, communications or other information received by the Administrative Agent from any Credit Party, any Subsidiary, the Required Lenders, any Lender or any other Person under or in connection with this Agreement or any other Credit Document except (i) as specifically provided in this Agreement or any other Credit Document and (ii) as specifically requested from time to time in writing by any Lender with respect to a specific document, instrument, notice or other written communication received by and in the possession of the Administrative Agent at the time of receipt of such request and then only in accordance with such specific request.

#4848-3242-6112v16

11.13   Withholding.  To the extent required by any applicable law, the Administrative Agent may withhold from any payment to any Lender an amount equivalent to any withholding tax applicable to such payment.  If any Governmental Authority asserts a claim that the Administrative Agent did not properly withhold tax from amounts paid to or for the account of any Lender for any other reason, or the Administrative Agent has paid any Governmental Authority applicable withholding tax relating to a payment to a Lender but no deduction has been made from such payment, such Lender shall indemnify the Administrative Agent fully for all amounts paid, directly or indirectly, by the Administrative Agent as tax or otherwise, including any penalties or interest and together with any and all expenses incurred, unless such amounts have been indemnified by the Borrowers, the Guarantors, or the relevant Lender.

SECTION 12.   Miscellaneous.

12.01   Payment of Expenses, etc.

(a)   The Borrowers hereby agree to pay, without the requirement of prior Bankruptcy Court approval and whether incurred before or after the Petition Date, all reasonable and documented out-of-pocket costs and expenses of the Administrative Agent and the Lenders (limited in the case of professional fees, to the reasonable and documented (having due regard to attorney-client privilege, confidentiality and other appropriate considerations) fees and disbursements of one primary legal counsel and one counsel in each relevant jurisdiction to the Administrative Agent, Milbank, Alvarez & Marsal, IBA and Arthur Cox (collectively, the "Lender Professionals")) in connection with the preparation, negotiation, execution and delivery of this Agreement and the other Credit Documents and the documents and instruments referred to herein and therein (whether or not the transactions contemplated hereby or thereby shall be consummated), any amendment, waiver or consent relating hereto or thereto, the making of the Term Loans from time to time hereunder, and the administration of this Agreement, the Credit Documents, the Collateral and the Security Documents in accordance with this Agreement and the other Credit Documents.

(b)   The Borrowers hereby further agree to pay, after the occurrence of an Event of Default (so long as once such Event of Default is no longer continuing the Secured Parties shall promptly take reasonable actions to stop the incurrence of further costs and expenses), and subject to the limitations set forth in clause (a) above, all out-of-pocket costs and expenses of the Administrative Agent, the Lender Professionals and each of the Lenders in connection with the enforcement of this Agreement and the other Credit Documents and the documents and instruments referred to herein and therein, the protection of its rights (including its rights under this Section 12), and any workout, restructuring or negotiations in respect of such Term Loans, including, without limitation, documented (having due regard to attorney-client privilege, confidentiality and other appropriate considerations) fees and disbursements of each of the Administrative Agent's consultants and one primary counsel for the Administrative Agent and one counsel in each relevant jurisdiction and one counsel in each jurisdiction for the Lenders as a group (in each case separate from the Administrative Agent's counsel(s)), provided that in the case of any actual or potential conflict of interest between or among the Lenders, the Borrowers shall pay the costs and expenses of one additional counsel for each group of affected Lenders).

(c)   To the full extent permitted by applicable law, no party hereto shall assert, and each party hereto hereby waives, any claim against any Indemnified Person or other party hereto, on any theory of liability, for special, indirect, consequential or incidental damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Term Loan or the use of the proceeds thereof.  No Indemnified Person shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or

-94-

other information transmission systems in connection with this Agreement or the other Credit Documents or the transactions contemplated hereby or thereby, except to the extent the liability of such Indemnified Person results from such Indemnified Person's gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable decision).

       12.02  <u>Right of Setoff</u>.  In addition to any rights now or hereafter granted under applicable law or otherwise, and not by way of limitation of any such rights, upon the occurrence and during the continuance of an Event of Default, the Administrative Agent, the Collateral Agent and each Lender is hereby authorized at any time or from time to time, without presentment, demand, protest or other notice of any kind to any Credit Party or to any other Person, any such notice being hereby expressly waived, to set off and to appropriate and apply any and all deposits (general or special) and any other Indebtedness at any time held or owing by the Administrative Agent or such Lender (including, without limitation, by branches and agencies of the Administrative Agent or such Lender wherever located) to or for the credit or the account of the Manager, the Borrowers or any Subsidiary of the Borrowers against and on account of the Secured Obligations and liabilities of the Credit Parties to the Administrative Agent or such Lender under this Agreement or under any of the other Credit Documents, including, without limitation, all interests in Secured Obligations purchased by such Lender pursuant to Section 12.04(b), and all other claims of any nature or description arising out of or connected with this Agreement or any other Credit Document, irrespective of whether or not the Administrative Agent or such Lender shall have made any demand hereunder and although said Secured Obligations, liabilities or claims, or any of them, shall be contingent or unmatured.  Each Lender agrees to notify the Manager and the Administrative Agent promptly after any such setoff and application; <u>provided</u>, <u>however</u>, that the failure to give such notice shall not affect the validity of such setoff and application.

       12.03  <u>Notices</u>.  Except for notices and other communications expressly permitted to be given by telephone hereunder (and except as provided in this Section 12.03), notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by fax or email, as follows:

       (a)    if to any Credit Party, at the address specified on Schedule 12.03;

       (b)    if to the Administrative Agent, to Ankura Trust Company, LLC, 60 State Street, Suite 700, Boston, MA 02109, Attention of: Michael J. Fey; Email: michael.fey@ankura.com;

       (c)    if to the Collateral Agent, to Ankura Trust Company, LLC, 60 State Street, Suite 700, Boston, MA 02109, Attention of: Michael J. Fey; Email: <u>michael.fey@ankura.com</u>;

       (d)    if to a Lender, to it at its address (or email address or fax number) set forth on Schedule 1.01(c) or in the Assignment and Assumption Agreement pursuant to which such Lender shall have become a party hereto; or

       (e)    if a Credit Party is providing notice to the Administrative Agent or the Lenders, such Credit Party shall also provide a copy of such notice and other communications to Milbank.

       All notices and other communications given to any party hereto in accordance with the provisions of this Agreement, shall be deemed to have been given on the date of receipt if delivered by hand or overnight courier service or sent by fax or on the date five (5) Business Days after dispatch by certified or registered mail if mailed, in each case delivered, sent or mailed (properly addressed) to such party as provided in this Section 12.03, or in accordance with the latest unrevoked direction from such party given in accordance with this Section 12.03.  As agreed to in writing among the Credit

Parties, the Administrative Agent and the applicable Lenders from time to time, notices and other communications may also be delivered by e-mail to the e-mail address of a representative of the applicable Person provided from time to time by such Person.

Each of the Credit Parties hereby agrees, unless directed otherwise by the Administrative Agent in writing in accordance with this Agreement or unless the electronic mail address referred to below has not been provided by the Administrative Agent to the Borrowers, that it will, and will cause its Subsidiaries to, provide to the Administrative Agent all information, documents and other materials that it is obligated to furnish to the Administrative Agent pursuant to the Credit Documents or to the Lenders under Section 8, including all notices, requests, financial statements, financial and other reports, certificates and other information materials, but excluding any such communication that (i) is or relates to the applicable Notice of Borrowing, (ii) relates to the payment of any principal or other amount due under this Agreement prior to the scheduled date therefor, (iii) provides notice of any Default or Event of Default under this Agreement or any other Credit Document or (iv) is required to be delivered to satisfy any condition precedent to the effectiveness of this Agreement and/or any Borrowing or other extension of credit hereunder (all such nonexcluded communications being referred to herein collectively as "Communications"), by transmitting the Communications in an electronic/soft medium that is properly identified in a format satisfactory to the Administrative Agent to an electronic mail address as directed by the Administrative Agent.  In addition, each of the Credit Parties party hereto agrees, and agrees to cause its Subsidiaries, to continue to provide the Communications to the Administrative Agent or the Lenders, as the case may be, in the manner specified in the Credit Documents but only to the extent requested by the Administrative Agent.

Each of the Credit Parties party hereto hereby acknowledges that (a) the Administrative Agent will make available to the Lenders materials and/or information provided by or on behalf of the Credit Parties hereunder (collectively, the "Borrower Materials") by posting the Borrower Materials on Intralinks, CTS Link or another similar electronic system (the "Platform") and (b) certain of the Lenders may be "public-side" Lenders (i.e., Lenders that do not wish to receive material nonpublic information with respect to the Credit Party securities) (each, a "Public Lender"). Each of Holdings and the other Borrowers hereby agrees that (i) all Borrower Materials that are to be made available to Public Lenders shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof, (ii) by marking Borrower Materials "PUBLIC," the Credit Parties shall be deemed to have authorized the Administrative Agent and the Lenders to treat such Borrower Materials as not containing any material nonpublic information with respect to the Credit Parties or their respective securities for purposes of Ireland, United States Federal and state securities laws (provided that such Borrower Materials shall be subject to Section 12.16 to the extent applicable), (iii) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated as "Public Investor" and (iv) the Administrative Agent shall be entitled to treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not marked as "Public Investor." Notwithstanding the foregoing, the following Borrower Materials shall be deemed to be marked "PUBLIC," unless the Borrowers notifies the Administrative Agent promptly that any such document contains material nonpublic information:  (1) the Credit Documents, (2) any notification of changes in the terms of the facility, provided that the Borrowers shall be afforded a reasonable opportunity to review such notifications and (3) all information delivered pursuant to Section 8.01.

Each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to at all times have selected the "Private Side Information" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance

with such Public Lender's compliance procedures and applicable law, including United States Federal and state securities laws, to make reference to Communications that are not made available through the "Public Side Information" portion of the Platform and that may contain material non-public information with respect to the Borrowers or its securities for purposes of United States Federal or state securities laws.

THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE".  NEITHER THE ADMINISTRATIVE AGENT NOR ANY OF ITS RELATED PARTIES WARRANTS THE ACCURACY OR COMPLETENESS OF THE COMMUNICATIONS OR THE ADEQUACY OF THE PLATFORM AND EACH EXPRESSLY DISCLAIMS LIABILITY FOR ERRORS OR OMISSIONS IN THE COMMUNICATIONS.  NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NONINFRINGEMENT OF THIRD-PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS IS MADE BY THE ADMINISTRATIVE AGENT OR ANY OF ITS RELATED PARTIES IN CONNECTION WITH THE COMMUNICATIONS OR THE PLATFORM.  IN NO EVENT SHALL THE ADMINISTRATIVE AGENT OR ANY OF ITS RELATED PARTIES HAVE ANY LIABILITY TO ANY CREDIT PARTY, ANY LENDER OR ANY OTHER PERSON FOR DAMAGES OF ANY KIND, WHETHER OR NOT BASED ON STRICT LIABILITY AND INCLUDING DIRECT OR INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, LOSSES OR EXPENSES (WHETHER IN TORT, CONTRACT OR OTHERWISE) ARISING OUT OF ANY CREDIT PARTY'S OR THE ADMINISTRATIVE AGENT'S TRANSMISSION OF COMMUNICATIONS THROUGH THE INTERNET, EXCEPT TO THE EXTENT THE LIABILITY OF ANY SUCH PERSON IS FOUND IN A FINAL AND NON-APPEALABLE JUDGEMENT OF A COURT OF COMPETENT JURISDICTION TO HAVE RESULTED FROM SUCH PERSON'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT (AS DETERMINED BY A COURT OF COMPETENT JURISDICTION IN A FINAL AND NON-APPEALABLE DECISION).

The Administrative Agent agrees that the receipt of the Communications by the Administrative Agent at its electronic mail address set forth above shall constitute effective delivery of the Communications to the Administrative Agent for purposes of the Credit Documents.  Each Lender agrees that receipt of notice to it (as provided in the next sentence) specifying that the Communications have been posted to the Platform shall constitute effective delivery of the Communications to such Lender for purposes of the Credit Documents.  Each Lender agrees to notify the Administrative Agent in writing (including by electronic communication) from time to time of such Lender's electronic mail address to which the foregoing notice may be sent by electronic transmission and that the foregoing notice may be sent to such e-mail address.

Nothing herein shall prejudice the right of the Administrative Agent, any Lender or any Credit Party to give any notice or other communication pursuant to any Credit Document in any other manner specified in such Credit Document.

12.04    Benefit of Agreement; Assignments; Participations.

(a)    This Agreement shall be binding upon and inure to the benefit of and be enforceable by the respective successors and assigns of the parties hereto; provided, however, that except as expressly provided in Section 9.02, none of Holdings, Luxco, the Manager or the other Borrowers may assign or transfer any of their respective rights, obligations or interest hereunder without the prior written consent of the Administrative Agent and each Lender; and provided, further, that although any Lender may grant participations to Eligible Transferees in its rights hereunder, such Lender shall remain a "Lender" for

all purposes hereunder (and may not transfer or assign all or any portion of its Term Loan Commitments hereunder except as provided in Sections 2.10 and 12.04(b)) and the participant shall not constitute a "Lender" hereunder; and provided, further, that (x) any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and any other Credit Document and to approve any amendment, modification or waiver of any provision of this Agreement or any other Credit Document; and (y) such agreement or instrument may provide that such Lender will not, without the consent of the participant, agree to any amendment, modification or waiver to the extent such amendment, modification or waiver would (i) extend the final scheduled maturity of any Term Loan in which such participant is participating, or reduce the rate or extend the time of payment of scheduled interest or Fees thereon (except in connection with a waiver of applicability of any post-default increase in interest rates) or reduce the principal amount thereof (it being understood that any amendment or modification to the financial definitions in this Agreement or to Section 12.07 shall not constitute a reduction in the rate of interest or Fees payable hereunder), or increase the amount of the participant's participation over the amount thereof then in effect (it being understood that a waiver of any Default or Event of Default or a mandatory prepayment of the Term Loans shall not constitute a change in the terms of such participation, and that an increase in any Term Loan Commitment (or the available portion thereof) or Term Loan shall be permitted without the consent of any participant if the participant's participation is not increased as a result thereof), (ii) consent to the assignment or transfer by any Guarantor or the Borrowers of any of its rights and obligations under this Agreement or (iii) release all or substantially all of the Collateral under all of the Security Documents (except as expressly provided in the Credit Documents) supporting the Term Loans hereunder in which such participant is participating. In the case of any such participation, except as otherwise set forth in Section 12.04(e), the participant shall not have any rights under this Agreement or any of the other Credit Documents (the participant's rights against such Lender in respect of such participation to be those set forth in the agreement executed by such Lender in favor of the participant relating thereto) and all amounts payable by the Borrowers hereunder shall be determined as if such Lender had not sold such participation.

(b)    Notwithstanding the foregoing, any Lender (or any Lender together with one or more other Lenders) may assign all or a portion of its Term Loan Commitments and related outstanding Secured Obligations (or, if the Term Loan Commitments have terminated, outstanding Secured Obligations) hereunder to any Eligible Transferee, which assignee shall become a party to this Agreement as a Lender by execution of an Assignment and Assumption Agreement; provided, further, that (x) the Administrative Agent shall receive at the time of each such assignment, from the assigning or assignee Lender, the payment of a non-refundable assignment fee of $3,500 and (y) the amount of the Term Loan Commitment or Term Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption Agreement with respect to such assignment is delivered to the Administrative Agent) shall be in an integral multiple of, and not less than, $5,000,000 (or, (A) if less, the entire remaining amount of such Lender's Term Loan Commitment or Term Loans, or (B) such lesser amount as the Administrative Agent and, so long as no Event of Default under Section 10.01 has occurred and is continuing, the Borrowers may otherwise agree). No consent shall be required for any assignment other than the consent of the Administrative Agent (which shall not be unreasonably withheld or delayed).

Upon such assignment, Schedule 1.01(a) shall be deemed modified to reflect the Term Loan Commitments and/or outstanding Term Loans, as the case may be, of such new Lender and of the existing Lenders; provided, however, that no such transfer or assignment will be effective until (i) recorded by the Administrative Agent on the Register pursuant to Section 12.15 and (ii) unless and until the applicable documents to be provided by an assignee Lender under Section 4.04 have been so provided. To the extent of any assignment pursuant to this Section 12.04(b), including the assumption of such obligations, the assigning Lender shall be relieved of its obligations hereunder with respect to its assigned Term Loan Commitments and outstanding Term Loans. To the extent that an assignment of all or any portion of a Lender's Term Loan Commitments and related outstanding Secured

#4848-3242-6112v16

Obligations pursuant to Section 2.10 or this Section 12.04(b) would, at the time of such assignment, result in increased costs or Taxes under Section 2.08 (*Increased Costs, Illegality, Market Disruption*), Section 2.09 (*Break Funding Compensation*) or Section 4.04 (*Taxes*) as compared to such costs being charged by the respective assigning Lender prior to such assignment, then, unless an Event of Default under Section 10.01(a) shall exist and shall have been continuing for seven (7) consecutive Business Days, the Borrowers shall not be obligated to pay such increased costs or Taxes (although the Borrowers, in accordance with and pursuant to the other provisions of this Agreement, shall be obligated to pay any other increased costs or Taxes of the type described above resulting from changes after the date of the respective assignment). No assignment by any Lender shall conflict with applicable law (including, without limitation, ERISA).

(c)    Nothing in this Agreement shall prevent or prohibit any Lender from pledging its Term Loans hereunder to a Federal Reserve Bank in support of borrowings made by such Lender from such Federal Reserve Bank and any Lender which is a fund, may pledge all or any portion of its Term Loans to its trustee or to a collateral agent providing credit or credit support to such Lender in support of its obligations to such trustee, such collateral agent or a holder of such obligations, as the case may be (whether or not such trustee, collateral agent or holder is an Eligible Transferee); provided, however, that only a Person that is an Eligible Transferee may exercise foreclosure remedies thereunder or otherwise succeed to the interest of such Lender in respect of the Term Loans of such Lender. No pledge pursuant to this clause (c) shall release the transferor Lender from any of its obligations hereunder.

(d)    Any Lender which assigns all of its Term Loan Commitments and/or Term Loans hereunder in accordance with Section 12.04(b) shall cease to constitute a "Lender" hereunder, except with respect to indemnification provisions under this Agreement (including, without limitation, Sections 2.07, 2.08, 4.04, 4.05, 11.06, 12.01 and 12.06), which shall survive as to such assigning Lender.

(e)    For the avoidance of doubt, no Lender may grant any participation in respect of its Term Loans or other rights hereunder to any Person other than an Eligible Transferee without the prior written consent of the Borrowers. The Borrowers agrees that each participant shall be entitled to the benefits of Sections 2.08 and 4.04 (subject to the requirements and limitations therein, including the requirements under Section 4.04(f) (it being understood that the documentation required under Section 4.04(f) shall be delivered to the participating Lender)); provided, however, that such participant (A) agrees to be subject to the provisions of Section 2.10 as if it were such Lender; and (B) shall not be entitled to receive any greater payment under Section 2.08 or 4.04, with respect to any participation, than its participating Lender would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from a change in law that occurs after the participant acquired the applicable participation to the extent that its participating Lender would have been entitled to receive. Each Lender that sells a participation shall, acting solely for this purpose as an agent of the Borrowers, maintain a register on which it enters the name and address of each participant and the principal amounts (and stated interest) of each participant's interest in the Term Loans or other obligations under the Credit Documents (the "Participant Register"); provided, however, that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any participant or any information relating to a participant's interest in any commitments, loans or its other obligations under any Credit Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

#4848-3242-6112v16

12.05   <u>No Waiver; Remedies Cumulative</u>.   No failure or delay on the part of the Administrative Agent, the Collateral Agent or any Lender in exercising any right, power or privilege hereunder or under any other Credit Document and no course of dealing between the Borrowers or any other Credit Party and the Administrative Agent, the Collateral Agent or any Lender shall operate as a waiver thereof; nor shall any single or partial exercise of any right, power or privilege hereunder or under any other Credit Document preclude any other or further exercise thereof or the exercise of any other right, power or privilege hereunder or thereunder.   The rights, powers and remedies herein or in any other Credit Document expressly provided are cumulative and not exclusive of any rights, powers or remedies which the Administrative Agent, the Collateral Agent or any Lender would otherwise have.   No notice to or demand on any Credit Party in any case shall entitle any Credit Party to any other or further notice or demand in similar or other circumstances or constitute a waiver of the rights of the Administrative Agent, the Collateral Agent or any Lender to any other or further action in any circumstances without notice or demand.

12.06   <u>Payments Pro Rata</u>.

(a)   Except as otherwise provided in this Agreement, the Administrative Agent agrees that promptly after its receipt of each payment from or on behalf of the Borrowers in respect of any Secured Obligations hereunder, the Administrative Agent shall distribute such payment to the Lenders entitled thereto (other than any Lender that has consented in writing to waive its *pro rata* share of any such payment) *pro rata* based upon their respective shares, if any, of the Secured Obligations with respect to which such payment was received.

(b)   Each of the Secured Parties agrees that, if it should receive any amount hereunder (whether by voluntary payment, by realization upon security, by the exercise of the right of setoff or banker's lien, by counterclaim or cross action, by the enforcement of any right under the Credit Documents, or otherwise), which is applicable to the payment of the principal of, or interest on, the Term Loans or Term Loan Commitment or applicable to the payment of any other amounts due to such Secured Party, of a sum which with respect to the related sum or sums received by other Secured Parties is in a greater proportion than the total of such Secured Obligation then owed and due to such Secured Party bears to the total of such Secured Obligation then owed and due to all of the Secured Parties immediately prior to such receipt, then such Secured Party receiving such excess payment shall purchase for cash without recourse or warranty from the other Secured Parties an interest in the Secured Obligations of the respective Credit Party to such Secured Parties in such amount as shall result in a proportional participation by all the Secured Parties in such amount; <u>provided</u>, <u>however</u>, that if all or any portion of such excess amount is thereafter recovered from such Secured Parties, such purchase shall be rescinded and the purchase price restored to the extent of such recovery, but without interest and <u>provided</u>, <u>further</u>, that this clause (b) shall not be construed to apply to any payment obtained by any Secured Party as consideration for the assignment or sale of a participation in any of its portion of any Term Loan to any assignee or participant.

(c)   Notwithstanding anything to the contrary contained herein, the provisions of the preceding Sections 12.06(a) and (b) shall be subject to Section 4.01(b) and the express provisions of this Agreement which require, or permit, differing payments to be made to Non-Defaulting Lenders as opposed to Defaulting Lenders.

12.07   <u>Calculations; Computations</u>.   Except as otherwise set forth in Section 8.01, the financial statements to be furnished to the Administrative Agent pursuant hereto shall be made and prepared in accordance with GAAP consistently applied throughout the periods involved (except as set forth in the notes thereto or as otherwise disclosed in writing by the Manager to the Administrative Agent); <u>provided</u>, <u>however</u>, that (a) except as otherwise specifically provided herein, all computations and all definitions (including accounting terms) used in determining compliance with Section 9 shall

-100-

utilize GAAP, and (b) notwithstanding anything to the contrary contained herein, all such financial statements shall be prepared without giving effect to any election under FASB ASC 825 (or any similar accounting principle under GAAP or otherwise) permitting a Person to value its financial liabilities at the fair value thereof and provided, further, that promptly after notification to the Manager and the Administrative Agent of any adoption of any material change to GAAP's lease accounting rules and policies which are applicable to any covenant or provision in this Agreement or any of the other Credit Documents, the Administrative Agent and the Manager shall consult in good faith with a view to agreeing to modify the related covenants and/or provisions in this Agreement to provide for the use of the GAAP standards then in effect, provided that, for the avoidance of doubt, the parties hereto agree and acknowledge that the Administrative Agent and the Manager shall not be obligated to reach an agreement with each other in connection with, or as a result of, such good faith consultations.

12.08    GOVERNING LAW; SUBMISSION TO JURISDICTION; VENUE; WAIVER OF JURY TRIAL.

(A)    EXCEPT TO THE EXTENT SUPERSEDED BY THE BANKRUPTCY CODE, THIS AGREEMENT AND THE OTHER NEW YORK LAW CREDIT DOCUMENTS AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER AND THEREUNDER SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAW OF THE STATE OF NEW YORK. ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER CREDIT DOCUMENT SHALL BE BROUGHT IN THE BANKRUPTCY COURT, AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT, EACH PARTY HERETO HEREBY IRREVOCABLY ACCEPTS IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE JURISDICTION OF THE BANKRUPTCY COURT. EACH PARTY HERETO HEREBY IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS OUT OF THE BANKRUPTCY COURT AND IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING OF COPIES THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO THE ADDRESS FOR NOTICES AS SET FORTH HEREIN. THE PARTIES HERETO AGREE THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW. NOTHING HEREIN SHALL AFFECT THE RIGHT OF THE PARTIES HERETO TO SERVICE OF PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST ANY OTHER PARTY HERETO IN ANY OTHER JURISDICTION. EACH PARTY HERETO HEREBY EXPRESSLY AND IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE JURISDICTION OR LAYING OF VENUE OF ANY SUCH LITIGATION BROUGHT IN SUCH COURT AND ANY CLAIM THAT ANY SUCH LITIGATION HAS BEEN BROUGHT IN AN INCONVENIENT FORUM. TO THE EXTENT THAT ANY PARTY HERETO HAS OR HEREAFTER MAY ACQUIRE ANY IMMUNITY FROM JURISDICTION OF ANY COURT OR FROM ANY LEGAL PROCESS (WHETHER THROUGH SERVICE OR NOTICE, ATTACHMENT PRIOR TO JUDGMENT, ATTACHMENT IN AID OF EXECUTION OR OTHERWISE) WITH RESPECT TO ITSELF OR ITS PROPERTY, EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES SUCH IMMUNITY IN RESPECT OF ITS OBLIGATIONS UNDER THIS AGREEMENT AND THE OTHER CREDIT DOCUMENTS.

(B)    EACH OF THE PARTIES TO THIS AGREEMENT HEREBY IRREVOCABLY WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT, THE OTHER NEW YORK LAW CREDIT DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY.

#4848-3242-6112v16

12.09    Counterparts.  This Agreement may be executed in any number of counterparts and by the different parties hereto on separate counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same instrument. A set of counterparts executed by all the parties hereto shall be lodged with the Borrowers and the Administrative Agent.

12.10    Effectiveness.  The words "execution," "signed," "signature," and words of like import in this Agreement or any Credit Document shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

12.11    Headings Descriptive.  The headings of the several sections and subsections of this Agreement are inserted for convenience only and shall not in any way affect the meaning or construction of any provision of this Agreement.

12.12    Amendment or Waiver, Administrative Agent; etc.

(a)    Neither this Agreement nor any other Credit Document (excluding, for the purposes of this clause (a), the Agent Fee Letter, or Assignment and Assumption Agreement each of which may be amended in accordance with its terms to the extent any such amendment is not prohibited by or inconsistent with the terms of this Agreement) nor any terms hereof or thereof may be changed or waived or, except to the extent of a repayment or prepayment of the Term Loans permitted or required hereunder, discharged or terminated unless such change or waiver or such discharge or termination is in writing signed by the respective Credit Parties party hereto or thereto and the Required Lenders (although additional parties may be added to (and annexes may be modified to reflect such additions), and the Credit Parties may be released from the Security Documents in accordance with the provisions hereof and thereof without the consent of the other Credit Parties party thereto or the Required Lenders); provided, however, that no such change or waiver or such discharge or termination shall, without the consent of, (A) in the case of clauses (i)(x) and (ii) to (ix), each Lender (other than (x) any Lender that is an Affiliate of the Borrowers or (y) a Defaulting Lender (other than a Defaulting Lender that has funded its Term Loan Commitment in full or in part and only with respect to clause (i) below)) and (B) in the case of clauses (i)(y), (i)(z) and (x), each Lender being directly and adversely affected thereby, (i)(x) extend the final scheduled maturity of any Term Loan, (y) reduce the rate or extend the time of payment of scheduled interest or Fees thereon (except in connection with the waiver of applicability of any post-default increase in interest rates), or (z) reduce (or forgive) the principal amount thereof (it being understood that any amendment or modification to the financial definitions in this Agreement or to Section 12.07 shall not constitute a reduction in the rate of interest or Fees for the purposes of this clause (i), other than in connection with a waiver of any mandatory prepayment under Section 4.02), (ii) release all or substantially all of the Collateral (except as expressly provided in the Credit Documents) under the Security Documents other than in a sale process in accordance with the Milestones, (iii) amend, modify or waive any provision of this Section 12.12(a) (except for technical amendments with respect to additional extensions of credit pursuant to this Agreement which afford the protections to such additional extensions of credit of the type provided to the Term Loans on the Closing Date), or Section 4.06(b) or Section 9.11(b), (iv) amend the definition of "Required Lenders" or amend any other provision in this Agreement that specifies the number or percentage of Lenders required for approval, (v) consent to the assignment or transfer by the Borrowers of any of its rights and obligations under this Agreement (other than pursuant to Section 9.02), (vi) amend the *pro rata* sharing provisions of the Lenders, (vii) release any Guarantor or consent to the assignment of transfer by any Guarantor of any

of its rights and obligations under this Agreement the effect of which release, assignment or transfer would result in the release of all or substantially all of the value of the Guaranty other than in a sale process in accordance with the Milestones, (viii) amend, modify or waive any provision of Section 12.06, except in connection with an amendment that provides for a prepayment of Term Loans by the Borrowers (offered ratably to all Lenders) at a discount to par on terms and conditions approved by the Administrative Agent and the Required Lenders, (ix) increase the Maximum Intercompany Balance for any WAC Group and (x) amend the definition of "Acceptable Plan of Reorganization" or amend any provision of this Agreement that uses "Acceptable Plan of Reorganization"; provided further that no such change, waiver, discharge or termination shall (1) increase the Term Loan Commitments of any Lender over the amount thereof then in effect without the consent of such Lender (it being understood that waivers or modifications of conditions precedent, covenants, Defaults or Events of Default or a mandatory repayment of Term Loans shall not constitute an increase of the Term Loan Commitment of any Lender, and that an increase in the available portion of any Term Loan Commitment of any Lender shall not constitute an increase of the Term Loan Commitment of such Lender), (2) without the consent of the Administrative Agent, amend, modify or waive any provision of Section 11 or any other provision of this Agreement or any other Credit Document relating to the rights or obligations of the Administrative Agent, or (3) without the consent of the Collateral Agent, amend, modify or waive any provision of Section 11 or any other provision of this Agreement or any other Credit Document relating to the rights or obligations of the Collateral Agent; provided further that no term or condition of this Agreement may be amended or modified in a manner that would either directly or indirectly adversely affect the rights of any Lender disproportionately to all other Lenders, except to the extent such party may consent; provided further, that no right afforded to the Required Lenders or Administrative Agent under this Section 12.12 may be waived or amended without the consent of each party to which such right is afforded.

(b)    If, in connection with any proposed change, waiver, discharge or termination of any of the provisions of this Agreement as contemplated by clauses (i) through (viii), inclusive, of the first proviso to Section 12.12(a), the consent of the Required Lenders is obtained but the consent of one or more Non-Consenting Lenders is not obtained, then the Borrowers shall have the right, so long as all Non-Consenting Lenders are treated as described in either clause (i) or (ii) below, to either:

(i)    replace each such Non-Consenting Lender or Non-Consenting Lenders with one or more Replacement Lenders pursuant to, and subject to the terms and conditions of, Section 2.10 so long as at the time of such replacement, each such Replacement Lender consents to the proposed change, waiver, discharge or termination; or

(ii)    terminate such Non-Consenting Lender's Term Loan Commitment and/or repay all of the outstanding Term Loans of any such Non-Consenting Lender in accordance with Sections 3.03 and/or 4.01(c).

(c)    Notwithstanding the foregoing, any provision of this Agreement may be amended by an agreement in writing entered into by the respective Credit Parties party hereto, the Required Lenders and the Administrative Agent if (i) by the terms of such agreement the Term Loan Commitment of each Lender not consenting to the amendment provided for therein shall terminate upon the effectiveness of such amendment and (ii) at the time such amendment becomes effective, each Lender not consenting thereto receives payment (including pursuant to an assignment to a replacement Lender in accordance with Section 12.04) in full of the principal of and interest accrued on each Term Loan made by it and all other amounts owing to it or accrued for its account under this Agreement.

(d)    Notwithstanding anything to the contrary contained in this Section 12.12, (x) Security Documents and related documents executed by Subsidiaries in connection with this Agreement may be in a form reasonably determined by the Administrative Agent and may be amended, supplemented

and waived with the consent of the Administrative Agent and the Borrowers without the need to obtain the consent of any other Person if such amendment, supplement or waiver is delivered in order (i) to comply with local law or advice of local counsel, (ii) to cure ambiguities, omissions, mistakes or defects (provided that such cure shall not adversely affect the rights of the Lenders) or (iii) to cause such Security Document or other document to be consistent with this Agreement and the other Credit Documents and (y) if following the Closing Date, the Administrative Agent and any Credit Party shall have jointly identified an ambiguity, inconsistency, obvious error or any error or omission of a technical or immaterial nature, in each case, in any provision of the Credit Documents (other than the Security Documents), then the Administrative Agent and the Credit Parties shall be permitted to amend such provision and such amendment shall become effective without any further action or consent of any other party to any Credit Documents if the same is not objected to in writing by the Required Lenders within five (5) Business Days following receipt of notice thereof.

12.13    Survival.  All indemnities (other than those provided under Section 4.04) set forth herein including, without limitation, in Sections 2.07, 2.08, 4.05, 11.06 and 12.01 shall survive the execution, delivery and termination of this Agreement and the making and repayment of the Secured Obligations.

12.14    Domicile of Term Loans.  Each Lender may transfer and carry its Term Loans at, to or for the account of any office, Subsidiary or Affiliate of such Lender, provided that the Subsidiary or Affiliate, as the case may be, is an Eligible Transferee on the date of such transfer or action.  Notwithstanding anything to the contrary contained herein, to the extent that a transfer of Term Loans pursuant to this Section 12.14 would, at the time of such transfer, result in increased costs under Section 2.07, 2.08 or 4.04 from those being charged by or owed to the respective Lender prior to such transfer, then the Borrowers shall not be obligated to pay such increased costs.

12.15    Register.  The Borrowers hereby designates the Administrative Agent to serve as its agent, solely for purposes of this Section 12.15, to maintain a register (the "Register") on which it will record the Term Loan Commitments from time to time of each of the Lenders, the Term Loans made by each of the Lenders and each repayment in respect of the principal amount of the Term Loans of each Lender.  Failure to make any such recordation, or any error in such recordation, shall not affect the Borrowers' obligations in respect of such Term Loans.  With respect to any Lender, the transfer of the Term Loan Commitments of such Lender and the rights to the principal of, and interest on, any Term Loan made pursuant to such Term Loan Commitments shall not be effective until such transfer is recorded on the Register maintained by the Administrative Agent with respect to ownership of such Term Loan Commitments and Term Loans and prior to such recordation all amounts owing to the transferor with respect to such Term Loan Commitments and Term Loans shall remain owing to the transferor.  The registration of assignment or transfer of all or part of any Term Loan Commitments and Term Loans shall be recorded by the Administrative Agent on the Register upon and only upon the acceptance by the Administrative Agent of a properly executed and delivered Assignment and Assumption Agreement pursuant to Section 12.04(b).  Upon such acceptance and recordation, the assignee specified therein shall be treated as a Lender for all purposes of this Agreement.  Upon request, the Administrative Agent shall provide a copy of the Register to Milbank or any Lender.

12.16    Confidentiality.

(a)    Subject to the provisions of clauses (b) and (c) of this Section 12.16, each of the Administrative Agent, Collateral Agent and each Lender agrees that (x) it will not disclose without the prior consent of the Manager any information with respect to any Permitted Holder, Holdings or any of its Subsidiaries, or any of their leases, Lessees or Sublessees, which is now or in the future furnished pursuant to this Agreement or any other Credit Document, and (y) it shall use any information with respect to the

#4848-3242-6112v16

Permitted Holders, Holdings or any of its Subsidiaries which is now or in the future furnished pursuant to this Agreement or any other Credit Document solely for the purposes of evaluating its investment in the Term Loans hereunder (if applicable) and in connection with administering and enforcing any of its rights and remedies in accordance with the terms of this Agreement and any other Credit Document; provided, however, that any Lender, the Administrative Agent and the Collateral Agent, as applicable, may disclose any such information (i) as has become generally available to the public other than by virtue of a breach of this Section 12.16(a) by the respective Lender, the Administrative Agent, Collateral Agent or any Person to whom it is permitted to disclose such information hereunder, or pursuant to a separate confidentiality agreement between such Lender, Administrative Agent, Collateral Agent or any Person and any Credit Party, (ii) to its Affiliates and to its and its Affiliates respective officers, directors, employees, agents, auditors, advisors or counsel, or to another Lender if such Lender or such Lender's holding or parent company in its sole discretion determines that any such party should have access to such information, provided such Persons shall be subject to the provisions of this Section 12.16 to the same extent as such Lender and such Lender agrees that any breach of the provisions of this Section 12.16 by any such Person shall be deemed a breach of this Section 12.16 by such Lender, (iii) subject to the consent of the Manager (not to be unreasonably withheld), to any rating agency in connection with rating the Borrowers or the credit facility hereunder, (iv) to the CUSIP Service Bureau or any similar agency in connection with the issuance and monitoring of CUSIP numbers with respect to the credit facility or market data collectors, similar services, providers to the lending industry and service providers to the Administrative Agent in connection with the administration and management of this Agreement and the Credit Documents, it being understood that in each case the Persons to whom such disclosure is made will be informed of the confidential nature of such information and instructed to keep such information confidential, (v) as may be required or appropriate in any report, statement or testimony submitted to any municipal, state or Federal regulatory body having or claiming to have jurisdiction over such Lender, Administrative Agent and Collateral Agent, as applicable, or to the Federal Reserve Board or the Federal Deposit Insurance Corporation or similar organizations (whether in the United States or elsewhere) or their successors or as may be required or requested by a bank examiner, regulatory examiner or self-regulatory examiner in the course of such examiner's examination, inspection or audit, (vi) as may be required or appropriate in respect to any summons or subpoena or in connection with any litigation, in which case such Lender, Administrative Agent and Collateral Agent, as applicable, shall promptly inform the Manager of such disclosure except to the extent prohibited by law from doing so, (vii) in order to comply with any law, order, regulation or ruling applicable to such Lender, in which case such Lender, Administrative Agent and Collateral Agent, as applicable, shall promptly inform the Manager of such disclosure except to the extent prohibited by law from doing so, (viii) among any other party hereto, (ix) to any direct or indirect contractual counterparty in any swap, hedge or similar agreement (or to any such contractual counterparty's professional advisor), so long as such contractual counterparty (or such professional advisor) agrees to be bound by the provisions of this Section 12.16, (x) to any prospective or actual transferee that is an Eligible Transferee (or other prospective or actual transferee as agreed to by the Borrowers) or participant that is an Eligible Transferee (or other participant as agreed to by the Borrowers) in connection with any contemplated transfer or participation of any of the Term Loan Commitments or any interest therein by such Lender, (xi) to the minimum extent necessary to exercise any remedies hereunder or under the other Credit Documents or to the minimum extent necessary to bring any suit, action or proceeding relating to the enforcement of its rights hereunder or thereunder, in each case, so long as an Event of Default has occurred and is continuing; or (xii) to any credit insurance provider relating to the Borrowers and its obligations hereunder; provided, however, that such prospective or actual transferee or participant or credit insurance provider agrees to be bound by confidentiality provisions substantially the same as those contained in this Section 12.16 and provided, further, that if the Administrative Agent, the Collateral Agent or any Lender is requested to disclose any such information pursuant to clause (vi) or (vii) above, unless prohibited by applicable law or court order, such Person will cooperate with the Manager to prevent or limit such disclosure and, at the request and cost and expense of the Manager, will use commercially reasonable efforts to assist the Manager in obtaining protection of its and its Affiliates' confidential information.

#4848-3242-6112v16

(b)    Each of Holdings, Luxco, the Manager and the other Borrowers hereby acknowledges and agrees that each Lender may share with any of its affiliates, and such affiliates may share with such Lender, any information related to Holdings or any of its Subsidiaries (including, without limitation, any non-public customer information regarding the creditworthiness of Holdings and its Subsidiaries), provided that such Persons shall be subject to the provisions of this Section 12.16 to the same extent as such Lender and each Lender shall only share such information with such Persons to the extent such disclosure relates to the transactions contemplated by this Agreement and the other Credit Documents, including, without limitation, in connection with any contemplated or actual transfer or participation of any of the Term Loan Commitments or any interest therein by such Lender.

(c)    Without limiting the foregoing, each of the Secured Parties party hereto hereby agrees that it shall not, and shall ensure that none of its Affiliates, Subsidiaries, employees or representatives shall, directly refer to any of the Permitted Holders, any Permitted Holder's name, in any press release, any public announcement or statement, in any generally published advertisement or in any interview or other discussion with any reporter or other member of the media in connection with this transaction, without the prior written consent of such Permitted Holder and Holdings with respect to each such reference; provided, however, that nothing herein shall prevent such Secured Party or its Affiliates, Subsidiaries, employees or representatives from using or referring to any such information pursuant to the exceptions set forth in clauses (ii) through (xii) of the first proviso in clause (a) of this Section 12.16.

12.17    Patriot Act.  Each Lender, the Administrative Agent (for itself and not on behalf of any Lender) and the Collateral Agent subject to the USA PATRIOT ACT (Title III of Pub. Law 107-5 6 (signed into law October 26, 200 1)) (as amended from time to time, the "Patriot Act") hereby notifies the Manager and the other Borrowers that pursuant to the requirements of the Patriot Act, it is required to obtain, verify and record information that identifies the Borrowers and the other Credit Parties and other information that will allow such Lender, the Administrative Agent and the Collateral Agent to identify the Borrowers and the other Credit Parties in accordance with the Patriot Act.  This notice is given in accordance with the requirements of the Patriot Act and is effective as to the Administrative Agent, the Collateral Agent and each Lender.  The Credit Parties party hereto hereby acknowledge and agree that the Administrative Agent shall be permitted to share any and all such information with the Lenders.

12.18    Interest Rate Limitation.  Notwithstanding anything to the contrary contained in any Credit Document, the interest paid or agreed to be paid under the Credit Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable law (the "Maximum Rate"). If the Administrative Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be returned to the Borrowers so long as no Event of Default shall have occurred or be continuing.  In determining whether the interest contracted for, charged, or received by the Administrative Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable law, (i) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (ii) exclude voluntary prepayments and the effects thereof, and (iii) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Secured Obligations hereunder.

12.19    Lender Action.  Each Lender agrees that it shall not take or institute any actions or proceedings, judicial or otherwise, for any right or remedy against any Credit Party or any other obligor under any of the Credit Documents (including the exercise of any right of setoff, rights on account of any banker's lien or similar claim or other rights of self-help), or institute any actions or proceedings, or otherwise commence any remedial procedures, with respect to any Collateral or any other property of any such Credit Party, unless expressly provided for herein or in any other Credit Document, without the prior written consent of the Administrative Agent.  The provisions of this

Section 12.19 are for the sole benefit of the Lenders and shall not afford any right to, or constitute a defense available to, any Credit Party.

12.20   Force Majeure.  In no event shall the Administrative Agent or the Collateral Agent be responsible or liable for any failure or delay in the performance of its obligations under this Agreement and the other Credit Documents arising out of or caused by, directly or indirectly, forces beyond its reasonable control, including without limitation strikes, work stoppages, accidents, acts of war or terrorism, civil or military disturbances, nuclear or natural catastrophes or acts of God, and interruptions, loss or malfunctions of utilities, communications or computer (software or hardware) services.

12.21   No Third Party Beneficiary.  The parties hereby acknowledge and agree that unless expressly provided herein no term or provision of this Agreement shall be for the benefit of, or enforceable by, any third party that is not a party hereto.

12.22   Change in Accounting Standards.  Holdings and its Subsidiaries may not change its financial reporting standards from GAAP.

12.23   [Reserved].

12.24   Nature of Liability.  No Guaranteed Creditor shall have any recourse against any individual officer, director, shareholder or member of any Guarantor or the Borrowers or its successors or assigns in respect of any obligations of such Credit Party to the Guaranteed Creditors pursuant to this Agreement except for such individual officer's, director's, shareholder's or member's gross negligence or willful misconduct.  No action may be brought against any such individual officer, director, shareholder or member of any Guarantor or the Borrowers personally except for such individual officer's, director's, shareholder's or member's gross negligence or willful misconduct.  For the avoidance of doubt, the parties hereto acknowledge and agree that this Section 12.24 shall only apply to the extent that any officer, director, shareholder or member of a Guarantor or the Borrowers or its successor or assigns is an individual person and is not a Company or a Governmental Authority.

12.25   Acknowledgement and Consent to Bail-In of EEA Financial Institutions. Notwithstanding anything to the contrary in any Credit Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Credit Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)   the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(b)   the effects of any Bail-in Action on any such liability, including, if applicable:

(i)   a reduction in full or in part or cancellation of any such liability;

(ii)   a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Credit Document; or

(iii)    the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of any EEA Resolution Authority.

For purposes of this Agreement:

"Bail-In Action" shall mean the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"Bail-In Legislation" shall mean, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"EEA Financial Institution" shall mean (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent;

"EEA Member Country" shall mean any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" shall mean any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"EU Bail-In Legislation Schedule" shall mean the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"Write-Down and Conversion Powers" shall mean, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

SECTION 13.    Guaranty.

13.01    Guaranty.  In order to induce the Administrative Agent, the Collateral Agent and the Lenders to enter into this Agreement and to extend credit hereunder, and in recognition of the direct benefits to be received by the Guarantors from the proceeds of the Term Loans: each Guarantor, jointly and severally, hereby unconditionally and irrevocably guarantees as primary obligor and not merely as surety the full and prompt payment and performance when due, whether upon maturity, acceleration or otherwise, of any and all of the Guaranteed Obligations to the Guaranteed Creditors subject to the Maximum Intercompany Balance with respect to each Participating WAC Credit Facility.  If any or all of the Guaranteed Obligations to the Guaranteed Creditors becomes due and payable hereunder, or if the Borrowers fail to perform and discharge any duty, agreement, covenant, undertaking or obligation of the Borrowers under this Agreement or any other Credit Document, then each Guarantor unconditionally and irrevocably, promises to (i) in the event of any failure to make payment of any amount, pay such indebtedness to the Administrative Agent and/or the other Guaranteed Creditors, or order, on demand, together with any and all expenses which may be incurred by the Administrative Agent and the other Guaranteed Creditors in collecting any of the Guaranteed

#4848-3242-6112v16

Obligations, and (ii) in the event of any failure to perform and discharge any such other duty, agreement, covenant, undertaking or obligation, shall cause the same to be promptly performed and discharged on demand.  If claim is ever made upon any Guaranteed Creditor for repayment or recovery of any amount or amounts received in payment or on account of any of the Guaranteed Obligations and any of the aforesaid payees repays all or part of said amount by reason of (x) any judgment, decree or order of any court or administrative body having jurisdiction over such payee or any of its property or (y) any settlement or compromise of any such claim effected by such payee with any such claimant (including the Borrowers), then and in such event each Guarantor agrees that any such judgment, decree, order, settlement or compromise shall be binding upon it, notwithstanding any revocation of this Guaranty or other instrument evidencing any liability of the Borrowers, and each Guarantor shall be and remain liable to the aforesaid payees hereunder for the amount so repaid or recovered to the same extent as if such amount had never originally been received by any such payee.

13.02   [Reserved].

13.03   Nature of Liability.  The liability of each Guarantor hereunder is primary, absolute and unconditional and irrevocable, exclusive and independent of any security for or other guaranty of the Guaranteed Obligations, whether executed by any other guarantor or by any other party, and the liability of each Guarantor hereunder shall not be affected or impaired by (i) any direction as to performance or application of payment by the Borrowers or by any other party, or (ii) any other continuing or other guaranty, undertaking or maximum liability of a guarantor or of any other party as to the Guaranteed Obligations, or (iii) any performance or payment on or in reduction of any such other guaranty or undertaking, or (iv) any dissolution, termination or increase, decrease or change in personnel by the Borrowers, or (v) any payment made to any Guaranteed Creditor on the Guaranteed Obligations which any such Guaranteed Creditor repays to a Credit Party pursuant to court order in any bankruptcy, reorganization, insolvency, examinership, arrangement, moratorium or other debtor relief proceeding, and each Guarantor waives any right to the deferral or modification of its obligations hereunder by reason of any such proceeding, or (vi) any action or inaction by the Guaranteed Creditors as contemplated in Section 13.05, or (vii) any invalidity, irregularity or enforceability of all or any part of the Guaranteed Obligations or of any security therefor.

13.04   Independent Obligation.  The obligations of each Guarantor hereunder are independent of the obligations of any other guarantor, any other party or the Borrowers, and a separate action or actions may be brought and prosecuted against each Guarantor whether or not action is brought against any other guarantor, any other party or the Borrowers and whether or not any other guarantor, any other party or the Borrowers may be joined in any such action or actions.  Any payment or performance by the Borrowers or other circumstance which operates to toll any statute of limitations as to the Borrowers shall operate to toll the statute of limitations as to each Guarantor.

13.05   Authorization.  Each Guarantor authorizes the Guaranteed Creditors without notice or demand (except as shall be required by applicable statute and cannot be waived and except for any notice or demand expressly required by the terms of the Credit Documents), and without affecting or impairing its liability hereunder, from time to time to:

(a)   change the manner, place or terms of performance or payment of, and/or change or extend the time of payment of, renew, increase, accelerate or alter, any of the Guaranteed Obligations (including any increase or decrease in the principal amount thereof or the rate of interest or fees thereon), any security therefor, or any liability incurred directly or indirectly in respect thereof, and this Guaranty shall apply to the Guaranteed Obligations as so changed, extended, renewed or altered;

#4848-3242-6112v16

(b)      take and hold security for the performance or payment of the Guaranteed Obligations and sell, exchange, release, impair, surrender, realize upon or otherwise deal with in any manner and in any order any property by whomsoever at any time pledged or mortgaged to secure, or howsoever securing, the Guaranteed Obligations or any liabilities (including any of those hereunder) incurred directly or indirectly in respect thereof or hereof, and/or any offset there against;

(c)      exercise or refrain from exercising any rights against the Borrowers, any other Credit Party or others or otherwise act or refrain from acting;

(d)      release or substitute any one or more endorsers, guarantors, the Borrowers, other Credit Parties or other obligors;

(e)      settle or compromise any of the Guaranteed Obligations, any security therefor or any liability (including any of those hereunder) incurred directly or indirectly in respect thereof or hereof,

and may subordinate the payment of all or any part thereof to the payment of any liability (whether due or not) of the Borrowers to its creditors other than the Guaranteed Creditors;

(f)      apply any sums by whomsoever paid or howsoever realized to any liability or liabilities of the Borrowers to the Guaranteed Creditors regardless of what liability or liabilities of the Borrowers remain unpaid;

(g)      consent to or waive any breach of, or any act, omission or default under, this Agreement, any other Credit Document or any of the instruments or agreements referred to herein or therein, or otherwise amend, modify or supplement this Agreement, any other Credit Document, or any of such other instruments or agreements; and/or

(h)      take any other action which would, under otherwise applicable principles of common law, give rise to a legal or equitable discharge of the Manager from its liabilities under this Manager Guaranty.

13.06    Reliance.  It is not necessary for any Guaranteed Creditor to inquire into the capacity or powers of the Manager or any of its Subsidiaries or the officers, directors, partners or agents acting or purporting to act on their behalf, and any Guaranteed Obligations made or created in reliance upon the professed exercise of such powers shall be guaranteed hereunder.

13.07    Subordination.  Any indebtedness of Holdings, Luxco, the Manager and other Borrowers or any Subsidiaries of a Borrower now or hereafter owing to any Guarantor is hereby subordinated to the Guaranteed Obligations owing to the Guaranteed Creditors (other than Net WAC Group Intercompany Claims and Net WLIL Intercompany Claims); and if the Administrative Agent so requests at a time when an Event of Default exists, all such indebtedness of Holdings, Luxco, the Manager and other Borrowers or any Subsidiaries of a Borrower to any Guarantor shall be collected, enforced and received by the applicable Guarantor, for the benefit of the Guaranteed Creditors and be paid over to the Administrative Agent on behalf of the Guaranteed Creditors on account of the Guaranteed Obligations to the Guaranteed Creditors, but without affecting or impairing in any manner the liability of each Guarantor under the other provisions of this Guaranty.  Prior to the transfer by the applicable Guarantor of any note or negotiable instrument evidencing any such indebtedness of the Borrowers to such Guarantor, it shall mark such note or negotiable instrument with a legend that the same is subject to this subordination.  Without limiting the generality of the foregoing, each Guarantor hereby agrees with the Guaranteed Creditors that it will not exercise any right of subrogation which it may at any time otherwise have as a result of this Guaranty (whether contractual, under section 509 of

the Bankruptcy Code or otherwise) until all Guaranteed Obligations have been irrevocably performed in full or paid in full in cash.

13.08    Waiver.

(a)    Each Guarantor waives any right (except as shall be required by applicable statute and cannot be waived and except as provided in this Agreement or any other Credit Document) to require any Guaranteed Creditor to (i) proceed against the Borrowers, any other guarantor or any other party, (ii) proceed against or exhaust any security held from the Borrowers, any other guarantor or any other party or (iii) pursue any other remedy in any Guaranteed Creditor's power whatsoever.  Each Guarantor waives any defense based on or arising out of any defense of the Borrowers, any other guarantor or any other party, other than performance or payment of the Guaranteed Obligations to the extent of such performance or payment, based on or arising out of the disability of the Borrowers, any other guarantor or any other party, or the validity, legality or unenforceability of the Guaranteed Obligations or any part thereof from any cause, or the cessation from any cause of the liability of the Borrowers, or the Manager other than performance or payment of the Guaranteed Obligations to the extent of such performance or payment.  The Guaranteed Creditors may, at their election, foreclose on any security held by the Administrative Agent, the Collateral Agent or any other Guaranteed Creditor by one or more judicial or nonjudicial sales, or exercise any other right or remedy the Guaranteed Creditors may have against the Borrowers or any other party, or any security, without affecting or impairing in any way the liability of each Guarantor hereunder except to the extent the Guaranteed Obligations have been performed or paid.  Each Guarantor waives any defense arising out of any such election by the Guaranteed Creditors, even though such election operates to impair or extinguish any right of reimbursement or subrogation or other right or remedy of the Guarantors against the Borrowers or any other party or any security.

(b)    Each Guarantor waives all presentments, demands for performance, protests and notices, including without limitation notices of nonperformance, notices of protest, notices of dishonor, notices of acceptance of this Guaranty, and notices of the existence, creation or incurring of new or additional Guaranteed Obligations, except in each case for notices to it as provided in this Agreement or in any other Credit Document.  Each Guarantor assumes all responsibility for being and keeping itself informed of the Borrowers' financial condition and assets, and of all other circumstances bearing upon the risk of nonperformance or nonpayment of the Guaranteed Obligations and the nature, scope and extent of the risks which each Guarantor assumes and incurs hereunder, and agrees that neither the Administrative Agent nor any of the other Guaranteed Creditors shall have any duty to advise the Guarantors of information known to them regarding such circumstances or risks.

13.09    Payments.  All payments made by any Guarantor pursuant to this Section 13 shall be made in Dollars and will be made without setoff, counterclaim or other defense, and shall be subject to the provisions of Sections 4.03 and 4.04.

13.10    Maximum Liability.  It is the desire and intent of each Guarantor and the Guaranteed Creditors that this Guaranty shall be enforced against such Guarantor to the fullest extent permissible under the laws and public policies applied in each jurisdiction in which enforcement is sought.  If, however, and to the extent that, the obligations of any Guarantor under this Guaranty shall be adjudicated to be invalid or unenforceable for any reason (including, without limitation, because of any applicable state or federal law relating to fraudulent conveyances or transfers), then the amount of such Guarantor's obligations under this Guaranty shall be deemed to be reduced and such Guarantor shall pay the maximum amount of the Guaranteed Obligations which would be permissible under applicable law.

13.11    <u>Judgment Currency</u>.  In respect of any judgment or order given or made for any amount due under this Agreement or any other Credit Document that is expressed and paid in a currency (the "<u>judgment currency</u>") other than the currency in which it is expressed to be payable under this Agreement or other Credit Document, the party hereto owing such amount due will indemnify the party due such amount against any loss incurred by them as a result of any variation as between (a) the rate of exchange at which the United States dollar amount is converted into the judgment currency for the purpose of such judgment or order and (b) the rate of exchange, as quoted by the Administrative Agent or by a known dealer in the judgment currency that is designated by the Administrative Agent, at which the Administrative Agent or such Lender is able to purchase Dollars with the amount of the judgment currency actually received by the Administrative Agent or such Lender.  The foregoing indemnity shall constitute a separate and independent obligation of the applicable party and shall survive any termination of this Agreement and the other Credit Documents, and shall continue in full force and effect notwithstanding any such judgment or order as aforesaid. The term "rate of exchange" shall include any premiums and costs of exchange payable in connection with the purchase of or conversion into Dollars.

SECTION 14.    <u>Security and Priority</u>.

14.01    <u>Grants, Rights and Remedies</u>.  The Liens and security interests granted pursuant to the Security Documents and the administrative priority and lien priority granted under the Orders may be independently granted by the Credit Documents and by other Credit Documents hereafter entered into.  This Agreement, the Orders and such other Credit Documents supplement each other, and the grants, priorities, rights and remedies of the Administrative Agent and the Lenders hereunder and thereunder are cumulative; <u>provided</u> that to the extent of conflict the Order controls.

14.02    <u>Survival</u>.  The Liens, lien priority, administrative priorities and other rights and remedies granted to the Administrative Agent and the Lenders pursuant to this Agreement, the Orders and the other Credit Documents (specifically including, but not limited to, the existence, perfection and priority of the Liens and security interests provided herein and therein, and the administrative priority provided herein and therein) shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of Indebtedness by the Borrowers (pursuant to Section 364 of the Bankruptcy Code or otherwise), or by any dismissal or conversion of any of the Cases, or by any other act or omission whatsoever, in each case, other than as the Administrative Agent (at the direction of the Required Lenders) or the Required Lenders consent or as otherwise ordered by the Bankruptcy Court.

SECTION 15.    <u>Orders</u>.  In the case of any conflict or inconsistency between the terms of this Agreement, the Cash Management Orders and the Orders, the terms of the Orders shall govern and control.

* * *

#4848-3242-6112v16

IN WITNESS WHEREOF, the parties hereto have caused their duly authorized officers or representatives to execute and deliver this Agreement as of the date first above written.

[Signature block]

ANKURA TRUST COMPANY, LLC,
as Administrative Agent

By: _____
Name: _____
Title: _____

ANKURA TRUST COMPANY, LLC,
as Collateral Agent

By: _____
Name: _____
Title: _____

[Lenders Signature block]

#4848-3242-6112v16

## EXHIBIT B

**INITIAL BUDGET**



**Waypoint Leasing - DIP Budget Analysis (No WAC2, WAC3, or WAC10)**

*Submitted as of: December 6, 2018*

12/6/2018
7:25 PM

---

## Disclaimer

---

None of Waypoint Leasing Holdings Ltd. (collectively with its subsidiaries, the "Company"), or any of its "Advisors" (consisting of Houlihan Lokey Capital, Inc., Seabury Aviation Consulting LLC, FTI Consulting, Inc., and Weil, Gotshal & Manges LLP) or any of their respective subsidiaries, affiliates, officers, directors, shareholders, managers, employees, consultants, advisors, agents or representatives (collectively, the "Representatives") makes any representation or warranty, express or implied at law or in equity, in connection with any of the information made available either herein or subsequent to this document, including, but not limited to, the past, present or future value of the anticipated cash flows, income, costs, expenses, liabilities and profits, if any, of the Company. Accordingly, any person, company or interested party will rely solely upon its own independent examination and assessment of the information in making any decision in connection with a proposed restructuring of the Company's balance sheet (a "Transaction") and in no event shall any recipient party make any claim against the Company, its Advisors or any of their respective Representatives in respect of, or based upon, the information contained either herein or subsequent to this presentation.

None of the Company, or its Advisors or any of their respective Representatives shall have any liability to any recipient party or its respective Representatives as a result of receiving and/or evaluating any information concerning the Transaction (including, but not limited to, this presentation).

This presentation contains forward-looking statements within the meaning of the "safe harbor" provisions of the Private Securities Litigation Reform Act of 1995. All statements, other than statements of historical facts, contained in this presentation, including statements of a general economic or industry specified nature and statements regarding the Company's opinions, expectations, beliefs, strategies, future operations, future financial position, future revenue or performance, financing needs, business trends, projected costs and other projections, prospects, future events, assumptions, plans and objectives of management and expected market growth and conditions are, or may be deemed to be, forward-looking statements. These forward-looking statements are based on management's current view of future events, industry publications and reports. These statements are subject to risks, uncertainties, assumptions and other important factors, many of which are beyond the Company's control, and could cause actual results to differ materially from those expressed or implied in these forward-looking statements. These statements should not be considered guarantees of future results, which could differ materially from the results set forth in, contemplated by, or underlying this presentation. Many of the factors that will determine future results, performance or achievement are beyond the Company's ability to control or predict, and, accordingly, you should not place undue reliance on such forward-looking statements. The forward-looking statements speak only as of the date made, and the Company undertakes no obligation, and expressly disavows any obligation, to update these forward-looking statements whether as a result of new information, future events or otherwise.

This presentation is confidential and was not prepared with a view toward public disclosure. Distribution of this presentation or disclosure of any of the information set forth herein to any party other than the intended recipient of this presentation is expressly prohibited and any copying, reproduction, transmission, disclosure or other form of distribution of this presentation or the information presented during the presentation without the express written permission of the Company is expressly prohibited.

12/6/2018
7:25 PM

**Waypoint Leasing**
Summary DIP Budget Assumptions
As of December 6, 2018
*($ in Thousands)*

A. The DIP budget is based on the Company's most recent view of the cash forecast.

B. Waypoint Leasing filed on 11/25/18.  No assumptions have been made as to when the Company will emerge from bankruptcy or the cash requirements to emerge.

C. Assumes all prepetition and post petition compensation & benefits, maintenance, bank fees and taxes are paid in the normal course per first day motions.

D. <u>Projected Professional fees assume that expenses are paid when incurred; No UCC</u>

E. Assumes that the Company receives a $45.0 million DIP credit facility. The Company then uses those proceeds to fund each WAC.

F. The assumptions outlined below reflect the overlays that are applied to the Company's current weekly cash flow forecast.  The resulting forecast is the DIP Budget.

G. <u>Excludes all the receipts and disbursements of Non-Participating WACs; Includes all receipts and excludes all disbursements of WAC11.</u>

*($ in thousands)*

Summary of DIP Overlay Assumptions

| | 11/30/18 | 12/07/18 | 12/14/18 | 12/21/18 | 12/28/18 | 01/04/19 | 01/11/19 | 01/18/19 | 01/25/19 | 02/01/19 | 02/08/19 | 02/15/19 | 02/22/19 | 03/01/19 | 14 Week Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. Percentage reduction in projected rental receipts | (200) | (169) | (47) | (214) | (183) | (297) | (17) | (45) | (145) | (361) | (28) | (25) | (110) | (416) | (2,258) |
| 2. Reduction in projected other receipts | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 3. Stay of prepetition A/P disbursements | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 4. Wages & benefits, maint., taxes paid in normal course | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 5. Non Operating Income / Expenses | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 6. Professional Fees | - | - | (7,425) | 3,369 | (1,192) | 1,589 | (2,786) | 1,265 | (2,056) | 978 | (2,629) | 1,107 | (2,556) | (11,830) | (22,167) |
| 7. Additional Professional Fee Retainers | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 8. Additional Bankruptcy Related Disbursements | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| 9. DIP Financing | - | - | 13,200 | - | - | - | 14,842 | - | 15,000 | - | (348) | - | - | - | 42,694 |
| 10. Transformation Bonus & Other | - | - | - | - | - | - | - | - | - | (2,943) | - | - | - | - | (2,943) |
| Total Change | $ (200) | $ (169) | $ 5,728 | $ 3,155 | $ (1,375) | $ 1,291 | $ 12,039 | $ 1,219 | $ 12,799 | $ (2,326) | $ (3,005) | $ 1,082 | $ (2,666) | $(12,246) | $ 15,326 |

12/6/2018
7:25 PM

**Waypoint Leasing**
Detailed DIP Budget Assumptions
As of December 06, 2018
*($ in Thousands)*

| | | Fcst 11/30/18 | Fcst 12/07/18 | Fcst 12/14/18 | Fcst 12/21/18 | Fcst 12/28/18 | Fcst 01/04/19 | Fcst 01/11/19 | Fcst 01/18/19 | Fcst 01/25/19 | Fcst 02/01/19 | Fcst 02/08/19 | Fcst 02/15/19 | Fcst 02/22/19 | Fcst 03/01/19 | 14 Week Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. % reduction in projected rental receipts | -10% | (200) | (169) | (47) | (214) | (183) | (297) | (17) | (45) | (145) | (361) | (28) | (25) | (110) | (416) | (2,258) |
| 2. Reduction in projected other receipts | 0% | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **3. Stay of prepetition A/P disbursements.** | | | | | | | | | | | | | | | | |
| Rent | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Ordinary Course Professionals | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Marketing | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other Overhead | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Reversal of Prepetition Disbursements | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |

4. Assumes all prepetition and post petition compensation & benefits, maintenance, bank fees and taxes are paid in the normal course per first day motions.

| | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **5. Non Operating** | | | | | | | | | | | | | | | | |
| Interest Income (Cap / Collar) | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total BK Impact on Non Operating | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| **6. Professional Fees** | | | | | | | | | | | | | | | | |
| Base Professional Fees | | - | - | 5,425 | - | 2,270 | - | 3,260 | - | 2,170 | - | 3,260 | - | 1,920 | | 18,304 |
| Incremental DIP Budget Assumptions | | - | - | 7,425 | (3,369) | 1,192 | (1,589) | 2,786 | (1,265) | 2,056 | (978) | 2,629 | (1,107) | 2,556 | 11,830 | 22,167 |
| DIP Budget Professional Fees | | $ - | $ - | $ 7,425 | $ 2,056 | $ 1,192 | $ 681 | $ 2,786 | $ 1,995 | $ 2,056 | $ 1,192 | $ 2,629 | $ 2,153 | $ 2,556 | $ 13,750 | $ 40,471 |

*See appendix for detailed professional fee assumptions.*

| | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **7. Professional Fee Retainers** | | | | | | | | | | | | | | | | |
| Reversal (Professional Fee Override) | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Professional Fee Retainers | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| **8. Additional Bankruptcy Related Disbursements** | | | | | | | | | | | | | | | | |
| Utility & Other Deposits | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| D&O Insurance Tail | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Additional Bankruptcy Related Disbursements | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| **9. DIP Financing** | | | | | | | | | | | | | | | | |
| DIP Financing | | - | 15,000 | - | - | - | 15,000 | - | 15,000 | - | - | - | - | - | - | 45,000 |
| DIP Cash Interest | | - | - | - | - | - | - | (158) | - | - | - | (348) | - | - | - | (506) |
| DIP Fees | | - | (1,800) | - | - | - | - | - | - | - | - | - | - | - | - | (1,800) |
| Total DIP Financing | | $ - | $ 13,200 | $ - | $ - | $ - | $ 14,842 | $ - | $ 15,000 | $ - | $ - | $ (348) | $ - | $ - | $ - | $ 42,694 |
| **10. Transformation Bonus & Other Employee Comp** | | | | | | | | | | | | | | | | |
| Contractual Transformation Bonus | | - | - | - | - | - | - | - | - | - | (2,439) | - | - | - | - | (2,439) |
| Key Employee Health Insurance | | - | - | - | - | - | - | - | - | - | (504) | - | - | - | - | (504) |
| Total Transformation Bonus & Other | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ (2,943) | $ - | $ - | $ - | $ - | $ (2,943) |

**Waypoint Leasing**

Consolidated DIP Budget

| ($ in thousands) | Fcst 1 11/30/18 | Fcst 2 12/07/18 | Fcst 3 12/14/18 | Fcst 4 12/21/18 | Fcst 5 12/28/18 | Fcst 6 01/04/19 | Fcst 7 01/11/19 | Fcst 8 01/18/19 | Fcst 9 01/25/19 | Fcst 10 02/01/19 | Fcst 11 02/08/19 | Fcst 12 02/15/19 | Fcst 13 02/22/19 | Fcst 14 03/01/19 | 14 Week Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Operating Receipts** | | | | | | | | | | | | | | | |
| Rental Receipts | 1,804 | 1,520 | 424 | 1,924 | 1,646 | 2,675 | 154 | 408 | 1,305 | 3,249 | 256 | 224 | 986 | 3,745 | 20,321 |
| Other | 131 | 85 | 85 | 85 | 85 | 131 | 85 | 85 | 90 | 131 | 85 | 125 | 85 | 131 | 1,419 |
| **Total Operating Receipts** | 1,935 | 1,605 | 509 | 2,009 | 1,731 | 2,806 | 239 | 493 | 1,395 | 3,380 | 341 | 349 | 1,071 | 3,876 | 21,740 |
| **Operating Disbursements** | | | | | | | | | | | | | | | |
| Payroll & Benefits | - | (18) | (387) | (309) | (361) | (26) | - | - | (381) | (7,506) | - | - | (331) | (390) | (9,708) |
| Rent | - | - | (13) | (15) | (55) | - | - | - | (65) | - | - | - | - | (55) | (202) |
| Ordinary Course Professionals | - | (18) | - | (672) | - | (669) | - | (200) | (130) | (200) | - | (250) | (200) | (250) | (2,588) |
| Marketing | - | - | - | (106) | (30) | - | (50) | - | (50) | - | - | (100) | (50) | - | (386) |
| Taxes | - | - | (416) | - | - | (175) | - | (50) | - | - | - | (16) | - | - | (657) |
| Security Deposit Refund | - | - | - | - | - | - | - | - | - | - | - | - | - | - | |
| Other Overhead | - | (104) | (104) | (307) | (62) | - | (150) | (5) | (187) | (10) | (150) | - | (191) | (10) | (1,279) |
| PBH Buy-Ins | - | - | - | (280) | - | - | - | (86) | - | - | - | - | - | - | (365) |
| Aircraft Transportation | - | - | - | - | - | - | - | - | - | - | - | - | - | - | |
| Maintenance | - | - | (2,486) | (1,201) | (926) | (155) | (495) | (1,255) | (280) | (255) | (255) | (1,056) | (155) | (700) | (9,219) |
| **Total Operating Disbursements** | - | (140) | (3,405) | (2,889) | (1,434) | (1,024) | (695) | (1,596) | (1,028) | (8,036) | (405) | (1,422) | (927) | (1,405) | (24,405) |
| **Operating Cash Flow** | 1,935 | 1,466 | (2,896) | (881) | 297 | 1,782 | (456) | (1,103) | 367 | (4,656) | (64) | (1,073) | 143 | 2,471 | (2,665) |
| **Non-Operating** | | | | | | | | | | | | | | | |
| Interest Expense | - | - | - | - | - | - | - | - | - | - | - | - | - | - | |
| Debt Amortization | - | - | - | - | - | - | - | - | - | - | - | - | - | - | |
| Bank Fees | - | (0) | (83) | - | (70) | - | (25) | - | (110) | - | (15) | - | (10) | (10) | (323) |
| **Total Non-Operating** | - | (0) | (83) | - | (70) | - | (25) | - | (110) | - | (15) | - | (10) | (10) | (323) |
| **Restructuring Related** | | | | | | | | | | | | | | | |
| Professional Fees | - | - | (7,425) | (2,056) | (1,192) | (681) | (2,786) | (1,995) | (2,056) | (1,192) | (2,629) | (2,153) | (2,556) | (13,750) | (40,471) |
| Professional Fees - Retainers | - | - | - | - | - | - | - | - | - | - | - | - | - | - | |
| Utility & Other Deposits | - | - | - | - | - | - | - | - | - | - | - | - | - | - | |
| DIP Financing (1) | - | - | 15,000 | - | - | - | 15,000 | - | 15,000 | - | - | - | - | - | 45,000 |
| DIP Cash Interest | - | - | - | - | - | - | - | (158) | - | - | - | (348) | - | - | (506) |
| DIP Fees | - | - | (1,800) | - | - | - | - | - | - | - | - | - | - | - | (1,800) |
| **Total Restructuring Related** | - | - | 5,775 | (2,056) | (1,192) | (681) | 12,056 | (1,995) | 12,944 | (1,192) | (2,976) | (2,153) | (2,556) | (13,750) | 2,224 |
| **Net Cash Flow** | 1,935 | 1,465 | 2,797 | (2,937) | (965) | 1,100 | 11,575 | (3,098) | 13,201 | (5,848) | (3,055) | (3,226) | (2,423) | (11,288) | (765) |
| **Cash** | | | | | | | | | | | | | | | |
| Beginning Balance | 8,198 | 10,133 | 11,598 | 14,395 | 11,458 | 10,493 | 11,594 | 23,169 | 20,071 | 33,272 | 27,425 | 24,370 | 21,144 | 18,721 | 8,198 |
| Net Cash Flow | 1,935 | 1,465 | 2,797 | (2,937) | (965) | 1,100 | 11,575 | (3,098) | 13,201 | (5,848) | (3,055) | (3,226) | (2,423) | (11,288) | (765) |
| **Ending Balance** | 10,133 | 11,598 | 14,395 | 11,458 | 10,493 | 11,594 | 23,169 | 20,071 | 33,272 | 27,425 | 24,370 | 21,144 | 18,721 | 7,433 | 7,433 |

(1) Represents the cash available to the Company at the interim and final DIP draws.

12/6/2018
7:25 PM

**Waypoint Leasing**
DIP Budget Operating Cash Flow by WAC

| ($ in thousands) | Allocation Methodology | NBV % / Loan % | Fcst 1 11/30/18 | Fcst 2 12/07/18 | Fcst 3 12/14/18 | Fcst 4 12/21/18 | Fcst 5 12/28/18 | Fcst 6 01/04/19 | Fcst 7 01/11/19 | Fcst 8 01/18/19 | Fcst 9 01/25/19 | Fcst 10 02/01/19 | Fcst 11 02/08/19 | Fcst 12 02/15/19 | Fcst 13 02/22/19 | Fcst 14 03/01/19 | 14 Week Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **WAC1** | | 38.1% | | | | | | | | | | | | | | | |
| Operating Receipts | | 35.1% | | | | | | | | | | | | | | | |
| Rental Receipts | Direct | | $ 414 | $ 580 | $ 100 | $ 1,002 | $ 153 | $ 1,000 | $ 28 | $ 92 | $ 311 | $ 1,000 | $ 18 | $ 26 | $ 325 | $ 982 | $ 6,032 |
| Other | NBV % | | 50 | 32 | 32 | 32 | 32 | 50 | 32 | 32 | 34 | 50 | 32 | 48 | 32 | 50 | 541 |
| Total Operating Receipts | | | $ 464 | $ 613 | $ 133 | $ 1,034 | $ 185 | $ 1,050 | $ 61 | $ 125 | $ 346 | $ 1,050 | $ 50 | $ 74 | $ 357 | $ 1,032 | $ 6,573 |
| | | | | | | | | | | | | | | | | | |
| Operating Disbursements | | | | | | | | | | | | | | | | | |
| Payroll & Benefits | NBV % | | - | (7) | (147) | (118) | (138) | (10) | - | - | (145) | (2,862) | - | - | (126) | (149) | (3,702) |
| PBH Buy-Ins | Direct | | - | - | - | (280) | - | - | - | (86) | - | - | - | - | - | - | (365) |
| Maintenance | Direct | | - | - | (288) | (157) | (766) | - | (110) | (513) | (50) | (100) | (100) | (30) | - | (495) | (2,609) |
| Other Maintenance | NBV % | | - | - | (57) | (294) | - | (59) | (59) | (59) | (59) | (59) | (59) | (59) | (59) | (59) | (883) |
| Security Deposit Refund | Direct | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other Overhead | NBV % | | - | (47) | (203) | (419) | (56) | (322) | (76) | (97) | (140) | (105) | (57) | (140) | (168) | (120) | (1,950) |
| BK Stay of Prepetition AP | NBV % | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Operating Disbursements | | | $ - | $ (53) | $ (696) | $ (1,268) | $ (960) | $ (391) | $ (245) | $ (754) | $ (394) | $ (3,126) | $ (216) | $ (229) | $ (354) | $ (823) | $ (9,508) |
| | | | | | | | | | | | | | | | | | |
| **Operating Cash Flow** | | | **$ 464** | **$ 559** | **$ (563)** | **$ (233)** | **$ (774)** | **$ 659** | **$ (185)** | **$ (630)** | **$ (49)** | **$ (2,076)** | **$ (166)** | **$ (155)** | **$ 4** | **$ 209** | **$ (2,935)** |
| | | | | | | | | | | | | | | | | | |
| Net Non-Operating | NBV % | | - | (0) | (32) | - | (27) | - | (10) | - | (42) | - | (6) | - | (4) | (4) | (123) |
| Net Non-Operating | Direct | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| DIP Cash Interest | Loan % | | - | - | - | - | - | - | (55) | - | - | - | - | - | - | - | (178) |
| DIP Fees | Loan % | | - | - | (632) | - | - | - | - | - | - | - | - | - | - | - | (632) |
| Professional Fees | NBV % | | - | - | (2,831) | (784) | (454) | (260) | (1,062) | (761) | (784) | (454) | (1,002) | (821) | (975) | (5,243) | (15,432) |
| **Net Cash Flow** | | | **$ 464** | **$ 559** | **$ (4,058)** | **$ (1,017)** | **$ (1,256)** | **$ 399** | **$ (1,312)** | **$ (1,391)** | **$ (875)** | **$ (2,531)** | **$ (1,296)** | **$ (976)** | **$ (975)** | **$ (5,038)** | **$ (19,300)** |
| | | | | | | | | | | | | | | | | | |
| Beginning Cash Balance | | | $ 210 | $ 673 | $ 1,233 | $ 500 | $ 500 | $ 500 | $ 899 | $ 500 | $ 500 | $ 500 | $ 500 | $ 500 | $ 500 | $ 500 | $ 210 |
| Plus: Cash Flow | | | 464 | 559 | (4,058) | (1,017) | (1,256) | 399 | (1,312) | (1,391) | (875) | (2,531) | (1,296) | (976) | (975) | (5,038) | (19,300) |
| Plus: Revolver Draw / (Pay Down) | | | - | - | 3,325 | 1,017 | 1,256 | - | 913 | 1,391 | 875 | 2,531 | 1,296 | 976 | 975 | 5,038 | 19,591 |
| Ending Cash Balance | | | $ 673 | $ 1,233 | $ 500 | $ 500 | $ 500 | $ 899 | $ 500 | $ 500 | $ 500 | $ 500 | $ 500 | $ 500 | $ 500 | $ 500 | $ 500 |
| | | | | | | | | | | | | | | | | | |
| Beginning DIP Facility Balance | | | $ - | $ - | $ - | $ 3,325 | $ 4,342 | $ 5,598 | $ 5,598 | $ 6,510 | $ 7,901 | $ 8,776 | $ 11,306 | $ 12,602 | $ 13,578 | $ 14,553 | $ - |
| Plus: Revolver Draw / (Pay Down) | | | - | - | 3,325 | 1,017 | 1,256 | - | 913 | 1,391 | 875 | 2,531 | 1,296 | 976 | 975 | 5,038 | 19,591 |
| Ending DIP Facility Balance | | | $ - | $ - | $ 3,325 | $ 4,342 | $ 5,598 | $ 5,598 | $ 6,510 | $ 7,901 | $ 8,776 | $ 11,306 | $ 12,602 | $ 13,578 | $ 14,553 | $ 19,591 | $ 19,591 |

12/6/2018
7:25 PM

**Waypoint Leasing**

DIP Budget Operating Cash Flow by WAC

| ($ in thousands) | Allocation Methodology | NBV % / Loan % | Fcst 1 11/30/18 | Fcst 2 12/07/18 | Fcst 3 12/14/18 | Fcst 4 12/21/18 | Fcst 5 12/28/18 | Fcst 6 01/04/19 | Fcst 7 01/11/19 | Fcst 8 01/18/19 | Fcst 9 01/25/19 | Fcst 10 02/01/19 | Fcst 11 02/08/19 | Fcst 12 02/15/19 | Fcst 13 02/22/19 | Fcst 14 03/01/19 | 14 Week Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| WAC2 | | 0.0% | | | | | | | | | | | | | | | |
| Operating Receipts | | 0.0% | | | | | | | | | | | | | | | |
| Rental Receipts | Direct | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Other | NBV % | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Operating Receipts | | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| | | | | | | | | | | | | | | | | | |
| Operating Disbursements | | | | | | | | | | | | | | | | | |
| Payroll & Benefits | NBV % | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| PBH Buy-Ins | Direct | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Maintenance | Direct | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other Maintenance | NBV % | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Security Deposit Refund | Direct | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other Overhead | NBV % | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| BK Stay of Prepetition AP | NBV % | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Operating Disbursements | | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| | | | | | | | | | | | | | | | | | |
| **Operating Cash Flow** | | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| | | | | | | | | | | | | | | | | | |
| Net Non-Operating | NBV % | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Net Non-Operating | Direct | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| DIP Cash Interest | Loan % | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| DIP Fees | Loan % | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Professional Fees | NBV % | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Net Cash Flow** | | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| | | | | | | | | | | | | | | | | | |
| Beginning Cash Balance | | | $ 5 | $ 5 | $ 5 | $ 5 | $ 5 | $ 5 | $ 5 | $ 5 | $ 5 | $ 5 | $ 5 | $ 5 | $ 5 | $ 5 | $ 5 |
| Plus: Cash Flow | | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Plus: Revolver Draw / (Pay Down) | | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Ending Cash Balance | | | $ 5 | $ 5 | $ 5 | $ 5 | $ 5 | $ 5 | $ 5 | $ 5 | $ 5 | $ 5 | $ 5 | $ 5 | $ 5 | $ 5 | $ 5 |
| | | | | | | | | | | | | | | | | | |
| Beginning DIP Facility Balance | | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Plus: Revolver Draw / (Pay Down) | | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Ending DIP Facility Balance | | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |

12/6/2018
7:25 PM

**Waypoint Leasing**

DIP Budget Operating Cash Flow by WAC

| ($ in thousands) | Allocation Methodology | NBV % / Loan % | Fcst 1 11/30/18 | Fcst 2 12/07/18 | Fcst 3 12/14/18 | Fcst 4 12/21/18 | Fcst 5 12/28/18 | Fcst 6 01/04/19 | Fcst 7 01/11/19 | Fcst 8 01/18/19 | Fcst 9 01/25/19 | Fcst 10 02/01/19 | Fcst 11 02/08/19 | Fcst 12 02/15/19 | Fcst 13 02/22/19 | Fcst 14 03/01/19 | 14 Week Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **WAC3** | | 0.0% | | | | | | | | | | | | | | | |
| Operating Receipts | | 0.0% | | | | | | | | | | | | | | | |
| Rental Receipts | Direct | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Other | NBV % | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Operating Receipts | | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| | | | | | | | | | | | | | | | | | |
| Operating Disbursements | | | | | | | | | | | | | | | | | |
| Payroll & Benefits | NBV % | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| PBH Buy-Ins | Direct | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Maintenance | Direct | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other Maintenance | NBV % | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Security Deposit Refund | Direct | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other Overhead | NBV % | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| BK Stay of Prepetition AP | NBV % | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Operating Disbursements | | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| | | | | | | | | | | | | | | | | | |
| **Operating Cash Flow** | | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| | | | | | | | | | | | | | | | | | |
| Net Non-Operating | NBV % | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Net Non-Operating | Direct | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| DIP Cash Interest | Loan % | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| DIP Fees | Loan % | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Professional Fees | NBV % | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Net Cash Flow** | | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| | | | | | | | | | | | | | | | | | |
| Beginning Cash Balance | | | $ 99 | $ 99 | $ 99 | $ 99 | $ 99 | $ 99 | $ 99 | $ 99 | $ 99 | $ 99 | $ 99 | $ 99 | $ 99 | $ 99 | $ 99 |
| Plus: Cash Flow | | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Plus: Revolver Draw / (Pay Down) | | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Ending Cash Balance | | | $ 99 | $ 99 | $ 99 | $ 99 | $ 99 | $ 99 | $ 99 | $ 99 | $ 99 | $ 99 | $ 99 | $ 99 | $ 99 | $ 99 | $ 99 |
| | | | | | | | | | | | | | | | | | |
| Beginning DIP Facility Balance | | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Plus: Revolver Draw / (Pay Down) | | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Ending DIP Facility Balance | | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |

12/6/2018
7:25 PM

**Waypoint Leasing**
DIP Budget Operating Cash Flow by WAC

| ($ in thousands) | Allocation Methodology | NBV % / Loan % | Fcst 1 11/30/18 | Fcst 2 12/07/18 | Fcst 3 12/14/18 | Fcst 4 12/21/18 | Fcst 5 12/28/18 | Fcst 6 01/04/19 | Fcst 7 01/11/19 | Fcst 8 01/18/19 | Fcst 9 01/25/19 | Fcst 10 02/01/19 | Fcst 11 02/08/19 | Fcst 12 02/15/19 | Fcst 13 02/22/19 | Fcst 14 03/01/19 | 14 Week Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **WAC5** | | 0.0% | | | | | | | | | | | | | | | |
| Operating Receipts | | 0.0% | | | | | | | | | | | | | | | |
| Rental Receipts | Direct | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Other | NBV % | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Operating Receipts | | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| | | | | | | | | | | | | | | | | | |
| Operating Disbursements | | | | | | | | | | | | | | | | | |
| Payroll & Benefits | NBV % | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| PBH Buy-Ins | Direct | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Maintenance | Direct | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other Maintenance | NBV % | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Security Deposit Refund | Direct | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other Overhead | NBV % | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| BK Stay of Prepetition AP | NBV % | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Operating Disbursements | | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| | | | | | | | | | | | | | | | | | |
| **Operating Cash Flow** | | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| | | | | | | | | | | | | | | | | | |
| Net Non-Operating | NBV % | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Net Non-Operating | Direct | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| DIP Cash Interest | Loan % | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| DIP Fees | Loan % | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Professional Fees | NBV % | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Net Cash Flow** | | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| | | | | | | | | | | | | | | | | | |
| Beginning Cash Balance | | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Plus: Cash Flow | | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Plus: Revolver Draw / (Pay Down) | | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Ending Cash Balance | | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| | | | | | | | | | | | | | | | | | |
| Beginning DIP Facility Balance | | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Plus: Revolver Draw / (Pay Down) | | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Ending DIP Facility Balance | | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |

**Waypoint Leasing**

DIP Budget Operating Cash Flow by WAC

| ($ in thousands) | Allocation Methodology | NBV % / Loan % | Fcst 1 11/30/18 | Fcst 2 12/07/18 | Fcst 3 12/14/18 | Fcst 4 12/21/18 | Fcst 5 12/28/18 | Fcst 6 01/04/19 | Fcst 7 01/11/19 | Fcst 8 01/18/19 | Fcst 9 01/25/19 | Fcst 10 02/01/19 | Fcst 11 02/08/19 | Fcst 12 02/15/19 | Fcst 13 02/22/19 | Fcst 14 03/01/19 | 14 Week Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| WAC6 | | 10.0% | | | | | | | | | | | | | | | |
| Operating Receipts | | 8.0% | | | | | | | | | | | | | | | |
| Rental Receipts | Direct | | $ - | $ - | 63 | 330 | - | - | 63 | 209 | 122 | - | - | 198 | 195 | - | 1,180 |
| Other | NBV % | | 13 | 9 | 9 | 9 | 9 | 13 | 9 | 9 | 9 | 13 | 9 | 13 | 9 | 13 | 143 |
| Total Operating Receipts | | | $ 13 | $ 9 | $ 72 | $ 339 | $ 9 | $ 13 | $ 72 | $ 217 | $ 131 | $ 13 | $ 9 | $ 211 | $ 204 | $ 13 | $ 1,323 |
| | | | | | | | | | | | | | | | | | |
| Operating Disbursements | | | | | | | | | | | | | | | | | |
| Payroll & Benefits | NBV % | | - | (2) | (39) | (31) | (36) | (3) | - | - | (38) | (754) | - | - | (33) | (39) | (976) |
| PBH Buy-Ins | Direct | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Maintenance | Direct | | - | - | (646) | - | (160) | - | - | (399) | - | - | - | - | - | (50) | (1,255) |
| Other Maintenance | NBV % | | - | - | (15) | (77) | - | (16) | (16) | (16) | (16) | (16) | (16) | (16) | (16) | (16) | (233) |
| Security Deposit Refund | Direct | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other Overhead | NBV % | | - | (12) | (54) | (110) | (15) | (85) | (20) | (26) | (37) | (28) | (15) | (37) | (44) | (32) | (514) |
| BK Stay of Prepetition AP | NBV % | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Operating Disbursements | | | $ - | $ (14) | $ (753) | $ (219) | $ (211) | $ (103) | $ (36) | $ (440) | $ (91) | $ (798) | $ (31) | $ (52) | $ (93) | $ (136) | $ (2,977) |
| | | | | | | | | | | | | | | | | | |
| **Operating Cash Flow** | | | $ 13 | $ (5) | $ (682) | $ 120 | $ (203) | $ (90) | $ 36 | $ (223) | $ 40 | $ (784) | $ (22) | $ 158 | $ 111 | $ (123) | $ (1,655) |
| | | | | | | | | | | | | | | | | | |
| Net Non-Operating | NBV % | | - | (0) | (8) | - | (7) | - | (3) | - | (11) | - | (2) | - | (1) | (1) | (32) |
| Net Non-Operating | Direct | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| DIP Cash Interest | Loan % | | - | - | - | - | - | - | (13) | - | - | - | (28) | - | - | - | (40) |
| DIP Fees | Loan % | | - | - | (144) | - | - | - | - | - | - | - | - | - | - | - | (144) |
| Professional Fees | NBV % | | - | - | (746) | (207) | (120) | (68) | (280) | (201) | (207) | (120) | (264) | (216) | (257) | (1,382) | (4,067) |
| **Net Cash Flow** | | | $ 13 | $ (5) | $ (1,580) | $ (87) | $ (329) | $ (158) | $ (259) | $ (423) | $ (178) | $ (904) | $ (316) | $ (58) | $ (147) | $ (1,506) | $ (5,939) |
| | | | | | | | | | | | | | | | | | |
| Beginning Cash Balance | | | $ 72 | $ 500 | $ 500 | $ 500 | $ 500 | $ 500 | $ 500 | $ 500 | $ 500 | $ 500 | $ 500 | $ 500 | $ 500 | $ 500 | $ 72 |
| Plus: Cash Flow | | | 13 | (5) | (1,580) | (87) | (329) | (158) | (259) | (423) | (178) | (904) | (316) | (58) | (147) | (1,506) | (5,939) |
| Plus: Revolver Draw / (Pay Down) | | | 415 | 5 | 1,580 | 87 | 329 | 158 | 259 | 423 | 178 | 904 | 316 | 58 | 147 | 1,506 | 6,367 |
| Ending Cash Balance | | | $ 500 | $ 500 | $ 500 | $ 500 | $ 500 | $ 500 | $ 500 | $ 500 | $ 500 | $ 500 | $ 500 | $ 500 | $ 500 | $ 500 | $ 500 |
| | | | | | | | | | | | | | | | | | |
| Beginning DIP Facility Balance | | | $ - | $ 415 | $ 420 | $ 2,001 | $ 2,087 | $ 2,417 | $ 2,575 | $ 2,834 | $ 3,258 | $ 3,436 | $ 4,340 | $ 4,655 | $ 4,714 | $ 4,861 | $ - |
| Plus: Revolver Draw / (Pay Down) | | | 415 | 5 | 1,580 | 87 | 329 | 158 | 259 | 423 | 178 | 904 | 316 | 58 | 147 | 1,506 | 6,367 |
| Ending DIP Facility Balance | | | $ 415 | $ 420 | $ 2,001 | $ 2,087 | $ 2,417 | $ 2,575 | $ 2,834 | $ 3,258 | $ 3,436 | $ 4,340 | $ 4,655 | $ 4,714 | $ 4,861 | $ 6,367 | $ 6,367 |

12/6/2018
7:25 PM

**Waypoint Leasing**

DIP Budget Operating Cash Flow by WAC

| ($ in thousands) | Allocation Methodology | NBV % / Loan % | Fcst 1 11/30/18 | Fcst 2 12/07/18 | Fcst 3 12/14/18 | Fcst 4 12/21/18 | Fcst 5 12/28/18 | Fcst 6 01/04/19 | Fcst 7 01/11/19 | Fcst 8 01/18/19 | Fcst 9 01/25/19 | Fcst 10 02/01/19 | Fcst 11 02/08/19 | Fcst 12 02/15/19 | Fcst 13 02/22/19 | Fcst 14 03/01/19 | 14 Week Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| WAC7 | | 5.7% | | | | | | | | | | | | | | | |
| Operating Receipts | | 12.0% | | | | | | | | | | | | | | | |
| Rental Receipts | Direct | | $ - | $ 170 | $ - | $ - | $ - | $ 170 | $ - | $ - | $ - | $ 80 | $ 90 | $ - | $ - | $ 80 | 590 |
| Other | NBV % | | 7 | 5 | 5 | 5 | 5 | 7 | 5 | 5 | 5 | 7 | 5 | 7 | 5 | 7 | 81 |
| Total Operating Receipts | | | $ 7 | $ 175 | $ 5 | $ 5 | $ 5 | $ 177 | $ 5 | $ 5 | $ 5 | $ 88 | $ 95 | $ 7 | $ 5 | $ 88 | $ 670 |
| | | | | | | | | | | | | | | | | | |
| Operating Disbursements | | | | | | | | | | | | | | | | | |
| Payroll & Benefits | NBV % | | - | (1) | (22) | (18) | (21) | (1) | - | - | (22) | (427) | - | - | (19) | (22) | (552) |
| PBH Buy-Ins | Direct | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Maintenance | Direct | | - | - | (250) | - | - | - | (230) | (189) | - | - | - | (721) | - | - | (1,390) |
| Other Maintenance | NBV % | | - | - | (9) | (44) | - | (9) | (9) | (9) | (9) | (9) | (9) | (9) | (9) | (9) | (132) |
| Security Deposit Refund | Direct | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other Overhead | NBV % | | - | (7) | (30) | (63) | (8) | (48) | (11) | (15) | (21) | (16) | (9) | (21) | (25) | (18) | (291) |
| BK Stay of Prepetition AP | NBV % | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Operating Disbursements | | | $ - | $ (8) | $ (311) | $ (124) | $ (29) | $ (58) | $ (250) | $ (212) | $ (51) | $ (452) | $ (17) | $ (751) | $ (53) | $ (49) | $ (2,365) |
| | | | | | | | | | | | | | | | | | |
| **Operating Cash Flow** | | | $ 7 | $ 167 | $ (306) | $ (119) | $ (24) | $ 119 | $ (245) | $ (207) | $ (46) | $ (364) | $ 77 | $ (744) | $ (48) | $ 39 | $ (1,694) |
| | | | | | | | | | | | | | | | | | |
| Net Non-Operating | NBV % | | - | (0) | (5) | - | (4) | - | (1) | - | (6) | - | (1) | - | (1) | (1) | (18) |
| Net Non-Operating | Direct | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| DIP Cash Interest | Loan % | | - | - | - | - | - | - | (19) | - | - | - | (42) | - | - | - | (61) |
| DIP Fees | Loan % | | - | - | (216) | - | - | - | - | - | - | - | - | - | - | - | (216) |
| Professional Fees | NBV % | | - | - | (422) | (117) | (68) | (39) | (159) | (114) | (117) | (68) | (150) | (122) | (145) | (782) | (2,303) |
| **Net Cash Flow** | | | $ 7 | $ 167 | $ (949) | $ (236) | $ (96) | $ 80 | $ (424) | $ (321) | $ (170) | $ (432) | $ (115) | $ (866) | $ (194) | $ (744) | $ (4,292) |
| | | | | | | | | | | | | | | | | | |
| Beginning Cash Balance | | | $ 6,284 | $ 6,292 | $ 6,459 | $ 5,510 | $ 5,273 | $ 5,178 | $ 5,258 | $ 4,834 | $ 4,513 | $ 4,344 | $ 3,912 | $ 3,797 | $ 2,931 | $ 2,737 | $ 6,284 |
| Plus: Cash Flow | | | 7 | 167 | (949) | (236) | (96) | 80 | (424) | (321) | (170) | (432) | (115) | (866) | (194) | (744) | (4,292) |
| Plus: Revolver Draw / (Pay Down) | | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Ending Cash Balance | | | $ 6,292 | $ 6,459 | $ 5,510 | $ 5,273 | $ 5,178 | $ 5,258 | $ 4,834 | $ 4,513 | $ 4,344 | $ 3,912 | $ 3,797 | $ 2,931 | $ 2,737 | $ 1,993 | $ 1,993 |
| | | | | | | | | | | | | | | | | | |
| Beginning DIP Facility Balance | | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Plus: Revolver Draw / (Pay Down) | | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Ending DIP Facility Balance | | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |

12/6/2018
7:25 PM

**Waypoint Leasing**
DIP Budget Operating Cash Flow by WAC

| ($ in thousands) | Allocation Methodology | NBV % / Loan % | Fcst 1 11/30/18 | Fcst 2 12/07/18 | Fcst 3 12/14/18 | Fcst 4 12/21/18 | Fcst 5 12/28/18 | Fcst 6 01/04/19 | Fcst 7 01/11/19 | Fcst 8 01/18/19 | Fcst 9 01/25/19 | Fcst 10 02/01/19 | Fcst 11 02/08/19 | Fcst 12 02/15/19 | Fcst 13 02/22/19 | Fcst 14 03/01/19 | 14 Week Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| WAC8 | | 20.5% | | | | | | | | | | | | | | | |
| Operating Receipts | | 20.0% | | | | | | | | | | | | | | | |
| Rental Receipts | Direct | | $ 290 | $ 270 | $ 171 | $ 220 | $ 417 | $ 604 | $ - | $ - | $ 381 | $ 684 | $ - | $ - | $ 130 | 935 | $ 4,102 |
| Other | NBV % | | 27 | 17 | 17 | 17 | 17 | 27 | 17 | 17 | 18 | 27 | 17 | 26 | 17 | 27 | 291 |
| Total Operating Receipts | | | $ 317 | $ 288 | $ 188 | $ 237 | $ 435 | $ 631 | $ 17 | $ 17 | $ 400 | $ 711 | $ 17 | $ 26 | $ 147 | $ 962 | $ 4,394 |
| Operating Disbursements | | | | | | | | | | | | | | | | | |
| Payroll & Benefits | NBV % | | - | (4) | (79) | (63) | (74) | (5) | - | - | (78) | (1,541) | - | - | (68) | (80) | (1,994) |
| PBH Buy-Ins | Direct | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Maintenance | Direct | | - | - | (800) | (225) | - | - | - | - | (75) | - | - | - | - | - | (1,100) |
| Other Maintenance | NBV % | | - | - | (31) | (158) | - | (32) | (32) | (32) | (32) | (32) | (32) | (32) | (32) | (32) | (475) |
| Security Deposit Refund | Direct | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other Overhead | NBV % | | - | (25) | (109) | (226) | (30) | (173) | (41) | (52) | (75) | (56) | (31) | (75) | (91) | (65) | (1,050) |
| BK Stay of Prepetition AP | NBV % | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Operating Disbursements | | | $ - | $ (29) | $ (1,019) | $ (672) | $ (104) | $ (210) | $ (73) | $ (84) | $ (260) | $ (1,630) | $ (63) | $ (107) | $ (190) | $ (177) | $ (4,619) |
| Operating Cash Flow | | | $ 317 | $ 259 | $ (831) | $ (435) | $ 330 | $ 420 | $ (55) | $ (67) | $ 140 | $ (919) | $ (45) | $ (81) | $ (43) | $ 786 | $ (225) |
| Net Non-Operating | NBV % | | - | (0) | (17) | - | (14) | - | (5) | - | (23) | - | (3) | - | (2) | (2) | (66) |
| Net Non-Operating | Direct | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| DIP Cash Interest | Loan % | | - | - | - | - | - | - | (32) | - | - | - | (70) | - | - | - | (101) |
| DIP Fees | Loan % | | - | - | (360) | - | - | - | - | - | - | - | - | - | - | - | (360) |
| Professional Fees | NBV % | | - | - | (1,525) | (422) | (245) | (140) | (572) | (410) | (422) | (245) | (540) | (442) | (525) | (2,824) | (8,311) |
| Net Cash Flow | | | $ 317 | $ 259 | $ (2,733) | $ (857) | $ 71 | $ 281 | $ (664) | $ (476) | $ (305) | $ (1,164) | $ (658) | $ (523) | $ (570) | $ (2,040) | $ (9,064) |
| Beginning Cash Balance | | | $ 16 | $ 500 | $ 759 | $ 500 | $ 500 | $ 571 | $ 852 | $ 500 | $ 500 | $ 500 | $ 500 | $ 500 | $ 500 | 500 | $ 16 |
| Plus: Cash Flow | | | 317 | 259 | (2,733) | (857) | 71 | 281 | (664) | (476) | (305) | (1,164) | (658) | (523) | (570) | (2,040) | (9,064) |
| Plus: Revolver Draw / (Pay Down) | | | 167 | - | 2,474 | 857 | - | - | 313 | 476 | 305 | 1,164 | 658 | 523 | 570 | 2,040 | 9,548 |
| Ending Cash Balance | | | $ 500 | $ 759 | $ 500 | $ 500 | $ 571 | $ 852 | $ 500 | $ 500 | $ 500 | $ 500 | $ 500 | $ 500 | $ 500 | 500 | $ 500 |
| Beginning DIP Facility Balance | | | $ - | $ 167 | $ 167 | $ 2,641 | $ 3,498 | $ 3,498 | $ 3,498 | $ 3,811 | $ 4,288 | $ 4,593 | $ 5,757 | $ 6,414 | $ 6,938 | 7,508 | $ - |
| Plus: Revolver Draw / (Pay Down) | | | 167 | - | 2,474 | 857 | - | - | 313 | 476 | 305 | 1,164 | 658 | 523 | 570 | 2,040 | 9,548 |
| Ending DIP Facility Balance | | | $ 167 | $ 167 | $ 2,641 | $ 3,498 | $ 3,498 | $ 3,498 | $ 3,811 | $ 4,288 | $ 4,593 | $ 5,757 | $ 6,414 | $ 6,938 | $ 7,508 | 9,548 | $ 9,548 |

12/6/2018
7:25 PM

**Waypoint Leasing**
DIP Budget Operating Cash Flow by WAC

| ($ in thousands) | Allocation Methodology | NBV % / Loan % | Fcst 1 11/30/18 | Fcst 2 12/07/18 | Fcst 3 12/14/18 | Fcst 4 12/21/18 | Fcst 5 12/28/18 | Fcst 6 01/04/19 | Fcst 7 01/11/19 | Fcst 8 01/18/19 | Fcst 9 01/25/19 | Fcst 10 02/01/19 | Fcst 11 02/08/19 | Fcst 12 02/15/19 | Fcst 13 02/22/19 | Fcst 14 03/01/19 | 14 Week Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| WAC9 | | 12.0% | | | | | | | | | | | | | | | |
| Operating Receipts | | 11.3% | | | | | | | | | | | | | | | |
| Rental Receipts | Direct | | $ 262 | $ 161 | $ 90 | $ 270 | $ 651 | $ 213 | $ - | $ 59 | $ 338 | $ 556 | $ - | $ - | $ 234 | $ 720 | $ 3,556 |
| Other | NBV % | | 16 | 10 | 10 | 10 | 10 | 16 | 10 | 10 | 11 | 16 | 10 | 15 | 10 | 16 | 170 |
| Total Operating Receipts | | | $ 278 | $ 171 | $ 100 | $ 280 | $ 661 | $ 229 | $ 10 | $ 70 | $ 349 | $ 572 | $ 10 | $ 15 | $ 245 | $ 735 | $ 3,725 |
| | | | | | | | | | | | | | | | | | |
| Operating Disbursements | | | | | | | | | | | | | | | | | |
| Payroll & Benefits | NBV % | | - | (2) | (46) | (37) | (43) | (3) | - | - | (46) | (898) | - | - | (40) | (47) | (1,161) |
| PBH Buy-Ins | Direct | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Maintenance | Direct | | - | - | (150) | (49) | - | - | - | - | - | - | - | (150) | - | - | (349) |
| Other Maintenance | NBV % | | - | - | (18) | (92) | - | (19) | (19) | (19) | (19) | (19) | (19) | (19) | (19) | (19) | (277) |
| Security Deposit Refund | Direct | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other Overhead | NBV % | | - | (15) | (64) | (131) | (18) | (101) | (24) | (30) | (44) | (33) | (18) | (44) | (53) | (38) | (611) |
| BK Stay of Prepetition AP | NBV % | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Operating Disbursements | | | $ - | $ (17) | $ (278) | $ (309) | $ (61) | $ (123) | $ (42) | $ (49) | $ (108) | $ (949) | $ (36) | $ (212) | $ (111) | $ (103) | $ (2,398) |
| | | | | | | | | | | | | | | | | | |
| **Operating Cash Flow** | | | **$ 278** | **$ 155** | **$ (178)** | **$ (29)** | **$ 600** | **$ 106** | **$ (32)** | **$ 21** | **$ 241** | **$ (377)** | **$ (26)** | **$ (197)** | **$ 134** | **$ 633** | **$ 1,327** |
| | | | | | | | | | | | | | | | | | |
| Net Non-Operating | NBV % | | - | (0) | (10) | - | (8) | - | (3) | - | (13) | - | (2) | - | (1) | (1) | (39) |
| Net Non-Operating | Direct | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| DIP Cash Interest | Loan % | | - | - | - | - | - | - | (18) | - | - | - | (39) | - | - | - | (57) |
| DIP Fees | Loan % | | - | - | (204) | - | - | - | - | - | - | - | - | - | - | - | (204) |
| Professional Fees | NBV % | | - | - | (888) | (246) | (143) | (81) | (333) | (239) | (246) | (143) | (314) | (257) | (306) | (1,644) | (4,840) |
| **Net Cash Flow** | | | **$ 278** | **$ 155** | **$ (1,279)** | **$ (275)** | **$ 449** | **$ 25** | **$ (386)** | **$ (218)** | **$ (18)** | **$ (520)** | **$ (382)** | **$ (455)** | **$ (173)** | **$ (1,013)** | **$ (3,813)** |
| | | | | | | | | | | | | | | | | | |
| Beginning Cash Balance | | | $ 5 | $ 500 | $ 655 | $ 500 | $ 500 | $ 949 | $ 974 | $ 588 | $ 500 | $ 500 | $ 500 | $ 500 | $ 500 | $ 500 | $ 5 |
| Plus: Cash Flow | | | 278 | 155 | (1,279) | (275) | 449 | 25 | (386) | (218) | (18) | (520) | (382) | (455) | (173) | (1,013) | (3,813) |
| Plus: Revolver Draw / (Pay Down) | | | 217 | - | 1,125 | 275 | - | - | - | 130 | 18 | 520 | 382 | 455 | 173 | 1,013 | 4,308 |
| Ending Cash Balance | | | $ 500 | $ 655 | $ 500 | $ 500 | $ 949 | $ 974 | $ 588 | $ 500 | $ 500 | $ 500 | $ 500 | $ 500 | $ 500 | $ 500 | $ 500 |
| | | | | | | | | | | | | | | | | | |
| Beginning DIP Facility Balance | | | $ - | $ 217 | $ 217 | $ 1,342 | $ 1,617 | $ 1,617 | $ 1,617 | $ 1,617 | $ 1,747 | $ 1,765 | $ 2,285 | $ 2,667 | $ 3,121 | $ 3,295 | $ - |
| Plus: Revolver Draw / (Pay Down) | | | 217 | - | 1,125 | 275 | - | - | - | 130 | 18 | 520 | 382 | 455 | 173 | 1,013 | 4,308 |
| Ending DIP Facility Balance | | | $ 217 | $ 217 | $ 1,342 | $ 1,617 | $ 1,617 | $ 1,617 | $ 1,617 | $ 1,747 | $ 1,765 | $ 2,285 | $ 2,667 | $ 3,121 | $ 3,295 | $ 4,308 | $ 4,308 |

**Waypoint Leasing**

DIP Budget Operating Cash Flow by WAC

| ($ in thousands) | Allocation Methodology | NBV % / Loan % | Fcst 1 11/30/18 | Fcst 2 12/07/18 | Fcst 3 12/14/18 | Fcst 4 12/21/18 | Fcst 5 12/28/18 | Fcst 6 01/04/19 | Fcst 7 01/11/19 | Fcst 8 01/18/19 | Fcst 9 01/25/19 | Fcst 10 02/01/19 | Fcst 11 02/08/19 | Fcst 12 02/15/19 | Fcst 13 02/22/19 | Fcst 14 03/01/19 | 14 Week Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| WAC10 | | 0.0% | | | | | | | | | | | | | | | |
| Operating Receipts | | 0.0% | | | | | | | | | | | | | | | |
| Rental Receipts | Direct | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Other | NBV % | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Operating Receipts | | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| | | | | | | | | | | | | | | | | | |
| Operating Disbursements | | | | | | | | | | | | | | | | | |
| Payroll & Benefits | NBV % | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| PBH Buy-Ins | Direct | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Maintenance | Direct | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other Maintenance | NBV % | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Security Deposit Refund | Direct | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other Overhead | NBV % | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| BK Stay of Prepetition AP | NBV % | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Operating Disbursements | | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| | | | | | | | | | | | | | | | | | |
| **Operating Cash Flow** | | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| | | | | | | | | | | | | | | | | | |
| Net Non-Operating | NBV % | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Net Non-Operating | Direct | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| DIP Cash Interest | Loan % | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| DIP Fees | Loan % | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Professional Fees | NBV % | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Net Cash Flow** | | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| | | | | | | | | | | | | | | | | | |
| Beginning Cash Balance | | | $ 155 | $ 155 | $ 155 | $ 155 | $ 155 | $ 155 | $ 155 | $ 155 | $ 155 | $ 155 | $ 155 | $ 155 | $ 155 | $ 155 | $ 155 |
| Plus: Cash Flow | | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Plus: Revolver Draw / (Pay Down) | | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Ending Cash Balance | | | $ 155 | $ 155 | $ 155 | $ 155 | $ 155 | $ 155 | $ 155 | $ 155 | $ 155 | $ 155 | $ 155 | $ 155 | $ 155 | $ 155 | $ 155 |
| | | | | | | | | | | | | | | | | | |
| Beginning DIP Facility Balance | | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Plus: Revolver Draw / (Pay Down) | | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Ending DIP Facility Balance | | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |

12/6/2018
7:25 PM

**Waypoint Leasing**

DIP Budget Operating Cash Flow by WAC

| ($ in thousands) | Allocation Methodology | NBV % / Loan % | Fcst 1 11/30/18 | Fcst 2 12/07/18 | Fcst 3 12/14/18 | Fcst 4 12/21/18 | Fcst 5 12/28/18 | Fcst 6 01/04/19 | Fcst 7 01/11/19 | Fcst 8 01/18/19 | Fcst 9 01/25/19 | Fcst 10 02/01/19 | Fcst 11 02/08/19 | Fcst 12 02/15/19 | Fcst 13 02/22/19 | Fcst 14 03/01/19 | 14 Week Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week # | | | | | | | | | | | | | | | | | |
| WAC11 | | 0.0% | | | | | | | | | | | | | | | |
| Operating Receipts | | 0.0% | | | | | | | | | | | | | | | |
| Rental Receipts | Direct | | $ 180 | $ - | $ - | $ - | $ 180 | $ - | $ - | $ - | $ - | $ 180 | $ - | $ - | $ - | $ 180 | $ 720 |
| Other | NBV % | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Operating Receipts | | | $ 180 | $ - | $ - | $ - | $ 180 | $ - | $ - | $ - | $ - | $ 180 | $ - | $ - | $ - | $ 180 | $ 720 |
| | | | | | | | | | | | | | | | | | |
| Operating Disbursements | | | | | | | | | | | | | | | | | |
| Payroll & Benefits | NBV % | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| PBH Buy-Ins | Direct | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Maintenance | Direct | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other Maintenance | NBV % | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Security Deposit Refund | Direct | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other Overhead | NBV % | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| BK Stay of Prepetition AP | NBV % | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Operating Disbursements | | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| | | | | | | | | | | | | | | | | | |
| **Operating Cash Flow** | | | $ 180 | $ - | $ - | $ - | $ 180 | $ - | $ - | $ - | $ - | $ 180 | $ - | $ - | $ - | $ 180 | $ 720 |
| | | | | | | | | | | | | | | | | | |
| Net Non-Operating | NBV % | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Net Non-Operating | Direct | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| DIP Cash Interest | Loan % | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| DIP Fees | Loan % | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Professional Fees | NBV % | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Net Cash Flow** | | | $ 180 | $ - | $ - | $ - | $ 180 | $ - | $ - | $ - | $ - | $ 180 | $ - | $ - | $ - | $ 180 | $ 720 |
| | | | | | | | | | | | | | | | | | |
| Beginning Cash Balance | | | $ 80 | $ 260 | $ 260 | $ 260 | $ 260 | $ 440 | $ 440 | $ 440 | $ 440 | $ 440 | $ 620 | $ 620 | $ 620 | $ 620 | $ 80 |
| Plus: Cash Flow | | | 180 | - | - | - | 180 | - | - | - | - | 180 | - | - | - | 180 | 720 |
| Plus: Revolver Draw / (Pay Down) | | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Ending Cash Balance | | | $ 260 | $ 260 | $ 260 | $ 260 | $ 440 | $ 440 | $ 440 | $ 440 | $ 440 | $ 620 | $ 620 | $ 620 | $ 620 | $ 800 | $ 800 |
| | | | | | | | | | | | | | | | | | |
| Beginning DIP Facility Balance | | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |
| Plus: Revolver Draw / (Pay Down) | | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Ending DIP Facility Balance | | | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - |

12/6/2018
7:25 PM

**Waypoint Leasing**

DIP Budget Operating Cash Flow by WAC

($ in thousands)

| Week # | Allocation Methodology | NBV % / Loan % | Fcst 1 11/30/18 | Fcst 2 12/07/18 | Fcst 3 12/14/18 | Fcst 4 12/21/18 | Fcst 5 12/28/18 | Fcst 6 01/04/19 | Fcst 7 01/11/19 | Fcst 8 01/18/19 | Fcst 9 01/25/19 | Fcst 10 02/01/19 | Fcst 11 02/08/19 | Fcst 12 02/15/19 | Fcst 13 02/22/19 | Fcst 14 03/01/19 | 14 Week Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| WAC12 | | 13.6% | | | | | | | | | | | | | | | |
| Operating Receipts | | 13.6% | | | | | | | | | | | | | | | |
| Rental Receipts | Direct | | 658 | 339 | - | 101 | 245 | 688 | 63 | 48 | 153 | 749 | 149 | - | 101 | 848 | 4,141 |
| Other | NBV % | | 18 | 12 | 12 | 12 | 12 | 18 | 12 | 12 | 12 | 18 | 12 | 17 | 12 | 18 | 193 |
| Total Operating Receipts | | | 676 | 350 | 12 | 113 | 257 | 706 | 75 | 59 | 165 | 767 | 160 | 17 | 113 | 866 | 4,334 |
| | | | | | | | | | | | | | | | | | |
| Operating Disbursements | | | | | | | | | | | | | | | | | |
| Payroll & Benefits | NBV % | | - | (2) | (53) | (42) | (49) | (4) | - | - | (52) | (1,023) | - | - | (45) | (53) | (1,323) |
| PBH Buy-Ins | Direct | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Maintenance | Direct | | - | - | (202) | - | - | - | - | - | - | - | - | - | - | - | (202) |
| Other Maintenance | NBV % | | - | - | (20) | (105) | - | (21) | (21) | (21) | (21) | (21) | (21) | (21) | (21) | (21) | (316) |
| Security Deposit Refund | Direct | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other Overhead | NBV % | | - | (17) | (73) | (150) | (20) | (115) | (27) | (35) | (50) | (37) | (20) | (50) | (60) | (43) | (697) |
| BK Stay of Prepetition AP | NBV % | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Operating Disbursements | | | - | (19) | (348) | (297) | (69) | (140) | (48) | (56) | (123) | (1,082) | (42) | (71) | (126) | (117) | (2,538) |
| | | | | | | | | | | | | | | | | | |
| **Operating Cash Flow** | | | **676** | **331** | **(336)** | **(184)** | **188** | **567** | **26** | **3** | **42** | **(315)** | **119** | **(54)** | **(14)** | **749** | **1,796** |
| | | | | | | | | | | | | | | | | | |
| Net Non-Operating | NBV % | | - | (0) | (11) | - | (10) | - | (3) | - | (15) | - | (2) | - | (1) | (1) | (44) |
| Net Non-Operating | Direct | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| DIP Cash Interest | Loan % | | - | - | - | - | - | - | (21) | - | - | - | (47) | - | - | - | (69) |
| DIP Fees | Loan % | | - | - | (244) | - | - | - | - | - | - | - | - | - | - | - | (244) |
| Professional Fees | NBV % | | - | - | (1,012) | (280) | (162) | (93) | (380) | (272) | (280) | (162) | (358) | (293) | (348) | (1,874) | (5,517) |
| **Net Cash Flow** | | | **676** | **331** | **(1,604)** | **(465)** | **15** | **474** | **(378)** | **(269)** | **(253)** | **(478)** | **(289)** | **(347)** | **(364)** | **(1,127)** | **(4,078)** |
| | | | | | | | | | | | | | | | | | |
| Beginning Cash Balance | | | 105 | 781 | 1,112 | 500 | 500 | 515 | 989 | 611 | 500 | 500 | 500 | 500 | 500 | 500 | 105 |
| Plus: Cash Flow | | | 676 | 331 | (1,604) | (465) | 15 | 474 | (378) | (269) | (253) | (478) | (289) | (347) | (364) | (1,127) | (4,078) |
| Plus: Revolver Draw / (Pay Down) | | | - | - | 992 | 465 | - | - | - | 158 | 253 | 478 | 289 | 347 | 364 | 1,127 | 4,472 |
| Ending Cash Balance | | | 781 | 1,112 | 500 | 500 | 515 | 989 | 611 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 |
| | | | | | | | | | | | | | | | | | |
| Beginning DIP Facility Balance | | | - | - | - | 992 | 1,456 | 1,456 | 1,456 | 1,456 | 1,614 | 1,868 | 2,345 | 2,634 | 2,982 | 3,345 | - |
| Plus: Revolver Draw / (Pay Down) | | | - | - | 992 | 465 | - | - | - | 158 | 253 | 478 | 289 | 347 | 364 | 1,127 | 4,472 |
| Ending DIP Facility Balance | | | - | - | 992 | 1,456 | 1,456 | 1,456 | 1,456 | 1,614 | 1,868 | 2,345 | 2,634 | 2,982 | 3,345 | 4,472 | 4,472 |

## EXHIBIT C

|  | WAC Specific Cap | Loan to Value Coverage Floor |
|---|---|---|
| **WAC 1** | $20,469,905 | $59,360,000 |
| **WAC 6** | $7,278,947 | $8,274,000 |
| **WAC 7** | $454,294 | $15,561,000 |
| **WAC 8** | $10,546,275 | $31,563,000 |
| **WAC 9** | $2,823,595 | $23,387,000 |
| **WAC 12** | $3,426,984 | $5,677,000 |

## Exhibit D

**Milestones**

## Annex D:  Milestones

The Borrowers will be pursuing the sale of all or substantially all of their assets pursuant to one or more transactions (the "**Sale Transaction**"). In the event the Borrowers and Participating WAC Lenders reach an agreement with a buyer to consummate a Sale Transaction pursuant to a Plan and the parties enter into definitive documentation, including a restructuring support agreement that provides for the terms of such sale and Plan and is executed by the lenders constituting more than one-half in number and at least two-thirds in claim amount of each Participating WAC Facility's Prepetition WAC Lenders, then the Sale Transaction shall be consummated as a sale of the equity of Waypoint Leasing (Luxembourg) S.a.r.l. ("**LuxCo**") or one or more subsidiaries of LuxCo (as agreed between Borrowers and Buyer) pursuant to a Plan (a "**Chapter 11 Sale**").

The agreement by each of the Borrowers to sell its assets or equity (or transfer such assets or equity to the Participating WAC Lenders on the terms set forth herein) and to comply with the Milestones and other obligations set forth herein is an integral component of the Adequate Protection provided to the Participating WAC Lenders for the Debtors' use of such Participating WAC Lenders' cash collateral and an inducement to obtain the consent of the Participating WAC Lenders to the terms of the DIP Facility, including the granting of the DIP Claims and the DIP Liens.

### A.  Bidding Process Milestones

(1)    As promptly as possible, but in no event later than 2 business days after the date of entry of the Interim DIP Order (the "**Sale Motion Filing Date**"), the Obligors shall file a motion (the "**Sale Motion**") seeking approval of the Bidding Procedures Order (as defined below), which may seek approval of the Stalking Horse Transaction in accordance with the provisions hereof.

(2)    The "**Stalking Horse Sale Transaction**" means a binding and executed purchase agreement (the "**Stalking Horse APA**") with Macquarie Rotorcraft Leasing Holdings Limited ("**Macquarie**"), that:

(a) provides for the purchase of up to substantially all of the Debtors' assets through a sale consummated pursuant to section 363 of the Bankruptcy Code (a "**363 Sale**") or, with the agreement of Macquarie, a Chapter 11 Sale;

(b) provides that a topping credit bid from one or more Participating WAC Facilities will be due no earlier than January 14, 2019;

(c) provides for an expense reimbursement of no more than $3 million;

(d) does not require the payment of a breakup or similar fee in connection with the consummation of a topping credit bid by one or more of the Participating WAC Facilities properly submitted in accordance with the terms below.

(3)    The Bidding Procedures Order may contain bidding protections for Macquarie; provided that such bidding protections (and the 363 Sale Approval Order (as defined below)) are consistent with the requirements for a Stalking Horse Sale Transaction described above. Other than with respect to the bidding protections specified above, the Bidding Procedures Order shall not contain any provision for bidding protections or a stalking horse bidder, unless consented to by the DIP Agent and the Participating WAC Lenders under each Participating WAC Facility.[1]

---

[1] As of the execution of this term sheet, the DIP Lenders and the Participating WAC Lenders have not reached agreement with Macquarie on a form of Stalking Horse APA.  All rights of the DIP Lenders and the Participating WAC Lenders in connection with the approval of a proposed form of Stalking Horse APA because such form contains a term or condition that is inconsistent with this Annex D or which otherwise has not been consented to by the DIP Agent and the Participating WAC Lenders are expressly preserved.

(4)    No later than 20 days following the date of the Sale Motion Filing Date, the Bankruptcy Court shall have entered an order (i) approving bidding procedures for the Sale Transaction and (ii) scheduling the date for an auction, if necessary, and the hearing to consider approval of the Sale Transaction.  Such order (the "**Bidding Procedures Order**") will incorporate the Bidding Provisions set forth in Section C below and shall be subject to the approval of the DIP Agent and the Participating WAC Lenders under each Participating WAC Facility.

(5)    In the event the Macquarie Bidding Provisions (as defined below) are not in effect:

(a)    The Bidding Procedures Order shall provide that (i) third-party bids are due by January 4, 2019 ("**Third Party Bid Deadline**") and (ii) credit bids from the lenders shall be due by January 14, 2019 (the "**Credit Bid Deadline**", and collectively with the Third Party Bid Deadline, the "**Bid Deadlines**");

(b)    Within 3 business days after the Third Party Bid Deadline, the Debtors shall have commenced the auction, if necessary, pursuant to the Bidding Procedures Order;

(c)    Within 10 business days after a definitive winning bidder(s) have been selected in accordance with the  bidding procedures approved by the Bankruptcy Court, the Bankruptcy Court shall have entered an order approving the Sale Transaction (the "**363 Sale Approval Order**"); and

(d)    The Debtors shall have consummated the Sale Transaction to the winning bidder or bidders no later than March 15, 2019 (other than a Chapter 11 Sale, which shall be consummated by May 15, 2019); provided, that the Bankruptcy Court has entered the Sale Order and the specified governmental approvals have been obtained and if not so provided, no later than March 31, 2019.

The Bidding Procedures Order, any proposed bidding procedures, and the 363 Sale Approval Order shall be at all times consistent with the Milestones above and otherwise in form and substance reasonably satisfactory to the Required DIP Lenders and the Participating WAC Lenders under each Participating WAC Facility.

### B.  Bidding Provisions

The Bidding Procedures Order will provide for the following whether or not the Sale Motion seeks approval of a Stalking Horse Sale Transaction:

(a)    subject to the terms and conditions of the applicable Participating WAC Facility, the applicable administrative agent or collateral agent under a Participating WAC Facility (as ultimately directed by the required lenders under such Participating WAC Facility, the "**Directing WAC Party**") shall have the absolute and irrevocable right to elect to consummate either an assisted streamlined credit bid (a "**Streamlined Credit Bid**") or a standard credit bid (a "**363K Credit Bid**" and together with a Streamlined Credit Bid, a "**Qualifying Credit Bid**"), each as set forth herein, on behalf of its respective Participating WAC Lenders for all but not part of such Participating WAC Facilities' WAC Specific Collateral (for the avoidance of doubt, any Qualifying Credit Bid may, but is not required to, include any equity subject to a pledge to secure such Participating WAC Facility);

(b)    a qualified bid (x) may be made for any single WAC Group, any combination of WAC Groups or substantially all of the Debtors' assets and (y) must allocate the purchase price by applicable WAC Group;

(c)    the Debtors will provide access to the data room established by Houlihan Lokey Capital, Inc. (the "**Data Room**") to a Participating WAC Lender or Directing WAC Party (subject to any restrictions pursuant to applicable law) and, upon request to the Debtors, to such party's financing source only upon execution of a confidentiality agreement by such financing source, which confidentiality agreement shall be in form and substance reasonably acceptable to the Debtors; provided, that a

2

Participating WAC Lender or Directing WAC Party's access to information in the Data Room shall be limited to information regarding its applicable Participating WAC Facility; and

(d) To the extent any alternative asset manager is restricted by agreement with the Debtors from engaging with discussions or negotiations with Participating WAC Lenders, Directing WAC Party or a Bidco (as defined below) to manage the assets of a Participating WAC Group following a successful credit bid, the Debtors agree that such restriction shall be automatically released upon entry of the Interim DIP Order; provided, that the Debtors, Participating WAC Lenders, and Bidco shall, prior to any disclosure to any such alternative asset manager of any confidential information, shall agree (with each such party acting reasonably and in good faith) on the scope of information to be provided to such alternative asset managers (taking into account commercial sensitivities and antitrust and other applicable law).

(e) **_Streamlined Credit Bid_**.  A Streamlined Credit Bid is a bid for all of the assets in a Participating WAC Group in exchange for some or all of the claim[2] of the respective Participating WAC Lenders (and/or Participating WAC Parties) under such Participating WAC Facility (all Participating WAC Lenders under a Participating WAC Facility that elects a Streamlined Credit Bid, each "**Electing WAC Lenders**").

   i) A successful Streamlined Credit Bid will be consummated pursuant to a sale of the equity in the relevant Borrower for such Participating WAC Facility (and/or the sale of other equity pledged by WLIL to secure such Participating WAC Facility) to an entity designated by the Directing WAC Party (a "**Bidco**").

   ii) The applicable Electing WAC Lenders and the Debtors will negotiate form documentation that is reasonably acceptable to the Debtors, Required DIP Lenders, and applicable Participating WAC Lenders to serve as the basis for implementing a Streamlined Credit Bid.

      (1) Such documentation shall include a mutual release between and among (i) the Debtors in the relevant Participating WAC Group, (ii) the remaining Debtors, (iii) the relevant Participating WAC Lenders; (iv) the administrative and collateral agent(s) for such Participating WAC Facility; (v) Bidco; and (vi) such parties' respective related parties including their officers, directors, employees, attorneys, other professionals, and shareholders, which release (w) shall include any claim that could be brought by or on behalf of such releasing party, (x) will not release any Net WAC Group Intercompany Claim (to the extent not repaid at closing); (y) will not release any reversionary interest in the Carve Out or Winddown Account and (z) will not waive the right of any party to object to any interim or final fee applications or the payment of any "success" or transaction fees.

   iii) Once a Directing WAC Party timely submits a Streamlined Credit Bid and Credit Bid Deposit with respect to their Participating WAC Group, which bid complies with the requirements set forth herein, the Debtors will accept such bid unless they receive a Superior Cash Offer (as defined below) that provides for payment in cash equal to the credit bid amount under such

---

[2] A Streamlined Credit Bid may "credit bid" less than all of the claim if (x) such Streamlined Credit Bid proposes to assume some or all of the applicable Participating WAC Facility and (y) releases any guaranty of such Participating WAC Facility given by a Non-WAC Group Member, in which case the value of the "credit bid" portion of the bid shall be deemed to be the sum of the (a) claim amount that is bid _plus_ (b) the portion of the assumed Participating WAC Facility.  Alternatively, if the Macquarie Bidding Provisions are in effect, a Directing WAC Party may elect to make a Streamlined Credit Bid (solely for purposes of constituting a Qualifying Credit Bid for the Macquarie Bidding Provisions) in an amount of less than all of the applicable claim so long as it releases any guaranty of such Participating WAC Facility given by a Non-WAC Group Member (in which case the value of the Qualified Credit Bid will include any assumption of the Participating WAC Facility provided for therein).

3

Participating WAC Facility (inclusive of the Exit Payment other than, with respect to Macquarie, the portion thereof related to Expense Reimbursement) by January 21, 2019.

(1) In the event the Macquarie Bidding Provisions are in effect, the Streamlined Credit Bid shall be consummated within 15 business days of the date on which the applicable bidder has failed to match the Streamlined Credit Bid unless the Bidco has failed to satisfy its conditions precedent to closing.

(2) In the event the Macquarie Bidding Provisions are not in effect, then, unless the Debtors receive a Superior Cash Offer[3] by the Bid Deadline (or if the Debtors fail to receive court approval of such Superior Cash Offer or are unable to consummate such Superior Cash Offer, each in accordance with the timeline set forth above), the Debtors shall proceed with the Streamlined Credit Bid received and shall consummate such Streamlined Credit Bid within 15 business days of the Bid Deadline or the failure of such superior cash offer unless the Bidco has failed to satisfy its conditions precedent to closing.

iv) The Debtors will use commercially reasonable efforts to assist the Directing WAC Party to transition the operation and support of their WAC Specific Collateral to Bidco or an operator or manager of Bidco's choice in a seamless manner (including by providing for the orderly transfer of all documentation and records consisting of or supporting such WAC Specific Collateral); provided, that the third party costs associated with such transition shall be (a) agreed upon between the Debtors and the Directing WAC Party; (b) borne by the Directing WAC Party; and (c) paid in advance of the Debtors' incurring such costs.

v) The Debtors, Bidco, and/or a Directing WAC Party may agree to enter into a reasonable transition services agreement on reasonable terms without the need for further Bankruptcy Court approval (a copy of which shall be provided to the advisors to the Steering Committee).

vi) The Debtors will use commercially reasonable efforts to cooperate with the Directing WAC Party to (at the option of such Directing WAC Party) novate, transfer, cancel, or otherwise seek a tax efficient disposition of any profit participating notes issued by the members of such Participating WAC Group; provided, however, that the Debtors shall not be required to spend any money, incur any liabilities, or suffer any loss of value (other than any value of the profit participating notes that are to be novated, transferred, cancelled or otherwise dealt with).

vii) The chapter 11 cases of the members of the Participating WAC Group subject to a Streamlined Credit Bid shall be severed from the joint administration of the chapter 11 cases of the remaining Debtors upon consummation of the Streamlined Credit Bid (or such other time as may be mutually agreed). After consummation of the Streamlined Credit Bid, the remaining Debtors shall not object to (and shall provide reasonable assistance with) the dismissal of the chapter 11 cases of the members of the Participating WAC Group subject to a Streamlined Credit Bid.

---

[3] A "**Superior Cash Offer**" means an irrevocable commitment to purchase the equity and/or assets of a Participating WAC Group that (A) provides for the indefeasible payment in full in cash of all principal, interest and fees due and payable under the applicable Participating WAC Facility and any Net WAC Intercompany Claim or other adequate protection undertakings in favor of the Participating WAC Group or Participating WAC Lenders as of (and through) the date of consummation of the purchase and (B) either (1) in the case of a transaction with Macquarie, is a bona fide bid that the applicable Directing WAC Party reasonably determines is likely to close by and which otherwise has a closing schedule and closing terms and conditions that are no less favorable to the Participating WAC Lenders than those set forth in the Stalking Horse APA, (2) in the case of a transaction with a party other than Macquarie, has no material closing conditions or uncertainties and has terms and conditions that are acceptable to the applicable Directing WAC Party in its sole discretion.

4

viii) To elect to pursue a Streamlined Credit Bid with respect to a Participating WAC Group, the applicable Directing WAC Party must agree to pay upon the closing of the transaction to WLIL, unless otherwise specified below, a cash amount equal to the sum of the following, eliminating any duplication as appropriate:  (i) the Net WLIL Intercompany Claim in respect of such Participating WAC Group, if any, reduced by its Net WAC Group Intercompany Claim; (ii) its allocated share of the Carve Out to the extent then unfunded (which amount shall be paid directly to the Fee Reserve Account); (iii) its allocated share of the Winddown Account up to the amounts and in the allocable portion set forth in the Winddown Budget attached as Annex F to the Term Sheet; (iv) the third party costs set forth in subsection (iv) above; (v) if applicable, its allocated share of the Expense Reimbursement; (vii) any true-up of opening cash balances to reflect the cash sources and uses during the forbearance period that have not already been reflected in the Net WLIL Intercompany Claim and/or the Net WAC Group Intercompany Claim; and (viii) its allocated share of the A&M transaction fee as set forth in the Approved Budget to the extent not included in (i) (collectively (i)-(viii) an "**Exit Payment**").

ix) With the submission of a Streamlined Credit Bid, the applicable Directing WAC Party must submit a cash deposit to the Debtors in the estimated amount of the Exit Payment (a "**Credit Bid Deposit**") provided that the Debtors shall have provided to each Participating WAC Facility an updated good faith estimate of the amount of the Exit Payment by no later than 5:00 p.m.(eastern time) on January 4, 2019. In the event that the Debtors accept a cash bid or a Superior Cash Offer, each as set forth in (iii) hereof, the Credit Bid Deposit shall be returned to the applicable Directing WAC Party by no later than January 31, 2019.

(f) *363K Credit Bid*.  A 363K Credit Bid is a bid for all of the assets in a Participating WAC Group in exchange for some or all of the claim of the respective Participating WAC Lenders that does not constitute a Streamlined Credit Bid. To elect to pursue a 363K Credit Bid, an electing Participating WAC Group must agree to pay a cash amount equal to its Exit Payment.

(g) *Failure to Consummate a Superior Cash Offer*.  In the event that (a) the terms and conditions of a Superior Cash Offer are modified in a manner adverse to Participating WAC Lenders or (b) a Superior Cash Offer involving Macquarie is for any reason not consummated by March 15, 2019, the applicable Directing WAC Party shall have the right immediately to make and promptly to consummate a Streamlined Credit Bid on the terms and conditions otherwise set forth herein.

C. **Macquarie Bidding Provisions**.  In the event the Debtors file a Sale Motion seeking approval of a Stalking Horse Sale Transaction, the Bidding Procedures Order shall provide for the following:

a. Bids may be submitted for any combination of the following:

   i. All of the assets of a WAC Group;

   ii. All of the assets of multiple WAC Groups;

   iii. All of the assets contemplated to be sold pursuant to the Stalking Horse APA; or

   iv. Any rotorcraft assets of the Debtors not contemplated to be sold pursuant to the Stalking Horse APA.

b. In the event (i) Macquarie is approved as the Stalking Horse Bidder and (ii) Macquarie is not the successful bidder at the auction and the assets are sold to a third party bidder, Macquarie shall be entitled to a breakup fee of 3% of the Base Purchase Price (as defined in the Stalking Horse APA) solely under the conditions set forth herein, and provided that such breakup fee shall not be payable in the event of one or more sales pursuant to a Qualifying Credit Bid (the "**Break Up Fee**").  For the avoidance of doubt, no Break Up Fee shall be due upon consummation of any transaction that is effected by any WAC

Facility Agent exercising its credit bid rights or exercising other remedies (including, without limitation, foreclosure of its collateral) under its WAC Facility and related documentation.

c.   In the event Macquarie is not the successful bidder with respect to a WAC Group, Macquarie shall be entitled to the reimbursement of the share of its reasonable and documented out-of-pocket expenses, solely as provided for in the Stalking Horse APA,(of up to $3 million in the aggregate) (the "**Expense Reimbursement**") that are allocable to such WAC Group.

d.   All bids (each, a "**Third Party Bid**") from third parties (which for the avoidance of doubt shall not include a credit bid from the agent under one or more Prepetition WAC Facilities or Qualifying Credit Bid), shall be due no later than January 4, 2019 at 5:00 p.m. (eastern time).

e.   To be a "**Qualified Bid**", a Third Party Bid must, among other things, provide for the payment of the Breakup Fee and the Expense Reimbursement allocable to the WAC Group or Groups whose assets are subject to such bid.

f.   With respect to each WAC Group:

   i.   If no Third Party Bids are timely received for the assets of such WAC Group or no such bids are deemed Qualified Bids by January 7, 2019,  the Debtors shall so advise Macquarie by no later than 9:00 a.m. (eastern time) on January 7, 2019, and Macquarie shall inform the advisors to the Debtors and the Steering Committee in writing by 9:00 a.m. January 8, 2019 regarding what portion of Macquarie's purchase price Macquarie allocates (in the aggregate) to the assets of each of the WAC Groups; the Debtors, in turn, will inform the agent for the applicable WAC Facility (with a copy to such agent's counsel) by no later than 9:00 a.m. on January 8, 2019 what portion of Macquarie's purchase price Macquarie allocates (in the aggregate) to the assets of such WAC Group.

   ii.   If one or more Third Party Bids is received for the assets of one or more WAC Group, the Debtors shall conduct an auction (the "**Auction**") on January 8, 2019 with respect to such WAC Group.

      1.   On January 9, 2019 or promptly following the conclusion of the auction, the Debtors will determine the best or highest bid for any assets subject to Auction; and

      2.   At the conclusion of the Auction, but in no event later than January 9, 2019, the bidder submitting the highest or best offer shall be selected by the Debtors and such bidder shall provide written notice to the Debtors of the portion of such bidder's (whether it is Macquarie or a third party bidder) purchase price such bidder allocates (in the aggregate) to the assets of each of the WAC Groups (and the Debtors, in turn, will inform the agent for the applicable WAC Facility what portion of such bidder's purchase price such bidder allocates (in the aggregate) to the assets of such WAC Group).

g.   On or before January 14, 2019 at 5:00 p.m. (eastern), the agent for each WAC Facility shall have the right to (a) submit a Qualifying Credit Bid or (b) deliver a plan support agreement for the Stalking Horse Transaction, in form and substance reasonably acceptable to the Debtors and Macquarie, executed by at least 1/2 of the lenders in such WAC Facility holding at least 2/3s of the obligations thereunder (a "**PSA**").

6

    i.   In the event the agent does neither (a) nor (b), the sale of the assets of such WAC Group, subject to court approval, shall proceed to the bidder with the highest or best bid (or if no auction occurred for such assets, Macquarie) and.

    ii.   In the event the agent for such WAC Facility submits a Qualifying Credit Bid, the bidder with the highest or best bid for the assets of such WAC Facility (or if no auction occurred for such assets, Macquarie) shall have the right to match such Qualifying Credit Bid until January 21, 2019 by agreeing to pay a cash amount equal to the sum of the "credit bid" inclusive of the Exit Payment other than the portion thereof related to Expense Reimbursement (less any credit for the Expense Reimbursement); provided, that a Streamlined Credit Bid may only be matched by a Superior Cash Offer.

        1.   If the Qualifying Credit Bid is so matched, the assets of such WAC Group shall be sold to such matching bidder.

        2.   If the Qualifying Credit Bid is not so matched, the assets of such WAC Group shall be sold to the bidding entity for such Qualifying Credit Bid or its designee.

    iii.   In the event PSAs are properly submitted with respect to WAC Groups that collectively hold 110 aircraft or more, Macquarie will have until February 4, 2019 (or such later date as may be agreed to by the Debtors, Macquarie, and the applicable Prepetition WAC Lenders for the WAC Facilities that delivered such PSAs) to determine whether to proceed with a Chapter 11 Sale.

        1.   In the event Macquarie declines to consummate the transaction pursuant to a Chapter 11 Plan, each agent for a WAC Facility that tendered a PSA shall have seven days to elect to submit a Qualifying Credit Bid, which will be subject to a seven day matching period for Macquarie, or to provide notice to Macquarie to consummate the 363 Sale under the terms of the Stalking Horse APA.

    iv.   Unless Macquarie agrees to accept such PSAs, in the event PSAs are properly submitted with respect to WAC Groups that collectively hold fewer than 110 aircraft, each agent for a WAC Facility that tendered a PSA shall have until January 21, 2019 at 5:00 p.m. (eastern) to submit a Qualifying Credit Bid, which will be subject to a seven day matching period for Macquarie.

h.   The purchase price under the Stalking Horse Sale Transaction will be subject to following adjustments:

    i.   If Macquarie does not have the right to purchase 110 aircraft at closing, the purchase price shall be reduced by an amount equal to $10 million plus the Expense Reimbursement.  If Macquarie does not have the right to purchase 50 "Core Aircraft" as defined in the Stalking Horse APA at closing, it may terminate the Stalking Horse APA and receive the Expense Reimbursement.

    ii.   If the transaction with Macquarie does not close by January 31, 2019, the purchase price shall be reduced by $6 million per month (adjusted daily) until closing.

    iii.   If Macquarie elects to proceed with a Chapter 11 Sale, the consideration to be paid by Macquarie shall be reduced by $10 million.

7

i.  For the avoidance of doubt, no Break Up Fee shall be due (a) upon the consummation of a plan of reorganization for one or more of the Debtors that does not effectuate a Chapter 11 Sale and results in the Participating WAC Lenders obtaining the equity of the Debtors or (b) any transaction that is effected by any WAC Facility Agent exercising its credit bid rights or exercising other remedies (including, without limitation, foreclosure of its collateral) under its WAC Facility and related documentation.

8