WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Gary T. Holtzer
Robert J. Lemons
Kelly DiBlasi
Matthew P. Goren

*Proposed Attorneys for Debtors*
*and Debtors In Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-------------------------------------------------------------x
                                       :
In re                                  :      Chapter 11
                                       :
WAYPOINT LEASING                       :      Case No. 18-13648 (SMB)
HOLDINGS LTD., et al.,                 :
                                       :      (Jointly Administered)
            Debtors.¹                  :
-------------------------------------------------------------x
```

**MOTION OF DEBTORS FOR ENTRY OF ORDERS**
**APPROVING: (I) (A) BIDDING PROCEDURES, (B) BID**
**PROTECTIONS, (C) FORM AND MANNER OF NOTICE OF AUCTION,**
**SALE TRANSACTION, AND SALE HEARING, AND (D) PROCEDURES FOR THE**
**ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND**
**UNEXPIRED LEASES; AND (II) (A) SALE OF SUBSTANTIALLY ALL OF THE**
**DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES,**
**AND OTHER INTERESTS, (B) ASSUMPTION AND ASSIGNMENT OF CERTAIN**
**EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (C) RELATED RELIEF**

---

[1] A list of the Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, is attached hereto as **Exhibit A**.

TO THE HONORABLE STUART M. BERNSTEIN,
UNITED STATES BANKRUPTCY JUDGE:

Waypoint Leasing Holdings Ltd. and certain of its subsidiaries and affiliates, as debtors and debtors in possession (collectively, the "**Debtors**") in the above-captioned chapter 11 cases (collectively, the "**Chapter 11 Cases**"), respectfully represent as follows in support of this motion (the "**Motion**"):

## Preliminary Statement

1.       Following an extensive prepetition marketing process, the Debtors commenced these Chapter 11 Cases to swiftly implement a comprehensive restructuring through a sale of substantially all of their assets pursuant to section 363 of title 11 of the United States Code (the "**Bankruptcy Code**").  A sale will keep the Debtors' global helicopter leasing platform intact and operating with minimal interruption.

2.       In the months leading up to the commencement of these Chapter 11 Cases, the Debtors and their advisors carefully analyzed their financial condition and determined that the Debtors faced unsustainable debt service obligations under their various secured lending facilities (each a "**WAC Facility**" and the lenders thereunder, "**WAC Lenders**") and significant liquidity restrictions.  The Debtors and their advisors quickly determined that the best way to maximize the value of the Debtors' assets would be through a going concern sale.

3.       To this end, the Debtors and their advisors spent the past four (4) months conducting a robust sale and marketing process (the "**M&A Process**").  This process culminated in the selection of Macquarie Rotorcraft Leasing Holdings Limited ("**Macquarie**") as the ultimate purchaser for substantially all of the Debtors' assets and the execution of a binding asset purchase

agreement (the "**Macquarie APA**").[2]  The consideration offered by Macquarie is approximately $650,000,000, comprised of cash consideration plus the assumption of certain liabilities, subject to certain adjustments.

4.      As set forth in greater detail below and in the Wolynski Declaration (as defined herein), the cyclical downturn in the oil and gas industry beginning in 2014 led to a significant decline in offshore oil exploration, cost reduction measures for production operations, and a substantially decreased demand for offshore drilling services by upstream exploration and production companies.  Although the price of crude oil has slowly begun to rebound, the effects of this protracted downturn remain.

5.      Because a substantial portion of the Debtors' business involves leasing helicopters to operators in the oil and gas sector, the Debtors were impacted by this downturn and were forced to implement a series of initiatives to improve their performance and operations. Notwithstanding these initiatives, the weakened offshore oil and gas market and the resulting contraction of demand for helicopter services have resulted in substantially reduced lease revenues, causing both near-term liquidity constraints and uncertainty regarding the Debtors' ability to maintain their current leveraged capital structure.  Wolynski Decl. ¶ 6.

6.      As further detailed in the declaration of Matthew R. Niemann, a Managing Director and Shareholder at Houlihan Lokey, Inc. ("**Houlihan Lokey**"), filed in support of the Motion (the "**Niemann Declaration**"), in an effort to maintain the value of their business in the midst of the industry downturn and declining liquidity, the Debtors, with the assistance of their financial and legal advisors and the support of a steering committee of WAC Lenders (the

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Macquarie APA or the Bidding Procedures Order (as defined herein), as applicable.

WEIL:\96835038\1\79984.0003

"**Steering Committee**") commenced a robust and comprehensive M&A Process whereby the Debtors solicited bids to purchase some or all of the Debtors' assets from over one hundred and eighty (180) strategic and financial investors as well as sovereign wealth funds.  The Debtors received fourteen (14) initial qualifying bids for their assets as part of the first round of the M&A Process.  As discussed in more detail below, after selecting nine (9) bidders to proceed to a second round of negotiations and receiving six (6) final bids, the Debtors ultimately chose to pursue the bid submitted by Macquarie.

7.      The Debtors and their advisors have developed bidding and auction procedures for the sale of their assets (the "**Proposed Bidding Procedures**" and, as approved by the Court, the "**Bidding Procedures**").  Under the Proposed Bidding Procedures, parties may submit bids (including credit bids) for the purchase and sale of substantially all of the Debtors' assets (the "**Purchased Assets**") in accordance with the terms of the Proposed Bidding Procedures. The Proposed Bidding Procedures are intended to generate the greatest level of interest in the Purchased Assets resulting in the highest or otherwise best offer (the "**Sale Transaction**").  The Debtors believe that the Macquarie APA and the Proposed Bidding Procedures, including approval of the Bid Protections (as defined herein), represent the best available option to maximize value for the Debtors' creditors and other stakeholders.

8.      The Debtors are confident that the Sale Transaction will maximize recoveries to the WAC Lenders and other stakeholders and position the Debtors' operations on a strengthened platform, ensuring continued first-rate customer service and prospects for growth as a market leader in the helicopter leasing industry.  Given the exigencies of the Debtors' business operations and financial condition, and the milestones contained in the Macquarie APA and the Debtors' postpetition financing agreement (the "**DIP Credit Agreement**" and the lenders

4

thereunder, the "**DIP Lenders**") in connection with the $45 million postpetition financing facility (the "**DIP Facility**"), the immediate sale of substantially all of the Debtors' assets is necessary to avoid a piecemeal liquidation of their estates, which would result in significantly less value for all stakeholders.  Accordingly, the relief requested herein should be approved.

9.    The Proposed Bidding Procedures establish the following key dates and deadlines for the sale process:

| Key Event | Deadline |
|---|---|
| Deadline to Object to Macquarie Bid | **January 3, 2019 at 5:00 p.m. (ET)** |
| Deadline to Submit Third Party Bids | **January 4, 2019 at 5:00 p.m. (ET)** |
| Deadline for Debtors to Notify Third Party Bidders of Status as Qualified Third Party Bidders | **January 7, 2019 at 9:00 a.m. (ET)** |
| Auction to be held if the Debtors receive Qualified Third Party Bids, to be conducted at the offices of Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 | **January 8, 2019 at 10:00 a.m. (ET)** |
| Deadline to File Notice and Identities of Successful Third Party Bid and Back-Up Third Party Bid | **January 9, 2019 at 5:00 p.m. (ET) or promptly following conclusion of the Auction** |
| Deadline to Submit Credit Bids | **January 14, 2019 at 5:00 p.m. (ET)** |
| Deadline for Requisite Lenders to Deliver PSA[3] | **January 14, 2019 at 5:00 p.m. (ET)** |
| Deadline to Object to Successful Third Party Bid and Cure Costs | **January 16, 2019 at 5:00 p.m. (ET)** |
| Deadline for Successful Third Party Bidder to Submit Matching Bid to Qualified Credit Bids | **January 21, 2019 at 5:00 p.m. (ET)** |
| If Qualified Credit Bids Are Timely Submitted and Debtors Do Not Receive Matching Bids, Deadline to File Notice and Identities of Successful Credit Bids | **January 21, 2019 at 5:00 p.m. (ET)** |
| If Requisite Lenders Collectively Hold Security Interests In Less Than 110 Aircraft, Deadline for Requisite Lenders to Submit Credit Bids | **January 21, 2019 at 5:00 p.m. (ET)** |

---

[3] "**PSA**" means an executed plan support agreement, in form and substance reasonably acceptable to the Debtors and Macquarie (the lenders thereunder, the "**Requisite Lenders**").

WEIL:\96835038\1\79984.0003

| | |
|---|---|
| If Requisite Lenders Collectively Holding Security Interests In Less Than 110 Aircraft Submit Credit Bids, Deadline for Successful Third Party Bidder to Submit Matching Bid to Requisite Lender Credit Bid | **January 28, 2019 at 5:00 p.m. (ET)** |
| If Requisite Lenders Collectively Hold Security Interests In 110 or More Aircraft, Deadline for Successful Third Party Bidder to Notify Debtors of Intent to Pursue Plan Sale | **February 4, 2019 at 5:00 p.m. (ET)** |
| If Successful Third Party Bidder Rejects Plan Sale, Deadline for Requisite Lenders to Submit Requisite Lender Credit Bids | **February 11, 2019 at 5:00 p.m. (ET)** |
| Deadline for Successful Third Party Bidder to Submit Matching Bid to Requisite Lender Credit Bid | **February 18, 2019 at 5:00 p.m. (ET)** |
| Deadline to Object to Successful Credit Bids | **February 18, 2019 at 5:00 p.m. (ET)** |
| Deadline to Object to Adequate Assurance of Future Performance | **February 22, 2019 at 5:00 p.m. (ET)** |
| Sale Hearing[4] | **Subject to the Court's availability, on such date the Debtors request** |

## **Relief Requested**

10.  By this Motion, pursuant to sections 105, 363, 365, 503, and 507 of the
Bankruptcy Code, Rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the
"**Bankruptcy Rules**"), Rules 2002-1, 6004-1, 6006-1, and 9006-1(b) of the Local Bankruptcy
Rules for the Southern District of New York (the "**Local Rules**"), and the *Amended Sale
Guidelines for the Conduct of Asset Sales Established and Adopted by the United States
Bankruptcy Code for the Southern District of New York* (the "**Sale Guidelines**"), the Debtors seek
entry of:

a.  an order substantially in the form attached hereto as **Exhibit B** (the "**Bidding
Procedures Order**"):

---

[4] If a sale transaction is consummated pursuant to a chapter 11 plan in accordance with a PSA, the Debtors will file a
scheduling order setting forth the applicable deadlines in connection with confirmation of a chapter 11 plan.

WEIL:\96835038\1\79984.0003

i.  authorizing and approving the Proposed Bidding Procedures substantially in the form attached as **Exhibit 1** to the Bidding Procedures Order;

ii.  authorizing and approving certain bidding protections for Macquarie, including an expense reimbursement and break-up fee on the terms described herein and set forth in the Macquarie APA;

iii.  scheduling an auction (the "**Auction**") to be held on **January 8, 2019 at 10:00 a.m. (ET)**, if necessary;

iv.  scheduling one or more hearings with respect to the approval of the sale of the Purchased Assets (each, a "**Sale Hearing**") and notices related thereto;

v.  authorizing and approving the procedures set forth in the Bidding Procedures Order (the "**Assumption and Assignment Procedures**") for the assumption and assignment of certain of the Debtors' executory contracts and unexpired leases and the determination of cure costs related thereto;

vi.  approving various deadlines in connection with the foregoing; and

vii.  authorizing and approving the form and manner of (i) the notice of Auction, Sale Transaction, and Sale Hearing, substantially in the form attached as **Exhibit 2** to the Bidding Procedures Order (the "**Sale Notice**") and (ii) the notice to various counterparties of proposed cure costs and the assumption and assignment of certain of the Debtors' executory contracts and unexpired leases, substantially in the form attached as **Exhibit 3** to the Bidding Procedures Order (the "**Cure Notice**"); and

b.  a separate order (the "**Sale Order**") authorizing and approving:

i.  the sale of the Purchased Assets free and clear of liens, claims, encumbrances, and other interests;

ii.  the assumption and assignment of certain of the Debtors' executory contracts and unexpired leases in connection therewith; and

iii.  certain related relief.

### Jurisdiction

11.  The Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

WEIL:\96835038\1\79984.0003

## Background

12.    On November 25, 2018 (the "**Petition Date**"), the Debtors each commenced with this Court a voluntary case under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their business and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee, examiner, or statutory committee of creditors has been appointed in these Chapter 11 Cases.

13.    These Chapter 11 Cases are being jointly administered for procedural purposes only pursuant to Bankruptcy Rule 1015(b).

14.    Additional information regarding the Debtors' business, capital structure, and the circumstances leading to the commencement of these Chapter 11 Cases is set forth in the *Declaration of Todd K. Wolynski Pursuant to L. Bankr. R. 1007-2* (the "**Wolynski Declaration**") and the *Declaration of Robert A. Del Genio in Support of First Day Motions and Applications* (the "**Del Genio Declaration**" and, together with the Wolynski Declaration, the "**First Day Declarations**").[5]

## Prepetition Marketing and Sale Process

15.    Towards the end of April and May 2018, the Debtors' prospects for timely consummation of strategic initiatives faded and the performance of their business was continuing to decline.  The Debtors' forecasts showed that their revenue and cash flow generating capacity would not be sufficient to service their outstanding debt, comply with their secured loan financial covenants, satisfy their aircraft purchase commitment obligations on a long-term basis, and maintain the liquidity necessary to operate their business and preserve their long-term viability and

---

[5] Capitalized terms used but not defined herein shall have the respective meanings ascribed to such terms in the First Day Declarations.

WEIL:\96835038\1\79984.0003

enterprise value.  The Debtors, with the assistance of Weil, Gotshal & Manges LLP ("**Weil**") and

Houlihan Lokey, began developing a comprehensive plan to restructure the Debtors' balance sheet,

whether in-court or out-of-court.  In June 2018, with this transition in focus, the Debtors retained

(i) FTI Consulting, Inc., as financial advisor, to assist them with cash flow forecasting and

(ii) Accenture LLP, successor in interest to Seabury Corporate Advisors LLC, as corporate

advisor, to assist them with analyzing their fleet composition and lease arrangements, including

performing valuations of the underlying collateral to inform both the M&A Process and lender

negotiations and to begin preparing for a potential in-court restructuring.

16.    In June 2018, the Debtors also facilitated the formation of the Steering

Committee to negotiate with the WAC Lenders regarding potential forbearances under the WAC

Facilities and a comprehensive restructuring plan.  Recognizing that all parties in interest would

benefit from additional time to explore and consider all possible restructuring alternatives rather

than a value destructive "freefall" into chapter 11, on June 29, 2018, required lenders under each

of the WAC Facilities directed their respective administrative agents to enter into a three (3)-month

forbearance from the exercise of the remedies with respect to certain specified events of default

(collectively, the "**Forbearance Agreements**"), which Forbearance Agreements were scheduled

to expire on September 28, 2018.

17.    Approximately forty-five (45) days into this initial forbearance period, the

Steering Committee requested the Debtors to consider extending the three (3)-month forbearance

for another three (3) months to allow the Steering Committee additional time to evaluate the

Debtors' restructuring alternatives.  On September 27, 2018, the Debtors and the required lenders

under each of the WAC Facilities through their respective administrative agents agreed to further

extend the Forbearance Agreements until November 30, 2018 with an option for such required

WEIL:\96835038\1\79984.0003

lenders to extend for an additional thirty-one (31) days. An extension of the Forbearance Agreements until November 30, 2018 provided the Debtors with, among other things, necessary breathing room to carry out the M&A Process in a manner that would maximize value for the Debtors' assets.

18.     In August and September 2018, the Debtors, with the assistance of their advisors, began the M&A Process by contacting over one hundred and eighty (180) potential investors, including over fifty (50) strategic investors (*i.e.*, investors holding investments in the helicopter and/or fixed wing industries that are strategically aligned with the Debtors' business), approximately one hundred (100) financial investors (*i.e.*, private equity firms, hedge funds, etc. who may have an interest in the helicopter and/or aviation sector), and over thirty (30) sovereign wealth funds, with the aim of attracting multiple competing bids for the Debtors' assets. In connection with this broad solicitation, the Debtors and their advisors prepared, among other things, a "teaser" investment summary, a comprehensive investor presentation, an electronic data room, and an investor memorandum to provide potential investors with adequate information upon which to make an investment decision.

19.     During this process, fifty-four (54) interested investors executed confidentiality agreements and were granted access to an electronic data room containing significant diligence and other confidential information about the Debtors' business. The Debtors received fourteen (14) initial qualifying letters of intent ("**LOIs**") from both strategic and financial investors. In evaluating the LOIs, the Debtors and Houlihan Lokey analyzed, among other things: (i) the structure of the proposed transaction; (ii) the form and amount of consideration offered; (iii) the assets to be acquired; and (iv) the investor's willingness and ability to provide postpetition financing in these Chapter 11 Cases. The Debtors shared the LOIs with the Steering Committee's

professionals and subsequently met with the Steering Committee to present a comprehensive summary of the LOIs and the Debtors' plan for next steps in the M&A Process, to which the Steering Committee provided their input.  Niemann Decl. ¶ 10.

20.       After discussions with the disinterested members of their boards of directors and deliberation with their advisors and the Steering Committee, the Debtors selected nine (9) investors to proceed to a second round of negotiations and diligence, including management presentations, which were held during the first two weeks of October 2018. Throughout early September and mid-October in 2018, the Debtors and their advisors actively engaged with each of the potential investors to clarify and firm up their bids in an effort to increase the consideration of the bids received.  The Debtors instructed each of the second round investors to submit their best and final second round bids on or before October 17, 2018.  The Debtors received six (6) final bids, five (5) of which were bids for substantially all of the Debtors' assets and one (1) of which was a bid for approximately one hundred (100) of the Debtors' aircraft. Niemann Decl. ¶ 11.

21.       Following several weeks of negotiations with each of the final potential investors, the Debtors ultimately decided to execute a purchase agreement term sheet with one of the potential investors.  Such term sheet granted the potential investor exclusivity for a limited period of time, during which the parties agreed to use good faith efforts to negotiate a definitive asset purchase agreement.  In the midst of negotiating an asset purchase agreement with such potential investor, the Debtors received a revised bid from Macquarie that represented a higher and better offer than the one contemplated in the potential investor's purchase agreement term sheet.

WEIL:\96835038\1\79984.0003

22.      After extensive deliberations, and consultation with the Steering Committee (and written demands by the Steering Committee to exercise the Debtors' "fiduciary out" under the term sheet), the Debtors decided to exercise their "fiduciary out" and proceed with Macquarie as the ultimate purchaser for substantially all of the Debtors' assets.  Accordingly, on November 21, 2018, the Debtors terminated exclusivity to pursue the Macquarie Bid.  From November 21, 2018 until the filing of this Motion, the Debtors engaged in lengthy negotiations with Macquarie and the Steering Committee in an effort to contemporaneously execute a binding asset purchase agreement and file the DIP Motion.[6]  Niemann Decl. ¶ 12.

23.      As a result of the Debtors' extensive prepetition M&A Process, the Debtors intend to implement a streamlined sale process.  As described in more detail below, the Debtors will conduct an auction only if they receive Qualified Third Party Bids (as defined in the Proposed Bidding Procedures) in the form of cash offers to purchase the Debtors' assets.  Niemann Decl. ¶ 17.

**Need for Timely Sale Process**

24.      The Debtors believe that the sale process and the time periods set forth in the Proposed Bidding Procedures are reasonable and will provide parties with sufficient time and information to submit a bid for the Purchased Assets.  In formulating the procedures and time periods, the Debtors balanced the need to provide adequate and appropriate notice to parties in interest and potential investors with the need to quickly and efficiently sell their assets while they have realizable value and can be maintained as a going concern.

---

[6] "**DIP Motion**" means the *Motion of Debtors Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 507, and 552, Fed. R. Bankr. P. 2002, 4001, 6003, 6004, and 9014, and L. Bankr. R. 2002-1, 4001-2, 9013-1, 9014-1, and 9014-2 for Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Senior Secured Priming Superpriority Postpetition Financing (B) Grant Liens and Superpriority Administrative Expense Status, and (C) Utilize Cash Collateral, (II) Granting Adequate Protection, (III) Scheduling Final Hearing, and (IV) Granting Related Relief*, filed on December 8, 2018 (ECF No. 51).

25.     The Debtors' formulation of the procedures was also informed by (i) the breadth of the M&A Process; (ii) the fact that all likely interested investors have been contacted and have been provided information with which to formulate an informed and binding bid; and (iii) the transparency and collaboration among the Debtors, the Steering Committee, and key stakeholders, all of whom have been fully informed of the M&A Process.  Furthermore, potential investors have had, and will, in accordance with the Proposed Bidding Procedures, continue to have access to comprehensive information, including information gathered based upon specific due diligence requests of the Macquarie Bid and other prepetition investors, prepared by the Debtors and their advisors that is compiled in an electronic data room.  Niemann Decl. ¶ 16.

26.     In addition, completion of the M&A Process in a timely and efficient manner will maximize recoveries for stakeholders and is essential for the Debtors' swift emergence from chapter 11.  The Debtors and the DIP Lenders have agreed to the following milestones:

a.  No later than twenty (20) days following the filing of this Motion, the Court shall have entered an order (i) approving bidding procedures for the Sale Transaction and (ii) scheduling the date for an auction, if necessary, and the hearing to consider approval of the Sale Transaction.

b.  Bids from third parties shall be due by January 4, 2019 (the "**Third Party Bid Deadline**") and credit bids from WAC Facility Agents shall be due by January 14, 2019 (the "**Credit Bid Deadline**").

c.  Within three (3) business days after the Third Party Bid Deadline, the Debtors shall have commenced the auction, if necessary, pursuant to the Proposed Bidding Procedures Order.

d.  Within ten (10) business days after each definitive winning bidder has been selected in accordance with the Bidding Procedures approved by the Court, the Court shall have entered an order approving the Sale Transaction.

e.  The Debtors shall have consummated the Sale Transaction to the winning bidder or bidders no later than March 15, 2019 (other than a sale transaction consummated pursuant to a chapter 11 plan, which shall be consummated by May 15, 2019); provided, that the Court has entered the Sale Order and the specified governmental approvals have been obtained and if not so provided, no later than March 31, 2019.

WEIL:\96835038\1\79984.0003

27.     Access to the funds available under the DIP Facility is critical to the Debtors' ability to continue their operations and manage their bankruptcy estates through the conclusion of the sale process. Failure to adhere to the time periods set forth in the Proposed Bidding Procedures and the DIP Credit Agreement could jeopardize the closing of the Sale Transaction, which the Debtors believe is the best means of maximizing the value of their assets, maintaining the business as a going concern, and minimizing claims against the Debtors' estates. Additionally, conducting an extended sale process beyond the time periods set forth in the Proposed Bidding Procedures could jeopardize the availability of funds under the DIP Facility because such funds could run out before such extended sale process concludes. In light of the foregoing, the Debtors have determined that pursuing the Sale Transaction in the manner and with the procedures proposed is in the best interests of the Debtors' estates and provides interested parties with sufficient opportunity to participate.

28.     As of the filing of this Motion, the DIP Lenders and the Participating WAC Lenders (as defined in the DIP Credit Agreement) continue to review the form of the Macquarie APA, Proposed Bidding Procedures, and proposed Bidding Procedures Order to ensure such documents are consistent with the DIP Facility, including Annex D thereto. As such, the DIP Lenders and the Participating WAC Lenders' rights are reserved with respect to the approval of the Sale Transaction, the Macquarie APA, the Bidding Procedures, and/or the Bidding Procedures Order.

WEIL:\96835038\1\79984.0003

## Proposed Sale Transaction

A.    **The Macquarie APA**[7]

29.    Pursuant to the Macquarie APA, Macquarie is purchasing substantially all of the Debtors' assets. After conducting significant due diligence and consulting with the Debtors' management, Macquarie has opted to purchase the Debtors' core and non-core aircraft (approximately one-hundred and sixty (160) aircraft) and to assume certain executory contracts, unexpired leases, and related liabilities in connection therewith.

30.    The base purchase price is $650,000,000, plus the assumption of certain liabilities, subject to certain adjustments. The assets proposed to be purchased include, among other things, aircraft, certain executory contracts and unexpired leases (the "**Transferred Contracts**") and certain inventory, deposits, intellectual property, licenses, books and records, and permits. In the event the sale to Macquarie is consummated, the Debtors intend to assume and assign the Transferred Contracts to Macquarie. The Debtors are responsible for paying any cure costs (the "**Cure Costs**") related to the assumption and assignment of the Transferred Contracts as well as paying any transfer taxes in connection with the transaction.

31.    The Macquarie APA provides for the payment of (i) an expense reimbursement up to a cap of $3,000,000 (the "**Expense Reimbursement**") for the actual, documented, and reasonable out of pocket costs, fees and expenses that are incurred or to be incurred by Macquarie in connection with or related to the authorization, preparation, investigation, negotiation, enforcement, execution, implementation, and performance of the transactions contemplated by the Macquarie APA and (ii) a break-up fee in an amount equal to

---

[7] The Debtors have filed the *Ex Parte Motion of the Debtors Pursuant to 11 U.S.C. §§ 107(b) and 105(a) and Fed. R. Bankr. P. 9018 for Authority to (I) File Document Under Seal and (II) Redact Commercially Sensitive, Nonpublic information* contemporaneously herewith requesting authority to redact commercially sensitive nonpublic information in the Macquarie APA and to file an unredacted version of the Macquarie APA under seal.

15

three percent (3%) of the Base Purchase Price ($19,500,000) (the "**Break-Up Fee**").  The Expense Reimbursement is payable in the event that the Macquarie APA is terminated:[8]  (i) by either Macquarie or the Debtors, if the Debtors enter into and consummate a definitive agreement with respect to a Competing Bid (as defined in the Macquarie APA) approved by the Court (other than an Exempt Transaction)[9]; (ii) by Macquarie, if the Purchased Assets consist of fifty (50) or less Core Aircraft (as defined in the Macquarie APA) due to the sale of such aircraft in accordance with the credit bidding provisions of the Macquarie APA; (iii) by Macquarie, in the event the Debtors breach the Macquarie APA in a manner that causes certain of the closing conditions in the Macquarie APA not to be satisfied; and (iv) by either Macquarie or the Debtors, if all of the Debtors' aircraft are sold pursuant to the credit bidding provisions of the Macquarie APA.

32.     The entire Break-Up Fee[10] is payable in the event that either Macquarie or the Debtors terminate the Macquarie APA if the Debtors enter into a definitive agreement with respect to a Competing Bid (as defined in the Macquarie APA) approved by the Court (other than an Exempt Transaction).[11]   In addition, if Macquarie terminates the Macquarie APA due to a breach thereof by the Debtors in a manner that causes certain of the closing conditions in the

---

[8] With respect to subsection (i), the Expense Reimbursement is due within two (2) business days following consummation of such Competing Bid.  With respect to subsections (ii), (iii), and (iv), the Expense Reimbursement is due within two (2) business days after Macquarie submits an invoice detailing such Expense Reimbursement.

[9] The Macquarie APA defines "**Exempt Transaction**" as any transaction that is effected by any WAC Facility Agent exercising its credit bid rights or exercising other remedies (including foreclosure of its collateral) under its WAC Facility and related documentation.

[10] In the event the Purchased Assets consist of less than one-hundred and ten (110) aircraft as of the Closing Date and the Macquarie APA has not been terminated, the Debtors shall pay $10,000,000 (the "**Aircraft Condition Fee**") in lieu of the Break-Up Fee and Expense Reimbursement.  The Aircraft Condition Fee and Expense Reimbursement shall be paid by way of set-off against the Purchase Price and deducted from the Closing Payment on the Closing Date (each as defined in the Macquarie APA).

[11] In such circumstance, the Break-Up Fee must be paid within two (2) business days following consummation of such Competing Bid.

WEIL:\96835038\1\79984.0003

Macquarie APA not to be satisfied and one or more Competing Bids (other than an Exempt

Transaction) is consummated during the eighteen (18)-month period following the termination of

the Macquarie APA, the pro rata portion of the Break-Up Fee is payable (calculated based on the

number of aircraft sold pursuant to such Competing Bid) upon consummation of each such

Competing Bid.  The Proposed Bidding Procedures also provide for initial overbid minimum and

subsequent bidding increment requirements for bids submitted for the Purchased Assets (the

Break-Up Fee, Expense Reimbursement, and the other bid protections described in this paragraph

collectively are referred to as the "**Bid Protections**").  In the event the Auction is held and

Macquarie is not the winning bidder, Macquarie has agreed to act as a "Back-Up Bidder" and, as

such, hold open its binding offer to purchase the Purchased Assets for a period of time after the

Auction in the event the winning bid at the Auction is not consummated.

33.     The following chart summarizes the key terms and conditions of the

Macquarie APA.[12]  The Macquarie APA is attached hereto as **Exhibit C**.

| APA Provision | Summary Description |
| --- | --- |
| **Purchase Price**<br>(APA, § 3.01) | The aggregate consideration to be paid by Buyer for the sale of all of the Transferred Equity Interests, the Transferred Assets and the obligations of the Seller Parties set forth in this Agreement (the "**Purchase Price**") shall be an amount in cash equal to the sum of (a) subject to adjustment under <u>Section 6.11</u> (if any), $650,000,000 (the "**Base Purchase Price**"), subject to certain adjustments. |
| **Bid Protections**<br>(APA, § 8.01) | In consideration for Buyer having expended considerable time and expense in connection with this Agreement and the negotiation thereof and the identification and quantification of assets of the Seller Parties, the Seller Parties shall pay Buyer, in accordance with the terms hereof (including this <u>Article VIII</u>) and the Sale Procedures Order, (a) a break-up fee in an amount equal to either $19,500,000 (the "**Break-Up Fee**") or $10,000,000 (the "**Aircraft Condition Fee**"), as applicable, <u>plus</u> (b) an aggregate amount of up to $3,000,000 for all of the actual, documented and reasonable out of pocket costs, fees and expenses (as delineated in invoice(s) sent by Buyer to the Seller Parties in accordance with <u>Section 12.03</u>) that are incurred or |

---

[12] Capitalized terms used in this chart but not otherwise defined therein shall have the meanings ascribed to such terms in the Macquarie APA.  This summary is qualified by reference to the Macquarie APA.  To the extent there is an inconsistency between this summary and the Macquarie APA, the Macquarie APA shall govern.

WEIL:\96835038\1\79984.0003

| | |
|---|---|
| | to be incurred by Buyer or its Affiliates, including reasonable out of pocket travel expenses and any fees, costs and expenses of any professionals (including financial advisors, outside legal counsel, accountants, experts and consultants) retained by Buyer or its Affiliates, in connection with or related to the authorization, preparation, investigation, negotiation, enforcement, execution, implementation and performance of this Agreement, the Buyer Transactions, the Plan of Reorganization, the Equity Sale Transaction and the Bankruptcy Cases and other judicial and regulatory proceedings related to such transactions (such costs, fees and expenses, the "**Expense Reimbursement**"). |
| **Purchased Assets** (APA, § 2.02(a)) | On the terms and subject to the conditions set forth in this Agreement, the Sale Order and the applicable Local Transfer Agreement, and subject to the exclusions set forth in <u>Section 2.02(b)</u> and <u>Section 2.03</u>, at the Closing, each of the applicable Seller Parties shall, and, solely with respect to <u>Section 2.02(a)(ix)</u>, the Servicing Entities shall sell, convey, assign, transfer and deliver to Buyer, and Buyer shall purchase, acquire and accept from each such Seller Party, all of such Seller Party's right, title and interest in, to and under all of the assets and properties and rights, free and clear of all Liens (other than Permitted Liens) as the same shall exist immediately prior to the Closing, of each such Seller Party, other than the Transferred Equity Interests (which are the subject of <u>Section 2.01</u>) and the Excluded Assets (collectively, the "**Transferred Assets**") including as follows: |

<br>

  (i)  to the maximum extent permitted by the Bankruptcy Code, all of the Seller Parties' right, title and interest (including the leasehold interests) in the real property leases listed on <u>Schedule 2.02(a)(i)</u> (collectively, the "**Transferred Leases**"), together with all improvements, facilities, fixtures and appurtenances thereto and all rights in respect thereof (the "**Transferred Leased Real Property**"), and all servitudes, easements, rights-of-way, other surface use agreements and water use agreements related thereto and all rights in respect thereof (including all options and rights of first refusal) and all tenements, hereditaments, appurtenances and other property rights appertaining thereto;

  (ii)  to the maximum extent permitted by the Bankruptcy Code, other than any Excluded Assets, all rights under (A) the Contracts set forth on <u>Schedule 2.02(a)(ii)(A)</u> and (B) the Intellectual Property and Technology licenses set forth on <u>Schedule 2.02(a)(ii)(B)</u> (collectively with the Transferred Leases, the "**Transferred Contracts**");

  (iii)  the Aircraft and the Aircraft Leases (and Related Aircraft Documents);

  (iv)  to the maximum extent permitted by the Bankruptcy Code or applicable Law, all Permits, including Environmental Permits (the "**Transferred Permits**");

(v)      to the extent transferrable or assignable, all non-Cash deposits (including all non-Cash deposits issued or delivered by lessees under the Transferred Contracts, and all other non-Cash maintenance deposits, customer deposits and security deposits for rent, electricity, telephone or otherwise) that have been prepaid by any Seller Party, other than any deposits paid in connection with or relating to any Excluded Assets;

(vi)     all rights of any Seller Party under non-disclosure or confidentiality, non-compete or non-solicitation agreements with current and former employees and agents of any Seller Party or with third parties related to the Transferred Assets or the Business (or any portion thereof);

(vii)    all rights of any Seller Party under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers and contractors to the extent relating to products sold, or services provided, to any Seller Party or to the extent affecting any Transferred Assets, to the extent assignable, other than any warranties, representations and guarantees pertaining primarily to any Excluded Assets or rights and defenses pertaining primarily to any Excluded Liabilities;

(viii)   to the maximum extent permitted by the Bankruptcy Code or applicable Law, all Business Intellectual Property (and the right to sue and bring claims or causes of action for infringement, misappropriation or violation thereof to the extent such infringement, misappropriation or violation occurs prior to the Closing Date) and Business Technology;

(ix)     all Assumed Employee Plans and all rights and assets relating to any Assumed Employee Plan;

(x)      the Transferred Books and Records;

(xi)     all personal property and interests therein, including furniture, furnishings, office equipment, communications equipment, vehicles, and other tangible personal property (including rights, if any, in any of the foregoing purchased subject to any conditional sales or title retention agreement in favor of any other Person);

(xii)    all inventory wherever located, including packaging, supplies, tooling and parts, whether held at any location or facility of any Seller Party or in transit to any Seller Party, in each case, as of the Closing Date;

(xiii)   the assets listed on Schedule 2.02(a)(xiii);

(xiv)    subject to Section 7.04(d), to the extent transferrable, all Insurance Policies set forth on Schedule 2.02(a)(xiv) (the "**Transferred**

WEIL:\96835038\1\79984.0003

|  | **Insurance Policies**") and all rights of any nature with respect to any such Insurance Policies, including subject to Section 2.02(a)(xv), any recoveries thereunder attributable to the post-Closing period and any rights to assert claims seeking any such recoveries; |
|---|---|
|  | (xv) all insurance proceeds received by the Seller Parties under any Insurance Policy, or under any insurance policy maintained by an Aircraft Lessee or a maintenance provider or storage facility provider, in each case, of the Seller Parties in respect of any damage to or loss of any Aircraft as a result of events or circumstances occurring prior to the Closing Date and regardless of whether such damage has resulted in such Aircraft being declared a total loss (to the extent such proceeds have not been applied to repair or restore such damage or loss); |
|  | (xvi) goodwill of the Business as a going concern; |
|  | (xvii) all accounts receivable other than those Excluded Assets described under Section 2.02(b)(iii); and |
|  | (xviii) other than any Excluded Assets, all other assets or rights of every kind and description related to the Business, wherever located, whether real, personal or mixed, tangible or intangible, that are owned by a Seller Party. |
| **Excluded Assets** (APA, § 2.02(b)) | Notwithstanding anything to the contrary herein, any right, title and interest in, to and under, the following assets and properties of the Seller Parties (the "**Excluded Assets**") shall be retained by the Seller Parties and their Affiliates, other than the Transferred Entities: |
|  | (i) all Aircraft set forth on Schedule 2.02(b)(i); |
|  | (ii) all Contracts set forth on Schedule 2.02(b)(ii) and all Contracts that are not Transferred Contracts ("**Excluded Contracts**"); |
|  | (iii) any account receivable to the extent arising out of any Excluded Asset (including any Excluded Contract) and all intercompany receivables owed to any Seller Party by any other Seller Party; |
|  | (iv) all Cash; |
|  | (v) other than the Transferred Leased Real Property, all of the Seller Parties' right, title and interest in owned and leased real property together with all improvements, facilities, fixtures and appurtenances thereto and all rights in respect thereof, and all servitudes, easements, rights-of-way, other surface use agreements and water use agreements related thereto and, with respect to any such real property, all rights in respect thereof (including all options and rights of first refusal) and all tenements, |

WEIL:\96835038\1\79984.0003

hereditaments, appurtenances and other property rights appertaining thereto;

(vi)     all causes of action (including counterclaims) and defenses arising in connection with the Bankruptcy Cases or related to the Excluded Assets;

(vii)    all refunds, rebates, credits, reimbursements or other rights of recovery related to Transfer Taxes imposed or arising with respect to the Transactions;

(viii)   all claims, rights or interests of the Seller Parties and their Affiliates (other than the Transferred Entities) in or to any refund, rebate, abatement or other recovery for Taxes, and any other Tax assets (including any Tax attributes), together with any interest due thereon or penalty rebate arising therefrom, for any Tax period (or portion thereof) other than with respect to any Taxes arising out of any Assumed Liabilities;

(ix)     all Tax Returns (for the avoidance of doubt, other than Tax Returns of one or more Transferred Entities);

(x)      all nontransferable or non-assignable Permits, including nontransferable or non-assignable Environmental Permits;

(xi)     all rights and interests of the Seller Parties under the Transaction Agreements;

(xii)    all Employee Plans that are not Assumed Employee Plans and all assets relating to the Employee Plans that are not Assumed Employee Plans;

(xiii)   (A) all minute books (and other similar corporate records) and stock records of any Seller Party, (B) any books and records relating to the Excluded Assets (subject to the proviso in clause (C)(y) of this Section 2.02(b)(xiii) with respect to materials related to Tax Returns), (C) any books and records or other materials of or in the possession of the Seller Parties or the Transferred Entities that (x) any of the Seller Parties are required by Law or by order of the Bankruptcy Court to retain, (y) any of the Seller Parties reasonably believes are necessary to enable the Seller Parties to prepare and/or file Tax Returns or (z) any of the Seller Parties are prohibited by Law or Contract from delivering to Buyer (including confidential and personal medical records) or (D) any copies of any books and records that any of the Seller Parties and their respective Affiliates retain pursuant to Section 7.03; provided, that the Seller Parties shall permit Buyer to make copies of any books and records excluded pursuant to clause (B) or clause (C) to the extent such books and records relate to any Transferred Assets or the Business, to the extent not prohibited by applicable Law;

21

<table>
<tr><td></td><td colspan="2">*provided further* that, to the extent any such information described in clause (C)(z) relates to any Transferred Assets or the Business, the Seller Parties will disclose the existence of such information and the applicable Law prohibiting delivery thereof and the Seller Parties shall use commercially reasonable efforts to seek such Consents as may permit delivering to Buyer of such information;</td></tr>
<tr><td></td><td>(xiv)</td><td>all records and reports prepared or received by any Seller Party or any of its Affiliates in connection with the proposed sale of the Business, the Transactions or any Transaction Agreement (including any analyses relating to the Business and any bids or expressions of interest received from third parties with respect to the Business) and all privileged (including attorney-client privileged) communications;</td></tr>
<tr><td></td><td>(xv)</td><td>any warranties, representations and guarantees to the extent pertaining to any Excluded Asset or rights and defenses pertaining to any Excluded Liability;</td></tr>
<tr><td></td><td>(xvi)</td><td>any deposits or prepaid charges and expenses to the extent paid in connection with or relating to any Excluded Assets;</td></tr>
<tr><td></td><td>(xvii)</td><td>all right, title and interest in and to the equity interests of the Persons set forth on Schedule C or any other Person that is not a Transferred Entity;</td></tr>
<tr><td></td><td>(xviii)</td><td>other than the Transferred Insurance Policies, all Insurance Policies, including all director and officer insurance liability policies (including EPL and tail policies), and all rights of any nature with respect to any such Insurance Policies, including any recoveries thereunder and any rights to assert claims seeking any such recoveries;</td></tr>
<tr><td></td><td>(xix)</td><td>all bank accounts of the Seller Parties;</td></tr>
<tr><td></td><td>(xx)</td><td>the assets set forth on Schedule 2.02(b)(xx); and</td></tr>
<tr><td></td><td>(xxi)</td><td>all Sellable Aircraft WAC Groups sold by the Seller Parties pursuant to Section 6.11 and all assets of the Seller Parties solely to the extent they are directly related to such Sellable Aircraft WAC Groups.</td></tr>
<tr><td><strong>Transferred Employees</strong><br>(APA, § 6.09 (c))</td><td colspan="2">For a period of at least twelve (12) months following the Closing Date, (A) each Transferred Employee who becomes an employee of Buyer or an Affiliate of Buyer by operation of Law in a country in which TUPE applies shall be entitled to receive, while in the employ of Buyer or its Affiliates, compensation, employee benefits, severance entitlements and other terms and conditions of employment that are no less favorable than those that were provided to each such Transferred Employee immediately prior to the Closing Date by the Seller Parties or the Transferred Entities consistent with the requirements of TUPE and (B) each Transferred Employee, other than</td></tr>
</table>

<table>
<tr><td></td><td>any Transferred Employee described in clause (A), shall be entitled to receive, while in the employ of Buyer or its Affiliates, compensation, employee benefits and severance entitlements and benefits that are no less favorable in the aggregate than that provided to each such Transferred Employee immediately prior to the Closing Date by the Seller Parties, the Services Entities or the Transferred Entitles; <u>provided</u>, that nothing in this <u>Section 6.09</u> shall be interpreted as interfering with the right of Buyer or its applicable Affiliate to terminate the employment of any Transferred Employee to the extent such termination complies with the requirements of applicable Laws.</td></tr>
</table>

| **Termination**<br>(APA, § 11.01) | Notwithstanding anything in this Agreement to the contrary, this Agreement may be terminated before the Closing: |
|---|---|

|  | i. | by the mutual written consent of the Seller Parties and Buyer; |
|---|---|---|
|  | ii. | by the Seller Parties, if Buyer shall have breached any representation or warranty or failed to comply with any covenant or agreement applicable to Buyer that would cause any Closing Condition set forth in <u>Section 10.01(a)</u> not to be satisfied, and (i) such breach is not waived by the Seller Parties or (ii) if such breach has not been waived by the Seller Parties but is curable and is not cured by Buyer prior to the earlier to occur of (A) ten (10) Business Days after receipt of the Seller Parties' notice of its intent to terminate and (B) the Outside Date (or March 31, 2019, to the extent applicable under subsection (d) below); <u>provided</u>, <u>however</u>, that no Seller Party is then in material breach of this Agreement; |
|  | iii. | by Buyer, if the Seller Parties shall have breached any representation or warranty or failed to comply with any covenant or agreement applicable to the Seller Parties that would cause any Closing Condition set forth in <u>Section 10.02(a)</u> not to be satisfied, and (i) such breach is not waived by Buyer or, (ii) if such breach has not been waived by Buyer but is curable and is not cured by the Seller Parties prior to the earlier to occur of (A) ten (10) Business Days after receipt of Buyer's notice of its intent to terminate and (B) the Outside Date (or March 31, 2019, to the extent applicable under subsection (d) below); <u>provided</u>, <u>however</u>, that Buyer is not then in material breach of this Agreement; |
|  | iv. | by either the Seller Parties or Buyer, if the Closing shall not have occurred by March 15, 2019 (the "**Outside Date**"); <u>provided</u>, <u>however</u>, that (i) if the Closing shall not have occurred due to the failure of the Bankruptcy Court to enter the Sale Order or the Closing Conditions set forth in <u>Section 10.01(b)</u> and <u>Section 10.02(b)</u> remain unsatisfied or not waived and (ii) if all other Closing Conditions of the respective Parties shall have been fulfilled or waived (other than such Closing Conditions as are to be satisfied only at the Closing but subject to such conditions being capable of being satisfied as of the Outside Date), then no Party may terminate this Agreement pursuant to this <u>Section 11.01(d)</u> prior to March 31, 2019; <u>provided</u> <u>further</u>, that if the Closing shall |

WEIL:\96835038\1\79984.0003

|  |  |  |
|---|---|---|
|  |  | not have occurred on or before the Outside Date or March 31, 2019, as applicable, due to a material breach of any representations, warranties, covenants or agreements contained in this Agreement by Buyer or the Seller Parties, then the breaching Party may not terminate this Agreement pursuant to this Section 11.01(d). |
|  | v. | by either the Seller Parties or Buyer, in the event that any Government Authority of competent jurisdiction shall have issued an Order that permanently enjoins the consummation of the purchase of the Transferred Equity Interests or the Transferred Assets contemplated by this Agreement and such Order shall have become final and non-appealable; provided, however, that the right to terminate this Agreement under this Section 11.01(e) shall not be available to the Seller Parties or Buyer whose action or failure to fulfill any obligation under this Agreement has been the cause of the issuance of such Order or other action; |
|  | vi. | by either the Seller Parties or Buyer, if the Seller Parties enter into a definitive agreement with respect to a Competing Bid (it being agreed and understood that any Exempt Transaction shall not be a Competing Bid for purposes of this Section 11.01(f)), upon entry by the Bankruptcy Court of an Order approving such agreement (subject to Buyer's obligation to be the backup bidder pursuant to Section 8.04); |
|  | vii. | by Buyer, at any time after the number of Core Aircraft to be included in the Transferred Assets transferred to Buyer at Closing is fifty (50) or less due to the Seller Parties' sale of Aircraft in accordance with Section 6.11; |
|  | viii. | by either the Seller Parties or Buyer, if the Seller Parties consummate the sale of all Aircraft pursuant to Section 6.11; and |
|  | ix. | by either the Seller Parties or Buyer, in accordance with the second sentence of Section of 2.09(b). |
| **Preservation of Books and Records** (APA, § 7.03) |  | The Seller Parties and their Affiliates shall have the right to retain copies of all books and records of the Business relating to periods ending on or before the Closing Date. Buyer agrees that it shall preserve and keep all original books and records in respect of the Business in the possession or control of Buyer or its Affiliates for the a period of three (3) years from the Closing Date. After such three (3) year period before Buyer or any Affiliate shall dispose of any of such books and records, Buyer shall give at least thirty (30) days' prior written notice to the Seller Parent of its such intention to dispose such books and records, and the Seller Parent, and/or any of its respective Affiliates shall be given an opportunity, at their cost and expense, to remove and retain all or any part of such books and records as it or they may elect. |

24

## **Proposed Bidding Procedures**

**A.     Overview**

34.     As a result of the extensive prepetition M&A Process conducted by Houlihan Lokey, the Debtors and their advisors believe they have adequately tested the marketplace for the purchase of the Debtors' assets.  As such, the Debtors intend to implement a streamlined sale process that contemplates an auction only in the event that the Debtors receive a cash bid from third parties.

35.     The Proposed Bidding Procedures are designed to maximize value for the Debtors' estates and will enable the Debtors to review, analyze, and compare all cash bids and credit bids received to determine which bid is the highest or best offer for the Purchased Assets. Although the Debtors believe that selling substantially all of their assets to Macquarie as a going concern would generate the most value for such assets, the Proposed Bidding Procedures, consistent with the Bankruptcy Code, provide each administrative agent under a WAC Facility (each, a "**WAC Facility Agent**") with an opportunity to submit a credit bid for its collateral.

36.     The Proposed Bidding Procedures describe, among other things, procedures for parties to access due diligence, the manner in which bidders and bids become "qualified," the receipt and negotiation of bids received, the conduct of the Auction (if any), the selection and approval of a successful third party bid (a "**Successful Third Party Bid**") and successful credit bid (a "**Successful Credit Bid**"), and the deadlines with respect to the Proposed Bidding Procedures.  The Proposed Bidding Procedures also set forth a timeline for the sale of the Purchased Assets if the WAC Lenders deliver a plan support agreement within a specified period of time.  The Debtors submit that the Proposed Bidding Procedures afford them the opportunity to pursue a streamlined sale process that will maximize the value of their estates.

WEIL:\96835038\1\79984.0003

37.     A description of certain key elements of the Proposed Bidding Procedures

is set forth below:[13]

a.    Bid Deadline.  The Proposed Bidding Procedures establish **January 4, 2018 at 5:00 p.m. (ET)** as the deadline for the submission of cash bids from third parties (each a "**Third Party Bid**").  Any such WAC Facility Agent shall be required to submit a Credit Bid by **January 14, 2019 at 5:00 p.m. (ET)** (the "**Credit Bid Deadline**").

b.    Qualified Third Party Bid Requirements.  To constitute a Qualified Third Party Bid, a bid must include the following:

i.    Finalized Asset Purchase Agreement (the "APA").  Each Third Party Bid must include, in both PDF and MS-WORD format, an executed copy of the APA and a copy of same that has been marked against the Macquarie APA, a copy of which is located in the Data Room.

ii.    Purchase Price; Minimum Bid.  Each Third Party Bid submitted may include substantially all of the Purchased Assets or a portion thereof and must (i) specify the purchase price, which purchase price must include the sum of the Minimum Overbid Amount plus the Break-Up Fee plus the Expense Reimbursement and (ii) propose an alternative transaction that provides greater consideration than the Macquarie Bid for the Purchased Assets included in such Third Party Bid.

iii.    Unconditional Offer.  A commitment that the Third Party Bid is formal, binding, and unconditional (except for those conditions expressly set forth in the APA), is not subject to any due diligence or financing contingency, and is irrevocable until the Debtors notify the Potential Bidder that such Third Party Bid is not a Successful Third Party Bid or a Back-Up Third Party Bid.

iv.    Form of Consideration.  A statement identifying the cash and non-cash components of the Third Party Bid, including confirmation that the cash component of the Third Party Bid is based in U.S. Dollars.

---

[13] To the extent there is any inconsistency between the terms of the Proposed Bidding Procedures and the summary of such terms in this Motion, the terms of the Proposed Bidding Procedures shall control.  Capitalized terms used but not defined in this summary shall have the respective meanings ascribed to such terms in the Proposed Bidding Procedures.

WEIL:\96835038\1\79984.0003

v.    <u>Proof of Financial Ability to Perform</u>.  Each Third Party Bid must contain such financial and other information that allows the Debtors to make a reasonable determination as to the Potential Bidder's financial and other capabilities to consummate the sale transaction, including, without limitation, such financial and other information setting forth adequate assurance of future performance in satisfaction of the requirements under section 365(f)(2)(B) of the Bankruptcy Code, and the Potential Bidder's willingness to perform under any contracts that are assumed and assigned to such party.    Without limiting the foregoing, such information must include current financial statements or similar financial information certified to be true and correct as of the date thereof, proof of financing commitments (if needed) to close the sale transaction, contact information for verification of such information, including any financing sources, and any other information reasonably requested by the Debtors necessary to demonstrate that such Potential Bidder has the ability to close the sale transaction.

vi.    <u>Designation of Contracts and Leases</u>.  Each Third Party Bid must identify with particularity each and every executory contract and unexpired lease, the assumption and assignment of which is a condition to closing the sale transaction; <u>provided</u>, that the APA may allow for the Potential Bidder to remove executory contracts and unexpired leases from the list of contracts to be assumed and assigned any time up to five business days prior to the closing of the sale transaction; <u>provided</u>, <u>further</u>, that to the extent the Debtors identify any additional executory contracts or unexpired leases after the Third Party Bid is submitted, the APA may allow for the Potential Bidder to add such executory contracts and unexpired leases to the list of contracts to be assumed and assigned any time from and after the Third Party Bid is submitted.

vii.    <u>Required Approvals</u>.  A statement or evidence (i) that the Potential Bidder has made or will make in a timely manner all necessary filings under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, or other Antitrust Laws (as defined in the Macquarie APA), as applicable, and pay the fees associated with such filings and (ii) of the Potential Bidder's plan and ability to obtain all requisite governmental, regulatory, or other third-party approvals and the proposed timing for the Potential Bidder to undertake the actions required to obtain such approvals.    A Potential Bidder further agrees that its legal counsel will coordinate in

27

good faith with Debtors' legal counsel to discuss and explain such Potential Bidder's regulatory analysis, strategy, and timeline for securing all such approvals as soon as reasonably practicable, and in no event later than the time period contemplated in the APA.

viii. <u>No Entitlement to Break-Up Fee, Expense Reimbursement, or Other Amounts</u>.  A statement that the Third Party Bid does not entitle the Potential Bidder to any break-up fee, termination fee, expense reimbursement or similar type of payment or reimbursement, and a waiver of any substantial contribution administrative expense claims under section 503(b) of the Bankruptcy Code related to the bidding process.

ix. <u>Joint Third Party Bids</u>.  The Debtors will be authorized to approve joint Third Party Bids in their reasonable discretion on a case-by-case basis; <u>provided</u>, <u>however</u>, that any parties intending to submit a joint Third Party Bid must first disclose in writing to the Debtors all parties to the joint Third Party Bid, and obtain the Debtors' written consent.

x. <u>Agreement to Terms of the Bidding Procedures</u>.  A statement that the Potential Bidder agrees to be bound by these Bidding Procedures.

A Potential Bidder must also accompany its Third Party Bid with:

xi. a Deposit (as defined in the Bidding Procedures);

xii. the contact information of the specific person(s) whom the Debtors or their advisors should contact in the event that the Debtors have any questions or wish to discuss the Third Party Bid submitted by the Potential Bidder;

xiii. written evidence of available cash, a commitment for financing (not subject to any conditions other than those expressly set forth in the APA) and such other evidence of ability to consummate the transaction contemplated by the APA, the Bidding Procedures Order, and the Bidding Procedures, as acceptable in the Debtors' business judgment;

xiv. the identity of each entity that will be participating in connection with such Third Party Bid and taking ownership of the assets (including any equity owners or sponsors, if the Potential Bidder is an entity formed for the purpose of consummating the sale transaction) and a copy of a board resolution or similar document demonstrating the authority

28

of the Potential Bidder to make a binding and irrevocable bid on the terms proposed and to consummate the transaction contemplated by the APA;

xv.     a covenant to cooperate with the Debtors to provide pertinent factual information regarding the Potential Bidder's operations reasonably required to analyze issues arising with respect to any applicable antitrust laws and other applicable regulatory requirements; and

xvi.    if the value of a Third Party Bid includes additional non-cash components, a detailed analysis of the value of any additional non-cash component of the Third Party Bid and back-up documentation to support such value.

c.    <u>Cancellation of the Auction</u>.  If no Qualified Third Party Bid other than the Macquarie Bid is received by the Third Party Bid Deadline, the Debtors will not conduct the Auction and shall file a notice with the Bankruptcy Court by **January 7, 2019 at 5:00 p.m. (ET)** indicating that the Auction has been cancelled.  The Debtors shall also publish such notice on the website of their claims and noticing agent, Kurtzman Carson Consultants LLC (www.kccllc.net/waypointleasing).  If no Qualified Third Party Bid is received, Macquarie shall be deemed the Successful Third Party Bidder and the Macquarie Bid shall be deemed the Successful Third Party Bid.

d.    <u>Designation of Qualified Third Party Bids</u>.  The Debtors will evaluate Third Party Bids that are timely submitted and may engage in negotiations with Potential Bidders who submitted Third Party Bids as the Debtors deem appropriate in the exercise of their business judgment, based upon the Debtors' evaluation of the content of each Third Party Bid.  The Debtors will provide a copy of each Third Party Bid received within one (1) day of receipt thereof to Macquarie.  Macquarie is a Qualified Third Party Bidder and the Macquarie Bid represents a Qualified Third Party Bid.  The Debtors shall determine, in their reasonable judgment, which of the Third Party Bids received by the Third Party Bid Deadline qualifies as a "**Qualified Third Party Bid**" (each Potential Bidder that submits such a Qualified Third Party Bid being a "**Qualified Third Party Bidder**") and shall notify each Qualified Third Party Bidder of its status as a Qualified Third Party Bidder by no later than **January 7, 2019 at 9:00 a.m. (ET)** (the "**Qualified Third Party Bid Deadline**").  The Debtors shall provide copies of such notice to Macquarie as soon as reasonably practicable thereafter.

e.    <u>Auction</u>.  If there are two or more Qualified Third Party Bids (including the Macquarie Bid), the Debtors will conduct the Auction on **January 8, 2019, beginning at 10:00 a.m. (ET) at the offices of Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153**.  Only a Qualified Third Party Bidder will be eligible to participate at the Auction, subject to such limitations as the Debtors may impose in good faith.  In addition, professionals and/or other

29

representatives of the Debtors will be permitted to attend and observe the Auction. Each Qualified Third Party Bidder shall be required to confirm, both before and after the Auction, that it has not engaged in any collusion with respect to the submission of any bid, the bidding, or the Auction.

Credit Bidding Provisions

A. Each WAC Facility Agent is authorized to submit either a streamlined credit bid (a "**Streamlined Credit Bid**") or a standard credit bid (a "**363(k) Credit Bid**" and together with a Streamlined Credit Bid, a "**Credit Bid**") for the purchase of all of the collateral (the "**WAC Collateral**") on which such WAC Facility Agent holds a valid, perfected, and unavoidable lien, which consists of any prepetition secured claims held against the Debtors in connection with such WAC Facility Agent's applicable WAC Facility. A Credit Bid shall be submitted in accordance with, and subject to, the terms of the applicable credit agreement, security agreement, pledge agreement, or related agreements with the Debtors and the other lenders party thereto. Any such WAC Facility Agent shall be required to submit a Credit Bid by **January 14, 2019 at 5:00 p.m. (ET)** (the "**Credit Bid Deadline**") and shall otherwise comply with all of the requirements of the Bidding Procedures.

a. Direction Letter. A Credit Bid submitted by a WAC Facility Agent shall include a copy of the direction by the applicable lenders under the WAC Facility to authorize the submission of such Credit Bid. For the avoidance of doubt, Credit Bids may not be submitted by individual secured lenders under a WAC Facility.

b. Satisfaction of Claim in Full. To the extent a WAC Facility Agent's prepetition secured claim is projected to be satisfied in full based on a Successful Third Party Bid's allocation of the purchase price, such WAC Facility Agent shall be precluded from submitting a Credit Bid.

c. Streamlined Credit Bid Requirements. In addition to the requirements set forth herein, a Streamlined Credit Bid submitted by a WAC Facility Agent must include:

i. evidence of the amount of its prepetition secured claim, the assets constituting the WAC Collateral securing its prepetition secured claim, and evidence of the grant, perfection, priority, and validity of its lien (the "**Secured Claim Documentation**"), which must be provided to the Debtors by **January 10, 2019 at 5:00 p.m. (ET)** to ensure that the Secured Claim Documentation is validated;

ii. the acquisition of all of the WAC Collateral that secures such WAC Facility Agent's WAC Facility;

30

iii.     a signed agreement (the "**Credit Bid Agreement**") that consists of the following commitments:

(a)     if a WAC Facility Agent credit bids less than the full amount of its prepetition secured claim, then it must (i) specify the amount, if any, equal to the portion of the applicable WAC Facility debt it will assume as part of its Streamlined Credit Bid and (ii) release all guaranties issued to such WAC Facility by a Non-WAC Group Member (in which case the deemed value of the Streamlined Credit Bid shall equal the sum of (A) the secured claim amount of the credit bid plus (B) the assumed WAC Facility debt that is specified in the credit bid);

(b)     a commitment to purchase all of the equity of the relevant WAC Facility pursuant to a stock agreement;

(c)     a mutual release between and among (i) the Debtors in the relevant Participating WAC Group; (ii) the remaining Debtors; (iii) the relevant Participating WAC Lenders; (iv) the WAC Facility Agent; (v) Credit Bidco; and (vi) such parties' respective related parties including their officers, directors, managers, partners, trustees, employees, attorneys, other professionals, and shareholders, which release (A) shall include any claim that could be brought by or on behalf of such releasing party; (B) will not release any Net WAC Group Intercompany Claim (to the extent not repaid at closing); (C) will not release any reversionary interest in the Carve Out or Winddown Account; and (D) will not waive the right of any party to object to any interim or final fee applications or the payment of any "success" or transaction fees;

(d)     the Debtors will use commercially reasonable efforts to assist the WAC Facility Agent to transition the operation and support of its WAC Collateral to Credit Bidco or an operator or manager of Credit Bidco's choice in a seamless manner (including by providing for the orderly transfer of all documentation and records consisting of or supporting such WAC Specific Collateral); provided, that the third party costs associated with such transition shall be (a) agreed upon between the Debtors and the Directing WAC Party; (b) borne by

31

the Directing WAC Party; and (c) paid in advance of the Debtors' incurring such costs;

(e)     the Debtors, Credit Bidco, and/or a WAC Facility Agent may agree to enter into a reasonable transition services agreement on reasonable terms without the need for further Bankruptcy Court approval (a copy of which shall be provided to the advisors to the Steering Committee);

(f)     the Debtors will use commercially reasonable efforts to cooperate with the WAC Facility Agent to (at the option of such Directing WAC Party) novate, transfer, cancel, or otherwise seek a tax efficient disposition of any profit participating notes issued by the members of such WAC Facility; provided, however, that the Debtors shall not be required to spend any money, incur any liabilities, or suffer any loss of value (other than any value of the profit participating notes that are to be novated, transferred, cancelled or otherwise dealt with);

(g)     the Chapter 11 Cases of the Debtor entities subject to a Streamlined Credit Bid shall be severed from the joint administration of the remaining Chapter 11 Cases upon consummation of the Streamlined Credit Bid (or such other time as may be mutually agreed); after consummation of the Streamlined Credit Bid, the remaining Debtors shall not object to (and shall provide reasonable assistance with) the dismissal of the Chapter 11 Cases of the Debtor entities subject to a Streamlined Credit Bid; and

iv.    a cash deposit equal to the sum of the following, eliminating any duplication as appropriate:[14]

(a)     the Net WLIL Intercompany Claim in respect of such Participating WAC Group, if any, reduced by its Net WAC Group Intercompany Claim;

---

[14] Upon written request by a WAC Facility Agent, the Debtors shall provide such WAC Facility Agent a good faith estimate of the amount of the Exit Payment no later than **January 11, 2019 at 5:00 p.m. (ET)**. In the event the Debtors accept a Matching Bid, the Exit Payment shall be returned to the applicable WAC Facility Agent no later than January 31, 2019.

WEIL:\96835038\1\79984.0003

    (b)    its allocated share of the Carve Out to the extent unfunded (which amount shall be paid directly to the Fee Reserve Account);

    (c)    its allocated share of the Winddown Account up to the amounts and in the allocable portion set forth in the Winddown Budget attached as Annex F to the Term Sheet;

    (d)    third party costs associated with the transition, operation, and support of the WAC Collateral;

    (e)    if applicable, its allocated share of the Expense Reimbursement;

    (f)    any true-up of opening cash balances to reflect the cash sources and uses during the forbearance period that have not already been reflected in the Net WLIL Intercompany Claim and/or the Net WAC Group Intercompany Claim; and

    (g)    its allocated share of the A&M transaction fee as set forth in the Approved Budget to the extent not included in (A) (collectively (A)-(G), an "**Exit Payment**").

    d.    <u>363K Credit Bid Requirements</u>.  In addition to the requirements set forth herein, a 363(k) Credit Bid submitted by a WAC Facility Agent must include:

    i.    the Secured Claim Documentation, which must be provided to the Debtors by **January 10, 2019 at 5:00 p.m. (ET)** to ensure that the Secured Claim Documentation is validated;

    ii.    the acquisition of all of the WAC Collateral that secures such WAC Facility Agent's WAC Facility;

    iii.    a cash deposit in the amount of the Exit Payment; and

    iv.    a written statement setting forth the amount of such WAC Facility Agent's 363(k) Credit Bid and attaching an executed copy of the APA as an exhibit to the statement in both PDF and MS-WORD format and a copy of same that has been marked against the Macquarie APA, a copy of which is located in the Data Room.

    B.    The Debtors shall determine, in their reasonable judgment, which Credit Bids received by the Credit Bid Deadline qualify as a "**Qualified Credit Bid**."  The

WEIL:\96835038\1\79984.0003

Debtors shall promptly notify the WAC Facility Agent and Successful Third Party Bidder of such Qualified Credit Bid as soon as reasonably practicable upon making such determination.  The Successful Third Party Bidder shall have until **January 21, 2019 at 5:00 p.m. (ET)** to submit a cash bid that provides for a payment equal to such WAC Facility Agent's credit bid amount (inclusive of the Exit Payment other than, with respect to Macquarie, the portion thereof related to Expense Reimbursement) (a "**Matching Bid**").  If the Debtors do not receive a Matching Bid by **January 21, 2019 at 5:00 p.m. (ET)**, such Qualified Credit Bid shall be deemed a successful credit bid (a "**Successful Credit Bid**" and the bidder making such bid, a "**Successful Credit Bidder**") and shall be consummated by February 5, 2019, unless a Credit Bidco has failed to satisfy the requisite conditions precedent to closing.

Plan Support Agreement Provisions

A. If a WAC Facility Agent does not submit a Credit Bid by the Credit Bid Deadline and instead, by the Credit Bid Deadline, the Debtors receive a PSA from Requisite Lenders, the following deadlines shall apply:

    a. To the extent the Requisite Lenders collectively hold security interests in one hundred and ten (110) or more aircraft, a Successful Third Party Bidder may pursue a sale transaction pursuant to a chapter 11 plan (the "**Plan Sale**") in accordance with the terms of the APA and shall notify the Debtors and the Requisite Lenders of its intent to pursue a Plan Sale by **February 4, 2019 at 5:00 p.m. (ET)**.

    b. If a Successful Third Party Bidder does not pursue a Plan Sale, the Requisite Lenders may submit a Credit Bid in accordance with these Bidding Procedures by **February 11, 2019 at 5:00 p.m. (ET)** (such bid, a "**Requisite Lender Credit Bid**").  The Successful Third Party Bidder shall have until **February 18, 2019 at 5:00 p.m. (ET)** to submit a Matching Bid.  Any Requisite Lender who fails to submit a Requisite Lender Credit Bid by the foregoing deadline shall be deemed to accept the Successful Third Party Bid and the sale of the relevant Purchased Assets shall be consummated pursuant to the Successful Third Party Bidder's APA.

B. To the extent the Requisite Lenders collectively hold security interests in less than one hundred and ten (110) aircraft, a Requisite Lender may submit a Requisite Lender Credit Bid by **January 21, 2019 at 5:00 p.m. (ET)**.  The Successful Third Party Bidder shall have until **January 28, 2019 at 5:00 p.m. (ET)** to submit a Matching Bid.  If a Successful Third Party Bidder does not submit a Matching Bid, such Requisite Lender Credit Bid shall be deemed a Successful Credit Bid.  Any Requisite Lender who fails to submit a Requisite Lender Credit Bid by **January 21, 2019 at 5:00 p.m. (ET)** shall be deemed to accept the Successful Third Party Bid and the sale of the relevant Purchased Assets shall be consummated pursuant to the Successful Third Party Bidder's APA.

        38.    The Debtors believe that the time periods set forth in the Proposed

Bidding Procedures are reasonable and appropriate.  The Debtors' business has been extensively

marketed to strategic and financial investors and sovereign wealth funds in recent months and information regarding the Debtors' business has been made available in an electronic data room during such process. Many parties that may have an interest in bidding at the Auction likely already have conducted diligence and evaluated the Debtors' business and will not be bidding in a vacuum. In addition, potential bidders who have not previously conducted diligence on the Debtors' business will have immediate access to, subject to the execution of an appropriate confidentiality agreement, a substantial body of information regarding the Debtors' assets, including information gathered based upon specific due diligence requests of Macquarie and other prepetition bidders.

### Assumption and Assignment Procedures

39.     The Assumption and Assignment Procedures will, among other things, govern the Debtors' provision of notice to non-Debtor parties to Transferred Contracts that such contracts may be assumed and assigned to Macquarie, a Successful Third Party Bidder, or a Successful Credit Bidder and of the Cure Costs the Debtors believe are necessary pursuant to section 365 of the Bankruptcy Code to assume and assign such contracts.

40.     Pursuant to the Assumption and Assignment Procedures, within three (3) days after the entry of the Bidding Procedures Order, the Debtors shall file the Cure Notice with the Court and serve the Cure Notice by first class mail on each non-Debtor party to the Transferred Contracts. Any objection to (i) the proposed Cure Costs set forth on the Cure Notice (a "**Cure Objection**") must be filed with the Court and served on the Objection Notice Parties (as defined in the Bidding Procedures Order) by **January 16, 2019 at 5:00 p.m. (ET)** and (ii) the provision of adequate assurance of future performance (an "**Adequate Assurance Objection**") must be filed with the Court and served on the Objection Notice Parties by **February 22, 2019 at 5:00 p.m. (ET)**.

WEIL:\96835038\1\79984.0003

**Relief Requested Is Warranted and In**
**the Best Interests of Debtors and Stakeholders**

### A.    The Proposed Bidding Procedures are Fair and Reasonable

41.    The Proposed Bidding Procedures are specifically designed to promote

what courts have deemed to be the paramount goal of any proposed sale of property of a debtor's

estate:  maximizing the value of sale proceeds received by the estate.  *See Official Comm. of*

*Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 659

(S.D.N.Y. 1992) (bidding procedures and bid protections "are important tools to encourage

bidding and to maximize the value of the debtor's assets"), *appeal dismissed*, 3 F. 3d 49 (2d Cir.

1993); *see also In re Metaldyne Corp.,* 409 B.R. 661, 670 (Bankr. S.D.N.Y. 2009) ("[b]idder

protections are granted when a bidder provides a floor for bidding by expending resources to

conduct due diligence and allowing its bid to be shopped around for a higher offer").  Courts

uniformly recognize that procedures established for the purpose of enhancing competitive bidding

are consistent with the fundamental goal of maximizing value of a debtor's estate.  *See In re*

*Integrated Res. Inc.*, 147 B.R. at 659 (observing that sale procedures "encourage bidding" and

"maximize the value of the debtor's assets").

42.    The Proposed Bidding Procedures provide for an orderly, uniform, and

appropriately competitive process through which interested parties may bid for the Purchased

Assets.  The Debtors, with the assistance of their advisors, have structured the Proposed Bidding

Procedures to promote active and competitive bidding by interested parties.  Additionally, the

Proposed Bidding Procedures will allow the Debtors to conduct the Auction in a fair and

transparent manner that will encourage participation by financially capable bidders with

demonstrated ability to consummate a timely sale transaction.  Moreover, entry into the Macquarie

APA ensures that the Debtors will obtain fair market value for the Purchased Assets by setting a

36

minimum purchase price for the Purchased Assets.  As such, the Debtors and their creditors can be assured that the consideration obtained will be fair and reasonable.

**B.     The Bid Protections are Reasonable and Appropriate and Should Be Approved**

43.     The Proposed Bidding Procedures contain certain Bid Protections for Macquarie, such as the initial overbid requirement, the subsequent bidding increments, the Break-Up Fee, and Expense Reimbursement.  Bidding incentives such as these Bid Protections have become commonplace in connection with sales of significant assets under section 363 of the Bankruptcy Code.

44.     Moreover, approval of expense reimbursements and break-up fees as administrative expense claims as a form of bidder protections in connection with a sale of assets has become a recognized practice in chapter 11 cases because it enables a debtor to ensure a sale to a contractually committed buyer at a price that the debtor believes is fair, while providing the debtor with the potential of obtaining an enhanced recovery through an auction process.[15]

45.     Bankruptcy courts in the Second Circuit analyze the appropriateness of bidding incentives such as the Bid Protections under the "business judgment rule", and it is well established in this District that courts consider whether:  (i) the relationship of the parties who negotiated the break-up fee was tainted by self-dealing or manipulation; (ii) the fee hampers, rather than encourages, bidding; and (iii) the amount of the fee is unreasonable relative to the proposed

---

[15] *See, e.g., In re Hooper Holmes, Inc.*, Case No. 18-23302 (RDD) (Bankr. S.D.N.Y. Sept. 20, 2018) (approving break-up fee and expense reimbursement); *In re Nine West Holdings, Inc.*, Case No. 18-10947 (SCC) (Bankr. S.D.N.Y. May 7, 2018) (same); *In re The Great Atlantic & Pacific Tea Co., Inc.*, Case No. 15-23007 (RDD) (Bankr. S.D.N.Y. Aug. 11, 2015) (same); *In re Delias, Inc.*, Case No. 14-23678 (RDD) (Bankr. S.D.N.Y. Feb. 10, 2015) (same); *In re Aereo, Inc.*, Case No. 14-13200 (SHL) (Bankr. S.D.N.Y. Dec. 24, 2014) (same); *In re Lehman Bros. Holdings Inc.*, Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Oct. 22, 2008) (same); *In re Bally Total Fitness of Greater N.Y., Inc.*, Case No. 07-12395 (BRL) (Bankr. S.D.N.Y. Aug. 21, 2007) (same); *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc., (In re Integrated Res., Inc.),* 147 B.R. 650 (S.D.N.Y. 1992), *appeal dismissed,* 3 F.3d 49 (2d Cir. 1993) (same).

WEIL:\96835038\1\79984.0003

purchase price. *In re Genco Shipping & Trading Ltd.*, 509 B.R. 455, 465 (Bankr. S.D.N.Y 2014) (citing *In re Metaldyne Corp.,* 409 B.R. at 670); *see also In re Integrated Res., Inc.*, 147 B.R. at 657–58 (holding that in evaluating bid protections, courts should employ the business judgment rule, which proscribes judicial second-guessing of the corporate debtor's actions taken in good faith absent self-dealing and in the exercise of honest judgment).

46.     First, the Bid Protections are the product of good faith, arms' length negotiations between Macquarie and the Debtors, who were acting not in their own self-interest, but rather, in the interest of their estates consistent with their fiduciary duties.  Furthermore, the Macquarie APA provisions relating to the Bid Protections (as well as the other Macquarie APA provisions) were scrutinized by the Debtors' professionals and approved by the disinterested members of the Debtors' boards of directors.  Niemann Decl. ¶ 21.

47.     Second, the Bid Protections promote competitive bidding by inducing Macquarie to hold its offer open as a minimum or floor bid for the Purchased Assets on which other bidders – and the Debtors – can rely.  The Bid Protections were a material inducement for, and a condition of, Macquarie's agreement to enter into the Macquarie APA.  Indeed, the Macquarie APA increases the likelihood that the price at which the Purchased Assets are sold will reflect their market value, and Macquarie is entitled to be compensated as a result.  Niemann Decl. ¶ 22.

48.     Third, the Bid Protections are reasonable relative to the proposed purchase price in view of the substantial benefits that the Debtors will receive from having the Macquarie APA serve as a floor for bidders who submit a bid for the Purchased Assets, which will confirm that the Debtors receive the highest or best offer for the Purchased Assets.  The Break-Up Fee represents three percent (3%) of the Base Purchase Price, which is within the range of what courts

in this District have held as reasonable.[16]   Moreover, the Macquarie APA provides the Debtors

with a high likelihood of consummation with a contractually committed party at a fair and

reasonable purchase price.   Accordingly, the Bid Protections will not deter or chill bidding, are

reasonable, and will enable the Debtors to maximize the value of their estates.   Niemann Decl.

¶ 23.

### C.   The Sale of the Purchased Assets Should Be Approved as an Exercise of the Debtors' Sound Business Judgment

49.      Ample authority exists for approval of the Sale Transaction.  Section 363

of the Bankruptcy Code provides, in relevant part, "[t]he trustee, after notice and a hearing, may

use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C.

§ 363(b)(1).  Courts in the Second Circuit and others, in applying this section, have required that

the sale of a debtor's assets be based upon the sound business judgment of the debtor.  *See Official

Comm. of Unsecured Creditors of LTV Aerospace & Defense Co. v. LTV Corp.* (*In re Chateaugay

Corp.*), 973 F.2d 141, 143 (2d Cir. 1992) (holding that a judge reviewing a section 363(b)

application must find from the evidence presented a good business reason to grant such

application); *Comm. of Equity Sec. Holders v. Lionel Corp.* (*In re Lionel Corp.*), 722 F.2d 1063,

1071 (2d Cir. 1983) (same); *In re Gen. Motors Corp.*, 407 B.R. 463, 493-94 (Bankr. S.D.N.Y.

2009), *aff'd sub nom. In re Motors Liquidation Co.*, 428 B.R. 43 (S.D.N.Y. 2010).  Once a court

is satisfied that there is a sound business justification for the proposed sale, the court must then

determine whether (i) the debtor has provided the interested parties with adequate and reasonable

---

[16] *See In re Hooper Holmes, Inc.*, Case No. 18-23302 (RDD) (Bankr. S.D.N.Y. Sept. 20, 2018) (approving a break-up fee representing 3% of the purchase price); *In re Nine West Holdings, Inc.*, Case No. 18-10947 (SCC) (Bankr. S.D.N.Y. May 7, 2018) (same); *ARO Liquidation, Inc.*, Case No. 16-11275 (SHL) (Bankr. S.D.N.Y. May 4, 2016) (same); *In re The Great Atlantic & Pacific Tea Co., Inc.*, Case No. 15-23007 (RDD) (Bankr. S.D.N.Y. Aug. 11, 2015) (same); *In re Delias, Inc.*, Case No. 14-23678 (RDD) (Bankr. S.D.N.Y. Feb. 10, 2015) (same); *In re Aereo, Inc.*, Case No. 14-13200 (SHL) (Bankr. S.D.N.Y. Dec. 24, 2014) (same).

notice; (ii) the sale price is fair and reasonable; and (iii) the purchaser is proceeding in good faith. *Id.* at 493-94; *Polvay v. B.O. Acquisitions, Inc.* (*In re Betty Owens Sch.*), 1977 WL 188127, *4 (S.D.N.Y. April 17, 1997).

> a.    ***The Debtors Have Demonstrated a Sound Business Justification for the Sale Transaction***

50.    As set forth in the Niemann Declaration, a strong business justification exists for the sale of the Purchased Assets.  An orderly and expeditious sale of the Purchased Assets is critical to preserving and realizing the Debtors' going concern value and maximizing recoveries for the Debtors' stakeholders.  Notably, the decisions to pursue a sale and then execute the Macquarie APA came after potential alternatives were evaluated.  Throughout May, June, and July 2018, the Debtors and their advisors considered and developed comprehensive proposals for both a stand-alone restructuring as well as a plan for soliciting third-party proposals to invest in, or acquire the assets of, the Debtors.

51.    Ultimately, the Debtors and their advisors, in consultation with the Steering Committee, decided the best approach would be to explore the market for a going concern sale of the business.  In August 2018, the Debtors commenced the M&A Process to ensure that any potential sale transaction was aggressively and thoroughly marketed.  The Sale Transaction was ultimately presented to the disinterested members of the Debtors' boards of directors who, in conjunction with advice from experienced professionals, exercised sound and appropriate business judgment, and determined to pursue the transaction on the terms of the Macquarie APA, subject to competitive bidding sanctioned by the Court.  Niemann Decl. ¶ 9-13.

52.    Accordingly, proceeding with the Sale Transaction is a sound exercise of the Debtors' business judgment and should be approved.

       b.     ***The Debtors Will Provide Adequate and Reasonable Notice of the Sale Transaction***

53.      The Sale Notice will be served on the various parties required by the Sale Guidelines.  The Sale Notice will also be published on the website of the Debtors' claims and noticing agent and once in the national editions of each of *The New York Times*, *The Financial Times*, and *Aviation Week*.  Accordingly, the Debtors submit that the Sale Notice will provide adequate notice of the Sale Transaction by the time of service thereof.

       c.     ***The Sale Transaction Will Produce a Fair and Reasonable Purchase Price for the Purchased Assets***

54.      As set forth above, the Debtors believe that the Sale Transaction will produce a fair and reasonable purchase price for the Purchased Assets.  The sale of the Purchased Assets has been subjected to an extensive M&A Process and scrutinized by the Debtors, their advisors, and major stakeholders before filing the Chapter 11 Cases.  The Macquarie APA contemplates an offer to purchase the Purchased Assets for a price that the Debtors have determined to be fair and reasonable.  Niemann Decl. ¶ 14.

55.      In addition, the Proposed Bidding Procedures were carefully designed to facilitate a robust and competitive bidding process.  The Proposed Bidding Procedures provide an appropriate framework for the Debtors to review, analyze, and compare all bids received to determine which bids are in the best interests of the Debtors' estates and their stakeholders.  The Sale Transaction governed by the Proposed Bidding Procedures undoubtedly will serve the important objective of obtaining not only a fair and reasonable purchase price for the Purchased Assets, but also the highest or best value for the Purchased Assets, which will inure to the benefit of all parties in interest in the Chapter 11 Cases.

WEIL:\96835038\1\79984.0003

d.      ***The Proposed Bidding Procedures Ensure that the Sale***
        ***Transaction Will Be Consummated in Good Faith***

56.     Section 363(m) of the Bankruptcy Code protects a good faith purchaser's

interest in property purchased from a debtor notwithstanding that the sale conducted under section

363(b) of the Bankruptcy Code is later reversed or modified on appeal.   Specifically, section

363(m) of the Bankruptcy Code states that:

> The reversal or modification on appeal of an authorization under
> [section 363(b)] . . . does not affect the validity of a sale … to an
> entity that purchased . . . such property in good faith, whether or not
> such entity knew of the pendency of the appeal, unless such
> authorization and such sale . . . were stayed pending appeal.

11 U.S.C. § 363(m).

57.     Section 363(m) of the Bankruptcy Code fosters the policy of not only

affording finality to the judgment of the Bankruptcy Court but particularly to give finality to those

orders and judgments upon which third parties rely.  *See Reloeb Co. v. LTV Corp* (*In re Chateaugay*

*Corp.*, 1993 U.S. Dist. Lexis 6130, at *3 (S.D.N.Y. May 10, 1993) (quoting *In re Abbotts Dairies*

*of Pa., Inc.*, 788 F.2d 143, 147 (3d Cir. 1986)); *see also Allstate Ins. Co. v. Hughes*, 174 B.R. 884,

888 (S.D.N.Y. 1994) ("Section 363(m) . . . provides that good faith transfers of property will not

be affected by the reversal or modification on appeal of an unstayed order, whether or not the

transferee knew of the pendency of the appeal"); *In re Stein & Day, Inc.*, 113 B.R. 157, 162 (Bankr.

S.D.N.Y. 1990) ("pursuant to 11 U.S.C. § 363(m), good faith purchasers are protected from the

reversal of a sale on appeal unless there is a stay pending appeal").   The Second Circuit has held

that a purchaser's good faith is shown by the integrity of his or her conduct during the course of

the sale proceedings, finding that where there is a lack of such integrity, a good faith finding may

not be made.  *See, e.g., Licensing By Paolo, Inc. v. Sinatra (In re Gucci)*, 126 F.3d 380, 390 (2d

Cir. 1997) (holding that a purchaser's good faith is lost by "fraud, collusion between the purchaser

42

and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders")
(internal citations omitted).

58.    The Debtors and Macquarie have entered into the Macquarie APA
without collusion, in good faith, and through extensive arms' length negotiations. To that end,
Macquarie and the Debtors have engaged separate counsel and other professional advisors to
represent their respective interests in the negotiation of the Macquarie APA and in the sale process
generally.  To the best of the Debtors' knowledge, information, and belief, no party has engaged
in any conduct that would cause or permit the Macquarie APA to be set aside under section 363(m)
of the Bankruptcy Code.

59.    Further, and as set forth above, the Proposed Bidding Procedures are
designed to produce a fair, transparent, and competitive bidding process.  Pursuant to the Proposed
Bidding Procedures, each Qualified Third Party Bidder will be required to confirm, both before
and after the Auction, that it has not engaged in any collusion with respect to the submission of
any bid, the bidding, or the Auction.  Furthermore, any asset purchase agreement with a Successful
Third Party Bidder executed by the Debtors will be negotiated at arms' length and in good faith.
Accordingly, the Debtors seek a finding that any Successful Third Party Bidder (including
Macquarie if named a Successful Third Party Bidder) is a good faith purchaser and is entitled to
the full protections afforded by section 363(m) of the Bankruptcy Code.

**D.    The Sale of the Purchased Assets Free and Clear of Liens, Claims, Encumbrances and Other Interests Is Warranted and Should Be Approved**

60.    In the interest of attracting the best offer, the sale of the Purchased Assets
should be free and clear of any and all liens, claims, encumbrances, and other interests in
accordance with section 363(f) of the Bankruptcy Code, with any such liens, claims,
encumbrances, and other interests attaching to the proceeds of the sale.  Pursuant to section 363(f)

43

of the Bankruptcy Code, a debtor in possession may sell property of the estate "free and clear of any interest in such property of an entity other than the estate" if (i) applicable non-bankruptcy law permits the sale of such property free and clear of such interest; (ii) such entity consents; (iii) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property; (iv) such interest is in bona fide dispute; or (v) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest. *See* 11 U.S.C. § 363(f)(1) -(5); *see also Contrarian Funds, LLC v. Westpoint Stevens, Inc. (In re Westpoint Stevens, Inc.)*, 333 B.R. 30, 50 (S.D.N.Y. 2005) (where a sale is to be free and clear of existing liens and interests other than those of the estate, one or more of the criteria specified in section 363(f) must also be met), *rev'd*, 600 F.3d 231 (2d Cir. 2010); *In re Dundee Equity Corp.*, No. 89-B-10233, 1992 WL 53743 (Bankr. S.D.N.Y March. 6, 1992) (same).

61.     Where the purchase price for a debtor's assets is the best available purchase price under the circumstances, a court may authorize the sale free and clear of existing liens, claims, and encumbrances pursuant to section 363(f)(3) of the Bankruptcy Code even if the purchase price is less than the face amount of liens, claims, and encumbrances. *See In re Boston Generating, LLC*, 440 B.R. 302, 332 (Bankr. S.D.N.Y. 2010); *In re Beker Indus., Corp.*, 63 B.R. 474, 477–78 (Bankr. S.D.N.Y. 1986).   The procedures outlined in the Proposed Bidding Procedures and the Debtors' extensive pre- and postpetition efforts to market their business ensure that the purchase price paid for the Purchased Assets is the best available.   Niemann Decl. ¶ 14. In addition, the Debtors believe that any of the parties holding liens in the Purchased Assets could be compelled to accept a monetary satisfaction of such interests.   Accordingly, the Debtors believe that the sale of the Purchased Assets will satisfy the statutory prerequisites of section 363(f) of the

44

Bankruptcy Code and the Sale Transaction should be approved free and clear of all liens, claims, and encumbrances against the Purchased Assets.

### E.    Assumption and Assignment of Transferred Contracts

62.    Section 365(a) of the Bankruptcy Code provides that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Upon finding that a debtor has exercised its sound business judgment in determining to assume an executory contract or unexpired lease, courts will approve the assumption under section 365(a) of the Bankruptcy Code. *See Nostas Assocs. v. Costich* (*In re Klein Sleep Prods.*, *Inc.*), 78 F.3d 18, 25 (2d Cir. 1996); *Orion Pictures Corp. v. Showtime Networks, Inc. (In re Orion Pictures Corp.*), 4 F.3d 1095, 1099 (2d Cir. 1993). The assumption of the Transferred Contracts is an exercise of the Debtors' sound business judgment because the transfer of the Transferred Contracts is necessary to obtain the best value for the Purchased Assets. Given that consummation of the Sale Transaction is critical to the Debtors' efforts to maximize value for their estates and stakeholders, the Debtors' assumption of the Transferred Contracts is an exercise of sound business judgment and should be approved.

63.    The consummation of the Sale Transaction, which will involve the assignment of the Transferred Contracts, will be contingent upon the Debtors' compliance with the applicable requirements of section 365 of the Bankruptcy Code. Section 365(b)(1) of the Bankruptcy Code requires that any outstanding defaults under the Transferred Contracts must be cured or that adequate assurance be provided that such defaults will be promptly cured. As set forth above, the Debtors propose to file with the Court, and serve on each non-Debtor party to a Transferred Contract, a Cure Notice indicating the Debtors' calculation of the Cure Cost for each such contract. Non-Debtor parties to the Transferred Contracts will have the opportunity to file

WEIL:\96835038\1\79984.0003

objections to the proposed assumption and assignment of the Transferred Contracts, including the proposed Cure Costs.

64.     Pursuant to section 365(f)(2) of the Bankruptcy Code, a debtor may assign an executory contract or unexpired lease of nonresidential real property if "adequate assurance of future performance by the assignee of such contract or lease is provided." 11 U.S.C. § 365(f)(2)(B).  The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." *See Carlisle Homes, Inc. v. Azzari* (*In re Carlisle Homes, Inc.*), 103 B.R. 524, 538 (Bankr. D.N.J. 1988) (citation omitted); *see also In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent); *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) ("[a]lthough no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance.").  Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned.  *See In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease has financial resources and expressed willingness to devote sufficient funding to business to give it strong likelihood of succeeding).

65.     As set forth in the Proposed Bidding Procedures, a bidder must submit Adequate Assurance Information regarding its ability (and the ability of its designated assignee, if applicable) to perform under the Transferred Contracts.  The Debtors will provide Adequate Assurance Information to all counterparties to the Transferred Contracts and counterparties will have an opportunity to file an Adequate Assurance Objection in advance of the Sale Hearing.

WEIL:\96835038\1\79984.0003

Based on the foregoing, the Debtors' assumption and assignment of the Transferred Contracts satisfy the requirements under section 365 of the Bankruptcy Code and should be approved.

66.     In addition, to facilitate the assumption and assignment of the Transferred Contracts, the Debtors further request that the Court find that all anti-assignment provisions in the Transferred Contracts, whether such provisions expressly prohibit or have the effect of restricting or limiting assignment of such contract or lease, to be unenforceable under section 365(f) of the Bankruptcy Code.[17]

### F.     Request for Relief Pursuant to Bankruptcy Rules 6004(h) and 6006(d)

67.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). Bankruptcy Rule 6006(d) provides that "[a]n order authorizing the trustee to assign an executory contract or unexpired lease under § 365(f) is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6006(d). In light of the Debtors' current financial condition and their obligation to comply with the milestones under the Macquarie APA and DIP Credit Agreement, the Debtors believe that in order to maximize value, the sale of the Purchased Assets pursuant to the Sale Transaction must be consummated as soon as practicable. Accordingly, the Debtors request that the Bidding Procedures Order and the Sale Order be effective immediately upon entry of each such

---

[17] Section 365(f)(1) provides in part that, "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease." 11 U.S.C. § 365(f)(1). Section 365(f)(3) further provides that, "[n]otwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law that terminates or modifies, or permits a party other than the debtor to terminate or modify, such contract or lease or a right or obligation under such contract or lease on account of an assignment of such contract or lease, such contract, lease, right, or obligation may not be terminated or modified under such provision because of the assumption or assignment of such contract or lease by the trustee." 11 U.S.C. § 365(f)(3).

order and that the fourteen (14)-day stay periods under Bankruptcy Rules 6004(h) and 6006(d) be waived.

## Notice

68.     Notice of this Motion has been provided to (i) William K. Harrington, U.S. Department of Justice, Office of the U.S. Trustee, 201 Varick Street, Room 1006, New York, NY 10014 (Attn: Andrea B. Schwartz, Esq.); (ii) the Debtors' thirty (30) largest unsecured creditors on a consolidated basis; (iii) the Internal Revenue Service; (iv) the United States Attorney's Office for the Southern District of New York; (v) the attorneys for SunTrust Bank, as administrative agent under that certain Amended and Restated Credit Agreement, dated as of November 8, 2013, and that certain Amended and Restated Credit Agreement, dated as of April 28, 2017; (vi) the attorneys for Wells Fargo Bank, National Association, as administrative agent under that certain Credit Agreement, dated as of April 16, 2014, and that certain Note Purchase Agreement, dated as of July 29, 2015; (vii) the attorneys for Airbus Helicopters Financial Services Limited, as agent under that certain Euro Term Loan Facility Agreement, dated February 21, 2017; (viii) the attorneys for BNP Paribas, as administrative agent under that certain Credit Agreement, dated as of August 6, 2014; (ix) the attorneys for Bank of Utah, as administrative agent under that certain Credit Agreement, dated as of March 23, 2015; (x) the attorneys for Lombard North Central PLC, as administrative agent under that certain Credit Agreement, dated as of March 24, 2016; (xi) the attorneys for Sumitomo Mitsui Banking Corporation, Brussels Branch, as administrative agent under that certain Credit Agreement, dated as of August 2, 2017; (xii) the attorneys for the Steering Committee of WAC Lenders; (xiii) the attorneys for the Sponsors; (xiv) the attorneys for Macquarie; (xv) all parties that have requested notice in these Chapter 11 Cases pursuant to Bankruptcy Rule 2002; (xvi) all entities known or reasonably believed to have asserted any lien,

claim, encumbrance, or other interest in the Purchased Assets; and (xvii) all non-Debtor parties to the Transferred Contracts (collectively, the "**Notice Parties**").  The Debtors submit that, in view of the facts and circumstances, such notice is sufficient and no other or further notice need be provided.

69.    No previous request for the relief sought herein has been made by the Debtors to this or any other court.

WEIL:\96835038\1\79984.0003

WHEREFORE the Debtors respectfully request that the Court grant the relief requested herein and such other and further relief as is just.

Dated: December 10, 2018
      New York, New York

                /s/ Gary T. Holtzer
                WEIL, GOTSHAL & MANGES LLP
                767 Fifth Avenue
                New York, New York 10153
                Telephone:  (212) 310-8000
                Facsimile:  (212) 310-8007
                Gary T. Holtzer
                Robert J. Lemons
                Kelly DiBlasi
                Matthew P. Goren

                *Proposed Attorneys for Debtors*
                *and Debtors in Possession*

**<u>Exhibit A</u>**

**Debtors**

| Debtor | Last 4 Digits of Tax ID Number | Debtor | Last 4 Digits of Tax ID Number |
|---|---|---|---|
| Waypoint Leasing Holdings Ltd. | 2899 | AE Helicopter (5) Limited | N/A |
| Waypoint Leasing (Luxembourg) S.à r.l. | 7041 | AE Helicopter (6) Limited | N/A |
| Waypoint Leasing (Ireland) Limited | 6600 | MSN 31141 Trust | N/A |
| Waypoint Asset Co 10 Limited | 2503 | MSN 31492 Trust | N/A |
| MSN 2826 Trust | N/A | MSN 36458 Trust | N/A |
| MSN 2879 Trust | N/A | MSN 760543 Trust | N/A |
| Waypoint Asset Co 11 Limited | 3073 | MSN 760551 Trust | N/A |
| MSN 2905 Trust | N/A | MSN 760581 Trust | N/A |
| Waypoint Asset Co 12 Limited | 0541 | MSN 760628 Trust | N/A |
| MSN 20042 Trust | N/A | MSN 760631 Trust | N/A |
| MSN 41202 Trust | N/A | MSN 760682 Trust | N/A |
| MSN 920280 Trust | N/A | MSN 920022 Trust | N/A |
| Waypoint Asset Co 1E Limited | 6089 | MSN 920062 Trust | N/A |
| Waypoint Asset Euro 1F Limited | 7099 | MSN 920125 Trust | N/A |
| MSN 20093 Trust | N/A | MSN 9229 AS | N/A |
| Waypoint Asset Malta 1A Limited | 2966 | Waypoint Asset Co 3A Limited | 6687 |
| Waypoint Leasing Singapore 1 Pte. Limited | 2403 | MSN 41371 Trust | N/A |
| Waypoint Leasing UK 1A Limited | 2226 | Waypoint Asset Euro 1A Limited | 9804 |
| Waypoint Asset Co 14 Limited | 1585 | MSN 4466 Trust | N/A |
| Waypoint Asset Co 15 Limited | 1776 | MSN 4469 Trust | N/A |
| Waypoint Asset Co 3 Limited | 3471 | MSN 6655 Trust | N/A |

| | | | |
|---|---|---|---|
| MSN 6658 Trust | N/A | Waypoint Asset Funding 6 LLC | 4964 |
| Waypoint 760626 Business Trust | N/A | Waypoint Asset Co 7 Limited | 9689 |
| MSN 7152 Trust | N/A | Waypoint Asset Euro 7A Limited | 2406 |
| MSN 7172 Trust | N/A | Waypoint Asset Co 8 Limited | 2532 |
| Waypoint Asset Funding 3 LLC | 4960 | MSN 31041 Trust | N/A |
| Waypoint Asset Malta Ltd | 5348 | MSN 31203 Trust | N/A |
| Waypoint Leasing Labuan 3A Limited | 8120 | MSN 31578 Trust | N/A |
| Waypoint Leasing UK 3A Limited | 0702 | MSN 760617 Trust | N/A |
| Waypoint Asset Co 4 Limited | 0301 | MSN 760624 Trust | N/A |
| Waypoint Asset Co 5 Limited | 7128 | MSN 760626 Trust | N/A |
| MSN 1251 Trust | N/A | MSN 760765 Trust | N/A |
| MSN 14786 Trust | N/A | MSN 920063 Trust | N/A |
| MSN 2047 Trust | N/A | MSN 920112 Trust | N/A |
| MSN 2057 Trust | N/A | Waypoint 206 Trust | N/A |
| Waypoint Asset Co 5B Limited | 2242 | Waypoint 407 Trust | N/A |
| Waypoint Leasing UK 5A Limited | 1970 | Waypoint Asset Euro 1B Limited | 3512 |
| Waypoint Asset Co 6 Limited | 8790 | Waypoint Asset Euro 1C Limited | 1060 |
| MSN 31042 Trust | N/A | MSN 20012 Trust | N/A |
| MSN 31295 Trust | N/A | MSN 20022 Trust | N/A |
| MSN 31308 Trust | N/A | MSN 20025 Trust | N/A |
| MSN 920119 Trust | N/A | MSN 920113 Trust | N/A |
| Waypoint Asset Funding 8 LLC | 4776 | Waypoint Asset Co Germany Limited | 5557 |
| Waypoint Leasing UK 8A Limited | 2906 | MSN 31046 Trust | N/A |
| Waypoint Leasing US 8A LLC | 8080 | MSN 41511 Trust | N/A |

| | | | |
|---|---|---|---|
| Waypoint Asset Co 9 Limited | 6340 | MSN 760608 Trust | N/A |
| MSN 20052 Trust | N/A | MSN 89007 Trust | N/A |
| MSN 31312 Trust | N/A | MSN 920141 Trust | N/A |
| MSN 41329 Trust | N/A | MSN 920152 Trust | N/A |
| MSN 760538 Trust | N/A | MSN 920153 Trust | N/A |
| MSN 760539 Trust | N/A | MSN 920273 Trust | N/A |
| MSN 760541 Trust | N/A | MSN 920281 Trust | N/A |
| MSN 760542 Trust | N/A | MSN 9205 Trust | N/A |
| Waypoint Asset Co 1B Limited | 5795 | MSN 9229 Trust | N/A |
| MSN 41272 Trust | N/A | Waypoint Asset Co 1A Limited | 1208 |
| Waypoint Asset Co 5A Limited | 4148 | Waypoint Leasing Labuan 1A Limited | 2299 |
| MSN 69052 Trust | N/A | Waypoint Asset Co 1C Limited | 0827 |
| Waypoint Asset Euro 9A Limited | 2276 | Waypoint Asset Co 1D Limited | 7018 |
| Waypoint Asset Euro 1E Limited | 6050 | Waypoint Asset Co 1F Limited | 6345 |
| Waypoint Leasing UK 9A Limited | 5686 | Waypoint Asset Co 1G Limited | 6494 |
| Waypoint Asset Sterling 9A Limited | 1161 | Waypoint Asset Co 1H Limited | 7349 |
| Waypoint Asset Company Number 1 (Ireland) Limited | 6861 | Waypoint Asset Co 1J Limited | 7729 |
| Waypoint Asset Euro 1D Limited | 1360 | MSN 20159 Trust | N/A |
| Waypoint Asset Co 1L Limited | 2360 | MSN 31431 Trust | N/A |
| Waypoint Asset Co 1M Limited | 5855 | MSN 760734 Trust | N/A |
| Waypoint Asset Co 1N Limited | 3701 | MSN 920024 Trust | N/A |
| Waypoint Asset Euro 1G Limited | 4786 | MSN 920030 Trust | N/A |
| Waypoint Asset Funding 1 LLC | 7392 | Waypoint Asset Funding 2 LLC | 7783 |
| Waypoint Leasing UK 1B Limited | 0592 | Waypoint Asset Co 1K Limited | 2087 |

| | | | |
|---|---|---|---|
| Waypoint Leasing UK 1C Limited | 0840 | Waypoint Leasing Services LLC | 8965 |
| Waypoint Asset Company Number 2 (Ireland) Limited | 7847 | Waypoint Leasing (Luxembourg) Euro S.à r.l. | 8928 |
| Waypoint 2916 Business Trust | N/A | | |

**<u>Exhibit B</u>**

**Bidding Procedures Order**

WEIL:\96731560\6\79984.0003

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
----------------------------------------------------------x
                                           :
In re                                      :    Chapter 11
                                           :
WAYPOINT LEASING                           :    Case No. 18-13648 (SMB)
HOLDINGS LTD., et al.,                     :
                                           :    (Jointly Administered)
           Debtors.¹                       :
----------------------------------------------------------x
```

### ORDER APPROVING (A) BIDDING PROCEDURES, (B) BID PROTECTIONS, (C) FORM AND MANNER OF NOTICE OF AUCTION, SALE TRANSACTION, AND SALE HEARING, (D) PROCEDURES FOR THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (E) DATE FOR AUCTION, IF NECESSARY, AND SALE HEARING

Upon the motion (the "**Motion**")[2] of Waypoint Leasing Holdings Ltd. and certain

of its subsidiaries and affiliates, as debtors and debtors in possession (collectively, the

"**Debtors**") in the above-captioned chapter 11 cases (the "**Chapter 11 Cases**"), pursuant to

sections 105, 363, 365, 503, and 507 of title 11 of the United States Code (the "**Bankruptcy

Code**"), Rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the

"**Bankruptcy Rules**"), Rules 2002-1, 6004-1, 6006-1, and 9006-1(b) of the Local Bankruptcy

Rules for the Southern District of New York (the "**Local Rules**"), and the *Amended Sale

Guidelines for the Conduct of Asset Sales Established and Adopted by the United States

Bankruptcy Code for the Southern District of New York* (the "**Sale Guidelines**") for:  (i) entry of

an order approving (a) the Bidding Procedures substantially in the form attached hereto as

**Exhibit 1**; (b) authorizing and approving certain bidding protections for Macquarie Rotorcraft

---

[1] A list of the Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, is attached to the Motion as **Exhibit A**.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Motion or the Macquarie APA (as defined herein), as applicable.

Leasing Holdings Limited ("**Macquarie**"), including an expense reimbursement and break-up fee on the terms set forth in the Macquarie APA (as defined below); (c) scheduling an auction (the "**Auction**") to be held on **January 8, 2019 at 10:00 a.m. (ET)**, if necessary; (d) scheduling one or more hearings with respect to the approval of the sale of the Purchased Assets (each, a "**Sale Hearing**"), subject to the Court's availability, and approving the notices related thereto; (e) authorizing and approving the procedures set forth in the Bidding Procedures Order (the "**Assumption and Assignment Procedures**") for the assumption and assignment of certain of the Debtors' executory contracts and unexpired leases and the determination of cure costs related thereto; (f) approving various deadlines in connection with the foregoing; and (g) authorizing and approving the form and manner of (y) the notice of Auction, Sale Transaction, and Sale Hearing (the "**Sale Notice**"), substantially in the form attached hereto as **Exhibit 2** and (z) the notice to various counterparties of proposed cure costs and the assumption and assignment of certain of the Debtors' executory contracts and unexpired leases (the "**Cure Notice**"), substantially in the form attached hereto as **Exhibit 3** ((a) through (g) collectively, the "**Bidding and Auction Process**"); and (ii) entry of one or more separate orders (each, a "**Sale Order**") approving (a) the sale of the Purchased Assets free and clear of liens, claims, encumbrances, and other interests; (b) the assumption and assignment of certain of the Debtors' executory contracts and unexpired leases in connection therewith (the "**Transferred Contracts**") ((a) and (b) collectively, the "**Sale Transaction**"); and (c) related relief, all as more fully described in the Motion; and the Court having jurisdiction to consider the Motion and the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334, and the Amended Standing Order of Reference M-431, dated January 31, 2012 (Preska, C.J.); and consideration of the Motion and the requested relief therein being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before

2

the Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the Motion

having been given as provided in the Motion, and such notice having been adequate and

appropriate under the circumstances; and it appearing that no other or further notice need be

provided; and any objections to the requested relief having been withdrawn or overruled on their

merits; and the Court having held a hearing to consider the relief requested in the Motion as to

the Bidding and Auction Process (the "**Hearing**"); and all of the proceedings had before the

Court; and the Court having reviewed the Motion and the Niemann Declaration filed in support

of the Motion; and the Court having found and determined that the relief sought in the Motion as

to the Bidding and Auction Process is in the best interests of the Debtors, their estates, creditors,

and all parties in interest, and that the legal and factual bases set forth in the Motion establish just

cause for the relief granted herein; and after due deliberation and sufficient cause appearing

therefor, it is hereby

## FOUND AND DETERMINED THAT:[3]

A.      The Court has jurisdiction to hear and determine the Motion and to grant

the relief requested herein with respect to the Bidding and Auction Process pursuant to 28

U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is

proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

B.      The statutory and legal predicates for the relief requested in the Motion are

sections 105, 363, 365, 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, and

6006, Local Rules 2002-1, 6004-1, 6006-1, and 9006-1(b), and the Sale Guidelines.

---

[3] The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law
pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the
extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent
any of the following conclusions of law constitute findings of fact, they are adopted as such.

WEIL:\96731560\6\79984.0003

C.      Good and sufficient notice of the Motion, the Bidding and Auction Process, and the relief sought in the Motion has been given under the circumstances, and no other or further notice is required except as set forth herein and in the Bidding Procedures.  A reasonable opportunity to object or be heard regarding the relief provided herein has been afforded to parties in interest.

D.      The Debtors and their advisors engaged in a robust and extensive marketing and sale process before the Petition Date to solicit and develop the highest or best offer for the Purchased Assets.

E.      Macquarie submitted a bid (the "**Macquarie Bid**") for the Purchased Assets as reflected in that certain Stock and Asset Purchase Agreement (the "**Macquarie APA**"), which represents the highest or best offer the Debtors have received to purchase the Purchased Assets.  The Macquarie Bid shall be subject to higher or better offers in accordance with the Bidding Procedures.

F.      Pursuit of the Macquarie Bid reflects a sound exercise of the Debtors' business judgment.  The Macquarie APA provides the Debtors with the opportunity to sell the Purchased Assets to preserve and realize their going concern value.  Without the Macquarie APA, the Debtors would likely realize a lower price for the Purchased Assets, therefore, the contributions of Macquarie to the process have indisputably provided a substantial benefit to the Debtors, their estates, and creditors.  The Macquarie APA will enable the Debtors to continue their operations, minimize disruption to the Debtors' business, and secure a fair and adequate baseline price for the Purchased Assets at the Auction and, accordingly, will provide a clear benefit to the Debtors' estates, their creditors, and all parties in interest.

4

G.       The Bid Protections, including the Break-Up Fee and Expense Reimbursement, have been negotiated by Macquarie, the Debtors, and their respective advisors at arms' length and in good faith and are necessary to ensure that Macquarie will continue to pursue the Macquarie APA and the Sale Transaction.    The Break-Up Fee and Expense Reimbursement, to the extent payable under the Macquarie APA, (a) is an actual and necessary cost and expense of preserving the Debtors' estates within the meaning of section 503(b) of the Bankruptcy Code and shall be treated as an allowed administrative expense claim against the Debtors' estates pursuant to sections 105(a), 503(b), and 507(a)(2) of the Bankruptcy Code; (b) is commensurate to the real and material benefits conferred upon the Debtors' estates by Macquarie; and (c) is fair, reasonable, and appropriate, including in light of the necessity to announce a sale transaction for the Purchased Assets at the outset of the Chapter 11 Cases, and the efforts that have been and will be expended by Macquarie.    The Bid Protections, including the Break-Up Fee and Expense Reimbursement, are material inducements for, and conditions of, Macquarie's execution of the Macquarie APA and are adequately designed to ensure that the highest or best offers are attained for the sale of the Debtors' assets.    Unless it is assured that the Bid Protections, including the Break-Up Fee and Expense Reimbursement, will be available, Macquarie is unwilling to remain obligated to consummate the Sale Transaction or otherwise be bound under the Macquarie APA (including the obligation to maintain its committed offer while such offer is subject to higher or better offers as contemplated by the Bidding Procedures).

H.       The Debtors have articulated good and sufficient business reasons for the Court to approve (i) the Bidding Procedures; (ii) the Assumption and Assignment Procedures; (iii) the Bid Protections, including the Break-Up Fee and Expense Reimbursement (to the extent

5

payable under the Macquarie APA); and (iv) the form and manner of notice of the Auction, Sale Transaction, and Sale Hearing.

I.       The Bidding Procedures were negotiated in good faith and at arms' length and are reasonably designed to promote participation and active bidding and ensure that the highest or best value is generated for the Purchased Assets, thus maximizing the value of the Debtors' estates.

J.       Macquarie is not an "insider" or "affiliate" of any of the Debtors, as those terms are defined in section 101 of the Bankruptcy Code, and no common identity of incorporators, directors, or controlling stockholders exists between Macquarie and the Debtors. Macquarie and its advisors have acted in "good faith" within the meaning of section 363(m) of the Bankruptcy Code in connection with Macquarie's negotiation of the Bid Protections and the Bidding Procedures and Macquarie's negotiation of and entry into the Macquarie APA.

K.       The Assumption and Assignment Procedures, including notice of proposed cure costs, are reasonable, appropriate, and consistent with section 365 of the Bankruptcy Code and Bankruptcy Rule 6006.  The Assumption and Assignment Procedures have been tailored to provide an adequate opportunity for all non-Debtor parties to the Transferred Contracts to raise any objections to the proposed assumption and assignment or to the cure costs.

L.       The Sale Notice and Cure Notice are appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the Bidding Procedures, Assumption and Assignment Procedures, Auction, Sale Hearing, and Sale Transaction free and clear of any liens, claims, encumbrances, or other interests pursuant to section 363(f) of the Bankruptcy Code (with such liens, claims, encumbrances or other interests attaching to the proceeds of any such sale) and any and all objection deadlines related thereto,

WEIL:\96731560\6\79984.0003

and no other or further notice shall be required for the Motion, the Sale Transaction, or the assumption and assignment of the Transferred Contracts except as expressly required herein.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT**:

1.      The Motion is granted to the extent set forth herein.

2.      All objections to the relief granted herein that have not been withdrawn with prejudice, waived, or settled, and all reservations of rights included in such objections, hereby are overruled and denied on the merits with prejudice.

**Bidding Procedures and Auction**

3.      The Bidding Procedures, attached hereto as **Exhibit 1**, are fully incorporated herein and approved and shall apply with respect to any bids for, and the auction and sale of, the Purchased Assets.  The procedures and requirements set forth in the Bidding Procedures, including those associated with submitting a Qualified Third Party Bid and a Credit Bid, are fair, reasonable and appropriate, and are designed to maximize recoveries for the benefit of the Debtors' estates, creditors, and all parties in interest.  The Debtors are authorized to take all actions, including incurring and paying costs and expenses, as are necessary or appropriate to implement the Bidding Procedures.

4.      The deadline for submitting Qualified Third Party Bids (the "**Third Party Bid Deadline**") is **January 4, 2019 at 5:00 p.m. (ET)**.  A party that does not submit a Qualified Third Party Bid by the Third Party Bid Deadline in accordance with the Bidding Procedures will not be allowed to (i) submit any offer after the Third Party Bid Deadline or (ii) participate in the Auction.  Macquarie is a Qualified Third Party Bidder and the Macquarie Bid is a Qualified Third Party Bid for all purposes and requirements pursuant to the Bidding Procedures.

5.    Each administrative agent under a WAC Facility (each, a "**WAC Facility Agent**") is authorized to submit either a streamlined credit bid (a "**Streamlined Credit Bid**") or a standard credit bid (a "**363(k) Credit Bid**" and together with a Streamlined Credit Bid, a "**Credit Bid**") for the prepetition secured amount of its claim, subject to limitation for cause pursuant to section 363(k) of the Bankruptcy Code; provided, that any such WAC Facility Agent shall be required to submit a Credit Bid by **January 14, 2019 at 5:00 p.m. (ET)** (the "**Credit Bid Deadline**") and shall otherwise comply with all of the requirements of the Bidding Procedures.  A Credit Bid submitted by a WAC Facility Agent shall include all of the WAC Collateral (as defined in the Bidding Procedures).  A WAC Facility Agent that does not submit a Credit Bid by the Credit Bid Deadline in accordance with the Bidding Procedures will not be allowed to submit any offer after the Credit Bid Deadline.

6.    All bidders submitting a Qualified Third Party Bid and Credit Bid are deemed to have submitted to the exclusive jurisdiction of the Court with respect to all matters related to the Bidding Procedures, the Auction, the Sale Hearing, and the terms and conditions of the sale or transfer of the Purchased Assets.

7.    Each Third Party Bid (including a Credit Bid) must be accompanied by, among other things, information supporting the bidder's ability to comply with the requirements of adequate assurance of future performance under section 365(f)(2)(B) of the Bankruptcy Code (the "**Adequate Assurance Information**"), including the bidder's financial wherewithal and willingness to perform under any contracts that will be assumed and assigned to such bidder.  In addition, each Qualified Third Party Bidder shall be required to confirm, both before and after the Auction, that it has not engaged in any collusion with respect to the submission of any bid, the bidding, or the Auction.

8

8.      Subject to the Bidding Procedures and this Order, the Debtors shall have the right as they may reasonably determine to be in the best interests of their estates to carry out the Bidding Procedures, including, without limitation, to:   (i) determine which bidders are Qualified Third Party Bidders; (ii) determine which bids are Qualified Third Party Bids; (iii) determine which bid is a Successful Third Party Bid and Back-Up Third Party Bid, each as it relates to the Auction; (iv) reject any Third Party Bid or Credit Bid that is (a) inadequate or insufficient, (b) not in conformity with the requirements of the Bidding Procedures or the requirements of the Bankruptcy Code, or (c) contrary to the best interests of the Debtors and their estates; (v) adjourn or cancel the Auction and/or the Sale Hearing as provided in the Bidding Procedures; (vi) modify the Bidding Procedures consistent with their fiduciary duties and the Bankruptcy Code; and (vii) withdraw the Motion at any time with or without prejudice, in each case, consistent with the terms of the Macquarie APA and the Bidding Procedures.  The Debtors shall provide a copy of any Third Party Bid or Credit Bid to Macquarie and Macquarie's counsel in accordance with the terms of the Macquarie APA within one (1) day following the Debtors' receipt of such Third Party Bid or Credit Bid.

9.      The Debtors shall identify those Third Party Bids that qualify as Qualified Third Party Bids (each bidder that submits such a Qualified Third Party Bid being a Qualified Third Party Bidder) by **January 7, 2019 at 9:00 a.m. (ET)**.  If more than one Qualified Third Party Bid is timely received, the Auction shall be conducted at the offices of Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153, on **January 8, 2019 at 10:00 a.m. (ET)**.  All proceedings at the Auction shall be transcribed and only Qualified Third Party Bidders and their legal and financial advisors shall be permitted to participate in the Auction.

WEIL:\96731560\6\79984.0003

The Debtors may, in the exercise of their business judgment, adjourn the Auction as set forth in the Bidding Procedures.

10.     If the Macquarie Bid, as reflected in the Macquarie APA, is the only Qualified Third Party Bid that is received by the Third Party Bid Deadline, no Auction will be conducted.  In such circumstances, the Debtors shall file and serve, by **January 7, 2019 at 5:00 p.m. (ET)**, a notice indicating that the Auction has been cancelled.

### Notice of Sale Transaction

11.     The Sale Notice, substantially in the form attached hereto as **Exhibit 2** is approved.

12.     All parties in interest shall receive or be deemed to have received good and sufficient notice of (i) the Motion; (ii) the Assumption and Assignment Procedures, including the proposed assumption and assignment of the Transferred Contracts to Macquarie pursuant to the Macquarie APA or to bidders submitting a Successful Third Party Bid or Successful Credit Bid; (iii) the Auction; and (iv) the Sale Transaction, including the sale of the Purchased Assets (as set forth under the Macquarie APA) free and clear of all liens, claims, encumbrances, and other interests and no further notice of the foregoing shall be required, if:

>  a) As soon as practicable, but no later than three (3) days[4] after entry of this Order, the Debtors cause the Sale Notice to be filed with the Court and served by email, mail, facsimile, or overnight delivery on:  (i) counsel for Macquarie; (ii) counsel for the Steering Committee; (iii) counsel for the DIP Agent; (iv) counsel for the WAC Facility Agents; (v) any official committee appointed in the Chapter 11 Cases; (vi) the Office of the United States Trustee for Region 2; (vii) all Persons known by the Debtors to have expressed an interest to the Debtors in a transaction with respect to the Purchased Assets in whole or in part during the past twelve (12) months; (viii) all entities known by the Debtors to have asserted any lien, claim, encumbrance, or other interest in the Purchased Assets (for whom identifying information and addresses are available to the Debtors); (ix) all

---

[4] All reference to "days" shall be calendar days, unless expressly noted.

non-Debtor parties to the Transferred Contracts (for whom identifying information and addresses are available to the Debtors); (x) any Government Authority (as defined in the Macquarie APA) known to have a claim in the Chapter 11 Cases; (xi) the United States Attorney for the Southern District of New York; (xii) the Office of the Attorney General in each state in which the Debtors operate; (xiii) the Office of the Secretary of State in each state in which the Debtors operate or are organized; (xiv) the Federal Trade Commission; (xv) the United States Attorney General/Antitrust Division of Department of Justice; (xvi) the Debtors' known creditors (for whom identifying information and addresses are available to the Debtors); (xvii) all affected federal, state, and local regulatory (including environmental) agencies; (xviii) the United States Environmental Protection Agency; (xix) the Internal Revenue Service; and (xx) all other Persons requesting notice under Bankruptcy Rule 2002 or as directed by the Court (for whom identifying information and addresses are available to the Debtors); and

b)   As soon as practicable, but no later than seven (7) days after entry of this Order, the Debtors shall cause the Sale Notice to be published on the website of the Debtors' claims and noticing agent and once in the national editions of each of *The New York Times*, *The Financial Times*, and *Aviation Week*.

### Macquarie APA and Bid Protections

13.    The Bid Protections are approved in their entirety, including the Break-Up Fee and Expense Reimbursement, payable in accordance with, and subject to the terms of, the Macquarie APA and this Order.  Specifically, Macquarie shall be entitled to payment of (i) an expense reimbursement up to a cap of $3,000,000 (the "**Expense Reimbursement**") for the actual, documented and reasonable out of pocket costs, fees and expenses that are incurred or to be incurred by Macquarie in connection with or related to the authorization, preparation, investigation, negotiation, enforcement, execution, implementation and performance of the transactions contemplated by the Macquarie APA and (ii) a break-up fee in an amount equal to three percent (3%) of the Base Purchase Price, or $19,500,000 (the "**Break-Up Fee**"), in each case, subject and pursuant to the terms and conditions in the Macquarie APA.  Except as expressly provided for herein, no other break-up fee or expense reimbursements are authorized

11

or permitted under this Order.  Except as set forth in the Macquarie APA, the Break-Up Fee and Expense Reimbursement shall not be subject to reduction for any reason.

14.    The Debtors are authorized and directed to pay the Break-Up Fee and Expense Reimbursement by wire transfer of immediately available funds in accordance with the terms and conditions set forth in the Macquarie APA and without further order of the Court.  The Break-Up Fee and Expense Reimbursement, to the extent payable under the Macquarie APA, shall constitute an allowed administrative expense claim against the Debtors' estates pursuant to sections 105(a), 503(b), and 507(a)(2) of the Bankruptcy Code.

15.    All of the Debtors' pre-closing obligations under the Macquarie APA are hereby authorized and approved.

### Sale Hearing(s) and Sale Objection Deadline

16.    At one or more Sale Hearings before the Bankruptcy Court, the Debtors will seek the entry of an order authorizing and approving, among other things, the applicable sale transaction or credit bid.  The Debtors, in the exercise of their business judgment, may adjourn a Sale Hearing without notice or with limited and shortened notice to parties, including by (i) an announcement of such adjournment at a Sale Hearing or (ii) the filing of a notice of adjournment with the Bankruptcy Court prior to the commencement of a Sale Hearing.

17.    A Successful Third Party Bidder and Successful Credit Bidder shall appear at the relevant Sale Hearing and be prepared, if necessary, to have a representative testify in support of the Successful Third Party Bid and Successful Credit Bid, as applicable, and such bidder's ability to close in a timely manner and provide adequate assurance of its future performance under any and all executory contracts and unexpired leases to be assumed and assigned to the Successful Third Party Bidder or Successful Credit Bidder.

12

18.    Objections to any sale transaction and entry of a Sale Order (each, a "**Sale Objection**") must:  (i) be in writing and specify the nature of such objection; (ii) comply with the Bankruptcy Rules and the Local Rules; and (iii) be filed with the Court and served on (a) the attorneys for the Debtors, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 (Attn: Gary T. Holtzer, Robert J. Lemons, and Kelly DiBlasi); (b) the attorneys for the official committee of unsecured creditors appointed in the Chapter 11 Cases, if any; (c) the attorneys for Macquarie, Vedder Price P.C., 1633 Broadway, 31st Floor, New York, New York 10019 (Attn: Douglas J. Lipke, Michael J. Edelman, and Geoffrey R. Kass); (d) the attorneys for the Steering Committee, Milbank, Tweed, Hadley &McCloy LLP, 28 Liberty Street, New York, New York 10005 (Attn: Dennis Dunne and Tyson M. Lomazow); (e) the attorneys for SunTrust Bank, as administrative agent under that certain Amended and Restated Credit Agreement, dated as of November 8, 2013, and that certain Amended and Restated Credit Agreement, dated as of April 28, 2017, Alston & Bird LLP, 1201 West Peachtree Street, Atlanta, Georgia 30309 (Attn: David Wender); (f) the attorneys for Wells Fargo Bank, National Association, as administrative agent under that certain Credit Agreement, dated as of April 16, 2014, and that certain Note Purchase Agreement, dated as of July 29, 2015, Mayer Brown LLP, 1221 Avenue of the Americas, New York, New York 10020 (Attn: Frederick Hyman and Scott Zemser); (g) the attorneys for Airbus Helicopters Financial Services Limited, as agent under that certain Euro Term Loan Facility Agreement, dated February 21, 2017, Dentons US LLP, 22 Little West 12th Street, New York, NY 10014 (Attn: Lee P. Whidden); (h) the attorneys for BNP Paribas, as administrative agent under that certain Credit Agreement, dated as of August 6, 2014, Mayer Brown LLP, 1221 Avenue of the Americas, New York, New York 10020 (Attn: Brian Trust and Scott Zemser); (i) the attorneys for Bank of Utah, as administrative agent under that certain

13

Credit Agreement, dated as of March 23, 2015, Norton Rose Fulbright US LLP, 1301 Avenue of the Americas, New York, New York 10019 (Attn: Howard Beltzer); (j) the attorneys for Lombard North Central PLC, as administrative agent under that certain Credit Agreement, dated as of March 24, 2016, Sullivan & Cromwell LLP, 125 Broad Street, New York, New York 10004 (Attn: Andrew G. Dietderich and Brian D. Glueckstein); (k) the attorneys for Sumitomo Mitsui Banking Corporation, Brussels Branch, as administrative agent under that certain Credit Agreement, dated as of August 2, 2017, Clifford Chance LLP, 31 West 52nd Street, New York, New York 10019 (Attn: Jennifer DeMarco); and (l) William K. Harrington, U.S. Department of Justice, Office of the U.S. Trustee, 201 Varick Street, Room 1006, New York, NY 10014 (Attn: Andrea B. Schwartz, Esq.) (collectively, the "**Objection Notice Parties**").

19.    The Debtors shall file a notice of a Sale Hearing and the deadline to file a Sale Objection (the "**Sale Objection Deadline**") at least fourteen (14) days before a Sale Hearing is scheduled, substantially in the form attached hereto as **Exhibit 2**.  Any timely Sale Objections will be heard by the Court at the Sale Hearing.

20.    The failure of any objecting person or entity to timely file and serve a Sale Objection shall be a bar to the assertion, at the Sale Hearing or thereafter, of any objection to the Motion, or to the consummation and performance of the Sale Transaction contemplated by the Macquarie APA, a Successful Third Party Bid (if an Auction is held), or a Successful Credit Bid, including the transfer of assets to Macquarie, a Successful Third Party Bidder, or Successful Credit Bidder, free and clear of all liens, claims, encumbrances, and other interests pursuant to section 363(f) of the Bankruptcy Code.

14

**Assumption and Assignment Procedures**

21.     The Assumption and Assignment Procedures are reasonable and appropriate under the circumstances, fair to all non-Debtor parties, comply in all respects with the Bankruptcy Code, and are approved.

22.     The Cure Notice, substantially in the form attached hereto as **Exhibit 3**, is hereby approved and is reasonably calculated to provide sufficient notice to the non-Debtor parties to the Transferred Contracts of the Debtors' intent to assume and assign the Transferred Contracts in connection with the Sale Transaction and constitutes adequate notice thereof.  As soon as practicable, but not later than three (3) days after the entry of this Order, the Debtors shall file the Cure Notice with the Court and serve such notice by first class mail on each non-Debtor party to the Transferred Contracts.  Service of the Cure Notice in accordance with this Order on all non-Debtor parties to the Transferred Contracts is hereby deemed to be good and sufficient notice of the Cure Costs for, and the proposed assumption and assignment of, the Transferred Contracts.  As soon as practicable, but not later than three (3) days after the entry of this Order, the Debtors shall post a copy of the Cure Notice on the website for the Chapter 11 Cases maintained by the Debtors' claims and noticing agent.

23.     Objections, if any, to any proposed Cure Costs (each, a "**Cure Objection**") and to the provision of adequate assurance of future performance (each, an "**Adequate Assurance Objection**") must: (i) be in writing; (ii) comply with the Bankruptcy Rules and the Local Rules; (iii) with respect to a Cure Objection, state with specificity what Cure Costs the objecting party believes are required; and (iv) be filed with the Court and served on the Objection Notice Parties.

24.     Any Cure Objection in respect of a Transferred Contract must be filed and served by **January 16, 2019 at 5:00 p.m. (ET)**.  Any Adequate Assurance Objection in respect of a Transferred Contract must be filed and served by **February 22, 2019 at 5:00 p.m. (ET)**.  If a timely Cure Objection or Adequate Assurance Objection is received and such objection cannot otherwise be resolved by the parties, such objection shall be heard at the Sale Hearing or such later date as the Debtors may determine.

25.     To the extent the Debtors identify, at any time after the Cure Notice is served, additional Transferred Contracts to be assumed and assigned to Macquarie, a Successful Third Party Bidder, or a Successful Credit Bidder, the Debtors shall file with the Court and serve by first class mail on the non-Debtor party to such Transferred Contract a supplemental Cure Notice (each, a "**Supplemental Cure Notice**," the form of which shall be identical to the form of Cure Notice attached hereto as **Exhibit 3**).  If such a related Cure Objection or Adequate Assurance Objection is timely received and cannot otherwise be resolved by the parties, such objection will be heard at an emergency hearing scheduled prior to any scheduled closing of the Sale Transaction.

26.     If no timely Cure Objection is filed and served in respect of a Transferred Contract, the Cure Cost identified on the Cure Notice or a Supplemental Cure Notice, as applicable, will be the only amount necessary under section 365(b) of the Bankruptcy Code to cure all defaults under such Transferred Contract.  Any party failing to timely file a Cure Objection shall be forever barred from objecting to the Cure Costs and from asserting any additional cure or other amounts against the Debtors, their estates, Macquarie, a Successful Third Party Bidder, or a Successful Credit Bidder.  If no timely Adequate Assurance Objection is filed and served with respect to a Transferred Contract, Macquarie, a Successful Third Party Bidder,

WEIL:\96731560\6\79984.0003

or a Successful Credit Bidder will be deemed to have provided adequate assurance of future performance for such Transferred Contract in accordance with section 365(f)(2)(B) of the Bankruptcy Code. If no timely Cure Objection or Adequate Assurance Objection is filed and served with respect to a Transferred Contract, the non-Debtor party to such Transferred Contract shall be deemed to have consented to the assumption and assignment of the Transferred Contract to Macquarie, a Successful Third Party Bidder, or a Successful Credit Bidder.

27.    The assumption and assignment of the Transferred Contracts to Macquarie, a Successful Third Party Bidder, or a Successful Credit Bidder is subject to approval of the Court and the consummation of the Sale Transaction. Accordingly, absent the closing of such sale, the Transferred Contracts shall not be deemed assumed or assigned, and shall in all respects be subject to further administration under the Bankruptcy Code.

28.    The inclusion of a contract, lease, or other agreement on the Cure Notice or any Supplemental Cure Notice shall not constitute or be deemed a determination or admission by the Debtors, Macquarie, or any other party in interest that such contract or other document is an executory contract or unexpired lease within the meaning of the Bankruptcy Code or that the stated Cure Cost is due (all rights with respect thereto being expressly reserved). The Debtors reserve all of their rights, claims, defenses, and causes of action with respect to each contract or other document listed on the Cure Notice or any Supplemental Cure Notice.

### General Provisions

29.    All persons or entities that participate in the bidding process shall be deemed to have knowingly and voluntarily (i) consented to the entry of a final order by the Court in connection with the Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent

17

with Article III of the United States Constitution and (ii) waived any right to a jury trial in connection with any disputes relating to any of the foregoing matters.

30.    To the extent the provisions of this Order are inconsistent with the provisions of any exhibits referenced herein or with the Motion, the provisions of this Order shall control; provided, however, that if the terms of this Order, the Macquarie APA and/or the Bidding Procedures (i) do not expressly resolve the issue under consideration or (ii) are ambiguous with regard to such issue, the Debtors, Macquarie, or other parties in interest, on such notice as may be appropriate, may seek such relief from this Court as may be necessary.

31.    Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), 6006(d), 9014, or any applicable provisions of the Local Rules or otherwise, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry, and no automatic stay of execution shall apply to this order.

32.    The requirements set forth in Local Rules 2002-1, 6004-1, 6006-1, 9006-1(b), and 9013-1 are hereby satisfied.

33.    The Debtors are authorized to take all action necessary to effectuate the relief granted in this Order.

34.    The Court shall retain jurisdiction to hear and determine all matters arising from the implementation of this Order.

Dated: _____, 2018
       New York, New York

_____
HONORABLE STUART M. BERNSTEIN
UNITED STATES BANKRUPTCY JUDGE

18

## **<u>Exhibit 1</u>**

**Bidding Procedures**

# BIDDING PROCEDURES

## Overview

On November 25, 2018, Waypoint Leasing Holdings Ltd. and certain of its subsidiaries and affiliates, as debtors and debtors in possession (collectively, the "**Debtors**"), filed voluntary petitions for relief under title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"). The chapter 11 cases have been consolidated for procedural purposes under the lead case, *In re Waypoint Leasing Holdings Ltd.*, *et al.*, Case No 18-13648 (SMB) (the "**Chapter 11 Cases**").

On [___], 2018, the Bankruptcy Court entered an order (ECF No. __) (the "**Bidding Procedures Order**"), which approved these procedures (the "**Bidding Procedures**") for the consideration of the highest or otherwise best bid for all or substantially all of the Debtors' assets, on the terms and conditions set forth herein.

Macquarie Rotorcraft Leasing Holdings Limited ("**Macquarie**") is the purchaser for substantially all of the Debtors' assets and executed that certain Stock and Asset Purchase Agreement (together with the exhibits thereto, and as may be amended, modified, or supplemented from time to time in accordance with the terms thereof, the "**Macquarie APA**"), dated as of December 7, 2018.[1]  The Macquarie APA contemplates, pursuant to the terms and subject to the conditions and purchase price adjustments contained therein, the sale of substantially all of the Debtors' assets (the "**Purchased Assets**") to Macquarie in consideration of approximately $650,000,000 (the "**Base Purchase Price**"), plus the assumption of the Assumed Liabilities (the "**Macquarie Bid**").

The Macquarie Bid is subject to higher or better offers submitted in accordance with the terms and conditions of these Bidding Procedures.  These Bidding Procedures describe, among other things:  (i) the procedures for bidders to submit bids (including credit bids) for some or all of the Purchased Assets; (ii) the manner in which bidders and bids become Qualified Third Party Bidders and Qualified Third Party Bids; (iii) the process for evaluating bids (including credit bids) received; (iv) the conduct of the Auction if the Debtors receive Qualified Third Party Bids; (v) the procedure for the ultimate selection of a Successful Third Party Bidder at the Auction; and (vi) the process for approval of the sale transaction at the Sale Hearing (each as defined herein).

**The Debtors reserve the right, subject to the exercise of their reasonable business judgment, to modify or terminate these Bidding Procedures, to waive terms and conditions set forth herein, to extend any of the deadlines or other dates set forth herein, to adjourn the Auction and/or Sale Hearing, and/or, subject to the terms of the Macquarie APA, to terminate discussions with any and all prospective bidders (except for Macquarie) at any time and without specifying the reasons therefor, in each case, without further notice but in each case to the extent not materially inconsistent with these Bidding Procedures and/or the Bidding Procedures Order.**

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Macquarie APA or the Bidding Procedures Order, as applicable.

### Summary of Important Dates

| Key Event | Deadline |
|---|---|
| Deadline to Object to Macquarie Bid | **January 3, 2019 at 5:00 p.m. (ET)** |
| Deadline to Submit Third Party Bids | **January 4, 2019 at 5:00 p.m. (ET)** |
| Deadline for Debtors to Notify Third Party Bidders of Status as Qualified Third Party Bidders | **January 7, 2019 at 9:00 a.m. (ET)** |
| Auction to be held if the Debtors receive Qualified Third Party Bids, to be conducted at the offices of Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153 | **January 8, 2019 at 10:00 a.m. (ET)** |
| Deadline to File Notice and Identities of Successful Third Party Bid and Back-Up Third Party Bid | **January 9, 2019 at 5:00 p.m. (ET) or promptly following conclusion of the Auction** |
| Deadline to Submit Credit Bids | **January 14, 2019 at 5:00 p.m. (ET)** |
| Deadline for Requisite Lenders to Deliver PSA[2] | **January 14, 2019 at 5:00 p.m. (ET)** |
| Deadline to Object to Successful Third Party Bid and Cure Costs | **January 16, 2019 at 5:00 p.m. (ET)** |
| Deadline for Successful Third Party Bidder to Submit Matching Bid to Qualified Credit Bids | **January 21, 2019 at 5:00 p.m. (ET)** |
| If Qualified Credit Bids Are Timely Submitted and Debtors Do Not Receive Matching Bids, Deadline to File Notice and Identities of Successful Credit Bids | **January 21, 2019 at 5:00 p.m. (ET)** |
| If Requisite Lenders Collectively Hold Security Interests In Less Than 110 Aircraft, Deadline for Requisite Lenders to Submit Credit Bids | **January 21, 2019 at 5:00 p.m. (ET)** |
| If Requisite Lenders Collectively Holding Security Interests In Less Than 110 Aircraft Submit Credit Bids, Deadline for Successful Third Party Bidder to Submit Matching Bid to Requisite Lender Credit Bid | **January 28, 2019 at 5:00 p.m. (ET)** |
| If Requisite Lenders Collectively Hold Security Interests In 110 or More Aircraft, Deadline for Successful Third Party Bidder to Notify Debtors of Intent to Pursue Plan Sale | **February 4, 2019 at 5:00 p.m. (ET)** |
| If Successful Third Party Bidder Rejects Plan Sale, Deadline for Requisite Lenders to Submit Requisite Lender Credit Bids | **February 11, 2019 at 5:00 p.m. (ET)** |
| Deadline for Successful Third Party Bidder to Submit Matching Bid to Requisite Lender Credit Bid | **February 18, 2019 at 5:00 p.m. (ET)** |

---

[2] "**PSA**" means an executed plan support agreement, in form and substance reasonably acceptable to the Debtors and Macquarie (the lenders thereunder, the "**Requisite Lenders**").

WEIL:\96830482\1\79984.0003

| Deadline to Object to Successful Credit Bids | **February 18, 2019 at 5:00 p.m. (ET)** |
|---|---|
| Deadline to Object to Adequate Assurance of Future Performance | **February 22, 2019 at 5:00 p.m. (ET)** |
| Sale Hearing[3] | **Subject to the Court's availability, on such date the Debtors request** |

## Assets To Be Sold

The Debtors' assets are primarily comprised of aircraft, which are owned by eight separate corporate entities or their wholly owned subsidiaries (each, a "**WAC**") consisting of different assets as follows:

| WAC | Number of Aircraft |
|---|---|
| WAC 1 | 30 |
| WAC 2 | 6 |
| WAC 3 | 45 |
| WAC 5 | 9 |
| WAC 6 | 7 |
| WAC 8 | 29 |
| WAC 9 | 17 |
| WAC 12 | 17 |
| Total: | 160 |

## Due Diligence

The Debtors have posted copies of all material documents related to the Debtors' assets to the Debtors' confidential electronic data room (the "**Data Room**").  To access the Data Room, an interested party must submit to the Debtors or their advisors the following:

(A)     an executed confidentiality agreement in form and substance reasonably satisfactory to the Debtors (unless such party is already a party to an existing confidentiality agreement with the Debtors that is acceptable to the Debtors for this due diligence process, in which case such agreement shall govern); and

(B)     sufficient information, as reasonably determined by the Debtors, to allow the Debtors to determine that the interested party has the financial wherewithal to consummate a sale transaction.

An interested party that meets the above requirements to the satisfaction of the Debtors shall be a "**Potential Bidder**."  As soon as practicable, the Debtors will provide such Potential Bidder access to the Data Room; underlined provided, that such access may be terminated by the

---

[3] If a sale transaction is consummated pursuant to a chapter 11 plan in accordance with a PSA, the Debtors will file a scheduling order setting forth the applicable deadlines in connection with confirmation of a chapter 11 plan.

WEIL:\96830482\1\79984.0003

Debtors in their discretion at any time for any reason whatsoever, including that a Potential Bidder does not become a Qualified Third Party Bidder or these Bidding Procedures are terminated.

Each Potential Bidder shall comply with all reasonable requests for information and due diligence access by the Debtors or their advisors regarding the ability of such Potential Bidder to consummate a sale transaction.

Until the Third Party Bid Deadline, the Debtors will provide any Potential Bidder with reasonable access to the Data Room and any additional information requested by Potential Bidders that the Debtors believe to be reasonable and appropriate under the circumstances. All additional due diligence requests shall be directed to the Debtors' advisors, Houlihan Lokey, Inc. ("**Houlihan Lokey**") at Project.Whiskey@HL.com. Unless prohibited by law or otherwise determined by the Debtors, the availability of additional due diligence to a Potential Bidder will cease if (a) the Potential Bidder does not become a Qualified Third Party Bidder or (b) these Bidding Procedures are terminated.

Neither the Debtors nor any of their representatives shall be obligated to furnish any information of any kind whatsoever relating to the Debtors' assets (a) to any person or entity who (i) is not a Potential Bidder; (ii) does not comply with the participation requirements set forth above; or (iii) in the case of competitively sensitive information, is a competitor of the Debtors and (b) to the extent not permitted by law.

The Debtors will provide access to the Data Room to WAC Lenders in their capacity as DIP Lenders (in such capacity, "**Participating WAC Lenders**") and the applicable WAC Facility Agent (subject to any restrictions pursuant to applicable law) and, upon request to the Debtors, to such Participating WAC Lender's financing source only upon execution of a confidentiality agreement by such financing source, which confidentiality agreement shall be in form and substance reasonably acceptable to the Debtors; provided, that a Participating WAC Lender or the applicable WAC Facility Agent's access to information in the Data Room shall be limited to information regarding its applicable WAC Facility.

With respect to any party requested by a WAC Lender to manage such WAC Lender's collateral upon consummation of a Successful Credit Bid (each, an "**Alternative Asset Manager**"), such Alternative Asset Manager is restricted by agreement with the Debtors from engaging in discussions or negotiations with Participating WAC Lenders, the applicable WAC Facility Agent, or an entity designated by the WAC Facility Agent (a "**Credit Bidco**") to manage assets following a Successful Credit Bid, the Debtors agree to release such restriction upon entry of an interim order approving the DIP Facility; provided, that the Debtors, Participating WAC Lenders, and Credit Bidco shall, prior to any disclosure to any such Alternative Asset Manager of any confidential information, shall agree (with each such party acting reasonably and in good faith) on the scope of information to be provided to such Alternative Asset Managers (taking into account commercial sensitivities and antitrust and other applicable law).

WEIL:\96830482\1\79984.0003

## Auction Qualification Procedures

### *Third Party Bid Deadline*

A Potential Bidder that desires to make a cash bid (a "**Third Party Bid**") on the Purchased Assets shall deliver electronic copies of the Third Party Bid so as to be received no later than **January 4, 2019 at 5:00 p.m. (ET)** (the "**Third Party Bid Deadline**"); provided, that the Debtors may extend the Third Party Bid Deadline without further order of the Bankruptcy Court subject to providing notice to all Potential Bidders. **The submission of a Third Party Bid by the Third Party Bid Deadline shall constitute a binding and irrevocable offer to acquire the assets specified in such bid.** Any party that does not submit a Third Party Bid by the Third Party Bid Deadline will not be allowed to (i) submit any offer after the Third Party Bid Deadline or (ii) participate in the Auction. Third Party Bids must be submitted by email to the following:

### Weil, Gotshal & Manges LLP
Waypointbids@weil.com
Gavin Westerman (Gavin.Westerman@weil.com)
Kelly DiBlasi (Kelly.DiBlasi@weil.com)
Mariel E. Cruz (Mariel.Cruz@weil.com)

### Houlihan Lokey
Project.Whiskey@HL.com

### Vedder Price P.C.
GKass@VedderPrice.com
DLipke@VedderPrice.com
MJEdelman@VedderPrice.com

### *Form and Content of Third Party Bids*

A Third Party Bid must contain a signed document from a Potential Bidder received by the Third Party Bid Deadline that identifies the purchaser by its legal name and any other party that will be participating in connection with the Third Party Bid or the sale transaction, and includes, at a minimum, the following:

(A)     Finalized Asset Purchase Agreement (the "APA"). Each Third Party Bid must include, in both PDF and MS-WORD format, an executed copy of the APA and a copy of same that has been marked against the Macquarie APA, a copy of which is located in the Data Room.

(B)     Purchase Price; Minimum Bid. Each Third Party Bid submitted may include substantially all of the Purchased Assets or a portion thereof and must (i) specify the purchase price, which purchase price must include the sum of the Minimum Overbid Amount plus the Break-Up Fee plus the Expense Reimbursement and (ii) propose an alternative transaction that provides greater consideration than the Macquarie Bid for the Purchased Assets included in such Third Party Bid.

WEIL:\96830482\1\79984.0003

(C)     Unconditional Offer.  A commitment that the Third Party Bid is formal, binding, and unconditional (except for those conditions expressly set forth in the APA), is not subject to any due diligence or financing contingency, and is irrevocable until the Debtors notify the Potential Bidder that such Third Party Bid is not a Successful Third Party Bid or a Back-Up Third Party Bid.

(D)     Form of Consideration.  A statement identifying the cash and non-cash components of the Third Party Bid, including confirmation that the cash component of the Third Party Bid is based in U.S. Dollars.

(E)     Proof of Financial Ability to Perform.  Each Third Party Bid must contain such financial and other information that allows the Debtors to make a reasonable determination as to the Potential Bidder's financial and other capabilities to consummate the sale transaction, including, without limitation, such financial and other information setting forth adequate assurance of future performance in satisfaction of the requirements under section 365(f)(2)(B) of the Bankruptcy Code, and the Potential Bidder's willingness to perform under any contracts that are assumed and assigned to such party.  Without limiting the foregoing, such information must include current financial statements or similar financial information certified to be true and correct as of the date thereof, proof of financing commitments (if needed) to close the sale transaction, contact information for verification of such information, including any financing sources, and any other information reasonably requested by the Debtors necessary to demonstrate that such Potential Bidder has the ability to close the sale transaction.

(F)     Designation of Contracts and Leases.  Each Third Party Bid must identify with particularity each and every executory contract and unexpired lease, the assumption and assignment of which is a condition to closing the sale transaction; provided, that the APA may allow for the Potential Bidder to remove executory contracts and unexpired leases from the list of contracts to be assumed and assigned any time up to five business days prior to the closing of the sale transaction; provided, further, that to the extent the Debtors identify any additional executory contracts or unexpired leases after the Third Party Bid is submitted, the APA may allow for the Potential Bidder to add such executory contracts and unexpired leases to the list of contracts to be assumed and assigned any time from and after the Third Party Bid is submitted.

(G)     Required Approvals.  A statement or evidence (i) that the Potential Bidder has made or will make in a timely manner all necessary filings under the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, or other Antitrust Laws (as defined in the Macquarie APA), as applicable, and pay the fees associated with such filings and (ii) of the Potential Bidder's plan and ability to obtain all requisite governmental, regulatory, or other third-party approvals and the proposed timing for the Potential Bidder to undertake the actions required to obtain such approvals. A Potential Bidder further agrees that its legal counsel will coordinate in good faith with Debtors' legal counsel to discuss and explain such Potential Bidder's regulatory analysis, strategy, and timeline for securing all such approvals as soon

6

as reasonably practicable, and in no event later than the time period contemplated in the APA.

(H)     <u>No Entitlement to Break-Up Fee, Expense Reimbursement, or Other Amounts</u>.  A statement that the Third Party Bid does not entitle the Potential Bidder to any break-up fee, termination fee, expense reimbursement or similar type of payment or reimbursement, and a waiver of any substantial contribution administrative expense claims under section 503(b) of the Bankruptcy Code related to the bidding process.

(I)     <u>Joint Third Party Bids</u>.  The Debtors will be authorized to approve joint Third Party Bids in their reasonable discretion on a case-by-case basis; <u>provided</u>, <u>however</u>, that any parties intending to submit a joint Third Party Bid must first disclose in writing to the Debtors all parties to the joint Third Party Bid, and obtain the Debtors' written consent.

(J)     <u>Agreement to Terms of the Bidding Procedures</u>.  A statement that the Potential Bidder agrees to be bound by these Bidding Procedures.

A Potential Bidder must also accompany its Third Party Bid with:

(K)     a Deposit (as defined herein);

(L)     the contact information of the specific person(s) whom the Debtors or their advisors should contact in the event that the Debtors have any questions or wish to discuss the Third Party Bid submitted by the Potential Bidder;

(M)     written evidence of available cash, a commitment for financing (not subject to any conditions other than those expressly set forth in the APA) and such other evidence of ability to consummate the transaction contemplated by the APA, the Bidding Procedures Order, and the Bidding Procedures, as acceptable in the Debtors' business judgment;

(N)     the identity of each entity that will be participating in connection with such Third Party Bid and taking ownership of the assets (including any equity owners or sponsors, if the Potential Bidder is an entity formed for the purpose of consummating the sale transaction) and a copy of a board resolution or similar document demonstrating the authority of the Potential Bidder to make a binding and irrevocable bid on the terms proposed and to consummate the transaction contemplated by the APA;

(O)     a covenant to cooperate with the Debtors to provide pertinent factual information regarding the Potential Bidder's operations reasonably required to analyze issues arising with respect to any applicable antitrust laws and other applicable regulatory requirements; and

(P)     if the value of a Third Party Bid includes additional non-cash components, a detailed analysis of the value of any additional non-cash component of the Third Party Bid and back-up documentation to support such value.

WEIL:\96830482\1\79984.0003

For the avoidance of doubt, a WAC Facility Agent that submits a Credit Bid shall be required to comply with the requirements contained in these Bidding Procedures, including paragraphs (A) through (P) above.

### *Review of Third Party Bids; Designation of Qualified Third Party Bids*

The Debtors will evaluate Third Party Bids that are timely submitted and may engage in negotiations with Potential Bidders who submitted Third Party Bids as the Debtors deem appropriate in the exercise of their business judgment, based upon the Debtors' evaluation of the content of each Third Party Bid. The Debtors will provide a copy of each Third Party Bid received within one (1) day of receipt thereof to Macquarie. Macquarie is a Qualified Third Party Bidder and the Macquarie Bid represents a Qualified Third Party Bid.

The Debtors shall determine, in their reasonable judgment, which of the Third Party Bids received by the Third Party Bid Deadline qualifies as a "**Qualified Third Party Bid**" (each Potential Bidder that submits such a Qualified Third Party Bid being a "**Qualified Third Party Bidder**") and shall notify each Qualified Third Party Bidder of its status as a Qualified Third Party Bidder by no later than **January 7, 2019 at 9:00 a.m. (ET)** (the "**Qualified Third Party Bid Deadline**"). The Debtors shall provide copies of such notice to Macquarie as soon as reasonably practicable thereafter.

Without the written consent of the Debtors, a Qualified Third Party Bidder may not modify, amend, or withdraw its Qualified Third Party Bid, except for proposed amendments to increase the purchase price or otherwise improve the terms of the Qualified Third Party Bid for the Debtors during the period that such Qualified Third Party Bid remains binding as specified herein; <u>provided</u>, that any Qualified Third Party Bid may be improved at the Auction as set forth in these Bidding Procedures. The Debtors reserve the right to work with any Potential Bidder in advance of the Auction to cure any deficiencies in a Third Party Bid that is not initially deemed a Qualified Third Party Bid and to clarify or otherwise improve such Third Party Bid.

### *Failure to Receive Qualified Third Party Bids*

If no Qualified Third Party Bid other than the Macquarie Bid is received by the Third Party Bid Deadline, the Debtors will not conduct the Auction and shall file a notice with the Bankruptcy Court by **January 7, 2019 at 5:00 p.m. (ET)** indicating that the Auction has been cancelled. The Debtors shall also publish such notice on the website of their claims and noticing agent, Kurtzman Carson Consultants LLC (www.kccllc.net/waypointleasing). If no Qualified Third Party Bid is received, Macquarie shall be deemed the Successful Third Party Bidder and the Macquarie Bid shall be deemed the Successful Third Party Bid.

The Debtors shall promptly notify Macquarie if no Qualified Third Party Bid other than the Macquarie Bid is received by the Third Party Bid Deadline. Within one (1) day after receiving such notice, Macquarie shall provide written notice to the Debtors of its allocation of the purchase price to the assets in the Macquarie Bid. The Debtors shall subsequently inform the applicable WAC Facility Agent the portion of Macquarie's purchase price that Macquarie allocates to the WAC Facility Agent's assets.

*Deposit*

A Third Party Bid must be accompanied by a good faith cash deposit in the amount of ten percent (10%) of the cash purchase price (a "**Deposit**"). A Deposit must be deposited prior to the Third Party Bid Deadline with an escrow agent selected by the Debtors (the "**Escrow Agent**") pursuant to an escrow agreement to be provided by the Debtors. To the extent a Qualified Third Party Bid is modified before, during, or after the Auction, the Debtors reserve the right to require that such Qualified Third Party Bidder adjust its Deposit so that it equals ten percent (10%) of the cash purchase price. The requirements set forth in this "Deposit" section do not apply with respect to Macquarie. The deposit provided by Macquarie shall be governed by the Macquarie APA. Other than the Debtors and Macquarie, no person or entity shall have any rights or interests in the deposit provided by Macquarie pursuant to the terms of the Macquarie APA.

## Auction Procedures for Qualified Third Party Bids

If there are two or more Qualified Third Party Bids (including the Macquarie Bid), the Debtors will conduct the Auction on **January 8, 2019, beginning at 10:00 a.m. (ET) at the offices of Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153**. Only a Qualified Third Party Bidder will be eligible to participate at the Auction, subject to such limitations as the Debtors may impose in good faith. In addition, professionals and/or other representatives of the Debtors will be permitted to attend and observe the Auction. Each Qualified Third Party Bidder shall be required to confirm, both before and after the Auction, that it has not engaged in any collusion with respect to the submission of any bid, the bidding, or the Auction.

If the Debtors receive two or more Qualified Third Party Bids (including the Macquarie Bid), bidding for the Purchased Assets will start with the highest and or otherwise best purchase price and/or terms received and will proceed thereafter in minimum cash bid increments of not less than $100,000 (a "**Minimum Overbid Amount**"). The Debtors reserve the right to and may increase or decrease the Minimum Overbid Amount at any time during the Auction. Macquarie and Qualified Third Party Bidders are authorized to increase their bids at the Auction, including with cash, cash equivalents, or other forms of consideration (such as contractual terms). Macquarie will also be entitled to a "credit" in the amount of the Break-Up Fee to be counted towards its bid such that the cash and other consideration proposed by Macquarie plus the Break-Up Fee "credit" must exceed the most recent bid by at least the Minimum Overbid Amount.

The Debtors may adopt rules for the Auction at any time that the Debtors reasonably determine to be appropriate to promote a competitive auction. Any rules adopted by the Debtors will not unilaterally modify any of the terms of the Macquarie APA (as may be consensually modified at the Auction) without the consent of Macquarie. Any rules developed by the Debtors will provide that all bids in the Auction will be made and received on an open basis, and all other bidders participating in the Auction will be entitled to be present for all bidding with the understanding that the true identity of each bidder placing a bid at the Auction will be fully disclosed to all other bidders participating in the Auction and that all material terms of each Qualified Third Party Bid submitted in response to any successive bids made at the Auction will be disclosed to all other bidders. Each Qualified Third Party Bidder will be permitted what the Debtors reasonably determine to be an appropriate amount of time to respond to the previous bid

WEIL:\96830482\1\79984.0003

at the Auction.  The Auction will be conducted openly and shall be transcribed or recorded, and the Qualified Third Party Bidders will be informed of the material terms of the previous bid.

The Debtors shall (i) review each Qualified Third Party Bid on the basis of the amount of cash, contractual terms, or other consideration to be paid or delivered, the speed and certainty of consummating a sale transaction, and any other relevant factor and (ii) identify the highest or otherwise best Qualified Third Party Bid (a "**Successful Third Party Bid**" and the bidder making such bid, a "**Successful Third Party Bidder**").  The Debtors shall also identify a Qualified Third Party Bidder that submitted the next highest or otherwise best Qualified Third Party Bid (a "**Back-Up Third Party Bid**" and the bidder making such bid, a "**Back-Up Third Party Bidder**").  A Back-Up Third Party Bid shall remain open and irrevocable until the earliest to occur of (i) the applicable outside date for consummation of the sale transaction, (ii) consummation of the sale transaction with a Successful Third Party Bidder, and (iii) the release of such bid by the Debtors in writing (such date, the "**Back-Up Third Party Bid Expiration Date**").  If a sale transaction with a Successful Third Party Bidder is terminated prior to the Back-Up Third Party Bid Expiration Date, the Back-Up Third Party Bidder shall be deemed a Successful Third Party Bidder and shall be obligated to consummate the Back-Up Third Party Bid as if it were a Successful Third Party Bid.

Within one (1) day after the Auction, the Successful Third Party Bidder shall provide written notice to the Debtors of its allocation of the purchase price (in the aggregate by WAC Facility) to the assets in the Successful Third Party Bid.  The Debtors shall subsequently inform the applicable WAC Facility Agent the portion of the Successful Third Party Bidder's purchase price that such bidder allocates to the WAC Facility Agent's assets.

Within one (1) day after the Auction, a Successful Third Party Bidder shall submit to the Debtors a fully executed APA and such other documentation memorializing the terms of a Successful Third Party Bid.  A Successful Third Party Bid may not be assigned to any party without the consent of the Debtors.

At any time before entry of an order approving the applicable sale transaction envisioned by a Qualified Third Party Bid, the Debtors reserve the right to and may reject such Qualified Third Party Bid if such Qualified Third Party Bid, in the Debtors' judgment, is: (i) inadequate or insufficient; (ii) not in conformity with the requirements of the Bankruptcy Code, these Bidding Procedures, or the terms and conditions of the applicable sale transaction; or (iii) contrary to the best interests of the Debtors and their estates.  No attempt by the Debtors to reject a Qualified Third Party Bid under this paragraph will modify any rights of the Debtors or Macquarie under the Macquarie APA (as may be consensually modified at the Auction).

### Post-Auction Process

By **January 9, 2019 at 5:00 p.m. (ET)**, the Debtors shall file with the Bankruptcy Court notice of the Successful Third Party Bid, Successful Third Party Bidder, Back-Up Third Party Bid, and Back-Up Third Party Bidder.  A Successful Third Party Bidder shall appear at the Sale Hearing and be prepared to have a representative(s) testify in support of the Successful Third Party Bid and the Successful Third Party Bidder's ability to close in a timely manner and provide

10

adequate assurance of its future performance under any and all executory contracts and unexpired leases to be assumed and/or assigned as part of the proposed sale transaction.

Within seven (7) days after the Auction, the Debtors shall direct the Escrow Agent to return the deposit of any bidder, together with interest accrued thereon, who is not declared a Successful Third Party Bidder or Back-Up Third Party Bidder. Within five (5) days after the Back-Up Third Party Bid Expiration Date, the Debtors shall direct the Escrow Agent to return the deposit of a Back-Up Third Party Bidder, together with interest accrued thereon (if any). Upon the authorized return of any such deposit, the bid of such Potential or Qualified Third Party Bidder shall be deemed revoked and no longer enforceable.

A Successful Third Party Bidder's deposit shall be applied against the cash portion of the purchase price of such bidder's Successful Third Party Bid upon the consummation of the sale transaction. In addition to the foregoing, the deposit of a Qualified Third Party Bidder will be forfeited to the Debtors if (i) the Qualified Third Party Bidder attempts to modify, amend, or withdraw its Qualified Third Party Bid, except as permitted herein, during the time the Qualified Third Party Bid remains binding and irrevocable or (ii) the Qualified Third Party Bidder is selected as a Successful Third Party Bidder and fails to enter into the required definitive documentation or to consummate a sale transaction according to these Bidding Procedures.

### Credit Bidding[4]

Each WAC Facility Agent is authorized to submit either a streamlined credit bid (a "**Streamlined Credit Bid**") or a standard credit bid (a "**363(k) Credit Bid**" and together with a Streamlined Credit Bid, a "**Credit Bid**") for the purchase of all of the collateral (the "**WAC Collateral**") on which such WAC Facility Agent holds a valid, perfected, and unavoidable lien, which consists of any prepetition secured claims held against the Debtors in connection with such WAC Facility Agent's applicable WAC Facility. A Credit Bid shall be submitted in accordance with, and subject to, the terms of the applicable credit agreement, security agreement, pledge agreement, or related agreements with the Debtors and the other lenders party thereto. Any such WAC Facility Agent shall be required to submit a Credit Bid by **January 14, 2019 at 5:00 p.m. (ET)** (the "**Credit Bid Deadline**") and shall otherwise comply with all of the requirements of the Bidding Procedures.

Direction Letter. A Credit Bid submitted by a WAC Facility Agent shall include a copy of the direction by the applicable lenders under the WAC Facility to authorize the submission of such Credit Bid. For the avoidance of doubt, Credit Bids may not be submitted by individual secured lenders under a WAC Facility.

---

[4] Capitalized terms used in this Section but not otherwise defined herein shall have the meanings ascribed to such terms in the *Motion of Debtors Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 507, and 552, Fed. R. Bankr. P. 2002, 4001, 6003, 6004, and 9014, and L. Bankr. R. 2002-1, 4001-2, 9013-1, 9014-1, and 9014-2 for Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Senior Secured Priming Superpriority Postpetition Financing (B) Grant Liens and Superpriority Administrative Expense Status, and (C) Utilize Cash Collateral, (II) Granting Adequate Protection, (III) Scheduling Final Hearing, and (IV) Granting Related Relief* (the "**DIP Motion**"), filed on December 8, 2018 (ECF No. 51).

WEIL:\96830482\1\79984.0003

Satisfaction of Claim in Full.  To the extent a WAC Facility Agent's prepetition secured claim is projected to be satisfied in full based on a Successful Third Party Bid's allocation of the purchase price, such WAC Facility Agent shall be precluded from submitting a Credit Bid.

Streamlined Credit Bid Requirements.  In addition to the requirements set forth herein, a Streamlined Credit Bid submitted by a WAC Facility Agent must include:

(a)  evidence of the amount of its prepetition secured claim, the assets constituting the WAC Collateral securing its prepetition secured claim, and evidence of the grant, perfection, priority, and validity of its lien (the "**Secured Claim Documentation**"), which must be provided to the Debtors by **January 10, 2019 at 5:00 p.m. (ET)** to ensure that the Secured Claim Documentation is validated;

(b) the acquisition of all of the WAC Collateral that secures such WAC Facility Agent's WAC Facility;

(c) a signed agreement (the "**Credit Bid Agreement**") that consists of the following commitments:

1.  if a WAC Facility Agent credit bids less than the full amount of its prepetition secured claim, then it must (i) specify the amount, if any, equal to the portion of the applicable WAC Facility debt it will assume as part of its Streamlined Credit Bid and (ii) release all guaranties issued to such WAC Facility by a Non-WAC Group Member (in which case the deemed value of the Streamlined Credit Bid shall equal the sum of (A) the secured claim amount of the credit bid plus (B) the assumed WAC Facility debt that is specified in the credit bid);

2.  a commitment to purchase all of the equity of the relevant WAC Facility pursuant to a stock agreement;

3.  a mutual release between and among (i) the Debtors in the relevant Participating WAC Group; (ii) the remaining Debtors; (iii) the relevant Participating WAC Lenders; (iv) the WAC Facility Agent; (v) Credit Bidco; and (vi) such parties' respective related parties including their officers, directors, managers, partners, trustees, employees, attorneys, other professionals, and shareholders, which release (A) shall include any claim that could be brought by or on behalf of such releasing party; (B) will not release any Net WAC Group Intercompany Claim (to the extent not repaid at closing); (C) will not release any reversionary interest in the Carve Out or Winddown Account; and (D) will not waive the right of any party to object to any interim or final fee applications or the payment of any "success" or transaction fees;

4.  the Debtors will use commercially reasonable efforts to assist the WAC Facility Agent to transition the operation and support of its WAC Collateral to Credit Bidco or an operator or manager of Credit Bidco's choice in a seamless manner (including by providing for the orderly transfer of all documentation and records consisting of or supporting such WAC Specific Collateral); provided, that the third party costs associated with such transition shall be (a) agreed upon

WEIL:\96830482\1\79984.0003

between the Debtors and the Directing WAC Party; (b) borne by the Directing WAC Party; and (c) paid in advance of the Debtors' incurring such costs;

5.  the Debtors, Credit Bidco, and/or a WAC Facility Agent may agree to enter into a reasonable transition services agreement on reasonable terms without the need for further Bankruptcy Court approval (a copy of which shall be provided to the advisors to the Steering Committee);

6.  the Debtors will use commercially reasonable efforts to cooperate with the WAC Facility Agent to (at the option of such Directing WAC Party) novate, transfer, cancel, or otherwise seek a tax efficient disposition of any profit participating notes issued by the members of such WAC Facility; provided, however, that the Debtors shall not be required to spend any money, incur any liabilities, or suffer any loss of value (other than any value of the profit participating notes that are to be novated, transferred, cancelled or otherwise dealt with);

7.  the Chapter 11 Cases of the Debtor entities subject to a Streamlined Credit Bid shall be severed from the joint administration of the remaining Chapter 11 Cases upon consummation of the Streamlined Credit Bid (or such other time as may be mutually agreed); after consummation of the Streamlined Credit Bid, the remaining Debtors shall not object to (and shall provide reasonable assistance with) the dismissal of the Chapter 11 Cases of the Debtor entities subject to a Streamlined Credit Bid; and

(d) a cash deposit equal to the sum of the following, eliminating any duplication as appropriate:[5] (A) the Net WLIL Intercompany Claim in respect of such Participating WAC Group, if any, reduced by its Net WAC Group Intercompany Claim; (B) its allocated share of the Carve Out to the extent unfunded (which amount shall be paid directly to the Fee Reserve Account); (C) its allocated share of the Winddown Account up to the amounts and in the allocable portion set forth in the Winddown Budget attached as Annex F to the Term Sheet; (D) third party costs associated with the transition, operation, and support of the WAC Collateral; (E) if applicable, its allocated share of the Expense Reimbursement; (F) any true-up of opening cash balances to reflect the cash sources and uses during the forbearance period that have not already been reflected in the Net WLIL Intercompany Claim and/or the Net WAC Group Intercompany Claim; and (G) its allocated share of the A&M transaction fee as set forth in the Approved Budget to the extent not included in (A) (collectively (A)-(G), an "**Exit Payment**").

---

[5] Upon written request by a WAC Facility Agent, the Debtors shall provide such WAC Facility Agent a good faith estimate of the amount of the Exit Payment no later than **January 11, 2019 at 5:00 p.m. (ET)**. In the event the Debtors accept a Matching Bid, the Exit Payment shall be returned to the applicable WAC Facility Agent no later than January 31, 2019.

WEIL:\96830482\1\79984.0003

363(k) Credit Bid Requirements.  In addition to the requirements set forth herein, a 363(k) Credit Bid submitted by a WAC Facility Agent must include:

(a)  the Secured Claim Documentation, which must be provided to the Debtors by **January 10, 2019 at 5:00 p.m. (ET)** to ensure that the Secured Claim Documentation is validated;

(b) the acquisition of all of the WAC Collateral that secures such WAC Facility Agent's WAC Facility;

(c) a cash deposit in the amount of the Exit Payment; and

(d) a written statement setting forth the amount of such WAC Facility Agent's 363(k) Credit Bid and attaching an executed copy of the APA as an exhibit to the statement in both PDF and MS-WORD format and a copy of same that has been marked against the Macquarie APA, a copy of which is located in the Data Room.

The Debtors shall determine, in their reasonable judgment, which Credit Bids received by the Credit Bid Deadline qualify as a "**Qualified Credit Bid**."  The Debtors shall promptly notify the WAC Facility Agent and Successful Third Party Bidder of such Qualified Credit Bid as soon as reasonably practicable upon making such determination.  The Successful Third Party Bidder shall have until **January 21, 2019 at 5:00 p.m. (ET)** to submit a cash bid that provides for a payment equal to such WAC Facility Agent's credit bid amount (inclusive of the Exit Payment other than, with respect to Macquarie, the portion thereof related to Expense Reimbursement) (a "**Matching Bid**").  If the Debtors do not receive a Matching Bid by **January 21, 2019 at 5:00 p.m. (ET)**, such Qualified Credit Bid shall be deemed a successful credit bid (a "**Successful Credit Bid**" and the bidder making such bid, a "**Successful Credit Bidder**") and shall be consummated by February 5, 2019, unless a Credit Bidco has failed to satisfy the requisite conditions precedent to closing.

## Plan Support Agreement

If a WAC Facility Agent does not submit a Credit Bid by the Credit Bid Deadline and instead, by the Credit Bid Deadline, the Debtors receive a PSA from Requisite Lenders, the following deadlines shall apply:

To the extent the Requisite Lenders collectively hold security interests in one hundred and ten (110) or more aircraft, a Successful Third Party Bidder may pursue a sale transaction pursuant to a chapter 11 plan (the "**Plan Sale**") in accordance with the terms of the APA and shall notify the Debtors and the Requisite Lenders of its intent to pursue a Plan Sale by **February 4, 2019 at 5:00 p.m. (ET)**.  If a Successful Third Party Bidder does not pursue a Plan Sale, the Requisite Lenders may submit a Credit Bid in accordance with these Bidding Procedures by **February 11, 2019 at 5:00 p.m. (ET)** (such bid, a "**Requisite Lender Credit Bid**").  The Successful Third Party Bidder shall have until **February 18, 2019 at 5:00 p.m. (ET)** to submit a Matching Bid.  Any Requisite Lender who fails to submit a Requisite Lender Credit Bid by the foregoing deadline shall be deemed to accept the Successful Third Party Bid and the sale of the relevant Purchased Assets shall be consummated pursuant to the Successful Third Party Bidder's APA.

To the extent the Requisite Lenders collectively hold security interests in less than one hundred and ten (110) aircraft, a Requisite Lender may submit a Requisite Lender Credit Bid by **January 21, 2019 at 5:00 p.m. (ET)**.  The Successful Third Party Bidder shall have until **January 28, 2019 at 5:00 p.m. (ET)** to submit a Matching Bid.  If a Successful Third Party Bidder does not submit a Matching Bid, such Requisite Lender Credit Bid shall be deemed a Successful Credit Bid.  Any Requisite Lender who fails to submit a Requisite Lender Credit Bid by **January 21, 2019 at 5:00 p.m. (ET)** shall be deemed to accept the Successful Third Party Bid and the sale of the relevant Purchased Assets shall be consummated pursuant to the Successful Third Party Bidder's APA.

## Sale Hearing(s) and Sale Order(s)

At one or more hearings before the Bankruptcy Court (each such hearing, a "**Sale Hearing**"), the Debtors will seek the entry of an order authorizing and approving, among other things, the applicable sale transaction or credit bid (each such order, a "**Sale Order**").  The Debtors, in the exercise of their business judgment, may adjourn a Sale Hearing without notice or with limited and shortened notice to parties, including by (i) an announcement of such adjournment at a Sale Hearing or at the Auction or (ii) the filing of a notice of adjournment with the Bankruptcy Court prior to the commencement of a Sale Hearing.

## Consent to Jurisdiction and Authority as Condition to Bidding

All bidders (including Macquarie) that participate in the bidding process shall be deemed to have (i) consented to the core jurisdiction of the Bankruptcy Court to enter any order or orders, which shall be binding in all respects, in any way related to these Bidding Procedures, the bid process, the Auction, the Sale Hearing, or the construction and enforcement of any agreement or any other document relating to the sale transaction; (ii) waived any right to a jury trial in connection with any disputes relating to these Bidding Procedures, the bid process, the Auction, the Sale Hearing, or the construction and enforcement of any agreement or any other document relating to the sale transaction; and (iii) consented to the entry of a final order or judgment in any way related to these Bidding Procedures, the bid process, the Auction, the Sale Hearing, or the construction and enforcement of any agreement or any other document relating to the sale transaction if it is determined that the Bankruptcy Court would lack Article III jurisdiction to enter such a final order or judgment absent the consent of the parties.

WEIL:\96830482\1\79984.0003

**<u>Exhibit 2</u>**

**Sale Notice**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
---------------------------------------------------------x
                                      :
In re                                 :      Chapter 11
                                      :
WAYPOINT LEASING                      :      Case No. 18-13648 (SMB)
HOLDINGS LTD., et al.,                :
                                      :      (Jointly Administered)
            Debtors.¹                 :
---------------------------------------------------------x
```

## NOTICE OF SALE OF SUBSTANTIALLY ALL ASSETS

Waypoint Leasing Holdings Ltd. and certain of its subsidiaries and affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**") are seeking to sell all or substantially all of their assets pursuant to a motion, dated December [__], 2018 (ECF No. __) (the "**Motion**").

Macquarie Rotorcraft Leasing Holdings Limited ("**Macquarie**") has already submitted a binding bid (the "**Macquarie Bid**") for substantially all of the Debtors' assets (the "**Purchased Assets**"), as set forth in a certain asset purchase agreement (the "**Macquarie APA**"). The Macquarie Bid remains subject to higher or better offers.

By order, dated [__], 2018 (ECF No. __) (the "**Bidding Procedures Order**"),² the Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") approved bidding procedures (the "**Bidding Procedures**") that govern the sale of the Purchased Assets to the highest or best bidder.

The Debtors have requested the Bankruptcy Court enter an order (the "**Sale Order**"), which provides, among other things, for the sale of the Debtors' assets free and clear of liens, claims, encumbrances, and other interests, to the extent permissible by law, and the assumption by the successful bidder of certain liabilities. A separate notice will be provided to counterparties to executory contracts and unexpired leases with the Debtors that may be assumed and assigned.

Copies of the Macquarie APA, the Bidding Procedures Order, and the Bidding Procedures are available on the website of the Debtors' claims and noticing agent, Kurtzman Carson Consultants LLC (www.kccllc.net/waypointleasing).

---

¹ A list of the Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, is attached to the Motion as **Exhibit A**.

² Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Bidding Procedures Order or the Motion.

**ANY INTERESTED BIDDER SHOULD CONTACT THE DEBTORS' ADVISORS AT:**

**Houlihan Lokey Capital, Inc.**
Project.Whiskey@HL.com

**PLEASE TAKE NOTE OF THE FOLLOWING IMPORTANT DEADLINES:**

- The deadline to submit a Third Party Bid is **January 4, 2019 at 5:00 p.m. (ET)**.  The deadline to submit a Credit Bid is **January 14, 2019 at 5:00 p.m. (ET)**.  The failure to abide by the procedures and deadlines set forth in the Bidding Procedures Order and the Bidding Procedures may result in the denial of your Third Party Bid or Credit Bid.

- If there are two or more Qualified Third Party Bids, the Debtors will conduct the Auction on **January 8, 2019 at 10:00 a.m. (ET)**.  The Auction may be cancelled if the Macquarie Bid is the only Qualified Third Party Bid received by the Debtors.  If the Auction is adjourned or cancelled, the Debtors shall file a notice with the Bankruptcy Court by **January 7, 2019 at 5:00 p.m. (ET)** and publish such notice on the website of the Debtors' claims and noticing agent, Kurtzman Carson Consultants LLC (www.kccllc.net/waypointleasing).

- The deadline to file an objection to the proposed sale transaction is **[__], 2019 at 4:00 p.m. (ET)** (the "**Sale Objection Deadline**").  Objections must be filed and served in accordance with the Bidding Procedures Order.

- The Bankruptcy Court will conduct a hearing (the "**Sale Hearing**") to consider the proposed sale on **[__], 2019 at 4:00 p.m. (ET)**.  The Debtors may adjourn the Sale Hearing without notice or with limited and shortened notice to parties, including by (i) an announcement of such adjournment at the Auction or at the Sale Hearing or (ii) the filing of a notice of adjournment with the Bankruptcy Court prior to the commencement of the Sale Hearing.

**THE FAILURE OF ANY PERSON OR ENTITY TO FILE AND SERVE AN OBJECTION BY THE SALE OBJECTION DEADLINE SHALL BE A BAR TO THE ASSERTION BY SUCH PERSON OR ENTITY OF ANY OBJECTION TO THE MOTION, THE SALE ORDER, THE SALE TRANSACTION, OR THE DEBTORS' CONSUMMATION AND PERFORMANCE OF THE MACQUARIE APA (INCLUDING, WITHOUT LIMITATION, THE DEBTORS' TRANSFER OF THE PURCHASED ASSETS AND ASSUMPTION AND ASSIGNMENT OF THE TRANSFERRED CONTRACTS, FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS).**

2

Dated: _____, 2018

_____

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

*Proposed Attorneys for Debtors and Debtors in Possession*

## **Exhibit 3**

**Cure Notice**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-----------------------------------------------------------x
                                        :
In re                                   :        Chapter 11
                                        :
WAYPOINT LEASING                        :        Case No. 18-13648 (SMB)
HOLDINGS LTD., et al.,                  :
                                        :        (Jointly Administered)
            Debtors.¹                   :
-----------------------------------------------------------x
```

### NOTICE OF ASSUMPTION, ASSIGNMENT AND CURE AMOUNT WITH RESPECT TO EXECUTORY CONTRACTS AND UNEXPIRED LEASES OF DEBTORS

Pursuant to procedures approved by order of the Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"), dated _____, 2018 (ECF No. __) (the "**Bidding Procedures Order**"), Waypoint Leasing Holdings Ltd. and certain of its subsidiaries and affiliates, as debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "**Debtors**") are seeking to assume and assign certain of their executory contracts and unexpired leases in connection with the sale of substantially all of their assets (the "**Purchased Assets**").

Macquarie Rotorcraft Leasing Holdings Limited ("**Macquarie**") has already submitted a binding bid (the "**Macquarie Bid**") for substantially all of the Debtors' assets (the "**Purchased Assets**"), as set forth in a certain asset purchase agreement (the "**Macquarie APA**"), and the Debtors are seeking Bankruptcy Court approval of the Macquarie Bid (or such higher or better bid for the Debtors' assets) pursuant to a motion, dated December [__], 2018 (ECF No. __) (the "**Motion**").²

**You are receiving this Notice because you may be a party to an executory contract or unexpired lease that is proposed to be assumed and assigned to Macquarie (collectively, the "Transferred Contracts"), or to such other bidder that submits a higher or better offer for the Purchased Assets**.

A list of the Transferred Contracts is attached hereto as **Exhibit A**.  A copy of the Macquarie APA is available on the website of the Debtors' claims and noticing agent, Kurtzman Carson Consultants LLC (www.kccllc.net/waypointleasing).

---

¹ A list of the Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, is attached to the Motion as **Exhibit A**.

² Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Bidding Procedures Order or the Motion.

The Debtors have determined the current amounts owing (the "**Cure Costs**") under each Transferred Contract and have listed the applicable Cure Costs on **Exhibit A**. The Cure Costs are the only amounts proposed to be paid upon the assumption and assignment of the Transferred Contracts.

**To the extent that a non-Debtor party objects to the applicable Cure Cost, the non-Debtor party must file and serve an objection by January 16, 2019 at 5:00 p.m. (ET).**

**To the extent that a non-Debtor party objects to the assumption and assignment of such party's Transferred Contract on the basis of failure to provide adequate assurance of future performance, the non-Debtor party must file and serve an objection by February 22, 2019 at 5:00 p.m. (ET).**

**All objections must be filed and served in accordance with the Bidding Procedures Order (ECF No. __), copies of which are available for download at www.kccllc.net/waypointleasing.**

**If no objection is timely received, (i) the non-Debtor party to a Transferred Contract shall be deemed to have consented to the assumption and assignment of the Transferred Contract and shall be forever barred from asserting any objection with regard to such assumption or assignment and (ii) the Cure Costs set forth on Exhibit A attached hereto shall be controlling, notwithstanding anything to the contrary in any Transferred Contract, or any other document, and the non-Debtor party to a Transferred Contract shall be deemed to have consented to the Cure Costs and shall be forever barred from asserting any other claims related to such Transferred Contract against the Debtors or the transferee, or the property of any of them.**

If one or more Qualified Third Party Bids are received, other than the Macquarie Bid, an auction for the Debtors' assets, including the Transferred Contracts, will be conducted on **January 8, 2019 at 10:00 a.m. (ET)** (the "**Auction**"). After the Auction, the Debtors will file a notice that identifies a Successful Third Party Bidder at the Auction.

The Debtors will seek to assume and assign the Transferred Contracts at one or more sale hearings before the Honorable Stuart M. Bernstein in the United States Bankruptcy Court for the Southern District of New York, 1 Bowling Green, New York, New York 10004 (the "**Sale Hearing**") as determined by the Debtors and in accordance with the Bidding Procedures Order. Objections, if any, will be heard at the Sale Hearing or at a later hearing, as determined by the Debtors in accordance with the Bidding Procedures Order.

The inclusion of any contract or lease on **Exhibit A** shall not constitute or be deemed a determination or admission by the Debtors that such contract or other document is, in fact, an executory contract or unexpired lease within the meaning of the Bankruptcy Code (all rights with respect thereto being expressly reserved).

Notwithstanding the inclusion of any lease or contract on **Exhibit A**, Macquarie, a Successful Third Party Bidder, and a Successful Credit Bidder is bound to accept assignment of any Transferred

2

Contract, and may amend the schedule of Transferred Contracts to remove any contract or lease at any time prior to the consummation of the Sale Transaction (each as defined in the Motion).

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, New York 10153
Telephone:  (212) 310-8000
Facsimile:  (212) 310-8007

*Proposed Attorneys for Debtors and Debtors in Possession*

3

**<u>Exhibit C</u>**

**Macquarie APA**

*EXECUTION VERSION*

**STOCK AND ASSET PURCHASE AGREEMENT**

dated as of December 7, 2018

by and among

**Waypoint Leasing (Ireland) Limited**,

the **Sellers** (as defined below),

**Macquarie Rotorcraft Leasing Holdings Limited**,

solely for purposes of Sections 2.02 and 6.09,

the **Servicing Entities** (as defined below),

and

solely for purposes of Section 12.25,

**Macquarie Financial Holdings Pty Limited**

ARTICLE I        DEFINITIONS ..............................................................................1

    Section 1.01.    Certain Defined Terms ..................................................................1

ARTICLE II       PURCHASE AND SALE; CLOSING.......................................................2

    Section 2.01.    Purchase and Sale of the Transferred Equity Interests ...........................2

    Section 2.02.    Purchase and Sale of Transferred Assets; Assumed Liabilities; Excluded Liabilities ................................................................2

    Section 2.03.    Assignment of Certain Transferred Assets ..........................................8

    Section 2.04.    Additional and Eliminated Transferred Contracts..................................8

    Section 2.05.    Closing ......................................................................................9

    Section 2.06.    Cure Costs ..................................................................................9

    Section 2.07.    Withholding .................................................................................9

    Section 2.08.    Local Transfer Agreements..............................................................9

    Section 2.09.    Plan of Reorganization ..................................................................10

ARTICLE III      PURCHASE PRICE AND CERTAIN CLOSING MATTERS .......................11

    Section 3.01.    Purchase Price .............................................................................11

    Section 3.02.    Escrowed Funds ...........................................................................11

    Section 3.03.    Certain Closing Deliverables ..........................................................12

    Section 3.04.    Estimated Closing Statement; Closing Payment...................................14

    Section 3.05.    Proposed Final Closing Statement and Final Closing Statement...........15

    Section 3.06.    Post-Closing Adjustment ...............................................................17

    Section 3.07.    Certain Calculation Principles.........................................................17

    Section 3.08.    Purchase Price Allocation ..............................................................18

    Section 3.09.    Buyer Nominee ...........................................................................19

    Section 3.10.    ███████ ...................................................................................19

ARTICLE IV       REPRESENTATIONS AND WARRANTIES OF SELLER ...........................21

    Section 4.01.    Formation and Qualification of the Transferred Entities.......................21

    Section 4.02.    Capital Structure of the Transferred Entities ......................................21

    Section 4.03.    Formation and Authority of the Seller Parties; Enforceability .............22

    Section 4.04.    No Conflict..................................................................................22

    Section 4.05.    Consents and Approvals .................................................................23

    Section 4.06.    Financial Information; Absence of Undisclosed Liabilities ..................23

i

Section 4.07.    Absence of Certain Changes or Events ................................................23

Section 4.08.    Absence of Litigation ......................................................................23

Section 4.09.    Compliance with Laws; Permits ........................................................24

Section 4.10.    Intellectual Property ......................................................................24

Section 4.11.    Environmental Matters ...................................................................25

Section 4.12.    Material Contracts ........................................................................25

Section 4.13.    Employment and Employee Benefits Matters......................................26

Section 4.14.    Taxes........................................................................................29

Section 4.15.    Real Property..............................................................................31

Section 4.16.    Brokers.....................................................................................32

Section 4.17.    Title.........................................................................................32

Section 4.18.    Insurance...................................................................................32

Section 4.19.    Aircraft Owned and Related Leases; Expected Purchases ....................32

Section 4.20.    No Other Representations or Warranties .............................................33

ARTICLE V     REPRESENTATIONS AND WARRANTIES OF BUYER .............................34

Section 5.01.    Formation and Authority of Buyer; Enforceability ...............................34

Section 5.02.    No Conflict ................................................................................35

Section 5.03.    Consents and Approvals .................................................................35

Section 5.04.    Absence of Restraints; Compliance with Laws ....................................35

Section 5.05.    Financial Ability..........................................................................36

Section 5.06.    Brokers.....................................................................................36

Section 5.07.    Investigation ..............................................................................36

ARTICLE VI     ADDITIONAL AGREEMENTS....................................................37

Section 6.01.    Conduct of Business Before the Closing .............................................37

Section 6.02.    Access to Information....................................................................39

Section 6.03.    Confidentiality............................................................................40

Section 6.04.    Regulatory Approvals ...................................................................40

Section 6.05.    Third Party Consents ....................................................................42

Section 6.06.    Intercompany Obligations...............................................................42

Section 6.07.    Cooperation ...............................................................................43

Section 6.08.    Bulk Transfer Laws ......................................................................43

Section 6.09.    Employee Matters........................................................................43

ii

Section 6.10.    Aircraft Matters ...................................................................46

Section 6.11.    Sellable Aircraft ...................................................................47

Section 6.12.    Third Party Amendment ........................................................48

ARTICLE VII    POST-CLOSING COVENANTS..................................................48

Section 7.01.    Access ...............................................................................48

Section 7.02.    Directors' and Officers' Indemnification and Exculpation ...................49

Section 7.03.    Preservation of Books and Records........................................50

Section 7.04.    Further Assurances ..............................................................50

Section 7.05.    License to Business Names and Business Marks.................................52

ARTICLE VIII  BANKRUPTCY PROVISIONS.................................................53

Section 8.01.    Approval of Break-Up Fee and Expense Reimbursement...................53

Section 8.02.    Competing Bid ....................................................................55

Section 8.03.    Bankruptcy Court Filings......................................................55

Section 8.04.    Back-up Bidder ...................................................................57

Section 8.05.    Bankruptcy Milestones .........................................................57

ARTICLE IX    TAX MATTERS..................................................................58

Section 9.01.    Taxes.................................................................................58

Section 9.02.    Tax Adjustments..................................................................62

Section 9.03.    Tax Cooperation ..................................................................62

Section 9.04.    Post-Closing Filing of Transferred Entity Tax Returns........................63

Section 9.05.    Survival .............................................................................63

Section 9.06.    Adjustment to Purchase Price ................................................63

ARTICLE X    CONDITIONS TO CLOSING ..................................................63

Section 10.01.    Conditions to Obligations of the Seller Parties ....................................63

Section 10.02.    Conditions to Obligations of Buyer.........................................64

Section 10.03.    Frustration of Closing Conditions ........................................65

Section 10.04.    Waiver of Closing Conditions..............................................65

ARTICLE XI    TERMINATION..................................................................65

Section 11.01.    Termination .......................................................................65

Section 11.02.    Notice of Termination..........................................................67

Section 11.03.    Effect of Termination ..........................................................67

iii

ARTICLE XII    MISCELLANEOUS ...................................................................................68

Section 12.01.    Rules of Construction .................................................................68

Section 12.02.    Expenses .....................................................................................69

Section 12.03.    Notices ........................................................................................69

Section 12.04.    Survival .......................................................................................71

Section 12.05.    Limitation on Liability ...............................................................71

Section 12.06.    Public Announcements ...............................................................71

Section 12.07.    Severability .................................................................................72

Section 12.08.    Assignment..................................................................................72

Section 12.09.    No Third-Party Beneficiaries .....................................................72

Section 12.10.    Entire Agreement .......................................................................72

Section 12.11.    Amendments ...............................................................................72

Section 12.12.    Waiver..........................................................................................72

Section 12.13.    Governing Law ...........................................................................73

Section 12.14.    Dispute Resolution; Consent to Jurisdiction .............................73

Section 12.15.    Waiver of Jury Trial ...................................................................74

Section 12.16.    Admissibility into Evidence .......................................................74

Section 12.17.    Remedies; Specific Performance................................................74

Section 12.18.    Non-Recourse .............................................................................75

Section 12.19.    Interest ........................................................................................75

Section 12.20.    Target Closing Timeline .............................................................75

Section 12.21.    Disclosure Schedules and Exhibits............................................75

Section 12.22.    Provision Respecting Legal Representation ...............................76

Section 12.23.    Privilege ......................................................................................76

Section 12.24.    Counterparts ...............................................................................77

Section 12.25.    Performance Guaranty ...............................................................77

iv

EXHIBITS

| | |
|---|---|
| Exhibit A | Definitions |
| Exhibit B-1 | Form of Bill of Sale, Assignment and Assumption Agreement |
| Exhibit B-2 | Form of Aircraft Bill of Sale |
| Exhibit C | Form of Transferred Leased Property Assignment and Assumption Agreement |
| Exhibit D | Form of IP Assignment Agreement |

SCHEDULES

| | |
|---|---|
| Schedule A | Transferred Entities |
| Schedule B | Debtors |
| Schedule C | Excluded Entities |
| Schedule D | Net Deposit Amount Exceptions |
| Schedule E | Servicing Entities |
| Schedule F | Core Aircraft |
| Schedule G | WAC Facilities |

WEIL:\96809416\18\79984.0003

This STOCK AND ASSET PURCHASE AGREEMENT, dated as of December 7, 2018 (the "**Agreement Date**"), is made by and among Waypoint Leasing (Ireland) Limited, an Irish limited liability company (the "**Seller Parent**") and each of the other Debtors that are parties to this Agreement (such undersigned Debtors, collectively, the "**Sellers**"), Macquarie Rotorcraft Leasing Holdings Limited, a UK limited liability company ("**Buyer**" and, together with the Sellers, the "**Parties**"), solely for purposes of Sections 2.02 and 6.09, the entities listed on Schedule E (the "**Servicing Entities**"), and, solely for purposes of Section 12.25, Macquarie Financial Holdings Pty Limited ABN 63 124 071 398, an Australian limited liability company (the "**Guarantor**").

## PRELIMINARY STATEMENTS

A.      The Seller Parties are debtors and debtors-in-possession under title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "**Bankruptcy Code**"), and have filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code on November 25, 2018 (the "**Petition Date**") in the United States Bankruptcy Court for the Southern District of New York ("**Bankruptcy Court**" and, such cases, the "**Bankruptcy Cases**").

B.      The Seller Parent owns or controls, directly or indirectly, the other Seller Parties.

C.      The Seller Parties own the equity interests (collectively, the "**Transferred Equity Interests**") of the Persons set forth on Schedule A (each a "**Transferred Entity**" and, together, the "**Transferred Entities**") as and to the extent set forth beside such Transferred Entity's name on Schedule A.

D.      The Seller Parties and the Transferred Entities are engaged in, or hold assets or liabilities relating to, the Business (and/or, in the case of certain of the Seller Parties, hold the Transferred Equity Interests).

E.      The Seller Parties desire to sell to Buyer, and Buyer desires to purchase from the Seller Parties, all of the Transferred Equity Interests and the Transferred Assets, and Buyer desires to assume the Assumed Liabilities, in each case on the terms and subject to the conditions set forth in this Agreement and the Sale Order.

F.      As a condition and material inducement to the willingness of the Seller Parties to enter into this Agreement pursuant to the terms and conditions hereof, the Guarantor is guaranteeing the obligations of Buyer in connection with this Agreement.

NOW, THEREFORE, in consideration of the foregoing and the representations, warranties, covenants and agreements set forth in this Agreement and the Sale Order, the Parties, intending to be legally bound, agree as follows:

## ARTICLE I

## DEFINITIONS

Section 1.01.    Certain Defined Terms.  Capitalized terms used in this Agreement have the meanings specified in Exhibit A.

# ARTICLE II

# PURCHASE AND SALE; CLOSING

Section 2.01.  <u>Purchase and Sale of the Transferred Equity Interests</u>.  On the terms and subject to the conditions set forth in this Agreement, the Sale Order and the applicable Local Transfer Agreements, at the Closing, each of the applicable Seller Parties shall sell, convey, assign, transfer and deliver to Buyer, and Buyer shall purchase, acquire and accept from each such Seller Party, all of such Seller Party's right, title and interest in and to the Transferred Equity Interests free and clear of all Liens (other than any restriction under the Securities Act or any other applicable securities Laws).

Section 2.02.  <u>Purchase and Sale of Transferred Assets; Assumed Liabilities; Excluded Liabilities</u>.

(a)  <u>Transferred Assets</u>.  On the terms and subject to the conditions set forth in this Agreement, the Sale Order and the applicable Local Transfer Agreement, and subject to the exclusions set forth in <u>Section 2.02(b)</u> and <u>Section 2.03</u>, at the Closing, each of the applicable Seller Parties shall, and, solely with respect to <u>Section 2.02(a)(ix)</u>, the Servicing Entities shall sell, convey, assign, transfer and deliver to Buyer, and Buyer shall purchase, acquire and accept from each such Seller Party, all of such Seller Party's right, title and interest in, to and under all of the assets and properties and rights, free and clear of all Liens (other than Permitted Liens) as the same shall exist immediately prior to the Closing, of each such Seller Party, other than the Transferred Equity Interests (which are the subject of <u>Section 2.01</u>) and the Excluded Assets (collectively, the "**Transferred Assets**") including as follows:

(i)  to the maximum extent permitted by the Bankruptcy Code, all of the Seller Parties' right, title and interest (including the leasehold interests) in the real property leases listed on <u>Schedule 2.02(a)(i)</u> (collectively, the "**Transferred Leases**"), together with all improvements, facilities, fixtures and appurtenances thereto and all rights in respect thereof (the "**Transferred Leased Real Property**"), and all servitudes, easements, rights-of-way, other surface use agreements and water use agreements related thereto and all rights in respect thereof (including all options and rights of first refusal) and all tenements, hereditaments, appurtenances and other property rights appertaining thereto;

(ii)  to the maximum extent permitted by the Bankruptcy Code, other than any Excluded Assets, all rights under (A) the Contracts set forth on <u>Schedule 2.02(a)(ii)(A)</u> and (B) the Intellectual Property and Technology licenses set forth on <u>Schedule 2.02(a)(ii)(B)</u> (collectively with the Transferred Leases, the "**Transferred Contracts**");

(iii)  the Aircraft and the Aircraft Leases (and Related Aircraft Documents);

(iv)  to the maximum extent permitted by the Bankruptcy Code or applicable Law, all Permits, including Environmental Permits (the "**Transferred Permits**");

2

(v)    to the extent transferrable or assignable, all non-Cash deposits (including all non-Cash deposits issued or delivered by lessees under the Transferred Contracts, and other non-Cash maintenance deposits, customer deposits and security deposits for rent, electricity, telephone or otherwise) that have been prepaid by any Seller Party, other than any deposits paid in connection with or relating to any Excluded Assets;

(vi)    all rights of any Seller Party under non-disclosure or confidentiality, non-compete or non-solicitation agreements with current and former employees and agents of any Seller Party or with third parties related to the Transferred Assets or the Business (or any portion thereof);

(vii)    all rights of any Seller Party under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers and contractors to the extent relating to products sold, or services provided, to any Seller Party or to the extent affecting any Transferred Assets, to the extent assignable, other than any warranties, representations and guarantees pertaining primarily to any Excluded Assets or rights and defenses pertaining primarily to any Excluded Liabilities;

(viii)    to the maximum extent permitted by the Bankruptcy Code or applicable Law, all Business Intellectual Property (and the right to sue and bring claims or causes of action for infringement, misappropriation or violation thereof to the extent such infringement, misappropriation or violation occurs prior to the Closing Date) and Business Technology;

(ix)    all Assumed Employee Plans and all rights and assets relating to any Assumed Employee Plan;

(x)    the Transferred Books and Records;

(xi)    all personal property and interests therein, including furniture, furnishings, office equipment, communications equipment, vehicles, and other tangible personal property (including rights, if any, in any of the foregoing purchased subject to any conditional sales or title retention agreement in favor of any other Person);

(xii)    all inventory wherever located, including packaging, supplies, tooling and parts, whether held at any location or facility of any Seller Party or in transit to any Seller Party, in each case, as of the Closing Date;

(xiii)    the assets listed on Schedule 2.02(a)(xiii);

(xiv)    subject to Section 7.04(d), to the extent transferrable, all Insurance Policies set forth on Schedule 2.02(a)(xiv) (the "**Transferred Insurance Policies**") and all rights of any nature with respect to any such Insurance Policies, including subject to Section 2.02(a)(xv), any recoveries thereunder attributable to the post-Closing period and any rights to assert claims seeking any such recoveries;

(xv)    all insurance proceeds received by the Seller Parties under any Insurance Policy, or under any insurance policy maintained by an Aircraft Lessee or a

3

maintenance provider or storage facility provider, in each case, of the Seller Parties in respect of any damage to or loss of any Aircraft as a result of events or circumstances occurring prior to the Closing Date and regardless of whether such damage has resulted in such Aircraft being declared a total loss (to the extent such proceeds have not been applied to repair or restore such damage or loss);

(xvi)    goodwill of the Business as a going concern;

(xvii)    all accounts receivable other than those Excluded Assets described under Section 2.02(b)(iii); and

(xviii)    other than any Excluded Assets, all other assets or rights of every kind and description related to the Business, wherever located, whether real, personal or mixed, tangible or intangible, that are owned by a Seller Party.

(b)    Excluded Assets.  Notwithstanding anything to the contrary herein, any right, title and interest in, to and under, the following assets and properties of the Seller Parties (the "**Excluded Assets**") shall be retained by the Seller Parties and their Affiliates, other than the Transferred Entities:

(i)    all Aircraft set forth on Schedule 2.02(b)(i);

(ii)    all Contracts set forth on Schedule 2.02(b)(ii) and all Contracts that are not Transferred Contracts ("**Excluded Contracts**");

(iii)    any account receivable to the extent arising out of any Excluded Asset (including any Excluded Contract) and all intercompany receivables owed to any Seller Party by any other Seller Party;

(iv)    all Cash;

(v)    other than the Transferred Leased Real Property, all of the Seller Parties' right, title and interest in owned and leased real property together with all improvements, facilities, fixtures and appurtenances thereto and all rights in respect thereof, and all servitudes, easements, rights-of-way, other surface use agreements and water use agreements related thereto and, with respect to any such real property, all rights in respect thereof (including all options and rights of first refusal) and all tenements, hereditaments, appurtenances and other property rights appertaining thereto;

(vi)    all causes of action (including counterclaims) and defenses arising in connection with the Bankruptcy Cases or related to the Excluded Assets;

(vii)    all refunds, rebates, credits, reimbursements or other rights of recovery related to Transfer Taxes imposed or arising with respect to the Transactions;

(viii)    all claims, rights or interests of the Seller Parties and their Affiliates (other than the Transferred Entities) in or to any refund, rebate, abatement or other recovery for Taxes, and any other Tax assets (including any Tax attributes), together with any

4

interest due thereon or penalty rebate arising therefrom, for any Tax period (or portion thereof) other than with respect to any Taxes arising out of any Assumed Liabilities;

(ix)     all Tax Returns (for the avoidance of doubt, other than Tax Returns of one or more Transferred Entities);

(x)     all nontransferable or non-assignable Permits, including nontransferable or non-assignable Environmental Permits;

(xi)     all rights and interests of the Seller Parties under the Transaction Agreements;

(xii)     all Employee Plans that are not Assumed Employee Plans and all assets relating to the Employee Plans that are not Assumed Employee Plans;

(xiii)     (A) all minute books (and other similar corporate records) and stock records of any Seller Party, (B) any books and records relating to the Excluded Assets (subject to the proviso in clause (C)(y) of this Section 2.02(b)(xiii) with respect to materials related to Tax Returns), (C) any books and records or other materials of or in the possession of the Seller Parties or the Transferred Entities that (x) any of the Seller Parties are required by Law or by order of the Bankruptcy Court to retain, (y) any of the Seller Parties reasonably believes are necessary to enable the Seller Parties to prepare and/or file Tax Returns or (z) any of the Seller Parties are prohibited by Law or Contract from delivering to Buyer (including confidential and personal medical records) or (D) any copies of any books and records that any of the Seller Parties and their respective Affiliates retain pursuant to Section 7.03; provided, that the Seller Parties shall permit Buyer to make copies of any books and records excluded pursuant to clause (B) or clause (C) to the extent such books and records relate to any Transferred Assets or the Business, to the extent not prohibited by applicable Law; provided further that, to the extent any such information described in clause (C)(z) relates to any Transferred Assets or the Business, the Seller Parties will disclose the existence of such information and the applicable Law prohibiting delivery thereof and the Seller Parties shall use commercially reasonable efforts to seek such Consents as may permit delivering to Buyer of such information;

(xiv)     all records and reports prepared or received by any Seller Party or any of its Affiliates in connection with the proposed sale of the Business, the Transactions or any Transaction Agreement (including any analyses relating to the Business and any bids or expressions of interest received from third parties with respect to the Business) and all privileged (including attorney-client privileged) communications;

(xv)     any warranties, representations and guarantees to the extent pertaining to any Excluded Asset or rights and defenses pertaining to any Excluded Liability;

(xvi)     any deposits or prepaid charges and expenses to the extent paid in connection with or relating to any Excluded Assets;

5

(xvii)   all right, title and interest in and to the equity interests of the Persons set forth on Schedule C or any other Person that is not a Transferred Entity;

(xviii)  other than the Transferred Insurance Policies, all Insurance Policies, including all director and officer insurance liability policies (including EPL and tail policies), and all rights of any nature with respect to any such Insurance Policies, including any recoveries thereunder and any rights to assert claims seeking any such recoveries;

(xix)   all bank accounts of the Seller Parties;

(xx)    the assets set forth on Schedule 2.02(b)(xx); and

(xxi)   all Sellable Aircraft WAC Groups sold by the Seller Parties pursuant to Section 6.11 and all assets of the Seller Parties solely to the extent they are directly related to such Sellable Aircraft WAC Groups.

(c)      Assumed Liabilities.  On the terms and subject to the conditions set forth in this Agreement and the Sale Order and subject to the exclusions set forth in Section 2.02(d) (and in the event of any conflict between the exclusions set forth in Section 2.02(d) and the provisions of this Section 2.02(c), the exclusions set forth in Section 2.02(d) shall prevail), as partial consideration for the Transferred Assets, Buyer shall, effective at the Effective Time, assume and thereafter timely pay, discharge and perform in accordance with their terms, only the following Liabilities of the Seller Parties and, solely with respect to the Liabilities discussed in Section 2.02(c)(vi), the Servicing Entities (the "**Assumed Liabilities**"):

(i)      all Liabilities arising under all of the Transferred Contracts to the extent that any such Liabilities under such Transferred Contracts: (A) arise at or after the Closing Date; (B) do not arise from a breach, violation or default of such Transferred Contract by any Seller Party prior to the Closing Date; and (C) are not required to be performed prior to the Closing Date;

(ii)     all Liabilities of the Seller Parties and their Affiliates for Taxes imposed in respect of the Transferred Assets or Transferred Equity Interests for any taxable period (or portion thereof) beginning after the Closing Date;

(iii)    all Liabilities under Environmental Laws solely to the extent arising from events, facts or circumstances that occur on or after the Closing Date, including those relating in any way to the environment or natural resources, human health and safety or Hazardous Materials (the "**Assumed Environmental Liabilities**");

(iv)    all Debt set forth on Schedule 2.02(c)(iv);

(v)     all Liabilities relating to Buyer's ownership or operation of the Transferred Assets to the extent arising from events, facts or circumstances that occur from and after the Closing;

(vi)    all Liabilities expressly assumed by Buyer pursuant to Section 6.09; and

6

(vii)    all accrued but uninvoiced accounts payable for maintenance of Aircraft existing as of the Closing Date.

(d)    <u>Excluded Liabilities</u>.  Buyer is not assuming or agreeing to pay or discharge any Liabilities of the Seller Parties (whether accruing before, on or after the Closing Date, whether known or unknown, fixed or contingent, asserted or unasserted, and not satisfied or extinguished as of the Closing Date), other than the Assumed Liabilities and the Seller Parties shall retain and be responsible for all other Liabilities of the Seller Parties and their Affiliates (other than the Transferred Entities) (the "**Excluded Liabilities**"), including:

(i)    except as set forth on <u>Schedule 2.02(c)(iv)</u>, any Debt;

(ii)    all Cure Costs payable with respect to the Transferred Contracts;

(iii)    all Transfer Taxes imposed or arising with respect to the Transactions;

(iv)    any Liability solely to the extent relating to any Excluded Asset;

(v)    any Liability (A) of the Seller Parties and their respective Affiliates (other than the Transferred Entities) for Taxes for any taxable period, (B) with respect to the Transferred Assets or the Transferred Equity Interests for any taxable period (or portion thereof) ending on or before the Closing Date, and (C) for Taxes imposed in respect of the Excluded Assets or the Excluded Liabilities (including Transfer Taxes) for any taxable period;

(vi)    any Liability related to employees, compensation or benefits that are not expressly assumed by Buyer pursuant to <u>Section 6.09</u> and any Liability associated with or related to any Employee Plans that are not Assumed Employee Plans;

(vii)    other than intercompany accounts payable exclusively between or among the Transferred Entities, any Liability for any intercompany accounts payable to any of the Seller Parties, which intercompany accounts payable by any Transferred Entity shall be extinguished by the applicable Seller Party prior to Closing;

(viii)    all Liabilities under Environmental Laws except for the Assumed Environmental Liabilities;

(ix)    all Liabilities relating to amounts to be paid by the Seller Parties hereunder, including brokers fees;

(x)    the Seller Transaction Expenses, including any employer portion of any payroll, social security or similar Taxes in respect thereof; and

(xi)    all accounts payable (including, for the avoidance of doubt, (A) invoiced accounts payable and (B) accrued but uninvoiced accounts payable), other than those accounts payable described in <u>Section 2.02(c)(vii)</u>.

7

Section 2.03.    <u>Assignment of Certain Transferred Assets</u>.  Notwithstanding any other provision of this Agreement to the contrary, this Agreement shall not constitute an agreement to assign or transfer any Transferred Asset or any claim or right or any benefit arising thereunder or resulting therefrom if an attempted assignment or transfer thereof, without the Consent of a third party (including any Government Authority), would after giving effect to the Sale Order and the Bankruptcy Code, constitute a breach or other contravention thereof or a violation of Law or Order by the Bankruptcy Court, or be ineffective with respect to any party to a Contract concerning such Transferred Asset, in each case that cannot be excused or rendered ineffective by operation of the Bankruptcy Code (or the Sale Order) or applicable nonbankruptcy Law; <u>provided</u>, <u>that</u> nothing in this <u>Section 2.03</u> shall modify any representation or warranty of the Seller Parties under this Agreement.  If, on the Closing Date, any such Consent has not been obtained, the Seller Parties and Buyer will comply with <u>Section 6.04</u> and <u>Section 6.05</u> and, until such Consent is obtained, cooperate in a mutually agreeable arrangement (a) under which Buyer would, in compliance with Law or an Order of the Bankruptcy Court, obtain the benefits and assume the obligations and bear the economic burdens associated with such Transferred Asset, claim, right or benefit in accordance with this Agreement, including, for example (and without limitation of other similar arrangements being employed instead and in place thereof), by subcontracting, sublicensing or subleasing such Transferred Asset to Buyer or (b) under which the Seller Parties would enforce for the benefit (and at the expense) of Buyer any and all of the Seller Parties' rights against a third party associated with such Transferred Asset, claim, right or benefit (collectively, "**Third Party Rights**"), and the Seller Parties would promptly pay to Buyer when received all monies received by them under any such Transferred Asset, claim, right or benefit (net of the Seller Parties' expenses incurred in connection with any assignment or other performance contemplated by this <u>Section 2.03</u>).  Upon obtaining any such Consent applicable to such Transferred Asset after the Closing, such Transferred Asset shall promptly be transferred and assigned to Buyer in accordance with the terms of this Agreement.

Section 2.04.    <u>Additional and Eliminated Transferred Contracts</u>.  Notwithstanding anything in this Agreement to the contrary, Buyer may, from time to time prior to a date which is five (5) Business Days prior to the Closing Date, and in its sole discretion, upon written notice to the Seller Parent, amend or revise <u>Schedule 2.02(a)(ii)(A)</u> or <u>Schedule 2.02(a)(ii)(B)</u> to eliminate any Contract therefrom (other than those Contracts set forth on <u>Schedule 2.04</u>) or to add any Contract thereto.  Automatically upon such addition of any Contract by Buyer in accordance with the previous sentence, such Contract shall be a Transferred Contract for all purposes of this Agreement.  Automatically upon any such deletion of any Contract by Buyer in accordance with the first sentence of this <u>Section 2.04</u>, such Contract shall be an Excluded Asset for all purposes of this Agreement, and no Liabilities arising thereunder or relating thereto shall be assumed by Buyer or be the obligation, Liability or responsibility of Buyer, in each case, until and unless such time, if any, as Buyer restores such eliminated Contract to <u>Schedule 2.02(a)(ii)(A)</u> or <u>Schedule 2.02(a)(ii)(B)</u> in accordance with the first sentence of this <u>Section 2.04</u>.  If any Contract is added to the list of Transferred Contracts, then the applicable Seller Parties shall take such steps as are reasonably necessary to cause such Contract to be assumed and assigned to Buyer as promptly as possible at or following the Closing, including payment of all Cure Costs.  For the avoidance of doubt, any Contract entered into by any Seller Party in accordance with this Agreement following the Petition Date shall be a Transferred Contract hereunder.

WEIL:\96809416\18\79984.0003

Section 2.05.    Closing.  The closing of the sale and purchase of the Transferred Equity Interests and the Transferred Assets and the assumption of the Assumed Liabilities (the "**Closing**") shall take place by telephone conference and electronic exchange of documents (or, if the Parties agree to hold a physical Closing, at the offices of Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, New York 10153), at 9:00 a.m. (New York City time) on the second Business Day following the date upon which all Closing Conditions are satisfied or waived in writing (to the extent permitted by applicable Law) in accordance with Article X (other than those Closing Conditions that by their nature can only be satisfied at the Closing, but subject to the satisfaction or waiver of those Closing Conditions at such time), or on such other date or at such other time or place as the Parties may agree in writing.  The date on which the Closing occurs is referred to in this Agreement as the "**Closing Date**."  For all purposes under this Agreement and each other Transaction Agreement, (a) except as otherwise provided in this Agreement or such other Transaction Agreements, all matters at the Closing will be considered to take place simultaneously and (b) the Closing shall be deemed effective as of the Effective Time.

Section 2.06.    Cure Costs.  At Closing and pursuant to Section 365 of the Bankruptcy Code and the Sale Order, each Seller Party shall assume and assign to Buyer, and Buyer shall assume from such Seller Party, respectively, the Transferred Contracts to which such Seller Party is a party.  The Cure Costs, if any, including any amounts necessary to cure all defaults, if any, and to pay all actual or pecuniary losses that have resulted from such defaults under the Transferred Contracts, shall be paid by the Seller Parties, upon or before Closing.

Section 2.07.    Withholding.  Buyer and its respective Affiliates shall be entitled to deduct and withhold from any amount otherwise payable under this Agreement such amounts as Buyer or any of its Affiliates are required to deduct and withhold with respect to the making of such payment under applicable Law.  To the extent that amounts are so deducted, withheld and timely paid over to the applicable Taxing Authority, such amounts shall be treated for all purposes of this Agreement as having been paid to the Person in respect of which such deduction and withholding were made.  At least fourteen (14) days prior to the Closing, Buyer shall provide the Seller Parent with a written notice of its intent to withhold, the estimated amount to be withheld, the legal basis therefor and a reasonable opportunity to furnish forms, certificates or other items that would reduce or eliminate such withholding, and shall cooperate with the Seller Parties using commercially reasonable efforts to reduce or eliminate any such withholding that otherwise would be required.

Section 2.08.    Local Transfer Agreements.

(a)    The Parties do not intend this Agreement to transfer title to any of the Transferred Equity Interests, the Transferred Assets or the Assumed Liabilities in any jurisdiction in which such transfer is required by applicable Law to be made pursuant to a Local Transfer Agreement, and any such Transferred Equity Interests, Transferred Assets or Assumed Liabilities, as applicable, shall only be transferred by the applicable Local Transfer Agreement.

(b)    Subject to Section 6.04, at Closing, the applicable Seller Parties and Buyer shall execute and deliver the applicable Local Transfer Agreements, in such form as may be necessary to satisfy the requirements of applicable local Law in order to transfer the applicable Transferred Equity Interests, Transferred Assets and/or Assumed Liabilities, and such Local

9

Transfer Agreements shall serve purely to effect and make enforceable vis-à-vis third parties the transfer of the legal and beneficial title to the applicable Transferred Equity Interests, Transferred Assets and/or Assumed Liabilities and shall not require the Seller Parties, Buyer or any of their respective Subsidiaries to make any additional representations, warranties or covenants, express or implied, not contained in this Agreement.

(c)     Notwithstanding the generality of <u>Section 2.08(a)</u> and without limiting <u>Section 2.08(b)</u>, (i) to the extent that the provisions of a Local Transfer Agreement are inconsistent with the provisions of this Agreement, the provisions of this Agreement shall prevail; and (ii) so far as permissible under applicable Law of the relevant jurisdiction, the Seller Parties and Buyer shall cause the provisions of the relevant Local Transfer Agreement to give effect to the provisions of this Agreement.

(d)     Each Party shall not, and shall cause its Affiliates not to, bring any claim (including for breach of any warranty, representation, undertaking, covenant or indemnity relating to the Transactions) against the other Party or any of its Affiliates in respect of or based upon any of the Local Transfer Agreements, except to the extent necessary to enforce any transfer of the Transferred Equity Interests, the Transferred Assets or the assumption of Assumed Liabilities sold or assigned to Buyer hereunder in a manner consistent with the terms of this Agreement. All such claims (except as referred to above) shall be brought in accordance with, and be subject to the provisions, rights and limitations set out in this Agreement and no Party shall be entitled to recover damages or obtain payment, reimbursement, restitution or indemnity under or pursuant to any of the Local Transfer Agreements (but without prejudice to any claim hereunder). To the extent that a Party does bring such a claim (except as referred to above), such Party shall indemnify the other Party (and/or such other Party's relevant Affiliates) against all Losses which it or they may suffer through or arising from the bringing of such claim against it or them.

Section 2.09.     <u>Plan of Reorganization</u>.

(a)     If, on or prior to the Credit Bid Due Date (or within two (2) Business Days thereafter pursuant to the terms provided for in the proviso to the definition of "Conversion Condition"), the Conversion Condition has been satisfied, Buyer shall file a notice with the Bankruptcy Court no later than twenty-one (21) days following the Credit Bid Due Date (or such later date as requested by Buyer and reasonably consented to by the agent under any debtor-in-possession financing facility and the Seller Parties) declaring that it has elected to (i) not consummate the Transactions through a Plan of Reorganization, in which case the Parties shall have no further obligations under this <u>Section 2.09</u> and the Transactions shall be consummated subject to, and in accordance with the terms of this Agreement, subject to, the Participating Lenders' right to credit bid within seven (7) days following delivery by Buyer of such notice in accordance with the Sale Procedures Order, or (ii) consummate the Transactions pursuant to, in lieu of the structure contemplated hereunder, a sale of the equity interests of some or all of the Seller Parties (an "**Equity Sale Transaction**") pursuant to a plan of reorganization ("**Plan of Reorganization**") (a notice delivered pursuant to the foregoing clause (ii), a "**Plan Conversion Notice**").

(b)     Promptly following the delivery of the Plan Conversion Notice, the Seller Parent and Buyer shall cooperate in good faith and use reasonable best efforts to (i) conduct the

10

diligence required to reasonably assess an Equity Sale Transaction pursuant to a Plan of Reorganization and (ii) prepare and negotiate such amendments to this Agreement (the "**SAPA Amendment**"), the Disclosure Schedules and the other Transaction Agreements (together with the SAPA Amendment and the amended Disclosure Schedules, the "**Plan Amendments**"), which amendments shall include the terms and conditions set forth on Schedule 2.09 and such other terms as are customary, appropriate and reasonably acceptable to each of Seller Parent and Buyer, to give effect to the conversion of the structure contemplated hereby to an Equity Sale Transaction. If the Seller Parent and Buyer have not entered into the SAPA Amendment on or prior to March 15, 2019, either Buyer or the Seller Parties may terminate this Agreement upon written notice to the other Parties; provided, however, that the terminating Party is not then in material breach of this Agreement, including this Section 2.09 (it being agreed and understood that any breach of a Party's obligation under this Section 2.09 shall be deemed a material breach of this Agreement).

(c)     If the Conversion Condition is not satisfied on or prior to the Credit Bid Due Date (or within two (2) Business Days thereafter pursuant to the terms provided for in the proviso to the definition of "Conversion Condition"), the Parties shall have no further obligations under this Section 2.09 and the Transactions shall be consummated in accordance with, and subject to, the terms of this Agreement.

## ARTICLE III

## PURCHASE PRICE AND CERTAIN CLOSING MATTERS

Section 3.01.     Purchase Price.  The aggregate consideration to be paid by Buyer for the sale of all of the Transferred Equity Interests, the Transferred Assets and the obligations of the Seller Parties set forth in this Agreement (the "**Purchase Price**") shall be an amount in cash equal to the sum of (a) subject to adjustment under Section 6.11 (if any), $650,000,000 (the "**Base Purchase Price**"), plus (b) the Final Transferred Entity Cash (if any), minus (c) the Final Transferred Entity Debt (if any), plus (d) the Final Net Deposit Amount, plus (e) the Aircraft Adjustment Amount, minus (f) the Closing Delay Payment (if applicable), minus (g) the Amendment Adjustment Amount (if applicable), and minus (h) the ███ Adjustment Amount (if applicable).

Section 3.02.     Escrowed Funds.  Upon the execution of this Agreement, or on the next Business Day thereafter, pursuant to the terms of the Escrow Agreement, Buyer shall immediately deposit with Citibank N.A., in its capacity as escrow agent (the "**Escrow Agent**") the sum of $65,000,000 by wire transfer of immediately available funds (the "**Escrowed Funds**"), to be released by the Escrow Agent and delivered to either Buyer or the Seller Parent in accordance with this Agreement and the provisions of the Escrow Agreement.  Pursuant to the terms of the Escrow Agreement, the Escrowed Funds (together with all accrued investment income thereon) shall be distributed as follows:

(a)     if the Closing shall occur, the Escrowed Funds shall be applied at the Closing towards the Purchase Price, by wire transfer of immediately available funds to the Seller Parties and all accrued investment income thereon (if any) shall be paid at Closing to Buyer by wire transfer available funds to Buyer; or

11

(b)        except as set forth in <u>Section 11.03</u>, if this Agreement is terminated for any reason, the Escrowed Funds, together with all accrued investment income thereon (if any), shall, in each case, be returned to Buyer.

Section 3.03.    <u>Certain Closing Deliverables</u>.  At the Closing:

(a)        The Seller Parties shall deliver or cause to be delivered to Buyer the following:

(i)        to the extent the Transferred Equity Interests are certificated, certificates evidencing the Transferred Equity Interests, duly endorsed in blank or accompanied by stock powers duly executed in blank or other duly executed instruments of transfer as required by applicable Law or otherwise to validly transfer title in and to the Transferred Equity Interests to Buyer;

(ii)        a counterpart of the Joint Written Instructions, duly executed by the Seller Parent, directing the Escrow Agent to deliver to the Seller Parent the Escrowed Funds in accordance with <u>Section 3.02(a)</u>;

(iii)        a counterpart of the Bill of Sale, Assignment and Assumption Agreement for Transferred Assets (other than the Transferred Leases and the Aircraft), in the form attached hereto as <u>Exhibit B-1</u> (the "**Bill of Sale, Assignment and Assumption Agreement**"), duly executed by the applicable Seller Parties that are to transfer Transferred Assets to Buyer at the Closing and a counterpart of the Bill of Sale (Aircraft) in the form attached hereto as <u>Exhibit B-2</u> (the "**Aircraft Bill of Sale**") for each Aircraft, duly executed by the applicable Seller Party;

(iv)        a counterpart of the Assignment and Assumption Agreement for Transferred Leases, in the form attached hereto as <u>Exhibit C</u> (the "**Transferred Leased Property Assignment and Assumption Agreement**"), duly executed by the applicable Seller Parties that are to transfer Transferred Leased Real Property to Buyer at the Closing;

(v)        a counterpart of the IP Assignment Agreement, in the form attached hereto as <u>Exhibit D</u> (the "**IP Assignment Agreement**"), duly executed by the applicable Seller Parties that are to transfer of the Business Intellectual Property to Buyer at the Closing;

(vi)        the officer's certificate required to be delivered pursuant to <u>Section 10.01(a)(iii)</u>;

(vii)        all Local Transfer Agreements duly executed by the applicable Seller Parties party thereto;

(viii)        a counterpart of the Transition Services Agreement, duly executed by the applicable Seller Parties party thereto; and

12

(ix)    all other instruments of conveyance and transfer, in form and substance reasonably acceptable to Buyer, as may be necessary to convey the Transferred Equity Interests and Transferred Assets to Buyer.

(b)    Buyer shall deliver or cause to be delivered to the Seller Parties (or with respect to clause (ii) and (iii), as directed by the Seller Parent, and with respect to clauses (iv) and (v), to the Escrow Agent) the following:

(i)    the Closing Payment (which, for the avoidance of doubt, includes the Segregated Transfer Tax Amount), by wire transfer of immediately available funds to an account or accounts as directed by the Seller Parties, in the Estimated Closing Statement;

(ii)    the Transferred Contract Expenses, by wire transfer of immediately available funds to an account or accounts as directed by the Seller Parent, on behalf of itself and the other Seller Parties, in the Estimated Closing Statement;

(iii)    the Seller Transaction Expenses, by wire transfer of immediately available funds to an account or accounts as directed by the Seller Parent, on behalf of itself and the other Seller Parties, in the Estimated Closing Statement;

(iv)    to the Escrow Agent, by wire transfer of immediately available funds:

(A)    the Post-Closing Adjustment Escrow Amount;

(B)    if applicable, the Transfer Tax Escrow Amount; and

(C)    if applicable, the ███ Escrow Amount;

(v)    a counterpart of the Joint Written Instructions, duly executed by Buyer, directing the Escrow Agent to deliver to the Seller Parent the Escrowed Funds in accordance with Section 3.02(a);

(vi)    all required Transfer Tax stamps and Transfer Tax Forms (duly stamped, as required), if any, unless under applicable Law such Transfer Tax stamps or Transfer Tax Forms are only available post-Closing (in which case such Transfer Tax stamps or Transfer Tax Forms shall be delivered to the Seller Parties promptly and in any event no later than five (5) Business Days after receipt thereof by Buyer);

(vii)    a receipt for the Transferred Equity Interests, duly executed by Buyer and other instruments of transfer duly executed by Buyer, as required by applicable Law or otherwise required to validly transfer title in and to the Transferred Equity Interests to Buyer;

(viii)    a counterpart of the Bill of Sale, Assignment and Assumption Agreement, duly executed by Buyer and a counterpart of Aircraft Bill of Sale for each Aircraft, duly executed by Buyer;

13

(ix)    a counterpart of the Transferred Leased Property Assignment and Assumption Agreement, duly executed by Buyer;

(x)    a counterpart of the IP Assignment Agreement, duly executed by Buyer;

(xi)    the officer's certificate required to be delivered to the Seller Parties pursuant to Section 10.02(a)(iii);

(xii)    a counterpart of the Transition Services Agreement, duly executed by Buyer; and

(xiii)    such other instruments of conveyance and transfer in form and substance reasonably acceptable to the Seller Parent as necessary to convey the Transferred Equity Interests, Transferred Assets and Assumed Liabilities to Buyer.

Section 3.04.    Estimated Closing Statement; Closing Payment.    No fewer than three (3) Business Days before the Closing Date, the Seller Parent (on behalf of itself and the other Seller Parties) shall prepare and deliver to Buyer a written statement (the "**Estimated Closing Statement**") setting forth each of: (i) the amount of Estimated Transferred Entity Cash (if any); (ii) the amount of Estimated Transferred Entity Debt (if any); (iii) the Estimated Net Deposit Amount; (iv) the aggregate amount to be paid by Buyer to the Seller Parent (for the benefit of itself and the other Seller Parties) at Closing (the "**Closing Payment**"), which amount shall be equal to the sum of:

(a)    the Base Purchase Price;

(b)    plus the Estimated Transferred Entity Cash (if any);

(c)    minus the Estimated Transferred Entity Debt (if any);

(d)    plus the Estimated Net Deposit Amount;

(e)    plus the Aircraft Adjustment Amount;

(f)    minus the Closing Delay Payment (if applicable);

(g)    minus the Amendment Adjustment Amount (if applicable);

(h)    minus the Post-Closing Adjustment Escrow Amount;

(i)    minus the Transfer Tax Escrow Amount;

(j)    minus the Segregated Transfer Tax Amount;

(k)    minus the ███ Adjustment Amount or the ███ Escrow Amount (as applicable);

(l)    minus the Escrowed Funds;

14

(m)    <u>minus</u> the aggregate amount of any set-off against the Purchase Price pursuant to <u>Section 8.01(b)</u> (if applicable);

(n)    <u>minus</u> the Seller Transaction Expenses; and

(o)    minus the Transferred Contracts Expenses;

(v) the amount of the Seller Transaction Expenses; (vi) the amount of the Transferred Contract Expenses; and (vii) the wire transfer information for the account or accounts to which Buyer shall pay the Closing Payment, the Seller Transaction Expenses and the Transferred Contract Expenses. The Seller Parties shall, during normal business hours, make available their respective Representatives responsible for and knowledgeable about the information used in, and the preparation of the Estimated Closing Statement, to respond to the reasonable inquiries of, or requests for information by, Buyer or its Representatives.  The Closing Payment and any other payments to be made to the Seller Parties under this Agreement shall be paid to the Seller Parent for its account and as agent for the account of the other Seller Parties, unless otherwise specified in the Estimated Closing Statement.

Section 3.05.    <u>Proposed Final Closing Statement and Final Closing Statement</u>.

(a)    Within forty-five (45) days after the Closing Date, Buyer may provide to the Seller Parties a written statement (the "**Proposed Final Closing Statement**") setting forth (i) the amount of Proposed Final Transferred Entity Cash (if any), (ii) the amount of Proposed Final Transferred Entity Debt (if any), (iii) the amount of any Proposed Final Net Deposit Amount and (iv) a description in reasonable detail, of any proposed changes to the Estimated Closing Statement.  If Buyer does not deliver the Proposed Final Closing Statement within such thirty (30)-day period, the Estimated Closing Statement shall become conclusive and binding upon the Parties as the Final Closing Statement.

(b)    The Seller Parties shall have sixty (60) days (the "**Review Period**") from the date upon which Buyer delivered its Proposed Final Closing Statement to review the same. During the Review Period, the Seller Parties and their respective Representatives shall be permitted to review Buyer's work papers, all books and records of Buyer and its Affiliates (including, after the Closing, the Transferred Entities) used or useful in the review of the Proposed Final Closing Statement, and the work papers of Buyer's accountants and Buyer's accountants' review of the Proposed Final Closing Statement, and Buyer shall upon reasonable request and during normal business hours, make available the individuals in Buyer's and its Affiliates' employ as well as Representatives of its independent accountants responsible for and knowledgeable about the information used in the preparation of the Proposed Final Closing Statement, to respond to the reasonable inquiries of, or requests for information by, the Seller Parties or their Representatives. Buyer agrees that, following the Closing through the date that the Final Closing Statement becomes conclusive and binding upon the Parties in accordance with this <u>Article III</u>, it will not (and will cause its Affiliates not to) take any actions with respect to any books or records on which the Proposed Final Closing Statement is based or on which the Final Closing Statement is to be based that would impede or delay the determination of the amount of the Final Transferred Entity Cash (if any), the Final Transferred Entity Debt (if any) and the Final Net Deposit Amount or the

15

preparation of the Dispute Notice (defined below) or the Final Closing Statement in the manner and utilizing the methods required by this Agreement.

(c)    If the Seller Parties dispute any item set forth in the Proposed Final Closing Statement, the Seller Parent (on behalf of itself and the other Seller Parties) shall, during the Review Period, deliver written notice to Buyer of the same, specifying in reasonable detail the basis for such dispute and the Seller Parties' proposed modifications to the Proposed Final Closing Statement (such notice, the "**Dispute Notice**").  Upon the expiration of the Review Period, any matters that are not subject to a timely delivered Dispute Notice shall be deemed to have been agreed to and shall be conclusive and binding upon the Parties.  During the thirty (30)-day period immediately following the Seller Parties' delivery of a Dispute Notice (the "**Resolution Period**"), Buyer and the Seller Parties shall negotiate in good faith to reach an agreement as to any matters identified in such Dispute Notice as being in dispute, and all such discussions related thereto will be governed by Rule 408 of the Federal Rules of Evidence (as in effect as of the date of this Agreement) and any applicable similar state rule, unless otherwise agreed in writing by the Seller Parties and Buyer, and, if such matters are so resolved within the Resolution Period, then the Proposed Final Closing Statement as revised to incorporate such changes as have been agreed between Buyer and the Seller Parties shall be conclusive and binding upon all Parties as the Final Closing Statement.

(d)    If Buyer and the Seller Parties fail to resolve all such matters in dispute within the Resolution Period then (subject to the last sentence of <u>Section 3.05(e)</u>), the disputed amount shall be finally and conclusively determined by Deloitte LLP, or if Deloitte LLP is unable or unwilling to serve in such capacity, KPMG (and if both Deloitte LLP and KPMG are unable or unwilling to serve in such capacity, such other independent accounting firm as shall be agreed upon in writing by the Seller Parent and Buyer) (the "**Independent Accounting Firm**"), which the parties shall use reasonable best efforts to engage as promptly as practicable (and in no event later than fifteen (15) days) following expiration of the Resolution Period pursuant to an engagement letter in customary form among the Parties and the Independent Accounting Firm.

(e)    The Seller Parent (on behalf of itself and the other Seller Parties) and Buyer shall instruct the Independent Accounting Firm to promptly, but no later than thirty (30) days after its acceptance of its appointment, determine (it being understood that in making such determination, the Independent Accounting Firm shall be functioning as an expert and not as an arbitrator), based solely on written presentations of Buyer, on the one hand, and the Seller Parties, on the other hand, submitted to the Independent Accounting Firm and not by independent review, only those matters in dispute and will render a written report setting forth its determination as to the disputed matters and the resulting calculations of the Final Transferred Entity Cash (if any), the Final Transferred Entity Debt (if any), the Final Net Deposit Amount and the Post-Closing Adjustment (if any), which report and calculations will be conclusive and binding upon all Parties absent manifest mathematical error.  A copy of all materials submitted to the Independent Accounting Firm pursuant to the immediately preceding sentence shall be provided by the Seller Parties or Buyer, as applicable, to the other Party concurrently with the submission thereof to the Independent Accounting Firm.  In resolving any disputed item, the Independent Accounting Firm (i) shall be bound by the provisions of this <u>Section 3.05(e)</u> and <u>Section 3.06</u> and (ii) may not assign a value to any item greater than the greatest value for such item claimed by Buyer (in the Proposed Final Closing Statement) or the Seller Parties (in the Dispute Notice), or less than the smallest

16

value for such item claimed by Buyer (in the Proposed Final Closing Statement) or the Seller Parties (in the Dispute Notice).  If, before the Independent Accounting Firm renders its determination with respect to the disputed items in accordance with this Section 3.05(e), (x) the Seller Parties notify Buyer of its agreement with any items in the Proposed Final Closing Statement or (y) Buyer notifies the Seller Parties of its agreement with any items in the Estimated Closing Statement, then in each case such items as so agreed will be conclusive and binding on all Parties immediately upon such notice.

(f)    With respect to fees and expenses of the Independent Accounting Firm incurred in accordance with this Section 3.05, (i) such fees and expenses shall be borne by the Seller Parties, on the one hand, or Buyer, on the other hand whose aggregate position with respect to the disputed amounts is further from the aggregate position with respect to the same determined by the Independent Accounting Firm pursuant to Section 3.05(e) or, (ii) if the positions of the Seller Parties and Buyer in clause (i) of this Section 3.05(f) differ in the same amount from the position of the Independent Accounting Firm with respect to the same, then the fees and expenses of the Independent Accounting Firm shall be borne fifty percent (50%) by the Seller Parties and fifty percent (50%) by Buyer.

Section 3.06.    Post-Closing Adjustment.

(a)    If the Post-Closing Adjustment is a positive number, Buyer shall pay an amount equal to the Post-Closing Adjustment to the Seller Parties and each of Buyer and the Seller Parent shall deliver Joint Written Instructions to the Escrow Agent directing the Escrow Agent to release the Post-Closing Adjustment Escrow Amount to the Seller Parent.  If the Post-Closing Adjustment is a negative number, Buyer and the Seller Parent shall deliver Joint Written Instructions to the Escrow Agent to pay (i) the amount equal to the Post-Closing Adjustment to Buyer and (ii) all remaining funds in such escrow account to the Seller Parent.

(b)    Any payment due under Section 3.06(a) shall be paid by wire transfer of immediately available funds to the Seller Parties' account or Buyer's account, as applicable, in each case, as designated by the Seller Parent, on behalf of itself and the other Seller Parties, or Buyer (as applicable) in writing within five (5) Business Days after the date on which the Final Closing Statement becomes conclusive and binding on the Parties in accordance with the provisions of Section 3.05, and, if not paid within such period, shall bear interest at the Interest Rate.  All computations of interest shall be made in accordance with Section 12.18.

(c)    On the Closing Date, Buyer shall deposit $25,000,000 (the "**Post-Closing Adjustment Escrow Amount**") into an escrow account with the Escrow Agent to be held as a reserve against payment of any Post-Closing Adjustment from the Seller Parties to Buyer and which funds shall be used to satisfy the Seller Parent's obligations pursuant to Section 3.06(a), if any.  Following the final determination of the Post-Closing Adjustment Amount, the Post-Closing Adjustment Amount shall be released in accordance with Section 3.06(a).

Section 3.07.    Certain Calculation Principles.  Each Closing Statement (and each of the components and defined terms from this Agreement reflected therein) shall be: (a) prepared and determined from the books and records of the Business and in accordance with GAAP; and (b) consistent with the provisions of this Agreement.

17

Section 3.08.    Purchase Price Allocation.

(a)    Buyer and the Seller Parties agree to allocate the Purchase Price (as finally determined hereunder), the Assumed Liabilities, and all other relevant items among (i) the Transferred Assets and the Transferred Equity Interests and (ii) the Seller Parties, in each case, in accordance with the allocation under this section, except as required by applicable Law.  On or before the date that is the later of (x) twenty-one (21) days prior to the Closing Date and (y) seven (7) days following the Credit Bid Due Date, the Seller Parent (on behalf of itself and the other Seller Parties) shall deliver to Buyer its proposed allocation, together with its calculation, of expected Transfer Taxes (in local currency and, if applicable, in U.S. dollars converted using the Exchange Rate) (each such estimated Transfer Tax, an "**Estimated Transfer Tax Amount**") to be incurred in connection with the Transactions and the date on which each such Transfer Tax is due and payable (the "**Purchase Price and Transfer Tax Schedule**").  Buyer and the Seller Parties shall mutually cooperate to resolve any differences in good faith, with the objective of having an agreed tentative Purchase Price and Transfer Tax Schedule at least five (5) Business Days prior to the Closing. In the absence of an agreed tentative Purchase Price and Transfer Tax Schedule, the Seller Parent's proposed Purchase Price and Transfer Tax Schedule (as adjusted after giving good faith consideration to any Buyer comments, and which adjusted Purchase Price and Transfer Tax Schedule (the "**Tentative Purchase Price and Transfer Tax Schedule**") shall be delivered to Buyer no later than three (3) Business Days prior to the Closing) shall govern, pending the final determination. Accordingly, the Tentative Purchase Price and Transfer Tax Schedule shall govern the initial remittance of any Transfer Taxes, subject to adjustment in accordance with later adjustments made pursuant to this Article III, including this Section 3.08.

(b)    No later than ten (10) Business Days after the Final Closing Statement becomes conclusive, the Seller Parent (on behalf of itself and the other Seller Parties) shall deliver to Buyer a proposed final Purchase Price and Transfer Tax Schedule, determined in a manner consistent with the Tentative Purchase Price and Transfer Tax Schedule and with appropriate adjustments for the Final Closing Statement and any adjustments proposed by Buyer or the Seller Parent (on behalf of itself and the other Seller Parties) in the interim to the extent mutually agreed (with all Parties acting in good faith to consider adjustments) (the "**Proposed Final Purchase Price and Transfer Tax Schedule**"), along with supporting documentation for the determinations made in the Schedule.

(c)    Buyer shall have fifteen (15) Business Days (the "**Allocation Review Period**") from the date upon which the Seller Parties delivered the Proposed Final Purchase Price and Transfer Tax Schedule to review the same.  If Buyer disputes any item related to the allocation of the Purchase Price set forth in the Proposed Final Purchase Price and Transfer Tax Schedule, Buyer shall, during the Allocation Review Period, deliver written notice to the Seller Parties of the same, specifying in reasonable detail the basis for such dispute and Buyer's proposed modifications to the Proposed Final Purchase Price and Transfer Tax Schedule (such notice, the "**Allocation Dispute Notice**").  Upon the expiration of the Allocation Review Period, any matters that are not subject to a timely delivered Allocation Dispute Notice shall be deemed to have been agreed to and shall be conclusive and binding upon the Parties.  During the fifteen (15)-Business Day period immediately following Buyer's delivery of an Allocation Dispute Notice (the "**Allocation Resolution Period**"), Buyer and the Seller Parties shall negotiate in good faith to reach an agreement as to any matters identified in such Allocation Dispute Notice as being in

18

dispute, and, if such matters are so resolved within the Allocation Resolution Period, then the Proposed Final Purchase Price and Transfer Tax Schedule revised to incorporate such changes as have been agreed between Buyer and the Seller Parties shall be conclusive and binding upon all Parties.

(d)    If Buyer and the Seller Parties fail to resolve all such matters in dispute that are subject to the Allocation Dispute Notice, within the Allocation Resolution Period then (subject to the last sentence of <u>Section 3.08(e)</u>), the disputed amount shall be finally and conclusively determined by the Independent Accounting Firm, in a manner consistent with the principles provided for in <u>Section 3.05(e)</u> and <u>Section 3.05(f)</u> (such schedule, or a schedule determined pursuant to the last sentence of <u>Section 3.08(c)</u>, the "**Final Purchase Price and Transfer Tax Schedule**").

(e)    The Final Purchase Price and Transfer Tax Schedule shall be conclusive and binding on the Parties; <u>provided</u>, that the Final Purchase Price and Transfer Tax Schedule shall not be binding on the Parties with respect to any distributions pursuant to a plan of reorganization filed by the Seller Parties in the Bankruptcy Cases.  None of the Parties shall take any position inconsistent with the Final Purchase Price and Transfer Tax Schedule on any Tax Return, except as required by applicable Law, or in any audit or Tax proceeding, unless otherwise required by a final determination by a Government Authority.  Notwithstanding any other provision of this Agreement, the terms and provisions of this <u>Section 3.08</u> shall survive the Closing without limitation.

Section 3.09.  <u>Buyer Nominee</u>.  Buyer shall have the right, by notice in writing to the Seller Parties as soon as reasonably practicable, and in no event later than thirty (30) days, prior to the Closing, to nominate a wholly owned Subsidiary of Macquarie Group Limited or a trust the beneficiary of which is a wholly owned Affiliate of Macquarie Group Limited (a "**Buyer Nominee**") to purchase and take title to any Transferred Asset pursuant to the provisions of this Agreement, and provided that such Buyer Nominee meets the following requirements, the Seller Parties shall sell the relevant Transferred Asset to such Buyer Nominee pursuant to the provisions of this Agreement: (a) such Buyer Nominee complies with the Know Your Customers requirements of the Seller Parties; and (b) such Buyer Nominee has the capacity to complete the purchase of such Asset.  Notwithstanding any such nomination, (i) Buyer shall remain fully and primarily liable for the performance of all of its obligations under this Agreement and (ii) none of the liabilities or obligations of the Seller Parties shall be increased as a result thereof and none of Seller Parties' rights or benefits under this Agreement shall be reduced, diminished or extinguished as a result thereof.

Section 3.10.  ███████████.

(a)    Set forth on <u>Schedule 3.10</u> is (i) a list of each Aircraft (identified by its MSN number) for which, as of the Agreement Date, the Seller Parties have not received a █████████ █████████████████████████, and (ii) the corresponding purchase price holdback amount allocated to such Aircraft (each, a "████████ **Amount**" and collectively, the "████████ **Amounts**").  For purposes of this Section 3.10, the ████████████████████████████████████

19



.

(b)    During the Pre-Closing Period, the Seller Parties shall use reasonable best efforts to obtain a ██ Letter with respect to each Aircraft listed on Schedule 3.10 and to keep Buyer reasonably informed about the status of such efforts.

(c)    At least fourteen (14) days prior to the Closing Date, if the Seller Parties have not received a ██ Letter in respect of all Aircraft set forth on Schedule 3.10, the Seller Parent (on behalf of itself and the other Seller Parties) shall (i) in good faith, update Schedule 3.10 (the "████████████████") to remove from such Schedule 3.10 those Aircraft for which the Seller Parties have received a ██ Letter and the corresponding ██ Amount for each such Aircraft and (ii) deliver to Buyer such Closing ██ Balance Schedule.

(d)    Upon the delivery by the Seller Parent of a Closing ██ Balance Schedule pursuant to Section 3.10(c),

(i)

or

(ii)

(e)    If the ██ Escrow Account is funded at Closing in accordance with this Section 3.10, following the Closing until the earlier of (i) March 15, 2019 (the "██ Deadline") and (ii) the date upon which all ██ Escrow Funds have been released to the Seller Parent pursuant to this Agreement and the Escrow Agreement, Buyer shall, and shall cause its applicable Affiliates to, use reasonable best efforts to obtain a ██ Letter with respect to each Aircraft listed on the Closing ██ Balance Schedule (the "**Remaining** ██ **Aircraft**") and to the extent practicable, shall keep the Seller Parent reasonably informed about the status of such efforts.  No later than five (5) Business Days following the receipt by Buyer or its Affiliates of each required ██ Letter

WEIL:\96809416\18\79984.0003

with respect to a Remaining  Aircraft, Buyer and the Seller Parent shall deliver Joint Written Instructions to the Escrow Agent, directing the Escrow Agent to distribute from the ▇▇ Escrow Funds, by wire transfer of immediately available funds, to the Seller Parent (for the account of itself and all the other Seller Parties) an amount equal to the ▇▇ Amount for such Remaining ▇▇ Aircraft as set forth in the Closing ▇▇ Balance Schedule. Notwithstanding the foregoing, if any funds remain in the ▇▇ Escrow Account on the ▇▇ Deadline, then, on the ▇▇ Deadline, Buyer and the Seller Parent shall deliver Joint Written Instructions to the Escrow Agent directing the Escrow Agent to distribute all remaining funds in the ▇▇ Escrow Account by wire transfer of immediately available funds to Buyer which distribution shall be deemed an adjustment to the Purchase Price.

(f)    The Seller Parties shall not be liable for any ▇▇ Amount related to any Remaining ▇▇ Aircraft in excess of the ▇▇ Escrow Amount and the ▇▇ Escrow Account shall be terminated by the Escrow Agent promptly following the disbursement of the remaining ▇▇ Escrow Amount.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF SELLER

Each Seller Party hereby represents and warrants on behalf of itself to Buyer that, except as set forth in the Disclosure Schedules:

Section 4.01.    <u>Formation and Qualification of the Transferred Entities</u>.    Each Transferred Entity is a corporation or other organization duly incorporated, formed or organized, validly existing and, to the extent legally applicable, in good standing under the Laws of its jurisdiction of incorporation, formation or organization, as set forth on <u>Schedule 4.01</u>, and has the requisite corporate or other appropriate power and authority to operate its business as now conducted. Each Transferred Entity is duly qualified as a foreign corporation or other organization to do business, and, to the extent legally applicable, is in good standing, in each jurisdiction in which the character of its owned, operated or leased properties or the nature of its activities makes such qualification necessary, except where the failure to be so qualified or in good standing would not reasonably be expected to have a Material Adverse Effect.

Section 4.02.    <u>Capital Structure of the Transferred Entities</u>.    The authorized capital stock or other equity interests and the number of issued and outstanding shares or other equity interests of each Transferred Entity, and each registered and direct owner thereof, is set forth on <u>Schedule 4.02</u>. The Seller Parties own or immediately prior to Closing will own all of the Transferred Equity Interests, free and clear of all Liens, except (i) any restriction under the Securities Act or any other applicable securities Laws or (ii) any Lien created by or through, Buyer or its Affiliates. All of the Transferred Equity Interests have been duly authorized and validly issued, are, as applicable, fully paid and nonassessable and were not issued in violation of any preemptive rights, right of first refusal, purchase option, call option, subscription right or other right. There are no outstanding or authorized options, warrants, purchase rights, subscription rights, or rights of conversion or exchange or other similar rights, agreements, arrangements or commitments obligating any Transferred Entity to issue or sell any shares of its capital stock, other equity interests or securities convertible into or exchangeable for its shares or other outstanding or

21

authorized equity interests, equity appreciation, phantom equity, or profit participation other than as set forth in Schedule 4.02. There are no voting trusts, stockholder or shareholder agreements, proxies or other agreements in effect with respect to the voting or transfer of the Transferred Equity Interests or other equity interests of any Transferred Entity.

Section 4.03. Formation and Authority of the Seller Parties; Enforceability. Each Seller Party is a corporation or other entity duly incorporated, formed or organized, validly existing and, to the extent legally applicable, in good standing under the Laws of its jurisdiction of incorporation, formation or organization. Except for such authorizations required by the Bankruptcy Court, each Seller Party has the requisite corporate or other appropriate power to execute, deliver and perform its obligations under the Seller Transaction Agreements (including the consummation of the Seller Transactions) to which it is a party. Each Seller Party has the requisite corporate or other power to operate its business with respect to the Transferred Assets or the Assets, as applicable, that it owns as now conducted and is duly qualified as a foreign corporation or other organization to do business, and to the extent legally applicable, is in good standing, with respect to the Business, in each jurisdiction in which the character of its owned, operated or leased properties or the nature of its activities makes such qualification necessary, except for jurisdictions where the failure to be so qualified or in good standing has not had a Material Adverse Effect. The execution, delivery and performance by each Seller Party of the Seller Transaction Agreements (including the consummation of the Seller Transactions) to which it is a party have been (or will be prior to the Closing) duly authorized by all requisite corporate or similar action on the part of such Seller Party. This Agreement has been duly executed and delivered by each Seller Party, and upon execution and delivery thereof, the other Seller Transaction Agreements will be duly executed and delivered by the Seller Parties party thereto, and (assuming due authorization, execution and delivery thereof by the other parties hereto and thereto (other than any Seller Parties)) this Agreement constitutes, and upon execution and delivery thereof, the other Seller Transaction Agreements will constitute, legal, valid and binding obligations of the Seller Parties party thereto, enforceable against the Seller Parties party thereto in accordance with their respective terms, subject to entry by the Bankruptcy Court of the Sale Order and the Bankruptcy and Equity Exception.

Section 4.04. No Conflict. Provided that all Consents listed on Schedules 4.04 and 4.05 have been obtained, except as may result from any facts or circumstances relating to Buyer or its Affiliates (as opposed to any other third party or its Affiliates), the execution, delivery and performance by the Seller Parties of the Seller Transaction Agreements do not and will not:

(a) violate or conflict with in any material respect the certificate or articles of incorporation or bylaws or similar organizational documents of any of the Seller Parties or the Transferred Entities;

(b) violate, conflict with, result in a breach of or constitute a violation or default (or any event that, with notice or lapse of time or both would constitute a default) under or give rise to any right of termination, cancellation, modification or acceleration of, or loss of a material benefit under, any Material Contract that would reasonably be expected to have a Material Adverse Effect; or

22

(c)      violate in any material respect any Law, Transferred Permit or Order applicable to the Seller Parties, the Transferred Entities or the Business.

Section 4.05.    <u>Consents and Approvals</u>.  Except for such authorizations required by the Bankruptcy Court, execution, delivery and performance by the Seller Parties of the Seller Transaction Agreements do not and will not require any material Consent, waiver, or other action by, or any material filing with or notification to, any Government Authority by any Seller Party or any Transferred Entity, except (a) in connection with applicable filing, notification, waiting period or approval requirements under applicable Antitrust Laws, (b) in connection with applicable filing, notification, waiting period or approval requirements under applicable export Laws, Ex-Im Laws and other Laws with respect to the ITAR Aircraft or otherwise, (c) where the failure to obtain such Consent or waiver, or to take such action or make such filing or notification, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect, (d) as may be necessary as a result of any facts or circumstances relating to Buyer or Buyer's Affiliates (as opposed to any other third party or its Affiliates) or (e) the filing, or receipt of, any Consents or notices listed on <u>Schedule 4.05</u>.

Section 4.06.    <u>Financial Information; Absence of Undisclosed Liabilities</u>.

(a)      <u>Schedule 4.06(a)</u> sets forth (i) the audited consolidated balance sheet and statements of operations, shareholders' equity and cash flows of Waypoint Leasing Holdings Ltd. for the fiscal years ended December 31, 2016 and December 31, 2017 and (ii) the unaudited consolidated balance sheet and related income statement of Waypoint Leasing Holdings Ltd. for the nine (9) month period ended September 30, 2018 (the balance sheets and income statements referred to in clauses (i) and (ii) collectively, the "**Financial Statements**").  The Financial Statements (A) have been prepared based on the books and records of the Seller Parties and the Transferred Entities, (B) have been prepared in all material respects in accordance with GAAP consistently applied during the periods covered thereby, and (C) present fairly, in all material respects in accordance with GAAP, the financial condition and results of operation of the Business as of the respective dates and for the respective periods presented, subject to normal year-end adjustments and the absence of complete notes (as applicable).

(b)      Other than (i) as set forth in the Financial Statements, (ii) Liabilities for Taxes, (iii) Liabilities incurred in the ordinary course of business consistent with past practice since September 30, 2018 and (iv) the Excluded Liabilities, there are no material Liabilities of the Business.

Section 4.07.    <u>Absence of Certain Changes or Events</u>.  Except as contemplated by the Transaction Agreements or in connection with the negotiation and execution of the Transaction Agreements or the consummation of the Transactions, since September 30, 2018 through the Agreement Date (a) the Seller Parties and the Transferred Entities have conducted the Business in all material respects in the ordinary course consistent with past practice and (b) there has not been any event, change, occurrence or circumstance that has had a Material Adverse Effect.

Section 4.08.    <u>Absence of Litigation</u>.  As of the Agreement Date, no Actions are pending or, to the Knowledge of Seller, threatened against the Seller Parties (with respect to the Business) or the Transferred Entities that would reasonably be expected to be material to the

23

Business taken as a whole or would prevent or materially impair or delay the ability of the Seller Parties to consummate the Seller Transactions.

Section 4.09.    Compliance with Laws; Permits.

(a)    None of the Seller Parties or the Transferred Entities is, or since January 1, 2017 has been, in violation in any material respect of any Laws or Orders applicable to it or to the conduct of the Business, except where the failure to be in compliance would not reasonably be expected to be material to the Business taken as a whole.  None of the Seller Parties or any of their respective Subsidiaries has received any written notice of or been charged with the violation of any Laws, except where such violation would not reasonably be expected to be material to the Business taken as a whole.  This provision shall not apply to Leased Real Property, the subject of which is addressed in Section 4.15(c).

(b)    None of the Seller Parties or the Transferred Entities is in default under or is currently violating in any material respect any Transferred Permit, and no event has occurred which, with notice or the lapse of time or both, would constitute a default or violation of any Transferred Permit, except where such default or violation would not be reasonably be expected to be material to the Business taken as a whole.

Section 4.10.    Intellectual Property.

(a)    To the Knowledge of Seller, as of the Agreement Date, the operation of the Business by the Seller Parties and the Transferred Entities as it is conducted on the Agreement Date does not infringe upon or misappropriate the Intellectual Property of any third party in a manner that would reasonably be expected to have a Material Adverse Effect.

(b)    None of the Seller Parties or the Transferred Entities has received any written claim or notice from any Person during the two (2)-year period ending on the Agreement Date alleging that the operation of the Business by the Seller Parties or the Transferred Entities infringes upon or misappropriates any Intellectual Property of any third party, which, if proven or established, would reasonably be expected to have a Material Adverse Effect.  As of the Agreement Date, there are no infringement Actions pending or, to the Knowledge of Seller, threatened in writing against the Seller Parties or the Transferred Entities alleging that the operation of the Business by the Seller Parties or the Transferred Entities infringes upon or misappropriates any Intellectual Property of any third party, which, if proven or established, would reasonably be expected to have a Material Adverse Effect.

(c)    To the Knowledge of Seller, as of the Agreement Date, no Person is engaging in any activity that infringes in any material respect upon any Business Intellectual Property, except for any such infringements that do not materially impair the ability of the Seller Parties or the Transferred Entities to operate the Business as conducted on the Agreement Date or that would not reasonably be expected to have a Material Adverse Effect.

(d)    During the two (2)-year period ending on the Agreement Date, there have been no security breaches, breakdowns, malfunctions, data losses or failures of the Systems that would not reasonably be expected to have a Material Adverse Effect.

24

(e)      The Seller Parties and the Transferred Entities take commercially reasonable steps to maintain the confidentiality of all material Trade Secrets included in the Business Intellectual Property and, to the Knowledge of Seller, there has been no unauthorized disclosure to or use by any Person of any such material Trade Secrets.

(f)      Notwithstanding anything in this Agreement to the contrary, the representations and warranties made by the Seller Parties in this <u>Section 4.10</u> are the sole and exclusive representations and warranties made regarding Intellectual Property.

Section 4.11.    <u>Environmental Matters</u>.  Except as disclosed on <u>Schedule 4.11</u>:

(a)      each of the Seller Parties, the Transferred Entities, the Transferred Assets, and the Business is, and has been since January 1, 2017, in compliance in all material respects with all applicable Environmental Laws, which compliance includes obtaining, maintaining and complying in all material respects with those Environmental Permits necessary to own and operate its business, properties and facilities;

(b)      there are no Actions pending or, to the Knowledge of Seller, threatened in writing, against the Seller Parties or the Transferred Entities in connection with the Business or the Transferred Assets, involving the actual or alleged material violation of, or material Liability under, any Environmental Law;

(c)      no Seller Party (with respect to the Business, the Transferred Assets, or the Transferred Entities) or Transferred Entity has Released, treated, stored, disposed of, arranged for or permitted the disposal of, transported, handled or exposed any Person to Hazardous Materials, or owned or operated any property or facility contaminated by Hazardous Materials, in each case so as to result in any material Liability under any Environmental Laws; and

(d)      the Transferred Entities have not assumed by Contract any material Liability of any other Person, or provided an indemnity with respect to any material Liability, arising under any Environmental Law.

Section 4.12.    <u>Material Contracts</u>.

(a)      <u>Schedule 4.12(a)</u> lists the following Contracts to which any Seller Party or Transferred Entity is a party, in each case that is in effect on the Agreement Date (collectively, the "**Material Contracts**"):

(i)      other than Contracts between and among the Seller Parties, Contracts for the provision of management services to any Seller Party or Transferred Entity which are not terminable by any Seller Party or any Transferred Entity on fewer than three (3) months' notice without Liability in excess of $100,000;

(ii)      material agreements or indentures relating to the borrowing of money or to mortgaging, pledging or otherwise placing a material Lien on any material portion of the assets of any Seller Party or any Transferred Entity;

25

(iii)     Contracts for the employment or engagement of any person on a full-time, part-time, consulting or similar basis and providing for annual compensation in excess of $150,000;

(iv)     collective bargaining agreement or other Contract with any labor organization, works council, or similar employee-representative body;

(v)     material guaranties of any obligation for borrowed money or other material guaranty;

(vi)     leases or agreements under which it is lessee of, or holds or operates any personal property owned by any other party, for which the annual rental exceeds $500,000 (excluding the Transferred Leases);

(vii)     leases or agreements under which it is lessor of, or permits any third party to hold or operate any personal property, for which the annual rental exceeds $500,000 (excluding the Transferred Leased Real Property and the Transferred Leases);

(viii)     material licenses or royalty agreements relating to the use of any third party Intellectual Property (other than commercially available Software); and

(ix)     material Contracts including a covenant not to compete which restricts the activities of the Seller Parties or the Transferred Entities in any geographical area.

(b)     Other than as set forth on Schedule 4.12(b), the Seller Parties and the Transferred Entities have made available to Buyer true and complete copies of each Material Contract, together with all amendments, waivers or other changes thereto.

(c)     Each Material Contract is a legal, valid and binding obligation of the Seller Party or Transferred Entity party thereto, as the case may be, and, to the Knowledge of Seller, each other party to such Material Contract, and is enforceable against the applicable Seller Party or Transferred Entity, as the case may be, and, to the Knowledge of Seller, each other party to such Material Contract, in accordance with its terms, subject, in each case, to the Bankruptcy and Equity Exception.

(d)     None of the Seller Parties or the Transferred Entities has delivered any notice of any default or event that with notice or lapse of time or both would constitute a default by a third party under any Material Contract, except for defaults that would not reasonably be expected to be material to the Business taken as a whole.

Section 4.13.     Employment and Employee Benefits Matters.

(a)     Schedule 4.13(a) lists all material Employee Plans.  With respect to each material Employee Plan, the Seller Parties have previously made available to Buyer a true and complete copy of the following documents, to the extent applicable: (i) any written plan documents and all amendments thereto, (ii) the most recent Forms 5500 and all schedules thereto and the most recent actuarial report, if any, and (iii) the most recent IRS determination letter.

26

(b)     Each Employee Plan that is intended to be qualified under Section 401(a) of the Code has received a favorable determination letter, or is entitled to rely on an opinion letter, from the IRS, and to the Knowledge of Seller, nothing has occurred that would reasonably be expected to adversely affect the qualified status of such Employee Plan or the Tax-exempt status of its related trust. Each Employee Plan maintained for employees outside of the United States that is intended to receive favorable Tax treatment under applicable Tax Laws has been qualified or similarly determined to satisfy the requirements of such Tax Laws, and to the Knowledge of Seller, nothing has occurred that would reasonably be expected to adversely affect the qualified or Tax status of such Employee Plan.

(c)     No Employee Plan is or was, within the last six (6) years, (i) a "defined benefit plan" (within the meaning of Section 3(35) of ERISA, whether or not subject to ERISA) or subject to Section 302 or Title IV of ERISA or Section 412 of the Code, (ii) a multiemployer plan (within the meaning of Section 3(37) or 4001(a)(3) of ERISA) ("**Multiemployer Plan**"), or (iii) a "multiple employer plan" as described in Section 413(e) of the Code, and none of the Transferred Entities or Servicing Entities has, or could reasonably be expected to have, any liability or obligation (including on account of any ERISA Affiliate) under or with respect to any employee benefit plan (as defined in Section 3(3) of ERISA) of the type described in foregoing clauses (i) through (iii).  No Employee Plan provides, nor has any of the Transferred Entities or Servicing Entities promised to provide, retiree or post-employment health or welfare benefits, except as required by Section 4980B of the Code or similar state Law or by the Laws of non-U.S. jurisdictions.

(d)     Each Employee Plan that is being assumed by Buyer or its Affiliates, or retained by the applicable Transferred Entity or Servicing Entity has been established, maintained, funded and operated in all material respects in accordance with its terms and the requirements of ERISA and all applicable Laws.

(e)     No material Actions are pending or, to the Knowledge of Seller, threatened in connection with any Employee Plan (other than routine benefit claims).

(f)     There has been no amendment to, announcement by any Seller Party, Transferred Entity, Servicing Entity or any of their respective Affiliates relating to, or change in employee participation or coverage under, any Employee Plan that would materially increase the annual expense of maintaining such plan above the level of the expense incurred for the most recently completed fiscal year (other than applicable insurance rate increases in the ordinary course) with respect to any director, officer, employee, consultant or independent contractor of any Seller Party or Transferred Entity or Servicing Entity.  Neither any Transferred Entity or Servicing Entity nor any of ERISA Affiliates has any commitment or obligation or has made any representations to any director, officer, employee, consultant or independent contractor of any Seller Party, Servicing Entity or Transferred Entity, whether or not legally binding, to adopt, amend, modify or terminate any Employee Plan.

(g)     Each Employee Plan that is subject to Section 409A of the Code has been administered in material compliance with its terms and the operational and documentary requirements of Section 409A of the Code and all applicable regulatory guidance (including, notices, rulings and proposed and final regulations) thereunder.  None of any Seller Party, any

27

Servicing Entity or any Transferred Entity has any obligation to gross up, indemnify or otherwise reimburse any individual for any excise taxes, interest or penalties incurred pursuant to Section 409A of the Code.

(h)    Neither any Seller Party (with respect to the Business) nor any of the Transferred Entities or the Servicing Entities is party to or bound by any collective bargaining agreement or other Contract or relationship with any labor organization, works council, or similar employee-representative body, and none of the Covered Employees is represented by any such body.  With respect to the Seller Parties (to the extent related to the Business), the Servicing Entities and the Transferred Entities, there are no, and within the past five (5) years there have not been any (i) strikes, work stoppages, work slowdowns, lockouts, or other material labor disputes pending, or, to the Knowledge of Seller, threatened (ii) unfair labor practice charges, material grievances or complaints pending, or, to the Knowledge of Seller, threatened by or on behalf of any employee or group of employees, or (iii) to the Knowledge of Seller, pending or threatened union organizing or similar activities.  Except as set forth on Schedule 4.13(h)(i), neither the execution of this Agreement nor the consummation of the Transactions requires any notice, consent, consultation, information, or bargaining to or with any Covered Employee or any representative thereof.  Except as set forth on Schedule 4.13(h)(ii), none of the Covered Employees requires a visa, work permit or similar authorization from any Government Authority to work for any Seller Party or any of the Servicing Entities or the Transferred Entities.

(i)    Except to the extent that they would not result in any liability to Buyer or its Affiliates, neither the execution or delivery of this Agreement nor the consummation of the Transactions, either alone or in combination with another event (including any action required by Section 6.09), will (i) entitle any current or former director, officer, employee, independent contractor or consultant of any Seller Party or the Transferred Entity to severance pay or any other payment; (ii) accelerate the time of payment, funding or vesting, or increase the amount of compensation (including stock-based compensation) due to any such individual; (iii) increase the amount payable under or result in any other material obligation pursuant to any Employee Plan; (iv) result in "excess parachute payments" within the meaning of Section 280G(b) of the Code; or (v) require a "gross-up" or other payment to any "disqualified individual" within the meaning of Section 280G(c) of the Code.

(j)    Except as would not reasonably be expected to result in material Liability to Buyer, (i) the Seller Parties, the Servicing Entities and the Transferred Entities are and have at all times been in compliance with the terms of all applicable Laws pertaining to employment and employment practices to the extent they relate to employees, volunteers, interns, consultants and independent contractors of the Business, including all Laws relating to labor relations, equal employment opportunities, fair employment practices, employment discrimination, harassment, retaliation, reasonable accommodation, disability rights or benefits, immigration, wages, hours, overtime compensation, child labor, hiring, promotion and termination of employees, working conditions, meal and break periods, privacy, health and safety, workers' compensation, leaves of absence, paid sick leave and unemployment insurance, (ii) all individuals characterized and treated by Seller Parties, the Servicing Entities and the Transferred Entities as consultants or independent contractors are properly treated as independent contractors under all applicable Laws, (iii) all employees of the Seller Parties, the Servicing Entities and the Transferred Entities classified as exempt under the Fair Labor Standards Act and state and local and non-U.S. wage and hour Laws

28

are and at all times have been properly classified, (iv) the Seller Parties, the Servicing Entities and the Transferred Entities are in compliance with and has at all times complied with all immigration Laws, including Form I-9 requirements and any applicable mandatory E-Verify obligations, and (v) except as set forth in Schedule 4.13(j), there are no Actions against any Seller Party, the Servicing Entity or the Transferred Entity pending, or to the Knowledge of Seller, threatened to be brought or filed, by or with any Government Authority or arbitrator in connection with the employment of any current or former applicant, employee, consultant, volunteer, intern or independent contractor of the Seller Parties, the Servicing Entities and the Transferred Entities, including, without limitation, any charge, investigation or claim relating to unfair labor practices, equal employment opportunities, fair employment practices, employment discrimination, harassment, retaliation, reasonable accommodation, disability rights or benefits, immigration, wages, hours, overtime compensation, employee classification, child labor, hiring, promotion and termination of employees, working conditions, meal and break periods, privacy, health and safety, workers' compensation, leaves of absence, paid sick leave, unemployment insurance or any other employment related matter arising under applicable Laws.

(k)    Except as would not, to the Knowledge of Seller, reasonably be expected to result in material Liability to Buyer, the Seller Parties, the Transferred Entities and the Servicing Entities have at all times complied with the WARN Act or any Law of similar effect.

Section 4.14.    Taxes.

(a)    The Seller Parties and the Transferred Entities have timely filed (or have had filed on their behalf) all material Tax Returns required to be filed (taking into account any extensions of time to file such Tax Returns) and all such material Tax Returns were complete and accurate in all material respects.  All material amounts of Taxes shown as due on such Tax Returns by the Seller Parties or the Transferred Entities have been fully and timely paid, other than with respect to any Taxes the payment of which was precluded by reason of the Bankruptcy Cases.

(b)    There are no (i) material deficiencies for any Taxes that have been proposed, asserted or assessed in writing by a Taxing Authority against any Seller Party or Transferred Entity that are still pending, (ii) audits or examinations outstanding by a Taxing Authority against any Seller Party or Transferred Entity with respect to Taxes or (iii) written notices received by any Seller Party or Transferred Entity from any Taxing Authority indicating an intent to open an audit, examination or other review with respect to a Taxes or a request for information related to Taxes, with respect to the Seller Parties or Transferred Entities, as to each of clause (i), clause (ii) and clause (iii) above, to the extent such deficiency, audit or examination could give rise to a Lien on the Transferred Assets or the assets of the Transferred Entities or the Transferred Equity Interests.

(c)    No Transferred Entity has any current material Liability for Taxes of any Person (other than any of the Transferred Entities) (i) under Treasury Regulations Section 1.1502-6 (or any similar provision of state, local or foreign Law), (ii) as a transferee or successor or (iii) by contract or otherwise by Law.

(d)    There are no Liens for Taxes on the Transferred Assets, the assets of the Transferred Entities, or the Transferred Equity Interests, other than Permitted Liens.

WEIL:\96809416\18\79984.0003

(e)    The Transferred Entities have complied in all material respects with all applicable withholding obligations for Taxes required to have been withheld in connection with amounts paid to any Covered Employee, independent contractor or other Person, have paid such amounts withheld to the appropriate Taxing Authority and have otherwise complied in all material respects with all applicable requirements with respect to the reporting of such Taxes.

(f)    To the Knowledge of Seller, no Transferred Entity is or has been a party to a "reportable transaction" as such term is defined in Treasury Regulations Section 1.6011-4(b).

(g)    Since January 1, 2015, no claim has been made by any Taxing Authority in a jurisdiction where any Transferred Entity has not filed a Tax Return that it is or may be subject to Tax by such jurisdiction.

(h)    No Transferred Entity has distributed shares of another Person, or has had its shares distributed by another Person, in a transaction that was purported or intended to be governed in whole or in part by Section 355 or Section 361 of the Code.

(i)    There has been no waiver of any statute of limitations in respect of any income or other Taxes of any Transferred Entity that remains in effect following the Closing Date and no Transferred Entity is the beneficiary of any extension of time within which to file any Tax Return, other than an extension arising out of an extension of the due date for filing a Tax Return in the ordinary course of business.

(j)    None of the Transferred Entities (i) is a party to or bound by any Tax sharing, allocation, or similar agreement (other than agreements entered into in the ordinary course of business the primary purpose of which is not related to Tax) or (ii) has been a member of an "affiliated group" as defined in Section 1504 of the Code (or any analogous combined, consolidated, unitary or similar group defined under state, local or non-U.S. Law).

(k)    No Transferred Entity is a party to any "closing agreement" as described in Section 7121 of the Code (or any similar provision of state, local or foreign Law) that will continue to apply following the Closing Date.

(l)    None of the Transferred Entities will be required to include any material item of income in, or exclude any material item of deduction from, taxable income for any taxable period (or portion thereof) ending after the Closing Date based on the Law in effect on the date hereof as a result of any: (i) change in method of accounting for a taxable period ending on or prior to the Closing Date; (ii) intercompany transactions made on or prior to the Closing Date; (iii) installment sale or open transaction disposition made on or prior to the Closing Date; (iv) prepaid amount received or deferred revenue accrued on or prior to the Closing Date; or (v) an election made pursuant to Section 108(i) of the Code (or any similar provision of state, local or foreign Law).

(m)    Each of the Transferred Entities is treated and properly classified as a disregarded entity for U.S. federal income tax purposes.

(n)    The prices and terms of the provision of any property or services with or between the Transferred Entities and/or Affiliates (other than the Seller Parties), branches, offices,

WEIL:\96809416\18\79984.0003

or permanent establishments of the foregoing comply in all material respects with the principles set forth in Section 482 of the Code (or any similar provision of foreign Law), are arm's length for purposes of all applicable transfer pricing Laws, and all related material documentation required by such Laws has been timely prepared or obtained and, if necessary, retained.

(o)    No Transferred Entity is subject to Tax in any country other than its country of incorporation or formation by virtue of having a permanent establishment or other place of business in such other country.

(p)    Nothing in this Section 4.14 or otherwise in this Agreement shall be construed as a representation or warranty with respect to the amount or availability of any net operating loss, capital loss, or Tax credit carryover or other Tax attribute or asset.

(q)    The representations and warranties in Section 4.06, Section 4.13 (to the extent related to Taxes) and this Section 4.14 constitute the sole and exclusive representations and warranties of the Seller Parties and the Transferred Entities with respect to Taxes, and no other representation or warranty contained in any other section of this Agreement shall apply to any Tax matters, and no other representation or warranty, express or implied, is being made with respect thereto.

Section 4.15.    Real Property.

(a)    Schedule 4.15(a) sets forth a list of the Leased Real Property, Transferred Leases and each lease for real property to which a Transferred Entity is a party (collectively with the Transferred Leases, the "**Acquired Leases**") as of the Agreement Date.  The Seller Parties and the Transferred Entities have a valid leasehold estate (as lessee or sublessee), or the equivalent in the applicable jurisdiction, in all such Leased Real Property set forth on Schedule 4.15(a), in each case free and clear of all Liens other than Permitted Liens.  A true and correct copy of each Acquired Lease has been made available to Buyer.

(b)    All Acquired Leases under which the Seller Parties or a Transferred Entity is a lessee or sublessee are in full force and effect and are enforceable as against such Seller Party or Transferred Entity, and to the Knowledge of Seller, against any other counterparty thereto, in all material respects, in accordance with their respective terms, subject to the Bankruptcy and Equity Exception, and, to the Knowledge of Seller no written notices of material default under any such lease or sublease have been sent or received by the Seller Parties or the Transferred Entities within the twelve (12)-month period ending on the Agreement Date, which default remains uncured or unwaived as of the Agreement Date.

(c)    None of the Seller Parties or the Transferred Entities has received any written notice from any Government Authority asserting any violation of applicable Laws with respect to the Transferred Leased Real Property that remains uncured as of the Agreement Date and that would reasonably be expected to be material to the Business.

(d)    No Seller Party or Transferred Entity holds a fee interest in any real property.

31

Section 4.16.    Brokers.  Except for fees and expenses of Houlihan Lokey and Seabury Consulting (the "**Seller's Financial Advisors**"), no broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission from the Seller Parties, the Transferred Entities or any of their respective Affiliates in connection with any Transaction.

Section 4.17.    Title.  Except for Permitted Liens, the Transferred Assets (other than (a) the leasehold estate (as lessee or sublessee) in the Transferred Leased Real Property, which are the subject of Section 4.15 and (b) Aircraft or interests in any Aircraft Leases which are the subject of Section 4.19) are owned by or otherwise made available to the Seller Parties or the Transferred Entities.  Except as set forth in Schedule 4.17, upon Closing, subject to Section 2.03, Section 6.05, requisite Bankruptcy Court approvals and the terms of the Sale Order, and assumption by the applicable Seller Party of the applicable Contract in accordance with applicable Law (including satisfaction of any applicable Cure Costs), Buyer will acquire from the Seller Parties good and valid title to or a valid leasehold interest in the Transferred Assets, free and clear of all Liens (other than Permitted Liens).

Section 4.18.    Insurance.  Schedule 4.18 provides a summary of all Insurance Policies maintained by any Seller Party at the expense of or for the benefit of the Transferred Assets, the Transferred Entities or the Business, including, with respect to any Insurance Policy insuring any Aircraft, the type and amount of coverage, and the expiration dates of such Transferred Insurance Policies.  Each such Transferred Insurance Policy is in full force and effect, all premiums due to date thereunder have been paid in full and no Seller Party is in material default with respect to any other obligations thereunder.  No written notice of cancellation or nonrenewal, in whole or in part, with respect to any such Insurance Policy currently in force has been received by any applicable Seller Party as of the Agreement Date.

Section 4.19.    Aircraft Owned and Related Leases; Expected Purchases.

(a)    Schedule 4.19(a) lists:

(i)    each Aircraft, together with its related Engine (each, by its model number and manufacturer, and related serial number), as of the Agreement Date legally and/or beneficially owned by the Seller Parties and the Transferred Entities free and clear of all Liens (except Permitted Liens) and the country in which each Aircraft is registered and, where such Aircraft is subject to a lease to a third party as of the Agreement Date, a description of such lease (an "**Aircraft Lease**"), including the following details: (A) the applicable Aircraft Lease commencement date, (B) the applicable Aircraft Lease maturity date, (C) the applicable lease rentals payable by the Aircraft Lessee on the relevant payment dates, (D) any early termination option thereunder, (E) any purchase option thereunder and (F) any security deposit applicable thereto or letter of credit in lieu thereof;

(ii)    each Aircraft that is not subject to an Aircraft Lease (each such Aircraft, an "**AOG Aircraft**") and its storage location; and

(iii)    with respect to each Aircraft (identified by MSN) that is subject to a power by the hour ("**PBH**") agreement: (A) the PBH agreement provider, (B) whether the relevant operator has agreed to transfer any remaining PBH reserve balances to the

32

relevant Seller Party at the end of the lease term (whether scheduled or otherwise), and (C) to the Knowledge of Seller, whether any such operator is in default under its PBH obligations.

(b)    The foregoing information relating to each Aircraft Lease is true and correct in all material respects.  Except as otherwise noted in Schedule 4.19(a), (i) each Aircraft (other than an AOG Aircraft) is, to the Knowledge of Seller, in operating condition and (ii) the rent payable under each Aircraft Lease is current and no event of default (or like term) is continuing thereunder.

(c)    Schedule 4.19(c) sets forth, as of the Agreement Date, a list of all outstanding purchase orders made by the Seller Parties and the Transferred Entities to purchase aircraft and/or aircraft engines, including the expected month of delivery, required progress payments and the purchase price therefor.  Except as set forth on Schedule 4.19(c), such purchase orders and other commitments are freely transferable to Buyer or its designee without the consent of the manufacturer or supplier thereunder, or if consent of such obligor is required, such consent has been obtained or will be requested in connection with the Closing.

Section 4.20.    No Other Representations or Warranties.

(a)    Except for the representations and warranties expressly set forth in this Article IV (as modified by the Disclosure Schedules) and the certificate to be delivered pursuant to Section 10.02(a)(iii), none of the Seller Parties or any other Person has made, makes or shall be deemed to make any other representation or warranty of any kind whatsoever, express or implied, written or oral, at Law or in equity, on behalf of the Seller Parties, the Transferred Entities or any of their respective Affiliates, including any representation or warranty regarding any Seller Party, any Transferred Entity or any other Person, the Transferred Equity Interests, any Assets, any Transferred Assets, any Liabilities of any Seller Party or Transferred Entity, any Assumed Liabilities, the Business, any Transaction, any other rights or obligations to be transferred, directly or indirectly, pursuant to the Transaction Agreements or any other matter, and the Seller Parties hereby disclaim all other representations and warranties of any kind whatsoever, express or implied, written or oral, at law or in equity, whether made by or on behalf of any Seller Parties, any Transferred Entity or any other Person, including any of their respective Representatives. Except for the representations and warranties expressly set forth in this Article IV, each Seller Party hereby (i) disclaims and negates any representation or warranty, expressed or implied, at common law, by statute, or otherwise, relating to the condition of the Transferred Assets, the Assets or the Business, and (ii) disclaims all Liability and responsibility for all projections, forecasts, estimates, financial statements, financial information, appraisals, statements, promises, advice, data or information made, communicated or furnished (orally or in writing, including electronically) to Buyer or any of Buyer's Affiliates or any Representatives of Buyer or any of Buyer's Affiliates (including any opinion, information, projection, or advice that may have been or may be provided to Buyer by any of Seller's Financial Advisors or other Representative of the Seller Parties or the Transferred Entities, respectively), including omissions therefrom.  Without limiting the foregoing, no Seller Party makes any representation or warranty of any kind whatsoever, express or implied, written or oral, at law or in equity, to Buyer or any of its Affiliates or any Representatives of Buyer of any of its Affiliates regarding the probable success, profitability or value of the Transferred Entities, the Transferred Assets or the Business.  The disclosure of any

33

matter or item in any Schedule shall not be deemed to constitute an acknowledgment that any such matter is required to be disclosed or is material or that such matter would be reasonably expected to result in a Material Adverse Effect.

(b)     WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, THE SELLER PARTIES SPECIFICALLY DISCLAIM, AND EXCLUDE HEREFROM, WITH RESPECT TO EACH AIRCRAFT (I) ANY WARRANTY AS TO THE AIRWORTHINESS, VALUE, DESIGN, QUALITY, MANUFACTURE, OR OPERATION OF SUCH AIRCRAFT, (II) ANY EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY OF MERCHANTABILITY OR FITNESS FOR USE OR FOR A PARTICULAR PURPOSE, (III) ANY EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY OF FREEDOM FROM ANY RIGHTFUL CLAIM BY WAY OF INFRINGEMENT OF ANY PATENT, TRADEMARK, COPYRIGHT, OR PROPRIETARY RIGHTS OR THE LIKE, (IV) ANY IMPLIED REPRESENTATION OR WARRANTY ARISING FROM COURSE OF PERFORMANCE, COURSE OF DEALING OR USAGE OF TRADE, (V) ANY EXPRESS OR IMPLIED WARRANTY REGARDING THE CONDITION OF SUCH AIRCRAFT AND (VI) ANY OBLIGATION OR LIABILITY ON ITS PART ARISING IN CONTRACT OR IN TORT (INCLUDING STRICT LIABILITY OR SUCH AS MAY ARISE BY REASON OF ITS NEGLIGENCE) ACTUAL OR IMPUTED, OR IN STRICT LIABILITY, INCLUDING ANY OBLIGATION OR LIABILITY FOR LOSS OF USE, REVENUE OR PROFIT WITH RESPECT TO SUCH AIRCRAFT OR FOR ANY LIABILITY OF THE SELLER PARTIES TO ANY THIRD PARTY OR ANY OTHER DIRECT, INCIDENTAL, SPECIAL OR CONSEQUENTIAL DAMAGE WHATSOEVER.

(c)     Nothing in this Section 4.20 shall limit Buyer's ability to rely on the express representations and warranties in Article IV (as modified by the Disclosure Schedules).

## ARTICLE V

## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to the Seller Parties that, except as set forth in the Disclosure Schedule:

Section 5.01.    Formation and Authority of Buyer; Enforceability.    Buyer is a corporation or other entity duly incorporated, formed or organized, validly existing and, to the extent legally applicable, in good standing under the Laws of its jurisdiction of incorporation, formation or organization and has the requisite corporate or other appropriate power and authority to execute, deliver and perform its obligations under the Buyer Transaction Agreements (including the consummation of the Buyer Transactions).    The execution, delivery and performance of the Buyer Transaction Agreements by Buyer (including the consummation of the Buyer Transactions) have been duly authorized by all requisite corporate or organizational action on the part of Buyer, and no shareholder or other similar approval is required in connection with Buyer's execution, delivery and performance of the Buyer Transaction Agreements.    This Agreement has been, and upon execution and delivery thereof, the other Buyer Transaction Agreements will be, duly executed and delivered by Buyer, and (assuming due authorization, execution and delivery by the other parties hereto and thereto) this Agreement constitutes, and upon execution and delivery

34

thereof, the other Buyer Transaction Agreements will constitute, legal, valid and binding obligations of Buyer enforceable against Buyer in accordance with their respective terms, subject to the Bankruptcy and Equity Exception.

Section 5.02.    No Conflict.  Provided that all Consents and other actions described in Section 5.03 have been obtained, except as may result from any facts or circumstances relating to the Seller Parties (as opposed to any other third party or its Affiliates), the Transferred Entities or their respective Affiliates, the execution, delivery and performance by Buyer of the Buyer Transaction Agreements do not and will not:

(a)    violate or conflict with in any material respect the certificate or articles of incorporation or bylaws or similar organizational documents of Buyer;

(b)    conflict with or violate in any material respect any Law or Order applicable to Buyer; or

(c)    result in any breach of, or constitute a default (with or without notice or lapse of time, or both) under, or give to any Person any right to terminate, amend, accelerate or cancel, or result in the creation of any Lien (other than a Permitted Lien) on any assets or properties of Buyer pursuant to, any Contract to which Buyer or any of its Subsidiaries or Affiliates is a party or by which any of such assets or properties is bound, except for any such conflicts, violations, terminations, cancellations, breaches, defaults, rights or Liens as would not materially impair or delay the ability of Buyer to consummate the Buyer Transactions or otherwise perform its obligations under the Buyer Transaction Agreements.

Section 5.03.    Consents and Approvals.  The execution, delivery and performance by Buyer of the Buyer Transaction Agreements do not and will not require any Consent, waiver or other action by, or any filing with or notification to, any Government Authority, except (a) in connection with applicable filing, notification, waiting period or approval requirements under applicable Antitrust Laws, (b) where the failure to obtain such Consent or waiver, to take such action, or to make such filing or notification, would not materially impair or delay the ability of Buyer to consummate the Buyer Transactions or otherwise perform its obligations under the Buyer Transaction Agreements, or (c) for the Consents and filings listed on Schedule 5.03.  Buyer is not aware of any reason why any necessary Consent, waiver or other action by any Government Authority will not be received or obtained in order to permit consummation of the Buyer Transactions on a timely basis or to permit Buyer to otherwise perform its obligations under the Buyer Transaction Agreements.

Section 5.04.    Absence of Restraints; Compliance with Laws.

(a)    To the knowledge of Buyer, no facts or circumstances exist that would reasonably be expected to impair or delay the ability of Buyer to consummate the Buyer Transactions or otherwise perform its obligations under the Buyer Transaction Agreements.

(b)    Buyer is not in violation of any Laws or Orders applicable to the conduct of its business, except for violations the existence of which would not reasonably be expected to impair or delay the ability of Buyer to consummate the Buyer Transactions or otherwise perform its obligations under the Buyer Transaction Agreements.

35

(c)    As of the Agreement Date, there are no Actions pending or, to the knowledge of Buyer, threatened, that would affect in any material respect Buyer's ability to perform its obligations under the Buyer Transaction Agreements or to consummate the Transactions contemplated by the Buyer Transaction Agreements.

Section 5.05.    Financial Ability.    Buyer will have at the Closing, (a) sufficient immediately available funds and the financial ability to pay the Purchase Price and any expenses incurred by Buyer in connection therewith and (b) the resources and capabilities (financial and otherwise) to perform its obligations under the Buyer Transaction Agreements and in each case to pay any expenses incurred by Buyer in connection therewith. Buyer has not incurred, and is not contemplating or aware of, any obligation, commitment, restriction or other Liability of any kind, in each case that would impair or adversely affect such resources, funds or capabilities.

Section 5.06.    Brokers.    No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission from Buyer or any of Buyer's Affiliates in connection with any Transaction.

Section 5.07.    Investigation.    Buyer acknowledges and agrees that it (a) has completed such inquiries and investigations as it has deemed appropriate into, and, based thereon, has formed an independent judgment concerning, the Transferred Entities, the Transferred Equity Interests, the Assets, the Liabilities of the Seller Parties or the Transferred Entities, the Transferred Assets, the Assumed Liabilities, the Business and the Transactions, and any other rights or obligations to be transferred, directly or indirectly, pursuant to the Transaction Agreements and (b) has been furnished with, or given access to, all such projections, forecasts, estimates, appraisals, statements, promises, advice, data or information about the Seller Parties, the Transferred Entities, the Transferred Equity Interests, the Assets, the Liabilities of the Seller Parties or the Transferred Entities, the Transferred Assets, the Assumed Liabilities, the Business and any other rights or obligations to be transferred, directly or indirectly, pursuant to the Transaction Agreements, as it has requested. Buyer further acknowledges and agrees that (x) the only representations and warranties made by the Seller Parties are the representations and warranties expressly set forth in Article IV (as modified by the Disclosure Schedules) and the certificate delivered pursuant to Section 10.02(a)(iii) and Buyer has not relied upon any other representations or warranties of any kind whatsoever, express or implied, written or oral, at Law or in equity, including any representation or warranty regarding any Seller Party, any Transferred Entity or any other Person, the Transferred Equity Interests, any Assets, any Transferred Assets, any Liabilities of any Seller Party or any Transferred Entity, any Assumed Liabilities, the Business, any Transaction, any other rights or obligations to be transferred, directly or indirectly, pursuant to the Transaction Agreements or any other matter, or other projections, forecasts, estimates, financial statements, financial information, appraisals, statements, promises, advice, data or information made, communicated or furnished (orally or in writing, including electronically) by or on behalf of the Seller Parties or any of their Affiliates, any Representatives of the Seller Parties or any of their Affiliates, or any other Person, including any projections, forecasts, estimates, financial statements, financial information, appraisals, statements, promises, advice, data or information made, communicated or furnished by or through the Seller's Financial Advisors, or management presentations, data rooms (electronic or otherwise) or other due diligence information (including any opinion, information, projection, or advance that may have been or may be provided to Buyer by any of Seller's Financial Advisors or other Representative of the Seller Parties or the

36

Transferred Entities, respectively), and that Buyer will not have any right or remedy arising out of any such representation, warranty or other projections, forecasts, estimates, financial statements, financial information, appraisals, statements, promises, advice, data or information and (y) any claims Buyer may have for breach of any representation or warranty shall be based solely on the representations and warranties of the Seller Parties expressly set forth in Article IV (as modified by the Disclosure Schedules) and the certificate delivered pursuant to Section 10.01(a)(iii). Except as otherwise expressly set forth in this Agreement, Buyer understands and agrees that the Transferred Entities, the Transferred Equity Interests, the Assets, the Liabilities of the Seller Parties, the Transferred Entities, the Business, the Transferred Assets and the Assumed Liabilities are being transferred on a "where-is" and, as to condition, "as-is" basis subject to the representations and warranties contained in Article IV (as modified by the Disclosure Schedules) without any other representations or warranties of any nature whatsoever. Without limiting the foregoing, Buyer further acknowledges and agrees that (i) Buyer has relied upon its own inspection and knowledge of the Aircraft, the Aircraft Leases and the Related Aircraft Documents in determining if the Aircraft, the Aircraft Leases and the Related Aircraft Documents are acceptable and satisfactory to Buyer and (ii) on the Closing Date, each Aircraft shall be transferred in "as is, where is" condition with all faults, and each Aircraft is being sold, without representation, warranty or guarantee of any kind with respect to the airworthiness, value, design, quality, manufacture, maintenance, operation or condition of such Aircraft being made by any Seller Party, or their respective servants or agents, express or implied, arising by Law or otherwise. Furthermore, Buyer hereby acknowledges the disclaimer set forth in Section 4.20(b).

## ARTICLE VI

## ADDITIONAL AGREEMENTS

Section 6.01.    Conduct of Business Before the Closing.  Buyer acknowledges that the Seller Parties and the Transferred Entities are operating the Business in the context of the Bankruptcy Cases.  Subject to the foregoing, (a) the Seller Parties shall use commercially reasonable efforts to maintain the Transferred Assets and the Assets in their current condition (subject to ordinary wear and tear) and, preserve in all material respects the present business operations, organization and goodwill of the Business, and the present relationships with material customers and material suppliers of the Business and (b) except (i) as required by applicable Law or by Order of the Bankruptcy Court, or as otherwise expressly contemplated by the Transaction Agreements or (ii) for matters identified on Schedule 6.01, during the Pre-Closing Period unless Buyer otherwise consents in writing (which consent shall not be unreasonably withheld, conditioned or delayed), the Seller Parties will, and will cause the Transferred Entities to, (x) conduct the Business in the ordinary course of business, (y) provide to Buyer copies of all notices and reports required to be delivered by Aircraft Lessees under the Aircraft Leases and received by any Seller Party and (z) solely with respect to the Business, the Transferred Assets and the Transferred Entities, not do any of the following:

(A)    grant any Lien on the Transferred Equity Interests or any material Assets or Transferred Assets (in each case, whether tangible or intangible), in each case, other than a Permitted Lien or in connection with the Seller Parties obtaining debtor-in-possession financing;

37

(B)     acquire (by merger, consolidation, acquisition of stock or assets or otherwise) any corporation, partnership or other business organization, business or division;

(C)     incur or issue any Debt or assume, grant, guarantee or endorse, or otherwise as an accommodation become responsible for, the obligations of any Person, or make any loans or advances (in each case, other than as would result in Liabilities that will constitute Excluded Liabilities or in connection with the Seller Parties obtaining debtor-in-possession financing);

(D)     redeem, repurchase, issue or sell any shares of, or other equity interests in, the Transferred Entities, or securities convertible into or exchangeable for such shares or equity interests, or issue or grant any options, warrants, calls, subscription rights or other rights of any kind to acquire such shares, other equity interests or securities;

(E)     sell, transfer or otherwise dispose of any Transferred Assets having a value in excess of $1,000,000 individually or $5,000,000 in the aggregate;

(F)     (i) increase the wages, salaries, bonuses, incentives, or other compensation payable to any Covered Employee, other than salary increases not to exceed €30,000 in the aggregate, effective December 1, 2018; (ii) establish, terminate, materially amend, or materially increase any benefits under any Employee Plan, except, in either case, (x) as required by applicable Law, or (y) as required by the existing terms of any Employee Plan or any Contract in existence on the Agreement Date; or (iii) hire or offer employment to any new employee;

(G)     implement any employee layoffs or reductions in force;

(H)     enter into any settlement or release with respect to any material Action relating to the Business, the Transferred Assets or the Assumed Liabilities, other than any settlement or release that contemplates only the payment of money without ongoing limits on the conduct or operation of the Business and results in a full release of the applicable Seller Parties or Transferred Entities with respect to the claims giving rise to such Action and which payment of money constitutes an Excluded Liability or is not in excess of $500,000, or initiate any material Action relating to the Business, the Transferred Assets or the Assumed Liabilities;

(I)     except in connection with the leasing or subleasing of Aircraft or any extension of a Material Contract, in each case only in the ordinary course of business after consulting with Buyer, enter into, materially amend or terminate any Material Contract, or any Contract that would be a Material Contract if entered into prior to the Agreement Date;

(J)     declare or set aside any dividends or distributions on any capital stock of any Transferred Entity (in cash or in kind), amend any organizational documents or commence any bankruptcy or insolvency proceeding with respect to any Transferred Entity;

(K)     solely with respect to the Transferred Entities, (i) settle any claim with respect to material Taxes, (ii) surrender any right to claim a refund of material Taxes, (iii) consent to any extension or waiver of the limitation period applicable to any claim or assessment with respect to Taxes (other than in the ordinary course of business), (iv) prepare or file any material Tax Return or change any Tax procedure, in each case, in a manner inconsistent with past practice, (v) file any amended Tax Return (other than any Tax Return filed based on estimated information),

38

(vi) fail to pay material Taxes that were due and payable (including estimated Tax payments), (vii) incur any liability for Taxes outside the ordinary course of business or (viii) enter into any closing agreement in respect of any Taxes;

(L)    make, change or revoke any material Tax election of any Transferred Entity, or change any material accounting practice, policy or procedure unless required by GAAP;

(M)    commit to making any capital expenditure in any post-Closing period materially in excess of the amount allocated for capital expenditures set forth in Schedule 6.01(M);

(N)    except in connection with any extension of an Aircraft Lease in the ordinary course of business, amend any Aircraft Lease in a manner materially adverse to the lessor thereunder without first duly consulting with Buyer;

(O)    waive any event of default under any Aircraft Lease without first duly consulting with Buyer (provided, that any failure to exercise a right under such Aircraft Lease or any other inaction by any Seller Party in good faith and in the ordinary course of business shall not constitute a waiver for purposes hereof); or

(P)    enter into any legally binding commitment with respect to any of the foregoing.

Section 6.02.    Access to Information.

(a)    During the Pre-Closing Period, upon reasonable prior notice, the Seller Parties shall, and shall cause each of the Transferred Entities to, (i) afford the Representatives of Buyer reasonable access, during normal business hours, to the properties, books and records of the Business and Transferred Entities and (ii) furnish to the Representatives of Buyer such additional financial and operating data and other information regarding the Business as Buyer or its Representatives may from time to time reasonably request for purposes of consummating the Transactions, in each case, at the sole cost and expense of Buyer.

(b)    Notwithstanding anything in this Agreement to the contrary,

(i)    (A) in no event shall the Seller Parties, the Transferred Entities or their respective Affiliates be obligated to provide any (1) access or information in violation of any applicable Law, (2) information the disclosure of which could reasonably be expected to jeopardize any applicable privilege (including the attorney-client privilege) available to any of the Seller Parties, the Transferred Entities or any of their respective Affiliates relating to such information, or (3) information the disclosure of which would cause any Seller Party, any Transferred Entity or any of their respective Affiliates to breach a confidentiality obligation to which it is bound; provided, that, in the event that the Seller Parties withhold access or information in reliance on the foregoing clause (A), the Seller Parent shall provide (to the extent possible without waiving or violating the applicable legal privilege or Law) notice to Buyer that such access or information is being so withheld and shall use commercially reasonable efforts to provide such access or information in a way that would not risk waiver of such legal privilege or applicable Law (including, as applicable, as contemplated by Section 6.02(c)), and (B) any access or investigation

39

contemplated by Section 6.02(a) shall not unreasonably interfere with any of the businesses, personnel or operations of any of the Seller Parties, the Transferred Entities or any of their respective Affiliates or the Business; and

(ii)    the auditors and accountants of any of the Seller Parties, the Transferred Entities or any of their respective Affiliates or the Business shall not be obligated to make any work papers available to any Person except in accordance with such auditors' and accountants' normal disclosure procedures and then only after such Person has signed a customary agreement relating to such access to work papers in form and substance reasonably acceptable to such auditors or accountants.

(c)    If so requested by the Seller Parties or Buyer, the Parties shall enter into a customary joint defense agreement or common interest agreement with one or more of the Seller Parties, the Transferred Entities or any of their respective Affiliates with respect to any information provided to Buyer, or to which Buyer gains access, pursuant to this Section 6.02 or otherwise.

Section 6.03.    Confidentiality.    Buyer acknowledges that the Confidential Information and Transaction Information (as defined in the Confidentiality Agreement) provided to it in connection with this Agreement, including information provided under Section 6.02, is subject to the Confidentiality Agreement and the terms of the Confidentiality Agreement are incorporated into this Agreement by reference and shall continue in full force and effect (and all obligations thereunder shall be binding upon Buyer, its Representatives (as defined in the Confidentiality Agreement) and any other third party who signed (or signs) a joinder thereto subject to and in accordance with the Confidentiality Agreement as if parties thereto) until the Closing, at which time the Confidentiality Agreement shall terminate (including any terms that purport to survive such termination). If for any reason the Closing does not occur and this Agreement is terminated, the Confidentiality Agreement shall continue in full force and effect in accordance with its terms.

Section 6.04.    Regulatory Approvals.

(a)    Each of Buyer and the Seller Parties shall take any and all steps to make all required filings and promptly obtain all Consents, Permits (including Environmental Permits) and Orders of all Government Authorities (other than any required approvals or action of the Bankruptcy Court, which are governed exclusively by Article VIII) that may be, or become, necessary for the execution and delivery of, and performance of its obligations pursuant to, the Transaction Agreements (including the consummation of the Transactions) (collectively, the "**Government Approvals**").

(b)    Without limiting the generality of the obligations under Section 6.04(a), to the extent required, each of the Parties shall make all filings required pursuant to applicable Antitrust Laws, with respect to the Transactions within ten (10) Business Days of the Agreement Date, unless otherwise extended by mutual agreement between the Seller Parties and Buyer.  Buyer shall, and shall cause its Affiliates to, take any and all necessary steps to resolve as soon as reasonably practicable any inquiry or investigation by any Government Authority relating to the Transactions under any Antitrust Law.  In connection with any such inquiry or investigation and in furtherance of its obligations under Section 6.04(f), Buyer further agrees to supply as promptly as reasonably practicable any additional information and documentary material that may be

40

requested or required pursuant to applicable Law, including any Antitrust Law. Neither Buyer nor the Seller Parties shall, without the consent of the other Parties, enter into any agreements that, pursuant to applicable Antitrust Laws, would require such Party not to consummate the Transactions. All filings fees related to any filings under any other Antitrust Laws shall be borne by Buyer.

(c)     Notwithstanding any other provision in this Agreement, Buyer shall, and shall cause its Affiliates to, promptly take and diligently pursue any and all actions to the extent necessary to eliminate each and every impediment under any Antitrust Law that may be asserted by any Government Authority or any other Person in opposition to the consummation of any of the Transactions, so as to enable the Parties to consummate the Transactions as soon as reasonably practicable, but in any event not later than the Outside Date. In furtherance of this obligation, and without limitation, Buyer shall, and shall cause its Affiliates to: (i) offer, negotiate, effect, and agree to, by consent decree, hold separate order or otherwise, any sale, divestiture, license, or other disposition of or restriction on, any of the Transferred Assets, Assets, Transferred Entities or Buyer's assets; provided, however, that any such sale, divestiture, license, disposition, restriction on, holding separate, or other similar arrangement or action on the Transferred Entities is conditioned on the occurrence of, and shall become effective only from and after, the Closing Date; and (ii) to take any and all actions to avoid and, if necessary, defend any threatened or initiated litigation under any Antitrust Law that would prevent or delay consummation of the Transactions.

(d)     Notwithstanding any other provision in this Agreement, Buyer shall, and shall cause its Affiliates to, promptly take and diligently pursue any or all actions (including such actions set forth in Sections 6.04(b) and 6.04(c)) to the extent necessary to eliminate each and every impediment under the International Traffic in Arms Regulations that may be asserted by any Government Authority or any other Person in opposition to the consummation of any of the Transactions, including applying for export licenses and submitting notifications as required by applicable Laws and regulations, so as to enable the Parties to consummate the Transactions as soon as reasonably practicable, but in any event not later than the Outside Date.

(e)     Each Party shall promptly notify the other Party of any material oral or written communication it or any of its Representatives receives from any Government Authority relating to the matters that are the subject of this Section 6.04, permit the other Party and its respective Representatives to review in advance any material communication relating to the matters that are the subject of this Section 6.04 proposed to be made by such Party to any Government Authority and provide the other Parties with copies of all material substantive correspondence, filings or other communications between them or any of their Representatives, on the one hand, and any Government Authority or members of its staff, on the other hand, relating to the matters that are the subject of this Section 6.04, provided, however, that materials proposed to be submitted in response to any such Government Authority communication may be redacted: (i) to remove references concerning the valuation of the Business; (ii) as necessary to comply with Contractual arrangements, applicable Law or by Order of the Bankruptcy Court; and (iii) as necessary to address reasonable attorney-client or other privilege or confidentiality concerns to the extent not governed by a common interest privilege or doctrine. No Party shall agree to participate in any meeting or discussion with any Government Authority in respect of any such filings, investigation or other inquiry unless it consults with the other Party in advance and, to the extent

41

permitted by such Government Authority, gives the other Party the opportunity to attend and participate at such meeting. Subject to the Confidentiality Agreement, the Parties will coordinate and cooperate fully with each other in exchanging such information and providing such assistance as the other Party may reasonably request in connection with the foregoing and in seeking early termination of any applicable waiting periods. The Parties shall share the right to control and direct the process by which the Parties seek to avoid or eliminate impediments under any antitrust, competition, trade regulation or foreign investment regulation Law, including by directing the strategy and making final determinations related to the review or investigation of the Transactions by any Government Authority and attending all meetings, discussions, and communications with any Government Authority except to the extent that such Government Authority may request to communicate exclusively with one Party. Nothing in this <u>Section 6.04(e)</u> shall be applicable to Tax matters.

(f)    Buyer shall not, and shall not permit any of its Affiliates to, take any action (including acquiring or agreeing to acquire by merging or consolidating with, or by purchasing the assets of or equity in, or by any other manner, any Person or portion thereof, or otherwise acquiring or agreeing to acquire any assets) that would reasonably be expected to have the effect of (i) delaying, impairing or impeding the receipt of, or increasing the risk of not receiving, any required Government Approval, (ii) delaying, impairing or impeding the expiration or termination of any applicable waiting period with respect to a Government Approval (and shall not, without the consent of the Seller Parties, withdraw or refile any filing or restart the waiting period on any Government Authority's review, or enter into a timing agreement with a Government Authority), (iii) increasing the risk of any Government Authority entering an Order prohibiting the consummation of the Transactions or (iv) otherwise materially delaying the consummation of the Transactions.

(g)    Actions or agreements required of Buyer pursuant to this <u>Section 6.04</u> shall under no circumstances be considered a Material Adverse Effect.

Section 6.05.    <u>Third Party Consents</u>. Each Party agrees to cooperate to obtain any other Consents from any third person other than a Government Authority that may be required in connection with the Transactions, including any Consents contemplated by <u>Section 2.03</u> (the "**Third Party Consents**"). Notwithstanding anything in this Agreement to the contrary, no Seller Party or any of its Affiliates shall be required to compensate any third party, commence or participate in any Action or offer or grant any accommodation (financial or otherwise, including any accommodation or arrangement to remain primarily, secondarily or contingently liable for any Assumed Liability) to any third party to obtain any such Third Party Consent. For the avoidance of doubt, no representation, warranty or covenant of the Seller Parties contained in the Transaction Agreements shall be breached or deemed breached, and no condition shall be deemed not satisfied, based on (a) the failure to obtain any Third Party Consents or (b) any Action commenced or threatened by or on behalf of any Person arising out of or relating to the failure to obtain any such Third Party Consents.

Section 6.06.    <u>Intercompany Obligations</u>. The Seller Parties shall take or cause to be taken such action and make or cause to be made such payments as may be necessary so that, as of the Closing Date, there shall be no intercompany obligations (other than (a) pursuant to the Transaction Agreements or (b) as set forth on <u>Schedule 6.06</u>) between the Transferred Entities, on

42

the one hand, and the Seller Parties (other than the Transferred Entities), on the other hand. Nothing in this Section 6.06 shall require the Seller Parties to terminate or cancel any intercompany obligations exclusively (i) between or among the Transferred Entities or (ii) between and among the Seller Parties.

Section 6.07.    Cooperation.  During the Pre-Closing Period, (a) the Seller Parties and Buyer shall, and shall cause their respective Affiliates to, (i) refrain from taking any actions that would reasonably be expected to impair, delay or impede the Closing and (ii) without limiting the foregoing, use reasonable best efforts to cause all Closing Conditions of the other Party to be met as promptly as practicable and in any event on or before the Outside Date and (b) each Party shall keep the other Party reasonably apprised of the status of the matters relating to the completion of the Transactions, including with respect to the negotiations relating to the satisfaction of the Closing Conditions of the other Party.

Section 6.08.    Bulk Transfer Laws.  The Parties intend that pursuant to Section 363(f) of the Bankruptcy Code, the transfer of the Transferred Assets shall be free and clear of any security interests in the Transferred Assets, including any Liens or claims arising out of the bulk transfer Laws, and the Parties shall take such steps as may be reasonably necessary or appropriate to so provide in the Sale Order.  In furtherance of the foregoing, each Party hereby waives, to the fullest extent permitted by applicable Law, compliance by the Parties with the "bulk sales," "bulk transfers" or similar Laws in all applicable jurisdictions in respect of the Transactions.  This Section 6.08 shall not affect any obligation of the Seller Parties with respect to Excluded Liabilities or Excluded Assets.

Section 6.09.    Employee Matters.

(a)    Employment of All Covered Employees.  Within three (3) Business Days following the Agreement Date, Seller shall provide Buyer with a written list of all employees engaged in the Business (the "**Definitive Employee List**"), which list may be updated from time to time to reflect any new employees hired in accordance with this Agreement.  All Covered Employees shall (i) become employees of Buyer or an Affiliate of Buyer by operation of Law if such Covered Employees are employed in a country in which TUPE applies and are entitled to transfer to Buyer or its Affiliates pursuant to TUPE, or (ii) be offered employment by Buyer or an Affiliate of Buyer within forty-five (45) days after the Agreement Date, in each case, such employment to be effective as of the Closing Date; provided, that, with respect to Covered Employees who are on an approved leave of absence that is not disability leave, maternity leave, paternity leave or medical leave, such employment shall be effective on such date as such Covered Employee presents himself or herself to Buyer or an Affiliate of Buyer for active employment.  Except as provided in the preceding sentence, each offer of employment made by Buyer or an Affiliate of Buyer to a Covered Employee, as applicable, shall be effective as of the Closing Date.  For purposes of this Section 6.09, any individual who becomes employed by Buyer or an Affiliate of Buyer (including the Transferred Entities) either by operation of Law pursuant to clause (i) above, unless such individual objects to becoming employed by Buyer or its Affiliates pursuant to TUPE, or by accepting an offer of employment pursuant to clause (ii) above, in either case, who actually commences employment with Buyer or an Affiliate of Buyer as of or after the Closing Date (including those on disability leave, maternity leave, paternity leave or other medical lease) is referred to as a "**Transferred Employee**"; provided, that, to the extent that any such individual

43

commences employment with Buyer or an Affiliate of Buyer after the Closing Date, such individual shall not be considered a Transferred Employee until the actual commencement of such individual's employment.

(b)    <u>Employees and Employee Plans</u>.

(i)    <u>Liabilities</u>.  Effective as of the Closing, Buyer shall, or shall cause an Affiliate (including the Transferred Entities) to, assume or retain, as the case may be, any and all Liabilities relating to, arising out of, or resulting from the employment or services, or termination of employment or services, of any Transferred Employee, whether arising on or after the Closing Date, and, to the extent such Liabilities are listed on <u>Schedule 6.09(b)(i)</u>, arising prior to the Closing Date.  The Seller Parties and the Servicing Entities shall retain any and all Liabilities relating to, arising out of, or resulting from the employment or services, or termination of employment or services, of any Transferred Employee or Covered Employee arising prior to the Closing Date, except to the extent as listed on <u>Schedule 6.09(b)(i)</u>.

(ii)    <u>Employee Plans</u>.  Effective as of the Closing, the Seller Parties and the Servicing Entities shall transfer (or cause to be transferred) and Buyer shall, or shall cause an Affiliate to, assume each Assumed Employee Plan and all Liabilities arising thereunder shall be Assumed Liabilities.  The Seller Parties and the Servicing Entities shall retain each Employee Plan that is not an Assumed Employee Plan and all Liabilities arising thereunder shall be Excluded Liabilities. Without derogating from the Seller Parties' and Buyer's obligations under this <u>Section 6.09</u>, Buyer and the Seller Parties may reasonably agree to add or remove any Employee Plans from <u>Schedule 6.09(b)(ii)</u> at any time prior to the date that is two (2) Business Days prior to the Closing Date.

(c)    <u>Transferred Employees – Additional Employment Terms</u>.

(i)    <u>Terms and Conditions of Employment</u>.  For a period of at least twelve (12) months following the Closing Date, (A) each Transferred Employee who becomes an employee of Buyer or an Affiliate of Buyer by operation of Law in a country in which TUPE applies shall be entitled to receive, while in the employ of Buyer or its Affiliates, compensation, employee benefits, severance entitlements and other terms and conditions of employment that are no less favorable than those that were provided to each such Transferred Employee immediately prior to the Closing Date by the Seller Parties or the Transferred Entities consistent with the requirements of TUPE and (B) each Transferred Employee, other than any Transferred Employee described in clause (A), shall be entitled to receive, while in the employ of Buyer or its Affiliates, compensation, employee benefits and severance entitlements and benefits that are no less favorable in the aggregate than that provided to each such Transferred Employee immediately prior to the Closing Date by the Seller Parties, the Servicing Entities or the Transferred Entities; <u>provided</u>, that nothing in this <u>Section 6.09</u> shall be interpreted as interfering with the right of Buyer or its applicable Affiliate to terminate the employment of any Transferred Employee to the extent such termination complies with the requirements of applicable Laws.

44

(ii)     <u>Credit for Service</u>.  Buyer shall, and shall cause its Affiliates to, credit Transferred Employees for service earned on and prior to the Closing Date with the Seller Parties, the Servicing Entities and any of their respective Affiliates (including the Transferred Entities) or predecessors, (i) to the extent that service is relevant for purposes of eligibility, vesting, paid-leave entitlement or the calculation of benefits under any employee benefit plan, program or arrangement of Buyer or any of its Affiliates for the benefit of the Transferred Employees on or after the Closing Date to the same extent and for the same purpose as such service was credited to such Transferred Employee under the applicable Employee Plan as of the Closing and (ii) for such additional purposes as may be required by applicable Law; <u>provided</u>, <u>however</u>, that nothing herein shall result in a duplication of benefits with respect to the Transferred Employees.

(iii)     <u>Pre-existing Conditions; Coordination</u>.  Buyer shall, and shall cause its Affiliates to, use commercially reasonable efforts to waive any pre-existing condition or actively at work limitations, evidence of insurability and waiting periods for the Transferred Employees and their eligible spouses and dependents under any group health plan of Buyer or any of its Affiliates for the benefit of the Transferred Employees on or after the Closing Date to the same extent waived for such person under the corresponding Employee Plan as of the Closing Date.  Buyer shall, and shall cause its Affiliates to, use commercially reasonable efforts to credit for purposes of determining and satisfying annual deductibles, co-insurance, co-pays, out-of-pocket limits and other applicable limits under the comparable health plans and arrangements offered to Transferred Employees, deductibles, co-insurance, co-pays and out-of-pocket expenses paid by Transferred Employees and their respective spouses and dependents under the Seller Parties, the Servicing Entities or any of their respective Affiliates' health plans in the plan year in which the Closing Date occurs, but only to the extent the Seller Parties or the Transferred Entities use commercially reasonable efforts to provide the relevant data to Buyer or its Affiliate in a reasonably usable form and in a manner that complies with applicable Law.

(d)     <u>Consultation with Employee Representative Bodies</u>.  The Parties shall, and shall cause their respective Affiliates to, mutually cooperate in undertaking all reasonably necessary or legally required provision of information to, or consultations, discussions or negotiations with, employee representative bodies (including any works councils) and/or elected employee representatives that represent Covered Employees and otherwise, with the Covered Employees directly, including but not limited to under TUPE, as described on <u>Schedule 4.13(h)(i)</u>.

(e)     <u>No Third Party Beneficiaries</u>.  Notwithstanding the provisions of this <u>Section 6.09</u> or any provision of the Agreement, nothing in this <u>Section 6.09</u> or the Agreement is intended to and shall not (i) create any third party rights, (ii) amend any Employee Plan or other employee benefit plan, program, policy or arrangement, (iii) require Buyer or any of its Affiliates or any Seller Party, Servicing Entity or any of their respective Affiliates to continue any employee benefit plan, program, policy or arrangement beyond the time when it otherwise lawfully could be terminated or modified or as otherwise required herein or (iv) provide any Covered Employee or any Transferred Employee with any rights to continued employment.

Section 6.10.    Aircraft Matters.

(a)    Risk of Loss.  As between the Seller Parties, on the one hand, and Buyer, on the other hand, all risk of loss of or damage to each Aircraft shall pass from the Seller Parties to Buyer or the applicable Buyer Nominee upon the execution and delivery of the Aircraft Bill of Sale for such Aircraft.

(b)    No Physical Delivery.  Buyer acknowledges that following the transfer of title to each Aircraft that is subject to an Aircraft Lease, such Aircraft will remain in the possession of the relevant Aircraft Lessee and no Seller Party shall be required to effect physical delivery of such Aircraft to Buyer; provided, however, that, at Closing, the applicable Seller Parties shall deliver to Buyer physical possession of each AOG Aircraft at the location thereof as set forth on Schedule 4.19(a).

(c)    Cape Town Convention Filings; Etc.  To the extent applicable, the Seller Parties and Buyer agree that they shall register the sale of each Aircraft to Buyer or the applicable Buyer Nominee as a sale (as defined in the Cape Town Convention) and each Lease Novation at the International Registry established pursuant to the Cape Town Convention (the "**International Registry**") (subject to the cooperation of any Aircraft Lessee or other third party where such cooperation is required).  In addition, the Seller Parties and Buyer agree that they shall register the sale of each Aircraft to Buyer or the applicable Buyer Nominee and each Lease Novation with any Government Authority as is reasonably necessary in order to effect such sale (subject to the cooperation of any Aircraft Lessee or other third party where such cooperation is required).  All such registrations shall be initiated by counsel (such counsel to be agreed in advance of the Closing Date by the Seller Parent and Buyer) on the Closing Date immediately following the Closing.  No prospective sale or prospective international interest (each as defined the Cape Town Convention) shall be registered with the International Registry or be permitted in respect of any Aircraft or Lease Novation by Buyer or any related entity.

(d)    Lease Novations.  On or prior to the Closing Date, Buyer or the applicable Buyer Nominee on the one hand, and the applicable Seller Party, on the other hand, shall (i) enter into, for each Aircraft subject to an Aircraft Lease, a Lease Novation with respect to such Aircraft Lease and (ii) to the extent that the consent of the applicable Aircraft Lessee is required under the terms of such Aircraft Lease to effect a transfer to Buyer or the applicable Buyer Nominee of such Aircraft Lease, use commercially reasonable efforts to obtain the consent of the applicable Aircraft Lessee (unless the requirement for a Lease Novation or the consent of such Aircraft Lessee is superseded by the Bankruptcy Code or any Order and is effective with respect to such Aircraft Lessee).  In addition, on or prior to the Closing Date, Buyer or the applicable Buyer Nominee on the one hand, and the applicable Seller Party, on the other hand, shall (x) enter into a novation agreement or assignment and assumption agreement with respect to each Related Aircraft Document for each Aircraft subject to an Aircraft Lease and (y) to the extent the consent of a third party is required under the terms of such Related Aircraft Document to effect a transfer to Buyer or the applicable Buyer Nominee, use commercially reasonable efforts to obtain the consent of such third party (unless the requirement for a novation agreement or assignment and assumption agreement or the consent of such third party is superseded by the Bankruptcy Code or any Order and is effective with respect to such third party). This Section 6.10(d) shall not apply to any Aircraft that are part of a Sellable Aircraft WAC Group sold by the Seller Parties pursuant to

46

Section 6.11 or to any other Aircraft sold by a Seller Party prior to the Closing Date pursuant to Section 6.01.

(e)    Letters of Credit.  If any letter of credit used for the account of an Aircraft Lessee in lieu of a security deposit (*i.e.*, a "non-Cash" security or similar deposit contemplated by Section 2.02(a)(v)) under the applicable Aircraft Lease is not transferrable by its terms to Buyer or the applicable Buyer Nominee as the new lessor under such Aircraft Lease, the Seller Parties shall use commercially reasonable efforts to cause a replacement letter of credit for the benefit of Buyer or the applicable Buyer Nominee to be issued with effect at Closing.  From and after the Closing until such time as such letter of credit is replaced and enforceable by Buyer, for six (6) months following the Closing Date, the Seller Parties shall use commercially reasonable efforts to enforce existing letters of credit with respect to the applicable Transferred Assets to the extent permitted by the terms of such letters of credit and the applicable Aircraft Lease, when and if requested by Buyer.

Section 6.11.    Sellable Aircraft.

(a)    Subject to Section 6.01, other than with respect to the Closing, the Seller Parties shall not, and shall not permit any of their Affiliates to, sell, transfer or otherwise dispose of any interest in any Aircraft, except, subject to the terms of this Section 6.11, pursuant to a sale of any Aircraft WAC Group (each such Aircraft WAC Group, a "**Sellable Aircraft WAC Group**"), directly or indirectly through the sale of the equity of the entity that owns the Aircraft within the Aircraft WAC Group, to the respective WAC Facility Agent that has a perfected security interest in such Sellable Aircraft WAC Group securing the applicable WAC Facility in exchange for such WAC Facility Agent's highest and best credit bid of bona fide debt obligations of Debtors under such WAC Facility submitted on or prior to the Credit Bid Due Date or the Participating Lender Credit Bid Due Date, as applicable, in each case, in accordance with the Sale Procedures Order.  No later than 9:00 a.m. New York City Time on the date that is immediately following the date upon which the Seller Parties received any such credit bids, the Seller Parties shall provide Buyer notice thereof.  Thereafter, until the date that is seven (7) days following the date of such notice, the Buyer shall have the right to match any such credit bid (and the Base Purchase Price would be increased by the increased amounts caused by such a match and the Aircraft that secure such WAC Facility would remain in the Buyer Transactions, all in accordance with the Sale Procedures Order.

(b)    No later than 9:00 a.m. New York City Time on the first (1st) day following Buyer's receipt of notice from the Seller Parent that, as applicable: (i) no qualified bids were submitted on or prior to the Third Party Bid Due Date or (B) the closing of the Auction has occurred and Buyer is the highest or best bid or the back-up bidder, then Buyer shall deliver to the Seller Parties a letter (the "**Allocation Letter**") setting forth Buyer's good faith allocation of the Base Purchase Price (subject to adjustments as provided for in this Agreement) (delineated in percentages) among each of the Sellable Aircraft WAC Groups.  Following receipt thereof, the Seller Parties shall disclose such Allocation Letter to the WAC Facility Agents and the lenders of each of the WAC Facilities.

(c)    Upon consummation of the sale or disposition, directly or indirectly, of any Sellable Aircraft WAC Group (or, at Closing, if any Seller Party enters into definitive documents

47

providing for the sale of any Sellable Aircraft WAC Group the consummation of which shall occur after the Closing) to any other Person (other than Buyer), the Base Purchase Price shall be automatically reduced by the portion of the Base Purchase Price allocated to such Aircraft WAC Group as set forth in the Allocation Letter (the "**Sale Amount**"), in which case, all assets of the Seller Parties that are directly related to such Sellable Aircraft WAC Group shall be Excluded Assets effective as of the date of the sale of such Sellable Aircraft WAC Group.

(d)    Notwithstanding anything to the contrary in this Section 6.11, to the extent that any Aircraft within a Sellable Aircraft WAC Group is sold by any Seller Party pursuant to a credit bid in a manner inconsistent with Section 6.01 or this Section 6.11, then, Buyer may, at its option, upon written notice to the Seller Party, designate all of the remaining Aircraft within such Sellable Aircraft WAC Group and all assets of the Seller Parties that are directly related to such Sellable Aircraft WAC Group as Excluded Assets hereunder and the Base Purchase Price shall automatically be reduced by the Sale Amount for such Sellable Aircraft WAC Group.

(e)    Nothing in this Section 6.11 or elsewhere in this Agreement shall prohibit the Seller Parties from leasing or releasing Aircraft in the ordinary course of business prior to the Closing.

Section 6.12.    Third Party Amendment.    From the Agreement Date to the Closing, the Parties shall cooperate in good faith to negotiate the Third Party Amendment.

Section 6.13.    Protections for Payment of Buyer Protections.    Both (a) the interim and final Orders approving any debtor-in-possession financing facility and (b) the Sale Procedures Order will provide that, notwithstanding any other terms of the agreements and Orders relating to such debtor-in-possession financing facilities, the Break-Up Fee and the Expense Reimbursement will be paid by the Seller Parties and their bankruptcy estates when due and, as applicable, the Break-Up Fee and the Expense Reimbursement will be paid from the sources (i.e., the Break-Up Fee and the Expense Reimbursement are payable as the initial uses of the proceeds obtained from any consummated sale transaction) and at the times specified in this Agreement.    The exact wording of such provisions must be reasonably acceptable to both the Seller Parties and Buyer.

## ARTICLE VII

## POST-CLOSING COVENANTS

Section 7.01.    Access.

(a)    From and after the Closing Date for a period of three (3) years, in connection with any reasonable business purpose, including the preparation or amendment of Tax Returns, claims or obligations relating to Excluded Liabilities, financial statements, or the determination of any matter relating to the rights or obligations of the Seller Parties or any of their Affiliates under any Transaction Agreement, or as is necessary to administer, or satisfy their obligations in connection with, the Bankruptcy Cases, upon reasonable prior notice, and except to the extent necessary to (i) ensure compliance with any applicable Law or an order of the Bankruptcy Court, (ii) preserve any applicable privilege (including the attorney-client privilege) or (iii) comply with any Contractual confidentiality obligations, Buyer shall, and shall cause each of the Transferred

48

Entities, their respective Affiliates and their respective Representatives to (A) afford each Seller Party and its Representatives and their respective Affiliates reasonable access, during normal business hours, to the properties, books and records of Buyer and its Affiliates in respect of any of the Transferred Entities and the Business, the Transferred Assets and the Assumed Liabilities with respect to periods or occurrences prior to the Closing Date, and (B) make reasonably available, during normal business hours and upon reasonable advance notice, to each Seller Party and its Representatives or their respective Affiliates those employees of Buyer or its Affiliates whose assistance, expertise, testimony, notes or recollections or presence may be necessary to assist such Seller Party or its Representatives or their respective Affiliates in connection with its inquiries for any purpose referred to above; provided, however, that such investigation shall not unreasonably interfere with the business or operations of Buyer or any of its Affiliates; and provided further, that the auditors and accountants of Buyer or its Affiliates shall not be obligated to make any work papers available to any Person except in accordance with such auditors' and accountants' normal disclosure procedures and then only after such Person has signed a customary agreement relating to such access to work papers in form and substance reasonably acceptable to such auditors or accountants.  Notwithstanding anything to the contrary herein, the Seller Parties shall have reasonable access to the Transferred Books and Records as is necessary to administer the Bankruptcy Cases and the Seller Parties may retain copies of such Transferred Books and Records, as necessary or appropriate in connection with such purpose.  Notwithstanding the foregoing, Buyer acknowledges that for any Aircraft that is subject to an Aircraft Lease, the ability of the Seller Parties to afford Buyer access to the Aircraft shall be subject to the terms of such Aircraft Lease.

(b)     If so requested by Buyer, on the one hand, or any of the Seller Parties, on the other hand, the Seller Parties or one of their Affiliates, or Buyer or one of its Affiliates, as the case may be, shall enter into a customary joint defense agreement or common interest agreement with Buyer and its Affiliates, or the Seller Parent and its Affiliates, as applicable, with respect to any information to be provided to the Seller Parties or their Affiliates pursuant to Section 7.01(a).

Section 7.02.     Directors' and Officers' Indemnification and Exculpation.

(a)     Buyer agrees that all rights of the individuals who on or prior to the Closing Date were directors, officers, managers or employees (in all of their capacities) of the Transferred Entities (collectively, the "**D&O Indemnified Parties**") to indemnification and exculpation from liabilities for acts or omissions occurring at or prior to the Closing Date as provided in the certificate of incorporation, bylaws, or comparable organizational documents of the Transferred Entities, as applicable, as now in effect, and any indemnification agreement set forth on Schedule 7.02(a), as now in effect by and between a D&O Indemnified Party and a Transferred Entity, shall survive the Closing Date and shall continue in full force and effect against the applicable Transferred Entity in accordance with the terms of such agreement. Such rights shall not be amended or otherwise modified in any manner that would adversely affect the rights of the D&O Indemnified Parties, unless such modification is required by Law.

(b)     The provisions of this Section 7.02 are intended to be for the benefit of and shall be enforceable by, each D&O Indemnified Party, his or her successors and heirs and his or her legal representatives and are in addition to, and not in substitution for, any other rights to indemnification or contribution that any such person may have by Contract or otherwise.  The

WEIL:\96809416\18\79984.0003

obligations of Buyer under this Section 7.02 shall not be amended, terminated or modified in such a manner as to adversely affect any D&O Indemnified Party (including such Person's successors, heirs and legal representatives) to whom this Section 7.02 applies without the written consent of the affected D&O Indemnified Party (it being expressly agreed that the D&O Indemnified Parties to whom this Section 7.02 applies shall be third-party beneficiaries of this Section 7.02), and this Section 7.02 shall be enforceable by such D&O Indemnified Parties and their respective successors, heirs and legal representatives and shall be binding on all successors and assigns of Buyer and each Transferred Entity.

Section 7.03.    Preservation of Books and Records.    The Seller Parties and their Affiliates shall have the right to retain copies of all books and records of the Business relating to periods ending on or before the Closing Date.  Buyer agrees that it shall preserve and keep all original books and records in respect of the Business in the possession or control of Buyer or its Affiliates for the a period of three (3) years from the Closing Date.  After such three (3) year period before Buyer or any Affiliate shall dispose of any of such books and records, Buyer shall give at least thirty (30) days' prior written notice to the Seller Parent of its such intention to dispose such books and records, and the Seller Parent, and/or any of its respective Affiliates shall be given an opportunity, at their cost and expense, to remove and retain all or any part of such books and records as it or they may elect.

Section 7.04.    Further Assurances.

(a)    From time to time following the Closing, the Parties shall, and shall cause their respective Affiliates to, execute, acknowledge and deliver all reasonable further conveyances, notices, assumptions, releases and acquittances and such instruments, and shall take such reasonable actions as may be necessary or appropriate to make effective the Transactions as may be reasonably requested by the other Party (including (a) transferring back to the applicable Seller Party or its designees each Excluded Asset and any asset or Liability not contemplated by this Agreement to be a Transferred Asset or an Assumed Liability, respectively, which asset or Liability was transferred to Buyer at the Closing and (b) transferring to Buyer (and having Buyer assume) any asset or Liability contemplated by this Agreement to be a Transferred Asset or an Assumed Liability, respectively, which was not transferred to Buyer at the Closing); provided, however, that except for Buyer's obligations to discharge an Assumed Liability, nothing in this Section 7.04 shall require any Party or its Affiliates to pay money to, commence or participate in any Action with respect to, or offer or grant any accommodation (financial or otherwise) to, any third party following the Closing.

(b)    In furtherance of the foregoing, if any Seller Party receives any payment related to any Transferred Asset after the Closing, such Seller Party agrees to promptly remit (or cause to be promptly remitted) such funds to Buyer to the extent related to such Transferred Asset, and Buyer shall reimburse such Seller Party for its reasonable expenses incurred in connection therewith. If Buyer or any Affiliate of Buyer (including, for the avoidance of doubt, the Transferred Entities) receives any payment related to any Excluded Asset after the Closing, Buyer agrees to promptly remit (or cause to be promptly remitted) such funds to the Seller Parent (on behalf of itself and the other Seller Parties) to the extent related to such Excluded Asset, and the Seller Parties shall reimburse Buyer for its reasonable expenses incurred in connection therewith.

50

(c)    Following the Closing, upon the written request of Buyer, the Seller Parties shall, and shall cause their respective Affiliates to, use commercially reasonable efforts to (i) provide to Buyer and its Affiliates access to and information with respect to all occurrence-based liability insurance policies that are not Transferred Insurance Policies that have provided coverage to any of the Transferred Assets, the Transferred Entities or the Business prior to the Closing (which, for the avoidance of doubt, shall not include any Excluded Assets set forth on Schedule 2.02(b)(xviii)) and (ii) to the extent any claims that are Transferred Assets are asserted following the Closing out of the operations of the Transferred Assets, the Transferred Entities and the Business prior to Closing, cooperate with Buyer and its Affiliates in any of their efforts to avail themselves of coverage under any such applicable insurance policies with respect to such claims to the extent permitted by and subject to the terms and limitations of such policies (it being understood that such efforts shall, in each case, be at the sole expense of Buyer and do not include commencement or prosecution of litigation by the Seller Parties or any of their Affiliates against an insurer or any other Person).  If any such claim is asserted after Closing, Buyer or its Affiliates shall be responsible to pay all deductibles, self-retention amounts or other costs or expenses as required under the applicable insurance policies (and neither the Seller Parties nor any of their Affiliates shall have any obligation to repay or reimburse Buyer for the same).  In the event the Seller Parties receive insurance proceeds in respect of any such claims made under this Section 7.04(c), it shall promptly remit such proceeds to Buyer.  In the event of any such claim, Buyer shall (and shall cause the Transferred Entities to) (i) to the extent assignable and permitted under the applicable insurance policy, assign or cause to be assigned to the Seller Parties or the applicable insurer or (ii) to the extent not so assignable and permitted, pursue or cause the Transferred Entities to pursue claims and other rights of recovery against third parties with respect to the matter for which a claim is made, and shall cooperate with the Seller Parties with respect to the pursuit of such rights.  The order of priority of any such recoveries shall inure first to the Seller Parties to reimburse any and all costs incurred by the Seller Parties or any of their Affiliates, directly or indirectly, as a result of such claims or losses.  Notwithstanding anything in this Agreement to the contrary, Buyer acknowledges that the Seller Parties retain exclusive control over all such insurance policies, including the right to exhaust, lapse, renew, alter, amend, settle, release, waive, commute, buy back or otherwise modify any of such insurance policies, notwithstanding any actual or potential impact such actions have or could have on the coverage and rights provided under this Section 7.04(c).  This Agreement shall not be considered as an attempted assignment of any such policy, and nothing in this Agreement is intended to waive or abrogate in any way the Seller Parties' own rights to insurance coverage for any liability, whether relating to the Seller Parties or any of their respective Affiliates, any Transferred Asset, Transferred Entity or otherwise.

(d)    Following the Closing, upon the written request of the Seller Parties, Buyer shall, and shall cause its Affiliates to, use commercially reasonable efforts to (i) provide to the Seller Parties and their Affiliates access to and information with respect to all occurrence-based liability insurance policies that are Transferred Insurance Policies that have provided coverage to any of the Excluded Assets or Excluded Liabilities prior to the Closing and (ii) to the extent any claims that are Excluded Assets or that cover Excluded Liabilities are asserted that arise out of the operations of the Business or the Excluded Assets prior to Closing, cooperate with the Seller Parties and their Affiliates in any of their efforts to avail themselves of coverage under any such applicable insurance policies with respect to such claims to the extent permitted by and subject to the terms and limitations of such policies (it being understood that such efforts shall, in each case, be at the sole expense of the Seller Parties and do not include commencement or prosecution of

51

litigation by Buyer or any Affiliate against an insurer or any other Person). If any such claim is asserted after Closing, the Seller Parties or their respective Affiliates shall be responsible to pay all deductibles, self-retention amounts or other costs or expenses as required under the applicable insurance policies (and neither Buyer nor any of its Affiliates shall have any obligation to repay or reimburse the Seller Parties for the same). In the event Buyer receives insurance proceeds in respect of any such claims made under this Section 7.04(d), it shall promptly remit such proceeds to the Seller Parties. In the event of any such claim, the applicable Seller Party shall (and shall cause its controlled Affiliates to) (i) to the extent assignable and permitted under the applicable insurance policy, assign or cause to be assigned to Buyer or the applicable insurer or (ii) to the extent not so assignable and permitted, pursue or cause its controlled Affiliates to pursue claims and other rights of recovery against third parties with respect to the matter for which a claim is made, and shall cooperate with Buyer with respect to the pursuit of such rights. The order of priority of any such recoveries shall inure first to Buyer to reimburse any and all costs incurred by Buyer or any of its Affiliates, directly or indirectly, as a result of such claims or losses. Notwithstanding anything in this Agreement to the contrary, the Seller Parties acknowledge that Buyer retains exclusive control over all such insurance policies, including the right to exhaust, lapse, renew, alter, amend, settle, release, waive, commute, buy back or otherwise modify any of such insurance policies, notwithstanding any actual or potential impact such actions have or could have on the coverage and rights provided under this Section 7.04(d). This Agreement shall not be considered as an attempted assignment of any such policy, and nothing in this Agreement is intended to waive or abrogate in any way Buyer's own rights to insurance coverage for any liability, whether relating to Buyer or any of its Affiliates or the Seller Parties or any of their respective Affiliates.

Section 7.05.    License to Business Names and Business Marks.

(a)    Effective as of the Closing Date, Buyer hereby grants to the Seller Parties and their Affiliates a royalty-free, fully paid-up, irrevocable, worldwide, non-sublicensable, non-transferable, non-exclusive license, for a period not to exceed nine (9) months from the Closing Date, to use and display the Business Names and Business Marks solely in connection with the winding down and cessation of Seller Parties' and their Affiliates' business and operations, including to sell or otherwise dispose of any Excluded Assets containing or referencing the Business Names and Business Marks. The foregoing license will expire nine (9) months from the Closing Date, at which time the Seller Parties and their Affiliates shall not be required to de-identify any Excluded Assets or alter the corporate entity names of any of the Seller Parties that bear the Business Names and Business Marks but shall otherwise cease and discontinue all other use of the Business Names and Business Marks.

(b)    Except as expressly provided in this Section 7.05, no other right to the Business Names and Business Marks is granted by Buyer to the Seller Parties and their Affiliates, whether by implication or otherwise, and nothing hereunder permits the Seller Parties and their Affiliates to register or seek to register any of the Business Names and Business Marks in any jurisdiction. Any and all goodwill generated by the use of the Business Names and Business Marks, including under this Section 7.05, shall inure solely to the benefit of Buyer. The Seller Parties and their Affiliates shall use the Business Name and Business Marks in a substantially similar manner

52

and form as used by the Seller Parties and their Affiliates during the one (1)-year period prior to the Closing Date.

## ARTICLE VIII

## BANKRUPTCY PROVISIONS

Section 8.01.    Approval of Break-Up Fee and Expense Reimbursement.

(a)    Break Up Fees and Expense Reimbursement.  In consideration for Buyer having expended considerable time and expense in connection with this Agreement and the negotiation thereof and the identification and quantification of assets of the Seller Parties, the Seller Parties shall pay Buyer, in accordance with the terms hereof (including this Article VIII) and the Sale Procedures Order, (a) a break-up fee in an amount equal to either $19,500,000 (the "**Break-Up Fee**") or $10,000,000 (the "**Aircraft Condition Fee**"), as applicable, plus (b) an aggregate amount of up to $3,000,000 for all of the actual, documented and reasonable out of pocket costs, fees and expenses (as delineated in invoice(s) sent by Buyer to the Seller Parties in accordance with Section 12.03) that are incurred or to be incurred by Buyer or its Affiliates, including reasonable out of pocket travel expenses and any fees, costs and expenses of any professionals (including financial advisors, outside legal counsel, accountants, experts and consultants) retained by Buyer or its Affiliates, in connection with or related to the authorization, preparation, investigation, negotiation, enforcement, execution, implementation and performance of this Agreement, the Buyer Transactions, the Plan of Reorganization, the Equity Sale Transaction and the Bankruptcy Cases and other judicial and regulatory proceedings related to such transactions, (such costs, fees and expenses, the "**Expense Reimbursement**").  Each of the Parties acknowledges and agrees that the agreements contained in this Section 8.01 are an integral part of the Transactions and this Agreement and that the Break-Up Fee or the Aircraft Condition Fee, as applicable, and the Expense Reimbursement are not a penalty, but rather are liquidated damages in a reasonable amount that will reasonably compensate Buyer in the circumstances in which such Break-Up Fee or Aircraft Condition Fee, as applicable, and/or Expense Reimbursement are payable for the efforts and resources expended and opportunities foregone by Buyer while negotiating and pursuing the Transactions and this Agreement and in reasonable reliance on this Agreement and on the reasonable expectation of the consummation of the Transactions, which amount would otherwise be impossible to calculate with precision.  Upon entry of the Sale Procedures Order (to the extent provided in such order), the claim of Buyer in respect of the Break-Up Fee or Aircraft Condition Fee, as applicable, and the Expense Reimbursement is and constitutes an allowed administrative expense claim against the Seller Parties under Sections 503(b) and 507(a)(2) of the Bankruptcy Code in the Bankruptcy Cases.

(b)    Timing of Payments of Break Up Fee and Expense Reimbursement and Related Matters.

(i)    Expense Reimbursement.  The Expense Reimbursement shall be payable on a joint and several basis by the Seller Parties upon (A) termination of this Agreement pursuant to Section 11.01(c), Section 11.01(f), Section 11.01(g) or Section 11.01(h) or (B) if the Aircraft Condition has not been met and this Agreement has not otherwise been terminated.  The Expense Reimbursement shall be paid by the Seller Parties

WEIL:\96809416\18\79984.0003

by wire transfer of immediately available funds to an account designated by Buyer as follows (1) if this Agreement is terminated pursuant to Section 11.01(f), within the later of (Y) two (2) Business Days following the date of consummation of a Competing Bid and (Z) two (2) Business Days after Buyer submits to the Seller Parent invoice(s) detailing the Expense Reimbursement amounts, which invoice(s) shall solely summarize the work incurred to enable the Debtors to review such invoice(s) for reasonableness, and shall not be subject to application or allowance by the Bankruptcy Court, or (2) if this Agreement is terminated pursuant to Section 11.01(c), Section 11.01(g), Section 11.01(h) or if the Aircraft Condition has not been met, within two (2) Business Days after Buyer submits to the Seller Parent invoice(s) detailing the Expense Reimbursement amounts, which invoice(s) shall solely summarize the work incurred to enable the Debtors to review such invoice(s) for reasonableness, and shall not be subject to application or allowance by the Bankruptcy Court (which amount shall be set off against the Purchase Price in the event the Expense Reimbursement is payable hereunder because the Aircraft Condition has not been met).

(ii)    Partial Expense Reimbursement.  In the event that one or more Sellable Aircraft WAC Groups are sold in accordance with Section 6.11 but the Aircraft Condition continues to be met, the allocable pro rata portion of the Expense Reimbursement (calculated by using the quotient of (x) the number of Aircraft in each such Sellable Aircraft WAC Group sold and (y) the total of Aircraft included in the Transferred Assets as of the Agreement Date) shall be payable on a joint and several basis by the Seller Parties.  In such event, such portion of the Expense Reimbursement shall be paid by way of set-off against the Purchase Price and accordingly deducted from the Closing Payment on the Closing Date.

(iii)    Break-Up Fee.

(A)    The Break-Up Fee shall be payable on a joint and several basis by the Seller Parties if this Agreement is terminated pursuant to Section 11.01(f) and a Competing Bid approved by the Bankruptcy Court is consummated. In such event, the Break-Up Fee shall be paid by the Seller Parties by wire transfer of immediately available funds to an account designated by Buyer no later than two (2) Business Days after the date of consummation of a Competing Bid approved by the Bankruptcy Court. Notwithstanding anything to the contrary in this Agreement, it is agreed and understood that an Exempt Transaction shall not be a Competing Bid for purposes of this Section 8.01(b)(iii)(A).

(B)    If this Agreement is terminated pursuant to Section 11.01(c) and the Seller Parties enter into one (1) or more definitive agreements with respect to one (1) or more Competing Bids approved by the Bankruptcy Court, and consummated, within the eighteen (18)-month period following the date of termination of this Agreement pursuant to Section 11.01(c), upon the consummation of each such Competing Bid, the allocable pro rata portion of the Break-Up Fee (calculated by using the quotient of (x) the number of Aircraft sold pursuant to the applicable transaction and (y) the total number of Aircraft included in the Transferred Assets as of the Agreement Date) shall be payable on a joint and

54

several basis by the Seller Parties. In such event, such portion of the Break-Up Fee shall be paid by the Seller Parties by wire transfer of immediately available funds to an account designated by Buyer no later than two (2) Business Days after the date of consummation of each such transaction. Notwithstanding anything to the contrary in this Agreement, (i) it is agreed and understood that an Exempt Transaction shall not be a Competing Bid for purposes of this Section 8.01(b)(iii)(B) and (ii) upon the consummation of any such Exempt Transaction, all obligations under this Section 8.01 of any Seller Party acquired pursuant to such Exempt Transaction shall terminate automatically without any further action of any Person, and any reference to joint and several obligations of the Seller Parties under this Section 8.01 shall be deemed to exclude any such Seller Party; provided, that such Seller Party shall be responsible for its pro rata portion of any Expense Reimbursement (calculated by using the quotient of (x) the number of Aircraft owned by such Seller Party and (y) the total number of Aircraft included in the Transferred Assets as of the Agreement Date).

(iv)     Aircraft Condition Fee.  The Aircraft Condition Fee shall be paid in a manner provided under this Section 8.01(b)(iv) if, as of the Closing Date, the Seller Parties have sold sufficient Sellable Aircraft WAC Groups to cause the Aircraft Condition not to be met and this Agreement has not been terminated.  The Aircraft Condition Fee shall be paid by way of set-off against the Purchase Price on the Closing Date.  For purposes of this Section 8.01, the "**Aircraft Condition**" means, at Closing, the Transferred Assets to be sold by the Seller Parties to Buyer hereunder includes 110 or more Aircraft.

Section 8.02.     Competing Bid.   This Agreement is subject to approval by the Bankruptcy Court and the consideration by the Seller Parties of higher or better competing bids in respect of all or any part of the Transferred Assets, the Assets and the Transferred Equity Interests (each a "**Competing Bid**").  From the Agreement Date (and any prior time) and until entry of the Sale Order, the Seller Parties are permitted to, and to cause their Representatives and Affiliates to, initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to Buyer and its Affiliates and Representatives) in connection with a Competing Bid.  In addition, the Seller Parties shall have the responsibility and obligation to respond to any inquiries or offers for a Competing Bid and perform any and all other acts related thereto which are required under the Bankruptcy Code, the Sale Procedures Order or other applicable Law, including supplying information relating to the Business and the Assets of the Seller Parties to prospective purchasers.

Section 8.03.     Bankruptcy Court Filings.

(a)     The Seller Parties and Buyer acknowledge that this Agreement and the Transactions are subject to entry of, as applicable, the Sale Procedures Order and the Sale Order. In the event of any discrepancy between this Agreement and the Sale Procedures Order and the Sale Order, the Sale Procedures Order and the Sale Order shall govern.

(b)     The Seller Parties shall give notice under the Bankruptcy Code of the request for the relief specified in the Sale Motion to all Persons entitled to such notice, including all Persons that have asserted Liens in the Transferred Assets and all non-debtor parties to the

55

Transferred Contracts, and other appropriate notice as required by the Federal Rules of Bankruptcy Procedure and the local rules of the Bankruptcy Court, including such additional notice as the Bankruptcy Court shall direct or as Buyer may reasonably request, and provide appropriate opportunity for hearing, to all parties entitled thereto, of all motions, orders, hearings, or other proceedings in the Bankruptcy Court relating to this Agreement or the Transactions.

(c)    The Seller Parties shall use commercially reasonable efforts to ensure that the proposed Sale Procedures Order and Sale Order state that, the provisions of this Agreement, including Article VIII, are reasonable, were a material inducement to Buyer, and were reasonably relied upon by Buyer in deciding, to enter into this Agreement, and are designed to achieve the highest or otherwise best price for the Business and Transferred Assets.

(d)    Subject to the Seller Parties exercising their rights pursuant to Section 8.02 and/or Section 11.01(f), Section 11.01(h), and Section 11.01(i), the Seller Parties shall not, and shall cause their Affiliates not to, take any action that is intended to result in, or fail to take any action that is intended to result in, or fail to take any action the intent of which failure to act would result in, the reversal, voiding, modification or staying of the Sale Procedures Order or, if applicable, if Buyer is the prevailing bidder at the Auction, the Sale Order.  The Seller Parties shall, and shall cause their Affiliates to, comply with the Sale Procedures Order and the Sale Order.

(e)    Buyer agrees that it will promptly take such actions as are reasonably requested by the Seller Parties to assist in obtaining entry of the Sale Procedures Order and the Sale Order and a finding of adequate assurance of future performance by Buyer, including furnishing witnesses, affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by Buyer under this Agreement and demonstrating that Buyer is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code.

(f)    The Seller Parties shall be responsible for making all necessary filings with the Bankruptcy Court, which material filings, including any amendments, supplements, or modifications thereto, shall be in form and substance reasonably acceptable to Buyer.  The Seller Parties and Buyer shall consult with one another regarding substantive pleadings that any of them intends to file with the Bankruptcy Court in connection with, or which might reasonably affect the Bankruptcy Court's approval or modification of, as applicable, the Sale Procedures Order or the Sale Order.  The Seller Parties shall provide (or shall cause their Representatives to provide) Buyer with advance drafts of, and a reasonable opportunity to review and comment upon, the Sale Motion, the Sale Procedures Order, the Sale Order, and any substantive pleadings, motions, applications, petitions, schedules and supporting papers prepared by the Seller Parties or their Subsidiaries to be filed with the Bankruptcy Court in furtherance of the Transaction as soon as reasonably practicable prior to the date the Seller Parties intend to file such motion, pleading or Bankruptcy Court filing, and the Seller Parties shall make any reasonable modifications of such documents requested by Buyer.  Unless (i) this Agreement has been terminated in accordance with Section 11 or (ii) the Seller Parties have breached any representation or warranty or failed to comply with any covenant or agreement applicable to the Seller Parties that would cause any Closing Condition set forth in Section 10.02(a) not to be satisfied (provided such breach or failure has not been waived or cured in accordance with Section 11.01(c)) and Buyer is seeking to enforce its rights under this Agreement with respect to such breach or failure, Buyer shall not, without the

56

prior written consent of the Seller Parent (which consent may not be unreasonably withheld or delayed), file, join in, or otherwise support in any manner whatsoever any motion or other pleading relating to the sale of the Transferred Assets, the Assets and/or the Transferred Equity Interests hereunder.  Buyer shall provide (or shall cause its Representatives to provide) the Seller Parties with advance drafts of, and a reasonable opportunity to review and comment upon substantive pleadings, motions, and supporting papers prepared by Buyer to be filed with the Bankruptcy Court in connection with the Transaction as soon as reasonably practicable prior to the date Buyer intends to file such motion, pleading or Bankruptcy Court filing, and Buyer shall make any reasonable modifications of such documents requested by the Seller Parties.  In the event the entry of the Sale Procedures Order and the Sale Order or any other Order of the Bankruptcy Court relating to this Agreement or the Transactions shall be appealed (or if any petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument shall be filed with respect to the Sale Procedures Order, the Sale Order or other such order), the Seller Parties and Buyer shall use their respective commercially reasonable efforts to defend such appeal, petition or motion and obtain an expedited resolution of any such appeal, petition or motion.

(g)    A list of the Transferred Contracts shall be attached to the cure notice (attached to the Sale Procedures Order) approved by the Bankruptcy Court (or, if required by the Bankruptcy Court, a motion to assume and assign the Transferred Contracts), shall be described in sufficient detail to provide adequate notice to the non-debtor parties to such Contracts, and shall set forth the applicable Cure Cost, if any, for each Transferred Contract as reasonably estimated in good faith by the Seller Parties.  As soon as practicable, but not later than three (3) days after the entry of the Sale Procedures Order, the Seller Parties shall file the cure notice with the Bankruptcy Court and serve such notice by first class mail on each non-debtor party to the Transferred Contracts.  Upon removal by Buyer of any Contract from Schedule 2.02(a)(ii)(A) and Schedule 2.02(a)(ii)(B) in accordance with Section 2.04, the Seller Parties shall promptly remove such Transferred Contract from the cure notice and notify the non-debtor parties to such Contracts of such removal.

Section 8.04.    Back-up Bidder.  If Buyer is not the winning bidder at either an auction held in accordance with the Sale Procedures Order (the "**Auction**") or as a result of the Seller Parent or any Seller Party entering into a Competing Bid that the Bankruptcy Court approves, and if and only if (a) this Agreement (or any further bid submitted by Buyer at the Auction) is the second highest or second best bid, and (b) the Seller Parent gives notice to Buyer on or before the Back-up Termination Date, stating that the Seller Parties (i) failed to consummate the sale with the winning bidder, and (ii) terminated the purchase agreement with the winning bidder, Buyer shall promptly consummate the Transaction upon the terms and conditions as set forth herein, including the Purchase Price, as the same may be increased by Buyer at the Auction, if applicable.  Notwithstanding the foregoing, if Buyer is selected as the second highest and/or second best bid at such Auction, then the Seller shall instruct the Escrow Agent to return the Escrowed Funds to Buyer within two (2) Business Days after such Auction.

Section 8.05.    Bankruptcy Milestones.  The Seller Parties shall use their reasonable best efforts to satisfy the following milestones (collectively, the "**Bankruptcy Milestones**"):

57

(a)      Within three (3) days after the Agreement Date (the "**Sale Motion Filing Date**"), the Seller Parties and affiliated Debtors shall have filed a motion, in form and substance reasonably acceptable to Buyer and the Seller Parties (the "**Sale Motion**"), (i) designating Buyer as the purchaser of the Transferred Assets subject to Bankruptcy Court approval, (ii) seeking approval of the Expense Reimbursement and Break-Up Fee or Aircraft Condition Fee, as applicable, protections for Buyer as provided in Section 8.01, (iii) requesting that Buyer and the Buyer Transactions be accorded the protections provided under Section 363(m) of the Bankruptcy Code, and (iv) seeking approval and entry of the Sale Procedures Order.

(b)      The Seller Parties shall have sought to schedule a hearing to approve the Sale Procedures Order to be held no later than twenty-four (24) days after the Sale Motion Filing Date.

(c)      On or before the date that is twenty-nine (29) days after the Sale Motion Filing Date, the Bankruptcy Court shall have entered the Sale Procedures Order.

(d)      The deadline for interested third parties to submit qualified bids in accordance with the Sale Procedures Order shall be January 4, 2019 (the "**Third-Party Bid Due Date**").

(e)      If required, the Auction shall occur no later than three (3) Business Days following the Third-Party Bid Due Date.

(f)      The deadline for interested lenders of each WAC Facility to submit qualified credit bids in accordance with the Sale Procedures Order shall be January 14, 2019 (the "**Credit Bid Due Date**").

(g)      The Seller Parties shall have sought to schedule a hearing to consider the approval of the Sale Order to be held no later than ten (10) days after the Transactions become fixed pursuant to the Sale Procedures Order.

(h)      On or before the date that is seventy-seven (77) days after the Sale Motion Filing Date, the Bankruptcy Court shall have entered the Sale Order.

The Bankruptcy Milestones may be extended upon mutual agreement between the Seller Parent (on behalf of itself and the other Seller Parties) and Buyer or as necessary to accommodate the availability of the Bankruptcy Court.

## ARTICLE IX

## TAX MATTERS

Section 9.01.      Taxes.

(a)      The Seller Parties shall be liable for, and shall promptly indemnify, defend and hold harmless Buyer and its Affiliates and Representatives from and against, Transfer Taxes imposed or arising with respect to the Transactions.  The Seller Parties shall timely remit, or the Seller Parties and Buyer shall timely send any Joint Written Instruction directing the Escrow Agent

58

to remit, to Buyer or to the Seller Parties' local agent for payment to the appropriate Taxing Authority or directly to the applicable Taxing Authority, all Transfer Taxes imposed or arising with respect to the Transactions first, using funds from the Transfer Tax Seller Account, then using funds from the Transfer Tax Escrow Account, and thereafter using funds from any other account of the Seller Parties.

(b)    (i) Promptly upon receipt of the Closing Payment, the Seller Parties shall deposit into a segregated account of the Seller Parent, ("**Transfer Tax Seller Account**") an amount equal to the Estimated Transfer Tax Amounts due and payable within the first ten (10) Business Days of the Closing Date (the "**Segregated Transfer Tax Amount**"), and (ii) at Closing, Buyer shall deposit with the Escrow Agent into a separate escrow account ("**Transfer Tax Escrow Account**") an amount equal to the sum of all of the Estimated Transfer Tax Amounts payable after the first ten (10) Business Days of the Closing Date (the "**Transfer Tax Escrow Amount**"), in each case in U.S. dollars set forth in the Tentative Purchase Price and Transfer Tax Schedule.  The amounts in the Transfer Tax Seller Account and the Transfer Tax Escrow Account shall be adjusted, if applicable, pursuant to Section 3.08.  From and after the Closing Date unless and until released in accordance with this Section 9.01, the Escrow Agent shall maintain the applicable amount of Estimated Transfer Tax Amounts in such Transfer Tax Escrow Account and shall release the same to Buyer or to the Seller Parties' local agent to pay relevant Transfer Taxes, or directly to the applicable Taxing Authority, upon receipt of each Joint Written Instruction; provided, that, upon the earlier of (i) the nine (9) month anniversary of the Closing Date and (ii) the date on which all applicable Transfer Taxes have been paid pursuant to this Section 9.01, any remaining amount in the Transfer Tax Escrow Account shall be for the Seller Parties' account and the Seller Parties shall no longer have any obligations to maintain the Transfer Tax Escrow Account contemplated hereby.

(c)    For the avoidance of doubt, the Seller Parties shall not be responsible, and shall not indemnify Buyer, for any Transfer Taxes which are:

(i)    Taxes arising in respect of events occurring after, but not including, the Closing Date, and Taxes that are not contemplated by the Transaction Agreements;

(ii)    Taxes imposed on Buyer that are not Transfer Taxes and are based on or measured by net income or profits of Buyer (including interest, additions to Tax, penalties, or other charges in respect thereof); or

(iii)    Taxes resulting from the gross negligence or willful misconduct of Buyer.

(d)    If a Transfer Tax is imposed on or arises with respect to any of the Transactions, and such Transfer Tax is a Recoverable Transfer Tax, the allocable Purchase Price in respect of such Transaction shall be exclusive of such Recoverable Transfer Tax. The applicable Seller Parties shall provide an invoice in a form and containing such information as is required by the applicable Law of the country in which such Transfer Tax is payable in respect of such Transaction that reflects an amount equal to the allocable Purchase Price plus the Recoverable Transfer Tax.  If a Transfer Tax is imposed on or arises with respect to any Transactions, and such

59

Transfer Tax is Non-Recoverable Transfer Tax, the allocable Purchase Price in respect of such Transaction shall be inclusive of such Transfer Tax.

(e)      In the case of Transfer Taxes imposed on or arising in respect of the Transaction for which the Tax Return is due on the Closing Date, the Party legally responsible for payment of such Transfer Taxes shall timely prepare and file, or cause to be timely prepared and filed, such Tax Returns; provided, that if the applicable Tax Return is required to be signed by the non-preparing Party, the preparing Party shall provide such Tax Return to the non-preparing Party sufficiently in advance for signature, which shall be promptly signed and returned to the preparing Party prior to the Closing.  In the case of Transfer Taxes imposed on or arising in respect of the Transaction for which the Tax Return is due after the Closing Date, Buyer shall promptly complete all registrations and Tax Returns with respect to Transfer Taxes in respect of the Transactions in accordance with the provisions herein, and shall timely file all such Tax Returns on behalf of the party legally responsible for such filings, or if applicable, use reasonable best efforts to timely complete and file any documentation necessary to evidence and claim any exemption from any Transfer Taxes that may be available under applicable Law with respect to the Transactions; provided, that (i) in such cases as the applicable Tax Returns are required to be signed by the Seller Parties, Buyer shall provide such Tax Returns to the Seller Parties sufficiently in advance for signature, which shall be promptly signed and returned to Buyer for filing, and (ii) to the extent that the Transfer Taxes must be paid by check (rather than electronic payment), the Seller Parties shall provide such check (made payable to the applicable Taxing Authority) to Buyer sufficiently in advance of the due date, and Buyer shall include such check with the filing of the applicable Tax Return or, if applicable, deliver such check the applicable Seller Parties' local agent for remittance to the applicable Taxing Authority.  To the extent that the final resolution of some or all of the disputed items pursuant to Section 3.08 differs from the reporting of such items on the applicable filed Tax Return, Buyer shall file or cause to be filed, to the extent permitted by applicable Law, an amended Tax Return reflecting the final resolution of such items, together with any additional Transfer Taxes that are owing, which shall be paid by the Seller Parties.  All Tax Returns with respect to Transfer Taxes imposed on or arising in respect of the Transaction shall be submitted by the preparing Party to the non-preparing Party for review and comments as soon as possible, but not later than five (5) Business Days before the due date for filing such Tax Returns (unless such date would fall on or before the Closing Date).  As to any Tax Returns prepared by the Seller Parties, the Seller Parties shall consider Buyer's comments in good faith.  As to any Tax Returns prepared by Buyer, the Seller Parties shall have the right to review and approve each such Tax Return before the filing thereof and Buyer shall make all changes reasonably requested by the Seller Parties.

(f)      All Transfer Tax Refunds with respect to the Transactions shall belong to the Seller Parties; provided, that if (x) there are any Transfer Taxes imposed or arising with respect to the Transactions that are still owing after the Closing Date, as set forth in the Final Purchase Price and Transfer Tax Schedule, and are the responsibility of a Seller Party or Buyer (or its Affiliates) under the applicable Law or a liability of Buyer (or its Affiliates) if not paid by the Seller Parties and (y)(A) the balance in the Transfer Tax Escrow Account has been released or (B) any amount in the Transfer Tax Escrow Account is insufficient to pay such Transfer Taxes, then the amount of any subsequent Transfer Tax Refunds that relates to any Seller Party responsible hereunder for any such Transfer Taxes referenced under clause (x) immediately above may be withheld by Buyer and placed into escrow, up to (i) the amount of any Transfer Taxes still owing

60

with respect to the Transactions in the case of clause (y)(A) immediately above and (ii) the amount of such insufficiency in the case of clause (y)(B) immediately above; provided, that if Buyer or any of its Affiliates has paid any Transfer Taxes with respect to the Transactions and has not been previously reimbursed therefor by the Seller Parties, then Buyer shall retain for its account the amount of any Transfer Tax Refund, up to the amount of such previously unreimbursed Transfer Taxes.  Any amount withheld by Buyer pursuant to the preceding sentence and placed into escrow shall be used by Buyer (in cooperation with the Seller Parties and only after providing the Seller Parties reasonable advance notice) to pay the Transfer Tax as soon as reasonably practicable or, to the extent such amount is no longer necessary to pay such Transfer Tax (because either the Tax has already been paid in the interim or the Seller Parties and Buyer have otherwise mutually determined that the all or a portion of such Transfer Tax is no longer payable, such as in the event of a change in Law or interpretation), shall be paid over to Seller Parent as provided herein.  Except as otherwise provided in this Section 9.01(f), Buyer shall pay over to the Seller Parent (for the benefit of itself and the other Seller Parties) any Transfer Tax Refunds within five (5) Business Days of receipt of such Transfer Tax Refund (net of, determined on a refund-by-refund basis, any Taxes incurred by Buyer or its Affiliates post-Closing with respect to the receipt and payment over of such Transfer Tax Refund and net of any reasonable documented out-of-pocket third party expenses incurred by Buyer or its Affiliates in obtaining such amount) in immediately available funds to one or more accounts as directed by the Seller Parent, and upon request of the Seller Parent, Buyer shall provide a listing of any deductions made and reasonable supporting documentation thereof.

(g)    Buyer shall as promptly as reasonably practicable (and in no event later than the sixth (6th) month anniversary of the Closing Date) file (or cause to be filed) all claims for Transfer Tax Refunds with respect to Recoverable Transfer Taxes, and shall use reasonable best efforts to recover such amounts.  In furtherance thereof, Buyer shall (i) promptly complete all registrations, Tax Returns and execute any and all appropriate documents (including as may be reasonably requested by the Seller Parties) in order to apply for any Transfer Tax Refunds with respect to Recoverable Transfer Taxes.  All claims for Transfer Tax Refunds shall be submitted to the Seller Parent (on behalf of itself and the other Seller Parties) for the Seller Parties' review and approval.  The Seller Parent (on behalf of itself and the other Seller Parties) shall provide any comments to Buyer within five (5) Business Days of receipt of such claims for review, and Buyer shall make all changes reasonably requested by the Seller Parties.  Any reasonable documented out-of-pocket third party costs or expenses incurred by Buyer or its Affiliates in obtaining a Transfer Tax Refund shall be borne by the Seller Parties and offset against such Transfer Tax Refunds in accordance with Section 9.01(f).  Buyer's obligations to seek recovery of any Transfer Tax Refunds shall terminate on the third (3rd) anniversary of the Closing Date.  Notwithstanding the foregoing, if following the third (3rd) anniversary of the Closing Date Buyer receives any Transfer Tax Refund, Buyer shall pay over such Transfer Tax Refund to the Seller Parent in accordance with Section 9.01(f).

(h)    Buyer shall provide to the Seller Parties, and the Seller Parties shall provide to Buyer, any written notices or correspondence received from the applicable Taxing Authority with respect to the payment of any Transfer Taxes with respect to the Transactions and any Transfer Tax Refunds.  Following the filing of any claims for Transfer Tax Refunds, shall provide the Seller Parties with periodic updates (but in any event, not less than once a quarter) of the status of the pending refunds, including actions being taken by Buyer in pursuit of such refunds (and,

61

upon request of the Seller Parties, a current estimate of any documented out-of-pocket third party costs or expenses, incurred through the end of the preceding month), and the status of any discussions and correspondence with the applicable Taxing Authorities.  Nothing in this Section 9.01(h) shall be construed to require Buyer or any of its Affiliates to make available its Tax Returns, books or records (or any other information that it deems confidential) to the Seller Parties, except for such portion as are applicable to the claim at issue (with reasonable redactions to preclude release of confidential information); provided, however, that Buyer shall make available to any Taxing Authority such information as is necessary or appropriate in connection with the seeking of the Transfer Taxes Refund; provided further, that this section does not itself restrict or narrow Buyer's obligations under Section 9.03.

(i)    The Seller Parties' rights under this Section 9.01 and Section 9.02 shall be freely assignable on or following the Closing Date, with the assignee(s) having the right to enforce such sections to the same extent as if such assignee had been the Seller Parties.  The Seller Parties shall notify Buyer of any assignment(s) of its rights under such sections.

Section 9.02.   Tax Adjustments.  Taxes (other than Transfer Taxes) imposed upon or assessed directly against the Transferred Assets and Transferred Equity Interests (including real estate Taxes, personal property Taxes and similar Taxes, and for the avoidance of doubt not to include Taxes of the Transferred Entities) for the Tax period in which the Closing occurs (the "**Straddle Period**") will be apportioned and prorated between Seller Parties and Buyer as of the Effective Time.  Buyer shall bear its proportionate share of such Taxes (which shall be equal to the product obtained by multiplying (i) a fraction, the numerator being the amount of the Taxes and the denominator being the total number of days in the Straddle Period, times (ii) the number of days in the Straddle Period following the Effective Time), and the Seller Parties shall bear the remaining portion of such Taxes.  If the precise amount of any such Tax cannot be ascertained as of the Effective Time, apportionment and proration shall be computed on the basis of the amount payable for each respective item during the Tax period immediately preceding the Straddle Period and any proration shall be adjusted thereafter on the basis of the actual charges for such items in the Straddle Period.  When the actual amounts become known, such proration shall be recalculated promptly, and Buyer or the Seller Parties, as applicable, shall within ten (10) days after notice of payment due and delivery of reasonable supporting documentation with respect to such amounts shall make any additional payment or refund so that the correct prorated amount is paid by each of Buyer and the Seller Parties.

Section 9.03.   Tax Cooperation.

(a)    Without limiting the obligations set forth in Sections 6.02 and 7.01, the Parties shall furnish or cause to be furnished to each other, upon request, and at the sole cost of the requesting Party (other than with respect to Section 9.01, in which event each Party bears its own expenses except to the extent provided therein), as promptly as practicable, such information and assistance relating to the Transferred Entities and the Transferred Assets as is reasonably necessary for the filing of Tax Returns, the making of any election related to Taxes permitted to be made under this Agreement, the claiming and pursuit of Tax refunds (including the Transfer Tax Refunds) and the preparation for, or the prosecution or defense of, any audit, claim, demand, proposed adjustment or deficiency relating to Taxes, and any other matter or proceeding relating

62

to Taxes. The Parties shall cooperate with each other in the conduct of any such audit or other proceeding related to Taxes and all other Tax matters relating to the Transferred Entities.

(b)    Buyer shall cooperate with the Seller Parties in good faith to take any reasonable actions to claim an exemption from, or reduction of, any Transfer Tax imposed with respect to the Transactions.

(c)    Buyer agrees that it shall preserve and keep, or cause to be preserved and kept, all original books and records in respect of the Business relating to Taxes with respect to taxable years or periods (or portion thereof) ending on or before the Closing Date and in the possession of Buyer or its Affiliates in accordance with Section 7.03.

Section 9.04.    Post-Closing Filing of Transferred Entity Tax Returns. The Seller Parties shall prepare and timely file (or cause to be prepared and timely filed) in a manner consistent with past practice any Tax Return of any Transferred Entity (i) due before the Closing Date, or (ii) filed on an affiliated, consolidated, combined or unitary basis with any of the Seller Parties or any of their Affiliates (other than a Transferred Entity) for taxable years or periods beginning on or before the Closing Date. With respect to each such Tax Return prepared and filed by the Seller Parties pursuant to this Section 9.04, the Seller Parties shall timely remit (or cause to be timely remitted) any Taxes shown as due on such Tax Returns. Except with the Seller Parent's consent (which consent shall not be unreasonably withheld, conditioned or delayed), neither Buyer nor any Affiliate of Buyer shall (or shall cause or permit any Transferred Entity to) amend, refile or otherwise modify (or grant an extension of any statute of limitation with respect to) (i) any Tax Return described in Section 9.03(c) or (ii) any Tax Return relating in whole or in part to any Transferred Entity for any taxable year or period (or portion thereof) commencing on or before the Closing Date (or with respect to any Straddle Period).

Section 9.05.    Survival. The obligations set forth in this Article IX with respect to Taxes shall survive until the date that is thirty (30) days following the later of (a) the expiration of the applicable statute of limitations with respect to the Tax Returns and Tax obligations, as applicable, contemplated hereby, and (b) in the case of any actions being taken pursuant to Section 9.01, the conclusion of any actions being taken or applications submitted in accordance with such section (including the obtaining of any Recoverable Transfer Taxes).

Section 9.06.    Adjustment to Purchase Price. The Parties agree to treat any payment made pursuant to this Agreement as an adjustment to the Purchase Price for all income Tax purposes.

## ARTICLE X

## CONDITIONS TO CLOSING

Section 10.01.    Conditions to Obligations of the Seller Parties. The obligation of the Seller Parties to consummate the Closing shall be subject to the satisfaction or waiver by the Seller Parties in its sole discretion, at or before the Closing, of each of the following conditions:

WEIL:\96809416\18\79984.0003

(a)     Representations and Warranties; Covenants.

(i)     all representations and warranties of Buyer contained in this Agreement shall be true and correct as of the Agreement Date and the Closing Date as if made on the Closing Date (other than representations and warranties that are made as of a specific date, which representations and warranties shall have been true and correct as of such date), except for breaches or inaccuracies, as the case may be, that, individually or in the aggregate, would not reasonably be expected to have a material adverse effect on Buyer's ability to perform its obligations under this Agreement and consummate the Transactions; provided, however, that for purposes of determining the satisfaction of the condition in this clause (i), no effect shall be given to the exceptions of "material" in such representations and warranties;

(ii)     the covenants contained in this Agreement required to be complied with by Buyer on or before the Closing shall have been complied with in all material respects, and

(iii)     the Seller Parties shall have received a certificate signed by an authorized officer of Buyer, dated as of the Closing Date, with respect to the matters set forth in the foregoing clauses (i) and (ii).

(b)     Governmental Approvals.   All Required Approvals shall have been obtained or, if applicable, shall have expired, shall have been waived by the applicable Government Authority or shall have been terminated.

(c)     No Order.   There shall be no Order in existence that enjoins or otherwise prohibits the sale of the Transferred Equity Interests or the Transferred Assets pursuant to this Agreement or the other Transactions.

(d)     Transaction Agreements.   Buyer shall have executed and delivered to the Seller Parties all Buyer Transaction Agreements and the other deliverables contemplated by Section 3.03(b)(v) through Section 3.03(b)(xiii).

(e)     Sale Order.   The Bankruptcy Court shall have entered the Sale Order and such Sale Order shall not be subject to any stay.

Section 10.02.   Conditions to Obligations of Buyer.   The obligations of Buyer to consummate the Closing shall be subject to the satisfaction or waiver by Buyer in its sole discretion, at or before the Closing, of each of the following conditions:

(a)     Representations and Warranties; Covenants.

(i)     all representations and warranties of the Seller Parties contained in this Agreement shall be true and correct as of the Closing as if made on the Closing Date (other than representations and warranties that are made as of a specific date, which representations and warranties shall have been true and correct as of such date), except for breaches or inaccuracies, as the case may be, that, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect; provided, however, that for

64

purposes of determining the satisfaction of the condition in this clause (i), no effect shall be given to the exceptions of "material" or "Material Adverse Effect" in such representations and warranties;

(ii)    the covenants contained in this Agreement required to be complied with by the Seller Parties on or before the Closing shall have been complied with in all material respects; and

(iii)    Buyer shall have received a certificate signed by an authorized officer of the Seller Parent (on behalf of itself and the other Seller Parties), dated as of the Closing Date, with respect to the matters set forth in the foregoing clauses (i) and (ii).

(b)    Governmental Approvals.    All Required Approvals shall have been obtained or, if applicable, shall have expired or been waived by the applicable Government Authority, have been terminated.

(c)    No Order.    There shall be no Order in existence that enjoins or otherwise prohibits the sale of the Transferred Equity Interests or the Transferred Assets pursuant to this Agreement or the other Transactions.

(d)    Seller Transaction Agreements.    The Seller Parties shall have executed and delivered, or caused to be executed and delivered, to Buyer all Seller Transaction Agreements and the other deliverables contemplated by Section 3.03(a).

(e)    Sale Order.    The Bankruptcy Court shall have entered the Sale Order and such Sale Order shall not be subject to any stay.

Section 10.03.    Frustration of Closing Conditions.    Neither the Seller Parties nor Buyer may rely on the failure of any condition set forth in this Article X to be satisfied if such failure was caused by such Party's failure to act in good faith or to use reasonable best efforts to cause the Closing Conditions of each such other Party to be satisfied, including as required by Section 6.04.

Section 10.04.    Waiver of Closing Conditions.    Upon the occurrence of the Closing, any condition set forth in this Article X that was not satisfied as of the Closing shall be deemed to have been waived as of and from the Closing.

# ARTICLE XI

# TERMINATION

Section 11.01.    Termination.    Notwithstanding anything in this Agreement to the contrary, this Agreement may be terminated before the Closing:

(a)    by the mutual written consent of the Seller Parties and Buyer;

(b)    by the Seller Parties, if Buyer shall have breached any representation or warranty or failed to comply with any covenant or agreement applicable to Buyer that would cause any Closing Condition set forth in Section 10.01(a) not to be satisfied, and (i) such breach is not

65

waived by the Seller Parties or (ii) if such breach has not been waived by the Seller Parties but is curable and is not cured by Buyer prior to the earlier to occur of (A) ten (10) Business Days after receipt of the Seller Parties' notice of its intent to terminate and (B) the Outside Date (or March 31, 2019, to the extent applicable under subsection (d) below); provided, however, that no Seller Party is then in material breach of this Agreement;

(c)    by Buyer, if the Seller Parties shall have breached any representation or warranty or failed to comply with any covenant or agreement applicable to the Seller Parties that would cause any Closing Condition set forth in Section 10.02(a) not to be satisfied, and (i) such breach is not waived by Buyer or, (ii) if such breach has not been waived by Buyer but is curable and is not cured by the Seller Parties prior to the earlier to occur of (A) ten (10) Business Days after receipt of Buyer's notice of its intent to terminate and (B) the Outside Date (or March 31, 2019, to the extent applicable under subsection (d) below); provided, however, that Buyer is not then in material breach of this Agreement;

(d)    by either the Seller Parties or Buyer, if the Closing shall not have occurred by March 15, 2019 (the "**Outside Date**"); provided, however, that (i) if the Closing shall not have occurred due to the failure of the Bankruptcy Court to enter the Sale Order or the Closing Conditions set forth in Section 10.01(b) and Section 10.02(b) remain unsatisfied or not waived and (ii) if all other Closing Conditions of the respective Parties shall have been fulfilled or waived (other than such Closing Conditions as are to be satisfied only at the Closing but subject to such conditions being capable of being satisfied as of the Outside Date), then no Party may terminate this Agreement pursuant to this Section 11.01(d) prior to March 31, 2019; provided further, that if the Closing shall not have occurred on or before the Outside Date or March 31, 2019, as applicable, due to a material breach of any representations, warranties, covenants or agreements contained in this Agreement by Buyer or the Seller Parties, then the breaching Party may not terminate this Agreement pursuant to this Section 11.01(d).

(e)    by either the Seller Parties or Buyer, in the event that any Government Authority of competent jurisdiction shall have issued an Order that permanently enjoins the consummation of the purchase of the Transferred Equity Interests or the Transferred Assets contemplated by this Agreement and such Order shall have become final and non-appealable; provided, however, that the right to terminate this Agreement under this Section 11.01(e) shall not be available to the Seller Parties or Buyer whose action or failure to fulfill any obligation under this Agreement has been the cause of the issuance of such Order or other action;

(f)    by either the Seller Parties or Buyer, if the Seller Parties enters into a definitive agreement with respect to a Competing Bid (it being agreed and understood that any Exempt Transaction shall not be a Competing Bid for purposes of this Section 11.01(f)), upon entry by the Bankruptcy Court of an Order approving such agreement (subject to Buyer's obligation to be the backup bidder pursuant to Section 8.04);

(g)    by Buyer, at any time after the number of Core Aircraft to be included in the Transferred Assets transferred to Buyer at Closing is fifty (50) or less due to the Seller Parties' sale of Aircraft in accordance with Section 6.11;

66

(h)      by either the Seller Parties or Buyer, if the Seller Parties consummate the sale of all Aircraft pursuant to Section 6.11; and

(i)      by either the Seller Parties or Buyer, in accordance with the second sentence of Section of 2.09(b).

Section 11.02.    Notice of Termination.    If either the Seller Parties or Buyer desires to terminate this Agreement pursuant to Section 11.01, such Party shall give written notice of such termination to the other Party.

Section 11.03.    Effect of Termination.

(a)      If this Agreement is terminated pursuant to Section 11.01, this Agreement shall thereupon become null and void and of no further force and effect, except for the provisions of (i) Section 6.03, (ii) Section 8.01, (iii) Section 11.01, (iv) this Section 11.03 and (v) Article XII. Nothing in this Section 11.03 shall be deemed to release any Party from any Liability for any breach by such Party of any term of this Agreement or impair the right of any Party to compel specific performance by any other Party of its obligations under this Agreement; provided, however, that, if this Agreement is validly terminated pursuant to this Article XI, no Party shall have any remedy or right to recover for any Liabilities resulting from any breach of this Agreement unless the breaching Party willfully and knowingly committed fraud against the non-breaching Party with the specific intent to deceive and mislead the non-breaching Party regarding the representations and warranties made in this Agreement; provided further, that a failure of Buyer to consummate the Closing when required pursuant to the terms of this Agreement shall be deemed to be a knowing and intentional breach or violation, whether or not Buyer had sufficient funds available.

(b)      Notwithstanding Section 11.03(a), in the event of a termination of this Agreement pursuant to Section 11.01(b), and at the time of such termination, the Closing Conditions set forth in Section 10.02 (in each case, other than those that can only be satisfied at the Closing itself but subject to such conditions being capable of satisfaction at such time) are satisfied or waived at the time of such termination, then (i) Buyer and the Seller Parent shall, within two (2) Business Days after the date of such termination, deliver Joint Written Instructions to the Escrow Agent directing the Escrow Agent to deliver an amount equal to $3,000,000 from the Escrowed Funds to the Seller Parent and (ii) the remaining Escrowed Funds shall remain in escrow with the Escrow Agent in accordance with the Escrow Agreement pending a binding non appealable judgment against Buyer with respect to any damages suffered by the Seller Parties as a result of Buyer's breach of this Agreement, and within two (2) Business Days after the date of such binding non appealable judgment is issued, Buyer and the Seller Parent shall deliver Joint Written Instructions to the Escrow Agent directing the Escrow Agent to release the remaining Escrowed Funds in accordance with such judgment.  Buyer acknowledges that the agreements contained in this Section 11.03(b) are an integral part of the Transactions, and that without these agreements, the Seller Parties would not have entered into this Agreement; accordingly, if Buyer fails to timely pay any amount due pursuant to this Section 11.03(b) and, in order to obtain the payment, the Seller Parties commence an Action which results in a judgment against Buyer for any payment set forth in this Section 11.03(b), Buyer shall pay the Seller Parties their costs and expenses (including attorney's fees and disbursements and any VAT) in connection with such

67

Action, together with interest on such payment at the Interest Rate through the date such payment was actually received. Further, Buyer agrees that the Seller Parties may seek any other remedies at law or equity arising from Buyer's breach of this Agreement, pursuant to <u>Section 12.17</u>.

## ARTICLE XII

## MISCELLANEOUS

Section 12.01.   <u>Rules of Construction</u>.  The following rules of construction shall govern the interpretation of this Agreement:

(a) references to "applicable" Law or Laws with respect to a particular Person, thing or matter means only such Law or Laws as to which the Government Authority that enacted or promulgated such Law or Laws has jurisdiction over such Person, thing or matter as determined under the Laws of the State of New York as required to be applied thereunder by the Bankruptcy Court; references to any statute, rule, regulation or form (including in the definition thereof) shall be deemed to include references to such statute, rule, regulation or form as amended, modified, supplemented or replaced from time to time (and, in the case of any statute, include any rules and regulations promulgated under such statute), and all references to any section of any statute, rule, regulation or form include any successor to such section;

(b) when calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is referenced in beginning the calculation of such period will be excluded (for example, if an action is to be taken within two (2) days after a triggering event and such event occurs on a Tuesday, then the action must be taken by Thursday); if the last day of such period is a non-Business Day, the period in question will end on the next succeeding Business Day;

(c) whenever the context requires, words in the singular shall be held to include the plural and vice versa, and words of one gender shall be held to include the other gender;

(d) (i) the provision of a table of contents, the division into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement and (ii) references to the terms "Article," "Section," "subsection," "subclause," "clause," "Schedule" and "Exhibit" are references to the Articles, Sections, subsections, subclauses, clauses, Schedules and Exhibits to this Agreement unless otherwise specified;

(e) (i) the terms "hereof," "herein," "hereby," "hereto," and derivative or similar words refer to this entire Agreement, including the Schedules and Exhibits thereto, (ii) the terms "thereof," "therein," "thereby," "thereto" and derivative or similar words refer to this Agreement to which the context refers, including the Schedules and Exhibits thereto, (iii) the terms "include," "includes," "including" and words of similar import when used in this Agreement mean "including, without limitation" unless otherwise specified, (iv) the term "any" means "any and all" and (v) where the context permits, the term "or" shall not be exclusive and shall mean "and/or";

(f) (i) references to "days" means calendar days unless Business Days are expressly specified, (ii) references to "written" or "in writing" include in electronic form

68

(including by e-mail transmission or electronic communication by portable document format (.pdf)) and (iii) references to "$" mean U.S. dollars;

(g)    accounting terms which are not otherwise defined in this Agreement have the meanings given to them under GAAP.  To the extent that the definition of an accounting term defined in this Agreement is inconsistent with the meaning of such term under GAAP, the definition set forth in this Agreement will control;

(h)    references to any Person includes such Person's successors and permitted assigns;

(i)    whenever this Agreement requires any Seller Party or Buyer, as applicable, to take any action, such requirement shall be deemed to involve an undertaking on the part of the Seller Parent or Buyer, as applicable, to take such action or to cause the Seller Parties or Buyer, as applicable, to take such action;

(j)    unless the context otherwise requires, the word "extent" in the phrase "to the extent" means the degree to which a subject or other thing extends, and such phrase does not mean simply "if";

(k)    each Party has participated in the negotiation and drafting of this Agreement, and if an ambiguity or question of interpretation should arise, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or burdening any Party by virtue of the authorship of any provision in this Agreement; the language used in this Agreement will be deemed to be the language chosen by the Parties to express their mutual intent, and no rule of strict construction will be applied against any Party. Further, prior drafts of this Agreement or any ancillary agreements, schedules or exhibits thereto or the fact that any clauses have been added, deleted or otherwise modified from any prior drafts of this Agreement or any ancillary agreements, schedules or exhibits hereto shall not be used as an aide of construction or otherwise constitute evidence of the intent of the Parties; and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of such prior drafts; and

(l)    any consent or notice to be delivered by the Seller Parties pursuant hereto shall be deemed to be delivered if delivered by the Seller Parent.

Section 12.02.    Expenses.  Except as otherwise specified in the Transaction Agreements, each Party will pay its own costs and expenses, including legal, consulting, financial advisor and accounting fees and expenses, incurred in connection with the Transaction Agreements and the Transactions, irrespective of when incurred or whether or not the Closing occurs; provided, that (a) the Seller Parties will be responsible for all Transfer Taxes pursuant to Section 9.01 and all Cure Costs pursuant to Section 2.06 and (b) the fees of the Independent Accounting Firm will be shared in accordance with Section 3.05(f).

Section 12.03.    Notices.  All notices and other communications under or by reason of this Agreement shall be in writing and shall be deemed to have been duly given or made (a) when personally delivered, (b) when delivered by e-mail transmission with receipt confirmed, or (c) upon delivery by overnight courier service, in each case, to the addresses and attention parties

WEIL:\96809416\18\79984.0003

indicated below (or such other address, e-mail address or attention party as the recipient party has specified by prior notice given to the sending party in accordance with this <u>Section 12.03</u>):

| | |
|---|---|
| If to any Seller Party, to: | Waypoint Leasing (Ireland) Limited<br>8 Riverpoint, Bishops Quay, Limerick<br>Limerick, v94 WC6A, Ireland<br>Attention:  Alan Jenkins<br>          Todd Wolynski<br>E-mails:    ajenkins@waypointleasing.com<br>          twolynski@waypointleasing.com |
| with a copy (which will not constitute notice) to: | Weil, Gotshal & Manges LLP<br>767 Fifth Avenue<br>New York, New York 10153<br>Attention:  Gary Holtzer<br>          Gavin Westerman<br>          Kelly DiBlasi<br>E-mails:    gary.holtzer@weil.com<br>          gavin.westerman@weil.com<br>          kelly.diblasi@weil.com |
| If to Buyer, to: | Macquarie Rotorcraft Leasing Holdings Limited<br>Ropemaker Place, 28 Ropemaker Street<br>London EC2Y 9HD<br>Attention:    Stephen Cook<br>            Tim Durham<br>E-mails:      Stephen.Cook@macquarie.com<br>            Tim.Durham@macquarierail.com |

70

| with a copy (which will not constitute notice) to: | Vedder Price P.C. |
| | 222 N. LaSalle St., Ste. 2600 |
| | Chicago, IL  60601 |
| | Phone:  (312) 609-7500 |
| | Attention: Geoffrey Kass and Douglas Lipke, Esqs. |
| | E-mails:      GKass@VedderPrice.com |
| | DLipke@VedderPrice.com |
| | |
| | and |
| | |
| | Vedder Price P.C. |
| | 1633 Broadway, 31st Floor |
| | New York, NY  10019 |
| | Phone:  (212) 407-7700 |
| | Attention: Michael J. Edelman, Esq. |
| | E-mails:        MJEdelman@VedderPrice.com |

Section 12.04.    <u>Survival</u>.  Except to the extent that any covenant that by its terms is to be performed (in whole or in part) by any Party following the Closing, none of the representations, warranties, or covenants of any Party set forth in this Agreement shall survive, and each of the same shall terminate and be of no further force or effect as of, the Effective Time.

Section 12.05.    <u>Limitation on Liability</u>.  Notwithstanding anything in this Agreement or in any other Transaction Agreement to the contrary, (x) except in the event of intentional fraud or willful misconduct, claims with respect to the calculation or payment of the Purchase Price or Post-Closing Adjustment in accordance with the terms of this Agreement (including <u>Section 3.06</u>), or claims with respect to Excluded Liabilities, the maximum aggregate Liability of the Seller Parties under this Agreement shall not exceed the aggregate amount of the Break-Up Fee and Expense Reimbursement, and (y) in no event shall any Party have any Liability under this Agreement (including under this <u>Article XII</u>) for any consequential, special, incidental, indirect or punitive damages or lost profits, or similar items (including loss of revenue, income or profits, diminution of value or loss of business reputation or opportunity relating to a breach or alleged breach of this Agreement);

Section 12.06.    <u>Public Announcements</u>.  The initial press release with respect to the execution of this Agreement shall be a joint press release to be reasonably agreed upon by the Parties.  No Party nor any Affiliate or Representative of such Party shall issue or cause the publication of any press release or public announcement or otherwise communicate with any news media in respect of the Transaction Agreements or the Transactions without the prior written consent of the other Parties (which consent shall not be unreasonably withheld, conditioned or delayed), except as a Party believes in good faith and based on reasonable advice of counsel is required by applicable Law or by order of the Bankruptcy Court, in which case Buyer and the Seller Parties, as applicable, will have the right to review and comment on such press release or announcement prior to publication; <u>provided</u>, that Buyer and its Affiliates will be entitled to communicate with its and its Affiliates' investors and proposed investors in connection with their fundraising and reporting activities.

WEIL:\96809416\18\79984.0003

Section 12.07.    <u>Severability</u>.  If any term or provision of this Agreement is held invalid, illegal or unenforceable in any respect under any applicable Law, as a matter of public policy or on any other grounds, the validity, legality and enforceability of all other terms and provisions of this Agreement will not in any way be affected or impaired.  If the final judgment of a court of competent jurisdiction or other Government Authority declares that any term or provision hereof is invalid, illegal or unenforceable, the Parties agree that the court making such determination will have the power to reduce the scope, duration, area or applicability of the term or provision, to delete specific words or phrases, or to replace any invalid, illegal or unenforceable term or provision with a term or provision that is valid, legal and enforceable and that comes closest to expressing the intention of the invalid, illegal or unenforceable term or provision.

Section 12.08.    <u>Assignment</u>.  This Agreement will be binding upon and inure to the benefit of and be enforceable by the respective successors and permitted assigns of the Parties.  No Party may assign (whether by operation of Law or otherwise) this Agreement or any rights, interests or obligations provided by this Agreement without the prior written consent of the other Parties; <u>provided</u>, <u>however</u>, that any Party may assign this Agreement and any or all rights and obligations under this Agreement to any of its controlled Affiliates; <u>provided</u> <u>further</u>, that a Seller Party may assign its rights and obligations under <u>Section 9.01</u> and <u>Section 9.02</u> in accordance with <u>Section 9.01(i)</u>; <u>provided</u> <u>further</u>, that, other than any assignment by a Seller Party pursuant to <u>Section 9.01(i)</u>, no such assignment shall release the assigning Party from any Liability under this Agreement.  Any attempted assignment in violation of this <u>Section 12.08</u> shall be void *ab initio*.

Section 12.09.    <u>No Third-Party Beneficiaries</u>.  This Agreement is for the sole benefit of the Parties and their respective successors and permitted assigns, and, except with respect to the D&O Indemnified Parties pursuant to <u>Section 7.02</u>, the Non-Contracting Parties pursuant to <u>Section 12.18</u>, or as expressly set forth in this Agreement, nothing in this Agreement shall create or be deemed to create any third-party beneficiary rights in any Person not a party hereto, including any Affiliates of any Party.

Section 12.10.    <u>Entire Agreement</u>.  This Agreement (including the Disclosure Schedules) and the other Transaction Agreements (and all exhibits and schedules hereto and thereto) collectively constitute and contain the entire agreement and understanding of the Parties with respect to the subject matter hereof and thereof and supersede all prior negotiations, correspondence, understandings, agreements and Contracts, whether written or oral, among the Parties respecting the subject matter hereof and thereof.  To the extent any terms and provisions of this Agreement are in any way inconsistent with or in conflict with any term, condition or provision of any other Transaction Agreement (which, for the avoidance of doubt, excludes the Sale Procedures Order, the Sale Order and any other Order of the Bankruptcy Court), this Agreement will govern and control.

Section 12.11.    <u>Amendments</u>.  This Agreement (including all exhibits and schedules hereto) may be amended, restated, supplemented or otherwise modified, only by written agreement duly executed by each Party.

Section 12.12.    <u>Waiver</u>.  At any time before the Closing, either the Seller Parties or Buyer may (a) extend the time for the performance of any obligation or other acts of the other Party, (b) waive any breaches or inaccuracies in the representations and warranties of the other Party

72

contained in this Agreement or in any document delivered pursuant to this Agreement or (c) waive compliance with any covenant, agreement or condition contained in this Agreement but such waiver of compliance with any such covenant, agreement or condition shall not operate as a waiver of, or estoppel with respect to, any subsequent or other failure.  Any such waiver shall be in a written instrument duly executed by the waiving Party.  No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

Section 12.13.    Governing Law.  This Agreement, and any Action that may be based upon, arise out of or relate or be incidental to any Transaction, this Agreement, the negotiation, execution, performance or consummation of the foregoing or the inducement of any Party to enter into the foregoing, whether for breach of Contract, tortious conduct or otherwise, and whether now existing or hereafter arising (each, a "**Transaction Dispute**"), will be exclusively governed by and construed and enforced in accordance with the internal Laws of the State of New York, without giving effect to any Law or rule that would cause the Laws of any jurisdiction other than the State of New York to be applied.

Section 12.14.    Dispute Resolution; Consent to Jurisdiction.

(a)    Without limiting any Party's right to appeal any order of the Bankruptcy Court, and except as otherwise provided in Section 3.05, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any Transaction Dispute which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the Transactions, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in Section 12.03; provided, however, upon the closing of the Bankruptcy Cases, the Parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the U.S. District Court for the Southern District of New York sitting in New York County or the Commercial Division of the Courts of the State of New York sitting in the County of New York and any appellate court from any thereof, for the resolution of any such Transaction Dispute.  In that context, and without limiting the generality of the foregoing, each Party irrevocably and unconditionally:

(i)    submits for itself and its property to the exclusive jurisdiction of such courts with respect to any Transaction Dispute and for recognition and enforcement of any judgment in respect thereof, and agrees that all claims in respect of any Transaction Dispute shall be heard and determined in such courts;

(ii)    agrees that venue would be proper in such courts, and waives any objection that it may now or hereafter have that any such court is an improper or inconvenient forum for the resolution of any Transaction Dispute; and

(iii)    agrees that the mailing by certified or registered mail, return receipt requested, to the Persons listed in Section 12.03 of any process required by any such court,

73

will be effective service of process; provided, however, that nothing herein will be deemed to prevent a Party from making service of process by any means authorized by the Laws of the State of New York.

(b)    The foregoing consent to jurisdiction will not constitute submission to jurisdiction or general consent to service of process in the State of New York for any purpose except with respect to any Transaction Dispute.

Section 12.15.    Waiver of Jury Trial.  To the maximum extent permitted by Law, each Party irrevocably and unconditionally waives any right to trial by jury in any forum in respect of any Transaction Dispute and covenants that neither it nor any of its Affiliates will assert (whether as plaintiff, defendant or otherwise) any right to such trial by jury.  Each Party certifies and acknowledges that (a) such Party has considered the implications of this waiver, (b) such Party makes this waiver voluntarily and (c) such waiver constitutes a material inducement upon which such Party is relying and will rely in entering into the this Agreement.  Each Party may file an original counterpart or a copy of this Section 12.15 with any court as written evidence of the consent of each Party to the waiver of its right to trial by jury.

Section 12.16.    Admissibility into Evidence.  All offers of compromise or settlement among the Parties or their Representatives in connection with the attempted resolution of any Transaction Dispute (including with respect to the matters contemplated by Section 3.05 (a) shall be deemed to have been delivered in furtherance of a Transaction Dispute settlement, (b) shall be exempt from discovery and production and (c) shall not be admissible into evidence (whether as an admission or otherwise) in any proceeding for the resolution of the Transaction Dispute.

Section 12.17.    Remedies; Specific Performance.

(a)    Except to the extent set forth otherwise in this Agreement, all remedies under this Agreement expressly conferred upon a Party will be deemed cumulative with and not exclusive of any other remedy conferred hereby, or by Law or equity upon such Party, and the exercise by a Party of any one remedy will not preclude the exercise of any other remedy.

(b)    Each Party agrees that irreparable damage would occur and the Parties would not have an adequate remedy at law if any provision of this Agreement is not performed in accordance with its specific terms or is otherwise breached.  Accordingly, each Party agrees that the other Party will be entitled to injunctive relief from time to time to prevent breaches of the provisions of this Agreement and to enforce specifically the terms and provisions of this Agreement, in each case (i) without the requirement of posting any bond or other indemnity and (ii) in addition to any other remedy to which it may be entitled, at law or in equity.  Furthermore, each Party agrees not to raise any objections to the availability of the equitable remedy of specific performance to prevent or restrain breaches of this Agreement, and to specifically enforce the terms of this Agreement to prevent breaches or threatened breaches of, or to enforce compliance with, the covenants and obligations of such Party under this Agreement.  Each Party expressly disclaims that it is owed any duty not expressly set forth in this Agreement, and waives and releases all tort claims and tort causes of action that may be based upon, arise out of or relate to this Agreement, or the negotiation, execution or performance of this Agreement.

74

Section 12.18.    Non-Recourse.  All claims, obligations, Liabilities, or causes of action (whether in Contract or in tort, in law or in equity, or granted by statute) that may be based upon, in respect of, arise under, out or by reason of, be connected with, or relate in any manner to this Agreement, or the negotiation, execution, or performance of this Agreement (including any representation or warranty made in, in connection with, or as an inducement to, this Agreement), may be made only against (and are expressly limited to) the entities that are expressly identified as parties hereto in the preamble to this Agreement or, if applicable, their permitted assignees ("**Contracting Parties**").  No Person who is not a Contracting Party, including any past, present or future director, officer, employee, incorporator, member, partner, manager, stockholder, Affiliate, agent, attorney, or representative of, and any financial advisor or lender to, any Contracting Party, or any director, officer, employee, incorporator, member, partner, manager, stockholder, Affiliate, agent, attorney, or representative of, and any financial advisor or lender to, any of the foregoing ("**Nonparty Affiliates**"), shall have any Liability (whether in Contract or in tort, in law or in equity, or granted by statute) for any claims, causes of action, obligations, or Liabilities arising under, out of, in connection with, or related in any manner to this Agreement or based on, in respect of, or by reason of this Agreement or their negotiation, execution, performance, or breach; and, to the maximum extent permitted by Law, each Contracting Party hereby waives and releases all such Liabilities, claims, causes of action, and obligations against any such Nonparty Affiliates. Nothing in this Agreement shall create or be deemed to create any third party beneficiary rights in any Person or entity not a party to this Agreement (it being expressly agreed that the Nonparty Affiliates to whom this Section 12.18 applies shall be third-party beneficiaries of this Section 12.18).

Section 12.19.    Interest.  If any payment required to be made to a Party under this Agreement is made after the date on which such payment is due, interest shall accrue at the Interest Rate on such amount from (but not including) the due date of the payment to (and including) the date such payment is actually made.  All computations of interest pursuant to this Agreement shall be made on the basis of a year of three hundred sixty-five (365) days, in each case for the actual number of days from (but not including) the first day to (and including) the last day occurring in the period for which such interest is payable.

Section 12.20.    Target Closing Timeline.  Acknowledging that effecting the Closing in accordance with the terms of this Agreement on or before January 31, 2019 is of material economic import for each of the Parties, subject to each Party's obligations hereunder (including Section 2.09 and Section 6.11), each of the Parties agrees to undertake good-faith, commercially reasonable steps to consummate the Closing as provided herein on or before January 31, 2019, subject in all respects to the satisfaction (or waiver) of the Closing Conditions and the other terms and provisions of this Agreement.

Section 12.21.    Disclosure Schedules and Exhibits.  The Disclosure Schedules, Schedules and Exhibits attached to this Agreement shall be construed with and as an integral part of this Agreement to the same extent as if the same had been set forth verbatim herein.  Any capitalized terms used in any Exhibit or Schedule or in the Disclosure Schedules but not otherwise defined therein shall be defined as set forth in this Agreement.  The representations and warranties of the Seller Parties set forth in this Agreement are made and given subject to the disclosures contained in the Disclosure Schedules.  Any description of any agreement, document, instrument, plan, arrangement or other item set forth on any Disclosure Schedule is a summary only and is

75

qualified in its entirety by the terms of such agreement, document, instrument, plan, arrangement or item. Any matter, information or item disclosed in the Disclosure Schedules, under any specific representation or warranty or Schedule or section thereof shall be deemed to be disclosed and incorporated by reference in any other Schedule or section of the Disclosure Schedules to the extent it is reasonably apparent from the face of such disclosure that such disclosure is applicable to such other Schedule(s) or section(s). The inclusion of any matter, information or item in the Disclosure Schedules as an exception to a representation or warranty shall not be deemed to constitute (i) an admission of any Liability by the Seller Parties to any third party, (ii) an admission that any breach or violation of applicable Laws or any contract or agreement to which a Seller Party is a party exists or has actually occurred, (iii) an admission that such item is outside the ordinary course of business or not consistent with past practice, or (iv) otherwise imply an admission that such item represents a material exception or material fact, event, circumstance or that such item has had, or would reasonably be expected to have a Material Adverse Effect. The Disclosure Schedules have been arranged for purposes of convenience in separately titled Schedules corresponding to the Sections of this Agreement.

Section 12.22.    <u>Provision Respecting Legal Representation</u>.    Each Party to this Agreement agrees, on its own behalf and on behalf of its Affiliates and Representatives, that Weil, Gotshal & Manges LLP may serve as counsel to the Seller Parties, on the one hand, and any Transferred Entity, on the other hand, in connection with the negotiation, preparation, execution and delivery of the Transaction Agreements and the consummation of the Transactions, and that, following consummation of the Transactions, Weil, Gotshal & Manges LLP may serve as counsel to any Seller Party or any Affiliate or Representative of any Seller Party, in connection with any litigation, claim or obligation arising out of or relating to the Transactions and the Transaction Agreements notwithstanding such prior representation of any Transferred Entity and each Party consents thereto and waives any conflict of interest arising therefrom, and each Party shall cause its Affiliates to consent to waive any conflict of interest arising from such representation.

Section 12.23.    <u>Privilege</u>.    Buyer, for itself and its Affiliates, and its and its Affiliates' respective successors and assigns, hereby irrevocably and unconditionally acknowledges and agrees that, other than in the case of potential willfully and knowingly committed fraud with the specific intent to deceive and mislead (such potential claims to be reasonably determined upon the advice of counsel), all attorney-client privileged communications between any Seller Party, any Transferred Entity and their respective current or former Affiliates or Representatives and their counsel, including Weil, Gotshal & Manges LLP, A&L Goodbody, Maples and Calder, Loyens & Loeff N.V. and White & Case LLP made before the consummation of the Closing in connection with the negotiation, preparation, execution, delivery and Closing under any Transaction Agreement, any Transaction Dispute or, before the Closing, any other matter, shall continue after the Closing to be privileged communications with such counsel and neither Buyer nor any of its former or current Affiliates nor any Person purporting to act on behalf of or through Buyer or any of its current of former Affiliates, shall seek to obtain the same by any process on the grounds that the privilege attaching to such communications belongs to Buyer, any Transferred Entity or the Business. Notwithstanding the foregoing, in the event that a dispute arises between Buyer or the Transferred Entities or any of their Subsidiaries, on the one hand, and a third party other than the Seller Parties and their Affiliates (solely in their capacity as direct or indirect equityholders of the Transferred Entities), on the other hand, after the Closing, the Transferred Entities may assert the attorney-client privilege with respect to such communications to prevent disclosure of confidential

communications to such third party; provided, however, that the Transferred Entities and their Subsidiaries may not waive such privilege without the prior written consent of the Seller Parent.

Section 12.24.   Counterparts.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which when taken together shall constitute one and the same instrument.  Facsimiles, e-mail transmission of .pdf signatures or other electronic copies of signatures shall be deemed to be originals.

Section 12.25.   Performance Guaranty.   The Guarantor hereby guarantees the due, prompt and faithful payment, performance and discharge by, and compliance with, all of the obligations, covenants, agreements, terms, conditions and undertakings of Buyer under this Agreement, in accordance with the terms hereof, including any such obligations, covenants, agreements, terms, conditions and undertakings that are required to be performed, discharged or complied with following the Closing.  Such guarantee is an absolute and unconditional guarantee of payment and performance and not merely of collectability, and is in no way conditioned or contingent upon any attempt to collect from, enforce performance or compliance by, or otherwise seek remedies from, Buyer.  The Guarantor is a corporation or other entity duly incorporated, formed or organized, validly existing and, to the extent legally applicable, in good standing under the Laws of its jurisdiction of incorporation, formation or organization and has the requisite corporate or other appropriate power and authority to execute, deliver and perform its obligations under this Agreement.  The execution, delivery and performance of this Agreement by the Guarantor has been duly and validly authorized by all requisite corporate or organizational action by the Guarantor, and no other proceedings on the part of the Guarantor are necessary to authorize the execution, delivery or performance of this Agreement by the Guarantor.  This Agreement has been duly and validly executed and delivered by the Guarantor and, as of the date hereof, is in full force and effect and constitutes a valid and binding obligation of the Guarantor, enforceable against the Guarantor in accordance with its terms, subject to the Bankruptcy and Equity Exception.  The Guarantor may not assign any of its obligations hereunder without prior written consent of the Seller Parent.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK;
SIGNATURE PAGE FOLLOWS]

WEIL:\96809416\18\79984.0003

IN WITNESS WHEREOF, the Sellers, the Servicing Entities, Buyer and Guarantor have caused this Agreement to be executed on the date first written above by their respective duly authorized officers.

**SELLERS:**

WAYPOINT ASSET CO 9 LIMITED

By: _____

Name:  Alan Jenkins
Title:    Director

**SELLERS:**

WAYPOINT LEASING (IRELAND) LIMITED

By: _____

      Name:  Alan Jenkins
      Title:    Director

**SELLERS:**

AE HELICOPTER (5) LIMITED

By:      _____

          Name:  Oliver Althoff
          Title:   Director

**SELLERS:**

AE HELICOPTER (6) LIMITED

By: _____

Name:  Oliver Althoff
Title:    Director

**SELLERS:**

WAYPOINT LEASING US 8A LLC

By: _____

Name: Oliver Althoff
Title:   Manager

**SELLERS:**

WAYPOINT LEASING UK 1B LIMITED

By: _____

Name:  Thomas Kelly
Title:    Director

[Signature Page to Stock and Asset Purchase Agreement]

**SELLERS:**

WAYPOINT LEASING UK 1C LIMITED

By: _____

Name:  Thomas Kelly
Title:    Director

[SIGNATURE PAGE TO STOCK AND ASSET PURCHASE AGREEMENT]

**SELLERS:**

WAYPOINT ASSET MALTA LTD

By: _____

Name:  Thomas Kelly
Title:   Director

**SELLERS:**

WAYPOINT LEASING LABUAN 3A LIMITED

By: _____

Name:  Thomas Kelly
Title:   Director

[SIGNATURE PAGE TO STOCK AND ASSET PURCHASE AGREEMENT]

**SELLERS:**

WAYPOINT LEASING UK 8A LIMITED

By: _____

Name:  Thomas Kelly
Title:   Director

**SELLERS:**

WAYPOINT LEASING UK 5A LIMITED

By: _____

Name:  Thomas Kelly
Title:  Director

[SIGNATURE PAGE TO STOCK AND ASSET PURCHASE AGREEMENT]

**SELLERS:**

WAYPOINT LEASING UK 9A LIMITED

By: _____

     Name:  Thomas Kelly
     Title:   Director

[SIGNATURE PAGE TO STOCK AND ASSET PURCHASE AGREEMENT]

**SELLERS:**

WAYPOINT ASSET MALTA 1A LIMITED

By: _____
    Name:  Thomas Kelly
    Title:  Director

**SELLERS:**

WAYPOINT LEASING SINGAPORE 1 PTE.
LIMITED

By: _____
       Name:  Thomas Kelly
       Title:   Director

**SELLERS:**

WAYPOINT LEASING UK 1A LIMITED

By: _____

      Name:  Thomas Kelly
      Title:   Director

[SIGNATURE PAGE TO STOCK AND ASSET PURCHASE AGREEMENT]

**SELLERS:**

WAYPOINT ASSET CO 12 LIMITED

By: _____
    Name:  Alan Jenkins
    Title:   Director

**SELLERS:**

WAYPOINT ASSET CO 1E LIMITED

By: _____

Name:  Alan Jenkins
Title:   Director

**SELLERS:**

WAYPOINT ASSET CO 1A LIMITED

By: _____
      Name:  Alan Jenkins
      Title:   Director

**SELLERS:**

WAYPOINT ASSET CO 1C LIMITED

By: _____

Name:  Alan Jenkins
Title:    Director

**SELLERS:**

WAYPOINT ASSET EURO 1D LIMITED

By: _____

Name:  Alan Jenkins
Title:    Director

**SELLERS:**

WAYPOINT ASSET CO 1D LIMITED

By:  _____
       Name:  Alan Jenkins
       Title:   Director

**SELLERS:**

WAYPOINT ASSET CO 1F LIMITED

By: _____

Name:  Alan Jenkins
Title:   Director

**SELLERS:**

MSN 9229 AS

By: _____

      Name:  Alan Jenkins
      Title:   Chairman

**SELLERS:**

WAYPOINT ASSET CO 1G LIMITED

By: _____

Name:  Alan Jenkins
Title:   Director

**SELLERS:**

WAYPOINT ASSET EURO 9A LIMITED

By: _____

Name:  Alan Jenkins
Title:   Director

**SELLERS:**

WAYPOINT ASSET CO 1H LIMITED

By: _____

Name:  Alan Jenkins
Title:    Director

**SELLERS:**

WAYPOINT ASSET CO 1K LIMITED

By: _____
        Name:  Alan Jenkins
        Title:    Director

**SELLERS:**

WAYPOINT ASSET CO 1L LIMITED

By: _____

       Name:  Alan Jenkins
       Title:   Director

**SELLERS:**

WAYPOINT ASSET EURO 1E LIMITED

By: _____
        Name:  Alan Jenkins
        Title:   Director

**SELLERS:**

WAYPOINT ASSET CO 1M LIMITED

By:    _____

        Name:  Alan Jenkins
        Title:   Director

**SELLERS:**

WAYPOINT ASSET CO 1N LIMITED

By: _____

Name:  Alan Jenkins
Title:    Director

**SELLERS:**

WAYPOINT ASSET EURO 1F LIMITED

By: _____

     Name:  Alan Jenkins
     Title:   Director

**SELLERS:**

WAYPOINT ASSET EURO 1G LIMITED

By: _____
      Name:  Alan Jenkins
      Title:   Director

**SELLERS:**

WAYPOINT ASSET COMPANY NUMBER 2
(IRELAND) LIMITED

By:    _____
         Name:  Alan Jenkins
         Title:   Director

**SELLERS:**

WAYPOINT ASSET CO 3 LIMITED

By: _____

      Name:  Alan Jenkins
      Title:   Director

**SELLERS:**

WAYPOINT ASSET COMPANY NUMBER 1
(IRELAND) LIMITED

By: _____

    Name:  Alan Jenkins
    Title:   Director

**SELLERS:**

WAYPOINT ASSET EURO 1A LIMITED

By: _____

Name:  Alan Jenkins
Title:    Director

**SELLERS:**

WAYPOINT ASSET CO 5 LIMITED

By: _____

      Name:  Alan Jenkins
      Title:    Director

**SELLERS:**

WAYPOINT ASSET CO 6 LIMITED

By: _____

      Name:  Alan Jenkins
      Title:   Director

**SELLERS:**

WAYPOINT ASSET EURO 1B LIMITED

By: _____

Name:  Alan Jenkins
Title:   Director

**SELLERS:**

WAYPOINT ASSET CO 8 LIMITED

By: _____

Name:  Alan Jenkins
Title:  Director

**SELLERS:**

WAYPOINT ASSET CO 5A LIMITED

By: _____

      Name:  Alan Jenkins
      Title:   Director

**SERVICING ENTITIES:**

WAYPOINT LEASING SERVICES UK LIMITED

By: _____
      Name:  Alan Jenkins
      Title:   Director

**SERVICING ENTITIES:**

WAYPOINT LEASING SERVICES
GERMANY GMBH

By: _____

Name:  Thomas Kelly
Title:    Geschäftsführer

**SERVICING ENTITIES:**

WAYPOINT LEASING SERVICES
HONG KONG PTE LIMITED

By: _____

    Name:  Thomas Kelly
    Title:   Director

**SERVICING ENTITIES:**

WAYPOINT LEASING SERVICES SA (PTY) LTD

By:      _____

Name:   Thomas Kelly

Title:   Director

**SERVICING ENTITIES:**

WAYPOINT LEASING SERVICES
CANADA LIMITED

By: _____
              Name:  Todd Wolynski
              Title:    Director

**SERVICING ENTITIES:**

WAYPOINT SERVICES BRASIL LTDA.

By: _____

Name: Steffen Bay
Title:   Manager

**BUYER:**

**MACQUARIE ROTORCRAFT LEASING
HOLDINGS LIMITED**

By: _____

    Name:   Robert Thompson
    Title:    DIRECTOR

By: _____

    Name:
    Title:    Timothy Durham
           Director

**GUARANTOR:**

**THE COMMON SEAL of**
**MACQUARIE FINANCIAL**
**HOLDINGS PTY LIMITED was**
**Hereunto affixed in accordance with the**
**company's constitution:**

_____
Signature of ~~Director~~/Secretary
~~ANTHONY ~~ ~~MCCANNEY~~
Paula Walsh
Company Secretary

_____
Signature of Director

Daniel Saad
Executive Director

[SIGNATURE PAGE TO STOCK AND ASSET PURCHASE AGREEMENT]

**EXHIBIT A**

**DEFINITIONS**

"**Action**" means any action, suit, arbitration, audit, investigation or proceeding by or before any Government Authority.

"**Affiliate**" means, with respect to any specified Person, any other Person that, at the time of determination, directly or indirectly through one or more intermediaries, Controls, is Controlled by or is under common Control with such specified Person; provided, however, that for the purposes of this Agreement (a) no Seller Party shall be deemed an Affiliate of Buyer, nor, after the Closing, of any Transferred Entity which is transferred to Buyer pursuant to this Agreement and (b) after the Closing, Buyer shall be deemed an Affiliate of each of the Transferred Entities.

"**Agreement**" means this Stock and Asset Purchase Agreement, dated as of 7, 2018, by and among the Sellers, Buyer, solely for purposes of Sections 2.02 and 6.09 the Servicing Entities and, solely for purposes of Section 12.25, the Guarantor, including the Disclosure Schedules and the Schedules, Exhibits, and all amendments to such agreement made in accordance with Section 12.11.

"**Aircraft**" means either collectively or individually, as applicable, the rotary wing aircraft described in Schedule 4.19 (as may be supplemented from time to time by the Seller Parties with the approval of Buyer in accordance with this Agreement), comprised of an Airframe, together with the Engines, Rotor Blades and Rotor Components associated with such Airframe, and, where the context permits, references to an "Aircraft" shall include Manuals and Technical Records associated therewith.

"**Aircraft Adjustment Amount**" means the aggregate purchase price of any rotary wing aircraft added to Schedule 4.19(a) by the Seller Parties following the date hereof, the acquisition and price of which have been approved in writing by Buyer.

"**Aircraft Lessee**" means, for any Aircraft Lease, the lessee under such Aircraft Lease.

"**Aircraft WAC Group**" means with respect to each WAC Facility, all of the Aircraft held as collateral by the WAC Facility Agent for such WAC Facility.

"**Airframe**" means, at any time, the airframe which is part of the relevant Aircraft at such time, together with all Parts relating to such airframe.

"**Amendment Adjustment Amount**" means, if, on the Closing Date, the Seller Parent or the applicable Seller Parties have not entered (or do not enter concurrently with Closing) into the Third Party Amendment, an amount equal ███████████.

"**Antitrust Laws**" means any Laws applicable to Buyer, any Seller Party or any Transferred Entity under any applicable jurisdiction that are designed to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade.

A-1

"**Assets**" means the assets, properties and rights (including tangible and intangible) that are owned, leased or licensed by any Transferred Entity.

"**Assumed Employee Plan**" means any Employee Plan set forth on Schedule 6.09(b)(ii).

"**Back-up Termination Date**" means the first to occur of (i) the later of: (A) sixty (60) days after the entry of an order approving a Competing Bid (it being agreed and understood that with respect to any credit bids only a sale of all of the Sellable Aircraft WAC Groups pursuant to Section 6.11 shall constitute a Competing Bid for purposes hereof), (B) one hundred twenty (120) days after the completion of the Auction, if any, (C) the Outside Date, (D) consummation of the transaction with: (1) the winning bidder at the Auction; or (2) the Person(s) with whom the Seller Parties enter into a definitive agreement with respect to a Competing Bid (it being agreed and understood that with respect to any credit bids only a sale of all of the Sellable Aircraft WAC Groups pursuant to Section 6.11 shall constitute a Competing Bid for purposes hereof) and as a result of which this Agreement is terminated pursuant to Section 11.01(f) or Section 11.01(h) or (ii) Buyer's receipt of notice from the Seller Parties of the release by the Seller Parties of Buyer's obligations under Section 8.04.

"**Bankruptcy and Equity Exception**" means the effect on enforceability of (a) any applicable Law relating to bankruptcy, reorganization, insolvency, moratorium, fraudulent conveyance or preferential transfers, or similar Law relating to or affecting creditors' rights generally and (b) general principles of equity (regardless of whether enforceability is considered in a proceeding in equity or at law).

"**Business**" means the ownership and leasing of helicopters by the Seller Parties and their respective Affiliates (including the Transferred Entities).

"**Business Day**" means any day that is not a Saturday, a Sunday or other day on which commercial banks in the Cities of (i) New York, New York, (ii) London, England or (iii) Dublin, Ireland are required or authorized by Law to be closed.

"**Business Intellectual Property**" means the Business Registrable IP, Intellectual Property in Software included in Business Technology, and all other Intellectual Property to the extent owned by any Seller Party or any of the Transferred Entities.

"**Business Names and Business Marks**" means the Trademarks of the Seller Parties and Internet domain names embodying any of the foregoing.

"**Business Registrable IP**" means patents, patent applications, registered trademarks, applications for registered trademarks, copyright registrations and Internet domain names owned by a Seller Party or Transferred Entity, including those set forth on Schedule 2.02(a)(viii).

"**Business Technology**" means all Software or Technology to the extent owned by any Seller Party or any of the Transferred Entities, including the Software set forth on Schedule 2.02(a)(viii).

WEIL:\96809416\18\79984.0003

"**Buyer Transaction Agreements**" means this Agreement and each other Transaction Agreement to which Buyer is named as a party on the signature pages thereto.

"**Buyer Transactions**" means the transactions contemplated by the Buyer Transaction Agreements.

"**Cape Town Convention**" means, together, the Convention on International Interests in Mobile Equipment and its Protocol on Matters Specific to Aircraft Equipment.

"**Cash**" means all cash and cash equivalents, including (i) checks, commercial paper, treasury bills, certificates of deposit and other bank deposits, securities, derivative securities, securities entitlements, instruments and other investments and all bank accounts and securities accounts, and (ii) all cash deposits (*e.g.*, customer, security and maintenance deposits arising under any Transferred Contract or Excluded Contract or other cash deposits for rent, electricity, telephone or otherwise) and restricted cash, in each case, calculated in accordance with GAAP and the Seller Parties' books and records.

"**Closing Conditions**" means conditions to the respective obligations of the Parties to consummate the Transactions, as set forth in Article X.

"**Closing Delay Payment**" means, to the extent that the Closing Date is a date occurring after January 31, 2019, an amount equal to the product of (A) the number of calendar days that elapse following January 31, 2019 and prior to the Closing Date, multiplied by (B) $200,000.

"**Closing Statement**" means, collectively, the Estimated Closing Statement, the Proposed Final Closing Statement and the Final Closing Statement.

"**Code**" means the U.S. Internal Revenue Code of 1986, as amended.

"**Confidentiality Agreement**" the means the Confidentiality Agreement dated as of September 14, 2018, by and between Macquarie Bank Limited and Waypoint Leasing Holdings Ltd., as the same may be amended from time to time in accordance with its terms.

"**Consent**" means any consent, approval, signature, novation, waiver of rights or authorization.

"**Contract**" means any written contract, agreement, undertaking, indenture, note, bond, mortgage, lease, sublease, license, sublicense, sales order, purchase order or other instrument or commitment that purports to be binding on any Person or any part of its property (or subjects any such assets or property to a Lien).

"**Control**" means, as to any Person, the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by Contract or otherwise. The terms "Controlled by," "Controlled," "under common Control with" and "Controlling" shall have correlative meanings.

A-3

"**Conversion Condition**" means the Requisite Lenders of each WAC Facility who collectively hold security interests in not less than 110 Aircraft have delivered signature page counterparts to a plan support agreement, in form and substance reasonably acceptable to Buyer and the Seller Parent, pursuant to which each such Requisite Lender agrees, among other things, to (a) vote, or cause to be voted, its Claims (as defined in the Bankruptcy Code) against the Debtors to accept a Plan of Reorganization that provides for an Equity Sale Transaction (which Equity Sale Transaction shall include the terms set forth on terms and conditions set forth on Schedule 2.09) and (b) not credit bid for any Aircraft, whether directly or indirectly, for as long as such plan support agreement is in effect and has not expired or otherwise been terminated by any party thereto in accordance therewith (any Requisite Lender who delivers such a signature page counterpart, a "**Participating Lender**"); provided, however, that the if the Requisite Lenders of the WAC Facilities that execute such a plan support agreement hold security interests in less than 110 Aircraft, then (y) Buyer may elect by written notice filed with the Bankruptcy Court within two (2) Business Days after the Credit Bid Due Date to accept such plan support agreement as satisfying the Conversion Condition and (z) in such event, the provisions of Section 2.09 shall apply.

"**Core Aircraft**" means the Aircraft set forth on Schedule F.

"**Covered Employee**" means any employee of any Seller Party, Servicing Entity, Transferred Entity or any other controlled Affiliate of the Seller Parent engaged in the Business immediately prior to Closing.

"**Cure Costs**" means any and all amounts, costs or expenses (including, for the avoidance of doubt, accrued and invoiced accounts payable with respect to Transferred Contracts) that must be paid or actions or obligations that must be performed or satisfied pursuant to the Bankruptcy Code to effectuate the assumption by the applicable Seller Party, and the assignment to Buyer, of the Transferred Contracts to which such Seller Party is party, as determined by the Bankruptcy Court or agreed to by the Seller Parties and the non-Seller Parties counterparty to the applicable Transferred Contract.

"**Data**" means databases and compilations, including all data and collections of data, whether machine readable or otherwise.

"**Debt**" means, without duplication, (i) indebtedness or other obligations for borrowed money or in respect of loans or advances or issued in substitution for or exchange of indebtedness for borrowed money or loans or advances, whether short-term or long-term, secured or unsecured, (ii) any indebtedness or other obligations evidenced by any note, bond, debenture or other debt security, (iii) all obligations to pay the deferred purchase price of property or services, contingent or otherwise (including all "earn-out" obligations), (iv) all obligations under interest rate and currency hedging agreements, including swap breakage or associated fees, (v) all obligations arising from bankers' acceptances, letters of credit (to the extent drawn) and cash/book overdrafts or similar facilities, (vi) any indebtedness or other obligations guaranteed, including guarantees in the form of an agreement to repurchase or reimburse or that assures a creditor against loss, (vii) any obligations under leases that have been or are required to be, in accordance with GAAP, recorded as capital leases, (viii) any indebtedness or other obligations secured by a Lien on any Seller Party's or Transferred Entity's interest in any assets (including any Aircraft), and

(ix) all accrued interest, premiums, penalties (including any prepayment penalties or premiums) and other obligations related to any of the foregoing.

"**Debtors**" means Waypoint Leasing Holdings Ltd., Waypoint Leasing (Luxembourg) S.à r.l., the Seller Parent, and each of the subsidiaries of the Seller Parent set forth on <u>Schedule B</u>.

"**Disclosure Schedules**" means the disclosure schedules dated as of the Agreement Date delivered by the Seller Parties to Buyer, which form a part of this Agreement.

"**Effective Time**" means 11:59 p.m. (local time) on the last calendar day immediately preceding the Closing Date.

"**Employee Plans**" means all employee benefit plans (within the meaning of Section 3(3) of ERISA, whether or not subject to ERISA), and each other material retirement, welfare benefit, bonus, stock option, stock purchase, restricted stock, incentive, deferred compensation, employment, retention, termination, or severance plans, programs, policies or agreements, in each case (i) that is sponsored, maintained, contributed to, or required to be contributed to by any of the Seller Parties or Servicing Entities, (ii) to which any of the Seller Parties or Servicing Entities is a party, (iii) to which any of the Seller Parties or Servicing Entities otherwise has or could reasonably expect to have any liability or obligation, or (iv) pursuant to which any of the Seller Parties or Servicing Entities has or could reasonably expect to have any obligation or liability with respect to any current or former employee, director, individual service provider (or the dependents or beneficiaries of any of them) of a Seller Party or a Transferred Entity, other than statutorily required plans or arrangements sponsored or maintained by a Government Authority.

"**Engine**" means, with respect to any Airframe, any of the engines that are included as part of the related Aircraft and any and all related Parts.

"**Environmental Law**" means any applicable U.S. federal, state, local or non-U.S. statute, law, ordinance, regulation, rule, code, Order or other requirement or rule of law (including common law) promulgated by a Government Authority, relating to public or worker health and safety (to the extent relating to exposure to Hazardous Materials), pollution or protection of the environment.

"**Environmental Permit**" means any Permit that is issued or required by a Government Authority under any Environmental Law and necessary to the operation of the Business as of the Agreement Date.

"**ERISA**" means the U.S. Employee Retirement Income Security Act of 1974, as amended.

"**ERISA Affiliate**" means any Person that could be treated as a single employer with any of the Seller Entities, Servicing Entities or Transferred Entities pursuant to Section 4001 of ERISA or Section 414 of the Code.

"**Escrow Agreement**" means that certain Escrow Agreement by and among the Escrow Agent, the Seller Parent and Buyer, dated as of the Agreement Date.

"**Estimated Net Deposit Amount**" means the Seller Parties' good faith estimate of the Net Deposit Amount, as of the Effective Time.

"**Estimated Transferred Entity Cash**" means an amount equal to the Seller Parties' good faith estimate of Transferred Entity Cash, as of the Effective Time.

"**Estimated Transferred Entity Debt**" means the Seller Parties' good faith estimate of Transferred Entity Debt, as of the Effective Time.

"**Exchange Rate**" means, with respect to any currency, the exchange rate for such currency converted into U.S. dollars, as published by the Wall Street Journal, United States Edition, on the date that is the last Business Day prior to date on which the Seller Parent delivers the Purchase Price and Transfer Tax Schedule pursuant to Section 3.08(a).

"**Exempt Transaction**" means any transaction that is effected by any WAC Facility Agent exercising its credit bid rights or exercising other remedies (including foreclosure of its collateral) under its WAC Facility and related documentation.

"**Exhibits**" means the exhibits dated as of the Agreement Date (and as may be amended from time to time) which form a part of this Agreement.

"**Ex-Im Laws**" means all U.S. and applicable non-U.S. Laws relating to export, reexport, transfer, and import controls, including the Export Administration Regulations, the International Traffic in Arms Regulations, and the customs and import Laws administered by U.S. Customs and Border Protection.

"**Final Closing Statement**" means a written statement setting forth the Final Transferred Entity Cash, the Final Transferred Entity Debt, the Final Net Deposit Amount, and the Post-Closing Adjustment, in each case, as finally determined pursuant to Section 3.05.

"**Final Net Deposit Amount**" means the Net Deposit Amount as of the Effective Time as finally determined pursuant to Section 3.05.

"**Final Transferred Entity Cash**" means an amount equal to the Transferred Entity Cash as of the Effective Time as finally determined pursuant to Section 3.05.

"**Final Transferred Entity Debt**" means the Transferred Entity Debt as of the Effective Time as finally determined pursuant to Section 3.05.

"**GAAP**" means U.S. generally accepted accounting principles.

"**Government Authority**" means any U.S. federal, state or local or any supra-national or non-U.S. government, political subdivision, governmental, regulatory or administrative authority, instrumentality, agency, body or commission, self-regulatory organization or any court, tribunal, or judicial or arbitral body.

WEIL:\96809416\18\79984.0003

"**Hazardous Materials**" means any substance, material or waste that is defined or regulated as "hazardous," "toxic," a "pollutant," a "contaminant" or words of similar meaning and regulatory effect under any applicable Environmental Law, including petroleum products or byproducts, asbestos, polychlorinated biphenyls or radiation.

"**Insurance Policies**" means, collectively, all policies and programs of or agreements for insurance and interests in insurance pools and programs (in each case including self-insurance and insurance from Affiliates).

"**Intellectual Property**" means any and all intellectual property and similar rights, title, or interest in or arising under the Laws of the U.S. or any other country, including: (a) patents, patent applications, and patent rights, including any such rights granted upon any reissue, reexamination, renewal, division, extension, provisional, continuation, or continuation-in-part applications, (b) copyrights, moral rights, mask work rights, database rights and design rights, whether or not registered, and registrations and applications for registration thereof, and all rights therein provided by international treaties or conventions, (c) Trademarks, (d) Trade Secrets, (e) Internet domain names and (f) all other intellectual property rights relating to Technology.

"**Interest Rate**" means the rate designated from time to time in Section 6621(a)(2) of the Code, compounded on a daily basis.

"**IRS**" means the U.S. Internal Revenue Service.

"**ITAR Aircraft**" has the meaning set forth on Schedule 1.01(c).

"**Joint Written Instructions**" means written instructions executed by the Seller Parent and Buyer, a form of which is attached to the Escrow Agreement as an exhibit thereto.

"**Knowledge of Seller**" means the actual knowledge of the Persons as of the Agreement Date listed on Schedule 1.01(a).

"**Law**" means any U.S. federal, state, local or non-U.S. statute, law, ordinance, regulation, rule, code, Order or other requirement or rule of law (including common law) promulgated by a Government Authority.

"**Lease Novation**" means, with respect to an Aircraft Lease, a novation agreement or deed or a lease assignment and assumption agreement or deed, which shall, among other things, provide for (x) the novation of such Aircraft Lease from the relevant Seller Party to Buyer or the applicable Buyer Nominee or (y) as applicable, the assignment by the relevant Seller Party of its rights as "Lessor" (or equivalent term) under such Aircraft Lease to Buyer or the applicable Buyer Nominee and the assumption by Buyer or the applicable Buyer Nominee of the obligations of the relevant Seller Party under such Aircraft Lease.

"**Leased Real Property**" means any real property that is leased by any Transferred Entity and the Transferred Leased Real Property.

"**Liabilities**" means any liability, Debt, guarantee, claim, demand, expense, commitment or obligation (whether direct or indirect, absolute or contingent, accrued or

unaccrued, liquidated or unliquidated, or known or unknown, due or to become due) of any kind, nature or and description, including all costs and expenses related thereto, regardless of whether or not required to be disclosed on a balance sheet prepared in accordance with GAAP and regardless of whether or not immediately due and payable.

"**Lien**" means any mortgage, deed of trust, pledge, hypothecation, security interest, encumbrance, claim, lien (as defined in Section 101(37) of the Bankruptcy Code) or charge of any kind.

"**Local Transfer Agreement**" means any agreement between Buyer and the applicable Seller Party (or their applicable Affiliates) or instrument of conveyance entered into or delivered, or to be entered into or delivered as reasonably requested by the applicable Seller Party or Buyer, in connection with the Transactions to transfer Transferred Assets or Transferred Equity Interests to Buyer, or for Buyer to assume the Assumed Liabilities, in any jurisdiction where the Business is organized or operates.  For the avoidance of doubt, "Local Transfer Agreement" shall not include any Lease Novations.

"**Losses**" means all losses, damages, costs, expenses, and Liabilities actually suffered or incurred (including reasonable attorneys' fees).

"**Material Adverse Effect**" means any fact, event, change, effect, development, circumstance, or occurrence that, individually or in the aggregate, has had or would reasonably be expected to have a material adverse effect on (A) the ability of any Seller Party to perform its obligations hereunder and consummate the Transactions or (B) the business, operations, properties, assets (including the Transferred Assets), liabilities (including the Assumed Liabilities) or financial condition of the Business; provided, that none of the following, either alone or in combination, will constitute a Material Adverse Effect: (i) any change in the United States or foreign economies or securities or financial markets in general (including any decline in the price of securities generally or any market or index); (ii) any change that generally affects any industry in which the Business operates; (iii) general business or economic conditions in any of the geographical areas in which the Business operates; (iv) national or international political or social conditions, including any change arising in connection with, hostilities, acts of war, sabotage or terrorism or military actions or any escalation or material worsening of any such hostilities, acts of war, sabotage or terrorism or military actions, whether commenced before or after the date hereof and whether or not pursuant to the declaration of a national emergency or war; (v) the occurrence of any act of God or other calamity or force majeure event (whether or not declared as such), including any civil disturbance, embargo, natural disaster, fire, flood, hurricane, tornado, or other weather event; (vi) any actions specifically required to be taken or omitted pursuant to this Agreement or any other Transaction Agreement or actions taken or omitted to be taken at the express written request, or with the expressly written consent, of Buyer; (vii) any changes in applicable Laws or GAAP; (viii) the filing or pendency of the Bankruptcy Cases, any Order of the Bankruptcy Court and any actions or omissions of any Seller Party in compliance with such Orders; (ix) any change resulting from (A) the public announcement of the entry into this Agreement or (B) the consummation of the Transactions; or (x) any effects or changes arising from or related to the breach of this Agreement by Buyer; provided, that that the exceptions set forth in clauses (i) through (v) of this definition shall not be regarded as exceptions solely to the extent that

WEIL:\96809416\18\79984.0003

any such described event has a disproportionately adverse impact on the Business, as compared to other companies in the industries in which the Business operates.

"**Net Deposit Amount**" means an amount equal to (i) the aggregate amount of all deposits, pre-paid expenses, including all lease and rental payments, each in respect of a Transferred Asset paid by any Seller Party to third-parties in respect of any period (or portion thereof) beginning on the Closing Date and ending thereafter, other than as set forth on Schedule D, plus (ii) the aggregate amount of all rental payments under Aircraft Leases referable to the period prior to the Closing and payable on or following the Closing Date, calculated on a cash basis, less (iii) the aggregate amount of all rental payments under Aircraft Leases referable to the period on or after the Closing and paid prior to the Closing Date, less (iv) the aggregate amount of the Seller Parties' obligations to third parties for Cash deposits (including customer deposits, security deposits, maintenance reserves or other similar deposits) arising under any Transferred Contract, less (v) the aggregate amount of prepaid expenses, including all lease and rental payments under Aircraft Leases paid by third parties to the Seller Parties in Cash prior to the Closing in respect of any period (or portion thereof) beginning on the Closing Date.

"**Non-Recoverable Transfer Taxes**" means any Transfer Taxes that are not Recoverable Transfer Taxes.

"**Order**" means any order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Government Authority.

"**Part**" means, with respect to an Airframe, Engine, Rotor Blade or Rotor Component, any auxiliary power unit, avionics, appliance, part, instrument, appurtenance, accessory, furnishing or other item of equipment of whatever nature (other than an Engine) which may from time to time be incorporated or installed in or attached to the relevant Airframe or Engine and to which the Seller Party that owns such Airframe or Engine has title or, after removal therefrom, so long as title thereto shall remain vested in the related Seller Party.

"**Participating Lender Credit Bid Due Date**" means the date that is seven (7) days following the timely filing (if made) by Buyer of the notice contemplated by Section 2.09(a)(i).



"**Permits**" means all permits, licenses, registrations (other than Aircraft registrations), concessions, grants, franchises, certificates (other than aviation-related certificates) and waivers issued or required by any Government Authority under applicable Law.

"**Permitted Liens**" means the following Liens: (a) Liens for Taxes, assessments or other governmental charges or levies that are not yet due and payable or that are being contested in good faith by appropriate proceedings and for which adequate reserves in accordance with GAAP have been made, (b) statutory Liens of landlords and Liens of carriers, warehousemen,

WEIL:\96809416\18\79984.0003

mechanics, materialmen, workmen, repairmen and other Liens imposed or permitted by Law, in the ordinary course of business for amounts that are not delinquent, or that are being contested in good faith by appropriate proceedings that do not involve any reasonable likelihood of the sale, seizure, forfeiture or loss of any Aircraft or title thereto, (c) Liens for fees or charges of any airport or air navigation authority that are not delinquent or which are being contested in good faith by appropriate proceedings that do not involve any imminent likelihood of the sale, seizure, forfeiture or loss of any Aircraft, Engine or title thereto, (d) salvage or similar rights of insurers under insurance policies maintained by any Seller Party, any Aircraft Lessee or any sublessee thereof, (e) the Aircraft Leases and the Related Aircraft Documents and any subleases or sub-subleases under the Aircraft Leases and all Liens arising by or through the Aircraft Lessees, sublessee or sub-sublessees (whether or not such Lien is in breach of the applicable Aircraft Lease), (f) deposits made in the ordinary course of business in connection with workers' compensation, unemployment insurance or other types of social security, (g) defects or imperfections of title (except with respect to any Aircraft), exceptions, easements, covenants, rights of way, restrictions and other similar charges, defects or encumbrances not materially interfering with the ordinary conduct of the Business and that do not materially detract from the value of the Business taken as a whole, (h) Liens (other than Acquired Leases) not created by any Seller Party or its Affiliates or the Transferred Entities affecting the underlying fee interest of any Leased Real Property or other real property over which the Seller Parties (with respect to the Business) or the Transferred Entities have easement or other property rights but do not own, (i) Liens created by Buyer or its Affiliates, (j) terms or conditions of any Acquired Leases, including title of a lessor under a capital or operating Acquired Lease, (k) in the case of Intellectual Property, licenses, options to license, covenants or other grants, (l) any Lien cured or removed in the Bankruptcy Cases and (m) Liens securing debt disclosed on the Financial Statements.

"**Person**" means any natural person, general or limited partnership, corporation, company, trust, limited liability company, limited liability partnership, firm, association or organization or other legal entity.

"**Post-Closing Adjustment**" means the amount (which may be positive or negative) equal to the sum of: (a) the Final Transferred Entity Cash minus the Estimated Transferred Entity Cash, (b) the Final Transferred Entity Debt minus the Estimated Transferred Entity Debt; and (c) the Final Net Deposit Amount minus the Estimated Net Deposit Amount.

"**Pre-Closing Period**" means the period beginning on the Agreement Date and ending on the earlier of the Closing Date and the date this Agreement is terminated in accordance with its terms.

"**Proposed Final Net Deposit Amount**" means Buyer's good faith, proposed final calculation of the Net Deposit Amount as of the Effective Time.

"**Proposed Final Transferred Entity Cash**" means Buyer's good faith, proposed final calculation of the Transferred Entity Cash as of the Effective Time.

"**Proposed Final Transferred Entity Debt**" means Buyer's good faith, proposed final calculation of the Transferred Entity Debt as of the Effective Time.

A-10

"**Recoverable Transfer Taxes**" mean any Transfer Taxes for which Buyer is permitted to obtain a Transfer Tax Refund.

"**Related Aircraft Documents**" means, with respect to any Aircraft Lease, the agreements and instruments relating to such Aircraft Lease to which a Seller Party is a party or which benefit a Seller Party (excluding for the avoidance of doubt any insurance policy or PBH agreement).

"**Release**" means the presence, spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, migration, movement or disposing into or through the environment.

"**Representative**" of a Person means the directors, officers, employees, advisors, agents, consultants, attorneys, accountants, investment bankers or other representatives of such Person.

"**Required Approvals**" means the approvals of the Government Authorities set forth on Schedules 10.01(b) and 10.02(b).

"**Requisite Lenders**" means, with respect to each WAC Facility, the lenders constituting more than one-half in number and at least two third in claim amount of such WAC Facility.

"**Rotor Blade**" means, with respect to any Airframe, each of the rotor blades associated with the related Aircraft, which may from time to time be installed on the relevant Airframe and to which the Seller Party that owns such Airframe has title, or after removal therefrom, so long as title thereto shall remain vested in the related Seller Party, or any rotor blade that may be supplied as a substitute in accordance with the relevant Aircraft Lease, together with any and all Rotor Components and Parts.

"**Rotor Component**" means each of the main rotor gear boxes, tail rotor gear boxes, combining gearboxes, transmissions, servos, main and tail rotor head components and other rotor components installed on an Airframe which may from time to time be installed on the relevant Airframe and to which the Seller Party that owns such Airframe has title or, after removal therefrom, so long as title thereto shall remain vested in the related Seller Party, or any rotor components that may be supplied as a substitute in accordance with the relevant Aircraft Lease, together with any and all Parts.

"**Sale Order**" shall be an order or orders of the Bankruptcy Court, in form and substance reasonably acceptable to Buyer and the Seller Parties, approving this Agreement and the terms and conditions hereof, approving and authorizing the Seller Parties to consummate the Transactions, determining that Buyer is a good faith purchaser within the meaning of Section 363(m) of the Bankruptcy Code.

"**Sale Procedures Order**" means that certain order of the Bankruptcy Court in form and substance reasonably acceptable to Buyer and the Seller Parties, that among other things, (a) establishes the date by which qualified bids are due, (b) approves the Break-Up Fee and Expense Reimbursement and (c) unless otherwise agreed by Buyer, specifies that (i) the Expense

WEIL:\96809416\18\79984.0003

Reimbursement shall be paid on the date provided in the Agreement and (ii) the Break-Up Fee payable by a third-party upon the consummation of a Competing Bid approved by the Bankruptcy Court (it being agreed and understood that any Exempt Transaction shall not be a Competing Bid for purposes hereof) shall be paid out of the purchase price proceeds of such Competing Bid and no other lender claims will attach thereto.

"**Securities Act**" means the Securities Act of 1933, as amended.

"**Seller Parties**" means Sellers and any Affiliate of Sellers designated by the Seller Parent to become a "Seller Party".

"**Seller Transaction Agreements**" means this Agreement and each other Transaction Agreement to which any Seller Party is named as a party on the signature pages thereto.

"**Seller Transaction Expenses**" means (a) the reasonable and documented out of pocket costs, fees and expenses of the Seller Parties (but not, for the avoidance of doubt, the Transferred Entities), including reasonable expenses of legal, tax, financial advisory, accounting and other similar costs, fees and expenses, (i) related to the Transaction, this Agreement and the Transaction Agreements, including all reasonable and documented expenses incurred by Seller's Financial Advisors, Weil, Gotshal & Manges, LLP, White & Case LLP and any local counsel, (ii) Transfer Taxes payable by the Seller Parties on the Closing Date pursuant to Section 9.01(a), (iii) the successful enforcement of any of the rights and remedies of the Seller Parties under this Agreement or the Transaction Agreements (except to the extent such expenses arise from a breach of this Agreement by the Seller Parties), (b) success, retention, stay, change of control or similar bonuses payable to employees upon the consummation of the Transactions or otherwise payable pursuant to a "Key Employee Incentive Plan" approved by the Bankruptcy Court, and (c) employee bonuses with respect to fiscal year 2018 (if any).

"**Seller Transactions**" means the transactions contemplated by the Seller Transaction Agreements.

"**Software**" means all (a) computer programs, including all software implementation of algorithms, models and methodologies, whether in source code, object code, human readable form or other form, (b) descriptions, flow charts and other work products used to design, plan, organize and develop any of the foregoing, screens, user interfaces, report formats, firmware, development tools, templates, menus, buttons and icons, (c) all documentation including user manuals and other training documentation relating to any of the foregoing, in each case (a)-(c), and (d) Data.

"**Subsidiary**" of any specified Person means any other Person of which such first Person owns (either directly or through one or more other Subsidiaries) a majority of the outstanding equity securities or securities carrying a majority of the voting power in the election of the board of directors or other governing body of such Person.

"**Systems**" means all the Software, hardware, network and telecommunications equipment and internet-related information technology that primarily relate to the Business and are material to the operation of the Business as conducted on the Agreement Date.

WEIL:\96809416\18\79984.0003

"**Tax**" or "**Taxes**" means all federal, state, local, foreign and other income, excise, gross receipts, ad valorem, value-added (including VAT), sales, use, production, employment, unemployment, severance, franchise, profits, registration, license, lease, service, service use, environmental, recording, documentary, filing, permit or authorization, stamp, business and occupation, gains, property, leasing, transfer, payroll, intangibles or other taxes, duties, levies or charges of any kind whatsoever (whether payable directly or by withholding), together with any interest and any penalties, additions to tax or additional amounts imposed by any Taxing Authority with respect thereto.

"**Tax Returns**" means all returns, reports and other filings (including elections, declarations, disclaimers, notices, disclosures, schedules, estimates, claims (including claims for refunds) and information returns) supplied or required to be supplied to a Taxing Authority relating to Taxes or otherwise appropriate, including any amendments thereof.

"**Taxing Authority**" means any federal, state, local or non-U.S. jurisdiction (including any subdivision and any revenue agency of a jurisdiction) imposing Taxes and the agencies, if any, charged with the collection, administration or enforcement of such Taxes for such jurisdiction.

"**Technology**" means, collectively, all technology, Software, designs, procedures, models, discoveries, processes, techniques, ideas, know-how, research and development, tools, materials, specifications, processes, inventions (whether patentable or unpatentable and whether or not reduced to practice) apparatus, creations, improvements, works of authorship in any media, confidential, proprietary or non-public information, and other similar materials, and all recordings, graphs, drawings, reports, analyses and other writings, and other tangible embodiments of the foregoing in any form whether or not listed herein, and all related technology.

"**Third Party Amendment**" has the meaning set forth on <u>Schedule 1.01(b)</u>.

"**Trade Secrets**" means confidential and proprietary information, including rights relating to know-how or trade secrets, including ideas, concepts, methods, techniques, inventions (whether patentable or unpatentable), and other works, whether or not developed or reduced to practice, rights in industrial property, customer, vendor, and prospect lists, and all associated information or databases, and other confidential or proprietary information, in each case other than Software.

"**Trademarks**" means trademarks, service marks, trade names, service names, trade dress, logos and other identifiers of same, including all goodwill associated therewith, and all common law rights, and registrations and applications for registration thereof, all rights therein provided by international treaties or conventions, and all reissues, extensions and renewals of any of the foregoing.

"**Transaction Agreements**" means this Agreement, the Bill of Sale, Assignment and Assumption Agreement, each Aircraft Bill of Sale, each Local Transfer Agreement, the Transferred Leased Property Assignment and Assumption Agreement, the IP Assignment Agreement, the Escrow Agreement, the Transition Services Agreement and any other agreements, instruments or documents required to be delivered at the Closing, in each case including all exhibits

A-13

and schedules thereto and all amendments thereto made in accordance with the respective terms thereof.

"**Transactions**" means the transactions contemplated by this Agreement and the other Transaction Agreements.

"**Transfer Tax Forms**" means any form, certificate, declaration or other documentation or evidence that is available to reduce, mitigate, relieve or otherwise claim exemptions from any Transfer Taxes available under applicable Law with respect to the Transaction.

"**Transfer Tax Refunds**" means all refunds, rebates, reimbursements, credits or other recovery of, or relating to Transfer Taxes imposed or arising with respect to the Transactions, including any interest and other amounts paid thereon by a Taxing Authority.

"**Transfer Taxes**" means all sales, use, excise, ad valorem, direct or indirect real property, transfer, intangible, stamp, business and occupation, value added (including VAT), recording, documentary, filing, permit or authorization, leasing, license, lease, service, service use, severance Taxes together with any interest and any penalties, additions to tax or additional amounts imposed by any Taxing Authority with respect thereto.

"**Transferred Books and Records**" means all books, records, files and papers, whether in hard copy or computer format, including sales and promotional literature, manuals and data, sales and purchase correspondence, customer lists, lists of suppliers, personnel and employment records, other than any Tax Returns and any Excluded Assets of the type described in Section 2.02(b)(xiii) or Section 2.02(b)(xiv), but including copies (to the extent originals are not transferred) of all materials that reasonably concern or relate to the preparation or filing of Tax Returns with respect to the Transferred Assets or Transferred Entities.

"**Transferred Contract Expenses**" means, as of the Closing Date, to the extent not a Cure Amount, the aggregate amount of all invoiced accounts payable arising under Transferred Contracts that directly relate to the Aircraft (e.g., maintenance and storage Contracts).

"**Transferred Entity Cash**" means the aggregate amount of Cash of the Transferred Entities (including all interest accrued thereon), as of the Effective Time, calculated in accordance with GAAP.

"**Transferred Entity Debt**" means the aggregate amount of all outstanding Debt of the Transferred Entities as of the Effective Time, calculated in accordance with GAAP and, for the purposes of this definition, Transferred Entity Debt shall exclude outstanding Debt of the Transferred Entities owed to any Seller Party or any of its Subsidiaries, which shall be cancelled or otherwise eliminated at or prior to Closing.

"**Transition Services Agreement**" means a transition services agreement, to be entered into by and among certain Seller Parties and Buyer, in form and substance reasonably acceptable to Seller and Buyer, pursuant to which Buyer shall provide certain services to the Seller Parties following the Closing Date.

"**TUPE**" means, in Ireland, the European Communities (Protection of Employees on Transfer of Undertakings) Regulations 2003 and elsewhere, any domestic legislation implementing Council Directive 2001/23/EC.

"**U.S.**" means the United States of America.

"**WAC Facility**" means each of the credit facilities set forth on <u>Schedule G</u>.

"**WAC Facility Agent**" means, with respect to each WAC Facility, the administrative agent and/or collateral agent under such WAC Facility that holds the collateral and/or holds the right to credit bid under such WAC Facility.

"**WARN Act**" means the U.S. Federal; Worker Adjustment and Retraining Act of 1988, and any similar state, local or non-U.S. law related to plant closings, relocations, mass layoffs and employment losses.

Action ....................................................................................................................... Exhibit A
Acquired Leases .................................................................................................. Section 4.15(a)
Affiliate .................................................................................................................... Exhibit A
Agreement ................................................................................................................ Exhibit A
Agreement Date ......................................................................................................... Preamble
Aircraft .................................................................................................................... Exhibit A
Aircraft Adjustment Amount ....................................................................................... Exhibit A
Aircraft Bill of Sale ......................................................................................... Section 3.03(a)(iii)
Aircraft Condition .......................................................................................... Section 8.01(b)(iv)
Aircraft Condition Fee .......................................................................................... Section 8.01(a)
Aircraft Lease .................................................................................................. Section 4.19(a)(i)
Aircraft Lessee ......................................................................................................... Exhibit A
Aircraft WAC Group.................................................................................................. Exhibit A
Airframe .................................................................................................................. Exhibit A
Allocation Dispute Notice ...................................................................................... Section 3.08(c)
Allocation Letter .................................................................................................. Section 6.11(b)
Allocation Resolution Period................................................................................... Section 3.08(c)
Allocation Review Period........................................................................................ Section 3.08(c)
Amendment Adjustment Amount ................................................................................. Exhibit A
Antitrust Laws ......................................................................................................... Exhibit A
AOG Aircraft ................................................................................................... Section 4.19(a)(ii)
Assets ..................................................................................................................... Exhibit A
Assumed Employee Plan ............................................................................................ Exhibit A
Assumed Environmental Liabilities.................................................................... Section 2.02(c)(iii)
Assumed Liabilities............................................................................................. Section 2.02(c)
Auction ............................................................................................................. Section 8.04
Back-up Termination Date ........................................................................................ Exhibit A

Bankruptcy and Equity Exception ............................................................. Exhibit A
Bankruptcy Cases............................................................. Preliminary Statements
Bankruptcy Code ............................................................. Preliminary Statements
Bankruptcy Court ............................................................. Preliminary Statements
Bankruptcy Milestones.................................................................... Section 8.05
Base Purchase Price ....................................................................... Section 3.01
Bill of Sale, Assignment and Assumption Agreement.................................... Section 3.03(a)(iii)
Break-Up Fee ..............................................................................Section 8.01(a)
Business.......................................................................................... Exhibit A
Business Day .................................................................................... Exhibit A
Business Intellectual Property ................................................................ Exhibit A
Business Names and Business Marks ........................................................ Exhibit A
Business Registrable IP ....................................................................... Exhibit A
Business Technology .......................................................................... Exhibit A
Buyer ............................................................................................Preamble
Buyer Nominee ........................................................................... Section 3.09
Buyer Transaction Agreements .............................................................. Exhibit A
Buyer Transactions ............................................................................ Exhibit A
Cape Town Convention ....................................................................... Exhibit A
Cash ............................................................................................. Exhibit A
Closing ..................................................................................... Section 2.05
Closing Conditions............................................................................ Exhibit A
Closing Date .............................................................................. Section 2.05
Closing Delay Payment ....................................................................... Exhibit A
Closing Payment .......................................................................... Section 3.04
████████████████████████ ........................................................ ████████████
Closing Statement ............................................................................. Exhibit A
Code ............................................................................................. Exhibit A
Competing Bid............................................................................ Section 8.02
Confidentiality Agreement ................................................................... Exhibit A
Consent ......................................................................................... Exhibit A
Contract ......................................................................................... Exhibit A
Contracting Parties...................................................................... Section 12.18
Control........................................................................................... Exhibit A
Conversion Condition ......................................................................... Exhibit A
Core Aircraft ................................................................................... Exhibit A
Covered Employee ............................................................................ Exhibit A
Credit Bid Due Date...................................................................... Section 8.05(f)
Cure Costs ...................................................................................... Exhibit A
D&O Indemnified Parties...............................................................Section 7.02(a)
Data ............................................................................................. Exhibit A
Debt ............................................................................................. Exhibit A
Debtors .......................................................................................... Exhibit A

Definitive Employee List ............................................................... Section 6.09(a)
Disclosure Schedules ................................................................... Exhibit A
Dispute Notice ............................................................................ Section 3.05(c)
Effective Time ............................................................................. Exhibit A
Employee Plans............................................................................ Exhibit A
Engine........................................................................................... Exhibit A
Environmental Law ...................................................................... Exhibit A
Environmental Permit .................................................................. Exhibit A
Equity Sale Transaction ............................................................... Section 2.09(a)
ERISA ........................................................................................... Exhibit A
ERISA Affiliate ............................................................................ Exhibit A
Escrow Agent............................................................................... Section 3.02
Escrow Agreement ....................................................................... Exhibit A
Escrowed Funds ........................................................................... Section 3.02
Estimated Closing Statement ....................................................... Section 3.04
Estimated Net Deposit Amount ................................................... Exhibit A
Estimated Transferred Entity Cash .............................................. Exhibit A
Estimated Transferred Entity Debt .............................................. Exhibit A
Estimated Transfer Tax Amount................................................... Section 3.08(a)
Exchange Rate .............................................................................. Exhibit A
Excluded Assets............................................................................ Section 2.02(b)
Excluded Contracts ...................................................................... Section 2.02(b)(ii)
Excluded Liabilities ..................................................................... Section 2.02(d)
Exempt Transaction ..................................................................... Exhibit A
Exhibits......................................................................................... Exhibit A
Ex-Im Laws .................................................................................. Exhibit A
Expense Reimbursement .............................................................. Section 8.01(a)
Final Closing Statement ............................................................... Exhibit A
Final Net Deposit Amount............................................................ Exhibit A
Final Purchase Price and Transfer Tax Schedule ......................... Section 3.08(d)
Final Transferred Entity Cash....................................................... Exhibit A
Final Transferred Entity Debt ...................................................... Exhibit A
Financial Statements .................................................................... Section 4.06(a)
GAAP ........................................................................................... Exhibit A
Government Approvals ................................................................. Section 6.04(a)
Government Authority .................................................................. Exhibit A
Guarantor...................................................................................... Preamble
Hazardous Materials..................................................................... Exhibit A
Independent Accounting Firm ...................................................... Section 3.05(d)
Insurance Policies ........................................................................ Exhibit A
Intellectual Property..................................................................... Exhibit A
Interest Rate ................................................................................. Exhibit A
International Registry.................................................................... Section 6.10(c)

WEIL:\96809416\18\79984.0003

IP Assignment Agreement .......................................................................... Section 3.03(a)(v)
IRS .............................................................................................................................. Exhibit A
ITAR Aircraft ............................................................................................................. Exhibit A
Joint Written Instructions ....................................................................................... Exhibit A
Knowledge of Seller ................................................................................................. Exhibit A
Law .............................................................................................................................. Exhibit A
Lease Novation .......................................................................................................... Exhibit A
Leased Real Property ................................................................................................ Exhibit A
Liabilities .................................................................................................................... Exhibit A
Lien ............................................................................................................................. Exhibit A
Local Transfer Agreement ....................................................................................... Exhibit A
Losses ......................................................................................................................... Exhibit A
Material Adverse Effect ........................................................................................... Exhibit A
Material Contracts .................................................................................................. Section 4.12(a)
Multiemployer Plan ................................................................................................ Section 4.13(c)
Net Deposit Amount ................................................................................................ Exhibit A
Nonparty Affiliates ................................................................................................. Section 12.18
Non-Recoverable Transfer Taxes .......................................................................... Exhibit A
Order ........................................................................................................................... Exhibit A
Outside Date ............................................................................................................ Section 11.01(d)
Part ............................................................................................................................. Exhibit A
Participating Lender Credit Bid Due Date ........................................................... Exhibit A
Parties ......................................................................................................................... Preamble
PBH ........................................................................................................................... Section 4.19(a)(iii)

Permits ....................................................................................................................... Exhibit A
Permitted Liens ......................................................................................................... Exhibit A
Person ......................................................................................................................... Exhibit A
Petition Date ................................................................................... Preliminary Statements
Plan Amendments .................................................................................................. Section 2.09(b)
Plan Conversion Notice ......................................................................................... Section 2.09(a)
Plan of Reorganization .......................................................................................... Section 2.09(a)
Post-Closing Adjustment ........................................................................................ Exhibit A
Post-Closing Adjustment Escrow Amount ......................................................... Section 3.06(c)
Pre-Closing Period ................................................................................................... Exhibit A
Proposed Final Closing Statement ....................................................................... Section 3.05(a)
Proposed Final Net Deposit Amount ................................................................... Exhibit A

WEIL:\96809416\18\79984.0003

Proposed Final Purchase Price and Transfer Tax Schedule ....................................Section 3.08(b)
Proposed Final Transferred Entity Cash ......................................................................... Exhibit A
Proposed Final Transferred Entity Debt......................................................................... Exhibit A
Purchase Price .......................................................................................................... Section 3.01
Purchase Price and Transfer Tax Schedule  ............................................................Section 3.08(a)
Recoverable Transfer Taxes ........................................................................................... Exhibit A
Related Aircraft Documents ........................................................................................... Exhibit A
Release............................................................................................................................ Exhibit A
███████████████████████████████████████████████████████████████████████████████████
Representative ................................................................................................................ Exhibit A
Required Approvals ........................................................................................................ Exhibit A
Requisite Lenders........................................................................................................... Exhibit A
Resolution Period .......................................................................................................Section 3.05(c)
Review Period.............................................................................................................Section 3.05(b)
Rotor Blade .................................................................................................................... Exhibit A
Rotor Component ........................................................................................................... Exhibit A
Sale Amount ..............................................................................................................Section 6.11(c)
Sale Motion.................................................................................................................Section 8.05(a)
Sale Motion Filing Date .............................................................................................Section8.05(a)
Sale Order ...................................................................................................................... Exhibit A
Sale Procedures Order.................................................................................................... Exhibit A
SAPA Amendment......................................................................................................Section 2.09(b)
Segregated Transfer Tax Amount ...............................................................................Section 9.01(b)
Sellable Aircraft WAC Group ....................................................................................Section 6.11(a)
Securities Act ................................................................................................................. Exhibit A
Seller Parent ................................................................................................................... Preamble
Seller Parties ................................................................................................................. Exhibit A
Seller Transaction Agreements....................................................................................... Exhibit A
Seller Transaction Expenses .......................................................................................... Exhibit A
Seller Transactions ......................................................................................................... Exhibit A
Seller's Financial Advisors............................................................................................. Section 4.16
Sellers ............................................................................................................................ Preamble
Servicing Entities ........................................................................................................... Preamble
Software.......................................................................................................................... Exhibit A
Straddle Period............................................................................................................. Section 9.02
Subsidiary ...................................................................................................................... Exhibit A
Systems ......................................................................................................................... Exhibit A
Tax ................................................................................................................................. Exhibit A
Tax Returns.................................................................................................................... Exhibit A
Taxing Authority............................................................................................................ Exhibit A
Technology ..................................................................................................................... Exhibit A
Tentative Purchase Price and Transfer Tax Schedule ...........................................Section 3.08(a)
Third Party Amendment ................................................................................................ Exhibit A

A-19

Third Party Consents.............................................................................. Section 6.05
Third Party Bid Due Date.....................................................................Section 8.05(d)
Third Party Rights .................................................................................. Section 2.03
Trade Secrets ............................................................................................ Exhibit A
Trademarks ............................................................................................... Exhibit A
Transaction Agreements........................................................................... Exhibit A
Transaction Dispute ............................................................................... Section 12.13
Transactions ............................................................................................. Exhibit A
Transfer Tax Escrow Account ..............................................................Section 9.01(b)
Transfer Tax Escrow Amount ..............................................................Section 9.01(b)
Transfer Tax Forms.................................................................................. Exhibit A
Transfer Tax Refunds............................................................................... Exhibit A
Transfer Tax Seller Account..................................................................Section 9.01(b)
Transfer Taxes ......................................................................................... Exhibit A
Transferred Assets.................................................................................Section 2.02(a)
Transferred Books and Records............................................................... Exhibit A
Transferred Contracts......................................................................... Section 2.02(a)(ii)
Transferred Contract Expenses................................................................ Exhibit A
Transferred Employee .........................................................................Section 6.09(a)
Transferred Entities .................................................................. Preliminary Statements
Transferred Entity Cash............................................................................ Exhibit A
Transferred Entity Debt............................................................................ Exhibit A
Transferred Equity Interests ..................................................... Preliminary Statements
Transferred Insurance Policies ............................................... Section 2.02(a)(xiv)
Transferred Leased Real Property ........................................... Section 2.02(a)(i)
Transferred Leased Property Assignment and Assumption Agreement ........... Section 3.03(a)(iv)
Transferred Leases ................................................................... Section 2.02(a)(i)
Transferred Permits.................................................................. Section 2.02(a)(iv)
Transition Services Agreement................................................................ Exhibit A
TUPE........................................................................................................ Exhibit A
U.S............................................................................................................ Exhibit A
WAC Facility ........................................................................................... Exhibit A
WAC Facility Agent ................................................................................ Exhibit A
WARN Act ............................................................................................... Exhibit A

A-20

# FORM OF BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT

**BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT** (this "Agreement"), dated as of [●], 2019 by and among [Seller Parties] (collectively, "Assignors") and [Buyer], a [●] ("Assignee") (each of the Assignors and Assignee, a "Party" and, together, the "Parties").

Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in that certain Stock and Asset Purchase Agreement (as amended, supplemented or otherwise modified, the "Purchase Agreement"), dated as of December 7, 2018, by and among Waypoint Leasing (Ireland) Limited, the other Sellers party thereto, Macquarie Rotorcraft Leasing Holdings Limited, solely for purposes of Sections 2.02 and 6.09 of the Purchase Agreement, the entities listed on Schedule E to the Purchase Agreement, and, solely for purposes of Section 12.25 of the Purchase Agreement, Macquarie Financial Holdings Pty Limited.

**WHEREAS**, Seller and Assignee have entered into the Purchase Agreement pursuant to which Assignee has agreed to purchase the Transferred Assets and to assume the Assumed Liabilities, in each case on the terms and subject to the conditions set forth in the Purchase Agreement; and

**WHEREAS**, pursuant to this Agreement, each of the Assignors shall sell, convey, assign, transfer and deliver to Assignee, and Assignee shall purchase, acquire, accept and assume from each such Assignor, all of such Assignor's right, title and interest in, to, and under the Transferred Assets and the Assumed Liabilities, in each case on the terms and subject to the conditions set forth in the Purchase Agreement (including Section 2.03 thereof).

**NOW, THEREFORE**, in consideration of the foregoing and the representations, warranties, covenants and agreements set forth in the Purchase Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1.      <u>Assignment of Transferred Assets</u>.  Effective as of the Closing, on the terms and subject to the conditions set forth in the Purchase Agreement (including Section 2.03 thereof), each Assignor hereby sells, conveys, assigns, transfers and delivers to Assignee, and Assignee hereby purchases, acquires and accepts from each such Assignor, all of such Assignor's right, title and interest in, to and under the Transferred Assets/other than the Aircrafts.

2.      <u>Assumption of Assumed Liabilities</u>.  Effective as of the Closing, on the terms and subject to the conditions set forth in the Purchase Agreement (including Section 2.03 thereof), Assignee hereby assumes and agrees to pay, discharge and perform in accordance with their terms, all of each Assignor's obligations and liabilities under the Assumed Liabilities; provided, that Assignee is not assuming or agreeing to pay, discharge or perform any Excluded Liabilities.

3.      <u>Binding Agreement</u>.  This Agreement is binding upon and inures to the benefit of the Parties and be enforceable by the legal representatives, respective successors and permitted assigns of the Parties.

4.    <u>Conflict</u>.  The respective rights of Assignors and Assignee with respect to the Transferred Assets sold, conveyed, assigned, transferred and delivered hereby and the Assumed Liabilities assumed hereby shall be governed exclusively by the Purchase Agreement and nothing in this Agreement shall alter any liability or obligation arising under the Purchase Agreement, which shall (without limiting the generality of the foregoing) govern, and shall contain the sole and exclusive representations, warranties and obligations of the Parties with respect to such Transferred Assets and such Assumed Liabilities.  If there is any conflict or inconsistency between the provisions of the Purchase Agreement and this Agreement, the provisions of the Purchase Agreement shall govern.

5.    <u>Sole Remedy</u>.  The sole and exclusive remedy of the Assignee and Assignors with respect to a breach of this Agreement shall be as set forth in the Purchase Agreement.

6.    <u>Notices.</u>    All notices and other communications under or by reason of this Agreement shall be in writing and shall be deemed to have been duly given or made (a) when personally delivered, (b) when delivered by e-mail transmission with receipt confirmed (followed by delivery of an original by another delivery method provided for in this Section 6) or (c) upon delivery by overnight courier service, in each case to the addresses and attention parties indicated below (or such other address, e-mail address or attention party as the recipient party has specified by prior notice given to the sending party in accordance with this Section 6):

If to Assignors, to:

Waypoint Leasing (Ireland) Limited
c/o Waypoint Leasing Services LLC
19 Old Kings Highway South
Darien, CT 06820
Attention:  Todd Wolynski
E-mail:  twolynski@waypointleasing.com

With a copy (which will not constitute notice) to:

Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, New York 10153
Attention:  Gary Holtzer
        Gavin Westerman
        Kelly DiBlasi
E-mail:    gary.holtzer@weil.com
        gavin.westerman@weil.com
        kelly.diblasi@weil.com

If to Assignee, to:

Macquarie Rotorcraft Leasing Holdings Limited
Ropemaker Place, 28 Ropemaker Street
London EC2Y 9HD
Attention:    Stephen Cook
        Tim Durham
E-mails:    Stephen.Cook@macquarie.com
        Tim.Durham@macquarierail.com

7.    <u>Severability</u>.  If any term or provision of this Agreement is held invalid, illegal or unenforceable in any respect under any applicable Law, as a matter of public policy or on any other grounds, the validity, legality and enforceability of all other terms and provisions of this Agreement will not in any way be affected or impaired. If the final judgment of a court of competent jurisdiction or other Government Authority declares that any term or provision hereof is invalid, illegal or unenforceable, the Parties agree that the court making such determination will have the power to reduce the scope, duration, area or applicability of the term or provision, to delete specific words or phrases, or to replace any invalid, illegal or unenforceable term or provision with a term or provision that is valid, legal and enforceable and that comes closest to expressing the intention of the invalid, illegal or unenforceable term or provision.

8.    <u>Amendments</u>.  This Agreement may be amended, restated, supplemented or otherwise modified, only by written agreement duly executed by each of Assignor and Assignee.

9.    <u>Further Assurances</u>.  Each of the Parties shall, and shall cause their respective Affiliates to, execute, acknowledge and deliver all reasonable further documents, and shall take such reasonable actions as may be necessary or appropriate to make effective the transactions contemplated hereby as may be reasonably requested by the other Party.

10.    <u>Counterparts</u>.  This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which when taken together shall constitute one and the same instrument.  Facsimiles, e-mail transmission of .pdf signatures or other electronic copies of signatures shall be deemed to be originals.

11.    <u>Governing Law</u>. This Agreement, and any Action that may be based upon, arise out of or relate or be incidental to this Agreement, the negotiation, execution, performance or consummation of the transactions contemplated by this Agreement or the inducement of either Party to enter into this Agreement, whether for breach of Contract, tortious conduct or otherwise, and whether now existing or hereafter arising, will  be exclusively governed by and construed and enforced in accordance with the internal Laws of the State of New York, without giving effect to any Law or rule that would cause the Laws of any jurisdiction other than the State of New York to be applied.

12.    <u>No Third-Party Beneficiaries</u>.  This Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing in this Agreement shall create or be deemed to create any third-party beneficiary rights in any Person not a Party hereto, including any Affiliates of any such Party.

13.    <u>Entire Agreement.</u>  This Agreement, and the Purchase Agreement (and all exhibits and schedules thereto) collectively constitute and contain the entire agreement and understanding of the Parties with respect to the subject matter hereof and supersede all prior negotiations, correspondence, understandings, agreements and Contracts, whether written or oral, among the Parties respecting the subject matter hereof.

*[Signature page follows]*

IN WITNESS WHEREOF, Assignee and Assignors have caused this Agreement to be executed by their duly authorized representatives as of the date first above written.

ASSIGNORS

By: _____
Name:
Title:


By: _____
Name:
Title:


By: _____
Name:
Title:


ASSIGNEE


By: _____
Name:
Title:

[SIGNATURE PAGE TO BILL OF SALE, ASSIGNMENT AND ASSUMPTION AGREEMENT]

## FORM OF AIRCRAFT BILL OF SALE

**AIRCRAFT BILL OF SALE** (this "**Aircraft Bill of Sale**"), dated [●], 2019 by [●] ("**Seller Party**"). For valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Seller Party, owner of the full legal and beneficial title to the aircraft, engines, equipment and documents described below (the "**Aircraft**"):

1. one [●] (Generic Model [●]) Aircraft bearing manufacturer's serial number [●];

2. two [●] (Generic Model [●]) engines bearing manufacturer's serial numbers [●] and [●]; and

3. all equipment, accessories and parts belonging to, installed in or appurtenant to such aircraft or engines,

does hereby sell, grant, transfer and deliver all of its right, title and interest in and to the Aircraft, to Macquarie Rotorcraft Leasing Holdings Limited ("**Buyer**") under and in accordance with the terms of the Stock and Asset Purchase Agreement (as amended, supplemented or otherwise modified, the purchase agreement, the "**Purchase Agreement**"), dated December 7, 2018, by and among Waypoint Leasing (Ireland) Limited, the other Sellers party thereto, Macquarie Rotorcraft Leasing Holdings Limited, solely for purposes of Sections 2.02 and 6.09 of the Purchase Agreement, the entities listed on Schedule E to the Purchase Agreement, and, solely for purposes of Section 12.25 of the Purchase Agreement, Macquarie Financial Holdings Pty Limited, to have and to hold the Aircraft forever. Seller Party hereby warrants to Buyer, and its successors and assigns, that there is hereby conveyed to Buyer good title to the Aircraft, free and clear of any Liens other than Permitted Liens, and that the Seller Party shall defend such title forever.

The terms "Liens" and "Permitted Liens" shall have the same meanings in this Aircraft Bill of Sale as in the Purchase Agreement.

Except as otherwise specifically provided in the Purchase Agreement, the Aircraft is sold "AS-IS and WHERE-IS and such sale is subject to the disclaimers in Section 4.20 of the Purchase Agreement.

This Aircraft Bill of Sale, and any Action that may be based upon, arise out of or relate or be incidental to this Aircraft Bill of Sale, the negotiation, execution, performance or consummation of the transaction contemplated by this Aircraft Bill of Sale or the inducement of either party to enter into this Aircraft Bill of Sale, whether for breach of Contract (as defined in the Purchase Agreement), tortious conduct or otherwise, and whether now existing or hereafter arising, will be exclusively governed by and construed and enforced in accordance with the internal laws of the State of New York, without giving effect to any Law or rule that would cause the Laws of any jurisdiction other than the State of New York, United States to be applied. The Seller Party hereby expressly agrees to exclude and disclaim the application of the provisions of the United Nations Convention on Contracts for the International Sale of Goods, and any successor convention or legislation, to this Aircraft Bill of Sale.

*[Signature page follows]*

IN WITNESS WHEREOF, Seller Party has caused this Aircraft Bill of Sale to be duly executed as of this date first above written.

**[SELLER PARTY]**

By:_____
Name:
Title:
Date:

EXHIBIT C

[Recording Requested By
And When Recorded, Return To:

_____
_____
_____
_____]¹

_____
DO NOT WRITE ABOVE THIS LINE
FOR RECORDER'S USE ONLY

APN:

[City], [State]

## FORM OF TRANSFERRED LEASED PROPERTY ASSIGNMENT AND ASSUMPTION AGREEMENT²

        **THIS TRANSFERRED LEASED PROPERTY ASSIGNMENT AND ASSUMPTION AGREEMENT** (this "<u>Assignment</u>") is made as of the [●] day of [●], 2019, by and between [●] a [●] ("<u>Assignor</u>"), and [●] a [●] ("<u>Assignee</u>") (each of Assignor and Assignee, a "<u>Party</u>" and, together, the "<u>Parties</u>").

        **WHEREAS**, on December 7, 2018, Assignor and certain of its affiliates (collectively, the "<u>Debtors</u>") each filed a voluntary petition for relief under chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101–1330 in the United States Bankruptcy Court for the Southern District of New York (the "<u>Bankruptcy Court</u>");

        **WHEREAS**, [the Parties are parties] [[●] and Assignee are parties] to that certain Stock and Asset Purchase Agreement, dated December 7, 2018, by and among Waypoint Leasing (Ireland) Limited, Macquarie Rotorcraft Leasing Holdings Limited and those other parties listed on the signature pages thereto (as amended, supplemented or otherwise modified, the "<u>Purchase Agreement</u>"). Capitalized terms used but not otherwise defined herein have the meanings given to such terms in the Purchase Agreement;

        **WHEREAS**, the execution and delivery of this Assignment is contemplated by Sections 3.03(a)(iv) and 3.03(b)(ix) of the Purchase Agreement;

        **WHEREAS**, Assignor desires to assign, transfer, convey and deliver to Assignee the lease described in Schedule I attached hereto, including all amendments, modifications, and supplements thereto (collectively, the "<u>Lease</u>"), and Assignee desires to accept an assignment of the Lease, together with all right, title, and interest of Assignor thereunder. [The property

---

¹ **Note to Draft:** To be added only for leases which are recorded.

² **Note to Draft:** Form to be duped out for each property transferred and to be modified to comply with local law requirements, if applicable. Non-US leases, if an assignment is required, may require different or additional forms of Local Transfer Agreements.

encumbered by the Lease (the "Leased Premises") is described on Schedule II attached hereto;][3] and

        **WHEREAS**, on [●], 201[_] the Bankruptcy Court entered the Sale Order [ECF No. [●]].

        **NOW, THEREFORE**, in consideration of the foregoing and the representations, warranties, covenants and agreements set forth in the Purchase Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

1. Assignment and Assumption of Lease.  For and in consideration of Ten Dollars ($10.00) and other valuable consideration, the receipt and adequacy of which are hereby acknowledged, effective as of the Closing, Assignor hereby assigns, transfers, conveys, and delivers to Assignee all of Assignor's estate, right, title and interest as tenant of the leasehold estate described under the Lease, and Assignee hereby accepts the assignment, transfer, conveyance and delivery of Assignor's estate, right, title and interest in, to and under such leasehold estate.

2. Assumption of Assumed Liabilities.  Effective as of the Closing, Assignor hereby assigns, and Assignee hereby assumes and agrees to pay, discharge, or perform when due, on or after the Closing, the Assumed Liabilities related to the Lease to the extent provided in the Purchase Agreement.  For the avoidance of doubt, and without limiting the foregoing, Assignee does not assume, and hereby disclaims, all Liabilities of Assignor or of any predecessor or Affiliate of Assignor other than such Assumed Liabilities with respect to the Lease.

3. Conflict.  The assignment and assumption of the Lease (and the Assumed Liabilities related thereto) made hereunder are made in accordance with, and subject to, the Purchase Agreement (including, without limitation, any surviving representations, warranties, covenants, and agreements contained therein), which are incorporated herein by reference.  If there is any conflict or inconsistency between the provisions of the Purchase Agreement and this Agreement, the provisions of the Purchase Agreement shall govern.

4. Binding Agreement.  This Assignment is binding upon and inures to the benefit of and be enforceable by the legal representatives, respective successors and permitted assigns of the Parties.

5. Sole Remedy.  Section 12.17 of the Purchase Agreement sets forth the sole and exclusive remedies conferred upon the Parties.

6. Notices.  All notices and other communications under or by reason of this Assignment shall be in writing and shall be deemed to have been duly given or made (a) when personally delivered, (b) when delivered by e-mail transmission with receipt confirmed (followed by delivery of an original by another delivery method provided for in this Section 6) or (c) upon

---

[3] **Note to Draft:** To be added only for leases which are recorded.

WEIL:\96832246\2\79984.0003

delivery by overnight courier service, in each case to the addresses and attention parties indicated below (or such other address, e-mail address or attention party as the recipient party has specified by prior notice given to the sending party in accordance with this Section 6):

| | |
|---|---|
| If to Assignor, to: | Waypoint Leasing (Ireland) Limited<br>c/o Waypoint Leasing Services LLC<br>19 Old Kings Highway South<br>Darien, CT 06820<br>Attention:  Todd Wolynski<br>E-mail:  twolynski@waypointleasing.com |
| With a copy (which will not constitute notice) to: | Weil, Gotshal & Manges LLP<br>767 Fifth Avenue<br>New York, New York 10153<br>Attention: Gary Holtzer<br>          Gavin Westerman<br>          Kelly DiBlasi<br>E-mail:  gary.holtzer@weil.com<br>          gavin.westerman@weil.com<br>          kelly.diblasi@weil.com |
| If to Assignee, to: | Macquarie Rotorcraft Leasing Holdings Limited<br>Ropemaker Place, 28 Ropemaker Street<br>London EC2Y 9HD<br>Attention:      Stephen Cook; Tim Durham<br>E-mails:      Stephen.Cook@macquarie.com<br><br>Tim.Durham@macquarierail.com |

7. <u>Severability</u>.  If any term or provision of this Assignment is held invalid, illegal or unenforceable in any respect under any applicable Law, as a matter of public policy or on any other grounds, the validity, legality and enforceability of all other terms and provisions of this Assignment will not in any way be affected or impaired.  If the final judgment of a court of competent jurisdiction or other Government Authority declares that any term or provision hereof is invalid, illegal or unenforceable, the Parties agree that the court making such determination will have the power to reduce the scope, duration, area or applicability of the term or provision, to delete specific words or phrases, or to replace any invalid, illegal or unenforceable term or provision with a term or provision that is valid, legal and enforceable and that comes closest to expressing the intention of the invalid, illegal or unenforceable term or provision.

8. <u>Amendments</u>.  This Assignment (including all exhibits and schedules hereto) may be amended, restated, supplemented or otherwise modified, only by written agreement duly executed by each of Assignor and Assignee.

9. <u>Further Assurances</u>.  Each of the Parties shall, and shall cause their respective Affiliates to, execute, acknowledge and deliver all reasonable further documents, and shall take such reasonable actions as may be necessary or appropriate to make effective the assignments

3

contemplated hereby as may be reasonably requested by the other Party[, including, without limitation, any other form of assignment agreement required in order to record this Assignment in the appropriate public records of the county in which the Leased Premises are located][4].

10. Counterparts.  This Assignment may be executed in counterparts, each of which shall be deemed an original, but all of which when taken together shall constitute one and the same instrument.  [Facsimiles, e-mail transmission of .pdf signatures or other electronic copies of signatures shall be deemed to be originals.][5]

11. Governing Law.  This Assignment, and any Action that may be based upon, arise out of or relate or be incidental to this Assignment, the negotiation, execution, performance or consummation of the Assignment or the inducement of either Party to enter into this Assignment, whether for breach of Contract, tortious conduct or otherwise, and whether now existing or hereafter arising, will  be exclusively governed by and construed and enforced in accordance with the internal Laws of the State of New York, without giving effect to any Law or rule that would cause the Laws of any jurisdiction other than the State of New York to be applied.

12. No Third-Party Beneficiaries.  This Assignment is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing in this Assignment shall create or be deemed to create any third-party beneficiary rights in any Person not a Party hereto, including any Affiliates of any such Party.

13. [Recordation.  Subject to the following sentence, this Assignment [shall be/may be] recorded in the appropriate public records of the county in which the Leased Premises are located. Assignor makes no representation regarding the recordability of this Assignment, nor the Lease or related documents, and Assignor shall bear no liability for the failure of this Assignment, the Lease or related documents to be recorded. Assignee shall bear all costs and expenses in connection with recording this Assignment or any other related documents.][6]

14. Entire Agreement.  This Assignment, (including the schedules attached hereto) and the Purchase Agreement (and all exhibits and schedules thereto) collectively constitute and contain the entire agreement and understanding of the Parties with respect to the subject matter hereof and supersede all prior negotiations, correspondence, understandings, agreements and Contracts, whether written or oral, among the Parties respecting the subject matter hereof.

* * * * *

---

[4] **Note to Draft:** To be added only for leases which are recorded.

[5] **Note to Draft:** To be added only for leases which are not recorded.

[6] **Note to Draft:** To be added only for leases which are recorded.

4

IN WITNESS WHEREOF, the Parties have executed this Assignment as of the date first above written.

**Assignor**:

[_____] a [_____]

By:_____
Name:_____
Title:_____

[1]THE STATE OF _____        )
                                     ) ss.
County of _____            )

On this _____ day of _____, 201__, before me, the undersigned, a Notary Public in and for said State, personally appeared _____, to me known to be the _____ of [_____], the [_____] that executed the foregoing instrument, and acknowledged to me that the said instrument is the free and voluntary act an deed of said [_____], for the uses and purposes therein mentioned, and on oath stated that s/he is authorized to execute the said instrument.

WITNESS MY HAND and official seal hereto affixed the day, month and year in this certificate first above written.

_____
Notary Public in and for the State of _____
Residing at _____
My commission expires: _____

---

[1] **Note to Draft:** Acknowledgments only required for recording purposes.

*[Signature Page to Transferred Leased Property Assignment and Assumption Agreement]*

**Assignee**:

[_____], a [_____]

By:_____
Name:_____
Title:_____


THE STATE OF _____          )
                                     ) ss.
County of _____           )


     On this _____ day of _____, 201__, before me, the undersigned, a Notary Public in and for said State, personally appeared _____, to me known to be the _____ of [_____], the [_____] that executed the foregoing instrument, and acknowledged to me that the said instrument is the free and voluntary act an deed of said [_____], for the uses and purposes therein mentioned, and on oath stated that s/he is authorized to execute the said instrument.

     WITNESS MY HAND and official seal hereto affixed the day, month and year in this certificate first above written.


_____
Notary Public in and for the State of _____
Residing at _____
My commission expires: _____


List of Schedules:
Schedule I - Lease
Schedule II - Leased Premises


*[Signature Page to Transferred Leased Property Assignment and Assumption Agreement]*

# SCHEDULE I

Lease

# SCHEDULE II

Leased Premises

EXHIBIT D

# FORM OF INTELLECTUAL PROPERTY ASSIGNMENT AGREEMENT[1]

**THIS INTELLECTUAL PROPERTY ASSIGNMENT AGREEMENT** ("Assignment"), effective as of [●] ("Effective Date"), is by and between [Seller Party], a [●] organized and existing under the laws of [●] ("Assignor"), and [Buyer], a [●] organized and existing under the laws of [●] ("Assignee") (each of Assignor and Assignee, a "Party" and, together, the "Parties").

**WHEREAS**, pursuant to that certain Stock and Asset Purchase Agreement, dated as of December 7, 2018, by and among Waypoint Leasing (Ireland) Limited, the other Sellers party thereto, Macquarie Rotorcraft Leasing Holdings Limited, solely for purposes of Sections 2.02 and 6.09 of the Purchase Agreement, the entities listed on Schedule E to the Purchase Agreement, and, solely for purposes of Section 12.25 of the Purchase Agreement, Macquarie Financial Holdings Pty Limited (the "Purchase Agreement"), Seller has agreed to cause each of the applicable Seller Parties to sell, and Assignee agreed to purchase from each such Seller Party, all of such Seller Party's right, title and interest in, to and under the Transferred Assets, in each case on the terms and subject to the conditions set forth in the Purchase Agreement. Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Purchase Agreement;

**WHEREAS**, as required in the Purchase Agreement, Assignor hereby desires to sell, convey, assign, transfer and deliver to Assignee all Business Registrable IP set forth on Exhibit A hereto (the "Assigned IP"); and

**WHEREAS**, Assignee desires to purchase, acquire and accept the Assigned IP from Assignor.

**NOW, THEREFORE**, for good and valuable consideration, the sufficiency and receipt of which is hereby acknowledged:

1. Assignment of Intellectual Property.  Assignor hereby sells, assigns and transfers to Assignee its entire worldwide right, title and interest in and to the Assigned IP, together with any and all goodwill connected with and symbolized by the Assigned IP, the same to be held and enjoyed by Assignee for its own use and enjoyment and the use and enjoyment of its successors, assigns and other legal representatives as fully and entirely as the same would have been held and enjoyed by Assignor if this assignment and sale had not been made, as assignee of its respective entire right, title and interest therein, including, without limitation, all rights in and to all income, royalties, damages and payments now or hereafter due or payable with respect thereto, all causes of action (whether in law or in equity) with respect thereto, and the right to sue, counterclaim, and recover for past, present and future infringement of the rights assigned or to be assigned under this Assignment.

2. Binding Agreement.  This Assignment is binding upon, and inures to the benefit of, the Parties and their respective legal representatives, successors and assigns.

3. Notices.  All notices and other communications under or by reason of this Assignment shall be in

---

[1] **Note to Draft**: To be duped out for each Seller Party transferring Business Registrable IP.

writing and shall be deemed to have been duly given or made (a) when personally delivered, (b) when delivered by e-mail transmission with receipt confirmed (followed by delivery of an original by another delivery method provided for in this Section 3) or (c) upon delivery by overnight courier service, in each case to the addresses and attention parties indicated below (or such other address, e-mail address or attention party as the recipient party has specified by prior notice given to the sending party in accordance with this Section 3):

If to Assignor, to:

Waypoint Leasing (Ireland) Limited.
c/o Waypoint Leasing Services LLC
19 Old Kings Highway South
Darien, CT 06820
Attention:  Todd Wolynski
E-mail:  twolynski@waypointleasing.com

If to Assignee, to:

Macquarie Rotorcraft Leasing Holdings Limited
Ropemaker Place, 28 Ropemaker Street
London EC2Y 9HD
Attention:       Stephen Cook; Tim Durham
E-mails:         Stephen.Cook@macquarie.com
                 Tim.Durham@macquarierail.com

4.   <u>Severability</u>.  If any term or provision of this Assignment is held invalid, illegal or unenforceable in any respect under any applicable Law, as a matter of public policy or on any other grounds, the validity, legality and enforceability of all other terms and provisions of this Assignment will not in any way be affected or impaired.  It is understood that any finding of invalidity of one assignment as effected hereby shall not affect the assignment of other Assigned IP.  If the final judgment of a court of competent jurisdiction or other Government Authority declares that any term or provision hereof is invalid, illegal or unenforceable, the Parties agree that the court making such determination will have the power to reduce the scope, duration, area or applicability of the term or provision, to delete specific words or phrases, or to replace any invalid, illegal or unenforceable term or provision with a term or provision that is valid, legal and enforceable and that comes closest to expressing the intention of the invalid, illegal or unenforceable term or provision.

5.   <u>Amendments</u>.   This Assignment (including Exhibit A hereto) may be amended, restated, supplemented or otherwise modified, only by written agreement duly executed by each of Assignor and Assignee.

6.   <u>Further Assurances</u>.   Each of the Parties shall, and shall cause their respective Affiliates to, execute, acknowledge and deliver all reasonable further documents, and shall take such reasonable actions as may be necessary or appropriate to make effective the assignments of the Assigned IP contemplated hereby as may be reasonably requested by the other Party.

7.   <u>Counterparts</u>.  This Assignment may be executed in counterparts, each of which shall be deemed an original, but all of which when taken together shall constitute one and the same instrument.  Facsimiles, e-mail transmission of.pdf signatures or other electronic copies of signatures shall be deemed to be originals.

8.   <u>Governing Law</u>.  This Assignment, and any Action that may be based upon, arise out of or relate

2

or be incidental to this Assignment, the negotiation, execution, performance or consummation of the Assignment or the inducement of either Party to enter into this Assignment, whether for breach of Contract, tortious conduct or otherwise, and whether now existing or hereafter arising, will  be exclusively governed by and construed and enforced in accordance with the internal Laws of the State of New York, without giving effect to any Law or rule that would cause the Laws of any jurisdiction other than the State of New York to be applied.

9.  <u>No Third-Party Beneficiaries</u>.  This Assignment is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing in this Assignment shall create or be deemed to create any third-party beneficiary rights in any Person not a Party hereto, including any Affiliates of any such Party.

10. <u>Entire Agreement</u>.   This Assignment, (including Exhibit A attached hereto) and the Purchase Agreement (and all exhibits and schedules thereto) collectively constitute and contain the entire agreement and understanding of the Parties with respect to the subject matter hereof and supersede all prior negotiations, correspondence, understandings, agreements and Contracts, whether written or oral, among the Parties respecting the subject matter hereof.

*[Signature page follows]*

3

IN WITNESS WHEREOF, the Parties, through their authorized representatives, have caused this Assignment to be duly executed and delivered as of the Effective Date.

**Assignor:**

**[●]**

By: _____

Name:
Title:

**Assignee:**

**[●]**

By: _____

Name:
Title:

# EXHIBIT A

## ASSIGNED IP

[Relevant portions of [Schedule 2.02(a)(viii)] (Business Registrable IP) of the Purchase Agreement]

**SCHEDULE A**

<u>Transferred Entities</u>

None.

## SCHEDULE B

### Debtors

1.  Waypoint Leasing Holdings Ltd.
2.  Waypoint Leasing (Luxembourg) S.à.r.l.
3.  Waypoint Leasing (Ireland) Limited
4.  Waypoint Asset Company Number 1 (Ireland) Limited
5.  MSN 20159 Trust
6.  MSN 31046 Trust
7.  MSN 41511 Trust
8.  MSN 760608 Trust
9.  MSN 89007 Trust
10. MSN 920141 Trust
11. MSN 920152 Trust
12. MSN 920153 Trust
13. MSN 920273 Trust
14. MSN 920281 Trust
15. MSN 9205 Trust
16. MSN 9229 Trust
17. Waypoint Asset Funding 1 LLC
18. Waypoint Asset Co 1A Limited
19. Waypoint Leasing Labuan 1A Limited
20. Waypoint Asset Co 1C Limited
21. Waypoint Asset Co 1D Limited
22. Waypoint Asset Co 1F Limited
23. Waypoint Asset Co 1G Limited
24. Waypoint Asset Co 1H Limited
25. Waypoint Asset Co 1J Limited
26. Waypoint Asset Co 1K Limited
27. Waypoint Asset Co 1L Limited
28. Waypoint Asset Co 1M Limited
29. Waypoint Asset Co 1N Limited
30. Waypoint Asset Euro 1G Limited
31. Waypoint Leasing UK 1B Limited
32. Waypoint Leasing UK 1C Limited
33. Waypoint Asset Company Number 2 (Ireland) Limited
34. MSN 31431 Trust
35. MSN 760734 Trust
36. MSN 920024 Trust
37. MSN 920030 Trust
38. Waypoint Asset Funding 2 LLC
39. Waypoint Asset Co 3 Limited
40. AE Helicopter (5) Limited
41. AE Helicopter (6) Limited
42. MSN 31141 Trust

WEIL:\96809416\18\79984.0003

43.   MSN 31492 Trust
44.   MSN 36458 Trust
45.   MSN 760543 Trust
46.   MSN 760551 Trust
47.   MSN 760581 Trust
48.   MSN 760628 Trust
49.   MSN 760631 Trust
50.   MSN 760682 Trust
51.   MSN 920022 Trust
52.   MSN 920062 Trust
53.   MSN 920125 Trust
54.   MSN 9229 AS
55.   Waypoint Asset Funding 3 LLC
56.   Waypoint Asset Co 3A Limited
57.   MSN 41371 Trust
58.   Waypoint Asset Euro 1A Limited
59.   MSN 4466 Trust
60.   MSN 4469 Trust
61.   MSN 6655 Trust
62.   MSN 7152 Trust
63.   MSN 7172 Trust
64.   Waypoint Asset Malta Ltd
65.   Waypoint Leasing Labuan 3A Limited
66.   Waypoint Leasing UK 3A Limited
67.   Waypoint Asset Co 4 Limited
68.   Waypoint Asset Co 5 Limited
69.   MSN 14786 Trust
70.   MSN 2047 Trust
71.   MSN 2057 Trust
72.   Waypoint Asset Co 6 Limited
73.   Waypoint Asset Funding 6 LLC
74.   MSN 31042 Trust
75.   MSN 31295 Trust
76.   MSN 31308 Trust
77.   MSN 920113 Trust
78.   MSN 920119 Trust
79.   Waypoint Asset Co 7 Limited
80.   Waypoint Asset Euro 7A Limited
81.   Waypoint Asset Co 8 Limited
82.   MSN 31041 Trust
83.   MSN 31203 Trust
84.   MSN 31578 Trust
85.   MSN 760617 Trust
86.   MSN 760624 Trust
87.   MSN 760626 Trust
88.   MSN 760765 Trust

Annex I-3

89. MSN 920063 Trust
90. MSN 920112 Trust
91. Waypoint 206 Trust
92. Waypoint 407 Trust
93. Waypoint 760626 Business Trust
94. Waypoint Asset Funding 8 LLC
95. Waypoint Asset Co 5A Limited
96. Waypoint Asset Euro 1B Limited
97. Waypoint Asset Euro 1C Limited
98. MSN 20012 Trust
99. MSN 20022 Trust
100. MSN 20025 Trust
101. Waypoint Asset Euro 1D Limited
102. Waypoint Leasing UK 8A Limited
103. Waypoint Leasing US 8A LLC
104. Waypoint Asset Co 9 Limited
105. MSN 20052 Trust
106. MSN 31312 Trust
107. MSN 41329 Trust
108. MSN 760538 Trust
109. MSN 760539 Trust
110. MSN 760541 Trust
111. MSN 6658 Trust
112. MSN 1251 Trust
113. MSN 760542 Trust
114. Waypoint Asset Co 5B Limited
115. Waypoint Leasing UK 5A Limited
116. Waypoint Asset Co 1B Limited
117. MSN 41272 Trust
118. MSN 69052 Trust
119. Waypoint Asset Euro 9A Limited
120. Waypoint Asset Euro 1E Limited
121. Waypoint Leasing UK 9A Limited
122. Waypoint Asset Sterling 9A Limited
123. Waypoint Asset Co 10 Limited
124. MSN 2826 Trust
125. MSN 2879 Trust
126. Waypoint 2916 Business Trust
127. Waypoint Asset Co 11 Limited
128. MSN 2905 Trust
129. Waypoint Asset Co 12 Limited
130. MSN 20042 Trust
131. MSN 41202 Trust
132. MSN 920280 Trust
133. Waypoint Asset Co 1E Limited
134. Waypoint Asset Euro 1F Limited

Annex I-4

135. MSN 20093 Trust
136. Waypoint Asset Malta 1A Limited
137. Waypoint Leasing Singapore 1 Pte Limited
138. Waypoint Leasing UK 1A Limited
139. Waypoint Asset Co 14 Limited
140. Waypoint Asset Co 15 Limited
141. Waypoint Leasing Services LLC
142. Waypoint Leasing (Luxembourg) Euro S.à r.l.
143. Waypoint Asset Co Germany Limited

WEIL:\96809416\18\79984.0003

# SCHEDULE C

Excluded Entities

All Subsidiaries of the Seller Parent.

WEIL:\96809416\18\79984.0003

**SCHEDULE D**

<u>Net Deposit Amount Exceptions</u>

Aggregate amount of all deposits made with third-party suppliers prior to Closing for flight equipment purchases.

Aggregate amount of all payments made to third parties in respect of any PBH enrolment "buy-in" costs.

WEIL:\96809416\18\79984.0003

**SCHEDULE E**

<u>Servicing Entities</u>

1.    Waypoint Leasing Services Canada Limited

2.    Waypoint Leasing Services Germany GmbH

3.    Waypoint Leasing Services Hong Kong Pte. Limited

4.    Waypoint Leasing Services SA (PTY) LTD

5.    Waypoint Leasing Services UK Limited

6.    Waypoint Services Brasil Ltda.

WEIL:\96809416\18\79984.0003

**SCHEDULE F**

<u>Core Aircraft</u>

[Intentionally Omitted]

WEIL:\96809416\18\79984.0003

## SCHEDULE G

### WAC Facilities

1.  The Amended and Restated Credit Agreement, dated as of November 8, 2013, among, Waypoint Asset Company Number 1 (Ireland) Limited and Waypoint Asset Funding 1 LLC, as borrowers, the Guarantors, as guarantors, the lenders party thereto from time to time, SunTrust Bank, as administrative agent, and Wells Fargo Bank, National Association, as collateral agent, as amended, restated, amended and restated, supplemented, or otherwise modified from time to time.

2.  The Credit Agreement dated as of April 16, 2014, among, Waypoint Asset Company Number 2 (Ireland) Limited and Waypoint Asset Funding 2 LLC, as borrowers, the Guarantors, as guarantors, the lenders party thereto from time to time, Wells Fargo Bank, National Association, as administrative agent and as collateral agent, as amended, restated, amended and restated, supplemented, or otherwise modified from time to time.

3.  The Credit Agreement, dated as of August 6, 2014, among, Waypoint Asset Funding 3 LLC, as borrowers, the Guarantors, as guarantors, the lenders party thereto from time to time, BNP Paribas, as administrative agent, and Wells Fargo Bank, National Association, as collateral agent, as amended, restated, amended and restated, supplemented, or otherwise modified from time to time.

4.  The Credit Agreement, dated as of March 23, 2015, among, Waypoint Asset Co 6 Limited and Waypoint Asset Funding 6 LLC, as borrowers, the Guarantors, as guarantors, the lenders party thereto from time to time, and Bank of Utah, as administrative agent and collateral agent, as amended, restated, amended and restated, supplemented, or otherwise modified from time to time.

5.  The Amended and Restated Credit Agreement, dated as of April 28, 2017, among, Waypoint Asset Co 7 Limited and Waypoint Asset Euro 7A Limited, as borrowers, the Guarantors, Waypoint Asset Co 4 Limited and Waypoint Asset Co 5 Limited as guarantors, the lenders party thereto from time to time, and SunTrust Bank, as administrative agent and collateral agent, as amended, restated, amended and restated, supplemented, or otherwise modified from time to time.

6.  The Note Purchase Agreement, dated as of July 29, 2015, among, Waypoint Asset Co 8 Limited and Waypoint Asset Funding 8 LLC, as issuers, the Guarantors, as guarantors, and Wells Fargo Bank, National Association, as administrative agent and collateral agent, as amended, restated, amended and restated, supplemented, or otherwise modified from time to time.

7.  The Credit Agreement, dated as of March 24, 2016, among, Waypoint Asset Co 9 Limited, as borrower, the Guarantors, Waypoint Asset Euro 9A Limited, and Waypoint Asset Sterling 9A Limited, as guarantors, the lenders party thereto from time to time, and

Lombard North Central Plc, as administrative agent and collateral agent, as amended, restated, amended and restated, supplemented, or otherwise modified from time to time.

8. The Facility Agreement, dated as of February 21, 2017, among, Waypoint Asset Co 10 Limited, as borrower, the Guarantors, as guarantor, the financial institutions listed on Schedule 1 thereto, as lenders, the agent, and the security trustee, as amended, restated, amended and restated, supplemented, or otherwise modified from time to time.

9. The Amended and Restated Credit Agreement, dated as of March 30, 2018, among, Waypoint Asset Co 11 Limited, as borrower, the Guarantors, as guarantors, the lenders party thereto from time to time, and KeyBank N.A., as both administrative agent and collateral agent, as security trustee, as amended, restated, amended and restated, supplemented, or otherwise modified from time to time.

10. The Credit Agreement, dated as of August 2, 2017, among, Waypoint Asset Co 12 Limited, as borrower, the Guarantors, as guarantors, the lenders party thereto from time to time, Sumitomo Mitsui Banking Corporation, Brussels Branch, as administrative agent and as collateral agent, as amended, restated, amended and restated, supplemented, or otherwise modified from time to time.

Annex I-2