UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------x
                                          :

| | |
|---|---|
| In re | :      **Chapter 11** |
| | : |
| **WAYPOINT LEASING** | :      **Case No. 18-13648 (SMB)** |
| **HOLDINGS LTD.,** *et al.*, | : |
| | :      **(Jointly Administered)** |
| Debtors.[1] | : |

-------------------------------------------------------------------x

## FINAL ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364, 507, AND 552 FED. R. BANKR. P. 2002, 4001, 6003, 6004, AND 9014, AND L. BANKR. R. 2002-1, 4001-2, 9013-1, 9014-1, AND 9014-2 (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN SENIOR SECURED PRIMING SUPERPRIORITY POSTPETITION FINANCING, (B) GRANT LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, AND (C) UTILIZE CASH COLLATERAL; (II) GRANTING ADEQUATE PROTECTION; AND (III) GRANTING RELATED RELIEF

Upon the motion dated December 7, 2018 (the "Motion")[2] [ECF No. 51] of the

above-captioned debtors and debtors in possession (collectively, the "Debtors") in the above-

captioned chapter 11 cases (collectively, the "Chapter 11 Cases"), for entry of interim orders

(the "First Interim Order" together with the "Second Interim Order," the "Interim Orders" ) and

this final order (the "Final Order"), pursuant to sections 105, 361, 362, 363(c), 364(c)(1),

364(c)(2), 364(c)(3), 364(d)(1), 364(e), 507 and 552 of title 11 of the United States Code, 11

U.S.C. §§ 101–1532 (the "Bankruptcy Code"), Rules 2002, 4001, 6003, 6004, 9013 and 9014 of

the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rules 2002-1, 4001-2,

9013-1, 9014-1 and 9014-2 of the Local Bankruptcy Rules for the Southern District of New York

(the "Local Rules") seeking, among other things, authorization for the DIP Borrowers (as

---

[1] A list of the Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, is attached to the Motion as Exhibit A.

[2] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Motion or the applicable DIP Documents (as defined herein).

defined herein) to (a) obtain postpetition secured debtor in possession financing in an aggregate principal amount of up to $49,000,000 (the "DIP Facility"), consisting of (x) up to $30,000,000, which became available to the DIP Borrowers upon entry of the Interim Orders and the net amount of the proceeds of such draws were deposited into a controlled deposit account held in the name of WLIL and maintained in the United Kingdom (the "Central DIP Account") and (y) $19,000,000, which may be drawn and the full amount of the proceeds shall be deposited into a segregated account (the "DIP Funding Account") maintained in the United States in the name of the DIP Agent (as defined herein), pursuant to the terms and conditions of that certain *Senior Secured Superpriority Debtor-In-Possession Credit Agreement* (substantially in the form attached hereto as Exhibit A, and as hereafter amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms thereof and hereof, the "DIP Credit Agreement"), by and among Waypoint Leasing Holdings Ltd. ("Holdings"), Waypoint Leasing (Luxembourg) S.a.r.l. ("LuxCo"), Waypoint Leasing (Ireland) Limited ("WLIL"), and each of the borrowers under the Participating WAC Facilities, as borrowers (each of the foregoing, a "DIP Borrower" and collectively, the "DIP Borrowers"), and (i) each subsidiary of WLIL that is a guarantor under the Participating WAC Facilities and (ii) Waypoint Asset Co. 11 Limited, as guarantors (collectively, the "DIP Guarantors" and, together with the DIP Borrowers, the "DIP Obligors"), Ankura Trust Company, LLC, as administrative agent and collateral agent (in such capacities, the "DIP Agent") and the lenders party thereto from time to time (the "DIP Lenders" and, together with the DIP Agent, the "DIP Parties"), and (b) incur the "Secured Obligations" under and as defined in the DIP Credit Agreement (such Secured Obligations, shall be referred to herein as the "DIP Obligations") (the DIP Credit Agreement, together with the Interim Orders, this Final Order and any related

agreements, documents, certificates, instruments, exhibits and schedules delivered or executed from time to time in connection therewith, as amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms thereof and hereof, collectively, the "DIP Documents"); and

This Court having found that due and proper notice of the Motion, the emergency hearing on the Motion (the "First Interim Hearing"), the further interim hearing (the "Second Interim Hearing" and together with the First Interim Hearing, the "Interim Hearings"), and the final hearing (the "Final Hearing") was provided by the Debtors, and having held the First Interim Hearing on December 10, 2018, the Second Interim Hearing on December 20, 2018, and **the Debtors having filed a Certificate of No Objection (Dkt No 212)** ~~the Final Hearing on January 10, 2019,~~ and after considering all the pleadings, motions and other papers filed with this Court and the evidence proffered or adduced on the record at the Interim Hearings and the Final Hearing; and all objections to the final relief requested in the Motion having been withdrawn, resolved, or overruled by the Court; and it appearing to the Court that granting the relief requested in the Motion is fair and reasonable and in the best interests of the Debtors, their creditors, their estates, and all parties-in-interest, represents a sound exercise of the Debtors' business judgment, and is necessary for the continued operation of the Debtors' businesses and preservation of the value of the Debtors' assets; and upon the record of these Chapter 11 Cases and after due deliberation and consideration and for good and sufficient cause appearing therefor:**[SMB: 1/9/19]**

### THE COURT HEREBY FINDS AND CONCLUDES AS FOLLOWS:

A.    *Petition Date*.  On November 25, 2018 (the "Petition Date"), each Debtor filed a voluntary petition with this Court commencing a case under chapter 11 of the Bankruptcy

Code.  The Debtors are continuing to operate their businesses and manage their respective properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in any of the Chapter 11 Cases.

B.      *Jurisdiction and Venue*.    This Court has jurisdiction over these proceedings pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of New York*, dated January 31, 2012.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  The statutory and legal predicates for the relief sought herein are sections 105, 361, 362, 363, 364, 507 and 552 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6003, 6004, 9013 and 9014 and Local Rules 2002-1, 4001-2, 9013-1, 9014-1 and 9014-2.

C.      *Committee Formation*.    As of the date hereof, no official committee of unsecured creditors or any other statutory committee (collectively, the "Committee") has been appointed in the Chapter 11 Cases.

D.      *Debtors' Stipulations*.    Without prejudice to the rights of any other non-Debtor party-in-interest with standing (but subject to the limitations thereon described in paragraph 17 below), the Debtors hereby admit, acknowledge, agree and stipulate to the following:

(i)     *WAC1 Credit Facility*.    Pursuant to that certain Amended and Restated Credit Agreement, dated as of November 8, 2013 (as amended, restated, supplemented, or otherwise modified from time to time, the "WAC1 Credit Facility" and collectively with the Credit Documents (as defined in the WAC1 Credit Facility) and any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, supplemented, waived or otherwise modified from time to time, the "WAC1 Documents"), among (a) Waypoint Asset Company Number 1 (Ireland) Limited and Waypoint Asset Funding 1 LLC (together, the "WAC1 Borrowers"), (b) the guarantor parties thereto (the "WAC1 Guarantors" and, together with the WAC1 Borrowers, the "WAC1 Obligors"), (c) SunTrust Bank, as administrative agent (in such capacity,

the "WAC1 Administrative Agent"), (d) Wells Fargo Bank, National Association, as collateral agent (in such capacity, the "WAC1 Collateral Agent"), and (e) the lenders party thereto from time to time (the "WAC1 Lenders" and, collectively with the WAC1 Administrative Agent and WAC1 Collateral Agent, the "WAC1 Secured Parties"), the WAC1 Lenders provided revolving credit and other financial accommodations to the WAC1 Borrowers pursuant to the WAC1 Documents. Prior to the Petition Date, the WAC1 Credit Facility was subject to that certain WAC1 Forbearance Agreement, dated as of June 29, 2018 (as amended, restated, supplemented, or otherwise modified from time to time). The WAC1 Documents are valid and enforceable in accordance with their terms by the WAC1 Secured Parties against, and are binding upon, each of the WAC1 Obligors party thereto.

(ii)     *WAC1 Obligations.* As of the Petition Date, the WAC1 Obligors were indebted to the WAC1 Secured Parties, without defense, counterclaim or offset of any kind, in respect of loans made under the WAC1 Documents in an amount, as of the Petition Date, not less than $300,608,604 (including accrued and unpaid interest and fees as of the Petition Date), which amount, for the avoidance of doubt, does not include the WAC1 Secured Parties' accrued and unpaid attorneys' fees, costs, and expenses, or any premium, fee, make-whole or penalty payments otherwise required by the terms of the WAC1 Documents, including, without limitation, upon a prepayment or acceleration of the obligations thereunder (such amounts, together with any amounts incurred or accrued but unpaid prior to the Petition Date in accordance with the WAC1 Documents, including but not limited to, any expenses, disbursements, derivative obligations, indemnification obligations, and other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the WAC1 Obligors' obligations pursuant to the WAC1 Documents, collectively, the "WAC1 Obligations"). The WAC1 Obligations constitute legal, valid, enforceable, non-avoidable, and binding obligations of the WAC1 Obligors, and (a) no offsets, set offs, defenses, or counterclaims to the WAC1 Obligations exist, (b) no portion of the WAC1 Obligations is subject to avoidance, disallowance, recharacterization, reduction, or subordination pursuant to contract, the Bankruptcy Code, or other applicable law, (c) the WAC1 Obligations constitute allowed secured claims against each of the applicable WAC1 Obligors' estate; and (d) the WAC1 Obligors and their estates have no claim, objection, challenge or cause of action against the WAC1 Secured Parties or any of their respective successors, assigns, affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers, shareholders, and employees, past, present and future, and their respective heirs, predecessors, successors and assigns, whether arising under applicable state or federal law (including, without limitation, any

5

recharacterization, subordination, avoidance, or other claims arising under or pursuant to sections 105, 510, or 542 through 553 of the Bankruptcy Code or any other applicable law), in connection with any of the WAC1 Documents (or the transactions contemplated thereunder), the WAC1 Obligations, the WAC1 Liens (as defined herein), or the WAC1 Collateral, including, without limitation, any right to assert any disgorgement or recovery.

(iii)     *WAC1 Liens.*  To secure the WAC1 Obligations, the WAC1 Obligors granted to the WAC1 Collateral Agent, for its benefit and the benefit of the WAC1 Lenders, a security interest in and lien upon (the "<u>WAC1 Liens</u>") certain categories of the WAC1 Obligors' respective assets, including, without limitation (a) certain aircraft, aircraft leases and related assets (including bills of sale for such aircraft, and all rights, powers and remedies of the WAC1 Obligors with respect thereto, including claims by the WAC1 Obligors for damages in respect of the aircraft and related assets arising as a result of the default by the manufacturer under any bill of sale), (b) bank accounts and cash on deposit in certain of the WAC1 Obligors' bank accounts, and (c) shares of capital stock, in each case subject to the parameters set forth in the WAC1 Documents (the "<u>WAC1 Collateral</u>").  The WAC1 Liens were fully perfected as of the Petition Date and constitute legal, valid, binding, enforceable and perfected first priority liens in and to the WAC1 Collateral and are not subject to avoidance, reduction, disallowance, disgorgement, counterclaim, surcharge, or (other than as contemplated by the WAC1 Documents) subordination pursuant to the Bankruptcy Code or any other applicable law, and such liens had priority over any and all other liens on the WAC1 Collateral, subject only to certain legal, valid, properly-perfected, non-avoidable and senior in priority liens that are otherwise expressly permitted by the WAC1 Documents and in existence as of the Petition Date or that are perfected subsequent thereto as permitted by section 546(b) of the Bankruptcy Code (the "<u>WAC1 Permitted Prior Liens</u>").

(iv)     *WAC1 Cash Collateral.*  All of the cash of Waypoint Asset Company Number 1 (Ireland) Limited and any of its subsidiaries (collectively, the "<u>WAC1 Group</u>"), wherever located, including, without limitation, any cash in deposit accounts of the WAC1 Group, constitutes Cash Collateral of the WAC1 Collateral Agent and the WAC1 Lenders.

(v)     *WAC3 Credit Facility.*  Pursuant to that certain Credit Agreement, dated as of August 6, 2014 (as amended, restated, supplemented or otherwise modified from time to time, the "<u>WAC3 Credit Facility</u>" and collectively with the Credit Documents (as defined in the WAC3 Credit Facility) and any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, supplemented, waived, or otherwise modified from time to time, the "<u>WAC3 Documents</u>"), among (a) Waypoint Asset Co 3 Limited and Waypoint Asset Funding 3 LLC, as

6

borrowers (together, the "WAC3 Borrowers"), (b) the guarantor parties thereto (the "WAC3 Guarantors" and, together with the WAC3 Borrowers, the "WAC3 Obligors), (c) BNP Paribas, as administrative agent (in such capacity, the "WAC3 Administrative Agent"), (d) Wells Fargo Bank, National Association, as collateral agent (in such capacity, the "WAC3 Collateral Agent" ); and (e) the lenders party thereto from time to time (collectively, the "WAC3 Lenders" and, collectively with the WAC3 Collateral Agent and the WAC3 Administrative Agent, the "WAC3 Secured Parties"), the WAC3 Lenders provided credit and other financial accommodations to the WAC3 Borrowers pursuant to the WAC3 Documents.. Prior to the Petition Date, the WAC3 Credit Facility was subject to that certain WAC3 Forbearance Agreement, dated as of June 29, 2018 (as amended, restated supplemented, or otherwise modified from time to time). The WAC3 Documents are valid and enforceable by the WAC3 Secured Parties against each of the WAC3 Obligors party thereto.

(vi)    *WAC3 Obligations.* As of the Petition Date, the WAC3 Obligors were indebted to the WAC3 Secured Parties, without defense, counterclaim or offset of any kind, in respect of loans made under the WAC3 Documents in an amount, as of the Petition Date, not less than $224,528,424 (including accrued but unpaid interest and fees as of the Petition Date), which amount, for the avoidance of doubt, does not include the WAC3 Secured Parties' accrued and unpaid attorneys' fees, costs, and expenses, or any premium, fee, make-whole or penalty payments otherwise required by the terms of the WAC3 Documents, including, without limitation, upon a prepayment or acceleration of the obligations thereunder) (such amounts, together with any amounts incurred or accrued but unpaid prior to the Petition Date in accordance with the WAC3 Documents, including but not limited to, any fees, expenses, disbursements, derivative obligations, indemnification obligations, and other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the WAC3 Obligors' obligations pursuant to the WAC3 Documents, collectively, the "WAC3 Obligations"). The WAC3 Obligations constitute legal, valid, enforceable, non-avoidable, and binding obligations of the WAC3 Obligors, and (a) no offsets, set offs, defenses or counterclaims to the WAC3 Obligations exist, (b) no portion of the WAC3 Obligations is subject to avoidance, disallowance, recharacterization, reduction, or subordination pursuant to the Bankruptcy Code or other applicable law, (c) the WAC3 Obligations constitute allowed secured claims against each of the applicable WAC3 Obligors' estate, as defined by the applicable WAC3 Document, and (d) the WAC3 Obligors and their estates have no claim, objection, challenge or cause of action against the WAC3 Secured Parties or any of their respective successors, assigns, affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers, shareholders, and

7

employees, past, present and future, and their respective heirs, predecessors, successors and assigns, whether arising under applicable state or federal law (including, without limitation, any recharacterization, subordination, avoidance, or other claims arising under or pursuant to sections 105, 510, or 542 through 553 of the Bankruptcy Code or any other applicable law), in connection with any of the WAC3 Documents (or the transactions contemplated thereunder), the WAC3 Obligations, and the WAC3 Liens (as defined herein), or the WAC3 Collateral including, without limitation, any right to assert any disgorgement or recovery.

(vii)    *WAC3 Liens*.  To secure the WAC3 Obligations, the WAC3 Obligors granted to the WAC3 Collateral Agent, for its benefit and the benefit of the WAC2 Lenders, a security interest in and lien upon (collectively, the "WAC3 Liens") certain categories of the WAC3 Obligors' respective assets, including, without limitation, (a) certain aircraft, aircraft leases and related assets (including bills of sale for such aircraft, and all rights, powers and remedies of the WAC3 Obligors with respect thereto, including claims by the WAC3 Obligors for damages in respect of the aircraft and related assets arising as a result of the default by the manufacturer under any bill of sale), (b) bank accounts and cash on deposit in certain of the WAC3 Obligors' bank accounts, and (c) shares of capital stock, in each case subject to the parameters set forth in the WAC3 Documents (the "WAC3 Collateral").  The WAC3 Liens were fully perfected as of the Petition Date, constitute legal, valid, binding, enforceable and perfected liens in and to the WAC3 Collateral, and are not subject to avoidance, reduction, disallowance, disgorgement, counterclaim, surcharge or (other than as contemplated by the WAC3 Documents) subordination pursuant to the Bankruptcy Code or any other applicable law, and such liens had priority over any and all other liens on the WAC3 Collateral, subject only to certain legal, valid, properly-perfected, non-avoidable and senior in priority liens that are otherwise expressly permitted by the WAC3 Documents and in existence as of the Petition Date or that are perfected subsequent thereto as permitted by section 546(b) of the Bankruptcy Code (the "WAC3 Permitted Prior Liens").

(viii)   *WAC3 Cash Collateral*.  All of the cash of Waypoint Asset Co 3 Limited and any of its subsidiaries, including any cash in deposit accounts of the WAC3 Group, wherever located, constitutes Cash Collateral of the WAC3 Collateral Agent and the WAC3 Lenders (the "WAC3 Cash Collateral").

(ix)    *WAC6 Credit Facility*.  Pursuant to that certain Credit Agreement, dated as of March 23, 2015 (as amended, restated supplemented, or otherwise modified from time to time, the "WAC6 Credit Facility" and collectively with the Credit Documents (as defined in the WAC6 Credit Facility) and any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, supplemented, waived, or

8

otherwise modified from time to time, the "<u>WAC6 Documents</u>"), among (a) Waypoint Asset Co 6 Limited and Waypoint Asset Funding 6 LLC (together, the "<u>WAC6 Borrowers</u>"), (b) the guarantor parties thereto (the "<u>WAC6 Guarantors</u>" and, together with the WAC6 Borrowers, the "<u>WAC6 Obligors</u>"), (c) Bank of Utah, as both administrative agent (in such capacity, the "<u>WAC6 Administrative Agent</u>") and collateral agent (in such capacity, the "<u>WAC6 Collateral Agent</u>"), and (d) the lenders party thereto from time to time (the "<u>WAC6 Lenders</u>" and, collectively with the WAC6 Administrative Agent and WAC6 Collateral Agent, the "<u>WAC6 Secured Parties</u>"), the WAC6 Lenders provided credit and other financial accommodations to the WAC6 Borrowers pursuant to the WAC6 Documents.   Prior to the Petition Date, the WAC6 Credit Facility is subject to that certain WAC6 Forbearance Agreement, dated as of June 29, 2018 (as amended, restated, supplemented, or otherwise modified from time to time).   The WAC6 Documents are valid and enforceable in accordance with their terms by the WAC6 Secured Parties against, and are binding upon, each of the WAC6 Obligors party thereto.

(x)      *WAC6 Obligations.*   As of the Petition Date, the WAC6 Obligors were indebted to the WAC6 Secured Parties, without defense, counterclaim or offset of any kind, in respect of loans made under the WAC6 Documents in an amount, as of the Petition Date, not less than $67,085,518 (including accrued but unpaid interest and fees as of the Petition Date), which amount, for the avoidance of doubt, does not include the WAC6 Secured Parties' accrued and unpaid attorneys' fees, costs, and expenses, or any premium, fee, make-whole, or penalty payments otherwise required by the terms of the WAC6 Documents, including, without limitation, upon a prepayment or acceleration of the obligations thereunder (such amounts, together with any amounts incurred or accrued but unpaid prior to the Petition Date in accordance with the WAC6 Documents, including but not limited to, any fees, expenses, disbursements, derivative obligations, indemnification obligations, and other charges, amounts, and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the WAC6 Obligors' obligations pursuant to the WAC6 Documents, collectively, the "<u>WAC6 Obligations</u>").   The WAC6 Obligations constitute legal, valid, enforceable, non-avoidable and binding obligations of the WAC6 Obligors, and (a) no offsets, set offs, defenses, or counterclaims to the WAC6 Obligations exist, (b) no portion of the WAC6 Obligations is subject to avoidance, disallowance, recharacterization, reduction or subordination pursuant to contract, the Bankruptcy Code or other applicable law, (c) the WAC6 Obligations constitute allowed secured claims against each of the applicable WAC6 Obligors' estate, and (d) the WAC6 Obligors and their estates have no claim, objection, challenge or cause of action against the WAC6 Secured Parties or any of their respective successors, assigns, affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors,

C:\USERS\FOUSTRAC\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\FBLUEZCE\WAY - FINAL DIP
ORDER_WEIL_96861720_6 (002).DOCX

financial advisors, consultants, professionals, officers, directors, members, managers, shareholders, and employees, past, present and future, and their respective heirs, predecessors, successors and assigns, whether arising under applicable state or federal law (including, without limitation, any recharacterization, subordination, avoidance or other claims arising under or pursuant to sections 105, 510 or 542 through 553 of the Bankruptcy Code or any other applicable law), in connection with any of the WAC6 Documents (or the transactions contemplated thereunder), the WAC6 Obligations, the WAC6 Liens (as defined herein), or the WAC6 Collateral, including, without limitation, any right to assert any disgorgement or recovery.

(xi)     *WAC6 Liens*.  To secure the WAC6 Obligations, the WAC6 Obligors granted to the WAC6 Collateral Agent, for its benefit and the benefit of the WAC6 Lenders, a security interest in and lien upon (the "WAC6 Liens") certain categories of the WAC6 Obligors' respective assets, including, without limitation, (a) certain aircraft, aircraft leases and related assets (including bills of sale for such aircraft, the beneficial interest in any owner trust that owns such aircraft, and all rights, powers and remedies of the WAC6 Obligors with respect thereto, including claims by the WAC6 Obligors for damages in respect of the aircraft and related assets arising as a result of the default by the manufacturer under any bill of sale), (b) bank accounts and cash on deposit in certain of the WAC6 Obligors' bank accounts, and (c) shares of capital stock, in each case subject to the parameters set forth in the WAC6 Documents (the "WAC6 Collateral").  The WAC6 Liens were fully perfected as of the Petition Date and constitute legal, valid, binding, enforceable and perfected first priority liens in and to the WAC6 Collateral and are not subject to avoidance, reduction, disallowance, disgorgement, counterclaim, surcharge or (other than as contemplated by the WAC6 Documents) subordination pursuant to the Bankruptcy Code or any other applicable law, and such liens had priority over any and all other liens on the WAC6 Collateral, subject only to certain legal, valid, properly-perfected, non-avoidable and senior in priority liens that are otherwise expressly permitted by the WAC6 Documents and in existence as of the Petition Date or that are perfected subsequent thereto as permitted by section 546(b) of the Bankruptcy Code (the "WAC6 Permitted Prior Liens").

(xii)    *WAC6 Cash Collateral.*  All of the cash of Waypoint Asset Co 6 Limited and any of its subsidiaries (collectively, the "WAC6 Group") cash, wherever located, including, without limitation, any cash in deposit accounts of the WAC6 Group, constitutes Cash Collateral of the WAC6 Collateral Agent and the WAC6 Lenders.

(xiii)   *WAC7 Credit Facility.*  Pursuant to that certain Amended and Restated Credit Agreement, dated as of April 28, 2017 (as amended, restated supplemented, or otherwise modified from time to time, the "WAC7

10

Credit Facility" and collectively with the Credit Documents (as defined in the WAC7 Credit Facility) and any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, supplemented, waived or otherwise modified from time to time, the "WAC7 Documents"), among (a) Waypoint Asset Co 7 Limited and Waypoint Asset Euro 7A Limited (together, the "WAC7 Borrowers"), (b) the guarantor parties thereto (the "WAC7 Guarantors" and, together with the WAC7 Borrowers, the "WAC7 Obligors"), (c) SunTrust Bank, as both administrative agent (in such capacity, the "WAC7 Administrative Agent") and collateral agent (in such capacity, the "WAC7 Collateral Agent"), and (d) the lenders party thereto from time to time (the "WAC7 Lenders" and, collectively with the WAC7 Administrative Agent and WAC7 Collateral Agent, the "WAC7 Secured Parties"), the WAC7 Lenders provided revolving credit and other financial accommodations to the WAC7 Borrowers pursuant to the WAC7 Documents. Prior to the Petition Date, the WAC7 Credit Facility was subject to that certain WAC7 Forbearance Agreement, dated as of June 29, 2018 (as amended, restated supplemented, or otherwise modified from time to time). The WAC7 Documents are valid and enforceable in accordance with their terms by the WAC7 Secured Parties against, and are binding upon, each of the WAC7 Obligors party thereto.

(xiv)  *WAC7 Obligations.*  As of the Petition Date, the WAC7 Obligors were indebted to the WAC7 Secured Parties, without defense, counterclaim or offset of any kind, in respect of loans made under the WAC7 Documents in an amount, as of the Petition Date, not less than $103,174,920 (including accrued but unpaid interest and fees), which amount, for the avoidance of doubt, does not include the WAC7 Secured Parties' accrued and unpaid attorneys' fees, costs, and expenses, or any premium, fee, make-whole or penalty payments otherwise required by the terms of the WAC7 Documents, including, without limitation, upon a prepayment or acceleration of the obligations thereunder (such amounts, together with any amounts incurred or accrued but unpaid prior to the Petition Date in accordance with the WAC7 Documents, including but not limited to, any fees, expenses, disbursements, derivative obligations, indemnification obligations, and other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the WAC7 Obligors' obligations pursuant to the WAC7 Documents, collectively, the "WAC7 Obligations"). The WAC7 Obligations constitute legal, valid, enforceable, non-avoidable and binding obligations of the WAC7 Obligors, and (a) no offsets, set offs, defenses, or counterclaims to the WAC7 Obligations exist, (b) no portion of the WAC7 Obligations is subject to avoidance, disallowance, recharacterization, reduction or subordination pursuant to contract, the Bankruptcy Code or other applicable law, (c) the WAC7 Obligations constitute allowed secured claims against each of the applicable WAC7 Obligors' estate, and (d) the WAC7 Obligors and their

11

estates have no claim, objection, challenge or cause of action against the WAC7 Secured Parties or any of their respective successors, assigns, affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers, shareholders, and employees, past, present and future, and their respective heirs, predecessors, successors and assigns, whether arising under applicable state or federal law (including, without limitation, any recharacterization, subordination, avoidance or other claims arising under or pursuant to sections 105, 510, or 542 through 553 of the Bankruptcy Code or any other applicable law), in connection with any of the WAC7 Documents (or the transactions contemplated thereunder), the WAC7 Obligations, the WAC7 Liens (as defined herein), or the WAC7 Collateral, including, without limitation, any right to assert any disgorgement or recovery.

(xv)    *WAC7 Liens.*  To secure the WAC7 Obligations, the WAC7 Obligors granted to the WAC7 Collateral Agent, for its benefit and the benefit of the WAC7 Lenders, a security interest in and lien upon (the "WAC7 Liens") certain categories of the WAC7 Obligors' respective assets, including, without limitation, (a) bank accounts and cash on deposit in certain of the WAC7 Obligors' bank accounts and (b) shares of capital stock, in each case subject to the parameters set forth in the WAC7 Documents (the "WAC7 Collateral").   The WAC7 Liens were fully perfected as of the Petition Date and constitute legal, valid, binding, enforceable, and perfected first priority liens in and to the WAC7 Collateral and are not subject to avoidance, reduction, disallowance, disgorgement, counterclaim, surcharge, (other than as contemplate by the WAC7 Documents) or subordination pursuant to the Bankruptcy Code or any other applicable law, and such liens had priority over any and all other liens on the WAC7 Collateral, subject only to certain legal, valid, properly-perfected, non-avoidable and senior in priority liens that are otherwise expressly permitted by the WAC7 Documents and in existence as of the Petition Date or that are perfected subsequent thereto as permitted by section 546(b) of the Bankruptcy Code (the "WAC7 Permitted Prior Liens").

(xvi)   *WAC7 Cash Collateral.*  All of the cash of Waypoint Asset Co 7 Limited and any of its subsidiaries (collectively, the "WAC7 Group") cash, wherever located, including, without limitation, any cash in deposit accounts of the WAC7 Group, constitutes Cash Collateral of the WAC7 Collateral Agent and the WAC7 Lenders.

(xvii)  *WAC8 Senior Secured Notes.*  Pursuant to that certain Note Purchase Agreement, dated as of July 29, 2015 (as amended, restated supplemented, or otherwise modified from time to time, the "WAC8 Note Purchase Agreement" and collectively with the Credit Documents (as defined in the WAC8 Note Purchase Agreement) and any other agreements and

12

documents executed or delivered in connection therewith, each as may be amended, restated, supplemented, waived or otherwise modified from time to time, the "WAC8 Documents"), among (a) Waypoint Asset Co 8 Limited and Waypoint Asset Funding 8 LLC (together, the "WAC8 Borrowers"), (b) the guarantor parties thereto (the "WAC8 Guarantors" and, together with the WAC8 Borrowers, the "WAC8 Obligors"), (c) Wells Fargo Bank, National Association, as both administrative agent (in such capacity, the "WAC8 Administrative Agent") and collateral agent (in such capacity, the "WAC8 Collateral Agent"), and (d) the purchasers parties thereto (the "WAC8 Holders" and, collectively with the WAC8 Administrative Agent and WAC8 Collateral Agent, the "WAC8 Secured Parties"), the WAC8 Holders provided credit and other financial accommodations to the WAC8 Borrowers pursuant to the WAC8 Documents. Prior to the Petition Date, the WAC8 Note Purchase Agreement was subject to that certain WAC8 Forbearance Agreement, dated as of June 29, 2018 (as amended, restated, supplemented, or otherwise modified from time to time). The WAC8 Documents are valid and enforceable in accordance with their terms by the WAC8 Secured Parties against, and are binding upon, each of the WAC8 Obligors party thereto.

(xviii) *WAC8 Obligations.*  As of the Petition Date, the WAC8 Obligors were indebted to the WAC8 Secured Parties, without defense, counterclaim or offset of any kind, in respect of loans made under the WAC8 Documents in an amount, as of the Petition Date, not less than $119,201,406 and €41,092,348, which amount, for the avoidance of doubt, does not include accrued but unpaid interest and fees as of the Petition Date, the Make-Whole Amount (as defined in the WAC8 Note Purchase Agreement) and the WAC8 Secured Parties' accrued and unpaid attorneys' fees, costs, and expenses, or any premium, fee, make whole or penalty payments otherwise required by the terms of the WAC8 Documents, including, without limitation, upon a prepayment or acceleration of the obligations thereunder) (such amounts, together with any amounts incurred or accrued but unpaid prior to the Petition Date in accordance with the WAC8 Documents, including but not limited to, any fees, expenses, disbursements, indemnification obligations, and other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing or chargeable in respect of any of the WAC8 Obligors' obligations pursuant to the WAC8 Documents, collectively, the "WAC8 Obligations").    The WAC8 Obligations constitute legal, valid, enforceable, non-avoidable and binding obligations of the WAC8 Obligors, and (a) no offsets, set offs defenses or counterclaims to the WAC8 Obligations exist, (b) no portion of the WAC8 Obligations is subject to avoidance, disallowance, recharacterization reduction or subordination pursuant to contract, the Bankruptcy Code or other applicable law, (c) the WAC8 Obligations constitute allowed secured claims against each of the applicable WAC8 Obligors' estate, and

C:\USERS\FOUSTRAC\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\FBLUEZCE\WAY - FINAL DIP ORDER_WEIL_96861720_6 (002).DOCX

(d) the WAC8 Obligors and their estates have no claim, objection, challenge or cause of action against the WAC8 Secured Parties or any of their respective successors, assigns, affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers, shareholders, and employees, past, present and future, and their respective heirs, predecessors, successors and assigns, whether arising under applicable state or federal law (including, without limitation, any recharacterization, subordination, avoidance or other claims arising under or pursuant to sections 105, 510, or 542 through 553 of the Bankruptcy Code or any other applicable law), in connection with any of the WAC8 Documents (or the transactions contemplated thereunder), the WAC8 Obligations, the WAC8 Liens (as defined herein), or the WAC8 Collateral, including, without limitation, any right to assert any disgorgement or recovery.

(xix)   *WAC8 Liens.*  To secure the WAC8 Obligations, the WAC8 Obligors granted to the WAC8 Collateral Agent, for its benefit and the benefit of the WAC8 Holders, a security interest in and lien upon (the "<u>WAC8 Liens</u>") certain categories of the WAC8 Obligors' respective assets, including, without limitation, (a) certain aircraft, aircraft leases and related assets (including bills of sale for such aircraft, and all rights, powers and remedies of the WAC8 Obligors with respect thereto, including claims by the WAC8 Obligors for damages in respect of the aircraft and related assets arising as a result of the default by the manufacturer under any bill of sale), (b) bank accounts and cash on deposit in certain of the WAC8 Obligors' bank accounts, and (c) shares of capital stock, in each case subject to the parameters set forth in the WAC8 Documents (the "<u>WAC8 Collateral</u>").  The WAC8 Liens were fully perfected as of the Petition Date and constitute legal, valid, binding, enforceable and perfected first priority liens in and to the WAC8 Collateral and are not subject to avoidance, reduction, disallowance, disgorgement, counterclaim, surcharge or (other than as contemplated by the WAC8 Documents) subordination pursuant to the Bankruptcy Code or any other applicable law, and such liens had priority over any and all other liens on the WAC8 Collateral, subject only to certain legal, valid, properly-perfected, non-avoidable and senior in priority liens that are otherwise expressly permitted by the WAC8 Documents and in existence as of the Petition Date or that are perfected subsequent thereto as permitted by section 546(b) of the Bankruptcy Code (the "<u>WAC8 Permitted Prior Liens</u>").

(xx)   *WAC8 Cash Collateral.*  All of the cash of Waypoint Asset Co 8 Limited and any of its subsidiaries (collectively, the "<u>WAC8 Group</u>"), wherever located, including, without limitation, any cash in deposit accounts of the WAC8 Group, constitutes Cash Collateral of the WAC8 Collateral Agent and the WAC8 Holders.

(xxi)  *WAC9 Credit Facility.*  Pursuant to that certain Credit Agreement, dated as of March 24, 2016 (as amended, restated supplemented, or otherwise modified from time to time, the "WAC9 Credit Facility" and collectively with the Credit Documents (as defined in the WAC9 Credit Facility) and any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, supplemented, waived or otherwise modified from time to time, the "WAC9 Documents"), among (a) Waypoint Asset Co 9 Limited, the "WAC9 Borrower"), (b) the guarantor parties thereto (the "WAC9 Guarantors" and, together with the WAC9 Borrower, the "WAC9 Obligors"), (c) Lombard North Central Plc, as both administrative agent (in such capacity, the "WAC9 Administrative Agent") and collateral agent (in such capacity, the "WAC9 Collateral Agent"), and (d) the lenders party thereto from time to time (the "WAC9 Lenders" and, collectively with the WAC9 Administrative Agent and WAC9 Collateral Agent, the "WAC9 Secured Parties"), the WAC9 Lenders provided credit and other financial accommodations to the WAC9 Borrower pursuant to the WAC9 Documents.  Prior to the Petition Date, the WAC9 Credit Facility was subject to that certain WAC9 Forbearance Agreement, dated as of June 29, 2018 (as amended, restated, supplemented, or otherwise modified from time to time).  The WAC9 Documents are valid and enforceable in accordance with their terms by the WAC9 Secured Parties against, and are binding upon, each of the WAC9 Obligors party thereto.

(xxii)  *WAC9 Obligations.*  As of the Petition Date, the WAC9 Obligors were indebted to the WAC9 Secured Parties, without defense, counterclaim or offset of any kind, in respect of loans made under the WAC9 Documents in an amount, as of the Petition Date, not less than $95,422,783 (including accrued but unpaid interest and fees as of the Petition Date), which amounts, for the avoidance of doubt, does not include the WAC9 Secured Parties' accrued and unpaid attorneys' fees, costs, and expenses, or any premium, fee, make-whole or penalty payments otherwise required by the terms of the WAC9 Documents, including, without limitation, upon a prepayment or acceleration of the obligations thereunder (such amounts, together with any amounts incurred or accrued but unpaid prior to the Petition Date in accordance with the WAC9 Documents, including but not limited to, any fees, expenses, disbursements, treasury, cash management, derivative obligations, indemnification obligations, and other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing or chargeable in respect of any of the WAC9 Obligors' obligations pursuant to the WAC9 Documents, collectively, the "WAC9 Obligations").  The WAC9 Obligations constitute legal, valid, enforceable, non-avoidable and binding obligations of the WAC9 Obligors, and (a) no offsets, set offs, defenses or counterclaims to the WAC9 Obligations exist, (b) no portion of the WAC9 Obligations is subject to avoidance, disallowance, recharacterization, reduction or subordination pursuant to contract, the Bankruptcy Code or

15

other applicable law, (c) the WAC9 Obligations constitute allowed secured claims against each of the applicable WAC9 Obligors' estate, and (d) the WAC9 Obligors and their estates have no claim, objection, challenge or cause of action against the WAC9 Secured Parties or any of their respective successors, assigns, affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers, shareholders, and employees, past, present and future, and their respective heirs, predecessors, successors and assigns, whether arising under applicable state or federal law (including, without limitation, any recharacterization, subordination, avoidance or other claims arising under or pursuant to sections 105, 510, or 542 through 553 of the Bankruptcy Code), in connection with any of the WAC9 Documents (or the transactions contemplated thereunder), the WAC9 Obligations, the WAC9 Liens (as defined herein), or the WAC9 Collateral, including, without limitation, any right to assert any disgorgement or recovery.

(xxiii)   *WAC9 Liens.*   To secure the WAC9 Obligations, the WAC9 Obligors granted to the WAC9 Collateral Agent, for its benefit and the benefit of the WAC9 Lenders, a security interest in and lien upon (the "<u>WAC9 Liens</u>") certain categories of the WAC9 Obligors' respective assets, including, without limitation, (a) certain aircraft, aircraft leases and related assets (including bills of sale for such aircraft, and all rights, powers and remedies of the WAC9 Obligors with respect thereto, including claims by the WAC9 Obligors for damages in respect of the aircraft and related assets arising as a result of the default by the manufacturer under any bill of sale), (b) bank accounts and cash on deposit in certain of the WAC9 Obligors' bank accounts, and (c) shares of capital stock, in each case subject to the parameters set forth in the WAC9 Documents (the "<u>WAC9 Collateral</u>").   The WAC9 Liens were fully perfected as of the Petition Date and constitute legal, valid, binding, enforceable and perfected first priority liens in and to the WAC9 Collateral and are not subject to avoidance, reduction, disallowance, disgorgement, counterclaim, surcharge or (other than as contemplated by the WAC9 Documents) subordination pursuant to the Bankruptcy Code or any other applicable law, and such liens had priority over any and all other liens on the WAC9 Collateral, subject only to certain legal, valid, properly-perfected, non-avoidable and senior in priority liens that are otherwise expressly permitted by the WAC9 Documents and in existence as of the Petition Date or that are perfected subsequent thereto as permitted by section 546(b) of the Bankruptcy Code (the "<u>WAC9 Permitted Prior Liens</u>").

(xxiv)   *WAC9 Cash Collateral.*   All of the cash of Waypoint Asset Co 9 Limited and any of its subsidiaries (the "<u>WAC9 Group</u>"), wherever located, including, without limitation, any cash in deposit accounts of the WAC9 Group, constitutes Cash Collateral of the WAC9 Collateral Agent and the WAC9 Lenders.

C:\USERS\FOUSTRAC\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\FBLUEZCE\WAY - FINAL DIP
ORDER_WEIL_96861720_6 (002).DOCX

(xxv) *WAC12 Credit Facility.* Pursuant to that certain Credit Agreement, dated as of August 2, 2017 (as amended, restated supplemented, or otherwise modified from time to time, the "WAC12 Credit Facility,"[3] and collectively with the Credit Documents (as defined in the WAC12 Credit Facility) and any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, supplemented, waived, or otherwise modified from time to time, the "WAC12 Documents")[4], among (a) Waypoint Asset Co 12 Limited (the "WAC12 Borrower"), (b) the guarantor parties thereto (the "WAC12 Guarantors" and, together with the WAC12 Borrower, the "WAC12 Obligors")[5], (c) Sumitomo Mitsui Banking Corporation, Brussels Branch, as administrative agent (in such capacity, the "WAC12 Administrative Agent")[6], (d) Sumitomo Mitsui Banking Corporation Europe Limited, as collateral agent (in such capacity, the "WAC12 Collateral Agent") [7], and (e) the lenders party thereto from time to time (the "WAC12 Lenders"[8] and, collectively with the WAC12 Administrative Agent, the WAC12 Collateral Agent, and each other Secured Party (as defined in the WAC12

---

[3] The WAC12 Credit Facility, collectively with the WAC1 Credit Facility, WAC3 Credit Facility, WAC6 Credit Facility, the WAC7 Credit Facility, the WAC8 Note Purchase Agreement, and the WAC9 Credit Facility shall be referred to herein as the "Participating WAC Facilities."

[4] The WAC12 Documents, collectively with the WAC1 Documents, the WAC3 Documents, the WAC6 Documents, the WAC7 Documents, the WAC8 Documents, and the WAC9 Documents shall be referred to herein as the "Participating WAC Loan Documents."

[5] The WAC12 Obligors, collectively with the WAC1 Obligors, the WAC3 Obligors, the WAC6 Obligors, the WAC7 Obligors, the WAC8 Obligors, and the WAC9 Obligors shall be referred to herein as the "Participating WAC Obligors" and together with the obligors under the Non-Participating WAC Facilities, the "Prepetition Obligors." The Participating WAC Obligors in each of the respective Participating WAC Facilities shall each be referred to herein as a "Participating WAC Group."

[6] The WAC12 Collateral Agent, collectively with the WAC1 Collateral Agent, the WAC3 Collateral Agent, the WAC6 Collateral Agent, the WAC7 Collateral Agent, the WAC8 Collateral Agent, and the WAC9 Collateral Agent, shall be referred to herein as the "Participating WAC Collateral Agents."

[7] The WAC12 Administrative Agent, collectively with the WAC1 Administrative Agent, the WAC3 Administrative Agent, the WAC6 Administrative Agent, the WAC7 Administrative Agent, the WAC8 Administrative Agent, and the WAC9 Administrative Agent, shall be referred to herein as the "Participating WAC Agents." For the avoidance of doubt, in each instance in which the consent or approval of the WAC8 Agent is required in this Final Order or in the DIP Documents, the consent of the Required Noteholders (as defined in the WAC8 Documents) shall constitute the consent of the WAC8 Administrative Agent.

[8] The WAC12 Lenders, collectively with the WAC1 Lenders, the WAC3 Lenders, the WAC6 Lenders, the WAC7 Lenders, the WAC8 Holders, and the WAC9 Lenders, shall be referred to herein as the "Participating WAC Lenders."

Credit Facility), the "WAC12 Secured Parties")[9], the WAC12 Lenders provided credit and other financial accommodations to the WAC12 Borrower pursuant to the WAC12 Documents. Prior to the Petition Date, the WAC12 Credit Facility was subject to that certain WAC12 Forbearance Agreement[10], dated as of June 29, 2018 (as amended, restated supplemented, or otherwise modified from time to time). The WAC12 Documents are valid and enforceable in accordance with their terms by the WAC12 Secured Parties against, and are binding upon, each of the WAC12 Obligors party thereto.

(xxvi)    *WAC12 Obligations.* As of the Petition Date, the WAC12 Obligors were indebted to the WAC12 Secured Parties, without defense, counterclaim or offset of any kind, in respect of loans made under the WAC12 Documents in an amount, as of the Petition Date, not less than $114,693,321 (including accrued but unpaid interest as of the Petition Date), which amount, for the avoidance of doubt, does not include the WAC12 Secured Parties' accrued and unpaid attorneys' fees, costs, and expenses, or any premium, fee, make-whole or penalty payments otherwise required by the terms of the WAC12 Documents, including, without limitation, upon a prepayment or acceleration of the obligations thereunder (such amounts, together with any amounts incurred or accrued but unpaid prior to the Petition Date in accordance with the WAC12 Documents, including but not limited to, any fees, expenses, disbursements, derivative obligations, indemnification obligations, and other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the WAC12 Obligors' obligations pursuant to the WAC12 Documents, collectively, the "WAC12 Obligations")[11]. The WAC12 Obligations constitute legal, valid, enforceable, non-avoidable, and binding obligations of the WAC12 Obligors, and (a) no offsets, set offs, defenses or counterclaims to the WAC12 Obligations exist, (b) no portion of the WAC12 Obligations is subject to avoidance, disallowance, recharacterization reduction or subordination pursuant to the Bankruptcy Code or other applicable law, (c) the WAC12 Obligations constitute

---

[9] The WAC12 Secured Parties, collectively with the WAC1 Secured Parties, the WAC3 Secured Parties, the WAC6 Secured Parties, the WAC7 Secured Parties, the WAC8 Secured Parties, and the WAC9 Secured Parties, shall be referred to herein as the "Participating WAC Secured Parties."

[10] The WAC12 Forbearance Agreement, collectively with the WAC1 Forbearance Agreement, the WAC3 Forbearance Agreement, the WAC6 Forbearance Agreement, the WAC7 Forbearance Agreement, the WAC8 Forbearance Agreement, and the WAC9 Forbearance Agreement, the "Forbearance Agreements."

[11] The WAC12 Obligations, collectively with the WAC1 Obligations, the WAC3 Obligations, the WAC6 Obligations, the WAC7 Obligations, the WAC8 Obligations, and the WAC9 Obligations, shall be referred to herein as the "Participating WAC Secured Obligations."

allowed secured claims against each of the applicable WAC12 Obligors' estate, and (d) the WAC12 Obligors and their estates have no claim, objection, challenge or cause of action against the WAC12 Secured Parties or any of their respective successors, assigns, affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers, shareholders, and employees, past, present and future, and their respective heirs, predecessors, successors and assigns, whether arising under applicable state or federal law (including, without limitation, any recharacterization, subordination, avoidance or other claims arising under or pursuant to sections 105, 510, or 542 through 553 of the Bankruptcy Code), in connection with any of the WAC12 Documents (or the transactions contemplated thereunder), the WAC12 Obligations, the WAC12 Liens (as defined herein), or the WAC12 Collateral, including, without limitation, any right to assert any disgorgement or recovery.

(xxvii) *WAC12 Liens*.  To secure the WAC12 Obligations, the WAC12 Obligors granted to the WAC12 Collateral Agent, for its benefit and the benefit of the WAC12 Secured Parties, a security interest in and lien upon (the "WAC12 Liens")[12] all Collateral (as defined in the WAC12 Credit Facility), including, without limitation, certain categories of the WAC12 Obligors' respective assets, including, (a) certain aircraft, aircraft leases and related assets, (b) bank accounts and cash on deposit in certain of the WAC12 Obligors' bank accounts, and (c) shares of capital stock, in each case subject to the parameters set forth in the WAC12 Documents (the "WAC12 Collateral")[13].  The WAC12 Liens were fully perfected as of the Petition Date and constitute legal, valid, binding, enforceable and perfected first priority liens in and to the WAC12 Collateral and are not subject to avoidance, reduction, disallowance, disgorgement, counterclaim, surcharge or subordination pursuant to the Bankruptcy Code or any other applicable law, and such liens had priority over any and all other liens on the WAC12 Collateral, subject only to certain legal, valid, properly-perfected, non-avoidable and senior in priority liens that are

---

[12] The WAC12 Liens, collectively with the WAC1 Liens, the WAC3 Liens, the WAC6 Liens, the WAC7 Liens, the WAC8 Liens, and the WAC9 Liens, shall be referred to herein as the "Participating WAC Liens."

[13] The WAC12 Collateral, collectively with the WAC1 Collateral, the WAC3 Collateral, the WAC6 Collateral, the WAC7 Collateral, the WAC8 Collateral, and the WAC9 Collateral, shall be referred to herein as the "Participating WAC Collateral."  In addition, the term "WAC Specific Collateral" shall mean all encumbered assets of each respective Participating WAC Group, including, without limitation, all aircraft fixed assets (together with the lease and other revenue associated therewith), subject to valid and perfected liens as of the Petition Date under the applicable Participating WAC Facility, as well as any assets of an entity (x) whose equity was pledged, via a valid and perfected equity pledge as of the Petition Date, to secure a Participating WAC Facility or (y) that is a subsidiary of an entity specified in (x).

otherwise expressly permitted by the WAC12 Documents and in existence as of the Petition Date or that are perfected subsequent thereto as permitted by section 546(b) of the Bankruptcy Code (the "<u>WAC12 Permitted Prior Liens</u>")[14].

(xxviii) *WAC12 Cash Collateral.*  All of the cash of WAC12 Borrower and any of its subsidiaries (the "<u>WAC12 Group</u>"), wherever located, including, without limitation, any cash in deposit accounts of the WAC12 Group, constitutes Cash Collateral of the WAC12 Collateral Agent and the WAC12 Secured Parties.

(xxix) As a result of, among other things, the commencement of the Chapter 11 Cases, the Participating WAC Obligors are in default of the Participating WAC Loan Documents; and subject to paragraph 17 of this Final Order (except with respect to section 364(e) of the Bankruptcy Code), the Debtors and each Participating WAC Obligor hereby forever, unconditionally and irrevocably release, discharge and acquit the Participating WAC Secured Parties, the Steering Committee (as defined herein), the DIP Lenders, and the DIP Agent, and each of their respective successors, assigns, affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers, shareholders, and employees, past, present and future, and their respective heirs, predecessors, successors and assigns (collectively, the "<u>Releasees</u>") of and from any and all claims, controversies, disputes, liabilities, obligations, demands, damages, expenses (including, without limitation, reasonable and documented out-of-pocket attorneys' fees), debts, liens, actions and causes of action of any and every nature whatsoever, whether arising in law or otherwise, and whether or not known or matured, arising out of or relating to the DIP Facility, the Participating WAC Secured Obligations, the Participating WAC Loan Documents, including, without limitation, (A) any so-called "lender liability" or equitable subordination claims or defenses, (B) any and all claims and causes of action arising under the Bankruptcy Code, and (C) any and all claims and causes of action with respect to the validity, priority, perfection or avoidability of the Participating WAC Liens and the Participating WAC Secured Obligations (collectively, "<u>Claims</u>"); provided that no party shall be released from any Claims found in a final, nonappealable judgment of a court of competent jurisdiction to have resulted from such party's fraud, gross negligence or willful misconduct.  The Participating WAC Obligors further waive and release any defense, right of counterclaim, right of set-off or deduction to the payment of the Participating WAC Secured

---

[14] The WAC12 Permitted Prior Liens, collectively with the WAC1 Permitted Prior Liens, the WAC3 Permitted Prior Liens, the WAC6 Permitted Prior Liens, the WAC7 Permitted Prior Liens, the WAC8 Permitted Prior Liens, the WAC9 Permitted Prior Liens, and the WAC12 Permitted Prior Liens, the "<u>Permitted Prior Liens</u>."

Obligations that the Participating WAC Obligors now have or may claim to have against the Releasees, arising out of, connected with or relating to any and all acts, omissions or events occurring prior to the Bankruptcy Court entering this Final Order.

(xxx) *WAC2 Credit Facility.* Pursuant to that certain Credit Agreement, dated as of April 16, 2014 (as amended, restated, supplemented or otherwise modified from time to time, the "WAC2 Credit Facility" and collectively with the Credit Documents (as defined in the WAC2 Credit Facility) and any other agreements and documents executed or delivered in connection therewith, each as may be amended, restated, supplemented, waived, or otherwise modified from time to time, the "WAC2 Documents"), among (a) Waypoint Asset Company Number 2 (Ireland) Limited and Waypoint Asset Funding 2 LLC, as borrowers (together, the "WAC2 Borrowers"), (b) the guarantor parties thereto (the "WAC2 Guarantors" and, together with the WAC2 Borrowers, the "WAC2 Obligors), (c) Wells Fargo Bank, National Association, as both administrative agent (in such capacity, the "WAC2 Administrative Agent") and collateral agent (in such capacity, the "WAC2 Collateral Agent"), and (d) the lenders party thereto from time to time (collectively, the "WAC2 Lenders" and, collectively with the WAC2 Collateral Agent and the WAC2 Administrative Agent, the "WAC2 Secured Parties"), pursuant to which the WAC2 Lenders have provided to the WAC2 Borrowers a term loan commitment in an aggregate principal amount of $72,500,000. Prior to the Petition Date, the WAC2 Credit Facility was subject to that certain WAC2 Forbearance Agreement, dated as of June 29, 2018 (as amended, restated supplemented, or otherwise modified from time to time). The WAC2 Documents are valid and enforceable by the WAC2 Secured Parties against each of the WAC2 Obligors party thereto.

(xxxi) *WAC2 Obligations.* As of the Petition Date, the WAC2 Obligors were indebted to the WAC2 Secured Parties, without defense, counterclaim or offset of any kind, in respect of loans made under the WAC2 Documents in an amount, as of the Petition Date, not less than $55,547,266 (including accrued but unpaid interest), which amount, for the avoidance of doubt, does not include the WAC2 Secured Parties' accrued and unpaid attorneys' fees, costs, and expenses, or any premium, fee, make-whole or penalty payments otherwise required by the terms of the WAC2 Documents, including, without limitation, upon a prepayment or acceleration of the obligations thereunder) (such amounts, together with any amounts incurred or accrued but unpaid prior to the Petition Date in accordance with the WAC2 Documents, including but not limited to, any fees, expenses, disbursements, derivative obligations, indemnification obligations, and other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the WAC2 Obligors' obligations pursuant to the WAC2 Documents, collectively, the "WAC2

21

Obligations"). The WAC2 Obligations constitute legal, valid, enforceable, non-avoidable, and binding obligations of the WAC2 Obligors, and (a) no offsets, set offs, defenses or counterclaims to the WAC2 Obligations exist, (b) no portion of the WAC2 Obligations is subject to avoidance, disallowance, recharacterization reduction or subordination pursuant to the Bankruptcy Code or other applicable law, (c) the WAC2 Obligations constitute allowed secured claims against each of the applicable WAC2 Obligors' estate, as defined by the applicable WAC2 Document, and (d) the WAC2 Obligors and their estates have no claim, objection, challenge or cause of action against the WAC2 Secured Parties or any of their respective successors, assigns, affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers, shareholders, and employees, past, present and future, and their respective heirs, predecessors, successors and assigns, whether arising under applicable state or federal law (including, without limitation, any recharacterization, subordination, avoidance or other claims arising under or pursuant to sections 105, 510, or 542 through 553 of the Bankruptcy Code), in connection with any of the WAC2 Documents (or the transactions contemplated thereunder), the WAC2 Obligations, and the WAC2 Liens (as defined herein), including, without limitation, any right to assert any disgorgement or recovery.

(xxxii) *WAC2 Liens*. To secure the WAC2 Obligations, the WAC2 Obligors granted to the WAC2 Collateral Agent, for its benefit and the benefit of the WAC2 Lenders, a security interest in and lien upon (collectively, the "WAC2 Liens") certain categories of the WAC2 Obligors' respective assets, including (a) certain aircraft, aircraft leases and related assets (including bills of sale for such aircraft, and all rights, powers and remedies of the WAC2 Obligors with respect thereto, including claims by the WAC2 Obligors for damages in respect of the aircraft and related assets arising as a result of the default by the manufacturer under any bill of sale), (b) bank accounts and cash on deposit in certain of the WAC2 Obligors' bank accounts, and (c) shares of capital stock, in each case subject to the parameters set forth in the WAC2 Documents (the "WAC2 Collateral"). The WAC2 Liens were fully perfected as of the Petition Date, constitute legal, valid, binding, enforceable and perfected liens in and to the WAC2 Collateral, and are not subject to avoidance, reduction, disallowance, disgorgement, counterclaim, surcharge or (other than as contemplated by the WAC2 Documents) subordination pursuant to the Bankruptcy Code or any other applicable law, and such liens had priority over any and all other liens on the WAC2 Collateral, subject only to certain legal, valid, properly-perfected, non-avoidable and senior in priority liens that are otherwise expressly permitted by the WAC2 Documents and in existence as of the Petition Date or that are perfected subsequent thereto as permitted by section 546(b) of the Bankruptcy Code (the "WAC2 Permitted Prior Liens").

(xxxiii) *WAC2 Cash Collateral.*  All of the WAC2 Group's cash, including any cash in deposit accounts of the WAC2 Group, wherever located, constitutes Cash Collateral of the WAC2 Collateral Agent and the WAC2 Lenders (the "WAC2 Cash Collateral").

(xxxiv) *WAC10 Credit Facility.*  That certain Facility Agreement, dated as of February 21, 2017 (as amended, restated, supplemented, or otherwise modified from time to time, the "WAC10 Credit Facility"[15] and, together with all agreements and documents delivered pursuant thereto or in connection therewith, each as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, the "WAC10 Documents"), among (a) Waypoint Asset Co 10 Limited, as borrower (the "WAC10 Borrower"), (b) the guarantor parties thereto (the "WAC10 Guarantors" and, together with the WAC10 Borrowers, the "WAC10 Obligors"), and (c) Airbus Helicopters Financial Services Limited, as lender (in such capacity the "WAC10 Lender"), as agent (in such capacity, the "WAC10 Agent"),[16] and as security trustee (in such capacity, the "WAC10 Security Trustee"[17] and together with the WAC10 Lender and the WAC10 Agent, the "WAC10 Secured Party"),[18] pursuant to which the WAC10 Lender has provided to the borrower thereunder a term loan commitment in an aggregate principal amount of €45 million.  The WAC10 Documents are valid and enforceable by the WAC10 Secured Party against each of the WAC10 Obligors party thereto.

(xxxv) *WAC10 Obligations.*  As of the Petition Date, the WAC10 Obligors were indebted to the WAC10 Secured Party, without defense, counterclaim or offset of any kind, in respect of loans made under the WAC10 Documents in an amount, as of the Petition Date, not less than $15,742,879 (including accrued but unpaid interest), which amount, for the avoidance of doubt, does not include the WAC10 Secured Party's accrued and unpaid attorneys' fees, costs, and expenses, or any premium, fee, make-whole or penalty payments otherwise required by the terms of the WAC10

---

[15] The WAC10 Credit Facility together with the WAC2 Credit Facility, shall be referred to herein as the "Non-Participating WAC Facilities."  For the avoidance of doubt, while the WAC2 Secured Parties, and WAC10 Secured Parties are not DIP Lenders, (i) the WAC2 Administrative Agent has consented, at the direction of the Required Lenders (as defined in the WAC2 Documents), to the use of WAC2 Cash Collateral in accordance with the terms of this Final Order and (ii) the WAC10 Secured Party has consented to the use of the WAC10 Cash Collateral in accordance with the terms of this Final Order.

[16] The WAC10 Agent together with the WAC2 Administrative Agent, shall be referred to herein as the "Non-Participating WAC Administrative Agents."

[17] The WAC10 Security Trustee together with the WAC10 Agent, the WAC2 Administrative Agent, and the WAC2 Collateral Agent, shall be referred to herein as the "Non-Participating WAC Agents."

[18] The WAC10 Secured Party together with the WAC2 Secured Parties, shall be referred to herein as the "Non-Participating WAC Secured Parties."  The Non-Participating WAC Secured Parties together with the Participating WAC Secured Parties, shall be referred to herein as the "WAC Secured Parties."

C:\USERS\FOUSTRAC\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\FBLUEZCE\WAY - FINAL DIP ORDER_WEIL_96861720_6 (002).DOCX

Documents, including, without limitation, upon a prepayment or acceleration of the obligations thereunder) (such amounts, together with any amounts incurred or accrued but unpaid prior to the Petition Date in accordance with the WAC10 Documents, including but not limited to, any fees, expenses, disbursements, derivative obligations, indemnification obligations, and other charges, amounts and costs of whatever nature owing, whether or not contingent, whenever arising, accrued, accruing, due, owing, or chargeable in respect of any of the WAC10 Obligors' obligations pursuant to the WAC10 Documents, collectively, the "<u>WAC10 Obligations</u>")[19].    The WAC10 Obligations constitute legal, valid, enforceable, non-avoidable, and binding obligations of the WAC10 Obligors, and (a) no offsets, set offs, defenses or counterclaims to the WAC10 Obligations exist, (b) no portion of the WAC10 Obligations is subject to avoidance, disallowance, recharacterization reduction or subordination pursuant to the Bankruptcy Code or other applicable law, (c) the WAC10 Obligations constitute allowed secured claims against each of the applicable WAC10 Obligors' estate, as defined by the applicable WAC10 Document, and (d) the WAC10 Obligors and their estates have no claim, objection, challenge or cause of action against the WAC10 Secured Parties or any of their respective successors, assigns, affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers, shareholders, and employees, past, present and future, and their respective heirs, predecessors, successors and assigns, whether arising under applicable state or federal law (including, without limitation, any recharacterization, subordination, avoidance or other claims arising under or pursuant to sections 105, 510, or 542 through 553 of the Bankruptcy Code), in connection with any of the WAC10 Documents (or the transactions contemplated thereunder), the WAC10 Obligations, and the WAC10 Liens (as defined herein), including, without limitation, any right to assert any disgorgement or recovery.

(xxxvi) *WAC10 Liens*.  To secure the WAC10 Obligations, the WAC10 Obligors granted to the WAC10 Security Trustee, for its benefit and the benefit of the WAC10 Lender, a security interest in and lien upon (collectively, the "<u>WAC10 Liens</u>")[20] certain categories of the WAC10 Obligors' respective assets, including (a) certain aircraft, aircraft leases and related assets (including bills of sale for such aircraft, and all rights, powers and remedies of the WAC10 Obligors with respect thereto, including claims by the WAC10 Obligors for damages in respect of the aircraft and related assets arising as a result of the default by the manufacturer under any bill

---

[19] The WAC10 Obligations together with the WAC2 Obligations, shall be referred to herein as the "<u>Non-Participating WAC Secured Obligations</u>."

[20] The WAC10 Liens together with the WAC2 Liens, shall be referred to herein as the "<u>Non-Participating WAC Liens</u>."

of sale), (b) bank accounts and cash on deposit in certain of the WAC10 Obligors' bank accounts, and (c) shares of capital stock, in each case subject to the parameters set forth in the WAC10 Documents (the "WAC10 Collateral"). [21] The WAC10 Liens were fully perfected as of the Petition Date, constitute legal, valid, binding, enforceable and perfected liens in and to the WAC10 Collateral, and are not subject to avoidance, reduction, disallowance, disgorgement, counterclaim, surcharge or (other than as contemplated by the WAC10 Documents) subordination pursuant to the Bankruptcy Code or any other applicable law, and such liens had priority over any and all other liens on the WAC10 Collateral, subject only to certain legal, valid, properly-perfected, non-avoidable and senior in priority liens that are otherwise expressly permitted by the WAC10 Documents and in existence as of the Petition Date or that are perfected subsequent thereto as permitted by section 546(b) of the Bankruptcy Code (the "WAC10 Permitted Prior Liens").

(xxxvii)    *WAC10 Cash Collateral*.  All of the WAC10 Group's cash, including any cash in deposit accounts of the WAC10 Group, wherever located, constitutes Cash Collateral of the WAC10 Security Trustee and the WAC10 Lender (the "WAC10 Cash Collateral").

E.    *Need for Postpetition Financing and Use of Cash Collateral*.

(i)    Based upon the pleadings and proceedings of record in the Chapter 11 Cases, the Debtors do not have sufficient available sources of working capital and financing to carry on the operation of their businesses without the DIP Facility and the use of "Cash Collateral" as defined in section 363(a) of the Bankruptcy Code ("Cash Collateral").

(ii)    Findings Regarding the Use of WAC2 Cash Collateral.  The Debtors need to continue to use the WAC2 Cash Collateral to, among other things, conduct their business operations, generate revenue, and preserve and maintain the value of the WAC2 Collateral.  The terms and conditions for the use of the WAC2 Cash Collateral pursuant to this Final Order are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and constitute reasonably equivalent value and fair consideration.  The use of the WAC2 Cash Collateral in accordance with the terms and conditions of this Final Order is in the best interest of the Debtors' estates.

(iii)    Findings Regarding the Use of WAC10 Cash Collateral.  The Debtors need to continue to use the WAC10 Cash Collateral to, among other things, conduct their business operations, generate revenue, and preserve

---

[21] The WAC10 Collateral together with the WAC2 Collateral, shall be referred to herein as the "Non-Participating WAC Collateral."  The Non-Participating WAC Collateral together with the Participating WAC Collateral, shall be referred to herein as the "WAC Collateral."

and maintain the value of the WAC10 Collateral. The terms and conditions for the use of the WAC10 Cash Collateral pursuant to this Final Order are fair and reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and constitute reasonably equivalent value and fair consideration. The use of the WAC10 Cash Collateral in accordance with the terms and conditions of this Final Order is in the best interest of the Debtors' estates.

F.    *No Credit on More Favorable Terms*.   Based upon, among other things, the testimony contained in the Niemann Declaration, given their current financial condition, financing arrangements and capital structure, the Debtors are unable to obtain sufficient interim and long-term financing from sources other than the DIP Lenders on terms more favorable than under the DIP Facility and the DIP Documents, and are not able to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code. The Debtors also have been unable to obtain sufficient credit (i) having priority over administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, (ii) secured solely by a lien on property of the Debtors and their estates that is not otherwise subject to a lien, or (iii) secured solely by a junior lien on property of the Debtors and their estates that is subject to a lien. Postpetition financing is unavailable to the Debtors without providing the DIP Agent for the benefit of itself and the DIP Lenders: (i) the DIP Liens in the DIP Collateral, as provided herein and in the DIP Documents with the priorities set forth herein; (ii) the DIP Superpriority Claims (as defined herein); and (iii) the other protections set forth in this Final Order. After considering all alternatives, the Debtors have concluded, in the exercise of their sound business judgment, that the DIP Facility represents the best financing available to them at this time, and is in the best interests of all of their stakeholders.

G.    *Findings Regarding the DIP Facility*.   Based upon the pleadings and proceedings of record in the Chapter 11 Cases, (i) the terms and conditions of the DIP Facility are fair and reasonable, are the best available to the Debtors under the circumstances, reflect the

Debtors' exercise of prudent business judgment consistent with their fiduciary duties and are supported by reasonably equivalent value and fair consideration, (ii) the terms and conditions of the DIP Facility and the use of the Cash Collateral, including the agreement to extend credit and permit the use of Cash Collateral have been negotiated in good faith and at arm's length among the Debtors, the DIP Parties, and the Participating WAC Secured Parties, and in express reliance upon the protections offered by Bankruptcy Code section 364(e).

H.    *Sections 506(c) and 552(b)*.

(i)    As a material inducement to the DIP Parties to agree to provide the DIP Facility, and in exchange for (i) the DIP Agent's and the DIP Lenders' agreement to subordinate their liens and superiority claims to the Carve-Out, the Intercompany Protection Claims, and the Intercompany Protection Liens, and (ii) the Participating WAC Secured Parties' agreement to (a) subordinate their Participating WAC Adequate Protection Liens (as defined herein) and their Participating WAC Liens to the DIP Liens, the Carve-Out, and the Intercompany Protection Liens, and (b) the consensual use of Cash Collateral in accordance with and subject to the Approved Budget (including any Permitted Variances thereto) and the terms of this Final Order, each of the DIP Agent, the DIP Lenders, and the Participating WAC Secured Parties are entitled to receive, (x) a waiver of any equities of the case exceptions or claims under section 552(b) of the Bankruptcy Code, and (y) a waiver of the provisions of section 506(c) of the Bankruptcy Code subject to the terms hereof.

(ii)    As a material inducement to the Non-Participating WAC Secured Parties to agree to the consensual use of their respective Cash Collateral in accordance with and subject to the Non-Participating WAC Budget (as defined herein) and the terms of this Final Order, each of the Non-Participating WAC Secured Parties are entitled to receive, a waiver of any equities of the case exceptions or claims under section 552(b) of the Bankruptcy Code.

I.    *Use of Proceeds of the DIP Facility; Use of Cash Collateral; Consent of WAC Secured Parties*.

(i)    The Debtors have received the necessary consents from the Participating WAC Secured Parties to the (i) financing arrangements contemplated by this Final Order and the DIP Documents and (ii) the Debtors' proposed use of the Participating WAC Secured Parties' Cash Collateral, on the terms and conditions set forth in this Final Order.  Such consents are expressly

27

limited to the postpetition financing being provided by the DIP Lenders
and the use of Cash Collateral (in each case as contemplated by this Final
Order and the DIP Documents and in accordance with the Approved
Budget and any Permitted Variances thereto) and the provision of
adequate protection as provided herein, and shall not extend to any other
postpetition financing or to any modified version of the DIP Facility or to
any other use of the Participating WAC Secured Parties' Cash Collateral,
except as otherwise provided herein or in the DIP Documents.  The
priming of the Participating WAC Liens on the Participating WAC
Collateral under section 364(d)(l) of the Bankruptcy Code, as
contemplated by, and solely to the extent set forth in this Final Order and
the DIP Facility and as further described below, will enable the DIP
Borrowers to obtain the DIP Facility and, among other benefits, continue
to operate their businesses for the benefit of their estates and stakeholders.
The Participating WAC Agents, on behalf of, and at the direction of, the
required lenders or noteholders, as applicable, under the applicable
Participating WAC Facility, consent to the priming of the Participating
WAC Liens on the WAC Specific Collateral, up to the Maximum
Intercompany Balance (as defined herein) with respect to each
Participating WAC Facility, solely to the extent contemplated by this Final
Order and the DIP Facility.  Further, as a condition to entry into the DIP
Documents, the extension of credit under the DIP Facility and the
authorization to use the Participating WAC Secured Parties' Cash
Collateral as provided in this Final Order, the DIP Parties and the
Participating WAC Secured Parties require, and the Debtors have agreed,
that proceeds of the DIP Facility and the Participating WAC Secured
Parties' Cash Collateral shall be used, in each case only in a manner
consistent with the terms and conditions of the DIP Documents and this
Final Order and in accordance with the Approved Budget (subject to the
Permitted Variances) (as the same may be modified from time to time
consistent with the terms of the DIP Documents and this Final Order),
solely for the purposes set forth in the DIP Credit Agreement and this
Final Order, including ongoing working capital and general corporate
needs of the Debtors, including to (a) pay the required debt service under
the DIP Documents (b) pay the fees, costs, and expenses of the DIP
Parties as set forth in the DIP Documents, (c) pay fees and expenses of
professionals retained in the Chapter 11 Cases, (d) fund the Carve-Out,
(e) make required adequate protection payments to the Participating WAC
Secured Parties, including, but not limited to, payment of the Participating
WAC Secured Parties' professional fees and expenses, and (f) fund the
Expense Reimbursement (as defined in Exhibit D hereto); provided, that
in no event shall any proceeds of the DIP Facility or the Participating
WAC Secured Parties' Cash Collateral be (a) transferred to (i) Waypoint
Asset Company Number 2 (Ireland) Limited or any of its subsidiaries (the
"WAC2 Group") or (ii)  Waypoint Asset Co 10 Limited or any of its
subsidiaries (the "WAC10 Group"), (each of (i)-(ii), a "Non-Participating

28

WAC Group"[22]); or (b) used to make payments for a Non-Participating WAC Group, except as expressly set forth in the Approved Budget (including any Permitted Variances thereto).

(ii)     The Debtors have received the necessary consents from the Non-Participating WAC Secured Parties to the Debtors' proposed use of the WAC2 Cash Collateral and WAC10 Cash Collateral on the terms and conditions set forth in this Final Order. Such consents are expressly limited to the use of the WAC2 Cash Collateral and WAC10 Cash Collateral (as contemplated by this Final Order) and the provision of adequate protection as provided herein, and shall not extend to any postpetition financing or to any other use of Cash Collateral.

J.     *Adequate Protection*.

(i)     The Participating WAC Secured Parties are entitled to receive adequate protection as set forth in this Final Order pursuant to sections 361, 362, 363, 364, and 507(b) of the Bankruptcy Code for any diminution in value of their respective interests in the Participating WAC Collateral, including the Participating WAC Secured Parties' Cash Collateral, resulting from, arising from, or attributable to, among other things, (a) the Debtors' use, sale or lease of the Participating WAC Collateral, including the Participating WAC Secured Parties' Cash Collateral, (b) the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code and (c) the priming of the Participating WAC Liens by the DIP Liens, the Intercompany Protection Liens, and the Carve-Out (collectively, and solely to the extent of any such diminution in value, the "Diminution in Value").

(ii)     The Non-Participating WAC Secured Parties are entitled to receive adequate protection as set forth in this Final Order pursuant to sections 361, 362, 363 and 507(b) of the Bankruptcy Code for any diminution in value of their respective interests in the WAC2 Collateral and WAC10 Collateral, including the Cash Collateral, resulting from, arising from, or attributable to, among other things, (a) the Debtors' use, sale or lease of the WAC2 Collateral and the WAC10 Collateral, including the Cash Collateral, and (b) the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code and solely to the extent of any such diminution in value.

K.     *Other Liens*.   Nothing herein shall constitute a finding or ruling by this

Court that any alleged Permitted Prior Lien, WAC2 Permitted Prior Lien, or WAC10 Permitted

---

[22] Collectively, the Non-Participating WAC Groups and the Participating WAC Groups, the "WAC Groups."

Prior Lien is valid, senior, enforceable, prior, perfected, or nonavoidable. Moreover, nothing shall prejudice the rights of any party-in-interest, including but not limited to the Debtors, the DIP Parties, the WAC Secured Parties, and the Committee, to challenge the validity, priority, enforceability, seniority, avoidability, perfection, or extent of any alleged or asserted lien or security interest against any asset of the Debtors other than the Participating WAC Liens, the Non-Participating WAC Liens, the DIP Liens, and the Intercompany Protection Liens.

L.      *Notice*. The Debtors have provided notice of the Final Hearing and the proposed entry of this Final Order to: (a) William K. Harrington (the "U.S. Trustee"), U.S. Department of Justice, Office of the U.S. Trustee, 201 Varick Street, Room 1006, New York, NY 10014 (Attn: Andrea B. Schwartz, Esq. and Paul Schwartzberg, Esq.); (b) the Debtors' thirty (30) largest unsecured creditors on a consolidated basis; (c) the Internal Revenue Service and any other applicable taxing authority; (d) the United States Attorney's Office for the Southern District of New York; (e) Milbank, Tweed, Hadley & McCloy LLP ("Milbank"), as counsel to the committee of lenders (the "Steering Committee") under the Participating WAC Facilities and the DIP Facility; (f) Alston & Bird LLP ("Alston & Bird"), as counsel to the WAC1 Administrative Agent and the WAC7 Administrative Agent; (g) Mayer Brown LLP ("Mayer Brown"), as counsel to the WAC2 Administrative Agent; (h) Mayer Brown, as counsel to the WAC3 Administrative Agent; (i) Norton Rose Fulbright US LLP ("Norton Rose"), as counsel to the WAC6 Administrative Agent; (j) Akin Gump Strauss Hauer & Feld LLP ("Akin"), as counsel to the WAC8 Noteholders; (k) Sullivan & Cromwell, LLP ("S&C"), as counsel to the WAC9 Administrative Agent; (l) counsel to Airbus Helicopters Financial Services Limited, as the WAC10 Administrative Agent; (m) Clifford Chance US LLP ("Clifford Chance"), as counsel to the WAC12 Administrative Agent; (n) Winston & Strawn LLP ("Winston") as counsel to the

DIP Agent; (o) counsel to MSD Capital, L.P., Quantum Strategic Partners Ltd., and Cartesian Capital Group LLC; (p) all known parties, to the best of the Debtors' knowledge, information, or belief, asserting a lien against the DIP Collateral; and (q) any other party that has filed a request for notice pursuant to Bankruptcy Rule 2002 or is required to receive notice under the Bankruptcy Rules. Requisite notice of the Motion and the relief requested thereby and this Final Order has been provided in accordance with Bankruptcy Rules 2002 and 4001, and no other notice need be provided for entry of this Final Order.

M.      *Immediate Entry*.  Entry of this Final Order is in the best interests of the Debtors' respective estates and their creditors and the Motion and this Final Order comply with the requirements of Local Rule 4001-2.

Based on the foregoing, and upon the record made before this Court at the Interim Hearings and the Final Hearing, and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1.      Approval of Final Order.  The Motion is granted, the DIP Facility is authorized and approved and the use of the Cash Collateral is authorized on a final basis, in each case, solely to the extent and subject to the terms and conditions set forth in this Final Order and the DIP Documents.  Any objections to the final relief requested in the Motion that have not previously been withdrawn, waived, settled, or resolved and all reservations of rights included therein, are hereby denied and overruled.  This Final Order shall become effective immediately upon its entry.

**DIP Facility Authorization**

2.      Approval of DIP Documents; Authority Thereunder.  The DIP Obligors were by the Interim Orders and continue to be by this Final Order, authorized to enter into, and execute and deliver, the DIP Documents, including, without limitation, the DIP Credit

31

Agreement, and such additional documents, instruments, certificates and agreements as may be required or reasonably requested by the DIP Parties to implement the terms or effectuate the purposes of this Final Order and the DIP Documents.

3.      Validity of DIP Documents.  Upon (a) entry of the First Interim Order and (b) execution and delivery of the DIP Documents, each of the DIP Documents constituted, and is hereby deemed to be, the legal, valid and binding obligation of the DIP Obligors party thereto, enforceable against each such DIP Obligor, its estate, and any successor thereto (including any trustee or other estate representative appointed or elected in the Chapter 11 Cases or any successor cases and/or upon the dismissal of any of the Chapter 11 Cases or any successor cases), in accordance with its terms.  Loans advanced under the DIP Credit Agreement will be made to fund the Debtors' working capital and general corporate needs to pay such amounts as are required or permitted to be paid pursuant to the DIP Credit Agreement, this Final Order and any other orders of this Court, in each case to the extent permitted under the DIP Credit Agreement and the Approved Budget (subject to the Permitted Variances).

4.      Authorization to Borrow.  Upon entry of the Interim Orders and during the period prior to entry of this Final Order, the DIP Borrowers were authorized to borrow from the DIP Lenders under the DIP Facility in two draws in an aggregate principal amount of $30,000,000, subject to the terms and conditions set forth in the DIP Documents, the Interim Orders and in accordance with the Approved Budget (subject to the Permitted Variances), and the DIP Guarantors were (and continue to be) authorized to guarantee such borrowings.  Upon entry of this Final Order, the DIP Borrowers are authorized to borrow from the DIP Lenders under the DIP Facility in one draw an additional aggregate principal amount of $19,000,000, subject to the terms and conditions set forth in the DIP Documents, this Final Order and in

accordance with the Approved Budget (subject to the Permitted Variances), and the DIP Guarantors are authorized to guarantee such borrowing. The DIP Lenders shall have no obligation to make any loan or advance under the DIP Documents unless all of the conditions precedent to the making of such extension of credit under the DIP Documents and this Final Order have been satisfied in full or waived by the DIP Agent acting at the direction of the Required DIP Lenders. Once repaid or prepaid, the DIP Loans incurred under the DIP Facility may not be re-borrowed.

5.     <u>Payment of DIP Costs and Expenses</u>. Subject to the limitations set forth below, the DIP Borrowers are hereby authorized to and shall pay all fees, costs, expenses, premiums and other amounts as and when payable under the terms of the DIP Documents and all other reasonable and documented out-of-pocket costs and expenses of the DIP Parties and Steering Committee in accordance with the terms of this Final Order and the DIP Documents as and when such amounts become due and payable (including, without limitation, the reasonable and documented prepetition and postpetition fees and out-of-pocket costs and expenses of (a) Milbank, as counsel to the Steering Committee, (b) Alvarez & Marsal Securities, LLC ("<u>A&M</u>"), as financial advisor to the Steering Committee (including the $2,500,000 "Completion Fee" described in the engagement letter dated June 13, 2018), (c) Winston, as counsel to the DIP Agent and (d) one counsel in each relevant jurisdiction to the DIP Agent, subject to receiving a written invoice therefor. None of such fees, costs, expenses or other amounts shall be subject to Court approval (subject to the limitations below) or U.S. Trustee guidelines, and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with this Court; <u>provided</u>, <u>however</u>, that copies of any such invoices provided to the Debtors shall be provided contemporaneously to the U.S. Trustee and counsel to the Committee

(if any).[23]    If the Debtors, the U.S. Trustee, or the Committee (if any) objects to the reasonableness of the fees and expenses of any DIP Parties, and such objection cannot be resolved within ten (10) calendar days of receipt of such invoices, the Debtors, the U.S. Trustee or the Committee (if any), as the case may be, shall file with the Court and serve on such DIP Parties and such professional (with a copy to the Debtors) an objection limited to the reasonableness of such fees and expenses and detailing with specificity which fees and/or expenses are being objected to (each, a "Fee Objection").    The professional fees of the DIP Parties shall not be subject to the provisions of sections 327, 328, 329, or 331 of the Bankruptcy Code.    The Debtors shall pay the fees and expenses of the DIP Parties in accordance with the terms and conditions of the DIP Documents and this Final Order within fifteen (15) calendar days after receipt of the applicable invoice (a) the full amount invoiced if no Fee Objection has been timely filed, and (b) the undisputed fees, costs, and expenses reflected on any invoice to which a Fee Objection has been timely filed.    All such unpaid fees, costs, expenses and other amounts owed or payable to the DIP Parties shall be secured by the DIP Collateral (in the case of the WAC Specific Collateral, solely to the extent of the applicable Net WLIL Intercompany Claim in respect of such Participating WAC Group, which can never exceed the applicable Maximum Intercompany Balance for such Participating WAC Group) and afforded all of the priorities and protections afforded to the DIP Obligations under this Final Order and the DIP Documents.

---

[23] For the avoidance of doubt, the fees provided for in this order must be reasonable. Although the U.S. Trustee fee guidelines do not specifically apply, professionals shall be required to submit time and expense detail with their invoices, and any further information or back up documentation required to determine the reasonableness of the request. Invoices for such fees and expenses provided to any party other than U.S. Trustee may be redacted to delete any information subject to the attorney-client privilege and any information constituting attorney work product. Any invoices submitted pursuant to the terms hereof (including pursuant to paragraph 11) shall not constitute any waiver of the attorney-client privilege or any benefits of the attorney work product doctrine.

6.      <u>Indemnification</u>.  The DIP Borrowers are hereby authorized to and hereby agree to indemnify and hold harmless the DIP Parties and the Participating WAC Secured Parties (each in their capacity as such) and, solely in their capacities as such, each of their respective officers, directors, employees, representatives, agents, partners, administrators, managers, advisors, trustees, successors, permitted assigns, and Affiliates (each, an "<u>Indemnified Party</u>") from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses (including, without limitation, reasonable and documented out-of-pocket attorney's fees) or disbursements of any nature whatsoever which may be imposed on, incurred by or asserted against an Indemnified Party in any way relating to or arising out of any of the DIP Documents or any other document contemplated hereby or thereby or the transactions contemplated thereby or by this Final Order or any action taken or omitted by the DIP Parties or the Participating WAC Secured Parties under any of the DIP Documents or any document contemplated hereby or thereby; <u>provided</u> that the DIP Borrowers shall not have any obligation to indemnify and hold harmless any Indemnified Party under this paragraph with respect to any matter resulting from (a) the fraud, gross negligence or willful misconduct of such Indemnified Party, as determined by a court of competent jurisdiction in a final, non-appealable judgment; (b) violations by such Indemnified Party of this Final Order, or from breaches by such Indemnified Party of the DIP Documents, in each case as determined by a court of competent jurisdiction in a final non-appealable judgment or order; (c) any misrepresentation or inaccuracy of any representation or warranty made by such Indemnified Party in relation to any DIP Document to which it is a party (but excluding any misrepresentation in consequence of a misrepresentation by any other party to a DIP Documents or a failure by any other party to a DIP Document to perform any of its obligations thereunder); or (d) ordinary and usual operating or

C:\USERS\FOUSTRAC\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\FBLUEZCE\WAY - FINAL DIP ORDER_WEIL_96861720_6 (002).DOCX

overhead expenses of the Indemnified Party unless incurred after an Event of Default, in which circumstances the DIP Obligors shall only be obligated to indemnify such Indemnified Party in respect of expenses to the extent that they are properly incurred and, if they relate to the expenditure of management time, to the extent that the time so expended was material.  No Indemnified Party shall have any liability (whether direct or indirect, in contract, tort or otherwise) to any Debtor or any of its subsidiaries or any shareholders or creditors of the foregoing for or in connection with the transactions contemplated hereby, except to the extent such liability is determined by a court of competent jurisdiction in a final non-appealable judgment or order to have resulted from such Indemnified Party's (x) fraud, gross negligence or willful misconduct, (y) violations of this Final Order or from material breaches of the DIP Documents (other than a breach in consequence of a failure by any other party to a DIP Document to perform any of its obligations under any DIP Document) or (z) any misrepresentation or the inaccuracy of any representation or warranty made by such Indemnified Party in relation to any DIP Document to which it is a party (but excluding any misrepresentation in consequence of a misrepresentation by any other party to a DIP Documents or a failure by any other party to a DIP Document to perform any of its obligations thereunder).  All indemnities made or owed by any Debtor to the Indemnified Parties shall be secured by the DIP Collateral (in the case of WAC Specific Collateral, solely to the extent of the applicable Net WLIL Intercompany Claim in respect of such Participating WAC Group, which can never exceed the applicable Maximum Intercompany Balance for such Participating WAC Group) and afforded all of the priorities and protections afforded to the DIP Obligations or adequate protection obligations, as applicable, under this Final Order and the DIP Documents.

C:\USERS\FOUSTRAC\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\FBLUEZCE\WAY - FINAL DIP ORDER_WEIL_96861720_6 (002).DOCX

7.    <u>DIP Superpriority Claims</u>.  The DIP Agent, for the benefit of the DIP Lenders, shall be granted, pursuant to Bankruptcy Code section 364(c)(1), and  the DIP Obligations shall constitute, superpriority administrative expense claims against each of (a) Holdings, (b) WLIL, (c) LuxCo, and (d) each DIP Obligor as to which neither its equity interests or those of its direct or indirect parent have been pledged to a Participating WAC Agent on account of a Participating WAC Facility ((a) through (d), collectively, the "<u>Non-WAC Group Obligors</u>"), on a joint and several basis (the "<u>DIP Parent Claims</u>"), subject to the Intercompany Protection Claims and the Carve-Out.  In addition, the DIP Agent, for the benefit of the DIP Lenders, shall be granted, pursuant to Bankruptcy Code section 364(c)(1), and  the DIP Obligations shall constitute, joint and several superpriority administrative expense claims (a "<u>WAC DIP Claim</u>" and together with the DIP Parent Claims, the "<u>DIP Superpriority Claims</u>") against each Participating WAC Group (but, for avoidance of doubt, the joint and several obligation will be within a given Participating WAC Group, not between Participating WAC Groups) in the amount of such Participating WAC Group's Net WLIL Intercompany Claim (as defined herein), which can never exceed its "<u>Maximum Intercompany Balance</u>," which shall mean the amount equal to the lesser of (a) the "<u>WAC Specific Cap</u>" for each Participating WAC Group as set forth on <u>Exhibit C</u> to hereto (which amount, for any Participating WAC Group, may not be amended without the consent of the relevant Prepetition Approving Party) and (b) a loan to value coverage floor for each Participating WAC Group as set forth on <u>Exhibit C</u> hereto (its "<u>LTV Coverage Floor</u>") with respect to each respective Participating WAC Group (which amount, for any Participating WAC Group, may not be amended without the consent of the relevant Prepetition Approving Party), subject in each case only to (i) the Intercompany Protection Claims (as defined herein) and (ii) the Carve-Out.  The DIP Superpriority Claims

shall have priority in payment over any and all administrative expenses at any time existing or arising against the obligors thereof, of any kind or nature whatsoever, including, without limitation, the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, but not limited to, Bankruptcy Code sections 105, 326, 328, 330, 331, 364, 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1113 and 1114 or otherwise, including those resulting from the conversion of any of the Chapter 11 Cases pursuant to section 1112 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment; provided, however, that the DIP Superpriority Claims shall be subject to the payment in full in cash of any amounts due (a) under the Carve-Out and (b) on account of the Intercompany Protection Claims; provided further, that the DIP Superpriority Claims shall have recourse to and be payable from all prepetition and postpetition property of the DIP Obligors and their estates and all proceeds thereof based on the priorities and subject to the limitations set forth herein; provided that the proceeds of avoidance actions under chapter 5 of the Bankruptcy Code or other applicable bankruptcy or non-bankruptcy law ("Avoidance Actions") will be available to fund such DIP Superpriority Claims.

8.      DIP Liens.  As security for the DIP Obligations, immediately upon, and effective as of entry of the First Interim Order, the DIP Agent, for the benefit of itself and the DIP Lenders, was granted (and hereby continues to be granted) continuing, valid, binding, enforceable, non-avoidable, and automatically and properly perfected security interests in and liens (collectively, the "DIP Liens") on all DIP Collateral (in the case of WAC Specific Collateral, subject to the limitation in paragraph 9(a)(iii)) as collateral security for the prompt and complete performance and payment when due (whether at the stated maturity, by acceleration or otherwise) of the DIP Obligations; provided that with respect to WAC Specific

C:\USERS\FOUSTRAC\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\FBLUEZCE\WAY - FINAL DIP ORDER_WEIL_96861720_6 (002).DOCX

Collateral of any Participating WAC Group the DIP Liens with respect thereto shall be solely to the extent of the applicable Net WLIL Intercompany Claim in respect of such Participating WAC Group, which can never exceed the applicable Maximum Intercompany Balance for such Participating WAC Group.  The term "DIP Collateral" means all assets and properties (whether tangible, intangible, real, personal, or mixed) of the DIP Obligors, whether now owned by or owing to, or hereafter acquired by, or arising in favor of, the DIP Obligors (including under any trade names, styles, or derivations thereof), and whether owned or consigned by or to, or leased from or to, or hereafter acquired by, the DIP Obligors, and regardless of where located, before or after the Petition Date including the proceeds, products, rents, profits, or offspring of the foregoing and including the proceeds of Avoidance Actions; provided, that DIP Collateral does not include (x) the Avoidance Actions (but includes the proceeds of Avoidance Actions) or (y) equity in a Debtor that is in a Non-Participating WAC Group and that is subject to a valid, unavoidable prepetition lien or security interest in favor of an agent for a Non-Participating WAC Facility.

9.    Priority of DIP Liens.

a.    In each case subject to the Intercompany Protection Liens, the Permitted Prior Liens, and the Carve-Out, the DIP Liens on the DIP Collateral shall have the following priorities:

(i)    pursuant to section 364(c)(2) of the Bankruptcy Code, first priority liens on and security interests in all DIP Collateral that is not otherwise (x) subject to a valid, perfected and non-avoidable security interest or lien as of the Petition Date or (y) deemed WAC Specific Collateral hereunder;

(ii)    pursuant to section 364(c)(3) of the Bankruptcy Code, junior liens (the "Junior DIP Liens") on and security interests in all DIP Collateral (other than as set forth in clauses (i) and (iii) of this paragraph) that is subject to valid, existing and perfected liens (including any Permitted Prior Lien) as of the Petition Date; and

39

(iii)    pursuant to section 364(d)(1) of the Bankruptcy Code, senior priming liens (the "Priming DIP Liens") on and security interests in all DIP Collateral that constitutes WAC Specific Collateral, wherever located, which Priming DIP Liens shall be senior to the Participating WAC Liens and the Participating WAC Adequate Protection Liens granted hereunder; provided, however that the DIP Parties' claims on account of such Priming DIP Liens at any Participating WAC Group shall in no event exceed the amount of the Net WLIL Intercompany Claim of such Participating WAC Group and such Net WLIL Intercompany Claim shall never exceed the applicable Maximum Intercompany Balance.

b.    Except as expressly set forth herein or in the DIP Documents, the DIP Liens and the DIP Superpriority Claims: (i) shall not be made junior to or *pari passu* with (A) any lien, security interest or claim heretofore or hereinafter granted in any of the Chapter 11 Cases or any successor cases, and shall be valid and enforceable against the DIP Borrowers and DIP Guarantors, their estates, any trustee or any other estate representative appointed or elected in the Chapter 11 Cases or any successor cases and/or upon the dismissal of any of the Chapter 11 Cases or any successor cases, (B) any lien that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code or otherwise, and (C) any intercompany or affiliate lien or claim; and (ii) shall not be subject to sections 510, 549, 550 or 551 of the Bankruptcy Code.

**Authorization to Use Cash Collateral and Adequate Protection**

10.    Authorization to Use Cash Collateral.  Subject to the terms and conditions of this Final Order, from and after the date of entry of this Final Order through the Cash Collateral Termination Date with respect to each relevant facility, the Debtors are authorized to use (a) the Cash Collateral of the Participating WAC Secured Parties solely to the extent and on the terms as set forth herein in accordance with the Approved Budget (and Permitted Variances), and (b) the Cash Collateral of the Non-Participating WAC Secured Parties, in accordance with the Non-Participating WAC Budget.

C:\USERS\FOUSTRAC\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\FBLUEZCE\WAY - FINAL DIP ORDER_WEIL_96861720_6 (002).DOCX

11.    <u>Adequate Protection of the Participating WAC Secured Parties</u>.

a.    As adequate protection of the interest of the Participating WAC Secured Parties in the Participating WAC Collateral, including Cash Collateral, the Participating WAC Agents and the Participating WAC Collateral Agents for the benefit of the other Participating WAC Secured Parties are hereby granted:

(i)    payment in cash on a current basis of all reasonable and documented out-of-pocket fees and expenses of the professional advisors of Participating WAC Secured Parties(including any accrued and unpaid amounts), which shall be limited to (A) Milbank, as counsel to the Steering Committee, (B) Alvarez & Marsal, as financial advisor to the Steering Committee, (C) Arthur Cox, as Irish counsel to the Steering Committee, (D) IBA Group Ltd. as special aviation consultant to the Steering Committee; (E) one (1) counsel to each of the Participating WAC Agents, and (F) any individual Participating WAC Lender's counsel to the extent approved (on a Participating WAC Group by Participating WAC Group basis) by the requisite Participating WAC Lenders for such Participating WAC Facility (collectively, (A) through (F), the "<u>Participating WAC Professionals</u>") <u>provided</u> that, the expenses in the previous clauses (E) and (F) shall be borne by each Participating WAC Group as a cash disbursement of such Participating WAC Group and included in such Participating WAC Group's Gross WAC Group Disbursements (as defined herein); and <u>provided</u> <u>further</u> that to the extent the expenses in (E) and (F) exceed the amount budgeted for such Participating WAC Group in the Approved Budget, such expenses shall only be paid to the extent that (x) after paying such amounts, the applicable Participating WAC Group does not have (and would not be projected to have during any week of the Approved Budget) a Net WLIL Intercompany Claim against it in excess of the Maximum Intercompany Balance for such Participating WAC Group or (y) (i) the Prepetition Approving Party for such Participating WAC Group agrees to increase such Participating WAC Group's WAC Specific Cap so that after paying such amounts, such Participating WAC Group does not have (and would not be projected to have during any week of the Approved Budget) a Net WLIL Intercompany Claim against it in excess of the Maximum Intercompany Balance for such Participating WAC Group and (ii) the aggregate amount of such increases in the WAC Specific Caps do not exceed $10,000,000.  With respect to any amounts payable on account of fees and expenses under clauses (E) and (F) that accrued prepetition, if invoices for such fees and expenses are provided as required in the following sentence no later than the date of entry of the First Interim Order then, unless a Fee Objection has been timely interposed, such invoices shall be paid in accordance with the terms and conditions of this Final Order.  None of such fees, costs, expenses or other amounts shall be subject to Court approval (subject to the limitations below) or U.S. Trustee guidelines, and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with this Court; <u>provided</u>, <u>however</u>, that the Participating WAC Professionals must provide written invoices to the Debtors and copies of any such invoices shall be provided by the Participating WAC Professionals contemporaneously to

41

the U.S. Trustee and counsel to the Committee (if any). If any of the Debtors, the U.S. Trustee, or the Committee objects to the reasonableness of the fees and expenses of any of the Participating WAC Professionals, and such objection cannot be resolved within ten (10) calendar days of receipt of such invoices, the Debtors, the U.S. Trustee, or the Committee, as the case may be, shall file with the Court and serve on the applicable Participating WAC Professionals (with a copy to the Debtors) an objection limited to the reasonableness of such fees and expenses (a "Fee Objection"). The professional fees of Participating WAC Professionals shall not be subject to the provisions of sections 327, 328, 329, or 331 of the Bankruptcy Code. The Debtors shall pay the fees and expenses of the Participating WAC Professionals in accordance with the terms and conditions of this Final Order within fifteen (15) calendar days after receipt of the applicable invoice (A) the full amount invoiced if no Fee Objection has been timely filed, and (B) the undisputed fees, costs, and expenses reflected on any invoice to which a Fee Objection has been timely filed, in each case regardless of whether such amounts are in excess of the amounts set forth in the Approved Budget. All such fees, costs, expenses and other amounts owed or payable to the Participating WAC Professionals shall be secured by the Participating WAC Adequate Protection Liens, and afforded all of the priorities and protections afforded to the Participating WAC Facilities under this Final Order and the Participating WAC Loan Documents. To the extent any Participating WAC Professional is holding a retainer, they may apply such retainer against any outstanding invoice (whether prepetition or postpetition) by providing ten (10) calendar days' notice of their intent to do the same to the Debtors, the U.S. Trustee, and the Committee. The payment of such fees shall not be subject to disgorgement, provided that the Debtors reserve the right to seek recharacterization of such payments (or with respect to fees of the Steering Committee, the portion of such payments allocable to a Participating WAC Facility) as being applied to outstanding prepetition amounts under the applicable Participating WAC Facility;

(ii)     solely to the extent of the Diminution in Value of the interest of the relevant Participating WAC Secured Parties in their applicable Participating WAC Collateral from and after the Petition Date, allowed superpriority administrative expense claims (the "Participating WAC Adequate Protection Claims") against each of the Participating WAC Obligors under the applicable Participating WAC Facility, senior to all other administrative expense claims in the Chapter 11 Cases, subject only to (A) the DIP Claims, (B) the Intercompany Protection Claims, and (C) the portion of the Carve-Out allocable to the relevant Participating WAC Facility;

(iii)     solely to the extent of the Diminution in Value of the interest of the relevant Participating WAC Secured Parties in their applicable Participating WAC Collateral from and after the Petition Date, continuing, valid, binding, enforceable, unavoidable and automatically perfected postpetition liens and security interests (the "Participating WAC Adequate Protection Non-WSC Liens"), in the DIP Collateral that is not WAC Specific Collateral (the "Adequate Protection Non-WSC Collateral") which liens shall be immediately junior to the DIP Liens, pari passu with the Non-Participating WAC Adequate Protection Non-WSC Liens (as defined herein) and subject to the Carve-Out, the Intercompany Protection Liens and any Permitted Liens (as defined in the DIP Documents), and (B) senior in priority to all other liens, including the

42

Participating WAC Liens.   Except as expressly provided in this Final Order or as otherwise agreed to by the Participating WAC Secured Parties, the Participating WAC Adequate Protection Non-WSC Liens shall not be made junior to or *pari passu* with any lien or security interest heretofore or hereinafter granted or created in any of the Chapter 11 Cases or any successor cases and shall be valid and enforceable against the Debtors, their estates and any successors thereto, including, without limitation, any trustee appointed in any of the Chapter 11 Cases or any successor cases until such time as the Participating WAC Secured Obligations owed under the Participating WAC Facilities are paid in full or otherwise treated pursuant to a confirmed and effective chapter 11 plan. The Participating WAC Adequate Protection Non-WSC Liens shall not be subject to sections 549 or 550 of the Bankruptcy Code.  No lien or interest avoided and preserved for the benefit of the estates pursuant to section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the Participating WAC Adequate Protection Non-WSC Liens;

(iv)     solely to the extent of any Diminution in Value of the interest of the relevant Participating WAC Secured Parties in their applicable Participating WAC Collateral, replacement liens (the "Participating WAC Adequate Protection Replacement Liens" and together with the Participating WAC Adequate Protection Non-WSC Liens, the "Participating WAC Adequate Protection Liens") in their WAC Specific Collateral, which liens shall be (A) immediately junior to the DIP Liens, (B) subject to the Carve-Out and the Intercompany Protection Liens, and (C) senior in priority to all other liens, including the Participating WAC Liens.  Except as expressly provided in this Final Order or as otherwise agreed to by the Participating WAC Secured Parties, the Participating WAC Adequate Protection Replacement Liens shall not be made junior to or *pari passu* with any lien or security interest heretofore or hereinafter granted or created in any of the Chapter 11 Cases or any successor cases and shall be valid and enforceable against the Debtors, their estates and any successors thereto, including, without limitation, any trustee appointed in any of the Chapter 11 Cases or any successor cases until such time as the Participating WAC Secured Obligations owed under the applicable Participating WAC Documents are paid in full or otherwise treated pursuant to a confirmed and effective chapter 11 plan.  The Participating WAC Adequate Protection Replacement Liens shall not be subject to sections 549 or 550 of the Bankruptcy Code.  No lien or interest avoided and preserved for the benefit of the estates pursuant to section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the Participating WAC Adequate Protection Replacement Liens;

(v)     the Debtors shall comply with the Approved Budget, subject to Permitted Variances, and all budget requirements set forth herein and in the DIP Documents;

(vi)     the Debtors shall comply with the milestones attached hereto as Exhibit D (the "Milestones"), to the extent the Milestones were incorporated into the Acceptable Bidding Procedures Order, on the terms and conditions set forth herein, which may not be amended without the consent of each Prepetition Approving Party;

(vii)    the Debtors shall comply with the Entered Bidding Procedures Order[24] and the Bidding Procedures attached thereto as Exhibit 1 (together the "<u>Acceptable Bidding Procedures Order</u>"), which Acceptable Bidding Procedures Order shall not be amended or modified without the consent of each Prepetition Approving Party; and

(viii)    the applicable Participating WAC Agent or Participating WAC Collateral Agent for a Participating WAC Facility will have the absolute and irrevocable right to credit bid for the WAC Specific Collateral of such Participating WAC Facility subject only to such party complying with all of the requirements for a Streamlined Credit Bid (as defined in the Milestones) (including payment of the Exit Fee), consistent with the Acceptable Bidding Procedures Order.   In the event that applicable Participating WAC Agent or Participating WAC Collateral Agent for a Participating WAC Facility elects to make a Streamlined Credit Bid by January 14, 2019, and complies with the requirements set forth in the Milestones, then by no later than February 15, 2019, either an order authorizing the sale pursuant to such credit bid shall have been entered (providing for consummation of such credit bid as soon as reasonably practicable) or, upon seven (7) days' notice by the relevant Participating WAC Agent or Participating WAC Collateral Agent to the Debtors, the automatic stay imposed under Bankruptcy Code section 362(a) shall be automatically and without further notice or action by any party or the requirement for the entry of a further order of the Court, lifted so that they can foreclose on their WAC Specific Collateral.

12.    <u>Adequate Protection of the Non-Participating WAC Secured Parties</u>.

a.    As adequate protection of the interest of the WAC2 Secured Parties and WAC10 Secured Party in the WAC2 Collateral and WAC10 Collateral, respectively, including Cash Collateral, each of the Non-Participating WAC Agents for the benefit of the other WAC2 Secured Parties and the WAC10 Secured Party, respectively, is hereby granted:

(i)    payment in cash on a current basis of all reasonable and documented out-of-pocket fees and expenses of the professional advisors of the WAC2 Secured Parties (the "<u>WAC2 Professionals</u>") and the WAC10 Secured Party (the "<u>WAC10 Professionals</u>"), in each case (A) solely from the WAC2 Cash Collateral and WAC10 Cash Collateral, respectively, and (B) solely to the extent cash is available after paying necessary expenses in respect of Non-Participating WAC Groups, as applicable, in accordance herewith; <u>provided</u>, <u>however</u>, that counsel is authorized to apply any funds held as a retainer to fees and expenses, whether incurred pre- or post-petition.  None of such fees, costs, expenses or other amounts shall be subject to Court approval (subject to the limitations below) or U.S. Trustee guidelines, and no recipient of any such payment

---

[24] The *Order Approving (A) Bidding Procedures, (B) Bid Protections, (C) Form and Manner of Notice of Cure Costs, Auction, Sale Transaction, and Sale Hearing, and (D) Date for Auction, if Necessary, and Sale Hearing* [ECF No. 159] (the "<u>Entered Bidding Procedures Order</u>").

C:\USERS\FOUSTRAC\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\FBLUEZCE\WAY - FINAL DIP ORDER_WEIL_96861720_6 (002).DOCX

shall be required to file with respect thereto any interim or final fee application with this Court; provided, further, however, that the WAC2 Professionals and WAC10 Professionals must provide written invoices to the Debtors and copies of any such invoices for post-petition amounts shall be provided by the WAC2 Professionals and WAC10 Professionals contemporaneously to the U.S. Trustee, counsel to the Steering Committee, and counsel to the Committee (if any). If any of the Debtors, the Steering Committee, the U.S. Trustee, or the Committee objects to the reasonableness of the fees and expenses of any of the WAC2 Professionals or WAC10 Professionals, and such objection cannot be resolved within ten (10) calendar days of receipt of such invoices, the Debtors, the Steering Committee, the U.S. Trustee, or the Committee, as the case may be, shall file with the Court and serve on the applicable professional (with a copy to the Debtors) a Fee Objection. The professional fees of the WAC2 Professionals and WAC10 Professionals shall not be subject to the provisions of sections 327, 328, 329, or 331 of the Bankruptcy Code. To the extent then available from WAC2 Cash Collateral or WAC10 Cash Collateral, as applicable, the Debtors shall pay in accordance with the terms and conditions of this Final Order within fifteen (15) calendar days after receipt of the applicable invoice (A) the full amount invoiced if no Fee Objection has been timely filed, and (B) the undisputed fees, costs, and expenses reflected on any invoice to which a Fee Objection has been timely filed. All such fees, costs, expenses and other amounts owed or payable to the WAC2 Professionals and WAC10 Professionals shall be secured by the Non-Participating WAC Adequate Protection Liens (as defined herein), respectively, and afforded all of the priorities and protections afforded to the WAC2 Credit Facility and the WAC10 Credit Facility, as applicable, under this Final Order and the applicable loan documents. The payment of such fees shall not be subject to disgorgement, provided that the Debtors reserve the right to seek recharacterization of such payments as being applied to outstanding prepetition amounts under the applicable Non-Participating WAC Facility;

(ii)    solely to the extent of the diminution in value of the interest of the Non-Participating WAC Secured Parties in their respective Non-Participating WAC Collateral from and after the Petition Date, continuing, valid, binding, enforceable, unavoidable and automatically perfected postpetition liens and security interests (the "Non-Participating WAC Adequate Protection Non-WSC Liens"), in the Adequate Protection Non-WSC Collateral which liens shall be (A) immediately junior to the DIP Liens and subject to the Carve-Out, the Intercompany Protection Liens and any Permitted Liens (as defined in the DIP Documents), (B) pari passu with any Participating WAC Adequate Protection Non-WSC Liens and (C) senior in priority to all other liens. Except as expressly provided in this Final Order or as otherwise agreed to by the parties, the Non-Participating WAC Adequate Protection Non-WSC Liens shall not be made junior to or pari passu with any lien or security interest heretofore or hereinafter granted or created in any of the Chapter 11 Cases or any successor cases and shall be valid and enforceable against the Debtors, their estates and any successors thereto, including, without limitation, any trustee appointed in any of the Chapter 11 Cases or any successor cases until such time as the Non-Participating WAC Secured Obligations owed under the Non-Participating WAC Facilities are paid in full or otherwise treated pursuant to a confirmed and effective chapter 11 plan. The Non-Participating WAC Adequate Protection Non-WSC Liens shall not be subject to sections 549 or 550 of the Bankruptcy

45

Code.  No lien or interest avoided and preserved for the benefit of the estates pursuant to section 551 of the Bankruptcy Code shall be *pari passu* with or senior to the Non-Participating WAC Adequate Protection Non-WSC Liens;

(iii)    solely to the extent of the diminution in value of the interest of the Non-Participating WAC Secured Parties in their respective Non-Participating WAC Collateral from and after the Petition Date, allowed superpriority administrative expense claims (the "Non-Participating WAC Adequate Protection Claims" and together with the Participating WAC Adequate Protection Claims, the "Adequate Protection Claims") against each of the WAC2 Obligors and WAC10 Obligors, respectively, that is (a) at a WAC2 Obligor or WAC10 Obligor that are not Non-WAC Group Obligors, senior to all other administrative expense claims in such Chapter 11 Cases and (b) at a WAC2 Obligor or WAC10 Obligor that is a Non-WAC Group Obligor, *pari passu* with the Participating WAC Adequate Protection Claims;

(iv)    each of the Non-Participating WAC Secured Parties shall receive, solely to the extent of any diminution in value of their respective interest in the Non-Participating WAC Collateral, replacement liens in the WAC2 Collateral and WAC10 Collateral, respectively, which liens shall be senior in priority to all other liens (the "Non-Participating WAC Replacement Liens" and together with the Non-Participating WAC Adequate Protection Non-WSC Liens, the "Non-Participating WAC Adequate Protection Liens").[25]  Except as expressly provided in this Final Order or as otherwise agreed to by the parties, the Non-Participating WAC Replacement Liens shall not be made junior to or *pari passu* with any lien or security interest heretofore or hereinafter granted or created in any of the Chapter 11 Cases or any successor cases and shall be valid and enforceable against the Debtors, their estates and any successors thereto, including, without limitation, any trustee appointed in any of the Chapter 11 Cases or any successor cases until such time as the Non-Participating WAC Secured Obligations, as applicable, are paid in full or otherwise treated pursuant to a confirmed and effective chapter 11 plan.  The Non-Participating WAC Replacement Liens shall not be subject to sections 549 or 550 of the Bankruptcy Code.  No lien or interest avoided and preserved for the benefit of the estates pursuant to section 551 of the Bankruptcy Code shall be *pari passu* with or senior to these replacement liens;

(v)    the Debtors shall comply with the Non-Participating WAC Budget, as may be amended, with respect to Non-Participating WAC Groups, as applicable, and all budget requirements set forth herein; and

(vi)    solely to the extent of the diminution in value of the interest of the Non-Participating WAC Secured Parties in their respective Non-Participating WAC Collateral from and after the Petition Date, the Debtors shall use the Non-Participating WAC Secured Parties' respective Cash Collateral solely to pay the direct expenses incurred at their respective Non-Participating WAC Group related to storage costs, aircraft maintenance, aircraft repair, insurance, and other costs necessary to

---

[25] The Non-Participating WAC Adequate Protection Liens together with the Participating WAC Adequate Protection Liens, shall be referred to herein as the "Adequate Protection Liens."

C:\USERS\FOUSTRAC\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\FBLUEZCE\WAY - FINAL DIP
ORDER_WEIL_96861720_6 (002).DOCX

maintain compliance with numerous aircraft regulations and to ensure that the aircraft in each Non-Participating WAC Group are properly maintained and their value preserved.

**Provisions Common to DIP Facility and Use of Cash Collateral**

13.    Use of Proceeds of DIP Facility and Cash Collateral; No Segregation.

a.    Notwithstanding anything to the contrary in any of the "first day" orders, from the date hereof, the Debtors shall (i) use advances of credit under the DIP Facility and Cash Collateral of the Participating WAC Secured Parties only for the purposes permitted by this Final Order and the DIP Documents and in compliance with the Approved Budget (subject to any Permitted Variances), and (ii) shall use Cash Collateral of the Non-Participating WAC Secured Parties only for the purposes permitted by this Final Order and in compliance with the Non-Participating WAC Budget; provided, that except as set forth in paragraph 17 hereof, no Cash Collateral or proceeds of the DIP Facility shall be used to investigate, challenge, object to, contest or raise any defense to, the validity, security, perfection, priority, extent or enforceability of any amount due under or the liens or claims granted under or in connection with the Participating WAC Facilities.  The Participating WAC Liens shall continue to attach to the Cash Collateral irrespective of any commingling of Cash Collateral with other cash of the Debtors (if any).  Any failure by the Debtors on or after the Petition Date to comply with the segregation requirements of section 363(c)(4) of the Bankruptcy Code (to the extent applicable) in respect of any Cash Collateral shall not be used as a basis to challenge the Participating WAC Secured Obligations, or the extent, validity, enforceability or perfected status of the Participating WAC Liens.

b.    The Debtors are hereby authorized to use the Cash Collateral of the Non-Participating WAC Secured Parties solely to pay for the unpaid direct expenses of the applicable Non-Participating WAC Group in accordance with the Non-Participating WAC

18-13648-smb    Doc 231    Filed 01/09/19    Entered 01/09/19 13:26:52    Main Document
Pg 48 of 91

Budget (as the same may be amended, modified, or supplemented by mutual agreement of the Debtors and the WAC2 Administrative Agent or WAC10 Agent, as applicable), including but not limited to expenses related to storage costs, aircraft maintenance, aircraft repair, insurance, and other costs necessary to maintain compliance with numerous aircraft regulations and to ensure that the aircraft owned by the applicable Non-Participating WAC Group are properly preserved and maintained in accordance with the terms and conditions of this Final Order. Notwithstanding any other provision of this Final Order, nothing in this Final Order shall permit the Debtors to use the Cash Collateral of the Non-Participating WAC Secured Parties to pay any administrative claim that WLIL may assert against any entity in the Non-Participating WAC Groups, including, without limitation, any professional fees or expenses of Estate Professionals. The WAC2 Cash Collateral and WAC10 Cash Collateral shall not be transferred to or used to pay any expenses of, a Debtor or non-Debtors affiliate that is not an entity in the applicable Non-Participating WAC Group. Each of the WAC2 Liens and WAC10 Liens shall continue to attach to the WAC2 Cash Collateral and WAC10 Cash Collateral, as applicable, irrespective of any commingling of the Cash Collateral of the Non-Participating Secured Parties with other cash of the Debtors (if any). Any failure by the Debtors on or after the Petition Date to comply with the segregation requirements of section 363(c)(4) of the Bankruptcy Code (to the extent applicable) in respect of any Cash Collateral shall not be used as a basis to challenge the Non-Participating WAC Secured Obligations, or the extent, validity, enforceability or perfected status of the WAC2 Liens or WAC10 Liens.

14.    <u>Approved Budget</u>.

a.    <u>General</u>.  Except as otherwise provided herein or approved by the DIP Agent (at the direction of the Required DIP Lenders) and each of the Prepetition Approving

C:\USERS\FOUSTRAC\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\FBLUEZCE\WAY - FINAL DIP
ORDER_WEIL_96861720_6 (002).DOCX

Parties, the proceeds of the DIP Facility and Cash Collateral shall be used only in compliance with the Approved Budget (subject to any Permitted Variance), which Approved Budget may not be amended or modified except with the consent of the DIP Agent and each Prepetition Approving Party. Solely with respect to the WAC2 Cash Collateral and WAC10 Cash Collateral, and except as otherwise provided in this Final Order, such Cash Collateral shall be used only in compliance with the Non-Participating WAC Budget timely provided pursuant to paragraph 14(f) of this Final Order.

b.    Initial Budget. Attached as Exhibit B hereto and incorporated by reference herein is a 13-week statement that includes a statement of receipts (on a cumulative basis) and disbursements (on a "Participating WAC Group by Participating WAC Group" basis) for the Debtors, broken down by week, including all anticipated cash uses for such period (the "Initial Budget"). The Initial Budget shall be deemed an "Approved Budget."

c.    Proposed and Approved Budget. At the end of each ten (10)-week period, commencing with the tenth full week after the Petition Date, and thereafter following the commencement of the then applicable Approved Budget, the Debtors shall deliver to the DIP Agent, each of the Prepetition Approving Parties, and each of the Non-Participating WAC Secured Parties an updated 13-week statement for the 13 weeks commencing immediately following the 13-week period covered by the then applicable Approved Budget (the "Proposed Budget"). Each Proposed Budget shall be substantially in the form as the Initial Budget and reasonably satisfactory to (i) the DIP Agent, acting at the direction of the Required DIP Lenders and (ii) each of the Prepetition Approving Parties. Each Proposed Budget shall become effective when approved by the DIP Agent (acting at the direction of the Required DIP Lenders) and each of the Prepetition Approving Parties; provided, that the DIP Agent and the Prepetition Approving

Parties shall be deemed to have approved a Proposed Budget unless the DIP Agent, acting at the direction of the Required DIP Lenders, or any Prepetition Approving Party, shall have objected to such Proposed Budget within five (5) business days of receiving such Proposed Budget; provided further that, to the extent the DIP Agent or any Prepetition Approving Party objects to any Proposed Budget and any such objection is unresolved prior to the end of the 13th week of the Approved Budget, then a hearing with respect to any such objection shall be conducted by the Court; provided further that, to the extent any amounts related to employee obligations (including, but not limited to, any amounts related to healthcare costs, payments earned under a key employee incentive plan, or severance, which must first be made by motion, on proper notice and approved by separate order of the Court) set forth in an Approved Budget are not actually paid during the period covered by such Approved Budget, such amounts may be paid during a subsequent period on the earlier of (i) the consummation of a sale of substantially all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code or (ii) the effective date of a plan in the Chapter 11 Cases without the need for further approval of the DIP Agent (acting at the direction of the Required DIP Lenders) or Prepetition Approving Parties for such delay in payment unless such payment would result in one or more Participating WAC Groups exceeding their respective Maximum Intercompany Balance. Any such approved Proposed Budget shall be deemed an "Approved Budget." For the avoidance of doubt, nothing in this Final Order or the DIP Documents other than the Maximum Intercompany Balances shall be construed as a cap or limitation on the use of DIP Collateral (including Cash Collateral) to fund the obligations benefitting from the Carve-Out.

        d.    <u>Variance Reporting</u>. On (i) December 20, 2018, (ii) January 10, 2019, and (iii) every second Thursday thereafter, the DIP Obligors shall deliver to the DIP

Agent, each of the Participating WAC Agents, and each of the Non-Participating WAC Secured Parties a variance report (a "Variance Report") comparing (x) on a "Participating WAC Group by Participating WAC Group" basis, the actual disbursements made by or on behalf of each Participating WAC Group to the amount set forth in the "Total Operating Disbursements" line for such WAC Group in the Approved Budget for such period and (y) the total actual "Rental Receipts" of the Obligors as compared to the "Total Rental Receipts" line in the Approved Budget.  Along with the Variance Report, the DIP Obligors shall deliver an informational update to the then applicable Approved Budget in substantially the same form, which interim 13-week statement shall add an additional two weeks (or three weeks, in the case of the initial and second update).

> e.    Permitted Variances and Financial Covenants.   For the period commencing on the Petition Date and ending on the last day of each applicable two (2) week period (or three (3)-week period in the case of the initial and second update) covered by a Variance Report (each such period, a "Test Period"), (x) the actual disbursements made by or on behalf of a Participating WAC Group on a "Participating WAC Group by Participating WAC Group" basis (excluding any amounts paid to professionals and adequate protection payments but including any Non-Participating WAC Fronted Expenses (as defined herein) may not exceed the greater of (i) $150,000 and (ii) 115% of the amount set forth in the "Total Operating Disbursements" line for such Participating WAC Group in the Approved Budget for such period (the amount by which the greater of (i) and (ii) would exceed the "Total Operating Disbursements" line for such Participating WAC Group in the Approved Budget for such period, a "Permitted Disbursement Variance"); and (y) the actual rental receipts of the DIP Obligors on a consolidated basis may not be less than the greater of (i) $1,000,000 and (ii) 80% of the amount

51

set forth on the "Total Rental Receipts" line in the Approved Budget for such period (the amount by which the "Total Rental Receipts" line in the Approved Budget for such period would exceed the greater of (i) and (ii), a "Permitted Receipts Variance" and together with the Permitted Disbursement Variance, the "Permitted Variances").

        f.      Non-Participating WAC Group Statements. For informational purposes only, the Debtor shall also provide to the DIP Agent, each of the Prepetition Approving Parties, and each of the Non-Participating WAC Secured Parties, (i) at the same time as the delivery of the Initial Budget and each Proposed Budget, a 13-week statement (the "Non-Participating WAC Budget") (as the same may be amended, modified, or supplemented by mutual agreement of the Debtors and the WAC2 Administrative Agent or WAC10 Agent, as applicable) of the projected (x) direct expenses of each Non Participating WAC Group ("Non-Participating WAC Direct Expenses") and (y) allocated expenses of each Non- Participating WAC Group on a "WAC Group by WAC Group" basis and (ii) at the same time as the delivery of the Variance Report, a variance report on the actual Non-Participating WAC Fronted Expenses (as defined herein) and Non-Participating WAC Direct Expenses made. The relevant Non-Participating WAC Group member shall not use Cash Collateral for Non-Participating WAC Direct Expenses in excess of the amounts shown on the Non-Participating WAC Budget.

        15.      Cash Management. As inducement for the DIP Lenders to provide the DIP Loans and as additional Adequate Protection for the Participating WAC Secured Parties, the following cash management procedures shall apply, consistent with any cash management order entered by the Court; provided, however, that the following cash management procedures shall not apply to any Non-Participating WAC Group.

C:\USERS\FOUSTRAC\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\FBLUEZCE\WAY - FINAL DIP ORDER_WEIL_96861720_6 (002).DOCX

a.  On  (i) December 14, 2018,  (ii) January 4, 2019,  and  (iii) every second Friday thereafter (any such date, a "Cash Sweep Date"), all post-petition receipts of any of the DIP Obligors shall be transferred or deposited into controlled deposit accounts held in the name of WLIL and maintained in the United Kingdom (the "Central Cash Account"), provided that such receipts (i) were received on or before the Thursday immediately preceding such Cash Sweep Date and (ii) for any Participating WAC Group, exceed $100,000 in the aggregate; provided that any sale, insurance, casualty, hedge termination payment, or other receipts, which receipt is not set forth in any period in the Approved Budget (collectively, the "Extraordinary Receipts") shall not be swept; and provided further that in the event the Net WAC Group Intercompany Claim in favor of WAC 9 would exceed $4,000,000, no further cash shall be swept from WAC 9 to the Central Cash Account until such time as the Net WAC Group Intercompany Claim in favor of WAC 9 would no longer exceed $4,000,000.

b.  Disbursements (including from the Central DIP Account and the Central Cash Account) shall be made solely in compliance with the Approved Budget (subject to Permitted Variances).

c.  Notwithstanding anything to the contrary in this Final Order, the Approved Budget, the DIP Credit Agreement, or any DIP Document, in no event shall any Debtor make any disbursement that would at any time result in a Net WLIL Intercompany Claim for any Participating WAC Group in excess of the Maximum Intercompany Balance for such Participating WAC Group.

d.  The Obligors shall maintain Participating WAC Group and entity-specific intercompany accounting, including with respect to all receipts and disbursements from the Central DIP Account and the Central Cash Account, which will be reported to the DIP Agent

and each Prepetition Approving Party on (i) December 14, 2018, (ii) January 4, 2019, and

(iii) every second Friday thereafter.  Specifically, they shall report:

> (i)      The net cash receipts received by or on behalf of each Participating WAC Group during such period other than Extraordinary Receipts that are not swept (such Participating WAC Group's "Gross WAC Group Receipts").

> (ii)      The net cash disbursements made by or on behalf of each Participating WAC Group during such period, including direct disbursements, allocated disbursements and, to the extent applicable, allocated Non-Participating WAC Fronted Expenses, (such amounts for each Participating WAC Group, its "Gross WAC Group Disbursements").

> (iii)      The net position of each Participating WAC Group vis-à-vis WLIL, calculated as the difference between such Participating WAC Group's Gross WAC Group Receipts and its Gross WAC Group Disbursements for such week and on a cumulative basis, in each case as deemed to be adjusted for purposes of effectuating the intercreditor settlement set forth in the Forbearance Agreements but not with respect to the Debtors' actual intercompany claim balances and for agreed opening cash balances including adjustments to reflect the cash sources and uses during the Forbearance Period (as defined in the Forbearance Agreements) (any such positive difference, a "Net WAC Group Intercompany Claim" and any such negative difference a "Net WLIL Intercompany Claim").

> e.      To the extent that WLIL has, at any time, on a cumulative basis, a

Net WLIL Intercompany Claim against a Participating WAC Group, WLIL shall receive a joint

and several superpriority intercompany claim (a "WLIL Intercompany Protection Claim")

against each member of such Participating WAC Group, secured by priming liens ("WLIL

Intercompany Protection Liens") against such Participating WAC Group's WAC Specific

Collateral, subject only to the Carve-Out.  To the extent any WLIL Intercompany Protection

Claim or WLIL Intercompany Protection Lien against any Participating WAC Group or WAC

Specific Collateral is satisfied by such Participating WAC Group or from such WAC Specific

Collateral, any DIP Superpriority Claim or DIP Lien against such Participating WAC Group or

WAC Specific Collateral shall automatically and to the same extent be satisfied and released.

f.      To the extent a Participating WAC Group, has at any time, on a cumulative basis, a Net WAC Group Intercompany Claim against WLIL, each member of such Participating WAC Group shall receive a superpriority intercompany claim (a "WAC Group Intercompany Protection Claim") against WLIL, secured by priming liens ("WAC Group Intercompany Protection Liens") against all assets of WLIL that constitute DIP Collateral (including the Central DIP Account, the Central Cash Account, and the WLIL Intercompany Protection Claims), subject only to the Carve-Out.

g.      Collectively, the WLIL Intercompany Protection Claims and the WAC Group Intercompany Protection Claims are referred to as the "Intercompany Protection Claims." Collectively the WLIL Intercompany Protection Liens and the WAC Group Intercompany Protection Liens are referred to as the "Intercompany Protection Liens."

h.      The Intercompany Protection Claims and Intercompany Protection Liens shall be held for the ratable benefit of the Participating WAC Lenders and the DIP Lenders and may not be waived, compromised, released, subordinated, settled or extinguished without the consent of the DIP Agent (at the direction of the Required DIP Lenders) and each Participating WAC Agent (or, with respect to WAC8, the Required Noteholders under and as defined in the WAC8 Documents) (each a "Prepetition Approving Party" and collectively, the "Prepetition Approving Parties").

16.     Carve-Out.

a.      As used in this Final Order, the term "Carve-Out" shall mean the sum of the following:

(i)      all fees required to be paid to (A) the Clerk of the Court and all statutory fees payable to the U.S. Trustee under 28 U.S.C. § 1930(a) and 31 U.S.C. § 3717 (without regard to the Carve-Out Trigger Notice (as defined herein), (B) fees and expenses up to $50,000 incurred by a trustee under section 726(b) of the

55

Bankruptcy Code (without regards to the Carve-Out Trigger Notice, ((A) and (B) together, the "Statutory Fees"), and (C) to the extent allowed by the Court at any time, whether by interim order or final compensation order, procedural order, or otherwise, all accrued and unpaid fees, disbursements, costs, and expenses (the "Estate Professional Fees") incurred by professionals or professional firms retained by the Debtors, their estates, and/or the Committee (if any) pursuant to sections 327, 328, 363, or 1103 of the Bankruptcy Code (collectively, the "Estate Professionals") at any time before or on the first business day after delivery by the DIP Agent of a Carve-Out Trigger Notice (the "Pre-Notice Professional Fees" and together with the Statutory Fees, the "Pre-Trigger Amount") and all unpaid out of pocket expenses of the members of the Committee ("Committee Members") (if any) that are incurred at any time before or on the first business day after delivery by the DIP Agent of a Carve-Out Trigger Notice, whether allowed by the Court or paid prior to or after delivery of a Carve-Out Trigger Notice; and

        (ii)    all fees, incurred following the delivery of a Carve-Out Trigger Notice (as defined herein), by the Debtors to the Estate Professionals and allowed by the Court at any time, in an aggregate amount not to exceed $4,000,000 (the "Post-Carve-Out Trigger Notice Cap") provided, that, there shall be a dollar-for-dollar reduction of the Carve-Out for any unused retainers (if any) held by or on behalf of the Estate Professionals as of the delivery of the Carve-Out Trigger Notice to the extent allowed or paid at any time, whether by interim of final compensation order, procedural order, or otherwise (collectively, the "Post-Notice Professional Fees" and together with the Pre-Notice Professional Fees, the "Professional Fees").

        b.    The Carve-Out shall be allocated, on a several basis, amongst the Participating WAC Groups on the same percentage allocation as allocated expenses as set forth on the then-current (or most recent) Approved Budget (without allocation to any Non-Participating WAC Group that has not consented to the Carve-Out).  The Carve-Out will be reduced dollar-for-dollar to the extent any Non-Participating WAC Group agrees to the imposition of a separate carve-out.  The Debtors shall use commercially reasonable efforts to recover (including by way of seeking a surcharge pursuant to section 506(c) of the Bankruptcy Code, if and when such surcharge is approved by final order of the Court) a ratable portion of the Carve-Out from any Non-Participating WAC Group that does not provide the Debtors a carve-out (or provides a carve-out that is substantially smaller on a ratable basis than the Carve-Out) and any amounts so recovered will be refunded to the Lenders under the Participating WAC Secured Parties that funded the Carve-Out based on their funding thereof.

c.      Notwithstanding the foregoing, subject to paragraph 17 herein, no portion of the Carve-Out shall be used for the payment of fees, disbursements, costs or expenses incurred by any Estate Professional to investigate, challenge, object to, contest, or raise any defense to, the validity, security, perfection, priority, extent or enforceability of any amount due under or the liens or claims granted under or in connection with the Participating WAC Loan Documents.

d.      As used herein, the term "Carve-Out Trigger Notice" means a written notice delivered by electronic mail by the DIP Agent (acting at the direction of the Required DIP Lenders) to the Debtors, lead restructuring counsel to the Debtors (Weil, Gotshal & Manges LLP), the U.S. Trustee, and counsel to the Committee (if any), which notice (i) shall expressly state that the Carve-Out is triggered and the Post-Carve-Out Trigger Notice Cap has been invoked, and (ii) may be delivered only upon (A) the occurrence and during the continuation of a DIP Event of Default (as defined herein) and acceleration of the DIP Obligations under the DIP Facility, or (B) the Maturity Date (as defined in the DIP Credit Agreement), in each case for which termination of funding under the DIP Credit Agreement has occurred.

e.      Fee Reserve Account.  The Debtors shall (i) have, subsequent to the second draw of the DIP Loans under the Second Interim Order, transferred cash proceeds from the DIP Facility in an amount equal to $1.5 million of the Post Carve-Out Trigger Notice Cap, (ii) thereafter on each Cash Sweep Date transfer cash proceeds from the DIP Facility or cash-on-hand in an amount equal to (x) the total budgeted weekly Professional Fees for the next unfunded week set forth in the Approved Budget, (y) to the extent not already so transferred, the total budgeted weekly Professional Fees for the prior week and (z) an amount equal to the

57

amount, if any, that, in the good faith estimate of the Estate Professionals, their aggregate actual

fees for the prior two weeks exceeded the total budgeted weekly Professional Fees and (iii) to the

extent not already so transferred, contemporaneously with the final draw of the DIP Loans under

this Final Order, or as soon as practicable thereafter, transfer cash proceeds from the DIP Facility

or cash-on-hand in an amount equal to the amount, based on the good faith estimate of the Estate

Professionals, of their aggregate actual fees for the period beginning with the Petition Date and

ending December 29, 2018, in each case (i)-(iii) into a segregated account not subject to the

control of the DIP Agent, any DIP Lender, or any WAC Secured Party (the "Fee Reserve

Account").  Upon the consummation of a credit bid with respect to a Participating WAC Group,

(A) if there are unfunded portions of the Carve-Out (other than the Post Carve-Out Trigger

Notice Cap but including the good faith estimates of the Estate Professionals of fees accrued

through the date of such consummation), the Debtors shall, to the extent consistent with the

Applicable Budget, transfer cash proceeds from the DIP Funding Account or the Central DIP

Account in an amount up to such Participating WAC Group's allocable portion of such unfunded

amount and (B) if there are any remaining unfunded portions of the Carve-Out allocable to such

Participating WAC Group (including its allocated portion of any unfunded portion of the Post

Carve-Out Trigger Notice Cap) following the transfer in (A), the Participating WAC Secured

Parties consummating such credit bid shall fund such amounts into the Fee Reserve Account

contemporaneously with such consummation.  Any amounts funded to the Fee Reserve Account

pursuant to (i), (ii), (iii) or (A) above shall be allocated to the applicable Participating WAC

Group and included in such Participating WAC Group's Gross WAC Group Disbursements.

Funds in the Fee Reserve Account shall be held in trust to pay Professional Fees and, after

delivery of a Carve-Out Trigger Notice as set forth above, to pay all amounts included in the

C:\USERS\FOUSTRAC\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\FBLUEZCE\WAY - FINAL DIP
ORDER_WEIL_96861720_6 (002).DOCX

Carve-Out.  The Debtors shall be authorized to use funds held in the Fee Reserve Account to pay Professional Fees and expenses of Committee Members as they become allowed and payable pursuant to the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and any interim or final orders of the Court; provided that the Debtors' obligations to pay allowed Professional Fees shall not be limited or be deemed limited to funds held in the Fee Reserve Account.

   f. <u>Fee Reserve Account Funding After a Carve-Out Trigger Notice</u>. On the day on which a Carve-Out Trigger Notice is received by the Debtors, the Carve-Out Trigger Notice shall constitute a demand to utilize all cash on hand in the Central Cash Account and the Central DIP Account to transfer to the Fee Reserve Account cash in an amount equal to all remaining unfunded portions of the Carve-Out as provided herein.  Any amounts funded to the Fee Reserve Account pursuant to the prior sentence shall be allocated to the applicable Participating WAC Group and included in such Participating WAC Group's Gross WAC Group Disbursements.  Following delivery of a Carve-Out Trigger Notice and the transfer set forth in the prior sentence, the DIP Agent shall deposit into the Fee Reserve Account any cash swept or foreclosed upon (including cash received as a result of the sale or other disposition of any assets) until the Fee Reserve Account has been fully funded in an amount equal to all remaining unfunded portions of the Carve-Out as provided herein.  Any amounts funded to the Fee Reserve Account pursuant to the prior sentence shall be allocated to the applicable Participating WAC Group and included in such Participating WAC Group's Gross WAC Group Disbursements. Notwithstanding anything to the contrary in the DIP Documents or this Final Order, following delivery of a Carve-Out Trigger Notice, the DIP Agent shall not sweep or foreclose on cash (including cash received as a result of the sale or other disposition of any assets) of the DIP Obligors until the Fee Reserve Account has been fully funded in an amount equal to the Carve-

Out.  Further, notwithstanding anything to the contrary herein, (i) disbursements by the Debtors

from the Fee Reserve Account shall not constitute DIP Loans, (ii) the failure of the Fee Reserve

Account to satisfy in full the Professional Fees shall not affect the priority of the Carve-Out, and

(iii) in no way shall the Carve-Out, Fee Reserve Account, or an Approved Budget or any of the

foregoing be construed as a cap on the amount of the Professional Fees due and payable by the

Debtors or that may be allowed by the Court at any time (whether by interim order, final order,

or otherwise).

g.    To the extent such cash on hand and availability and/or proceeds of

any other postpetition financing facility are not sufficient to fully fund the Fee Reserve Account,

the Carve-Out Trigger Notice shall be deemed to constitute a draw request to the DIP Agent

under the DIP Documents to fully fund the Fee Reserve Account from the DIP Funding Account,

following delivery of the Carve-Out Trigger Notice by the Debtors notwithstanding anything in

the DIP Documents to the contrary, including with respect to the existence of any default or

Event of Default (as defined in the DIP Documents), or any termination of the commitments

thereunder following an Event of Default.  Any amounts transferred to the Fee Reserve Account

shall be allocated to the Participating WAC Groups and shall be included as part of such

Participating WAC Group's Gross WAC Group Disbursements.  Funds transferred to the Fee

Reserve Account shall not (i) be subject to the Intercompany Protection Liens, Intercompany

Protection Claims, DIP Liens, the DIP Superpriority Claims, the Adequate Protection Claims, the

Adequate Protection Liens or any claim, liens or security interests granted to any other party

(including the Non-Participating WAC Secured Parties), (ii) constitute DIP Collateral,

(iii) constitute WAC Specific Collateral, (iv) constitute WAC Collateral, or (v) constitute Cash

Collateral; provided that the Participating WAC Lenders shall have a reversionary interest (in the

same proportion that they funded) in the funds held in the Fee Reserve Account, if any, after all amounts included in the Carve-Out, including any allowed Professional Fees, have been paid in full pursuant to a final order of the Court (regardless of when such Professional Fees are allowed by the Court). All payments and reimbursements made from the Fee Reserve Account after the delivery of a Carve-Out Trigger Notice shall permanently reduce the Carve-Out on a dollar-for-dollar basis. For the avoidance of doubt, any payment or reimbursement in respect of any allowed Professional Fees made prior to the delivery of a Carve-Out Trigger Notice shall not reduce the Carve-Out.

h.      For the avoidance of doubt, the Carve-Out shall be senior to all liens and claims securing the DIP Facility and any and all other forms of adequate protection liens and claims securing the DIP Obligations including the Intercompany Protection Liens and Intercompany Protections Claims. Notwithstanding anything to the contrary contained in this Final Order, any DIP Documents or any Participating WAC Loan Documents, the security interests, liens and claims granted to any of the DIP Parties or any of the Participating WAC Secured Parties (including, without limitation, the DIP Liens, DIP Superpriority Claims, Adequate Protection Liens and Adequate Protection Claims) under, pursuant to or in connection with the DIP Facility, any DIP Document, this Final Order or any Participating WAC Loan Document, as applicable, shall be subject to the payment in full in cash of the amounts due under the Carve-Out.

i.      After receipt of the Carve-Out Trigger Notice, the Debtors shall provide notice by email and facsimile to all Estate Professionals, at the email addresses and facsimile numbers set forth in each Estate Professional's notice of appearance filed with the Court (or, if there is no such notice of appearance, at such Estate Professional's last known email

C:\USERS\FOUSTRAC\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\FBLUEZCE\WAY - FINAL DIP
ORDER_WEIL_96861720_6 (002).DOCX

address and facsimile number) and by filing a notice thereof on the docket of the Court within

two (2) business days after the Debtors' receipt of a Carve-Out Trigger Notice, informing them

that such Carve-Out Trigger Notice has been received and further advising them that the

Debtors' ability to pay such Estate Professionals is subject to and limited by the Carve-Out.

j.    Notwithstanding the foregoing, so long as a Carve-Out Trigger

Notice has not been delivered in accordance with this Final Order: (i) the Debtors shall be

permitted to pay administrative expenses of Estate Professionals allowed and payable under

sections 328, 330 and 331 of the Bankruptcy Code, as the same may become due and payable,

including on an interim basis, and (ii) such payments shall not reduce, or be deemed to reduce,

the Post Carve-Out Trigger Notice Cap.

k.    None of the DIP Agent, the DIP Lenders, or the Participating

WAC Secured Parties shall be (i) responsible for the direct payment or reimbursement of any

fees or disbursements of any Estate Professional incurred in connection with the Chapter 11

Cases or any successor cases under any chapter of the Bankruptcy Code, or (ii) obligated in any

way to compensate, or to reimburse expenses of, any Estate Professional or to guarantee that the

Debtors have sufficient funds to pay such compensation or reimbursement.

l.    Nothing in this Final Order shall or shall be construed to limit the

payment following the delivery of a Carve-Out Trigger Notice of any of the amounts included in

the Carve-Out from cash that is not Cash Collateral, if any.

m.    Nothing contained herein is intended to constitute, nor should be

construed as consent to, the allowance of any Estate Professional's fees, costs or expenses by any

party and shall not affect the right of the Debtors, the DIP Parties, the Participating WAC

Secured Parties, the Committee (if any), the U.S. Trustee, or any other party-in-interest to object

to the retention or terms of retention of any Estate Professional or to the allowance and payment of any amounts incurred or requested.

17.     <u>Limitation on Use of Cash Collateral and DIP Facility Proceeds</u>. Notwithstanding anything herein to the contrary, no portion of the Carve-Out, DIP Facility, DIP Collateral, or WAC Collateral, including Cash Collateral, shall include, apply to, or be available for any fees, costs or expenses incurred by any party, including the Debtors or the Committee (if any), in connection with any of the following: (a) the investigation (including by way of examinations or discovery proceedings), initiation, assertion, joining, commencement, support or prosecution of any claims, counter-claims, causes of action, adversary proceedings, applications, motions, objections, defenses, or other contested matters against any of the DIP Parties or the WAC Secured Parties, and each of their respective successors, assigns, affiliates, parents, subsidiaries, partners, controlling persons, representatives, agents, attorneys, advisors, financial advisors, consultants, professionals, officers, directors, members, managers, shareholders, and employees, past, present and future, and their respective heirs, predecessors, successors and assigns, in each case in their respective capacities as such and with respect to any contested matter, adversary proceeding, or other matter challenging or otherwise objecting to the admissions,    stipulations,    findings,    or    releases    included    in    paragraph    D    herein (the "<u>Stipulations</u>"), including, (i) investigating or challenging the amount, validity, extent, perfection, priority, or enforceability of, or asserting any defense, counterclaim, or offset to the DIP Obligations, DIP Superpriority Claims or security interests and liens of the DIP Parties in respect thereof, (ii) investigating or challenging the amount, validity, extent, perfection, priority, or enforceability of, or asserting any defense, counterclaim, or offset to the Participating WAC Secured Obligations, the Non-Participating WAC Secured Obligations, the Participating WAC

Liens, WAC2 Liens, or WAC10 Liens, (iii) investigating or asserting any claims or causes of action arising under chapter 5 of the Bankruptcy Code against the WAC Secured Parties, (iv) investigating or asserting any so-called "lender liability" claims and causes of action against the WAC Secured Parties or the DIP Parties; and (v) investigating or asserting any action seeking to invalidate, set aside, avoid or (other than as contemplated by this Final Order and Bankruptcy Code section 510(a)) subordinate, in whole or in part, the Participating WAC Secured Obligations, the Non-Participating WAC Secured Obligations, or the DIP Loans (each, a "Loan Party Claim"), provided, however, the Committee (if any) may use up to $25,000 (the "Investigation Budget") to investigate the foregoing items (i) through (v) in this paragraph 17, provided, further, however that no portion of the Investigation Budget may be used by the Committee (if any) or any other party to prosecute or support any claims or challenges; (b) the assertion of any claims or causes of action against the WAC Secured Parties or the DIP Parties, including, without limitation, claims or actions to hinder or delay the assertion, enforcement or realization on the DIP Collateral or the liens securing the Participating WAC Secured Obligations or the Non-Participating WAC Secured Obligations in accordance with this Final Order other than to contest in good faith the occurrence or continuance of any DIP Termination Event or Cash Collateral Termination Event; (c) seeking to modify any of the rights, remedies, priorities, privileges, protections and benefits granted to the WAC Secured Parties or the DIP Parties hereunder or under the DIP Documents, the Participating WAC Loan Documents, the WAC2 Documents or WAC10 Documents, in each of the foregoing cases without such applicable parties' prior written consent; (d) the payment of any amount on account of any claims arising prior to the Petition Date unless such payments are permitted by the Approved Budget (subject to any Permitted Variances) or the Non-Participating WAC Budget and the DIP

C:\USERS\FOUSTRAC\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\FBLUEZCE\WAY - FINAL DIP ORDER_WEIL_96861720_6 (002).DOCX

Credit Agreement or are approved by order of the Court; or (e) any purpose that is prohibited under the Bankruptcy Code. For the avoidance of doubt, nothing in this order shall be deemed to preclude any party with standing with respect to a WAC Group from challenging the value of (i) liens on such Debtors' assets, (ii) the assets underlying such liens, or (iii) any other assets of the Debtors.

18.    <u>Protection of DIP Lenders' Rights and Participating WAC Adequate Protection Liens</u>. Subject to the right of the Participating WAC Secured Parties to succeed to the DIP Liens in respect of the WAC Specific Collateral by paying the DIP Agent cash in an amount equal to the amount of the Net WLIL Intercompany Claim, so long as there are any DIP Obligations outstanding under the DIP Credit Agreement, the Participating WAC Secured Parties shall: (a) subject to Paragraph 38 have no right to, and take no action to, foreclose upon or recover in connection with the liens granted thereto pursuant to the Participating WAC Loan Documents or this Final Order or otherwise seek or exercise any enforcement rights or remedies against any DIP Collateral or in connection with the debt and obligations underlying the Participating WAC Loan Documents or the Participating WAC Adequate Protection Liens, including, without limitation, in respect of the occurrence or continuance of any Event of Default (as defined in the applicable Participating WAC Loan Documents, as applicable); (b) not file any further financing statements, patent filings, trademark filings, copyright filings, mortgages, memoranda of lease, notices of lien or similar instruments, or otherwise take any action to perfect their security interests in the DIP Collateral, <u>unless</u>, solely as to this clause (c), the DIP Lenders also file financing statements or other documents to perfect the liens granted pursuant to the DIP Documents and/or this Final Order, or as may be required by applicable state law to continue the perfection of valid and unavoidable liens or security interests as of the date of filing;

and (d) deliver or cause to be delivered, at the Debtors' costs and expense (for which the
applicable Participating WAC Secured Parties shall be reimbursed upon submission to the
Debtors of invoices or billing statements), any termination statements, releases and/or
assignments (to the extent provided for herein) in favor of the DIP Agent and the DIP Lenders or
other documents necessary to effectuate and/or evidence the release, termination and/or
assignment of the Participating WAC Adequate Protection Liens on any portion of the DIP
Collateral subject to any sale or disposition approved or arranged for by the DIP Agent.

19.    <u>Reservation of Certain Third-Party Rights</u>.  The Committee (if any) and
any other party in interest solely to the extent such party is granted standing shall have a
maximum of sixty (60) calendar days (or such other later date as ordered by this Court for cause
shown or extended by the written consent of the applicable Prepetition Approving Party) from
the date of entry of this Final Order (the "<u>Investigation Termination Date</u>") to commence an
appropriate contested matter or adversary proceeding (a "<u>Challenge</u>") asserting any Loan Party
Claim.  If a motion seeking standing to file a Challenge is not filed (or with respect to the
Committee a Challenge is not filed) on or before the Investigation Termination Date then: (a) the
Stipulations shall be irrevocably binding on the Debtors, the Committee (if any), all creditors of
the Debtors, and all parties-in-interest and any and all successors-in-interest as to any of the
foregoing, including any chapter 11 trustee or chapter 7 trustee appointed in the Chapter 11
Cases or any subsequent chapter 7 cases, without further action by any party or this Court, and
the Debtors, the Committee (if any), all creditors of the Debtors, and any other party-in-interest
and any and all successors-in-interest as to any of the foregoing, including any chapter 11 trustee
or chapter 7 trustee appointed in the Chapter 11 Cases or any subsequent chapter 7 cases, shall
thereafter be forever barred from bringing any Challenge with respect thereto; (b) the

66

Participating WAC Liens, WAC2 Liens, and WAC10 Liens shall be deemed to constitute valid, binding, enforceable and perfected liens and security interests not subject to avoidance or disallowance pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (c) the Participating WAC Secured Obligations and the Non-Participating WAC Secured Obligations shall be deemed to be finally allowed claims for all purposes against each of the respective Participating WAC Obligors, WAC2 Obligors, and WAC10 Obligors, including in any subsequent chapter 7 cases, in the amounts set forth in paragraph D herein, and shall not be subject to challenge by any party-in-interest as to validity, priority or otherwise; and (d) the Debtors shall be deemed to have released, waived and discharged the Releasees, from any and all claims and causes of action arising out of, based upon or related to, in whole or in part, the Participating WAC Secured Obligations, including on the terms set forth in paragraph D herein; provided, however that the Releasees shall not be released from claims or causes of action determined in a final, non-appealable judgment of a court of competent jurisdiction to have arisen primarily from such party's gross negligence or willful misconduct.  Notwithstanding anything to the contrary herein, except to the extent that such Stipulations are successfully challenged in such Challenge: (x) if any such Challenge is timely commenced, the Stipulations shall nonetheless remain binding and preclusive on all parties-in-interest (other than the party that has brought such Challenge in connection therewith and then only with respect to the Stipulations that are subject to the Challenge and not to any Stipulations not subject to the Challenge); and (y) the WAC Secured Parties and the DIP Parties reserve all of their rights to contest on any grounds any Challenge and preserve any and all of their rights to appeal and stay any orders issued in connection with a successful Challenge.  For the avoidance of doubt, the Committee (if any) is hereby granted standing; provided, however, nothing in this Final Order

C:\USERS\FOUSTRAC\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\FBLUEZCE\WAY - FINAL DIP ORDER_WEIL_96861720_6 (002).DOCX

shall confer standing or authority on any other person (as defined in the Bankruptcy Code) to pursue any cause of action belonging to the Debtors or their estates.

20.    <u>Bankruptcy Code Section 506(c) Waiver</u>.   The Debtors on behalf of themselves and their respective estates irrevocably waive, and shall be prohibited from asserting any surcharge claim, under section 506(c) of the Bankruptcy Code or otherwise, for any costs and expenses incurred in connection with the preservation, protection or enhancement of, or realization by the DIP Parties upon the DIP Collateral, or the realization by Participating WAC Secured Parties upon the Participating WAC Collateral (as applicable); provided that the Debtors reserve all rights to surcharge the WAC2 Collateral and/or the WAC10 Collateral pursuant to section 506(c) of the Bankruptcy Code subject to approval by the Court upon a motion after notice and hearing.

21.    <u>No Marshaling/Application of Proceeds</u>.   None of the Intercompany Protection Liens, the DIP Parties nor the WAC Secured Parties shall be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to the DIP Collateral or the WAC Collateral and all proceeds thereof shall be received and used in accordance with this Final Order.

22.    <u>Section 552(b)</u>.   The WAC Secured Parties are entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the "equities of the case" exception under section 552(b) shall not apply to the WAC Secured Parties with respect to the proceeds, products, offspring, or profits of any of the WAC Collateral.

23.    <u>Disposition of Collateral; Application of Proceeds</u>.   The Debtors shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP Collateral or the Participating WAC Collateral other than in the ordinary course of business without an order of

the Court.    Notwithstanding anything otherwise provided herein, upon the sale of all or substantially all of the DIP Collateral, the Debtors shall, subject to the satisfaction of the Carve-Out, the Intercompany Protection Liens, and the Permitted Liens, use cash in an amount equal to 100% of any net cash proceeds of such sale to immediately satisfy the DIP Obligations; provided that upon the occurrence of an Asset Sale or Event of Loss (as such terms are defined in the DIP Credit Agreement) with respect to WAC Specific Collateral, other than in the case of (x) a sale, transfer, or other disposition of substantially all of the assets or equity of a Participating WAC Group; (y) in connection with a transaction resulting in a Change of Control (as such term is defined in the DIP Credit Agreement); or (z) the B412 SP MSN 33156 (in which case the proceeds shall be placed in a segregated account of WAC 7 and shall be excluded from DIP Collateral), the net cash proceeds used to satisfy the DIP Obligations shall not exceed the applicable Net WLIL Intercompany Claim of the applicable Participating WAC Group which can never exceed the applicable Maximum Intercompany Balance for such Participating WAC Group.    Further, notwithstanding anything otherwise provided herein, in connection with the novation of existing leases within a WAC Group, the Debtors shall be permitted to encumber or otherwise permit liens on new leases entered into in connection therewith in favor of the DIP Agent, any Participating WAC Collateral Agent or Non-Participating WAC Agent, as applicable, in each case in accordance with the applicable Participating WAC Loan Documents or otherwise with the consent of the applicable Participating WAC Agent or Non-Participating WAC Agent.

24.    Proceeds of Subsequent Financing.  Subject in all respects to the Carve-Out, if at any time prior to (a) the indefeasible payment in full or otherwise acceptable satisfaction of all DIP Obligations and the DIP Superpriority Claims; and (b) the termination of the DIP Agent's and the DIP Lenders' obligation to extend credit under the DIP Facilities, any of

the Debtors or any trustee or examiner with expanded powers or any responsible officer

subsequently appointed in any of the Chapter 11 Cases or any successor cases obtains credit or

incurs debt pursuant to section 364(b), 364(c), or 364(d) of the Bankruptcy Code, whether or not

in violation of the DIP Documents or this Final Order, then unless otherwise agreed by the

Required DIP Lenders, all of the cash proceeds derived from such credit or debt shall

immediately be turned over to the DIP Agent and distributed in accordance with the terms of the

DIP Documents.

25.    <u>Automatic Effectiveness of Liens</u>.  This Final Order shall be sufficient and

conclusive evidence of the creation, validity, perfection, and priority of all liens granted herein,

including the Intercompany Protection Liens, DIP Liens, and Adequate Protection Liens, and

such liens shall attach and become valid, perfected, binding, enforceable, non-avoidable and

effective liens by operation of law without any further action by the Debtors, the DIP Parties, any

of the Participating WAC Secured Parties or the Non-Participating WAC Secured Parties, and

without the necessity of executing, filing or recording any financing statements, security

agreements, vehicle lien applications, mortgages, filings with a governmental unit (including,

without limitation, the U.S. Patent and Trademark Office or the Library of Congress), or other

documents or the taking of any other actions (including, for the avoidance of doubt, entering into

any deposit account control agreement or taking possession of any collateral) to validate or

perfect (in accordance with applicable law) such liens, or to entitle the applicable Debtor, DIP

Parties, any of the Participating WAC Secured Parties, or any of the Non-Participating WAC

Secured Parties the priorities granted herein.  Any property or assets or other items of collateral

constituting DIP Collateral which are in the possession of a Participating WAC Agent (or its

agents or bailees) or under the control (as defined in the Uniform Commercial Code) of a

Participating WAC Agent as at the Petition Date shall at all times be held by such Participating WAC Agent as gratuitous bailee for the benefit of the DIP Agent and the other DIP Parties (in the case of the WAC Specific Collateral, solely to the extent of the applicable Net WLIL Intercompany Claim for such Participating WAC Group, which can never exceed the Maximum Intercompany Balance for such Participating WAC Group) to the extent otherwise provided herein.  If the DIP Agent or any of the Participating WAC Agents hereafter requests that the Debtors execute and deliver to the DIP Agent or any of the Participating WAC Agents financing statements, security agreements, pledge agreements, control agreements, collateral assignments, mortgages, or other instruments and documents considered by the DIP Agent or any of the Participating WAC Agents, as applicable, to be reasonably necessary or desirable to further evidence the perfection of the DIP Liens or Adequate Protection Liens, as applicable, the Debtors are hereby authorized to execute and deliver such financing statements, security agreements, pledge agreements, control agreements, mortgages, collateral assignments, instruments, and documents, and the DIP Agent and each of the Participating WAC Agents, as applicable, is hereby authorized to file or record such documents in their discretion without seeking modification of the automatic stay under section 362 of the Bankruptcy Code, in which event all such documents shall be deemed to have been filed or recorded at the time and on December 7, 2018; provided, however, no such filing or recordation shall be necessary or required in order to create or perfect the DIP Liens and the Adequate Protection Liens.  The DIP Agent, each Participating WAC Agent, and each Non-Participating WAC Agent, as applicable, each in its sole discretion, may file a photocopy of this Final Order as a financing statement with any filing or recording office or with any registry of deeds or similar office in addition to, or in

C:\USERS\FOUSTRAC\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\FBLUEZCE\WAY - FINAL DIP ORDER_WEIL_96861720_6 (002).DOCX

lieu of, such financing statements, notices of liens, or similar statements, and any such filing, recording, or similar office is directed to accept such filing as a financing statement.

26.    <u>Automatic Stay; Rights and Remedies Upon DIP Event of Default</u>. Subject to the terms set forth herein, the automatic stay imposed under section 362(a) of the Bankruptcy Code is hereby modified as necessary to effectuate all of the terms, rights, benefits, privileges, remedies and provisions of this Final Order and the DIP Documents, including, without limitation, to permit: (a) the DIP Obligors to grant the DIP Liens and the DIP Superpriority Claims, and to perform such acts as the DIP Agent may reasonably request, to assure the perfection and priority of the DIP Liens and any other liens granted hereunder; (b) the Debtors to take all appropriate actions necessary to (i) grant the Intercompany Protection Claims, Intercompany Protection Liens, Adequate Protection Claims, Adequate Protection Liens, and any other liens set forth herein, and (ii) ensure that the Intercompany Protection Liens, the Adequate Protection Liens, and any other liens granted hereunder are perfected and maintain the priority set forth herein; (c) the Debtors to incur all liabilities and obligations (including, with respect to the DIP Obligors, all the DIP Obligations) to the DIP Parties, the Participating WAC Secured Parties, the Non-Participating WAC Secured Parties and each other (as applicable), as contemplated under this Final Order and the DIP Documents; (d) the DIP Obligors to pay all amounts required under, in accordance with, and subject to the DIP Documents and this Final Order; (e) the DIP Parties, the Participating WAC Secured Parties and the Non-Participating WAC Secured Parties to retain and apply payments made in accordance with the DIP Documents and this Final Order; (f) subject to the following sentence, upon the occurrence and during the continuance of any Event of Default (under and as defined in the DIP Documents, a "<u>DIP Event of Default</u>"), the DIP Parties to exercise all rights and remedies provided for in the DIP

C:\USERS\FOUSTRAC\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\FBLUEZCE\WAY - FINAL DIP ORDER_WEIL_96861720_6 (002).DOCX

Documents and take any or all actions provided therein, and (g) the implementation of all of the terms, rights, benefits, privileges, remedies, and provisions of this Final Order and the DIP Documents, in each case, without further notice, motion, or application to, or order of or hearing before, this Court, subject to the terms of this Final Order including as to the DIP Remedies Notice Period (as defined herein).  Moreover, subject to the provisions of the DIP Documents and without further order from this Court, the automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified to the extent necessary to permit the DIP Parties (or any of their respective agents) to exercise, upon the occurrence and during the continuance of any DIP Event of Default, all rights and remedies provided for in the DIP Documents, and to take any or all of the following actions without further notice, motion or application to, order of or hearing before, this Court:   (1) by notice to the DIP Obligors, declare the Term Loan Commitment (as defined in the DIP Credit Agreement) terminated, whereupon all Term Loan Commitments of each DIP Lender shall forthwith terminate immediately and any commitment fee shall forthwith become due and payable without any other notice of any kind; (2) by notice to the DIP Obligors, accelerate and declare the principal of and any accrued interest in respect of all Term Loans (as defined in the DIP Credit Agreement) and all other DIP Obligations owing hereunder and thereunder to be, whereupon the same shall become, forthwith due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby waived by each DIP Obligor; (3) by notice to the DIP Obligors and subject to the Intercompany Protection Liens, the Intercompany Protection Claims, and funding of the Carve-Out with respect to any Participating WAC Group that has not funded its ratable portion of the Carve-Out, apply the balance, if any, of funds in the DIP Funding Account to repayment of the DIP Obligations; (4) by notice to the DIP Obligors and subject to the Intercompany Protection Liens, the

Intercompany Protection Claims, and the Carve-Out and in accordance with the provisions of this Final Order and the Credit Documents, enforce all of the Liens and security interests created in favor of the DIP Agent pursuant to this Final Order and the DIP Documents; and (5) (A) terminate the DIP Facility as to any future liability or obligation of the DIP Agent and the DIP Lenders, but without affecting any of the obligations under the DIP Facility, the Liens under the DIP Facility, the DIP Superpriority Claim, subject to the Carve-Out and (B) declare a termination, reduction or restriction on the ability of the DIP Obligors to use any Cash Collateral derived solely from the proceeds of DIP Collateral (in each case, subject to and solely to the extent in accordance with the terms of this Final Order); provided, however, that prior to the exercise of any right or remedy described in this paragraph, the DIP Agent shall be required to provide seven (7) days' written notice of the DIP Agent's intent to exercise its rights and remedies to the DIP Borrowers (with a copy to their bankruptcy counsel), counsel to the Committee (if any), counsel to the Steering Committee, all counsel to the Participating WAC Secured Parties and the U.S. Trustee (the "Remedies Notice Period").  During the Remedies Notice Period, (a) any party in interest shall be entitled to request a hearing on an expedited basis, including, without limitation to seek to stay the DIP Agent's exercise of any rights or remedies and Cash Collateral may be used for such purposes subject to the rights of both the Participating WAC Agents and the Non-Participating WAC Agents upon a Cash Collateral Event of Default, and (b) subject to the rights of both the Participating WAC Agents and the Non-Participating WAC Agents upon a Cash Collateral Event of Default, the Debtors may continue to use Cash Collateral for critical and necessary expenses, set forth in the Approved Budget, including, with respect to the Participating WAC Secured Parties' Cash Collateral, for the purposes of funding the Carve-Out, and in no event may the Borrowers make any insider

payments (other than ordinary course payroll, benefits, and employee expense reimbursements) or other extraordinary payments.  Unless the Court orders otherwise during the Remedies Notice Period (or extends the Remedies Notice Period to permit such expedited hearing to occur), the automatic stay, as to the DIP Parties, shall automatically be terminated at the end of the Remedies Notice Period without further notice or order, and, upon expiration of such notice period, the DIP Parties shall be permitted, subject to the Carve-Out and the Intercompany Protection Claims and Intercompany Protection Liens, to exercise all rights and remedies set forth in this Final Order, the DIP Credit Agreement and the other DIP Documents, as applicable, and as otherwise available at law, without further notice, motion or application to, order of or hearing before, this Court, and without restriction or restraint by any stay under sections 105 or 362 of the Bankruptcy Code, or otherwise.  The rights and remedies of the DIP Parties specified herein are cumulative and not exclusive of any rights or remedies that the DIP Parties may have under the DIP Documents or otherwise.  Upon expiration of the Remedies Notice Period, the Debtors shall cooperate with the DIP Parties in their exercise of their rights and remedies, whether against the DIP Collateral or otherwise, shall not challenge or raise any objections to the exercise of such rights and shall waive any right to seek relief under the Bankruptcy Code, including under section 105 thereof, to the extent such relief would restrict or impair the rights and remedies of the DIP Parties set forth in this Final Order and in the DIP Documents.  This Court shall retain exclusive jurisdiction to hear and resolve any disputes and enter any orders required by the provisions of this paragraph and relating to the application, re-imposition or continuance of the automatic stay as provided hereunder.  The delay or failure to exercise rights and remedies under the applicable DIP Documents or this Final Order by the DIP Agent and the DIP Lenders shall not constitute a waiver of the applicable DIP Agent's or the DIP Lenders'

C:\USERS\FOUSTRAC\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\FBLUEZCE\WAY - FINAL DIP
ORDER_WEIL_96861720_6 (002).DOCX

rights hereunder, thereunder or otherwise, unless such waiver is pursuant to a written instrument executed in accordance with the terms of the applicable DIP Documents and this Final Order, as applicable.

27.    <u>Agreement Concerning Exercise of Remedies</u>.    Notwithstanding the foregoing or anything in this Final Order to the contrary, the DIP Lenders and DIP Agent agree that, in connection with any exercise of remedies, they will look to recover on the DIP Obligations as follows:  (i) *first*, from the DIP Funding Account, (ii) *second*, from DIP Collateral that is not WAC Specific Collateral, and (iii) *third*, on no less than 15 days' notice to the relevant Participating WAC Agent for the Participating WAC Facility, from each Participating WAC Group's WAC Specific Collateral up to but not exceeding the amount of such Participating WAC Group's Net WLIL Intercompany Claim, if any; provided that during such 15 day period the relevant Participating WAC Secured Parties may elect to succeed to the DIP Liens in respect of the WAC Specific Collateral by paying the DIP Agent cash in an amount of the Net WLIL Intercompany Claim, and upon payment of such amount such Participating WAC Secured Parties shall automatically and without further notice or action by any party, succeed to the DIP Liens in respect of such WAC Specific Collateral.

28.    <u>Rights and Remedies Upon Cash Collateral Event of Default</u>.

a.    With respect to the Cash Collateral of any Participating WAC Facility, the following shall constitute "<u>Cash Collateral Events of Default</u>":

(i)    acceleration, termination, or maturity of the DIP Facility;

(ii)    failure of the Debtors to comply in any material respect with any covenant, agreement, or provision of this Final Order with respect to its obligations to a Participating WAC Secured Party in such Participating WAC Facility and such failure shall continue unremedied for five (5) business days following notice by the applicable Participating WAC Agent of such failure;

(iii)    failure of the Debtors to comply with any Milestone (in the form attached hereto as <u>Exhibit D</u>), to the extent such Milestones are incorporated into the Acceptable Bidding Procedures Order, and such failure shall continue unremedied for five (5) business days following notice by the applicable Participating WAC Agent of such failure;

(iv)    with respect to any Participating WAC Facility, failure of the Debtors to comply with terms of the Acceptable Bidding Procedures Order with respect to the rights granted thereunder to a secured party under such Participating WAC Facility, including the failure to obtain an order authorizing a sale pursuant to a properly submitted Streamlined Credit Bid by February 15, 2019;

(v)    amendment of any Milestone on <u>Exhibit D,</u> to the extent such Milestone is incorporated into the Acceptable Bidding Procedures Order,  without the consent of the Prepetition Approving Parties;

(vi)    appointment of a trustee, examiner with expanded powers or receiver in any of the Chapter 11 Cases (other than solely in the Chapter 11 Case of one or more members of a Non-Participating WAC Group);

(vii)    an order is entered reversing, amending, supplementing, staying, vacating or otherwise modifying this Final Order with respect to any provision concerning cash management, the Intercompany Protection Liens, the Intercompany Protection Claims, the Maximum Intercompany Balance, or the adequate protection granted to the applicable Participating WAC Secured Parties without the consent of the applicable Prepetition Approving Party;

(viii)    this Final Order is not consistent with the DIP term sheet attached as Exhibit A to the Omnibus Consent Letter dated as of November 24, 2018, as subsequently amended in accordance with its terms and (to the extent it varies from the Second Interim Order) is not in form and substance reasonably acceptable to applicable Prepetition Approving Party with respect to any provision concerning cash management, credit bidding, the Intercompany Protection Liens, the Intercompany Protection Claims, the Maximum Intercompany Balance, or the adequate protection granted to the applicable Participating WAC Secured Parties;

(ix)    any adverse deviation of more than the Permitted Variance under the Approved Budget for any Test Period;

(x)    this Court (or any court of competent jurisdiction) enters an order dismissing any of the Chapter 11 Cases (other than the Chapter 11 Case of a member of a Non-Participating WAC Group or the Chapter 11 Case of a member of different Participating WAC Group with the consent of the applicable Prepetition Approving Party for such Participating WAC Group);

(xi)    this Court (or any court of competent jurisdiction) enters an order converting any of the Chapter 11 Cases (other than the Chapter 11 Case of a

C:\USERS\FOUSTRAC\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\FBLUEZCE\WAY - FINAL DIP ORDER_WEIL_96861720_6 (002).DOCX

member of a Non-Participating WAC Group) to a case under chapter 7 of the Bankruptcy Code;

(xii)    this Court (or any court of competent jurisdiction) enters an order terminating the use of the Participating WAC Facilities' Cash Collateral other than by consent of the applicable Participating WAC Agent;

(xiii)    invalidation or impairment of the Participating WAC Adequate Protection Liens, Intercompany Protection Liens, or Participating WAC Liens of the applicable Participating WAC Secured Parties;

(xiv)    the entry of an order by the Court terminating or modifying the exclusive right of any DIP Obligor to file a plan pursuant to Section 1121 of the Bankruptcy Code, without the prior written consent of the Required DIP Lenders, other than an order entered pursuant to a motion filed by or with the consent of the applicable Prepetition Approving Parties;

(xv)    any DIP Obligor seeks approval of a sale of any WAC Specific Collateral or approval of bidding procedures for such a sale (whether implemented through a plan of reorganization or otherwise) that would be inconsistent with the terms of the DIP Facility and the Milestones, to the extent such Milestones are incorporated into the Acceptable Bidding Procedures Order, without the prior written consent of the applicable Prepetition Approving Parties;

(xvi)    with respect to a Participating WAC Facility, failure to comply with terms of the Acceptable Bidding Procedures Order with respect to the rights granted thereunder to a secured party under such Participating WAC Facility, including the failure to obtain an order authorizing a sale pursuant to a properly submitted Streamlined Credit Bid by February 15, 2019; and

(xvii)    the failure of the Debtors to comply with sections 8.03, 8.04, 8.05, 8.07, 8.11, 8.15, 8.19, 8.23, 8.24, 9.01, 9.02, 9.03, 9.04, 9.05, 9.07, 9.08, 9.10, 9.12, or 9.15 of the DIP Credit Agreement (in the form attached as Exhibit A hereto) with respect to a Participating WAC Group or its WAC Specific Collateral, as applicable, and such failure continues unremedied for 15 days after the applicable Prepetition Approving Party gives notice to the Debtors of such failure.

b.    With respect to the WAC2 Cash Collateral or the WAC10 Cash Collateral, the following shall constitute "Cash Collateral Events of Default":

(i)    acceleration or maturity of the DIP Facility;

(ii)    failure of the Debtors to comply in any material respect with any covenant, agreement, or provision of this Final Order with respect to its obligations to a WAC2 Secured Party in the WAC2 Credit Facility or the WAC10 Secured Party in the WAC10 Credit Facility and such failure shall continue unremedied

78

for five (5) business days following notice by the WAC2 Administrative Agent or the WAC10 Agent, as applicable, of such failure;

(iii)    appointment of a trustee, examiner with expanded powers or receiver in the Chapter 11 Case of one or more members of the WAC2 Group or the WAC10 Group, as applicable;

(iv)    an order is entered reversing, amending, supplementing, staying, vacating or otherwise modifying this Final Order with respect to any provision concerning the adequate protection granted to the Non-Participating WAC Secured Parties, as applicable, without the consent of the applicable Non-Participating WAC Secured Parties;

(v)    [Reserved]

(vi)    any adverse deviation from the Non-Participating WAC Budget for the WAC2 Group or WAC10 Group, as applicable, without the consent of the WAC2 Administrative Agent or WAC10 Agent, as applicable;

(vii)    this Court (or any court of competent jurisdiction) enters an order dismissing the Chapter 11 Case of a member of the WAC2 Group or the WAC10 Group, as applicable (other than with the consent of the WAC2 Administrative Agent or the WAC10 Agent, as applicable);

(viii)    this Court (or any court of competent jurisdiction) enters an order converting the Chapter 11 Case of a member of the WAC2 Group or the WAC10 Group, as applicable, to a case under chapter 7 of the Bankruptcy Code;

(ix)    invalidation or impairment of the Non-Participating WAC Adequate Protection Liens;

(x)    the entry of an order by the Court terminating or modifying the exclusive right of any WAC2 Obligor or WAC10 Obligor, as applicable, to file a plan pursuant to Section 1121 of the Bankruptcy Code, without the prior written consent of the WAC2 Administrative Agent or the WAC10 Agent, as applicable, other than an order entered pursuant to a motion filed by or with the consent of the applicable WAC2 Administrative Agent or WAC10 Agent; and

(xi)    the Debtors object to the right of the Non-Participating WAC Agents to credit bid as part of any asset sale process.

c.    Upon the occurrence of a Cash Collateral Event of Default, the

applicable Participating WAC Agent (which, for the avoidance of doubt, with respect to

subsections (a)(ii), (a)(iv), (a)(v), (a)(vii), (a)(x) and (a)(xii), (a)(viii), (a)(xv), (a)(xvi), and

(a)(xvii) above, shall mean solely the Participating WAC Agent for the affected Participating

C:\USERS\FOUSTRAC\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\FBLUEZCE\WAY - FINAL DIP
ORDER_WEIL_96861720_6 (002).DOCX

WAC Facility or Participating WAC Secured Parties), the WAC2 Administrative Agent or the WAC10 Agent, may provide five (5) days' written notice of such agent's intent to terminate the use of Cash Collateral of its Participating WAC Facility or Non-Participating WAC Credit Facility (as applicable) to the Debtors (with a copy to their bankruptcy counsel), counsel to the Committee (if any), counsel to the DIP Parties, all counsel to the Participating WAC Secured Parties and the U.S. Trustee (the "Cash Collateral Remedies Notice Period").  During the Cash Collateral Remedies Notice Period the Debtors may continue to utilize Cash Collateral (including of the Participating WAC Facility or Non-Participating WAC Credit Facility seeking to terminate such use) in accordance with the terms of this Final Order and as set forth in the Approved Budget; provided that immediately upon receipt of such notice from a Participating WAC Agent, the Debtors shall not transfer the Cash Collateral of the applicable Participating WAC Group to any other Debtor entity other than to satisfy a Net WLIL Intercompany Protection Claim.  During the Cash Collateral Remedies Notice Period, any party in interest shall be entitled to seek an emergency hearing with the Court seeking (x) a finding that such Cash Collateral Event of Default has not occurred or is not continuing, (y) seeking a stay of the effectiveness of the termination of the use of Cash Collateral, or (z) to use the Cash Collateral of such terminating WAC Secured Parties without their consent.  Following the termination of the use of Cash Collateral, WLIL shall not make any payments to or on behalf of such terminating Participating WAC Group.  Unless the Court orders otherwise during the Cash Collateral Remedies Notice Period (or extends the Cash Collateral Remedies Notice Period to permit such expedited hearing to occur), the automatic stay shall automatically be terminated at the end of the Cash Collateral Remedies Notice Period (such date, the "Cash Collateral Termination Date") subject to the Carve-Out and the Intercompany Protection Claims and Intercompany Protection

C:\USERS\FOUSTRAC\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\FBLUEZCE\WAY - FINAL DIP ORDER_WEIL_96861720_6 (002).DOCX

Liens, to permit the applicable Participating WAC Agent or Non-Participating WAC Agent to immediately terminate its consent to the Debtors' use of its Cash Collateral under this Final Order.  For the avoidance of doubt, declaration of a Cash Collateral Event of Default and the termination by one group of WAC Secured Parties will not constitute a Cash Collateral Event of Default for, or terminate the use of Cash Collateral of, any other group of WAC Secured Parties.

29.  <u>Third Party Access</u>.  Without limiting any other rights or remedies of the DIP Parties available at law or in equity, and subject to the terms of the DIP Documents, upon seven (7) days' written notice to counsel to the Debtors, counsel to the Committee (if any), any lienholder, licensor, or other third party owner of any licensed premises or intellectual property, that an Event of Default has occurred and is continuing under the DIP Documents, the DIP Agent, (a) may, unless otherwise expressly provided in any separate agreement by and between the applicable licensor and the DIP Agent (the terms of which shall be reasonably acceptable to the parties thereto), enter upon any licensed premises of the DIP Obligors for the purpose of exercising any remedy with respect to DIP Collateral located thereon and (b) shall be entitled to all of the DIP Obligors' rights, privileges, and responsibilities as licensee under the applicable license and to use any and all trademarks, trade names, copyrights, licenses, patents, or any other similar assets of the DIP Obligors, which are owned by or subject to a lien of any third party and which are used by DIP Obligors in their businesses, in either the case of subparagraph (a) or (b) of this paragraph 29 without interference from lienholders or licensors thereunder, subject to such lienholders' or licensors' rights under applicable law; <u>provided</u>, <u>however</u>, that the DIP Agent (on behalf of the DIP Lenders) shall pay only fees, royalties, or other monetary obligations of the DIP Obligors that first arise after the written notice referenced above from the DIP Agent and that accrue during the period of such occupancy or use by DIP Agent calculated

C:\USERS\FOUSTRAC\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\FBLUEZCE\WAY - FINAL DIP ORDER_WEIL_96861720_6 (002).DOCX

on a per diem basis.  Nothing herein shall require the Debtors or the DIP Parties to assume any license under Bankruptcy Code section 365(a) as a precondition to the rights afforded to each of the foregoing in this paragraph 29.  For the avoidance of doubt, subject to (and without the waiver of) the rights of the DIP Parties under nonbankruptcy law, the DIP Parties can only enter upon a leased premises after a DIP Event of Default in accordance with (a) a separate agreement with the landlord of the applicable leased premises or (b) upon entry of an order of this Court upon motion by the DIP Parties and upon such notice to the landlord as shall be required by this Court.

30.    <u>Maintenance of DIP Collateral</u>.  Unless the DIP Agent (at the direction of the Required DIP Lenders) may otherwise consent in writing, until (x) the indefeasible payment in full or otherwise acceptable satisfaction of all DIP Obligations and (y) the termination of the DIP Agent's and the DIP Lenders' obligation to extend credit under the DIP Facilities, the DIP Obligors shall (a) insure the DIP Collateral as required under the DIP Facilities or the Participating WAC Facilities, as applicable and (b) maintain the cash management system in effect as of the Petition Date, as modified by this Final Order.

31.    <u>Binding Effect</u>.  The provisions of this Final Order shall inure to the benefit of the Debtors, the DIP Parties, the WAC Secured Parties, and their respective successors and permitted assigns, and, subject to paragraph 17, shall be binding upon the Debtors, the DIP Parties, the WAC Secured Parties, the Committee (if any), and any and all other creditors of the Debtors or other parties in interest and their successors and assigns, including without limitation, any trustee hereafter appointed for the estate of any of the Debtors, whether in these Chapter 11 Cases or in the event of a conversion of any of the Chapter 11 Cases to a liquidation under chapter 7 of the Bankruptcy Code or dismissal of any of the Chapter 11 Cases.  Such binding

effect is an integral part of this Final Order. Further, upon entry of this Final Order, the Stipulations shall be binding on the Debtors, and the DIP Obligations shall constitute allowed claims for all purposes in each of the Chapter 11 Cases.

32. <u>Survival</u>. The terms and provisions of this Final Order and any actions taken pursuant hereto, including but not limited to the Intercompany Protection Liens, Intercompany Protection Claims, DIP Superpriority Claims, the DIP Liens, and the Adequate Protection Liens and Adequate Protection Claims granted pursuant to this Final Order or the DIP Documents, shall survive the entry of any order: (a) confirming any chapter 11 plan in any of the Chapter 11 Cases; (b) converting any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code; or (c) dismissing any of the Chapter 11 Cases or any successor cases, and the terms and provisions of this Final Order shall continue in full force and effect notwithstanding the entry of any such order. Such claims and liens shall maintain their priority as provided by this Final Order and the DIP Documents, as applicable, and to the maximum extent permitted by law, until all of the DIP Obligations and Participating WAC Secured Obligations are indefeasibly paid in full in cash (other than contingent indemnification obligations for which no claim has been asserted) and discharged or, with respect to the Participating WAC Secured Obligations or the Non-Participating WAC Secured Obligations, otherwise treated under a chapter 11 plan. In no event shall any plan of reorganization be allowed to alter the terms of repayment of any of the DIP Obligations from those set forth in the DIP Documents unless agreed to by and among the DIP Borrowers and the DIP Parties.

33. <u>Modifications of DIP Documents</u>. Subject to the limitations set forth below, the DIP Obligors and the DIP Parties are hereby authorized to implement, in accordance with the terms of the DIP Documents, any non-material modifications or amendments (including

without limitation, any change in the number or composition of the DIP Lenders or the DIP Agent) of the DIP Documents without further notice, motion or application to, order of or hearing before, this Court. Any proposed material modification or amendment to the DIP Documents shall (a) be filed on the Court's docket and (b) provide parties-in-interest five (5) business days from the date of filing of such material modification or amendment to object in writing to such amendment, and if no objections are received, shall be submitted under certification of counsel; provided, that any forbearance from, or waiver of, (x) a breach by the DIP Obligors of a covenant, representation or any other agreement or (y) a default or a DIP Event of Default shall not require an order of this Court. If no objections are timely received during such five (5) business day notice period, the DIP Obligors, the DIP Agent and the DIP Lenders are authorized and empowered to implement, in accordance with the terms of the DIP Documents, such material modification or amendment, without further notice, hearing or approval of this Court. Any proposed material modification or amendment to the DIP Documents that is subject to a timely filed objection in accordance with this paragraph shall be subject to further order of this Court.

34.    Insurance Policies.    Upon entry of this Final Order, on each insurance policy maintained by the DIP Obligors which in any way relates to the DIP Collateral: (a) the DIP Agent and the DIP Lenders shall be, and shall be deemed to be, without any further action by or notice to any person, named as additional insureds; and (b) the DIP Agent, on behalf of the DIP Lenders, shall be, and shall be deemed to be, without any further action by or notice to any person, named as a loss payee.

35.    Protection Under Section 364(e) of the Bankruptcy Code. The DIP Parties and the WAC Secured Parties have acted in good faith in connection with this Final Order and

C:\USERS\FOUSTRAC\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\FBLUEZCE\WAY - FINAL DIP ORDER_WEIL_96861720_6 (002).DOCX

their reliance on this Final Order is in good faith. The DIP Parties and the applicable WAC Secured Party shall be entitled to all of the rights, remedies, protections and benefits granted under section 364(e) of the Bankruptcy Code, this Final Order, and the DIP Documents with respect to all uses of Cash Collateral and the incurrence of DIP Obligations and adequate protection obligations.

36. <u>Effect of Dismissal or Conversion of Chapter 11 Cases</u>. If the Chapter 11 Cases are dismissed or converted, then such dismissal or conversion of the Chapter 11 Cases shall not affect the rights of the DIP Parties or the WAC Secured Parties under their respective DIP Documents, Participating WAC Loan Documents, WAC2 Documents, or WAC10 Documents, or this Final Order, and all of the respective rights and remedies thereunder of the DIP Parties and WAC Secured Parties shall remain in full force and effect as if the Chapter 11 Cases had not been dismissed or converted. Notwithstanding entry of an order dismissing any of the Chapter 11 Cases, the following rights shall survive such dismissal: (a) the DIP Liens and DIP Superpriority Claims granted to and conferred upon the DIP Parties and the protections afforded to the DIP Parties pursuant to this Final Order and the DIP Documents shall continue in full force and effect and shall maintain their priorities as provided in this Final Order until all DIP Obligations shall have been paid and indefeasibly satisfied in full in cash (and that such DIP Liens, DIP Superpriority Claims and other protections shall, notwithstanding such dismissal, remain binding on all interested parties); (b) all Participating WAC Liens, Adequate Protection Liens and Adequate Protection Claims granted to and conferred upon the applicable WAC Secured Parties shall continue in full force and effect and shall maintain their priorities as provided in this Final Order until all Participating WAC Secured Obligations and Non-Participating WAC Secured Obligations shall have been paid and satisfied in full in cash (and

that such Adequate Protection Liens and Adequate Protection Claims shall, notwithstanding such dismissal, remain binding on all interested parties); and (c) to the greatest extent permitted by applicable law, this Court shall retain jurisdiction, notwithstanding such dismissal, for the purpose of enforcing the DIP Liens, Adequate Protection Liens, Adequate Protection Claims and DIP Superpriority Claims referred to herein.

37.    Proofs of Claim.    Notwithstanding any order entered by the Court in relation to the establishment of a bar date in the Chapter 11 Cases to the contrary, or otherwise, the DIP Parties and the WAC Secured Parties shall not be required to file proofs of claim in the Chapter 11 Cases for any claim allowed herein, and Stipulations shall be deemed to constitute a timely filed proof of claim against the applicable Debtors.  Notwithstanding the foregoing, each of the Participating WAC Agents (on behalf of themselves and the applicable other Participating WAC Secured Parties), the WAC2 Administrative Agent (on behalf of itself and the other WAC2 Secured Parties), and the WAC10 Secured Party is hereby authorized and entitled, in its sole discretion, but not required, to file (and amend and/or supplement, as it sees fit) a master proof of claim for any claims of the applicable WAC Secured Parties arising from the applicable Participating WAC Loan Documents, WAC2 Documents, or WAC10 Documents; provided that nothing herein shall waive the right of any WAC Secured Party to file its own proofs of claim against the Debtors.  The provisions set forth in this paragraph are intended solely for the purpose of administrative convenience and shall not affect the substantive rights of any party-in-interest or their respective successors-in-interest, including, without limitation, the numerosity requirements set forth in section 1126 of the Bankruptcy Code.

38.    Credit Bidding.    Subject to the terms of Exhibit D hereto, the Debtors agree not to object to a Non-Participating WAC Agents right to credit bid as part of any asset

sale process an amount up to the full amount of their respective claims during any sale of their respective Non-Participating WAC Collateral, including without limitation, sales pursuant to section 363 of the Bankruptcy Code or included as part of any chapter 11 plan subject to confirmation under section 1129(b)(2)(A)(ii)–(iii) of the Bankruptcy Code, without prejudice to the right of any other party to object and subject to the terms of the DIP Documents, the Debtors agree not to object to the Participating WAC Agents and/or Participating WAC Collateral Agents right to credit bid as part of any asset sale process an amount up to the full amount of their respective claims during any sale of their respective Participating WAC Collateral, including without limitation, sales pursuant to section 363 of the Bankruptcy Code or included as part of any chapter 11 plan subject to confirmation under section 1129(b)(2)(A)(ii)–(iii) of the Bankruptcy Code, without prejudice to the right of any other party to object.  In any credit bid made by a Participating WAC Agent and/or Participating WAC Collateral Agents, such bid shall include cash equal to the Exit Payment (as defined in <u>Exhibit D</u> hereto) as set forth in the Milestones.  As part of such Exit Payment, in connection with a sale that is not consummated through a chapter 11 plan, the Participating WAC Agents, and/or Participating WAC Collateral Agents at the direction of the required lenders under each Participating WAC Facility, consent to (a) the creation of a segregated winddown cash collateral account (the "<u>Winddown Account</u>"); (b) the funding of such Participating WAC Facility's allocable portion of such Winddown Account, and (c) the use of funds in the Winddown Account to pay the items specified in the definition thereof in the Milestones; <u>provided</u>, <u>that</u> the Participating WAC Lenders shall have a reversionary interest in the funds held in the Winddown Account, if any, after all winddown costs have been paid in full and such reversionary interest shall constitute a superpriority administrative claim in favor of the applicable Participating WAC Secured Parties.  Funds

maintained in the Winddown Account shall be pledged to support the reversionary interest but shall not otherwise (i) be subject to the Intercompany Protection Liens, Intercompany Protection Claims, DIP Liens, the DIP Superpriority Claims, the Adequate Protection Claims, the Adequate Protection Liens or any claim, liens or security interests granted to any other party (including the lenders and agents under the Non-Participating WAC Facilities), (ii) constitute DIP Collateral, (iii) constitute WAC Specific Collateral, (iv) constitute WAC Collateral, or (v) constitute Cash Collateral.

39.    No Third-Party Rights.  Except as explicitly provided for herein, this Final Order does not create any rights for the benefit of any third party, creditor, equity holder, or any direct, indirect, or incidental beneficiary other than the DIP Agent, the DIP Lenders and the WAC Secured Parties.

40.    Joint and Several Liability.  Nothing in this Final Order shall be construed to constitute a substantive consolidation of any of the Debtors' estates, it being understood, however, that the Non-WAC Group Obligors shall be jointly and severally liable for all DIP Obligations as provided herein, including without limitation, the DIP Superpriority Claims in accordance with the terms of the DIP Facility and the DIP Documents.

41.    Non-Participating WAC Facilities.

a.    In no event shall the Debtors use the proceeds of the DIP Facility or the Cash Collateral of the Participating WAC Facilities to pay any Non-Participating WAC Direct Expenses.

b.    WLIL may utilize the proceeds of the DIP Financing and/or Cash Collateral of the Participating WAC Secured Parties, in accordance with the amounts set forth on the Approved Budget, to pay for Non-Participating WAC Allocated Expenses (any amounts so

88

used, the "Non-Participating WAC Fronted Expenses"), which expenses shall be allocated to each Participating WAC Facility in the proportion set forth on the Approved Budget.

        c.      WLIL will receive an administrative claim against any Non-Participating WAC Group to the extent of any Non-Participating WAC Fronted Expenses. WLIL will use its commercially reasonable efforts to collect the Non-Participating WAC Fronted Expenses, including by seeking to surcharge the collateral of the applicable Non-Participating WAC under section 506(c) of the Bankruptcy Code for any Non-Participating WAC Fronted Expenses.

        42.    <u>Limitations on Liability</u>.  In determining to make extensions of credit under the DIP Facility, or permitting the use of Cash Collateral pursuant to this Final Order, the DIP Documents, the Participating WAC Loan Documents, WAC2 Documents, or WAC10 Documents, as applicable, none of the DIP Parties, the WAC Secured Parties or any successor of any of the foregoing, shall be deemed to be in control of the operations of the Debtors or any affiliate (as defined in section 101(2) of the Bankruptcy Code) of the Debtors, or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors or any affiliate of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601 *et seq*., as amended, or any similar foreign, federal, or state statute). Furthermore, nothing in this Final Order, the DIP Documents, the Participating WAC Loan Documents, WAC2 Documents, or WAC10 Documents shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Agent, the DIP Lenders, the WAC Secured Parties, or any successor of any of the foregoing, of any liability for any claims arising from the prepetition or postpetition activities of the Debtors or any affiliate of the Debtors,

including any and all activities by the Debtors in the operation of their business in connection with the Debtors' restructuring efforts, except to the extent caused by their gross negligence or willful misconduct.

43.    <u>Findings of Fact and Conclusions of Law</u>.  This Final Order constitutes the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, and shall take effect and be fully enforceable, immediately upon entry hereof.  To the extent any findings of fact constitute conclusions of law, they are adopted as such.  To the extent any conclusions of law constitute findings of fact, they are adopted as such.

44.    <u>Entry of this Final Order; Waiver of Stay</u>.  Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 7062 or 9024, any other Bankruptcy Rule or Rule 62(a) of the Federal Rules of Civil Procedure, this Final Order shall be immediately effective and enforceable upon its entry and there shall be no stay of execution or effectiveness of this Final Order.

45.    <u>Jurisdiction</u>.  The Court shall have exclusive jurisdiction with respect to any and all disputes or matters under, or arising out of or in connection with, either the DIP Facility or DIP Documents.

46.    <u>Controlling Effect of Final Order</u>.  To the extent any provision of this Final Order conflicts or is inconsistent with the Motion, any Interim Order, or any DIP Document, the provisions of this Final Order shall control.

47.    <u>Service</u>.  Service of this Final Order shall be made upon the parties described in paragraph L of this Final Order.

48.    <u>Reservation of Rights of WAC Secured Parties</u>.  This Final Order and the transactions contemplated hereby shall be without prejudice to (a) the ability of each Participating WAC Secured Party to move to vacate the automatic stay, move for appointment of

a trustee or examiner, move to dismiss or convert the Chapter 11 Cases or to take any other action in the Chapter 11 Cases and to appear and be heard in any matter raised in the Chapter 11 Cases, and (b) any and all rights, remedies, claims and causes of action which the applicable Participating WAC Agent or the applicable WAC Secured Parties may have against any non-Debtor party liable for the Participating WAC Secured Obligations or the Non-Participating WAC Secured Obligations.  This Final Order and the transactions contemplated hereby shall be without prejudice to (x) the ability of each Non-Participating WAC Secured Party to appear and be heard on any matter raised in the Chapter 11 Cases, and (y) any and all rights, remedies, claims, and causes of action which the WAC2 Administrative Agent or WAC10 Agent may have against any other non-Debtor party liable for the Non-Participating WAC Secured Obligations. For all adequate protection and stay relief purposes throughout the Chapter 11 Cases, the Participating WAC Secured Parties shall be deemed to have requested relief from the automatic stay and adequate protection as of the Petition Date.  For the avoidance of doubt such request will survive termination of this Final Order.

Dated: **January 9, 2019**                     **/s/ STUART M. BERNSTEIN**
                                               Honorable Stuart M. Bernstein
                                               United States Bankruptcy Judge

C:\USERS\FOUSTRAC\APPDATA\LOCAL\MICROSOFT\WINDOWS\INETCACHE\CONTENT.OUTLOOK\FBLUEZCE\WAY - FINAL DIP ORDER_WEIL_96861720_6 (002).DOCX