**PAUL HASTINGS LLP**
G. Alexander Bongartz, Esq.
200 Park Avenue
New York, New York 10166
Telephone:    (212) 318-6000
Facsimile:    (212) 319-4090
alexbongartz@paulhastings.com

-and-

**PAUL HASTINGS LLP**
Chris L. Dickerson (admitted *pro hac vice*)
Mark D. Pollack (*pro hac vice* admission pending)
Nathan S. Gimpel (admitted *pro hac vice*)
Michael C. Whalen (*pro hac vice* admission pending)
71 S. Wacker Drive, Suite 4500
Chicago, Illinois 60606
Telephone:    (312) 499-6000
Facsimile:    (312) 499-6100

*Counsel for Macquarie Rotorcraft Leasing Holdings Limited*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | Chapter 11 |
| WAYPOINT LEASING HOLDINGS LTD., *et al.*, | Case No. 18-13648 (SMB) |
| Debtors. | Jointly Administered |
| MACQUARIE ROTORCRAFT LEASING HOLDINGS LIMITED, | |
| Plaintiff, | |
| v. | Adversary Proceeding No. 19-_____ |
| LCI HELICOPTERS (IRELAND) LIMITED, | |
| Defendant. | |

## ADVERSARY COMPLAINT

Plaintiff Macquarie Rotorcraft Leasing Holdings Limited ("Macquarie" or "Plaintiff"),

for its Adversary Complaint (this "Complaint") against Defendant LCI Helicopters (Ireland)

Limited ("LCI" or "Defendant"), allege as follows:

## INTRODUCTION

1.      This case results from LCI's brazen disregard of explicit confidentiality

obligations to which it was and remains contractually obligated and the resultant damages caused

thereby.  More specifically, the Defendant engaged in discussions with third parties, contrary to

its contractual promises, to purchase assets belonging to Waypoint Leasing Holdings Ltd.

("Waypoint") and certain of its subsidiaries and affiliates, as debtors and debtors in possession

(collectively, the "Debtors"), thereby causing substantial damages to the Plaintiff and its

business.

2.      Although the Defendant willingly entered into a non-disclosure agreement with

Waypoint on August 29, 2018, attached as **Exhibit A** (the "NDA"), and although the Defendant

knew of its obligations under the NDA—including the strict requirement in section 4 of the NDA

that it may only engage in discussions with any person or entity other than the Debtors' financial

advisor regarding the purchase of any of the Debtors' assets upon receiving explicit prior

permission to do so—the Defendant disregarded its obligations and actively pursued such

discussions.  To make matters worse, the Debtors and Macquarie repeatedly cautioned the

Defendant that its actions violated the NDA and warned that legal action would be necessary if

the Defendant did not cease and desist immediately.  It chose to ignore such warnings.

3.      Simply put, the Defendant knowingly engaged in discussions forbidden by the

NDA without seeking or obtaining the advance approvals to do so as required by the

unambiguous terms of the NDA.  As a result, the Defendant benefitted from its misconduct and now possesses assets to which it is not entitled.

## JURISDICTION AND VENUE

4.      The United States Bankruptcy Court for the Southern District of New York (the "Court") has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of New York*, dated January 31, 2012.  Venue is proper in this Court pursuant to 28 U.S.C. § 1409.

5.      This adversary proceeding is commenced pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedures (the "Bankruptcy Rules").  Pursuant to Bankruptcy Rule 7008, Plaintiff consents to the entry of final orders and judgments by this Court in connection with this Complaint.

6.      This Court retained jurisdiction to hear and determine all matters, including adjudication of any disputes, relating to and arising from the implementation of the *Order (I) (A) Approving Purchase Agreement among Debtors and Successful Credit Bidder, (B) Authorizing Sale of Certain of Debtors' Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests, (C) Authorizing Assumption and Assignment of Certain Executory Contracts and Unexpired Leases in Connection Therewith, and (D) Granting Related Relief, and (II) Authorizing Debtors to Take Certain Actions with Respect to Related Intercompany Claims in Connection Therewith* [Docket No. 525] (the "Sale Order") and the *Order Approving (A) Bidding Procedures, (B) Bid Protections, (C) Form and Manner of Notice of Cure Costs, Auction, Sale Transaction, and Sale Hearing, and (D) Date for Auction, If Necessary, and Sale Hearing* [Docket No. 159] (the "Bidding Procedures Order").

3

7.      Pursuant to paragraph 10 of the NDA, LCI irrevocably and unconditionally consented to submit to the exclusive jurisdiction of this Court for any lawsuits, actions, or other proceedings arising out of or relating to the NDA.

## PARTIES

8.      Plaintiff Macquarie is a wholly owned subsidiary of Macquarie Group Limited ("Macquarie Group"), a multinational financial services group providing asset management, finance, banking, advisory, risk, and capital services.  Macquarie Group is headquartered in Australia and is listed on the Australian Securities Exchange.

9.      Upon information and belief, Defendant LCI is a privately owned aircraft lessor founded in 2004.  LCI is owned by the Libra Group, a privately held international conglomerate operating in the aviation, energy, hospitality, real estate, and shipping industries, among others.

## BACKGROUND

### The Waypoint Non-Disclosure Agreement with LCI

10.     On November 25, 2018, the Debtors filed voluntary cases under chapter 11 of the Bankruptcy Code (the "Chapter 11 Cases").

11.     Prior to the filing of the Chapter 11 Cases, the Debtors engaged in an out-of-court sale and marketing process for substantially all of their assets.  LCI was involved in the bidding process and, accordingly, executed the NDA on August 29, 2018.

12.     The NDA allowed LCI to obtain Confidential Information[1] from Waypoint relevant to the sale of certain of the Debtors' assets.  The NDA significantly restricted the information provided by Waypoint that LCI could consider during the sale process and in contemplation of acquiring the Debtors' assets as well as the purposes for which such

---

[1]      Capitalized terms used but not defined herein shall have the meanings ascribed to them in the NDA.

information could be used.  In executing the NDA, LCI agreed to use such Confidential Information "***solely*** for the purpose of evaluating and participating in discussions with the Company[2] regarding, a possible Transaction ***and for no other purpose***."  NDA § 2 (emphasis added).  The NDA defines Confidential Information as:

> . . . all notes, memoranda, summaries, analyses, compilations, forecasts, data, studies, interpretations or other documents or materials prepared by the Company or its Representatives, or [LCI] or [its] Representatives, which use, contain, reflect or are based upon or derived from, in whole or in part, information furnished to [LCI] or [its] Representatives by or on behalf of the Company.

*Id*. § 1(a).

## LCI's Violations of the NDA's Restrictions on the Use of Confidential Information

13.    Under the NDA, Confidential Information excluded information that "becomes available to [LCI] on a non-confidential basis from a source other than the Company or any of its Representatives," with the important caveat "that such source is ***not known by you (after reasonable inquiry) to be bound by a contractual, legal or fiduciary obligation of confidentiality to the Company or any other party with respect to such information*."  *Id*. (emphasis added).

14.    Upon information and belief, LCI has continuously possessed, and still possesses, Confidential Information, and used such Confidential Information to evaluate proposed acquisitions of certain of the Debtors' assets outside of the Court-ordered sale process, in violation of the NDA, and to consummate such acquisitions.

## Lombard Acquires the WAC9 Assets

15.    On December 21, 2018, the Bankruptcy Court entered the Bidding Procedures Order approving global bidding and sale procedures, substantially in the form attached to the

---

[2]    "Company," as defined in the NDA, generally refers to Waypoint and its subsidiaries.

Bidding Procedures Order as <u>Exhibit 1</u>, in connection with the sale or disposition of substantially all of the Debtors' assets.

16.     The Bidding Procedures Order authorized each Waypoint Asset Co debt facility ("<u>WAC</u>") agent (each, a "<u>WAC Facility Agent</u>") to submit "either a streamlined credit bid (a '**Streamlined Credit Bid**') or a standard credit bid (a '**363(k) Credit Bid**' and together with a Streamlined Credit Bid, a '**Credit Bid**')."  *See* Bidding Procedures Order, Ex. 1, at 12.

17.     Lombard North Central plc ("<u>Lombard</u>"), the sole lender and agent of the Waypoint Asset Co 9 Limited ("<u>WAC9</u>") secured debt facility, submitted a Streamlined Credit Bid (the "<u>Lombard Credit Bid</u>") for (a) 100 percent of the equity interests of WAC9 and its subsidiaries and (b) all profit participating notes issued by the subsidiaries of WAC9 being transferred pursuant to the transaction.  The aggregate consideration comprised, *inter alia*, a credit bid for 100 percent of the obligations under the WAC9 credit facility.

18.     On January 23, 2019, the Debtors filed a notice [Docket No. 297] that the Lombard Credit Bid was successful.

### LCI's Violation of the NDA's No-Contact Provisions

19.     Section 4 of the NDA contains the following provision imposing certain no-contact obligations on LCI:

> **[LCI] further agree[s] that, without the prior written consent of Houlihan Lokey,[3] neither [LCI] nor any of [its] Representatives shall, directly or indirectly, initiate, solicit or maintain, or cause to be initiated solicited or maintained, contact with any** officer, director, employee, any person known to [LCI] to be a former (within the past twelve (12) months) employee of the Company or its affiliates, stockholder, **creditor**, affiliate, supplier, distributor, vendor, customer, provider, agent, regulator (other than as permitted in Section 2(b) [of the NDA]) **or other commercial counterparty of the Company or any subsidiary of the Company regarding the Company or its business,**

---

[3]    Houlihan Lokey Capital, Inc. ("<u>Houlihan Lokey</u>") has served as the Debtors' investment banker in the Chapter 11 Cases.

financial condition, operations, strategy, prospects, **assets**, or liabilities (except as such communications regarding the Company's business, financial condition, operation, strategy, prospects, assets or liabilities may occur in the ordinary course of business on matters unrelated to, and otherwise not in connection with, the Possible Transaction) or concerning any Confidential Information, any Transaction Information or any Possible Transaction.

*Id.* at § 4 (emphasis added).

20.    As such, the NDA bars LCI from making contact with any creditor of the Debtors regarding the Debtors' assets, without first obtaining express written permission to do so from Houlihan Lokey.

21.    Despite this prohibition, a Lombard representative admitted on the Court's record that Lombard and LCI had made improper contact regarding LCI's acquisition of WAC9 assets. In addition to making improper contact, upon Plaintiff's information and belief, LCI furthermore received confidential information, originally compiled by Waypoint, from Lombard during the Debtors' sale process.  LCI moreover, upon information and belief, has continuously possessed, and continues to possess, that Confidential Information and has improperly used such information to evaluate, and to ultimately consummate, acquisitions of certain of the Debtors' assets outside of the Court-ordered sale process.

22.    On February 11, 2019, Lombard filed an affidavit by its representative Ms. Jacqueline McDermott in the Chapter 11 Cases [Docket No. 410] (the "Lombard Affidavit").  Paragraph 6 of the Lombard Affidavit stated:

> ***Lombard is discussing with its servicer [LCI] a subsequent transaction pursuant to which the Designated Transferee and/or the underlying business would be recapitalized and sold to the servicer***.  Neither Lombard, the Designated Transferee, or the servicer have reached an agreement or arrangement with respect to this subsequent sale, but discussions continue and a subsequent sale could occur soon after consummation of Lombard's credit bid if outstanding items are resolved and a binding agreement is reached among the parties.

7

Lombard Aff. at ¶ 6 (emphasis added).

23.    On February 12, 2019, Ms. McDermott testified, under penalty of perjury, that: (a) the "servicer" referred to in the Lombard Affidavit was LCI; (b) at no time had the Debtors or Houlihan Lokey given permission to Lombard for Lombard to discuss with LCI the sale of WAC9 or its assets to LCI; and (c) at no time had the Debtors or Houlihan Lokey given permission to Lombard for Lombard to disclose to LCI information regarding WAC9 or its assets for the purposes of discussions relating to LCI purchasing WAC9 or its assets.

24.    Also on February 12, 2019, Mr. Matthew Niemann (a senior representative of Houlihan Lokey) testified before this Court.  Mr. Niemann testified that (a) he was aware of the NDA and (b) Houlihan Lokey never consented to LCI discussing a purchase of WAC9 or its assets from Lombard.

25.    At the conclusion of testimony on February 12, 2019, the Court acknowledged Macquarie's claim that the testimony indicated an apparent violation of the NDA, but specifically instructed that any claims for alleged wilful violations of the NDA should be left "for another day."  *See* Sale Hr'g Tr. [Docket No. 537], at 251–52.

### Macquarie's Acquisition of the NDA Rights and Warnings to LCI

26.    On December 7, 2018, Macquarie and certain of its affiliates entered into an agreement to purchase certain assets of Waypoint pursuant to that certain Stock and Asset Purchase Agreement [Docket No. 64, Ex. C] (the "Macquarie APA," as amended, supplemented, or otherwise modified).  The Macquarie APA initially contemplated the sale of substantially all of the Debtors' assets to Macquarie in consideration of approximately $650 million, plus the assumption of certain assumed liabilities.

27.    As of March 13, 2019, Macquarie closed its acquisition of the assets in the Macquarie APA that were not included in the Credit Bids, with a modified sale price to reflect

the exclusion of the assets that were subject to the Credit Bids.  The assets acquired by

Macquarie included all of the Debtors' rights and interests under the NDA, which Macquarie

assumed.  These rights and interests include any and all claims arising from any breach of the

NDA.  As such, as of March 13, 2019, all of LCI's obligations under the NDA constitute

obligations owed to Macquarie, and Macquarie has the right to enforce the NDA and seek

redress for any breaches thereof.

28.    The record of warnings to LCI stretches over the course of several months.  *First*,

on December 27, 2018, the Debtors made LCI aware that the Debtors believed LCI had received

confidential information in violation of confidentiality agreements between the Debtors and their

lenders (the "December Letter," attached hereto as **Exhibit B**).  *Second*, on February 14, 2019,

Macquarie advised LCI of additional breaches of the NDA's no-contact provisions and

demanded that LCI immediately cease from any further violations of the NDA, including, but not

limited to, making further contact with Lombard regarding the purchase of any assets of the

Debtors (the "February Letter," attached hereto as **Exhibit C**).  *Third*, on March 14, 2019,

Macquarie again advised LCI of its breaches of the NDA and again demanded that LCI cease

and desist from any ongoing breaches of the NDA and to immediately bring itself into

compliance with its contractual obligations thereunder (the "March Letter," attached hereto as

**Exhibit D**).

29.    Notwithstanding these warnings, upon information and belief, LCI has purchased

from Lombard, and continues to possess, the WAC9 assets in question, which transaction was

consummated within days of Lombard's acquisition of the assets from Waypoint.  Specifically,

upon information and belief, on March 7, 2019, LCI closed its purchase of the equity in the

WAC9 assets.  Simultaneously, certain directors of Waypoint Leasing UK 9A Limited resigned

and were immediately replaced by employees of LCI and the Libra Group. Furthermore,
Waypoint Leasing UK 9A changed its registered address to the Libra Group's London location.
All of these changes occurred merely 10 days after the closing of the equity purchase of the
WAC9 entities by Lombard.

## CLAIMS FOR RELIEF

### COUNT I
### Breach of the Non-Disclosure Agreement

30.     Plaintiff repeats and re-alleges each and every allegation contained in the
preceding paragraphs and incorporates them by reference as though fully set forth herein.

31.     Plaintiff, as successor to the Debtors, and Defendant are parties to the NDA. The
NDA is a valid and binding contract.

32.     Plaintiff (and the Debtors) have fully performed their obligations under the NDA.

33.     LCI breached the confidentiality and no-contact provisions of the NDA through
its improper contact with Lombard regarding LCI's acquisition of WAC9 assets.

34.     LCI's breaches of the NDA have caused damage to Plaintiff in an amount to be
proven at trial.

35.     In defiance of the Plaintiff's repeated objections, LCI's past and continuing
breaches are wilful and blatant. Accordingly, the Plaintiff seeks relief in the form of specific
performance of the return of any and all Confidential Information as well as compensatory and
indirect, incidental, special, and/or punitive damages in an amount to be determined at trial.

### COUNT II
### Tortious Interference with Business Relations

36.     Plaintiff repeats and re-alleges each and every allegation contained in the
preceding paragraphs and incorporates them by reference as though fully set forth herein.

37.    The Plaintiff had engaged in discussions with the Debtors regarding the acquisition of substantially all of the Debtors' assets—including the WAC9 assets—and executed a stalking-horse sale agreement, subject to certain eligible credit bids, to this effect.  The Macquarie APA, as approved by the Sale Order, ultimately did not include the WAC9 assets due to LCI's interference—despite the Plaintiff's continued interest in those assets.  But for LCI's interference, the Plaintiff would have purchased the WAC9 assets as initially contemplated.

38.    LCI intentionally breached its obligations under the NDA by failing to adhere to its no-contact and confidentiality provisions.

39.    LCI's breaches of its obligations had the result of enabling Lombard's purchase of the WAC9 assets, with the intention of then reselling those assets to LCI.

40.    Such breaches interfered with Plaintiff's ability to fully and fairly participate in the WAC9 asset sale process and subsequent resale by Lombard.

41.    The Plaintiff has been harmed by this lost opportunity as a direct and proximate result of LCI's breach of its NDA obligations.

42.    LCI's conduct set forth herein was fraudulent, wanton, malicious, or wilful in complete disregard of the Plaintiff's rights.  Accordingly, the Plaintiff seeks relief in the form of compensatory and indirect, incidental, special, and/or punitive damages in an amount to be determined at trial.


[*Remainder of Page Intentionally Left Blank*]

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff prays for relief and judgment as follows:

Awarding compensatory damages in favor of the Plaintiff against Defendant LCI for all damages sustained as a result of Defendant's wrongdoing, in an amount to be proved at trial, including interest thereon;

Awarding damages in favor of the Plaintiff against Defendant LCI for all damages sustained as a result of Defendant's unjust enrichment, in an amount to be proved at trial, including interest thereon;

Awarding the Plaintiff indirect, incidental, special, and/or punitive damages where such damages are available;

Awarding injunctive relief precluding Defendant LCI from using improperly obtained Confidential Information to purchase any assets sold pursuant to any Credit Bids or further retaining or utilizing the Confidential Information;

Awarding the Plaintiff reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

Such other and further relief as the Court may deem just and proper.

*[Remainder of Page Intentionally Left Blank]*

Dated: April 3, 2019
New York, New York

Respectfully submitted,

*/s/  G. Alexander Bongartz*

G. Alexander Bongartz, Esq.
**PAUL HASTINGS LLP**
200 Park Avenue
New York, New York 10166
Telephone:      (212) 318-6000
Facsimile:      (212) 319-4090
alexbongartz@paulhastings.com

-and-

Chris L. Dickerson (admitted *pro hac vice*)
Mark D. Pollack (*pro hac vice* admission pending)
Nathan S. Gimpel (admitted *pro hac vice*)
Michael C. Whalen (*pro hac vice* admission pending)
**PAUL HASTINGS LLP**
71 South Wacker Drive, Suite 4500
Chicago, Illinois 60606
Telephone:      (312) 499-6000
Facsimile:      (312) 499-6100

*Counsel to Macquarie Rotorcraft Leasing Holdings Limited*

## EXHIBIT A

**Non-Disclosure Agreement**

CONFIDENTIAL

Waypoint Leasing Holdings Ltd.
c/o Maples Corporate Services Limited
PO Box 309, Ugland House
Grand Cayman
KY1-1104
Cayman Islands

August 29, 2018

LCI HELICOPTERS (IRELAND) LIMITED C/O LEASE CORPORATION INTERNATIONAL LIMITED
6 GEORGE'S DOCK, IFSC
DUBLIN 1 IRELAND

DEAR LADIES AND GENTLEMEN:

In connection with the consideration by LCI Helicopters (Ireland) Limited or any affiliate thereof ("<u>you</u>" or "<u>your</u>") of a possible negotiated transaction (the "<u>Possible Transaction</u>") with Waypoint Leasing Holdings Ltd., ("<u>Target</u>") and/or its direct and indirect subsidiaries (together with Target, the "<u>Company</u>") (each of you and the Company, a "<u>Party</u>," and collectively, the "<u>Parties</u>"), the Company is prepared to make available to you certain information concerning the business, financial condition, operations, strategy, prospects, assets, liabilities and other non-public, confidential and/or proprietary information of the Company. In consideration for and as a condition to such information being furnished to you and your Representatives (as defined below), you agree that you and your Representatives will treat any information concerning the Company (whether prepared by the Company, its advisors or other Representatives or otherwise and irrespective of the form of communication) which has been or will be furnished, or otherwise made available, to you or your Representatives by or on behalf of the Company (collectively referred to as the "<u>Confidential Information</u>") in accordance with the provisions of this letter agreement (this "<u>Agreement</u>"), and to take or abstain from taking certain other actions hereinafter set forth.

1.    <u>Confidential Information</u>. (a) The term "Confidential Information" shall include all notes, memoranda, summaries, analyses, compilations, forecasts, data, studies, interpretations or other documents or materials prepared by the Company or its Representatives, or you or your Representatives, which use, contain, reflect or are based upon or derived from, in whole or in part, information furnished to you or your Representatives by or on behalf of the Company. The term "Confidential Information" does not include information that you can reasonably demonstrate (i) at the time of disclosure by you is generally available to the public other than as a result of a disclosure by you or your Representatives in breach of this Agreement, (ii) was within your possession prior to it being furnished to you or your affiliates or your respective Representatives by or on behalf of the Company; *provided* that the source of such information was not known by you (after reasonable inquiry) to be bound by a contractual, legal or fiduciary obligation of confidentiality to the Company with respect to such information, (iii) becomes available to you on a non-confidential basis from a source other than the Company or any of its Representatives; *provided* that such source is not known by you (after reasonable inquiry) to be bound by a contractual, legal or fiduciary obligation of confidentiality to the Company or any other party with respect to such information, or (iv) has been independently conceived or developed by you or your Representatives without use of or reference to, in whole or in part,

any Confidential Information or any information from a source known to you to be bound by a contractual, legal or fiduciary obligation of confidentiality to the Company or any of its affiliates, and not otherwise in breach of this Agreement.

(b) For purposes of this Agreement:

    (i)    "Representatives" shall mean:

        (A) with respect to you: your affiliates and your and such affiliates' members, general partners, managers, directors, officers, employees and professional advisors (including, without limitation, accountants, attorneys and financial advisors); *provided that* "Representatives" of you shall not include, without the Target's prior written consent: (1) any of your actual or potential bidding partners or equity financing sources, or (2) any of your actual or potential debt financing sources (the "Named Partners"), and *provided further* that the Target and its advisors hereby undertakes: (aa) to keep the identity of any such Named Partners confidential and not disclose to any third party without your prior consent, unless otherwise demonstrably public information, that you are working with any such Named Party in connection with the Possible Transaction (other than (x) if any of the Company or its Representatives is Legally Compelled to do so or (y) in connection with internal communications among the Company and its Representatives); and (bb) other than in the ordinary course of the Company's business, not to contact any such Named Partner in connection with a Possible Transaction with you, or discuss the Possible Transaction with you with such Named Partner without either you being present or your prior consent.

        (B) Notwithstanding the foregoing, nothing in this Agreement shall preclude the Company from contacting or discussing a Possible Transaction with you with any Named Partner if such Named Partner is an existing lender or debt financing source of the Company or any of its affiliates.

        (C) with respect to the Company: each of the Company's and its affiliates' respective directors, officers, employees, representatives and professional advisors (including, without limitation, accountants, attorneys and financial advisors).

    (ii)    the term "person" shall be broadly interpreted to include the media and any corporation, partnership, group, individual or other entity; and

2

   (iii) the term "<u>affiliates</u>" means any person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified person; and for purposes of this definition, "control," as used with respect to any person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such person, whether through the ownership of voting securities, by agreement or otherwise (and the terms "controlling," "controlled by" and "under common control with" have correlative meanings).

2. <u>Use and Disclosure of Confidential Information</u>.

(a)  You hereby agree that (i) you and your Representatives shall use the Confidential Information solely for the purpose of evaluating and participating in discussions with the Company regarding, a Possible Transaction and for no other purpose and (ii) for the period commencing upon the execution of this Agreement by both Parties and ending on the second (2nd) anniversary of the date of this Agreement or such earlier date as the Target or the Company ceases to be active in the helicopter leasing market,  (such period, as it may be extended by mutual written agreement of the Parties, the "<u>Confidentiality Period</u>"), the Confidential Information will be kept confidential by you and your Representatives and that you and your Representatives will not disclose any of the Confidential Information to any third parties; *provided* that (A) you may make any disclosure of such information to which Target gives its prior written consent, (B) such information may only be disclosed to those of your Representatives who have a need to know such information for the sole purpose of evaluating a Possible Transaction on your behalf, who are provided with a copy of this Agreement and who agree to be bound by the applicable terms hereof to the same extent as if they were parties hereto, (C) you may disclose and discuss Confidential Information to your actual or potential bidding partners, equity financing sources or debt financing sources which Houlihan Lokey (as defined herein) has confirmed in good faith has also signed a confidentiality agreement with the Company or Target regarding the Possible Transaction with you, the Confidential Information and the Transaction Information (a "<u>Permitted Third Party</u>") and (D) subject to paragraph 2(c), you may make disclosure of such information to the extent Legally Compelled (as defined below) to do so (provided that such requirement did not arise from discretionary acts by you or your Representatives).  In any event, you agree, at your sole expense, to (x) undertake reasonable precautions to safeguard and protect the confidentiality of the Confidential Information and Transaction Information (as defined below) (which shall be no less stringent than measures taken with respect to your own confidential and proprietary information and in any event no less than a reasonable degree of care), (y) be responsible for any breach of this Agreement by any of your Representatives, including, without limitation, any actions or inactions by your Representatives that would constitute a breach of this Agreement if such Representatives were parties hereto (it being understood that such responsibility shall be in addition to and not by way of limitation of any right or remedy the Company may have against your Representatives with respect to such breach), and (z) take all reasonable measures to restrain your Representatives from prohibited or unauthorized disclosure or use of the Confidential Information or Transaction Information. Notwithstanding the foregoing, the Company recognizes that you are a competitor of the Company in that you lease helicopters to many of the same customers, solicit many of the same potential or actual customers for the leasing of helicopters, borrow from many of the same financial institutions, in each case, as the Company and have business relationships

3

with many of the same manufacturers as the Company, and nothing contained in this Agreement shall in impair your ability to conduct your business with any third parties in the ordinary course so long as you do not, directly or indirectly, use, disclose or refer to the Possible Transaction, the Confidential Information or the Transaction Information in connection with such activities or otherwise in violation of this Agreement.

(b)     In addition, you agree that, without the prior written consent of Target, except as Legally Compelled (and provided that such requirement did not arise from discretionary acts by you or any of your Representatives that triggered such disclosure or requirement and only in compliance with paragraph 2(c)), you and your Representatives will not disclose to any other person (other than your Representatives or any other Permitted Third Party who have a need to know such information for the sole purpose of evaluating a Possible Transaction on your behalf) the fact that the Parties are considering a Possible Transaction, that this Agreement exists or the contents hereof, that the Confidential Information has been made available to you or your Representatives, that the Parties and their respective Representatives are engaged in discussions with respect to the matters contemplated by this Agreement, that discussions, negotiations or investigations are taking place or have taken place concerning a Possible Transaction or any of the terms, conditions or other facts with respect thereto (including, without limitation, the status thereof) (all of the foregoing being referred to as "Transaction Information"). Without limiting the generality of the foregoing, you further agree that neither you nor any of your affiliates (who are provided with or granted access to the Confidential Information or Transaction Information) will, directly or indirectly, share the Confidential Information or the Transaction Information with or enter into any agreement, arrangement or understanding that relates to the Possible Transaction, with any other person (in each case, other than your Representatives or Permitted Third Parties as permitted above), including, without limitation, other potential bidders, bidding partners or actual or potential source of equity or debt financing, the Company's lenders, or the Company's competitors without the prior written consent of Target and only upon such person executing a confidentiality agreement in favor of Target with terms and conditions consistent with this Agreement.

(c)     In the event that you or any of your Representatives are required by applicable law or regulation or by deposition, interrogatories, requests for information or documents in legal or administrative proceedings, subpoena, civil investigative demand or other similar legal process ("Legally Compelled") to disclose any of the Confidential Information or Transaction Information, you shall provide Target with prompt (and in any event prior to any disclosure) written notice to the extent not legally prohibited of the existence, terms and circumstances of any such requirement, including a list of any Confidential Information or Transaction Information that you intend (or any of your Representatives intend) to disclose so that the Company may seek a protective order or other appropriate remedy and/or waive compliance with the provisions of this Agreement. If, in the absence of a protective order or other remedy or the receipt of a waiver by Target, you or any of your Representatives are nonetheless, upon advice of outside counsel, Legally Compelled to disclose Confidential Information or Transaction Information or else stand liable for contempt or suffer other censure or penalty, you or your Representatives may, without liability hereunder, disclose only that portion of the Confidential Information or Transaction Information which such outside counsel advises is legally required to be disclosed; provided that (i) you exercise (and cause your Representatives to exercise) reasonable efforts, at Company's expense, to preserve the confidentiality of the Confidential Information and Transaction Information, including, without limitation, exercising reasonable efforts, at Company's expense, to obtain

4

an order or other reliable assurance that confidential treatment shall be accorded to such information and (ii) such disclosure was not caused by or resulted from a previous disclosure by you or any of your Representatives in violation of this Agreement. In no event will you or any of your Representatives oppose action by Target to obtain a protective order or other relief to prevent or narrow the disclosure of the Confidential Information and Transaction Information or to obtain reliable assurance that confidential treatment will be afforded the Confidential Information and Transaction Information and, if the Company seeks such an order, you agree to (and shall cause your Representatives to) cooperate as Target shall reasonably request at the Company's expense.

3.   <u>Destruction of Confidential Information</u>.   If you determine you do not wish to proceed with a Possible Transaction, you will reasonably promptly notify the Company in writing of that decision. In that case or if requested by the Company or one of its Representatives, you will promptly (and in any event within ten (10) days of such event) return to Target or destroy or erase (including, without limitation, expunging all such Confidential Information or Transaction Information from any computer, system, server, word processor or other device containing such information) all Confidential Information and Transaction Information (and all copies, reproductions, summaries, analyses or extracts thereof or based thereon) furnished to you or your Representatives by or on behalf of the Company, including, without limitation, any materials prepared by you or your Representatives containing, based upon, reflecting or derived from Confidential Information or Transaction Information, and you shall deliver within ten (10) days of such request a certificate in writing executed by an authorized officer supervising the return or destruction that such return or destruction has occurred; *provided* that you and your Representatives may retain one copy of any Confidential Information or Transaction Information to the extent required to comply with legal or regulatory requirements or established document retention policies for use solely to demonstrate compliance with such requirements (and, to the extent such Confidential Information or Transaction Information is retained electronically, ordinary access thereto shall be limited to information technology personnel in connection with their information technology duties and shall solely be accessed to demonstrate compliance with legal or regulatory requirements). Notwithstanding the return, destruction or retention of the Confidential Information and Transaction Information, you and your Representatives will continue to be bound by your obligations of confidentiality, use restrictions and other obligations hereunder.

4.   <u>Inquiries</u>.   You agree that Houlihan Lokey Capital, Inc. ("<u>Houlihan Lokey</u>") has responsibility for arranging appropriate contacts for due diligence in connection with the Possible Transaction and that (i) all communications regarding a Possible Transaction, (ii) requests for additional information and requests for facility tours, management or similar meetings in connection with a Possible Transaction, Confidential Information or Transaction Information, and (iii) discussions or questions regarding procedures with respect to a Possible Transaction will be submitted or directed only to Houlihan Lokey or such other person as may be expressly designated by Houlihan Lokey in writing, and not to any other Representative of the Company. You further agree that, without the prior written consent of Houlihan Lokey, neither you nor any of your Representatives shall, directly or indirectly, initiate, solicit or maintain, or cause to be initiated, solicited or maintained, contact with any officer, director, employee, any person known to you to be a former (within the past twelve (12) months) employee of the Company or its affiliates, stockholder, creditor, affiliate, supplier, distributor, vendor, customer, provider, agent, regulator (other than as permitted in Section 2(b) above) or other commercial counterparty of the Company or any subsidiary of

5

the Company regarding the Company or its business, financial condition, operations, strategy, prospects, assets or liabilities (except as such communications regarding the Company's business, financial condition, operation, strategy, prospects, assets or liabilities may occur in the ordinary course of business on matters unrelated to, and otherwise not in connection with, the Possible Transaction) or concerning any Confidential Information, any Transaction Information or any Possible Transaction.

5.    No Representations or Warranties; No Agreement.    You understand and acknowledge that neither the Company nor any of its Representatives make any representation or warranty, express or implied, as to the timeliness, accuracy or completeness of the Confidential Information or Transaction Information, including, without limitation, any projections, estimates, budgets or information relating to the assets, liabilities, results of operations, condition, customers, suppliers or employees of the Company. Under no circumstances is the Company obligated to provide or make available any information, including, without limitation, any Confidential Information, that in its sole and absolute discretion it determines not to provide. You agree that neither the Company nor any of its Representatives shall have any obligation or liability to you or to any of your Representatives on any basis (including, without limitation, in contract, tort, under federal or state securities law or otherwise) relating to or resulting from the use of the Confidential Information or Transaction Information (including but not limited to any obligation to update any Confidential Information or any Transaction Information). You agree that only those representations, covenants or warranties which are made in a final definitive agreement regarding a Possible Transaction, subject to such limitations and restrictions as may be specified therein (a "Definitive Transaction Agreement"), when, as and if executed, will be relied on by you or your Representatives and have any legal effect. You agree, and you agree to direct your Representatives, not to make or facilitate in the making of any claims whatsoever against the Company or any of its Representatives with respect to or arising out of: (i) a Possible Transaction, as a result of this Agreement, any other written or oral expression or otherwise; (ii) the participation of you and your Representatives in evaluating a Possible Transaction; (iii) the review or use of any Confidential Information or any Transaction Information or any errors therein or omissions therefrom; or (iv) any action taken or any inaction occurring in reliance on the Confidential Information or any Transaction Information, except and solely to the extent as may be included in any Definitive Transaction Agreement. You agree that unless and until a Definitive Transaction Agreement between the Company and you has been executed and delivered, none of the Parties will be under any legal obligation with respect to such a transaction by virtue of this Agreement, any other written or oral expression or otherwise, except for the rights and obligations specifically agreed to herein. Neither the Company nor any advisor to the Company, nor any of their respective Representatives shall have any legal, fiduciary or other duty to any prospective or actual purchaser with respect to the manner in which any sale process is conducted. You further acknowledge and agree that the Company reserves the right, in its sole discretion, to conduct the process leading up to a Possible Transaction, if any, as the Company and its Representatives determine, including, without limitation, by negotiating with any third party and entering into a preliminary or definitive agreement with a third party, rejecting any and all proposals made by you or any of your Representatives with regard to a Possible Transaction, and terminating discussions and negotiations with you at any time and for no reason and that you have no right to participate in any Possible Transaction whether by virtue of this Agreement, any other written or oral expression or otherwise. Furthermore, nothing contained in this Agreement nor the furnishing of Confidential Information shall be construed as granting or conferring any rights by license or otherwise in any intellectual property of the

Company, except for the limited right of use expressly set forth herein. All right, title and interest in the Confidential Information shall remain with the Company.

6. <u>No Waiver of Privilege</u>. To the extent the Confidential Information includes materials subject to work product, attorney-client or similar privilege, the Company is not waiving, and shall not be deemed to have waived or diminished, its attorney work-product protections, attorney-client privileges or similar protections and privileges as a result of disclosing any Confidential Information to you or any of your Representatives.

7. <u>No Solicitation</u>. In consideration of and as a condition to the Confidential Information and Transaction Information being furnished to you, you hereby agree that, for a period of eighteen (18) months from the date hereof or such earlier date as the Target or the Company ceases to be active in the helicopter leasing market, neither you nor any of your affiliates will, directly or indirectly, solicit, interfere with or endeavor to entice away, offer to employ or employ (including, without limitation, as an independent contractor) any of the current officers or employees of the Company or any of its subsidiaries without obtaining the prior written consent of Target; *provided* that nothing herein shall restrict you or any of your affiliates from (i) making any general solicitation for employment by use of advertisements in the media that is not specifically directed at employees of the Company and (ii) hiring any such employee who responds to any such general solicitation or who first contacts you or your Representatives regarding employment without any solicitation in violation of this paragraph 7.

8. <u>Material Non-Public Information</u>. You acknowledge and agree that you are aware (and that your Representatives are aware or, upon providing any Confidential Information or Transaction Information to such Representatives, will be advised by you) that Confidential Information and Transaction Information being furnished to you may contain material non-public information regarding the Company and that the United States securities laws generally prohibit any persons who have such material, non-public information from purchasing or selling securities of the Company on the basis of such information or from communicating such information to any person under circumstances in which it is reasonably foreseeable that such person is likely to purchase or sell such securities on the basis of such information.

9. <u>Remedies</u>. You recognize and acknowledge the competitive value and confidential nature of the Confidential Information and the Transaction Information and the damage that would result to the Company and its affiliates if any of the Confidential Information and/or the Transaction Information is disclosed to any third party. You hereby agree that any breach of this Agreement by you or any of your Representatives would result in irreparable harm to the Company, that money damages would not be a sufficient remedy for any such breach of this Agreement and that the Company shall be entitled to equitable relief, including injunction and specific performance, as a remedy for any such breach or threatened breach and that neither you nor your Representatives shall oppose the granting of such relief. Such relief shall be available without the obligation to prove any damages underlying such breach or threatened breach. You further agree to waive, and to use commercially reasonable efforts to direct your Representatives to waive, any requirement for the securing or posting of any bond in connection with any such remedy. Such remedies shall not be deemed to be the exclusive remedies for a breach by you of this Agreement but shall be in addition to all other remedies available at law or equity to the Company. In the event of a breach of any obligations under this Agreement by you or your Representatives, you shall, immediately following the discovery of such breach, give notice to the Company of

7

the nature of such breach and, upon consultation with the Company, take all necessary steps to limit the extent of such breach. In the event of litigation relating to this Agreement, if a court of competent jurisdiction determines that you or any of your Representatives have breached this Agreement, then you shall be liable and pay to the Company the reasonable legal fees incurred by the Company in connection with such litigation, including, without limitation, any appeal therefrom.

10.   Governing Law; Jurisdiction; Waiver of Jury Trial.   This Agreement shall be governed by, construed and enforced in accordance with the laws of the State of New York, without regard to the conflict of laws provisions thereof.   You hereby irrevocably and unconditionally consent to submit to the exclusive jurisdiction of the courts of the State of New York located in New York County (except that in the event that Target or any of its direct or indirect subsidiaries becomes the subject of any bankruptcy cases under chapter 11 of Title 11 of the United States Code, then the presiding bankruptcy court, or, if under applicable law exclusive jurisdiction over such matters is vested in federal courts, the United States District Court for the Southern District of New York) (collectively, the "New York Courts") for any lawsuits, actions or other proceedings arising out of or relating to this Agreement and agree not to commence any such lawsuit, action or other proceeding except in such courts.   You further agree that service of any process, summons, notice or document by mail to your address set forth below shall be effective service of process for any lawsuit, action or other proceeding brought against you in any such court.   Service made in such manner, to the fullest extent permitted by applicable law, shall have the same legal force and effect as if served upon such party personally within the State of New York.   Nothing herein shall be deemed to limit or prohibit service of process by any other manner as may be permitted by applicable law.   You hereby irrevocably and unconditionally waive any objection to the laying of venue of any lawsuit, action or other proceeding arising out of or relating to this Agreement in the New York Courts, and hereby further irrevocably and unconditionally waive and agree not to plead or claim in any such court that any such lawsuit, action or other proceeding brought in any such court has been brought in an inconvenient forum.   **ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO ANY LAWSUIT, CLAIM OR OTHER PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT IS EXPRESSLY AND IRREVOCABLY WAIVED.**

11.   Authority to Enter into Agreement.   You hereby represent and warrant to the Company that this Agreement has been duly authorized, executed and delivered by one of your officers and is enforceable in accordance with its terms.

12.   Third Party Beneficiaries.   Each person included in the definition of the Company, other than Target, is an express third-party beneficiary of, and shall have the right to enforce the terms of, this Agreement.

13.   Entire Agreement.   This Agreement constitutes the entire agreement between the Parties regarding the subject matter hereof, and supersedes all negotiations, understandings, arrangements and agreements, oral or written, made prior to the execution hereof. In the event of any conflict between this Agreement, on the one hand, and the terms of any confidentiality legend set forth in a confidential information memorandum (or similar documents) related to a Possible Transaction or the terms of any "click-through" agreement related to an internet-based data room or similar repository of Confidential Information, on the other hand, the terms of this Agreement shall govern.

14. <u>Assignment</u>. This Agreement and the rights and obligations herein may not be assigned or otherwise transferred, in whole or in part, by you without the written consent of Target. The benefits of this Agreement shall inure to the respective successors and permitted assigns of the Parties hereto and the obligations and liabilities of the Parties under this Agreement shall be binding upon their respective successors and permitted assigns. Any attempted assignment not in compliance with this Agreement shall be void ab initio.

15. <u>No Modification</u>. No provision of this Agreement can be waived, modified or amended without the prior written consent of a duly authorized officer of the parties hereto, which consent shall specifically refer to the provision to be waived, modified or amended and shall explicitly make such waiver, modification or amendment. It is understood and agreed that no failure or delay by the Company in exercising any right, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege hereunder. The failure of a party to insist upon strict adherence to any term of this Agreement on one or more occasions shall not be considered a waiver or deprive that party of the right thereafter to insist upon strict adherence to that term or any other term of this Agreement.

16. <u>Counterparts</u>. This Agreement may be executed in counterparts and exchanged by electronic means, each of which shall be deemed an original and all such counterparts shall together constitute one instrument.

17. <u>Severability</u>. If any term or provision of this Agreement is found to violate any statute, regulation, rule, order or decree of any governmental authority, court, agency or exchange, such invalidity shall not be deemed to affect any other term or provision hereof or the validity of the remainder of this Agreement, and there shall be substituted for the invalid term or provision a substitute term or provision that shall as nearly as possible achieve the intent of the invalid term or provision.

18. <u>Term</u>. This Agreement shall expire upon the expiration of the Confidentiality Period; *provided* that the final sentence of Section 3 of this Agreement shall survive such termination; *and provided further*, that any liability for breach of this Agreement arises prior to termination, such liability shall survive such termination.

19. <u>Notices</u>. All notices to be given to the Company hereunder shall be in writing and by electronic mail or fax, or delivered personally or by overnight courier, addressed to Waypoint Leasing Holdings Ltd. c/o Waypoint Leasing Services LLC, 19 Old Kings Highway South, Darien, CT 06820 ATTN: Todd Wolynski. All notices to be given to you hereunder shall be in writing and delivered personally or by overnight courier, addressed to: LCI Helicopters (Ireland) Limited, C/O Lease Corporation International Limited, 6 George's Dock, IFSC, Dublin 1, Ireland, Attn: General Counsel (copied to: Libra Group Services Limited, 13-14 Hobart Place, London SW1W 0HH, UK, Attn: Group General Counsel).

*[Remainder of Page Intentionally Left Blank]*

Please confirm your agreement with the foregoing by signing and returning one copy of this letter to the undersigned, whereupon this Agreement shall become a binding agreement between you and Target.

Very truly yours,

WAYPOINT LEASING HOLDINGS LTD.

By: _____
    Name: Hooman Yazhari
    Title: Director

Accepted and agreed as of
the date first written above:

LCI HELICOPTERS (IRELAND) LIMITED

By: _____
    Name: T FOLEY
    Title: DIRECTOR

*Signature Page to Confidentiality Agreement*

## EXHIBIT B

**December Letter**

# Weil, Gotshal & Manges LLP

1395 Brickell Avenue, Suite 1200
Miami, FL 33131-3368
+1 305 577 3100 tel
+1 305 374 7159 fax

**Edward Soto**
+1 (305) 577-3177
edward.soto@weil.com

BY E-MAIL

December 27, 2018

LCI Helicopters (Ireland) Limited C/O
Lease Corporation International Limited
Ground Floor
6 George's Dock, IFSC
Dublin 1 Ireland
+353 1 6728708
Attn: Michael Platt (CEO), Jaspal Jandu (CFO)

Re: Waypoint Leasing Holdings Ltd.

Dear Messrs. Platt and Jandu:

We are not aware of the counsel LCI Helicopters (Ireland) Limited ("**LCI**") is using in connection with the issues addressed herein. If LCI has retained counsel to address these issues, we ask that you pass this communication on to your counsel as immediately as possible.

I am a litigation partner at the law firm Weil, Gotshal & Manges LLP. We represent Waypoint Leasing Holdings Ltd. ("**Waypoint**") and certain of its subsidiaries and affiliates as debtors and debtors in possession (collectively, the "**Company**" and the "**Debtors**") in the jointly administered chapter 11 cases captioned *In re Waypoint Leasing Holdings Ltd., et al.*, Case No. 18-13648 (SMB), currently pending before the Honorable Judge Stuart Bernstein in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**").

As you know, before the Debtors filed their chapter 11 petitions, they engaged in an out-of-court sale and marketing process of the Company. As you also know, LCI was one of the potential bidders for the Company and, accordingly, executed a non-disclosure agreement dated August 29, 2018 (the "**NDA**"). The Company required potential bidders like LCI to execute the NDA because, in connection with the sale and marketing process, the Company made available to LCI certain non-public, commercially-sensitive, and/or otherwise proprietary information about the Company. The NDA and all obligations thereunder remain effective and binding.

In executing the NDA, LCI agreed to treat certain Confidential Information[1] "solely for the purpose of evaluating and participating in discussions with the Company regarding, a Possible Transaction and for no other purpose." Under the NDA, Confidential Information was defined to

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the NDA.

LCI Helicopters (Ireland) Limited C/O
Lease Corporation International Limited
December 27, 2018
Page 2

**Weil, Gotshal & Manges LLP**

exclude information that "becomes available to you [LCI] on a non-confidential basis from a source other than the Company or any of its Representatives, *provided* that such source is not known by you (after reasonable inquiry) to be bound by a contractual, legal or fiduciary obligation of confidentiality to the Company or any other party with respect to such information."

The Debtors have provided certain information to their lenders—also subject to certain non-disclosure obligations—in connection with the pre-petition sale and marketing process, the pre-petition forbearance negotiations, and now their chapter 11 cases. It has come to our attention that one or more lenders may have provided LCI with Confidential Information in violation of the lenders' confidentiality agreements. As such, to the extent LCI has come to possess such information, that information is included in the definition of Confidential Information under the NDA. LCI, therefore, is contractually obligated to treat that Confidential Information in accordance with the NDA, including maintaining the confidentiality thereof. Moreover, the only allowable use of that Confidential Information is to evaluate and participate in discussions with the Company regarding a Possible Transaction.

In addition, the Company has permitted its lenders to speak with certain third parties about the possible provision of asset management services in the event that such lenders successfully credit bid for certain of the Company's assets. The Company's agreement to permit these discussions, however, is conditioned on the Company having prior consent rights over any information shared by the lenders with any such alternative asset manager, and in such circumstances all obligations to maintain the confidentiality of the Company's information remain effective. To the extent that LCI is engaged in any discussions with any lenders regarding the provision of asset management services, these restrictions apply.

Please be advised that the Debtors have a fiduciary duty to protect their Confidential Information and must (and will) enforce any breach of non-disclosure obligations and use restrictions to the fullest extent allowable under the law. If the Company determines that the NDA or any of its terms were breached, or that any Confidential Information was shared and/or used in a manner causing harm to the Company and its assets, the Company will enforce any and all resulting claims and causes of action before the Bankruptcy Court, and will seek damages and other available relief.

Thank you for your prompt attention to this matter.

Sincerely,

*Edward Soto*

Edward Soto

cc:  Gary T. Holtzer
     Kelly DiBlasi

## **EXHIBIT C**

**February Letter**



February 14, 2019

**VIA OVERNIGHT MAIL AND PDF EMAIL**

LCI Helicopters (Ireland) Limited C/O
Lease Corporation International Limited
Ground Floor
6 George's Dock, IFSC
Dublin 1 Ireland

Attn:   Michael Platt (CEO), michael.platt@lciaviation.com
        Jaspal Jandu (CFO), jaspal.jandu@lciaviation.com

Re:     *Waypoint Leasing Holdings Ltd.*

Dear Messrs. Platt and Jandu:

I am writing concerning LCI Helicopters (Ireland) Limited's ("LCI" or "you") material and ongoing breaches of the non-disclosure agreement between LCI and Waypoint Leasing Holdings Ltd. ("Waypoint") dated August 29, 2018 (the "NDA").

We are not aware of LCI having retained counsel in connection with the matters addressed in this letter. If LCI has retained counsel to address these issues, we ask that you promptly forward this communication to your attorneys.

We serve as legal counsel to Macquarie Rotorcraft Holdings Limited and its affiliates (collectively, "Macquarie"). As you would be aware, Macquarie is the purchaser of certain assets of Waypoint and certain of its affiliates as debtors and debtors in possession (collectively, the "Debtors") in the jointly administered chapter 11 cases captioned *In re Waypoint Leasing Holdings Ltd., et al.,* Case No. 18-13648 (SMB) (the "Bankruptcy Proceedings"), currently pending before the Honorable Judge Stuart Bernstein in the United States Bankruptcy Court for the Southern District of New York (the "Court").

Macquarie will acquire all of the Debtors' rights and interests under the NDA pursuant to a Stock and Asset Purchase Agreement dated December 7, 2018 (Court Docket 64 Exhibit C). Therefore, all of LCI's obligations under the NDA will be obligations owed to Macquarie.

By letter dated December 27, 2018 (attached as **Exhibit A**), the Debtors made LCI aware that the Debtors believed LCI had received Confidential Information in violation of confidentiality agreements between the Debtors and their lenders. The Debtors reminded LCI of its obligations under the NDA and advised LCI that the Debtors intended to enforce any breach of the NDA to the fullest extent permitted by law.

An affidavit by a representative of Lombard North Central plc ("Lombard") (the sole lender and agent of the Waypoint Asset Co 9 Limited ("WAC9") secured debt facility) was filed in the Bankruptcy Proceedings on February 11, 2019 (Court Docket 410) (the "Lombard Affidavit"). The Lombard Affidavit contained the following statement:



*"Lombard is discussing with its servicer a subsequent transaction pursuant to which the Designated Transferee and/or the underlying business would be recapitalized and sold to the servicer. Neither Lombard, the Designated Transferee, or the servicer have reached an agreement or arrangement with respect to this subsequent sale, but discussions continue and a subsequent sale could occur soon after consummation of Lombard's credit bid if outstanding items are resolved and a binding agreement is reached among the parties."*

The Lombard Affidavit was declared under penalty of perjury by Ms. Jacqueline McDermott. Ms. McDermott was cross-examined before Justice Bernstein in Court on February 12, 2019. Amongst other matters, Ms. McDermott testified, again under penalty of perjury:

(a)     that the "servicer" referred to in the Lombard Affidavit was "LCI";

(b)     at no time had the Debtors or Houlihan Lokey given permission to Lombard for Lombard to discuss with LCI the sale of WAC9 or its assets to LCI; and

(c)     at no time had the Debtors or Houlihan Lokey given permission to Lombard for Lombard to disclose to LCI information regarding WAC9 or its assets for the purposes of discussions relating to LCI purchasing WAC9 or its assets.

Clause 4 of the NDA contains the following provision (emphasis added):

***"You [LCI] further agree that, without the prior written consent of Houlihan Lokey, neither you nor any of your Representatives shall, directly or indirectly, initiate, solicit or maintain, or cause to be initiated, solicited or maintained,*** *contact with any officer, director, employee, any person known to you to be a former (within the past twelve (12) months) employee of the Company or its affiliates, stockholder,* ***creditor,*** *affiliate, supplier, distributor, vendor, customer, provider, agent, regulator (other than as permitted in Section 2(b) above)* ***or other commercial counterparty of the Company or any subsidiary of the Company regarding the Company or its business,*** *financial condition, operations, strategy, prospects,* ***assets*** *or liabilities (except as such communications regarding the Company's business, financial condition, operation, strategy, prospects, assets or liabilities may occur in the ordinary course of business on matters unrelated to, and otherwise not in connection with, the Possible Transaction) or concerning any Confidential Information, any Transaction Information or any Possible Transaction.*

A senior representative of Houlihan Lokey (Mr. Matthew Niemann) testified before Justice Bernstein in Court on February 12, 2019 that he was aware of the NDA and that Houlihan Lokey had never consented to LCI discussing a purchase of WAC9 or its assets from Lombard.

The evidence presented to the Court in the Lombard Affidavit and the testimony under oath of Ms. McDermott and Mr. Niemann clearly establishes that LCI has breached the NDA and that the breaches are continuing.

LCI's past and continuing breaches of the NDA are willful and blatant. They are the source of ongoing irreparable harm to Macquarie, with such harm to be further aggravated upon the closing of Macquarie's impending asset acquisition. Accordingly, you are liable or will be liable to Macquarie for, among other things, tortious interference with contract, tortious interference with prospective business



relations, and/or breach of your contractual obligations and duties owed to Macquarie.  Macquarie reserves the right to pursue any and all remedies available to it, including, but not limited to:  injunctive relief, specific performance, rescission, money damages, and attorneys' fees.

Macquarie demands that LCI immediately cease and desist from engaging in further breaches of the NDA, including engaging in any discussions with Lombard or any other party regarding the purchase of any assets of the Debtors.

This letter shall serve as a formal document preservation demand in anticipation of litigation. Macquarie hereby places you on notice of your obligation not to access, alter, modify, or destroy (including by erasure) any evidence relating to this matter, including any hard or soft-copy documents, corporate or personal email accounts, cloud storage accounts, text messages, Instant Messages, Instant Message archives, notes, journals, logs, servers, back-up tapes, electronic files, voicemail messages, telephone records, corporate or personal communication devices (i.e., iPhones, BlackBerries, etc.), corporate or personal electronic storage devices (i.e. USB drives, stand-alone hard drives, software that pushes or copies communications to a desktop, etc.) intranet web pages, or any other data or evidence related to the Debtors, Macquarie, the purchase of the Debtors' assets, any option relating to the purchase of the Debtor's assets, WAC9, any servicing arrangement with WAC9, any secured collateral of WAC9, Lombard, Waypoint Asset Co 12 Limited ("WAC12"), lenders to WAC12, the administrative agent for the WAC12 secured debt facility, any other lender to the Debtors, the NDA, or Confidential Information, in each case, created or modified on or after June 19, 2018.  This obligation applies to you as well as all of your affiliates, subsidiaries, agents, and assigns.

Macquarie waives no rights or remedies it may have at law or in equity, and expressly reserves all rights with regard to this matter, including all past, ongoing, and future breaches of the NDA, both known and unknown.

Very truly yours,

Chris Dickerson
of PAUL HASTINGS LLP

**<u>EXHIBIT D</u>**

**March Letter**

# PAUL
# HASTINGS

March 14, 2019

**VIA OVERNIGHT MAIL AND PDF EMAIL**

LCI Helicopters (Ireland) Limited C/O
Lease Corporation International Limited
Ground Floor
6 George's Dock, IFSC
Dublin 1 Ireland

Attn:    Michael Platt (CEO), michael.platt@lciaviation.com
         Jaspal Jandu (CFO), jaspal.jandu@lciaviation.com

Re:    *Waypoint Leasing Holdings Ltd.*

Dear Messrs. Platt and Jandu:

        I am writing in follow-up to my letter dated February 14, 2019 ("February 14th Letter"), which advised LCI Helicopters (Ireland) Limited's ("LCI" or "you") of its material and ongoing breaches of the non-disclosure agreement between LCI and Waypoint Leasing Holdings Ltd. ("Waypoint") dated August 29, 2018 (the "NDA").  We have not received any response from you or your counsel to the February 14th Letter.

        We advise that Macquarie Rotorcraft Leasing Holdings Limited and its affiliates (collectively, "Macquarie") closed its acquisition of certain assets of Waypoint and certain of its affiliates as debtors and debtors in possession (collectively, the "Debtors") on March 13, 2019, pursuant to a Stock and Asset Purchase Agreement dated December 7, 2018 (Court Docket 64 Exhibit C) in the jointly administered chapter 11 cases captioned *In re Waypoint Leasing Holdings Ltd., et al.,* Case No. 18-13648 (SMB) (the "Bankruptcy Proceedings"), currently pending before the Honorable Judge Stuart Bernstein in the United States Bankruptcy Court for the Southern District of New York (the "Court").  Those assets included all of the Debtors' rights and interests under the NDA.  Therefore, as of yesterday, all of LCI's obligations under the NDA are obligations owed to Macquarie and Macquarie has the right to enforce the NDA and seek redress for any breaches thereof.

        By letter dated December 27, 2018 (attached as **Exhibit A**), the Debtors made LCI aware that the Debtors believed LCI had received Confidential Information[1] in violation of confidentiality agreements between the Debtors and their lenders.  The Debtors reminded LCI of its obligations under the NDA and advised LCI that the Debtors intended to enforce any breach of the NDA to the fullest extent permitted by law.  In the February 14th Letter (attached as **Exhibit B**), Macquarie advised LCI of additional breaches of the NDA's no-contact provisions, and demanded that LCI immediately cease from any further violations of the NDA, including, but not limited to, making further contact with Lombard North Central plc ("Lombard") (the sole lender and agent of the Waypoint Asset Co 9 Limited ("WAC9")).  Macquarie has now also succeeded to the Debtors' rights and interests under the aforementioned confidentiality agreements.

        Because you have failed to comply with your legal duties and obligations, and failed to comply with or respond to the demand in the February 14th Letter, it is apparent that LCI has made no effort to cease and desist from its violations of the NDA, or comply with its ongoing obligations thereunder.  In

---

[1] All capitalized terms not defined herein shall have the meanings ascribed to them in the NDA.

PAUL
HASTINGS

March 14, 2019
Page 2

view of such violations and non-compliance, Macquarie has no choice but to seek legal redress to vindicate and protect its rights. Before initiating legal claims, however, Macquarie is willing to give LCI the opportunity to immediately return any and all Confidential Information in LCI's possession violative of the NDA and confidentiality agreements between the Debtors and their lenders. Macquarie will consider LCI's prompt compliance with this request as it continues to evaluate its legal options to redress the NDA violations to date. Macquarie further repeats and reiterates its demand that LCI immediately cease and desist from engaging in further breaches of the NDA.

Macquarie requests that LCI immediately provide its undersigned counsel with the following documents, communications, and information, along with a sworn certification attesting to the fact that LCI no longer retains any Confidential Information received pursuant to or in violation of the NDA or the confidentiality agreements between the Debtors and their lenders:

1.  Any and all documents and communications regarding the Debtors, Macquarie, the purchase of the Debtors' assets, any option relating to the purchase of the Debtor's assets, WAC9, assets of WAC9 (or subsidiaries of WAC9), any servicing arrangement with WAC9, any proposal to purchase WAC9 or assets of WAC9 (or subsidiaries of WAC9), any proposal to enter into an option to purchase WAC9 or assets of WAC9 (or subsidiaries of WAC9), any secured collateral of WAC9, Lombard, Waypoint Asset Co 12 Limited ("WAC12"), lenders to WAC12, the administrative agent for the WAC12 secured debt facility, any other lender to the Debtors, any aircraft assets owned by the Debtors or their subsidiaries and affiliates as of June 19, 2018, the NDA, or Confidential Information, in each case, created or modified on or after June 19, 2018.

2.  Any and all Confidential Information obtained from Lombard or any other source regarding the Debtors, Macquarie, the purchase of the Debtors' assets, any option relating to the purchase of the Debtor's assets, WAC9, assets of WAC9 (or subsidiaries of WAC9), any servicing arrangement with WAC9, any proposal to purchase WAC9 or assets of WAC9 (or subsidiaries of WAC9), any proposal to enter into an option to purchase WAC9 or assets of WAC9 (or subsidiaries of WAC9), any secured collateral of WAC9, Lombard, WAC12, lenders to WAC12, the administrative agent for the WAC12 secured debt facility, any other lender to the Debtors, any aircraft assets owned by the Debtors or their subsidiaries and affiliates as of June 19, 2018, the NDA, or Confidential Information, in each case, created or modified on or after June 19, 2018.

3.  A list of all individuals involved in contact between LCI and Lombard regarding the Debtors, Macquarie, the purchase of the Debtors' assets, any option relating to the purchase of the Debtor's assets, WAC9, assets of WAC9 (or subsidiaries of WAC9), any servicing arrangement with WAC9, any proposal to purchase WAC9 or assets of WAC9 (or subsidiaries of WAC9), any proposal to enter into an option to purchase WAC9 or assets of WAC9 (or subsidiaries of WAC9), any secured collateral of WAC9, Lombard, WAC12, lenders to WAC12, the administrative agent for the WAC12 secured debt facility, any other lender to the Debtors, any aircraft assets owned by the Debtors or their subsidiaries and affiliates as of June 19, 2018, the NDA, or Confidential Information, in each case, created or modified on or after June 19, 2018.

4.  A list of any and all Confidential Information obtained from Lombard or any other source, whether retained, disposed, or destroyed, regarding Debtors, Macquarie, the purchase of the Debtors' assets, any option relating to the purchase of the Debtor's assets, WAC9, assets of WAC9 (or subsidiaries of WAC9), any servicing arrangement with WAC9, any proposal to purchase WAC9 or assets of WAC9 (or subsidiaries of WAC9), any proposal

PAUL
HASTINGS

March 14, 2019
Page 3

to enter into an option to purchase WAC9 or assets of WAC9 (or subsidiaries of WAC9), any secured collateral of WAC9, Lombard, WAC12, lenders to WAC12, the administrative agent for the WAC12 secured debt facility, any other lender to the Debtors, any aircraft assets owned by the Debtors or their subsidiaries and affiliates as of June 19, 2018, the NDA, or Confidential Information, in each case, created or modified on or after June 19, 2018.

We previously cautioned that LCI's failure to immediately cease and desist from its breaches of the NDA would result in Macquarie's pursuit of all remedies available to it, including, but not limited to: injunctive relief, specific performance, rescission, money damages, and attorneys' fees. LCI's lack of response to the February 14th Letter sends a clear message that such remedies are now necessary. **Please respond to this letter within seven (7) days, and in no event later than March 21, 2019 at 5:00 p.m. Eastern Daylight Time, confirming your (i) compliance with the cease and desist demands and (ii) willingness to immediately provide Macquarie's undersigned counsel, and in no event later than March 25, 2019, with the documents and information requested herein, along with a sworn certification that LCI has not retained copies of any Confidential Information received pursuant to or in violation of the NDA or the confidentiality agreements between the Debtors and their lenders.** Failure to so respond will result in immediate legal action by Macquarie to protect its rights under the NDAs and all other applicable agreements, laws, and regulations.

Nothing in this letter shall be construed as in any way affecting, altering, or obviating Macquarie's earlier formal document preservation demand. LCI continues to be subject to all applicable document preservation obligations, including its obligation not to access, alter, modify, or destroy (including by erasure) any evidence relating to this matter, including any hard or soft-copy documents, corporate or personal email accounts, cloud storage accounts, text messages, Instant Messages, Instant Message archives, notes, journals, logs, servers, back-up tapes, electronic files, voicemail messages, telephone records, corporate or personal communication devices (i.e., iPhones, BlackBerries, etc.), corporate or personal electronic storage devices (i.e. USB drives, stand-alone hard drives, software that pushes or copies communications to a desktop, etc.) intranet web pages, or any other data or evidence related to the Debtors, Macquarie, the purchase of the Debtors' assets, any option relating to the purchase of the Debtor's assets, WAC9, assets of WAC9 (or subsidiaries of WAC9), any servicing arrangement with WAC9, any proposal to purchase WAC9 or assets of WAC9 (or subsidiaries of WAC9), any proposal to enter into an option to purchase WAC9 or assets of WAC9 (or subsidiaries of WAC9), any secured collateral of WAC9, Lombard, WAC12, lenders to WAC12, the administrative agent for the WAC12 secured debt facility, any other lender to the Debtors, any aircraft assets owned by the Debtors or their subsidiaries and affiliates as of June 19, 2018, the NDA, or Confidential Information, in each case, created or modified on or after June 19, 2018. This obligation applies to you as well as all of your affiliates, subsidiaries, agents, and assigns.

Macquarie waives no rights or remedies it may have at law or in equity, and expressly reserves all rights with regard to this matter, including all past, ongoing, and future breaches of the NDA, both known and unknown.

Very truly yours,

/MCW

Chris Dickerson
of PAUL HASTINGS LLP

## **Exhibit A**

**December 27, 2018 Letter**

# Weil, Gotshal & Manges LLP

1395 Brickell Avenue, Suite 1200
Miami, FL 33131-3368
+1 305 577 3100 tel
+1 305 374 7159 fax

BY E-MAIL

**Edward Soto**
+1 (305) 577-3177
edward.soto@weil.com

December 27, 2018

LCI Helicopters (Ireland) Limited C/O
Lease Corporation International Limited
Ground Floor
6 George's Dock, IFSC
Dublin 1 Ireland
+353 1 6728708
Attn: Michael Platt (CEO), Jaspal Jandu (CFO)

Re: Waypoint Leasing Holdings Ltd.

Dear Messrs. Platt and Jandu:

We are not aware of the counsel LCI Helicopters (Ireland) Limited ("**LCI**") is using in connection with the issues addressed herein. If LCI has retained counsel to address these issues, we ask that you pass this communication on to your counsel as immediately as possible.

I am a litigation partner at the law firm Weil, Gotshal & Manges LLP. We represent Waypoint Leasing Holdings Ltd. ("**Waypoint**") and certain of its subsidiaries and affiliates as debtors and debtors in possession (collectively, the "**Company**" and the "**Debtors**") in the jointly administered chapter 11 cases captioned *In re Waypoint Leasing Holdings Ltd., et al.*, Case No. 18-13648 (SMB), currently pending before the Honorable Judge Stuart Bernstein in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**").

As you know, before the Debtors filed their chapter 11 petitions, they engaged in an out-of-court sale and marketing process of the Company. As you also know, LCI was one of the potential bidders for the Company and, accordingly, executed a non-disclosure agreement dated August 29, 2018 (the "**NDA**"). The Company required potential bidders like LCI to execute the NDA because, in connection with the sale and marketing process, the Company made available to LCI certain non-public, commercially-sensitive, and/or otherwise proprietary information about the Company. The NDA and all obligations thereunder remain effective and binding.

In executing the NDA, LCI agreed to treat certain Confidential Information[1] "solely for the purpose of evaluating and participating in discussions with the Company regarding, a Possible Transaction and for no other purpose." Under the NDA, Confidential Information was defined to

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the NDA.

LCI Helicopters (Ireland) Limited C/O                        **Weil, Gotshal & Manges LLP**
Lease Corporation International Limited
December 27, 2018
Page 2

exclude information that "becomes available to you [LCI] on a non-confidential basis from a source other than the Company or any of its Representatives, *provided* that such source is not known by you (after reasonable inquiry) to be bound by a contractual, legal or fiduciary obligation of confidentiality to the Company or any other party with respect to such information."

The Debtors have provided certain information to their lenders—also subject to certain non-disclosure obligations—in connection with the pre-petition sale and marketing process, the pre-petition forbearance negotiations, and now their chapter 11 cases. It has come to our attention that one or more lenders may have provided LCI with Confidential Information in violation of the lenders' confidentiality agreements. As such, to the extent LCI has come to possess such information, that information is included in the definition of Confidential Information under the NDA. LCI, therefore, is contractually obligated to treat that Confidential Information in accordance with the NDA, including maintaining the confidentiality thereof. Moreover, the only allowable use of that Confidential Information is to evaluate and participate in discussions with the Company regarding a Possible Transaction.

In addition, the Company has permitted its lenders to speak with certain third parties about the possible provision of asset management services in the event that such lenders successfully credit bid for certain of the Company's assets. The Company's agreement to permit these discussions, however, is conditioned on the Company having prior consent rights over any information shared by the lenders with any such alternative asset manager, and in such circumstances all obligations to maintain the confidentiality of the Company's information remain effective. To the extent that LCI is engaged in any discussions with any lenders regarding the provision of asset management services, these restrictions apply.

Please be advised that the Debtors have a fiduciary duty to protect their Confidential Information and must (and will) enforce any breach of non-disclosure obligations and use restrictions to the fullest extent allowable under the law. If the Company determines that the NDA or any of its terms were breached, or that any Confidential Information was shared and/or used in a manner causing harm to the Company and its assets, the Company will enforce any and all resulting claims and causes of action before the Bankruptcy Court, and will seek damages and other available relief.

Thank you for your prompt attention to this matter.

Sincerely,

*Edward Soto*

Edward Soto

cc:  Gary T. Holtzer
     Kelly DiBlasi

**<u>Exhibit B</u>**

**February 14, 2019 Letter**



February 14, 2019

**VIA OVERNIGHT MAIL AND PDF EMAIL**

LCI Helicopters (Ireland) Limited C/O
Lease Corporation International Limited
Ground Floor
6 George's Dock, IFSC
Dublin 1 Ireland

Attn:   Michael Platt (CEO), michael.platt@lciaviation.com
        Jaspal Jandu (CFO), jaspal.jandu@lciaviation.com

Re:     *Waypoint Leasing Holdings Ltd.*

Dear Messrs. Platt and Jandu:

I am writing concerning LCI Helicopters (Ireland) Limited's ("LCI" or "you") material and ongoing breaches of the non-disclosure agreement between LCI and Waypoint Leasing Holdings Ltd. ("Waypoint") dated August 29, 2018 (the "NDA").

We are not aware of LCI having retained counsel in connection with the matters addressed in this letter.  If LCI has retained counsel to address these issues, we ask that you promptly forward this communication to your attorneys.

We serve as legal counsel to Macquarie Rotorcraft Holdings Limited and its affiliates (collectively, "Macquarie").  As you would be aware, Macquarie is the purchaser of certain assets of Waypoint and certain of its affiliates as debtors and debtors in possession (collectively, the "Debtors") in the jointly administered chapter 11 cases captioned *In re Waypoint Leasing Holdings Ltd., et al.,* Case No. 18-13648 (SMB) (the "Bankruptcy Proceedings"), currently pending before the Honorable Judge Stuart Bernstein in the United States Bankruptcy Court for the Southern District of New York (the "Court").

Macquarie will acquire all of the Debtors' rights and interests under the NDA pursuant to a Stock and Asset Purchase Agreement dated December 7, 2018 (Court Docket 64 Exhibit C).  Therefore, all of LCI's obligations under the NDA will be obligations owed to Macquarie.

By letter dated December 27, 2018 (attached as **Exhibit A**), the Debtors made LCI aware that the Debtors believed LCI had received Confidential Information in violation of confidentiality agreements between the Debtors and their lenders.  The Debtors reminded LCI of its obligations under the NDA and advised LCI that the Debtors intended to enforce any breach of the NDA to the fullest extent permitted by law.

An affidavit by a representative of Lombard North Central plc ("Lombard") (the sole lender and agent of the Waypoint Asset Co 9 Limited ("WAC9") secured debt facility) was filed in the Bankruptcy Proceedings on February 11, 2019 (Court Docket 410) (the "Lombard Affidavit").  The Lombard Affidavit contained the following statement:



*"Lombard is discussing with its servicer a subsequent transaction pursuant to which the Designated Transferee and/or the underlying business would be recapitalized and sold to the servicer. Neither Lombard, the Designated Transferee, or the servicer have reached an agreement or arrangement with respect to this subsequent sale, but discussions continue and a subsequent sale could occur soon after consummation of Lombard's credit bid if outstanding items are resolved and a binding agreement is reached among the parties."*

The Lombard Affidavit was declared under penalty of perjury by Ms. Jacqueline McDermott. Ms. McDermott was cross-examined before Justice Bernstein in Court on February 12, 2019. Amongst other matters, Ms. McDermott testified, again under penalty of perjury:

(a)     that the "servicer" referred to in the Lombard Affidavit was "LCI";

(b)     at no time had the Debtors or Houlihan Lokey given permission to Lombard for Lombard to discuss with LCI the sale of WAC9 or its assets to LCI; and

(c)     at no time had the Debtors or Houlihan Lokey given permission to Lombard for Lombard to disclose to LCI information regarding WAC9 or its assets for the purposes of discussions relating to LCI purchasing WAC9 or its assets.

Clause 4 of the NDA contains the following provision (emphasis added):

*"**You [LCI] further agree that, without the prior written consent of Houlihan Lokey, neither you nor any of your Representatives shall, directly or indirectly, initiate, solicit or maintain, or cause to be initiated, solicited or maintained, contact with any** officer, director, employee, any person known to you to be a former (within the past twelve (12) months) employee of the Company or its affiliates, stockholder, **creditor**, affiliate, supplier, distributor, vendor, customer, provider, agent, regulator (other than as permitted in Section 2(b) above) **or other commercial counterparty of the Company or any subsidiary of the Company regarding the Company or its business,** financial condition, operations, strategy, prospects, **assets** or liabilities (except as such communications regarding the Company's business, financial condition, operation, strategy, prospects, assets or liabilities may occur in the ordinary course of business on matters unrelated to, and otherwise not in connection with, the Possible Transaction) or concerning any Confidential Information, any Transaction Information or any Possible Transaction.*

A senior representative of Houlihan Lokey (Mr. Matthew Niemann) testified before Justice Bernstein in Court on February 12, 2019 that he was aware of the NDA and that Houlihan Lokey had never consented to LCI discussing a purchase of WAC9 or its assets from Lombard.

The evidence presented to the Court in the Lombard Affidavit and the testimony under oath of Ms. McDermott and Mr. Niemann clearly establishes that LCI has breached the NDA and that the breaches are continuing.

LCI's past and continuing breaches of the NDA are willful and blatant. They are the source of ongoing irreparable harm to Macquarie, with such harm to be further aggravated upon the closing of Macquarie's impending asset acquisition. Accordingly, you are liable or will be liable to Macquarie for, among other things, tortious interference with contract, tortious interference with prospective business



relations, and/or breach of your contractual obligations and duties owed to Macquarie. Macquarie reserves the right to pursue any and all remedies available to it, including, but not limited to: injunctive relief, specific performance, rescission, money damages, and attorneys' fees.

Macquarie demands that LCI immediately cease and desist from engaging in further breaches of the NDA, including engaging in any discussions with Lombard or any other party regarding the purchase of any assets of the Debtors.

This letter shall serve as a formal document preservation demand in anticipation of litigation. Macquarie hereby places you on notice of your obligation not to access, alter, modify, or destroy (including by erasure) any evidence relating to this matter, including any hard or soft-copy documents, corporate or personal email accounts, cloud storage accounts, text messages, Instant Messages, Instant Message archives, notes, journals, logs, servers, back-up tapes, electronic files, voicemail messages, telephone records, corporate or personal communication devices (i.e., iPhones, BlackBerries, etc.), corporate or personal electronic storage devices (i.e. USB drives, stand-alone hard drives, software that pushes or copies communications to a desktop, etc.) intranet web pages, or any other data or evidence related to the Debtors, Macquarie, the purchase of the Debtors' assets, any option relating to the purchase of the Debtor's assets, WAC9, any servicing arrangement with WAC9, any secured collateral of WAC9, Lombard, Waypoint Asset Co 12 Limited ("WAC12"), lenders to WAC12, the administrative agent for the WAC12 secured debt facility, any other lender to the Debtors, the NDA, or Confidential Information, in each case, created or modified on or after June 19, 2018. This obligation applies to you as well as all of your affiliates, subsidiaries, agents, and assigns.

Macquarie waives no rights or remedies it may have at law or in equity, and expressly reserves all rights with regard to this matter, including all past, ongoing, and future breaches of the NDA, both known and unknown.

Very truly yours,

Chris Dickerson
of PAUL HASTINGS LLP