**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ x

|  |  |  |
|---|---|---|
| In re | : | Chapter 11 |
|  | : |  |
| **WAYPOINT LEASING** | : | **Case No. 18-13648 (SMB)** |
| **HOLDINGS LTD.**, *et al.*, | : |  |
|  | : | **(Jointly Administered)** |
| Debtors.[1] | : |  |

‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ ‑ x

**DISCLOSURE STATEMENT FOR SECOND**
**AMENDED MODIFIED CHAPTER 11 PLAN OF LIQUIDATION OF**
**WAYPOINT LEASING HOLDINGS LTD. AND ITS AFFILIATED DEBTORS**

> **A SOLICITATION OF VOTES IS BEING CONDUCTED TO OBTAIN SUFFICIENT ACCEPTANCES OF THE *SECOND AMENDED MODIFIED CHAPTER 11 PLAN OF LIQUIDATION OF WAYPOINT LEASING HOLDINGS LTD. AND ITS AFFILIATED DEBTORS*, DATED JUNE 3, 2019.**

**WEIL, GOTSHAL & MANGES LLP**

Gary T. Holtzer
Robert J. Lemons
Kelly DiBlasi
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007

*Attorneys for Debtors*
*and Debtors in Possession*

Dated: June 3, 2019
       New York, New York

---

[1] A list of the Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, is attached hereto as **Exhibit A**.

## Table of Contents

DISCLAIMER ..................................................................................................................1

QUESTIONS AND ADDITIONAL INFORMATION.................................................... 2

I.      INTRODUCTION .................................................................................................3

        A.      VOTING PROCEDURES ..........................................................................4

        B.      DISCLOSURE STATEMENT EXHIBITS..................................................6

        C.      BRIEF OVERVIEW OF THE PLAN.........................................................6

        D.      SUMMARY OF DISTRIBUTIONS AND VOTING ELIGIBILITY ....................7

        E.      CONFIRMATION UNDER SECTION 1129(b): "CRAMDOWN"....................16

        F.      CONFIRMATION HEARING....................................................................16

II.     OVERVIEW OF THE DEBTORS' OPERATIONS ...........................................17

        A.      THE DEBTORS' BUSINESS ..................................................................17

        B.      THE DEBTORS' CAPITAL STRUCTURE..............................................18

                1.      Prepetition Indebtedness .................................................................18

                2.      Equity Ownership ..........................................................................21

III.    KEY EVENTS LEADING TO THE COMMENCEMENT OF THE CHAPTER
        11 CASES ...........................................................................................................21

        A.      DECLINING PERFORMANCE AND INABILITY TO REVERSE
                TREND .....................................................................................................21

        B.      PREPETITION RESTRUCTURING INITIATIVES...................................22

        C.      NEGOTIATED FORBEARANCES WITH LENDERS ..............................24

        D.      PREPETITION MARKETING AND SALE PROCESS .....................25

IV.     KEY EVENTS DURING THE CHAPTER 11 CASES ......................................26

        A.      VOLUNTARY PETITIONS .....................................................................26

        B.      FIRST AND SECOND DAY PLEADINGS ...............................................27

        C.      DEBTOR-IN-POSSESSION FINANCING .................................................27

        D.      SALES OF THE DEBTORS' ASSETS .....................................................28

                1.      Post-Petition Sale Processes ..........................................................28

                2.      Consummation of Sales .................................................................30

                3.      The Debtors' Remaining Assets .....................................................34

                4.      Post-Sale Management and Governance of the Debtors...............36

        E.      RETENTION OF THE DEBTORS' PROFESSIONALS .....................36

        F.      OTHER MOTIONS IN THE CHAPTER 11 CASES ...........................37

|  | 1. | Motion to Approve Key Employee Incentive Program | 37 |
|  | 2. | Motion to Consolidate and Extend the Time to File Schedules of Assets and Liabilities, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs | 37 |
|  | 3. | Motion to Approve Proposed Updated DIP Budget and Resolve Allocation Methodology for Winddown Account | 38 |
|  | 4. | Motion to Extend Exclusivity | 38 |
| G. | | SCHEDULES, BAR DATES, AND THE CLAIMS PROCESS | 39 |
| H. | | ADVERSARY PROCEEDING INITIATED BY MACQUARIE | 39 |
| V. | | THE PLAN | 40 |
| A. | | INTRODUCTION | 40 |
| B. | | CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN | 40 |
| C. | | ADMINISTRATIVE EXPENSE CLAIMS, PRIORITY CLAIMS, AND STATUTORY FEES | 41 |
|  | 1. | Administrative Expense Claims | 41 |
|  | 2. | Fee Claims | 41 |
|  | 3. | Priority Tax Claims | 41 |
|  | 4. | Statutory Fees | 42 |
| D. | | CLASSIFICATION OF CLAIMS AND INTERESTS | 42 |
|  | 1. | Classification in General | 42 |
|  | 2. | Formation of Debtor Groups for Convenience Only | 42 |
|  | 3. | Summary of Classification | 44 |
|  | 4. | Special Provision Governing Unimpaired Claims | 45 |
|  | 5. | Elimination of Vacant Classes | 45 |
| E. | | ACCEPTANCE OR REJECTION OF THE PLAN | 45 |
|  | 1. | Presumed Acceptance | 45 |
|  | 2. | Votes Required for Acceptance by a Class | 45 |
|  | 3. | Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code | 45 |
| F. | | TREATMENT OF CLAIMS AND INTERESTS | 45 |
|  | 1. | Priority Non-Tax Claims (Classes 1A through 20A) | 45 |
|  | 2. | Other Secured Claims (Classes 1B through 20B) | 46 |
|  | 3. | WAC1 Secured Claims Against the WAC1 Group (Class 1C) | 46 |

4.      WAC2 Secured Claims Against the WAC2 Group (Class 2C) ................46

5.      WAC3 Secured Claims Against the WAC3 Group (Class 3C) ................46

6.      WAC6 Secured Claims Against the WAC6 Group (Class 6C) ................46

7.      WAC7 Secured Claims Against the WAC7 Group (Class 7C) ................46

8.      WAC8 Secured Claims Against the WAC8 Group (Class 8C) ................47

9.      WAC10 Secured Claims Against the WAC10 Group (Class 10C) ..........47

10.     General Unsecured Claims Against the WAC1 Group (Class 1D) ..........47

11.     General Unsecured Claims Against the WAC2 Group (Class 2D) ..........47

12.     General Unsecured Claims Against the WAC3 Group (Class 3D) ..........47

13.     General Unsecured Claims Against WAC4 (Class 4D) ...........................47

14.     General Unsecured Claims Against WAC5 (Class 5(i)D).........................47

15.     General Unsecured Claims Against MSN 2047 Trust (Class 5(ii)D)........47

16.     General Unsecured Claims Against MSN 2057 Trust (Class
        5(iii)D) ....................................................................................................48

17.     General Unsecured Claims Against MSN 14786 Trust (Class
        5(iv)D).....................................................................................................48

18.     General Unsecured Claims Against WLUK5A (Class 5(v)D) ................48

19.     General Unsecured Claims Against the WAC6 Group (Class 6D) ..........48

20.     General Unsecured Claims Against the WAC7 Group (Class 7D) ..........48

21.     General Unsecured Claims Against the WAC8 Group (Class 8D) ..........48

22.     General Unsecured Claims Against WAC10 (Class 10(i)D)....................48

23.     General Unsecured Claims Against MSN 2826 Trust (Class
        10(ii)D) ....................................................................................................49

24.     General Unsecured Claims Against MSN 2879 Trust (Class
        10(iii)D)....................................................................................................49

25.     General Unsecured Claims Against MSN 2916 Trust (Class
        10(iv)D).....................................................................................................49

26.     General Unsecured Claims Against WAC11 (Class 11(i)D)....................49

27.     General Unsecured Claims Against WAG (Class 11(ii)D) ......................49

28.     General Unsecured Claims Against MSN 2905 Trust (Class
        11(iii)D)....................................................................................................49

29.     General Unsecured Claims Against WAC14 (Class 14(i)D)....................49

30.     General Unsecured Claims Against WAC5B (Class 14(ii)D)..................50

31.     General Unsecured Claims Against WAC15 (Class 15D) .......................50

32.   General Unsecured Claims Against WLIL (Class 16D)............................50

33.   General Unsecured Claims Against LuxCo (Class 17D)..........................50

34.   General Unsecured Claims Against LuxCo Euro (Class 18D)................50

35.   General Unsecured Claims Against Holdings (Class 19D) ....................50

36.   General Unsecured Claims Against Services (Class 20D) .....................50

37.   Intercompany Claims Against the Debtors (Class 1E through 20E) .........51

38.   Other Interests (Class 1F through 18F, and 20F)....................................51

39.   Holdings Interests (Class 19G) ..............................................................51

G.   MEANS FOR IMPLEMENTATION .....................................................................51

1.   Joint Chapter 11 Plan .............................................................................51

2.   Severability ............................................................................................51

3.   Plan Oversight Board .............................................................................51

4.   Plan Administrator .................................................................................52

5.   Effectuating Documents; Further Transactions ......................................54

6.   Corporate Action....................................................................................54

7.   Withholding and Reporting Requirements ..............................................54

8.   Exemption from Certain Transfer Taxes .................................................55

9.   Preservation of Rights of Action.............................................................55

10.   Notice of Effective Date .......................................................................55

11.   Deemed Substantive Consolidation of WAC Groups for Voting
and Distribution Purposes......................................................................56

12.   Cooperation and Access.........................................................................56

13.   Winddown Account ................................................................................56

14.   Fee Reserve Account ..............................................................................57

15.   Settlement of Certain Matters with Airbus .............................................57

16.   Closing of the Chapter 11 Cases ............................................................58

H.   CORPORATE GOVERNANCE ............................................................................58

1.   Corporate Form......................................................................................58

2.   Boards of Directors and Officers ...........................................................58

3.   Corporate Existence ...............................................................................58

4.   Certificates of Incorporation and Bylaws ...............................................59

5.   Winddown...............................................................................................59

I.   DISTRIBUTIONS ...............................................................................................59

|   |   |   |   |
|---|---|---|---|
|   | 1. | Distribution Record Date | 59 |
|   | 2. | Date of Distributions | 59 |
|   | 3. | Delivery of Distributions | 60 |
|   | 4. | Allocation of Distributions Between Principal and Interest | 60 |
|   | 5. | Payment of Disputed Claims | 60 |
| J. | | PROCEDURES FOR DISPUTED CLAIMS | 61 |
|   | 1. | Allowance of Claims | 61 |
|   | 2. | Objections to Claims | 61 |
|   | 3. | Estimation of Claims | 61 |
|   | 4. | No Distributions Pending Allowance | 61 |
|   | 5. | Resolution of Claims | 62 |
|   | 6. | Disallowed Claims | 62 |
| K. | | EXECUTORY CONTRACTS AND UNEXPIRED LEASES | 62 |
|   | 1. | Rejection of Executory Contracts and Unexpired Leases | 62 |
|   | 2. | Cure of Defaults for Assumed Executory Contracts and Unexpired Leases | 62 |
|   | 3. | Claims Based on Rejection of Executory Contracts and Unexpired Leases | 63 |
|   | 4. | Modifications, Amendments, Supplements, Restatements, or Other Agreements | 63 |
|   | 5. | Insurance Policies for Directors and Officers | 64 |
|   | 6. | Survival of Debtors' Indemnification Obligations | 64 |
|   | 7. | Reservation of Rights | 64 |
| L. | | CONDITIONS PRECEDENT TO EFFECTIVE DATE | 65 |
|   | 1. | Conditions Precedent to Effective Date | 65 |
|   | 2. | Effect of Failure of Conditions Precedent to Effective Date | 65 |
| M. | | EFFECTS OF CONFIRMATION | 65 |
|   | 1. | Vesting of Assets | 65 |
|   | 2. | Subordinated Claims | 65 |
|   | 3. | Binding Effect | 66 |
|   | 4. | Term of Injunctions or Stays | 66 |
|   | 5. | **Estate Releases** | 66 |
|   | 6. | **Releases by Holders of Claims and Interests** | 68 |

      7.     Exculpation ........................................................................69

      8.     Injunction ..........................................................................70

      9.     Waiver of Statutory Limitation on Releases ................................70

      10.    Retention of Causes of Action/Reservation of Rights .............70

      11.    Retention of Jurisdiction ..................................................71

  N.    MISCELLANEOUS PROVISIONS........................................................73

      1.     Post-Confirmation Reporting...............................................73

      2.     Request for Expedited Determination of Taxes........................73

      3.     Amendments ..................................................................73

      4.     WAC Agent Retainers ......................................................74

      5.     Revocation or Withdrawal of Plan ......................................74

      6.     Severability of Plan Provisions ..........................................74

      7.     Governing Law ..............................................................74

      8.     Immediate Binding Effect..................................................75

      9.     Successors and Assigns......................................................75

VI.  CERTAIN RISK FACTORS AFFECTING THE DEBTORS .........................75

  A.    NON-CONFIRMATION OF THE PLAN.............................................75

  B.    NONCONSENSUAL CONFIRMATION ............................................76

  C.    CLAIM OBJECTIONS ...............................................................76

  D.    DISTRIBUTIONS ....................................................................76

  E.    JURISDICTION .....................................................................76

  F.    ADMINISTRATIVE INSOLVENCY ................................................76

  G.    DEBTORS HAVE NO DUTY TO UPDATE ......................................77

  H.    NO REPRESENTATIONS OUTSIDE THE DISCLOSURE
       STATEMENT ARE AUTHORIZED ................................................77

  I.    NO LEGAL OR TAX ADVICE IS PROVIDED TO YOU BY THE
       DISCLOSURE STATEMENT ......................................................77

  J.    NO REPRESENTATION MADE .....................................................77

  K.    FAILURE TO IDENTIFY ANY LITIGATION CLAIMS OR
       PROJECTED OBJECTIONS ......................................................78

  L.    NO WAIVER OF RIGHT TO OBJECT OR RIGHT TO RECOVER
       TRANSFERS AND ASSETS......................................................78

  M.   AMENDMENT, WAIVER, MODIFICATION, OR WITHDRAWAL OF
       PLAN ................................................................................78

N.    INFORMATION WAS PROVIDED BY THE DEBTORS AND RELIED
UPON BY THE DEBTORS' ADVISORS ................................................... 78

O.    NON-OCCURRENCE OR DELAYED OCCURRENCE OF THE
EFFECTIVE DATE ................................................................................. 78

P.    CONVERSION TO CHAPTER 7 ............................................................. 79

Q.    DISMISSAL OF THE CHAPTER 11 CASES ........................................... 79

R.    COST OF ADMINISTERING THE DEBTORS' ESTATES ........................ 79

VII.    CERTAIN TAX CONSEQUENCES OF THE PLAN ........................................ 79

A.    CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE
PLAN ................................................................................................... 79

1.    Consequences to the Debtors .................................................... 80

2.    Consequences to U.S. Holders of Certain Claims .................... 81

3.    Withholding on Distributions and Information Reporting ........ 83

B.    CERTAIN IRISH TAX CONSEQUENCES OF THE PLAN TO THE
DEBTORS ............................................................................................. 84

1.    Tax Residency ............................................................................ 84

2.    Tax Losses ................................................................................. 84

3.    Section 110 Companies .............................................................. 85

4.    Trading Companies .................................................................... 85

5.    Tax Implications of the Release of Accrued Interest ................ 85

6.    Balancing Event for Tax Depreciation Purposes ..................... 85

7.    Cessation to Trade ..................................................................... 86

8.    Appointment of a Liquidator ..................................................... 86

9.    Time Limits for the Filing of Corporation Tax Returns ........... 86

10.    Withholding Tax on Distributions ............................................. 86

VIII.    CONFIRMATION OF THE PLAN ................................................................ 87

A.    CONFIRMATION HEARING ................................................................. 87

B.    OBJECTIONS ....................................................................................... 87

C.    REQUIREMENTS FOR CONFIRMATION OF THE PLAN ......................... 89

1.    Requirements of Section 1129(a) of the Bankruptcy Code ...... 89

2.    Requirements of Section 1129(b) of the Bankruptcy Code ...... 91

IX.    CONCLUSION ........................................................................................... 93

**EXHIBIT A – DEBTORS**
**EXHIBIT B – PLAN**
**EXHIBIT C – DEBTORS' PREPETITION ORGANIZATIONAL STRUCTURE**
**EXHIBIT D – LIQUIDATION ANALYSIS**
**EXHIBIT E – CHAPTER 11 CASES**

## DISCLAIMER

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT (THIS "**DISCLOSURE STATEMENT**") IS INCLUDED FOR THE PURPOSE OF SOLICITING ACCEPTANCES OF THE *SECOND AMENDED MODIFIED CHAPTER 11 PLAN OF LIQUIDATION OF WAYPOINT LEASING HOLDINGS LTD. AND ITS AFFILIATED DEBTORS*, DATED JUNE 3, 2019 (AS MAY BE AMENDED, MODIFIED, OR SUPPLEMENTED FROM TIME TO TIME, THE "**PLAN**"), AND IS INTENDED TO BE USED SOLELY TO DETERMINE HOW TO VOTE ON THE PLAN.[2]  A COPY OF THE PLAN IS ATTACHED HERETO AS **EXHIBIT B**.  NO SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN MAY BE MADE EXCEPT PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE.

ALL HOLDERS OF CLAIMS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.  IN PARTICULAR, ALL HOLDERS OF CLAIMS SHOULD CAREFULLY READ AND CONSIDER THE RISK FACTORS SET FORTH IN SECTION VI OF THIS DISCLOSURE STATEMENT – "CERTAIN RISK FACTORS AFFECTING THE DEBTORS" – BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.  THE PLAN SUMMARY AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN ITSELF AND THE EXHIBITS ATTACHED TO BOTH THE PLAN AND THIS DISCLOSURE STATEMENT.  IN THE EVENT OF ANY CONFLICT BETWEEN ANY DESCRIPTION SET FORTH IN THIS DISCLOSURE STATEMENT AND THE TERMS OF THE PLAN, THE TERMS OF THE PLAN SHALL GOVERN.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(b) AND NOT NECESSARILY IN ACCORDANCE WITH NON-BANKRUPTCY LAW.  THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION (THE "**SEC**"), ANY STATE SECURITIES COMMISSION OR ANY SECURITIES EXCHANGE OR ASSOCIATION.  NOR HAS THE SEC, ANY STATE SECURITIES COMMISSION, OR ANY SECURITIES EXCHANGE OR ASSOCIATION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT.

CERTAIN STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING WITH RESPECT TO PROJECTED CREDITOR RECOVERIES AND OTHER FORWARD-LOOKING STATEMENTS, ARE BASED ON ESTIMATES AND ASSUMPTIONS.  THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES.  FORWARD-LOOKING STATEMENTS ARE PROVIDED IN THIS DISCLOSURE STATEMENT PURSUANT TO THE SAFE HARBOR ESTABLISHED UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995

---

[2] Unless otherwise expressly set forth herein, capitalized terms used but not defined herein have the meanings ascribed to such terms in the Plan.

1

AND SHOULD BE EVALUATED IN THE CONTEXT OF THE ESTIMATES, ASSUMPTIONS, UNCERTAINTIES, AND RISKS DESCRIBED HEREIN.

THIS DISCLOSURE STATEMENT ALSO WILL NOT BE CONSTRUED TO BE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, THE DEBTORS IN THE CHAPTER 11 CASES. THE DEBTORS URGE EACH HOLDER OF A CLAIM OR INTEREST TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN ON SUCH HOLDER'S CLAIM OR INTEREST.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED HEREIN, AND THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT CREATE AN IMPLICATION THAT THERE HAS BEEN NO CHANGE IN THE INFORMATION STATED SINCE THE DATE HEREOF.

ON JUNE 4, 2019, THE BANKRUPTCY COURT APPROVED THIS DISCLOSURE STATEMENT AS CONTAINING "ADEQUATE INFORMATION" AS THAT TERM IS USED IN SECTION 1125(a)(1) OF THE BANKRUPTCY CODE. **APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN. CREDITORS SHOULD CAREFULLY READ THE DISCLOSURE STATEMENT, IN ITS ENTIRETY, BEFORE VOTING ON THE PLAN.**

## <u>QUESTIONS AND ADDITIONAL INFORMATION</u>

All holders of Claims entitled to vote on the Plan will receive copies of this Disclosure Statement, the Plan, and the exhibits annexed thereto. If you are not entitled to vote on the Plan, but would like to obtain copies of this Disclosure Statement, the Plan, or any of the other documents attached hereto or referenced herein, or if you have questions about the solicitation and voting process or the Chapter 11 Cases more generally, please visit http://www.kccllc.net/ waypointleasing, send an e-mail to WaypointInfo@kccllc.com, or call (888) 733-1446 (toll free) for U.S. and Canada-based parties or +1 (310) 751-2635 for international parties.

# I.

## INTRODUCTION

On November 25, 2018 (the "**Petition Date**"), Waypoint Leasing Holdings Ltd. ("**Holdings**") and certain of its subsidiaries and affiliates, as debtors and debtors in possession (collectively, the "**Debtors**")[3] each commenced with the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") a voluntary case pursuant to chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"). The Debtors' chapter 11 cases (the "**Chapter 11 Cases**") are being administered under the caption *In re Waypoint Leasing Holdings Ltd.*, Case No. 18-13648 (SMB). No trustee, examiner, or statutory committee of creditors has been appointed in these Chapter 11 Cases.

On February 26, 2019, the Chapter 11 Cases of the following former Debtors were dismissed: Waypoint Asset Co 9 Limited, MSN 20052 Trust, MSN 31312 Trust, MSN 41329 Trust, MSN 760538 Trust, MSN 760539 Trust, MSN 760541 Trust, MSN 760542 Trust, Waypoint Asset Co 1B Limited, MSN 41272 Trust, Waypoint Asset Euro 9A Limited, Waypoint Asset Euro 1E Limited, Waypoint Leasing UK 9A Limited, Waypoint Asset Sterling 9A Limited, Waypoint Asset Co 5A Limited, and MSN 69052 Trust. On March 1, 2019, the Chapter 11 Cases of the following former Debtors were dismissed: Waypoint Asset Co 12 Limited, MSN 20042 Trust, MSN 41202 Trust, MSN 920280 Trust, Waypoint Asset Co 1E Limited, Waypoint Asset Euro 1F Limited, MSN 20093 Trust, Waypoint Asset Malta 1A Limited, Waypoint Leasing Singapore 1 Pte. Limited, and Waypoint Leasing UK 1A Limited. On March 28, 2019, the Chapter 11 Cases of the following former Debtors were dismissed: MSN 31431 Trust, MSN 760734 Trust, MSN 920024 Trust, MSN 920030 Trust, MSN 4466 Trust, and MSN 20184 Trust (formerly named MSN 1251 Trust). On May 2, 2019, the Chapter 11 Case of MSN 920022 Trust was dismissed. Each of the former Debtors were purchased by third parties pursuant to the sale transactions described more fully below in Section IV.D of this Disclosure Statement. The remaining Debtors' Chapter 11 Cases are being jointly administered for procedural purposes only pursuant to Rule 1015(b) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

The purpose of this Disclosure Statement is to provide holders of Claims entitled to vote to accept or reject the Plan with adequate information about (i) the Debtors' business and certain historical events, (ii) the Chapter 11 Cases, (iii) the Plan and alternatives to the Plan, (iv) the rights of holders of Claims and Interests under the Plan, and (v) other information necessary to enable each holder of a Claim entitled to vote on the Plan to make an informed judgment as to whether to vote to accept or reject the Plan. Holders of Interests are not entitled to vote on the Plan (*see* discussion at Section V of this Disclosure Statement below). The Disclosure Statement is also meant to assist the Bankruptcy Court in determining whether the Plan complies with the provisions of the Bankruptcy Code and should be confirmed.

---

[3] Certain of the original Debtors' Chapter 11 Cases have been dismissed, as described in more detail in Section IV.D. herein. References herein to the Debtors shall mean, interchangeably, the original Debtors or the remaining Debtors, as applicable. **Exhibit E** attached hereto identifies each current and former Debtor and whether its Chapter 11 Case is open or has been dismissed.

This Disclosure Statement is also available to all holders of Claims against and Interests in the Debtors for informational purposes, including the impact the Plan will have on such holders' Claims and Interests.

This Disclosure Statement is organized as follows:

- Section I provides an introduction and general information about the Plan and Confirmation of the Plan.

- Section II provides an overview of the Debtors' business.

- Section III sets forth key events leading to the Chapter 11 Cases.

- Section IV discusses the Chapter 11 Cases.

- Section V contains a summary of the Plan.

- Section VI describes certain risk factors affecting the Debtors.

- Section VII discusses certain U.S. federal income tax consequences of the Plan.

- Section VIII addresses Confirmation of the Plan.

- Section IX concludes this Disclosure Statement and recommends that eligible holders of Claims vote to accept the Plan.

## A.    <u>VOTING PROCEDURES</u>

THE DEBTORS STRONGLY RECOMMEND THAT EACH HOLDER OF A CLAIM ENTITLED TO VOTE ON THE PLAN VOTE TO <u>ACCEPT</u> THE PLAN AS BEING IN THEIR BEST INTERESTS.

As set forth in more detail in Section V of this Disclosure Statement, certain holders of Claims are entitled to vote to accept or reject the Plan. For each holder of a Claim entitled to vote, the Debtors have enclosed, along with a copy of this Disclosure Statement, among other things, a ballot and voting instructions regarding how to properly complete the ballot and submit a vote on the Plan. Holders of Claims in more than one Class may receive more than one ballot, each labeled for a different Class of Claims. The individual ballots must be used to vote each individual Claim. For detailed voting instructions, please refer to the specific voting instructions and the ballot enclosed with this Disclosure Statement. All completed ballots must be actually received by the Debtors' claims agent, Kurtzman Carson Consultants LLC ("**KCC**"), **no later than 4:00 p.m. (Eastern Time) on July 3, 2019** (the "**Voting Deadline**").

The method of delivery of a ballot is at the election and risk of the voter. If such delivery is by mail, it is recommended that voters use an air courier with a guaranteed next-day delivery or registered mail, properly insured, with return receipt requested. In all cases, sufficient time should be allowed to ensure timely delivery.

By overnight courier or first class mail to:

Waypoint Ballot Processing Center
c/o KCC
222 N. Pacific Coast Highway, Suite 300
El Segundo, California 90245
T: (888) 733-1446

By hand delivery to:

Waypoint Ballot Processing Center
c/o KCC
222 N. Pacific Coast Highway, Suite 300
El Segundo, California 90245
T: (888) 733-1446

The Debtors will also be accepting ballots via electronic, online transmission through an e-ballot platform available on KCC's website. Holders of Claims may cast an electronic ballot and electronically sign and submit such ballot via the platform. Instructions for casting an electronic ballot are available on KCC's website at http://www.kccllc.net/ waypointleasing. The encrypted ballot data and audit trail created by such electronic submission shall become part of the record of any electronic ballot submitted in this manner and the creditor's electronic signature will be deemed to be an original signature that is legally valid and effective. For the avoidance of doubt, electronic submissions of ballots may only be made via the e-ballot platform. Ballots submitted by electronic mail, facsimile, or any other means of electronic submission will not be counted.

If you are the holder of a Claim that is entitled to vote on the Plan and you did not receive a ballot, received a damaged ballot, or lost your ballot, or if you have any questions concerning this Disclosure Statement, the Plan, or the procedures for voting on the Plan, please contact KCC at (888) 733-1446 (toll free) for U.S. and Canada-based parties or +1 (310) 751-2635 for international parties, or by sending an e-mail to WaypointInfo@kccllc.com.

The record date for purposes of determining (i) which eligible holders of Claims are entitled to vote on the Plan and (ii) which holders of Claims and Interests are entitled to receive other notices is **May 31, 2019** (the "**Voting Record Date**").

The transferee of a transferred Claim is entitled to receive a Disclosure Statement and cast a ballot on account of such transferred Claim only if (i) documentation evidencing such transfer was filed with the Bankruptcy Court on or before five (5) business days prior to the Voting Record Date, (ii) the transfer is not defective, and (iii) no timely objection with respect to such transfer was filed by the transferor. In instances where a Claim has been the subject of one or more partial transfers, each holder of a portion of said Claim shall be deemed to hold one Claim for numerosity purposes.

A Class of Claims is deemed to accept the Plan if at least two-thirds in amount and more than one-half in number of the Allowed Claims in the Class that actually vote are cast in favor of the Plan. Whether or not a holder of a Claim or Interest votes on the Plan, such holder

will be bound by the terms and treatment as set forth in the Plan if the Plan is confirmed by the Bankruptcy Court, other than the releases set forth in section 11.5(b) of the Plan, which are only binding on holders of Claims that vote in favor of the Plan. Pursuant to section 1126(e) of the Bankruptcy Code, the Bankruptcy Court may disallow any vote accepting or rejecting the Plan if such vote is not cast in good faith.

The Debtors or other parties in interest may dispute proofs of claim that have been filed. Holders whose Claims are disputed may vote on or otherwise participate in distributions under the Plan only to the extent that the Bankruptcy Court allows their Claims. The Bankruptcy Court may temporarily allow a Claim for voting purposes only. The allowance of a Claim for voting purposes or the disallowance of a Claim for voting purposes does not necessarily mean that all or a portion of such Claim will be Allowed or Disallowed for distribution purposes. Claims listed in the Debtors' Schedules as contingent, unliquidated, and disputed are barred unless the holders of such Claims filed timely proofs of claim. The Debtors' Schedules listing Claims and whether such Claims are disputed can be inspected online at http://www.kccllc.net/ waypointleasing.

**KCC WILL NOT COUNT ANY BALLOTS RECEIVED AFTER THE VOTING DEADLINE.**

## B.    DISCLOSURE STATEMENT EXHIBITS

The following exhibits are attached to this Disclosure Statement:

- EXHIBIT A – List of Debtors

- EXHIBIT B – Plan

- EXHIBIT C – Debtors' Prepetition Organizational Structure

- EXHIBIT D – Liquidation Analysis

## C.    BRIEF OVERVIEW OF THE PLAN[4]

As described in more detail below, the Debtors' assets have been substantially liquidated pursuant to four separate sale transactions, and a significant portion of those proceeds was previously distributed to the WAC Lenders. The Plan contemplates a liquidation of the Debtors' Estates and their remaining assets. The Plan's primary objective is to distribute the bulk of the remaining sale proceeds plus any additional proceeds or other funds that are or become available for distribution, all in accordance with the priorities established by the Bankruptcy Code. The Plan constitutes a joint chapter 11 plan for all of the Debtors, and the classifications and treatment of Claims and Interests in the Plan apply to all of the Debtors. Given the amount and extent of the WAC Lenders' secured claims and their underlying collateral, the Plan provides for

---

[4] This summary is qualified in its entirety by reference to the Plan. Statements as to the rationale underlying the treatment of Claims and Interests under the Plan are not intended to, and will not, waive, compromise, or limit any rights, Claims, defenses, or Causes of Action in the event that any objections to classification or treatment are filed or the Plan is not confirmed. You should read the Plan in its entirety before voting to accept or reject it.

the deemed consolidation of the WAC Groups for voting and distribution purposes, such that all assets and liabilities of each member of a WAC Group shall be treated as though they were pooled, each Claim against any member of a WAC Group shall be deemed a single obligation of the WAC Group, and any joint or several liability of any of the members of a WAC Group shall be one obligation of the WAC Group.  The remaining Debtors not within a WAC Group will not be substantively consolidated.

A portion of the remaining proceeds resulting from the Debtors' asset sales will be used to fund the costs of completing the Chapter 11 Cases and winding down the Debtors' Estates. The purpose of the Plan is to provide a structured and efficient mechanism to implement the liquidation of the Debtors' remaining assets and Estates, resolve any outstanding Claims that have been asserted against the Debtors, and position the Debtors' Estates for an orderly, cost-efficient global winddown.  Under the Plan, the Debtors will appoint a Plan Administrator that will, among other things, steer the Debtors and their non-Debtor affiliates towards a quick and efficient final resolution after the Effective Date.  The Debtors believe that the distributions under the Plan will provide holders of Claims and Interests at least the same recovery as they would otherwise receive from distributions through a liquidation pursuant to chapter 7 of the Bankruptcy Code.  The Debtors believe that distributions under the Plan will be made more quickly than distributions by a chapter 7 trustee would be made, and that a chapter 7 trustee would charge a substantial fee, which would reduce the amount available for distribution on account of Allowed Claims.

Section V of this Disclosure Statement provides a more detailed description of the Plan.

## D.    <u>SUMMARY OF DISTRIBUTIONS AND VOTING ELIGIBILITY</u>

The following summary table briefly outlines the classification and treatment of Claims against and Interests in the Debtors under the Plan and the voting eligibility of the holders of such Claims and Interests.  As set forth in the Plan, certain Debtors are grouped together for the purposes of (i) describing the treatment of Claims and Interests under the Plan; (ii) tabulating votes; and (iii) making the Distributions.[5]  Each Debtor or group of Debtors has been assigned a number in the Plan.  Additionally each Class of Claims or Interests has been assigned separate letters based on the type of Claim or Interest.  Accordingly, the classification of Claims and Interests in any Debtor or consolidated group of Debtors depends on the particular Debtor against which such Claim is asserted (or in which such Interest is held) and the type of Claim or Interest in question. The following summary table is qualified in its entirety by reference to the full text of the Plan.

---

[5] The Debtors expect that the holders of the WAC Lenders' Secured Claims in Classes 1C, 2C, 3C, 6C, 7C, and 8C will likely receive all of any distributions from those WAC Groups; accordingly, Classes 1D, 2D, 3D, 6D, 7D, and 8D will receive no distributions and are not entitled to vote on the Plan.  Remaining Allowed General Unsecured Claims in Classes 4D, 5D, and 10D through 20D are entitled to vote on the Plan because WAC Lender Secured Claims do not exist at those Debtors.

| Class(es) | Claim or Interest | Treatment | Impaired or Unimpaired | Approximate Percentage Recovery[6] | Voting Status |
|---|---|---|---|---|---|
| 1A through 20A | Priority Non-Tax Claims against the Debtors | The legal, equitable, and contractual rights of the holders of Allowed Priority Non-Tax Claims are unaltered by the Plan. Except to the extent that a holder of an Allowed Priority Non-Tax Claim has agreed to less favorable treatment of such Claim, each such holder shall receive, in full and final satisfaction of such Claim, Cash in an amount equal to such Claim, payable on or as soon as reasonably practical after the later of the Effective Date and the date on which such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, or as soon as reasonably practical thereafter; provided, however, that Allowed Priority Non-Tax Claims that arise in the ordinary course of the Debtors' business and which are not due and payable on or before the Effective Date shall be paid in the ordinary course of business in accordance with the terms thereof. | Unimpaired | 100% | No (presumed to accept) |
| 1B through 20B | Other Secured Claims against the Debtors | The legal, equitable, and contractual rights of the holders of Allowed Other Secured Claims are unaltered by the Plan. Except to the extent that a holder of an Allowed Other Secured Claim against any of the Debtors has agreed to less favorable treatment of such Claim, each holder of an Allowed Other Secured Claim shall receive, at the option of the Debtors or the Plan Administrator, in full and final satisfaction of such Claim, payable on, or as soon as reasonably practical after, the later of the Effective Date and the date on | Unimpaired | 100% | No (presumed to accept) |

---

[6] The approximate percentage recovery for each Class set forth in this Disclosure Statement is based upon certain assumptions that are subject to change. Among other things, the approximate percentage recovery for each Class does not reflect any potential recoveries by the WAC Lenders, the WAC9 Lender, and the WAC12 Lenders on account of their reversionary interests in any excess funds remaining in the Winddown Account. Any funds remaining in the Winddown Account after the Debtors have completed the activities described in Article VI of the Plan shall be distributed in accordance with section 5.12 of the Plan. The Debtors expect that certain escrowed funds that were included when calculating the approximate percentage recovery will be distributed to the applicable WAC Lenders promptly after the entry of the Disclosure Statement Order (as defined herein) prior to the Effective Date pursuant to the Macquarie Sale Order. *See* Section IV.D.2.a. of this Disclosure Statement for additional information about these escrowed funds (the "**Escrowed Funds**").

| Class(es) | Claim or Interest | Treatment | Impaired or Unimpaired | Approximate Percentage Recovery[6] | Voting Status |
|---|---|---|---|---|---|
| | | which such Other Secured Claim becomes an Allowed Other Secured Claim (i) payment in full in Cash (from proceeds from the collateral securing such Allowed Other Secured Claim); or (ii) such other treatment necessary to satisfy section 1129 of the Bankruptcy Code. | | | |
| 1C | WAC1 Secured Claims against the WAC1 Group | The WAC1 Administrative Agent on behalf of the WAC1 Lenders shall receive on the Effective Date or as soon as reasonably practicable thereafter, but no later than the Initial Distribution Date, payment in Cash of all funds held by the members of the WAC1 Group (including the applicable Holdback Amount). | Impaired | 14.7% | Yes |
| 2C | WAC2 Secured Claims against the WAC2 Group | The WAC2 Administrative Agent on behalf of the WAC2 Lenders shall receive on the Effective Date or as soon as reasonably practicable thereafter, but no later than the Initial Distribution Date, payment in Cash of all funds held by the members of the WAC2 Group. | Impaired | 0% | Yes[7] |
| 3C | WAC3 Secured Claims against the WAC3 Group | The WAC3 Administrative Agent on behalf of the WAC3 Lenders shall receive on the Effective Date or as soon as reasonably practicable thereafter, but no later than the Initial Distribution Date, payment in Cash of all funds held by the members of the WAC3 Group (including the applicable Holdback Amount). | Impaired | 9.2% | Yes |
| 6C | WAC6 Secured Claims against the WAC6 Group | The WAC6 Administrative Agent on behalf of the WAC6 Lenders shall receive on the Effective Date or as soon as reasonably practicable thereafter, but no later than the Initial Distribution Date, payment in Cash of all funds held by the members of the WAC6 Group (including the applicable Holdback Amount). | Impaired | 6.7% | Yes |

---

[7] The approximate percentage recovery for each Class set forth in this Disclosure Statement represents the Debtors' best estimate of recovery for such Class at the time the Plan is solicited. Although certain Classes are expected to receive no recovery under the Plan, there remains a possibility that such Classes may, nonetheless, receive a *de minimis* distribution. Accordingly, out of an abundance of caution, the Debtors have designated such Classes as voting Classes.

| Class(es) | Claim or Interest | Treatment | Impaired or Unimpaired | Approximate Percentage Recovery[6] | Voting Status |
|---|---|---|---|---|---|
| 7C | WAC7 Secured Claims against the WAC7 Group | The WAC7 Administrative Agent on behalf of the WAC7 Lenders shall receive on the Effective Date or as soon as reasonably practicable thereafter, but no later than the Initial Distribution Date, payment in Cash of all funds held by the members of the WAC7 Group (including the applicable Holdback Amount). | Impaired | 6.0% | Yes |
| 8C | WAC8 Secured Claims against the WAC8 Group | The WAC8 Administrative Agent on behalf of the WAC8 Lenders shall receive on the Effective Date or as soon as reasonably practicable thereafter, but no later than the Initial Distribution Date, payment in Cash of all funds held by the members of the WAC8 Group (including the applicable Holdback Amount). | Impaired | 13.4% | Yes |
| 10C | WAC10 Secured Claims against the WAC10 Group | The WAC10 Administrative Agent on behalf of the WAC10 Lender shall receive, on the Effective Date, or as soon as reasonably practicable thereafter, subject to the terms of section 4.9 of the Plan, the WAC10 Collateral in full and final satisfaction of the WAC10 Secured Claims. | Impaired | 100% | Yes |
| 1D | General Unsecured Claims against the WAC1 Group | Each General Unsecured Claim against the WAC1 Group shall receive no distribution on account of such General Unsecured Claim. | Impaired | 0% | No (presumed to reject) |
| 2D | General Unsecured Claims against the WAC2 Group | Each General Unsecured Claim against the WAC2 Group shall receive no distribution on account of such General Unsecured Claim. | Impaired | 0% | No (presumed to reject) |
| 3D | General Unsecured Claims against the WAC3 Group | Each General Unsecured Claim against the WAC3 Group shall receive no distribution on account of such General Unsecured Claim. | Impaired | 0% | No (presumed to reject) |
| 4D | General Unsecured Claims | Only to the extent there is residual value available for distribution from WAC4 after Statutory Fees, Allowed Administrative | Impaired | 0% | Yes |

| Class(es) | Claim or Interest | Treatment | Impaired or Unimpaired | Approximate Percentage Recovery[6] | Voting Status |
|---|---|---|---|---|---|
| | against WAC4 | Claims, and Allowed Priority Tax Claims are paid in full, each holder of an Allowed General Unsecured Claim against WAC4 shall receive Cash in the amount of its Pro Rata share of any such residual value. | | | |
| 5(i)D | General Unsecured Claims against WAC5 | Only to the extent there is residual value available for distribution from WAC5 after Statutory Fees, Allowed Administrative Claims, and Allowed Priority Tax Claims are paid in full, each holder of an Allowed General Unsecured Claim against WAC5 shall receive Cash in the amount of its Pro Rata share of any such residual value. | Impaired | 0% | Yes |
| 5(ii)D | General Unsecured Claims against MSN 2047 Trust | Only to the extent there is residual value available for distribution from MSN 2047 Trust after Statutory Fees, Allowed Administrative Claims, and Allowed Priority Tax Claims are paid in full, each holder of an Allowed General Unsecured Claim against MSN 2047 Trust shall receive Cash in the amount of its Pro Rata share of any such residual value. | Impaired | 0% | Yes |
| 5(iii)D | General Unsecured Claims against MSN 2057 Trust | Only to the extent there is residual value available for distribution from MSN 2057 Trust after Statutory Fees, Allowed Administrative Claims, and Allowed Priority Tax Claims are paid in full, each holder of an Allowed General Unsecured Claim against MSN 2057 Trust shall receive Cash in the amount of its Pro Rata share of any such residual value. | Impaired | 0% | Yes |
| 5(iv)D | General Unsecured Claims against MSN 14786 Trust | Only to the extent there is residual value available for distribution from MSN 14786 Trust after Statutory Fees, Allowed Administrative Claims, and Allowed Priority Tax Claims are paid in full, each holder of an Allowed General Unsecured Claim against MSN 14786 Trust shall receive Cash in the amount of its Pro Rata share of any such residual value. | Impaired | 0% | Yes |
| 5(v)D | General Unsecured Claims | Only to the extent there is residual value available for distribution from WLUK5A after Statutory Fees, Allowed Administrative Claims, and Allowed | Impaired | 0% | Yes |

11

| Class(es) | Claim or Interest | Treatment | Impaired or Unimpaired | Approximate Percentage Recovery[6] | Voting Status |
|---|---|---|---|---|---|
| | against WLUK5A | Priority Tax Claims are paid in full, each holder of an Allowed General Unsecured Claim against WLUK5A Trust shall receive Cash in the amount of its Pro Rata share of any such residual value. | | | |
| 6D | General Unsecured Claims against the WAC6 Group | Each General Unsecured Claim against the WAC6 Group shall receive no distribution on account of such General Unsecured Claim. | Impaired | 0% | No (presumed to reject) |
| 7D | General Unsecured Claims against the WAC7 Group | Each General Unsecured Claim against the WAC7 Group shall receive no distribution on account of such General Unsecured Claim. | Impaired | 0% | No (presumed to reject) |
| 8D | General Unsecured Claims against the WAC8 Group | Each General Unsecured Claim against the WAC8 Group shall receive no distribution on account of such General Unsecured Claim. | Impaired | 0% | No (presumed to reject) |
| 10(i)D | General Unsecured Claims against WAC10 | Only to the extent there is residual value available for distribution from WAC10 after Statutory Fees, Allowed Administrative Claims, and Allowed Priority Tax Claims are paid in full, each holder of an Allowed General Unsecured Claim against WAC10 shall receive Cash in the amount of its Pro Rata share of any such residual value. | Impaired | 0% | Yes |
| 10(ii)D | General Unsecured Claims against MSN 2826 Trust | Only to the extent there is residual value available for distribution from MSN 2826 Trust after Statutory Fees, Allowed Administrative Claims, and Allowed Priority Tax Claims are paid in full, each holder of an Allowed General Unsecured Claim against MSN 2826 Trust shall receive Cash in the amount of its Pro Rata share of any such residual value. | Impaired | 0% | Yes |
| 10(iii)D | General Unsecured Claims | Only to the extent there is residual value available for distribution from MSN 2879 Trust after Statutory Fees, Allowed Administrative Claims, and Allowed | Impaired | 0% | Yes |

| Class(es) | Claim or Interest | Treatment | Impaired or Unimpaired | Approximate Percentage Recovery[6] | Voting Status |
|---|---|---|---|---|---|
| | against MSN 2879 Trust | Priority Tax Claims are paid in full, each holder of an Allowed General Unsecured Claim against MSN 2879 Trust shall receive Cash in the amount of its Pro Rata share of any such residual value. | | | |
| 10(iv)D | General Unsecured Claims against MSN 2916 Trust | Only to the extent there is residual value available for distribution from MSN 2916 Trust after Statutory Fees, Allowed Administrative Claims, and Allowed Priority Tax Claims are paid in full, each holder of an Allowed General Unsecured Claim against MSN 2916 Trust shall receive Cash in the amount of its Pro Rata share of any such residual value. | Impaired | 0% | Yes |
| 11(i)D | General Unsecured Claims against WAC11 | Only to the extent there is residual value available for distribution from WAC11 after Statutory Fees, Allowed Administrative Claims, and Allowed Priority Tax Claims are paid in full, each holder of an Allowed General Unsecured Claim against WAC11 shall receive Cash in the amount of its Pro Rata share of any such residual value. | Impaired | 0% - 100%[8] | Yes |
| 11(ii)D | General Unsecured Claims against WAG | Only to the extent there is residual value available for distribution from WAG after Statutory Fees, Allowed Administrative Claims, and Allowed Priority Tax Claims are paid in full, each holder of an Allowed General Unsecured Claim against WAG shall receive Cash in the amount of its Pro Rata share of any such residual value. | Impaired | 0% | Yes |
| 11(iii)D | General Unsecured Claims against MSN 2905 Trust | Only to the extent there is residual value available for distribution from MSN 2905 Trust after Statutory Fees, Allowed Administrative Claims, and Allowed Priority Tax Claims are paid in full, each holder of an Allowed General Unsecured Claim against MSN 2905 Trust shall | Impaired | 0% | Yes |

---

[8] The Debtors expect to sell the remaining H225 aircraft in WAC11. If such aircraft is sold, holders of General Unsecured Claims against WAC11 would share Pro Rata in any residual value from such sale after payment of any higher priority Claims. As of the date hereof, the Debtors are unaware of any General Unsecured Claims against WAC11. Once Allowed General Unsecured Claims against WAC11 (if any) are satisfied, any additional value will be used to satisfy Claims against WLIL, which is the sole holder of Interests in WAC11.

| Class(es) | Claim or Interest | Treatment | Impaired or Unimpaired | Approximate Percentage Recovery[6] | Voting Status |
|---|---|---|---|---|---|
| | | receive Cash in the amount of its Pro Rata share of any such residual value. | | | |
| 14(i)D | General Unsecured Claims against WAC14 | Only to the extent there is residual value available for distribution from WAC14 after Statutory Fees, Allowed Administrative Claims, and Allowed Priority Tax Claims are paid in full, each holder of an Allowed General Unsecured Claim against WAC14 shall receive Cash in the amount of its Pro Rata share of any such residual value. | Impaired | 0% | Yes |
| 14(ii)D | General Unsecured Claims against WAC5B | Only to the extent there is residual value available for distribution from WAC5B after Statutory Fees, Allowed Administrative Claims, and Allowed Priority Tax Claims are paid in full, each holder of an Allowed General Unsecured Claim against WAC5B shall receive Cash in the amount of its Pro Rata share of any such residual value. | Impaired | 0% | Yes |
| 15D | General Unsecured Claims against WAC15 | Only to the extent there is residual value available for distribution from the WAC15 after Statutory Fees, Allowed Administrative Claims, and Priority Tax Claims are paid in full, each Allowed General Unsecured Claim against WAC15 shall receive Cash in the amount of its Pro Rata share of any such residual value. | Impaired | 0% | Yes |
| 16D | General Unsecured Claims against WLIL | Only to the extent there is residual value available for distribution from WLIL after Statutory Fees, Allowed Administrative Claims, and Allowed Priority Tax Claims are paid in full, each holder of an Allowed General Unsecured Claim against WLIL shall receive Cash in the amount of its Pro Rata share of any such residual value. | Impaired | 0% - 1.1% | Yes |
| 17D | General Unsecured Claims against LuxCo | Only to the extent there is residual value available for distribution from LuxCo after Statutory Fees, Allowed Administrative Claims, and Allowed Priority Tax Claims are paid in full, each holder of an Allowed General Unsecured Claim against LuxCo shall receive Cash in the amount of its Pro Rata share of any such residual value. | Impaired | 0% | Yes |

| Class(es) | Claim or Interest | Treatment | Impaired or Unimpaired | Approximate Percentage Recovery[6] | Voting Status |
|---|---|---|---|---|---|
| 18D | General Unsecured Claims against LuxCo Euro | Only to the extent there is residual value available for distribution from LuxCo Euro after Statutory Fees, Allowed Administrative Claims, and Priority Tax Claims are paid in full, each holder of an Allowed General Unsecured Claim against LuxCo Euro shall receive Cash in the amount of its Pro Rata share of any such residual value. | Impaired | 0% | Yes |
| 19D | General Unsecured Claims against Holdings | Only to the extent there is residual value available for distribution from Holdings after Statutory Fees, Allowed Administrative Claims, and Priority Tax Claims are paid in full, each holder of an Allowed General Unsecured Claim against Holdings shall receive Cash in the amount of its Pro Rata share of any such residual value. | Impaired | 0% | Yes |
| 20D | General Unsecured Claims against Services | Only to the extent there is residual value available for distribution from Services after Statutory Fees, Allowed Administrative Claims, and Priority Tax Claims are paid in full, each holder of an Allowed General Unsecured Claim against Services shall receive Cash in the amount of its Pro Rata share of any such residual value. | Impaired | 0% - 100%[9] | Yes |
| 1E through 20E | Intercompany Claims against the Debtors | Holders of Intercompany Claims shall not receive or retain any property under the Plan on account of such Claims. | Impaired | 0% | No (presumed to accept as Plan proponents) |
| 1F through 18F, and 20F | Other Interests in the Debtors | Each Other Interest shall be Unimpaired because it shall be Reinstated on the Effective Date and shall be entitled to any residual value of the applicable Debtor after such Debtor repays in full all Allowed Claims against such Debtor. Unless otherwise determined by the Plan Administrator, on the date that each Debtor's Chapter 11 Case is closed in | Unimpaired | N/A | No (presumed to accept) |

---

[9] The Debtors dispute certain of the Claims filed against Services, the allowance or disallowance of which may materially impact the recovery in Class 20D.

| Class(es) | Claim or Interest | Treatment | Impaired or Unimpaired | Approximate Percentage Recovery[6] | Voting Status |
|---|---|---|---|---|---|
| | | accordance with section 5.10 of the Plan, the Other Interests shall be deemed cancelled and of no further force and effect provided that such cancellation does not adversely impact the Debtors' Estates. | | | |
| 19G | Holdings Interests | On the Effective Date, all of the Holdings Interests shall be surrendered, cancelled, and/or redeemed and new shares of Holdings' common stock shall be issued to the Plan Administrator (sufficient to give the Plan Administrator control over Holdings) who will hold such shares for the benefit of the former holdings of Holdings Interests with their former economic entitlements.  Each holder of a Holdings Interest shall neither receive nor retain any property or interest in property on account of such Holdings Interest. | Impaired | 0% | No (presumed to reject) |

Section V of this Disclosure Statement provides a more detailed description of the treatment of Claims and Interests under the Plan.

**E.        CONFIRMATION UNDER SECTION 1129(b): "CRAMDOWN"**

If a Class of Claims entitled to vote on the Plan rejects the Plan, the Debtors reserve the right to amend the Plan or request Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code, or both.  In addition, with respect to the Classes that are deemed to have rejected the Plan, the Debtors intend to request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code.  Section 1129(b) of the Bankruptcy Code permits the confirmation of a chapter 11 plan notwithstanding the rejection of such plan by one or more impaired classes of claims or interests.  Under section 1129(b) of the Bankruptcy Code, a plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each rejecting class.  A more detailed description of the requirements for confirmation of a nonconsensual plan is set forth in Section VIII of this Disclosure Statement.

**F.        CONFIRMATION HEARING**

Pursuant to section 1128 of the Bankruptcy Code, the Confirmation Hearing will be held on **July 25, 2019 at 10:00 a.m. (Eastern Time)** before the Honorable Stuart M. Bernstein, United States Bankruptcy Judge, at the United States Bankruptcy Court for the Southern District of New York, One Bowling Green, Room 723, New York, New York 10004-1408.

Objections and responses to Confirmation of the Plan, if any, must be served and filed so as to be received on or before the Confirmation Objection Deadline, **July 8, 2019 at 4:00**

**p.m.** (**Eastern Time**), in the manner described in the order approving this Disclosure Statement (the "**Disclosure Statement Order**") and Section V of this Disclosure Statement. The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court or the Debtors without further notice, except for adjournments announced in open court or as indicated in any notice of agenda of matters scheduled for hearing filed with the Bankruptcy Court.

II.

**OVERVIEW OF THE DEBTORS' OPERATIONS**

**A.    THE DEBTORS' BUSINESS**

As of the Petition Date, the Debtors were the largest independent helicopter leasing company in the world, with a presence in North and South America, Europe, Africa, Asia, and Australia. As of October 31, 2018, the Debtors' unaudited consolidated financial statements reflected total year-to-date revenues of approximately $95 million and a year-to-date net loss of approximately $50.2 million. As of October 31, 2018, the Debtors' unaudited consolidated financial statements reflected assets totaling approximately $1.62 billion and liabilities totaling approximately $1.23 billion.

The Debtors' asset acquisition strategy focused on heavy, super medium, medium, and intermediate twin engine helicopters manufactured by the four major helicopter original equipment manufacturers ("**OEMs**"): Sikorsky Aircraft Corporation, Bell Helicopter, Airbus Helicopters ("**Airbus**"), and Leonardo-Finmeccanica. As of November 16, 2018, the Debtors owned one-hundred and sixty-five (165) helicopters comprised of twenty-five (25) heavy, three (3) super medium, seventy-three (73) medium, forty-one (41) intermediate twin, and twenty-three (23) light helicopters. The Debtors' portfolio contained seventeen (17) different helicopter models, with a few variants within a helicopter model, manufactured by the four OEMs between 1980 and June 2018, totaling approximately $1.5 billion in net book value. The Debtors managed their fleet of helicopters principally through their headquarters in Limerick, Ireland, along with offices in the United States, United Kingdom, Brazil, Hong Kong, South Africa, Canada, Singapore, and Germany.

As of the Petition Date, the Debtors had a knowledgeable senior management team, with an average of more than twenty (20) years of experience in the helicopter and aviation industry, an in-depth knowledge of helicopter operating and leasing, and a wide array of contacts in the aviation sector. The Debtors also maintained a core sales team of five (5) people embedded in key local markets around the world. As of November 16, 2018, the Debtors had a total of forty-two (42) full-time personnel. The Debtors typically leased their helicopters to third-party operators that serve a broad mix of high-quality end users principally in the oil and gas, emergency medical, search and rescue, and utility sectors. The Debtors derived the majority of their revenues from a small number of global helicopter operators, including CHC Group Ltd. ("**CHC**"), Babcock Mission Critical Services, and Bristow Group Inc., with assets servicing the offshore oil and gas industry comprising 73% of the Debtors' aircraft based on net book value. The Debtors had a total of thirty-six (36) lessee customers located in thirty-four (34) countries across the globe, with lease terms generally ranging from three (3) months at the low end to ten (10) years at the high end.

17

A chart illustrating the organizational structure of the Debtors as of the Petition Date is attached hereto as **Exhibit C**. Additional information regarding the Debtors' business, capital structure, and the circumstances leading to the commencement of these Chapter 11 Cases is set forth in the *Declaration of Todd K. Wolynski Pursuant to L. Bankr. R. 1007-2* [ECF No. 14] and the *Declaration of Robert A. Del Genio in Support of First Day Motions and Applications* [ECF No. 15] (together, the "**First Day Declarations**"), which have been filed with the Bankruptcy Court.

## B.    THE DEBTORS' CAPITAL STRUCTURE

   1.    *Prepetition Indebtedness*

        As of the Petition Date, the Debtors had outstanding funded debt obligations in the aggregate amount of approximately $1 billion in United States dollars ("**USD**") or USD-equivalent debt obligations, which amount consisted of not less than:  (i) $300,608,604 (including accrued but unpaid interest and fees) in secured borrowings under the Debtors' WAC1 Revolving Facility (as defined herein); (ii) $55,547,266 (including accrued but unpaid interest) in secured borrowings under the Debtors' WAC2 Facility (as defined herein); (iii) $224,528,424 (including accrued but unpaid interest and fees) in secured borrowings under the Debtors' WAC3 Facility (as defined herein); (iv) $67,085,518 (including accrued but unpaid interest and fees) in secured borrowings under the Debtors' WAC6 Facility (as defined herein); (v) $103,174,920 (including accrued but unpaid interest and fees) in secured borrowings under the Debtors' WAC7 Revolving Facility (as defined herein); (vi) $119,201,406 and €41,092,348 {excluding accrued but unpaid interest and fees and the Make-Whole Amount [as defined in the WAC8 Note Purchase Agreement (as defined herein)]} in secured borrowings under the Debtors' WAC8 Senior Secured Notes (as defined herein); (vii) $95,422,783 (including accrued but unpaid interest and fees) in secured borrowings under the Debtors' WAC9 Facility (as defined herein); (viii) $15,742,879 (including accrued but unpaid interest) in secured borrowings under the Debtors' WAC10 Facility (as defined herein); and (ix) $114,693,321 (including accrued but unpaid interest) in secured borrowings under the Debtors' WAC12 Facility (as defined herein).

        a.    WAC1 Revolving Facility

        As of the Petition Date, Debtors Waypoint Asset Company Number 1 (Ireland) Limited and Waypoint Asset Funding 1 LLC, as borrowers, along with Holdings, Waypoint Leasing (Luxembourg) S.à r.l. ("**LuxCo**"), and Waypoint Leasing (Ireland) Limited ("**WLIL**," and, together with Holdings and LuxCo, the "**Parent Guarantors**"), as guarantors, were party to that certain *Amended and Restated Credit Agreement*, dated as of November 8, 2013 (the "**WAC1 Credit Agreement**"), with the lenders party thereto from time to time, SunTrust Bank, as administrative agent, and Wells Fargo Bank, National Association, as collateral agent. The WAC1 Credit Agreement provides for revolving credit commitments in an aggregate principal amount of up to $428 million, composed of a tranche A commitment of $145 million that matured on September 30, 2018, and a tranche B commitment of $283 million, maturing on September 30, 2020 (the "**WAC1 Revolving Facility**").

b.      WAC2 Facility

As of the Petition Date, Debtors Waypoint Asset Company Number 2 (Ireland) Limited and Waypoint Asset Funding 2 LLC, as borrowers, along with the Parent Guarantors, as guarantors, were party to that certain *Credit Agreement*, dated as of April 16, 2014 (the "**WAC2 Credit Agreement**"), with the lenders party thereto from time to time, and Wells Fargo Bank, National Association, as both administrative agent and as collateral agent. The WAC2 Credit Agreement provided for a term loan commitment in an aggregate principal amount of $72.5 million, maturing on April 16, 2019 (the "**WAC2 Facility**").

c.      WAC3 Facility

As of the Petition Date, Debtors Waypoint Asset Co 3 Limited and Waypoint Asset Funding 3 LLC, as borrowers, along with the Parent Guarantors, as guarantors, were party to that certain *Credit Agreement*, dated as of August 6, 2014 (the "**WAC3 Credit Agreement**"), with the lenders party thereto from time to time, BNP Paribas, as administrative agent, and Wells Fargo Bank, National Association, as collateral agent. The WAC3 Credit Agreement provides for a term loan commitment in an aggregate principal amount of $340 million, composed of an initial term loan commitment of $300 million and an incremental term loan commitment of $40 million, maturing on August 6, 2019 (the "**WAC3 Facility**").

d.      WAC6 Facility

As of the Petition Date, Debtors Waypoint Asset Co 6 Limited and Waypoint Asset Funding 6 LLC, as borrowers, along with the Parent Guarantors, as guarantors, were party to that certain *Credit Agreement*, dated as of March 23, 2015 (the "**WAC6 Credit Agreement**"), with the lenders party thereto from time to time, and Bank of Utah, as both administrative agent and collateral agent. The WAC6 Credit Agreement provides for a term loan commitment in an aggregate principal amount of $85 million, maturing on March 23, 2020 (the "**WAC6 Facility**").

e.      WAC7 Revolving Facility

As of the Petition Date, Debtors Waypoint Asset Co 7 Limited and Waypoint Asset Euro 7A Limited, as borrowers, along with the Parent Guarantors, Waypoint Asset Co 4 Limited, Waypoint Asset Co 5 Limited ("**WAC5**"), and the subsidiaries of WAC5, as guarantors, were party to that certain *Amended and Restated Credit Agreement*, dated as of April 28, 2017 (the "**WAC7 Credit Agreement**"), with the lenders party thereto from time to time, and SunTrust Bank, as both administrative agent and collateral agent. The WAC7 Credit Agreement provides for revolving credit commitments in an aggregate principal amount of up to $110 million, maturing on September 30, 2019 (the "**WAC7 Revolving Facility**").

f.      WAC8 Senior Secured Notes

As of the Petition Date, Debtors Waypoint Asset Co 8 Limited ("**WAC8**") and Waypoint Asset Funding 8 LLC (together with WAC8, the "**WAC8 Issuers**"), as issuers, along with the Parent Guarantors, as guarantors, were party to that certain *Note Purchase Agreement*, dated as of July 29, 2015 (the "**WAC8 Note Purchase Agreement**"), and Wells Fargo Bank, National Association, as both administrative agent and collateral agent, pursuant to which the

WAC8 Issuers issued (i) 4.41% Series A Guaranteed Senior Secured Notes, due in 2022, in the aggregate principal amount of $125 million, (ii) 2.83625% Series B Guaranteed Senior Secured Notes, due in 2022, in the aggregate principal amount of €45 million, and (iii) 4.51% Series C Guaranteed Senior Secured Notes, due in 2022, in the aggregate principal amount of $25 million (the Series A Guaranteed Senior Secured Notes, Series B Guaranteed Senior Secured Notes, and Series C Guaranteed Senior Secured Notes collectively, the "**WAC8 Senior Secured Notes**").

      g.    <u>WAC9 Facility</u>

As of the Petition Date, Debtor Waypoint Asset Co 9 Limited, as borrower, along with the Parent Guarantors, Waypoint Asset Euro 9A Limited, and Waypoint Asset Sterling 9A Limited, as guarantors, were party to that certain *Credit Agreement*, dated as of March 24, 2016 (the "**WAC9 Credit Agreement**"), with the lenders party thereto from time to time, and Lombard North Central PLC, as both administrative agent and collateral agent. The WAC9 Credit Agreement provided for a term loan commitment in the aggregate principal amount of $100 million, maturing on December 31, 2021 (the "**WAC9 Facility**").

      h.    <u>WAC10 Facility</u>

As of the Petition Date, Debtor Waypoint Asset Co 10 Limited ("**WAC10**"), as borrower, along with the Parent Guarantors, as guarantors, were party to that certain *Facility Agreement*, dated as of February 21, 2017 (the "**WAC10 Facility Agreement**"), with Airbus Helicopters Financial Services Limited, as lender, agent, and security trustee. The WAC10 Facility Agreement provided for a term loan commitment in an aggregate principal amount of €45 million, that matured on February 28, 2019 (the "**WAC10 Facility**").

      i.    <u>WAC12 Facility</u>

As of the Petition Date, Debtor Waypoint Asset Co 12 Limited, as borrower, along with the Parent Guarantors, as guarantors, were party to that certain *Credit Agreement*, dated as of August 2, 2017 (the "**WAC12 Credit Agreement**"), with the lenders party thereto from time to time, Sumitomo Mitsui Banking Corporation, Brussels Branch, as administrative agent, and Sumitomo Mitsui Banking Corporation Europe Limited, as collateral agent. The WAC12 Credit Agreement provided for a term loan commitment in the aggregate principal amount of $120 million, composed of an initial term loan commitment of $87.5 million and an incremental term loan commitment up to a maximum of $37.5 million, maturing on May 31, 2021 (the "**WAC12 Facility**").

      j.    <u>Unsecured Obligations</u>

As of the Petition Date, in addition to the Debtors' funded debt obligations as described above, the Debtors collectively owed approximately $9 million in outstanding unsecured obligations to their third-party suppliers, vendors, employees, and other unsecured creditors in the ordinary course.

2.    *Equity Ownership*

The Debtors' ultimate parent, Holdings, was formed in the Cayman Islands on March 25, 2013, and its subsidiaries commenced operations in late April 2013 upon securing a $375 million equity commitment from the Debtors' primary investor group: (i) MSD Waypoint Investors, LLC ("**MSD**"), (ii) Quantum Strategic Partners Ltd. ("**Quantum**"), and (iii) Pangaea Two Acquisition Holdings VI, LP c/o Cartesian Capital Group LLC ("**Cartesian**" and, collectively with MSD and Quantum, the "**Sponsors**").

Collectively, the Sponsors own approximately 99% of the shares in Holdings, with MSD owning approximately 40%, Quantum owning approximately 40%, and Cartesian owning approximately 19%. The remaining 1% of the shares in Holdings is owned by various individuals, many of whom are current or former officers, directors, or employees of the Debtors. As illustrated in the Debtors' *Consolidated Corporate Ownership Statement Pursuant to Fed. R. Bankr. P. 1007 and 7007.1* [ECF No. 2], Holdings owns 100% of the equity in LuxCo. LuxCo owns 100% of the equity in Waypoint Leasing (Luxembourg) Euro S.à r.l. ("**LuxCo Euro**") and WLIL. WLIL is the primary operating company of the Debtors, and every remaining entity in the Debtors' organizational chart, including each of the non-Debtors, is wholly owned either by WLIL or by one of WLIL's wholly-owned subsidiaries. As of the Petition Date, there were one-hundred and fifty-five (155) entities in the Debtors' organizational structure.

### III.

### KEY EVENTS LEADING TO THE COMMENCEMENT OF THE CHAPTER 11 CASES

### A.    DECLINING PERFORMANCE AND INABILITY TO REVERSE TREND

The cyclical downturn in the oil and gas industry beginning in 2014 led to a significant decline in offshore oil exploration, cost reduction measures for production operations, and a substantially decreased demand for offshore drilling services by upstream exploration, and production companies. Although the price of crude oil slowly began to rebound, the effects of this protracted downturn remained with decreased spending on offshore exploration, development, and production activities. With a significant portion of their customer base in the offshore oil and gas industry, the Debtors experienced significant and increasing pressure in response to the distressed market conditions over the three-plus years leading up to the Petition Date. Major oil and gas companies cut costs by employing less frequent offshore worker rotations and service patterns and looked to their helicopter operators to cut costs by cancelling contracts, requesting contract price reductions, and decreasing the number of aircraft utilized. The cost-cutting employed by these oil companies had a ripple effect: decreased demand for helicopter operators caused such operators to implement their own cost-cutting measures, which, in turn, negatively impacted helicopter lessors such as the Debtors.

Notably, in May 2016, CHC, the Debtors' largest customer, filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code. Prior to its filing, CHC accounted for approximately 53% of the Debtors' annual operating revenues at $75 million. During its chapter 11 cases, CHC sought to restructure its helicopter lease obligations through both lease rejections and the renegotiation of existing lease terms with its lessors. CHC rejected fifteen (15)

of the forty-four (44) aircraft leases that it held with the Debtors, and renegotiated the remaining leases with less favorable terms for the Debtors.  Aircraft returned to the Debtors by CHC had no remaining maintenance coverage and, in many instances, were in need of significant repair, resulting in a significant, unexpected expense.  As a result of CHC's bankruptcy, the Debtors experienced an annualized $45 million reduction in their revenues related to the same forty-four (44) helicopters, despite successfully remarketing certain of the rejected or returned aircraft. Additionally, the Debtors incurred approximately $28.4 million in unexpected transition and maintenance costs to return these aircraft to service.

Additionally, six (6) of the Debtors' heavy aircraft were H225 model helicopters manufactured by Airbus, which cost the Debtors approximately $156 million in late 2013 through early 2016.  Following a fatal crash in Norway on April 29, 2016 that involved an H225 helicopter (but did not involve the Debtors), the European Aviation Safety Agency issued an emergency airworthiness directive on June 2, 2016 to ground the H225 model fleet for all operators in Europe due to potential safety concerns regarding its main rotor assembly.  Other civil aviation authorities, such as the Federal Aviation Administration in the United States, the Civil Aviation Authority in the United Kingdom, and the Civil Aviation Authority in Norway, also grounded the H225 model fleet for similar concerns.  Thereafter, there was little to no demand for the H225 model aircraft from the Debtors' customer base.

While the Debtors were successful in diversifying their customer base away from the oil and gas sector, helicopter lessors generally continued to struggle with excess capacity in their fleets and with lower demand for helicopter leases in the market.  The Debtors' fleet utilization significantly deteriorated over the two (2) years prior to the Petition Date, along with lease terms expiring with significantly fewer lease extensions in the oil and gas sector than there had been historically.  The weak demand from helicopter operators coupled with the oversupply of available helicopters in the market led to total revenue for the Debtors declining by 12% in 2017 as compared to 2016, and the decline accelerated in 2018.  Moreover, the weighted average remaining lease term was reduced to 2.2 years by the end of 2017, which was down from 3.1 years at the end of 2016 and 4.7 years at the end of 2015.  As of November 16, 2018, out of the one-hundred and sixty-five (165) aircraft in the Debtors' fleet, approximately thirty-five (35) aircraft were not generating revenue, with other leases expiring in the near future.  As of the Petition Date, the Debtors' total fleet utilization was approximately 78%, which was significantly down from utilization rates of approximately 94% to 100% during 2013 to 2015, before the cyclical downturn in the industry.  As a result, in spite of the growth in the overall portfolio asset base, net revenue fell from an annualized rate of $135 million in January 2016, generated by one-hundred and twenty-one (121) aircraft, to an annualized rate of $106 million in November 2018, generated by one-hundred and sixty-five (165) aircraft.

## B.    PREPETITION RESTRUCTURING INITIATIVES

In an effort to maintain their business in the midst of this industry downturn, the Debtors began to explore options in late 2016 that would allow them to deleverage their capital structure, increase their revenues, and reduce their costs, including further diversifying their customer base to increase fleet utilization, pursuing certain strategic transactions to increase liquidity and strengthen their balance sheet, negotiating with their lenders for a potential out-of-court restructuring of the Debtors' indebtedness, negotiating with the OEMs with respect to aircraft

on order, and implementing management changes to position the Debtors for future success in the current market.

Beginning in 2016, the Debtors shifted their sales strategy from a centrally located sales team to embedding relationship managers in local markets with the opportunity for growth arising from fostering deeper relationships with the management teams of current and potential customers. This initiative focused on increasing deal origination flow and improving channels for remarketing and trading aircraft. Beginning in early 2016, the Debtors diversified their customer base by increasing the number of customers from sixteen (16) to thirty-six (36).

Simultaneously with their efforts to diversify and expand their customer base, the Debtors pursued a variety of strategic and financial initiatives to address the market challenges. From November 2016 through the end of January 2018, the Debtors were engaged in negotiations to sell their enterprise to a Chinese strategic acquirer at a premium. Unfortunately, despite promising indicators that the transaction would close, including the execution of letters of intent, the finalization of an execution form of sale and purchase agreement, and the receipt of certain Chinese regulatory approvals, the proposed acquirer was unable to close the deal, and the Debtors were unable to consummate this strategic transaction.

In November 2017, the Debtors negotiated with their Sponsors for the suspension of the Sponsors' management fee, applied retroactively from April 1, 2017, which resulted in a savings of approximately $3 million per year. During March 2018, the Sponsors also contributed an additional $20 million in equity capital to the Debtors to support the business and aid in the completion of certain other strategic initiatives that the Debtors were pursuing. These initiatives included the pursuit of a settlement with Airbus regarding claims and causes of action related to the Debtors' H225 aircraft and a potential equity-swap transaction to acquire a portfolio of unlevered aircraft assets, which could have supported a strengthened balance sheet and improved liquidity and provided a runway to the refinancing of certain of the Debtors' term-loan debt facilities to the benefit of all of the Debtors' stakeholders. It was anticipated that the equity-swap transaction would have contributed approximately $12 million in annual revenue and added approximately $120 million of aircraft to the Debtors' net book value. The Debtors' management and the Sponsors believed that there was a high probability that the equity-swap transaction would close before June 30, 2018, but the parties were unable to come to such an agreement during the second quarter of 2018.

For over a year prior to the Petition Date, the Debtors were in negotiations with Airbus over the terms of a commercial settlement related to the grounding of their H225 aircraft and other commercial issues existing between Airbus and the Debtors. While the Debtors held valuable claims and causes of action against Airbus as a result of the grounding, the Debtors also owed significant amounts to Airbus pursuant to the parties' orderbook contract. The Debtors and Airbus engaged in good-faith negotiations in an attempt to reach a global resolution on these outstanding issues and preserve their long-standing commercial relationship. In the weeks leading up to the Petition Date, the Debtors and Airbus executed a global settlement that provided the Debtors with critical benefits and further cemented a strong relationship with Airbus going forward. In exchange for releasing their claims in connection with the grounding of the H225 aircraft and for selling two (2) of the H225 aircraft back to Airbus, the Debtors received a partial paydown of the WAC10 Facility and the full payoff of that certain *Amended and Restated Credit*

*Agreement*, dated as of March 30, 2018, among Debtor Waypoint Asset Co. Limited, as borrower, the Parent Guarantors, as guarantors, the lenders party thereto from time to time, and Keybank N.A., as both administrative agent and collateral agent.  Airbus also agreed to remove its pledge over approximately €20 million in pre-delivery payments, thereby allowing the Debtors to purchase and/or retrofit aircraft that were otherwise ready to be delivered to customers. Additionally, Airbus agreed as part of the settlement to release its debt claims against the Debtors if, among other things, the Debtors returned the collateral for the WAC10 Facility on or prior to the effective date of a chapter 11 plan.  Favorably resolving the Debtors' claims while preserving the Airbus relationship was a cornerstone of the Debtors' prepetition restructuring efforts.

Through May 2018, the Debtors determined that their revenue stream and capacity to generate cash flow would not be sufficient to service their outstanding debt and contractual obligations on a long-term basis while maintaining the liquidity necessary to operate their business and preserving their long-term viability and enterprise value, as prospects for the timely consummation of strategic initiatives faded and the performance of their business continued to decline.  Accordingly, the Debtors engaged restructuring professionals to assist in developing and implementing a more comprehensive plan to restructure the Debtors' balance sheet.

## C.    NEGOTIATED FORBEARANCES WITH LENDERS

Facing potential defaults on covenants for their funded debt at the end of June 2018, the Debtors and their restructuring advisors facilitated the formation of a ten (10) member steering committee in early June 2018 (the "**Steering Committee**") made up of certain significant holders of indebtedness under the Debtors' various secured lending facilities (each, a "**WAC Facility**" and each of the lenders under the various WAC Facilities, a "**WAC Lender**") to negotiate with the Debtors regarding potential forbearances under their various debt instruments and, more broadly, a comprehensive restructuring plan.  The Steering Committee was comprised of the requisite WAC Lenders needed to approve forbearances under most of the WAC Facilities.

Throughout June 2018, the Debtors and their advisors held a number of in-person and telephonic meetings with the Steering Committee and its advisors to discuss the terms of a potential forbearance to allow the Debtors time to negotiate a comprehensive, consensual restructuring plan with all of their stakeholders.  Recognizing that all parties in interest would benefit from additional time to carefully explore and consider all possible restructuring alternatives, the requisite WAC Lenders under each of the WAC Facilities directed their respective agents on June 29, 2018, to provide the Debtors with a three (3) month forbearance from the exercise of remedies with respect to certain specified events of default (collectively, the "**Forbearance Agreements**"), which would expire on September 28, 2018.

With the Forbearance Agreements in place, the Debtors and their advisors actively engaged in a comprehensive strategic review beginning in early July 2018 in order to revamp the Debtors' business plan, develop an optimal fleet plan, assess the go-forward liquidity needs and projected debt capacity for the Debtors' business, and identify various restructuring alternatives for the Debtors' business, including exploring the sale of some or all of the Debtors' assets.  At the end of July 2018, the Debtors presented the WAC Lenders and their advisors with comprehensive proposals for both a standalone restructuring as well as a plan for soliciting third-party proposals to invest in, or acquire the assets of, the Debtors.  Recognizing the risk of a

potential chapter 11 filing, the Debtors also presented the WAC Lenders with a debtor-in-possession financing ("**DIP Financing**") term sheet to provide the Debtors with such funding if necessary.

After delivering these proposals, the Debtors and their advisors undertook significant efforts to engage with the Steering Committee and their advisors throughout the remainder of July, August, and early September 2018. This engagement included managing a data room of over five thousand (5,000) documents for the WAC Lenders and their advisors, hosting eight (8) in-person meetings with the WAC Lenders and/or their advisors to provide business and process updates, holding frequent diligence calls, and providing weekly cash-flow update calls and monthly financial statements to keep the WAC Lenders up to date on the Debtors' financial performance.

In early September 2018, the Debtors commenced negotiations with the Steering Committee for an extension of the Forbearance Agreements in order to allow time for the Debtors' marketing and sale process to continue outside of chapter 11 and for the Debtors' restructuring negotiations with the WAC Lenders to continue. The Debtors ultimately reached agreements with the requisite WAC Lenders from all of the WAC Facilities to extend the Forbearance Agreements by a period of sixty (60) days, with the WAC Lenders having the option to further extend the Forbearance Agreements for an additional thirty (30) days should they so choose. Thus, on September 27, 2018, the Forbearance Agreements were extended until November 30, 2018. In addition, certain OEMs provided the Debtors with similar relief under their commercial contracts.

D.     **PREPETITION MARKETING AND SALE PROCESS**

Having secured the Forbearance Agreements with the WAC Lenders and after consulting with the members of the Steering Committee, the Debtors proceeded to formally commence a robust and comprehensive sale process on August 6, 2018 (the "**M&A Process**"), soliciting bids to purchase some or all of the Debtors' assets from over one-hundred and eighty (180) strategic and financial buyers, as well as from certain sovereign wealth funds. In connection with this broad solicitation, the Debtors and their advisors prepared, among other things, "teaser" materials and a comprehensive information memorandum. The Debtors were satisfied with the market's response to the M&A Process, both in terms of the level of engagement and with the bid levels.

The Debtors formally engaged with numerous potential bidders, executing fifty-four (54) non-disclosure agreements and then providing data room access to those potential bidders after they executed the non-disclosure agreements. The deadline for the submission of initial bids was September 10, 2018. Out of this solicitation process, the Debtors received fourteen (14) qualifying initial letters of intent. These bids were submitted by both strategic and financial buyers, with significant variation in the preliminary valuations provided. Following substantial ongoing discussions with their advisors and the independent members of the boards of directors and deliberation with their advisors and the Steering Committee, on September 21, 2018, the Debtors selected nine (9) bidders to proceed to a second round of negotiations and diligence, which included formal presentations by the Debtors' management.

Over the course of the formal management presentations, which were held between October 1, 2018 and October 12, 2018, the Debtors and their advisors continued negotiations with these remaining potential bidders in order to increase the value of the bids received.  After the completion of the second round of bidding, on or around October 17, 2018, the Debtors received six (6) final bids.  Five (5) of these final bids were bids for substantially all of the Debtors' assets and one (1) was a bid for approximately one hundred (100) of the Debtors' aircraft.

Following several weeks of negotiations with each of the final potential investors, the Debtors ultimately decided to execute a purchase agreement term sheet with one (1) of the final potential investors.  Such term sheet granted the potential investor exclusivity for a limited period of time during which the parties agreed to use good-faith efforts to negotiate a definitive asset purchase agreement.  In the midst of negotiating an asset purchase agreement with that potential investor, the Debtors received a revised bid from Macquarie Rotorcraft Leasing Holdings Limited ("**Macquarie**") that represented a higher and better offer than the one contemplated in the other potential investor's term sheet.

After extensive deliberations with their advisors and consultation with the Steering Committee (and written demands by the Steering Committee to exercise the Debtors' "fiduciary out" under the term sheet), the Debtors decided to exercise their fiduciary out to terminate the term sheet with the potential investor and proceed with Macquarie as the stalking horse bidder for substantially all of the Debtors' assets.  Accordingly, on November 21, 2018, the Debtors terminated the term sheet with the other potential investor in order to pursue a transaction with Macquarie.  From November 21, 2018 until the Petition Date and afterwards, the Debtors engaged in lengthy negotiations with Macquarie and the Steering Committee in an effort to execute a binding asset purchase agreement.  As of the Petition Date, the Debtors, the independent members of their boards of directors, and their advisors were continuing to negotiate and review the final bids with the expectation of formally selecting a bidder and filing a motion to approve bidding procedures shortly after the Petition Date.

## IV.

## KEY EVENTS DURING THE CHAPTER 11 CASES

### A.    VOLUNTARY PETITIONS

On the Petition Date, the Debtors commenced these Chapter 11 Cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  Pursuant to the *Order Pursuant to Fed. R. Bankr. P. 1015(b) Directing Joint Administration of Chapter 11 Cases* [ECF No. 25], dated November 27, 2018, the Chapter 11 Cases were consolidated for procedural purposes only and are being administered jointly.  The Debtors continue to manage their business as debtors-in-possession, subject to the supervision of the Bankruptcy Court and in accordance with the provisions of the Bankruptcy Code.  An immediate effect of the filing of the Chapter 11 Cases was the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code, which enjoined the commencement or continuation of all collection efforts by creditors against the Debtors, enforcement of liens against any assets of the Debtors, and any litigation against the Debtors.  The Chapter 11 Cases are pending before the Honorable Stuart M. Bernstein.

## B.   FIRST AND SECOND DAY PLEADINGS

On the Petition Date or shortly thereafter, the Debtors filed various "first-day" and "second-day" motions seeking certain immediate or expedited relief from the Bankruptcy Court designed to allow the Debtors to continue to operate in chapter 11 and avoid irreparable harm due to the commencement of the Chapter 11 Cases.  A description of these pleadings is set forth in the First Day Declarations.  The Bankruptcy Court granted substantially all of the relief requested in the first and second-day motions and entered various orders authorizing the Debtors to, among other things:

- jointly administer the Chapter 11 Cases for procedural purposes;
- pay employee obligations and continue employee benefit programs;
- pay certain prepetition taxes and assessments;
- maintain and honor prepetition customer deposits and reimbursements;
- enforce the protections of sections 362, 365, 525, and 541 of the Bankruptcy Code;
- pay prepetition obligations owed to lien claimants and other critical vendors and confirm administrative status for goods and services delivered to the debtors post-petition;
- pay prepetition insurance obligations, continue all insurance programs, and modify the automatic stay with respect to workers' compensation claims;
- continue the Debtors' existing cash management system, honor certain prepetition obligations related to the use thereof, and continue intercompany transactions and provide administrative expense priority for post-petition intercompany claims; and
- implement certain notice and case management procedures.

## C.   DEBTOR-IN-POSSESSION FINANCING

Shortly after the Petition Date, on December 8, 2018, the Debtors filed a motion to obtain approval of a $49 million debtor-in-possession financing facility (the "**DIP Facility**," and the underlying agreement, the "**DIP Agreement**") and for authorization to use cash collateral (the "**DIP Motion**"), in order to fund their operations through the completion of the sale of their assets and to provide adequate protection to the WAC Lenders.  The DIP Facility was a senior secured, priming, superpriority term loan facility with Ankura Trust Company, LLC, as administrative agent and collateral agent, for the WAC Lenders participating thereto from time to time (collectively, the "**DIP Lenders**").  The first priority liens securing the DIP Facility only primed the liens of the participating WAC Lenders, and only up to a capped amount.  The participating WAC Lenders also consented to the Debtors' use of their cash collateral to fund the Cash needs related to the Debtors' operations, including the amounts necessary to administer the Chapter 11 Cases.  Separately, the nonparticipating WAC Lenders under the WAC2 Facility and the WAC10 Facility consented to the use of their cash collateral to fund direct expenses associated with their collateral.  As the DIP Facility was only available to fund the Debtors' operations through the completion of the sale to Macquarie, the DIP Agreement did not contain any milestones related to a chapter 11 plan.  The DIP Agreement did, however, include bidding process milestones in order to ensure a timely sale of the Debtors' assets.

The DIP Motion was approved on an interim basis on December 12, 2018 [ECF No. 77] (the "**First Interim DIP Order**"). Upon interim approval of the DIP Facility, the Debtors obtained access to $30 million under the DIP Facility, which was drawn in two (2) draws. The first such draw, in a gross principal amount of $15 million, was made following entry of the First Interim DIP Order. The DIP Motion was approved on a second interim basis on December 21, 2018 [ECF No. 156] (the "**Second Interim DIP Order**"). Upon the entry of the Second Interim DIP Order and the order approving the Bidding Procedures Motion (as defined herein), in accordance with the terms of such orders, the Debtors made a second draw under the DIP Facility in a gross principal amount of $15 million and transferred Cash proceeds from the DIP Facility in an amount equal to $1.5 million into the Fee Reserve Account in connection with the Carve-Out (as defined in the Second Interim DIP Order). The DIP Motion was approved on a final basis on January 9, 2019 [ECF No. 231] (the "**Final DIP Order**"). Upon the entry of the Final DIP Order, the Debtors were provided with access to and drew the remaining $19 million under the DIP Facility.

Approval of the DIP Facility and the consensual use of cash collateral, together with the obligation of the participating WAC Lenders to fund certain specified winddown costs of the Debtors' Estates, provided the Debtors with sufficient liquidity to support their working capital needs to operate their business during the Chapter 11 Cases and to carry out the sale of substantially all of the Debtors' assets, and will enable the Debtors to wind down their Estates in an orderly and efficient manner, in each case without serious disruption and to the benefit of all of the Debtors' stakeholders. Upon the closing of the sale to Macquarie of substantially all of the Debtors' assets (as described below), the DIP Facility matured and all outstanding amounts owing to the DIP Lenders on account of the DIP Facility were satisfied in full in Cash. Pursuant to the Final DIP Order, upon the maturity of the DIP Facility and the closing of the sale transactions described below, the DIP Lenders funded the remaining $2.5 million of the Carve-Out into the Fee Reserve Account. Funds in the Fee Reserve Account are held in trust to pay the Debtors' professional fees and to pay any and all amounts included in the Carve-Out.

## D.    SALES OF THE DEBTORS' ASSETS

### 1.    *Post-Petition Sale Processes*

After having exercised the fiduciary out prepetition in order to pursue a transaction with Macquarie, the Debtors commenced their Chapter 11 Cases in order to swiftly implement a comprehensive restructuring through the sale of substantially all of their assets pursuant to section 363 of the Bankruptcy Code. Following the Petition Date, the Debtors engaged in lengthy negotiations with Macquarie and the Steering Committee in an effort to contemporaneously execute a binding asset purchase agreement and file a motion to approve the DIP Financing. After conducting significant due diligence and consulting with the Debtors' management, Macquarie agreed to purchase nearly all of the Debtors' aircraft (approximately one-hundred and sixty (160) helicopters total) and to assume certain executory contracts, unexpired leases, and related liabilities in connection therewith for a base purchase price of $650 million. The Debtors and their advisors developed bidding and auction procedures for the sale of their assets to be approved by the Bankruptcy Court, with Macquarie to serve as the Debtors' stalking horse bidder.

On December 10, 2018, the Debtors filed with the Bankruptcy Court the *Motion of Debtors for Entry of Orders Approving: (I) (A) Bidding Procedures, (B) Bid Protections, (C) Form and Manner of Notice of Auction, Sale Transaction, and Sale Hearing, and (D) Procedures for the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (II) (A) Sale of Substantially All of the Debtors' Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests, (B) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (C) Related Relief* [ECF No. 64] (the "**Bidding Procedures Motion**") seeking to sell substantially all of their assets to Macquarie. Under the proposed bidding procedures, parties could submit bids (including credit bids) for the purchase and sale of some or all of the Debtors' assets in accordance with the terms of the proposed bidding procedures, which were intended to generate the greatest level of interest in the Debtors' assets in order to result in the highest or otherwise best offer.

A hearing to consider the Bidding Procedures Motion was held on December 20, 2019, and the Bankruptcy Court entered an order approving the Bidding Procedures Motion on December 21, 2019 [ECF No. 159]. The approved bidding procedures set January 4, 2019 as the deadline for any third parties to submit competing bids. Pursuant to the approved bidding procedures, the Debtors filed the *Notice of Cancellation of Auction* on January 7, 2019 [ECF No. 216], providing notice that, other than the bid from Macquarie, no other third-party bids had been received, resulting in the Debtors cancelling the auction. Pursuant to the bidding procedures, and subject to the Debtors' receipt of any credit bids, Macquarie was deemed the successful third-party bidder.

On January 23, 2019, the Debtors filed the *Notice and Identities of Successful Credit Bidders* [ECF No. 297], disclosing the three (3) credit bids submitted for the Debtors' assets securing the WAC2 Facility, the WAC9 Facility, and the WAC12 Facility. Macquarie did not submit a matching bid for any of these credit bids, and all three were named successful credit bids. As described below, substantially all of the Debtors' assets were then sold pursuant to four (4) separate sales, with the majority of the Debtors' assets sold to Macquarie and three (3) separate silos sold pursuant to the three (3) credit bids.

The approved bidding procedures permitted any WAC Lenders who supported a sale to Macquarie to deliver a plan support agreement to the Debtors by January 14, 2019. On January 14, 2019, the WAC Lenders party to the WAC7 Revolving Facility (the "**WAC7 Lenders**") and the WAC8 Noteholders (together with the WAC7 Lenders, the "**Supporting WAC Lenders**") submitted separate plan support agreements to the Debtors. However, such plan support agreements contained inconsistencies with each other and with the approved bidding procedures. Thus, the Debtors, the Supporting WAC Lenders, and Macquarie entered into negotiations to revise those plan support agreements, which resulted in the agreed upon and executed Plan & Sale Support Agreement (as defined below). On February 3, 2019, the Debtors filed the *Notice of Filing of Proposed Macquarie Sale Order* [ECF No. 326] (the "**Proposed Macquarie Sale Order**"). Annexed to the Proposed Macquarie Sale Order was a copy of that certain *Plan and Asset Sale Support Agreement*, dated January 14, 2019, among the Debtors, Macquarie, and the Supporting WAC Lenders (the "**Plan & Sale Support Agreement**"). The Plan & Sale Support Agreement redacted the amount of the aggregate holdings of each of the Supporting WAC Lenders.

The Plan & Sale Support Agreement resolved outstanding issues regarding the Supporting WAC Lenders' credit bidding rights and potential objections to a sale to Macquarie, and provided for the Supporting WAC Lenders' support of a sale of their collateral to Macquarie. The Plan & Sale Support Agreement allowed Macquarie to purchase the Supporting WAC Lenders' collateral either through a chapter 11 plan or a sale under section 363 of the Bankruptcy Code. The Plan & Sale Support Agreement required the Debtors to seek approval of the allocation of Macquarie's purchase price to each of the Supporting WAC Lenders' collateral, and required the Debtors to include a provision in the Proposed Macquarie Sale Order to provide an interim distribution to the Supporting WAC Lenders, subject to certain holdbacks described below. The Plan & Sale Support Agreement benefitted the Debtors and their stakeholders by effectuating a going-concern sale of the contemplated assets, maximizing the value of such assets, establishing levels of recovery agreed to by the Supporting WAC Lenders, and providing Macquarie with a sufficient number of aircraft in order to satisfy certain sale conditions. On February 7, 2019, the Debtors filed the *Notice of Filing of Unredacted Plan & Sale Support Agreement* [ECF No. 383], which provided the previously redacted amounts of the aggregate holdings for each of the Supporting WAC Lenders.

Because an insufficient number of the WAC Lenders submitted plan support agreements, Macquarie had the option of proceeding with a sale with the Supporting WAC Lenders under a chapter 11 plan, or with a sale for the collateral of the Supporting WAC Lenders pursuant to section 363 of the Bankruptcy Code. The Plan & Sale Support Agreement provided for a sale under section 363 of the Bankruptcy Code with respect to the collateral of the Supporting WAC Lenders unless Macquarie filed a notice in the Chapter 11 Cases of its intent to pursue a sale under a chapter 11 plan by February 4, 2019 (the "**Plan Election**"). If Macquarie had made the Plan Election, the Supporting WAC Lenders would have been required to support and vote for the Debtors' plan. Macquarie did not make the Plan Election. Instead, on January 23, 2019, Macquarie filed the *Notice of Election to Treat Revised PSA Executed on January 23, 2019 as Meeting Requirements for the Conversion Condition* [ECF No. 296], electing to consummate the sale of the assets securing the Supporting WAC Lenders' Claims to Macquarie through a sale under section 363 of the Bankruptcy Code.

2.    *Consummation of Sales*

Pursuant to the approved bidding procedures, the agent for each WAC Facility was authorized to submit a credit bid, in the form of either a streamlined credit bid or a 363(k) credit bid, for the purchase of their respective collateral.

On January 14, 2019, the Debtors received the following three (3) credit bids: (i) a 363(k) credit bid from Wells Fargo Bank, N.A., as agent for the WAC Lenders for Waypoint Asset Company Number 2 (Ireland) Limited ("**WAC2**," and such bid, the "**WAC2 Credit Bid**"); (ii) a streamlined credit bid from Lombard North Central PLC, as agent for the WAC Lender for Waypoint Asset Co 9 Limited ("**WAC9**," and such bid, the "**WAC9 Credit Bid**"); and (iii) a streamlined credit bid from Sumitomo Mitsui Banking Corporation, Brussels Branch, and Sumitomo Mitsui Banking Corporation Europe Limited, as agents for the WAC Lenders for Waypoint Asset Co 12 Limited ("**WAC12**," and such bid, the "**WAC12 Credit Bid**").

Pursuant to the approved bidding procedures, Macquarie agreed not to submit a matching bid for the WAC9 Credit Bid. With respect to the WAC2 Credit Bid and the WAC12 Credit Bid, Macquarie was required to submit a matching bid by January 22, 2019. The Debtors did not receive a matching bid from Macquarie for either transaction. On January 23, 2019, the Debtors deemed the WAC2 Credit Bid, the WAC9 Credit Bid, and the WAC12 Credit Bid each to be a successful credit bid, subject to (i) finalization of the transaction documents necessary to effectuate the credit bids, (ii) approval of the relevant Debtors' boards of directors or managers (as applicable), and (iii) parties' rights to object to such credit bids.

        a.    <u>Macquarie Sale Transaction</u>

Pursuant to the Macquarie Purchase Agreement (defined below), Macquarie acquired substantially all of the assets of the Debtors, including without limitation, one-hundred and twenty (120) aircraft, all outstanding leases with respect to such aircraft, related parts, tooling and other inventory, certain leases for real estate, intellectual property, and certain other contracts for total consideration of approximately $445 million.

Annexed to the Bidding Procedures Motion, the Debtors filed a copy of that certain *Stock and Asset Purchase Agreement* among WLIL, the subsidiaries of WLIL that were designated sellers thereunder, Macquarie, and, solely for certain enumerated purposes thereunder, Waypoint Leasing Services Canada Limited, Waypoint Leasing Services Germany GmbH, Waypoint Leasing Services Hong Kong Pte. Limited, Waypoint Leasing Services SA (PTY) LTD, Waypoint Leasing Services UK Limited, Waypoint Services Brasil Ltda., and Macquarie Financial Holdings Pty Limited, dated December 7, 2018 (the "**Macquarie Purchase Agreement**," and the transactions contemplated and to be effected thereby, the "**Macquarie Sale Transaction**"). A hearing to consider the Macquarie Sale Transaction was held on February 12, 2019, and the Bankruptcy Court entered an order approving the Macquarie Purchase Agreement on February 15, 2019 [ECF No. 444]. The Macquarie Sale Transaction closed on March 13, 2019. Following the closing, substantially all of the remaining assets of the Debtors were transferred to Macquarie, save those assets pending any requisite governmental or other third-party approval necessary to complete the sale of such asset to Macquarie. As of May 1, 2019, all such retained aircraft had been transferred to Macquarie following the receipt of the necessary approvals, as provided in the Macquarie Purchase Agreement, and the remainder of the purchase price for such retained aircraft of approximately $18.436 million that was being held in escrow has been transferred into the applicable bank accounts of WAC1, WAC3, and WAC8 as Escrowed Funds on a direct-allocation basis for those retained aircraft. Any other such retained assets will be transferred to Macquarie following the receipt of such necessary approval, as provided in the Macquarie Purchase Agreement. On May 3, 2019, the post-closing amount of $25 million that was being held in escrow pending the final determination of whether any additional purchase price adjustments would apply post-closing was transferred once it was determined that no additional purchase price adjustments applied into the applicable bank accounts of WAC1, WAC3, WAC6, WAC7, and WAC8 as Escrowed Funds allocated based on net book value. The Debtors expect that all of the Escrowed

Funds[10] will be distributed to the applicable WAC Lenders promptly after the entry of the Disclosure Statement Order pursuant to the Macquarie Sale Order.

Following the closing, the Bankruptcy Court entered an order on March 28, 2019, dismissing the Chapter 11 Cases for the two (2) trust entities purchased by Macquarie: MSN 4466 Trust and MSN 20184 Trust (formerly named MSN 1251 Trust) [ECF No. 561]. The Bankruptcy Court entered a further order on April 25, 2019, approving the purchase of one (1) additional trust entity, MSN 920022 Trust, by Macquarie pursuant to the Macquarie Sale Transaction [ECF No. 728]. The Bankruptcy Court entered an order on May 2, 2019, dismissing the Chapter 11 Case for MSN 920022 Trust [ECF No. 744].

Upon the closing of the Macquarie Sale Transaction, the Debtors funded the Winddown Account with a portion of the net proceeds of the Macquarie Sale Transaction. Pursuant to the Macquarie Sale Order, among other things, the Winddown Account includes amounts sufficient to pay the WAC Lenders' allocable share of (i) the costs to wind down the Debtors and their remaining non-Debtor affiliates; (ii) key employee retention and incentive plans; (iii) employee transformation amounts; (iv) the Debtors' professionals' success fees (to the extent not already funded into the Fee Reserve Account or paid upon the closing of the Macquarie Sale Transaction); (v) administrative expenses directly incurred by or on behalf of the relevant Participating WAC Group (as defined in the Final DIP Order), in each case to the extent that such amounts have not been paid as of such date; and (vi) costs directly related to the sale of the WAC Lenders' collateral, including any transfer taxes, filing fees, and costs to liquidate any remaining corporate shells of the Debtors and their remaining non-Debtor affiliates under applicable law. Additionally, the Winddown Account includes amounts sufficient to pay the Statutory Fees for each of the Debtors, including those Debtors whose Chapter 11 Cases have been dismissed. Upon the closing of each of the WAC2 Sale Transaction, the WAC9 Sale Transaction, and the WAC12 Sale Transaction (each as defined below), the WAC2 Lenders, the WAC9 Lender, and the WAC12 Lenders each funded their allocable portion of the winddown amounts into the Winddown Account. Each of the WAC Lenders, the WAC9 Lender, and the WAC12 Lenders have a reversionary interest in any funds remaining in the Winddown Account after all of the winddown costs have been paid in full.

Additionally, upon the closing of the Macquarie Sale Transaction, pursuant to the Macquarie Sale Order, the Debtors retained $22,855,431 of sale proceeds as Holdback Amounts that will be distributed to the applicable WAC Lenders pursuant to the Plan.

      b.    <u>WAC2 Sale Transaction</u>

The WAC2 Credit Bid was a credit bid for substantially all of the assets of WAC2, including, among other things, (i) 100% of the beneficial interests of certain trust subsidiaries of WAC2 and (ii) aircraft and related leases and certain other assets owned by WAC2, as identified in the WAC2 Credit Bid. The aggregate consideration provided was a credit bid of $18,340,000 and $4,449,500.00 in Cash for a winddown payment, provided as a reimbursement of certain expenses incurred by the Debtors in connection with the WAC2 Credit Bid, the payment of certain

---

[10] Less the $2.4 million paid by the Debtors to satisfy certain VAT tax payment obligations in connection with the sale of the WAC1 Collateral pursuant to the terms of the Macquarie Sale Transaction.

costs associated with the winding down of WAC2 and certain of its subsidiaries, and the settlement of certain other claims as between the WAC Lenders for WAC2 and the Debtors (the "**Winddown Payment**"). In addition, the WAC2 Administrative Agent paid all cure costs using proceeds from the Winddown Payment and transfer taxes and assumed all liabilities arising from and after the closing date in connection with the assumption and assignment of WAC2's leases, as well as certain other liabilities identified in the WAC2 Credit Bid.

In connection with the WAC2 Credit Bid, the Debtors filed a copy of that certain *Asset Purchase Agreement* among WAC2 and Wells Fargo Bank N.A., dated March 1, 2019 [ECF No. 486] (the "**WAC2 Purchase Agreement**," and the transactions contemplated and to be effected thereby, the "**WAC2 Sale Transaction**"). A hearing to consider the WAC2 Sale Transaction was held on March 12, 2019, and the Bankruptcy Court entered an order approving the WAC2 Purchase Agreement on March 13, 2019 [ECF No. 525]. On March 22, 2019, the WAC2 Administrative Agent filed an executed copy of the WAC2 Purchase Agreement [ECF No. 543]. The WAC2 Sale Transaction closed on March 28, 2019. Following the closing, the Bankruptcy Court entered an order on March 28, 2019, dismissing the Chapter 11 Cases for the four (4) trust entities purchased — the trust subsidiaries of WAC2 [ECF No. 563].

      c.     WAC9 Sale Transaction

The WAC9 Credit Bid was a credit bid for (i) 100% of the equity of WAC9 and (ii) all profit participating notes issued by WAC9 or any of its subsidiaries. The aggregate consideration provided was a credit bid for 100% of the obligations under the WAC Facility for WAC9, in an amount not less than $60,464,373.77 (in terms of the dollar-denominated tranche of the credit agreement obligations) and €33,588,431.00 (in terms of the euro-denominated tranche of the credit agreement obligations) as of the closing date and $3,569,259.39 in Cash for the exit payment, provided as a reimbursement of certain expenses incurred or to be incurred by the Debtors.

In connection with the WAC9 Credit Bid, the Debtors filed a copy of that certain *Equity and PPN Purchase Agreement* among WLIL, LuxCo Euro, LuxCo, and Lombard North Central PLC, dated January 25, 2019 [ECF No. 301] (the "**WAC9 Purchase Agreement**," and the transactions contemplated and to be effected thereby, the "**WAC9 Sale Transaction**"). The Debtors filed a revised version of the WAC9 Purchase Agreement on February 11, 2019 [ECF No. 416]. A hearing to consider the WAC9 Sale Transaction was held on February 12, 2019, and the Bankruptcy Court entered an order approving the WAC9 Purchase Agreement on February 14, 2019 [ECF No. 441]. The WAC9 Sale Transaction closed on February 26, 2019. Following the closing, the Bankruptcy Court entered an order on February 26, 2019, dismissing the Chapter 11 Cases for WAC9 and its subsidiaries [ECF No. 467].

      d.     WAC12 Sale Transaction

The WAC12 Credit Bid was a credit bid for (i) 100% of the equity of WAC12 and (ii) all profit participating notes issued by WAC12 or any of its subsidiaries. The aggregate consideration provided was a credit bid for 100% of the obligations under the WAC Facility for WAC12, in an amount not less than $115 million and $2,805,839.67 in Cash for the exit payment, provided as a reimbursement of certain expenses incurred or to be incurred by the Debtors.

In connection with the WAC12 Credit Bid, the Debtors filed a copy of that certain *Credit Bid Equity Purchase Agreement* among WLIL, LuxCo Euro, LuxCo, Sumitomo Mitsui Banking Corporation, Brussels Branch, and Sumitomo Mitsui Banking Corporation Europe Limited, dated February 1, 2019 [ECF No. 320] (the "**WAC12 Purchase Agreement**," and the transactions contemplated and to be effected thereby, the "**WAC12 Sale Transaction**"). The Debtors filed a revised version of the WAC12 Purchase Agreement on February 12, 2019 [ECF No. 435]. A hearing to consider the WAC12 Sale Transaction was held on February 12, 2019, and the Bankruptcy Court entered an order approving the WAC12 Purchase Agreement on February 14, 2019 [ECF No. 440]. The WAC12 Sale Transaction closed on February 28, 2019. Following the closing, the Bankruptcy Court entered an order on March 1, 2019, dismissing the Chapter 11 Cases for WAC12 and its subsidiaries [ECF No. 483].

3.    *The Debtors' Remaining Assets*

Pursuant to the terms of the Macquarie Purchase Agreement, the Debtors retained all rights, title, and interests in certain property and assets excluded from the sale to Macquarie (collectively, the "**Remaining Assets**"). The primary Remaining Assets that the Debtors still own as of May 28, 2019 are: (i) the assets of WAC10, which include three (3) H225 helicopters, any remaining Cash in WAC10 bank accounts, and spare parts for the three (3) H225 helicopters; (ii) one (1) H225 helicopter owned by WAC11; and (iii) certain bank accounts owned by certain of the Debtors, including the Fee Reserve Account with $20,289,537, the Winddown Account with $19,893,818, and bank accounts holding the remaining unencumbered Cash totaling $2,640,268, the Holdback Amounts totaling $22,855,431, and the Escrowed Funds totaling $41,017,988.[11]

| Consolidated Debtor Group/Name | Remaining Material Assets |
|---|---|
| WAC1 Group | • $9,415,197 encumbered cash with liens held by the WAC1 Lenders (Holdback Amount)<br>• $16,906,099 Escrowed Funds |
| WAC2 Group | • None |
| WAC3 Group | • $5,854,233 encumbered cash with liens held by the WAC3 Lenders (Holdback Amount)<br>• $9,794,527 Escrowed Funds |
| WAC4 | • None |
| WAC5 | • None |
| MSN 2047 Trust | • None |
| MSN 2057 Trust | • None |

---

[11] All dollar amounts referenced in this section are approximate and are listed as of May 28, 2019.

| Consolidated Debtor Group/Name | Remaining Material Assets |
|---|---|
| MSN 14786 Trust | • None |
| WLUK5A | • None |
| WAC6 Group | • $1,376,559 encumbered cash with liens held by the WAC6 Lenders (Holdback Amount)<br>• $2,333,549 Escrowed Funds |
| WAC7 Group | • $2,244,343 encumbered cash with liens held by the WAC7 Lenders (Holdback Amount)<br>• $1,321,143 Escrowed Funds |
| WAC8 Group | • $3,965,099 encumbered cash with liens held by the WAC8 Noteholders (Holdback Amount)<br>• $10,662,669 Escrowed Funds |
| WAC10 | • Three (3) H225 helicopters<br>• Spare parts for the three (3) H225 helicopters<br>• $1,411,284 encumbered cash with lien held by the WAC10 Lender |
| MSN 2826 Trust | • None |
| MSN 2879 Trust | • None |
| MSN 2916 Trust | • None |
| WAC11 | • One (1) H225 helicopter<br>• $481,733 unencumbered cash |
| WAG | • None |
| MSN 2905 Trust | • None |
| WAC14 | • $19,893,818 unencumbered cash (Winddown Account) |
| WAC5B | • None |
| WAC15 | • $20,289,537 unencumbered cash (Fee Reserve Account) |

| Consolidated Debtor Group/Name | Remaining Material Assets |
|---|---|
| WLIL | • $2,145,373 unencumbered cash |
| LuxCo | • $8,667 unencumbered cash |
| LuxCo Euro | • None |
| Holdings | • $152 unencumbered cash |
| Services | • $4,343 unencumbered cash |

4.      *Post-Sale Management and Governance of the Debtors*

Post-closing, the Debtors have no employees.  In furtherance of the transactions contemplated by the Macquarie Purchase Agreement, and in order to ensure an orderly winddown of the business and operations of WLIL and its affiliates, WLIL and Macquarie Rotorcraft Leasing Services (Ireland) Limited ("**Macquarie Services**") entered into that certain *Transition Services Agreement*, dated March 13, 2019 (the "**TSA**"), pursuant to which Macquarie Services agreed to provide or cause to be provided to WLIL and its affiliates and subsidiaries certain services and other professional assistance on a transitional basis in exchange for a negotiated fee.  Such services primarily consist of performing various activities in aid of the Debtors' Chapter 11 Cases, and are provided primarily by former employees of the Debtors who are now employed by Macquarie and/or its affiliates.

The Debtors' various boards of directors continue to govern.  On or about March 27, 2019, the Debtors adopted an amended constitution for WLIL in order to expand the size of WLIL's board of directors to allow for the appointment of the independent director of Holdings, William Transier, to the board of directors of WLIL, as well as to the boards of directors of certain of WLIL's subsidiaries.  Once the amended constitution for WLIL was adopted, the boards of directors of WLIL and each of its applicable subsidiaries voted to approve the appointment of Mr. Transier as a director to each of their boards.  Mr. Transier will retain his director positions with Holdings, WLIL, and certain of WLIL's subsidiaries upon assuming his role as Plan Administrator (as described in Section V.G. herein).

E.      **RETENTION OF THE DEBTORS' PROFESSIONALS**

After the commencement of the Chapter 11 Cases, the Debtors obtained Bankruptcy Court approval to retain certain professionals to represent them and assist them in connection with the Chapter 11 Cases.  Specifically, the Debtors have retained, and the Bankruptcy Court has approved the retention of, the following professionals: (i) Weil, Gotshal & Manges LLP, as their restructuring counsel [ECF No. 230]; (ii) Houlihan Lokey Capital, Inc. ("**Houlihan**"), as their investment bankers [ECF No. 290]; (iii) FTI Consulting, Inc. ("**FTI**"), as their financial advisors [ECF No. 222]; (iv) A&L Goodbody, as their Irish law advisors [ECF No. 221]; (v) White & Case LLP, as their special counsel [ECF No. 224], (vi) KCC, as their claims, noticing, and balloting agents and administrative advisors [ECF No. 223], and (vii) Accenture LLP, as their

corporate advisors [ECF No. 553]. Certain additional professional retention applications remain pending.

In connection with these applications, the Debtors sought and obtained approval to establish procedures for interim monthly compensation of the professionals [ECF No. 250]. The Debtors also employed other professionals in the ordinary course of their business pursuant to the *Order Pursuant to 11 U.S.C. §§ 105(a), 327, 328 and 330 Authorizing Debtors to Employ Professionals Used in the Ordinary Course of Business* Nunc Pro Tunc *to the Petition Date* [ECF No. 227].

## F.    OTHER MOTIONS IN THE CHAPTER 11 CASES

Since the Petition Date, the Debtors have sought and obtained approval of a number of additional motions to aid in the efficient administration of the Chapter 11 Cases. The most significant additional motions are described below.

1.    *Motion to Approve Key Employee Incentive Program*

The success of the Debtors' restructuring and sale initiatives, which preserved and maximized the value of the Debtors' business, turned, in part, on the performance and productivity of certain of the Debtors' senior key employees during the Chapter 11 Cases. Pending the close of the sale of substantially all of the Debtors' assets, these senior employees comprising the Debtors' upper management were the key drivers of the Debtors' ability to meet and exceed operational and financial milestones in order to maximize value. To ensure that these key members of the Debtors' management team were properly incentivized to work toward a value-maximizing transaction for the benefit of all parties in interest, the Debtors, with the assistance of their professionals, developed a key employee incentive program (the "**KEIP**").

The participants in the KEIP consisted of eight (8) members of the Debtors' senior management team (collectively, the "**KEIP Participants**") who were largely responsible for the continuity of the Debtors' day-to-day operations, and who would prove to be critical to the consummation of the later effectuated sale transactions. The KEIP was incentive-based, conditioning any award granted under the KEIP on meeting challenging financial and growth metrics. Pursuant to sections 363 and 503 of the Bankruptcy Code, the Debtors sought approval and authority for the KEIP in order to make payments under the KEIP to the KEIP Participants upon satisfying the metrics. After extensive discussions with the United States Trustee and the Debtors making certain changes to the KEIP, the Bankruptcy Court entered an order approving the KEIP on March 1, 2019 [ECF No. 481]. On March 27, 2019, the Debtors paid approximately $3,625,725 to the KEIP Participants under the terms of the KEIP.

2.    *Motion to Consolidate and Extend the Time to File Schedules of Assets and Liabilities, Schedules of Executory Contracts and Unexpired Leases, and Statements of Financial Affairs*

Pursuant to sections 521 and 105(a) of the Bankruptcy Code and Bankruptcy Rule 1007(c), the Debtors sought to extend their time to file the Schedules, and to file the same on a partially consolidated basis. To prepare the required Schedules, the Debtors had to gather information from books, records, and documents relating to a multitude of transactions concerning

over one-hundred and sixty (160) aircraft affecting all one-hundred and forty-three (143) of the Debtors. Collection of the necessary information required an expenditure of substantial time and effort on the part of the Debtors' representatives.

Because of the complexity of their operations, the number of Debtors, the limited number of the Debtors' employees, and the burdens imposed on the Debtors as a result of the commencement of the Chapter 11 Cases and the ongoing sale processes, the Debtors determined that an extension of the statutory deadline to file the Schedules would be necessary. Additionally, the Debtors determined it would be an overly difficult and burdensome task to compile their Schedules for each and every Debtor. An order approving the requested relief, including consolidating certain of the Debtors' filings and extending the deadline to file the Schedules to March 31, 2019, was entered on January 8, 2019 [ECF No. 225].

3.    *Motion to Approve Proposed Updated DIP Budget and Resolve Allocation Methodology for Winddown Account*

At the time the Debtors were seeking Bankruptcy Court approval of their sale transactions, an intercreditor dispute arose regarding how certain expenses should be allocated between the Debtors' various groups of lenders, both in the context of the Debtors' proposed extended budget for the use of the proceeds of the DIP Facility for the next thirteen (13) week period following the expiration of the initial budget, and with respect to the winddown expenses that were to be funded into the Winddown Account as a part of the closing of the Debtors' proposed asset sales. The parties were at an impasse and the continued lack of a resolution jeopardized the Debtors' access to the proceeds of the DIP Facility and cash collateral from certain of the Debtors' lenders, thereby threatening to derail the Chapter 11 Cases and the Debtors' sale processes. As a result, the Debtors had to bring the dispute to the Bankruptcy Court for prompt resolution in order to preserve the Debtors' access to Cash necessary to continue operating the business as a going concern, sufficiently fund the accounts to wind down the Debtors, and allow for the Debtors' sale processes to continue unabated, thereby preserving the value of the Debtors' Estates.

Thus, pursuant to section 105(a) of the Bankruptcy Code, the Debtors filed an emergency motion seeking approval of the proposed budget for the next thirteen (13) week period and the resolution of the appropriate allocation methodology for funding the Winddown Account. Certain of the WAC Lenders filed objections. On February 13, 2019, the Bankruptcy Court entered an order approving the requested relief, including settling "net book value" as the appropriate methodology [ECF No. 438].

4.    *Motion to Extend Exclusivity*

Pursuant to section 1121 of the Bankruptcy Code, a debtor has the exclusive right to (i) file a chapter 11 plan during the first one-hundred and twenty (120) days of its chapter 11 case and (ii) solicit acceptances of such plan during the first one-hundred and eighty (180) days of its chapter 11 case. These deadlines may be extended for "cause" up to a date that is eighteen (18) months after the filing date.

On March 25, 2019, the Debtors filed a motion seeking to extend the period during which the Debtors would have the exclusive right to file a chapter 11 plan or plans by

approximately forty-five (45) days, through and including May 9, 2019, and to extend the period during which the Debtors would have the exclusive right to solicit acceptances thereof by approximately forty-five (45) days, through and including July 8, 2019. No party objected to the motion, however the Steering Committee filed a reservation or rights indicating that it was still considering whether a chapter 11 plan process was necessary in light of the fact that the Debtors had already successfully sold substantially all of their assets. Accordingly, the Steering Committee reserved its rights both with respect to (i) whether a chapter 11 plan process was necessary to wind down the Debtors' Estates and (ii) any further exclusivity extension requests by the Debtors. An order approving the requested relief was entered on April 9, 2019 [ECF No. 701].

## G.    SCHEDULES, BAR DATES, AND THE CLAIMS PROCESS

On March 31, 2019, the Debtors filed their schedules of assets and liabilities, schedules of executory contracts and unexpired leases, and statements of financial affairs.

On March 26, 2019, the Bankruptcy Court entered an order [ECF No. 552] (the "**Bar Date Order**"), establishing (i) May 17, 2019 at 5:00 p.m. (Eastern Time) as the deadline for each person or entity, not including governmental units, to file proofs of claim in respect of any prepetition claims against any of the Debtors, including claims pursuant to section 503(b)(9) of the Bankruptcy Code (the "**General Bar Date**"), and (ii) May 24, 2019 at 5:00 p.m. (Eastern Time) as the deadline for governmental units (together with the General Bar Date, the "**Bar Dates**") to file proofs of claim in respect of any prepetition claims against any of the Debtors.

To date, two-hundred and eighty-seven (287) proofs of claim have been filed in the Debtors' Chapter 11 Cases, of which two-hundred and sixteen (216) were filed by or on behalf of the WAC Lenders. The remaining seventy-one (71) filed proofs of claim were filed by only forty-five (45) entities because several entities filed multiple proofs of claim against multiple Debtors. Out of these forty-five (45) entities, fifteen (15) are current or former employees, officers, or directors of the Debtors or their non-Debtor affiliates. Thus, only thirty (30) entities that are neither the WAC Lenders nor current or former employees, officers, or directors of the Debtors or their non-Debtor affiliates filed proofs of claim. Because the claims resolution process is at its beginning, the actual ultimate aggregate amount of Allowed Claims may differ from the amounts used for the purposes of the Debtors' estimates.

## H.    ADVERSARY PROCEEDING INITIATED BY MACQUARIE

On April 3, 2019, Macquarie filed an adversary complaint against LCI Helicopters (Ireland) Limited ("**LCI**") alleging that LCI breached its confidentiality obligations under its executed nondisclosure agreement (the "**NDA**") with Holdings. Macquarie assumed the NDA, acquiring all of the Debtors' rights and interests thereunder, as part of the Macquarie Sale Transaction.

The adversary complaint raises two claims against LCI: (i) breach of the NDA and (ii) tortious interference with business relations. In support of its claims, Macquarie alleges, among other things, that LCI breached the NDA by using confidential information to evaluate and consummate the acquisition of the assets of WAC9 outside of the sale process sanctioned by the Bankruptcy Court and, but for LCI's interference, Macquarie would have successfully

consummated its offer to purchase the assets of WAC9.  Macquarie has not named any of the Debtors as a party in the adversary complaint.

V.

THE PLAN

THE FOLLOWING IS A BRIEF SUMMARY OF CERTAIN OF THE MORE SIGNIFICANT MATTERS CONTEMPLATED BY OR IN CONNECTION WITH THE CONFIRMATION OF THE PLAN.  THUS, THE FOLLOWING SUMMARY IS QUALIFIED IN ITS ENTIRETY BY THE PLAN, WHICH IS ATTACHED TO THIS DISCLOSURE STATEMENT AS **EXHIBIT B**.  THIS SUMMARY ONLY HIGHLIGHTS CERTAIN SUBSTANTIVE PROVISIONS OF THE PLAN.  CONSIDERATION OF THIS SUMMARY WILL NOT, NOR IS IT INTENDED TO, YIELD A THOROUGH UNDERSTANDING OF THE PLAN.  CONSIDERATION OF THIS SUMMARY IS NOT A SUBSTITUTE FOR A FULL AND COMPLETE READING OF THE PLAN.  ALL HOLDERS OF CLAIMS AND INTERESTS ARE URGED TO REVIEW THE PLAN CAREFULLY.  THE PLAN, IF CONFIRMED, WILL BE BINDING ON EACH OF THE DEBTORS AND ALL HOLDERS OF CLAIMS AND INTERESTS THERETO.

**A.    INTRODUCTION**

In general, a chapter 11 plan divides claims and interests into separate classes, specifies the property that each class is to receive under such plan, and contains other provisions necessary to implement such plan.

Under the Bankruptcy Code, "claims" and "interests," rather than "creditors" and "equity holders," are classified because creditors and equity holders may hold claims and interests in more than one class.

Statements as to the rationale underlying the treatment of Claims and Interests under the Plan are not intended to, and will not, waive, compromise, or limit any rights, Claims, or Causes of Action in the event objections to classification or treatment under the Plan are filed or the Plan is not confirmed.

THE DEBTORS URGE YOU TO READ THE PLAN IN ITS
ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

**B.    CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS UNDER THE PLAN**

Pursuant to section 1126(f) of the Bankruptcy Code, holders of unimpaired claims or interests are "conclusively presumed" to have accepted a plan.  Additionally, holders of claims or interests who are plan proponents may also be deemed to have accepted a plan.  Accordingly, their votes are not solicited.  Under the Plan, the following Classes are Unimpaired, and, therefore, the holders of such Claims are "conclusively presumed" to have voted to accept the Plan:  1A through 20A, 1B through 20B, 1E through 20E, 1F through 18F, and 20F.

40

Under certain circumstances, a class of claims or interests may be deemed to reject a plan. For example, a class is deemed to reject a plan under section 1126(g) of the Bankruptcy Code if the holders of claims or interests in such class do not receive or retain property under the plan on account of their claims or interests. Accordingly, their votes are not solicited. Under the Plan, the following Classes are deemed to have rejected the Plan: 1D through 3D, 6D through 8D, and 19G.

## C.   **ADMINISTRATIVE EXPENSE CLAIMS, PRIORITY CLAIMS, AND STATUTORY FEES**

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expense Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests described in the Plan and are not entitled to vote to accept or reject the Plan.

1.   *Administrative Expense Claims*

Except to the extent that a holder of an Allowed Administrative Expense Claim agrees to less favorable treatment, each holder of an Allowed Administrative Expense Claim shall receive, in full and final satisfaction of such Claim, Cash in an amount equal to such Allowed Administrative Expense Claim on, or as soon thereafter as is reasonably practicable, the later of (i) the Effective Date and (ii) the first Business Day after the date such Administrative Expense Claim becomes an Allowed Administrative Expense Claim; provided that the Fee Claims shall receive the treatment provided in section 2.2 of the Plan; provided further that Allowed Administrative Expense Claims representing liabilities incurred in the ordinary course of operating or liquidating the business by the Debtors shall be paid by the Debtors in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any agreements governing instruments evidencing or other documents relating to such transactions.

2.   *Fee Claims*

All entities seeking an award by the Bankruptcy Court of Fee Claims (i) shall file their respective final applications for allowance of compensation for services rendered and reimbursement of expenses incurred by the date that is thirty (30) days after the Effective Date, and (ii) shall be paid in full from the Fee Reserve Account in such amounts as are Allowed by the Bankruptcy Court (a) upon the later of the Effective Date and the date upon which the order relating to any such Allowed Fee Claim is entered or (b) upon such other terms as may be mutually agreed upon between the holder of such an Allowed Fee Claim and the Plan Administrator. The Plan Administrator is authorized to pay compensation for services rendered or reimbursement of expenses incurred after the Effective Date in the ordinary course and without the need for Bankruptcy Court approval.

3.   *Priority Tax Claims*

Except to the extent that a holder of an Allowed Priority Tax Claim agrees to a different treatment, each holder of an Allowed Priority Tax Claim shall receive, in full satisfaction, settlement, and release of, and in exchange for such Allowed Priority Tax Claim, Cash in an amount equal to such Claim on, or as soon thereafter as is reasonably practicable, (i) the later of

the Effective Date, (ii) the first Business Day after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, and (iii) the date such Allowed Priority Tax Claim is due and payable in the ordinary course.

4.    *Statutory Fees*

On the Effective Date, the Debtors shall pay all Statutory Fees that are then due and payable, and, thereafter as required, the Plan Administrator shall pay all Statutory Fees when due and payable. The obligations under section 2.4 of the Plan shall remain for each Debtor until such time as a final decree is entered closing the Chapter 11 Case for such Debtor, a Final Order converting such Debtor's Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code is entered, or a Final Order dismissing such Debtor's Chapter 11 Case is entered.

## D.    CLASSIFICATION OF CLAIMS AND INTERESTS

1.    *Classification in General*

A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation, and distribution under the Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code; *provided that*, a Claim or Interest is placed in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Allowed Claim or Allowed Interest has not been satisfied, released, or otherwise settled prior to the Effective Date.

2.    *Formation of Debtor Groups for Convenience Only*

The Plan groups the Debtors together solely for the purposes of (i) describing treatment under the Plan in respect of Claims against and Interests in the Debtors; (ii) tabulating votes; and (iii) making Distributions. Each Debtor or group of consolidated Debtors has been assigned a number below for these purposes. The Claims against and Interests in each Debtor or consolidated group of Debtors, in turn, have been assigned separate lettered Classes based on the type of Claim or Interest involved. Accordingly, the classification of any particular Claim against or Interest in any Debtor or consolidated group of Debtors depends on the particular Debtor against which such Claim is asserted (or in which such Interest is held) and the type of Claim or Interest in question. The number will denote which Debtor or consolidated group of Debtors against which a Claim or Interest has been asserted, and the letter will denote the Class of such Claim or Interest. The numbers applicable to the various Debtor groups are as follows:

| Number | Consolidated Debtor Group or Debtor Name |
|--------|------------------------------------------|
| 1 | WAC1 Group |
| 2 | WAC2 Group |
| 3 | WAC3 Group |
| 4 | WAC4 |

| Number | Consolidated Debtor Group or Debtor Name |
|---|---|
| 5(i) | WAC5 |
| 5(ii) | MSN 2047 Trust |
| 5(iii) | MSN 2057 Trust |
| 5(iv) | MSN 14786 Trust |
| 5(v) | WLUK5A |
| 6 | WAC6 Group |
| 7 | WAC7 Group |
| 8 | WAC8 Group |
| Intentionally Omitted | Intentionally Omitted |
| 10(i) | WAC10 |
| 10(ii) | MSN 2826 Trust |
| 10(iii) | MSN 2879 Trust |
| 10(iv) | MSN 2916 Trust |
| 11(i) | WAC11 |
| 11(ii) | WAG |
| 11(iii) | MSN 2905 Trust |
| Intentionally Omitted | Intentionally Omitted |
| Intentionally Omitted | Intentionally Omitted |
| 14(i) | WAC14 |
| 14(ii) | WAC5B |
| 15 | WAC15 |
| 16 | WLIL |
| 17 | LuxCo |

| Number | Consolidated Debtor Group or Debtor Name |
|:------:|:----------------------------------------:|
| 18 | LuxCo Euro |
| 19 | Holdings |
| 20 | Services |

Such groupings shall not affect any Debtor's status as a separate legal Entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal Entities, or cause the transfer of any assets; and, except as otherwise provided by or permitted under the Plan, all Debtors shall continue to exist as separate legal Entities after the Effective Date until liquidated, dissolved, or otherwise terminated.

      3.    *Summary of Classification*

Claims against and Interests in each of the Debtors are divided into lettered Classes. Not all of the Classes apply to every Debtor or Debtor group, and consequently, not all of the lettered Classes appear in the case of each Debtor or group of consolidated Debtors. For purposes of voting, Claims within the Class shall be counted for each applicable Debtor or group of consolidated Debtors. Whenever such a Class of Claims or Interests is relevant to a particular Debtor, that class of Claims or Interests shall be grouped under the appropriate lettered Class.

| Class | Description |
|:-----:|:-----------:|
| Class A | Class A consists of Priority Non-Tax Claims against the applicable Debtor or consolidated group of Debtors |
| Class B | Class B consists of the Other Secured Claims against the applicable Debtor or consolidated group of Debtors |
| Class C | Class C consists of WAC Lender Secured Claims against the applicable Debtor or consolidated group of Debtors |
| Class D | Class D consists of all General Unsecured Claims against the applicable Debtor or consolidated group of Debtors |
| Class E | Class E consists of Intercompany Claims against the applicable Debtor or consolidated group of Debtors |
| Class F | Class F consists of Other Interests |
| Class G | Class G consists of the Holdings Interests |

4.      *Special Provision Governing Unimpaired Claims*

Nothing under the Plan shall affect the rights of the Debtors, in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

5.      *Elimination of Vacant Classes*

Any Class of Claims against or Interests in the Debtors or a consolidated group of Debtors that, as of the commencement of the Confirmation Hearing, does not have at least one holder of a Claim or Interest that is Allowed in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of voting to accept or reject the Plan, and disregarded for purposes of determining whether the Plan satisfies section 1129(a)(8) of the Bankruptcy Code with respect to that Class.

## E.    ACCEPTANCE OR REJECTION OF THE PLAN

1.      *Presumed Acceptance*

If a Class contains Claims or Interests eligible to vote and no holder of Claims or Interests eligible to vote in such Class votes to accept or reject the Plan, the Debtors shall request the Bankruptcy Court at the Confirmation Hearing to deem the Plan accepted by such Class.

2.      *Votes Required for Acceptance by a Class*

A Class of Claims will have accepted the Plan if it is accepted by at least two-thirds in amount and more than one-half in number of the Allowed Claims in such Class that have voted on the Plan in accordance with the Disclosure Statement Order.

3.      *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code*

The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.  The Debtors reserve the right to modify the Plan in accordance with Section 13.4 of the Plan to the extent, if any, that Confirmation pursuant to section 1129(b) of the Bankruptcy Code requires modification, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and the Bankruptcy Rules.

## F.    TREATMENT OF CLAIMS AND INTERESTS

1.      *Priority Non-Tax Claims (Classes 1A through 20A)*

Except to the extent that a holder of an Allowed Priority Non-Tax Claim has agreed to less favorable treatment of such Claim, each such holder shall receive, in full and final satisfaction of such Claim, Cash in an amount equal to such Claim, payable on or as soon as reasonably practical after the later of the Effective Date and the date on which such Priority Non-

Tax Claim becomes an Allowed Priority Non-Tax Claim, or as soon as reasonably practical thereafter; provided, however, that Allowed Priority Non-Tax Claims that arise in the ordinary course of the Debtors' business and which are not due and payable on or before the Effective Date shall be paid in the ordinary course of business in accordance with the terms thereof.

2.    *Other Secured Claims (Classes 1B through 20B)*

Except to the extent that a holder of an Allowed Other Secured Claim against any of the Debtors has agreed to less favorable treatment of such Claim, each holder of an Allowed Other Secured Claim shall receive, at the option of the Debtors or the Plan Administrator, in full and final satisfaction of such Claim, payable on, or as soon as reasonably practical after, the later of the Effective Date and the date on which such Other Secured Claim becomes an Allowed Other Secured Claim (i) payment in full in Cash (from proceeds from the collateral securing such Allowed Other Secured Claim); or (ii) such other treatment necessary to satisfy section 1129 of the Bankruptcy Code.

3.    *WAC1 Secured Claims Against the WAC1 Group (Class 1C)*

The WAC1 Administrative Agent on behalf of the WAC1 Lenders shall receive on the Effective Date or as soon as reasonably practicable thereafter, but no later than the Initial Distribution Date, payment in Cash of all funds held by the members of the WAC1 Group (including the applicable Holdback Amount).

4.    *WAC2 Secured Claims Against the WAC2 Group (Class 2C)*

The WAC2 Administrative Agent on behalf of the WAC2 Lenders shall receive on the Effective Date or as soon as reasonably practicable thereafter, but no later than the Initial Distribution Date, payment in Cash of all funds held by the members of the WAC2 Group.

5.    *WAC3 Secured Claims Against the WAC3 Group (Class 3C)*

The WAC3 Administrative Agent on behalf of the WAC3 Lenders shall receive on the Effective Date or as soon as reasonably practicable thereafter, but no later than the Initial Distribution Date, payment in Cash of all funds held by the members of the WAC3 Group (including the applicable Holdback Amount).

6.    *WAC6 Secured Claims Against the WAC6 Group (Class 6C)*

The WAC6 Administrative Agent on behalf of the WAC6 Lenders shall receive on the Effective Date or as soon as reasonably practicable thereafter, but no later than the Initial Distribution Date, payment in Cash of all funds held by the members of the WAC6 Group (including the applicable Holdback Amount).

7.    *WAC7 Secured Claims Against the WAC7 Group (Class 7C)*

The WAC7 Administrative Agent on behalf of the WAC7 Lenders shall receive on the Effective Date or as soon as reasonably practicable thereafter, but no later than the Initial

Distribution Date, payment in Cash of all funds held by the members of the WAC7 Group (including the applicable Holdback Amount).

8.    *WAC8 Secured Claims Against the WAC8 Group (Class 8C)*

The WAC8 Administrative Agent on behalf of the WAC8 Lenders shall receive on the Effective Date or as soon as reasonably practicable thereafter, but no later than the Initial Distribution Date, payment in Cash of all funds held by the members of the WAC8 Group (including the applicable Holdback Amount).

9.    *WAC10 Secured Claims Against the WAC10 Group (Class 10C)*

The WAC10 Administrative Agent on behalf of the WAC10 Lender shall receive, on the Effective Date, or as soon as reasonably practicable thereafter, subject to the terms of the Plan, the WAC10 Collateral in full and final satisfaction of the WAC10 Secured Claims.

10.    *General Unsecured Claims Against the WAC1 Group (Class 1D)*

Each General Unsecured Claim against the WAC1 Group shall receive no distribution on account of such General Unsecured Claim.

11.    *General Unsecured Claims Against the WAC2 Group (Class 2D)*

Each General Unsecured Claim against the WAC2 Group shall receive no distribution on account of such General Unsecured Claim.

12.    *General Unsecured Claims Against the WAC3 Group (Class 3D)*

Each General Unsecured Claim against the WAC3 Group shall receive no distribution on account of such General Unsecured Claim.

13.    *General Unsecured Claims Against WAC4 (Class 4D)*

Only to the extent there is residual value available for distribution from WAC4 after Statutory Fees, Allowed Administrative Claims, and Allowed Priority Tax Claims are paid in full, each holder of an Allowed General Unsecured Claim against WAC4 shall receive Cash in the amount of its Pro Rata share of any such residual value.

14.    *General Unsecured Claims Against WAC5 (Class 5(i)D)*

Only to the extent there is residual value available for distribution from WAC5 after Statutory Fees, Allowed Administrative Claims, and Allowed Priority Tax Claims are paid in full, each holder of an Allowed General Unsecured Claim against WAC5 shall receive Cash in the amount of its Pro Rata share of any such residual value.

15.    *General Unsecured Claims Against MSN 2047 Trust (Class 5(ii)D)*

Only to the extent there is residual value available for distribution from MSN 2047 Trust after Statutory Fees, Allowed Administrative Claims, and Allowed Priority Tax Claims are

paid in full, each holder of an Allowed General Unsecured Claim against MSN 2047 Trust shall receive Cash in the amount of its Pro Rata share of any such residual value.

16.    *General Unsecured Claims Against MSN 2057 Trust (Class 5(iii)D)*

Only to the extent there is residual value available for distribution from MSN 2057 Trust after Statutory Fees, Allowed Administrative Claims, and Allowed Priority Tax Claims are paid in full, each holder of an Allowed General Unsecured Claim against MSN 2057 Trust shall receive Cash in the amount of its Pro Rata share of any such residual value.

17.    *General Unsecured Claims Against MSN 14786 Trust (Class 5(iv)D)*

Only to the extent there is residual value available for distribution from MSN 14786 Trust after Statutory Fees, Allowed Administrative Claims, and Allowed Priority Tax Claims are paid in full, each holder of an Allowed General Unsecured Claim against MSN 14786 Trust shall receive Cash in the amount of its Pro Rata share of any such residual value.

18.    *General Unsecured Claims Against WLUK5A (Class 5(v)D)*

Only to the extent there any residual value available for distribution from WLUK5A after Statutory Fees, Allowed Administrative Claims, and Allowed Priority Tax Claims are paid in full, each holder of an Allowed General Unsecured Claim against WLUK5A Trust shall receive Cash in the amount of its Pro Rata share of any such residual value.

19.    *General Unsecured Claims Against the WAC6 Group (Class 6D)*

Each General Unsecured Claim against the WAC6 Group shall receive no distribution on account of such General Unsecured Claim.

20.    *General Unsecured Claims Against the WAC7 Group (Class 7D)*

Each General Unsecured Claim against the WAC7 Group shall receive no distribution on account of such General Unsecured Claim.

21.    *General Unsecured Claims Against the WAC8 Group (Class 8D)*

Each General Unsecured Claim against the WAC8 Group shall receive no distribution on account of such General Unsecured Claim.

22.    *General Unsecured Claims Against WAC10 (Class 10(i)D)*

Only to the extent there is residual value available for distribution from WAC10 after Statutory Fees, Allowed Administrative Claims, and Allowed Priority Tax Claims are paid in full, each holder of an Allowed General Unsecured Claim against WAC10 shall receive Cash in the amount of its Pro Rata share of any such residual value.

23.     *General Unsecured Claims Against MSN 2826 Trust (Class 10(ii)D)*

Only to the extent there is residual value available for distribution from MSN 2826 Trust after Statutory Fees, Allowed Administrative Claims, and Allowed Priority Tax Claims are paid in full, each holder of an Allowed General Unsecured Claim against MSN 2826 Trust shall receive Cash in the amount of its Pro Rata share of any such residual value.

24.     *General Unsecured Claims Against MSN 2879 Trust (Class 10(iii)D)*

Only to the extent there is residual value available for distribution from MSN 2879 Trust after Statutory Fees, Allowed Administrative Claims, and Allowed Priority Tax Claims are paid in full, each holder of an Allowed General Unsecured Claim against MSN 2879 Trust shall receive Cash in the amount of its Pro Rata share of any such residual value.

25.     *General Unsecured Claims Against MSN 2916 Trust (Class 10(iv)D)*

Only to the extent there is residual value available for distribution from MSN 2916 Trust after Statutory Fees, Allowed Administrative Claims, and Allowed Priority Tax Claims are paid in full, each holder of an Allowed General Unsecured Claim against MSN 2916 Trust shall receive Cash in the amount of its Pro Rata share of any such residual value.

26.     *General Unsecured Claims Against WAC11 (Class 11(i)D)*

Only to the extent there is residual value available for distribution from WAC11 after Statutory Fees, Allowed Administrative Claims, and Allowed Priority Tax Claims are paid in full, each holder of an Allowed General Unsecured Claim against WAC11 shall receive Cash in the amount of its Pro Rata share of any such residual value.

27.     *General Unsecured Claims Against WAG (Class 11(ii)D)*

Only to the extent there is residual value available for distribution from WAG after Statutory Fees, Allowed Administrative Claims, and Allowed Priority Tax Claims are paid in full, each holder of an Allowed General Unsecured Claim against WAG shall receive Cash in the amount of its Pro Rata share of any such residual value.

28.     *General Unsecured Claims Against MSN 2905 Trust (Class 11(iii)D)*

Only to the extent there is residual value available for distribution from MSN 2905 Trust after Statutory Fees, Allowed Administrative Claims, and Allowed Priority Tax Claims are paid in full, each holder of an Allowed General Unsecured Claim against MSN 2905 Trust shall receive Cash in the amount of its Pro Rata share of any such residual value.

29.     *General Unsecured Claims Against WAC14 (Class 14(i)D)*

Only to the extent there is residual value available for distribution from WAC14 after Statutory Fees, Allowed Administrative Claims, and Allowed Priority Tax Claims are paid in full, each holder of an Allowed General Unsecured Claim against WAC14 shall receive Cash in the amount of its Pro Rata share of any such residual value.

18-13648-smb    Doc 819    Filed 06/04/19    Entered 06/04/19 13:32:49    Main Document
Pg 59 of 103

30.     *General Unsecured Claims Against WAC5B (Class 14(ii)D)*

Only to the extent there is residual value available for distribution from WAC5B after Statutory Fees, Allowed Administrative Claims, and Allowed Priority Tax Claims are paid in full, each holder of an Allowed General Unsecured Claim against WAC5B shall receive Cash in the amount of its Pro Rata share of any such residual value.

31.     *General Unsecured Claims Against WAC15 (Class 15D)*

Only to the extent there is residual value available for distribution from the WAC15 after Statutory Fees, Allowed Administrative Claims, and Priority Tax Claims are paid in full, each Allowed General Unsecured Claim against WAC15 shall receive Cash in the amount of its Pro Rata share of any such residual value.

32.     *General Unsecured Claims Against WLIL (Class 16D)*

Only to the extent there is residual value available for distribution from WLIL after Statutory Fees, Allowed Administrative Claims, and Allowed Priority Tax Claims are paid in full, each holder of an Allowed General Unsecured Claim against WLIL shall receive Cash in the amount of its Pro Rata share of any such residual value.

33.     *General Unsecured Claims Against LuxCo (Class 17D)*

Only to the extent there is residual value available for distribution from LuxCo after Statutory Fees, Allowed Administrative Claims, and Allowed Priority Tax Claims are paid in full, each holder of an Allowed General Unsecured Claim against LuxCo shall receive Cash in the amount of its Pro Rata share of any such residual value.

34.     *General Unsecured Claims Against LuxCo Euro (Class 18D)*

Only to the extent there is residual value available for distribution from LuxCo Euro after Statutory Fees, Allowed Administrative Claims, and Priority Tax Claims are paid in full, each holder of an Allowed General Unsecured Claim against LuxCo Euro shall receive Cash in the amount of its Pro Rata share of any such residual value.

35.     *General Unsecured Claims Against Holdings (Class 19D)*

Only to the extent there is residual value available for distribution from Holdings after Statutory Fees, Allowed Administrative Claims, and Priority Tax Claims are paid in full, each holder of an Allowed General Unsecured Claim against Holdings shall receive Cash in the amount of its Pro Rata share of any such residual value.

36.     *General Unsecured Claims Against Services (Class 20D)*

Only to the extent there is residual value available for distribution from Services after Statutory Fees, Allowed Administrative Claims, and Priority Tax Claims are paid in full, each holder of an Allowed General Unsecured Claim against Services shall receive Cash in the amount of its Pro Rata share of any such residual value.

37.     *Intercompany Claims Against the Debtors (Class 1E through 20E)*

Holders of Intercompany Claims shall not receive or retain any property under the Plan on account of such Claims.

38.     *Other Interests (Class 1F through 18F, and 20F)*

Each Other Interest shall be Unimpaired because it shall be Reinstated on the Effective Date and shall be entitled to any residual value of the applicable Debtor after such Debtor repays in full all Allowed Claims against such Debtor.  Unless otherwise determined by the Plan Administrator, on the date that each  Debtor's case is closed in accordance with section 5.10 of the Plan, the Other Interests shall be deemed cancelled and of no further force and effect provided that such cancellation does not adversely impact the Debtors' Estates.

39.     *Holdings Interests (Class 19G)*

On the Effective Date, all of the Holdings Interests shall be surrendered, cancelled, and/or redeemed and new shares of Holdings' common stock shall be issued to the Plan Administrator (sufficient to give the Plan Administrator control over Holdings) who will hold such shares for the benefit of the former holdings of Holdings Interests with their former economic entitlements.  Each holder of a Holdings Interest shall neither receive nor retain any property or interest in property on account of such Holdings Interest.

## G.    MEANS FOR IMPLEMENTATION

1.     *Joint Chapter 11 Plan*

The Plan is a joint chapter 11 plan for each of the Debtors.

2.     *Severability*

The Plan for each Debtor shall be severable and independent from each other; provided however, that each of the WAC Groups' Plans may not be confirmed and the Effective Date shall not occur unless the Plan for each of the Parent Guarantors are confirmed and the Effective Date occurs simultaneously with the Confirmation Date and the Effective Date for the WAC Groups.  For the avoidance of doubt, the Plans for each of the WAC Groups shall be severable and independent from each other.

3.     *Plan Oversight Board*

a.     Appointment.

The Plan Oversight Board members shall be listed in the Plan Supplement.  If a member resigns from the Plan Oversight Board, the respective party that appointed such resigning member shall have the exclusive right to appoint a substitute member for the resigned member.

b.    <u>Authority</u>.

The Plan Oversight Board shall be responsible for overseeing and directing the Plan Administrator and his implementation and administration of the Plan; provided, however, that the Plan Administrator shall perform the day-to-day activities.    The specific terms of the Plan Oversight Board's supervision of the Plan Administrator will be set forth in the Plan Supplement.

4.    *Plan Administrator*

a.    <u>Appointment</u>.

William Transier shall serve as Plan Administrator for each of the Debtors, as of the Effective Date.

b.    <u>Authority</u>.

Subject to section 5.3 of the Plan, upon the Effective Date, the Plan Administrator shall have the authority and right on behalf of each of the Debtors, without the need for Bankruptcy Court approval (unless otherwise indicated), to carry out and implement all provisions of the Plan, including, without limitation, to:

(i)    subject to Bankruptcy Court approval when necessary, except to the extent Claims have been previously Allowed, control and effectuate the Claims reconciliation process, including to object to, seek to subordinate, compromise or settle any and all Claims against the Debtors;

(ii)    make Distributions to holders of Allowed Claims in accordance with the Plan;

(iii)    exercise his reasonable business judgment to direct and control the winddown, liquidation, sale and/or abandoning of the remaining assets of the Debtors under the Plan and in accordance with applicable law as necessary to maximize Distributions to holders of Allowed Claims;

(iv)    exercise his reasonable business judgment to direct and control the dissolution, liquidation, striking off, or similar action to wind down each of the Debtors and their direct and indirect non-Debtor wholly owned subsidiaries;

(v)    prepare, file, and prosecute any necessary filings and/or pleadings with the Bankruptcy Court to carry out the duties of the Plan Administer as described in the Plan;

(vi)    subject to Bankruptcy Court approval when necessary, prosecute all Causes of Action on behalf of the Debtors, elect not to pursue any Causes of Action, and determine whether and when to compromise,

settle, abandon, dismiss, or otherwise dispose of any such Causes of Action, as the Plan Administrator may determine is in the best interests of the Debtors;

(vii)    make payments to the Debtors' professionals (consistent with the terms of any Bankruptcy Court order approving such retention and subject to any applicable Bankruptcy Court approval requirements), as well as other professionals who may be engaged after the Effective Date;

(viii)   retain professionals to assist in performing his duties under the Plan;

(ix)     maintain the books and records and accounts of the Debtors;

(x)      invest Cash of the Debtors, including any Cash proceeds realized from the liquidation of any assets of the Debtors, including any Causes of Action, and any income earned thereon;

(xi)     incur and pay reasonable and necessary expenses in connection with the performance of duties under the Plan, including the reasonable fees and expenses of professionals retained by the Plan Administrator; provided, however, at least ten (10) business days prior to paying any professional invoice in excess of $50,000 from the Winddown Account, the Plan Administrator shall provide a copy of a summary invoice for such professional to the WAC Lenders;

(xii)    administer each Debtor's tax obligations, including (i) filing tax returns and paying tax obligations, (ii) requesting, if necessary, an expedited determination of any unpaid tax liability of each Debtor or its estate under Bankruptcy Code section 505(b) for all taxable periods of such Debtor ending after the Petition Date through the liquidation of such Debtor as determined under applicable tax laws, and (iii) representing the interest and account of each Debtor or its estate before any taxing authority in all matters including, without limitation, any action, suit, proceeding, or audit;

(xiii)   prepare and file any and all informational returns, reports, statements, returns, or disclosures relating to the Debtors that are required hereunder by any Governmental Unit or applicable law;

(xiv)    exercise any rights of the Debtors under the TSA and pay for such services;

(xv)     pay Statutory Fees and file reports in accordance with section 13.1 of the Plan; and

(xvi)    perform other duties and functions that are consistent with the implementation of the Plan.

    c.    <u>Indemnification</u>.

Each of the Debtors shall indemnify and hold harmless William Transier, solely in his capacity as the Plan Administrator for any losses incurred in such capacity, except to the extent such losses were the result of the Plan Administrator's fraud, gross negligence, willful misconduct or criminal conduct.

    5.    *Effectuating Documents; Further Transactions*

On and after the Effective Date, the Plan Administrator is authorized to and may issue, execute, deliver, file, or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan in the name of and on behalf of the Debtors, without the need for any approvals, authorization, or consents except for those expressly required pursuant to the Plan.

    6.    *Corporate Action*

Upon the Effective Date, by virtue of the solicitation of votes in favor of the Plan and entry of the Confirmation Order, all actions contemplated by the Plan (including any action to be undertaken by the Plan Administrator) shall be deemed authorized, approved, and, to the extent taken prior to the Effective Date, ratified without any requirement for further action by holders of Claims or Interests, the Debtors, or any other Entity or Person. All matters provided for in the Plan involving the corporate structure of the Debtors, and any corporate action required by the Debtors in connection therewith, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Debtors or the Estates.

    7.    *Withholding and Reporting Requirements*

    a.    *<u>Withholding Rights</u>*.

In connection with the Plan, any party issuing any instrument or making any distribution described in the Plan shall comply with all applicable tax withholding and reporting requirements imposed by any Governmental Unit, and all distributions pursuant to the Plan and all related agreements shall be subject to any such withholding or reporting requirements. Notwithstanding the foregoing, each holder of an Allowed Claim or any other Person that receives a distribution pursuant to the Plan shall have responsibility for any taxes imposed by any Governmental Unit, including, without limitation, income, withholding, and other taxes, on account of such distribution. Any party issuing any instrument or making any distribution pursuant to the Plan has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such tax obligations.

    b.    *<u>Forms</u>*.

Any party entitled to receive any property as an issuance or distribution under the Plan shall, upon request, deliver to the Plan Administrator or such other Person designated by the Plan Administrator (which entity shall subsequently deliver to the Plan Administrator or such other

Person any applicable IRS Form W-8 or Form W-9 received) an appropriate Form W-9 or (if the payee is a foreign Person) Form W-8, unless such Person is exempt under the tax code and so notifies the Plan Administrator or such other Person.  If such request is made by the Plan Administrator or such other Person designated by the Plan Administrator and the holder fails to comply before the date that is one-hundred and eighty (180) days after the request is made, the amount of such distribution shall irrevocably revert to the Debtors and any Claim in respect of such distribution shall be discharged and forever barred from assertion against any Debtor and its respective property.

8.       *Exemption from Certain Transfer Taxes*

To the maximum extent provided by section 1146(a) of the Bankruptcy Code, any post Confirmation sale by any Debtor, or any transfer from any Entity pursuant to, in contemplation of, or in connection with the Plan or pursuant to: (i) the issuance, distribution, transfer, or exchange of any debt, equity security, or other interest in the Debtors; or (ii) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instruments of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any stamp tax or similar tax, in each case to the extent permitted by applicable bankruptcy law, and the appropriate state or local government officials or agents shall forego collection of any such tax or governmental assessment and accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

9.       *Preservation of Rights of Action*

Other than Causes of Action against an Entity that are waived, relinquished, exculpated, released, compromised, or settled in the Plan or by a Bankruptcy Court order, the Debtors reserve any and all Causes of Action.  On and after the Effective Date, the Plan Administrator may pursue such Causes of Action, in consultation with the WAC Lenders prior to pursuit thereof.  No Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against them as any indication that the Debtors or the Plan Administrator will not pursue any and all available Causes of Action against them.  On and after the Effective Date, the Plan Administrator, shall have, including through its authorized agents or representatives, the exclusive right, and authority to initiate, file, prosecute, enforce, abandon, settle, compromise, release, withdraw, or litigate to judgment any such Causes of Action and to decline to do any of the foregoing without further notice to or action, order, or approval of the Bankruptcy Court.

10.      *Notice of Effective Date*

On the Effective Date, the Plan Administrator shall file a notice of the occurrence of the Effective Date with the Bankruptcy Court.

11.     *Deemed Substantive Consolidation of WAC Groups for Voting and Distribution Purposes*

On and after the Effective Date, solely for Distribution purposes (i) all assets and liabilities of each member of a WAC Group shall be treated as though they were pooled, (ii) each Claim filed or to be filed against any member of a WAC Group shall be deemed filed as a single Claim against, and a single obligation of, the WAC Group, (iii) any Claims on account of a guarantee provided by a Debtor within a WAC Group of the obligations of another member of the WAC Group shall be eliminated so that any Claim against any member of a WAC Group and any Claim based upon a guarantee thereof by any other member of a WAC Group shall be treated as one consolidated Claim against the WAC Group, and (iv) any joint or several liability of any of the members of a WAC Group shall be one obligation of the WAC Group and any Claims based upon such joint or several liability shall be treated as one consolidated Claim against the WAC Group.

The deemed substantive consolidation of the WAC Groups under the Plan shall not (other than for purposes related to funding Distributions under the Plan) affect (i) the legal and organizational structure of the Debtors, (ii) Executory Contracts that were entered into during the Chapter 11 Cases or that have been or will be assumed or rejected, (iii) the Debtors' ability to subordinate or otherwise challenge Claims on an entity-by-entity basis, (iv) any Causes of Action or defenses thereto, which in each case shall survive entry of the Confirmation Order as if there had been no substantive consolidation of the Estates of the WAC Groups, and (v) distributions to the Debtors from any insurance policies or the proceeds thereof. Notwithstanding the limited substantive consolidation called for in the Plan, each and every Debtor shall remain responsible for the payment of the Statutory Fees until each Debtor's particular case is closed, dismissed or converted. For the avoidance of doubt, nothing in section 5.11 of the Plan shall impact any General Unsecured Claim against a Debtor that is not part of a WAC Group.

12.     *Cooperation and Access*

From and after the Effective Date, in connection with any reasonable business purpose, or as is necessary in connection with implementing the Plan and administering the Chapter 11 Cases, the Plan Administrator will (a) afford the Plan Oversight Board access to the Plan Administrator, and the Debtors, properties, and books and records, and (b) furnish to the Plan Oversight Board financial and other information as may be reasonably necessary to assist the Plan Oversight Board.

13.     *Winddown Account*

On the Effective Date, the Debtors shall transfer all funds from the Old Winddown Account into the Winddown Account. The funds in the Winddown Account shall remain the property of the respective Debtors, subject to the WAC Lenders, WAC9 Lender, and WAC12 Lenders' reversionary interest in the funds. The Plan Administrator may use the funds in the Winddown Account to fund the expenses only of the respective Debtors and their non-Debtor wholly-owned direct and indirect subsidiaries incurred in conducting the activities described in Article VI of the Plan. Any funds remaining in the Winddown Account after the Debtors have completed the activities described in Article VI of the Plan shall be distributed by Holdings, on

behalf of the Debtors to the WAC Lenders, the WAC9 Lender, and the WAC12 Lenders in the proportion of funds each such lender contributed and/or agreed to allocate to the Winddown Account (including by contributing funds to the Old Winddown Account), as adjusted based on the actual direct costs and allocated costs (based on net book value) charged (or deemed to be charged) to the relevant Debtor entities in connection with amounts paid out of the Winddown Account.

Unless, otherwise agreed to between the WAC Lenders and the Plan Administrator, the Plan Administrator shall provide a monthly report to the WAC Lenders on the funds remaining in the Winddown Account and the recent disbursement activity from the Winddown Account.

14.    *Fee Reserve Account*

Notwithstanding anything to the contrary in the Plan, funds in the Fee Reserve Account shall not be distributed on account of any Claims or Interests other than to pay Allowed Fee Claims to the extent covered by the Carve Out; provided however, that upon payment of all amounts that are properly paid from the Fee Reserve Account, the Debtors shall distribute to each WAC Lender, WAC9 Lender, and WAC12 Lender in the proportion of funds each such lender contributed and/or agreed to allocate to the Fee Reserve Account, as adjusted based on the actual direct costs and allocated costs (based on net book value) charged (or deemed to be charged) to the relevant Debtor entities in connection with amounts paid out of the Fee Reserve Account. The funds in the Fee Reserve Account shall be free of all Liens, charges or other encumbrances and shall remain property of the respective Debtors.

15.    *Settlement of Certain Matters with Airbus*

Pursuant to sections 1123(a)(5) and 1123(b)(3) of the Bankruptcy Code and Bankruptcy Rule 9019, the Plan incorporates a comprehensive compromise and settlement by and among the Debtors, the WAC10 Administrative Agent, the WAC10 Security Trustee, and the WAC10 Lenders of issues and disputes relating to the Settled WAC10 Claims. In furtherance thereof, on the Effective Date of the Plan, Airbus Helicopters Financial Services Limited, for itself as lender, administrative agent and security trustee, shall make or otherwise permit the Debtors to transfer (as applicable) the WAC10 Winddown Payment into the Winddown Account in full and final satisfaction of the WAC10 Settled Claims. Upon deposit of the WAC10 Winddown Payment, the Debtors shall release any claim for any costs or expenses against the WAC10 Administrative Agent, the WAC10 Security Trustee, and the WAC10 Lenders with respect to the surcharge of their collateral pursuant to section 506(c) of the Bankruptcy Code or otherwise. The funds constituting the WAC10 Winddown Payment shall not (i) be subject to the Intercompany Protection Liens, the Intercompany Protection Claims, the DIP Liens, the DIP Superpriority Claims, the Adequate Protection Liens, or any claims, liens, or security interests granted to any other party (including the WAC Lenders and WAC Agents under the Non-Participating WAC Facilities) (each as defined in the Final DIP Order), (ii) constitute DIP Collateral (as defined in the Final DIP Order), (iii) constitute WAC Specific Collateral (as defined in the Final DIP Order), (iv) constitute WAC Collateral (as defined in the Final DIP Order), or (v) constitute Cash Collateral (as defined in the Final DIP Order).

Provided that, on or before the Effective Date, title to the aircraft constituting the WAC10 Collateral and related equipment or spare parts shall have been delivered to the WAC10 Administrative Agent, the WAC10 Security Trustee, and the WAC10 Lenders free and clear of any interests of the Debtors. The Plan accordingly represents a full, final, integrated, complete, and good faith compromise, settlement, release, and resolution of, among other matters, disputes and potential litigation among the Debtors, the WAC10 Administrative Agent, the WAC10 Security Trustee, and the WAC10 Lenders regarding the Settled WAC10 Claims, including: (i) the treatment under the Plan of the WAC10 Collateral, including the WAC10 Cash Collateral, and (ii) any Causes of Action arising out of the Final DIP Order that the Debtors could potentially assert against the WAC10 Administrative Agent, the WAC10 Security Trustee, and the WAC10 Lenders or any of their affiliates. This comprehensive compromise and settlement concerning such Settled WAC10 Claims will be binding on the Debtors, the WAC10 Administrative Agent, the WAC10 Security Trustee,  the WAC10 Lenders, any successor chapter 7 trustee, and the Plan Administrator. This comprehensive compromise and settlement is a fundamental part of the Plan. As such, the releases and settlements effected under the Plan will be operative as of the Effective Date and subject to enforcement by the Bankruptcy Court from and after the Effective Date.

16.    *Closing of the Chapter 11 Cases*

After the Chapter 11 Case of a Debtor has been fully administered, the Plan Administrator shall promptly seek authority from the Bankruptcy Court to close such Debtor's Chapter 11 Case in accordance with the Bankruptcy Code, the Bankruptcy Rules, and the Local Bankruptcy Rules.

Unless the Bankruptcy Court orders otherwise, within fourteen (14) days after any Debtor is fully administered, the Plan Administrator will file and serve upon the United States Trustee a closing report substantially in the form available on the Bankruptcy Court's website in accordance with Local Rule 3022-1.

## H.    CORPORATE GOVERNANCE

1.    *Corporate Form*

On the Effective Date, each of the Debtors shall maintain its current corporate form.

2.    *Boards of Directors and Officers*

The initial directors and officers of the Debtors after the Effective Date shall be included as part of the Plan Supplement. After the Effective Date, the Plan Administrator shall elect such additional directors and officers as the Plan Administrator deems necessary to implement the Plan and the actions contemplated therein. The Plan Administrator shall also have the power to act by written consent to remove any director or officer at any time with or without cause.

3.    *Corporate Existence*

After the Effective Date, the Plan Administrator shall take commercially reasonable actions as required, consistent with applicable non-bankruptcy law and consistent with the

implementation of the Plan, to dissolve, liquidate, strike off or take such other similar action with respect to each Debtor (including the cancellation of all Interests in the Debtor pursuant to the Confirmation Order) and complete the winding up of such Debtor as expeditiously as practicable without the necessity for any other or further actions to be taken by or on behalf of such Debtor or its shareholders or any payments to be made in connection therewith, subject to the filing of a certificate of dissolution with the appropriate governmental authorities or complying with the laws and procedures governing the winding down of any such Debtor that is organized under the laws of a jurisdiction outside of the United States; provided, however, that the foregoing does not limit the Plan Administrator's ability to otherwise abandon an Interest in a Debtor. The Plan Administrator may, to the extent required by applicable non-bankruptcy law, maintain a Debtor as a corporation in good standing until such time as all aspects of the Plan pertaining to such Debtor and the winding up of such Debtor is complete.

4.    *Certificates of Incorporation and Bylaws*

As of the Effective Date, the certificate of incorporation, operating agreement, by-laws, and any other organizational document, of the Debtors shall be amended to the extent necessary to carry out provisions of the Plan.

5.    *Winddown*

After the Effective Date, pursuant to the Plan, the Plan Administrator shall, as soon as practicable, commence steps to cause each Debtor to wind down, sell, and otherwise liquidate or abandon its assets, which steps shall be undertaken in a commercially reasonable manner and as expeditiously as practicable.

## I.    **DISTRIBUTIONS**

1.    *Distribution Record Date*

As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims or Interests as maintained by the Debtors or their respective agents, shall be deemed closed, and there shall be no further changes in the record of holders of any of the Claims or Interests. The Debtors or the Plan Administrator shall have no obligation to recognize any transfer of the Claims or Interests occurring on or after the Distribution Record Date.

2.    *Date of Distributions*

Except as otherwise provided in the Plan, the Debtors shall make the Initial Distribution to holders of Allowed Claims no later than the Initial Distribution Date, and thereafter the Plan Administrator shall from time to time determine the subsequent Distribution Dates. The Initial Distribution Date shall be on or a reasonable time after the Effective Date. In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

The Plan Administrator shall reserve an amount sufficient to pay holders of Disputed Claims the amount such holders would be entitled to receive under the Plan if such Claims were to become Allowed Claims. In the event the holders of Allowed Claims have not received payment in full on account of their Claims after the resolution of all Disputed Claims, then the Plan Administrator shall make a final distribution to all holders of Allowed Claims.

Notwithstanding anything to the contrary in the Plan, no holder of an Allowed Claim shall, on account of such Allowed Claim, receive a distribution in excess of the Allowed amount of such Claim plus any interest accruing on such Claim that is actually payable in accordance with the Plan.

Any (i) Transfer Tax Refunds (as defined in the Macquarie Purchase Agreement) or (ii) remaining amounts in the Transfer Tax Escrow Account (as defined in the Macquarie Purchase Agreement) shall be distributed in accordance with section 7.2 of the Plan after taking into account whether such funds are allocated to a specific aircraft.

3.      *Delivery of Distributions*

In the event that any distribution to any holder is returned as undeliverable, no distribution to such holder shall be made unless and until the Debtors or the Plan Administrator, as applicable, has determined the then current address of such holder, at which time such distribution shall be made to such holder without interest; provided that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of six (6) months from the applicable Distribution Date is made. After such date, all unclaimed property or interests in property shall revert (notwithstanding any applicable federal or state escheat, abandoned, or unclaimed property laws to the contrary) to the Debtors automatically and without need for a further order by the Bankruptcy Court for distribution in accordance with the Plan and the Claim of any such holder to such property or interest in property shall be released, settled, compromised, and forever barred.

4.      *Allocation of Distributions Between Principal and Interest*

Except as otherwise provided in the Plan, to the extent that any Allowed Claim entitled to a distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such distribution shall be allocated to the principal amount (as determined for U.S. federal income tax purposes) of the Claim first, and then to accrued but unpaid interest.

5.      *Payment of Disputed Claims*

As Disputed Claims are resolved pursuant to Article VIII of the Plan, the Plan Administrator shall make distributions on account of such Disputed Claims as if such Disputed Claims were Allowed Claims as of the Effective Date. Such distributions shall be made on the first Distribution Date that is at least forty-five (45) days after the date on which a Disputed Claim becomes an Allowed Claim, or on an earlier date selected by the Plan Administrator in the Plan Administrator's sole discretion.

**J.**    **PROCEDURES FOR DISPUTED CLAIMS**

1.    *Allowance of Claims*

After the Effective Date, the Debtors or the Plan Administrator shall have and shall retain any and all rights and defenses that the Debtors had with respect to any Claim, except with respect to any Claim deemed Allowed under the Plan.  Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases prior to the Effective Date (including, without limitation, the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed under the Plan or the Bankruptcy Code, or the Bankruptcy Court has entered a Final Order, including, without limitation, the Confirmation Order, in the Chapter 11 Cases allowing such Claim.

2.    *Objections to Claims*

As of the Effective Date, objections to, and requests for estimation of, Claims against the Debtors may be interposed and prosecuted only by the Plan Administrator.  Such objections and requests for estimation shall be served and filed (i) on or before the 75th day following the later of (a) the Effective Date and (b) the date that a proof of Claim is filed or amended or a Claim is otherwise asserted or amended in writing by or on behalf of a holder of such Claim or (ii) such later date as ordered by the Bankruptcy Court upon a motion filed by the Plan Administrator.

3.    *Estimation of Claims*

The Plan Administrator may at any time request that the Bankruptcy Court estimate any contingent, unliquidated, or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtors or the Plan Administrator previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection.  In the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim, the amount so estimated shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court.  If the estimated amount constitutes a maximum limitation on the amount of such Claim, the Debtors or Plan Administrator, as applicable, may pursue supplementary proceedings to object to the allowance of such Claim.  All of the aforementioned objection, estimation, and resolution procedures are intended to be cumulative and not exclusive of one another.  Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

4.    *No Distributions Pending Allowance*

If an objection to a Claim is filed as set forth in section 8.2 of the Plan, no payment or distribution provided under the Plan shall be made on account of such Claim unless and until such Disputed Claim becomes an Allowed Claim.

5.      *Resolution of Claims*

Except as otherwise provided in the Plan, the Confirmation Order, or in any contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan, in accordance with section 1123(b) of the Bankruptcy Code, the Plan Administrator shall retain and may enforce, sue on, settle, or compromise (or decline to do any of the foregoing) all Claims, Disputed Claims, rights, Causes of Action, suits and proceedings, whether in law or in equity, whether known or unknown, that the Debtors or their Estates may hold against any Person, without the approval of the Bankruptcy Court.  The Plan Administrator or its successor may pursue such retained Claims, rights, Causes of Action, suits or proceedings, as appropriate, in accordance with the best interests of the Debtors.

6.      *Disallowed Claims*

All Claims held by Persons or entities against whom or which any of the Debtors or the Plan Administrator has commenced a proceeding asserting a Cause of Action under sections 542, 543, 544, 545, 547, 548, 549, and/or 550 of the Bankruptcy Code shall be deemed "Disallowed" Claims pursuant to section 502(d) of the Bankruptcy Code and holders of such Claims shall not be entitled to vote to accept or reject the Plan.  Claims that are deemed Disallowed pursuant to section 8.6 of the Plan shall continue to be Disallowed for all purposes until the Avoidance Action against such party has been settled or resolved by Final Order and any sums due to the Debtors or the Plan Administrator from such party have been paid.

## K.    **EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

1.      *Rejection of Executory Contracts and Unexpired Leases*

On the Effective Date, except as otherwise provided in the Plan, each Executory Contract not previously rejected, assumed, or assumed and assigned shall be deemed automatically rejected pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such Executory Contract: (i) is identified for assumption in the Plan Supplement; (ii) as of the Effective Date is subject to a pending motion to assume such Executory Contract; (iii) is a contract, instrument, release, indenture, or other agreement or document entered into in connection with the Plan; or (iv) is a D&O Policy.

2.      *Cure of Defaults for Assumed Executory Contracts and Unexpired Leases*

Any Cure due under each Executory Contract to be assumed pursuant to the Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment in Cash on the Effective Date, subject to the limitation described in the Plan, by the Debtors, or on such other terms as the parties to such Executory Contracts may otherwise agree.

In the event of a dispute regarding (i) the amount of the Cure, (ii) the ability of the Debtors or any other applicable assignee to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under the Executory Contract or Unexpired Lease, or (iii) any other matter pertaining to assumption or assumption and assignment (as applicable), the obligations of section 365 of the Bankruptcy Code shall be deemed satisfied following the entry of a Final Order or orders resolving the dispute and approving the assumption

or assumption and assignment (as applicable); provided, however, that the Debtors or the Plan Administrator (as applicable) may settle any dispute regarding the amount of any Cure without any further notice to any party or any action, order, or approval of the Bankruptcy Court.

Assumption of any Executory Contract pursuant to the Plan, or otherwise, shall result in the full release and satisfaction of any defaults, subject to satisfaction of the Cure, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed Executory Contract at any time before the Effective Date of assumption and/or assignment.

3.      *Claims Based on Rejection of Executory Contracts and Unexpired Leases*

Unless otherwise provided by an order of the Bankruptcy Court, any proofs of Claim based on the rejection of the Debtors' Executory Contracts pursuant to the Plan must be filed with the Bankruptcy Court and served on the Plan Administrator no later than fourteen (14) days after the effective date of rejection of such Executory Contract; provided, however, that the effective date of any Executory Contracts rejected under the Plan shall be the Effective Date.

Any holders of Claims arising from the rejection of an Executory Contract for which proofs of Claims were not timely filed as set forth in the paragraph above shall not (i) be treated as a creditor with respect to such Claim, (ii) be permitted to vote to accept or reject the Plan on account of any Claim arising from such rejection, or (iii) participate in any distribution in the Chapter 11 Cases on account of such Claim, and any Claims arising from the rejection of an Executory Contract not filed with the Bankruptcy Court within such time will be automatically Disallowed, forever barred from assertion, and shall not be enforceable against the Debtors, the Plan Administrator, the Estates, or the property for any of the foregoing without the need for any objection by the Plan Administrator or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract shall be deemed fully compromised, settled, and released, notwithstanding anything in the Schedules or a proof of claim to the contrary.  All Allowed Claims arising from the rejection of the Debtors' prepetition Executory Contracts shall be classified as General Unsecured Claims, except as otherwise provided by order of the Bankruptcy Court.

4.      *Modifications, Amendments, Supplements, Restatements, or Other Agreements*

Unless otherwise provided in the Plan, each Assumed Executory Contract shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract, and all Executory Contracts related thereto, if any, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously rejected or repudiated or is rejected or repudiated under the Plan.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract, or the validity, priority, or amount of any Claims that may arise in connection therewith.

5.      *Insurance Policies for Directors and Officers*

Notwithstanding anything to the contrary in the Plan, each insurance policy, including any D&O Policies to which the Debtors are a party as of the Effective Date, shall be deemed executory and shall be assumed by the Debtors on behalf of the applicable Debtor effective as of the Effective Date, pursuant to sections 365 and 1123 of the Bankruptcy Code, unless such insurance policy previously was assumed and assigned to Macquarie, was rejected by the Debtors pursuant to a Bankruptcy Court order, or is the subject of a motion to reject pending on the Effective Date, and coverage for defense and indemnity under the D&O Policy shall remain available to all individuals within the definition of "Insured" in the D&O Policy.

In addition, after the Effective Date, all officers, directors, agents, or employees who served in such capacity at any time before the Effective Date shall be entitled to the full benefits of any D&O Policy (including any "tail" policy) in effect or purchased as of the Effective Date for the full term of such policy regardless of whether such officers, directors, agents, and/or employees remain in such positions at or after the Effective Date, in each case, to the extent set forth in such policies.

6.      *Survival of Debtors' Indemnification Obligations*

Subject to the applicable limits in the Debtors' D&O Policies, to the fullest extent permitted by applicable law, any obligations of the Debtors pursuant to their corporate charters, by-laws, limited liability company agreements, memorandum and articles of association, or other organizational documents and agreements to indemnify current and former officers, directors, agents, or employees with respect to all present and future actions, suits, and proceedings against the Debtors or such officers, directors, agents, or employees based upon any act or omission for or on behalf of the Debtors shall not be discharged, impaired, or otherwise affected by the Plan; provided that the Debtors shall not indemnify officers, directors, agents, or employees of the Debtors for any claims or Causes of Action arising out of or relating to any act or omission (i) that is a criminal act unless such officer, director, agent, or employee had no reasonable cause to believe its conduct was unlawful; (ii) that is determined by a Final Order to be the result of fraud, gross negligence, or willful misconduct; or (iii) for any other acts or omissions that are excluded under the terms of the foregoing organizational documents.  All such obligations shall be deemed and treated as executory contracts to be assumed by the Debtors under the Plan unless such obligation previously was assumed and assigned to the Purchaser, was rejected by the Debtors pursuant to a Bankruptcy Court order, or is the subject of a motion to reject pending on the Effective Date.

7.      *Reservation of Rights*

The exclusion nor inclusion of any contract or lease in the Plan Supplement or anything contained in the Plan, shall not constitute an admission by the Debtors that any such contract or lease is in fact an Executory Contract or that the Estates have any liability thereunder. In the event of a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Debtors or the Plan Administrator, as applicable, shall have sixty (60) days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease as otherwise provided in the Plan.

L.    **CONDITIONS PRECEDENT TO EFFECTIVE DATE**

1.    *Conditions Precedent to Effective Date*

The occurrence of the Effective Date of the Plan is subject to the following conditions precedent:

a.    the Bankruptcy Court shall have entered the Confirmation Order, the Confirmation Date shall have occurred, and the Confirmation Order shall not be subject to any stay, reversal, or vacatur;

b.    any unpaid DIP Claims and Adequate Protection Claims (to the extent Allowed) have been paid or otherwise satisfied in full; and

c.    all actions, documents, and agreements necessary to implement and consummate the Plan shall have been effected or executed and binding on all parties thereto.

2.    *Effect of Failure of Conditions Precedent to Effective Date*

If the conditions listed in section 10.1 of the Plan are not satisfied on or before the first Business Day that is more than sixty (60) days after the date on which the Confirmation Order is entered or by such later date as set forth by the Debtor in a notice filed with the Bankruptcy Court prior to the expiration of such period, upon filing a notice with the Bankruptcy Court the Debtors may deem the Plan null and void in all respects, and in such a case nothing contained in the Plan or the Disclosure Statement shall (i) constitute a waiver or release of any Claims by or against or any Interests in the Debtor, (ii) prejudice in any manner the rights of any Entity, or (iii) constitute an admission, acknowledgement, offer, or undertaking by the Debtors or any other Entity.

M.    **EFFECTS OF CONFIRMATION**

1.    *Vesting of Assets*

On the Effective Date, pursuant to section 1141(b) of the Bankruptcy Code, all property of the Estates, including the Debtors' rights under the Purchase Agreements and the TSA, shall vest in the Debtors.

2.    *Subordinated Claims*

The allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise. Pursuant to section 510 of the Bankruptcy Code, the Debtors reserve the right for the Plan Administrator to reclassify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

3.      *Binding Effect*

As of the Effective Date, the Plan shall bind all holders of Claims against and Interests in the Debtor and their respective successors and assigns, notwithstanding whether any such holders were (i) Impaired or Unimpaired under the Plan, (ii) deemed to accept or reject the Plan, (iii) failed to vote to accept or reject the Plan, or (iv) voted to reject the Plan.

4.      *Term of Injunctions or Stays*

Unless otherwise provided in the Plan, the Confirmation Order, or in a Final Order of the Bankruptcy Court, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

5.      ***Estate Releases***

**As of the Effective Date, except as otherwise expressly provided in the Plan, the Macquarie Sale Order, or the Confirmation Order, and to the fullest extent authorized by applicable law, for good and valuable consideration, the adequacy of which is hereby confirmed, any Debtor Released Party[12] is deemed released by the Debtors, each of the Debtors' current direct and indirect wholly-owned non-debtor subsidiaries (with respect to non-Debtors, to the extent permitted by applicable law), the respective Estates and any Person or entity, seeking to exercise the rights of the Debtors or their Estates and their respective property (and each such Debtor Released Party shall be deemed released by each Debtor and its Estate and their respective property) from any and all Claims, obligations, suits, judgments, damages, demands, debts, remedies, Causes of Action, rights of setoff, other rights, and liabilities whatsoever, whether for tort, contract, violations of federal or state securities laws, avoidance actions, including any derivative claims, asserted or that could possibly have been asserted directly or indirectly, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity, or otherwise, and any and all Causes of Action asserted or that could possibly have been asserted, based on or in any way relating to, or in any manner arising from, in whole or in part, the Debtors, their Estates, or their Affiliates, the conduct of the Debtors' business, the formulation, preparation, solicitation, dissemination, negotiation, or filing of the Forbearance Agreements, the Purchase Agreements, the Disclosure Statement or Plan or any contract, instrument, release, or other agreement or document created or entered into in connection with or pursuant to, the Forbearance Agreements, the Purchase Agreements, the Disclosure Statement, the Plan, the filing and prosecution of the Chapter 11 Cases, the pursuit of consummation of the Plan, the subject matter of, or the transactions or events giving rise to, any Claim or Interest that is treated in the Plan, the business or contractual arrangements between the Debtors, their Estates, or**

---

[12] **"Debtor Released Party"** means all holders of Claims who vote to accept the Plan, as well as all of the Released Parties (as defined in section 1.82 of the Plan and restated in footnote 13 herein); provided, however, that the holder of a Claim (other than a Debtor or a wholly-owned direct or indirect subsidiary of a Debtor) who is deemed to have accepted the Plan, but does not actually vote to accept the Plan, shall not be a Debtor Released Party.

their Affiliates, on the one hand, and any Debtor Released Party, on the other hand, or any other act or omission, transaction, agreement, event, or other occurrence taking place before the Confirmation Date; provided that to the extent that a Claim or Cause of Action is determined by a Final Order to have resulted from fraud, gross negligence, or willful misconduct of a Debtor Released Party, such Claim or Cause of Action shall not be so released against such Debtor Released Party and a party alleging fraud, gross negligence, or willful misconduct on the part of a Debtor Released Party shall not be prevented from pursuing such an action; provided further, that any Released Parties who served the Debtors in a role described in clause (v) of the definition of "Released Parties" shall only be released by section 11.5(a) of the Plan if such Released Party served in such role on or after the Petition Date; provided further, that the releases set forth in section 11.5(a) of the Plan shall not release any conduct, Causes of Action, or Claims arising on or before June 1, 2018; provided further, to the extent that the Debtors or the Plan Administrator (as applicable) holds a Cause of Action or Claim not released by section 11.5(a) of the Plan, the Debtors and the Plan Administrator may only seek to recover from any Released Party to the extent of any available D&O Policy proceeds.  Notwithstanding anything to the contrary in the foregoing, the releases above do not release the Debtors' Claims, obligations, suits, judgments, damages, demands, debts, remedies, Causes of Action, rights of setoff, other rights, and liabilities under any of the Purchase Agreements, the TSA, or any other agreements entered into by the Debtors after the Petition Date.

As the Debtors will demonstrate in connection with confirmation of the Plan, the Debtors have concluded that the estate releases in the Plan are justified due to, among other things, the substantial contributions by the Debtor Released Parties to the successful sales of the Debtors' assets and the confirmation of the Plan; the probable lack of value of any Causes of Action or Claims against the Debtor Released Parties; the need for continued support from current officers and directors and former employees, officers, and directors to conclude the Debtors' winddown as efficiently and inexpensively as possible; and the benefits to the Debtors' efforts to wind down under non-bankruptcy law afforded by the elimination of indemnification claims and claims of creditors who vote in favor of the Plan (and thus provide a consensual release of the Debtors, their Affiliates, and certain of their other related parties).  In short, the Debtors believe that the estate releases will benefit the Debtors' Estates by enhancing the likelihood of the quickest and most cost-effective winddown of the Debtors and their non-Debtor affiliates, which in turn will increase the likelihood that there will be funds remaining from the Winddown Account to return to the WAC Lenders, the WAC9 Lender, and the WAC12 Lenders following the conclusion of the winddown.

6.      *Releases by Holders of Claims and Interests*

Effective as of the Effective Date, the Releasing Parties[13] shall be deemed to provide a full release to the Released Parties[14], and their respective property, from any and all Claims, obligations, suits, judgments, damages, demands, debts, remedies, Causes of Action, rights of setoff, other rights, and liabilities whatsoever, whether for tort, contract, violations of federal or state securities laws, avoidance actions, including any derivative claims, asserted or that could possibly have been asserted directly or indirectly, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, existing or hereafter arising, in law, equity, or otherwise, and any and all Causes of Action asserted or that could possibly have been asserted, based on or in any way relating to, or in any manner arising from, in whole or in part, the Debtors, their Estates or their Affiliates, the conduct of the Debtors' business, the formulation, preparation, solicitation, dissemination, negotiation, or filing of the Forbearance Agreements, the Purchase Agreements, the Disclosure Statement or Plan or any contract, instrument, release, or other agreement or document created or entered into in connection with or pursuant to the Purchase Agreements, the Disclosure Statement, the Plan, the filing and prosecution of the Chapter 11 Cases, the pursuit of consummation of the Plan, the subject matter of, or the transactions or events giving rise to, any claim or equity interest that is treated in the Plan, the business or contractual arrangements between the Debtors, their Estates or their Affiliates, on the one hand, and any Released Party, on the other hand, or any other act or omission, transaction, agreement, event, or other occurrence taking place before the

---

[13] "Releasing Parties" means collectively and in each case in their capacity as such, (i) the WAC Agents (except to the extent the Required Lenders under the applicable WAC Facility vote to reject the Plan); (ii) the Steering Committee; and (iii) all holders of Claims who vote to accept the Plan; provided, however, that the holder of a Claim (other than a Debtor or a wholly-owned direct or indirect subsidiary of a Debtor) who is deemed to have accepted the Plan, but does not actually vote to accept the Plan, shall not be a Releasing Party.

[14] "Released Parties" means collectively and in each case in their capacity as such, (i) the Debtors; (ii) the WAC Agents (except to the extent the Required Lenders under the applicable WAC Facility vote to reject the Plan); (iii) the WAC Lenders that vote to accept the Plan; (iv) the Steering Committee; and (v) with respect to each of the foregoing (i) through (iv), their respective current and former predecessors, successors and assigns, subsidiaries, and Affiliates, and its and their officers, directors, members, managers, employees, agents, financial advisors, attorneys, accountants, investment bankers, consultants, representatives, management companies, and other professionals, and such persons' respective heirs, executors, estates, servants, and nominees; provided, however, that former officers of the Debtors listed in clause (v) who are related to the Debtors and who have pending or threatened litigation (including Causes of Action for breach of contract or breach of fiduciary duty, whether or not asserted in proofs of claim for rejection damages, but excluding Claims related to indemnification, reimbursement, or other ordinary course obligations of the Debtors) against the Debtors, their Affiliates, officers, directors, principals, shareholders, members, managers, partners, or employees shall not constitute Released Parties for any capacity in which they may have served the Debtors.

The Debtors' ultimate parent, Holdings, is owned by shareholders rather than by members or managers. *See* Section II.B.2. of this Disclosure Statement. Within the Debtors' capital structure, certain Debtors are controlled by a member or by managers. Services is a member-managed limited liability company, with WLIL controlling Services as its sole member. The other limited liability companies within the Debtors' capital structure are manager-managed, so that those Debtors are controlled by boards of managers that operate indistinguishably from the boards of directors controlling the other Debtors. Further, the Debtors in certain foreign jurisdictions, such as those formed as Société à Responsabilité Limitée entities under the laws of Luxembourg, have managers whose controlling roles are indistinguishable from those of the directors controlling the other Debtors.

**Confirmation Date; provided that to the extent that a Claim or Cause of Action is determined by a Final Order to have resulted from fraud, gross negligence, or willful misconduct of a Released Party, such Claim or Cause of Action shall not be so released against such Released Party and a party alleging fraud, gross negligence, or willful misconduct on the part of a Debtor Released Party shall not be prevented from pursuing such an action; provided further, that any Released Parties who served the Debtors in a role described in clause (v) of the definition of "Released Parties" shall only be released by section 11.5(b) of the Plan if such Released Party served in such role on or after the Petition Date; provided further, that the releases set forth in section 11.5(b) of the Plan shall not release any conduct, Causes of Action, or Claims arising on or before June 1, 2018; provided further, to the extent that a Releasing Party holds a Cause of Action or Claim not released by section 11.5(b) of the Plan, such Releasing Party may only seek to recover from any Released Party to the extent of any available D&O Policy proceeds. The releases set forth above (i) do not release any post-Effective Date obligations of any party or Entity under the Plan; (ii) are applicable only to the maximum extent permitted by law; and (iii) do not release any Releasing Party's Claims, obligations, suits, judgments, damages, demands, debts, remedies, Causes of Action, rights of setoff, other rights, and liabilities under any of the Purchase Agreements, the TSA, or any other agreements entered into by the Debtors after the Petition Date.**

**All releases to be provided by the Releasing Parties are consensual, as they will only be granted by holders of Claims who actually vote to accept the Plan. Any holders of Claims who vote against the Plan or fail to vote at all (even if such holders of Claims are deemed to accept the Plan) will not be included as a Releasing Party. While the Debtors strongly recommend that all holders of Claims entitled to vote under the Plan vote to accept the Plan, each holder of Claims entitled to vote should review the release provisions of the Plan carefully.**

7.    *Exculpation*

To the extent permitted by section 1125(e) of the Bankruptcy Code, notwithstanding anything in the Plan to the contrary, and to the maximum extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party is hereby released and exculpated from, any Claim, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, remedy, loss, and liability for any Claim in connection with or arising out of the administration of the Chapter 11 Cases; the negotiation, formulation, preparation, and pursuit of the Purchase Agreements, the Disclosure Statement, the Plan, and the solicitation of votes for, and confirmation of, the Plan; the funding and consummation of the Plan, and any related agreements, instruments, and other documents (in each case in furtherance of the foregoing); the solicitation of votes on the Plan; the making of Distributions under the Plan; the occurrence of the Effective Date; negotiations regarding or concerning any of the foregoing, or the administration of the Plan or property to be distributed under the Plan, except for actions determined by Final Order to constitute willful misconduct or fraud. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable law or rules protecting such Exculpated Parties from liability. Notwithstanding anything to the contrary in the foregoing, the exculpation shall not release any party's Claims, obligations, suits, judgments, damages, demands, debts, remedies, Causes of Action, rights of setoff, other rights, and liabilities under any of the

Purchase Agreements, the TSA, or the Plan.  Nothing in the Plan shall limit the liability of attorneys to their respective clients pursuant to Rule 1.8(h) of the New York Rules of Professional Conduct.

8.    *Injunction*

a.    <u>Injunction Against Asserting Claims of Debtors</u>.

On and after the Effective Date, all Persons and entities other than the Plan Administrator are permanently enjoined from commencing or continuing in any manner any action or proceeding (whether directly, indirectly, derivatively, or otherwise) on account of or respecting any Claim, debt, right, or Cause of Action of the Debtors for which a Debtor retains sole and exclusive authority to pursue in accordance with the Plan.

b.    <u>Injunctions Against Interference with or Consummation or Implementation of the Plan</u>.

Except as provided in the Plan, upon the Effective Date, all Persons shall be enjoined from commencing or continuing any judicial or administrative proceeding, employing any process, or taking any action whatsoever against the Debtors, the Estates, or the Plan Administrator that interferes with the consummation and implementation of the Plan, including the transfers, payments, and Distributions to be made in accordance with the Plan.  For the avoidance of doubt, nothing in section 11.7 of the Plan shall act as a release of any Claims or Causes of Action; provided, however, the Bankruptcy Court shall retain the authority, after notice and a hearing, to lift the injunction set forth in section 11.7 of the Plan (to the extent necessary) upon request from any Person who holds a Claim or Cause of Action not released, discharged, waived, or otherwise satisfied under the Plan.

9.    *Waiver of Statutory Limitation on Releases*

Each Debtor and Releasing Party expressly acknowledges that although ordinarily a general release may not extend to Claims which a releasing party does not know or suspect to exist in its or their favor, which if known by it may have materially affected its settlement with the party released, such Debtor or Releasing Party has carefully considered and taken into account in determining to enter into the above releases the possible existence of such unknown losses or claims.  Without limiting the generality of the foregoing, each Debtor or Releasing Party expressly waives any and all rights conferred upon it by any statute or rule of law which provides that a release does not extend to claims which the claimant does not know or suspect to exist in its favor at the time of executing the release, which if known by it may have materially affected its settlement with the Released Party, including the provisions of California Civil Code Section 1542. The releases contained in of the Plan are effective regardless of whether those released matters are presently known, unknown, suspected or unsuspected, foreseen or unforeseen.

10.    *Retention of Causes of Action/Reservation of Rights*

Except as otherwise provided in the Plan, nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, Claims, Causes of Action, rights of setoff or recoupment, or other legal or equitable defenses that the Debtor had immediately prior to the Effective Date on behalf of the Estate or itself in accordance with any

provision of the Bankruptcy Code or any applicable non-bankruptcy law, including, without limitation, any affirmative Causes of Action against parties with a relationship with the Debtor, other than the Released Parties and the Debtor Released Parties.  Following the Effective Date, the Plan Administrator shall have, retain, reserve, and be entitled to assert all such Claims, Causes of Action, rights of setoff or recoupment, and other legal or equitable defenses as fully as if the Chapter 11 Cases had not been commenced, and all of the Debtors' legal and equitable rights in respect of any Unimpaired Claim may be asserted after the Confirmation Date and the Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.

11.    *Retention of Jurisdiction*

On and after the Effective Date, the Bankruptcy Court shall retain non-exclusive jurisdiction over all matters arising in, arising under, and related to the Chapter 11 Cases for, among other things, the following purposes:

a.    to hear and determine motions and/or applications for the assumption or rejection of executory contracts or unexpired leases, and the allowance, classification, priority, compromise, estimation, or payment of Claims resulting therefrom;

b.    to determine any motion, adversary proceeding, application, contested matter, and other litigated matter pending on or commenced after the Confirmation Date;

c.    to ensure that distributions to holders of Allowed Claims are accomplished as provided for in the Plan and Confirmation Order and to adjudicate any and all disputes arising from or relating to distributions under the Plan;

d.    to consider the allowance, classification, priority, compromise, estimation, or payment of any Claim;

e.    to enter, implement, or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

f.    to issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Entity with the consummation, implementation, or enforcement of the Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

g.    to hear and determine any application to modify the Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in the Plan, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

h.    to hear and determine all Fee Claims;

i.      to hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, or any agreement, instrument, or other document governing or relating to any of the foregoing;

j.      to take any action and issue such orders as may be necessary to construe, interpret, enforce, implement, execute, and consummate the Plan;

k.      to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

l.      to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code);

m.      to hear, adjudicate, decide, or resolve any and all matters related to Article XI of the Plan, including, without limitation, the releases, exculpations, and injunctions issued thereunder;

n.      to resolve disputes concerning Disputed Claims or the administration thereof;

o.      to hear and determine any other matters related to the Plan and not inconsistent with the Bankruptcy Code and title 28 of the United States Code;

p.      to enter a final decree closing the Chapter 11 Cases;

q.      to recover all assets of the Debtors and property of the Debtors' Estates, wherever located;

r.      to hear and determine any rights, Claims, or Causes of Action held by or accruing to the Debtors pursuant to the Bankruptcy Code or pursuant to any federal statute or legal theory; and

s.      to hear and resolve any dispute over the application to any Claim of any limit on the allowance of such Claim set forth in sections 502 or 503 of the Bankruptcy Code, other than defenses or limits that are asserted under non-bankruptcy law pursuant to section 502(b)(1) of the Bankruptcy Code.

To the extent that the Bankruptcy Court does not otherwise have jurisdiction over the non-Debtor affiliates, nothing in this Plan shall confer such jurisdiction.

N.    **MISCELLANEOUS PROVISIONS**

1.    *Post-Confirmation Reporting*

Following the Effective Date, the Plan Administrator will submit to the Bankruptcy Court such periodic post-Confirmation reports as required by Local Rule 3021-1.  After the Effective Date, in accordance with the Guidelines established by the United States Trustee, the Plan Administrator will file quarterly operating reports with the Bankruptcy Court.

2.    *Request for Expedited Determination of Taxes*

The Debtors or the Plan Administrator, as applicable, shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns filed, or to be filed, for any and all taxable periods ending after the Petition Date through dissolution.

3.    *Amendments*

a.    Plan Modifications.

The Debtors reserve the right, in accordance with the Bankruptcy Code and the Bankruptcy Rules, to amend or modify the Plan prior to the entry of the Confirmation Order, including amendments or modifications to satisfy section 1129(b) of the Bankruptcy Code, and  after entry of the Confirmation Order, the Debtors may, upon order of the Bankruptcy Court, amend, modify, or supplement the Plan in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by law, in each case without additional disclosure pursuant to section 1125 of the Bankruptcy Code.  In addition, after the Confirmation Date, so long as such action does not materially and adversely affect the treatment of holders of Allowed Claims or Allowed Interests pursuant to the Plan, the Debtors, without the need for Bankruptcy Court approval, may remedy any defect or omission or reconcile any inconsistencies in the Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes or effects of the Plan, and any holder of a Claim or Interest that has accepted the Plan shall be deemed to have accepted the Plan as amended, modified, or supplemented.

b.    Plan Treatment Modifications.

Notwithstanding the treatment of Classes 1D, 3D, 6D, 7D, and 8D, in the event the Debtors identify any unencumbered distributable value at one or more Debtors within WAC Groups 1, 3, 6, 7, or 8, the Debtors shall amend the Plan to provide for a distribution to holders of Allowed General Unsecured Claims against the relevant Debtor entity that owns such distributable value, to the extent there is any residual value available for distribution after Allowed Administrative Expense Claims, Allowed Priority Tax Claims, and Allowed Priority Non-Tax Claims are paid in full.

      c.      <u>Other Amendments</u>.

Before the Effective Date, the Debtors may make appropriate technical adjustments and modifications to the Plan and the documents contained in the Plan Supplement without further order or approval of the Bankruptcy Court.

4.     *WAC Agent Retainers*

Upon the occurrence of the Effective Date, the automatic stay applicable pursuant to section 362 of the Bankruptcy Code shall be terminated with respect to any retainers received by the WAC Agents, and shall not preclude the applicable WAC Agent from taking any action it deems necessary or appropriate to realize upon such retainers received.

5.     *Revocation or Withdrawal of Plan*

The Debtors reserve the right to revoke or withdraw the Plan, including the right to revoke or withdraw the Plan for any Debtor or all Debtors, prior to the Confirmation Date. If the Debtors revoke or withdraw the Plan, or if Confirmation or Consummation does not occur, then: (i) the Plan shall be null and void in all respects; (ii) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Interest or Class of Claims or Interests), assumption or rejection of Executory Contracts effected by the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (iii) nothing contained in the Plan shall (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of the Debtors, the Estates, or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by the Debtors, the Estates, or any other Entity.

6.     *Severability of Plan Provisions*

If, before the entry of the Confirmation Order, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors, shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is (a) valid and enforceable pursuant to its terms, (b) integral to the Plan and may not be deleted or modified without the consent of the Debtors or the Plan Administrator (as the case may be), and (c) subject to section 5.2 of the Plan, nonseverable and mutually dependent.

7.     *Governing Law*

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit hereto or a schedule in the Plan Supplement provides otherwise, the rights, duties, and obligations arising under the Plan shall be governed by, and construed and enforced in

accordance with, the laws of the State of New York, without giving effect to the principles of conflict of laws thereof.

8.    *Immediate Binding Effect*

Notwithstanding Bankruptcy Rules 3020(e), 6004(h), 7062, or otherwise, upon the occurrence of the Effective Date, the terms of the Plan and Plan Supplement shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Debtors, the holders of Claims and Interests, the Released Parties, the Exculpated Parties and each of their respective successors and assigns, including, without limitation, the Plan Administrator.

9.    *Successors and Assigns*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or permitted assignee, if any, of each Entity.

## VI.

## CERTAIN RISK FACTORS AFFECTING THE DEBTORS

Parties in interest should read and carefully consider the following risk factors, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith and/or incorporated by reference herein), before deciding whether to vote to accept or to reject the Plan.

## A.    <u>NON-CONFIRMATION OF THE PLAN</u>

Although the Debtors believe that the Plan will satisfy all requirements necessary for Confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion, that modifications of the Plan will not be required for Confirmation, or that such modifications would not necessitate re-solicitation of votes. Finally, there can be no assurances that the Plan will receive sufficient votes for Confirmation.

The Bankruptcy Code requires that a chapter 11 plan comply with certain requirements (including, but not limited to, the requirements of section 1129 of the Bankruptcy Code) in order to be confirmed. The Bankruptcy Court may determine that one or more of those requirements is not satisfied with respect to the Plan. If the Bankruptcy Court makes such a determination, the Debtors could be required to restart the solicitation process and (i) seek the approval of a new disclosure statement, (ii) solicit or re-solicit votes from the holders of Claims or Interests, and/or (iii) seek the confirmation of a newly proposed plan. Alternatively, if the confirmation requirements are not satisfied with respect to the plans of some, but not all, of the Debtors, the Debtors may choose to sever such plans and proceed with confirmation of the Plan for the remaining Debtors; provided, however, that a Plan for a WAC Group cannot be confirmed unless the Plans for the Parent Guarantors are also confirmed. Additionally, should the Plan fail to be approved, confirmed, or consummated, then non-Debtor parties in interest may be in a position to file alternative plans pursuant to section 1121 of the Bankruptcy Code. As such, non-

confirmation of the Plan would likely entail significantly greater risk of delay, expense, and uncertainty to the Debtors and their Estates.

## B.    NONCONSENSUAL CONFIRMATION

In the event that any impaired class of claims or interests entitled to vote on a plan of reorganization or liquidation does not accept such plan of reorganization or liquidation, respectively, a bankruptcy court may nevertheless confirm such plan at the proponent's request if at least one (1) impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes.

## C.    CLAIM OBJECTIONS

The Debtors may object to a proof of claim filed by or on behalf of a holder of a Claim.  The distribution estimates set forth in this Disclosure Statement are not applicable to any holder of any Claim whose Claim is or may be subject to an objection.  Any such holder may not receive its specified share of the estimated distributions described in this Disclosure Statement.

## D.    DISTRIBUTIONS

While the Debtors have endeavored to project what they believe are likely distributions, if any, to be made to parties holding Allowed Claims, there can be no certainty that the projections will be accurate and that holders will receive the distributions described in the Plan. The projections will necessarily be affected by, among other things:  (i) recoveries generated in connection with the liquidation of all of the Debtors' remaining assets; (ii) the outcome of objections to Claims; and (iii) the cost and expenses of such actions and generally administering and winding down the Debtors' Estates.

## E.    JURISDICTION

After the Effective Date, the Bankruptcy Court or another court of competent jurisdiction may find that the Bankruptcy Court does not have jurisdiction to enforce certain provisions of the Plan with respect to the non-Debtors.

## F.    ADMINISTRATIVE INSOLVENCY

Section 1129(a)(9)(A) of the Bankruptcy Code states that in order for a chapter 11 plan to be confirmed, it must provide that each holder of an allowed claim brought under section 507(a)(2) or 507(a)(3) of the Bankruptcy Code (*i.e.*, allowed administrative expense claims) receive cash equal to the full allowed amount of such claim, unless such holder agrees to different treatment.  Additionally, section 1129(a)(9)(C) of the Bankruptcy Code states that in order for a chapter 11 plan to be confirmed, it must provide that each holder of an allowed claim entitled to priority under section 507(a) of the Bankruptcy Code (*i.e.*, allowed priority tax claims) receive regular installment payments in cash of a total value equal to the allowed amount of such claim over a period ending not later than five (5) years after the petition date, and in a manner that is not less favorable than the most favored nonpriority unsecured claim under such plan.  Finally, other

priority claims may similarly be required to receive a certain treatment under section 1129(a)(9) of the Bankruptcy Code (such as cash equal to the full allowed amount of such claim).

The Debtors presently believe that they have sufficient Cash to pay all Allowed Administrative Expense Claims, Allowed Priority Tax Claims, and Allowed Priority Non-Tax Claims, and/or that they will be able to reach agreements with the holders of such Claims as to any different treatment of such Claims, as necessary.  However, if the Debtors are administratively insolvent, then the Bankruptcy Court may not confirm the Plan and the Bankruptcy Court may convert the Chapter 11 Cases to cases under chapter 7 of the Bankruptcy Code, either or both of which possible outcomes would likely entail significantly greater risk of delay, expense, and uncertainty to the Debtors and their Estates.

## G.    DEBTORS HAVE NO DUTY TO UPDATE

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date.  The Debtors have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

## H.    NO REPRESENTATIONS OUTSIDE THE DISCLOSURE STATEMENT ARE AUTHORIZED

No representations concerning or related to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement should not be relied upon by you in arriving at your decision.

## I.    NO LEGAL OR TAX ADVICE IS PROVIDED TO YOU BY THE DISCLOSURE STATEMENT

The contents of this Disclosure Statement should not be construed as legal, business, or tax advice.  Each holder of a Claim or Interest should consult his, her, or its own legal counsel and accountant as to legal, tax, and other matters concerning his, her, or its Claim or Interest.

This Disclosure Statement is not legal advice to you.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or to object to Confirmation of the Plan.

## J.    NO REPRESENTATION MADE

Nothing contained herein or in the Plan shall constitute a representation of the tax or other legal effects of the Plan on the Debtors or on holders of Claims or Interests.

**K.    FAILURE TO IDENTIFY ANY LITIGATION CLAIMS OR PROJECTED OBJECTIONS**

No reliance should be placed on the fact that any particular litigation claim or projected objection to a particular Claim or Interest is, or is not, identified in this Disclosure Statement. The Debtors may seek to investigate, file, and prosecute Causes of Action and may object to Claims or Interests after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies such Causes of Action or objections to such Claims or Interests.

**L.    NO WAIVER OF RIGHT TO OBJECT OR RIGHT TO RECOVER TRANSFERS AND ASSETS**

Except as provided in the Plan, the vote by a holder of a Claim for or against the Plan does not constitute a waiver or release of any Claims, Causes of Action, or rights of the Debtors (or any entity, as the case may be) to object to that holder's Claim or Interest, or recover any preferential, fraudulent, or other voidable transfer of assets, regardless of whether any Claims or Causes of Action of the Debtors or their respective Estates are specifically or generally identified in this Disclosure Statement.

**M.    AMENDMENT, WAIVER, MODIFICATION, OR WITHDRAWAL OF PLAN**

Under certain circumstances, the Debtors may, prior to the Confirmation or the substantial consummation of the Plan and subject to the provisions of section 1127 of the Bankruptcy Code, Bankruptcy Rule 3019, and the Plan, amend the terms of the Plan or waive any conditions thereto, if and to the extent such amendments or waivers are necessary or desirable to consummate the Plan. The potential impact of any such amendment or waiver on the holders of Claims cannot presently be foreseen, but may include a change in the economic impact of the Plan on some or all of the Classes or a change in the relative rights of such Classes.

**N.    INFORMATION WAS PROVIDED BY THE DEBTORS AND RELIED UPON BY THE DEBTORS' ADVISORS**

The Debtors' advisors have relied upon information provided by the Debtors or by the Debtors' former employees through the TSA in connection with the preparation of this Disclosure Statement. Although the Debtors' advisors have performed certain limited due diligence in connection with the preparation of this Disclosure Statement, they have not independently verified the information contained in this Disclosure Statement.

**O.    NON-OCCURRENCE OR DELAYED OCCURRENCE OF THE EFFECTIVE DATE**

Although the Debtors believe that the Effective Date will occur shortly after the Confirmation Date following the satisfaction of any applicable conditions precedent, there can be no assurance as to the precise timing of the Effective Date. If the conditions precedent to the Effective Date, as described in Article X of the Plan, have not occurred or otherwise been waived by the date that is sixty (60) days after the entry of the Confirmation Order or by such later date as set forth by the Debtor in a notice filed with the Bankruptcy Court prior to the expiration of such

period, then, upon filing a notice with the Bankruptcy Court, the Debtors may deem the Plan null and void in all respects.  Under such circumstances, no distributions would be made under the Plan, the Debtors and all holders of Claims and Interests would be restored to the status quo as of the day immediately preceding the date of confirmation, and the Debtors' obligations with respect to all Claims and Interests would remain unchanged.

## P.    CONVERSION TO CHAPTER 7

If no plan can be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interests of the creditors and/or the Debtors, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code.  The Debtors believe that liquidation under chapter 7 would result in smaller distributions being made to the Debtors' creditors than as provided for in the Plan, as further detailed in Section VIII of this Disclosure Statement.

## Q.    DISMISSAL OF THE CHAPTER 11 CASES

If no plan can be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interests of the creditors and/or the Debtors, one or more of the Chapter 11 Cases may be dismissed by order of the Bankruptcy Court.

## R.    COST OF ADMINISTERING THE DEBTORS' ESTATES

Liquidation of the Debtors' remaining assets and the disbursement of the proceeds of such liquidation, as well as the winddown of the various Debtors and non-Debtor entities across a multitude of jurisdictions, will require certain administrative costs that may vary based on a variety of factors, including many out of the Debtors' control.  Such administrative costs cannot be predicted with certainty and may affect recoveries under the Plan.

## VII.

## CERTAIN TAX CONSEQUENCES OF THE PLAN

## A.    CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtors and to holders of certain Claims. This summary does not address the U.S. federal income tax consequences to holders of Claims and Interests whose Claims are not entitled to vote on the Plan, or holders of Claims who are deemed to have accepted or rejected the Plan (such as holders of Interests in Holdings).

This summary is based on the U.S. Internal Revenue Code of 1986, as amended (the "**Tax Code**"), existing and proposed U.S. Treasury regulations thereunder (the "**Treasury Regulations**"), judicial decisions, and published administrative rules and pronouncements of the Internal Revenue Service (the "**IRS**") as in effect on the date hereof, all of which are subject to change, possibly on a retroactive basis.  Any such change could significantly affect the U.S. federal income tax consequences described below.

The U.S. federal income tax consequences of the Plan are complex and subject to significant uncertainties. The Debtors have not requested an opinion of counsel or a ruling from the IRS with respect to any of the tax aspects of the Plan. This summary does not address state, local, or foreign income or other tax consequences of the Plan, nor does it purport to address the U.S. federal income tax consequences of the Plan to special classes of taxpayers (such as non-U.S. persons, broker dealers, banks, mutual funds, insurance companies, financial institutions, thrifts, small business investment companies, regulated investment companies, real estate investment trusts, tax-exempt organizations, retirement plans, individual retirement and other tax-deferred accounts, S corporations, partnerships or other pass-through entities for U.S. federal income tax purposes, any other Debtor entity, persons holding securities as part of a hedging, straddle, conversion, or constructive sale transaction or other integrated investment, traders in securities that elect to use a mark-to-market method of accounting for their security holding, dealers in securities or foreign currencies, persons whose functional currency is not the U.S. dollar, certain expatriates or former long-term residents of the United States, persons who received their Claim as compensation or who acquired their Claim in the secondary market, and persons subject to the alternative minimum tax or the "Medicare" tax on net investment income). Additionally, this discussion does not address the Foreign Account Tax Compliance Act.

The following discussion generally assumes that the various debt and other arrangements to which the Debtors are parties will be respected for U.S. federal income tax purposes in accordance with their form, that the Plan will be treated as a plan of liquidation of the Debtors for U.S. federal income tax purposes, and that all distributions to holders of Claims and Interests will be taxed accordingly.

ACCORDINGLY, AS WITH ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE FOLLOWING SUMMARY IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING OR FOR ADVICE BASED UPON THE PARTICULAR CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR INTEREST. EACH HOLDER OF A CLAIM OR INTEREST IS URGED TO CONSULT ITS OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL, AND FOREIGN INCOME AND OTHER TAX CONSEQUENCES APPLICABLE TO IT UNDER THE PLAN.

1.    *Consequences to the Debtors*

Only two (2) of the Debtors are subject to corporate federal income tax in the United States: Waypoint Leasing Services LLC ("**Services**") and Waypoint Leasing US 8A LLC ("**US 8A**"). Both Services and US 8A, each a Delaware limited liability company, have elected to be taxable as a corporation for U.S. federal income tax purposes. LuxCo, a Luxemburg entity, also files a U.S. corporate federal income tax return, but is not subject to U.S. tax due to applicable treaty exemptions.

Holdings, a Cayman entity, is treated as a partnership for U.S. federal income tax purposes. Thus, in general, all items of income, gain, deduction, and loss of Holdings pass through to the holders of Interests in Holdings, and are not taxable to Holdings for U.S. federal income tax purposes. All other Debtors (including Waypoint Asset Funding 8 LLC, a Delaware limited

liability company with no U.S. operations or assets) are treated as disregarded entities owned by LuxCo for U.S. federal income tax purposes.

Accordingly, the Debtors do not expect the implementation of the Plan to result in any material U.S. federal income tax liability. As indicated above, the Debtors intend to treat the Plan as a plan of liquidation for U.S. federal income tax purposes, in that the Debtors will remain in existence following the Effective Date solely for the purpose of winding up their affairs, including, but not limited to, resolving outstanding Claims, selling their remaining assets, if any, and distributing the proceeds and any remaining property to or for the benefit of holders of Allowed Claims and Interests. Any remaining U.S. tax attributes of Services, US 8A, and LuxCo will be eliminated upon the completion of their liquidation.

2.    *Consequences to U.S. Holders of Certain Claims*

This summary discusses the U.S. federal income tax consequences to holders of WAC Lender Secured Claims (Class C) and holders of General Unsecured Claims (Class D) who are U.S. Holders (as defined herein) and are entitled to receive distributions under the Plan. This summary does not discuss any U.S. federal income tax consequences to persons who are not U.S. Holders.

As used herein, the term "**U.S. Holder**" means any beneficial owner of a Claim listed in the previous paragraph that is for U.S. federal income tax purposes:

- an individual who is a citizen or resident of the United States;

- a corporation, or other entity taxable as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States, any state thereof, or the District of Columbia;

- an estate, the income of which is subject to U.S. federal income taxation regardless of its source; or

- a trust, if (i) a court within the United States is able to exercise primary jurisdiction over its administration and one or more U.S. persons have authority to control all of its substantial decisions, or (ii) if the trust has a valid election in effect under the applicable Treasury Regulations to be treated as a U.S. person.

If a partnership or other entity or arrangement taxable as a partnership for U.S. federal income tax purposes holds any such Claim, then the U.S. federal income tax treatment of a partner in such partnership generally will depend upon the status of the partner and the activities of the partnership. If you are a partner in such a partnership holding any of such instruments, then you are urged to consult your tax advisor.

a.    <u>Gain or Loss</u>

Pursuant to the Plan, holders of Allowed WAC Lender Secured Claims will receive payment in Cash on the Effective Date or as soon as reasonably practicable thereafter, and, in the

event there are unused funds in the Winddown Account, may receive an additional Cash distribution, and certain holders of Allowed General Unsecured Claims will receive Cash distributions (not to exceed the amount of their Allowed Claim) to the extent there remains any available Cash after payment of all Allowed Administrative Claims and Allowed Priority Tax Claims.

The receipt by a U.S. Holder of Cash in satisfaction of its debt obligation will be a fully taxable transaction to such U.S. Holder. Accordingly, a U.S. Holder of a debt obligation will generally recognize gain or loss in an amount equal to the difference, if any, between (i) the sum of the amount of any Cash received in satisfaction of its Claim (other than any amount allocable to accrued but unpaid interest or possibly original issue discount ("**OID**")), and (ii) the U.S. Holder's adjusted tax basis in its Claim immediately prior to the exchange (other than any amount allocable to accrued but unpaid interest or possibly OID). *See* discussion of "Distributions in Discharge of Accrued Interest or OID," in subsection b below.

Where gain or loss is recognized by a U.S. Holder, the character of such gain or loss as long-term or short-term capital gain or loss, or as ordinary income or loss, will be determined by a number of factors, including the tax status of the holder, whether the Claim constitutes a capital asset in the hands of the holder and how long it has been held, whether the Claim was acquired at a "market discount," and whether and to what extent the holder previously claimed a bad debt deduction. A U.S. Holder that purchased its Claim from a prior holder at a market discount may be subject to the market discount rules of the Tax Code. In general, a debt instrument is considered to have been acquired with market discount if the U.S. Holder's adjusted tax basis in the debt instrument is less than (i) its stated principal amount or (ii) in the case of a debt instrument issued with OID, its adjusted issue price (generally, the aggregate amount of OID accrued on a holder's debt instrument prior to such U.S. Holder's acquisition of the debt instrument), in each case by at least a *de minimis* amount. Under these rules, any gain recognized generally will be treated as ordinary income to the extent of the market discount accrued (on a straight-line basis or, at the election of the U.S. Holder, on a constant-yield basis) during the U.S. Holder's period of ownership, unless the U.S. Holder elected to include the market discount in income as it accrued. If a U.S. Holder did not elect to include the market discount in income as it accrued and, thus, under the market discount rules, was required to defer all or a portion of any deductions for interest on debt incurred or maintained to purchase or carry its Claims, such deferred amounts would become deductible at the time of the exchange.

b.    Distributions in Discharge of Accrued Interest or OID

In general, to the extent any Cash received pursuant to the Plan by a U.S. Holder of a Claim is received in satisfaction of interest or OID accrued during its holding period, such amount will be taxable to the holder as interest income if not previously (or otherwise currently required to be) included in the holder's gross income. Conversely, a U.S. Holder may be entitled to recognize a deductible loss to the extent any accrued interest or OID was included in its gross income and was not paid in full. However, the IRS has privately ruled, in the case of a tax-free exchange, that a holder could not claim an ordinary deduction with respect to any accrued OID. It is unclear whether the same result would occur in the case of a taxable transaction.

The Plan provides in relevant part that, except as otherwise required by law, consideration received in respect of a Claim is allocable first to the principal amount of the Claim (as determined for U.S. federal income tax purposes) and then, to the extent of any excess, to any Claim for accrued but unpaid interest. *See* section 7.9 of the Plan. There is no assurance that the IRS will respect such allocation for U.S. federal income tax purposes. You are urged to consult your own tax advisor regarding the allocation of consideration received under the Plan, as well as the deductibility of accrued but unpaid interest (including OID) and the character of any loss claimed with respect to accrued but unpaid interest (including OID) previously included in gross income for U.S. federal income tax purposes.

3.    *Withholding on Distributions and Information Reporting*

Payments of interest (including accruals of OID, if any), dividends, and any other reportable payments, including amounts received pursuant to the Plan and payments of proceeds from the sale, retirement, or other disposition of the exchange consideration, by each of Services and US 8A, generally will be subject to information reporting and may be subject to "backup withholding" (currently at a rate of 24%) if a recipient of those payments fails to furnish to the payor certain identifying information and, in some cases, a certification that the recipient is not subject to backup withholding. Backup withholding is not an additional tax. Any amounts deducted and withheld generally will be allowed as a credit against or refund of that recipient's U.S. federal income tax liability, provided that appropriate proof is timely provided under rules established by the IRS. Furthermore, certain penalties may be imposed by the IRS on a recipient of payments who is required to supply information but who does not do so in the proper manner. Backup withholding generally will not apply with respect to payments made to exempt recipients, such as corporations and financial institutions. You are urged to consult your tax advisor regarding your qualification for exemption from backup withholding and information reporting, and the procedures for obtaining such an exemption.

Treasury Regulations generally require disclosure by a taxpayer on its U.S. federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of certain thresholds. You are urged to consult your tax advisor regarding these Treasury Regulations, so as to consider whether the contemplated transactions under the Plan would be subject to these Treasury Regulations and require disclosure on your tax return.

THE FOREGOING SUMMARY HAS BEEN PROVIDED FOR INFORMATIONAL PURPOSES ONLY. EACH U.S. HOLDER IS URGED TO CONSULT ITS TAX ADVISOR CONCERNING THE U.S. FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

**B.**  **CERTAIN IRISH TAX CONSEQUENCES OF THE PLAN TO THE DEBTORS**

The following discussion summarizes certain Irish corporation tax consequences of the implementation of the Plan with respect to the Debtors who are Irish tax resident companies, (the "**Irish Companies**").[15]

All legislative references are with respect to the Irish Taxes Consolidation Act 1997, unless otherwise stated.  The views expressed below are based on the interpretation of the current relevant tax law and practice as in effect on the date hereof, all of which are subject to change, possibly on a retroactive basis.  Any such change could significantly affect the Irish corporation tax consequences described below.

The Irish corporation tax consequences of the Plan are complex and subject to significant uncertainties.  The Debtors have not requested an opinion of counsel or a ruling from the Irish tax authorities with respect to any of the tax aspects of the Plan.

ACCORDINGLY, AS WITH ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, THE FOLLOWING SUMMARY IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING OR FOR ADVICE. EACH INTERESTED PARTY IS URGED TO CONSULT ITS TAX ADVISOR CONCERNING THE TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

1.  *Tax Residency*

For the most part, the Irish Companies are Irish incorporated and have to date been treated as Irish tax residents by virtue of not being managed and controlled outside Ireland.  To the extent that the central management and control of the Irish Companies is moved outside of Ireland as a result of the Plan, this could adversely impact the Irish tax residency position.  Any such cessation of Irish tax residency may result in a liability for Irish corporation tax.

2.  *Tax Losses*

A number of the Irish Companies have tax losses carried forward as a result of claiming tax depreciation on the aircraft they owned.  Such tax losses should generally be available to offset taxable income within the same Irish Company, but such tax losses cannot be transferred from one Irish Company to another.

---

[15] The Irish Companies are:  Waypoint Leasing (Ireland) Limited, Waypoint Asset Company Number 1 (Ireland) Limited, Waypoint Asset Company Number 2 (Ireland) Limited, Waypoint Asset Co 3 Limited, Waypoint Asset Co 4 Limited, Waypoint Asset Co 5 Limited, Waypoint Asset Co 6 Limited, Waypoint Asset Co 7 Limited, Waypoint Asset Co 8 Limited, Waypoint Asset Co 10 Limited, Waypoint Asset Co 11 Limited, Waypoint Asset Co 14 Limited, Waypoint Asset Co 15 Limited, Waypoint Asset Co 1A Limited, Waypoint Asset Co 1C Limited, Waypoint Asset Co 1D Limited, Waypoint Asset Co 1F Limited, Waypoint Asset Co 1G Limited, Waypoint Asset Co 1H Limited, Waypoint Asset Co 1J Limited, Waypoint Asset Co 1K Limited, Waypoint Asset Co 1L Limited, Waypoint Asset Co 1M Limited, Waypoint Asset Co 1N Limited, Waypoint Asset Co 3A Limited, Waypoint Asset Co 5B Limited, Waypoint Asset Euro 1A Limited, Waypoint Asset Euro 1B Limited, Waypoint Asset Euro 1C Limited, Waypoint Asset Euro 1D Limited, Waypoint Asset Euro 1G Limited, Waypoint Asset Euro 7A Limited, Waypoint Asset Co Germany Limited, and MSN 9229 AS.

3.      *Section 110 Companies*

A number of the Irish Companies have elected to be treated as Section 110 companies for Irish tax purposes, having met both the initial and continuing conditions as set out within Section 110 (the "**S110 Companies**").

The S110 Companies are chargeable to Irish corporation tax at a rate of 25% on all profits and gains.  Under Irish tax legislation, interest on profit-participating debt is generally reclassified as a non-tax deductible distribution.  However, provided certain conditions are met, a company which has elected into the Section 110 regime can obtain a deduction for profit-participating debt which can result in a *de minimis* amount of profits being within the charge to Irish corporation tax.  This has been the case for the S110 Companies to date, with a tax deduction having been taken for interest on profit-participating debt paid to LuxCo.

The Plan may result in a formal debt release for some of the S110 Companies.  This may give rise to taxable income for those S110  Companies.  Such income may be offset to the extent that there are sufficient tax losses available within that S110 Company.  Such income could also be offset to the extent that the debt release is matched with payments of profit-participating interest to LuxCo.  To the extent that the Plan gives rise to net taxable income in the S110 Companies, any such income would be taxable at a rate of 25%.

4.      *Trading Companies*

A number of the Irish Companies are considered to be carrying on a trade for Irish tax purposes (the "**Trading Companies**") and are therefore subject to Irish corporation tax at a rate of 12.5% on their profits, computed by reference to accounting profits subject to certain tax adjustments.

The Plan may result in a formal debt release for some of the Trading Companies.  The taxation of this release will depend on whether the loan should be considered "revenue" or "capital" in nature for Irish tax purposes.  To the extent that the release is treated as capital in nature, it should generally be the case that the release should not give rise to corporation tax.  However, if the release is viewed as revenue in nature, it should be subject to tax in the Trading Companies.  To the extent that a Trading Company has tax losses carried forward, such losses could be used to offset any such taxable income within that Trading Company.

5.      *Tax Implications of the Release of Accrued Interest*

Where interest has been accrued but unpaid in any of the Irish Companies (both for the S110 Companies and the Trading Companies), and that interest is subsequently released pursuant to the Plan, the resulting write back of that interest should be considered taxable income.

6.      *Balancing Event for Tax Depreciation Purposes*

The sale of aircraft by the Irish Companies will give rise to a balancing event for Irish tax depreciation purposes.  Where the sale proceeds arising from any individual aircraft sale exceeds the original cost of the aircraft incurred by the relevant Irish Company, less the tax

depreciation claimed during the period of aircraft ownership, a balancing charge will arise.  A balancing charge is a recapture of tax depreciation previously claimed, and is included in the computation of taxable income.

Where the sale proceeds are less than the original cost of the aircraft incurred by the relevant Irish Company, less the tax depreciation claimed during the period of aircraft ownership, a balancing allowance will arise.  A balancing allowance is a further allowance of tax depreciation, which should reduce the amount of taxable income otherwise attributable to a company in a given period of taxation.

7.    *Cessation to Trade*

The Plan may result in the Trading Companies ceasing to carry on a trade for Irish tax purposes.  Income which is earned post a cessation to trade should be taxable at a rate of 25%, rather than 12.5%.  To the extent that the income earned would have constituted trading income had it arisen prior to the cessation, it may be possible to offset any such income with unused tax losses carried forward within that Trading Company.

8.    *Appointment of a Liquidator*

The Plan will result in the liquidation of the Irish Companies.  Upon liquidation, the management and control of the Irish Companies will be undertaken by the appointed liquidator.  In order to maintain the Irish tax residence of the Irish Companies, the appointed liquidator must be an Irish resident.  If there is a cessation of Irish tax residence, this may result in a liability for Irish corporation tax.

9.    *Time Limits for the Filing of Corporation Tax Returns*

Generally, Irish corporation tax returns are filed within eight (8) months and twenty-three (23) days of the end of an accounting period.  For the Irish Companies, which have their year-end on December 31st, they are required to file their Irish corporation tax returns by September 23rd of the following year.

This timeline can be accelerated where there is a cessation to trade or where a liquidator is appointed for a company.  Failure to file Irish corporation tax returns on a timely basis can give rise to penalties and interest, and it can also result in the denial of certain relief.

10.    *Withholding Tax on Distributions*

Dividends or other distributions made by the Irish Companies pursuant to the Plan are, in principle, within the scope of Irish dividend withholding tax ("**Irish DWT**") at a rate of 20%.  Subject to meeting certain administrative requirements, Irish DWT generally does not apply on payments made to companies which are tax resident in either the European Union or a country with which Ireland has concluded a double taxation agreement.  As such, no Irish DWT should apply where distributions are made to LuxCo from an Irish Company.

To the extent that distributions are made by an Irish Company to another Irish Company, there should be no Irish DWT applied, provided that the distributing Irish Company is

a 51% direct or indirect subsidiary of the recipient Irish Company.  As such, Irish DWT should not be expected to apply with respect to distributions between the Irish Companies.

THE FOREGOING SUMMARY HAS BEEN PROVIDED FOR INFORMATIONAL PURPOSES ONLY.  EACH INTERESTED PARTY IS URGED TO CONSULT ITS TAX ADVISOR CONCERNING THE TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

## VIII.

## CONFIRMATION OF THE PLAN

### A.    CONFIRMATION HEARING

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after appropriate notice, to hold a hearing on Confirmation of the Plan.  The Bankruptcy Court has scheduled the Confirmation Hearing to commence on **July 25, 2019 at 10:00 a.m. (Eastern Time)**.  The Confirmation Hearing may be adjourned from time to time by the Debtors or the Bankruptcy Court without further notice except for an announcement of the adjourned date in open court or as indicated in any notice of agenda of matters scheduled for hearing filed with the Bankruptcy Court.

### B.    OBJECTIONS

Section 1128 of the Bankruptcy Code provides that any party in interest may object to the Confirmation of a plan.  Objections to Confirmation of the Plan are governed by Bankruptcy Rule 9014.

Any objection to Confirmation of the Plan must:  (i) be in writing; (ii) state the name and address of the objecting party and the amount and nature of the Claim or Interest of such party; (iii) state with particularity the basis and nature of any objection; (iv) conform to the Bankruptcy Rules and the Local Bankruptcy Rules for the Southern District of New York, (v) be filed with the Bankruptcy Court (a) by registered users of the Bankruptcy Court's case filing system, electronically in accordance with General Order M-399 (which can be found at http://nysb.uscourts.gov) and (b) by all other parties in interest, on a CD-ROM, in text-searchable portable document format (PDF) (with a hard copy delivered directly to the chambers of the Honorable Stuart M. Bernstein, United States Bankruptcy Court for the Southern District of New York, One Bowling Green, Room 723, New York, New York 10004-1408) in accordance with the customary practices of the Bankruptcy Court and General Order M-399, to the extent applicable; and (vi) be served in accordance with General Order M-399 upon the parties listed below so as to be received no later than the Confirmation Objection Deadline of **July 8, 2019** at **4:00 p.m. (Eastern Time)**:

| | |
|---|---|
| ***Counsel to Debtors***<br><br>Weil, Gotshal & Manges LLP<br>767 Fifth Avenue<br>New York, New York 10153<br>Attn:  Gary T. Holtzer<br>         Robert J. Lemons<br>         Kelly DiBlasi | ***Counsel to the United States Trustee***<br><br>U.S. Department of Justice<br>Office of the U.S. Trustee<br>201 Varick Street, Room 1006<br>New York, New York 10014<br>Attn:  Andrea B. Schwartz |
| ***Counsel to Macquarie PF Inc.***<br><br>Paul Hastings LLP<br>71 South Wacker Drive Suite 4500<br>Chicago, Illinois 60606<br>Attn:  Chris Dickerson<br>         Nathan Gimpel<br>         Mark Pollack<br>         Michael Whalen | ***Counsel to Wells Fargo Bank, N.A.***<br><br>Akin Gump Strauss Hauer & Feld LLP<br>100 Pearl Street, 14th Floor<br>Hartford, Connecticut 06103<br>Attn:  Renee Dailey<br>         Katherine Lindsay |
| ***Counsel to SunTrust Bank***<br><br>Alston & Bird LLP<br>One Atlantic Center<br>1201 West Peachtree Street, Suite 4900<br>Atlanta, Georgia 30309<br>Attn:  Rick Blumen<br>         David Wender | ***Counsel to Sumitomo Mitsui Banking Corporation, Brussels Branch***<br><br>Clifford Chance US LLP<br>31 West 52nd Street<br>New York, New York 10019<br>Attn:  Jennifer DeMarco<br>         Robert Johnson |
| ***Counsel to Airbus Helicopters Financial Services Limited***<br><br>Dentons LLP<br>1221 Avenue of the Americas<br>New York, New York 10020<br>Attn:  Lee Whidden | ***Counsel to BNP Paribas***<br><br>Mayer Brown LLP<br>1221 Avenue of the Americas<br>New York, New York 10020<br>Attn:  Scott Zemser<br>         Brian Trust |
| ***Counsel to Bank of Utah***<br><br>Norton Rose Fulbright US LLP<br>1301 Avenue of the Americas<br>New York, New York 10019<br>Attn:  Howard Beltzer<br>         James Copeland | ***Counsel to Lombard North Central PLC***<br><br>Sullivan & Cromwell LLP<br>125 Broad Street<br>New York, New York 10004<br>Attn:  Andrew Dietderich<br>         Brian Glueckstein |

| *Counsel to Macquarie* | *Counsel to Wells Fargo Bank, N.A.* |
|---|---|
| Vedder Price<br>1633 Broadway, 47th Floor<br>New York, New York 10019<br>Attn:   Michael Edelman | Duane Morris LLP<br>1540 Broadway<br>New York, New York 10036<br>Attn:   Frederick Hyman |
| *Counsel to the Sponsors*<br><br>Willkie Farr & Gallagher LLP<br>787 Seventh Avenue<br>New York, New York 10019<br>Attn:   Leonard Klingbaum<br>          Jason Pearl | |

**UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY SERVED AND FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

**C.**    **REQUIREMENTS FOR CONFIRMATION OF THE PLAN**

1.    *Requirements of Section 1129(a) of the Bankruptcy Code*

a.    General Requirements

At the Confirmation Hearing, the Bankruptcy Court will determine whether the following confirmation requirements specified in section 1129 of the Bankruptcy Code have been satisfied including, without limitation, whether:

(i)    the Plan complies with the applicable provisions of the Bankruptcy Code;

(ii)    the Debtors have complied with the applicable provisions of the Bankruptcy Code;

(iii)    the Plan has been proposed in good faith and not by any means forbidden by law;

(iv)    any payment made or promised by the Debtors or by a person issuing securities or acquiring property under the Plan for services or for costs and expenses in, or in connection with, the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been approved or is subject to the approval of the Bankruptcy Court, as reasonable;

(v)    the Debtors have disclosed the identity and affiliations of any individual proposed to serve, after Confirmation of the Plan, as a director, officer, or voting trustee of the Debtors, an affiliate of the

Debtors participating in a joint plan with the Debtors, or a successor to the Debtors under the Plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests of creditors and equity holders and with public policy;

(vi)     with respect to each Class of Claims or Interests, each holder of an Impaired Claim or Impaired Interest either has accepted the Plan or will receive or retain under the Plan on account of such holder's Claim or Interest, property of a value, as of the Effective Date, that is not less than the amount such holder would receive or retain if the Debtors were liquidated on the Effective Date under chapter 7 of the Bankruptcy Code (*see* discussion of the "Best Interests Test" in subsection b below);

(vii)    except to the extent the Plan meets the requirements of section 1129(b) of the Bankruptcy Code (discussed below), each Class of Claims or Interests has either accepted the Plan or is not Impaired under the Plan;

(viii)   except to the extent that the holder of a particular Claim has agreed to a different treatment of such claim, the Plan provides that administrative expenses and priority Claims other than priority tax Claims will be paid in full on the Effective Date, and that priority tax Claims will receive either payment in full on the Effective Date or deferred Cash payments over a period not exceeding five (5) years after the Petition Date, of a value, as of the Effective Date of the Plan, equal to the allowed amount of such Claims;

(ix)     at least one Class of Impaired Claims has accepted the Plan, which is determined without including any acceptance of the Plan by any insider holding a Claim in such Class;

(x)      confirmation of the Plan is not likely to be followed by liquidation or the need for further financial reorganization of the Debtors or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan (*see* discussion of "Feasibility Analysis" in subsection c below); and

(xi)     all fees payable under section 1930 of title 28 of the United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing for the Plan, have been paid or the Plan provides for the payment of all such fees on the Effective Date of the Plan.

b.    <u>Best Interests Test</u>

As noted above, the Bankruptcy Code requires that each holder of an Impaired Claim or Interest either (i) accepts the Plan or (ii) receives or retains under the Plan property of a value, as of the Effective Date, that is not less than the value such holder would receive or retain

if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on the Effective Date. This requirement is referred to as the "best interests test."

The best interests test requires a bankruptcy court to determine what the holders of allowed claims and allowed interests in each impaired class would receive from a liquidation of the debtor's assets and properties in the context of a liquidation under chapter 7 of the Bankruptcy Code. To determine if a plan is in the best interests of each impaired class, the value of the distributions from the proceeds of the liquidation of the debtor's assets and properties (after subtracting the amounts attributable to the aforesaid claims) is then compared with the value offered to such classes of claims and interests under the plan.

The Debtors believe that, under the Plan, all holders of Impaired Claims and Interests will receive property with a value not less than the value such holder would receive in a liquidation under chapter 7 of the Bankruptcy Code. The Debtors' belief is based primarily on the Liquidation Analysis prepared by the Debtors' financial advisor, FTI, that is attached hereto as **Exhibit D**.

The Liquidation Analysis is a comparison of (i) the estimated recoveries for creditors and equity holders of the Debtors that may result from the Plan and (ii) an estimate of the recoveries for creditors and equity holders of the Debtors that may result from a hypothetical chapter 7 liquidation. The Liquidation Analysis is based upon a number of significant assumptions which are described therein. The Liquidation Analysis is solely for the purpose of disclosing to holders of Claims and Interests the effects of a hypothetical chapter 7 liquidation of the Debtors, subject to the assumptions set forth therein. There can be no assurance as to the values that would be actually realized in a chapter 7 liquidation, nor can there be any assurance that the Bankruptcy Court will accept the Debtors' conclusions or concur with such assumptions in making its determinations under section 1129(a)(7) of the Bankruptcy Code.

        c.     <u>Feasibility Analysis</u>

In connection with Confirmation of the Plan, the Bankruptcy Court will have to determine that the Plan is feasible pursuant to section 1129(a)(11) of the Bankruptcy Code, which means that Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtors unless the Plan provides for the liquidation of the Debtors. Since the Plan provides for the liquidation of the Debtors, the Bankruptcy Court will find that the Plan is feasible if it determines that the Debtors will be able to satisfy the conditions precedent to the Effective Date and otherwise have sufficient funds to meet their post-Confirmation Date obligations to pay for the costs of administering and fully consummating the Plan, including sufficient funds for the Plan Administrator to liquidate the Debtors' remaining entities and assets. Accordingly, the Debtors believe that the Plan satisfies the financial feasibility requirement imposed by section 1129(a)(11) of the Bankruptcy Code.

        2.     *Requirements of Section 1129(b) of the Bankruptcy Code*

In the event that any Impaired Class of Claims or Interests does not accept or is deemed to reject the Plan, the Bankruptcy Court still may confirm the Plan over the rejection or deemed rejection of the Plan by a Class of Claims or Interests if the Plan "does not discriminate

unfairly" and is "fair and equitable" with respect to such Class, pursuant to section 1129(b) of the Bankruptcy Code.

### a.    No Unfair Discrimination

The "no unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under a chapter 11 plan. A chapter 11 plan does not discriminate unfairly within the meaning of the Bankruptcy Code if the legal rights of a dissenting class are treated in a manner consistent with the treatment of other classes whose legal rights are substantially similar to those of the dissenting class and if no class of claims or interests receives more than such class is legally entitled to receive for its claims or interests. This test does not require that the treatment be the same or equivalent, but that such treatment is "fair."

### b.    Fair and Equitable Test

The "fair and equitable" test applies to classes of different priority and status (*e.g.*, secured claims versus unsecured claims) and includes the general requirement that no class of claims receive more than 100% of the allowed amount of the claims in such class. The test sets forth different standards for what is fair and equitable depending on the type of claims or interests in such class. In order to demonstrate that a plan is "fair and equitable," the plan proponent must demonstrate the following:

#### (i)    Secured Creditors

With respect to a class of impaired secured claims, a proposed plan must provide the following: (i) that the holders of secured claims retain their liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims, and receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estates' interest in such property; (ii) for a sale, subject to section 363(k) of the Bankruptcy Code, of any property that is subject to the liens securing such claims, free and clear of such liens, with such liens to attach to the proceeds of such sale, and the treatment of such liens on proceeds under clause (i) or (iii) of this paragraph; or (iii) that the holders of secured claims receive the "indubitable equivalent" of their allowed secured claim.

#### (ii)    Unsecured Creditors

With respect to a class of impaired unsecured claims, a proposed plan must provide the following: either (i) that each holder of an impaired unsecured claim receives or retains under the plan property of a value equal to the amount of its allowed claim; or (ii) that the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

#### (iii)    Holders of Interests

With respect to a class of interests, a proposed plan must provide the following: (i) that each holder of an interest receives or retains on account of such interest property of a value,

92

as of the effective date of the plan, equal to the greatest of the allowed amount of any fixed liquidation preference to which such holder is entitled, any fixed redemption price to which such holder is entitled, or the value of such interest; or (ii) that the holder of any interest that is junior to the interests of the class of interests will not receive or retain any property under the plan on account of such junior interest.

      c.    <u>Application to Plan</u>

Pursuant to the Plan, holders of Claims in Classes 1D-3D and 6D-8D and Interests in Class 19G (collectively, the "**Deemed Rejecting Classes**") will not receive a distribution and are thereby deemed to reject the Plan.  However, the Debtors submit that they satisfy the "unfair discrimination" and "fair and equitable" tests because (i) no Class that is junior to the Deemed Rejecting Classes will receive or retain any property under the Plan, (ii) no Class of equal priority to the Deemed Rejecting Classes is receiving more favorable treatment, and (iii) with respect to the Holdings Interests in Class 19G, there is no junior Class.  As to any Class that may vote to reject the Plan, the Debtors believe that the Plan will satisfy both the "no unfair discrimination" requirement and the "fair and equitable" test because (i) as to any dissenting Class of secured creditors, such creditors will either receive the full amount of the proceeds from the sale of their collateral or will receive their collateral and (ii) as to any dissenting Class of general unsecured creditors, no Class that is junior to such creditors will receive or retain any property under the Plan.

If any Impaired Class of Claims entitled to vote does not accept the Plan by the requisite statutory majority provided for in section 1126(c) of the Bankruptcy Code, then the Debtors reserve the right to amend the Plan or undertake to have the Bankruptcy Court confirm the Plan under section 1129(b) of the Bankruptcy Code, or both.  With respect to Classes of Impaired Claims that are deemed to reject the Plan, the Debtors will request that the Bankruptcy Court confirm the Plan pursuant to section 1129(b) of the Bankruptcy Code.

## IX.

## CONCLUSION

Any statements in this Disclosure Statement concerning the provisions of any other document are not necessarily complete, and in each instance reference is made to such other document for the full text thereof.  Certain documents described or referred to in this Disclosure Statement have not been attached as exhibits hereto because of the impracticability of furnishing copies of all such documents to all recipients of this Disclosure Statement.  All exhibits to the Plan have been or will be filed with the Bankruptcy Court.  All holders of Claims entitled to vote on the Plan are encouraged to review all such exhibits to the Plan prior to voting.

The Debtors believe that Confirmation and implementation of the Plan is in the best interests of all creditors and parties in interest, and urge all holders of Claims in Classes 1C through 10C, 4D, 5(i)D through 5(v)D, 10(i)D through 10(iv)D, 11(i)D though 11(iii)D, 14(i)D, 14(ii)D, and 15D through 20D to vote to accept the Plan and to evidence such acceptance by returning their ballots so that they will be received by no later than the Voting Deadline on **July 3, 2019 at 4:00 p.m. (Eastern Time)**.

Dated: June 3, 2019
      New York, New York

           Respectfully submitted,


By:    */s/ William Transier*
        Name:  William Transier
        Title:   Director